Terry Corbin (SBN 132360)
Chris Kelley (SBN 166608)
Erik Moller (SBN 147674)
Louis Campbell (SBN 221282)
HOWREY SIMON ARNOLD & WHITE, LLP
301 Ravenswood Avenue
Menlo Park, California 94025
Telephone: (650)463-8100
Facsimile: (650)463-8400

Attorneys for Plaintiff
SYNOPSYS, INC.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| SYNOPSYS, INC., | C03-02289 MJJ |
| Plaintiff, | **DECLARATION OF ERIK MOLLER IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE TO STAY OR TRANSFER VENUE** |
| vs. | |
| RICOH COMPANY, LTD., | |
| Defendant. | Date: August 19, 2003 |
| | Time: 9:30 a.m. |
| | Place: Courtroom 11 |

I, Erik K. Moller, hereby declare as follows:

1.     I am an attorney at law licensed to practice in the Sstate of California and an associate of the law firm of Howrey Simon Arnold & White, LLP, attorneys for plaintiff Synopsys, Inc.  The matters set forth in this declaration are based upon my personal knowledge, except where otherwise indicated, and if called as a witness, I could and would testify competently thereto.

2.     Attached hereto as Exhibit A are true and correct copies of letters from Gary M. Hoffman to Steve McMinn of Chip Express Corporation and Kuang Chiu from Winbond America dated March 7, 2003.

3.     Attached hereto as Exhibit B are true and correct copies of pages 1-8 and 35-60 from the July 15, 2003 deposition of Hisashi Ishijima taken in *Ricoh Company, Ltd., v. Aeroflex Incorporated, et al.*, Civil Action No. 03-103-GMS pending in the United Stated District Court for the District of Delaware.

4.    Attached hereto as Exhibit C is a true and correct copy of the Declaration of Alan MacPherson in Support of Defendants' Motion to Stay or, in the Alternative, Transfer dated June 10, 2003 and filed in *Ricoh Company, Ltd., v. Aeroflex Incorporated, et al.*, Civil Action No. 03-103-GMS pending in the United Stated District Court for the District of Delaware.

5.    Attached hereto as Exhibit D is a true and correct copy of Plaintiff's Answers to Defendant Aeroflex Incorporated's First Set of Interrogatories (1-11) dated July 15, 2003 July 21, 2003 in *Ricoh Company, Ltd., v. Aeroflex Incorporated, et al.*, Civil Action No. 03-103-GMS pending in the United Stated District Court for the District of Delaware.

6.    According to its web site, Ricoh has five subsidiaries located in California; Ricoh Electronics, Inc. in Tustin, Ricoh Innovations, Inc. in Menlo Park, Ricoh Corporation Office Solutions and Systems Development Group in San Jose, Ricoh Silicon Valley, Inc. in Cupertino, and Ricoh Business Systems, Inc. in Huntington Beach.  Three of these subsidiaries, Ricoh Innovations, Inc., Ricoh Corporation Office Solutions and Systems Development Group, and Ricoh Silicon Valley, Inc., Cupertino, California are located in the Silicon Valley, within the Northern District of California. True and correct copies of Ricoh's 2003 Annual Report, 2003 Fact Sheet and pages 1-2, 23-25, and 57-68 from Ricoh Company, Ltd. Securities and Exchange Commission Form 20-F for the fiscal year ended March 21, 2003 are attached as Exhibit E, F, and G.

7.    According to its web site, Ricoh operates in the United States through its wholly owned subsidiary, Ricoh Corporation.  True and correct copies of web pages from Ricoh Corporation's web site are attached hereto as Exhibits H, I, and J.

8.    Attached hereto as Exhibit K is a true and correct copy of Ricoh Business Systems, Inc.'s registration with the California Secretary of State as of July 25, 2003.

9.    Attached hereto as Exhibit L is a true and correct copy of Ricoh Corporation's registration with the California Secretary of State as of July 25, 2003.

10.    Attached hereto as Exhibit M is a true and correct copy of the Declaration of Julie MacManus in Support of Defendants' Motion to Stay or, in the Alternative, Transfer dated June 12,

2003 and filed in *Ricoh Company, Ltd., v. Aeroflex Incorporated, et al.*, Civil Action No. 03-103-GMS pending in the United Stated District Court for the District of Delaware.

11.     Attached hereto as Exhibit N is a true and correct copy of the Declaration of Charles Badlato in Support of Defendants' Motion to Stay or, in the Alternative, Transfer dated May 19, 2003 and filed in *Ricoh Company, Ltd., v. Aeroflex Incorporated, et al.*, Civil Action No. 03-103-GMS pending in the United Stated District Court for the District of Delaware.

12.     Attached hereto as Exhibit O is a true and correct copy of the Declaration of Jon Stoner in Support of Defendants' Motion to Stay or, in the Alternative, Transfer dated June 2, 2003 and filed in *Ricoh Company, Ltd., v. Aeroflex Incorporated, et al.*, Civil Action No. 03-103-GMS pending in the United Stated District Court for the District of Delaware.

13.     Attached hereto as Exhibit P is a true and correct copy of the Declaration of Andres Desbiens in Support of Defendants' Motion to Stay or, in the Alternative, Transfer dated June 12, 2003 and filed in *Ricoh Company, Ltd., v. Aeroflex Incorporated, et al.*, Civil Action No. 03-103-GMS pending in the United Stated District Court for the District of Delaware.

14.     Attached hereto as Exhibit Q is a true and correct copy of *Symbol Techs. Inc. v. Lemelson Med., Educ. & Res. Found., Ltd. Partnership*, 2000 U.S. Dist. LEXIS 21863 (D. Nev. Mar. 15, 2000).

15.     Attached hereto as Exhibit R is a true and correct copy of *Dow Chem. Co. v. Exxon Chem. Patents, Inc.*, 1995 U.S. Dist. LEXIS 13888 (D. Del. Aug. 16, 1995).

16.     Attached hereto as Exhibit S is a true and correct copy of *F.B. Leopold Co., Inc. v. Roberts Filter Mfg. Co., Inc.*, 1995 U.S. Dist. LEXIS 19737 (W.D. Pa. Aug. 2, 1995).

17.     Attached hereto as Exhibit T is a true and correct copy of *EIC Labs., Inc. v. Deuterium Corp.*, 1982 U.S. Dist. LEXIS 17604 (S.D.N.Y. 1982).

18.     Attached hereto as Exhibit U is a true and correct copy of *IKOS Systems, Inc. v. Cadence Design Systems, Inc.*, 2002 U.S. Dist. LEXIS 20574 (D. Del. 2002).

19.    Attached hereto as Exhibit W is a true and Correct copy of *Tandem Computers Incorporated v. Seymour C. Yuter and Apex Technology,* 1989 U.S. Dist. LEXIS 18384 (N.D. Ca. Dec. 20, 1989).

20.    Attached hereto as Exhibit X is a true and Correct copy of *Meade Instruments Corp. v. Reddwarf Starware, LLC*, 1998 U.S. Dist. LEXIS 9041 (C.D. Ca. May 11, 1998).

21.    On May 20, 2003, Edward A. Meilman, counsel for Ricoh Company, Ltd. ("Ricoh") in the present action, told me by email that he would not accept service of the D.J. Complaint on behalf of Ricoh.

22.    On May 30, 2003, Guaranteed Process Service unsuccessfully attempted to serve Mr. Katsumi Yoshida, executive vice president and managing director of Ricoh and CEO of Ricoh Corporation, Inc., in his capacity as an officer of Ricoh with the D.J. Complaint at Mr. Yoshida's place of business at Ricoh Corporation, Inc. in West Caldwell, New Jersey.  According to the process server, Mr. Yoshida would not meet him, and neither the receptionist, Mr. Yoshida's assistant, nor Ricoh Corporation, Inc.'s in-house counsel agreed to accept substituted service of the D.J. Complaint.

23.    U.S. Patent No. 4,922,432 (the "'432 patent"), the patent in suit, was assigned at issuance to co-assignees Ricoh and International Chip Corporation ("ICC") of Columbia, South Carolina.  International Chip Corporation subsequently assigned its interest in the '432 patent to Knowledge Based Silicon Corporation ("KBSC") of Columbia, South Carolina on July 23, 1991. Knowledge Based Silicon Corporation then assigned its interest to Ricoh on October 12, 2001.  A true and correct copy of the assignment history of the '432 patent is attached hereto as Exhibit V.

24.    Early logic synthesis systems that are likely to be relevant to this case include: the Cathedral system, the Socrates system, and the Yorktown Silicon Compiler.  Dr. Jan Rabaey, a principal engineer involved with the design of the Cathedral system, is currently on the faculty of the University of California at Berkeley.  Dr. David Gregory, a principal engineer involved with the design of the Socrates system, is CEO of ReShape, Inc., located in Mountain View, California.  Drs. Robert Brayton, Raul Camposano, and Giovanni Di Michelli are principal engineers involved with the design of the Yorktown Silicon Compiler.  Dr. Brayton is on the faculty at University of California at

1  Berkeley.  Dr. Camposano is an executive with Synopsys.  Dr. Di Micheli is on the faculty at Stanford

2  University.

3          I declare under penalty of perjury under the laws of the United States of America that the

4  foregoing is true and correct.  This declaration was executed in Mountain View, California on July 29,

5  2003.

6          Dated:  July 29, 2003                          Respectfully Submitted,

7                                                         HOWREY SIMON ARNOLD & WHITE, LLP

8

9                                                         _____/s/_____

10                                                        Erik K. Moller
                                                          Attorneys for Plaintiff
11                                                        Synopsys, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

2101 L Street NW • Washington, DC 20037-1526
Tel (202) 785-9700 • Fax (202) 887-0689
Writer's Direct Dial: (202) 828-2228
E-Mail Address: HoffmanG@dsmo.com

March 7, 2003

**BY CERTIFIED MAIL-**
**RETURN RECEIPT REQUESTED**

Mr. Steve McMinn                              CONFIDENTIAL TREATMENT
President & CEO                                            REQUESTED
Chip Express Corporation
2323 Owen Street
Santa Clara CA 95054

Dear Mr. McMinn:

We are writing to you on behalf of Ricoh Company Ltd. because we are aware
that your company is involved with the design of custom ICs that include application
specific designed circuitry. We understand that in designing these circuits, you use a
computer-aided design system obtained from Synopsys, including Design Compiler.

As you may know, Ricoh owns two of the basic patents directed to computer-
aided design processes. These are U.S. Patent Nos. 4,922,432 and 5,197,016. They cover
significant advances in computer-aided design processes for designing custom designed ICs
for specific applications directly from architecture independent functional specifications for
the integrated circuit. We are enclosing copies of these patents for your information.

While Ricoh is currently enforcing these patents in a lawsuit it recently filed in
the U.S. District Court for the District of Delaware, Ricoh remains willing to license the
patents. In fact, Ricoh has already granted non-exclusive licenses under these patents.
Ricoh also would be willing to provide your company with a non-exclusive license. For
your information, there are counterpart patents and applications in a number of countries
outside the United States.

Because Ricoh is at an early stage in its licensing activities, at the current time,
Ricoh is prepared to grant a non-exclusive license on favorable terms. However, we trust
you will recognize that such favorable terms will cease to exist as time progresses.

If you are of the opinion that you do not need or want a license from Ricoh, it
would be helpful if you would give us some insight into your reasons. We request your
response within 60 days from the date of this letter.

Very truly yours,

Gary M. Hoffman

1177 Avenue of the Americas • New York, New York 10036-2714
Tel (212) 835-1400 • Fax (212) 997-9880
www.legalinnovators.com

1574342 v1; XQRQ01!.DOC

DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

2101 L Street NW • Washington, DC 20037-1526
Tel (202) 785-9700 • Fax (202) 887-0689
Writer's Direct Dial: (202) 828-2228
E-Mail Address: HoffmanG@dsmo.com

March 7, 2003

**BY CERTIFIED MAIL-**
**RETURN RECEIPT REQUESTED**

Mr. Kuang Chiu
President
Winbond America
2727 North First Street
San Jose CA 95134

                                                  **CONFIDENTIAL TREATMENT**
                                                  **REQUESTED**

Dear Mr. Chiu:

        We are writing to you on behalf of Ricoh Company Ltd. because we are aware that your company is involved with the design of custom ICs that include application specific designed circuitry. We understand that in designing these circuits, you use a computer-aided design system obtained from Synopsys, including Design Compiler.

        As you may know, Ricoh owns two of the basic patents directed to computer-aided design processes. These are U.S. Patent Nos. 4,922,432 and 5,197,016. They cover significant advances in computer-aided design processes for designing custom designed ICs for specific applications directly from architecture independent functional specifications for the integrated circuit. We are enclosing copies of these patents for your information.

        While Ricoh is currently enforcing these patents in a lawsuit it recently filed in the U.S. District Court for the District of Delaware, Ricoh remains willing to license the patents. In fact, Ricoh has already granted non-exclusive licenses under these patents. Ricoh also would be willing to provide your company with a non-exclusive license. For your information, there are counterpart patents and applications in a number of countries outside the United States.

        Because Ricoh is at an early stage in its licensing activities, at the current time, Ricoh is prepared to grant a non-exclusive license on favorable terms. However, we trust you will recognize that such favorable terms will cease to exist as time progresses.

        If you are of the opinion that you do not need or want a license from Ricoh, it would be helpful if you would give us some insight into your reasons. We request your response within 60 days from the date of this letter.

                                        Very truly yours,

                                        Gary M. Hoffman

1177 Avenue of the Americas • New York, New York 10036-2714
Tel (212) 835-1400 • Fax (212) 997-9880
www.legalinnovators.com

1580782 v1; XVQM01!.DOC

Teresa M. Corbin (SBN 132360)
Christopher Kelley (SBN 166608)
Erik K. Moller (SBN 147674)
HOWREY SIMON ARNOLD & WHITE, LLP
301 Ravenswood Avenue
Menlo Park, California 94025
Telephone: (650) 463-8100
Facsimile: (650) 463-8400

Attorneys for Plaintiff Synopsys, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYNOPSYS, INC., | ) Case No. C03-02289 |
| Plaintiff, | ) |
| vs. | ) |
| RICOH COMPANY, LTD., a Japanese corporation., | ) |
| Defendant. | ) |

# NOTICE OF MANUAL FILING

HOWREY
SIMON
ARNOLD &
WHITE

Case No. C03-02289
Notice of Manual Filing

-1-

1   The following documents filed by Plaintiff Synopsys, Inc. ("Synopsys") on this date are in
2   paper form only and are being maintained in the case file in the Clerk's office:

3   1.    Opposition To Motion To Dismiss Or In The Alternative To Stay Or Transfer Venue;

4   2.    Exhibit B, a true and correct copy of pages 1-8 and 35-60 from the July 15, 2003
5   deposition of Hisashi Ishijima taken in *Ricoh Company, Ltd., v. Aeroflex Incorporated, et al.*, Civil
6   Action No. 03-103-GMS pending in the United Stated District Court for the District of Delaware to
7   Declaration of Erik Moller in Opposition to Defendant's Motion to Dismiss or in the Alternative to
8   Stay or Transfer Venue;

9   3.    Exhibit D, a true and correct copy of Plaintiff's Answers to Defendant AMI
10  Semiconductor, Inc.'s First Set of Interrogatories (1-2) dated July 15, 2003 July 21, 2003 in *Ricoh
11  Company, Ltd., v. Aeroflex Incorporated, et al.*, Civil Action No. 03-103-GMS pending in the United
12  Stated District Court for the District of Delaware to Declaration of Erik Moller in Opposition to
13  Defendant's Motion to Dismiss or in the Alternative to Stay or Transfer Venue.

14  These documents contain confidential information of Ricoh Company, Ltd. and are being filed
15  under seal pursuant to Protective Order filed on June 9, 2003 in *Ricoh Company, Ltd. v. AeroFlex, Inc.,
16  et al.,* Case No. 03-103-GMS.

17
    Dated:  Dated:  July 29, 2003          HOWREY SIMON ARNOLD & WHITE, LLP
18

19

20                                         By:  /s/_____
                                                Erik K. Moller
21                                              Attorneys for Plaintiff
                                                Synopsys, Inc.
22

23

24

25

26

27

28

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RICOH COMPANY, LTD.       ) | |
|                  ) | |
|       Plaintiff,      ) | |
|                  ) | |
|       v.           ) | C.A. No. 03-103-GMS |
|                  ) | |
| AEROFLEX INCORPORATED, AMI    ) | |
| SEMICONDUCTOR, INC., MATROX    ) | |
| ELECTRONIC SYSTEMS LTD.,      ) | |
| MATROX GRAPHICS INC., MATROX   ) | |
| INTERNATIONAL CORP., and       ) | |
| MATROX TECH, INC.,          ) | |
|                  ) | |
|       Defendants.     ) | |

## DECLARATION OF ALAN MACPHERSON IN SUPPORT OF DEFENDANTS' MOTION TO STAY OR, IN THE ALTERNATIVE, TRANSFER

I, Alan MacPherson, hereby declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a partner of the law firm of MacPherson Kowk Chen & Heid LLP, attorneys for defendant AMI Semiconductor, Inc ("AMIS"). The matters set forth in this declaration are based upon my personal knowledge, except where otherwise indicated, and if called as a witness, I could and would testify competently thereto.

2.      On or about February 10, 2003, I spoke by telephone regarding this matter with Gary Hoffman, Esq., of the law firm of Dickstein Shapiro Warren & Moshinsky, LLP in Washington, D.C., who I knew from an earlier conversation with Mr. Hoffman to be an attorney for plaintiff Ricoh Company Ltd. ("Ricoh").

3.      Mr. Hoffman stated that the basis for Ricoh suing AMIS was because of AMIS' use of Synopsys' Design Compiler® product.

4.    My understanding following this conversation was that the other parties in this litigation had also been sued because of their use of Synopsys' Design Compiler Product.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  This declaration was executed in San Jose, California on June 10, 2003.

Alan MacPherson

-2-

## CERTIFICATE OF SERVICE

I, Francis DiGiovanni, hereby certify that on the 12th day of June, 2003, a true and correct

copy of the foregoing was caused to be served on the attorneys of record at the following addresses:

**VIA HAND DELIVERY**

Robert W. Whetzel
Richards Layton & Finger
One Rodney Square
Wilmington, DE 19899

**FEDERAL EXPRESS**
Gary M. Hoffman
Dickstein Shapiro Morin & Oshinsky LLP
2101 L Street, N.W.
Washington, D.C.  20037-1526

**VIA FEDERAL EXPRESS**
Edward A. Meilman
Dickstein Shapiro Morin & Oshinsky, LLP
1177 Avenue of the Americas
New York, N.Y.  10036-2714

Francis DiGiovanni (#3189)

265624

Teresa M. Corbin (SBN 132360)
Christopher Kelley (SBN 166608)
Erik K. Moller (SBN 147674)
HOWREY SIMON ARNOLD & WHITE, LLP
301 Ravenswood Avenue
Menlo Park, California  94025
Telephone:  (650) 463-8100
Facsimile:  (650) 463-8400

Attorneys for Plaintiff Synopsys, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SYNOPSYS, INC.,                                    )  Case No. C03-02289
                                                   )
              Plaintiff,                           )
                                                   )
       vs.                                         )
                                                   )
RICOH COMPANY, LTD., a Japanese                    )
corporation.,                                      )
                                                   )
              Defendant.                           )
                                                   )
                                                   )
                                                   )
                                                   )
_____             )

# NOTICE OF MANUAL FILING

HOWREY
SIMON
ARNOLD &
WHITE

Case No.  C03-02289
Notice of Manual Filing

-1-

1       The following documents filed by Plaintiff Synopsys, Inc. ("Synopsys") on this date are in

2  paper form only and are being maintained in the case file in the Clerk's office:

3       1.    Opposition To Motion To Dismiss Or In The Alternative To Stay Or Transfer Venue;

4       2.    Exhibit B, a true and correct copy of pages 1-8 and 35-60 from the July 15, 2003

5  deposition of Hisashi Ishijima taken in *Ricoh Company, Ltd., v. Aeroflex Incorporated, et al.*, Civil

6  Action No. 03-103-GMS pending in the United Stated District Court for the District of Delaware to

7  Declaration of Erik Moller in Opposition to Defendant's Motion to Dismiss or in the Alternative to

8  Stay or Transfer Venue;

9       3.    Exhibit D, a true and correct copy of Plaintiff's Answers to Defendant AMI

10  Semiconductor, Inc.'s First Set of Interrogatories (1-2) dated July 15, 2003 July 21, 2003 in *Ricoh*

11  *Company, Ltd., v. Aeroflex Incorporated, et al.*, Civil Action No. 03-103-GMS pending in the United

12  Stated District Court for the District of Delaware to Declaration of Erik Moller in Opposition to

13  Defendant's Motion to Dismiss or in the Alternative to Stay or Transfer Venue.

14       These documents contain confidential information of Ricoh Company, Ltd. and are being filed

15  under seal pursuant to Protective Order filed on June 9, 2003 in *Ricoh Company, Ltd. v. AeroFlex, Inc.,*

16  *et al.,* Case No. 03-103-GMS.

17

18  Dated:  Dated:  July 29, 2003          HOWREY SIMON ARNOLD & WHITE, LLP

19

20                      By:  /s/

21                         Erik K. Moller

22                         Attorneys for Plaintiff

23                         Synopsys, Inc.

24

25

26

27

28

HOWREY
SIMON
ARNOLD &
WHITE

Case No.  C03-02289
Notice of Manual Filing

-2-

# FACT BOOK 2003



## CORPORATE PHILOSOPHY

**The Spirit of Three Loves**
Love your neighbor
Love your country
Love your work

## MANAGEMENT PHILOSOPHY

**Our Purpose**
To constantly create new values for the world
at the interface of people and information

**Our Goal**
To be a good global corporate citizen with reliability and appeal

**Our Principles**
To think as an entrepreneur
To put ourselves in the other person's place
To find personal value in our work

**Contents**

| | |
|---|---:|
| Financial Highlights | 1 |
| Historical Highlights | 2 |
| Product Innovations | 8 |
| Key Financial Figures | 12 |
| Global Network | 18 |
| Principal Overseas Operations | 20 |
| Domestic Network | 22 |
| Major Domestic Operations | 23 |
| Organization | 24 |
| Senior Management/Corporate Data | 25 |

# Financial Highlights

As of March 31, 2003

## Consolidated (¥ million)

| | | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Net sales | | 968,318 | 1,020,296 | 1,113,030 | 1,316,072 | 1,403,348 | 1,425,999 | 1,447,157 | 1,538,262 | 1,672,340 | 1,738,358 |
| By product line* | Office equipment | 814,080 | 866,109 | 941,873 | 1,136,712 | 1,213,468 | 1,250,938 | 1,253,070 | 1,338,374 | 1,485,389 | 1,520,574 |
| | Other businesses | 154,238 | 154,187 | 171,157 | 179,360 | 189,880 | 175,061 | 194,087 | 199,888 | 186,951 | 217,784 |
| By region | Japan | 719,221 | 750,657 | 782,127 | 821,004 | 831,339 | 820,975 | 873,170 | 930,433 | 902,655 | 896,022 |
| | The Americas** | 114,217 | 112,030 | 135,107 | 204,157 | 230,342 | 239,623 | 231,181 | 252,698 | 341,747 | 343,940 |
| | Europe | 94,958 | 110,604 | 141,959 | 209,548 | 252,042 | 283,373 | 258,515 | 247,449 | 311,312 | 354,477 |
| | Other | 39.922 | 47,005 | 53,837 | 81,363 | 89,625 | 82,028 | 84,291 | 107,682 | 116,626 | 143.919 |
| Net sales growth (%) | | -5.3 | 5.4 | 9.1 | 18.2 | 6.6 | 1.6 | 1.5 | 6.3 | 8.7 | 3.9 |
| Income before income taxes | | 26,167 | 41,674 | 51,020 | 66,905 | 68,428 | 53,054 | 70,393 | 97,765 | 113,950 | 123,470 |
| Net income | | 9,520 | 18,593 | 21,869 | 28,922 | 30,131 | 30,655 | 41,928 | 53,228 | 61,614 | 72,513 |
| Net income per share (¥) | Basic | 14.61 | 28.54 | 33.55 | 44.16 | 44.97 | 44.33 | 60.61 | 76.85 | 88.27 | 99.79 |
| | Diluted | 14.47 | 26.43 | 31.21 | 38.95 | 41.35 | 40.94 | 56.06 | 71.02 | 82.46 | 96.81 |
| Total assets | | 1,238,275 | 1,320,617 | 1,508,519 | 1,644,896 | 1,660,496 | 1,628,017 | 1,543,320 | 1,704,791 | 1,832,928 | 1,884,922 |
| Shareholders' investment | | 349,945 | 377,840 | 401,471 | 422,923 | 475,005 | 487,459 | 541,506 | 556,728 | 633,020 | 657,514 |
| Equity ratio (%) | | 28.3 | 28.6 | 26.6 | 25.7 | 28.6 | 29.9 | 35.1 | 32.7 | 34.5 | 34.9 |
| Current ratio (%) | | 123.3 | 129.6 | 123.5 | 110.6 | 104.1 | 126.6 | 131.7 | 100.0 | 129.7 | 139.7 |
| Cash flows (Net income plus depreciation and amortization) | | 58,675 | 63,553 | 68,299 | 79,922 | 92,102 | 98,111 | 103,874 | 115,370 | 135,396 | 149,064 |
| Capital expenditures (including leases) | | 44,928 | 45,437 | 48,828 | 78,666 | 94,117 | 70,469 | 58,356 | 73,329 | 75,676 | 73,956 |
| Number of employees | | 50,300 | 50,200 | 59,700 | 61,200 | 63,600 | 65,400 | 67,300 | 74,300 | 74,200 | 74,600 |

*From fiscal 2000, Ricoh moved optical disc products from other businesses to the office equipment category
**Introduced in fiscal 1997, this category includes North, Central and South America

## Non-Consolidated (¥ million)

| | | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Net sales | | 596,820 | 616,577 | 646,293 | 698,836 | 752,630 | 720,502 | 777,501 | 855,499 | 860,149 | 855,024 |
| By product line* | Office equipment | — | — | — | — | — | 683,833 | 733,868 | 793,502 | 808,002 | 802,310 |
| | Other businesses | — | — | — | — | — | 36,669 | 43,633 | 61,997 | 52,146 | 52,714 |
| Domestic and exports | Domestic | 450,200 | 454,431 | 477,337 | 488,534 | 490,990 | 475,753 | 509,377 | 555,727 | 517,966 | 484.160 |
| | Export | 146,620 | 162,145 | 168,956 | 210,302 | 261,640 | 244,748 | 268,123 | 299,771 | 342,182 | 370,863 |
| Net sales growth (%) | | -8.5 | 3.4 | 4.8 | 8.1 | 7.7 | -4.3 | 7.9 | 10.0 | 0.5 | -0.6 |
| Ordinary income | | 14,595 | 21,631 | 31,887 | 40,696 | 42,935 | 36,032 | 50,113 | 65,971 | 67,688 | 68.898 |
| Net income | | 7,155 | 13,254 | 17,047 | 19,816 | 22,505 | 18,977 | 22,613 | 34,404 | 40,085 | 42,880 |
| Net income per share (¥) | Basic | 10.98 | 20.34 | 26.16 | 30.25 | 33.59 | 27.44 | 32.69 | 49.67 | 57.43 | 58.76 |
| | Diluted | — | — | 24.52 | 27.23 | 30.37 | 25.69 | 30.58 | 46.24 | 53.70 | 56.98 |
| Total assets | | 683,230 | 669,825 | 685,773 | 742,449 | 760,484 | 755,016 | 763,078 | 824,119 | 908,009 | 933.341 |
| Shareholders' investment | | 325,036 | 331,789 | 342,922 | 359,980 | 416,235 | 427,512 | 457,960 | 489,176 | 553,693 | 596.694 |
| Equity ratio (%) | | 47.6 | 49.5 | 50.0 | 48.5 | 54.7 | 56.6 | 60.0 | 59.4 | 61.0 | 63.9 |
| Current ratio (%) | | 194.3 | 239.5 | 199.3 | 193.3 | 218.6 | 241.0 | 289.7 | 202.4 | 245.2 | 247.5 |
| Expenditures for plant and equipment (including leases) | | 26,430 | 20,910 | 21,936 | 35,410 | 35,434 | 23,511 | 18,354 | 27,251 | 19,432 | 18,696 |
| R&D expenditures | | 52,833 | 52,816 | 56,983 | 61,678 | 67,394 | 64,044 | 64,378 | 72,592 | 77,692 | 78.735 |
| R&D expenditures ratio to net sales (%) | | 8.9 | 8.6 | 8.8 | 8.8 | 9.0 | 8.9 | 8.3 | 8.5 | 9.0 | 9.2 |
| Cash dividends per share (¥) | | 10.00 | 10.00 | 10.00 | 10.00 | 12.00 | 11.00 | 11.00 | 12.00 | 13.00 | 14.00 |
| Dividend payout ratio (%) | | 91.0 | 49.2 | 38.2 | 39.7 | 33.1 | 40.1 | 33.7 | 24.2 | 23.1 | 24.0 |
| Number of employees | | 13,724 | 13,363 | 13,109 | 12,865 | 12,741 | 12,622 | 12,392 | 12,242 | 12,161 | 12.085 |

*From fiscal 2000, Ricoh moved optical disc products from other businesses to the office equipment category.

## Patents and Utility Models Laid Open to Public Inspection

| | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 6,502 | 5,508 | 4,713 | 4,573 | 5,565 | 4,938 | 5,036 | 5,021 | 5,220 | 7,760 |
| Patents | 6,328 | 5,436 | 4,690 | 4,563 | 5,557 | 4,936 | 5,035 | 5,021 | 5,220 | 7,760 |
| Utility models | 174 | 72 | 23 | 10 | 8 | 2 | 1 | 0 | 0 | 0 |
| Ricoh's ranking among all Japanese companies* | 9 | 9 | 9 | 9 | 7 | 7 | 8 | 8 | 8 | 4 |

*Rankings after 2000 are comparisons with other Japanese companies based on data accumulated by the Company's electronic record searching system.

# Historical Highlights

| Era | Companywide & Chairman/President | R&D (Overseas & Domestic) |
|---|---|---|
| **1930s** | **Feb. 2, 1936**   Kiyoshi Ichimura appointed executive managing director [until Jan. 11, 1946]<br>**Feb. 6, 1936**   Riken Kankoshi Co., Ltd., formed to make and market sensitized paper [until 1938]<br>**Mar. 1938**   Name changed to Riken Optical Co., Ltd. and started production of optical devices and equipment [until 1963] | — |
| **1940s** | **Jan. 12, 1946**   Kiyoshi Ichimura appointed president [until Dec. 16, 1968] | — |
| **1950s** | — | — |
| **1960s** | **May 1962**   Ohmori Plant and General Research Laboratory completed<br>**Apr. 1, 1963**   Name changed to Ricoh Co., Ltd.<br>**May 1967**   Ginza Office established<br>**Dec. 16, 1968**   Founder and President Kiyoshi Ichimura passed away<br>**Jan. 30, 1969**   Mikio Tatebayashi appointed president [until Oct. 22, 1976] | — |

| Sales and Other | | Production | |
|---|---|---|---|
| **Domestic** | **Overseas** | **Domestic** | **Overseas** |
| **Aug. 1937** Opened Osaka, Nagoya and Fukuoka branches | — | **Dec. 1937** Opened Ohji Plant<br>**Apr. 1938** Founded Takano Seimitsu Kogyo Co., Ltd. (name changed to Ricoh Tokei Co., Ltd. in Aug. 1962 and to Ricoh Elemex Corp. in Apr. 1986) | — |
| **Aug. 1949** Opened Sapporo branch | — | — | — |
| **May 1958** Founded Office Soken Co., Ltd.<br>**Jun. 1958** Opened Sendai branch<br>**May 1959** Founded Tokyo Ricoh Co., Ltd.<br>**Oct. 1959** Founded Chiba Ricoh Co., Ltd. | — | **Mar. 1950** Founded Ricoh Keiki Co., Ltd.<br>**Apr. 1953** Ohmori Plant opened in Ota-ku, Tokyo, through merger of affiliate companies Asahi Seimitsu Kogyo Co., Ltd. and Aiko Trading Co., Ltd.; camera manufacturing resumed<br>**Jan. 1957** Established Japan's first mass-production system for cameras; awarded Ohkochi Memorial Production Prize for techniques to mass-produce cameras | — |
| **Dec. 1960** Founded Nichibei Inryo Co., Ltd. (Merged with Sanyo Coca Cola Bottling Co., Ltd. and name changed to Coca Cola West Japan Co., Ltd. in Jul. 1999)<br>**Feb. 1961** Founded Miyazaki Ricoh Co., Ltd.<br>**Feb. 1962** Founded Gifu Ricoh Co., Ltd.<br>**Apr. 1962** Founded Saga Ricoh Co., Ltd.<br>**Jun. 1962** Opened Hiroshima branch<br>**Dec. 1962** Founded Tochigi Ricoh Co., Ltd.<br>**Sept. 1963** Opened Kanto and Tokyo branches<br>**Feb. 1964** Founded Kagoshima Ricoh Co., Ltd. and Ricoh Logistics System Co., Ltd.<br>**Jun. 1964** Founded Aichi Ricoh Co., Ltd.<br>**May 1966** Founded San-Ai Logistics System Co., Ltd. (Tobu)<br>**Aug. 1966** Founded San-Ai Kanko Co., Ltd.<br>**Jan. 1967** Founded Osaka Ricoh Co., Ltd.<br>**May 1967** Founded Hiroshima Ricoh Co., Ltd.<br>**Jul. 1967** Founded Ohita Ricoh Co., Ltd.<br>**Aug. 1967** Founded Ricoh San-Ai Service Co., Ltd.<br>**Oct. 1967** Founded Saitama Ricoh Co., Ltd.<br>**Feb. 1968** Founded Fukuoka Ricoh Co., Ltd.<br>**Jul. 1968** Founded Akita Ricoh Co., Ltd.<br>**Nov. 1968** Founded Miyagi Ricoh Co., Ltd.<br>**Jan. 1969** Founded Nagasaki Ricoh Co., Ltd. | **Dec. 1962** Founded overseas subsidiary Ricoh Industries, U.S.A., Inc. [until 1970]<br>**Apr. 1963** Founded overseas subsidiary Ricoh (Europe) S.A. in Switzerland [until 1971] | **May 1961** Osaka Plant opened in Ikeda, Osaka, to manufacture sensitized paper<br>**Apr. 1962** Completed Numazu Plant, with world's first fully integrated sensitized paper production system<br>**Jul. 1967** Founded Tohoku Ricoh Co., Ltd. in Miyagi Prefecture<br>**Oct. 1967** Founded Sohka Ricoh Co., Ltd. in Saitama Prefecture (name changed to Ricoh Tokki Co., Ltd. in Jan. 1972, and to Ricoh Unitechno Co., Ltd. in Apr. 1990) | **Jul. 1960** Founded Sindo Koeki Co., Ltd. in Korea (name changed to Sindo Ricoh Co., Ltd. in 1970)<br>**Mar. 1965** Founded manufacturing subsidiary Taiwan Ricoh Co., Ltd. in Taiwan |

| Era | Companywide & Chairman/President | | Environmental Activities | | R&D (Overseas & Domestic) | |
|---|---|---|---|---|---|---|
| **1970s** | Mar. 1970 | Ricoh Pavilion opened at Expo '70 in Japan with theme "Better Vision for Humanity" | 1976 | Environment Promotion Office established | Jul. 1978 | Completed construction of Numazu R&D Center |
| | Nov. 1971 | Introduced Total Quality Control System | 1977 | Environment Measurement Office founded | May 1979 | Established overseas subsidiary Ricoh Systems, Inc. in California to carry out R&D (later merged with Ricoh Corporation in Apr. 1987) |
| | Apr. 1973 | RIFAX 600S, first office facsimile machine, transmitted world's first international high-speed facsimile transmission, between Tokyo and New York via communications satellite | | | Jul. 1979 | Formed Materials R&D Center at Numazu R&D Center (name changed to Chemical Products R&D Center in Jan. 1990) |
| | Oct. 1974 | Companywide divisional system introduced | | | | |
| | Nov. 1975 | The first company in the office automation industry to win the coveted Deming Prize for excellence in quality control | | | | |
| | Jul. 1976 | RIFAX 600S played active role in Montreal Olympic Games | | | | |
| | Oct. 22, 1976 | President Mikio Tatebayashi passed away | | | | |
| | Oct. 26, 1976 | Shinichi Miyoshi appointed chairman [until Jun. 27, 1980] | | | | |
| | Oct. 26, 1976 | Takeshi Ouye appointed president [until Mar. 31, 1983] | | | | |
| | Mar. 1977 | Completed construction and operations began at Aoyama Headquarters | | | | |
| | Apr. 1977 | Introduced the acronym OA, for office automation, at the Hannover Messe | | | | |
| **1980s** | Mar. 1980 | Completed construction of Higashi Matsuyama Training Center | 1980 | Tohoku Ricoh starts making aluminum ingots as part of our recycling system | Jul. 1980 | Established Toda Technical Center in Atsugi, Kanagawa |
| | Apr. 1, 1983 | Takeshi Ouye appointed chairman [until Mar. 31, 1984] | | | Apr. 1981 | Completed construction of Ricoh Electronics Development Center at Osaka Plant |
| | Apr. 1, 1983 | Hiroshi Hamada appointed president [until Mar. 31, 1996] | | | May 1982 | Established Software Research Center |
| | Feb. 1984 | RIFAX 1300HS awarded Nikkei Product Excellence Prize | | | Oct. 1982 | Founded Ricoh System Kaihatsu Co., Ltd. |
| | Mar. 31, 1984 | Chairman Takeshi Ouye passed away | | | Sept. 1983 | Established Semiconductor R&D Center (currently Imaging LSI R&D Center) and Ricoh Tottori Software Technology Co., Ltd. |
| | Mar. 1985 | Awarded Ohkochi Memorial Production Prize for development of multi-product production system for plain-paper copiers | | | Apr. 1984 | Established Manufacturing Technology R&D Center at Atsugi Plant, and Imaging Technology Development Center (name changed to Imaging Technology Center in Mar. 1995 and Imaging Technology Division in Apr. 1999) and General Electronics R&D Center |
| | Oct. 1987 | OHP313R awarded 1987 Good Design Grand Award | | | | |
| | Sept. 1989 | Worldwide Sponsorship contract in facsimile machine category for 1992 Barcelona Olympic Games | | | May 1985 | Developed speech recognition and optical character recognition technology |
| | Nov. 1989 | Established Ricoh System Center | | | Apr. 1986 | Founded Ricoh Research and Development Center in Yokohama in commemoration of 50th year of operations |
| | Dec. 1989 | TSS initiative | | | Oct. 1987 | Founded RDG European Facsimile Design Center in Germany (name changed to Ricoh European Digital Solution Center in Oct. 1996) |
| | | | | | Oct. 1989 | Founded Ricoh System Kaihatsu Co., Ltd. (Kitami) |
| | | | | | Nov. 1989 | Established Ricoh California Research Center (integrated into Ricoh Silicon Valley, Inc. in Sept. 1997) |

| Sales and Other | | Production | |
|---|---|---|---|
| **Domestic** | **Overseas** | **Domestic** | **Overseas** |
| **Feb. 1970** Founded Hokkaido Ricoh Co., Ltd. | **Jan. 1970** Founded Ricoh of America, Inc. in New Jersey [until 1984], wholly owned subsidiary established through integration of New York office and Ricoh Industries U.S.A., Inc. | **May 1971** Founded Atsugi Plant as key manufacturing base for business machines and communication and information systems | **Jan. 1973** Founded manufacturing subsidiary Ricoh Electronics, Inc. (REI) in US (currently Irvine Plant) |
| **May 1970** Founded Shizuoka Ricoh Co., Ltd. | | | |
| **Jun. 1970** Founded Aomori Ricoh Co., Ltd. and Yamagata Ricoh Co., Ltd. | | | **Dec. 1979** Founded REI Santa Ana Plant |
| **Jul. 1970** Founded Yamaguchi Ricoh Co., Ltd. and Okayama Ricoh Co., Ltd. | **Nov. 1971** Founded overseas subsidiary Ricoh Nederland B.V. in Holland (name changed to Ricoh Europe B.V. in Jul. 1986) | **Apr. 1973** Founded Hasama Tohoku Ricoh Co., Ltd. (name changed to Hasama Ricoh Co., Ltd. in Sept. 1977) | |
| **Jan. 1972** Founded Toyama Ricoh Service Co., Ltd. (Merged with Ricoh Information Systems Co., Ltd. and name changed to Toyama Ricoh Co., Ltd. in Jan. 1999) | **May 1973** Founded overseas subsidiary Rapifax Corp. in US for marketing of facsimiles (name changed to Rapicom, Inc. in Mar. 1978) | | |
| | **Mar. 1978** Founded Ricoh Development of California, Inc. | **Jul. 1973** Founded Ricoh Optical Industries Co., Ltd. in Iwate Prefecture | |
| **Jul. 1972** Founded Ricoh Masters Club (sales incentive organization) | **Jul. 1978** Founded overseas subsidiary Ricoh Deutschland GmbH in Germany | | |
| **Oct. 1972** Founded Niigata Ricoh Co., Ltd., Kanagawa Ricoh Co., Ltd. and Kumamoto Ricoh Co., Ltd. | **Dec. 1978** Founded Ricoh Business Machines, Ltd. in Hong Kong (name changed to Ricoh Hong Kong Ltd. in Jul. 1987) | | |
| **Jul. 1973** Founded Nagano Ricoh Co., Ltd. and Fukui Ricoh Co., Ltd. | **Dec. 1978** Founded European Service Parts Center | | |
| **Oct. 1973** Founded Shikoku Ricoh Co., Ltd. | | | |
| **Jan. 1975** Founded Ishikawa Ricoh Co., Ltd. | | | |
| **Jun. 1975** Founded Ibaraki Ricoh Co., Ltd., Yamanashi Ricoh Co., Ltd. and Gunma Ricoh Co., Ltd. | | | |
| **Dec. 1976** Established Ricoh Credit Co., Ltd. (name changed to RICOH LEASING COMPANY, LTD. in Apr. 1984) | | | |
| **Mar. 1977** Founded NBS Ricoh Co., Ltd. | | | |
| **Oct. 1977** Founded Ricoh Electronics Service Co., Ltd. | | | |
| **Nov. 1977** Founded Kyoto Ricoh Co., Ltd. and San-Ai Logistics System Co., Ltd. (Chubu) | | | |
| **Dec. 1977** Founded San-Ai Logistics System Co., Ltd. (Kansai) | | | |
| **Apr. 1979** Founded Hyogo Ricoh Co., Ltd. | | | |
| **Sept. 1979** Founded Nishi-Tokyo Ricoh Co., Ltd. | | | |
| **Apr. 1980** Founded Mie Ricoh Co., Ltd. and Tottori Ricoh Co., Ltd. | **Jul. 1980** Founded overseas subsidiary Ricoh UK Ltd. | **Feb. 1980** Founded Ricoh Engineering Co., Ltd. | **Dec. 1983** Founded overseas subsidiary Ricoh UK Products Ltd. |
| **Apr. 1981** Founded Iwate Ricoh Co., Ltd. | **Jan. 1981** Began marketing Ricoh brand dry PPCs in Europe | **Mar. 1981** Established Service Parts Center in Atsugi | **Apr. 1987** Founded overseas subsidiary Ricoh Industrie France S.A. |
| **Jun. 1982** Founded Wakayama Ricoh Co., Ltd. | **Apr. 1981** Began marketing Ricoh brand dry PPCs in North America | **May 1982** Founded Fukui Plant for production of sensitized paper | **Jul. 1988** Opened REI Tustin Plant |
| **Sept. 1982** Founded Fukushima Ricoh Co., Ltd. | **Apr. 1984** Merged Ricoh of America, Inc. and Rapicom, Inc. to establish overseas subsidiary Ricoh Corporation | **Jul. 1982** Hatano Plant began operations | |
| **Oct. 1983** Founded Shiga Ricoh Co., Ltd., Shimane Ricoh Co., Ltd. and Parts Component System Co., Ltd. | **Jul. 1984** Established National Service Parts Center in US | **Oct. 1985** Opened Gotemba Plant | |
| | **Sept. 1984** Founded Ricoh Australia Pty, Ltd. | **Apr. 1988** Founded Ricoh Microelectronics Co., Ltd. in Tottori for cutting-edge FA manufacturing of electronic circuit parts | |
| **Nov. 1983** Founded Okinawa Ricoh Co., Ltd. | **Apr. 1986** Founded overseas subsidiary Ricoh España S.A. in Spain | | |
| **Apr. 1984** Eleven service subsidiaries merged into two— Ricoh Service Co., Ltd. (Tokyo) and Ricoh Service Co., Ltd. (Osaka) (names later changed to Ricoh Technonet Co., Ltd. (Tokyo) and Ricoh Technonet Co., Ltd. (Osaka) in Apr. 1988) and founded Nara Ricoh Co., Ltd. | **May 1986** Founded overseas subsidiary Ricoh France S.A. | | |
| | **Feb. 1987** Founded overseas subsidiary Ricoh Norge A.S. in Norway | **Apr. 1989** Opened Yashiro Plant for manufacturing electronic devices in Hyogo Prefecture | |
| | **Apr. 1987** Integrated administration of three US subsidiaries under centralized control of Ricoh Corporation | | |
| | **May 1987** Founded Ricoh Finance Nederland B.V. | | |
| **Feb. 1987** Started Ricoh OA top dealers meeting | **Apr. 1988** Founded Ricoh Finance Corporation in the US | | |
| **Oct. 1988** Established Ricoh Sales College | **Apr. 1988** Founded Ricoh Office Systems Nederland B.V. (currently Ricoh Nederland B.V.) | | |
| **Jun. 1989** Established Ricoh Techno Research Co., Ltd. | | | |

| Era | Companywide & Chairman/President | | Environmental Activities | | R&D (Overseas & Domestic) | |
|---|---|---|---|---|---|---|
| **1990s** | Aug. 1991 | Completed Ricoh's Olympic Fax Network to connect International Olympic Committee (IOC) to Olympic family | Mar. 1990 | Phase-out of ozone layer-depleting styrofoam packaging materials | Apr. 1990 | Founded Ricoh System Kaihatsu Co., Ltd. (Akita) |
| | Sept. 1992 | Initiated full-scale entrance into CD business as part of efforts to address multimedia | Dec. 1990 | Founded Environment Administration Office (name changed to Corporate Environment Office in Apr. 1998 and Corporate Environment Division in Apr. 2001) | Oct. 1990 | Founded Ricoh System Kaihatsu Co., Ltd. (Kagoshima) |
| | Aug. 1993 | Established Shin-Yokohama Office | Feb. 1992 | Enacted Ricoh General Principles on the Environment | Apr. 1991 | Ricoh California Research Center developed world's fastest color imaging compression algorithm |
| | Oct. 1993 | Signed Olympic Fax Network supplier contract with IOC | Sept. 1992 | Ricoh Unitechno Co., Ltd. became first subsidiary of Ricoh Group to obtain ISO 9002 certification, followed by Atsugi Plant and Gotemba Plant | | |
| | Dec. 1993 | Initiated an internal project to promote entrepreneurial spirit | Mar. 1993 | Totally eliminated use of ozone-depleting substances | Apr. 1992 | Founded Ricoh Sozo Kaihatsu Co., Ltd. |
| | Oct. 1994 | Initiated nationwide development of long-distance diagnostic service for copiers in Japan | Apr. 1993 | Ricoh UK Products Ltd. (RPL) became inaugural recipient of Queen's Award for Environmental Achievement | May 1994 | Established Ricoh Corporation, Systems Research and Development Group (name changed to Office Solutions and Systems Development Group in Nov. 2000) |
| | May 1995 | RICOH R-1 compact camera awarded Camera Grand Prix '95 Special Prize | May 1994 | RPL received Highly Recommended prize in European Better Environment Awards for Industry '94 for chlorofluocarbon-free recycling system | | |
| | Apr. 1, 1996 | Hiroshi Hamada appointed chairman; Masamitsu Sakurai appointed president | Mar. 1995 | Won top award from Japan's Minister of International Trade and Industry for environmental activities, product assessment and recyclable design | | |
| | Nov. 1996 | Declared "Image Communication" as corporate slogan | Dec. 1995 | Gotemba Plant obtained ISO/DIS 14001 certification | Mar. 1997 | Founded Ricoh Silicon Valley, Inc. in California |
| | Dec. 1999 | Received Japan Quality Award | Jun. 1996 | Environmental Protection Agency of United States awarded Ricoh Corporation the ENERGY STAR Award (received five years running until 2000) | | |
| | | | Feb. 1997 | Established Ricoh Kanto Recycling Center to disassemble and separate recycled PPCs | | |
| | | | Feb. 1998 | RIFAX BL110 Shatara2 facsimile machine awarded Japan Machinery Federation President's Award at 18th Energy Saving Excellent Awards | | |
| | | | Dec. 1998 | Awarded first place in second annual Environmental Management Survey by *Nihon Keizai Shimbun*, Japan's top business daily (received three years running until 2000) | | |
| | | | May 1999 | Awarded Minister of International Trade and Industry Prize in 8th annual Global Environment Awards from *Japan Industrial Journal* | | |
| | | | May 1999 | Received the Environmental Protection Prize in the 9th Corporate Contribution to the Society Survey held by the Asahi Shimbun Cultural Foundation | | |
| | | | Jun. 1999 | Initiated Environmental Volunteer Leadership Training System for promoting activities to contribute to society and environment | | |
| | | | Nov. 1999 | Received Energy Conservation Technology Award for Copier of the Future from the DSM Program sponsored by the International Energy Agency | | |
| **2000s** | Feb. 2000 | Received the Grand Prize in the 10th Corporate Contribution to the Society Survey held by the Asahi Shimbun Cultural Foundation | Jan. 2000 | Eco Mark designation obtained for 28 Ricoh copiers | Mar. 2000 | Construction of Ohmori Office completed as developmental base for imaging technology |
| | | | Mar. 2000 | Ricoh Corporation received the 2000 ENERGY STAR Award in three categories | | |
| | Jun. 2000 | Introduced executive officer system | Apr. 2000 | Awarded the Keidanren Chairman's Prize at the 9th Global Environmental Awards | Apr. 2002 | Photonics R&D Center, Optical Memory R&D Center and Environmental Technology R&D Center established |
| | Oct. 2000 | Introduced internal company system | | The Ricoh Group Environmental Report 1999 won Best Report | | |
| | Jan. 2001 | Announced Ricoh Document Highway concept | | | | |
| | Feb. 2002 | Received the "7th Disclosure Award for Listed Companies" by the Tokyo Stock Exchange | Feb. 2001 | Received Minister of Economy, Trade and Industry Award for the advanced environmental friendliness of the imagio Neo 350 series | Jun. 2002 | Founded Ricoh Software Technology (Shanghai) Co., Ltd. in China |
| | Jun. 2002 | Ranked first in world for corporate responsibility rating by Oekom Research AG of Germany | Dec. 2001 | Received the "Climate Is Business" Award from the European Business Council and US Business Council for the Company's contributions to global warming prevention | Oct. 2002 | Ubiquitous Solution Lab, Image Appliance Lab, Multimedia Lab, and Network and Systems Lab in the Software R&D Group established |
| | Jul. 2002 | Participated in United Nations (UN) Global Compact | Jan. 2002 | Ricoh's multifunctional "imagio Neo 220/270 Series" received the Energy Conservation Center Chairman's Prize for energy conservation | | |
| | Apr. 2003 | Masamitsu Sakurai received the CBE, one of the UK's most prestigious awards | Aug. 2002 | Received 18th Corporate Report Award for Excellence from Nippon Keidanren and Keizai Koho Center | | |
| | | | Apr. 2003 | Received Grand Prix Global Environment Award from *Japan Industrial Journal* | | |
| | | | May 2003 | Ricoh Group received Gold Medal from World Environment Center (WEC) | | |

**6**    Ricoh Fact Book 2003



| Sales and Other | | Production | |
|---|---|---|---|
| **Domestic** | **Overseas** | **Domestic** | **Overseas** |
| Apr. 1994 Founded Ricoh Espoir Co., Ltd.<br>Oct. 1994 Founded Ricoh Human Creates Co., Ltd.<br>Jan. 1999 Merged Ricoh Technonet Co., Ltd. (Tokyo), Ricoh Technonet Co., Ltd. (Osaka) and Ricoh Information Systems Co., Ltd., to form Ricoh Technosystems Co., Ltd. | Sept. 1990 Founded overseas subsidiary Ricoh Italia S.p.A.<br>Mar. 1995 Established Savin Corporation as a wholly owned sales subsidiary<br>Sept. 1995 Acquired Gestetner Holdings PLC of UK to reinforce overseas sales network (name changed to NRG Group PLC in July 2001)<br>Jul. 1996 Inaugurated Aficio as unified global brand for Ricoh products<br>Dec. 1996 Formed Ricoh Asia Pacific Pte. Ltd. in Singapore<br>Oct. 1997 Formed joint venture company Mitsui-Ricoh CIS Ltd. in Russia with Mitsui & Co., Ltd.<br>Oct. 1997 Established Ricoh Latin America, Inc. in US to manage sales in Central and South America | Jun. 1992 Completed construction of OPC system at Numazu Plant<br>Nov. 1996 Launched production of CD-RW discs | Jul. 1990 Completed construction of REI Georgia Plant in suburbs of Atlanta as fourth plant for Ricoh Electronics, Inc.<br>Jan. 1991 Founded Ricoh Asia Industry (Shenzhen) Ltd. (RAI) in China to manufacture OA equipment<br>Mar. 1991 Founded Dong Guan Tailien Optical Co., Ltd. in Shenzhen, China, to manufacture parts for compact cameras<br>May 1992 Created thermal paper plant in Ricoh Industrie France S.A.<br>Apr. 1993 Founded GR Advanced Materials, Ltd. in the UK<br>Oct. 1993 Founded joint venture company Shanghai Ricoh Facsimile Co., Ltd. in China<br>Oct. 1993 Founded joint venture company RPG Ricoh Ltd. in Bombay, India (disbanded in May 1998, and name changed to Ricoh India Limited)<br>Aug. 1998 RAI became first Japanese-owned facsimile machine manufacturer to reach 1,000,000 unit production mark |
| Jun. 2000 Founded San-Ai Logistics System Co., Ltd. (Kyushu)<br>Jul. 2001 Founded regionally administrative companies, Ricoh Chugoku Co., Ltd. and Ricoh Tohoku Co., Ltd.<br>Nov. 2001 Founded San-Ai Logistics System Co., Ltd. (Tokyo)<br>Dec. 2001 Founded regionally administrative companies, Ricoh Chubu Co., Ltd. and Ricoh Kyushu Co., Ltd.<br>Jan. 2002 Founded a regionally administrative company, Ricoh Kansai Co., Ltd.<br>Mar. 2002 Founded San-Ai Logistics System Co., Ltd. (Kanto) | Jan. 2001 Strengthened sales by making a subsidiary of Lanier Worldwide, Inc. (headquaters: Georgia), an OA equipment marketing company in the US<br>Jul. 2002 Received first J.D. Power and Associates Award for office automation at Lanier Worldwide, Inc. of the US<br>Jan. 2003 Ricoh China Co., Ltd. established in Beijing as top China management company | Dec. 2002 Tohoku Ricoh Co., Ltd. became wholly owned subsidiary of Ricoh | Oct. 2000 Started printer production at RAI<br>Jan. 2002 Shanghai Ricoh Facsimile Co., Ltd. achieved cumulative facsimile machine production totaling 1,000,000 units<br>Oct. 2002 RPL ranked first in Midlands and Excellence Awards for management quality in the UK |

# Product Innovations



| Product Group | Year | Product Name (Overseas names in parentheses) | Remarks |
|---|---|---|---|
| **Diazo copier** | May 1955 | RICOPY 101 | Ricoh's first diazo copier and business machine |
| | Mar. 1973 | RICOPY SUPER DRY 205 | Ricoh's first compact office copier to employ the Super Dry System |
| | Oct. 1997 | RICOPY BLUENEO 300 | A wet process-based machine for blueprints |
| **Electrostatic copiers** | Sept. 1965 | RICOPY BS-1 | Ricoh's first electrostatic copier, with midrange pricing |
| | Jul. 1967 | RICOPY BS-2 | A high-speed, fully automatic machine |
| **Analog PPCs** | Mar. 1972 | PPC900 | Ricoh's first plain-paper copier |
| | Feb. 1975 | RICOPY DT1200 | A best-selling, high-performance desktop model |
| | Jun. 1982 | RICOPY FT4060 (RICOH FT4060) | An A3 machine with zooming and reduction functions; 100,000 units sold in the first 10 months |
| | Nov. 1994 | spirio 2700 (RICOH FT4027) | The first model in the spirio series |
| | Dec. 1996 | spirio 105BB | A 105-copy-per-minute model using recyclable parts |
| | Oct. 1997 | spirio 5000RM | A spirio model incorporating 60% recycled materials |
| **Digital PPCs** | Nov. 1982 | RICORE 3000 | An image editing system |
| | Jun. 1987 | IMAGIO 320 (DS320) | The first digital copier below the ¥1 million barrier |
| | Jul. 1991 | IMAGIO MF530 | A model incorporating six different core functions |
| | Jun. 1995 | imagio MF-P Series | A high-performance copier/fax machine |
| | Aug. 1996 | imagio MF200 SERIES (Aficio 200) | Compact model, with an output tray-free design and A3 output |
| | Dec. 1999 | imagio MF105 Pro (Aficio 1105) | Fastest digital copier for general use at 105 copies per minute |
| | Feb. 2001 | imagio Neo 350 Series (Aficio 1035/1045) | Digital copier for efficient use of both paper and electronic documents Received the Minister of Economy, Trade and Industry Award for its advanced environmental friendliness |
| | Jan. 2002 | imagio MF6550 RC (Aficio 650) | Environmentally friendly, multifunctional digital device with a reused-part ratio of over 87% |
| **Color PPCs** | Feb. 1985 | RICOH COLOR 5000 | A high-performance full-color machine with enlarging and reduction functions |
| | Oct. 1990 | ARTAGE 8000 | A digital 15-copy-per-minute model |
| | Jun. 1993 | PRETER 550/500 (NC 5006) | A high-image-quality, multifunctional digital machine |
| | Dec. 1998 | imagio Color 2800 Series (Aficio Color 4006) | World's first fax extension for color PPCs |
| | Jun. 2002 | imagio Neo C240 Series (Aficio 1224C) | Full-color digital copier realizing minimized space and a low price |
| | | imagio Neo C380 | A high-speed full-color digital copier that uses the tandem printing method |
| **Laser printers** | Jun. 1983 | RICOH LP4120 | Ricoh's first laser printer |
| | Mar. 1988 | RICOH LP1060-SP3 | Compact machine for personal computers |
| | Feb. 1991 | RICOH LP5100-UX | Ethernet-linked machine |
| | Jul. 1998 | IPSiO Color 2000 (Aficio AP204) | Ricoh's first color laser printer |
| | Feb. 2001 | IPSiO Color 8000 (Aficio AP3800C) | High-speed color laser printer that enjoys tandem printing method |
| **Scanners** | Oct. 1984 | RICOH IS20 | Ricoh's first image scanner |
| | Mar. 1995 | FS2/UX | A color scanner for networked computers |
| | Jan. 2001 | IPSiO Scan 3000DC | A network-ready color scanner that can send paper documents to designated PCs |



| Product Group | Year | Product Name (Overseas names in parentheses) | Remarks |
|---|---|---|---|
| **Facsimile machines** | Apr. 1974 | RIFAX 600S | The world's first high-speed office fax machine |
| | Oct. 1983 | RIFAX 1300 SERIES | The world's first high-speed plain-paper fax machine |
| | Apr. 1988 | RIFAX 2000S (RICOH FAX1000L) | A compact, low-cost laser fax machine |
| | Apr. 1989 | RIFAX D7000 (RICOH FAX7000L) | A fax machine that can send a page in three seconds over ISDN lines |
| | May 1997 | RIFAX HL5200 super | A fax machine that uses super G3 fax mode to send a page in three seconds over regular phone lines |
| *RIFAX 600S* | Jun. 1998 | IC FAX 3200 | An internet facsimile |
| **Duplicators** | Oct. 1960 | RICOH OFFSET B4 | Ricoh's first duplicator |
| | Oct. 1970 | RICOH HYPER PRINTER E70 | Ricoh's first stencil duplicator |
| | Feb. 1986 | RICOH PRIPORT SS880 | A fully automatic digital stencil duplicator |
| | May 1999 | RICOH Priport JP 5800 | Ricoh's first front-loading digital printer |
| *Ricoh Satelio A400* | Mar. 2003 | Ricoh Satelio A400 | Ricoh's next-generation office press printer that offers high-quality images by using a new master |
| **Word processors** | Nov. 1977 | Ricoh Word Processor WP-1 | Ricoh's first word processor |
| | Sept. 1981 | RIPORT 600 SERIES | The Company's first Japanese-language word processor |
| | Feb. 1985 | My Riport 20 | Ricoh's first word processor for personal use |
| | Dec. 1993 | RIPORT PC NW70 SERIES | Windows®-based combined computer and word processor |
| **Personal computers** | Jun. 1983 | RICOH SP200 | Ricoh's first personal computer |
| | Jul. 1986 | RICOH PS SERIES | Ricoh brand desktop and laptop PCs from IBM Japan |
| | Oct. 1995 | SUPER NOTE CS | Ricoh's first notebook PC with assorted preinstalled business software |
| **Electronic filing systems** | Feb. 1985 | RIFILE 4500 | Ricoh's first optical filing system |
| | Nov. 1989 | RIFILE 21 | A high-performance, low-cost multifunctional model |
| | Oct. 1992 | RIFILE FF-1 | A low-cost, compact, and keyboardless desktop system |
| **Software and systems** | Jul. 1984 | RICOH My Tool | Software with four functions essential to business |
| | Feb. 1987 | DESIGNBASE | A solid modeling package for 3D computer-aided design. Software that displays data of stereoscopic structures |
| | Oct. 1987 | G-BASE | A full-fledged database management system |
| | Aug. 1993 | YOMITORI MONOGATARI | An advanced Japanese optical character recognition package |
| | Sept. 1993 | LIMEDIO | An open network library information management system |
| | Oct. 1993 | TrueTypeWorld | A Japanese TrueType font package for Windows PCs |
| | Jun. 1995 | Ricoh Venture Program Packages | Industry- and business-specific software developed through special in-house project teams |
| | Aug. 1996 | RGO | Software based on Ricoh's groupware reform expertise |
| | Feb. 1998 | LIFISA | An intranet-oriented integrated document management system |
| | Jun. 1999 | Ridoc Desk | Electronic and paper document management software |
| | Apr. 2000 | REDMS | System software that centrally manages OA equipment and seamlessly connects paper documents and electronic documents |
| *Ridoc Desk 2000 Version 2* | Jan. 2001 | Ridoc Document System | Document distribution and management system with advanced compatibility with IMAGIO NEO |
| | Apr. 2003 | MPMeister | Software that automatically creates Web content from the table of contents of visual slide-show presentations |

| Product Group | Year | Product Name (Overseas names in parentheses) | Remarks |
|---|---|---|---|
| **Presentation equipment** | Apr. 1998 | RICOH MEDIA SITE MB1-40V SERIES | A multimedia display board featuring 40-inch display with touch panel capability |
| | Nov. 1998 | RICOH MEDIA SITE MB2-50X SERIES | XGA-compatible multimedia board for use in 52-inch displays |
| **Conventional cameras** | Mar. 1938 | OLYMPIC 4 | Ricoh's first camera |
| | Mar. 1950 | RICOHFLEX III | Twin-lens model that triggered a camera boom in Japan |
| | Nov. 1962 | RICOH AUTO HALF | Highly popular half-framed model |
| | Sept. 1978 | RICOH XR500 | A model that made single lens reflex cameras popular in Japan |
| | Oct. 1988 | MIRAI | A 4X power zoom autofocus model |
| | Apr. 1994 | RICOH XR SOLAR | A solar-powered model |
| | Sept. 1994 | RICOH R1 | The world's slimmest compact camera |
| | Oct. 1996 | RICOH GR1 | An ultraslim, high-end compact camera |
| | Feb. 1998 | RICOH GR10 | A high-image-quality, affordable compact camera |
| | Mar. 2001 | RICOH GR21 | A compact camera with high-performance, wide-angle 21mm lens |
| **Digital cameras** | Apr. 1995 | RICOH DC-1 | A multimedia still and video camera that can record sound and transmit images |
| | Jun. 1996 | RICOH DC-2L | Inexpensive model, with multiple functions and high image quality |
| | Jul. 1997 | RICOH DC-3 | High-performance, low-cost model for personal use |
| | Apr. 1999 | RDC-5000 | A 2.3-million-pixel compact camera |
| | Sept. 2000 | RDC-i700 | Communications-ready model able to send images via email |
| | Jun. 2001 | Caplio RR10 | A 2.11-million-pixel compact camera able to easily send data to PCs |
| | Sept. 2002 | Caplio RR30 | A 3.24 megapixel compact digital camera with a 0.22 second release time lag |
| | Feb. 2003 | Caplio G3 | Digital camera with improved 0.14 second release time lag |
| **CD-R/RW DVD+RW/+R** | Oct. 1992 | CD-R discs | Ricoh's first mass-produced CD-Recordable discs |
| | Oct. 1992 | RICOH RS-9200CD | Ricoh's first CD-Recordable drive |
| | Nov. 1996 | CD-RW disc | The world's first CD-ReWritable media |
| | Apr. 1997 | RICOH MP6200 SERIES | The world's first CD-R/RW drive |
| | Oct. 1999 | RICOH MP9060A | CD-R/RW drive that can read DVD-ROMs |
| | Sept. 2001 | RICOH MP5120A | First drive compatible with both DVD and RW formats |
| | Sept. 2001 | DVD and RW disc | Media compatible with DVD and RW formats |
| | Apr. 2002 | RICOH MP5125A | Drive compatible with DVD and R formats in addition to DVD and RW |
| | Apr. 2002 | DVD + R disc | Write-once type DVD media |
| | Jun. 2003 | RICOH MP5240A | DVD+RW/+R4x drive |

| Product Group | Year | Product Name (Overseas names in parentheses) | Remarks |
|---|---|---|---|
| **Semiconductor devices** | Apr. 1982 | Real-time clock IC | Equipment clock controller |
| | May 1983 | 64-kilobit mask ROM | Game machine IC |
| | Jul. 1987 | One-chip FAX engine | A single chip incorporating fax functions |
| | Oct. 1987 | Power source IC | Equipment voltage regulator |
| | Dec. 1989 | Voice recognition LSI | LSI sold with chip mounted on board |
| | Oct. 1990 | CD-R signal processing LSI | LSI that conforms with international Orange Book standard |
| | Jul. 1993 | Image compression/expansion LSI | LSI that processes at high speed in line with JPEG standards |
| | Aug. 1996 | Voice synthesis chip set | Chip set that delivers superior sound quality |
| | Jun. 2001 | RF5V 850/860 SERIES | Specialized processor for middleware image processing in photocopiers |
| | Jul. 2001 | LSI conforming to JPEG 2000 | World's first processor of animated images |
| | Sept. 2001 | R1113Z | World's smallest power IC |
| | Apr. 2002 | R5C590 | PC-interfaced LSI integrating three functions onto one chip |
| | Jun. 2002 | RC5T623 | ASSP, a power supply system for mobile phones |
| **Supplies** | Feb. 1936 | Positive Sensitized Paper | Ricoh's first commercial product |
| | Apr. 1953 | ND Positive Sensitized Paper | Japan's first blue moist sensitized development paper |
| | Feb. 1975 | Type 1000 Toner | Ricoh's first wet developer toner |
| | Oct. 1980 | Ricoh Thermal Paper Type 110LA | The first storable thermal paper for food point-of-sale systems |
| | Jul. 1990 | Shigen | Recycled paper |
| | Oct. 1991 | TC Film TCK01 | An advanced heat-reversible information display film |
| | Jan. 1994 | Ricoh Thermal Paper Type 130LHB | The first high-sensitivity, highly durable thermal paper to resist coloring even at 100°C |
| | Oct. 1995 | CLEANART Transparent Thermal Paper | A high-sensitivity transparent thermal film for environmentally friendly dry printing plates |
| | Dec. 2000 | Ricoh Diazo Photosensitive Paper N-90R | World's first neutral-temperature diazo photosensitive paper for blueing |
| **Internet service peripherals** | Oct. 1997 | nextlink | Management information support service |
| | Oct. 1997 | RICOH Photonet | Digital photo storage and printing service |
| | Mar. 2000 | NetRICOH | One-to-one marketing portal site |

JPEG-standard LSI

NetRICOH

# Key Financial Figures

## Consolidated



**Sales by Product Line**
(¥ million)

- Office equipment
- Other businesses

| | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 968,318 | 1,020,296 | 1,113,030 | 1,316,072 | 1,403,348 | 1,425,999 | 1,447,157 | 1,538,262 | 1,672,340 | 1,738,358* |
| Office equipment | 814,080 | 866,109 | 941,873 | 1,136,712 | 1,213,468 | 1,250,938 | 1,253,070 | 1,338,374 | 1,485,389 | 1,520,574 |
| Percentage of net sales | 84.1% | 84.9% | 84.6% | 86.4% | 86.5% | 87.7% | 86.6% | 87.0% | 88.8% | 87.5% |
| Other businesses | 154,238 | 154,187 | 171,157 | 179,360 | 189,880 | 175,061 | 194,087 | 199,888 | 186,951 | 217,784 |
| Percentage of net sales | 15.9% | 15.1% | 15.4% | 13.6% | 13.5% | 12.3% | 13.4% | 13.0% | 11.2% | 12.5% |

Note: From fiscal 2000, Ricoh moved optical disc products from other businesses to the communications and information systems category
*The Company has posted nine consecutive annual increases in net sales from fiscal 1995, and has achieved eight consecutive years of record net sales from fiscal 1996

**<Reference>**

| | 1999 | | | 2000 | | | 2001 | | | 2002 | | | 2003 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Domestic | Overseas | Total | Domestic | Overseas | Total | Domestic | Overseas | Total | Domestic | Overseas | Total | Domestic | Overseas |
| Total | 1,425,999 | 820,975 | 605,024 | 1,447,157 | 873,170 | 573,987 | 1,538,262 | 930,433 | 607,829 | 1,672,340 | 902,655 | 769,685 | 1,738,358 | 896,022 | 842,336 |
| Office equipment | 1,250,938 | 688,186 | 562,752 | 1,253,070 | 715,786 | 537,284 | 1,338,374 | 768,638 | 569,736 | 1,485,389 | 753,053 | 732,336 | 1,520,574 | 728,657 | 791,917 |
| Imaging solutions | 954,306 | 458,072 | 496,234 | 898,023 | 448,930 | 449,093 | 867,033 | 434,768 | 432,265 | 934,180 | 392,183 | 541,997 | 859,713 | 346,174 | 513,539 |
| Networking input/output systems | 128,356 | 62,354 | 66,002 | 173,108 | 87,170 | 85,938 | 261,838 | 129,160 | 132,678 | 344,247 | 156,239 | 188,008 | 463,379 | 187,610 | 275,769 |
| Network system solutions | 168,276 | 167,760 | 516 | 181,939 | 179,686 | 2,253 | 209,503 | 204,710 | 4,793 | 206,962 | 204,631 | 2,331 | 197,482 | 194,873 | 2,609 |
| Others | 175,061 | 132,789 | 42,272 | 194,087 | 157,384 | 36,703 | 199,888 | 161,795 | 38,093 | 186,951 | 149,602 | 37,349 | 217,784 | 167,365 | 50,419 |

Note: Office equipment (copiers and related supplies plus communication and information systems) has been further sub-divided to more accurately reflect recent changes in operations.
From fiscal 2000, Ricoh moved optical disc products from others to networking input/output systems category.



**Net Income**
(¥ million)

| | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net income | 9,520 | 18,593 | 21,869 | 28,922 | 30,131 | 30,655 | 41,928 | 53,228 | 61,614 | 72,513* |
| Change from previous year | +89.8% | +95.3% | +17.6% | +32.3% | +4.2% | +1.7% | +36.8% | +27.0% | +15.8% | +17.7% |

*The Company has posted eleven consecutive years of increases in net income since fiscal 1993, and has achieved nine consecutive years of record net income from fiscal 1995



**Sales by Region** (¥ million)

¥ billion

Legend:
- Japan
- The Americas
- Europe
- Other

| | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | 968,318 | 1,020,296 | 1,113,030 | 1,316,072 | 1,403,348 | 1,425,999 | 1,447,157 | 1,538,262 | 1,672,340 | 1,738,358 |
| **Overseas sales ratio** | 25.7% | 26.4% | 29.7% | 37.6% | 40.8% | 42.4% | 39.7% | 39.5% | 46.0% | 48.5% |
| Japan | 719,221 | 750,657 | 782,127 | 821,004 | 831,339 | 820,975 | 873,170 | 930,433 | 902,655 | 896,022 |
| Percentage of net sales | 74.3% | 73.6% | 70.3% | 62.4% | 59.2% | 57.6% | 60.3% | 60.5% | 54.0% | 51.5% |
| The Americas* | 114,217 | 112,030 | 135,107 | 204,157 | 230,342 | 239,623 | 231,181 | 252,698 | 341,747 | 343,940 |
| Percentage of net sales | 11.8% | 11.0% | 12.1% | 15.5% | 16.4% | 16.8% | 16.0% | 16.4% | 20.4% | 19.8% |
| Europe | 94,958 | 110,604 | 141,959 | 209,548 | 252,042 | 283,373 | 258,515 | 247,449 | 311,312 | 354,477 |
| Percentage of net sales | 9.8% | 10.8% | 12.8% | 15.9% | 18.0% | 19.9% | 17.9% | 16.1% | 18.6% | 20.4% |
| Other | 39,922 | 47,005 | 53,837 | 81,363 | 89,625 | 82,028 | 84,291 | 107,682 | 116,626 | 143,919 |
| Percentage of net sales | 4.1% | 4.6% | 4.8% | 6.2% | 6.4% | 5.8% | 5.8% | 7.0% | 7.0% | 8.3% |

* Introduced in fiscal 1997, this category includes North, Central and South America.



**Net Income per Share** (¥)

¥

Legend:
- Basic
- Diluted

| Net income per share | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|
| Basic | 14.61 | 28.54 | 33.55 | 44.16 | 44.97 | 44.33 | 60.61 | 76.85 | 88.27 | 99.79 |
| Diluted | 14.47 | 26.43 | 31.21 | 38.95 | 41.35 | 40.94 | 56.06 | 71.02 | 82.46 | 96.81 |

## Consolidated

**Total Assets**
(¥ million)



| | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total assets | 1,238,275 | 1,320,617 | 1,508,519 | 1,644,896 | 1,660,496 | 1,628,017 | 1,543,320 | 1,704,791 | 1,832,928 | 1,884,922 |
| Change from previous year | +0.8% | +6.6% | +14.2% | +9.0% | +0.9% | −2.0% | −5.2% | +10.5% | +7.5% | +2.8% |

**Shareholders' Investment**
(¥ million)
**Equity Ratio** (%)



■ Shareholders' investment
— Equity ratio

| | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|
| Shareholders' investment | 349,945 | 377,840 | 401,471 | 422,923 | 475,005 | 487,459 | 541,506 | 556,728 | 633,020 | 657,514 |
| Change from previous year | −0.5% | +8.0% | +6.3% | +5.3% | +12.3% | +2.6% | +11.1% | +2.8% | +13.7% | +3.9% |
| Equity ratio | 28.3 | 28.6 | 26.6 | 25.7 | 28.6 | 29.9 | 35.1 | 32.7 | 34.5 | 34.9 |

**Cash Flows**
(¥ million)



| | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash flows (Net income plus depreciation and amortization) | 58,675 | 63,553 | 68,299 | 79,922 | 92,102 | 98,111 | 103,874 | 115,370 | 135,396 | 149,064 |
| Change from previous year | −3.6% | +8.3% | +7.5% | +17.0% | +15.2% | +6.5% | +5.9% | +11.1% | +17.4% | +10.1% |

# Global Network



- ● Marketing and Other Operations
- ■ R&D and Manufacturing Facilities

Ricoh Electronics, Inc.
Tustin Plant
Santa Ana Plant
Irvine Plant

Ricoh Canada Inc.

Savin Corporation
Ricoh Corporation
Ricoh Finance Corporation

Ricoh Innovations, Inc.

Ricoh Industrial
de Mexico,
S.A. de C.V.

Lanier Worldwide, Inc.
Ricoh Electronics, Inc.
Georgia Plant

Ricoh Corporation
Office Solutions and Systems Development Group

Ricoh Latin America, Inc.

Ricoh Mexicana, S.A. de C.V.

Lanier Dominicana, S.A.

Lanier de Guatemala, S.A.

NRG Distribution Corporation
Lanier Puerto Rico, Inc.

Lanier de El Salvador, S.A. de C.V.
Lanier de Costa Rica, S.A.

Gestetner S.A.

Lanier de Panama, S.A.

Gestetner
Colombia S.A.

Lanier Colombia, S.A.

Gestetner S.A.

Gestetner do Brazil S.A.

Lanier de Chile, S.A.

Ricoh South America
Distribution Center S.A.

Ricoh Latin America
Distribution Center S.A.

Gestetner Limitada

Ricoh Argentina S.A.

| Group Companies on a Consolidated Basis | 395 |
|---|---|
| Japan | 133 |
| Overseas | 262 |

As of March 31, 2003



NRG Gestetner Ireland Limited
**GR Advanced Materials Ltd.**
**Ricoh Wellingborough Products Ltd.**
NRG International Limited

**Ricoh UK Products Ltd.**

Ricoh UK Ltd.
NRG Group PLC
Midland Copying
Consultants Limited
NRG Group UK Ltd.
Lanier United Kingdom Limited

**Ricoh European Digital
Solution Center**

NRG Scandinavia A/S
Ricoh Norge A.S.
NRG Scandinavia AB
Mitsui-Ricoh CIS Ltd.
Ricoh Polska Sp.zo.o.
Ricoh Finland Oy
NRG Belgium S.A.
Lanier Belgium N.V./S.A.
**Ricoh Industrie France S.A.**
Ricoh France S.A.
NRG France S.A.
Rex-Rotary S.A.

Lanier Deutschland GmbH & Co. KG
NRG Deutschland GmbH
Ricoh Deutschland GmbH

Ricoh Europe B.V.
Ricoh Nederland B.V.
Ricoh Finance Nederland B.V.
Kulk & Kramer Kantoorsystemen B.V.
NRG Benelux B.V.
Lanier C.V.

**Tohoku Ricoh (Fuzhou)
Printing Products Co., Ltd.**

Ricoh Thailand
Ltd.

Gesteiner
(Israel) Limited

Ricoh Hungary Kft.
Ricoh Austria GmbH
Lanier Burosysteme GmbH & Co.KG

Ricoh Italia S.p.A.
NRG Italia S.p.A.
Lanier Italia S.p.A.
Lanier (Schweiz) AG

NRG Gestetner South Africa (Pty) Ltd.

Ricoh España S.A.
NRG Group Spain S.A.

Lanier España S.A.

**Sindo Ricoh Co., Ltd.**
Ricoh Electronic
Technology Ltd. (Beijing)
**Ricoh Company, Ltd.**
Ricoh China Co., Ltd.
Ricoh Electronic Technology Ltd.
(China)
**Shanghai Ricoh Facsimile Co., Ltd.**
**Ricoh International (Shanghai) Co., Ltd.**
**Ricoh Software Technology (Shanghai) Co., Ltd.**
**Taiwan Ricoh Co., Ltd.**

Ricoh
Philippines, Inc.

Ricoh Hong Kong Ltd.
Ricoh Asia industry Ltd.
Ricoh Component (H.K.) Ltd.
Ricoh Elemex (H.K.) Ltd.
Ricoh International
Logistics (H.K.) Ltd.
**Ricoh Eleme Office Machine
(H.K.) Ltd.**
**Ricoh Microelectronics (H.K.) Ltd.**
**Ricoh Asia Industry
(Shenzhen) Ltd.**
**Ricoh Dianzhuang (Shenzhen)
Electronics Co., Ltd.**
**Dongguan Ricoh Eleme Office
Machine Co., Ltd.**

Ricoh Asia
Pacific Pte. Ltd.
Ricoh Singapore
Pte. Ltd.
Ricoh Malaysia
Sdn. Bhd.
Ricoh India Limited
Gestetner (India) Limited

Ricoh Australia Pty. Ltd.
Hanimex Pty. Limited
Rabbit Photo Holdings Limited

Lanier (Australia) Pty. Ltd.

Ricoh New Zealand Limited
Hanimex (NZ) Limited
Camera House Limited
Viko New Zealand Limited

# Principal Overseas Operations

## SALES

| Facility & Company | Address | Telephone No.<br>Fax No. | Establishment | Area of Operation |
|---|---|---|---|---|
| Ricoh Corporation | 5 Dedrick Place, West Caldwell,<br>New Jersey 07006, U.S.A. | (1) 973-882-2000<br>(1) 973-882-2048 | December<br>1962 | Marketing in U.S.A. |
| Lanier Worldwide, Inc. | 2300 Parklake Drive. NE, Atlanta, Georgia 30345,<br>U.S.A. | (1) 770-496-9500 | January<br>2001* | Marketing in U.S.A., Europe,<br>Australia and Asia |
| Savin Corporation | Stamford Harbor Park, 333 Ludlow Street,<br>Stamford, Connecticut 06904, U.S.A. | (1) 203-967-5000<br>(1) 203-967-5005 | March<br>1995* | Marketing in U.S.A. |
| Ricoh Latin America, Inc. | 7650 NW 19 Street,<br>Suite #290, Miami, Florida 33126, U.S.A. | (1) 305-597-1000<br>(1) 305-597-1055 | October<br>1997 | Marketing in Latin America |
| Ricoh Silicon Valley, Inc. | 4 Results Way, Cupertino,<br>California 95014, U.S.A. | (1) 408-346-4500<br>(1) 408-346-4453 | March<br>1997 | Developing and Marketing |
| Ricoh Canada Inc. | 4100 Yonge Street, Suite 600, Toronto,<br>Ontario, M2P 2B5, Canada | (1) 416-218-8202<br>(1) 416-218-8261 | January<br>1997 | Marketing in Canada |
| Ricoh Mexicana, S.A. de C.V. | Insurgentes Sur664 Colonia Del Valle,<br>Mexico, D.F CP 03100 | (525) 682-9360<br>(525) 536-1326 | October<br>1991 | Marketing in Mexico |
| Ricoh Europe B.V. | Groenelaan 3, 1186 AA,<br>Amstelveen, Netherlands | (31) 20-5474-111<br>(31) 20-6473-504 | November<br>1971 | Marketing in Europe, Middle East,<br>and Africa |
| Ricoh Nederland B.V. | Basicweg 24, 3821 BR,<br>Amersfoort, Netherlands | (31) 33-4507-811<br>(31) 33-4507-860 | April<br>1988 | Marketing in the Netherlands |
| Ricoh Austria GmbH | Kettenbruckengasse 16, 1052,<br>Vienna, Austria | (43) 1-588-650<br>(43) 1-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 | November<br>1996 | Marketing in Austria, Bosnia-<br>Herzegovina, Macedonia and<br>Yugoslavia |
| Ricoh Deutschland GmbH | Mergenthalerallee 38-40, 65760,<br>Eschborn, Germany | (49) 6196-9060<br>(49) 6196-45104 | July<br>1978 | Marketing in Germany |
| Ricoh UK Ltd. | Ricoh House, 1 Plane Tree Crescent,<br>Feltham, Middlesex TW13 7HG, U.K. | (44) 20-8261-4000<br>(44) 20-8261-4004 | July<br>1980 | Marketing in U.K. and Ireland |
| NRG Group PLC | 68 Chiltern Street, London<br>W1U 4AG, U.K. | (44) 20-7465-1000<br>(44) 20-7465-1127 | September<br>1995* | Marketing in Europe, Middle East,<br>and Africa |
| Ricoh France S.A. | 383, Avenue du Général de Gaulle<br>BP307, 92143 Clamart Cédex, France | (33) 1-4094-3838<br>(33) 1-4094-3535 | May<br>1986 | Marketing in France |
| Ricoh Italia S.p.A. | Viale Della Metallurgia 12,<br>Zona Basson 37139 Verona, Italy | (39) 045-8181500<br>(39) 045-8510009 | September<br>1990 | Marketing in Italy |
| Ricoh España S.A. | Avda. Litoral Mar. 12-14 08005,<br>Barcelona, Spain | (34) 9-3-295-7600<br>(34) 9-3-295-7605 | April<br>1986 | Marketing in Spain |
| Ricoh Norge A.S. | Gjerdrumsvel 11 Nydalen Park,<br>P.O Box 73, 0409 Oslo, Norway | (47) 22-58-7800<br>(47) 22-58-1716 | February<br>1987 | Marketing in Norway |
| Ricoh Hungary Kft. | Lomb. U 37-39 H-1139, Budapest,<br>Hungary | (36) 1-270-9797<br>(36) 1-270-9799 | May<br>1995 | Marketing in Hungary |
| Ricoh Polska Sp.zo.o. | Al. Jerozolimskie 146 A 02-305 Warsaw,<br>Poland | (48) 22-608-1555<br>(48) 22-608-1580 | April<br>1996 | Marketing in Poland |
| Ricoh Europe B.V. Belgium Branch | Horizon Park Leuvensesteenweg 510, Gebouw 7,<br>Bus 46, 1930 Zaventem, Belgium | (32) 271-212-12<br>(32) 271-212-13 | April<br>1985 | Marketing in Belgium |
| Ricoh Europe B.V. Portugal Branch | Rua da Paz 66-06, 4050 PORTO,<br>Portugal | (351) 2-2-608-3800<br>(351) 2-2-600-3639 | January<br>1994 | Marketing in Portugal |
| Ricoh Hong Kong Ltd. | 21/F., Tai Yau Building,<br>181 Johnston Road, Wan Chai, Hong Kong | (852) 2862-2888<br>(852) 2866-1120 | December<br>1978 | Marketing in China, Hong Kong,<br>and Taiwan |
| Ricoh Asia Pacific Pte. Ltd. | 260 Orchard Road, #15-01/02 The Heeren,<br>Singapore 238855 | (65) 6830-5888<br>(65) 6830-5830 | December<br>1996 | Marketing in Asia and Oceania |
| Ricoh China Co., Ltd. | 29/F., Lippo Plaza No.222 Huai Hai Zhong Road,<br>Lu Wan District, Shanghai 200021,<br>People's Republic of China | (86) 21-5396-6888<br>(86) 21-5396-5860 | January<br>2003 | Marketing in China |
| Ricoh Asia Industry Ltd. | 16/F., Grandmark, 8A-10, Grandville Road,<br>Tsimshatsui, Kowloon, Hong Kong | (852) 2368-4238<br>(852) 2367-7162 | December<br>1990 | Marketing in Hong Kong |
| Ricoh Electronic Technology (China) Co., Ltd. | 2F., 3F., No. 30 Building, 69 Gui Qing Road,<br>Shanghai 200233, People's Republic of China | (86) 21-6485-1058<br>(86) 21-6485-0201 | April<br>1995 | Maintenance in China |
| Ricoh Electronic Technology (Beijing) Co., Ltd. | No. 6 Yangfangdian Road,<br>Haidian District, Beijing 100038,<br>People's Republic of China | (86) 10-6396-9392<br>(86) 10-6396-9153 | August<br>1995 | Marketing supplies in China |
| Ricoh Software Technology (Shanghai) Co., Ltd. | Xinyin Building 20F, No. 888 Yishan Road,<br>Shanghai, People's Republic of China | (86) 21-6495-8992<br>(86) 21-6495-8994 | June<br>2002 | Software development |
| Ricoh International Logistics (H.K.) Ltd. | 9/F., No. 100 Canton Road, Tsimshatsui, Kowloon,<br>Hong Kong | (852) 2369-7128<br>(852) 2369-7382 | February<br>1995 | Logistics, warehousing, packaging,<br>export and import |
| Ricoh India Limited | 52-B, First Floor, Okhla Industrial Estate (Phase III)<br>New Delhi, 110 020 India | (91) 11-631-1480<br>(91) 11-631-2241 | October<br>1993 | Marketing in India |
| Ricoh Australia Pty, Ltd. | 8 Rodborough Road, Frenchs Forest,<br>NSW 2086, Australia | (61) 2-8977-1111<br>(61) 2-8977-1100 | March<br>1995 | Marketing in Australia |

*indicates data when company became part of the Ricoh Group

## MANUFACTURING

| Facility & Company | Address | Telephone No. Fax No. | Establishment/Group Incorporation | Area of Operation |
|---|---|---|---|---|
| Ricoh Electronics, Inc. | One Ricoh Square, 1100 Valencia Avenue, Tustin, California 92780, U.S.A. | (1) 714-566-2500 (1) 714-566-2507 | January 1973 | Office equipment and supplies |
| Ricoh Electronics, Inc. Georgia Plant | 1125 Hurricane Shoals Road, Lawrenceville, Georgia 30243, U.S.A. | (1) 770-338-7200 (1) 770-338-7250 | June 1988 | Supplies |
| Ricoh UK Products Ltd. | Priorslee, Telford, Shropshire TF2 9NS, U.K. | (44) 1952-29-0090 (44) 1952-29-0288 | December 1983 | Copiers and supplies |
| GR Advanced Materials Ltd. | P.O. Box 22 Stirling FK9 5N2 Scotland, U.K. | (44) 178-644-6555 (44) 178-844-1288 | January 1994 | Supplies for duplicators |
| Ricoh Industrie France S.A. | 144 Route de Rouffach 68920, Wettolsheim, France | (33) 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 (33) 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 | April 1987 | Copiers, fax machines, and supplies |
| Taiwan Ricoh Co., Ltd. | 34 Lane 200, Jwu Her Road, Fuh Shing Li, Chang Hwa, Taiwan | (886) 47-224661 (886) 47-251540 | June 1966 | Photographic equipment |
| Ricoh Component (H.K.) Ltd. | 13/F., Grandmark, 8A-10, Grandville Road, Tsimshatsui, Kowloon, Hong Kong | (852) 3684-238 (852) 3677-162 | March 1994 | Parts and components |
| Ricoh Asia Industry (Shenzhen) Ltd. | Color TV Industrial Zone, Futian District, Shenzhen, People's Republic of China | (86) 21-755-3360-885 (86) 21-755-3344-944 | January 1991 | Copiers |
| Ricoh Dianzhuang (Shenzhen) Electronics Co., Ltd. | Shangmei Lin, Beihuan Road, Shenzhen, People's Republic of China | (86) 755-331-8240 (86) 755-331-8234 | September 1992 | Copiers |
| Ricoh International (Shanghai) Co., Ltd. | F-7-6 Block Xiya-Lu, Waigaoqiao Free Trade Zone, Shanghai, People's Republic of China | (86) 21-5046-0698 (86) 21-5046-0690 | December 1996 | Fax machines and copiers |
| Shanghai Ricoh Facsimile Co., Ltd. | No. 885, Jingang Road, Jinqiao Export Processing Area, Pudong, Shanghai, People's Republic of China | (86) 21-5854-9000 (86) 21-5854-8999 | October 1993 | Fax machines |
| Sindo Ricoh Co., Ltd. | 277-22, 2Ka, Sungsu-Dong, Sungdong-ku, Seoul 133, Republic of Korea | (82) 2-463-3781 (82) 2-464-3194 | July 1960 | Copiers, fax machines, and supplies |

## R&D

| Facility & Company | Address | Telephone No. Fax No. | Establishment/Group Incorporation | Area of Operation |
|---|---|---|---|---|
| Ricoh Innovations, Inc. | 2882 Sand Hill Road, Suite 115, Menlo Park, California 94025-7022, U.S.A. | (1) 650-496-5700 (1) 650-854-8740 | March 1997 | Basic and applied R&D and venture capital financing |
| Ricoh Corporation Offices Solutions and Systems Development Group | 2071 Concourse Drive, San Jose, California 95131, U.S.A. | (1) 408-432-8800 (1) 408-944-3316 | May 1994 | OA-related equipment |
| Ricoh European Digital Solution Center | Oberrather Strasse 6, 40472 Dusseldorf, Germany | (49) 21-165-460 (49) 21-165-6111 | October 1987 | Communications-related equipment |

# Domestic Network



● Marketing and Other Operations

■ R&D and Manufacturing Facilities

| Sales Bases | 8 branches and 51 sales subsidiaries |
|---|---|
| Service Bases | 858 |
| Production Facilities | 14 |
| R&D Facilities | 20 |

As of March 31, 2003

Ricoh System Kaihatsu Co., Ltd. (Kitami)

Sapporo Branch

Tohoku Ricoh Co., Ltd.

Ricoh System Kaihatsu Co., Ltd. (Akita)

Ricoh Unitechno Co., Ltd.

Kanto Branch

Ricoh Optical Industries Co., Ltd.

Hasama Ricoh, Inc.

Ikeda Plant
Imaging LSI R&D Center

Software Research Center

Ricoh Tohoku Co., Ltd.
Sendai Branch

Ricoh Microelectronics Co., Ltd.

General Electronics R&D Center

Ricoh Tottori Technical Development Co., Ltd.

Tokyo Branch
Aoyama Office
Ohmori Office
Imaging Technology Division

Ricoh System Kaihatsu Co., Ltd.

Ricoh Chugoku Co., Ltd.
Hiroshima Branch

System Center
Ricoh Leasing Co., Ltd.
Ricoh Logistics System Co., Ltd.

Ricoh Kyushu Co., Ltd.
Fukuoka Branch

Shin-Yokohama Office

Research and Development Center
Office System R&D Center
Photonics R&D Center
Environmental Technology R&D Center
Optical Memory R&D Center

Toda Technical Center

Atsugi Plant
Manufacturing Technology R&D Center

Ricoh System Kaihatsu Co., Ltd. (Kagoshima)

Service Parts Center

Hatano Plant

Yashiro Plant

Gotemba Plant

Ricoh Kansai Co., Ltd.
Osaka Branch

Numazu Plant

Fukui Plant

Ricoh Keiki Co., Ltd.    Ricoh Chubu Co., Ltd.
Nagoya Branch

Ricoh Elemex Corporation



# Major Domestic Operations

| Facility & Company | Address | Telephone No. Fax No. | Establishment/Group Membership Date | Area of Operation |
|---|---|---|---|---|
| Atsugi Plant | 1005 Shimo-Ogino, Atsugi, Kanagawa 243-0298, Japan | (81) 46-241-1511 (81) 46-241-5813 | May 1971 | OA equipment and other products |
| Numazu Plant | 16-1 Honda-machi, Numazu, Shizuoka 410-8505, Japan | (81) 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 (81) 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 | April 1960 | Supplies |
| Ikeda Plant | 13-1 Himemuro-cho, Ikeda, Osaka 563-8501, Japan | (81) 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 (81) 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 | April 1981 | Electronic devices |
| Hatano Plant | 423 Hirasawa, Hadano, Kanagawa 257-8586, Japan | (81) 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 (81) 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 | July 1982 | Printed circuit boards and electronic components |
| Fukui Plant | 64-1 Ohmi, Sakai-cho, Sakai-gun, Fukui 919-0547, Japan | (81) 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 (81) 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 | May 1982 | Supplies |
| Gotemba Plant | 1-10 Komakado, Gotemba, Shizuoka 412-0038, Japan | (81) 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 (81) 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 | October 1985 | Copiers, fax machines, and data processing systems |
| Yashiro Plant | 30-1 Saho, Yashiro-cho, Kato-gun, Hyogo 673-1447, Japan | (81) 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 (81) 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 | April 1989 | Electronic devices |
| Ricoh Optical Industries Co., Ltd. | 10-109 Ohata, Hanamaki, Iwate 025-0303, Japan | (81) 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 (81) 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 | July 1973 | Photographic equipment |
| Tohoku Ricoh Co., Ltd. | 3-1 Shinmeido, Nakanomyo, Shibata-machi, Shibata-gun, Miyagi 989-1695, Japan | (81) 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 (81) 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 | July 1967 | OA equipment and parts for copiers |
| Hasama Ricoh, Inc. | 86 Aza-Kitasanden, Sanuma, Hasama-cho, Tome-gun, Miyagi 987-0511, Japan | (81) 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 (81) 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 | April 1973 | Parts for copiers, and data processing equipment |
| Ricoh Unitechno Co., Ltd. | 713 Tsurugasone, Yashio, Saitama 340-0802, Japan | (81) 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 (81) 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 | October 1967 | Fax machines, copiers, and microfilm equipment |
| Ricoh Keiki Co., Ltd. | 3144-1 Aza-Ipponguri Shimoizumi, Kuboizumi-machi, Saga 849-0903, Japan | (81) 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 (81) 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 | March 1950 | Parts for copiers and data processing equipment |
| Ricoh Microelectronics Co., Ltd. | 10-3 Kitamura, Tottori 680-0911, Japan | (81) 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 (81) 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 | April 1988 | Printed circuit boards |
| Ricoh Elemex Corporation | 2-13 Nishiki 2-chome, Naka-ku, Nagoya, Aichi 460-0003, Japan | (81) 52-223-5221 (81) 52-223-5271 | April 1938 | OA equipment, clocks, watches, and educational equipment |
| Research and Development Center | 16-1 Shinei-cho, Tsuzuki-ku, Yokohama, Kanagawa 224-0035, Japan | (81) 45-593-3411 (81) 45-593-3482 | April 1986 | Materials and devices R&D |
| Manufacturing Technology R&D Center | c/o Atsugi Plant, 1005 Shimo-Ogino, Atsugi, Kanagawa 243-0298, Japan | (81) 46-241-1511 (81) 46-241-8958 | April 1985 | Manufacturing system technology R&D |
| Office System R&D Center | c/o Research and Development Center, 16-1 Shinei-cho, Tsuzuki-ku, Yokohama, Kanagawa 224-0035, Japan | (81) 45-593-3411 (81) 45-593-3482 | August 1997 | Total R&D forecasting future offices |
| Imaging Technology Division | c/o Ohmori Office, 1-3-6 Nakamagome, Ota-ku, Tokyo 143-8555, Japan | (81) 3-3777-8111 | April 1999 | Imaging technology-related R&D |
| Imaging LSI R&D Center | c/o Ikeda Plant, 13-1 Himemuro-cho, Ikeda, Osaka 563-8501, Japan | (81) 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 (81) 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 | September 1983 | Electronic device component technology R&D |
| Software R&D Group | Tomin Nissei Kasuga-cho Bldg., 1-17 Koishikawa 1-chome, Bunkyo-ku, Tokyo 112-0002, Japan | (81) 3-3815-7261 (81) 3-3818-0348 | May 1982 | Software R&D |
| Toda Technical Center | 2446, Toda, Atsugi, Kanagawa 243-0023, Japan | (81) 46-228-1371 (81) 46-228-2590 | July 1980 | Communications-related equipment R&D |
| Photonics R&D Center | c/o Research and Development Center, 16-1 Shinei-cho, Tsuzuki-ku, Yokohama, Kanagawa 224-0035, Japan | (81) 45-593-3411 (81) 45-593-3482 | April 2002 | Photonics-related technology R&D |
| Environmental Technology R&D Center | c/o Research and Development Center, 16-1 Shinei-cho, Tsuzuki-ku, Yokohama, Kanagawa 224-0035, Japan | (81) 45-593-3411 (81) 45-593-3482 | April 2002 | Environmental technology R&D |
| Optical Memory R&D Center | c/o Research and Development Center, 16-1 Shinei-cho, Tsuzuki-ku, Yokohama, Kanagawa 224-0035, Japan | (81) 45-593-3411 (81) 45-593-3482 | April 2002 | Optical memory-related technology R&D |
| General Electronics R&D Center | 5-10 Aza-Yokata-kami, Kumanodo Takadate, Natori, Miyagi 981-1243, Japan | (81) 22-386-2011 | | Compounds and devices R&D |
| Ubiquitous Solution Lab | Tomin Nissei Kasuga-cho Bldg., 1-17 Koishikawa 1-chome, Bunkyo-ku, Tokyo 112-0002, Japan | (81) 3-3815-7261 (81) 3-3818-0348 | October 2002 | Document management solutions related technology R&D |
| Image Appliance Lab | Tomin Nissei Kasuga-cho Bldg., 1-17 Koishikawa 1-chome, Bunkyo-ku, Tokyo 112-0002, Japan | (81) 3-3815-7261 (81) 3-3818-0348 | October 2002 | Image processing and recognition technologies R&D |
| Multimedia Lab | Tomin Nissei Kasuga-cho Bldg., 1-17 Koishikawa 1-chome, Bunkyo-ku, Tokyo 112-0002, Japan | (81) 3-3815-7261 (81) 3-3818-0348 | October 2002 | Multimedia data management R&D |
| Network and Systems Lab | Tomin Nissei Kasuga-cho Bldg., 1-17 Koishikawa 1-chome, Bunkyo-ku, Tokyo 112-0002, Japan | (81) 3-3815-7261 (81) 3-3818-0348 | October 2002 | Network and communication, and user interface technologies R&D |
| Ricoh Tottori Software Technology Co., Ltd. | 1-100 Chiyomi, Tottori 680-1172, Japan | (81) 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 (81) 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 | September 1983 | Software R&D |
| Ricoh System Kaihatsu Co., Ltd. | Forefront Tower, 12-1, Kachidoki 3-chome, Chuo-ku, Tokyo 104-0054, Japan | (81) 3-5560-8911 (81) 3-5560-8915 | October 1982 | Software R&D |
| Ricoh System Kaihatsu Co., Ltd. (Kitami) | 592-7 Takiwa-cho 2-chome, Kitami, Hokkaido 090-0013, Japan | (81) 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 (81) 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 | October 1989 | Software R&D |
| Ricoh System Kaihatsu Co., Ltd. (Akita) | 6-46 Omachi 2-chome, Akita 010-0921, Japan | (81) 18-864-1211 (81) 18-864-1800 | April 1990 | Software R&D |
| Ricoh System Kaihatsu Co., Ltd. (Kagoshima) | 2-30 Yamanokuchi-cho, Kagoshima 892-0844, Japan | (81) 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 (81) 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 | October 1990 | Software R&D |

# Organization

As of April 1, 2003

Chairman — President

- Corporate Planning Division
  - Corporate Communication Center
  - Corporate Design Center
- Corporate Technology Planning Division
- Corporate Social Responsibility Division
  - Corporate Citizenship Promotion Office
- Supply Chain Management Planning Division
- CSM (Customer Satisfaction Management) Division
- Personnel Division
- Finance and Accounting Division
- Information Technology and Solution Division
- Legal Division
- Corporate Environment Division
- New Business Development Center
- Research and Development Group
  - Technical Personnel Development Center
  - Research and Development Center
  - Manufacturing Technology R&D Center
  - Office System R&D Center
  - Photonics R&D Center
  - Environmental Technology R&D Center
  - Optical Memory R&D Center
- Imaging Technology Division
- Software R&D Group
  - R&D Strategy and Planning Center
- α Task Force
  - β Task Force
- Imaging System Business Group
  - Business Strategy and Planning Center
  - Engineering Process Innovation Center
  - C&F (Copier & Fax) Business Division 1
  - C&F (Copier & Fax) Business Division 2
  - C&F (Copier & Fax) Business Division 3
  - P&S (Printer & System) Business Division
  - Recycle Business Division
  - Engine Development Division
  - Platform Development Division
  - Quality Assurance Center
- Production Business Group
  - Production Strategic Center
  - Procurement Control Center
  - Imaging System Production Division
  - Imaging System Component Production Division
  - RS (Reprographic Supply) Products Division
  - Imaging System Quality Assurance System Center
  - PCUP (PC Unit Products) Division
  - Optical Component Development Center
- Marketing Group
  - Business Strategic Planning Office
  - Business Innovation Center
  - e-CRM Center
  - Solution Marketing Center
  - Technical Services Center
  - Major Dealer and Distributor Sales Division
  - Sapporo Branch
  - Sendai Branch
  - Kanto Branch
  - Tokyo Branch
  - Nagoya Branch
  - Osaka Branch
  - Hiroshima Branch
  - Fukuoka Branch
  - Major Accounts Marketing Division
- International Marketing Group
- Thermal Media Company
- Personal MultiMedia Products Company
  - Strategic Management Control Center
  - Marketing & Sales Center
  - MultiMedia Printer Division
  - Image Capturing Solution Division
- Electronic Devices Company

# Senior Management

As of June 26, 2003

## BOARD OF DIRECTORS

### Chairman

Hiroshi Hamada

### President, Chief Executive Officer and Chief Operating Officer

Masamitsu Sakurai

### Deputy Presidents

Haruo Kamimoto

Tatsuo Hirakawa

### Executive Managing Directors

Naoto Shibata

Koichi Endo

Masami Takeiri

Masayuki Matsumoto

### Managing Directors

Makoto Hashimoto

Katsumi Yoshida

Kiyoshi Sakai

Shiroh Kondoh

Kazuo Togashi

Kazunori Azuma

### Directors

Josei Itoh
(Chairman of Nippon Life Insurance Company)

Nobuo Mii
(Managing Partner of IGNITE Group)

## CORPORATE AUDITORS

Hisaaki Koga

Hideyuki Takamatsu

Kenji Matsuishi

Takehiko Wada

## EXECUTIVE OFFICERS

### Executive Vice Presidents

Terumoto Nonaka

Tadatoshi Sakamaki

Etsuo Kobayashi

Hiroshi Tategami

Zenji Miura

### Senior Vice Presidents

Kenji Hatanaka

Hideko Kunii

Kunio Taniguchi

Hiroshi Kobayashi

Hiroshi Tsuruga

Kiyoto Nagasawa

Yutaka Ebi

Hiroo Matsuda

Hiroshi Adachi

Koji Sawa

## GROUP EXECUTIVE OFFICERS

### Senior Vice Presidents

Itsuo Kawaji

Takashi Nakamura

Yuji Inoue

Peter E. Hart

Masami Yoneyama

Bernard Decugis

Yoichi Shirahata

Norihisa Goto

# Corporate Data

As of March 31, 2003

| | |
|---|---|
| Corporate Name | Ricoh Company, Ltd. |
| Founded | February 6, 1936 |
| Capital | ¥120,461 million |
| Business Lines | <Imaging Solutions> Digital PPCs, color PPCs, printing machines, facsimile machines, analog PPCs, diazo copiers and related supplies and services, thermal paper, etc. <Networking Input/Output Systems> Multifunction printers, printer equipment and related supplies, services and software, optical disc products and systems, scanners, etc. <Network System Solutions> PCs, servers, networking equipment, network-related software, application software, services and support, etc. <Others> Optical equipment, semiconductors, etc. |
| Number of Employees | 74,600 |
| Headquarters | 15-5, Minami Aoyama 1-chome, Minato-ku, Tokyo 107-8544, Japan |
| Web Site | http://www.ricoh.com/ |

# Ricoh PR Contact List

**Ricoh Corporation**

5 Dedrick Place, West Caldwell,

New Jersey 07006, U.S.A.

Tel: (1) 973-882-2000

Fax: (1) 973-882-2506

Web Site: http://www.ricoh-usa.com/

**Ricoh Europe B.V.**

Groenelaan 3,

P.O. Box 114, 1186 AA

Amstelveen, Netherlands

Tel: (31) 20-5474111

Fax: (31) 20-5474154

Web Site: http://www.ricoh-europe.com/

**Ricoh Asia Pacific Pte. Ltd.**

260 Orchard Road, #15-01/02 The Heeren,

Singapore 238855

Tel: (65) 830-5888

Fax: (65) 830-5830

Web Site: http://www.ricoh.com.sg/

**Ricoh China Co., Ltd.**

29/F., Lippo Plaza No.222 Huai Hai Zhong Road,

Lu Wan District, Shanghai 200021,

People's Republic of China

Tel: (86) 21-5396-6888

Fax: (86) 21-5396-5860

**Ricoh Company, Ltd.**

15-5, Minami-Aoyama 1-chome,

Minato-ku, Tokyo 107-8544, Japan

Tel: (81) 3-3479-3111

Fax: (81) 3-3403-1578

Web Site: http://www.ricoh.com/

PRINTED WITH
SOY INK

July 15, 2003



WINNING IN COLO



ANNUAL REPORT 2003

## CORPORATE PROFILE

Ricoh Company, Ltd., is a leading global manufacturer of office automation equipment.

Our lineup includes copiers, multifunctional and other printers, fax machines, personal computers, CD-Recordable, CD-ReWritable, and DVD+ReWritable drives and media, and related supplies and services, as well as digital cameras and advanced electronic devices.

We are rapidly building a solid presence worldwide as a provider of comprehensive document solutions that help customers streamline their businesses and cut operating costs.

Ricoh has 133 consolidated subsidiaries and affiliates in Japan and 262 overseas, together employing around 74,600 people.

## FINANCIAL HIGHLIGHTS

| | Millions of yen | | Thousands of U.S. dollars | % change |
|---|---|---|---|---|
| | 2002 | 2003 | 2003 | 2003/2002 |
| **For the Year:** | | | | |
| Net sales | ¥1,672,340 | ¥1,738,358 | $14,731,847 | 3.9% |
| Japan | 902,655 | 896,022 | 7,593,407 | -0.7 |
| Overseas | 769,685 | 842,336 | 7,138,440 | 9.4 |
| Net income | 61,614 | 72,513 | 614,517 | 17.7 |
| **Per Share Data** (in yen and dollars): | | | | |
| Net income | | | | |
| Basic | ¥ 88.27 | ¥ 99.79 | $ 0.85 | 13.1% |
| Diluted | 82.46 | 96.81 | 0.82 | 17.4 |
| Cash dividends paid | 12.00 | 14.00 | 0.12 | 16.7 |
| **At Year-End:** | | | | |
| Total assets | ¥1,832,928 | ¥1,884,922 | $15,973,915 | 2.8% |
| Shareholders' investment | 633,020 | 657,514 | 5,572,153 | 3.9 |

## Contents

| | |
|---|---|
| To Our Shareholders and Customers | 1 |
| Winning in Color | 6 |
| Toward Sustainable Management | 8 |
| Review of Operations | 10 |
| Financial Section | 17 |
| Ricoh's Global Network | 54 |
| Senior Management | 55 |
| Corporate Data | 56 |

CAUTIONARY STATEMENT
Ricoh bases the estimates in this annual report on information currently available to management, which involves risks and uncertainties that could cause actual results to differ materially from those projected.

Notes on graphs in To Our Shareholders and Customers
1. Return on sales based on net income.
2. Return on shareholders' investment based on net income.
3. Return on assets based on income before income taxes, minority interests and equity in earnings of affiliates.

TO OUR SHAREHOLDERS AND CUSTOMERS

### RECORD RESULTS

Fiscal 2003 was another banner year for Ricoh, one in which we boosted net sales for the ninth straight year and net income for the 11th consecutive term. Both figures were record highs, and owed much to the release of color multifunctional printers (MFPs) and high-speed mono-chrome MFPs. Our results also benefited from very successful rollouts of laser printers in Japan and overseas that deliver color at speeds and prices comparable to those of monochrome machines. Another key factor was printing solutions, in which we drew on our global sales and support structure to optimize total printing costs and increase the number of major accounts around the world.

### Performance in Depth

Net sales rose 3.9%, to a record ¥1,738.3 billion ($14,732 million). This was the ninth consecutive rise. The increase would have been 2.7% without fluctuations in foreign exchange rates.

We again encountered tough going in Japan owing to a generally bleak local economic picture, although we were able to limit the decline in revenues by increasing sales of such printing systems as MFPs and laser printers. We also generated greater solutions business sales, notably for useware and document management offerings. At the same time, demand was lower for analog machines, personal computers, servers, and measurement equipment. As a result, domestic sales were off 0.7%, to ¥896.0 billion ($7,593 million). This represented 51.5% of net sales, down 2.5 percentage points.

The situation was much brighter internationally. Overseas sales increased 9.4%, to ¥842.3 billion ($7,138 million). Sales advanced solidly for core digital equipment, while sales of printing systems were up significantly in Europe and the United States. Sales were favorable for optical disc and semiconductor operations. Without the foreign exchange effect, overseas sales would have gained 6.8%. These sales represented 48.5% of net sales, up 2.5 percentage points.

Operating income was up 3.1%, to ¥133.6 billion ($1,133 million). High-margin models and cost-cutting initiatives contributed much to this rise.

Net income gained 17.7%, to ¥72.5 billion ($615 million), another record high. Basic net income per share increased 13.1%, to ¥99.79 ($0.85). Fully diluted net income per share was up 17.4%, to ¥96.81 ($0.82). Return on shareholders' investment was 11.2%, from 10.4% in fiscal 2002.

NET SALES AND RETURN ON SALES

NET INCOME



(Billions of Yen, %)
*See Note 1 on inside front cover.



(Billions of Yen)

1

As part of an ongoing commitment to improving shareholder returns, we raised cash dividends per share of common stock for the third consecutive year, to ¥14.00 ($0.11).

At the close of fiscal 2003, total assets were up 2.8% from a year earlier, at ¥1,884.9 billion ($15,974 million). Total liabilities increased 2.2%, to ¥1,174.1 billion ($9,950 million).

Total shareholders' investment was up 3.9%, to ¥657.5 billion ($5,572 million).

Net cash provided by operating activities was up ¥80.6 billion, to ¥185.7 billion ($1,574 million). This owed to higher net income and depreciation and amortization and a decrease in inventories as a result of strong supply chain management.

Net cash used in investing activities increased ¥16.7 billion, to ¥98.1 billion ($832 million). This stemmed from higher capital expenditures for new production lines and additions to bond investments.

Free cash flow generated by operating and investing activities thus totaled ¥87.5 billion ($742 million), up ¥63.8 billion.

Net cash used in financing activities was ¥67.1 billion ($569 million), compared with ¥36.2 billion provided by such activities in fiscal 2002. This reflected reductions in interest-bearing debt to harness Group funds more efficiently. Outlays included dividend payments of ¥10.1 billion ($86 million) and expenses of ¥17.2 billion ($146 million) to secure treasury stock.

As a result of these factors, cash and cash equivalents at the close of the term were ¥19.0 billion higher than a year earlier, at ¥189.2 billion ($1,604 million).

### AGGRESSIVE STRATEGIES

During the year, we continued to go from strength to strength in implementing our 14th medium-term business plan to broaden our revenues and earnings foundations. The plan addresses two important emerging trends. First, users increasingly seek ways to enhance productivity. Second, they rely more on color-based documents nowadays and have to handle more information.

Our plan has three basic components, all of which will help us build total document volume and increase sales and profits.

The first is to replace monochrome products with color models. We are building a full lineup of compact color machines at prices comparable to monochrome models so we can secure new markets by meeting new demand for color. We won top marks in Japan and abroad during the year for our Aficio AP 3800C (IPSiO Color 8000 in Japan) series of fast color laser printers,



NET INCOME PER SHARE OF
COMMON STOCK

(Yen)



SHAREHOLDERS' INVESTMENT AND
RETURN ON SHAREHOLDERS' INVESTMENT

(Billions of Yen, %)
*See Note 2 on inside front cover.



TOTAL ASSETS AND
RETURN ON ASSETS

(Billions of Yen, %)
*See Note 3 on inside front cover.



Hiroshi Hamada (right), Chairman and Masamitsu Sakurai, President, Chief Executive Officer and Chief Operating Officer

which deliver color performance at monochrome speeds and prices. We released the Aficio 1224C/1232C (Imagio Neo C240/C320) series of MFPs for regular offices, which helped expand our share of the domestic color copier market.

The second is to expand sales of high-speed models. We aim to attract more customers through fast machines that are competitively priced, cost less to maintain, and are even more reliable. For example, our Aficio 1105 (Imagio MF105ProII) digital copier was very well received domestically and abroad for its affordability and consistent performance. This machine attracted more customers seeking high-volume copying and output.

Third, we are deploying printing solutions. Here, we suggest ways for customers to optimize the total output costs of their copiers and printers so we can expand equipment sales and increase total document volume. In the European and U.S. markets, in particular, during the term we drew on a global service and support structure that optimizes total printing costs for copiers and printers. We thus steadily increased the number of major accounts worldwide.

### Organizational Improvements

One of the highlights of the year was the establishment of Ricoh China Co., Ltd. This holding company is working to expand our operations in the highly promising Chinese market. We have already achieved impressive results to date in that nation, and the new operation is strategically expanding our business by integrating sales, production, and development.

We are striving to bolster our technological capabilities to become the world's No. 1 product engineering company, providing the most competitive hardware, software, and services. Specific focuses include technologies to develop next-generation, high-speed color imaging equipment and designing and developing hardware and software that allow users to freely and simply connect and operate various office machines. We are hard at work creating environmentally friendly offerings. In the year under review, we set up four research centers within the Research and Development Group to support the development of basic technologies. They include one center that specializes in photonics and another that concentrates on environmental technologies. In



### Common Stock Price Range



(Yen)

4

addition, we established operations within the Software Research and Development Group. We also decided to make Tohoku Ricoh Co., Ltd., a wholly owned subsidiary in keeping with efforts to reinforce Group development and design capabilities so we can integrate our strategies while delivering cost-competitive offerings.

Change extended to corporate governance in the year under review. This is in keeping with our conviction that we must deliver value not just through our products and services but also through our commitment to the interests of shareholders and the communities in which we operate.

In recent years, for example, we introduced an executive officer system that transfers authority to divisions. We now have a board of 16 directors, including two external officials, to handle major decisions on Group management. Four auditors, including two external ones, now oversee compliance and institute independent internal checks through our auditing office. During fiscal 2003, we established the Corporate Social Responsibility Division to coordinate activities worldwide. The Division also cooperates with other internal bodies that handle environmental, information security, and compliance issues.

### PURSUING GREATER VALUE

Our drive to become the world's No. 1 product engineering company entails providing new value through our customer-oriented management. Also key is our commitment to technological innovations that simplify digital networking, delivering ease of use and superior productivity. Environmental management remains central to our mission, and we aim to contribute even more to the resolution of environmental missions without compromising profitability. A complementary objective is to slash expenses so we can achieve a low-cost, highly competitive management structure that lets us operate even more efficiently in deflationary environments.



We anticipate higher revenues and earnings in fiscal 2004, and invite you to monitor progress through our investor relations website (www.ricoh.com/ir/).

As always, we deeply appreciate your support and encouragement, and look forward to a great fiscal 2004.

June 26, 2003

Sincerely,

Hiroshi Hamada
Chairman

Masamitsu Sakurai
President, Chief Executive Officer and Chief Operating Officer

**Color paper documents** have long been desirable in the office. They have also been too expensive. This is unfortunate given the many affordable color display products that have emerged in recent years and the meteoric rise of an Internet culture in which color is often essential to effective communication.

But what if color equipment and output were as affordable as monochrome, child's play to create, and could be produced just as fast? Wouldn't it make sense to shift to color? Of course it would. And you'd likely output reams of color materials.

That's why Ricoh took a leading role in developing a host of technologies that help most office workers opt for color output when it suits them. By bringing out highly affordable color equipment we can not only enhance our market share but also build and dominate massive new color markets that deliver superb value to our customers. This while driving our revenues and earnings to new heights by increasing total document volume.

The past year or so has seen Ricoh take major steps toward that goal, with the launch of the breakthrough **Aficio 1224C/1232C** **(Imagio Neo C240/C320)** series of workgroup MFPs that deliver color convenience affordably. Our proprietary vertical paper pass design has resulted in color models that are as compact as monochrome machines. These and other fast, compact MFPs, laser printers, and copiers meet the need for speed and

WINNING IN



## Aficio 1224C/1232C

The Aficio 1224C/1232C (Imagio Neo C240/C320) series of workgroup MFPs integrates copying, printing, scanning, and optional faxing. These systems separate themselves from the competition by offering the convenience of color at highly affordable prices. At the click of a mouse or push of a button, users can seamlessly integrate color pages into documents and finish them without manual intervention.



**Ri10**

The Ri10 is the world's first single chip to handle all copier imaging functions. This dedicated image processing middleware LSI eliminates the "clutter" found on application-specific integrated circuits, handling all copier image processing on a single chip. The Ri10's 224 calculators use parallel processing to perform 25.7 billion calculations per second, which is more than 10 times faster than a personal computer's central processing unit. Software can be used to modify processing capabilities. The Ri10 LSI has thus slashed the time and cost otherwise needed to develop color systems. The Ri10 is a central feature in our latest offerings, including the Aficio 1224C/1232C (Imagio Neo C240/C320) series.

allow users to seamlessly integrate color pages into documents and finish them without manual intervention. We have thus become a major force in the Japanese color market, and we are well on the way to replicating that achievement internationally.

But how did Ricoh make color a viable option for the regular office? Two factors have fueled our goal of becoming a preeminent provider of solutions. The first is technology. The second is our unmatched global sales, support, and service structure.

On the technology front, our most important achievement has been the creation of the **Ri10**, the world's first single chip to handle all copier imaging functions. This dedicated image processing middleware LSI eliminates the "clutter" found on application-specific integrated circuits to dramatically enhance performance. The Ri10 lives and breathes imaging efficiency. Software can be used to modify processing capabilities. This LSI has thus slashed the time and cost otherwise needed to develop color systems. The Ri10 is a central element in our latest offerings.

Another innovation, featured in the Aficio AP 3800C (IPSiO Color 8000), is a proprietary tandem drum printing system that prints all four colors in a single pass.

Zero maintenance is the Holy Grail of office equipment. Ricoh brings this close to reality through the modules in its multifunctional models. The modules can be serviced simply and quickly, thus minimizing downtimes.

While color is largely the future both for us and our customers, this does not mean that we are abandoning the world of monochrome solutions. Indeed, black-and-white output remains a top priority for many high-volume users. We are meeting that need—in

spades. At the top of the line in our monochrome range is the **Aficio 2105** (Imagio Neo 1050Pro), an on-demand input/output station. This model can output a stunning 105 copies per minute. Double that figure when two units are used in tandem for ultra-high-volume runs.

As mentioned earlier, our direct sales, support, and service structure is central to our color strategy. In recent years, we have acquired several office equipment companies around the world so that today we can provide the best possible solutions globally. We have been able to marshal this network to identify the true needs of our customers. All the people on the network are on the same page. They seek and feed back relevant information to our development operations so we can provide even more useful products. Just as important, our global network provides color and monochrome solutions through systems and operating proposals that help customers enhance efficiency while lowering the total cost of ownership. That approach has helped us land many new major accounts in recent years, and will pave the way for even more contracts with small and large companies that find that color is a winner.

## Aficio 2105

This monochrome system complements Ricoh's color offerings. It supports work-intensive walk-up environments, networked corporate workgroups, central reprographics departments or print-for-pay operations. It rips through copy/print runs at 105 pages per minute and offers ultimate versatility for all job requirements.



7

# TOWARD SUSTAINABLE MANAGEMENT

**Sustainable management** is central to all aspects of our business. You can see this first in our unwavering commitment to environmental preservation.

Sustainability also underlies our dedication to good corporate citizenship—covering everything from ethical conduct to close community involvement—which is ultimately good for business.

To better coordinate our sustainable management efforts, in fiscal 2003 we established the Corporate Social Responsibility Division. This organ monitors relevant activities across the Group and ensures that all Group operations and employees share our values, thereby enhancing enterprise value. The Division reports directly to the president and works closely with other internal bodies that deal with environmental, information security, and compliance issues.

The Ricoh Group's concerted approach to corporate responsibility has won broad recognition internationally. In 2002, for example, Oekom Research, a German agency that ranks corporate responsibility, rated Ricoh first worldwide among companies manufacturing office equipment and electrical household items. A 2002 *Financial Times* survey of the **World's Most Respected Companies** placed us sixth among companies that "best manage environmental resources." In May 2003, we received the World Environment Center's prestigious 19th annual **WEC Gold Medal** for International Corporate Achievement in Sustainable Development. Mr. Sakurai, president of Ricoh, characterized the award as "testament to the strengths of our beliefs and operating principles."

In Japan, our report on environmental management (you can download the English PDF version from www.ricoh.co.jp/ecology/e-/report/index.html) received prizes in early 2003 for excellence and sustainability report encouragement at the 6th Environmental Report Awards. The awards were sponsored by the Global Environmental Forum and were supported by Japan's Ministry of the Environment. For 2003, the *Japan Industrial Journal* bestowed the Global Environmental Award Grand Prix on Ricoh.

We are determined to keep broadening our commitment to sustainable management in the years ahead. One component of that is our participation in the Global Compact. This United Nations initiative consists of nine principles covering human rights, labor, and the environment. Around 1,000 companies around the world have agreed to engage in the Global Compact.

8



## One of the World's Most Respected Companies

The January 20, 2003, edition of the *Financial Times* released the results of a poll of chief executive officers around the world. The survey placed Ricoh sixth among the World's Most Respected Companies in the category of "companies that best manage environmental resources."



## 2003 WEC Gold Medal Winner

In May 2003, Ricoh received the World Environment Center's prestigious 19th annual WEC Gold Medal for International Corporate Achievement in Sustainable Development from Dr. Klaus Toeofer, executive director of the United Nations Environmental Programme.



## Support for Bushland Restoration in Australia

Ricoh Australia Pty, Ltd., is funding an initiative at the Warrimoo Public School, located around 50 kilometers west of Sydney, Australia, for students to restore the surrounding bushland.



## Involvement in Hong Kong Replanting Initiative

Through sponsorship and volunteer employee participation, Ricoh Hong Kong Ltd. is working closely with the government of the Hong Kong Special Administrative Region and an environmental nongovernment organization in a program to plant about 10,000 trees and shrubs in burned out parkland.

9

REVIEW OF OPERATIONS

# OFFICE EQUIPMENT
## I M A G I N G   S O L U T I O N S

SALES OF IMAGING SOLUTIONS



(Billions of Yen)

This segment comprises digital and other imaging systems. Digital imaging systems include monochrome and color digital copiers, digital duplicators, facsimile machines, and supplies and services. Other imaging systems encompass analog copiers, diazo copiers, supplies and services for those products, and thermal paper.

WarwickPrint, the print center at Warwick University in the United Kingdom, relies heavily on its six Aficio 1105 copiers to rip through copy and print jobs at 105 pages per minute.

### PERFORMANCE

Sales of imaging solutions dropped 8.0% in fiscal 2003, to ¥859.7 billion ($7,286 million). This accounted for 49.5% of net sales, down 6.3 percentage points. The decline reflected the Ricoh Group's intensified efforts to shift away from analog offerings in favor of networkable digital systems.

*Digital Imaging Systems:* We continued to reinforce our lineup of digital copiers during the year. New releases included every-





The Dr. Peters Group in Dortmund, Germany, a prominent issuing house for closed property funds and participations in ship ownership, harnesses the high resolution of the Aficio 2105 to output and finish everything from financial reports to information for more than 30,000 shareholders.



Ricoh Italia S.p.A. and affiliate Ricoh Point Torino joined hands to deliver document management solutions to Juventus, Italy's most prestigious soccer team, by providing several Aficio 1032 copiers.



The St. Joe Company, Florida, a preeminent real estate operating company and the state's largest private landowner, chose the Ricoh FAX441ONF, whose advanced network connectivity capabilities include Color Scan to E-mail, IP faxing, and LAN faxing right out of the box.

thing from the Aficio 1013 and 1015 for small workgroups to the high-volume Aficio 1105 (Imagio MF105 ProII). Unit sales of digital copiers increased significantly during the year, but sales were down in Japan because of the lackluster economy and a trend toward printing systems. Sales of digital imaging systems therefore decreased 4.2%, to ¥626.9 billion ($5,313 million).

*Other Imaging Systems:* The shift away from analog copiers to digital models and MFPs caused sales of other imaging systems to fall 16.8%, to ¥232.7 billion ($1,972 million).

### HIGHLIGHTS

The Aficio 1105 (Imagio MF105 ProII) remained very popular for its performance, pricing, and reliability. In Japan, we expanded our range of models incorporating high proportions of recycled parts. New offerings included the Imagio MF4570RC and the Imagio MF3570RC.

### OUTLOOK

In fiscal 2004, Ricoh will bring out more high-speed machines that offer competitive pricing and reliability for customers seeking high-volume output capabilities.



Foto ABB, the Italian subsidiary of a multinational leader in technologies for energy and automation, chose Ricoh to supply around 200 Aficio machines for several regional centers.

REVIEW OF OPERATIONS



InTACT, the insourcing agency for computing and telecommunications for the government of the Australian Capital Territory, in Canberra, ordered 700 multifunctional devices and copiers from Ricoh, to be phased in over the next three years as leases expire.

# NETWORK INPUT/OUTPUT SYSTEMS

This segment has two subcategories. The first is printing systems, notably MFPs, laser printers, supplies, services, and software. The second is other input/output systems, which include optical discs and systems and scanners.

**SALES OF NETWORK INPUT/OUTPUT SYSTEMS**



1999 2000 2001 2002 2003

(Billions of Yen)

## PERFORMANCE
Segment sales were up 34.6%, to ¥463.3 billion ($3,927 million). This amount constituted 26.7% of net sales, up 6.1 percentage points.

*Printing systems:* We expanded sales of these systems on the strength of new models that satisfied demand for color, speed, and networking. Printing systems sales gained 36.6%, to ¥408.8 billion ($3,465 million), reflecting higher unit sales of MFPs and color laser printers.

*Other input/output systems:* Demand for DVD+RW drives was up significantly during the term. These and other optical disc-

related products, including CD-R/RW offerings, contributed greatly to performance. As a result, sales in this subcategory gained 21.2%, to ¥54.5 billion ($462 million).

## HIGHLIGHTS
*Printing systems:* Two new digital color MFP series triggered a shift among general office users from monochrome to color. These systems were the Aficio 1224C and 1232C (Imagio Neo C240 and C320). Their popularity stemmed from their space-saving designs, diverse optional post-processing capabilities, and superior affordability.

Also during the year, we did well in color



Discover Tec, Inc., in Jacksonville, Florida, chose its Aficio CL5000 color printer to provide imaging support for its technology solutions operations, which range from graphic and web design to web hosting and server consulting.



The Investigation Department of the Nassau County Sheriff's Office in Fernandina Beach, Florida, selected an Aficio 1232C for full-color printing and copying capabilities, complemented by scanning and faxing.



laser printers, with new models spearheading the way, notably the Aficio CL7000 (IPSiO CX8200), IPSiO CX7200, and the Aficio CL5000 (IPSiO Color 6500).

In high-speed monochrome models, we did well with two on-demand printing machines, the Aficio 2105 (Imagio Neo 1050Pro) and the Aficio 2090 (Imagio Neo 900Pro). Also successful were the Aficio 1075 and 1060 (Imagio Neo 751 and 601) series of fast multifunctional systems.

*Other input/output systems:* Demand is rising for high-capacity removable media that can seamlessly handle videos and other large data volumes, thus integrating PCs and the audiovisual world. We have responded to such needs with fast and convenient DVD+RW products that work with DVD-ROM drives and DVD players. We have captured large market shares in all our operating regions for our MP5125A drive, which can handle DVD+RW and DVD+R discs.

## OUTLOOK

In the year ahead, we will expand our range of printing systems offerings that meet diverse digital networking needs. We aim to provide comprehensive output solutions with fast color and monochrome models.

In other input/output solutions, we will launch faster drives that are compatible with the DVD+RW/+R formats and attract even more customers by bringing the PC and audiovisual worlds closer together.

The Ricoh MP5125A drive lets users record and rewrite DVD+RW and DVD+R discs that can store full-length motion pictures and other image-heavy data, and also handles rewritable CDs.



Otis France uses around 10 Aficio machines at its Courbevoie headquarters, including the high-speed Aficio AP 3800C color laser printer, and also uses 160 Aficio copiers at offices throughout France.

14

REVIEW OF OPERATIONS



Ricoh's GlobalScan software server is the platform for all alliance technologies, processing, managing, and distributing hard copy documents in electronic form. GlobalScan is for document-intensive office environments and easily integrates with existing mail infrastructures to significantly boost workgroup productivity.



Acxiom Corporation, a leading provider of customer and information management solutions based in Little Rock, Arkansas, uses Ricoh GlobalScan, which turns its Aficio MFPs into scanners that route digital documents over its network.

This segment includes PCs and servers, network systems, networking software, applications software, and services and support.

# N E T W O R K   S Y S T E M   S O L U T I O N S

### PERFORMANCE

Ricoh boosted sales of useware, document management software, and other solutions businesses to help customers minimize their total costs of ownership. At the same time, our sales of PCs and servers were down during the term, as companies suppressed their information technology spending. Segment sales thus decreased 4.6%, to ¥197.4 billion ($1,674 million). This represented 11.3% of net sales, down 1.1 percentage point from a year earlier.

### HIGHLIGHTS

Several systems were very popular during the term. They included Ridoc Desk 2000 personal document management software and Ridoc Document Server Pro (Ver. 2), a document management application for large offices that features enhanced operability. The Ridoc Web Navigator browser portal platform for the Ridoc Document System

also did well, as did other imaging equipment in the Ridoc series.

We strengthened our information security business. For example, TrustyCabinet UX V1 server software, which safeguards electronic document originals, was certified under the JIS X5070 standard in fiscal 2003.

In North America, we developed Global Scan. This allows large corporations to use MFPs to make their paper documents electronic.

### OUTLOOK

We will continue to bring out software linked with networked equipment as part of efforts to reinforce our solutions business, and will suggest ways for customers to build optimal systems.

SALES OF NETWORK SYSTEM SOLUTIONS



(Billions of Yen)

15

REVIEW OF OPERATIONS



The RB5C633 is a single-chip encoder that is fully compliant with JPEG2000, the new international standard for still image compression, and can perform real-time coding and decoding.

The R5313B series of complete power management system devices is designed for GSM and other cellular handsets, and allows the setting of different output voltage settings for all seven voltage regulators.



The Caplio G3 is a 3.24-megapixel digital camera with a 3x zoom and a shutter release of just 0.14 second to maximize photo opportunities.

This category covers semiconductors, photographic equipment, measurement equipment, and leasing and logistics services.

# OTHER BUSINESSES

### PERFORMANCE

Segment sales rose 16.5%, to ¥217.7 billion ($1,846 million), and constituted 12.5% of net sales, up 1.3 percentage point.

The domestic semiconductor industry began to turn around during the term, while market conditions in Europe and other regions remained favorable. We enjoyed steady gains in leasing and other operations, although sales decreased for measurement equipment owing to a stagnant business cycle.

### HIGHLIGHTS

Our semiconductor business broadly covers two areas. The first is digital LSIs for our office equipment. This business works closely with equipment development sections to create advanced imaging LSIs for MFPs and printers, thus supporting our office solutions approach. The second area is supplying external customers with power management ICs that conserve energy, second-generation battery ICs, real-time clock ICs, and analog LSIs for mobile phones. We enjoy large shares in the markets for PC interface LSIs, DVD+RW/+R controllers, and imaging and other digital LSIs based on technologies cultivated in developing office equipment.

In the photographic equipment category, we concentrate on digital cameras. We entered the digital camera arena in 1995, and now center on business models. A good example is the Caplio G3 series, which eliminates the slow shutter response times of digital cameras for performance comparable to that of film-based models. Our broad range also includes several unique offerings, such as a waterproof camera for outdoor use and another model that incorporates a global positioning system.

### OUTLOOK

In the semiconductor business, we will focus on developing key components for our digital products. For external customers, we will concentrate on system power management LSIs and other LSIs, such as for image processing and PC peripherals, to achieve further growth. In digital cameras, we will strengthen our business lineup and step up our solutions sales.

SALES OF OTHER BUSINESSES



1999  2000  2001  2002  2003

(Billions of Yen)

# Financial Section

| | |
|---|---|
| Management's Discussion and Analysis of Fiscal 2003 Results | 18 |
| Selected Financial Data | 24 |
| Consolidated Balance Sheets | 26 |
| Consolidated Statements of Income | 28 |
| Consolidated Statements of Shareholders' Investment | 29 |
| Consolidated Statements of Cash Flows | 30 |
| Notes to Consolidated Financial Statements | 31 |
| Independent Auditor's Report | 53 |
| Ricoh's Global Network | 54 |
| Senior Management | 55 |
| Corporate Data | 56 |

# Management's Discussion and Analysis of Fiscal 2003 Results

## Revenues

In fiscal 2003, ended March 31, 2003, consolidated net sales increased 3.9%, to ¥1,738.3 billion ($14,732 million). This was the ninth consecutive rise. The average exchange rates prevailing during the term were ¥121.96 to the dollar (up ¥3.14) and ¥121.00 to the euro (down ¥10.40). The sales increase would have been 2.7% without the impact of foreign exchange fluctuations.

Domestic sales were down 0.7%, to ¥896.0 billion ($7,593 million). On the positive side, sales expanded for printing systems, such as MFPs (multifunctional printers) and laser printers. Sales were also favorable for useware, document management, and other areas of the solutions business. In contrast, sales of standalone analog equipment fell amid a shift toward MFPs, while sales were off for personal computer and servers owing mainly to sluggish domestic demand for information technology. Sales declined for measuring equipment as a result of a slow business cycle. Domestic sales accounted for 51.5% of net sales, down 2.5 percentage points.

Overseas sales increased 9.4%, to ¥842.3 billion ($7,138 million). Sales were steady despite an economic slowdown in the United States and turmoil in the Middle East. Ricoh continued to perform well in Europe, where the economic environment stabilized, and in other areas.

By product line, sales of core digital equipment increased solidly, while sales of strategic printing systems increased significantly in Europe and the United States. Optical disc and semiconductor operations enjoyed favorable sales. Without the foreign exchange effect, overseas sales would have gained 6.8%. These sales represented 48.5% of net sales, up 2.5 percentage points.

## Operating Income

Gross profit increased 6.5%, to ¥745.3 billion ($6,317 million). In both Japan and abroad, sales were up for high-margin, high-value-added products, notably MFPs and laser printers. The gross profit gain also reflected ongoing cost reductions and the yen's depreciation against the euro. Ricoh incurred additional costs to cover quality problems on some metering equipment. Selling, general and administrative expenses increased 7.3%, to ¥611.6 billion ($5,184 million), reflecting strategic spending on research and development and on basic systems development. As a result of the above factors, operating income increased 3.1%, to ¥133.6 billion ($1,133 million).

## SALES BY PRODUCT LINE

| | 2002 | | 2003 | | |
|---|---|---|---|---|---|
| | Millions of yen | Percentage of net sales | Millions of yen | Percentage of net sales | Thousands of U.S. dollars |
| **Office Equipment:** | | | | | |
| Imaging Solutions | ¥934,180 | 55.8% | ¥ 859,713 | 49.5% | $ 7,285,703 |
| Network Input/Output Systems | 344,247 | 20.6 | 463,379 | 26.7 | 3,926,941 |
| Network System Solutions | 206,962 | 12.4 | 197,482 | 11.3 | 1,673,576 |
| **Other Businesses** | 186,951 | 11.2 | 217,784 | 12.5 | 1,845,627 |
| Total | ¥1,672,340 | 100.0% | ¥1,738,358 | 100.0% | $14,731,847 |

## SALES BY GEOGRAPHIC AREA

| | 2002 | | 2003 | | |
|---|---|---|---|---|---|
| | Millions of yen | Percentage of net sales | Millions of yen | Percentage of net sales | Thousands of U.S. dollars |
| Japan | ¥ 902,655 | 54.0% | ¥ 896,022 | 51.5% | $ 7,593,407 |
| The Americas | 341,747 | 20.4 | 343,940 | 19.8 | 2,914,746 |
| Europe | 311,312 | 18.6 | 354,477 | 20.4 | 3,004,042 |
| Other | 116,626 | 7.0 | 143,919 | 8.3 | 1,219,652 |
| Total | ¥1,672,340 | 100.0% | ¥1,738,358 | 100.0% | $14,731,847 |

## Income before Income Taxes

Interest and dividend income decreased primarily because of sluggish financial markets. At the same time, foreign exchange losses declined, while Ricoh constrained interest-bearing debt by reinforcing cash management systems in Japan, the United States, and Europe. Ricoh valued its holding marketable securities in accordance with generally accepted accounting principles. As a result, income before income taxes, minority interests and equity in earnings of affiliates increased 8.4%, to ¥123.4 billion ($1,046 million).

## Net Income

Net income surged 17.7%, to ¥72.5 billion ($615 million), the 11th consecutive gain and the ninth consecutive record high. Ricoh remeasured its deferred tax assets and liabilities in response to the introduction of a corporate enterprise tax system and other changes in tax laws. Ricoh posted losses on minority holdings in measuring equipment affiliates. Subject to approval at the ordinary general meeting of shareholders on June 26, 2003, management plans to make cash dividends for fiscal 2003 of ¥14.00 ($0.12). This is in keeping with management's commitment to ensuring solid shareholder returns.

## Segment Information

### CONSOLIDATED SALES BY PRODUCT LINE

#### 1. Office Equipment

To help customers more efficiently manage their total document volume, the Ricoh Group proposes solutions that optimize total printing costs. Ricoh is thus shifting away from standalone analog equipment toward digital, networking, and color and high-speed technologies.

These efforts allowed Ricoh to greatly expand sales of MFPs, laser printers, and other printing systems during the year while increasing revenues from use-ware, software, and other solutions businesses.

In Japan, sales of personal computer and servers declined, primarily because of poor economic conditions and sluggish demand for information technology.

Overseas sales increased, particularly in Europe and other regions. Demand was slow in the United States, owing largely to an economic slowdown in that nation and turmoil in the Middle East, while the yen's rise against the dollar also affected operations.

Nonetheless, Ricoh performed solidly because of its strengthened sales networks in the United States. Sales of office equipment thus advanced 2.4%, to ¥1,520.5 billion ($12,886 million).

#### Imaging Solutions

In digital imaging systems, Ricoh strengthened its lineup with new digital plain-paper copiers (PPCs), which cover everything from such low-end models as the Aficio 1013/1015 (Imagio MF 1340/1540 in Japan) series to high-speed models, notably the Aficio 2105 (Imagio Neo 1050 Pro). Domestic sales of digital imaging systems were down because of the depressed economy and the shift toward printing systems. Overseas, sales decreased for fax machines and other imaging solutions, although digital PPC sales improved in Europe and other regions. As a result of these factors, overall sales of digital imaging systems dropped 4.2%. In other imaging systems, sales fell 16.8%, reflecting the trend away from analog to MFPs and other digital equipment. Sales of imaging solutions decreased 8.0%, to ¥859.7 billion ($7,285 million), reflecting Ricoh's strategies. Imaging solutions accounted for 49.5% of consolidated net sales, down 6.3 percentage points.

#### Network Input/Output Systems

Here, Ricoh released fast, more networkable, and color offerings and further expanded sales of printing equipment to meet customer needs.

In MFPs, the Aficio 1075/1060 (Imagio Neo 750/600) series and Aficio 1050 (Imagio Neo 105 Pro) contributed to sales growth.

In laser printers, sales rose for the AP 3800C (IPSiO Color 6000/7100). Overall sales of printing systems thus increased 36.6%. Sales of other input/output systems gained 21.2%. Although up a year earlier, domestic sales of CD-R/RW drives and media decreased due to a trend toward DVDs based on new standards. In contrast, sales improved for DVD drives and media in the United States and for

CD-R/RW shipments to other regions. Sales of network input/output systems thus advanced 34.6%, to ¥463.3 billion ($3,927 million). This segment represented 26.7% of net sales, up 6.1 percentage points.

*Network System Solutions*
Ricoh strengthened its solutions businesses, such as useware, document management and software. These areas allow Ricoh to help customers optimize their total printing costs. Sales in Japan and overseas increased steadily during the year. In contrast, sales of personal computers and servers continued to decline in Japan, reflecting sluggish information technology spending.

## 2. Other Businesses
Sales in this segment increased 16.5%, to ¥217.7 billion ($1,846 million). This improvement reflected a recovery in the domestic semiconductor business, as well as solid results in Europe and other regions. On top of that, Ricoh enjoyed steady gains in leasing and other operations. In contrast, sales decreased for measuring equipment because of a stagnant business cycle.

## CONSOLIDATED SALES BY GEOGRAPHIC AREA

### 1. Japan
Although the domestic economy remained very unfavorable, Ricoh responded to customer needs by pursuing product and sales strategies that boosted sales of printing systems, such as MFPs and printers.

In the solutions business, Ricoh's proposals for improving total cost performance were well received, leading to higher sales in this area. At the same time, sales of standalone analog equipment fell amid the shift toward MFPs and color models, while personal computer and server sales also declined.

In other businesses, the adverse business cycle dampened sales of measuring equipment, while demand for semiconductors began to recover.

As a result, sales in Japan decreased 0.7%, to ¥896.0 billion ($7,593 million). Domestic operations accounted for 51.5% of net sales, down 2.5 percentage points.

### 2. The Americas
Ricoh further broadened and reinforced its sales network, especially in North America, against a background of a slower U.S. economy, the turmoil in the Middle East and severe competition.

Ricoh stepped up sales of new printing systems that matched a demand shift away from analog offerings toward networked digital PPCs and color models, and strove to expand sales to major accounts. Sales were solid for DVD drives and media based on new standards.

Sales in the Americas increased 0.6%, to ¥343.9 billion ($2,915 million). After factoring out the yen's appreciation against the dollar, regional sales gained 3.2%.

### 3. Europe
With European economies remaining relatively stable, sales of digital PPCs and printing systems increased. Ricoh strengthened its sales network to reinforce its brand clout. These efforts helped Ricoh to maintain its top share of the European market for copiers and MFPs. The yen's depreciation against the euro contributed to performance.

Sales in Europe thus increased 13.9%, to ¥354.4 billion ($3,004 million).

### 4. Other
In China and other Asian markets, a full-fledged shift in business equipment to digital networked and color models led to an increase in sales of digital PPCs and printing systems. Demand for optical discs also continued to improve, while semiconductor sales remained solid.

Sales in this segment increased 23.4%, to ¥143.9 billion ($1,220 million). During the term, Ricoh established a regional headquarters in Shanghai to reinforce its operations in the promising Chinese market. Ricoh aims to further integrate its production, sales, and services while focusing even more on customer needs to strengthen its revenues and earnings in China.

## Financial Position
Cash and cash equivalents and time deposits rose in line with marketable securities repayments and maturities. Trade receivables decreased, reflecting additional collections in Japan and the United States. Inventories declined owing to the impact of supply chain management and other initiatives. Fixed assets decreased, as Ricoh kept capital expenditures at less than depreciation. Finance receivables rose, mainly in Japan, and other investments were up, reflecting purchases of marketable securities and an increase in deferred income taxes. As a result, total assets were ¥1,884.9 billion ($15,974 million) at the close of fiscal 2003, up ¥51.9 billion from a year earlier.

## LONG-TERM INDEBTEDNESS
(Excluding capital lease obligations and SFAS No. 133 fair value adjustment)

| | Average pay rate | Total | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 and thereafter | Fair Value |
|---|---|---|---|---|---|---|---|---|---|
| | | | Millions of yen — Expected maturity date | | | | | | |
| Bonds | 1.35% | ¥154,910 | ¥14,910 | ¥10,000 | ¥40,000 | ¥45,000 | ¥10,000 | ¥35,000 | ¥160,124 |
| Medium-Term Notes | 0.21 | 24,000 | 9,000 | 12,000 | 3,000 | — | — | — | 24,028 |
| Loans | 1.61 | 212,595 | 29,096 | 62,860 | 82,286 | 10,809 | 17,110 | 10,434 | 212,757 |
| Total | | ¥391,505 | ¥53,006 | ¥84,860 | ¥125,286 | ¥55,809 | ¥27,110 | ¥45,434 | ¥396,909 |

| | Average pay rate | Total | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 and thereafter | Fair Value |
|---|---|---|---|---|---|---|---|---|---|
| | | | Thousands of U.S. dollars — Expected maturity date | | | | | | |
| Bonds | 1.35% | $1,312,797 | $126,356 | $84,746 | $338,983 | $381,356 | $84,746 | $296,610 | $1,356,983 |
| Medium-Term Notes | 0.21 | 203,389 | 76,271 | 101,695 | 25,423 | — | — | — | 203,627 |
| Loans | 1.61 | 1,801,653 | 246,576 | 532,712 | 697,339 | 91,602 | 145,000 | 88,424 | 1,803,025 |
| Total | | $3,317,839 | $449,203 | $719,153 | $1,061,745 | $472,958 | $229,746 | $385,034 | $3,363,635 |

## INTEREST RATE SWAPS

| Notional amounts (Millions) | Type of swap | Average receive rate | Average pay rate | Total | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 and thereafter | Fair Value |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Millions of yen — Expected maturity date | | | | | | |
| ¥ 59,179 | Receive floating/Pay fixed | 0.08% | 0.36% | ¥59,179 | ¥ 229 | ¥ 4,950 | ¥52,000 | ¥2,000 | ¥ — | ¥ — | ¥3,961 |
| 79,000 | Receive fixed/Pay floating | 1.98 | 0.11 | 79,000 | 18,000 | 17,000 | 19,000 | 1,000 | 6,000 | 18,000 | (206) |
| US$ 20 | Receive floating/Pay floating | 7.36% | 1.96% | ¥ 2,404 | ¥ — | ¥ 2,404 | ¥ — | ¥ — | ¥ — | ¥ — | ¥ 230 |

| Notional amounts (Millions) | Type of swap | Average receive rate | Average pay rate | Total | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 and thereafter | Fair Value |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Thousands of U.S. dollars — Expected maturity date | | | | | | |
| ¥ 59,179 | Receive floating/Pay fixed | 0.08% | 0.36% | $501,517 | $ 1,941 | $ 41,949 | $440,678 | $16,949 | $ — | $ — | $33,568 |
| 79,000 | Receive fixed/Pay floating | 1.98 | 0.11 | 669,491 | 152,542 | 144,068 | 161,017 | 8,475 | 50,847 | 152,542 | (1,746) |
| US$ 20 | Receive floating/Pay floating | 7.36% | 1.96% | $ 20,373 | $ — | $ 20,373 | $ — | $ — | $ — | $ — | $ 1,949 |

Trade payables rose from a year earlier. Interest-bearing debt was down because of redemptions and conversions of convertible bonds and efforts to reduce borrowings. Other current liabilities and retirement benefit obligations expanded. Total liabilities thus rose ¥25.2 billion, to ¥1,174.1 billion ($9,950 million).

Common stock and additional paid-in capital rose owing to convertible bond conversions. Accumulated other comprehensive loss declined, reflecting pension liability adjustments.

Total shareholders' investment thus expanded ¥24.4 billion, to ¥657.5 billion ($5,572 million).

## Cash Flows

Net cash provided by operating activities was up ¥80.6 billion, to ¥185.7 billion ($1,574 million). This owed to higher net income and depreciation and amortization and decreases in trade receivable and in inventories as a result of strong supply chain management.

Net cash used in investing activities increased ¥16.7 billion, to ¥98.1 billion ($832 million). This stemmed from higher capital expenditures for new production lines and additions to bond investments.

Free cash flow generated by operating and investing activities thus totaled ¥87.5 billion ($742 million), up ¥63.8 billion.

Net cash used in financing activities was ¥67.1 billion ($569 million), compared with ¥36.2 billion provided by such activities in fiscal 2002. This reflected reductions in interest-bearing debt to harness Group funds more efficiently. Outlays included dividend payments of ¥10.1 billion ($86 million) and expenses of ¥17.2 billion ($146 million) to secure treasury stock.

As a result of these factors, cash and cash equivalents at the close of the term were ¥19.0 billion higher than a year earlier, at ¥189.2 billion ($1,604 million).

## Capital Expenditures

Capital expenditures for fiscal 2001, 2002 and 2003 were ¥73.3 billion, ¥75.6 billion and ¥73.9 billion ($627 million), respectively. Ricoh allocates significant portions of capital expenditures to digital and networking equipment, such as digital PPCs, MFPs, and laser printers, and manufacturing facilities to maintain and enhance competitiveness.

Ricoh also invests in information systems to support such back office operations as procurement, accounting, and intellectual property management.

In the year under review, Ricoh began to construct new accounting and intellectual property management systems. Management expects capital expenditures to reach about ¥75.0 billion in fiscal 2004.

## Key Financial Ratios

We have provided the following ratios to facilitate analysis of Ricoh's operations for fiscal 2001, 2002, and 2003.

| | Fiscal 2001 | Fiscal 2002 | Fiscal 2003 |
|---|---|---|---|
| Return on sales | 3.5% | 3.7% | 4.2% |
| Return on shareholders' investment | 9.7% | 10.4% | 11.2% |
| Current ratio | 1.00 | 1.30 | 1.40 |
| Debt-to-equity ratio (interest-bearing debt to shareholders' investment) | 0.97 | 0.89 | 0.74 |
| Interest coverage | 14.5 | 16.3 | 20.1 |

## Market Risk

### MARKET RISK EXPOSURE

Ricoh is exposed to market risks primarily from changes in foreign currency exchange rates and interest rates, which affect outstanding debt and certain assets and liabilities denominated in foreign currencies.

To a lesser extent, Ricoh is also exposed to equity price risk. To manage these risks that arise in the normal course of business, Ricoh enters into various hedging transactions pursuant to its policies and procedures covering such areas as counterparty exposure and hedging practices. Ricoh does not hold or issue derivative financial instruments for trading purposes or to generate income.

Ricoh regularly assesses these market risks based on the policies and procedures established to protect against adverse effects of these risks and other potential exposures, primarily by reference to the market value of the financial instruments. As a result of the latest assessment, Ricoh does not anticipate any material losses in these

## FOREIGN EXCHANGE FORWARD CONTRACTS

| | Average contractual rates | Millions of yen | | Thousands of U.S. dollars | |
|---|---|---|---|---|---|
| | | Contract amounts | Estimated fair value | Contract amounts | Estimated fair value |
| US$/¥ | 120.41 | ¥ 1,204 | ¥ 3 | $ 10,203 | $ 25 |
| EUR/¥ | 125.67 | 14,238 | (418) | 120,661 | (3,542) |

areas for fiscal 2003, and there were no material quantitative changes in market risk exposure at March 31, 2003.

In the normal course of business, Ricoh also faces risks that are either nonfinancial or unquantifiable. Such risks principally include credit and legal risk, and are not represented in the tables.

### FOREIGN CURRENCY RISK

In the ordinary course of business, Ricoh uses foreign exchange forward contracts to manage the effects of foreign currency exchange risk on monetary assets and liabilities denominated in foreign currencies.

Contracts related to operating activities generally have maturities of less than six months, while the contracts related to financing activities have the same maturities as the underlying assets and liabilities.

The table above provides information about Ricoh's material derivative financial instruments that are sensitive to foreign currency exchange rates.

The table relating to foreign exchange forward contracts presents the notional amounts, weighted average exchange rates and estimated fair value. These notional amounts generally are used to calculate the contractual payments to be exchanged under the contracts.

### INTEREST RATE RISK

In the ordinary course of business, Ricoh enters into interest rate swap agreements to reduce interest rate risk and to modify the interest rate characteristics of its outstanding debt. These agreements primarily involve the exchange of fixed and floating rate interest payments over the life of the agreement without the exchange of the underlying principal amounts. The table on page 21 provides information about Ricoh's major derivative and other financial instruments that are sensitive to changes in interest rates, including interest rate swaps and debt obligations. For debt obligations, the table presents principal cash flows by expected maturity date, related weighted average interest rates and estimated fair value. For interest rate swaps, the table presents notional amounts by expected

maturity date, weighted average interest rates and estimated fair value. Notional amounts are generally used to calculate the contractual payments to be exchanged under the contract.

### CREDIT RISK

Ricoh is also exposed to credit-related losses in the event of nonperformance by counterparties to financial instruments. However, credit risk arising from the failure of counterparties to meet the terms of financial instrument contracts is generally limited to the amounts by which the counterparties' obligations exceed the obligations of Ricoh. It is Ricoh's policy only to enter into financial instrument contracts with a diversified group of financial institutions having credit ratings satisfactory to Ricoh to minimize the concentration of credit risk. Therefore, Ricoh does not expect to incur material credit losses on its financial instruments.

### EQUITY PRICE RISK

A relatively small portion of Ricoh's marketable securities is subject to equity price risk arising from changes in their market prices. Marketable securities consist of a diversified pool of Japanese equities. Ricoh's overall investment policy is to invest in highly-liquid, low risk investments.

The table below provides information about contractual maturities for available-for-sale securities and the fair values for market risk sensitive securities as of March 31, 2003.

| | Millions of yen | | Thousands of U.S. dollars | |
|---|---|---|---|---|
| | Cost | Fair value | Cost | Fair value |
| Debt securities | | | | |
| Due within one year | ¥ 107 | ¥ 107 | $ 907 | $ 907 |
| Due within one year through five years | 45,020 | 44,830 | 381,525 | 379,915 |
| Equity securities | 6,328 | 10,957 | 53,628 | 92,856 |
| Investment trusts * | 9,459 | 8,815 | 80,161 | 74,704 |
| Total | ¥60,914 | ¥64,709 | $516,221 | $548,382 |

* Investment trusts consist of investments in marketable debt and equity securities.

# Selected Financial Data

Ricoh Company, Ltd. and Consolidated Subsidiaries
For the Years Ended March 31

|  | 1994 | 1995 |
|---|---|---|
| **For the Year:** | | |
| Net sales | ¥ 968,318 | ¥1,020,296 |
| Cost of sales | 605,958 | 628,071 |
| Selling, general and administrative expenses | 326,352 | 339,891 |
| Income before income taxes, minority interests and equity in earnings of affiliates | 26,167 | 41,674 |
| Provision for income taxes | 18,233 | 24,931 |
| Net income | 9,520 | 18,593 |
| | | |
| Capital expenditures | 44,928 | 45,437 |
| Depreciation and amortization | 49,155 | 44,960 |
| **Per Share Data** (in yen and dollars): | | |
| Net income: | | |
| Basic | ¥ 14.61 | ¥ 28.54 |
| Diluted | 14.47 | 26.43 |
| Cash dividends paid | 10.00 | 10.00 |
| **At Year-End:** | | |
| Total assets | ¥1,238,275 | ¥1,320,617 |
| Long-term indebtedness | 337,592 | 386,535 |
| Shareholders' investment | 349,945 | 377,840 |
| Working capital | 116,108 | 142,021 |
| | | |
| Return on sales | 1.0% | 1.8% |
| Return on shareholders' investment | 2.7 | 5.1 |
| **Common Stock Price Range** (in yen and dollars): | | |
| High | ¥ 849 | ¥ 1,020 |
| Low | 561 | 726 |

24

| | Millions of yen | | | | | | | | Thousands of U.S. dollars |
|---|---|---|---|---|---|---|---|---|---|
| 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2003 |
| ¥1,113,030 | ¥1,316,072 | ¥1,403,348 | ¥1,425,999 | ¥1,447,157 | ¥1,538,262 | ¥1,672,340 | ¥1,738,358 | $14,731,847 |
| 683,406 | 772,238 | 838,440 | 857,423 | 867,148 | 924,893 | 972,394 | 993,009 | 8,415,330 |
| 374,246 | 460,471 | 475,201 | 495,029 | 491,088 | 508,264 | 570,251 | 611,695 | 5,183,856 |
| 51,020 | 66,905 | 68,428 | 53,054 | 70,393 | 97,765 | 113,950 | 123,470 | 1,046,356 |
| 28,251 | 39,864 | 40,210 | 24,555 | 28,363 | 43,512 | 51,147 | 51,984 | 440,542 |
| 21,869 | 28,922 | 30,131 | 30,655 | 41,928 | 53,228 | 61,614 | 72,513 | 614,517 |
| | | | | | | | | |
| 48,828 | 78,666 | 94,117 | 70,469 | 58,356 | 73,329 | 75,676 | 73,956 | 626,746 |
| 46,430 | 51,000 | 61,971 | 67,456 | 61,946 | 62,142 | 73,782 | 76,551 | 648,737 |
| | | | | | | | | |
| ¥33.55 | ¥44.16 | ¥44.97 | ¥44.33 | ¥60.61 | ¥76.85 | ¥88.27 | ¥99.79 | $0.85 |
| 31.21 | 38.95 | 41.35 | 40.94 | 56.06 | 71.02 | 82.46 | 96.81 | 0.82 |
| 10.00 | 11.00 | 11.50 | 11.00 | 11.00 | 11.50 | 12.00 | 14.00 | 0.12 |
| | | | | | | | | |
| ¥1,508,519 | ¥1,644,896 | ¥1,660,496 | ¥1,628,017 | ¥1,543,320 | ¥1,704,791 | ¥1,832,928 | ¥1,884,922 | $15,973,915 |
| 411,023 | 386,918 | 295,536 | 344,580 | 307,962 | 217,743 | 332,995 | 345,902 | 2,931,373 |
| 401,471 | 422,923 | 475,005 | 487,459 | 541,506 | 556,728 | 633,020 | 657,514 | 5,572,153 |
| 139,163 | 77,527 | 31,681 | 176,161 | 187,553 | (29) | 197,967 | 233,930 | 1,982,458 |
| | | | | | | | | |
| 2.0% | 2.2% | 2.1% | 2.1% | 2.9% | 3.5% | 3.7% | 4.2% | — |
| 5.6 | 7.0 | 6.7 | 6.4 | 8.1 | 9.7 | 10.4 | 11.2 | — |
| | | | | | | | | |
| ¥1,230 | ¥1,530 | ¥1,900 | ¥1,634 | ¥2,525 | ¥2,495 | ¥2,735 | ¥2,470 | $20.93 |
| 650 | 1,050 | 1,270 | 969 | 1,078 | 1,627 | 1,563 | 1,637 | 13.87 |

# Consolidated Balance Sheets

Ricoh Company, Ltd. and Consolidated Subsidiaries
March 31, 2002 and 2003

| ASSETS | Millions of yen | | Thousands of U.S. dollars |
|---|---|---|---|
| | 2002 | 2003 | 2003 |
| **Current Assets:** | | | |
| Cash and cash equivalents | ¥ 170,172 | ¥ 189,243 | $ 1,603,754 |
| Time deposits | 12,478 | 11,087 | 93,958 |
| Marketable securities | 22,935 | 107 | 907 |
| Trade receivables— | | | |
| Notes | 85,269 | 76,022 | 644,254 |
| Accounts | 376,073 | 359,769 | 3,048,890 |
| Less—Allowance for doubtful receivables | (18,943) | (17,849) | (151,263) |
| Inventories— | | | |
| Finished goods | 116,435 | 102,164 | 865,796 |
| Work in process and raw materials | 45,741 | 43,887 | 371,924 |
| Deferred income taxes and other | 53,508 | 58,083 | 492,229 |
| Total current assets | 863,668 | 822,513 | 6,970,449 |
| | | | |
| **Property, Plant and Equipment, at Cost:** | | | |
| Land | 44,542 | 42,990 | 364,322 |
| Buildings | 202,581 | 204,606 | 1,733,949 |
| Machinery and equipment | 663,723 | 660,458 | 5,597,102 |
| Construction in progress | 2,969 | 6,540 | 55,424 |
| | 913,815 | 914,594 | 7,750,797 |
| Less—Accumulated depreciation | (654,435) | (665,842) | (5,642,729) |
| | 259,380 | 248,752 | 2,108,068 |
| | | | |
| **Investments and Other Assets:** | | | |
| Finance receivables | 447,829 | 476,293 | 4,036,381 |
| Investment securities | 28,886 | 71,973 | 609,941 |
| Investments in and advances to affiliates | 47,434 | 45,791 | 388,059 |
| Goodwill | 29,687 | 28,109 | 238,212 |
| Other intangible assets | 37,598 | 40,020 | 339,153 |
| Lease deposits and other | 118,446 | 151,471 | 1,283,652 |
| | 709,880 | 813,657 | 6,895,398 |
| | ¥1,832,928 | ¥1,884,922 | $15,973,915 |

The accompanying notes to consolidated financial statements are an integral part of these balance sheets.

| **LIABILITIES AND SHAREHOLDERS' INVESTMENT** | Millions of yen | | Thousands of U.S. dollars |
|---|---|---|---|
| | 2002 | 2003 | 2003 |
| **Current Liabilities:** | | | |
| Short-term borrowings | ¥ 161,094 | ¥ 84,478 | $ 715,915 |
| Current maturities of long-term indebtedness | 67,314 | 54,235 | 459,619 |
| Trade payables— | | | |
| Notes | 35,481 | 32,943 | 279,178 |
| Accounts | 242,272 | 247,855 | 2,100,466 |
| Accrued income taxes | 33,356 | 42,393 | 359,263 |
| Accrued expenses and other | 126,184 | 126,679 | 1,073,550 |
| Total current liabilities | 665,701 | 588,583 | 4,987,991 |
| | | | |
| **Long-Term Liabilities:** | | | |
| Long-term indebtedness | 332,995 | 345,902 | 2,931,373 |
| Accrued pension and severance costs | 119,572 | 209,011 | 1,771,280 |
| Deferred income taxes | 30,592 | 30,653 | 259,771 |
| | 483,159 | 585,566 | 4,962,424 |
| **Minority Interests** | 51,048 | 53,259 | 451,347 |
| | | | |
| **Commitments and Contingent Liabilities (Note 16)** | | | |
| | | | |
| **Shareholders' Investment:** | | | |
| Common stock: | | | |
| Authorized—1,000,000,000 shares in 2002 and 993,000,000 shares in 2003 | | | |
| Issued and outstanding—727,278,256 shares and 727,086,738 shares in 2002 | | | |
| and 744,912,078 shares and 742,608,635 shares in 2003 | 120,461 | 135,364 | 1,147,153 |
| Additional paid-in capital | 171,628 | 186,521 | 1,580,686 |
| Retained earnings | 385,741 | 434,748 | 3,684,305 |
| Accumulated other comprehensive income (loss) | (44,376) | (94,733) | (802,822) |
| Treasury stock at cost; 191,518 shares in 2002 and 2,303,443 shares in 2003 | (434) | (4,386) | (37,169) |
| Total shareholders' investment | 633,020 | 657,514 | 5,572,153 |
| | ¥1,832,928 | ¥1,884,922 | $15,973,915 |

# Consolidated Statements of Income

| Ricoh Company, Ltd. and Consolidated Subsidiaries<br>For the Years Ended March 31, 2001, 2002 and 2003 | | Millions of yen | | Thousands of<br>U.S. dollars |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2003 |
| **Net Sales** | ¥1,538,262 | ¥1,672,340 | **¥1,738,358** | **$14,731,847** |
| **Cost of Sales** | 924,893 | 972,394 | **993,009** | **8,415,330** |
| Gross profit | 613,369 | 699,946 | 745,349 | 6,316,517 |
| **Selling, General and Administrative Expenses** | 508,264 | 570,251 | **611,695** | **5,183,856** |
| Operating income | 105,105 | 129,695 | 133,654 | 1,132,661 |
| **Other (Income) Expenses:** | | | | |
| Interest and dividend income | (8,045) | (4,753) | **(3,772)** | **(31,966)** |
| Interest expense | 7,787 | 8,233 | **6,853** | **58,076** |
| Foreign currency exchange (gain) loss, net | (3,490) | 5,732 | **566** | **4,797** |
| Other, net | 11,088 | 6,533 | **6,537** | **55,398** |
| Total | 7,340 | 15,745 | 10,184 | 86,305 |
| **Income before Income Taxes, Minority Interests and Equity in Earnings of Affiliates** | 97,765 | 113,950 | **123,470** | **1,046,356** |
| **Provision for Income Taxes:** | | | | |
| Current | 53,506 | 52,365 | **63,183** | **535,449** |
| Deferred | (9,994) | (1,218) | **(11,199)** | **(94,907)** |
| Total | 43,512 | 51,147 | 51,984 | 440,542 |
| **Income before Minority Interests and Equity in Earnings of Affiliates** | 54,253 | 62,803 | **71,486** | **605,814** |
| **Minority Interests** | 3,123 | 3,080 | **1,376** | **11,661** |
| **Equity in Earnings of Affiliates** | 2,098 | 1,891 | **2,403** | **20,364** |
| **Net Income** | ¥ 53,228 | ¥ 61,614 | **¥ 72,513** | **$ 614,517** |
| | | Yen | | U.S. dollars |
| **Per Share of Common Stock:** | | | | |
| Net income: | | | | |
| Basic | ¥ 76.85 | ¥ 88.27 | **¥ 99.79** | **$ 0.85** |
| Diluted | 71.02 | 82.46 | **96.81** | **0.82** |
| Cash dividends paid | ¥ 11.50 | ¥ 12.00 | **¥ 14.00** | **$ 0.12** |
| **Per American Depositary Share, Each Representing 5 Shares of Common Stock:** | | | | |
| Net income: | | | | |
| Basic | ¥ 384.25 | ¥ 441.35 | **¥ 498.95** | **$ 4.23** |
| Diluted | 355.10 | 412.30 | **484.05** | **4.10** |
| Cash dividends paid | ¥ 57.50 | ¥ 60.00 | **¥ 70.00** | **$ 0.59** |

The accompanying notes to consolidated financial statements are an integral part of these statements.

# Consolidated Statements of Shareholders' Investment

| Ricoh Company, Ltd. and Consolidated Subsidiaries<br>For the Years Ended March 31, 2001, 2002 and 2003 | Millions of yen | | | Thousands of<br>U.S. dollars |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2003 |
| **Common Stock:** | | | | |
| Beginning balance | ¥103,112 | ¥103,434 | ¥120,461 | $1,020,856 |
| Conversion of convertible bonds; 672,625 shares in 2001,<br>34,522,672 shares in 2002, and 24,633,822 shares in 2003 | 322 | 17,027 | 14,903 | 126,297 |
| Ending balance | ¥103,434 | ¥120,461 | ¥135,364 | $1,147,153 |
| **Additional Paid-in Capital:** | | | | |
| Beginning balance | ¥154,314 | ¥154,635 | ¥171,628 | $1,454,474 |
| Conversion of convertible bonds | 321 | 16,993 | 14,893 | 126,212 |
| Ending balance | ¥154,635 | ¥171,628 | ¥186,521 | $1,580,686 |
| **Retained Earnings:** | | | | |
| Beginning balance | ¥287,182 | ¥332,447 | ¥385,741 | $3,268,991 |
| Net income for the year | 53,228 | 61,614 | 72,513 | 614,517 |
| Dividends declared and approved | (7,963) | (8,320) | (10,178) | (86,254) |
| Retirement of treasury stock; 7,000,000 shares in 2003 | — | — | (13,328) | (112,949) |
| Ending balance | ¥332,447 | ¥385,741 | ¥434,748 | $3,684,305 |
| **Accumulated Other Comprehensive Income (Loss):** | | | | |
| Beginning balance | ¥ (3,102) | ¥ (33,788) | ¥ (44,376) | $ (376,068) |
| Foreign currency translation adjustments | (1,740) | 6,516 | 1,007 | 8,534 |
| Unrealized gains (losses) on securities,<br>net of reclassification adjustment | (6,967) | (766) | (1,984) | (16,814) |
| Unrealized gains (losses) on derivatives, net of reclassification adjustment | — | (207) | 29 | 246 |
| Minimum pension liability adjustments | (21,979) | (16,131) | (49,409) | (418,720) |
| Ending balance | ¥(33,788) | ¥ (44,376) | ¥ (94,733) | $ (802,822) |
| **Treasury stock:** | | | | |
| Beginning balance | — | ¥ — | ¥ (434) | $ (3,678) |
| Purchase of treasury stock; 446,928 shares in 2002 and 9,111,925 shares in 2003 | — | (1,083) | (17,280) | (146,440) |
| Sales of treasury stock; 269,000 shares in 2002 | — | 649 | — | — |
| Retirement of treasury stock; 7,000,000 shares in 2003 | — | — | 13,328 | 112,949 |
| Ending balance | — | ¥ (434) | ¥ (4,386) | $ (37,169) |
| **Comprehensive Income:** | | | | |
| Net income for the year | ¥ 53,228 | ¥ 61,614 | ¥ 72,513 | $ 614,517 |
| Other comprehensive income (loss) for the year, net of tax | (30,686) | (10,588) | (50,357) | (426,754) |
| Total comprehensive income for the year | ¥ 22,542 | ¥ 51,026 | ¥ 22,156 | $ 187,763 |

The accompanying notes to consolidated financial statements are an integral part of these statements.

# Consolidated Statements of Cash Flows

Ricoh Company, Ltd. and Consolidated Subsidiaries
For the Years Ended March 31, 2001, 2002 and 2003

| | 2001 | 2002 | 2003 | 2003 |
|---|---|---|---|---|
| | Millions of yen | | | Thousands of U.S. dollars |
| **Cash Flows from Operating Activities:** | | | | |
| Net income | ¥ 53,228 | ¥ 61,614 | ¥ 72,513 | $ 614,517 |
| Adjustments to reconcile net income to net cash | | | | |
| provided by operating activities— | | | | |
| Depreciation and amortization | 62,142 | 73,782 | 76,551 | 648,737 |
| Equity in earnings of affiliates, net of dividends received | (1,056) | (1,260) | (1,167) | (9,890) |
| Deferred income taxes | (9,994) | (1,218) | (9,289) | (78,720) |
| Losses on disposals and sales of property, plant and equipment | 2,223 | 1,665 | 1,975 | 16,737 |
| Changes in assets and liabilities, net of effects from acquisition— | | | | |
| (Increase) decrease in trade receivables | (32,476) | (20,006) | 22,176 | 187,932 |
| (Increase) decrease in inventories | (7,167) | 21,194 | 14,983 | 126,975 |
| Increase in finance receivables | (15,127) | (13,620) | (33,109) | (280,585) |
| (Decrease) increase in trade payables | 16,235 | (19,535) | 5,632 | 47,729 |
| (Decrease) increase in accrued income taxes and | | | | |
| accrued expenses and other | 27,310 | (13,592) | 11,173 | 94,686 |
| Increase in accrued pension and severance costs | 1,667 | 8,374 | 7,806 | 66,153 |
| Other, net | 5,743 | 7,740 | 16,498 | 139,814 |
| Net cash provided by operating activities | 102,728 | 105,138 | 185,742 | 1,574,085 |
| **Cash Flows from Investing Activities:** | | | | |
| Proceeds from sales of property, plant and equipment | 1,120 | 756 | 245 | 2,076 |
| Expenditures for property, plant and equipment | (73,040) | (75,231) | (71,984) | (610,034) |
| Payments for purchases of available-for-sale securities | (23,395) | (10,025) | (52,219) | (442,534) |
| Proceeds from sales of available-for-sale securities | 66,778 | 24,568 | 24,513 | 207,737 |
| (Increase) decrease in time deposits | 6,797 | (477) | 944 | 8,000 |
| Payments for acquisition of Lanier Worldwide, Inc., net of cash acquired | (28,103) | — | — | — |
| Other, net | (10,354) | (21,012) | 302 | 2,560 |
| Net cash used in investing activities | (60,197) | (81,421) | (98,199) | (832,195) |
| **Cash Flows from Financing Activities:** | | | | |
| Proceeds from long-term loans | 33,183 | 71,075 | 58,194 | 493,169 |
| Repayment of long-term loans | (114,701) | (79,640) | (23,133) | (196,042) |
| (Decrease) increase in short-term borrowings, net | 5,565 | (39,414) | (73,393) | (621,975) |
| Proceeds from issuance of long-term debt securities | — | 103,500 | 11,000 | 93,220 |
| Repayment of long-term debt securities | (2,990) | (10,000) | (11,723) | (99,347) |
| Dividend payments | (7,964) | (8,322) | (10,176) | (86,237) |
| Payment for purchase of treasury stock | — | (1,054) | (17,281) | (146,449) |
| Other, net | (1,475) | 90 | (631) | (5,347) |
| Net cash provided by (used in) financing activities | (88,382) | 36,235 | (67,143) | (569,008) |
| **Effect of Exchange Rate Changes on Cash and Cash Equivalents** | 975 | 2,474 | (1,329) | (11,263) |
| **Net Increase (Decrease) in Cash and Cash Equivalents** | (44,876) | 62,426 | 19,071 | 161,619 |
| **Cash and Cash Equivalents at Beginning of Year** | 152,622 | 107,746 | 170,172 | 1,442,135 |
| **Cash and Cash Equivalents at End of Year** | ¥ 107,746 | ¥170,172 | ¥189,243 | $1,603,754 |
| **Supplemental Disclosures of Cash Flow Information:** | | | | |
| **Cash Paid during the Year for—** | | | | |
| Interest | ¥ 13,749 | ¥ 9,418 | ¥ 7,300 | $ 61,864 |
| Income taxes | 57,192 | 53,129 | 52,154 | 441,983 |

The accompanying notes to consolidated financial statements are an integral part of these statements.

# Notes to Consolidated Financial Statements

Ricoh Company, Ltd. and Consolidated Subsidiaries

## 1. NATURE OF OPERATIONS

Ricoh Company, Ltd. (the "Company"), was established in 1936, and is headquartered in Tokyo, Japan. The Company and its consolidated subsidiaries ("Ricoh" as a consolidated group) is a worldwide supplier of office automation equipment, including copiers, facsimile machines, data processing systems, printers and related supplies. Ricoh is also well known for its state-of-the-art electronic devices, digital photographic equipment, and other products.

Ricoh distributes its products primarily through domestic (Japanese) and foreign sales subsidiaries. Overseas, Ricoh owns and distributes not only Ricoh brand products but also other brands, such as Gestetner, Lanier and Savin.

Ricoh manufactures its products primarily in 15 plants in Japan and 7 plants overseas, which are located in the United States, United Kingdom, France, and China.

## 2. SIGNIFICANT ACCOUNTING AND REPORTING POLICIES

The accompanying consolidated financial statements of Ricoh have been prepared in conformity with accounting principles generally accepted in the United States of America. Significant accounting and reporting policies are summarized below:

### (a) Basis of Presentation

The accompanying consolidated financial statements for the three years ended March 31, 2003 are presented in Japanese yen, the functional currency of the Company and its domestic subsidiaries. The translation of Japanese yen into U.S. dollar equivalents for the year ended March 31, 2003 is included solely for the convenience of readers outside Japan and has been made using the exchange rate of ¥118 to US$1, the approximate rate of exchange prevailing at the Federal Reserve Bank of New York on March 31, 2003.

The books of the Company and its domestic subsidiaries are maintained in conformity with Japanese accounting principles and practices, while foreign subsidiaries maintain their books in conformity with the standards of their country of domicile.

The accompanying consolidated financial statements reflect necessary adjustments, not recorded in the books, to present them in conformity with accounting principles generally accepted in the United States of America.

### (b) Principles of Consolidation

The accompanying consolidated financial statements include the accounts of Ricoh. Investments in entities in which Ricoh has the ability to exercise significant influence over the entities' operating and financial policies (generally 20 to 50 percent ownership) are accounted for on an equity basis. All significant intercompany balances and transactions have been eliminated in consolidation.

The accounts of certain consolidated subsidiaries have been included on the basis of fiscal periods ended within three months prior to March 31.

### (c) Revenue Recognition

Ricoh generates revenue principally through the sale of equipment, supplies and related services under separate contractual arrangements for each. Generally, Ricoh recognizes revenue when (1) it has a firm contract, (2) the product has been shipped to and accepted by the customer or the service has been provided, (3) the sales price is fixed or determinable and (4) amounts are reasonably assured of collection.

Most equipment sales require that Ricoh install the product. As such, revenue is recognized at the time of delivery and installation at the customer location. Equipment revenues are based on established prices by product type and model and are net of discounts and trade-in allowances. A sales return is accepted only when the equipment is defective and does not meet Ricoh's product performance specifications. Other than installation, there are no customer acceptance clauses in the sales contract.

Service revenues result primarily from maintenance contracts that are normally entered into at the time the equipment is sold. Standard service fee prices are established depending on equipment classification and include a cost value for the estimated services to be performed based on historical experience plus a profit margin thereon. As a matter of policy, Ricoh does not discount such prices. On a monthly basis, maintenance service revenues are earned and recognized by Ricoh and billed to the customer in accordance with the contract and include a fixed monthly fee plus a variable amount based on usage. The length of the contract ranges up to five years, however, most contracts are cancelable at any time by the customer upon a short notice period.

### (d) Foreign Currency Translation

For foreign operations with functional currencies other than Japanese yen, assets and liabilities are translated at the exchange rates in effect at each fiscal year-end, and income and expenses are translated at the average rates of exchange prevailing during each fiscal year. The resulting translation adjustments are included as a part of accumulated other comprehensive income (loss) in shareholders' investment.

All foreign currency transaction gains and losses are included in other income and expense in the period incurred.

### (e) Cash Equivalents

Cash and cash equivalents include highly liquid investments with maturities of three months or less at the date of purchase.

Beginning April 1, 2002, Ricoh changed its policy concerning which short-term investments are treated as cash equivalents in its consolidated balance sheets and statements of cash flows. Cash equivalents formerly included certificates of deposit and time deposits with maturities of three months or less at the date of purchase. In addition to the above, Ricoh decided to include in cash equivalents other short-term investment securities which are available-for-sale at any time, present insignificant risk of changes in value due to being readily convertible into cash and have an original maturity of three months or less, such as money management funds and free financial funds. Ricoh believes this change is preferable, since it expects to utilize such short-term investment securities more significantly in its operating cash management activities. In relation to this change, Ricoh has restated its consolidated balance sheets and consolidated statements of cash flows for prior years. The effect of this change on previously reported amounts was to increase cash and cash equivalents by ¥40,784 million, ¥43,289 million and ¥27,664 million with corresponding decreases to marketable securities as of March 31, 2000, 2001 and 2002, respectively, and to decrease net cash used in investing activities by ¥2,531 million and to increase by ¥15,629 million, respectively, for the years ended March 31, 2001 and 2002.

31

### (f) Derivative Financial Instruments and Hedging Activities

As discussed further in Note 15, Ricoh manages its exposure to certain market risks, primarily foreign currency and interest rate risks, through the use of derivative instruments. As a matter of policy, Ricoh does not enter into derivative contracts for trading or speculative purposes. On April 1, 2001 Ricoh adopted SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," and SFAS No. 138, "Accounting for Certain Derivative Instruments and Certain Hedging Activities," which require that all derivative instruments be recorded on the balance sheets at their respective fair values. In accordance with the transition provisions of SFAS No. 133, Ricoh recorded a cumulative effect adjustment, net of tax, resulting in a decrease in net income of ¥66 million and a decrease in other comprehensive income (loss) of ¥1,864 million at April 1, 2001.

In accordance with SFAS No. 133, Ricoh, when it enters into a derivative contract, makes a determination as to whether or not for accounting purposes the derivative is part of a hedging relationship. In general, a derivative may be designated as either (1) a hedge of the fair value of a recognized asset or liability or an unrecognized firm commitment ("fair value hedge"), (2) a hedge of the variability of the expected cash flows associated with an existing asset or liability or a forecasted transaction ("cash flow hedge"), or (3) a foreign currency fair value or cash flow hedge ("foreign currency hedge"). Ricoh formally documents all relationships between hedging instruments and hedged items, as well as its risk-management objective and strategy for undertaking various hedge transactions. This process includes linking all derivatives that are designated as fair values, cash flow, or foreign currency hedges to specific assets and liabilities on the consolidated balance sheet or to specific firm commitments or forecasted transactions.

For derivative contracts that are designated and qualify as fair value hedges including foreign currency fair value hedges, the derivative instrument is marked-to-market with gains and losses recognized in current period earnings to offset the respective losses and gains recognized on the underlying exposure. For derivative contracts that are designated and qualify as cash flow hedges including foreign currency cash flow hedges, the effective portion of gains and losses on these contracts is reported as a component of accumulated other comprehensive income (loss) and reclassified into earnings in the same period the hedged item or transaction affects earnings. Any hedge ineffectiveness on cash flow hedges is immediately recognized in earnings. For all derivative instruments that are not designated as part of a hedging relationship and for designated derivative instruments that do not qualify for hedge accounting, the contracts are recorded at fair value with the gain or loss recognized in current period earnings.

Prior to April 1, 2001, gains and losses on qualifying hedges of existing assets or liabilities were included in the carrying amounts of those assets or liabilities and were ultimately recognized in income as part of those carrying amounts. Gains and losses related to qualifying hedges of firm commitments and anticipated transactions were deferred and recognized in income, or as adjustments of carrying amounts, when the hedged transaction occurred.

### (g) Allowance for Doubtful Trade Receivables and Finance Receivables

Ricoh records allowances for doubtful receivables that are based upon historical experience and specific customer collection issues. The estimated amount of probable credit losses in its existing receivables is determined from the write-off history, adjusted to reflect current economic conditions and specific allowances for receivables including nonperforming leases, impaired loans or other accounts of which Ricoh has concluded it will be unable to collect all amounts due according to original terms of the lease or loan agreement. Account balances are charged-off against the allowances when collection is considered remote.

### (h) Securities

Ricoh conforms with SFAS No. 115, "Accounting for Certain Investments in Debt and Equity Securities," which requires all investments in debt and marketable equity securities to be classified as either held-to-maturity, trading, or available-for-sale securities. As of March 31, 2002 and 2003, all of Ricoh's investments in debt and marketable equity securities are classified as available-for-sale securities. Those available-for-sale securities are reported at fair value with unrealized gains and losses, net of related taxes, excluded from earnings and reported in accumulated other comprehensive income (loss). Available-for-sale securities, which mature or are expected to be sold in one year, are classified as current assets.

Individual securities classified as available-for-sale securities are reduced to their then fair value for any declines in market value determined to be other than temporary. These impairment losses are charged against earnings at the time that a decline has been determined to be other than temporary based primarily on the financial condition of the issuer and the extent and length of time of the decline. Investments whose market values have declined below cost that extends for nine months are automatically written-down to their then fair value in all cases.

The cost of the securities sold is computed based on the average cost of each security held at the time of sale.

Non-marketable equity securities owned by Ricoh primarily relate to less than 20% owned companies and are stated at cost.

### (i) Inventories

Inventories are mainly stated at the lower of average cost or net realizable values. Inventory costs include raw materials, labor and manufacturing overheads.

### (j) Property, Plant and Equipment

For the Company and its domestic subsidiaries, depreciation of property, plant and equipment is computed principally by using the declining-balance method over the estimated useful lives. Most of the foreign subsidiaries have adopted the straight-line method for computing depreciation, which currently accounts for approximately 41% of the consolidated depreciation expense. The depreciation period generally ranges from 5 years to 50 years for buildings and 2 years to 12 years for machinery and equipment.

Effective rates of depreciation for the years ended March 31, 2001, 2002 and 2003 are summarized below:

|  | 2001 | 2002 | 2003 |
|---|---|---|---|
| Buildings | 8.0% | 8.3% | 8.1% |
| Machinery and equipment | 36.6 | 40.6 | 41.0 |

Certain leased buildings, machinery and equipment are accounted for as capital leases in conformity with SFAS No. 13, "Accounting for Leases." The aggregate cost included in plant and equipment and related accumulated depreciation as of March 31, 2002 and 2003 were as follows:

|  | Millions of yen | | Thousands of U.S. dollars |
|---|---|---|---|
|  | 2002 | 2003 | 2003 |
| Aggregate cost | ¥6,578 | ¥7,339 | $62,195 |
| Accumulated depreciation | 3,965 | 4,036 | 34,203 |

The related future minimum lease payments and the present value of the net minimum lease payments as of March 31, 2003 were ¥4,676 million ($39,627 thousand) and ¥4,237 million ($35,907 thousand), respectively.

Ordinary maintenance and repairs are charged to expense as incurred. Major replacements and improvements are capitalized. When properties are retired or otherwise disposed of, the property and related accumulated depreciation accounts are relieved of the applicable amounts, and any differences are included in earnings.

### (k) Goodwill and Other Intangible Assets

In June 2001, the Financial Accounting Standards Board ("FASB") issued SFAS No. 141, "Business Combinations," and SFAS No. 142, "Goodwill and Other Intangible Assets." SFAS No. 141 requires the use of only the purchase method of accounting for business combinations and refines the definition of intangible assets acquired in a purchase business combination. SFAS No. 142 eliminates the amortization of goodwill and instead requires annual impairment testing thereof. SFAS No. 142 also requires acquired intangible assets with a definite useful life to be amortized over their respective estimated useful lives and reviewed for impairment in accordance with SFAS No. 144. Any acquired intangible asset determined to have an indefinite useful life is not amortized, but instead is tested for impairment based on its fair value until its life would be determined to no longer be indefinite.

Ricoh fully adopted the provisions of SFAS No. 141 and SFAS No. 142 as of April 1, 2002. Goodwill acquired in business combinations completed before July 1, 2001, was amortized until March 31, 2002. In connection with the transitional impairment evaluation, SFAS No. 142 required Ricoh to perform an assessment of whether there was an indication that goodwill was impaired as of April 1, 2002. To accomplish this, Ricoh (1) identified its reporting units, (2) determined the carrying value of each reporting unit by assigning the assets and liabilities, including the existing goodwill and intangible assets, to those reporting units, and (3) determined the fair value of each reporting unit. Ricoh completed the transitional assessment by September 30, 2002, and determined there was no indication that goodwill had been impaired as of April 1, 2002. Ricoh also completed the annual assessment for the year ended March 31, 2003 and determined that no goodwill impairment charge was necessary.

Prior to the adoption of SFAS No. 142, Ricoh classified the cost in excess of fair value of the net assets of companies acquired in purchase transactions as goodwill, and the goodwill was being amortized on a straight-line method over the estimated periods benefited, not to exceed 20 years.

### (l) Pension and Retirement Allowances Plans

The measurement of pension costs and liabilities is determined in accordance with SFAS No. 87, "Employers' Accounting for Pensions." Under SFAS No. 87, changes in the amount of either the projected benefit obligation or plan assets resulting from actual results different from that assumed and from changes in assumptions can result in gains and losses not yet recognized in the consolidated financial statements. Amortization of an unrecognized net gain or loss is included as a component of the net periodic benefit plan cost for a year if, as of the beginning of the year, that unrecognized net gain or loss exceeds 10 percent of the greater of (1) the projected benefit obligation or (2) the fair value of that plan's assets.  In such case, the amount of amortization recognized is the resulting excess divided by the average remaining service period of active employees expected to receive benefits under the plan. The expected long-term rate of return on plan assets used for pension accounting is determined based on the historical

long-term rate of return on plan assets. The discount rate is determined based on the rates of return of high-quality fixed-income investments currently available and expected to be available during the period to maturity of the pension benefits.

### (m) Income Taxes

Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences and carryforwards are expected to be realized or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

Income taxes are provided for undistributed earnings of foreign subsidiaries.

### (n) Research and Development Expenses and Advertising Costs

Research and development expenses and advertising costs are expensed as incurred.

### (o) Shipping and Handling Costs

Shipping and handling costs, which mainly include transportation to customers, are included in selling, general and administrative expenses in the consolidated statements of income.

### (p) Impairment or Disposal of Long-Lived Assets

In August 2001, the FASB issued SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets." SFAS No. 144 develops a single accounting model, based on the framework established in SFAS No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of" for long-lived assets to be disposed of by sale, and broadens the scope of what constitutes a business to be disposed of that should be reported as a discontinued operation. The new standard was adopted on April 1, 2002, and did not have a material effect on Ricoh's consolidated financial position or results of operations.

SFAS No. 144 requires that long-lived assets and acquired intangible assets with a definite life are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset or group of assets may not be recoverable. Recoverability of assets to be held and used is assessed by comparing the carrying amount of an asset or asset group to the expected future undiscounted net cash flows of the asset or group of assets. If an asset or group of assets is considered to be impaired, the impairment charge to be recognized is measured as the amount by which the carrying amount of the asset or group of assets exceeds fair value. Long-lived assets meeting the criteria to be considered as held for sale are reported at the lower of their carrying amount or fair value less costs to sell.

Prior to the adoption of SFAS No. 144, Ricoh accounted for long-lived assets in accordance with SFAS No. 121.

### (q) Earnings Per Share

Basic net income per common share is calculated by dividing net income by the weighted-average number of shares outstanding during the period. The calculation of diluted net income per common share is similar to the calculation of basic net income per share, except that the weighted-average number of shares outstanding includes the additional dilution from potential common stock equivalents such as convertible bonds.

33

### (r) Non-cash Transactions

The following non-cash transactions have been excluded from the consolidated statements of cash flows:

| | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2003 |
| Conversion of convertible bonds | ¥ 1,088 | ¥35,620 | ¥32,905 | $278,856 |
| Capital lease obligations incurred | 289 | 445 | 1,697 | 14,381 |
| Assets and liabilities of Lanier Worldwide, Inc., in 2001: | | | | |
| Fair value of assets acquired | 134,586 | — | — | — |
| Liabilities assumed | 104,623 | — | — | — |
| Retirement of treasury stock | — | — | 13,328 | 112,949 |

### (s) Use of Estimates

Management of the Company has made a number of estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses, including impairment losses of long-lived assets and the disclosures of fair value of financial instruments and contingent assets and liabilities, to prepare these financial statements in conformity with generally accepted accounting principles. Actual results could differ from those estimates.

The Company has identified five areas where it believes assumptions and estimates are particularly critical to the consolidated financial statements. These are revenue recognition, determination of the allowance for doubtful receivables, impairment on long-lived assets and goodwill, realizability of deferred tax assets and pension accounting.

### (t) New Accounting Standards

In June 2001, the FASB issued SFAS No. 143, "Accounting for Asset Retirement Obligations." This statement addresses financial accounting and reporting for obligations associated with the retirement of tangible long-lived assets and the associated asset retirement costs. The new standard will be adopted on April 1, 2003, and is not expected to have a material effect on Ricoh's consolidated financial position or results of operations.

In April 2002, the FASB issued SFAS No. 145, "Rescission of FASB Statements No. 4, 44 and 64, Amendment of FASB Statement 13 and Technical Corrections." SFAS No. 145 requires gains and losses on extinguishments of debt to be classified as gains or losses from continuing operations rather than as extraordinary items as previously required under SFAS No. 4, unless the gains and losses meet the criteria to be classified as extraordinary pursuant to APB 30. SFAS No. 145 also amends SFAS No. 13, "Accounting for Leases," to eliminate an inconsistency between the required accounting for sale-lease back transactions and the required accounting for certain lease modifications that have economic effects that are similar to sale-lease back transactions. The rescission of SFAS No. 4 is effective for transactions occurring after May 15, 2002. The provisions of SFAS No. 145 related

to SFAS No. 13 are effective for transactions occurring after May 15, 2002. The adoption of these provisions had no impact on Ricoh's consolidated financial position or results of operations.

In July 2002, the FASB issued SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities." The Statement requires that a liability for costs associated with exit or disposal activities be recognized in the period in which the costs are incurred if a reasonable estimate of fair value can be made. Under current accounting guidance, a liability can be recognized when management has committed to an exit plan. The requirements under SFAS No. 146 are effective prospectively for exit or disposal activities initiated after December 31, 2002. Restatement of previously issued financial statements is not permitted. The adoption of this Statement did not have a material effect on Ricoh's consolidated financial position or results of operations.

In November 2002, the Emerging Issue Task Force ("EITF") reached a final consensus on EITF 00-21, "Revenue Arrangements with Multiple Deliverables." EITF 00-21 addresses certain aspects of the accounting for revenue arrangements with multiple deliverables by a vendor. The Issue outlines an approach to determine when a revenue arrangement for multiple deliverables should be divided into separate units of accounting and, if separation is appropriate, how the arrangement consideration should be allocated to the identified accounting units. The consensus reached in the Issue will be effective for Ricoh in its financial statements beginning July 1, 2003. Ricoh will adopt EITF00-21 in the quarter beginning July 1, 2003. Ricoh is currently determining the impact, if any, of the adoption of EITF 00-21 on Ricoh's consolidated financial position and results of operations.

In November 2002, the FASB issued Interpretation No. 45 (FIN 45), "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness to Others, an interpretation of FASB Statements No. 5, 57 and 107 and a rescission of FASB Interpretation No. 34." This Interpretation elaborates on the disclosures to be made by a guarantor in its financial statements about its obligations under guarantees issued. The Interpretation also clarifies that a guarantor is required to recognize, at inception of a guarantee, a liability for the fair value of the obligation undertaken. The initial recognition and measurement provisions of the Interpretation are applicable to guarantees issued or modified after December 31, 2002. The Interpretation has not had a material effect on Ricoh's consolidated financial position or results of operations.

In January 2003, the FASB issued Interpretation No. 46 (FIN 46), "Consolidation of Variable Interest Entities ("VIEs")," which addresses consolidation by business enterprises of variable interest entities that either: (1) do not have sufficient equity investment at risk to permit the entity to finance its activities without additional subordinated financial support, or (2) the equity investors lack an essential characteristic of a controlling financial interest. Ricoh does not anticipate the adoption of this Interpretation will have any impact on its financial position or results of operations as it presently does not have investments in VIEs.

### (u) Reclassification

Certain reclassifications have been made to the prior years' consolidated financial statements to conform the presentation used for the year ended March 31, 2003.

## 3. ACQUISITION

In January 2001, Ricoh completed a take-over bid for Lanier Worldwide, Inc. ("Lanier"), for cash of ¥29,963 million. As a result of this acquisition, Lanier became a wholly owned subsidiary that distributes Lanier brand name office equipment products in the global marketplace. The acquisition was accounted for using the purchase method of accounting. The cash purchase price has been allocated on Ricoh's balance sheets to the tangible and intangible net assets and resulted in goodwill of ¥25,496 million. The results of operations for Lanier for the post-acquisition period for the two months ended March 31, 2001, and years thereafter are included in the accompanying consolidated statements of income. The following unaudited pro forma information presents the consolidated results of operations for the year ended March 31, 2001, as if the acquisition had occurred as of the beginning of that year:

|  | Millions of yen |
| --- | --- |
|  | 2001 |
| Net sales | ¥1,624,036 |
| Net income | 49,474 |

|  | Yen |
| --- | --- |
|  | 2001 |
| Net income per share of common stock— |  |
| Basic | ¥71.43 |
| Diluted | 66.03 |

The pro forma results of operations are not necessarily indicative of the actual results of operations that would have occurred had the acquisition been made at the beginning of the year or the results that may occur in the future.

In December 2002, Ricoh acquired the remaining outstanding shares of Shanghai Ricoh Facsimile Co., Ltd. ("Shanghai Ricoh") for ¥1,745 million ($14,788 thousand). The acquisition of the remaining 45% interest in Shanghai Ricoh was accounted for using the purchase method of accounting and resulted in goodwill of ¥778 million ($6,593 thousand).

## 4. FINANCE RECEIVABLES

Finance receivables as of March 31, 2002 and 2003 are comprised primarily of lease receivables and installment loans.

Ricoh's products are leased to domestic customers primarily through Ricoh Leasing Company, Ltd., a majority-owned domestic subsidiary and to overseas customers primarily through certain overseas subsidiaries. These leases qualify and are accounted for as sales-type leases in conformity with SFAS No. 13. Sales revenue from sales-type leases is recognized at the inception of the leases.

Information pertaining to Ricoh's lease receivables as of March 31, 2002 and 2003 is as follows:

|  | Millions of yen | | Thousands of U.S. dollars |
| --- | --- | --- | --- |
|  | 2002 | 2003 | 2003 |
| Minimum lease payments receivable | ¥460,380 | ¥486,165 | $4,120,042 |
| Estimated non-guaranteed residual value | 1,976 | 2,209 | 18,720 |
| Unearned income | (50,576) | (49,039) | (415,584) |
| Allowance for doubtful receivables | (12,926) | (13,573) | (115,025) |
| Net lease receivables | ¥398,854 | ¥425,762 | $3,608,153 |

As of March 31, 2003, the minimum lease payments receivable due in each of the next five years and thereafter are as follows:

| Years ending March 31 | Millions of yen | Thousands of U.S. dollars |
| --- | --- | --- |
| 2004 | ¥157,672 | $1,336,203 |
| 2005 | 132,590 | 1,123,644 |
| 2006 | 98,457 | 834,381 |
| 2007 | 64,847 | 549,551 |
| 2008 | 26,907 | 228,026 |
| 2009 and thereafter | 5,692 | 48,237 |
| Total | ¥486,165 | $4,120,042 |

Ricoh Leasing Company, Ltd., has also extended certain other types of loans as part of its business activities, which are primarily residential housing loans to individuals in Japan secured by the underlying real estate properties. Loan terms range from 15 years to 30 years with monthly repayments. The total balances of these loans, net of allowance for doubtful receivables, as of March 31, 2002 and 2003 were ¥48,975 million and ¥50,531 million ($428,229 thousand), respectively. Loan activities for the years ended March 31, 2001, 2002 and 2003 were as follows:

|  | Millions of yen | | | Thousands of U.S. dollars |
| --- | --- | --- | --- | --- |
|  | 2001 | 2002 | 2003 | 2003 |
| Extension of new loans | ¥10,916 | ¥8,638 | ¥11,559 | $97,958 |
| Repayment of outstanding loans | 6,393 | 7,554 | 9,993 | 84,686 |

Ricoh sold finance lease receivables with pretax gains of ¥175 million and ¥225 million for the years ended March 31, 2001 and 2002, respectively, through securitization transactions. Servicing assets or liabilities related to securitization transactions initiated were not recorded because the servicing fees adequately compensated Ricoh. Ricoh's retained interests are subordinate to investors' interests. Their value is subject to credit and interest rate risk on the sold financial assets. The investors and Special Purpose Entities have no recourse to Ricoh's other assets for failure of debtors to pay.

Key economic assumptions used in measuring the fair value of retained interests related to securitization transactions completed during the years ended March 31, 2002 and 2003 were as follows:

|  | 2002 | 2003 |
| --- | --- | --- |
| Expected credit losses | 0.75%–1.35% | 0.75%–1.35% |
| Discount rate | 0.89%–3.00% | 0.89%–3.00% |

The impacts of 10% and 20% adverse changes to the key economic assumptions on the fair value of retained interests as of March 31, 2003 are presented below.

|  | Millions of yen | Thousands of U.S. dollars |
|---|---|---|
|  | 2003 | 2003 |
| Carrying value of retained interests (included in lease deposits and other in the consolidated balance sheets) | ¥10,596 | $89,797 |
| Expected credit losses: |  |  |
| +10% | 119 | 1,008 |
| +20% | 237 | 2,008 |
| Discount rate: |  |  |
| +10% | 47 | 398 |
| +20% | 86 | 729 |

The hypothetical scenario does not reflect expected market conditions and should not be used as a prediction of future performance. As the figures indicate, changes in fair value may not be linear. Also, in the above table, the effect of a variation in a particular assumption on the fair value of the retained interest is calculated without changing any other assumption; in reality, changes in one factor may result in changes in another, which might magnify or counteract the sensitivities.

The following table summarizes certain cash flows received from and paid to the Special Purpose Entities for all securitization activity for the years ended March 31, 2001, 2002 and 2003:

|  | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
|  | 2001 | 2002 | 2003 | 2003 |
| Proceeds from new securitization | ¥29,869 | ¥25,000 | ¥ — | $ — |
| Servicing fees received | 32 | 39 | 37 | 314 |
| Repurchases of delinquent or ineligible assets | 3,277 | 5,138 | 5,750 | 48,729 |

Amounts of delinquencies, net credit losses, and components of all receivables managed and securitized as of March 31, 2002 and 2003, and for the years then ended, are as follows:

| | Millions of yen | | | | | |
|---|---|---|---|---|---|---|
| | 2002 | | | 2003 | | |
| | Total principal amount of receivables | Principal amount of receivables 4 months or more past due | Net credit losses | Total principal amount of receivables | Principal amount of receivables 4 months or more past due | Net credit losses |
| Principal amount outstanding | ¥491,791 | ¥977 | ¥3,937 | ¥504,252 | ¥1,175 | ¥3,893 |
| Less: receivables securitized | ( 80,011) | | | (64,917) | | |
| Receivables held in portfolio | ¥411,780 | | | ¥439,335 | | |

| | Thousands of U.S. dollars | | |
|---|---|---|---|
| | 2003 | | |
| | Total principal amount of receivables | Principal amount of receivables 4 months or more past due | Net credit losses |
| Principal amount outstanding | $4,273,322 | $9,958 | $32,992 |
| Less: receivables securitized | (550,144) | | |
| Receivables held in portfolio | $3,723,178 | | |

36

## 5. SECURITIES

Marketable securities and investment securities as of March 31, 2002 and 2003 consist of the following:

| | Millions of yen | | Thousands of U.S. dollars |
| | 2002 | 2003 | 2003 |
|---|---|---|---|
| Marketable securities: | | | |
| Available-for-sale securities | ¥22,935 | ¥ 107 | $ 907 |
| Investment securities: | | | |
| Available-for-sale securities | ¥23,337 | ¥64,602 | $547,475 |
| Non-marketable equity securities | 5,549 | 7,371 | 62,466 |
| | ¥28,886 | ¥71,973 | $609,941 |

The current and noncurrent security types of available-for-sale securities, and the respective cost, gross unrealized holding gains, gross unrealized holding losses and fair value as of March 31, 2002 and 2003 are as follows:

| | Millions of yen | | | | | | | |
| | 2002 | | | | 2003 | | | |
| | Cost | Gross unrealized holding gains | Gross unrealized holding losses | Fair value | Cost | Gross unrealized holding gains | Gross unrealized holding losses | Fair value |
|---|---|---|---|---|---|---|---|---|
| Current: | | | | | | | | |
| Corporate debt securities | ¥ 21,338 | ¥1,205 | ¥ 12 | ¥22,531 | ¥ 107 | ¥ — | ¥ — | ¥ 107 |
| Other | 404 | — | — | 404 | — | | | — |
| | ¥21,742 | ¥1,205 | ¥ 12 | ¥22,935 | ¥ 107 | ¥ — | ¥ — | ¥ 107 |
| Noncurrent: | | | | | | | | |
| Equity securities | ¥ 7,457 | ¥6,025 | ¥469 | ¥13,013 | ¥ 6,328 | ¥5,148 | ¥ 519 | ¥10,957 |
| Corporate debt securities | 20 | 6 | — | 26 | 45,020 | 5 | 195 | 44,830 |
| Other | 10,612 | 205 | 519 | 10,298 | 9,459 | 10 | 654 | 8,815 |
| | ¥18,089 | ¥6,236 | ¥988 | ¥23,337 | ¥60,807 | ¥5,163 | ¥1,368 | ¥64,602 |

| | Thousands of U.S. dollars | | | |
| | 2003 | | | |
| | Cost | Gross unrealized holding gains | Gross unrealized holding losses | Fair value |
|---|---|---|---|---|
| Current: | | | | |
| Corporate debt securities | $ 907 | $ — | $ — | $ 907 |
| Other | | | | — |
| | $907 | $ — | $ — | $ 907 |
| Noncurrent: | | | | |
| Equity securities | $ 53,628 | $43,627 | $ 4,399 | $ 92,856 |
| Corporate debt securities | 381,525 | 42 | 1,652 | 379,915 |
| Other | 80,161 | 85 | 5,542 | 74,704 |
| | $515,314 | $43,754 | $11,593 | $547,475 |

The table presented in the preceding paragraph and other information in this note were restated to reflect the change in policy for short-term investments treated as cash equivalents (see Note 2 (e)).

Other non-current securities mainly include investment trusts consisting of investment in marketable debt and equity securities.

The contractual maturities of debt securities classified as available-for-sale as of March 31, 2003, regardless of their balance sheet classification, are as follows:

| | Millions of yen | | Thousands of U.S. dollars | |
| | Cost | Fair value | Cost | Fair value |
|---|---|---|---|---|
| Due within one year | ¥ 107 | ¥ 107 | $ 907 | $ 907 |
| Due after one year through five years | 45,020 | 44,830 | 381,525 | 379,915 |
| | ¥45,127 | ¥44,937 | $382,432 | $380,822 |

Proceeds from the sales of available-for-sale securities were ¥66,778 million, ¥24,568 million and ¥24,513 million ($207,737 thousand) for the years ended March 31, 2001, 2002 and 2003, respectively.

The gross realized gains on sales of available-for-sale securities were ¥2,898 million for the year ended March 31, 2001, and there were no significant realized gains on sales of available-for-sale securities for the years ended March 31, 2002 and 2003. There were no significant realized losses on sales of available-for-sale securities for the three years ended March 31, 2003. The losses on securities of ¥2,739 million and ¥2,260 million ($19,153 thousand) for the years ended March 31, 2002 and 2003, respectively, were charged to other expense for declines in market value of available-for-sale securities where the decline was determined to be other than temporary.

In March 2000, the Company contributed certain marketable equity securities, not including those of its subsidiaries and affiliated companies, to an employee retirement benefit trust fully administered and controlled by an independent bank trustee, with no cash proceeds thereon. The transfer of the available-for-sale securities was accounted for as a sale in accordance with SFAS No. 125, "Accounting for Transfer and Servicing of Financial Assets and Extinguishments of Liabilities" and accordingly the recorded pension liability was reduced by the fair market value amount of the transferred securities. The fair value of these securities at the time of contribution was ¥20,760 million. The net unrealized gains on these available-for-sale securities amounting to ¥13,095 million continues to be included in "Accumulated other comprehensive income (loss)" on the consolidated balance sheets and will only be reflected in realized gains in the statements of income upon the future sale of the transferred securities by the trustee.

## 6. INVESTMENTS IN AND ADVANCES TO AFFILIATES

The investments in and advances to affiliates primarily relate to 20% to 50% owned companies. Included in these companies is COCA-COLA WEST JAPAN COMPANY, LIMITED, a 21.1% owned affiliate. The common stock of this company is publicly traded. The carrying value of the investment in this company was equal to its underlying book value and amounted to ¥37,529 million ($318,042 thousand) as of March 31, 2003. The quoted market value of this company was ¥33,577 million ($284,551 thousand) as of March 31, 2003.

Ricoh's equity in the underlying net book values of the other 20% to 50% owned companies is approximately equal to their individual carrying values.

Summarized financial information for all affiliates as of March 31, 2002 and 2003 and for the years ended March 31, 2001, 2002 and 2003 is as follows:

### Financial Position

| | Millions of yen | | Thousands of U.S. dollars |
|---|---|---|---|
| | 2002 | 2003 | 2003 |
| Assets— | | | |
| Current assets | ¥122,974 | ¥124,156 | $1,052,169 |
| Other assets | 141,148 | 139,357 | 1,180,992 |
| | ¥264,122 | ¥263,513 | $2,233,161 |
| Liabilities and shareholders' investment— | | | |
| Current liabilities | ¥ 41,852 | ¥ 40,954 | $ 347,068 |
| Other liabilities | 13,972 | 13,176 | 111,661 |
| Shareholders' investment | 208,298 | 209,383 | 1,774,432 |
| | ¥264,122 | ¥263,513 | $2,233,161 |

### Operations

| | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2003 |
| Sales | ¥263,804 | ¥288,992 | ¥338,035 | $2,864,703 |
| Costs and expenses | 254,137 | 277,950 | 327,139 | 2,772,364 |
| Net income | ¥ 9,667 | ¥ 11,042 | ¥ 10,896 | $ 92,339 |

The significant transactions of Ricoh with these affiliates for the years ended March 31, 2001, 2002 and 2003, and the related account balances at March 31, 2002 and 2003 are summarized as follows:

| | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2003 |
| Transactions— | | | | |
| Sales | ¥20,952 | ¥25,413 | ¥26,510 | $224,661 |
| Purchases | 13,673 | 15,584 | 19,808 | 167,864 |
| Dividend income | 1,008 | 1,133 | 1,236 | 10,475 |

The unrealized profits regarding the above transactions were eliminated in the consolidated financial statements.

| | Millions of yen | | Thousands of U.S. dollars |
|---|---|---|---|
| | 2002 | 2003 | 2003 |
| Account balances— | | | |
| Receivables | ¥8,513 | ¥6,434 | $54,525 |
| Payables | 2,858 | 1,604 | 13,593 |

As of March 31, 2003, consolidated retained earnings included undistributed earnings of 20% to 50% owned companies accounted for by the equity method in the amount of ¥38,913 million ($329,771 thousand).

# 7. GOODWILL AND OTHER INTANGIBLE ASSETS

Information for intangible assets subject to amortization and for intangible assets not subject to amortization is as follows:

| | Millions of yen | | | | | |
|---|---|---|---|---|---|---|
| | **2002** | | | **2003** | | |
| | Gross carrying amount | Accumulated amortization | Net carrying amount | Gross carrying amount | Accumulated amortization | Net carrying amount |
| Other intangible assets subject to amortization | | | | | | |
| Software | ¥20,956 | ¥(7,315) | ¥13,641 | **¥31,764** | **¥(12,763)** | **¥19,001** |
| Trade name and customer base | 14,427 | (1,897) | 12,530 | 13,463 | (3,217) | 10,246 |
| Other | 12,843 | (3,217) | 9,626 | 13,633 | (4,192) | 9,441 |
| Total | 48,226 | (12,429) | 35,797 | 58,860 | (20,172) | 38,688 |
| Other intangible assets not subject to amortization | | | 1,801 | | | 1,332 |
| Total other intangible assets | | | ¥37,598 | | | ¥40,020 |

| | Thousands of U.S. dollars | | |
|---|---|---|---|
| | **2003** | | |
| | Gross carrying amount | Accumulated amortization | Net carrying amount |
| Other intangible assets subject to amortization | | | |
| Software | **$269,186** | **$(108,161)** | **$161,025** |
| Trade name and customer base | 114,094 | (27,263) | 86,831 |
| Other | 115,534 | (35,525) | 80,009 |
| Total | 498,814 | (170,949) | 327,865 |
| Other intangible assets not subject to amortization | | | 11,288 |
| Total other intangible assets | | | $339,153 |

The aggregate amortization expense of other intangible assets subject to amortization for the year ended March 31, 2003 was ¥6,993 million ($59,263 thousand). The future amortization expense for each of the five years relating to intangible assets currently recorded in the consolidated balance sheets is estimated to be the following at March 31, 2003:

| Years ending March 31 | Millions of yen | Thousands of U.S. dollars |
|---|---|---|
| 2004 | ¥8,140 | $68,983 |
| 2005 | 6,985 | 59,195 |
| 2006 | 5,451 | 46,195 |
| 2007 | 3,243 | 27,483 |
| 2008 | 1,993 | 16,890 |

The changes in the carrying amounts of goodwill for the year ended March 31, 2003, were as follows:

| | Millions of yen | Thousands of U.S. dollars |
|---|---|---|
| Balance at beginning of year | ¥29,687 | $251,585 |
| Goodwill acquired during the year | 1,176 | 9,966 |
| Foreign exchange impact | (2,754) | (23,339) |
| Balance at end of year | ¥28,109 | $238,212 |

As of March 31, 2003, all the carrying value of goodwill was allocated to the office equipment segment.

The following table reconciles previously reported net income and net income per share for the years ended March 31, 2001 and 2002, as if the provisions of SFAS No. 142 had been in effect.

| | Millions of yen | |
|---|---|---|
| | 2001 | 2002 |
| Net income | | |
| Reported net income | ¥53,228 | ¥61,614 |
| Goodwill amortization | 736 | 2,514 |
| Adjusted net income | 53,964 | 64,128 |

| | Yen | |
|---|---|---|
| | 2001 | 2002 |
| Net income per share | | |
| Reported net income per share—basic | ¥ 76.85 | ¥ 88.27 |
| Goodwill amortization | 1.06 | 3.60 |
| Adjusted net income per share—basic | 77.91 | 91.87 |
| Reported net income per share—diluted | 71.02 | 82.46 |
| Goodwill amortization | 0.98 | 3.34 |
| Adjusted net income per share—diluted | 72.00 | 85.80 |

39

## 8. INCOME TAXES

Income before income taxes, minority interests and equity in earnings of affiliates and provision for income taxes for the years ended March 31, 2001, 2002 and 2003 are as follows:

| | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2003 |
| Income before income taxes, minority interests and equity in earnings of affiliates— | | | | |
| Domestic | ¥77,820 | ¥ 95,723 | ¥ 84,946 | $ 719,881 |
| Foreign | 19,945 | 18,227 | 38,524 | 326,475 |
| | ¥97,765 | ¥113,950 | ¥123,470 | $1,046,356 |
| Provision for income taxes— | | | | |
| Current: | | | | |
| Domestic | ¥45,684 | ¥ 43,564 | ¥ 50,103 | $ 424,602 |
| Foreign | 7,822 | 8,801 | 13,080 | 110,847 |
| | 53,506 | 52,365 | 63,183 | 535,449 |
| Deferred: | | | | |
| Domestic | (10,380) | (3,524) | (9,043) | (76,636) |
| Foreign | 386 | 2,306 | (2,156) | (18,271) |
| | (9,994) | (1,218) | (11,199) | (94,907) |
| Consolidated provision for income taxes | ¥43,512 | ¥ 51,147 | ¥ 51,984 | $ 440,542 |

Total income taxes are allocated as follows:

| | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2003 |
| Provision for income taxes | ¥43,512 | ¥51,147 | ¥51,984 | $ 440,542 |
| Shareholders' investment: | | | | |
| Foreign currency translation adjustments | (1,252) | 2,062 | (826) | (7,000) |
| Unrealized gains (losses) on securities | 629 | (582) | (1,130) | (9,576) |
| Unrealized losses on derivatives | — | (146) | (9) | (76) |
| Minimum pension liability adjustment | (15,818) | (11,760) | (30,811) | (261,110) |
| | ¥27,071 | ¥40,721 | ¥19,208 | $ 162,780 |

The Company and its domestic subsidiaries are subject to National Corporate tax of 30%, an inhabitant tax of approximately 6% and a deductible Enterprise tax approximately 10%, which in the aggregate resulted in the normal statutory tax rate of approximately 42%. The normal statutory tax rate differs from the effective tax rate for the years ended March 31, 2001, 2002 and 2003 as a result of the following:

| | 2001 | 2002 | 2003 |
|---|---|---|---|
| Normal tax rate | 42% | 42% | 42% |
| Nondeductible expenses | 2 | 1 | 1 |
| Tax benefits not recognized on operating losses of certain consolidated subsidiaries | 0 | 3 | 3 |
| Utilization of net operating loss carryforward not previously recognized | (2) | (0) | (4) |
| Tax credit for increased research and development expense | (0) | (0) | (1) |
| Effect of change in enacted tax rate | — | — | 2 |
| Other, net | 3 | (1) | (1) |
| Effective tax rate | 45% | 45% | 42% |

Nondeductible expenses include directors' bonuses and entertainment expenses.

Based on an enacted change in the Japanese tax laws in March, 2003, the normal statutory tax rate will be reduced to approximately 40% effective April 1, 2004, and such rate has been used in calculating the future expected tax effects of temporary differences and carryforwards that will be realized or settled after March 31, 2004.

The tax effects of temporary differences and carryforwards giving rise to the consolidated deferred income tax assets and liabilities as of March 31, 2002 and 2003 are as follows:

40

| | | Millions of yen | | Thousands of U.S. dollars |
| --- | --- | --- | --- | --- |
| | | 2002 | 2003 | 2003 |
| Assets: | | | | |
| Accrued expenses | | ¥ 17,866 | ¥ 26,184 | $ 221,898 |
| Depreciation | | 4,640 | 4,014 | 34,017 |
| Accrued pension and severance costs | | 41,523 | 84,230 | 713,814 |
| Net operating losses carryforward | | 19,080 | 13,839 | 117,280 |
| Other | | 28,222 | 31,460 | 266,610 |
| | | 111,331 | 159,727 | 1,353,619 |
| Less—Valuation allowance | | (11,300) | (9,193) | (77,907) |
| | | ¥100,031 | ¥150,534 | $1,275,712 |
| Liabilities: | | | | |
| Sales-type leases | | ¥ (4,964) | ¥ (7,112) | $ (60,271) |
| Undistributed earnings of foreign subsidiaries and affiliates | | (12,291) | (12,801) | (108,483) |
| Net unrealized holding gains on available-for-sale securities | | (8,932) | (8,957) | (75,907) |
| Other | | (9,757) | (11,361) | (96,280) |
| | | ¥(35,944) | ¥(40,231) | $ (340,941) |
| Net deferred tax assets | | ¥ 64,087 | ¥110,303 | $ 934,771 |

Net deferred tax assets as of March 31, 2002 and 2003 are included in the consolidated balance sheets as follows:

| | Millions of yen | | Thousands of U.S. dollars |
| --- | --- | --- | --- |
| | 2002 | 2003 | 2003 |
| Deferred income taxes and other (Current Assets) | ¥ 35,508 | ¥ 41,993 | $ 355,873 |
| Lease deposits and other (Non-Current Assets) | 59,732 | 99,204 | 840,712 |
| Accrued expenses and other (Current Liabilities) | (561) | (241) | (2,043) |
| Deferred income taxes (Long-Term Liabilities) | (30,592) | (30,653) | (259,771) |
| | ¥ 64,087 | ¥110,303 | $ 934,771 |

The net changes in the total valuation allowance for the years ended March 31, 2001, 2002 and 2003 were increases of ¥246 million and ¥2,897 million and a decrease of ¥2,107 million (\$17,856 thousand), respectively.

In assessing the realizability of deferred tax assets, Ricoh considers whether it is more likely than not that some portion or all of the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible. Ricoh considers the scheduled reversal of deferred tax liabilities, projected future taxable income, and tax planning strategies in making this assessment. Based upon the level of historical taxable income and projections for future taxable income over the periods in which the deferred tax

assets are deductible, Ricoh believes it is more likely than not that the benefits of these deductible differences, net of the existing valuation allowance will be realized. The amount of the deferred tax asset considered realizable, however, would be reduced if estimates of future taxable income during the carryforward period are reduced.

As of March 31, 2003, certain subsidiaries had net operating losses carried forward for income tax purposes of approximately ¥36,434 million (\$308,763 thousand) which were available to reduce future income taxes, if any. Approximately ¥26,225 million (\$222,246 thousand) of the operating losses expire within a five-year period while the remainder principally have an indefinite carryforward period.

## 9. SHORT-TERM BORROWINGS AND TRADE NOTES RECEIVABLE DISCOUNTED WITH BANKS

Short-term borrowings as of March 31, 2002 and 2003 consist of the following:

| | Weighted average interest rate | | Millions of yen | | Thousands of U.S. dollars |
| --- | --- | --- | --- | --- | --- |
| | 2002 | 2003 | 2002 | 2003 | 2003 |
| Borrowings, principally from banks | 1.3% | 1.8% | ¥103,784 | ¥28,258 | $239,474 |
| Commercial paper | 1.5 | 0.9 | 57,310 | 56,220 | 476,441 |
| | | | ¥161,094 | ¥84,478 | $715,915 |

The Company and certain of its subsidiaries enter into the contracts with financial institutions regarding lines of credit and overdrawing, and hold the issuing programs of commercial paper and medium-term notes. The unused lines of credit amounted to ¥580,785 million and ¥613,884 million ($5,202,407 thousand) as of March 31, 2002 and 2003, respectively, of which ¥194,658 million and ¥234,704 million ($1,989,017 thousand) related to commercial paper and ¥147,388 million and ¥144,280 million ($1,222,712 thousand) related to medium-term notes programs at prevailing interest rates.

## 10. LONG-TERM INDEBTEDNESS

Long-term indebtedness as of March 31, 2002 and 2003 consists of the following:

| | Conversion price | Millions of yen | | Thousands of U.S. dollars |
|---|---|---|---|---|
| | (Per share) | 2002 | 2003 | 2003 |
| Convertible bonds— | | | | |
| 0.35%, payable in yen, due March 2003 | ¥1,210.00 | ¥ 29,886 | ¥ — | $ — |
| 0.4%, payable in yen, due September 2002 issued by a consolidated subsidiary | 1,594.40 | 4,163 | — | — |
| Total convertible bonds | | 34,049 | — | — |
| Bonds— | | | | |
| 2.075%, straight bonds, payable in yen, due April 2005 | | 40,000 | 40,000 | 338,983 |
| 0.87%, straight bonds, payable in yen, due March 2007 | | 35,000 | 35,000 | 296,610 |
| 1.34%, straight bonds, payable in yen, due March 2009 | | 25,000 | 25,000 | 211,864 |
| 0.9%, straight bonds, payable in yen, due June 2003 issued by a consolidated subsidiary | | 5,000 | 5,000 | 42,373 |
| 1.1%, straight bonds, payable in yen, due February 2004 issued by a consolidated subsidiary | | 10,000 | 9,910 | 83,983 |
| 1.17%, straight bonds, payable in yen, due June 2004 issued by a consolidated subsidiary | | 10,000 | 10,000 | 84,746 |
| 0.73%, straight bonds, payable in yen, due June 2006 issued by a consolidated subsidiary | | 10,000 | 10,000 | 84,746 |
| 0.7%, straight bonds, payable in yen, due June 2007 issued by a consolidated subsidiary | | — | 10,000 | 84,746 |
| 2.1%, straight bonds, payable in yen, due October 2009 issued by a consolidated subsidiary | | 10,000 | 10,000 | 84,746 |
| Medium-term notes, 0.21% weighted average, due through 2005 issued by a consolidated subsidiary | | 39,162 | 24,000 | 203,389 |
| Total bonds | | 184,162 | 178,910 | 1,516,186 |
| Unsecured loans— | | | | |
| Banks and insurance companies, 1.62% weighted average, due through 2011 | | 170,537 | 210,042 | 1,780,017 |
| Secured loans— | | | | |
| Banks, insurance companies and other financial institution, 1.45% weighted average, due through 2020 | | 4,799 | 2,553 | 21,636 |
| Capital lease obligations (see Note 2 (j)) | | 3,113 | 4,237 | 35,907 |
| Total | | 396,660 | 395,742 | 3,353,746 |
| SFAS No. 133 fair value adjustment | | 3,649 | 4,395 | 37,246 |
| Less—Current maturities included in current liabilities | | (67,314) | (54,235) | (459,619) |
| | | ¥332,995 | ¥345,902 | $2,931,373 |

Secured loans are collateralized by land, buildings and lease receivables with a book value of ¥8,432 million (¥71,458 thousand) as of March 31, 2003.

All bonds outstanding as of March 31, 2003 are redeemable at the option of Ricoh at 100% of the principal amounts under certain conditions as provided in the applicable agreements.

Bonds are subject to certain covenants such as restrictions on certain additional secured indebtedness, as defined in the agreements. Ricoh presently is in compliance with such covenants as of March 31, 2003.

Certain loan agreements provide, among other things, that the lender may request the Company to submit proposals for appropriations of earnings (including payment of dividends) to the lender for its review and approval prior to presentation to the shareholders. The Company has never been requested to submit such proposals for approval. In addition, as is customary in Japan, substantially all of the bank borrowings are subject to general agreements with each bank which provide, among other things, that the banks may request additional security for these loans if there is reasonable and probable cause and may treat any

security furnished to the banks as well as cash deposited as security for all present and future indebtedness. The Company has never been requested to submit such additional security.

The aggregate annual maturities of long-term indebtedness subsequent to March 31, 2003 are as follows:

| Years ending March 31 | Millions of yen | Thousands of U.S. dollars |
|---|---|---|
| 2004 | ¥ 54,482 | $ 461,712 |
| 2005 | 85,966 | 728,525 |
| 2006 | 125,776 | 1,065,898 |
| 2007 | 56,027 | 474,805 |
| 2008 | 27,236 | 230,814 |
| 2009 and thereafter | 46,255 | 391,992 |
| Total | ¥395,742 | $3,353,746 |

## 11. PENSION AND RETIREMENT ALLOWANCES PLANS

The Company and certain of its subsidiaries have various trusted contributory and noncontributory employees pension fund plans covering substantially all of their employees. Under the plans, employees are entitled to lump-sum payments at the time of termination or retirement, or to pension payments. Under the terms of the domestic employer pension fund ("EPF") plan, the government mandated welfare pension insurance benefit is included and commingled with the primary corporate benefit provided by Ricoh. The amounts of lump-sum or pension payments under the plans are generally determined on the basis of length of service and remuneration at the time of termination. These contributory and non contributory plans are funded in conformity with governmental regulations. The plan assets consist principally of interest-bearing bonds and listed equity securities.

The changes in the benefit obligation and plan assets of the defined benefit plans for the years ended March 31, 2002 and 2003 are as follows:

| | Millions of yen | | Thousands of U.S. dollars |
|---|---|---|---|
| | 2002 | 2003 | 2003 |
| Change in benefit obligation: | | | |
| Benefit obligation at beginning of year | ¥ 424,176 | ¥ 452,562 | $ 3,835,271 |
| Service cost | 15,636 | 16,943 | 143,585 |
| Interest cost | 13,693 | 14,292 | 121,119 |
| Plan participants' contributions | 1,585 | 1,105 | 9,364 |
| Amendments | — | (10,924) | (92,576) |
| Actuarial loss | 8,309 | 64,852 | 549,593 |
| Settlement | (3,005) | (2,009) | (17,026) |
| Benefits paid | (12,558) | (13,197) | (111,839) |
| Foreign exchange impact | 4,726 | (1,349) | (11,432) |
| Benefit obligation at end of year | ¥ 452,562 | ¥ 522,275 | $ 4,426,059 |
| | | | |
| Change in plan assets: | | | |
| Fair value of plan assets at beginning of year | ¥ 274,323 | ¥ 268,377 | $ 2,274,381 |
| Actual return on plan assets | (11,715) | (36,838) | (312,186) |
| Employer contribution | 12,680 | 14,281 | 121,026 |
| Plan participants' contributions | 1,585 | 1,105 | 9,364 |
| Settlement | (2,858) | (1,636) | (13,864) |
| Benefits paid | (9,767) | (9,246) | (78,356) |
| Foreign exchange impact | 4,129 | (697) | (5,907) |
| Fair value of plan assets at end of year | ¥ 268,377 | ¥ 235,346 | $ 1,994,458 |
| | | | |
| Funded status | ¥(184,185) | ¥(286,929) | $(2,431,601) |
| Unrecognized net actuarial loss | 143,448 | 245,632 | 2,081,627 |
| Unrecognized prior service cost | — | (10,081) | (85,432) |
| Unrecognized net asset at transition, net of amortization | (2,953) | (2,414) | (20,458) |
| Net amount recognized | ¥ (43,690) | ¥ (53,792) | $ (455,864) |
| | | | |
| Amounts recognized in the balance sheets consist of: | | | |
| Prepaid benefit cost | ¥ 1,262 | ¥ 61 | $ 517 |
| Accrued benefit liability | (113,685) | (207,948) | (1,762,271) |
| Intangible assets | — | 199 | 1,687 |
| Accumulated other comprehensive income, gross of tax | 68,733 | 153,896 | 1,304,203 |
| Net amount recognized | ¥ (43,690) | ¥ (53,792) | $ (455,864) |

| | 2002 | 2003 |
|---|---|---|
| Weighted average assumptions | | |
| Discount rate | 3.3% | 2.6% |
| Rate of increase in compensation levels | 3.4% | 3.4% |
| Expected long-term rate of return on plan assets | 4.8% | 3.6% |

43

The Japanese domestic plans represented approximately 88% of the above total projected benefit obligation as of March 31, 2003. The weighted-average discount rate, rate of increase in compensation and expected long-term rate of return on plan assets of the domestic pension plans were 3.0%, 3.3% and 4.4%, respectively, for the year ended March 31, 2002 and 2.2%, 3.4% and 2.9%, respectively, for the year ended March 31, 2003.

The net periodic benefit costs of the defined benefit plans for the three years ended March 31, 2003 consisted of the following components:

|  | Millions of yen | | | Thousands of U.S. dollars |
|  | 2001 | 2002 | 2003 | 2003 |
|---|---|---|---|---|
| Service costs | ¥15,449 | ¥15,636 | ¥16,943 | $143,585 |
| Interest costs | 11,706 | 13,693 | 14,292 | 121,119 |
| Expected return on plan assets | (13,410) | (13,031) | (9,763) | (82,737) |
| Net amortization | 1,123 | 4,707 | 5,081 | 43,059 |
| Settlement loss | — | 183 | (35) | (297) |
| Net periodic benefit cost | ¥14,868 | ¥21,188 | ¥26,518 | $224,729 |

In accordance with the provisions of SFAS 87, Ricoh recorded an adjustment for minimum pension liability at March 31, 2002 and 2003. This liability represents the excess of the accumulated benefit obligations over the fair value of plan assets and severance costs already recognized before recording the minimum pension liability. This excess is primarily attributable to a substantial reduction in the discount rate used in pension calculation and loss on plan assets. A corresponding amount was recognized as an intangible asset to the extent of the unrecognized prior service cost, and the balance was recorded as a component of accumulated other comprehensive income (loss), net of tax.

The projected benefit obligations, accumulated benefit obligations, and fair value of plan assets for the pension plans with accumulated benefit obligations in excess of plan assets were ¥335,517 million, ¥280,930 million and ¥208,712 million, respectively, as of March 31, 2002 and ¥453,956 million ($3,847,085 thousand), ¥387,481 million ($3,283,737 thousand) and ¥218,058 million ($1,847,949 thousand), respectively, as of March 31, 2003.

Employees of certain domestic subsidiaries not covered by the EPF plan and directors of the Company are primarily covered by unfunded retirement allowances plans. The payments to directors are subject to shareholders' approval.

As noted above, the domestic EPF plan is composed of (1) a corporate defined benefit portion established by Ricoh and (2) a substitutional portion based on benefits prescribed by the government (similar to social security benefits in the United States). Ricoh has been exempted from contributing to the Japanese Pension Insurance ("JPI") program that would otherwise have been required if it had not elected to fund the government substitutional portion of the benefit through an EPF arrangement. The plan assets of the EPF are invested and managed as a single portfolio for the entire EPF and are not separately attributed to the substitutional and corporate portions. The substitutional portion represents approximately 39% of the total projected benefit obligation of the EPF as of March 31, 2003. In June 2001, the Japanese pension law was amended to permit an employer to elect to transfer the entire substitutional portion benefit obligation from the EPF to the government together with a specified amount of plan assets pursuant to a government formula. After such transfer, the employer would be required to make periodic contributions to JPI, and the Japanese government would be responsible for all benefit payments. The corporate portion of the EPF would continue to exist exclusively as a corporate defined benefit pension plan. In this regard, Ricoh has elected to transfer the substitutional portion of its EPF to the government. The process of separating the substitutional portion from the corporate portion includes several phases. In January 2003, Ricoh received government approval of exemption from the obligation for benefits related to future employee service with respect to the substitutional portion of its EPF and is proceeding with the remaining steps to effectuate the transfer which is presently expected to be completed by the end of calendar year 2003. Ricoh will account for the transfer in accordance with EITF 03-2 "Accounting for the Transfer to the Japanese Government of the Substitutional Portion of Employee Pension Fund Liabilities." As specified in EITF 03-2, the entire separation process is to be accounted for at the time of completion of the transfer to the government of the benefit obligation and related plan assets as a settlement in accordance with SFAS No. 88 "Employers' Accounting for Settlements and Curtailments of Defined Benefit Pension Plans and for Termination Benefits." Accordingly, there has been no effect on Ricoh's consolidated financial statements for the fiscal year ended March 31, 2003. The aggregate effect of this separation will be determined based on the Company's total pension benefits obligation as of the date the transfer is completed and the amount of plan assets required to be transferred. Based on the Company's current estimates as to the total amount of such pension benefits obligation and the amount of plan assets required to be transferred, Ricoh's management does not presently expect that this separation will have a significant effect on Ricoh's financial condition or results of operation. However, the final amount of the impact could be significantly different depending on any change in the amounts of the pension benefit obligation or plan assets to be transferred.

## 12. SHAREHOLDERS' INVESTMENT

The Japanese Commercial Code provides that an amount equal to at least 10% of cash dividends and other distributions from retained earnings paid by the Company and its domestic subsidiaries be appropriated as a legal reserve. No further appropriation is required when the total amount of the legal reserve and additional paid-in capital equals 25% of common stock. Legal reserves included in retained earnings as of March 31, 2002 and 2003 were ¥16,815 million and ¥16,903 million ($143,246 thousand), respectively, and are restricted from being used as dividends.

Semiannual cash dividends are approved by the shareholders after the end of each fiscal period or are declared by the Board of Directors after the end of each interim six-month period. Such dividends are payable to shareholders of record at the end of each such fiscal or interim six-month period. At the general meeting to be held on June 26, 2003, the shareholders will be asked to approve the declaration of a cash dividend (¥7 per share) on the common stock totaling ¥5,198 million ($44,051 thousand), which will be paid to shareholders of record as of March 31, 2003. The declaration of this dividend has not been reflected in the consolidated financial statements as of March 31, 2003.

The Japanese Commercial Code provides that at least one-half of the proceeds from shares issued is included in common stock. In conformity therewith, the Company has divided the principal amount of bonds converted into common stock between common stock and additional paid-in capital.

The amount of retained earnings legally available for dividend distribution is that recorded in the Company's non-consolidated books and amounted to ¥268,687 million ($2,277,008 thousand) as of March 31, 2003.

The Japanese Commercial Code allows the Company to purchase treasury stock for any reason at any time by the resolution of the Board of Directors up to the limi-

tation approved by the shareholders. On June 27, 2002, the shareholders of the Company approved the purchase of treasury stock up to 8 million shares for a maximum total cost of ¥20,000 million during the period up to the resolution of the subsequent Ordinary General Shareholders' Meeting, to be held on June 26, 2003. In accordance with this approval, the Company repurchased 8 million shares and retired 7 million shares during the year ended March 31, 2003. The retirement of common stock reduced retained earnings during the year ended March 31, 2003 by ¥13,328 million ($112,949 thousand).

## 13. OTHER COMPREHENSIVE INCOME (LOSS)

Tax effects allocated to each component of other comprehensive income (loss) are as follows:

| | Millions of yen | | |
| --- | --- | --- | --- |
| | Before-tax amount | Tax expense | Net-of-tax amount |
| **2001:** | | | |
| Foreign currency translation adjustments | ¥ (2,992) | ¥ 1,252 | ¥ (1,740) |
| Unrealized gains (losses) on securities: | | | |
| Unrealized holding gains (losses) arising during the year | (3,440) | (1,842) | (5,282) |
| Less—Reclassification adjustment for (gains) losses realized in net income | (2,898) | 1,213 | (1,685) |
| Net unrealized gains (losses) | (6,338) | (629) | (6,967) |
| Minimum pension liability adjustment | (37,797) | 15,818 | (21,979) |
| Other comprehensive income (loss) | ¥ (47,127) | ¥ 16,441 | ¥ (30,686) |
| **2002:** | | | |
| Foreign currency translation adjustments | ¥ 8,578 | ¥ (2,062) | ¥ 6,516 |
| Unrealized gains (losses) on securities: | | | |
| Unrealized holding gains (losses) arising during the year | (4,212) | 1,781 | (2,431) |
| Less—Reclassification adjustment for (gains) losses realized in net income | 2,864 | (1,199) | 1,665 |
| Net unrealized gains (losses) | (1,348) | 582 | (766) |
| Unrealized losses on derivatives: | | | |
| Cumulative effect of accounting change | (3,206) | 1,342 | (1,864) |
| Unrealized holding gains (losses) arising during the year | 2,061 | (871) | 1,190 |
| Less—Reclassification adjustment for (gains) losses realized in net income | 792 | (325) | 467 |
| Net unrealized gains (losses) | (353) | 146 | (207) |
| Minimum pension liability adjustment | (27,891) | 11,760 | (16,131) |
| Other comprehensive income (loss) | ¥ (21,014) | ¥ 10,426 | ¥ (10,588) |
| **2003:** | | | |
| Foreign currency translation adjustments | ¥ 181 | ¥ 826 | ¥ 1,007 |
| Unrealized gains (losses) on securities: | | | |
| Unrealized holding gains (losses) arising during the year | (5,348) | 2,065 | (3,283) |
| Less—Reclassification adjustment for (gains) losses realized in net income | 2,234 | (935) | 1,299 |
| Net unrealized gains (losses) | (3,114) | 1,130 | (1,984) |
| Unrealized losses on derivatives: | | | |
| Unrealized holding gains (losses) arising during the year | (634) | 277 | (357) |
| Less—Reclassification adjustment for (gains) losses realized in net income | 654 | (268) | 386 |
| Net unrealized gains (losses) | 20 | 9 | 29 |
| Minimum pension liability adjustment | (80,220) | 30,811 | (49,409) |
| Other comprehensive income (loss) | ¥(83,133) | ¥32,776 | ¥ (50,357) |

45

| | Thousands of U.S. dollars | | |
| --- | --- | --- | --- |
| | Before-tax amount | Tax expense | Net-of-tax amount |
| **2003:** | | | |
| Foreign currency translation adjustments | $ 1,534 | $ 7,000 | $ 8,534 |
| Unrealized gains (losses) on securities: | | | |
| Unrealized holding gains (losses) arising during the year | (45,322) | 17,500 | (27,822) |
| Less—Reclassification adjustment for (gains) losses realized in net income | 18,932 | (7,924) | 11,008 |
| Net unrealized gains (losses) | (26,390) | 9,576 | (16,814) |
| Unrealized losses on derivatives: | | | |
| Unrealized holding gains (losses) arising during the year | (5,373) | 2,348 | (3,025) |
| Less—Reclassification adjustment for (gains) losses realized in net income | 5,542 | (2,271) | 3,271 |
| Net unrealized gains (losses) | 169 | 77 | 246 |
| Minimum pension liability adjustment | (679,830) | 261,110 | (418,720) |
| Other comprehensive income (loss) | $(704,517) | $277,763 | $(426,754) |

Changes in accumulated other comprehensive income (loss) are as follows:

| | Millions of yen | | | | |
| --- | --- | --- | --- | --- | --- |
| | Foreign currency translation adjustments | Unrealized gains on securities | Unrealized losses on derivatives | Minimum pension liability adjustment | Accumulated other comprehensive income (loss) |
| **2001:** | | | | | |
| Beginning balance | ¥ (19,801) | ¥ 18,299 | ¥ — | ¥ (1,600) | ¥ (3,102) |
| Change during the year | (1,740) | (6,967) | — | (21,979) | (30,686) |
| Ending balance | ¥ (21,541) | ¥ 11,332 | ¥ — | ¥ (23,579) | ¥ (33,788) |
| **2002:** | | | | | |
| Beginning balance | ¥ (21,541) | ¥ 11,332 | ¥ — | ¥ (23,579) | ¥ (33,788) |
| Cumulative effect of accounting change | — | — | (1,864) | — | (1,864) |
| Change during the year | 6,516 | (766) | 1,657 | (16,131) | (8,724) |
| Ending balance | ¥ (15,025) | ¥ 10,566 | ¥ (207) | ¥ (39,710) | ¥ (44,376) |
| **2003:** | | | | | |
| Beginning balance | ¥ (15,025) | ¥ 10,566 | ¥ (207) | ¥ (39,710) | ¥ (44,376) |
| Change during the year | 1,007 | (1,984) | 29 | (49,409) | (50,357) |
| Ending balance | ¥ (14,018) | ¥ 8,582 | ¥ (178) | ¥ (89,119) | ¥ (94,733) |

| | Thousands of U.S. dollars | | | | |
| --- | --- | --- | --- | --- | --- |
| **2003:** | | | | | |
| Beginning balance | $(127,331) | $ 89,543 | $ (1,754) | $(336,526) | $(376,068) |
| Change during the year | 8,534 | (16,814) | 246 | (418,720) | (426,754) |
| Ending balance | $(118,797) | $ 72,729 | $(1,508) | $(755,246) | $(802,822) |

## 14. PER SHARE DATA

Dividends per share shown in the consolidated statements of income are computed based on dividends paid for the year.

The following table sets forth the computation of basic and diluted earnings per share showing the reconciliation of the numerators and denominators used for the computation.

| | Thousands of shares | | |
|---|---|---|---|
| | 2001 | 2002 | 2003 |
| Weighted average common shares outstanding | 692,617 | 698,025 | 726,660 |
| | | | |
| Effect of dilutive securities: | | | |
| Convertible bonds— | | | |
| 1.8%, payable in yen, due March 2002 | 1,636 | 997 | — |
| 1.5%, payable in yen, due March 2002 | 33,070 | 28,195 | — |
| 0.35%, payable in yen, due March 2003 | 24,703 | 24,699 | 23,250 |
| Diluted common shares outstanding | 752,026 | 751,916 | 749,910 |

| | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2003 |
| Net income applicable to common shareholders | ¥53,228 | ¥61,614 | ¥72,513 | $614,517 |
| | | | | |
| Effect of dilutive securities: | | | | |
| Convertible bonds— | | | | |
| 1.8%, payable in yen, due March 2002 | 14 | 10 | — | — |
| 1.5%, payable in yen, due March 2002 | 295 | 258 | — | — |
| 0.35%, payable in yen, due March 2003 | 119 | 119 | 86 | 729 |
| Other | (249) | — | — | — |
| Diluted net income | ¥53,407 | ¥62,001 | ¥72,599 | $615,246 |

| | Yen | | | U.S. dollars |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2003 |
| Earnings per share: | | | | |
| Basic | ¥ 76.85 | ¥ 88.27 | ¥ 99.79 | $ 0.85 |
| Diluted | 71.02 | 82.46 | 96.81 | 0.82 |

## 15. DERIVATIVE FINANCIAL INSTRUMENTS

### Risk Management Policy

Ricoh enters into various derivative financial instrument contracts in the normal course of business in connection with the management of its assets and liabilities.

Ricoh uses derivative instruments to reduce risk and protect market value of assets and liabilities in conformity with Ricoh's policy. Ricoh does not use derivative financial instruments for trading or speculative purposes, nor is it a party to leveraged derivatives.

All derivative instruments are exposed to credit risk arising from the inability of counterparties to meet the terms of the derivative contracts. However, Ricoh does not expect any counterparties to fail to meet their obligations because these counterparties are financial institutions with satisfactory credit ratings. Ricoh utilizes a number of counterparties to minimize the concentration of credit risk.

### Foreign Exchange Risk Management

Ricoh conducts business on a global basis and holds assets and liabilities denominated in foreign currencies. Ricoh enters into foreign exchange contracts and foreign currency options to hedge against the potentially adverse impacts of foreign currency fluctuations on these assets and liabilities denominated in foreign currencies.

### Interest Rate Risk Management

Ricoh enters into interest rate swap agreements to hedge against the potential adverse impacts of changes in fair value or cash flow fluctuations on interest of its outstanding debt.

### Fair Value Hedges

Changes in the fair value of derivative instruments and the related hedged items designated and qualifying as fair value hedges are included in other (income) expenses on the consolidated statements of income. There is no hedging ineffectiveness nor are net gains or losses excluded from the assessment of hedge effectiveness for the years ended March 31, 2002 and 2003 as the critical terms of the interest rate swap match the terms of the hedged debt obligations.

**Cash Flow Hedges**

Changes in the fair value of derivative instruments designated and qualifying as cash flow hedges are included in accumulated other comprehensive income (loss) on the consolidated balance sheets. These amounts are reclassified into earnings as interest on the hedged loans is paid. There is no hedging ineffectiveness nor are net gains or losses excluded from the assessment of hedge effectiveness for the years ended March 31, 2002 and 2003 as the critical terms of the interest rate swap match the terms of the hedged debt obligations. Ricoh expects that it will reclassify to earnings through other (income) expenses during the next 12 months approximately ¥149 million ($1,263 thousand) of the balance of accumulated other comprehensive loss as of March 31, 2003.

**Undesignated Derivative Instruments**

Derivative instruments not designated as hedging instruments are held to reduce the risk relating to the variability in exchange rates on assets and liabilities denominated in foreign currencies. Changes in the fair value of these instruments are included in other (income) expenses on the consolidated statements of income.

## 16. COMMITMENTS AND CONTINGENT LIABILITIES

As of March 31, 2003, Ricoh had outstanding contractual commitments for acquisition or construction of plant, equipment and other assets aggregating ¥2,234 million ($18,932 thousand).

As of March 31, 2003, Ricoh was also contingently liable as guarantor for employees' housing loans of ¥461 million ($3,907 thousand).

Ricoh made rental payments totaling ¥39,956 million, ¥46,426 million and ¥50,218 million ($425,576 thousand) for the years ended March 31, 2001, 2002 and 2003, respectively, under operating lease agreements for office space and machinery and equipment, which are primarily cancelable and renewable.

As of March 31, 2003, the Company and certain of its subsidiaries were parties to litigation involving routine matters, such as patent rights. In the opinion of management, the ultimate liability, if any, resulting from such litigation will not materially affect the consolidated financial position or the results of operations of Ricoh.

## 17. DISCLOSURES ABOUT THE FAIR VALUE OF FINANCIAL INSTRUMENTS

**(a) Cash and cash equivalents, Time deposits, Trade receivables, Short-term borrowings, Current maturities of long-term indebtedness, Trade payables and Accrued expenses**

The carrying amounts approximate fair values because of the short maturities of these instruments.

**(b) Marketable securities and Investment securities**

The fair value of the marketable securities and investment securities is principally based on quoted market price.

**(c) Installment loans**

The fair value of installment loans is based on the present value of future cash flows using the current rate for similar instruments of comparable maturity.

**(d) Long-term indebtedness**

The fair value of each of the long-term indebtedness instruments is based on the quoted price in the most active market or the present value of future cash flows associated with each instrument discounted using the current borrowing rate for similar instruments of comparable maturity.

**(e) Interest rate swap agreements**

The fair value of interest rate swap agreements is estimated by obtaining quotes from brokers.

**(f) Foreign currency contracts and Foreign currency options**

The fair value of foreign currency contracts and foreign currency options used for hedging purposes is estimated by obtaining quotes from brokers.

The estimated fair value of the financial instruments as of March 31, 2002 and 2003 is summarized as follows:

| | Millions of yen | | | | Thousands of U.S. dollars | |
| | 2002 | | 2003 | | 2003 | |
| | Carrying amount | Estimated fair value | Carrying amount | Estimated fair value | Carrying amount | Estimated fair value |
|---|---|---|---|---|---|---|
| Marketable securities and Investment securities | ¥ 51,821 | ¥ 51,821 | ¥ 72,080 | ¥ 72,080 | $ 610,847 | $ 610,847 |
| Installment loans | 48,975 | 49,319 | 50,531 | 50,783 | 428,229 | 430,364 |
| Long-term indebtedness | (332,995) | (337,670) | (345,902) | (351,305) | (2,931,373) | (2,977,161) |
| Interest rate swap agreements, net | 4,081 | 4,081 | 3,985 | 3,985 | 33,771 | 33,771 |
| Foreign currency contracts, net | (8,304) | (8,304) | (594) | (594) | (5,034) | (5,034) |
| Foreign currency options, net | (314) | (314) | (466) | (466) | (3,949) | (3,949) |

**Limitations**

Fair value estimates are made at a specific point in time, based on relevant market information and information about the financial instrument. These estimates are subjective in nature and involve uncertainties and matters of significant judgment and therefore cannot be determined with precision. Changes in assumptions could significantly affect the estimates.

# 18. SEGMENT INFORMATION

The operating segments presented below are the segments of Ricoh for which separate financial information is available and for which a measure of profit or loss is evaluated regularly by Ricoh's management in deciding how to allocate resources and in assessing performance. The accounting policies of the segments are substantially the same as those described in the summary of significant accounting policies, as discussed in Note 2.

Ricoh's operating segments are comprised of office equipment, including copiers and related supplies, communications and information systems, and others, including optical equipment and electronic devices.

The following tables present certain information regarding Ricoh's operating segments and operations by geographic areas for the three years in the period ended March 31, 2003.

## (a) Operating Segment Information

|  | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
|  | 2001 | 2002 | 2003 | 2003 |
| Sales— |  |  |  |  |
| Office equipment | ¥1,338,374 | ¥1,485,389 | ¥1,520,574 | $12,886,220 |
| Other | 205,095 | 190,815 | 220,539 | 1,868,975 |
| Intersegment transaction | (5,207) | (3,864) | (2,755) | (23,348) |
| Consolidated | ¥1,538,262 | ¥1,672,340 | ¥1,738,358 | $14,731,847 |
|  |  |  |  |  |
| Operating expenses— |  |  |  |  |
| Office equipment | ¥1,195,834 | ¥1,304,079 | ¥1,329,776 | $11,269,288 |
| Other | 191,909 | 187,424 | 222,772 | 1,887,898 |
| Intersegment transaction | (5,218) | (3,893) | (2,726) | (23,102) |
| Unallocated expense | 50,632 | 55,035 | 54,882 | 465,102 |
| Consolidated | ¥1,433,157 | ¥1,542,645 | ¥1,604,704 | $13,599,186 |
|  |  |  |  |  |
| Operating income— |  |  |  |  |
| Office equipment | ¥ 142,540 | ¥ 181,310 | ¥ 190,798 | $ 1,616,932 |
| Other | 13,186 | 3,391 | (2,233) | (18,924) |
| Elimination | (50,621) | (55,006) | (54,911) | (465,347) |
| Consolidated | ¥ 105,105 | ¥ 129,695 | ¥ 133,654 | $ 1,132,661 |
|  |  |  |  |  |
| Other expenses | ¥ (7,340) | ¥ (15,745) | ¥ (10,184) | $ (86,305) |
|  |  |  |  |  |
| Income before income taxes, minority interests and equity in earnings of affiliates | ¥ 97,765 | ¥ 113,950 | ¥ 123,470 | $ 1,046,356 |

49

|  | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
|  | 2001 | 2002 | 2003 | 2003 |
| Total assets— | | | | |
| Office equipment | ¥1,179,499 | ¥1,219,723 | ¥1,198,706 | $10,158,525 |
| Other | 180,164 | 185,158 | 176,296 | 1,494,034 |
| Elimination | (9,116) | (6,991) | (6,908) | (58,542) |
| Corporate assets | 354,244 | 435,038 | 516,828 | 4,379,898 |
| Consolidated | ¥1,704,791 | ¥1,832,928 | ¥1,884,922 | $15,973,915 |
| | | | | |
| Expenditure for segment assets— | | | | |
| Office equipment | ¥ 61,836 | ¥ 68,513 | ¥ 65,720 | $ 556,949 |
| Other | 10,235 | 5,633 | 7,213 | 61,127 |
| Corporate assets | 1,258 | 1,530 | 1,023 | 8,670 |
| Consolidated | ¥ 73,329 | ¥ 75,676 | ¥ 73,956 | $ 626,746 |
| | | | | |
| Depreciation— | | | | |
| Office equipment | ¥ 52,908 | ¥ 64,426 | ¥ 60,687 | $ 514,297 |
| Other | 7,598 | 7,448 | 6,917 | 58,619 |
| Corporate assets | 1,636 | 1,908 | 1,954 | 16,559 |
| Consolidated | ¥ 62,142 | ¥ 73,782 | ¥ 69,558 | $ 589,475 |

Unallocated expense represents expenses for corporate headquarters.
Intersegment sales are not separated by operating segment because they are immaterial.
Corporate assets consist primary of cash and cash equivalents and marketable securities maintained for general corporate purposes.

## (b) Geographic Information

Sales which are attributed to countries based on location of customers and long-lived assets for the years ended March 31, 2001, 2002 and 2003 are as follows:

|  | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
|  | 2001 | 2002 | 2003 | 2003 |
| Sales— | | | | |
| Japan | ¥ 930,433 | ¥ 902,655 | ¥ 896,022 | $ 7,593,407 |
| The Americas | 252,698 | 341,747 | 343,940 | 2,914,746 |
| Europe | 247,449 | 311,312 | 354,477 | 3,004,042 |
| Other | 107,682 | 116,626 | 143,919 | 1,219,652 |
| Consolidated | ¥1,538,262 | ¥1,672,340 | ¥1,738,358 | $14,731,847 |
| | | | | |
| Long-lived assets— | | | | |
| Japan | ¥ 244,506 | ¥ 257,752 | ¥ 251,214 | $ 2,128,932 |
| The Americas | 70,809 | 77,269 | 71,850 | 608,898 |
| Europe | 37,557 | 38,320 | 34,062 | 288,661 |
| Other | 12,694 | 12,897 | 11,742 | 99,509 |
| Consolidated | ¥ 365,566 | ¥ 386,238 | ¥ 368,868 | $ 3,126,000 |

Ricoh's long-lived assets consist of property, plant and equipment, goodwill, other intangible assets and lease deposits and other.

**(c) Additional Information**

The following information shows net sales and operating income recognized by geographic origin for the years ended March 31, 2001, 2002 and 2003. In addition to the disclosure requirements under SFAS No. 131, "Disclosure about Segments of an Enterprise and Related Information," Ricoh discloses this information as supplemental information in light of the disclosure requirements of the Japanese Securities and Exchange Law, which a Japanese public company is subject to.

|  | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
|  | 2001 | 2002 | 2003 | 2003 |
| **Sales—** | | | | |
| Japan | | | | |
| External customers | ¥ 954,125 | ¥ 938,946 | ¥ 954,310 | $ 8,087,373 |
| Intersegment | 279,802 | 309,745 | 320,596 | 2,716,915 |
| Total | 1,233,927 | 1,248,691 | 1,274,906 | 10,804,288 |
| The Americas | | | | |
| External customers | 252,029 | 338,016 | 333,935 | 2,829,958 |
| Intersegment | 4,470 | 8,937 | 5,620 | 47,627 |
| Total | 256,499 | 346,953 | 339,555 | 2,877,585 |
| Europe | | | | |
| External customers | 254,548 | 309,086 | 352,943 | 2,991,042 |
| Intersegment | 3,246 | 4,265 | 3,019 | 25,585 |
| Total | 257,794 | 313,351 | 355,962 | 3,016,627 |
| Other | | | | |
| External customers | 77,560 | 86,292 | 97,170 | 823,474 |
| Intersegment | 39,571 | 60,655 | 72,664 | 615,797 |
| Total | 117,131 | 146,947 | 169,834 | 1,439,271 |
| Elimination of intersegment sales | (327,089) | (383,602) | (401,899) | (3,405,924) |
| Consolidated | ¥1,538,262 | ¥1,672,340 | ¥1,738,358 | $14,731,847 |
| **Operating expenses—** | | | | |
| Japan | ¥1,150,353 | ¥1,142,522 | ¥1,188,760 | $ 10,074,237 |
| The Americas | 247,521 | 335,521 | 325,228 | 2,756,169 |
| Europe | 246,498 | 301,152 | 337,693 | 2,861,805 |
| Other | 110,937 | 139,874 | 159,864 | 1,354,780 |
| Elimination of intersegment sales | (322,152) | (376,424) | (406,841) | (3,447,805) |
| Consolidated | ¥1,433,157 | ¥1,542,645 | ¥1,604,704 | $13,599,186 |
| **Operating income—** | | | | |
| Japan | ¥ 83,574 | ¥ 106,169 | ¥ 86,146 | $ 730,051 |
| The Americas | 8,978 | 11,432 | 14,327 | 121,415 |
| Europe | 11,296 | 12,199 | 18,269 | 154,822 |
| Other | 6,194 | 7,073 | 9,970 | 84,492 |
| Elimination of intersegment profit | (4,937) | (7,178) | 4,942 | 41,881 |
| Consolidated | ¥ 105,105 | ¥ 129,695 | ¥ 133,654 | $ 1,132,661 |
| Other expenses | ¥ (7,340) | ¥ (15,745) | ¥ (10,184) | $ (86,305) |
| Income before income taxes, minority interests and equity in earnings of affiliates | ¥ 97,765 | ¥ 113,950 | ¥ 123,470 | $ 1,046,356 |
| **Total assets—** | | | | |
| Japan | ¥1,042,557 | ¥1,084,387 | ¥1,064,857 | $ 9,024,212 |
| The Americas | 209,638 | 228,743 | 201,359 | 1,706,432 |
| Europe | 163,542 | 172,408 | 174,541 | 1,479,161 |
| Other | 63,438 | 61,549 | 70,458 | 597,102 |
| Elimination | (128,628) | (149,197) | (143,121) | (1,212,890) |
| Corporate assets | 354,244 | 435,038 | 516,828 | 4,379,898 |
| Consolidated | ¥1,704,791 | ¥1,832,928 | ¥1,884,922 | $15,973,915 |

51

Intersegment sales between geographic areas are made at cost plus profit. Operating income by geographic area is sales less expense related to the area's operating revenue.

No single customer accounted for 10% or more of the total revenues for the periods ended March 31, 2000, 2001 and 2002.

## 19. SUPPLEMENTARY INFORMATION TO THE STATEMENTS OF INCOME

The following amounts were charged to selling, general and administrative expenses for the years ended March 31, 2001, 2002 and 2003:

| | Millions of yen | | | Thousands of U.S. dollars |
| | 2001 | 2002 | 2003 | 2003 |
|---|---|---|---|---|
| Research and development costs | ¥78,239 | ¥80,799 | ¥83,551 | $708,059 |
| Advertising costs | 18,592 | 16,868 | 16,958 | 143,712 |
| Shipping and handling costs | 11,123 | 13,332 | 12,582 | 106,627 |

## 20. SUBSEQUENT EVENTS

On December 17, 2002, the Company entered into a definitive share exchange agreement with Tohoku Ricoh Co., Ltd (Tohoku Ricoh), a domestic subsidiary of the Company, in order to convert Tohoku Ricoh into a wholly owned subsidiary. Under the terms of the agreement, 0.345 of one share of the Company's common stock was granted in exchange for each share of Tohoku Ricoh's common stock.

The Company completed the share exchange on April 1, 2003, using 2,239,533 shares of treasury stock it held as of March 31, 2003, with a cost value of ¥4,264 million ($36,136 thousand).

# Independent Auditors' Report

To the Shareholders and the Board of Directors
of Ricoh Company, Ltd.:

We have audited the accompanying consolidated balance sheets of Ricoh Company, Ltd. (a Japanese corporation) and subsidiaries as of March 31, 2002 and 2003, and the related consolidated statements of income, shareholders' investment and cash flows for each of the years in the three-year period ended March 31, 2003, expressed in yen. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Ricoh Company, Ltd. and subsidiaries as of March 31, 2002 and 2003, and the results of their operations and their cash flows for each of the years in the three-year period ended March 31, 2003, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 2 to the consolidated financial statements, the Company changed its policy concerning which short-term investments are treated as cash equivalents.

Also, as discussed in Note 2 to the consolidated financial statements, the Company and its subsidiaries adopted the provisions of Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets," effective April 1, 2002 and the provisions of Statement of Financial Accounting Standards No. 133, "Accounting for Derivative Instruments and Hedging Activities," effective April 1, 2001.

The accompanying consolidated financial statements as of and for the year ended March 31, 2003 have been translated into United States dollars solely for the convenience of the reader. We have recomputed the translation and, in our opinion, the consolidated financial statements, expressed in yen, have been translated into dollars on the basis set forth in Note 2 to the consolidated financial statements.

*K P M G*

Tokyo, Japan
April 30, 2003

# Ricoh's Global Network

As of March 31, 2003

## Japan

**Production**
Tohoku Ricoh Co., Ltd.
Hasama Ricoh, Inc.
Ricoh Optical Industries Co., Ltd.
Ricoh Unitechno Co., Ltd.
Ricoh Elemex Corporation
Ricoh Keiki Co., Ltd.
Ricoh Microelectronics Co., Ltd.

**Sales and Other**
Ricoh Tohoku Co., Ltd.
Ricoh Chubu Co., Ltd.
Ricoh Kansai Co., Ltd.
Ricoh Chugoku Co., Ltd.
Ricoh Kyushu Co., Ltd.
Tokyo Ricoh Co., Ltd.
Osaka Ricoh Co., Ltd.
NBS Ricoh Co., Ltd.
Ricoh Technosystems Co., Ltd.
Ricoh Leasing Company, Ltd.
Ricoh Logistics System Co., Ltd.

## The Americas

**Production**
*Mexico*
Ricoh Industrial de Mexico, S.A. de C.V.
*United States*
Ricoh Electronics, Inc.

**Sales and Other**
*Argentina*
Ricoh Argentina S.A.
*Brazil*
Gestetner do Brazil S.A.
*Canada*
Ricoh Canada Inc.
*Chile*
Lanier de Chile, S.A.
*Colombia*
Gestetner Colombia S.A.
Lanier Colombia, S.A.
*Costa Rica*
Lanier de Costa Rica, S.A.
*Dominican Republic*
Lanier Dominicana, S.A.
*El Salvador*
Lanier de El Salvador, S.A. de C.V.
*Guatemala*
Lanier de Guatemala, S.A.

*Mexico*
Ricoh Mexicana, S.A. de C.V.
*Panama*
Lanier de Panama, S.A.
*Puerto Rico*
NRG Distribution Corporation
Lanier Puerto Rico, Inc.
*United States*
Ricoh Corporation
Ricoh Finance Corporation
Ricoh Innovations, Inc.
Ricoh Latin America, Inc.
Savin Corporation
Lanier Worldwide, Inc.
*Uruguay*
Gestetner Limitada
Ricoh South America Distribution Center S.A.
*Venezuela*
Ricoh de Venezuela S.A.

## Europe, Africa, and the Middle East

**Production**
*France*
Ricoh Industrie France S.A.
*United Kingdom*
Ricoh UK Products Ltd.
Ricoh Wellingborough Products Ltd.
GR Advanced Materials Ltd.

**Sales and Other**
*Austria*
Ricoh Austria GmbH
Gestetner Buromaschinen-Verkaufsgesellschaft m.b.H
Lanier Bürosysteme GmbH & Co. KG
*Belgium*
Lanier Belgium N.V./S.A.
NRG Belgium S.A.
*Denmark*
NRG Scandinavia A/S
*Finland*
Ricoh Finland Oy
*France*
Ricoh France S.A.
NRG France S.A.
Rex-Rotary S.A.

*Germany*
Ricoh Deutschland GmbH
NRG Deutschland GmbH
Lanier Deutschland GmbH & Co. KG
*Guernsey*
NRG International Limited
*Hungary*
Ricoh Hungary Kft.
*Ireland*
NRG Ireland Limited
*Israel*
Gestetner (Israel) Limited
*Italy*
Ricoh Italia S.p.A.
NRG Italia S.p.A.
Lanier Italia, S.p.A.
*Netherlands*
Ricoh Europe B.V.
Ricoh Nederland B.V.
Ricoh Finance Nederland B.V.
Kulk & Kramer Kantoorsystemen BV
NRG Benelux BV
Lanier CV
*Norway*
Ricoh Norge A.S.
*Poland*
Ricoh Polska Sp.zo.o.
*Russia*
Mitsui-Ricoh CIS Ltd.
*South Africa*
NRG Gestetner South Africa (Pty) Ltd.
*Spain*
Ricoh España S.A.
NRG Group Spain S.A.
Lanier España S.A.
*Sweden*
NRG Scandinavia AB
*Switzerland*
Lanier (Schweiz) AG
*United Kingdom*
Ricoh UK Ltd.
NRG Group PLC
Midland Copying Consultants Limited
NRG Group UK Limited
Lanier United Kingdom Ltd.

## Asia and Oceania

**Production**
*China*
Ricoh Asia Industry (Shenzhen) Ltd.
Ricoh Dianzhuang (Shenzhen) Electronics Co., Ltd.
Ricoh International (Shanghai) Co., Ltd.
Shanghai Ricoh Facsimile Co., Ltd.
*Korea*
Sindo Ricoh Co., Ltd.
*Taiwan*
Taiwan Ricoh Co., Ltd.

**Sales and Other**
*Australia*
Ricoh Australia Pty. Ltd.
Lanier (Australia) Pty. Ltd.
Hanimex Pty, Limited
Rabbit Photo Holdings Limited
*China*
Ricoh China Co., Ltd.
Ricoh Electronic Technology Ltd. (China)
Ricoh Electronic Technology Ltd. (Beijing)
*Hong Kong*
Ricoh Hong Kong Ltd.
Ricoh Asia Industry Ltd.
Ricoh Component (H.K.) Ltd.
*India*
Ricoh India Limited
Gestetner (India) Limited
*Malaysia*
Ricoh Malaysia Sdn. Bhd.
*New Zealand*
Ricoh New Zealand Limited
Hanimex (NZ) Limited
Camera House Limited
Viko New Zealand Limited
*Philippines*
Ricoh Philippines, Inc.
*Singapore*
Ricoh Asia Pacific Pte. Ltd.
Ricoh Singapore Pte Ltd.
Lanier Singapore Pte. Ltd.
*Thailand*
Ricoh Thailand Ltd.

# Senior Management
As of June 26, 2003

   

**Hiroshi Hamada**
Chairman

**Masamitsu Sakurai**
President, Chief Executive Officer
and Chief Operating Officer

**Haruo Kamimoto**
Deputy President

**Tatsuo Hirakawa**
Deputy President

## Board of Directors

**Chairman**
Hiroshi Hamada

**President, Chief Executive Officer and Chief Operating Officer**
Masamitsu Sakurai

**Deputy Presidents**
Haruo Kamimoto*
Tatsuo Hirakawa*

**Executive Managing Directors**
Naoto Shibata*
Koichi Endo*
Masami Takeiri*
Masayuki Matsumoto*

**Managing Directors**
Makoto Hashimoto*
Katsumi Yoshida*
Kiyoshi Sakai*
Shiroh Kondoh*
Kazuo Togashi*
Kazunori Azuma*

**Directors**
Josei Itoh
   (Chairman of Nippon Life Insurance Company)
Nobuo Mii
   (Managing Partner of IGNITE Group)

## Corporate Auditors

Hisaaki Koga
Hideyuki Takamatsu
Kenji Matsuishi
Takehiko Wada

## Executive Officers

**Executive Vice Presidents**
Terumoto Nonaka
Tadatoshi Sakamaki
Etsuo Kobayashi
Hiroshi Tategami
Zenji Miura

**Senior Vice Presidents**
Kenji Hatanaka
Hideko Kunii
Kunio Taniguchi
Hiroshi Kobayashi
Hiroshi Tsuruga
Kiyoto Nagasawa
Yutaka Ebi
Hiroo Matsuda
Hiroshi Adachi
Kohji Sawa

## Group Executive Officers

**Senior Vice Presidents**
Itsuo Kawaji
Takashi Nakamura
Yuji Inoue
Peter E. Hart
Masami Yoneyama
Bernard Decugis
Yoichi Shirahata
Norihisa Goto

*Concurrently serving as Executive Vice Presidents

# Corporate Data

## Ricoh Company, Ltd.

**Corporate Headquarters**
15-5, Minami-Aoyama 1-chome,
Minato-ku, Tokyo 107-8544, Japan
Tel: (81) 3-3479-3111
Fax: (81) 3-3403-1578

**Date of Establishment**
February 6, 1936

**Number of Shares Authorized**
993,000,000 shares

**Number of Shares Issued (as of March 31, 2003)**
744,912,078 shares

**Stock Listings**
Tokyo, Osaka, Nagoya, Fukuoka,
Sapporo, Amsterdam, Frankfurt, Paris

**Independent Public Accountants**
KPMG

**Transfer Agent for Common Stock**
The Chuo Mitsui Trust and Banking Co., Ltd.
33-1, Shiba 3-chome,
Minato-ku, Tokyo 105-8574, Japan

**Depositary and Agent for American Depositary Receipts**
The Bank of New York
101 Barclay Street, 22 West
New York, NY 10286, U.S.A.
Tel: 212-815-2042
US toll free: 1-888-269-2377
Website: http://www.bankofny.com/adr

**Listing in the Amsterdam Security Account**
**System on Euronext Amsterdam**
Nominee Amsterdam Stock Exchange

**Depositaries and Agents for Global Bearer Certificates**
Clearstream Banking Aktiengesellschaft
Commerzbank Aktiengesellschaft

**Clearing House and Sponsoring Banks for Listing on**
**Euronext Paris**
Euroclear France
Crédit Lyonnais
Banque Nomura France

For further information and additional copies of our annual report and other
publications, please write to the Public Relations Department at our corporate
headquarters.



**RICOH CORPORATION**

5 Dedrick Place, West Caldwell,
New Jersey 07006, U.S.A.
Tel: (1) 973-882-2000
Fax: (1) 973-882-2506
Website: http://www.ricoh-usa.com/


**RICOH EUROPE B.V.**

Groenelaan 3,
P.O. Box 114, 1186 AA
Amstelveen, Netherlands
Tel: (31) 20-5474111
Fax: (31) 20-5474154
Website: http://www.ricoh-europe.com/


**RICOH ASIA PACIFIC PTE. LTD.**

#15-01/02 The Heeren, 260 Orchard Road,
Singapore 238855
Tel: (65) 830-5888
Fax: (65) 830-5830
Website: http://www.ricoh.com.sg/


**RICOH CHINA CO., LTD.**

29/F., Lippo Plaza,
No. 222 Huai Hai Zhong Road,
Lu Wan District, Shanghai, China
Tel: (86) 21-5396-6888
Fax: (86) 21-5396-5860
Website: http://www.ricoh.com.cn/


**RICOH COMPANY, LTD.**

15-5, Minami-Aoyama 1-chome,
Minato-ku, Tokyo 107-8544, Japan
Tel: (81) 3-3479-3111
Fax: (81) 3-3403-1578
Website: http://www.ricoh.com/





The covers and pages 1 to 16 and 53 to 56 of this publication were printed on
100%-recycled paper; the paper on pages 17 to 52 is 60%-recycled.

Printed in Japan
0307

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 K3P5tgj7pzICqTAetzsQB+dY7qYPrCHlVCt5Go3Vgx2smjkhnXiPsOyBtP/SUtUa
 JiEyyAWw8Sz8zOwetS2mbQ==

<SEC-DOCUMENT>0000317891-03-000023.txt : 20030630
<SEC-HEADER>0000317891-03-000023.hdr.sgml : 20030630
<ACCEPTANCE-DATETIME>20030630081225
ACCESSION NUMBER:          0000317891-03-000023
CONFORMED SUBMISSION TYPE: 20-F
PUBLIC DOCUMENT COUNT:     7
CONFORMED PERIOD OF REPORT: 20030630
FILED AS OF DATE:          20030630

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:              RICOH CO LTD
                CENTRAL INDEX KEY:                   0000317891
                STANDARD INDUSTRIAL CLASSIFICATION:  PHOTOGRAPHIC EQUIPMENT & SUP
                IRS NUMBER:                          000000000
                STATE OF INCORPORATION:              M0
                FISCAL YEAR END:                     0331

        FILING VALUES:
                FORM TYPE:        20-F
                SEC ACT:          1934 Act
                SEC FILE NUMBER:  002-68279
                FILM NUMBER:      03762592

        BUSINESS ADDRESS:
                STREET 1:         15-5 1-CHOME MINAMI-AOYAMA
                STREET 2:         MINATO-KU
                CITY:             TOKYO 107-8544 JAPAN
                STATE:            M0
                ZIP:              00000

        MAIL ADDRESS:
                STREET 1:         15-5 1-CHOME MINAMI-AOYAMA
                STREET 2:         MINATO-KU
                CITY:             TOKYO 107-8544 JAPAN
                STATE:            M0
                ZIP:              00000
</SEC-HEADER>
<DOCUMENT>
<TYPE>20-F
<SEQUENCE>1
<FILENAME>r20f030331.txt
<DESCRIPTION>FORM 20-F
<TEXT>
<PAGE>
```

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

Form 20-F

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended March 31, 2003
Commission file number 2 - 68279

KABUSHIKI KAISHA RICOH
(Exact name of registrant as specified in its charter)

RICOH COMPANY, LTD.
(Translation of registrant's name into English)

Japan
(Jurisdiction of incorporation or organization)

15-5, Minami-Aoyama 1-chome, Minato-ku, Tokyo 107-8544, Japan
(Address of principal executive offices)

Securities registered or to be registered pursuant to
Section 12(b) of the Act.

| Title of each class | Name of each exchange on which registered |
|---|---|
| None | None |

Securities registered or to be registered pursuant to
Section 12(g) of the Act.

None
(Title of Class)

Securities for which there is a reporting obligation pursuant to
Section 15(d) of the Act.

Common Stock*
(Title of Class)

*American Depositary Shares evidenced by 228,043 American Depositary Receipts, each American Depositary Share representing 5 shares of Common Stock of Ricoh Company, Ltd.

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report.

Common stock outstanding as of March 31, 2003: 742,608,635 shares (excluding 2,303,443 shares of Treasury Stock)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes [X] No [_].

Indicate by check mark which financial statement item the registrant has

comparable raw materials, parts and components in sufficient quantities to meet its manufacturing needs in the future. Ricoh also believes that there is little risk of price volatility with respect to obtaining raw materials, parts and components that it uses in manufacturing its products.

INTELLECTUAL PROPERTY

    Ricoh holds a large number of patents and trademark rights. While Ricoh considers such intellectual property rights to be valuable assets and important for its operations, it believes that its business is not dependent to any material extent upon any single patent or trademark right, or any related group of such rights it holds.

    Ricoh also has many licenses and technical assistance agreements covering a wide variety of products. Such agreements grant Ricoh the right to use certain Japanese and foreign patents or the right to receive certain technical information. However, Ricoh is not materially dependent on any single such agreement.

    In addition, Ricoh has granted licenses and technical assistance to various

                              -20-

<PAGE>

companies located in and outside of Japan. In certain instances, Ricoh has entered into cross-licensing agreements with other major international electronics and electrical equipment manufacturers. None of these agreements are likely to materially affect Ricoh's business or profitability.

GOVERNMENT REGULATIONS

    Ricoh's business activities are subject to various governmental regulations in the various countries in which it operates, including regulations relating to business and investment approvals, export regulations, tariffs, antitrust, intellectual property, consumer and business taxation, exchange controls, and environmental and recycling requirements. Ricoh is also subject to environmental regulations in the jurisdictions in which it operates, particularly in those in which it has manufacturing, research, or similar operations. Currently, Ricoh operates its business without having significant difficulty complying with such government regulations, and it hopes to do so in the future.

C.  Organizational structure

    As of March 31, 2003, the Ricoh Group is comprised of 371 subsidiaries and 24 affiliates located worldwide. Ricoh's research and development, manufacturing, sales, and service activities center on office equipment, optical equipment, and other devices.

    The Company is the parent of the Ricoh Group. The Company heads the research and development of Ricoh products with assistance from its subsidiaries. The Company and its subsidiaries and affiliates maintain an integrated domestic and international manufacturing and distribution structure.

The following is a list of the principal subsidiaries and affiliates of Ricoh:

<TABLE>
<CAPTION>
- --------------------------------------------------------------------------------

| Company Name | Country of Formation | Proportion of ownership interest | |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| (SUBSIDIARIES) | | | |
| Ricoh Optical Industries Co., Ltd. | Japan | 100.0 | Manufactur |
| Tohoku Ricoh Co., Ltd. | Japan | 65.7 (66.1) | Manufactur |
| Ricoh Unitechno Co., Ltd. | Japan | 100.0 | Manufactur |
| Ricoh Elemex Corporation | Japan | 49.8 (50.9) | Manufactur equipment |
| Ricoh Microelectronics Co., Ltd. | Japan | 100.0 | Manufactur |
| Ricoh Keiki Co., Ltd. | Japan | 100.0 | Manufactur |
| Ricoh Tohoku Co., Ltd. | Japan | 100.0 | Sale of of |

</TABLE>

-21-

<PAGE>

<TABLE>
<CAPTION>

| Company Name | Country of Formation | Proportion of ownership interest | |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| Ricoh Chubu Co., Ltd. | Japan | 100.0 | Sale of of |
| Ricoh Kansai Co., Ltd. | Japan | 100.0 | Sale of of |
| Ricoh Chugoku Co., Ltd. | Japan | 100.0 | Sale of of |
| Ricoh Kyushu Co., Ltd. | Japan | 100.0 | Sale of of |
| Hokkaido Ricoh Co., Ltd. | Japan | 97.8 | Sale of of |
| Tokyo Ricoh Co., Ltd. | Japan | 100.0 | Sale of of |
| Ricoh Technosystems Co., Ltd. | Japan | 100.0 | Maintenanc equipment |
| Ricoh Logistics System Co., Ltd. | Japan | 85.2 (87.6) | Logistics |
| Ricoh Leasing Co., Ltd. | Japan | 50.8 (51.1) | General le |
| Ricoh Electronics, Inc. | U.S.A. | 100.0 | Manufactur related su |
| Ricoh UK Products Ltd. | U.K. | 100.0 | Manufactur |

| | | | |
|---|---|---|---|
| Ricoh Industrie France S.A. | France | 100.0 | Manufactur related su |
| Ricoh Asia Industry (Shenzhen) Ltd. | China | 91.0 (100.0) | Manufactur related su |
| Shanghai Ricoh Facsimile Co., Ltd. | China | 94.5 | Manufactur equipment |
| Ricoh Corporation | U.S.A. | 100.0 | Sale of of |
| Lanier Worldwide, Inc. | U.S.A. | 100.0 | Sale of of |
| Ricoh Europe B.V. | Netherlands | 100.0 | Sale of of |
| NRG Group PLC | U.K. | 100.0 | Sale of of |
| Ricoh Asia Industry Ltd. | Hong Kong, China | 90.0 | Sale of of |
| Ricoh Asia Pacific Pte, Ltd. | Singapore | 100.0 | Sale of of |
| Ricoh Finance Nederland B.V. | Netherlands | 100.0 | Corporate |
| And 343 other subsidiaries | | | |
| (AFFILIATES) | | | |
| Coca-Cola West Japan Co., Ltd. | Japan | 21.1 (21.3) | Manufactur |
| Sindo Ricoh Co., Ltd. | Korea | 20.5 | Manufactur equipment |
| And 22 other affiliates | | | |

</TABLE>

Notes:

1. Proportion of ownership interest includes indirect ownership.

2. Figures in parentheses indicate portion of voting power if different from portion of ownership interest.

-22-

<PAGE>

3. Ricoh converted Tohoku Ricoh Co., Ltd. into a wholly-owned subsidiary on April 1, 2003 by a share exchange.

4. Ricoh Leasing Co., Ltd. is the only subsidiary of Ricoh that is a "significant subsidiary" as defined in Rule 1-02(w) of Regulation S-X.

D. Property, plants and equipment

Ricoh manufactures its products primarily in fifteen plants in Japan and seven plants overseas. Ricoh owns all of the buildings and the land on which

Statements No. 5, 57 and 107 and a rescission of FASB Interpretation No. 34."
This Interpretation elaborates on the disclosures to be made by a guarantor in
its financial statements about its obligations under guarantees issued. The
Interpretation also clarifies that a guarantor is required to recognize, at
inception of a guarantee, a liability for the fair value of the obligation
undertaken. The initial recognition and measurement provisions of the
Interpretation are applicable to guarantees issued or modified after December
31, 2002. The Interpretation has not had a material effect on Ricoh's
consolidated financial position or results of operations.

    In January 2003, the FASB issued Interpretation No. 46 (FIN 46),
"Consolidation of Variable Interest Entities ("VIEs")," which addresses
consolidation by business enterprises of variable interest entities that either:
(1) do not have sufficient equity investment at risk to permit the entity to
finance its activities without additional subordinated financial support, or (2)
the equity investors lack an essential characteristic of a controlling financial
interest. Ricoh does not anticipate the adoption of this Interpretation will
have any impact on its financial position or results of operations as it
presently does not have investments in VIEs.

Item 6. Directors, Senior Management and Employees

A. Directors and senior management

    Directors and Corporate Auditors of the Company as of June 30, 2003 were as
follows:

<TABLE>
<CAPTION>

| Name (Date of Birth) | Current Position (Function/Business area) | Date | Business |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| Hiroshi Hamada (April 28, 1933) | Chairman | Apr. 1957 | Joined the Comp |
| | | May 1975 | General Manager Staff Office i |
| | | May 1975 | Director |
| | | June 1980 | Managing Direct |
| | | Apr. 1981 | Executive Manag |
| | | Apr. 1983 | President |
| | | Apr. 1996 | Chairman (Curre |
| | | June 2000 | Chief Executive |

                    Principal business activities and other principal director
                    outside Ricoh:
                        Adviser of Japan Business Federation
                        Member of National Public Service Ethics Board
                        Member of National Commission on Educational Reform
                        Director of Saga Television Station Co., Ltd.
                        Director of Coca-Cola West Japan Co., Ltd.
                        Director of Nippon Venture Capital Co., Ltd.
                        Advisory board member of The Nomura Securities Co., L
                        Director of UFJ Holdings, Inc.

</TABLE>

                                    -57-

<PAGE>

<TABLE>
<CAPTION>

| Name (Date of Birth) | Current Position (Function/Business area) | Date | Business |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| Masamitsu Sakurai (January 8, 1942) | President, Chief Executive Officer and Chief Operating Officer | Apr. 1966 | Joined the Comp |
| | | Apr. 1990 | General Manager Division |
| | | June 1992 | Director |
| | | June 1994 | Managing Direct |
| | | Apr. 1996 | President (Curr |
| | | June 2000 | Chief Operating |
| | | June 2003 | Chief Executive |

Principal business activities and other principal director
  outside Ricoh:
      Vice Chairperson of Japan Association of Corporate Ex
      Vice President of Japan Business Machine and Informat
        Industries Association
      Representative of Asahi Insurance Company
      Corporate Auditor of San-Ai Oil Co., Ltd.
      Director of Millea Holdings, Inc.

| Haruo Kamimoto (January 12, 1938) | Deputy President (Corporate Environment) (Corporate Citizenship Promotion and Public Relations) | Apr. 1953 | Joined the Comp |
| | | Feb. 1980 | Manager of Copi |
| | | June 1980 | Director |
| | | June 1990 | Managing Direct |
| | | June 1994 | Executive Manag |
| | | June 2000 | Executive Vice |
| | | Oct. 2001 | Deputy presiden |

| Tatsuo Hirakawa (November 17, 1937) | Deputy President (Accounting and Personnel) | Apr. 1960 | Joined the Comp |
| | | Jan. 1982 | Deputy General Accounting and |
| | | June 1983 | Director |
| | | June 1990 | Managing Direct |
| | | June 1994 | Executive Manag |
| | | June 2000 | Executive Vice |
| | | Oct. 2001 | Deputy presiden |

Principal business activities and other principal director
  outside Ricoh:
      Corporate Auditor of Coca-Cola West Japan Co., Ltd.

| Naoto Shibata (December 16, 1938) | Executive Managing Director (Legal, Intellectual Property and Corporate Social Responsibility) | Apr. 1961 | Joined the Comp |
| | | Apr. 1990 | General Manager Division |
| | | June 1992 | Director |
| | | Sep. 1995 | Chairman of Ges (now NRG Group |
| | | June 1996 | Managing Direct |
| | | Apr. 1997 | Chairman of Ric |
| | | June 2000 | Executive Manag |
| | | June 2000 | Executive Vice |

</TABLE>

-58-

```
<PAGE>

<TABLE>
<CAPTION>
    Name                Current Position
(Date of Birth)       (Function/Business area)        Date            Business
- ---------------      ------------------------      ---------       --------------
<S>                    <C>                           <C>             <C>
Koichi Endo            Executive Managing Director   Apr. 1966       Joined the Comp
(February 16, 1944)    (Corporate Planning,          Oct. 1990       General Manager
                        Investors Relations and                        Division
                        Corporate Communication)     June 1992       Director
                       (Restructuring by Supply      June 1997       Managing Direct
                        Chain Management)            Apr. 1998       General Manager
                       (IT & Solution)                                Business Group

                                                     June 2000       Executive Manag
                                                     June 2000       Executive Vice

                       Principal business activities and other principal directors
                           outside Ricoh:
                           Director of Sindo Ricoh Co., Ltd.
                           Director of San-Ai Plant Construction Co., Ltd.

- ---------------      ------------------------      ---------       --------------
Masami Takeiri         Executive Managing Director   Apr. 1962       Joined the Comp
(May 3, 1938)          (International Marketing)     Apr. 1994       General Manager
                       (General Manager of                             Marketing Grou
                        International Marketing      June 1994       Director
                        Group)                       June 1998       Managing Direct
                                                     June 2000       Executive Vice
                                                     June 2002       Executive Manag
                                                                       (Current)
                                                     Jan. 2003       Chairman of Ric
                                                                       (Current)

- ---------------      ------------------------      ---------       --------------
Masayuki Matsumoto     Executive Managing Director   Apr. 1970       Joined the Comp
(December 10, 1944)    (Domestic sales)             July 1993       General Manager
                       (General Manager of                             Staff Office i
                        Marketing Group)             June 1994       Director
                                                     Oct. 1998       Managing Direct
                                                     Oct. 1998       General Manager
                                                                       (Current)
                                                     June 2000       Executive Vice
                                                     June 2002       Executive Manag
                                                                       (Current)

- ---------------      ------------------------      ---------       --------------
Makoto Hashimoto       Managing Director             Nov. 1972       Joined the Comp
(August 26, 1945)      (Customer Satisfaction        Apr. 1993       General Manager
                        and Quality Control                            Imaging System
                       (Production and Procurement)  June 1994       Director
                       (General Manager of           Apr. 1998       General Manager
                        Customer Satisfaction                          Business Group
                        Management Division)         June 1998       Managing Direct
                                                     June 2000       Executive Vice
                                                     June 2003       General Manager
                                                                       Satisfaction M
                                                                       (Current)
</TABLE>
```

-59-

<PAGE>

<TABLE>
<CAPTION>

| Name<br>(Date of Birth) | Current Position<br>(Function/Business area) | Date | Business |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Katsumi Yoshida<br>(August 20, 1944) | Managing Director<br>(Sales in the Americas) | Apr. 1967<br>Apr. 1989<br>Feb. 1996<br><br>Apr. 2000<br>Apr. 2001<br>June 2002<br>Jan. 2003 | Joined the Comp<br>General Manager<br>Chairman of Ric<br>(Current)<br>President of Ri<br>Executive Vice<br>Managing Direct<br>Chairman of Ric<br>(Current) |
| Kiyoshi Sakai<br>(December 25, 1945) | Managing Director<br>(Research and Development)<br>(General Manager of Research<br>and Development Group)<br>(General Manager of Group<br>technology planning)<br>(General Manager of New<br>Business Development Group) | Apr. 1970<br>Jan. 1996<br><br>June 1996<br>Apr. 1999<br><br>June 2000<br>June 2002<br>June 2002 | Joined the Comp<br>General Manger<br>Planning Divis<br>Director<br>General Manager<br>Development Gr<br>Senior Vice Pre<br>Executive Vice<br>Managing Direct |
| Shiroh Kondoh<br>(October 7, 1949) | Managing Director<br>(Imaging System Business)<br>(Planning, Development and<br>design of Imaging System)<br>(General Manger of Imaging<br>System Business Group) | Apr. 1973<br>Apr. 1998<br><br>June 2000<br>Oct. 2000<br><br>June 2002<br>June 2003 | Joined the Comp<br>Manager of Prin<br>Imaging System<br>Senior Vice Pre<br>General Manager<br>Business Group<br>Executive Vice<br>Managing Direct |
| Kazuo Togashi<br>(November 28, 1949) | Managing Director<br>(Sales in Europe) | Apr. 1972<br>Apr. 1998<br>June 2000<br>Apr. 2002<br>Apr. 2002<br>June 2002<br>June 2003 | Joined the Comp<br>President of Ri<br>Group Senior Vi<br>Chairman of sai<br>Chairman of NRG<br>Executive Vice<br>Managing Direct |
| Kazunori Azuma<br>(February 11, 1949) | Managing Director<br>(Planning of Domestic Sales) | Apr. 1971<br>Oct. 1994<br>June 2000<br>Oct. 2000<br>Oct. 2000<br><br>June 2003 | Joined the Comp<br>President of Ho<br>Senior Vice Pre<br>Group Senior Vi<br>President of Ri<br>Co., Ltd. (Cur<br>Executive Vice<br>Managing Direct |

</TABLE>

-60-

<PAGE>

<TABLE>
<CAPTION>

| Name<br>(Date of Birth) | Current Position<br>(Function/Business area) | Date | Business |
|---|---|---|---|
| - -------------- | --------------------------- | --------- | -------------- |
| <S> | <C> | <C> | <C> |
| Josei Itoh<br>(May 25, 1929) | Director<br>(General Management) | Mar. 1953 | Joined the Nipp<br>Company |
| | | July 1981 | Director of sai |
| | | Mar. 1984 | Managing Direct |
| | | Mar. 1987 | Executive Manag<br>company |
| | | Mar. 1988 | Vice President |
| | | July 1989 | President of sa |
| | | Apr. 1997 | Chairman of sai |
| | | June 2000 | Director of the |
| - -------------- | --------------------------- | --------- | -------------- |
| Nobuo Mii<br>(July 4, 1931) | Director<br>(Technical of Information<br>and Communication) | Apr. 1955 | Joined the Nipp<br>(Japan Broadca |
| | | Jan. 1969 | Joined IBM Japa |
| | | Jan. 1969 | Joined IBM Corp |
| | | Mar. 1977 | Director of IBM |
| | | Apr. 1990 | Vice President |
| | | Oct. 1997 | Managing Partne<br>(Current) |
| | | June 2000 | Director of the |
| - -------------- | --------------------------- | --------- | -------------- |
| Hisaaki Koga<br>(April 5, 1943) | Corporate Auditor | Apr. 1967 | Joined the Comp |
| | | Apr. 1998 | General Manager<br>Staff Office i |
| | | June 1998 | Corporate Audit<br>(Current) |
| - -------------- | --------------------------- | --------- | -------------- |
| Hideyuki Takamatsu<br>(May 21, 1942) | Corporate Auditor | Apr. 1966 | Joined the Comp |
| | | Dec. 1997 | Executive Manag<br>Co., Ltd. |
| | | June 2000 | Corporate Audit<br>(Current) |
| - -------------- | --------------------------- | --------- | -------------- |
| Kenji Matsuishi<br>(July 24, 1937) | Corporate Auditor | Apr. 1965 | Graduated from<br>Training and R |
| | | Apr. 1965 | Legal registrat<br>attorney |
| | | Apr. 1965 | Joined Takano &<br>Services |
| | | Feb. 1972 | General Manager<br>Legal Services |
| | | June 1994 | Corporate Audit<br>(Current) |
| - -------------- | --------------------------- | --------- | -------------- |
| Takehiko Wada | Corporate Auditor | Apr. 1958 | Joined San-Ai O |

(October 24, 1935)

| | June 1985 | Director of sai |
| | June 1990 | Managing Direct |
| | July 1994 | Executive Manag company |
| | July 1999 | President of sa |
| | June 2001 | Corporate Audit (Current) |

</TABLE>

-61-

<PAGE>

Directors and Corporate Auditors are elected at a general meeting of shareholders for two and three years terms, respectively, and may serve any number of consecutive terms.

The Board of Directors has appointed from among its members a Chairman, a President, and one or more Vice Presidents, Executive Managing Directors and Managing Directors, in accordance with Japanese commercial law. As of June 30, 2003, the Company maintains an executive officer system and under such system there are 35 such officers each with one of the following roles:

. Executive officers: Oversee operations under the authority granted from the president and report to the president.

. Group executive officers: Assist the president with the management of Ricoh Group.

Executive Officers of the Company as of June 30, 2003 were as follows:

<TABLE>
<CAPTION>

| Name | Current Position (Function/Business area) | Date |
| --- | --- | --- |
| <S> | <C> | <C>        <C> |
| Masamitsu Sakurai | President and Chief Operating Officer | See above for his information. |
| Haruo Kamimoto | Executive Vice President (Corporate Environment) (Corporate Citizenship Promotion and Public Relations) | See above for his information. |
| Tatsuo Hirakawa | Executive Vice President (Finance and Personnel) | See above for his information. |
| Naoto Shibata | Executive Vice President (Legal, intellectual property and Corporate Social Responsibility) | See above for his information. |
| Koichi Endo | Executive Vice President (Corporate Planning, Investors Relations and | See above for his information. |

                    Corporate Communication)
                    (Restructuring)
                    (IT & Solution)

| | | |
|---|---|---|
| Masami Takeiri | Executive Vice President (General Manager of International Marketing Group) (Chairman of Ricoh China Co., Ltd.) | See above for his information. |

</TABLE>

                              -62-

<PAGE>

<TABLE>
<CAPTION>

| Name | Current Position (Function/Business area) | Date |
|---|---|---|
| <S> | <C> | <C>    <C> |
| Masayuki Matsumoto | Executive Vice President (General Manager of Marketing Group) | See above for his information. |
| Makoto Hashimoto | Executive Vice President (General Manager of Customer Satisfaction Management Division) | See above for his information. |
| Katsumi Yoshida | Executive Vice President (Chairman of Ricoh Corporation) (Chairman of Ricoh Electronics, Inc.) | See above for his information. |
| Kiyoshi Sakai | Executive Vice President (General Manager of Research and Development Group) (General Manager of Group Technology Planning) (General Manager of New Business Development Group) | See above for his information. |
| Shiroh Kondoh | Executive Vice President (General Manger of Imaging System Business Group) | See above for his information. |
| Kazuo Togashi | Executive Vice President (Chairman of Ricoh Europe B.V.) (Chairman of NRG Group PLC) | See above for his information. |

```
- --------------------------       ------------------------------       -------------    -
Kazunori Azuma                     Executive Vice President             See above for his
                                   (President of Ricoh                   information.
                                    Technosystems Co., Ltd.)

- --------------------------       ------------------------------       -------------    -
Terumoto Nonaka                    Executive Vice President             Jan. 1988        Jo
(October 28, 1947)                 (President of Electronic             Oct. 2000        Pr
                                    Devices Company)                                     C
                                                                        June 2002        Ex
                                                                                         C

- --------------------------       ------------------------------       -------------    -
Tadatoshi Sakamaki                 Executive Vice President             Apr. 1967        Jo
(April 23, 1942)                   (President of                        June 2000        Se
                                    Personal MultiMedia                                  C
                                    Products Company)                   Apr. 2002        Ge
                                   (General Manager of                                   o
                                    Marketing Center of                                  C
                                    Personal                            June 2003        Pr
                                    MultiMedia Products                                  P
                                    Company)                            June 2003        Ex
                                                                                         C

</TABLE>

                                        -63-

<PAGE>

<TABLE>
<CAPTION>
                                         Current Position
            Name                     (Function/Business area)            Date
- --------------------------       ------------------------------       -------------    -
<S>                                <C>                                  <C>              <C>
Etsuo Kobayashi                    Executive Vice President             Apr. 1970        Jo
(July 4, 1947)                     (General Manager of                  Apr. 1998        Ge
                                    Personnel Division)                                  D
                                                                        June 2000        Se
                                                                                         C
                                                                        June 2003        Ex

- --------------------------       ------------------------------       -------------    -
Hiroshi Tategami                   Executive Vice President             Apr. 1962        Jo
(March 31, 1941)                   (General Manager of                  June 2000        Se
                                    Production Business Group)                           C
                                   (General Manager of RS              Oct. 2000         Ge
                                    Products Division)                                   D
                                                                        June 2003        Ge
                                                                                         B
                                                                        June 2003        Ex

- --------------------------       ------------------------------       -------------    -
Zenji Miura                        Executive Vice President             Apr. 1976        Jo
(January 5, 1950)                  (General Manager of                  Oct. 2000         Se
                                    Accounting Division)                                 C
                                                                        Oct. 2000         Ge
                                                                                         A
```

| | | June 2003 | Ex |
|---|---|---|---|
| - ------------------------ | ----------------------------- | ------------- | - |
| Kenji Hatanaka (July 1, 1946) | Senior Vice President (General Manager of Tokyo Branch) (General Manager of Kanto Branch) | Apr. 1969 June 2000 June 2003 June 2003 | Jo Se C Ge ( Ge ( |
| - ------------------------ | ----------------------------- | ------------- | - |
| Hideko Kunii (December 13, 1947) | Senior Vice President (General Manager of Software Research and Development) (Chairman of Ricoh Software Technology (Shanghai) Co., Ltd.) | May 1982 Oct. 1999 June 2000 Oct. 2000 June 2002 Oct. 2002 | Jo Ge R Se C De P Ch T ( Ge R |
| - ------------------------ | ----------------------------- | ------------- | - |
| Kunio Taniguchi (December 18, 1948) | Senior Vice President (General Manager of Osaka Branch) (President of Ricoh Kansai Co., Ltd.) | Apr. 1972 June 2000 June 2003 June 2003 | Jo Se C Ge ( Pr ( |
| - ------------------------ | ----------------------------- | ------------- | - |
| Hiroshi Kobayashi (July 2, 1948) | Senior Vice President (General Manager of Corporate Planning Division) | Apr. 1974 Apr. 2002 June 2002 Apr. 2003 | Jo Ge P Se C Ge C |

</TABLE>

-64-

<PAGE>

<TABLE>
<CAPTION>

| Name | Current Position (Function/Business area) | Date | |
|---|---|---|---|
| - ------------------------ | ----------------------------- | ------------- | - |
| <S> | <C> | <C> | <C> |
| Hiroshi Tsuruga (November 18, 1948) | Senior Vice President (General Manger of Information/Technology and Service Division) | Apr. 1971 Apr. 1999 June 2002 | Jo Ge I D Se C |

| - ------------------------- | ------------------------------ | ------------ | - |
| Kiyoto Nagasawa<br>(August 16, 1948) | Senior Vice President<br>(General Manger of C&F<br>Business Division 2) | Apr. 1973<br>Apr. 2001<br><br>May  2002<br><br>June 2002 | Jo<br>Ge<br>D<br>Di<br>D<br>Se<br>C |
| - ------------------------- | ------------------------------ | ------------ | - |
| Yutaka Ebi<br>(October 20, 1949) | Senior Vice President<br>(General Manger of Imaging<br>Technology Division) | Apr. 1972<br>Apr. 2001<br><br>June 2002 | Jo<br>Ge<br>T<br>Se<br>C |
| - ------------------------- | ------------------------------ | ------------ | - |
| Hiroo Matsuda<br>(April 19, 1948) | Senior Vice President<br>(General Manger of Major<br>Accounts Marketing Division) | Apr. 1972<br>Apr. 2002<br><br>June 2002 | Jo<br>Ge<br>M<br>Se<br>C |
| - ------------------------- | ------------------------------ | ------------ | - |
| Hiroshi Adachi<br>(January 8, 1946) | Senior Vice President<br>(President of Thermal Media<br>Company)<br>(Chairman of Ricoh<br>Electronic Technology<br>(Beijing) Co., Ltd.) | Apr. 1968<br>Oct. 2000<br><br>Nov. 2001<br><br><br>June 2002 | Jo<br>Pr<br>(<br>Ch<br>T<br>(<br>Se<br>C |
| - ------------------------- | ------------------------------ | ------------ | - |
| Kouji Sawa<br>(June 5, 1948) | Senior Vice President<br>(General Manager of<br>Production Strategic Center)<br>(General Manager of Optical<br>Component Development<br>Division) | Apr. 1971<br>Apr. 1998<br><br>Apr. 2000<br><br>July 2001<br><br>June 2002 | Jo<br>Ge<br>C<br>Ge<br>S<br>Ge<br>C<br>(<br>Se<br>C |
| - ------------------------- | ------------------------------ | ------------ | - |
| Itsuo Kawaji<br>(September 12, 1938) | Group Senior Vice President<br>(Chairman of Ricoh Logistics<br>System Co., Ltd.) | Apr. 1961<br>Apr. 1997<br><br>June 2000<br><br>June 2003 | Jo<br>Pr<br>C<br>Gr<br>C<br>Ch<br>C |

</TABLE>

-65-

<PAGE>

<TABLE>

<CAPTION>

| Name | Current Position (Function/Business area) | Date | |
|------|-------------------------------------------|------|--|
| <S> | <C> | <C> | <C> |
| Takashi Nakamura (September 2, 1946) | Group Senior Vice President (President of Ricoh Elemex Corporation) | Apr. 1972 June 1998 June 2000 Apr. 2002 June 2002 | Jo Di Se C Gr C Pr C |
| Yuji Inoue (April 4, 1948) | Group Senior Vice President (President of Ricoh Leasing Co., Ltd.) | Apr. 1971 Apr. 2000 June 2000 | Jo Pr ( Gr C |
| Peter E. Hart (February 27, 1941) | Group Senior Vice President (Chairman and President of Ricoh Innovations, Inc.) | Mar. 1997 Feb. 2000 June 2000 | Pr I Ch S I Gr C |
| Masami Yoneyama (March 25, 1942) | Group Senior Vice President (Vice Chairman and President of Ricoh China Co., Ltd.) (Chairman of Ricoh Electronic Technology Ltd. (China)) | Mar. 1961 June 2000 Oct. 2000 Oct. 2000 Oct. 2000 Jan. 2003 | Jo Se C Gr ( Ch Ch Te Vi R |
| Bernard Decugis (October 23, 1942) | Group Senior Vice President (President of Ricoh France S.A.) | Aug. 1993 Apr. 2001 | Pr ( Gr C |
| Yoichi Shirahata (December 20, 1943) | Group Senior Vice President (President of Tohoku Ricoh Co., Ltd.) | Mar. 1962 June 2002 June 2002 | Jo Gr C Pr ( |
| Norihisa Goto (March 8, 1949) | Group Senior Vice President (President of Lanier Worldwide, Inc. ) | Apr. 1972 Oct. 1997 Mar. 2001 | Jo Pr Ch |

Jan. 2003       Pr
                (
June 2003       Gr
                t

</TABLE>
          There are no family relationships between any Director, Corporate
Auditor or Executive Officer and any other Director, Corporate Auditor or
Executive Officer of the Company. There are no arrangements or understandings
with major shareholders, customers, suppliers or others pursuant to which any
person named above was selected as a Director, Corporate Auditor, or an
Executive Officer.

                                    -66-

<PAGE>

B.    Compensation

          The aggregate remuneration, including bonuses but excluding retirement
allowances, paid by the Company for the fiscal year ended March 31, 2003 to all
Directors, Corporate Auditors and Executive Officers of the Company who served
during the fiscal year ended March 31, 2003 was Yen 1,041 million.

          In accordance with customary Japanese business practice, annual bonuses
are paid to the Directors and Corporate Auditors of the Company out of the
profit of the Company available for dividends, as such profit is determined in
accordance with the Japanese Commercial Code. Such bonuses are approved at the
annual shareholders meeting customarily held in June of each year. Bonuses so
paid are not deductible by the Company for tax purposes. Included in the figure
for aggregate remuneration set forth above is a total of Yen 170 million in
bonuses paid to Directors and Corporate Auditors as a group in their capacity as
such (excluding bonuses for their services as employees) in respect of the
fiscal year 2003, as approved by the Company's shareholders at the General
Meeting of Shareholders held on June 27, 2002. Moreover the amount of retirement
allowances to Directors and Corporate Auditors, which were approved at the same
meeting and paid during the fiscal year 2003, totals Yen 37 million.

          In accordance with customary Japanese business practice, when a
Director or Corporate Auditor retires, a proposal to pay a lump-sum retirement
allowance is submitted to the shareholders for their approval. After
shareholders' approval is obtained, the amount of the retirement allowance for a
Director or Corporate Auditor is fixed by the Board of Directors or Board of
Corporate Auditors and generally reflects his remuneration and position at the
time of retirement, the length of his service as a Director or Corporate Auditor
and his contribution to the Company's performance.

C.    Board practices

          Under the Japanese Commercial Code, all Directors and Corporate
Auditors shall be elected at the General Meeting of Shareholders. In general,
under the Articles of Incorporation of the Company, the terms of office of
Directors shall expire at the conclusion of the Ordinary General Meeting of
Shareholders held with respect to the last closing of accounts within two years
after their assumption of office, and the terms of office of Corporate Auditors
shall expire at the conclusion of the Ordinary General Meeting of Shareholders
held with respect to the last closing of accounts within four years after their
assumption of office. However, both the Directors and Corporate Auditors may
serve any number of consecutive terms.

          From among the Directors, the Board of Directors shall elect one or



How well d

About Ricoh

# about ricoh

### Welcome to the Ricoh Corporation Web Site.

Ricoh Corporation is the North and South American sales and marketing unit of Ricoh Company, Ltd., our parent company in Japan.

In every market we serve, we strive to provide the most outstanding products, services, and overall customer satisfaction. Our mission is to be a 21st Century leader through "Image Communication", the Ricoh concept for flexible office automation which uses image information to help people be more creative and productive.

During your visit to our web site, please take time to learn more about Ricoh's world-class automation and photographic products, our sales and manufacturing subsidiaries and, especially, our efforts towards energy conservation and preserving the environment.

Thank you for allowing us to serve you, and to share our vision.

### Corporate Information

> **Corporate Overview**
Ricoh Corporation, a 39-year old U.S. company with headquarters in West Caldwell, New Jersey, is a diversified office automation equipment and electronics provider with sales in excess of 2.2 billion annually.

> **History of Ricoh**
Explore Ricoh Company LTD and Ricoh Corporations' evolution into one of the world's leading providers of digital imaging solutions.

> **Ricoh and the Environment**
At Ricoh, a deep respect for the Earth is part of our corporate culture. For over 25 years, Ricoh has led the office automation industry in creating environmentally friendly products and processes, and in helping to build partnership among government, industry and environmental groups. In this section you will see that environmental protection is a key management priority at Ricoh.

> **Image Communication**
Image Communication is the Ricoh commitment to provide imaging processing equipment and solutions that make communicating information more efficient than ever before.

> **Media Library**
All multimedia files within the site are available here for your viewing ease.

> **Making It Better in The US**
Ricoh Electronics, Inc. delivering excellence in Image Communication for the future...Today.

> **Diversity Program**
Ricoh seeks to attract minority vendors and encourage them to compete for our business, with help, if desired, from our Minority Vendor Purchasing Program.

> **Investor Relations**

### Sidebar navigation
> Corporate Overview
> History of Ricoh
> Ricoh Environment
> Image Comm.
> Media Library
> Better in the USA
> Diversity Program
> Investor Relations
> Press Releases
> Office Locations
> Awards
> Accessibility



Katsumi "Kir
Chairman

### Awards

> **Environmental**

Ricoh has been r
many times both
internationally.

> **Products**

Ricoh products a
recognized for th
outstanding
quality/functiona

> **Industry**

Ricoh products a
recognized for th
outstanding
quality/functiona

> **Deming**

Few corporations
won one. Ricoh h

> Japan Quality A

View our last three Annual Reports.



 **Press Releases**
View 2001 Ricoh Press releases as well as our press release archive
going back to 1996.

 **Office Locations**
Find Ricoh office locations throughout North and South America.

Awarded to Ricoh
1999, this award
Ricoh's commitm
customer satisfac

 **Quality, Product and Environmental Awards**
Ricoh commitment to the customer, the environment and
delivering quality products has earned us various awards. You may
view our achievements here.

Home  |  About Ricoh  |  Product Showroom  |  Support Center  |  Software Download  |  Contact  |  Se

Copyright © 2001-200



How well d

Home   |   About Ricoh   |   Product Showroom   |   Support Center   |   Software Download   |   Conta

About Ricoh >Investor Relations

# **investor** relations

- › **Corporate Overview**
- › **History of Ricoh**
- › **Ricoh Environment**
- › **Image Comm.**
- › **Media Library**
- › **Better in the USA**
- › **Diversity Program**
- › **Investor Relations**
- › **Press Releases**
- › **Office Locations**
- › **Awards**
- › **Accessibility**

Ricoh Corporation is the North and South American Sales and Marketing unit of Ricoh Company, Ltd. The Ricoh Company, Ltd investor relation's information can be viewed here.



## Investor Information

› **Annual Reports**
  - 2001 Report (1.31 MB)
  - 2000 Report (3.92 MB)
  - 1998 Report (2.40 MB)

› **Ricoh Fact Book** (408 KB)

› **Investor Relations**
  Link to the Ricoh Company, Ltd. which overseas the operations in the Americas.

Home   |   About Ricoh   |   Product Showroom   |   Support Center   |   Software Download   |   Contact   |   Se

Copyright © 2001-200



Home  |  About Ricoh  |  Product Showroom  |  Support Center  | Software Download |  Conta

How well d

About Ricoh > Office Locations

Corporate Overview
History of Ricoh
Ricoh Environment
Image Comm.
Media Library
Better in the USA
Diversity Program
Investor Relations
Press Releases
Office Locations
Awards
Accessibility

# **office** locations

Find addresses and phone numbers for the various Ricoh offices located throughout North and South America.



## Corporate Headquarters

Ricoh Corporation
5 Dedrick Place
West Caldwell, NJ 07006
Phone: 973/882-2000
Fax: 973/882-5840

**SALES LOCATIONS FOR:**
*Copiers, Facsimile, Multifunction, Black & White and Color, Digital Imaging System Duplicators, and Wide Format Copiers*

- Call 1-800-63-RICOH (1-800-637-4264) for the nearest authorized Ricoh Sales lo
- You can also find a Ricoh Subsidiary, Branch & Sales Location listing by state or re
- Order Sales literature online

**SALES LOCATIONS FOR:**
*Electronic Devices, CD Recorders, Rewritables and Media Products, Digital Camera Scanners, SecureFax, and Ricoh Major Accounts*

- Call 1-800-63-RICOH (1-800-637-4264) for the nearest authorized Ricoh Sales lo
- You can also find a location here.

**REGIONAL OFFICE LOCATIONS:**
*(Dealer Sales Only)*

**Northeast Region**
5 Dedrick Place,
West Caldwell, NJ 07006
Phone: 973-882-2000
Fax: 973-882-5840

**Central Region**
100 West 22nd Street, Suite 150
Lombard, IL 60148
Phone: 630-268-0405
Fax: 630-268-1266

**Western Region**
1231 Warner Avenu
Tustin, CA 92780
Phone: 714-259-13
Fax: 714-566-3655

Home  |  About Ricoh  |  Product Showroom  |  Support Center  |  Software Download  |  Contact  |  Se

Copyright © 2001-20(

# California Business Portal

Secretary of State Kevin Shelley

**DISCLAIMER:** The information displayed here is current as of JUL 25, 2003 and is updated weekly. It is not a complete or certified record of the Corporation.

| Corporation | | |
|---|---|---|
| RICOH BUSINESS SYSTEMS, INC. | | |
| **Number:** C1252994 | **Date Filed:** 8/1/1984 | **Status:** active |
| **Jurisdiction:** California | | |
| **Mailing Address** | | |
| 5632 BOLSA AVE | | |
| HUNTINGTON BEACH, CA 92649 | | |
| **Agent for Service of Process** | | |
| C T CORPORATION SYSTEM | | |
| 818 WEST SEVENTH STREET | | |
| LOS ANGELES, CA 90017 | | |

For information about certification of corporate records or for additional corporate information, please refer to Corporate Records. If you are unable to locate a corporate record, you may submit a request to this office for a more extensive search. Fees and instructions for requesting this search are included on the Corporate Records Order Form.

Blank fields indicate the information is not contained in the computer file.

If the status of the corporation is "Surrender", the agent for service of process is automatically revoked. Please refer to California Corporations Code Section 2114 for information relating to service upon corporations that have surrendered.

# California Business Portal
## Secretary of State Kevin Shelley

**DISCLAIMER:** The information displayed here is current as of JUL 25, 2003 and is updated weekly. It is not a complete or certified record of the Corporation.

| Corporation | | |
|---|---|---|
| **RICOH CORPORATION** | | |
| **Number:** C1582994 | **Date Filed:** 3/30/1987 | **Status:** active |
| **Jurisdiction:** DELAWARE | | |
| **Mailing Address** | | |
| 5 DEDRICK PL | | |
| WEST CALDWELL, NJ 07006 | | |
| **Agent for Service of Process** | | |
| C T CORPORATION SYSTEM | | |
| 818 WEST SEVENTH STREET | | |
| LOS ANGELES, CA 90017 | | |

For information about certification of corporate records or for additional corporate information, please refer to Corporate Records. If you are unable to locate a corporate record, you may submit a request to this office for a more extensive search. Fees and instructions for requesting this search are included on the Corporate Records Order Form.

Blank fields indicate the information is not contained in the computer file.

If the status of the corporation is "Surrender", the agent for service of process is automatically revoked. Please refer to California Corporations Code Section 2114 for information relating to service upon corporations that have surrendered.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RICOH COMPANY, LTD. | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 03-103-GMS |
| AEROFLEX INCORPORATED, AMI SEMICONDUCTOR, INC., MATROX ELECTRONIC SYSTEMS LTD., MATROX GRAPHICS INC., MATROX INTERNATIONAL CORP., and MATROX TECH, INC., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF JULIE D. McMANUS IN SUPPORT OF DEFENDANTS' MOTION TO STAY OR, IN THE ALTERNATIVE, TRANSFER

I, Julie D. McManus, hereby declare as follows:

1.      I am an Executive Assistant for Synopsys, Inc. ("Synopsys"). I am familiar with Synopsys' business, facilities, and personnel. The matters set forth in this declaration are based upon my personal knowledge, except where otherwise indicated, and if called as a witness, I could and would testify competently thereto.

2.      Synopsys is a designer and manufacturer of high-level design automation solutions for the design of integrated circuits, systems on a chip (SoCs) and electronic systems, and sells its products to semiconductor, computer, communications, consumer electronics and aerospace companies, including all of the defendants.

3.      Synopsys has its principal place of business at a facility with a business address in Mountain View, California and buildings in both Mountain View and Sunnyvale, California. Synopsys houses its corporate, manufacturing, research and development, and sales and distribution resources at this facility.

4.    Synopsys does not maintain any office or facility in the state of Delaware.

5.    Most of Synopsys' present and former research and development engineers work in Synopsys' Mountain View/Sunnyvale campus and live in northern California, including those responsible for the development of Synopsys' Design Compiler product.

6.    I am not aware of any present or former Synopsys engineering personnel knowledgeable as to Design Compiler who reside within the state of Delaware.

7.    Synopsys does not provide its customers with detailed information regarding the internal operation of its products, including Design Compiler.

8.    On information and belief, on or about 1991 and/or early 1992, representatives of Knowledge Based Silicon Corporation ("KBS") met with representatives of Synopsys, at the Design Automation Conference held in San Francisco, California and/or other industry trade shows in an effort to obtain Synopsys' agreement to take a license to the Kobayashi family of patents. Synopsys did not take a license, and KBS abandoned its efforts. KBS never again raised the issue of Synopsys' taking a license to the Kobayashi patents.

9.    David Gregory, one of the co-founders of Synopsys, was involved with the design and development of the SOCRATES system for the synthesis and optimization of logic circuit design prior to founding Synopsys. Dr. Gregory managed the development of the Design Compiler product in addition to other Synopsys' synthesis tools. SOCRATES was a building block for Synopsys' products, including the Design Compiler product, and Dr. Gregory developed many key algorithms that may be of issue in relation to the patent.

10.    Dr. Gregory is no longer an employee of Synopsys, and is currently President and CEO of ReShape, Inc. also located in Mountain View, California. ReShape, Inc. is a designer of electronic design automation software that assists engineers in developing system-on-a-chip integrated circuit designs.

270756_1

-2-

11.    It would be extremely burdensome and a major inconvenience for Synopsys to be forced to send witnesses to Delaware to testify regarding the design and operation of the Design Compiler product in a patent case to which Synopsys is not a party.

12.    Synopsys' primary synthesis competitors include Cadence Design Systems, Inc. ("Cadence"), Monterey Design Systems ("Monterey"), Magma Design Automation ("Magma"), Get2Chip, Inc. (recently acquired by Cadence) ("Get2Chip"), and Incentia Design Systems, Inc. ("Incentia"). All of these companies are based in the Silicon Valley area of northern California; Cadence has its corporate headquarters in San Jose, California, Monterey has its corporate headquarters in Sunnyvale, California, Magma has its has its corporate headquarters in Cupertino, California, Get2Chip has its corporate headquarters in San Jose, California, and Incentia has its corporate headquarters in Santa Clara, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed in Mountain View, California on June 12, 2003.

Julie D. McManus

## CERTIFICATE OF SERVICE

I, Francis DiGiovanni, hereby certify that on the 12th day of June, 2003, a true and correct copy of the foregoing was caused to be served on the attorneys of record at the following addresses:

### VIA HAND DELIVERY

Robert W. Whetzel
Richards Layton & Finger
One Rodney Square
Wilmington, DE 19899

### FEDERAL EXPRESS
Gary M. Hoffman
Dickstein Shapiro Morin & Oshinsky LLP
2101 L Street, N.W.
Washington, D.C. 20037-1526

### VIA FEDERAL EXPRESS
Edward A. Meilman
Dickstein Shapiro Morin & Oshinsky, LLP
1177 Avenue of the Americas
New York, N.Y. 10036-2714

Francis DiGiovanni (#3189)

265624

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RICOH COMPANY, LTD. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 03-103-GMS |
| ) | |
| ) | |
| AEROFLEX INCORPORATED, AMI ) | |
| SEMICONDUCTOR, INC., MATROX ) | |
| ELECTRONIC SYSTEMS LTD., ) | |
| MATROX GRAPHICS INC., MATROX ) | |
| INTERNATIONAL CORP., and ) | |
| MATROX TECH, INC., ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF CHARLES BADLATO IN SUPPORT OF DEFENDANTS' MOTION TO STAY OR, IN THE ALTERNATIVE, TRANSFER

I, Charles Badlato, hereby declare as follows:

1.    I am treasure for defendant Aeroflex Incorporated ("Aeroflex"). I have been an employee of Aeroflex since 1987, and am familiar with Aeroflex' facilities and operations during the period 1991 to the present. The matters set forth in this declaration are based upon my personal knowledge, except where otherwise indicated, and if called as a witness, I could and would testify competently thereto.

2.    Aeroflex' principal place of business is in Plainview, New York. This facility houses the corporate office for Aeroflex and its subsidiaries.

3.    Aeroflex does not presently have any corporate, manufacturing, research and development, sales and distribution, or repair facilities in the state of Delaware.

4.    If this action were to proceed, the United States District Court for the Northern District of California would be a more convenient forum for the litigation of this action than the District of Delaware.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed in Plainview, New York on May _19_, 2003.

_____
Charles Badlato

## CERTIFICATE OF SERVICE

I, Francis DiGiovanni, hereby certify that on the 12th day of June, 2003, a true and correct copy of the foregoing was caused to be served on the attorneys of record at the following addresses:

**VIA HAND DELIVERY**

Robert W. Whetzel
Richards Layton & Finger
One Rodney Square
Wilmington, DE 19899

**FEDERAL EXPRESS**
Gary M. Hoffman
Dickstein Shapiro Morin & Oshinsky LLP
2101 L Street, N.W.
Washington, D.C.  20037-1526

**VIA FEDERAL EXPRESS**
Edward A. Meilman
Dickstein Shapiro Morin & Oshinsky, LLP
1177 Avenue of the Americas
New York, N.Y.  10036-2714

Francis DiGiovanni (#3189)

265624

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RICOH COMPANY, LTD.<br><br>Plaintiff,<br><br>v.<br><br>AEROFLEX INCORPORATED, AMI<br>SEMICONDUCTOR, INC., MATROX<br>ELECTRONIC SYSTEMS LTD.,<br>MATROX GRAPHICS INC., MATROX<br>INTERNATIONAL CORP., and<br>MATROX TECH, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)     C.A. No. 03-103-GMS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF JON STONER IN SUPPORT OF DEFENDANTS' MOTION TO STAY OR, IN THE ALTERNATIVE, TRANSFER

I, Jon Stoner, hereby declare as follows:

1.      I am Chief Technology Officer for defendant AMI Semiconductor, Inc ("AMIS"). I am familiar with AMIS' facilities and operations during the period 1991 to the present. The matters set forth in this declaration are based upon my personal knowledge, except where otherwise indicated, and if called as a witness, I could and would testify competently thereto.

2.      AMIS' principal place of business is in Pocatello, Idaho. This facility houses the AMIS corporate office, as well as a substantial portion of AMIS' research and development and manufacturing facilities.

3.      AMIS does not presently have any corporate, manufacturing, research and development, sales and distribution, or repair facilities in the state of Delaware.

-1-

4.    If this action were to proceed, the United States District Court for the Northern District of California would be a more convenient forum than the District of Delaware for AMIS because of AMIS' more substantial business connections in northern California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed in Pocatello, Idaho on May __, 2003. June 2, 2003

_____
Jon Stoner

-2-

## CERTIFICATE OF SERVICE

I, Francis DiGiovanni, hereby certify that on the 12th day of June, 2003, a true and correct

copy of the foregoing was caused to be served on the attorneys of record at the following addresses:

**VIA HAND DELIVERY**

Robert W. Whetzel
Richards Layton & Finger
One Rodney Square
Wilmington, DE 19899

**FEDERAL EXPRESS**
Gary M. Hoffman
Dickstein Shapiro Morin & Oshinsky LLP
2101 L Street, N.W.
Washington, D.C. 20037-1526

**VIA FEDERAL EXPRESS**
Edward A. Meilman
Dickstein Shapiro Morin & Oshinsky, LLP
1177 Avenue of the Americas
New York, N.Y. 10036-2714

Francis DiGiovanni (#3189)

265624

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RICOH COMPANY, LTD.<br><br>          Plaintiff,<br><br>     v.<br><br>AEROFLEX INCORPORATED, AMI<br>SEMICONDUCTOR, INC., MATROX<br>ELECTRONIC SYSTEMS LTD.,<br>MATROX GRAPHICS INC., MATROX<br>INTERNATIONAL CORP., and<br>MATROX TECH, INC.,<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)          C.A. No. 03-103-GMS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF ANDRÉ DESBIENS IN SUPPORT OF DEFENDANTS' MOTION TO STAY OR, IN THE ALTERNATIVE, TRANSFER

I, André Desbiens, hereby declare as follows:

1.      I am Corporate Controller for defendant Matrox Electronic Systems, Inc. ("Matrox").  Matrox is the sister company of defendant Matrox Graphics, Inc. ("Matrox Graphics"), parent company of Matrox International Corp. ("Matrox Int'l"), and an affiliate of Matrox Tech, Inc. ("Matrox Tech") (collectively "Matrox entities").  I have been an employee of Matrox since 1998, and am familiar with the Matrox entities' facilities and operations during the period 1991 to the present.  The matters set forth in this declaration are based upon my personal knowledge, except where otherwise indicated, and if called as a witness, I could and would testify competently thereto.

2.      Matrox' and Matrox Graphics' share a principal place of business in Dorval, Quebec.  This facility houses both companies' corporate offices, as well as a substantial portion of their manufacturing facilities.

3.    Matrox Int'l has its principal place of business in Plattsburg, New York. This facility houses all of Matrox Int'l's corporate offices.

4.    Matrox Tech has its principal place of business in Boca Raton, Florida. This facility houses all of Matrox Tech's corporate offices.

5.    The Matrox entities do not presently have any corporate, manufacturing, research and development, sales and distribution, or repair facilities in the state of Delaware.

6.    If this action were to proceed, the United States District Court for the Northern District of California would be a more convenient forum than the District of Delaware for the Matrox entities' because of the Matrox entities' more substantial business connections in northern California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed in Dorval, Qc., Canada, on June 12, 2003.

André Desbiens, CA

-2-

## CERTIFICATE OF SERVICE

I, Francis DiGiovanni, hereby certify that on the 12th day of June, 2003, a true and correct copy of the foregoing was caused to be served on the attorneys of record at the following addresses:

**VIA HAND DELIVERY**

Robert W. Whetzel
Richards Layton & Finger
One Rodney Square
Wilmington, DE 19899

**FEDERAL EXPRESS**
Gary M. Hoffman
Dickstein Shapiro Morin & Oshinsky LLP
2101 L Street, N.W.
Washington, D.C.  20037-1526

**VIA FEDERAL EXPRESS**
Edward A. Meilman
Dickstein Shapiro Morin & Oshinsky, LLP
1177 Avenue of the Americas
New York, N.Y.  10036-2714

Francis DiGiovanni (#3189)

265624

LEXSEE 2000 U.S. DIST. LEXIS 21863

**SYMBOL TECHNOLOGIES, INC., et al., Plaintiffs, v. LEMELSON MEDICAL, EDUCATION & RESEARCH FOUNDATION, LIMITED PARTNERSHIP, Defendant. COGNEX CORPORATION, Plaintiff, v. LEMELSON MEDICAL, EDUCATION & RESEARCH FOUNDATION, LIMITED PARTNERSHIP, Defendant.**

**CV-S-01-0701-PMP-RJJ, CV-N-99-0397-PMP(PHA) (Base File), CV-N-99-0533-PMP (PHA)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA**

*2000 U.S. Dist. LEXIS 21863*

**March 15, 2000, Decided**
**March 20, 2000, Filed; March 21, 2000, Entered and Served**

**SUBSEQUENT HISTORY:** Rev'd, remanded, *Symbol Techs. Inc. v. Lemelson Med.,Educ., & Research Found., Limited Partnership, 277 F.3d 1361, 2002 U.S. App. LEXIS 938 (Fed. Cir. 2002).*

**DISPOSITION:** [*1] Defendant's Motions to Dismiss, Transfer or Stay Proceedings GRANTED in part and DENIED in part.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** For Accu-Sort Systems, Inc., Intermec Technologies Corp., Metrologic Instruments, Inc., PSC Inc., Symbol Technologies, Inc., Teklogix Corp., Zebra Technologies Corp., PLAINTIFFS (CV-S-01-0701): Eugene Wait, Reno, NV.

For Accu-Sort Systems, Inc., Intermec Technologies Corp., Metrologic Instruments, Inc., PSC Inc., Symbol Technologies, Inc., Teklogix Corp., Zebra Technologies Corp., PLAINTIFFS (CV-S-01-0701): Steven C. Cherny, Albert E. Fey, John P. Hanish, Jesse J. Jenner, Charles A. Krauss, Charles Quinn, New York, NY.

For Accu-Sort Systems, Inc., Intermec Technologies Corp., Metrologic Instruments, Inc., PSC Inc., Symbol Technologies Inc., Teklogix Corp., Zebra Technologies Corp., PLAINTIFFS (CV-S-01-0701): Elissa Cadish, Las Vegas, NV.

For Cognex Corporation, Telxon Corporation (CV-S-01-0701): Eugene Wait, Reno, NV.

For Cognex Corporation (CV-S-01-0701): Albert E. Fey, New York, NY.

For Cognex Corporation, Telxon Corporation (CV-S-01-0701): Jesse J. Jenner, Charles Quinn, New York, [*2] NY.

For Cognex Corporation, Telxon Corporation (CV-S-01-0701): Elissa Cadish, Las Vegas, NV.

For Lemelson Medical, Education/Research Foundation, DEFENDANT (CV-S-01-0701): Mary Ann Morgan, Reno, NV.

For Lemelson Medical, Education/Research Foundation, DEFENDANT (CV-S-01-0701): Victoria Gruver Curtin, Louis James Hoffman, Scottsdale, AZ.

For Lemelson Medical, Education/Research Foundation, DEFENDANT (CV-S-01-0701): Gerald Hosier, Stephen Morris, Las Vegas, NV.

For Lemelson Medical, Education/Research Foundation, DEFENDANT (CV-S-01-0701): Steven G. Lisa, Mitch Mcaknin, Bruce S. Sperling, Chicago, IL.

For Lemelson Medical, Education/Research Foundation, DEFENDANT (CV-S-01-0701): Peter C. Warner, Scottsdate, AZ.

For Lemelson Medical, Education/Research Foundation, DEFENDANT (CV-S-01-0701): Donald J. Lisa, Paradise Valley, AZ.

National Retail Federation, AMICUS CURIAE (CV-S-01-0701): Dan Bowen, Reno, NV.

National Retail Federation, AMICUS CURIAE (CV-S-01-0701): R. Kevin Bailey, Bruce M. Berman, Paul J. Mode, Washington, DC.

**JUDGES:** PHILIP M. PRO, United States District Judge.

**OPINIONBY:** PHILIP M. PRO

**OPINION:**

ORDER

# I. INTRODUCTION

Before the [*3] Court for consideration are Motions to Dismiss, Transfer or Stay Proceedings filed in both of the above-referenced cases.

In Case CV-N-99-0397-PMP (PHA), Defendant Lemelson Medical, Education & Research Foundation ("Lemelson") filed a Motion to Dismiss, Transfer or Stay Proceedings (Doc. # 31) filed on October 15, 1999. On November 1, 1999, Plaintiffs Symbol Technologies, Inc. ("Symbol"), Accu-Sort Systems, Inc. ("Accu-Sort"), Intermec Technologies Corp. ("Intermec"), Metrologic Instruments, Inc. ("Metrologic"), PSC Inc. ("PSC"), Teklogix Corp. ("Teklogix") and Zebra Technologies, Corp. ("Zebra") (collectively "Plaintiffs") filed their Opposition to Lemelson's Motion to Dismiss, Transfer or Stay Proceedings (Doc. # 33). Lemelson filed a Reply on November 12, 1999 (Doc. # 34).

In Case CV-N-99-0533-PMP (PHA), Defendant Lemelson Medical, Education & Research Foundation filed a Motion to Dismiss, Transfer or Stay Proceedings (Doc. # 31) filed on December 17, 1999. On January 10, 2000, Plaintiff Cognex Corporation ("Cognex") filed its Opposition to Lemelson's Motion to Dismiss, Transfer or Stay Proceedings (Doc. # 33). Lemelson filed a Reply on January 28, 2000 (Doc. # 35).

Both of these [*4] cases were reassigned to the undersigned on December 3, 1999. Because these cases are related and will be consolidated by the Court, the foregoing Motions are being considered together in this single Order.

# II. FACTUAL BACKGROUND

Plaintiffs are engaged in the business of designing, manufacturing and selling bar code scanners and related products. Plaintiffs claim that their customers have been threatened with numerous lawsuits by Lemelson arising from their use of Plaintiffs' products in their own business endeavors. Plaintiffs have brought the present lawsuit arguing that they will be forced to indemnify their customers if the Lemelson patents have been infringed upon and could be subject to direct lawsuits by Lemelson in the future. Plaintiffs claim they have already received numerous requests for indemnification by various customers.

Lemelson claims it is the owner by assignment of about one hundred eighty-five (185) unexpired patents and numerous pending patent applications of Jerome H. Lemelson. The patents at issue generally involve machine vision and automatic identification ("Auto-ID"). Machine vision is described as use of a computer system to analyze images obtained [*5] by means of a camera or scanner. Auto-ID is a type of machine vision commonly seen as bar code reading technology. Machine vision and Auto-ID are widely used by manufacturers and some of these manufacturers constitute Plaintiffs' customers.

Lemelson claims in defending its patents that it will only pursue process claims and not apparatus claims against any alleged infringer. Process claims are described by Lemelson as involving the use of machine vision or Auto-ID in a manufacturing process, while apparatus claims involve the actual equipment used in such process. Process claims are directed at Plaintiffs' customers while apparatus claims would be directed at Plaintiffs themselves. Lemelson argues that manufacturers who use machine vision and Auto-ID are direct infringers, while Plaintiffs, because they supply the parts of an overall bar code scanning system, are at best only contributory infringers. Lemelson has instituted process claims against manufacturers of automobiles, computers, semiconductors, and electronic products but has thus far not made any direct claims against Plaintiffs.

Lemelson currently has two pending actions in the District of Arizona [*6] (Lemelson Foundation Partnership v. Intel, et al., Case No. CIV 98-1413 PHX PGR(HRH) and Lemelson Foundation Partnership v. Lucent Technologies, et al., Case No. CIV 99-0377 PHX RGS(HRH)), which it claims involve the same patents at issue in this case. Plaintiffs argue however, that the Arizona cases also involve different patents, products and technologies not at issue in this dispute.

# III. STANDARD FOR MOTION TO DISMISS

The Declaratory Judgment Act permits a federal court to "declare the rights and other legal relations of any interested party seeking such declaration...." *28 U.S.C.A. § 2201*(a) (1994); See *Societe de Conditionnement en Aluminium v. Hunter Engineering Co., 655 F.2d 938, 942 (9th Cir. 1981)*. Generally in order to show that there is an actual case or controversy, "a party is required to show that, under all the circumstances of the case, there is a substantial controversy between parties having adverse legal interests, and the controversy is of sufficient immediacy and reality to warrant declaratory relief." *Hal Roach Studios, Inc. v. Richard Feiner and Company, Inc., 896 F.2d 1542, 1555 (9th Cir. 1990)* (citing [*7] *Societe de Conditionnement, 655 F.2d at 942)*. The requirements of a case or controversy are no less strict under the Declaratory Judgment Act than in other cases. See *Cardinal Chemical Co. v. Morton International, Inc., 508 U.S. 83, 94, 124 L. Ed. 2d 1, 113 S. Ct. 1967 (1993)* (citation omitted). At the trial court level, the party seeking a declaratory judgment has the burden of establishing an actual case or controversy. See *Id. at 95* (citing *Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-241, 81 L. Ed. 617, 57 S. Ct. 461 (1937))*. A plaintiff may establish an actual controversy by the totality of circumstances. See *Spectronics Corp. v. H.B. Fuller Co., 940 F.2d 631, 634 (Fed. Cir. 1991)* (citations omitted). "In ruling on a motion to dismiss for lack of subject matter jurisdiction, we may consider not only the facts alleged in the plaintiff's well-pleaded complaint, but also any other evidence submitted on the issue." *Dow Chemical Co. v. Viskase Corp., 892 F. Supp. 991, 992 (N.D. Ill. 1995)* (citing *Field Container Co. v. Somerville Packaging Corp., 842 F. Supp. 338, 341, n. 3 (N.D. Ill. 1994)*. [*8]

In considering a motion to dismiss for failure to state a claim, the factual allegations of Plaintiffs' Complaint must be presumed to be true, and this Court must draw all reasonable inferences in favor of Plaintiffs. See *Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987)*. The issue is not whether Plaintiffs will ultimately prevail, but whether they are entitled to offer evidence in support of their claims. See *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)*. Consequently, the Court may not grant a motion to dismiss for failure to state a claim, "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. The Court does not, however, necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations in Plaintiffs' Complaint. See *Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981)*.

## IV. DISCUSSION

Lemelson argues in its Motion to Dismiss, Transfer or Stay [*9] Proceedings that there is no case or controversy between the parties. Lemelson also argues that if subject matter jurisdiction is found, this Court in its discretion should decline to exercise it. In the alternative, Lemelson contends that this Court should either transfer the case to the District of Arizona or stay all proceedings pending the conclusion of ongoing cases in that District. Finally, Lemelson asserts that Plaintiffs' fourth cause of action for laches fails to state a claim upon which relief can be granted. For the reasons set forth below this Court concludes that the present dispute meets the requirements for a case or controversy, the case should not be transferred to another district or stayed at this time and Plaintiffs' fourth cause of action fails to state a claim upon which relief can be granted.

In order to satisfy the case or controversy requirement in a patent case seeking declaratory relief there are generally two requirements. First, Defendant's conduct must create a reasonable apprehension in Plaintiffs that the Defendant will initiate suit if the alleged infringing activity continues. Second, Plaintiffs must actually have either produced the device or have [*10] prepared to produce the device that is allegedly infringing. See *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 736 (Fed. Cir. 1988)*. The test is objective and applies to the facts that existed when the Complaint was filed. See Id. (citation omitted). To meet the first prong of the test it is sufficient that reasonable apprehension of a lawsuit is created in Plaintiffs' customers. See Id. "[A] course of conduct on the part of the defendant which would cause a reasonable man to fear that he or his customers face an infringement suit or the threat of one is sufficient." *Grafon Corp. v. Hausermann, 602 F.2d 781, 784 (7th Cir. 1979)* (citation omitted).

As to the first prong, various customers of Plaintiffs have a reasonable apprehension of a potential lawsuit brought by Lemelson. In a form letter dated February 18, 1998, and purportedly sent to some of Plaintiffs' customers, Lemelson specifically stated "the purpose of this letter is to give your company notice of infringement... and to offer it a license under those patents on very favorable terms." (Pls.' Opp'n to Defs.' Mot. to Dismiss, Ex. A). Language such as "to encourage [*11] prompt settlement..." and "please understand that a lawsuit for infringement of the Lemelson patents will be filed at or before conclusion of the Ford litigation, unless a license agreement is accepted...", conveys a specific threat of litigation sufficient to find reasonable apprehension. Later letters are substantially similar, and while they omit a specific threat of litigation, such a threat is implied. In both sets of letters Lemelson makes

reference to the fact that as many as one hundred companies have already received licenses and that in the aggregate such companies have paid many millions of dollars for such licenses. Also found in the letters is a reference to how many lawsuits have been filed by Lemelson and against what specific companies. Use of such language conveys a message that Lemelson actively pursues its claims of infringement and that unless a licensing agreement is reached between the parties, litigation would be forthcoming. The letters serve to show that Lemelson had effectively decided that there had been infringement and that it intended to file a lawsuit. See *EMC Corp. v. Norand, 89 F.3d 807, 812 (Fed. Cir. 1996)*.

While Lemelson specifically [*12] states that it will not pursue any claims of past or present infringement against Plaintiffs, such a statement does not preclude Lemelson from pursuing such claims in the future. (Def's. Mot. to Dismiss, p. 6). More importantly, Plaintiffs are at a substantial risk of having to indemnify their customers for costs associated with the infringement of any Lemelson patent. In this case the fear of indemnification is reasonable. *Viking Injector Co. Inc. v. Chemtron Inc., 1993 U.S. Dist. LEXIS 19679, 29 U.S.P.Q.2d 1547, 1549 (M.D. Pa. 1993)*. Plaintiffs do not merely have a substantial economic interest in the dispute, since indemnification is a legal obligation. *Dow Chemical, 892 F. Supp. at 997*. Plaintiffs include numerous affidavits with their Opposition describing contractual obligations to indemnify or defend their customers.

Specifically, Symbol states that it has received numerous requests for indemnity both written and oral. In his Declaration, Leonard H. Goldner states that Symbol has agreed to defend and indemnify customers as stated in specific agreements or pursuant to Symbol's standard indemnity provision. (Decl. of Leonard H. Goldner, p. 3, [*13] P 9). Symbol claims that it has expressly agreed to indemnify three customers and has confirmed that it will fulfill its indemnity obligation to ten others. (See Id. at p. 3, P 9, 10). Symbol has also received indemnity requests from three customers who have settled with Lemelson and are now seeking contribution from Symbol. (See Id. at p. 3, P 11). Lemelson acknowledges that it has sent inquiry letters to sixty-four of Symbol's customers, that it has licensed twenty-nine and has sued seven in pending lawsuits in the District of Arizona. (Def's. Mo. to Dismiss, p. 16).

In a Declaration by Steven M. Luscinski, Accu-Sort claims it has received fifty customer requests for defense and indemnity while not acknowledging that it is required to indemnify any of its customers. (Decl. of Steven Luscinski, p. 2, P 5, 6). Paragraph six of Accu-Sort's standard agreement however, states that it will

"defend, at its expense, and [] pay the cost and damages incurred in settlement or awarded as a result of any action under such claim...." (Decl. of Steven Luscinski, Ex. A). Thus there is still a question of whether Accu-Sort would be required to indemnify its customers. Lemelson has licensed [*14] six of Accu-Sort's customers, sued two in the Arizona proceedings and twenty customers were sent letters. (Def's. Mo. to Dismiss, p. 10).

Intermec states that it will defend and indemnify customers pursuant to its standard agreement. (Decl. of M. Michael Carpenter, p. 2, P 5). It has received numerous requests for indemnification and has honored an indemnification request by Southwest Airlines. (See Id. at p. 3, P 8). Two companies, Micromotion and Furniture International Inc., have stopped all acquisitions of Intermec products until the present dispute is concluded. (See Id. at p. 3, P 10). Lemelson has already licensed forty-eight of Intermec's customers, sued seven in the Arizona lawsuit and has sent letters to forty-six. (Def's. Mo. to Dismiss, p. 14, 15).

Metrologic is similar. It also has agreed to indemnify its customers pursuant to its standard indemnity provision. (Decl. of Nancy A. Smith, p. 2, P 5). It has received six formal requests for indemnification and has affirmed its responsibility for its indemnity obligations. (See Id. at p. 2, P 6). Lemelson has already licensed four of Metrologic's customers and has contacted three more. (Def's. Mo. to Dismiss, [*15] p. 11).

PSC has received sixteen written requests for indemnification as well as a number of oral requests. (Decl. of Elizabeth J. McDonald, p. 2, P 5) Six customers have been licensed thus far by Lemelson and inquiry notices have been sent to five. (Def's. Mo. to Dismiss, p. 11, 12).

Teklogix has also agreed to indemnify its customers as part of its standard terms and conditions of sale. (Decl. of Constance L. Crosby, p. 1, P 4). It has received ten requests for indemnification. (See Id. at p. 2, P 5). Two customers have been licensed by Lemelson and inquiry notices have been sent to four. (Def's. Mo. to Dismiss, p. 12).

The last Plaintiff, Zebra has received more than seven requests for indemnification and all requests have been based upon Zebra's standard indemnity provision. (Decl. of John Kindsvater, p. 2, P 6). Lemelson has licensed four customers, sent inquiry notices to two and three are presently Defendants in the Arizona proceedings. (Def's. Mo. to Dismiss, p. 13).

This Court also finds that some Cognex customers have a reasonable apprehension of suit by Lemelson

sufficient to warrant the conclusion that this case presents an actual case or controversy, thereby allowing [*16] this Court to retain jurisdiction over the matter. In his Declaration, Michael L. Steir states that Cognex has agreed to indemnify its customers against patent infringement claims and that Cognex has received numerous requests for indemnification from its customers. ( *Decl. of Michael L. Steir, p. 3, P 9, p. 4, P 11, 12, p. 5 P 14*). Cognex has received requests from Westvaco and Gould Electronics for indemnity in the amounts of $ 250,966.00 and $ 46,071.00, respectively. (Id. at p. 5, P 15). Cognex also claims that Lemelson has caused it to lose sales and business in other ways. (Id. at p. 6, P 16, p. 7, P 17). Lemelson acknowledges that it has licensed nineteen of Cognex's customers, that five Cognex customers are defendants in pending litigation in Arizona and that Lemelson has contacted other Cognex customers in writing. (Def's. Mot. to Dismiss, p. 8-11).

The second prong of the test requiring that Plaintiffs must actually have either produced the device or have prepared to produce the device that is allegedly infringing, is only in issue with regard to Zebra. Lemelson does not dispute, with the exception of Zebra, that Plaintiffs' products are infringing. Zebra, [*17] is the leading manufacturer of bar code label printing systems and also sells hand-held bar code scanners. Lemelson claims that Zebra has not demonstrated that its products could constitute infringement of the applicable Lemelson patents. While it is less certain that bar code label printing systems could infringe upon the Lemelson patents, Zebra also sells hand-held bar code scanners which could infringe. As such Zebra has adequately demonstrated that its products could infringe.

Lemelson argues that this Court should in its discretion decline to hear the merits of this case. None of the arguments made by Lemelson however, are sufficiently persuasive. Lemelson presents no evidence in support of its claim that the present dispute is merely a public relations tool brought by Plaintiffs. Lemelson's claim that only a small percentage of Plaintiffs' customers have been "threatened" does not alone justify preventing Plaintiffs from seeking relief in this Court. *28 U.S.C.A. § 1404*(a) states, "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have [*18] been brought." *28 U.S.C.A. § 1404*(a) (1993). While not addressing the issue of whether this dispute could have been properly brought in the District of Arizona, this Court is unpersuaded that the transfer of this matter to that district would be of any direct benefit to the parties.

The remaining issue presented to this Court is whether the fourth count of Plaintiffs' Complaint fails to state a claim upon which relief can be granted. It is unnecessary to go into a lengthy analysis of the pertinent case law since the same issue was decided by this Court in 1997. In *Ford Motor Co. v. Lemelson, 1997 U.S. Dist. LEXIS 21497, 42 U.S.P.Q.2d. 1706 (1997)*, the Honorable Lloyd D. George, Senior United States District Judge, held that "Lemelson's use of the continuation applications process may have exploited an open area of patent practice, [but] the court should not intervene in equity to regulate what Congress has not." *42 P.Q. 2d. 1706, 1707*. It is therefore improper to introduce the equitable doctrine of laches into the statutory scheme of continuation practice. *42 P.Q. 2d., 1706, 1709*. This Court agrees with the decision and reasoning in Ford Motor. Thus [*19] Plaintiffs' fourth count fails to state a claim upon which relief can be granted.

## V. CONCLUSION

IT IS THEREFORE ORDERED that Lemelson's Motions to Dismiss, Transfer or Stay Proceedings (Doc. # 31 in CV-N-99-0397-PMP (PHA) and Doc. # 31 in CV-N-99-0533-PMP (PHA)) are hereby GRANTED in part and DENIED in part. Lemelson's Motions to Dismiss for lack of subject matter jurisdiction are hereby DENIED. Lemelson's Motions to transfer the cases to the District of Arizona or to stay the cases pending the conclusion of two lawsuits in the District of Arizona are hereby DENIED. Lemelson's Motion to Dismiss for failure to state a claim with regard to the fourth count in CV-N-99-0397-PMP (PHA) is hereby GRANTED. Lemelson's Motion to Dismiss for failure to state a claim with regard to the fifth count in CV-N-99-0533-PMP (PHA) is hereby GRANTED. n1

n1 In its Opposition, Cognex repeatedly refers to Lemelson's Motion to Dismiss the fourth count of the Complaint. Lemelson's Motion to Dismiss however, refers only to the fifth count of the Complaint. This Court will thus interpret Cognex's Opposition as referring to only the fifth count.

[*20]

IT IS FURTHER ORDERED that CV-N-99-0397-PMP(PHA) shall be consolidated with CV-N-99-0533-PMP(PHA), this Court having found the issues in such cases to be substantially similar. CV-N-99-0397-PMP(PHA) shall serve as the base file for all further matters and future filings.

DATED: March 15, 2000

PHILIP M. PRO

2000 U.S. Dist. LEXIS 21863, *

United States District Judge

LEXSEE 1995 U.S. DIST. LEXIS 13888

**DOW CHEMICAL COMPANY, Plaintiff, v. EXXON CHEMICAL PATENTS, INC. and EXXON CORPORATION, Defendants.**

**Civil Action No. 94-572-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1995 U.S. Dist. LEXIS 13888*

**August 16, 1995, Decided**

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** [*1] Donald F. Parsons, Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, attorney for plaintiff. Of counsel: Harry J. Roper, Esquire, Raymond N. Nimrod, Esquire, Aaron A. Barlow, Esquire, of Roper & Quigg, Chicago, Illinois; and L. Wayne White, Esquire, of Dow Chemical Company, Freeport, Texas.

William J. Wade, Esquire, of Richards, Layton & Finger, Wilmington, Delaware, attorney for defendants. Of Counsel: David W. Plant, Esquire, Glenn A. Ousterhout, Esquire, Duane-David Hough, Esquire, Eric R. Hubbard, Esquire, of Fish & Neave, New York, New York.

**JUDGES:** Sue L. Robinson, District Judge

**OPINIONBY:** Sue L. Robinson

**OPINION:**

### MEMORANDUM OPINION

Dated: August 16, 1995

Wilmington, Delaware

Sue L. Robinson, District Judge

## I. INTRODUCTION

In this declaratory judgment action brought by the Dow Chemical Company ("Dow"), plaintiff seeks a declaration that the manufacture, sale, or use of wire and cable devices which utilize Dow ENGAGE polymers do not infringe United States Patent No. *5,246,783* (the "*'783* patent") held by defendants, and that this patent is invalid. Plaintiff also seeks a declaration that Exxon Corporation ("Exxon Corp.") unfairly interfered [*2] with Dow's contractual relations, as well as injunctive and monetary relief. n1 (D.I. 62, Ex. 1). Before the court is defendants' motion to dismiss for want of subject matter jurisdiction. (D.I. 66) For the reasons that follow, the court shall deny defendants' motion.

n1 The defendants shall hereinafter be collectively referred to as "Exxon."

## II. BACKGROUND

Both parties in this litigation manufacture certain polymers for use in, inter alia, wire and cable devices. (D.I. 32 at 5) Two of defendants' polymers are sold under the trade names VISTALON and EXACT. Plaintiff's relevant product has the trade name ENGAGE.

On September 21, 1993, the *'783* patent was issued to Exxon Chemical Patents, Inc.. (D.I. 9, Ex. 1) The patent is entitled "Electrical Devices Comprising Polymeric Insulating or Semiconducting Members" and relates to wire and cable devices covered with a polymer consisting of particular characteristics. (Id.; D.I. 61 at 7) Also in September of 1993, Dow introduced its first line of [*3] "ITP n2" polymer products under the trademark name of AFFINITY. By February of 1994, Dow had introduced a second line of ITP products, the ENGAGE products, with two polymers (ENGAGE CL 8001 and ENGAGE CL 8002) specifically for cable wire use. (D.I. 26 at PP9-7) By June, Dow also developed a third

ENGAGE product, ENGAGE CL 8003, which is also designed for wire and cable use. n3 (Id.)

n2 ITP products are those which are produced using INSIGHT technology. (D.I. 26 at P3)

n3 Exxon claims that by December of 1993 it had made the policy decision to 1) extend or offer a license to all of its customers; 2) refrain from assertions or threats of infringement by marketing and sales representatives; and 3) refer inquiries concerning patent infringement to customers' own counsel. (D.I. 61 at 8)

The conduct of Exxon following the introduction of its patent falls into two main categories. The first category concerns Exxon's conduct toward plaintiff and some significant communications between the two. On December [*4] 15, 1993, Edward T. Duffy ("Duffy"), Manager of Planning Polymers Technology for Exxon Chemical, sent to Edwin Gambrell ("Gambrell"), Vice President of Dow's Business Platform for Insight Technology (which includes ENGAGE), a November 10, 1993 press release concerning the '783 patent. In the accompanying letter, Exxon Chemical informed Dow of the patent and stated:

> To the best of my knowledge neither Dow nor its affiliates make, use or sell a product in the U.S. which falls within the scope of U.S. patent *5246783*. Accordingly, our patent might not apply directly to Dow's operations, but Dow is in a better position to make that assessment than I. In contrast, Dow's sale of ethylene polymers, based on metallocene technology, to the wire and cable industry, as described in your December 14 press release, **could present patent related issues.**
>
> Under the circumstances Dow may have an interest in examining Exxon Chemical's patent (US *5246783*). I believe that examination will lead Dow to conclude **it would be appropriate to advise certain customers of the existence of Exxon Chemical's patent so those customers can test whether their wire and cable devices made with certain Dow [*5] polymers raise possible patent related issues.**

(D.I.9, Ex. 2) (emphasis added).

Defendants had additional direct in-person communications with plaintiff. The relevant meetings occurred in the context of negotiations between the parties concerning a joint venture identified as project Xavier. While the parameters of the project remain unclear to the court, what is certain is that the joint venture negotiations coincided with, and were not entirely unrelated to, an ongoing interference proceeding conducted between the two parties with the United States Patent and Trademark Office (the "PTO"). (D.I. 52 at P7) The relevant meetings were the last of eleven such meetings occurring between February and August of 1994.

With respect to Exxon's conduct at two of these meetings, Gambrell alleges that on August 16, 1994, Doug Selman ("Selman") and Greg McPike ("McPike") of Exxon, stated that the '783 patent "gave Exxon the ability to stop Dow from participating in the wire and cable market...." (D.I. 25 at P3) Selman and McPike deny this allegation, arguing that because the purpose of their meeting was to encourage a joint venture, the tone of their meetings was congenial. Therefore, [*6] they argue that they would have said nothing hostile to a Dow representative. (D.I. 42 at P8; 39 at PP 16-26)

Gambrell also alleges that these actions were essentially repeated at a second meeting which took place August 29, 1994. Specifically, he alleges that McPike stated that "Exxon had been using the '783 patent aggressively in the marketplace so that wire and cable customers would be concerned about buying Dow's ENGAGE materials...." (D.I. 25 at P4) McPike denies making such statements, averring that it would have been counterproductive to do so. n4

n4 While the minutes of said meeting, drafted by Exxon and uncorrected by Gambrell after their receipt, do not reflect such statements, the court notes that soon thereafter defendants filed interference proceedings in the PTO against plaintiff. (D.I. 39 at PP26-29; 52 at P21)

As to what actually occurred at these meetings, the dispute becomes simply a contest of fact between affiants. Given the contextual background noted supra, i.e., during August 1994 [*7] defendants were preparing a lengthy motion alleging inequitable conduct on the part of plaintiff before the PTO, and plaintiff had already considered this litigation (D.I. 58 at 9; 61 at 17), the court finds Gambrell's version of the tone of the meetings more compelling. n5 On January 5, 1995, two months after plaintiff filed its original complaint, but five months before the stipulated amended filing date, G.S. Rizzo, Exxon Senior Vice President, wrote A.J. Carbone of

Dow reemphasizing defendants' offer to license its product at $ .075 per pound. (D.I. 67, Ex. 1)

n5 Exxon's argument that the conversations which occurred are similar to the "high level negotiations" which occurred in *Shell Oil Co. v. Amoco Corp., 970 F.2d 885 (Fed. Cir. 1992)* is misplaced. The negotiations in Shell were licensing negotiations, naturally lending themselves to statements about the effects of failing to purchase a license. *Id. at 888.* Such comments would be less receptive in another setting.

The second area of activity [*8] which is relevant to the question of jurisdiction concerns defendants' conduct towards their and Dow's customers. In February of 1994, Exxon Chemical issued a letter to all potential customers announcing the patent and inviting them to license with Exxon Chemical. In describing Exxon Chemical's patent, Harland R. DeWitt ("DeWitt"), Director of Electricals and Specialty Polymer Group, stated the following:

The ethylene copolymers used to manufacture [wire and cable] devices specifically include polymers made with single site or metallocene catalysts, such as our EXACT plastomer resins. The **existence of long chain branching in such polymers would not of itself preclude devices made with these polymers from being covered by Exxon's patent.**

* * *

We invite you to review [the accompanying press release's] content and to consider whether your company's products (commercial and under development) are covered by its claims. If so, one easy way to license is to purchase EXACT plastomers from Exxon Chemical...Licensing is also available for those who wish to manufacture covered devices not using Exxon polymers.

(D.I. 9, Ex. 4) (emphasis added). The letter continued [*9] to provide information as to the appropriate person to contact for information about both the EXACT product and licensing arrangements for products covered by the patent. No company has yet to accept defendants' offer to license at $ .075 per pound. (D.I. 69 at 15)

Plaintiff argues that these letters were nothing more than veiled threats of litigation. This argument is supported by defendants' concession that the February 1994 letter's reference to "long chain polymers" was a direct reference to plaintiff's products. While defendants further argue that they included said reference to address a misconception in the marketplace created by Dow representatives for the benefit of the parties' customers, such does not alter the fact or the effect of the statement itself. (D.I. 33 at B44)

Activity occurring between defendants and customers also includes face-to-face meetings. Specifically, plaintiff urges, as a basis for jurisdiction, certain statements allegedly made by Peter C. Attwood ("Attwood"), Senior Account Executive for Exxon Chemical's Electricals and Specialty Polymers Group, to various Dow and Exxon customers. As a preliminary matter, the court notes that Exxon held out Attwood [*10] as an authoritative Exxon representative on the patent. Attwood had previously signed a December 13, 1993 letter sent to various customers announcing the patent and concluding with the following statement: "If you have any questions about this patent or EXACT resins, please do not hesitate to call me...." n6 (D.I. 33 at B211)

n6 Exxon argues that it did not authorize Attwood to threaten lawsuits. (D.I. 67 at 16) Viewed objectively, however, because the letter signed by Attwood indicates an apparent authority to address issues with respect to the patent, his statements about the patent could create a reasonable apprehension of suit.

Thomas A. Carr ("Carr"), Senior Product Manager for Dow, alleges that Attwood threatened American Insulated Wire ("AIW") by telling AIW's representatives that they could not use the ENGAGE polymer without violating the patent. Carr also claims that Attwood made similar statements to representatives of Triangle Wire and Cable ("TWC"). n7 (D.I. 26 at PP15(a), 15(b), 16)

n7 General Cable, AIW, BICC, and Triangle have all requested indemnification from Dow. (D.I. 61 at 56, 58)

[*11]

Carr's allegations are uniformly hearsay. Attwood denies engaging in any such behavior and insists that he followed Exxon's policy with respect to the '783 patent, by explaining to the customer that its attorney should review the patent claims and determine if its product is

covered by the patent and, if so, should contact its polymer supplier to receive information about the polymer being supplied. (D.I. 41 at P4) With respect to AIW, Attwood acknowledges that he was asked directly by AIW employees over lunch whether the Dow ENGAGE polymers were covered by the patent. They also asked him what Exxon would do if a customer used a polymer covered by the patent but did not pay a license. Attwood avers that he explained the licensing policy, telling the AIW employees that it was unlikely that Exxon would sue a customer, but that it might consider defending its patent. (Id. at P10(e)) Attwood also disputes Carr's allegations with respect to TWC. (Id. at P12) Attwood's claim that his comments were consistent with company policy is supported by contemporaneous records which indicate that a copy of the patent was mailed to the customer, and that TWC was awaiting Dow's response to [*12] its inquiry about the '783 patent. (Id., Ex. 8, 9) Attwood acknowledges that TWC called a meeting in June of 1994 to discuss the patent and, in said meeting, Exxon's attorney explained that Dow's patent concerning its own technology had no effect on whether a resulting product was covered by the Exxon's '783 patent. (Id. at P12(e))

Were these the only allegations against Attwood and Exxon, the court would be compelled to favor the non-hearsay evidence over that of Mr. Carr. However, for two customers, General Cable Corporation ("General Cable") and BICC Corporation ("BICC"), plaintiff offers the testimony of said companies' representatives. n8 This evidence supports the version of Attwood's behavior as described by Carr. Mr. Thomas Falcofsky ("Falcofsky"), Corporate Vice President of Purchasing for General Cable, avers that after receipt of the February letter from Exxon, he believed that a potential conflict may have existed between Dow's product and the '783 patent. This belief was confirmed after meeting with Attwood. He felt that Attwood was "looking really to intimidate our relationship with Dow over this material." (D.I. 33 at B169-170, 200) He further "vaguely recalls the [*13] conversation" in which he inquired from Attwood about licensing information "with respect to the wire and cable patent" and "with respect to technology relating to the manufacture of polymers." n9 (Id. at B171-172) He further avers that his request was not well received and that Attwood stated that he would get back to him with information. Falcofsky cannot recall whether anyone ever contacted him with licensing information nor does he recall anyone ever informing him of the possibility of obtaining a license under the patent in order to use Dow's products. (Id. at B173-175) After his discussions with Attwood, Falcofsky believed that licensing under the patent was not readily available to General Cable if it were to use Dow's products.

n8 Plaintiff accuses defendants of intimidating customers into not filing promised affidavits which would support plaintiff's allegations of threats. As evidence, they selectively offer a portion of the testimony of Larry Cardiff ("Cardiff"), Vice President of Procurement for BICC, while ignoring his explicit statement that he was not directly threatened by defendants. (Cardiff, 67-68, 100; D.I. 54 at B349, B371) [*14]

n9 Falcofsky is "not certain, but believe[s] [he] did" ask about both topics. (Id. at B172) He is not sure that he asked about the polymers, but is more sure that he requested licensing information about the wire and cable products. (Id. B173-175)

Attwood's version of the facts differs greatly from Falcofsky's. Attwood denies ever making any of the alleged threats. Moreover, he states that Falcofsky inquired from him only about licenses to manufacture Exxon's EXACT polymers. Attwood states that he was surprised by this request since manufacturing polymers was not General Cable's business. Attwood's version of events is supported by a contemporaneous record in which he notes "Tom requested the name of a contact for EXACT licensing. Considering the nature of General Cable's business this request was unusual, but Tom would not elaborate on the reasons for his interest." (D.I. 41, Ex. 4) On May 30, 1994 Attwood sent a letter to Falcofsky identifying Mike Jeffries as the appropriate contact person for such an inquiry. (Id., Ex. 6)

In surreply to defendants' representations, plaintiff [*15] also offers the testimony of Cardiff of BICC. He avers that prior to October 24, 1994, he believed that defendants would take legal action against Dow's customers if they used Dow's ENGAGE polymers to make wire and cable products. n10 (D.I. 54 at B345) Cardiff based this belief in part on the February 1994 letter. (Id.) An April 1994 meeting also occurred between defendants and BICC for which the minutes of said meeting were kept. Evidence exists of record to find that defendants stated that the use of "alternative material," including Dow's material, would infringe the relevant patent. (Id. at 354, Cardiff at 86; D.I. 33 at B234)

n10 This witness no longer believes that simply the customer would be sued and, in light

of this litigation, believes that Dow would be as well. (Id.)

Plaintiff claims that, based on its knowledge of the above acts, it grew apprehensive of a lawsuit against it by Exxon. (D.I. 62 at P23) On October 25, 1994 plaintiff commenced this action seeking declaratory judgment concerning [*16] the '783 patent and a claim of unfair business practice against defendants. The court held oral argument on March 2, 1995. As stipulated by the parties, plaintiff then filed an amended complaint seeking the same relief on May 5, 1995. (D.I. 62; 65)

## III. DISCUSSION

Jurisdiction by this court over plaintiff's patent claim can only arise from the Declaratory Judgment Act (the "Act"). 28 U.S.C. § § 2201 and 2202. "The existence of an actual controversy is an absolute predicate for declaratory judgment jurisdiction. When there is no actual controversy the court has no jurisdiction to decide the case. When there is an actual controversy and thus jurisdiction, the exercise of that jurisdiction is discretionary." *Spectronics Corp. v. H.B. Fuller Co., 940 F.2d 631, 633-634* (Fed.Cir.), cert. denied, *502 U.S. 1013, 116 L. Ed. 2d 749, 112 S. Ct. 658 (1991)* (citations omitted). No absolute right to a declaratory judgment exists. *Serco Servs. Co. L.P. v. Kelley Co., Inc., 51 F.3d 1037, 34 USPQ2d 1217 (Fed. Cir. 1995); Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 733 n.6 (Fed. Cir. 1988)*. When a defendant files a motion to challenge the court's jurisdiction [*17] pursuant to Fed.R.Civ.P. 12(b)(1), the plaintiff has the burden of proof and must establish an actual case or controversy on the totality of the circumstances. *Spectronics, 940 F.2d at 634* (citing *Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 272, 85 L. Ed. 826, 61 S. Ct. 510 (1941)*). When a factual dispute exists, it is plaintiff's burden to establish jurisdiction by the preponderance of the evidence. *West Interactive Corp. v. First Data Resources, Inc., 972 F.2d 1295, 1297 (Fed. Cir. 1992)*.

"The presence or absence of jurisdiction must be determined on the facts existing at the time the complaint under consideration was filed." *Arrowhead, 846 F.2d at 734 fn. 2; see also West Interactive, 972 F.2d at 1296*. Therefore, the party seeking a declaratory judgment, in this case Dow, must plead facts initially sufficient to establish the existence of an actual controversy on May 5, 1995. *Arrowhead, 846 F.2d at 736*.

The purpose of the Act is to enable a party who is reasonably at risk because of an unresolved dispute to obtain a judicial resolution of that dispute without having to await commencement of legal action by the other side. *B.P. Chemicals, [*18] Ltd. v. Union Carbide Corp., 4 F.3d 975, 977 (Fed. Cir. 1992)*. Thus, the Act seeks to balance the interest of a plaintiff to resolve an imminent legal matter and that of a defendant who has no intention of seeking a lawsuit.

The Federal Circuit has set forth the following two-prong standard for determining whether "a case of actual controversy" exists in actions seeking a declaratory judgment of patent non-infringement or invalidity:

> First, the accused infringer must have actually produced or prepared to produce an allegedly infringing product. *Jervis B. Webb Co. v. Southern Sys., Inc., 742 F.2d 1388, 1398-99, 222 USPQ. (BNA) 943, 949 (Fed. Cir. 1984)*. The first prong "looks to the accused infringer's conduct and ensures that the controversy is sufficiently real and substantial." *Lang v. Pacific Marine and Supply Co., 895 F.2d 761, 764, 13 USPQ2D (BNA) 1820, 1822 (Fed. Cir. 1990)*... Second, the patent holder's conduct must create an objectively reasonable apprehension on the part of the accused infringer that the patent holder will initiate suit if the allegedly infringing activity continues.

*Spectronics, 940 F.2d at 634* (citations omitted). Thus, the [*19] first prong of the test reviews plaintiff's conduct and the second that of defendant. *Arrowhead, 846 F.2d at 736; B.P. Chemicals, 4 F.3d at 978*. These actions are reviewed objectively. *Mobil Oil Corp. v. Advanced Envtl. Recycling Technologies, Inc., 26 USPQ2D (BNA) 1238, 1239 (D.Del. 1992)*.

### A. Count One

#### 1. Preparation

Dow has the burden to establish that its customers have produced or are prepared to produce an infringing product. The Federal Circuit Court of Appeals has noted that this prong of the test requires plaintiff or its customers to "be engaged in an actual making, selling, or using activity subject to an infringement charge or must have made meaningful preparation for such activity." *Arrowhead, 846 F.2d at 736*. More recently the Federal Circuit has stated this test is met by establishing "present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." *In re Laitram Machinery, Inc., 1995 U.S. App. LEXIS 6558, at *8 (Fed. Cir. March 21, 1995)* (emphasis added).

As noted, the actual controversy must exist at the filing of the complaint. Subsequent to plaintiff's original complaint, it filed [*20] a supplemental complaint. Therefore the relevant date by which plaintiff must

demonstrate adequate preparation is May 5, 1995. In said complaint plaintiff alleges that General Cable n11 has manufactured and sold portable cords in commercial quantities made from ENGAGE CL 8001.

n11 The court focuses on the production by General Cable because it is the most advanced in production of the customers at issue.

Specifically, James Hemphill, a Dow project leader, avers that Dow began shipping commercial quantities of ENGAGE CL 8001 to General Cable in 1995. Indeed, the record reflects that General Cable purchased over $ 86,000 of ENGAGE CL 8001 which is enough polymer to produce between 200,000 and 1.8 million portable cords. (D.I. 70) Hemphill also avers that he has witnessed General Cable's production of portable cords using ENGAGE CL 8001. Dow purchased 100 such cords though its wholesaler, Wholesale Electric. (D.I. 63, Ex. A, PP5-11; Ex. B, PP5-6) This product, therefore, is commercially available.

Even if the [*21] court were to accept defendants' argument that the product was not "commercially available, " defendants would not meet success. At a minimum, the record reflects "meaningful preparation" to production. The law does not offer bright guidelines for determining what actions by a possible patent infringer adequately constitute "meaningful preparation." It is clear that a plaintiff need not have engaged in the actual manufacture, use, or sale of an infringing product. *Interdigital Technology Corp. v. OKI Am., 845 F. Supp. 276 (E.D. Pa 1994).* This court has previously held that jurisdiction exists when a minimal amount of testing remains. *BOC Healthcare, Inc. v. Nellcor, Inc., 1993 U.S. Dist. LEXIS 19839,* No. 92-715-SLR (D.Del. March 30, 1993). The court notes, however, that in BOC the defendant acknowledged that the product, if marketed, infringed.

The Federal Circuit requires that the activity of the plaintiff and customers merely constitute "concrete steps" with the intent to produce an infringing product. Such has occurred prior to May 5, 1995, as evidenced by the commercial sale of products using the ENGAGE technology by General Cable. Therefore, the record reflects that as of May 1995, Dow and at [*22] least General Cable have taken concrete steps towards production with the intent to make or sell a possibly infringing product. *In re Laitram, 1995 U.S. App. LEXIS 6558* at *8.

**2. Reasonable Apprehension of Suit**

"[A] patent holder's conduct must create an objectively reasonable apprehension on the part of the accused infringer that the patent holder will initiate suit if the allegedly infringing activity continues." *Spectronics. 940 F.2d at 634* (citing *Arrowhead, 846 F.2d at 736); B.P. Chemicals, 4 F.3d at 978.* "The 'reasonable apprehension of suit' test requires more than the nervous state of mind of a possible infringer; it requires that the objective circumstances support such an apprehension." *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha, 1995 U.S. App. LEXIS 14682,* 93-1530, slip op. at 5 (Fed. Cir. June 15, 1995). Whether a reasonable apprehension of suit exists is determined by the totality of the circumstances. *Arrowhead, 846 F.2d at 737; Mobil, 26 USPQ2d at 1239.* Such an analysis is done on a case by case basis.

The record indicates that plaintiff did, at the time of filing this action, have a reasonable apprehension that it, directly or indirectly, would [*23] be sued by defendants should Dow and its customers continue producing the products at issue. While the court agrees with defendants that the letters sent to both plaintiff and the customers did not explicitly threaten plaintiff or its customers, the specific reference to Dow and its products add to the totality of the circumstances which indicate a reasonable apprehension of suit.

The most compelling of this evidence is the information put forth by Gambrell of the threats made by McPike and Selman. As discussed, the court embraces Gambrell's description of the relevant conversations occurring during the project Xavier negotiations. Moreover, the representations of Falcofsky and Cardiff, while not without flaws, are worthy of some credence. (Cardiff, at 51-52; D.I. 54 at B345)

Defendants contend that the January 5, 1995 letter offering a license and plaintiff's refusal of such offer (D.I. 67 at 3), as well as a lack of knowledge on their part of the properties of plaintiff's product, implicitly preclude the existence of a case or controversy. Such a position is myopic and ignores the context in which this litigation has developed. With respect to the offer to license, it is simply [*24] outweighed by other actions of defendants which have implied a threat to sue. Moreover, the law does not require a party to either 1) enter into a licensing agreement for what it considers an invalid patent or 2) to engage in a costly business while awaiting suit by the patent holder. The Declaratory Judgment Act protects parties from such a Hobbesian choice, and allows them to sue for declaratory relief.

With respect to defendants' lack of knowledge as to plaintiff's product, while the court is unwilling to embrace plaintiff's position (which would require a defendant to stipulate that it will not sue in order to eliminate a case or controversy), the court also refuses to adopt defendants' representation that insufficient

1995 U.S. Dist. LEXIS 13888, *

information to sue is an adequate substitute for a stipulation not to sue. "Although a patentee's refusal to give assurances that it will not enforce its patent is relevant to the determination, this factor is not dispositive." *B.P. Chemicals, 4 F.3d at 980* (citations omitted).

Therefore, while no one incident recited above may be sufficient to satisfy plaintiff's burden, reviewing the incidents under the totality of the circumstances -- letters from defendants [*25] to Dow and their customers with veiled references to Dow's products, direct threats to

Dow executives, and veiled threats to Dow customers by Exxon sales representatives -- the court concludes that plaintiff has demonstrated a reasonable apprehension of suit.

**IV. CONCLUSION**

For the reasons stated, the court shall deny defendants' motion to dismiss plaintiff's suit. The parties' remaining arguments concerning Count II are moot. An order consistent with this memorandum opinion shall issue.

LEXSEE 1995 U.S. DIST. LEXIS 19737

THE F.B. LEOPOLD COMPANY, INC., Plaintiff, -vs- ROBERTS FILTER
MANUFACTURING COMPANY, INC., Defendant.

Civil Action No. 92-2427

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
PENNSYLVANIA

1995 U.S. Dist. LEXIS 19737; 36 U.S.P.Q.2D (BNA) 1782

August 2, 1995, Decided
August 2, 1995, DATE FILED

LexisNexis (TM) HEADNOTES - Core Concepts:

COUNSEL:    [*1]    For THE F.B. LEOPOLD
COMPANY, INC., plaintiff: John E. Hall, Pietragallo,
Bosick & Gordon, Pittsburgh, PA. David C. Hanson,
John W. McIlvaine, III, Webb, Burden, Ziesenheim &
Webb, Pittsburgh, PA. Timothy E. Perrott, Zelienople,
PA.

For    ROBERTS    FILTER    MANUFACTURING
COMPANY, INC., defendant: Jeffrey B. Yao, Stanley
M. Stein, Feldstein, Grinberg, Stein & McKee,
Pittsburgh, PA. Leland P. Schermer, Dickie, McCamey
& Chilcote, Pittsburgh, PA.

JUDGES: Donetta W. Ambrose, U. S. District Judge

OPINIONBY: Donetta W. Ambrose

OPINION:

### OPINION

and

### ORDER OF COURT

Pending before the Court is the Motion of Plaintiff,
The F.B. Leopold Company, Inc. ("Leopold") to Dismiss
pursuant to Fed. R. Civ. P. 12(h)(3). Leopold asks this
Court to "dismiss without prejudice plaintiff's Complaint
and Defendant's n1 Answer and Counterclaim relating to
infringement, validity and unenforceability of claims 1-
15 and 17-19 of Patent No. 5,149,427," and to "dismiss
without prejudice Defendant's Counterclaims as to Patent

No. 5,232,592." (Leopold's Motion to Dismiss, P 1 - 2)
Leopold essentially argues that dismissal is mandated
because there is no case or controversy with respect to
the aforementioned claims.    [*2]    In the alternative,
Leopold asks this Court to exercise its discretion under
the Declaratory Judgment Act, 28 U.S.C. § 2201, to
dismiss the claims. For the reasons set forth below,
Leopold's motion will be denied.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - -
- - - - - - -

n1 Roberts Filter Manufacturing Company,
Inc. ("Roberts Filter").

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - -
- - - - - - - - -

When subject matter jurisdiction is challenged, a
court "is free to weigh the evidence and satisfy itself as
to the existence of its power to hear the case." *BASF
Corp. v. PPG Indus., Inc., 1991 U.S. Dist. LEXIS 20954,
1991 WL 354884, 23 U.S.P.Q.2D (BNA) 1193, 1198* (D.
N.J. Feb. 11, 1991). The existence of a case or
controversy is evaluated on a claim-by-claim basis.
*Jervis B. Webb Co. v. Southern Sys., Inc., 742 F.2d 1388,
1399 (Fed. Cir. 1984).* "When there is no actual
controversy, the court has no discretion to decide the
case. When there is an actual controversy and thus
jurisdiction,    the    exercise    of    that    jurisdiction    is
discretionary." *Spectronics Corp. v. H.B. Fuller Co.,
Inc., 940 F.2d 631, 634 (Fed. Cir. 1991).* In determining
[*3]    whether there is an actual controversy, I am guided
by the following:

Case 5:03-cv-02289-JW    Document 23-20    Filed 07/29/2003    Page 2 of 4

Page 2

1995 U.S. Dist. LEXIS 19737, *; 36 U.S.P.Q.2D (BNA) 1782

In cases involving a declaratory judgment of patent non-infringement or invalidity, the test for determining whether an actual controversy exists is two-pronged. First the accused infringer must have actually produced or prepared to produce an allegedly infringing product. The first prong looks to the accused infringer's conduct and ensures that the controversy is sufficiently real and substantial. Second, the patent holder's conduct must create an objectively reasonable apprehension on the part of the accused infringer that the patent holder will initiate suit if the allegedly infringing activity commences or continues.

*Spectronics, 940 F.2d at 634* (internal citations and quotations omitted), *Jervis B. Webb, 742 F.2d at 1398.*

In looking at the second prong of this test, I must determine whether there has been "an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit." *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha, 57 F.3d 1051, 35 U.S.P.Q.2D (BNA) 1222,* No. 93-1530 [*4] slip op. at 3 (Fed. Cir. June 15, 1995). An accused infringer "need not prove that the patentee expressly has threatened to take legal action. . . rather, a justiciable controversy may exist even where the threat of infringement action is indirect and unspecific." *BASF Corp., 23 U.S.P.Q.2D (BNA) at 1199* (internal quotations and citations omitted). Moreover, if a patentee "has expressly charged a current activity of [the alleged infringer] as an infringement, there is clearly an actual controversy. . . [but if the patentee's] conduct, including its statement, falls short of an express charge, one must consider the 'totality of the circumstances' in determining whether that conduct meets" the second prong of the Spectronics test. *Arrowhead Indus. Water, Inc. v. Ecolochem Inc., 846 F.2d 731, 736 (Fed. Cir. 1988).*

The first prong of the Spectronics test requires that the accused infringer "must be engaged in an actual making, selling, or using activity subject to an infringement charge or must have made meaningful preparation for such activity." *Arrowhead, 846 F.2d at 736.*

1. The '427 Patent

With respect to the '427 patent, the main argument raised by Leopold [*5] is that since it allegedly has limited its claims of infringement to claims 16 and 20 in answers to interrogatories, there is no actual case or controversy with respect to claims 1-15 and 17-19.

Roberts Filter contends, inter alia, that when Leopold initiated this action, it created an actual controversy as to all claims of the '427 patent by alleging a general charge of infringement.

In an attempt to eliminate the case or controversy, Leopold "unconditionally agrees" in its Reply Memorandum:

not to sue Roberts Filter for infringement as to claims 1-15 and 17-19 of U.S. Patent No. *5,149,427* based upon the porous cap/filter underdrain block which Roberts Filter constructed, demonstrated and offered for sale to the City of Reading in the latter part of 1992. Further, Leopold will not sue Roberts Filter for infringement of claims 1-15 and 17-19 based upon any porous cap/filter underdrain block according to the Roberts Filter designs for such devices already made known to Leopold through discovery in this matter, regardless of when such device is/was first made, used or sold.

Reply Memorandum of Leopold, p. 5.

Leopold claims that in accordance with the court's holding [*6] in *Super Sack Man. Corp. v. Chase Packaging Corp., 57 F.3d 1054, 35 U.S.P.Q.2D (BNA) 1139,* No. 95-1001, slip op. (Fed. Cir. June 15, 1995), its unconditional agreement warrants dismissal of claims 1-15 and 17-19. n2 I do not find that Leopold's "unconditional agreement" requires dismissal under the holding of Super Sack. In Super Sack, the plaintiff/patent holder ("Super Sack") initiated suit against Chase Packaging Corporation ("Chase") alleging infringement by Chase of two patents owned by Super Sack. Nearly six years after the suit was initiated, the district court dismissed the action "with prejudice for lack of a reasonable apprehension of a future infringement suit after super Sack. . .withdrew its infringement allegations." Super Sack, slip op. at 1. The Federal Circuit upheld the district court's dismissal based on, inter alia, Super Sack's promise "not to sue Chase for infringement as to any claim of the patents-in-suit based upon the products currently manufactured and sold by Chase." Id. slip op. at 3. This promise eliminated all allegations of patent infringement from the case.

n2 As correctly pointed out by Roberts Filter, Leopold cannot, at this point, simply withdraw its claims as asserted in the Complaint under Rule 41. See Fed. R. Civ. P. 41(a)(1).

Case 5:03-cv-02289-JW    Document 23-20    Filed 07/29/2003    Page 3 of 4

Page 3

1995 U.S. Dist. LEXIS 19737, *; 36 U.S.P.Q.2D (BNA) 1782

[*7]

I find the promise in Super Sack to be significantly different from the promise offered by Leopold in this case. The Leopold agreement does not eliminate all allegations of patent infringement from this case and does not eliminate Roberts Filter's potential "reasonable apprehension that it will face an infringement suit on the. . .patents with respect to past and present products." Super Sack, slip op. at 9. Similarly, Leopold's unconditional agreement is not simply limited to products which may be produced by Roberts Filter in the future; rather, Leopold's promise is limited to "porous cap/filter underdrain block which Roberts Filter constructed, demonstrated and offered for sale to the City of Reading in the latter part of 1992," and "designs for such devices already made known to Leopold through discovery in this matter, regardless of when such device is/was first made, used or sold." Reply Memorandum of Leopold, p. 5 (emphasis added). Leopold's "unconditional agreement" does not eliminate the actual case or controversy. Compare, Spectronics, 940 F.2d at 633.

Moreover, I find the alleged withdrawal of claims 1-15 and 17-19 by Leopold in its answers to interrogatories [*8] is insufficient to demonstrate there is no case or controversy. Jervis B. Webb, 742 F.2d 1388 at 1399-1400 fn. 8 ("This holding does not preclude the issuance of a declaratory judgment that all claims are valid or invalid in response to. . .the filing of a declaratory judgment counterclaim asserting the invalidity of all of patentee's claims in response to a complaint that asserted the infringement of all of the claims.") See also Sterling Aluminum Prod., Inc. v. Bohn Aluminum & Brass Corp., 298 F.2d 538, 540 (6th Cir. 1962).

I do not find Grain Processing Corp. v. American Maize-Products Co., 840 F.2d 902, 905-06 (Fed. Cir. 1988), to require a different result. In Grain Processing, the court found that the alleged infringer had no reasonable apprehension that it would face an infringement suit on the withdrawn claims. Id. at 906. Roberts Filter, on the other hand, does have a reasonable apprehension that it would face an infringement suit on claims 1-15 and 17-19.

With respect to Leopold's argument that I should exercise my discretion to dismiss the claims, I find that it would be inappropriate and unfair to dismiss claims 1-15 and 17-19 at this time. In exercising [*9] discretion to issue a declaratory judgment, I look to whether "the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and. . .[whether the declaratory judgment] will terminate and afford relief from the uncertainty, insecurity, and controversy giving

rise to the proceeding." Minnesota Mining and Mfg. Co. v. Norton Co., 929 F.2d 670, 672-73 (Fed. Cir. 1991). I find that these requirements are satisfied in the case at bar. Particularly, Roberts Filter has come forward with letters which indicate that Leopold has made general threats of infringement on the '427 patent to customers of Roberts Filter (Exhibits Q and AA to Roberts Filter's Memorandum in Opposition to Motion to Dismiss) and has actually filed a suit alleging general claims of infringement of the '427 patent. Moreover, the parties are currently competitors in the water filtration business and this litigation will terminate and afford relief from the uncertainty, insecurity, and controversy of the permitted use by Roberts Filter of a system utilizing a porous plate.

2. The '592 Patent

Leopold contends that dismissal is even more clear with respect to the '592 patent [*10] because it has never charged Roberts Filter with infringement of this patent. Leopold further argues that Roberts Filter has not acted or made preparations to act in a way that could constitute infringement. Finally, Leopold argues that the '592 patent was not even issued until August 8, 1993, which according to Leopold is eight months after the alleged infringing activity of Roberts Filter. Roberts Filter raises several arguments in response to Leopold's contentions. Roberts Filter argues that Leopold has expressly charged Roberts Filter with infringement of the '592 patent and furthermore that the '592 patent was a continuation of the '427 patent. (See e.g. Exhibits S and U to Roberts Filter's Memorandum in Opposition to Motion to Dismiss) Roberts Filter also points out that Leopold did not object when Roberts Filter amended its Answer and Counterclaim to include the '592 patent. Finally, Roberts Filter offers two affidavits from R. Lee Roberts in an effort to demonstrate that steps are being taken by Roberts Filter to sell the porous cap.

As set forth above, in determining whether an actual case or controversy exists as to the '592 patent, I must determine whether Roberts Filter [*11] has actually produced or prepared to produce an allegedly infringing product and whether Leopold's conduct has created an objectively reasonable apprehension on the part of Roberts Filter that the patent holder will initiate suit if the allegedly infringing activity commences or continues. Spectronics, 940 F.2d at 634 (internal citations and quotations omitted), Jervis B. Webb, 742 F.2d at 1398. I find that Roberts Filter has demonstrated that both of these elements are satisfied and that there is an actual case or controversy with respect to the '592 patent.

I first address whether Roberts Filter has actually produced or prepared to produce an allegedly infringing product. The evidence of record dealing with the prosecution history of the '592 patent is sufficient, along

Case 5:03-cv-02289-JW    Document 23-20    Filed 07/29/2003    Page 4 of 4

Page 4

1995 U.S. Dist. LEXIS 19737, *; 36 U.S.P.Q.2D (BNA) 1782

with the affidavits of Mr. Roberts, to demonstrate that an allegedly infringing product has actually been produced or prepared by Roberts Filter. Specifically, Leopold alleged in its Petition to Make Special Because of Actual Infringement during the prosecution of the '592 patent that:

> there is a real and immediate threat of infringement because the Assignee's competitor has made substantial preparations [*12] for making the invention since the competitor has been named a low bidder and has apparently completed a demonstration of a device substantially in accordance with Exhibit 1. . .

> . . .there is an actual infringement of this invention by reason of a competitor of the Assignee making a full scale operating model of the invention to secure a bid to supply the invention to the City of Reading, Pennsylvania. . .the device which I allege infringes this invention was first discovered to exist on November 5, 1992. . .

Exhibit O to Roberts Filter's Memorandum in Opposition to Motion to Dismiss, Declarations of Attorney McIlvaine and Marvin Brown.

Furthermore, the affidavits of Mr. Roberts indicate that Roberts Filter is preparing to produce water filtration systems that include the use of porous plate over an underdrain block.

I next must determine whether Leopold's conduct has created an objectively reasonable apprehension on the part of Roberts Filter that Leopold will initiate suit if the allegedly infringing activity commences or continues. I find that the evidence of record demonstrates that Roberts Filter has an objectively reasonable apprehension that Leopold will initiate [*13] suit if Roberts Filter continues to demonstrate porous plate over an underdrain block. See Exhibits S, O to Roberts Filter's Memorandum in Opposition to Motion to Dismiss. See also *Arrowhead, 846 F.2d at 736-37*.

Additionally, I find, as discussed in the section addressing the *'427* patent, that Leopold's "unconditional agreement" is insufficient to eliminate the actual case or controversy as to the '592 patent.

Finally, I find that the evidence of record to date indicates that a declaratory judgment as to the '592 patent will serve a useful purpose in clarifying and settling the legal relations in issue, and that it will terminate and afford relief from the uncertainty, insecurity, and controversy concerning Roberts Filter's use of a porous plate design. *Minnesota Mining, 929 F.2d at 672-73*.

**ORDER OF COURT**

**AND NOW**, this **2nd** day of August, 1995, after careful consideration and for the reasons set forth in the Opinion accompanying this Order, it is hereby **ORDERED** that Plaintiff's Motion to Dismiss This Action and Defendant's Counterclaims as to Claims 1-15, inclusive, and 17-19, Inclusive, of Patent No. *5,149,427* and to Dismiss Defendant's Declaratory [*14] Judgment Counterclaim as to Patent No. 5,232,592 (Docket #: 209) is **DENIED.**

BY THE COURT:

Donetta W. Ambrose,

U. S. District Judge

LEXSEE 1982 U.S. DIST. LEXIS 17604

**EIC Laboratories, Inc. v. Deuteruim Corporation**

**No. 81 Civ. 4232**

**United States District Court for the Southern District New York**

*1982 U.S. Dist. LEXIS 17604; 220 U.S.P.Q. (BNA) 573*

**February 11, 1982**

**COUNSEL:** [*1]

H. John Campaign, and Graham, Campaign & McCarthy, P.C., both of New York, N.Y., for plaintiff.

Galpeer, Altus, Karp & Beckerman, New York, N.Y., for defendant.

**OPINIONBY:**

KNAPP

**OPINION:**

Knapp, District Judge.

Defendant moves to dismiss the complaint. For reasons set forth below, we deny that motion.

Background

Plaintiff is a Massachusetts corporation with its principal place of business in Boston, Massachusetts. Defendant is a Nevada corporation. Its principal place of business, at the time this action commenced, was in New Rochelle, New York.

The complaint states that plaintiff has developed a process for removing hydrogen sulfide from geothermal steam, and has licensed its process for use in controlling emissions from certain yet-to-be-constructed power plants. It states in addition that defendant has charged that such use of plaintiff's process would infringe defendant's patents. Defendant conceded in the course of argument that it has contacted at least two of plaintiff's licensees and told them just that. Plaintiff alleged at oral argument that it advised its licensees to use its process in the precise manner challenged by defendant.

Claiming resultant injury [*2] to its business in excess of $10,000, plaintiff seeks: (1) a declaration that its process "and facilities for its practice" do not infringe defendant's patents; (2) an order barring defendant from charging its licensees and potential licensees with infringement; and (3) damages to recompense it for defendant's alleged unfair competition to date. Jurisdiction is predicated on *28 U.S.C. § 1338* (relating to actions arising under the patent laws), *28 U.S.C. § 2201* (relating to actions for declaratory judgment), and *28 U.S.C. § 1332* (diversity jurisdiction).

The Motion

Defendant's attack on the complaint is two-pronged. It asserts that plaintiff has no standing to complain of its charges of infringement, and that there is, therefore, no case or controversy before us as to the patent claim. As to the claim for unfair compeition, defendant asserts that plaintiff has failed to meet the amount in controversy requirement of *28 U.S.C. § 1332*. n1

n1 Defendant makes several other contentions, most of which were disposed of at oral argument. Neither party having, to our memory, there addressed what appears to be an argument of file wrapper estoppel, we decline to rule on that ground. Should it deem appropriate, defendant is therefore free to renew this argument at a later date. [*3]

Case 5:03-cv-02289-JW    Document 23-21    Filed 07/29/2003    Page 2 of 3

Page 2

1982 U.S. Dist. LEXIS 17604, *; 220 U.S.P.Q. (BNA) 573

## Discussion

### The Patent Claim

As indicated above, plaintiff alleges that it has developed a process for removing hydrogen sulfide from geothermal steam, and that it has licensed this process for use by power plants. Defendant readily concedes that this process does not by itself infringe any of defendant's patents; it argues, instead, that such infringement can -- and will -- occur only when that process is used, by a power plant, actually to cleanse its emissions of hydrogen sulfide. It thus analogizes its position to that of the defendant in *Aralac, Inc. v. Hat Corporation of America (3d Cir. 1946) 166 F.2d 286, 76 USPQ 337.*

The plaintiff in Aralac was a manufacturer of casein fiber. He had for years manufactured and sold such fiber to manufacturers of fur felt hats, who used it as a substitute for animal fur in the mixture subjected to the felting process. Defendant asserted directly to some of plaintiff's hat-making customers and prospective customers that its patents encompassed the use of casein fiber in the manufacture of hats. Claiming injury to its business, plaintiff brought suit seeking a declaratory judgment of invalidity and non-infringement. There was no diverstiy [*4] of citizenship, and jurisdiction was predicated solely on *28 U.S.C. § 1338.* The defendant moved to dismiss for lack of jurisdiction, on the grounds that there was no case or controversy sufficient to support an action for declaratory judgment exists where, on the law and the facts, the named defendant could not have brought an action against the named plaintiff for either direct or contributory infringement. It was careful, moreover, to ascertain that it waas indeed faced with such a situation. Thus, it observed *(166 F.2d at 294-295, 76 USPQ at 344-345):*

We assume arguendo that casein fibers are a standard article of commerce capable of various uses. Plaintiff sold to hat manufacturers and to others.

* * * [I]t was and is the law that the sale of an article of commerce of ordinary use without relation to any apparatus does not make the manufacturer guilty of contributory infringement if the buyer later makes use of the article in an infringing apparatus.

Where a person is not engaged in possible infringing conduct and with no intention of doing so, he lacks an interest in a controversy to support an action for declaratory judgment relief to test the validity of the patent. [*5] (Emphasis supplied; citations and footnotes omitted.)

The problem with defendant's reliance upon Aralac is that we cannot, on the current record, be clear that the decision is applicable to the case at bar. In the first place, it is not readily apparent that plaintiff's process (like the casein fibers involved in Aralac) is a standard article of commerce capable of many uses: to the contrary, it seems not unlikely that it is capable of only a limited number of uses, perhaps only that of which defendant complains. In the second place, as noted above, plaintiff claimed at oral argument of this motion that it had counseled its licensees in the use challenged by defendants -- had, in fact, directed them how to go about using its process in the precise way defendant claims amounts to an infringement of its patents. Should either of these alternatives prove to exist, it seems to us that Aralac would not compel dismissal. n2 However, if plaintiff's process is readily susceptible of divergent uses, and its relationship to its licensees is really the simple relationship of a seller to a buyer, Aralac would control.

n2 It is, moreover, perhaps worthy of note that the Court in Aralac felt that plaintiff's claim, if it had one, was one for unfair competition. *Id. at 295, 76 USPQ at 344-45.* [*6]

It follows that at this stage of the proceeding we deny the motion insofar as it relates to the patent claim, with leave to defendant to renew at completion of discovery.

### Amount in Controversy

The complaint clearly alleges that the matter in controversy exceeds $10,000, exclusive of interest and costs. Defendant contests the sufficiency of this allegation, noting that despite its allegation of unfair competition, plaintiff has succeeded in retaining the two contracts specifically mentioned in the complaint. The complaint, however, asserts that defendant's charges of infringement extend not only to plaintiff's current licensees, but to potential licensees. Thus, it states:

Defendant has charged that use, and the facilities for such use, including the facilities to be constructed pursuant to the licenses to MCR and PG & E of the EICL process, infringe Defendant's U.S. Patents . . ., thereby placing a cloud over EICL's right to freely exploit its process, and creating an impediment to EICL's ability to further license its process . . . (Emphasis supplied.)
Moreover, plaintiff explicitly seeks relief "preventing defendant from making further charges of such infringement [*7] to plaintiff's licensees and potential licensees." (Emphasis supplied.)

While matter outside the pleading has been presented in the course of this motion, and we may therefore treat it as a motion for summary judgment, we are not persuaded that plaintiff's failure to come forth at this point with further specific examples of defendant's wrongful acts and resultant harm to it should prove decisive. Plaintiff has clearly alleged enough to establish

1982 U.S. Dist. LEXIS 17604, *; 220 U.S.P.Q. (BNA) 573

its good faith in claiming injury to its business. We therefore stand by the general rule, and assess the sufficiency of the amount in controversy solely be reference to the allegations of the complaint. 1 J. Moore, Federal Practice, P0.91[1].

Conclusion

In sum, we deny defendant's motion on both counts, with leave to renew as to the patent claims following completion of discovery. n3

n3 Defendant urged before us that its real quarrel is not with plaintiff, but with plaintiff's licensees -- both of which are located in California. It contends that the interests of justice would best be served by a litigation between it and those licensees. So far as we know, however, no such litigation is pending. Should such litigation be instituted by the present defendant, we would, upon appropriate request, explore the possibility of transferring this case to California so that the suits could be consolidated, or of staying this proceeding pending the outcome of the California action. Needless to say, this footnote is not intended to indicate how we would decide such an application if made. Such decision would await appropriate argument by the parties. [*8]

So Ordered.

LEXSEE 2002 U.S. DIST. LEXIS 20574

**IKOS SYSTEMS, INC., Plaintiff, v. CADENCE DESIGN SYSTEMS, INC., and QUICK TURN DESIGN SYSTEMS, INC., Defendant.**

**C.A. No. 02-1335-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 20574*

**October 21, 2002, Decided**

**DISPOSITION:** [*1] Defendants' motion to transfer the case granted.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** For Ikos Systems Inc, PLAINTIFF: Robert K Payson, Potter Anderson & Corroon, LLP, Wilmington, DE USA.

For Cadence Design Systems, Inc, Quickturn Design Systems, Inc, DEFENDANTS: Josy W Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE USA.

For Cadence Design Systems, Inc, Quickturn Design Systems, Inc, COUNTER-CLAIMANTS: Josy W Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE USA.

For Ikos Systems Inc, COUNTER-DEFENDANT: Robert K Payson, Potter Anderson & Corroon, LLP, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION:**

### MEMORANDUM AND ORDER

### I. INTRODUCTION

On July 29, 2002, the plaintiff, IKOS Systems, Inc. ("IKOS"), filed the instant action for patent infringement against Cadence Design Systems, Inc. ("Cadence") and Quick Turn Design Systems, Inc. ("Quick Turn") (collectively "the defendants"). IKOS alleges that Quick Turn's Palladium TM design verification product infringes United States Patent No. 5,847,578 ("the '578 patent"). The defendants, move [*2] to transfer this case to the United States District Court for the Northern District of California pursuant to *28 U.S.C. § 1404*(a) (D.I. 11). For the following reasons, the court will grant the defendants' motion.

### II. DISCUSSION

Each of the parties in this case is a Delaware corporation n1 with headquarters located within several miles of one another in what is commonly known as the Silicon Valley of northern California.

> n1 IKOS is a subsidiary of Mentor Graphics Corporation ("Mentor") which is incorporated under the laws of the State of Oregon. The defendants assert that Mentor is the real party in interest in this action. IKOS does not seem to seriously contest this assertion. Nevertheless, given the court's analysis and conclusions as to the most appropriate forum for the litigation of this matter, the court need not reach this issue.

The defendants move to transfer this action to the District Court for the Northern District of California pursuant to *28 U.S.C. § 1404*(a) [*3] . Section 1404(a) provides that "for convenience of [the] parties and witnesses, in the interest of justice," the court may transfer a civil action "to any other district ... where it might have been brought." *28 U.S.C. § 1404*(a). It is the movants' burden to establish the need for transfer, and

'the plaintiff's choice of venue [will] not be lightly disturbed.' *Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995)* (citations omitted).

When considering a motion to transfer, the court must determine 'whether on balance the litigation would more conveniently proceed and the interest of justice be better served by transfer to a different forum.' *Id.*. This inquiry requires "a multi-factor balancing test" embracing not only the statutory criteria of convenience of the parties and the witnesses and the interests of justice, but all relevant factors, including certain private and public interests. *Id. at 875, 879*. These private interests include the plaintiff's choice of forum; the defendants' preference; whether the claim arose elsewhere; and the location of books and record, to the extent that they could not be [*4] produced in the alternative forum. n2 *Id. at 879*. Among the relevant public interests are: "the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; [and] the public policies of the fora." *Id. at 879-80* (citations omitted).

n2 The first three of these private interest collapse into other portions of the *Jumara* analysis. The court, therefore, will consider them in the context of the entire inquiry only. *See Affymetrix, Inc. v. Synteni, Inc. and Incite Pharmaceuticals, Inc., 28 F. Supp. 2d 192 (D. Del. 1998).*

Upon consideration of these factors, the court finds that the defendants have met their burden of demonstrating that transfer is appropriate. In reaching this conclusion the court relied on the following considerations, among others: (1) while [*5] the defendants and the plaintiff are Delaware corporations and should reasonably expect to litigate in the forum, there seems to be little connection between Delaware and this action or the parties; (2) each party is headquartered in northern California; (3) the parties are large national and international organizations with apparently substantial assets; (4) because the parties maintain geographically diverse operating locations, travel time and convenience in the aggregate would be neither increased nor decreased substantially with a transfer of forum; (5) any disparity in court congestion is not so great as to justify a transfer of venue; (6) while patent disputes are often not properly characterized as "local" in nature or otherwise unique to a particular locale, *see Affymetrix, 28 F. Supp. 2d at 207*, the relevant industry, the Electronic Design Automotive Industry, is apparently located in the Silicon Valley. Finally, IKOS has identified six potential witnesses who are not employed by the defendants and reside on the east coast. n3 However, it appears that the majority of the defendants' engineers, as well as other potential witnesses, are located in the Northern [*6] District. Thus, the court is convinced that this fact and the other public and private interests are sufficient to tip "the balance of convenience ... *strongly* in favor of [the] defendant[s]." *Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970)* (emphasis in original).

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n3 In its brief and an accompanying declaration by Giovanni Mancini, a former employee of the plaintiff, IKOS has identified William R. Beausoleil as a seventh potential non-party employee witness. In his declaration, Mr. Mancini states that the witness elected not to join the defendant, Cadence. In contrast, the defendants offer the declaration of the witness himself. In that declaration, Mr. Beausoleil attests that he entered the employ of Cadence on March 28, 2002. The court will credit Mr. Beausoleil's declaration.

## III. CONCLUSION

For the aforementioned reasons, IT IS HEREBY ORDERED that:

1. The defendants' motion to transfer the case to the United States District Court for the Northern District [*7] of California (D.I. 11) is GRANTED.

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

Dated: October 21, 2002

# Patent Assignment Abstract of Title

**NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.**

**Total Assignments: 3**

**Patent #:** 4922432   **Issue Dt:** 05/01/1990   **Application #:** 07143821   **Filing Dt:** 01/13/1988

**Inventors:** HIDEAKI KOBAYASHI, MASAHIRO SHINDO

**Title:** KNOWLEDGE BASED METHOD AND APPARATUS FOR DESIGNING INTEGRATED CIRCUITS USING FUNCTIONAL SPECIFICATIONS

**Assignment: 1**

**Reel/Frame:** 004836/0017      **Recorded:** 01/13/1988            **Pages:** 3

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST.

**Assignors:** KOBAYASHI, HIDEAKI                     **Exec Dt:** 01/12/1988
SHINDO, MASAHIRO                        **Exec Dt:** 01/12/1988

**Assignees:** INTERNATIONAL CHIP CORPORATION, COLUMBIA, SOUTH CAROLINA A CORP. OF SC
RICOH COMPANY, LTD.

**Correspondent:** RAYMOND O. LINKER, JR.
BELL, SELTZER, PARK & GIBSON
POST OFFICE DRAWER 34009
CHARLOTTE, NC 28234

**Assignment: 2**

**Reel/Frame:** 007411/0318      **Recorded:** 03/20/1995            **Pages:** 2

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** INTERNATIONAL CHIP CORPORATION            **Exec Dt:** 07/23/1991

**Assignee:** KNOWLEDGE BASED SILICON CORPORATION
1201 MAIN STREET, STE. 2000 COLUMBIA, SC 29201

**Correspondent:** RAYMOND O. LINKER, JR.
BELL, SELTZER, PARK & GIBSON
P.O. DRAWER 34009
CHARLOTTE, NC 28234

**Assignment: 3**

**Reel/Frame:** 012333/0522      **Recorded:** 12/04/2001            **Pages:** 3

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** KNOWLEDGE BASED SILICON CORPORATION      **Exec Dt:** 10/12/2001

**Assignee:** RICOH COMPANY, LTD.
OHTA-KU
3-6, 1-CHOME NAKAMAGOME
TOKYO, JAPAN

**Correspondent:** DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP
MARK J. THRONSON
2101-L STREET, N.W.
WASHINGTON, DC 20037

Search Results as of: 2/20/2003 2:53:42 P.M.

If you have any comments or questions concerning the data displayed, contact OPR / Assignments at 703-308-9723
Web interface last modified: Oct. 5, 2002

LEXSEE 47 USPQ2D 1157

**MEADE INSTRUMENTS CORP., Plaintiff, vs. REDDWARF STARWARE, LLC, Defendant.**

**Case No. SA CV 98-240-GLT(ANx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

*1998 U.S. Dist. LEXIS 9041; 47 U.S.P.Q.2D (BNA) 1157*

**May 11, 1998, Decided**
**May 11, 1998, Filed**

**DISPOSITION:** [*1] Defendant's motion to dismiss for lack of personal jurisdiction DENIED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff alleged patent user, a California resident, brought suit against defendant patent owner, a nonresident, after the patent owner sent cease-and-desist letters to the alleged patent user and one of its customers. The alleged patent user utilized Cal. Civ. Proc. Code § 410.10 in support of jurisdiction. The patent owner filed a motion to dismiss, based upon its claim of lack of personal jurisdiction.

**OVERVIEW:** The court first determined that the issue was whether the requirements of due process were satisfied. The patent owner argued that its contacts were insufficient to warrant personal jurisdiction, and that its only forum contacts included sending the cease-and-desist letters. The patent owner otherwise insisted it had no agents, property, business, or similar contact with California. The court noted that while at first blush this contact may have seemed like a small basis upon which to rest the exercise of the court's personal jurisdiction, it was legally sufficient in this case. Specific jurisdiction focused on the quality and nature of the contact. The court further noted that it was reasonable the patent owner should have anticipated being brought into court in California after notifying the alleged patent user it was contemplating "immediate legal action." Thus, the court concluded that the controversy was related to and arose out of the patent owner's contacts directed toward the forum and that the exercise of jurisdiction was reasonable.

**OUTCOME:** The court denied the patent owner's motion to dismiss for lack of personal jurisdiction.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal JurisdictionCivil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
[HN1] California's long-arm statute permits a court to exercise personal jurisdiction over a defendant to the extent permitted by the Due Process Clause of the Constitution. Cal. Civ. Proc. Code § 410.10.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN2] A party has a liberty interest in not being subject to judgments of a forum with which it has no "minimum contacts."

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN3] The requirement of minimum contacts ensures the assertion of jurisdiction does not violate "traditional notions of fair play and substantial justice."

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN4] Sufficient minimum contacts for specific jurisdiction typically exist where a nonresident

Case 5:03-cv-02289-JW     Document 23-24     Filed 07/29/2003     Page 2 of 4

Page 2

1998 U.S. Dist. LEXIS 9041, *; 47 U.S.P.Q.2D (BNA) 1157

"deliberately" has engaged in significant activities within a state or has created "continuing obligations" between himself and residents of the forum.

**Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction**
[HN5] Under the so-called "foreign-act-forum-effect" doctrine, there is a presumption of reasonableness upon a showing that a defendant purposefully directed his activities at forum residents which the defendant bears the burden of overcoming by presenting a compelling case that jurisdiction would be unreasonable. Therefore, purposeful availment may include a defendant whose only "contact" with the forum state is the "purposeful direction" of a foreign act having effect in the forum state.

**Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction**
[HN6] In some circumstances, a few instances of correspondence or telephone contact may confer jurisdiction.

**Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction**
[HN7] The effects doctrine is held inapplicable where a defendant had no other contacts with a forum other than the maintaining of a web page on the Internet which had an effect in the forum.

**Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction**
[HN8] The registration of an Internet domain name coupled with a subjective scheme having an effect in California is sufficient contact for specific jurisdiction. The "something more" amounted to evidence a defendant actually intended an effect.

**Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction**
[HN9] Unlike general jurisdiction, which focuses on the quantity of forum contact, specific jurisdiction focuses on the quality and nature of the Contact.

COUNSEL: For MEAD INSTRUMENTS CORPORATION, plaintiff: William J O'Brien, Christie Parker & Hale, Pasadena, CA.

For REDDWARF STARWARE LLC aka Reddwarf Instruments LLC, defendant: Richard Morganstern, Richard Morganstern Law Offices, Los Angeles, CA.

For REDDWARF STARWARE LLC aka Reddwarf Instruments LLC, counter-claimant: Richard

Morganstern, Richard Morganstern Law Offices, Los Angeles, CA.

For MEAD INSTRUMENTS CORPORATION, counter-defendant: William J O'Brien, Christie Parker & Hale, Pasadena, CA.

JUDGES: GARY L. TAYLOR, UNITED STATES DISTRICT JUDGE.

OPINIONBY: GARY L. TAYLOR

OPINION:

ORDER DENYING DEFENDANT'S MOTION TO DISMISS

Defendant Reddwarf Starware, LLC ("Reddwarf") claims the Court lacks personal jurisdiction and moves to dismiss pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure ("FRCP"). In the alternative, Reddwarf moves to quash service of the summons and complaint.

I. PERSONAL JURISDICTION

[HN1] California's long-arm statute permits a court to exercise personal jurisdiction over a defendant to the extent permitted by the Due Process Clause of the Constitution. Cal. Code Civ. P. § 410.10; [*2] *Gordy v. Daily News, L.P., 95 F.3d 829, 831 (9th Cir. 1996).* The issue is whether the requirements of due process are satisfied. n1

> n1 Defendant argues law of the Federal Circuit governs this motion because the Federal Circuit sits as the appellate court for this matter. Motion at 7; Reply at 9. However, Defendant admits it is inevitable both Federal Circuit and Ninth Circuit lines of precedent must reach the same result because they use the same analytic framework set forth by the Supreme Court. Motion at 7 n.1. Moreover, authorities cited by Defendant do not support Defendants' conclusion. *Stairmaster Sports/Medical Products, Inc. v. Pacific Fitness Corp., 916 F. Supp. 1049, 1053 (W.D.Wash. 1994)* (stating Ninth Circuit precedent governs questions of personal jurisdiction in a declaratory patent infringement suit).

[HN2]

A party has a liberty interest in not being subject to judgments of a forum with which it has no "minimum contacts." E.g., *Vons Companies, Inc. v. Seabest Foods, Inc., 14 Cal. 4th 434,* [*3] *445, 926 P.2d 1085 (1996).* [HN3] The requirement of minimum contacts ensures the

Case 5:03-cv-02289-JW    Document 23-24    Filed 07/29/2003    Page 3 of 4

Page 3

1998 U.S. Dist. LEXIS 9041, *; 47 U.S.P.Q.2D (BNA) 1157

assertion of jurisdiction does not violate "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945).*

[HN4] Sufficient minimum contacts for specific jurisdiction typically exist where a nonresident "'deliberately' has engaged in significant activities within a state or has created 'continuing obligations' between himself and residents of the forum." *Burger King Corp., 471 U.S. 462 at 475-76, 85 L. Ed. 2d 528, 105 S. Ct. 2174.*

[HN5] Under the so-called "foreign-act-forum-effect" doctrine, "there is a presumption of reasonableness upon a showing that the defendant purposefully directed his activities at forum residents which the defendant bears the burden of overcoming by presenting a compelling case that jurisdiction would be unreasonable." *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd., 784 F.2d 1392, 1397 (9th Cir. 1986).* Therefore, purposeful availment may include a defendant "whose only 'contact' with the forum state is the 'purposeful direction' of a foreign act having effect in the forum state." n2 Id. (emphasis in original); [*4] see also *Core-Vent Corp. v. Nobel Industries AB, 11 F.3d 1482, 1486 (9th Cir. 1993).* [HN6] In some circumstances, "a few instances of correspondence or telephone contact may confer jurisdiction." *Tandem Computers Inc. v. Yuter, 1989 U.S. Dist. LEXIS 18384 (N.D. Cal. Dec. 20, 1989); accord Brainerd v. Governors of the University of Alberta, 873 F.2d 1257, 1259 (9th Cir. 1989); Edwards v. Pulitzer Publishing Co., 716 F. Supp. 438 (N.D. Cal. 1989).* n3

n2 Defendant cites the Ninth Circuit's opinions in *Kransco Mfg., Inc. v. Markwitz, 656 F.2d 1376 (9th Cir. 1981)* (holding patent infringement letters directed at a forum insufficient contact for personal jurisdiction) and *Cascade Corp. v. Hiab-Foco AB, 619 F.2d 36 (9th Cir. 1980)* (holding national advertising and threatening letters directed at a forum insufficient contact for personal jurisdiction). However, these cases, which Defendant characterizes as the "definitive word on this issue," pre-date the Supreme Court's cases in *Calder v. Jones, 465 U.S. 783, 79 L. Ed. 2d 804, 104 S. Ct. 1482 (1984)* and *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985).* Motion at 9. In its reply, Defendant admits these later Supreme Court cases "place a gloss" on the doctrine of minimum contacts. Reply at 6. [*5]

n3 Defendant argues these cases are contrary to the Ninth Circuit's application of the effects doctrine. Reply at 8. Defendant cites *Cybersell, Inc. v. Cybersell, Inc., 130 F.3d 414 (9th Cir. 1997),* which held [HN7] the effects doctrine inapplicable where the defendant had no other contacts with the forum other than the maintaining of a web page on the Internet which had an effect in the forum. However, Cybersell focused on the fact California was not the "focal point" of the harm suffered and that "something more" was required to indicate the defendant purposefully directed his activity to the forum state. *Id. at 418.*

The narrow scope of the Cybersell opinion became apparent when the court in *Panavision International, L.P. v. Toeppen, 141 F.3d 1316, 1998 U.S. App. LEXIS 7557, 1998 WL 178553 *6 (9th Cir. 1998),* recently held [HN8] the registration of a Internet domain name coupled with a subjective scheme having an effect in California was sufficient contact for specific jurisdiction. The "something more" amounted to evidence the defendant actually intended an effect. While Defendant characterizes its two letters as "polite letter[s]" asserting a "belief . . . the recipient is using the invention claimed by a U.S. patent," Reply at 7, its intent in sending the letter (which demanded the recipient cease-and-desist, take a license or suffer the legal consequences) could only be to have an effect on chilling Plaintiff's business and the business relationship between Plaintiff and Plaintiff's California-based customer.

[*6]

Defendant argues its contacts are insufficient to warrant personal jurisdiction. Motion at 6. Defendant contends its only forum contacts include sending Plaintiff and one of Plaintiff's California based customers a "cease-and-desist" letter. Defendant otherwise insists it has no agents, property, business or similar contact with California. Motion at 3-4.

While at first blush this contact may seem like a small basis upon which to rest the exercise of the Court's personal jurisdiction, it is legally sufficient in this case. [HN9] Unlike general jurisdiction, which focuses on the quantity of forum contact, specific jurisdiction focuses on the quality and nature of the Contact. *Brainerd, 873 F.2d at 1259.* Many courts in this forum have held intentional contacts like Defendant's are of the quality and nature to have an effect on California residents and

Case 5:03-cv-02289-JW    Document 23-24    Filed 07/29/2003    Page 4 of 4

Page 4

1998 U.S. Dist. LEXIS 9041, *; 47 U.S.P.Q.2D (BNA) 1157

their businesses. E.g., *Oki America, Inc. v. Tsakanikas, 1993 U.S. Dist. LEXIS 19475, 1993 WL 515860 (N.D.Cal. 1993)* (asserting jurisdiction based on one letter, two telephone calls and two facsimiles); *Burbank Aeronautical Corp. II v. Aeronautical Development Corp., 16 U.S.P.Q.2D (BNA) 1069 (C.D.Cal. 1990)* (asserting jurisdiction based on three letters--two of [*7] which were cease-and-desist letters); *Tandem Computers Inc. v. Yuter, 1989 U.S. Dist. LEXIS 18384* (N.D. Cal. Dec. 20, 1989) (asserting jurisdiction based on two cease-and-desist letters); *Edwards v. Pulitzer Publishing Co., 716 F. Supp. 438 (N.D. Cal. 1989)* (asserting jurisdiction based on one letter and one telephone call); *Dolco Packaging Corp. v. Creative Industries, Inc., 1986 U.S. Dist. LEXIS 19226, 1 U.S.P.Q.2D (BNA) 1586 (C.D.Cal. 1986)* (asserting jurisdiction based on a single cease-and-desist letter); contra *Douglas Furniture Co. of California, Inc. v. Wood Dimensions, Inc., 963 F. Supp. 899, 901 (C.D.Cal. 1997)* (declining to follow Dolco where defendant sent two cease-and-desist letters). n4 Moreover, it is reasonable Defendant should have anticipated being brought into court in California after notifying Plaintiff it was contemplating "immediate legal action." Hersh Decl. at 18.

n4 Defendant points to Judge Pregerson's opinion in Douglas Furniture which, in declining to assert personal jurisdiction based upon two cease-and-desist letters, adhered "to the rule articulated in the commercial context, which is that 'use of the mails, telephone, or other international communications simply do not qualify as purposeful activity invoking the benefits and protections of the [forum] state.'" *Douglas Furniture, 963 F. Supp. at 902* (quoting *Roth v. Garcia Marquez, 942 F.2d 617, 622 (9th Cir. 1991))*. However, this is inconsistent with the current trend in jurisdictional analysis as evidenced by Panavision. See also *Hall v. LaRonde, 56 Cal. App. 4th 1342 (1997)* (asserting personal jurisdiction, in a commercial context, based on use of electronic mail over the Internet and telephone by a foreign defendant).

[*8]

Defendant aimed two letters at California intending they have an effect--that the addressees cease-and-desist their commercial activity. The controversy is related to and arises out of Defendant's contacts directed toward the forum and the Court finds the exercise of jurisdiction is reasonable. Defendant's motion to dismiss for lack of personal jurisdiction is DENIED.

II. SERVICE

New service has now taken place. Therefore, the Court withholds ruling on the validity of the first service, as it may be moot. The Court will rule on the validity of the first service at such time as it may later become necessary to do so.

DATED: May 11, 1998

GARY L. TAYLOR

UNITED STATES DISTRICT JUDGE

LEXSEE 1989 U.S. DIST. LEXIS 18384

**TANDEM COMPUTERS INCORPORATED, a Delaware corporation, Plaintiff, v. SEYMOUR C. YUTER, an individual, and APEX TECHNOLOGY, a California corporation, Defendants.**

No. C 89-20646 RFP

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*1989 U.S. Dist. LEXIS 18384*

December 20, 1989, Decided
December 22, 1989, Filed

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant patentee filed a motion to quash service of summons in the court to determine whether the court had jurisdiction over him in plaintiff claimant's declaratory judgment action.

**OVERVIEW:** The claimant brought an action against the patentee, seeking a declaratory judgment that the claimant's resale of a computer peripheral product designed and manufactured by an independent supplier, did not infringe two patents owned by the patentee. The patentee filed a competing patent infringement action in the another federal district court, which was stayed pending his motion to quash service of summons in the court. The court denied the patentee's motion. The court found that the patentee sent a letter to the claimant, accusing it of patent infringement. This was purposeful direction of an act at a California resident, which would have had an effect in California on its business. Furthermore, the patentee should have reasonably anticipated being haled into court in California after notifying the claimant of its infringement claim. Therefore, the first prong of the specific personal jurisdiction test was satisfied. Second, the dispute arose out of the patentee's forum-related activities, his solicitation of a license and subsequent negotiations regarding the patent infringement. The second prong was satisfied. Finally, it was reasonable for the court to assert jurisdiction.

**OUTCOME:** The court denied the patentee's motion to quash service of summons. The patentee failed to carry his burden of presenting a compelling case that the court's exercise of jurisdiction would be unreasonable. Thus, the court's exercise of jurisdiction was reasonable.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN1] California law confers jurisdiction coextensive with the United States Constitution; therefore, the existence of specific personal jurisdiction depends solely on the requirements of federal due process. Basic due process for personal jurisdiction requires that a defendant have fair warning that a particular activity may subject him or her to jurisdiction. This requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum state and the litigation arises out of or relates to those activities. The critical issue is whether the defendant's conduct and connection with the forum state are such that he could reasonably anticipate being haled into court there.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN2] The United States Court of Appeals for the Ninth Circuit establishes a three-part test for determining whether specific personal jurisdiction may be exercised: 1) the nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposely avails himself of the

1989 U.S. Dist. LEXIS 18384, *

privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws, 2) the claims must be one which arises out of or results from the defendant's forum-related activities; and 3) exercise of jurisdiction must be reasonable. It, however, modifies the three-part test and adopts a more flexible approach. First, purposeful availment may include a defendant whose only contact with the forum state is the purposeful direction of a foreign act having effect in the forum state. Second, jurisdiction may be exercised with a lesser showing of a minimum contacts than would otherwise be required if considerations of reasonableness dictate. Third, there is a presumption of reasonableness upon a showing that the defendant purposefully directed his activities at forum residents which the defendant bears the burden of overcoming by presenting a compelling case that jurisdiction would be unreasonable.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN3] A lesser showing of minimum contacts may satisfy personal jurisdiction if considerations of reasonableness dictate. Thus, even a few instances of correspondence or telephone contact may confer jurisdiction.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN4] If a defendant purposefully engages in forum related activity, there is a presumption of personal jurisdiction and the defendant has the burden of presenting a compelling case that the court's exercise of jurisdiction would be unreasonable. Seven factors must be analyzed to make a determination of reasonableness: (1) burden on the defendant; (2) existence of an alternative forum; (3) convenience and effectiveness of relief for the plaintiff; (4) interest of the forum state; (5) efficiency of adjudication; (6) extent of defendant's purposeful interjection into the forum; and (7) possibility of conflict with other sovereignty.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN5] A state generally has a manifest interest in providing its residents with a convenient forum for addressing injuries inflicted by out-of-state actors.

**JUDGES:** [*1] Peckham

**OPINIONBY:** ROBERT F. PECKHAM

**OPINION:**

ORDER

I. INTRODUCTION

Plaintiff Tandem Computers Incorporated ("Tandem") brings this action against Seymour C. Yuter ("Yuter") seeking declaratory judgment that Tandem's resale of a computer peripheral product designed, developed, and manufactured by an independent supplier, Apex Technology ("Apex"), does not infringe two patents owned by Yuter. n1 Yuter filed a competing patent infringement action in the Southern District of New York, which has been stayed pending this motion. Yuter also filed the present Motion to Quash Service of Summons to determine whether this court has jurisdiction over him.

n1 Tandem also brings this action against Apex, because Apex agreed to indemnify Tandem against any patent infringement action.

II. BACKGROUND

In 1983, Apex, a California corporation, developed a remote printer interface product for use with a Tandem computer system. The Apex device allows the computer to print data at a remote location.

In 1984, Tandem invited Apex and another company, [*2] Digital Associates Corporation ("DAC"), to submit bids for a possible contract to supply the remote printer interface to Tandem. After comparative testing, Tandem awarded Apex an original equipment manufacturing ("OEM") contract in May 1984.

Yuter acquired two pending patent applications from DAC a few weeks prior to the issuance of the first patent ("'263 patent") n2 on February 3, 1987. In a February 10, 1987 letter to Tandem headquarters in California, Yuter accused Tandem of infringing the '263 patent and offered Tandem a license. Yuter sent a similar letter to Hewlett-Packard Corporation, also headquartered in California, on March 3, 1987.

n2 A second patent (" '421 patent") was issued on May 9, 1989, and Yuter claims this patent is also infringed by the Apex product.

During the next two years, both parties conducted settlement negotiations without success. On January 26, 1989, Yuter made the first of two visits to Tandem's Cupertino, California headquarters to discuss the possible license of the '263 patent. [*3] On that date, a Confidentiality Agreement was signed by the two parties to enhance the possibility of settlement.

On September 29, 1989, Tandem filed this action. Tandem's amended complaint, filed on October 16, 1989, seeks the following relief:

(1) a declaration that the '263 and '421 patents are invalid;

(2) a declaration that the '263 patent is unenforceable because Yuter has engaged in patent misuse by demanding a total sales royalty on complete Tandem computer systems sold independently of the Apex device;

(3) a declaration that the Apex device does not infringe either the '263 patent or the '421 patent;

(4) an injunction prohibiting Yuter from initiating unfair and coercive litigation against Tandem and its customers in violation of California Business and Professions Code § 17200;

(5) specific performance of the provisions of the January 26, 1989 Confidentiality Agreement; and

(6) a declaration that Apex is obligated to defend and hold Tandem harmless against Yuter's claims of patent infringement.

On October 3, 1989, Yuter filed a patent infringement action in the Southern District of New York against Tandem and four named customers: Merrill Lynch & Co., Inc., National Broadcasting [*4] Co., Inc., National Westminster Bank USA, Inc., and MASDQ, Inc. Yuter filed a motion in the New York court to stay this California action. On October 30, 1989, after hearing oral argument from Yuter and Tandem, Chief Judge Charles L. Brieant of the Southern District of New York denied Yuter's motion to stay this action. Chief Judge Brieant further ruled that the New York action would be stayed pending a determination by this court on Yuter's motion to dismiss the present action on jurisdictional grounds. Yuter's present Motion to Quash Service of Summons was filed on October 30, 1989.

III. DISCUSSION

A. The Standard For Asserting Specific Personal Jurisdiction

[HN1] California law confers jurisdiction coextensive with the United States Constitution; therefore, the existence of specific personal jurisdiction depends solely on the requirements of federal due process. *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd., 784 F.2d 1392, 1396 (9th Cir. 1986).* Basic due process for personal jurisdiction requires that a defendant have fair warning that a particular activity may subject him or her to jurisdiction. *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985).* [*5] This requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum state and the litigation arises out of or relates to those activities. Id. The critical issue is whether "the defendant's conduct and connection with the forum State are such that he could reasonably anticipate being haled into court there." *Id. at 474,* quoting *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980).*

[HN2] The Ninth Circuit established a three-part test for determining whether specific personal jurisdiction may be exercised:

1. The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposely avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws.

2. The claims must be one which arises out of or results from the defendant's forum-related activities.

3. Exercise of jurisdiction must be reasonable.

*Data Disc, Inc. v. Systems Technology Associates, Inc., 557 F.2d 1280, 1287 (9th Cir. 1977)* (emphasis [*6] added).

In response to recent Supreme Court decisions, the Ninth Circuit modified the three-part test and adopted a more flexible approach. *Haisten, 784 F.2d at 1397.* First, purposeful availment may include a defendant "whose only 'contact' with the forum state is the 'purposeful direction' of a foreign act having effect in the forum state." Id. (emphasis in the original). Second, "jurisdiction may be exercised with a lesser showing of a minimum contacts than would otherwise be required if considerations of reasonableness dictate." Id. (emphasis in the original). Third, "there is a presumption of reasonableness upon a showing that the defendant purposefully directed his activities at forum residents which the defendant bears the burden of overcoming by presenting a compelling case that jurisdiction would be unreasonable." Id. (emphasis in the original).

B. Analysis

1. Purposeful Availment

Tandem contends that Yuter purposefully availed himself of the privilege of conducting business in California by attempting to license his patents in

California. n3 Tandem focuses on Yuter's letter of February 10, 1987, which claimed [*7] patent infringement and solicited Tandem's license of the '263 patent. Yuter sent a similar letter to Hewlett-Packard Corporation in California on March 3, 1987. Tandem also contends that Yuter's activities related to the patent infringement were directed to Tandem in California and included numerous letters, telephone calls, and facsimile transmissions.

n3 Tandem also argues that the court has specific personal jurisdiction over Yuter because he engaged in conduct in which he knew would injure Tandem in California and which is the subject of Tandem's claim. This conduct allegedly involves patent misuse, unfair competition, and breach of the Confidentiality Agreement. Since the court finds specific personal jurisdiction on other grounds, the court does not need to reach the determination of whether this allegedly injurious conduct confers jurisdiction.

Additionally, Tandem contends that Yuter litigated a lengthy breach of contract and fraud action in a federal court in California between 1984 and 1988. n4 Tandem and [*8] Yuter also agree that in July 1979, Yuter appeared in California as an amicus curiae in an action before a federal court in Los Angeles. Yuter traveled to Los Angeles once for that suit.

n4 Yuter admits that he litigated this action in California. He states that he made eleven (11) trips to California during this time period and he was awarded a default judgment in excess of $ 9 million, although the primary defendant, a convicted felon, apparently left the country without satisfying the judgment.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Yuter argues that his attempts to negotiate a contract with Tandem to settle his patent infringement claim do not constitute purposeful availment. He contends that a finding of purposeful availment would be against the public policy of encouraging settlement negotiations in lieu of litigation.

Yuter's acts satisfy the modified and flexible purposeful availment standard established by post Burger King cases. As indicated by the Haisten court, [HN3] a lesser showing of minimum contacts may satisfy personal jurisdiction [*9] if considerations of reasonableness dictate. *Haisten, 784 F.2d at 1397.* Thus, even a few instances of correspondence or telephone contact may confer jurisdiction. See, e.g., *Brainerd v. Governors of the University of Alberta, 873 F.2d 1257, 1259 (9th Cir. 1989)* (defendant did not visit or transact business in California, but contacts were sufficient for conferring specific personal jurisdiction because defendant purposefully directed communications to plaintiff in forum state that he knew would injure plaintiff there); see also *Edwards v. Pulitzer Publishing Company, 716 F. Supp. 438 (N.D. Cal. 1989)* (asserting specific personal jurisdiction based on purposeful direction of one letter and one telephone call to California).

*Dolco Packaging Corp. v. Creative Industries, Inc., 1 U.S.P.Q.2d 1586 (C.D. Cal. 1986),* offers extremely persuasive, although not binding, authority for a finding of personal jurisdiction in the present case. The defendant in Dolco had no facilities, bank accounts, or employees in California, but had written a letter to Dolco in California [*10] accusing Dolco of patent infringement. The court denied defendant's motion to dismiss for lack of personal jurisdiction. The court found the letter to be a forum related activity which posed "a threat to Dolco's activities and sales in California." *Id. at 1587.* This single act satisfied due process requirements for limited personal jurisdiction and the court held that the defendant had "purposefully directed acts at a forum resident with the intent of having an effect in California and thereby purposefully availed itself of the privilege of conducting activities in this forum." Id. n5

n5 Yuter attempts to distinguish the Dolco decision by focusing on contacts the Dolco defendant had in the forum state which involved matters unrelated to the patent infringement letter, such as occasional advertisement in national trade publications and sales of products to California over the past five years. However, the Dolco court specifically and solely relies on the letter threatening patent infringement as the basis for limited (or specific) personal jurisdiction. Therefore, Yuter's argument holds little merit.

Yuter also relies on authority, especially *Kransco Mfg., Inc. v. Markwitz, 656 F.2d 1376 (9th Cir. 1981)* and *Rheodyne, Inc. v. Ramin', 201 U.S.P.Q. 667 (N.D. Cal. 1978),* discussing specific personal jurisdiction that was decided prior to the Burger King decision and its Ninth Circuit interpretation in Haisten. Since the post Burger King decisions follow its more flexible

standard, reliance upon pre Burger King cases is not persuasive.

[*11]

Yuter sent a letter to both Tandem and Hewlett-Packard accusing them of patent infringement and suggesting a license of the relevant technology. As in Dolco, this conduct reflects a purposeful direction of an act at California residents which certainly would have an effect in California on their respective businesses. Furthermore, Yuter should have reasonably anticipated being haled into court in California after notifying Tandem of his infringement claim. See *Haisten, 784 F.2d at 1397,* citing *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980).*

Therefore, the court should find that Yuter has purposefully directed activities to Tandem in California which satisfies the first prong of the specific personal jurisdiction test.

### 2. Arising Out Of Forum Related Activities

There can be little dispute among parties that Tandem's claim arises out of or results from Yuter's forum related activities, i.e., his solicitation of a license with Tandem and subsequent negotiations regarding the patent infringement. Thus, the second prong of the Ninth Circuit standard is satisfied.

### 3. Reasonableness

[HN4] Since Yuter has [*12] purposefully engaged in forum related activity, there is a presumption of personal jurisdiction and Yuter has the burden of presenting a compelling case that the court's exercise of jurisdiction would be unreasonable. *Haisten, 784 F.2d at 1397.* Seven factors must be analyzed to make a determination of reasonableness: (1) burden on the defendant; (2) existence of an alternative forum; (3) convenience and effectiveness of relief for the plaintiff; (4) interest of the forum state; (5) efficiency of adjudication; (6) extent of defendant's purposeful interjection into the forum; and (7) possibility of conflict with other sovereignty. *Brainerd, 873 F.2d at 1260.*

#### a. Burden on the defendant

Yuter argues that the burden will be extreme, because he is a sole practitioner of patent and trademark law in New York. No one is available to handle his caseload if he is involved in lengthy litigation in California. Most of his key witnesses reside on the East Coast. Furthermore, he states that his wife suffers from multiple sclerosis, and she would have difficulty coping without him.

Tandem argues that Yuter has twice visited California [*13] to pursue his patent infringement claim and that he previously litigated a lengthy action in California from 1984 to 1988, as well as appeared as amicus curiae in an unrelated case.

#### b. Existence of an alternate form

As the action in the Southern District of New York indicates, New York offers an alternate forum.

#### c. Convenience for the plaintiff

California represents a much more convenient forum for the plaintiff, because Tandem is based on California, and Apex, the manufacturer of the allegedly infringing product, is also based in California. Tandem contends that most of its key witnesses and documents are in California.

Yuter argues that Tandem, as a Fortune 500 company, has ample resources to conduct litigation in New York.

#### d. Interest of the forum state

Tandem offers the statement of the United States Supreme Court as representative of its position: [HN5] A state "generally has a 'manifest interest' in providing its residents with a convenient forum for addressing injuries inflicted by out-of-state actors." *Burger King, 471 U.S. at 473.*

Yuter disingenuously argues that a patent claim, being a federal cause of action, holds little interest [*14] for the State of California.

#### e. Efficiency of adjudication

Tandem contends that Apex, as manufacturer of the allegedly infringing product, is a necessary party to the action. Apex currently is a party only to the California proceeding.

Yuter argues similarly that Tandem's customers, as direct infringers of the patent, are only present in the New York action.

#### f. Defendant's purposeful interjection

Yuter contends that his purposeful interjection into California served "the laudatory and limited purpose of trying to settle a dispute." Nonetheless, Yuter concedes purposeful interjection.

#### g. Conflict with a sovereignty

This factor has no relevance to the present action.

A majority of the reasonableness factors either favor Tandem or offer no clear advantage to either party. The determination of reasonableness appears to hinge on whether the burden on Yuter substantially outweighs the

1989 U.S. Dist. LEXIS 18384, *

advantage to Tandem of having the litigation proceed in California. Yuter himself litigated a lengthy case in California n6 from 1984 to 1988 which involved eleven visits to the state. As a patent attorney for over thirty-five years who is familiar both with the law and the federal courts, Yuter [*15] suffers a lesser burden than a typical individual defendant facing a larger corporation.

    n6 The docket in that case consisted of twelve pages and 224 separate entries. Therefore, Yuter is no stranger to litigation in the federal courts in California.

Yuter has failed to carry his burden to present a compelling case that the court's exercise of jurisdiction would be unreasonable. Thus, the court's exercise of jurisdiction over Yuter is reasonable, satisfying the third prong of the Ninth Circuit standard.

Due to the medical condition of Yuter's wife, the court wishes to be sensitive to Yuter's concern about excessive travel away from home. Therefore, the court, whenever possible, will accommodate him by conducting hearings by telephone.

ACCORDINGLY, Yuter's Motion To Quash Service of Summons is denied.

IT IS SO ORDERED.

Dated: December 20, 1989

    Robert F. Peckham

    United States District Judge

1  Teresa M. Corbin (SBN 132360)
   Christopher Kelley (SBN 166608)
2  Erik K. Moller (SBN 147674)
   HOWREY SIMON ARNOLD & WHITE, LLP
3  301 Ravenswood Avenue
   Menlo Park, California  94025
4  Telephone:  (650) 463-8100
   Facsimile:  (650) 463-8400
5
6  Attorneys for Plaintiff Synopsys, Inc.

7

8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11

12  SYNOPSYS, INC.,                    )  Case No. C03-02289
                                       )
13             Plaintiff,              )  **PROOF OF SERVICE**
                                       )
14       vs.                           )
                                       )
15  RICOH COMPANY, LTD., a Japanese    )
    corporation.,                      )
16                                     )
               Defendant.              )
17                                     )
                                       )
18                                     )
                                       )
19  _____  )

20  STATE OF CALIFORNIA        )
                               )  ss.:
21  COUNTY OF SAN MATEO        )

22

23      I am employed in the County of San Mateo, State of California.  I am over the age of 18 and
    not a party to the within action.  My business address is P.O. Box 28404, San Jose, CA  95159.

24      On July 29, 2003, I served the within:

25      Opposition To Motion To Dismiss Or In The Alternative To Stay Or Transfer Venue;

26      Exhibit B to Declaration of Erik Moller in Opposition to Defendant's Motion to Dismiss or in
    the Alternative to Stay or Transfer Venue;
27
28      Exhibit D to Declaration of Erik Moller in Opposition to Defendant's Motion to Dismiss or in
    the Alternative to Stay or Transfer Venue.

HOWREY
SIMON
ARNOLD &
WHITE

Case No.  C03-02289
Notice of Manual Filing

by placing true copies thereof in a sealed envelope(s) addressed as stated below and causing such envelope(s) to be delivered via personal service.

Jeffrey B. Demain
Jonathan Weissglass
Altshuler, Berzon, Nussbaum, Rubin & Demain
177 Post Street, Suite 300
San Francisco, CA 94108

[X]    (PERSONAL SERVICE) I caused each such envelope to be delivered by hand to the offices of each interested party.

I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction the service was made and that the foregoing is true and correct.

Executed on July 29, 2003, at Meno Park, California.

| Gayle L. Jacob | /s/ |
|---|---|
| (Type or print name) | (Signature) |

HOWREY
SIMON
ARNOLD &
WHITE

Case No. C03-02289
Notice of Manual Filing

-2-



W I N N I N G   I N   C O L O



ANNUAL REPORT 2003

## CORPORATE PROFILE

Ricoh Company, Ltd., is a leading global manufacturer of office automation equipment.

Our lineup includes copiers, multifunctional and other printers, fax machines, personal computers, CD-Recordable, CD-ReWritable, and DVD+ReWritable drives and media, and related supplies and services, as well as digital cameras and advanced electronic devices.

We are rapidly building a solid presence worldwide as a provider of comprehensive document solutions that help customers streamline their businesses and cut operating costs.

Ricoh has 133 consolidated subsidiaries and affiliates in Japan and 262 overseas, together employing around 74,600 people.

## FINANCIAL HIGHLIGHTS

|  | Millions of yen | | Thousands of U.S. dollars | % change |
|---|---|---|---|---|
|  | 2002 | 2003 | 2003 | 2003/2002 |
| **For the Year:** | | | | |
| Net sales | ¥1,672,340 | ¥1,738,358 | $14,731,847 | 3.9% |
| Japan | 902,655 | 896,022 | 7,593,407 | -0.7 |
| Overseas | 769,685 | 842,336 | 7,138,440 | 9.4 |
| Net income | 61,614 | 72,513 | 614,517 | 17.7 |
| **Per Share Data** (in yen and dollars): | | | | |
| Net income | | | | |
| Basic | ¥ 88.27 | ¥ 99.79 | $ 0.85 | 13.1% |
| Diluted | 82.46 | 96.81 | 0.82 | 17.4 |
| Cash dividends paid | 12.00 | 14.00 | 0.12 | 16.7 |
| **At Year-End:** | | | | |
| Total assets | ¥1,832,928 | ¥1,884,922 | $15,973,915 | 2.8% |
| Shareholders' investment | 633,020 | 657,514 | 5,572,153 | 3.9 |

**Contents**

| | |
|---|---|
| To Our Shareholders and Customers | 1 |
| Winning in Color | 6 |
| Toward Sustainable Management | 8 |
| Review of Operations | 10 |
| Financial Section | 17 |
| Ricoh's Global Network | 54 |
| Senior Management | 55 |
| Corporate Data | 56 |

CAUTIONARY STATEMENT
Ricoh bases the estimates in this annual report on information currently available to management, which involves risks and uncertainties that could cause actual results to differ materially from those projected.

Notes on graphs in To Our Shareholders and Customers
1. Return on sales based on net income.
2. Return on shareholders' investment based on net income.
3. Return on assets based on income before income taxes, minority interests and equity in earnings of affiliates.

**TO OUR SHAREHOLDERS AND CUSTOMERS**

**RECORD RESULTS**

Fiscal 2003 was another banner year for Ricoh, one in which we boosted net sales for the ninth straight year and net income for the 11th consecutive term. Both figures were record highs, and owed much to the release of color multifunctional printers (MFPs) and high-speed monochrome MFPs. Our results also benefited from very successful rollouts of laser printers in Japan and overseas that deliver color at speeds and prices comparable to those of monochrome machines. Another key factor was printing solutions, in which we drew on our global sales and support structure to optimize total printing costs and increase the number of major accounts around the world.

**Performance in Depth**

Net sales rose 3.9%, to a record ¥1,738.3 billion ($14,732 million). This was the ninth consecutive rise. The increase would have been 2.7% without fluctuations in foreign exchange rates.

We again encountered tough going in Japan owing to a generally bleak local economic picture, although we were able to limit the decline in revenues by increasing sales of such printing systems as MFPs and laser printers. We also generated greater solutions business sales, notably for useware and document management offerings. At the same time, demand was lower for analog machines, personal computers, servers, and measurement equipment. As a result, domestic sales were off 0.7%, to ¥896.0 billion ($7,593 million). This represented 51.5% of net sales, down 2.5 percentage points.

The situation was much brighter internationally. Overseas sales increased 9.4%, to ¥842.3 billion ($7,138 million). Sales advanced solidly for core digital equipment, while sales of printing systems were up significantly in Europe and the United States. Sales were favorable for optical disc and semiconductor operations. Without the foreign exchange effect, overseas sales would have gained 6.8%. These sales represented 48.5% of net sales, up 2.5 percentage points.

Operating income was up 3.1%, to ¥133.6 billion ($1,133 million). High-margin models and cost-cutting initiatives contributed much to this rise.

Net income gained 17.7%, to ¥72.5 billion ($615 million), another record high. Basic net income per share increased 13.1%, to ¥99.79 ($0.85). Fully diluted net income per share was up 17.4%, to ¥96.81 ($0.82). Return on shareholders' investment was 11.2%, from 10.4% in fiscal 2002.



NET SALES AND RETURN ON SALES

(Billions of Yen, %)
*See Note 1 on inside front cover.



NET INCOME

(Billions of Yen)

1

As part of an ongoing commitment to improving shareholder returns, we raised cash dividends per share of common stock for the third consecutive year, to ¥14.00 ($0.11).

At the close of fiscal 2003, total assets were up 2.8% from a year earlier, at ¥1,884.9 billion ($15,974 million). Total liabilities increased 2.2%, to ¥1,174.1 billion ($9,950 million).

Total shareholders' investment was up 3.9%, to ¥657.5 billion ($5,572 million).

Net cash provided by operating activities was up ¥80.6 billion, to ¥185.7 billion ($1,574 million). This owed to higher net income and depreciation and amortization and a decrease in inventories as a result of strong supply chain management.

Net cash used in investing activities increased ¥16.7 billion, to ¥98.1 billion ($832 million). This stemmed from higher capital expenditures for new production lines and additions to bond investments.

Free cash flow generated by operating and investing activities thus totaled ¥87.5 billion ($742 million), up ¥63.8 billion.

Net cash used in financing activities was ¥67.1 billion ($569 million), compared with ¥36.2 billion provided by such activities in fiscal 2002. This reflected reductions in interest-bearing debt to harness Group funds more efficiently. Outlays included dividend payments of ¥10.1 billion ($86 million) and expenses of ¥17.2 billion ($146 million) to secure treasury stock.

As a result of these factors, cash and cash equivalents at the close of the term were ¥19.0 billion higher than a year earlier, at ¥189.2 billion ($1,604 million).

### AGGRESSIVE STRATEGIES

During the year, we continued to go from strength to strength in implementing our 14th medium-term business plan to broaden our revenues and earnings foundations. The plan addresses two important emerging trends. First, users increasingly seek ways to enhance productivity. Second, they rely more on color-based documents nowadays and have to handle more information.

Our plan has three basic components, all of which will help us build total document volume and increase sales and profits.

The first is to replace monochrome products with color models. We are building a full line-up of compact color machines at prices comparable to monochrome models so we can secure new markets by meeting new demand for color. We won top marks in Japan and abroad during the year for our Aficio AP 3800C (IPSiO Color 8000 in Japan) series of fast color laser printers,

NET INCOME PER SHARE OF
COMMON STOCK



(Yen)

SHAREHOLDERS' INVESTMENT AND
RETURN ON SHAREHOLDERS' INVESTMENT



(Billions of Yen, %)
*See Note 2 on inside front cover.

TOTAL ASSETS AND
RETURN ON ASSETS



(Billions of Yen, %)
*See Note 3 on inside front cover.



Hiroshi Hamada (right), Chairman and Masamitsu Sakurai, President, Chief Executive Officer and Chief Operating Officer

which deliver color performance at monochrome speeds and prices. We released the Aficio 1224C/1232C (Imagio Neo C240/C320) series of MFPs for regular offices, which helped expand our share of the domestic color copier market.

The second is to expand sales of high-speed models. We aim to attract more customers through fast machines that are competitively priced, cost less to maintain, and are even more reliable. For example, our Aficio 1105 (Imagio MF105ProII) digital copier was very well received domestically and abroad for its affordability and consistent performance. This machine attracted more customers seeking high-volume copying and output.

Third, we are deploying printing solutions. Here, we suggest ways for customers to optimize the total output costs of their copiers and printers so we can expand equipment sales and increase total document volume. In the European and U.S. markets, in particular, during the term we drew on a global service and support structure that optimizes total printing costs for copiers and printers. We thus steadily increased the number of major accounts worldwide.

### ORGANIZATIONAL IMPROVEMENTS

One of the highlights of the year was the establishment of Ricoh China Co., Ltd. This holding company is working to expand our operations in the highly promising Chinese market. We have already achieved impressive results to date in that nation, and the new operation is strategically expanding our business by integrating sales, production, and development.

We are striving to bolster our technological capabilities to become the world's No. 1 product engineering company, providing the most competitive hardware, software, and services. Specific focuses include technologies to develop next-generation, high-speed color imaging equipment and designing and developing hardware and software that allow users to freely and simply connect and operate various office machines. We are hard at work creating environmentally friendly offerings. In the year under review, we set up four research centers within the Research and Development Group to support the development of basic technologies. They include one center that specializes in photonics and another that concentrates on environmental technologies. In



COMMON STOCK PRICE RANGE



4

addition, we established operations within the Software Research and Development Group. We also decided to make Tohoku Ricoh Co., Ltd., a wholly owned subsidiary in keeping with efforts to reinforce Group development and design capabilities so we can integrate our strategies while delivering cost-competitive offerings.

Change extended to corporate governance in the year under review. This is in keeping with our conviction that we must deliver value not just through our products and services but also through our commitment to the interests of shareholders and the communities in which we operate.

In recent years, for example, we introduced an executive officer system that transfers authority to divisions. We now have a board of 16 directors, including two external officials, to handle major decisions on Group management. Four auditors, including two external ones, now oversee compliance and institute independent internal checks through our auditing office. During fiscal 2003, we established the Corporate Social Responsibility Division to coordinate activities worldwide. The Division also cooperates with other internal bodies that handle environmental, information security, and compliance issues.

**PURSUING GREATER VALUE**

Our drive to become the world's No. 1 product engineering company entails providing new value through our customer-oriented management. Also key is our commitment to technological innovations that simplify digital networking, delivering ease of use and superior productivity. Environmental management remains central to our mission, and we aim to contribute even more to the resolution of environmental missions without compromising profitability. A complementary objective is to slash expenses so we can achieve a low-cost, highly competitive man-



agement structure that lets us operate even more efficiently in deflationary environments.

We anticipate higher revenues and earnings in fiscal 2004, and invite you to monitor progress through our investor relations website (www.ricoh.com/ir/).

As always, we deeply appreciate your support and encouragement, and look forward to a great fiscal 2004.

June 26, 2003

Sincerely,

Hiroshi Hamada
Chairman

Masamitsu Sakurai
President, Chief Executive Officer and Chief Operating Officer

5

**Color paper documents** have long been desirable in the office. They have also been too expensive. This is unfortunate given the many affordable color display products that have emerged in recent years and the meteoric rise of an Internet culture in which color is often essential to effective communication.

But what if color equipment and output were as affordable as monochrome, child's play to create, and could be produced just as fast? Wouldn't it make sense to shift to color? Of course it would. And you'd likely output reams of color materials.

That's why Ricoh took a leading role in developing a host of technologies that help most office workers opt for color output when it suits them. By bringing out highly

affordable color equipment we can not only enhance our market share but also build and dominate massive new color markets that deliver superb value to our customers. This while driving our revenues and earnings to new heights by increasing total document volume.

The past year or so has seen Ricoh take major steps toward that goal, with the launch of the breakthrough **Aficio 1224C/1232C** (Imagio Neo C240/C320) series of workgroup MFPs that deliver color convenience affordably. Our proprietary vertical paper pass design has resulted in color models that are as compact as monochrome machines. These and other fast, compact MFPs, laser printers, and copiers meet the need for speed and

WINNING IN    O



## Aficio 1224C/1232C

The Aficio 1224C/1232C (Imagio Neo C240/C320) series of workgroup MFPs integrates copying, printing, scanning and optional faxing. These systems separate themselves from the competition by offering the convenience of color at highly affordable prices. At the click of a mouse or push of a button, users can seamlessly integrate color pages into documents and finish them without manual intervention.



**Ri10**

The Ri10 is the world's first single chip to handle all copier imaging functions. This dedicated image processing middleware LSI eliminates the "clutter" found on application-specific integrated circuits, handling all copier image processing on a single chip. The Ri10's 224 calculators use parallel processing to perform 25.7 billion calculations per second, which is more than 10 times faster than a personal computer's central processing unit. Software can be used to modify processing capabilities. The Ri10 LSI has thus slashed the time and cost otherwise needed to develop color systems. The Ri10 is a central feature in our latest offerings, including the Aficio 1224C/1232C (Imagio Neo C240/C320) series.

allow users to seamlessly integrate color pages into documents and finish them without manual intervention. We have thus become a major force in the Japanese color market, and we are well on the way to replicating that achievement internationally.

But how did Ricoh make color a viable option for the regular office? Two factors have fueled our goal of becoming a preeminent provider of solutions. The first is technology. The second is our unmatched global sales, support, and service structure.

On the technology front, our most important achievement has been the creation of the **Ri10**, the world's first single chip to handle all copier imaging functions. This dedicated image processing middleware LSI eliminates the "clutter" found on application-specific integrated circuits to dramatically enhance performance. The Ri10 lives and breathes imaging efficiency. Software can be used to modify processing capabilities. This LSI has thus slashed the time and cost otherwise needed to develop color systems. The Ri10 is a central element in our latest offerings.

Another innovation, featured in the Aficio AP 3800C (IPSiO Color 8000), is a proprietary tandem drum printing system that prints all four colors in a single pass.

Zero maintenance is the Holy Grail of office equipment. Ricoh brings this close to reality through the modules in its multifunctional models. The modules can be serviced simply and quickly, thus minimizing downtimes.

While color is largely the future both for us and our customers, this does not mean that we are abandoning the world of monochrome solutions. Indeed, black-and-white output remains a top priority for many high-volume users. We are meeting that need—in

spades. At the top of the line in our monochrome range is the **Aficio 2105** (Imagio Neo 1050Pro), an on-demand input/output station. This model can output a stunning 105 copies per minute. Double that figure when two units are used in tandem for ultra-high-volume runs.

As mentioned earlier, our direct sales, support, and service structure is central to our color strategy. In recent years, we have acquired several office equipment companies around the world so that today we can provide the best possible solutions globally. We have been able to marshal this network to identify the true needs of our customers. All the people on the network are on the same page. They seek and feed back relevant information to our development operations so we can provide even more useful products. Just as important, our global network provides color and monochrome solutions through systems and operating proposals that help customers enhance efficiency while lowering the total cost of ownership. That approach has helped us land many new major accounts in recent years, and will pave the way for even more contracts with small and large companies that find that color is a winner.

**Aficio 2105**

This monochrome system complements Ricoh's color offerings. It supports work-intensive walk-up environments, networked corporate workgroups, central reprographics departments or print-for-pay operations. It rips through copy/print runs at 105 pages per minute and offers ultimate versatility for all job requirements.



# TOWARD SUSTAINABLE MANAGEMENT

**Sustainable management** is central to all aspects of our business. You can see this first in our unwavering commitment to environmental preservation.

Sustainability also underlies our dedication to good corporate citizenship—covering everything from ethical conduct to close community involvement—which is ultimately good for business.

To better coordinate our sustainable management efforts, in fiscal 2003 we established the Corporate Social Responsibility Division. This organ monitors relevant activities across the Group and ensures that all Group operations and employees share our values, thereby enhancing enterprise value. The Division reports directly to the president and works closely with other internal bodies that deal with environmental, information security, and compliance issues.

The Ricoh Group's concerted approach to corporate responsibility has won broad recognition internationally. In 2002, for example, Oekom Research, a German agency that ranks corporate responsibility, rated Ricoh first worldwide among companies manufacturing office equipment and electrical household items. A 2002 *Financial Times* survey of the **World's Most Respected Companies** placed us sixth among companies that "best manage environmental resources." In May 2003, we received the World Environment Center's prestigious 19th annual **WEC Gold Medal** for International Corporate Achievement in Sustainable Development. Mr. Sakurai, president of Ricoh, characterized the award as "testament to the strengths of our beliefs and operating principles."

In Japan, our report on environmental management (you can download the English PDF version from www.ricoh.co.jp/ecology/e-/report/index.html) received prizes in early 2003 for excellence and sustainability report encouragement at the 6th Environmental Report Awards. The awards were sponsored by the Global Environmental Forum and were supported by Japan's Ministry of the Environment. For 2003, the *Japan Industrial Journal* bestowed the Global Environmental Award Grand Prix on Ricoh.

We are determined to keep broadening our commitment to sustainable management in the years ahead. One component of that is our participation in the Global Compact. This United Nations initiative consists of nine principles covering human rights, labor, and the environment. Around 1,000 companies around the world have agreed to engage in the Global Compact.

## One of the World's Most Respected Companies

The January 20, 2003, edition of the *Financial Times* released the results of a poll of chief executive officers around the world. The survey placed Ricoh sixth among the World's Most Respected Companies in the category of "companies that best manage environmental resources."





## 2003 WEC Gold Medal Winner

In May 2003, Ricoh received the World Environment Center's prestigious 19th annual WEC Gold Medal for International Corporate Achievement in Sustainable Development from Dr. Klaus Toeofer, executive director of the United Nations Environmental Programme.



## Support for Bushland Restoration in Australia

Ricoh Australia Pty. Ltd., is funding an initiative at the Warrimoo Public School, located around 50 kilometers west of Sydney, Australia, for students to restore the surrounding bushland.



## Involvement in Hong Kong Replanting Initiative

Through sponsorship and volunteer employee participation, Ricoh Hong Kong Ltd. is working closely with the government of the Hong Kong Special Administrative Region and an environmental nongovernment organization in a program to plant about 10,000 trees and shrubs in burned out parkland.

**REVIEW OF OPERATIONS**

# OFFICE EQUIPMENT
## I M A G I N G     S O L U T I O N S

**SALES OF IMAGING SOLUTIONS**



(Billions of Yen)

This segment comprises digital and other imaging systems. Digital imaging systems include monochrome and color digital copiers, digital duplicators, facsimile machines, and supplies and services. Other imaging systems encompass analog copiers, diazo copiers, supplies and services for those products, and thermal paper.

WarwickPrint, the print center at Warwick University in the United Kingdom, relies heavily on its six Aficio 1105 copiers to rip through copy and print jobs at 105 pages per minute.

**PERFORMANCE**

Sales of imaging solutions dropped 8.0% in fiscal 2003, to ¥859.7 billion ($7,286 million). This accounted for 49.5% of net sales, down 6.3 percentage points. The decline reflected the Ricoh Group's intensified efforts to shift away from analog offerings in favor of networkable digital systems.

*Digital Imaging Systems:* We continued to reinforce our lineup of digital copiers during the year. New releases included every-





The Dr. Peters Group in Dortmund, Germany, a prominent issuing house for closed property funds and participations in ship ownership, harnesses the high resolution of the Aficio 2105 to output and finish everything from financial reports to information for more than 30,000 shareholders.



Ricoh Italia S.p.A. and affiliate Ricoh Point Torino joined hands to deliver document management solutions to Juventus, Italy's most prestigious soccer team, by providing several Aficio 1032 copiers.



The St. Joe Company, Florida, a preeminent real estate operating company and the state's largest private landowner, chose the Ricoh FAX4410NF, whose advanced network connectivity capabilities include Color Scan to E-mail, IP faxing, and LAN faxing right out of the box.

thing from the Aficio 1013 and 1015 for small workgroups to the high-volume Aficio 1105 (Imagio MF105 ProII). Unit sales of digital copiers increased significantly during the year, but sales were down in Japan because of the lackluster economy and a trend toward printing systems. Sales of digital imaging systems therefore decreased 4.2%, to ¥626.9 billion ($5,313 million).

*Other Imaging Systems:* The shift away from analog copiers to digital models and MFPs caused sales of other imaging systems to fall 16.8%, to ¥232.7 billion ($1,972 million).

### HIGHLIGHTS

The Aficio 1105 (Imagio MF105 ProII) remained very popular for its performance, pricing, and reliability. In Japan, we expanded our range of models incorporating high proportions of recycled parts. New offerings included the Imagio MF4570RC and the Imagio MF3570RC.

### OUTLOOK

In fiscal 2004, Ricoh will bring out more high-speed machines that offer competitive pricing and reliability for customers seeking high-volume output capabilities.



Foto ABB, the Italian subsidiary of a multinational leader in technologies for energy and automation, chose Ricoh to supply around 200 Aficio machines for several regional centers.

11

**REVIEW OF OPERATIONS**



InTACT, the insourcing agency for computing and telecommunications for the government of the Australian Capital Territory, in Canberra, ordered 700 multifunctional devices and copiers from Ricoh, to be phased in over the next three years as leases expire.

# NETWORK INPUT/OUTPUT SYSTEMS

This segment has two subcategories. The first is printing systems, notably MFPs, laser printers, supplies, services, and software. The second is other input/output systems, which include optical discs and systems and scanners.

**SALES OF NETWORK INPUT/OUTPUT SYSTEMS**



(Billions of Yen)

**PERFORMANCE**

Segment sales were up 34.6%, to ¥463.3 billion ($3,927 million). This amount constituted 26.7% of net sales, up 6.1 percentage points.

*Printing systems:* We expanded sales of these systems on the strength of new models that satisfied demand for color, speed, and networking. Printing systems sales gained 36.6%, to ¥408.8 billion ($3,465 million), reflecting higher unit sales of MFPs and color laser printers.

*Other input/output systems:* Demand for DVD+RW drives was up significantly during the term. These and other optical disc-

related products, including CD-R/RW offerings, contributed greatly to performance. As a result, sales in this subcategory gained 21.2%, to ¥54.5 billion ($462 million).

**HIGHLIGHTS**

*Printing systems:* Two new digital color MFP series triggered a shift among general office users from monochrome to color. These systems were the Aficio 1224C and 1232C (Imagio Neo C240 and C320). Their popularity stemmed from their space-saving designs, diverse optional post-processing capabilities, and superior affordability.

Also during the year, we did well in color



Discover-Tec, Inc., in Jackson ____ Floor____
chose its Aficio CL-000 ____ ____
er to provide imaging supp____ ____
technology solutions opera____ ____
range from graphic and w____ ____
web hosting and server su____ ____



The Investigation Departm____ ____
Nassau County Sheriff's Or____ ____
Fernandina Beach, Florida ____ ____
Aficio 1232C for full-color ____ ____
copying capabilities, comp____ ____
scanning and faxing



laser printers, with new models spearheading the way, notably the Aficio CL7000 (IPSiO CX8200), IPSiO CX7200, and the Aficio CL5000 (IPSiO Color 6500).

In high-speed monochrome models, we did well with two on-demand printing machines, the Aficio 2105 (Imagio Neo 1050Pro) and the Aficio 2090 (Imagio Neo 900Pro). Also successful were the Aficio 1075 and 1060 (Imagio Neo 751 and 601) series of fast multifunctional systems.

*Other input/output systems:* Demand is rising for high-capacity removable media that can seamlessly handle videos and other large data volumes, thus integrating PCs and the audiovisual world. We have responded to such needs with fast and convenient DVD+RW products that work with DVD-ROM drives and DVD players. We have captured large market shares in all our operating regions for our MP5125A drive, which can handle DVD+RW and DVD+R discs.

**OUTLOOK**

In the year ahead, we will expand our range of printing systems offerings that meet diverse digital networking needs. We aim to provide comprehensive output solutions with fast color and monochrome models.

In other input/output solutions, we will launch faster drives that are compatible with the DVD+RW/+R formats and attract even more customers by bringing the PC and audiovisual worlds closer together.

The Ricoh MP5125A drive lets users record and rewrite DVD+RW and DVD+R discs that can store full-length motion pictures and other image-heavy data, and also handles rewritable CDs.



Otis France uses around 10 Aficio machines at its Courbevoie headquarters, including the high-speed Aficio AP 3800C color laser printer, and also uses 160 Aficio copiers at offices throughout France.

REVIEW OF OPERATIONS



## GlobalScan™

Ricoh's GlobalScan software server is the platform for all alliance technologies, processing, managing, and distributing hard copy documents in electronic form. GlobalScan is for document-intensive office environments and easily integrates with existing mail infrastructures to significantly boost workgroup productivity.



Acxiom Corporation, a leading provider of customer and information management solutions based in Little Rock, Arkansas, uses Ricoh GlobalScan, which turns its Aficio MFPs into scanners that route digital documents over its network.

This segment includes PCs and servers, network systems, networking software, applications software, and services and support.

# NETWORK SYSTEM SOLUTIONS

### PERFORMANCE

Ricoh boosted sales of useware, document management software, and other solutions businesses to help customers minimize their total costs of ownership. At the same time, our sales of PCs and servers were down during the term, as companies suppressed their information technology spending. Segment sales thus decreased 4.6%, to ¥197.4 billion ($1,674 million). This represented 11.3% of net sales, down 1.1 percentage point from a year earlier.

### HIGHLIGHTS

Several systems were very popular during the term. They included Ridoc Desk 2000 personal document management software and Ridoc Document Server Pro (Ver. 2), a document management application for large offices that features enhanced operability. The Ridoc Web Navigator browser portal platform for the Ridoc Document System

also did well, as did other imaging equipment in the Ridoc series.

We strengthened our information security business. For example, TrustyCabinet UX VI server software, which safeguards electronic document originals, was certified under the JIS X5070 standard in fiscal 2003.

In North America, we developed Global Scan. This allows large corporations to use MFPs to make their paper documents electronic.

### OUTLOOK

We will continue to bring out software linked with networked equipment as part of efforts to reinforce our solutions business, and will suggest ways for customers to build optimal systems.

SALES OF NETWORK SYSTEM SOLUTIONS



(Billions of Yen)

## REVIEW OF OPERATIONS



The RB5C633 is a single-chip encoder that is fully compliant with JPEG2000, the new international standard for still image compression, and can perform real-time coding and decoding.

The R5313B series of complete power management system devices is designed for GSM and other cellular handsets, and allows the setting of different output voltage settings for all seven voltage regulators.



The Caplio G3 is a 3.24-megapixel digital camera with a 3x zoom and a shutter release of just 0.14 second to maximize photo opportunities.

This category covers semiconductors, photographic equipment, measurement equipment, and leasing and logistics services.

# OTHER BUSINESSES

### PERFORMANCE
Segment sales rose 16.5%, to ¥217.7 billion ($1,846 million), and constituted 12.5% of net sales, up 1.3 percentage point.

The domestic semiconductor industry began to turn around during the term, while market conditions in Europe and other regions remained favorable. We enjoyed steady gains in leasing and other operations, although sales decreased for measurement equipment owing to a stagnant business cycle.

### HIGHLIGHTS
Our semiconductor business broadly covers two areas. The first is digital LSIs for our office equipment. This business works closely with equipment development sections to create advanced imaging LSIs for MFPs and printers, thus supporting our office solutions approach. The second area is supplying external customers with power management ICs that conserve energy, second-generation battery ICs, real-time clock ICs, and analog

LSIs for mobile phones. We enjoy large shares in the markets for PC interface LSIs, DVD+RW/+R controllers, and imaging and other digital LSIs based on technologies cultivated in developing office equipment.

In the photographic equipment category, we concentrate on digital cameras. We entered the digital camera arena in 1995, and now center on business models. A good example is the Caplio G3 series, which eliminates the slow shutter response times of digital cameras for performance comparable to that of film-based models. Our broad range also includes several unique offerings, such as a waterproof camera for outdoor use and another model that incorporates a global positioning system.

### OUTLOOK
In the semiconductor business, we will focus on developing key components for our digital products. For external customers, we will concentrate on system power management LSIs and other LSIs, such as for image processing and PC peripherals, to achieve further growth. In digital cameras, we will strengthen our business lineup and step up our solutions sales.

SALES OF OTHER BUSINESSES



(Billions of Yen)

16

# Financial Section

**Management's Discussion and Analysis of Fiscal 2003 Results**   18

**Selected Financial Data**                                        24

**Consolidated Balance Sheets**                                    26

**Consolidated Statements of Income**                              28

**Consolidated Statements of Shareholders' Investment**            29

**Consolidated Statements of Cash Flows**                          30

**Notes to Consolidated Financial Statements**                     31

**Independent Auditor's Report**                                   53

**Ricoh's Global Network**                                         54

**Senior Management**                                              55

**Corporate Data**                                                 56

# Management's Discussion and Analysis of Fiscal 2003 Results

## Revenues

In fiscal 2003, ended March 31, 2003, consolidated net sales increased 3.9%, to ¥1,738.3 billion ($14,732 million). This was the ninth consecutive rise. The average exchange rates prevailing during the term were ¥121.96 to the dollar (up ¥3.14) and ¥121.00 to the euro (down ¥10.40). The sales increase would have been 2.7% without the impact of foreign exchange fluctuations.

Domestic sales were down 0.7%, to ¥896.0 billion ($7,593 million). On the positive side, sales expanded for printing systems, such as MFPs (multifunctional printers) and laser printers. Sales were also favorable for useware, document management, and other areas of the solutions business. In contrast, sales of standalone analog equipment fell amid a shift toward MFPs, while sales were off for personal computer and servers owing mainly to sluggish domestic demand for information technology. Sales declined for measuring equipment as a result of a slow business cycle. Domestic sales accounted for 51.5% of net sales, down 2.5 percentage points.

Overseas sales increased 9.4%, to ¥842.3 billion ($7,138 million). Sales were steady despite an economic slowdown in the United States and turmoil in the Middle East. Ricoh continued to perform well in Europe, where the economic environment stabilized, and in other areas.

By product line, sales of core digital equipment increased solidly, while sales of strategic printing systems increased significantly in Europe and the United States. Optical disc and semiconductor operations enjoyed favorable sales. Without the foreign exchange effect, overseas sales would have gained 6.8%. These sales represented 48.5% of net sales, up 2.5 percentage points.

## Operating Income

Gross profit increased 6.5%, to ¥745.3 billion ($6,317 million). In both Japan and abroad, sales were up for high-margin, high-value-added products, notably MFPs and laser printers. The gross profit gain also reflected ongoing cost reductions and the yen's depreciation against the euro. Ricoh incurred additional costs to cover quality problems on some metering equipment. Selling, general and administrative expenses increased 7.3%, to ¥611.6 billion ($5,184 million), reflecting strategic spending on research and development and on basic systems development. As a result of the above factors, operating income increased 3.1%, to ¥133.6 billion ($1,133 million).

### SALES BY PRODUCT LINE

|  | 2002 | | 2003 | | |
|---|---|---|---|---|---|
|  | Millions of yen | Percentage of net sales | Millions of yen | Percentage of net sales | Thousands of U.S. dollars |
| **Office Equipment:** |  |  |  |  |  |
| Imaging Solutions | ¥934,180 | 55.8% | ¥ 859,713 | 49.5% | $ 7,285,703 |
| Network Input/Output Systems | 344,247 | 20.6 | 463,379 | 26.7 | 3,926,941 |
| Network System Solutions | 206,962 | 12.4 | 197,482 | 11.3 | 1,673,576 |
| **Other Businesses** | 186,951 | 11.2 | 217,784 | 12.5 | 1,845,627 |
| Total | ¥1,672,340 | 100.0% | ¥1,738,358 | 100.0% | $14,731,847 |

### SALES BY GEOGRAPHIC AREA

|  | 2002 | | 2003 | | |
|---|---|---|---|---|---|
|  | Millions of yen | Percentage of net sales | Millions of yen | Percentage of net sales | Thousands of U.S. dollars |
| Japan | ¥ 902,655 | 54.0% | ¥ 896,022 | 51.5% | $7,593,407 |
| The Americas | 341,747 | 20.4 | 343,940 | 19.8 | 2,914,746 |
| Europe | 311,312 | 18.6 | 354,477 | 20.4 | 3,004,042 |
| Other | 116,626 | 7.0 | 143,919 | 8.3 | 1,219,652 |
| Total | ¥1,672,340 | 100.0% | ¥1,738,358 | 100.0% | $14,731,847 |

# Income before Income Taxes

Interest and dividend income decreased primarily because of sluggish financial markets. At the same time, foreign exchange losses declined, while Ricoh constrained interest-bearing debt by reinforcing cash management systems in Japan, the United States, and Europe. Ricoh valued its holding marketable securities in accordance with generally accepted accounting principles. As a result, income before income taxes, minority interests and equity in earnings of affiliates increased 8.4%, to ¥123.4 billion ($1,046 million).

# Net Income

Net income surged 17.7%, to ¥72.5 billion ($615 million), the 11th consecutive gain and the ninth consecutive record high. Ricoh remeasured its deferred tax assets and liabilities in response to the introduction of a corporate enterprise tax system and other changes in tax laws. Ricoh posted losses on minority holdings in measuring equipment affiliates. Subject to approval at the ordinary general meeting of shareholders on June 26, 2003, management plans to make cash dividends for fiscal 2003 of ¥14.00 ($0.12). This is in keeping with management's commitment to ensuring solid shareholder returns.

# Segment Information

## CONSOLIDATED SALES BY PRODUCT LINE

### 1. Office Equipment

To help customers more efficiently manage their total document volume, the Ricoh Group proposes solutions that optimize total printing costs. Ricoh is thus shifting away from standalone analog equipment toward digital, networking, and color and high-speed technologies.

These efforts allowed Ricoh to greatly expand sales of MFPs, laser printers, and other printing systems during the year while increasing revenues from useware, software, and other solutions businesses.

In Japan, sales of personal computer and servers declined, primarily because of poor economic conditions and sluggish demand for information technology.

Overseas sales increased, particularly in Europe and other regions. Demand was slow in the United States, owing largely to an economic slowdown in that nation and turmoil in the Middle East, while the yen's rise against the dollar also affected operations.

Nonetheless, Ricoh performed solidly because of its strengthened sales networks in the United States. Sales of office equipment thus advanced 2.4%, to ¥1,520.5 billion ($12,886 million).

### Imaging Solutions

In digital imaging systems, Ricoh strengthened its lineup with new digital plain-paper copiers (PPCs), which cover everything from such low-end models as the Aficio 1013/1015 (Imagio MF 1340/1540 in Japan) series to high-speed models, notably the Aficio 2105 (Imagio Neo 1050 Pro). Domestic sales of digital imaging systems were down because of the depressed economy and the shift toward printing systems. Overseas, sales decreased for fax machines and other imaging solutions, although digital PPC sales improved in Europe and other regions. As a result of these factors, overall sales of digital imaging systems dropped 4.2%. In other imaging systems, sales fell 16.8%, reflecting the trend away from analog to MFPs and other digital equipment. Sales of imaging solutions decreased 8.0%, to ¥859.7 billion ($7,285 million), reflecting Ricoh's strategies. Imaging solutions accounted for 49.5% of consolidated net sales, down 6.3 percentage points.

### Network Input/Output Systems

Here, Ricoh released fast, more networkable, and color offerings and further expanded sales of printing equipment to meet customer needs.

In MFPs, the Aficio 1075/1060 (Imagio Neo 750/600) series and Aficio 1050 (Imagio Neo 105 Pro) contributed to sales growth.

In laser printers, sales rose for the AP 3800C (IPSiO Color 6000/7100). Overall sales of printing systems thus increased 36.6%. Sales of other input/output systems gained 21.2%. Although up a year earlier, domestic sales of CD-R/RW drives and media decreased due to a trend toward DVDs based on new standards. In contrast, sales improved for DVD drives and media in the United States and for

CD-R/RW shipments to other regions. Sales of network input/output systems thus advanced 34.6%, to ¥463.3 billion ($3,927 million). This segment represented 26.7% of net sales, up 6.1 percentage points.

### Network System Solutions

Ricoh strengthened its solutions businesses, such as useware, document management and software. These areas allow Ricoh to help customers optimize their total printing costs. Sales in Japan and overseas increased steadily during the year. In contrast, sales of personal computers and servers continued to decline in Japan, reflecting sluggish information technology spending.

### 2. Other Businesses

Sales in this segment increased 16.5%, to ¥217.7 billion ($1,846 million). This improvement reflected a recovery in the domestic semiconductor business, as well as solid results in Europe and other regions. On top of that, Ricoh enjoyed steady gains in leasing and other operations. In contrast, sales decreased for measuring equipment because of a stagnant business cycle.

### CONSOLIDATED SALES BY GEOGRAPHIC AREA

### 1. Japan

Although the domestic economy remained very unfavorable, Ricoh responded to customer needs by pursuing product and sales strategies that boosted sales of printing systems, such as MFPs and printers.

In the solutions business, Ricoh's proposals for improving total cost performance were well received, leading to higher sales in this area. At the same time, sales of standalone analog equipment fell amid the shift toward MFPs and color models, while personal computer and server sales also declined.

In other businesses, the adverse business cycle dampened sales of measuring equipment, while demand for semiconductors began to recover.

As a result, sales in Japan decreased 0.7%, to ¥896.0 billion ($7,593 million). Domestic operations accounted for 51.5% of net sales, down 2.5 percentage points.

### 2. The Americas

Ricoh further broadened and reinforced its sales network, especially in North America, against a background of a slower U.S. economy, the turmoil in the Middle East and severe competition.

Ricoh stepped up sales of new printing systems that matched a demand shift away from analog offerings toward networked digital PPCs and color models, and strove to expand sales to major accounts. Sales were solid for DVD drives and media based on new standards.

Sales in the Americas increased 0.6%, to ¥343.9 billion ($2,915 million). After factoring out the yen's appreciation against the dollar, regional sales gained 3.2%.

### 3. Europe

With European economies remaining relatively stable, sales of digital PPCs and printing systems increased. Ricoh strengthened its sales network to reinforce its brand clout. These efforts helped Ricoh to maintain its top share of the European market for copiers and MFPs. The yen's depreciation against the euro contributed to performance.

Sales in Europe thus increased 13.9%, to ¥354.4 billion ($3,004 million).

### 4. Other

In China and other Asian markets, a full-fledged shift in business equipment to digital networked and color models led to an increase in sales of digital PPCs and printing systems. Demand for optical discs also continued to improve, while semiconductor sales remained solid.

Sales in this segment increased 23.4%, to ¥143.9 billion ($1,220 million). During the term, Ricoh established a regional headquarters in Shanghai to reinforce its operations in the promising Chinese market. Ricoh aims to further integrate its production, sales, and services while focusing even more on customer needs to strengthen its revenues and earnings in China.

## Financial Position

Cash and cash equivalents and time deposits rose in line with marketable securities repayments and maturities. Trade receivables decreased, reflecting additional collections in Japan and the United States. Inventories declined owing to the impact of supply chain management and other initiatives. Fixed assets decreased, as Ricoh kept capital expenditures at less than depreciation. Finance receivables rose, mainly in Japan, and other investments were up, reflecting purchases of marketable securities and an increase in deferred income taxes. As a result, total assets were ¥1,884.9 billion ($15,974 million) at the close of fiscal 2003, up ¥51.9 billion from a year earlier.

## LONG-TERM INDEBTEDNESS
(Excluding capital lease obligations and SFAS No. 133 fair value adjustment)

| | Average pay rate | Total | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 and thereafter | Fair Value |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Expected maturity date (Millions of yen) | | | | | |
| Bonds | 1.35% | ¥154,910 | ¥14,910 | ¥10,000 | ¥ 40,000 | ¥45,000 | ¥10,000 | ¥35,000 | ¥160,124 |
| Medium-Term Notes | 0.21 | 24,000 | 9,000 | 12,000 | 3,000 | — | — | — | 24,028 |
| Loans | 1.61 | 212,595 | 29,096 | 62,860 | 82,286 | 10,809 | 17,110 | 10,434 | 212,757 |
| Total | | ¥391,505 | ¥53,006 | ¥84,860 | ¥125,286 | ¥55,809 | ¥27,110 | ¥45,434 | ¥396,909 |

| | Average pay rate | Total | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 and thereafter | Fair Value |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Expected maturity date (Thousands of U.S. dollars) | | | | | |
| Bonds | 1.35% | $1,312,797 | $126,356 | $84,746 | $ 338,983 | $381,356 | $84,746 | $296,610 | $1,356,983 |
| Medium-Term Notes | 0.21 | 203,389 | 76,271 | 101,695 | 25,423 | — | — | — | 203,627 |
| Loans | 1.61 | 1,801,653 | 246,576 | 532,712 | 697,339 | 91,602 | 145,000 | 88,424 | 1,803,025 |
| Total | | $3,317,839 | $449,203 | $719,153 | $1,061,745 | $472,958 | $229,746 | $385,034 | $3,363,635 |

## INTEREST RATE SWAPS

| Notional amounts (Millions) | Type of swap | Average receive rate | Average pay rate | Total | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 and thereafter | Fair Value |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Expected maturity date (Millions of yen) | | | | | |
| ¥ 59,179 | Receive floating/Pay fixed | 0.08% | 0.36% | ¥59,179 | ¥ 229 | ¥ 4,950 | ¥52,000 | ¥2,000 | ¥ — | ¥ — | ¥3,961 |
| 79,000 | Receive fixed/Pay floating | 1.98 | 0.11 | 79,000 | 18,000 | 17,000 | 19,000 | 1,000 | 6,000 | 18,000 | (206) |
| US$ 20 | Receive floating/Pay floating | 7.36% | 1.96% | ¥ 2,404 | ¥ — | ¥ 2,404 | ¥ — | ¥ — | ¥ — | ¥ — | ¥ 230 |

| Notional amounts (Millions) | Type of swap | Average receive rate | Average pay rate | Total | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 and thereafter | Fair Value |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Expected maturity date (Thousands of U.S. dollars) | | | | | |
| ¥ 59,179 | Receive floating/Pay fixed | 0.08% | 0.36% | $501,517 | $ 1,941 | $ 41,949 | $440,678 | $16,949 | $ — | $ — | $33,568 |
| 79,000 | Receive fixed/Pay floating | 1.98 | 0.11 | 669,491 | 152,542 | 144,068 | 161,017 | 8,475 | 50,847 | 152,542 | (1,746) |
| US$ 20 | Receive floating/Pay floating | 7.36% | 1.96% | $ 20,373 | $ — | $ 20,373 | $ — | $ — | $ — | $ — | $ 1,949 |

Trade payables rose from a year earlier. Interest-bearing debt was down because of redemptions and conversions of convertible bonds and efforts to reduce borrowings. Other current liabilities and retirement benefit obligations expanded. Total liabilities thus rose ¥25.2 billion, to ¥1,174.1 billion ($9,950 million).

Common stock and additional paid-in capital rose owing to convertible bond conversions. Accumulated other comprehensive loss declined, reflecting pension liability adjustments.

Total shareholders' investment thus expanded ¥24.4 billion, to ¥657.5 billion ($5,572 million).

## Cash Flows

Net cash provided by operating activities was up ¥80.6 billion, to ¥185.7 billion ($1,574 million). This owed to higher net income and depreciation and amortization and decreases in trade receivable and in inventories as a result of strong supply chain management.

Net cash used in investing activities increased ¥16.7 billion, to ¥98.1 billion ($832 million). This stemmed from higher capital expenditures for new production lines and additions to bond investments.

Free cash flow generated by operating and investing activities thus totaled ¥87.5 billion ($742 million), up ¥63.8 billion.

Net cash used in financing activities was ¥67.1 billion ($569 million), compared with ¥36.2 billion provided by such activities in fiscal 2002. This reflected reductions in interest-bearing debt to harness Group funds more efficiently. Outlays included dividend payments of ¥10.1 billion ($86 million) and expenses of ¥17.2 billion ($146 million) to secure treasury stock.

As a result of these factors, cash and cash equivalents at the close of the term were ¥19.0 billion higher than a year earlier, at ¥189.2 billion ($1,604 million).

## Capital Expenditures

Capital expenditures for fiscal 2001, 2002 and 2003 were ¥73.3 billion, ¥75.6 billion and ¥73.9 billion ($627 million), respectively. Ricoh allocates significant portions of capital expenditures to digital and networking equipment, such as digital PPCs, MFPs, and laser printers, and manufacturing facilities to maintain and enhance competitiveness.

Ricoh also invests in information systems to support such back office operations as procurement, accounting, and intellectual property management.

In the year under review, Ricoh began to construct new accounting and intellectual property management systems. Management expects capital expenditures to reach about ¥75.0 billion in fiscal 2004.

## Key Financial Ratios

We have provided the following ratios to facilitate analysis of Ricoh's operations for fiscal 2001, 2002, and 2003.

|  | Fiscal 2001 | Fiscal 2002 | Fiscal 2003 |
|---|---|---|---|
| Return on sales | 3.5% | 3.7% | 4.2% |
| Return on shareholders' investment | 9.7% | 10.4% | 11.2% |
| Current ratio | 1.00 | 1.30 | 1.40 |
| Debt-to-equity ratio (interest-bearing debt to shareholders' investment) | 0.97 | 0.89 | 0.74 |
| Interest coverage | 14.5 | 16.3 | 20.1 |

## Market Risk

### MARKET RISK EXPOSURE

Ricoh is exposed to market risks primarily from changes in foreign currency exchange rates and interest rates, which affect outstanding debt and certain assets and liabilities denominated in foreign currencies.

To a lesser extent, Ricoh is also exposed to equity price risk. To manage these risks that arise in the normal course of business, Ricoh enters into various hedging transactions pursuant to its policies and procedures covering such areas as counterparty exposure and hedging practices. Ricoh does not hold or issue derivative financial instruments for trading purposes or to generate income.

Ricoh regularly assesses these market risks based on the policies and procedures established to protect against adverse effects of these risks and other potential exposures, primarily by reference to the market value of the financial instruments. As a result of the latest assessment, Ricoh does not anticipate any material losses in these

## FOREIGN EXCHANGE FORWARD CONTRACTS

|  | Average contractual rates | Millions of yen | | Thousands of U.S. dollars | |
|---|---|---|---|---|---|
|  |  | Contract amounts | Estimated fair value | Contract amounts | Estimated fair value |
| US$/¥ | 120.41 | ¥ 1,204 | ¥ 3 | $ 10,203 | $ 25 |
| EUR/¥ | 125.67 | 14,238 | (418) | 120,661 | (3,542) |

areas for fiscal 2003, and there were no material quantitative changes in market risk exposure at March 31, 2003.

In the normal course of business, Ricoh also faces risks that are either nonfinancial or unquantifiable. Such risks principally include credit and legal risk, and are not represented in the tables.

### FOREIGN CURRENCY RISK

In the ordinary course of business, Ricoh uses foreign exchange forward contracts to manage the effects of foreign currency exchange risk on monetary assets and liabilities denominated in foreign currencies.

Contracts related to operating activities generally have maturities of less than six months, while the contracts related to financing activities have the same maturities as the underlying assets and liabilities.

The table above provides information about Ricoh's material derivative financial instruments that are sensitive to foreign currency exchange rates.

The table relating to foreign exchange forward contracts presents the notional amounts, weighted average exchange rates and estimated fair value. These notional amounts generally are used to calculate the contractual payments to be exchanged under the contracts.

### INTEREST RATE RISK

In the ordinary course of business, Ricoh enters into interest rate swap agreements to reduce interest rate risk and to modify the interest rate characteristics of its outstanding debt. These agreements primarily involve the exchange of fixed and floating rate interest payments over the life of the agreement without the exchange of the underlying principal amounts. The table on page 21 provides information about Ricoh's major derivative and other financial instruments that are sensitive to changes in interest rates, including interest rate swaps and debt obligations. For debt obligations, the table presents principal cash flows by expected maturity date, related weighted average interest rates and estimated fair value. For interest rate swaps, the table presents notional amounts by expected

maturity date, weighted average interest rates and estimated fair value. Notional amounts are generally used to calculate the contractual payments to be exchanged under the contract.

### CREDIT RISK

Ricoh is also exposed to credit-related losses in the event of nonperformance by counterparties to financial instruments. However, credit risk arising from the failure of counterparties to meet the terms of financial instrument contracts is generally limited to the amounts by which the counterparties' obligations exceed the obligations of Ricoh. It is Ricoh's policy only to enter into financial instrument contracts with a diversified group of financial institutions having credit ratings satisfactory to Ricoh to minimize the concentration of credit risk. Therefore, Ricoh does not expect to incur material credit losses on its financial instruments.

### EQUITY PRICE RISK

A relatively small portion of Ricoh's marketable securities is subject to equity price risk arising from changes in their market prices. Marketable securities consist of a diversified pool of Japanese equities. Ricoh's overall investment policy is to invest in highly-liquid, low risk investments.

The table below provides information about contractual maturities for available-for-sale securities and the fair values for market risk sensitive securities as of March 31, 2003.

|  | Millions of yen | | Thousands of U.S. dollars | |
|---|---|---|---|---|
|  | Cost | Fair value | Cost | Fair value |
| Debt securities |  |  |  |  |
| Due within one year | ¥ 107 | ¥ 107 | $ 907 | $ 907 |
| Due within one year through five years | 45,020 | 44,830 | 381,525 | 379,915 |
| Equity securities | 6,328 | 10,957 | 53,628 | 92,856 |
| Investment trusts* | 9,459 | 8,815 | 80,161 | 74,704 |
| Total | ¥60,914 | ¥64,709 | $516,221 | $548,382 |

* Investment trusts consist of investments in marketable debt and equity securities.

## Selected Financial Data

Ricoh Company, Ltd. and Consolidated Subsidiaries
For the Years Ended March 31

| | 1994 | 1995 |
|---|---|---|
| **For the Year:** | | |
| Net sales | ¥ 968,318 | ¥1,020,296 |
| Cost of sales | 605,958 | 628,071 |
| Selling, general and administrative expenses | 326,352 | 339,891 |
| Income before income taxes, minority interests and equity in earnings of affiliates | 26,167 | 41,674 |
| Provision for income taxes | 18,233 | 24,931 |
| Net income | 9,520 | 18,593 |
| | | |
| Capital expenditures | 44,928 | 45,437 |
| Depreciation and amortization | 49,155 | 44,960 |
| **Per Share Data** (in yen and dollars): | | |
| Net income: | | |
| Basic | ¥    14.61 | ¥    28.54 |
| Diluted | 14.47 | 26.43 |
| Cash dividends paid | 10.00 | 10.00 |
| **At Year-End:** | | |
| Total assets | ¥1,238,275 | ¥1,320,617 |
| Long-term indebtedness | 337,592 | 386,535 |
| Shareholders' investment | 349,945 | 377,840 |
| Working capital | 116,108 | 142,021 |
| Return on sales | 1.0% | 1.8% |
| Return on shareholders' investment | 2.7 | 5.1 |
| **Common Stock Price Range** (in yen and dollars): | | |
| High | ¥     849 | ¥    1,020 |
| Low | 561 | 726 |

| | | Millions of yen | | | | | | Thousands of U.S. dollars |
|---|---|---|---|---|---|---|---|---|
| 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2003 |
| ¥1,113,030 | ¥1,316,072 | ¥1,403,348 | ¥1,425,999 | ¥1,447,157 | ¥1,538,262 | ¥1,672,340 | ¥1,738,358 | $14,731,847 |
| 683,406 | 772,238 | 838,440 | 857,423 | 867,148 | 924,893 | 972,394 | 993,009 | 8,415,330 |
| 374,246 | 460,471 | 475,201 | 495,029 | 491,088 | 508,264 | 570,251 | 611,695 | 5,183,856 |
| 51,020 | 66,905 | 68,428 | 53,054 | 70,393 | 97,765 | 113,950 | 123,470 | 1,046,356 |
| 28,251 | 39,864 | 40,210 | 24,555 | 28,363 | 43,512 | 51,147 | 51,984 | 440,542 |
| 21,869 | 28,922 | 30,131 | 30,655 | 41,928 | 53,228 | 61,614 | 72,513 | 614,517 |
| 48,828 | 78,666 | 94,117 | 70,469 | 58,356 | 73,329 | 75,676 | 73,956 | 626,746 |
| 46,430 | 51,000 | 61,971 | 67,456 | 61,946 | 62,142 | 73,782 | 76,551 | 648,737 |
| ¥ 33.55 | ¥ 44.16 | ¥ 44.97 | ¥ 44.33 | ¥ 60.61 | ¥ 76.85 | ¥ 88.27 | ¥ 99.79 | $ 0.85 |
| 31.21 | 38.95 | 41.35 | 40.94 | 56.06 | 71.02 | 82.46 | 96.81 | 0.82 |
| 10.00 | 11.00 | 11.50 | 11.00 | 11.00 | 11.50 | 12.00 | 14.00 | 0.12 |
| ¥1,508,519 | ¥1,644,896 | ¥1,660,496 | ¥1,628,017 | ¥1,543,320 | ¥1,704,791 | ¥1,832,928 | ¥1,884,922 | $15,973,915 |
| 411,023 | 386,918 | 295,536 | 344,580 | 307,962 | 217,743 | 332,995 | 345,902 | 2,931,373 |
| 401,471 | 422,923 | 475,005 | 487,459 | 541,506 | 556,728 | 633,020 | 657,514 | 5,572,153 |
| 139,163 | 77,527 | 31,681 | 176,161 | 187,553 | (29) | 197,967 | 233,930 | 1,982,458 |
| 2.0% | 2.2% | 2.1% | 2.1% | 2.9% | 3.5% | 3.7% | 4.2% | — |
| 5.6 | 7.0 | 6.7 | 6.4 | 8.1 | 9.7 | 10.4 | 11.2 | — |
| ¥ 1,230 | ¥ 1,530 | ¥ 1,900 | ¥ 1,634 | ¥ 2,525 | ¥ 2,495 | ¥ 2,735 | ¥ 2,470 | $ 20.93 |
| 650 | 1,050 | 1,270 | 969 | 1,078 | 1,627 | 1,563 | 1,637 | 13.87 |

# Consolidated Balance Sheets

Ricoh Company, Ltd. and Consolidated Subsidiaries
March 31, 2002 and 2003

| ASSETS | Millions of yen | | Thousands of U.S. dollars |
|---|---|---|---|
| | 2002 | 2003 | 2003 |
| **Current Assets:** | | | |
| Cash and cash equivalents | ¥ 170,172 | ¥ 189,243 | $ 1,603,754 |
| Time deposits | 12,478 | 11,087 | 93,958 |
| Marketable securities | 22,935 | 107 | 907 |
| Trade receivables— | | | |
| Notes | 85,269 | 76,022 | 644,254 |
| Accounts | 376,073 | 359,769 | 3,048,890 |
| Less—Allowance for doubtful receivables | (18,943) | (17,849) | (151,263) |
| Inventories— | | | |
| Finished goods | 116,435 | 102,164 | 865,796 |
| Work in process and raw materials | 45,741 | 43,887 | 371,924 |
| Deferred income taxes and other | 53,508 | 58,083 | 492,229 |
| Total current assets | 863,668 | 822,513 | 6,970,449 |
| **Property, Plant and Equipment, at Cost:** | | | |
| Land | 44,542 | 42,990 | 364,322 |
| Buildings | 202,581 | 204,606 | 1,733,949 |
| Machinery and equipment | 663,723 | 660,458 | 5,597,102 |
| Construction in progress | 2,969 | 6,540 | 55,424 |
| | 913,815 | 914,594 | 7,750,797 |
| Less—Accumulated depreciation | (654,435) | (665,842) | (5,642,729) |
| | 259,380 | 248,752 | 2,108,068 |
| **Investments and Other Assets:** | | | |
| Finance receivables | 447,829 | 476,293 | 4,036,381 |
| Investment securities | 28,886 | 71,973 | 609,941 |
| Investments in and advances to affiliates | 47,434 | 45,791 | 388,059 |
| Goodwill | 29,687 | 28,109 | 238,212 |
| Other intangible assets | 37,598 | 40,020 | 339,153 |
| Lease deposits and other | 118,446 | 151,471 | 1,283,652 |
| | 709,880 | 813,657 | 6,895,398 |
| | ¥1,832,928 | ¥1,884,922 | $15,973,915 |

The accompanying notes to consolidated financial statements are an integral part of these balance sheets.

| LIABILITIES AND SHAREHOLDERS' INVESTMENT | Millions of yen | | Thousands of U.S. dollars |
|---|---|---|---|
| | 2002 | 2003 | 2003 |
| **Current Liabilities:** | | | |
| Short-term borrowings | ¥ 161,094 | ¥ 84,478 | $ 715,915 |
| Current maturities of long-term indebtedness | 67,314 | 54,235 | 459,619 |
| Trade payables— | | | |
| Notes | 35,481 | 32,943 | 279,178 |
| Accounts | 242,272 | 247,855 | 2,100,466 |
| Accrued income taxes | 33,356 | 42,393 | 359,263 |
| Accrued expenses and other | 126,184 | 126,679 | 1,073,550 |
| Total current liabilities | 665,701 | 588,583 | 4,987,991 |
| | | | |
| **Long-Term Liabilities:** | | | |
| Long-term indebtedness | 332,995 | 345,902 | 2,931,373 |
| Accrued pension and severance costs | 119,572 | 209,011 | 1,771,280 |
| Deferred income taxes | 30,592 | 30,653 | 259,771 |
| | 483,159 | 585,566 | 4,962,424 |
| **Minority Interests** | 51,048 | 53,259 | 451,347 |
| | | | |
| **Commitments and Contingent Liabilities (Note 16)** | | | |
| | | | |
| **Shareholders' Investment:** | | | |
| Common stock: | | | |
| Authorized—1,000,000,000 shares in 2002 and 993,000,000 shares in 2003 | | | |
| Issued and outstanding—727,278,256 shares and 727,086,738 shares in 2002 | | | |
| and  744,912,078 shares and 742,608,635 shares in 2003 | 120,461 | 135,364 | 1,147,153 |
| Additional paid-in capital | 171,628 | 186,521 | 1,580,686 |
| Retained earnings | 385,741 | 434,748 | 3,684,305 |
| Accumulated other comprehensive income (loss) | (44,376) | (94,733) | (802,822) |
| Treasury stock at cost; 191,518 shares in 2002 and 2,303,443 shares in 2003 | (434) | (4,386) | (37,169) |
| Total shareholders' investment | 633,020 | 657,514 | 5,572,153 |
| | ¥1,832,928 | ¥1,884,922 | $15,973,915 |

# Consolidated Statements of Income

| Ricoh Company, Ltd. and Consolidated Subsidiaries<br>For the Years Ended March 31, 2001, 2002 and 2003 | Millions of yen | | | Thousands of<br>U.S. dollars |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2003 |
| **Net Sales** | ¥1,538,262 | ¥1,672,340 | ¥1,738,358 | $14,731,847 |
| **Cost of Sales** | 924,893 | 972,394 | 993,009 | 8,415,330 |
| Gross profit | 613,369 | 699,946 | 745,349 | 6,316,517 |
| **Selling, General and Administrative Expenses** | 508,264 | 570,251 | 611,695 | 5,183,856 |
| Operating income | 105,105 | 129,695 | 133,654 | 1,132,661 |
| **Other (Income) Expenses:** | | | | |
| Interest and dividend income | (8,045) | (4,753) | (3,772) | (31,966) |
| Interest expense | 7,787 | 8,233 | 6,853 | 58,076 |
| Foreign currency exchange (gain) loss, net | (3,490) | 5,732 | 566 | 4,797 |
| Other, net | 11,088 | 6,533 | 6,537 | 55,398 |
| Total | 7,340 | 15,745 | 10,184 | 86,305 |
| **Income before Income Taxes, Minority Interests and Equity in Earnings of Affiliates** | 97,765 | 113,950 | 123,470 | 1,046,356 |
| **Provision for Income Taxes:** | | | | |
| Current | 53,506 | 52,365 | 63,183 | 535,449 |
| Deferred | (9,994) | (1,218) | (11,199) | (94,907) |
| Total | 43,512 | 51,147 | 51,984 | 440,542 |
| **Income before Minority Interests and Equity in Earnings of Affiliates** | 54,253 | 62,803 | 71,486 | 605,814 |
| **Minority Interests** | 3,123 | 3,080 | 1,376 | 11,661 |
| **Equity in Earnings of Affiliates** | 2,098 | 1,891 | 2,403 | 20,364 |
| **Net Income** | ¥ 53,228 | ¥ 61,614 | ¥ 72,513 | $ 614,517 |
| | Yen | | | U.S. dollars |
| **Per Share of Common Stock:** | | | | |
| Net income: | | | | |
| Basic | ¥ 76.85 | ¥ 88.27 | ¥ 99.79 | $ 0.85 |
| Diluted | 71.02 | 82.46 | 96.81 | 0.82 |
| Cash dividends paid | ¥ 11.50 | ¥ 12.00 | ¥ 14.00 | $ 0.12 |
| **Per American Depositary Share, Each Representing 5 Shares of Common Stock:** | | | | |
| Net income: | | | | |
| Basic | ¥ 384.25 | ¥ 441.35 | ¥ 498.95 | $ 4.23 |
| Diluted | 355.10 | 412.30 | 484.05 | 4.10 |
| Cash dividends paid | ¥ 57.50 | ¥ 60.00 | ¥ 70.00 | $ 0.59 |

The accompanying notes to consolidated financial statements are an integral part of these statements.

# Consolidated Statements of Shareholders' Investment

| Ricoh Company, Ltd. and Consolidated Subsidiaries For the Years Ended March 31, 2001, 2002 and 2003 | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2003 |
| **Common Stock:** | | | | |
| Beginning balance | ¥103,112 | ¥103,434 | ¥120,461 | $1,020,856 |
| Conversion of convertible bonds; 672,625 shares in 2001, 34,522,672 shares in 2002, and 24,633,822 shares in 2003 | 322 | 17,027 | 14,903 | 126,297 |
| Ending balance | ¥103,434 | ¥120,461 | ¥135,364 | $1,147,153 |
| **Additional Paid-in Capital:** | | | | |
| Beginning balance | ¥154,314 | ¥154,635 | ¥171,628 | $1,454,474 |
| Conversion of convertible bonds | 321 | 16,993 | 14,893 | 126,212 |
| Ending balance | ¥154,635 | ¥171,628 | ¥186,521 | $1,580,686 |
| **Retained Earnings:** | | | | |
| Beginning balance | ¥287,182 | ¥332,447 | ¥385,741 | $3,268,991 |
| Net income for the year | 53,228 | 61,614 | 72,513 | 614,517 |
| Dividends declared and approved | (7,963) | (8,320) | (10,178) | (86,254) |
| Retirement of treasury stock; 7,000,000 shares in 2003 | — | — | (13,328) | (112,949) |
| Ending balance | ¥332,447 | ¥385,741 | ¥434,748 | $3,684,305 |
| **Accumulated Other Comprehensive Income (Loss):** | | | | |
| Beginning balance | ¥ (3,102) | ¥ (33,788) | ¥ (44,376) | $ (376,068) |
| Foreign currency translation adjustments | (1,740) | 6,516 | 1,007 | 8,534 |
| Unrealized gains (losses) on securities, net of reclassification adjustment | (6,967) | (766) | (1,984) | (16,814) |
| Unrealized gains (losses) on derivatives, net of reclassification adjustment | — | (207) | 29 | 246 |
| Minimum pension liability adjustments | (21,979) | (16,131) | (49,409) | (418,720) |
| Ending balance | ¥(33,788) | ¥ (44,376) | ¥ (94,733) | $ (802,822) |
| **Treasury stock:** | | | | |
| Beginning balance | — | ¥ — | ¥ (434) | $ (3,678) |
| Purchase of treasury stock; 446,928 shares in 2002 and 9,111,925 shares in 2003 | — | (1,083) | (17,280) | (146,440) |
| Sales of treasury stock; 269,000 shares in 2002 | — | 649 | — | — |
| Retirement of treasury stock; 7,000,000 shares in 2003 | — | — | 13,328 | 112,949 |
| Ending balance | — | ¥ (434) | ¥ (4,386) | $ (37,169) |
| **Comprehensive Income:** | | | | |
| Net income for the year | ¥ 53,228 | ¥ 61,614 | ¥ 72,513 | $ 614,517 |
| Other comprehensive income (loss) for the year, net of tax | (30,686) | (10,588) | (50,357) | (426,754) |
| Total comprehensive income for the year | ¥ 22,542 | ¥ 51,026 | ¥ 22,156 | $ 187,763 |

The accompanying notes to consolidated financial statements are an integral part of these statements.

29

# Consolidated Statements of Cash Flows

| Ricoh Company, Ltd. and Consolidated Subsidiaries<br>For the Years Ended March 31, 2001, 2002 and 2003 | Millions of yen | | | Thousands of<br>U.S. dollars |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2003 |
| **Cash Flows from Operating Activities:** | | | | |
| Net income | ¥ 53,228 | ¥ 61,614 | ¥ 72,513 | $ 614,517 |
| Adjustments to reconcile net income to net cash | | | | |
| provided by operating activities— | | | | |
| Depreciation and amortization | 62,142 | 73,782 | 76,551 | 648,737 |
| Equity in earnings of affiliates, net of dividends received | (1,056) | (1,260) | (1,167) | (9,890) |
| Deferred income taxes | (9,994) | (1,218) | (9,289) | (78,720) |
| Losses on disposals and sales of property, plant and equipment | 2,223 | 1,665 | 1,975 | 16,737 |
| Changes in assets and liabilities, net of effects from acquisition— | | | | |
| (Increase) decrease in trade receivables | (32,476) | (20,006) | 22,176 | 187,932 |
| (Increase) decrease in inventories | (7,167) | 21,194 | 14,983 | 126,975 |
| Increase in finance receivables | (15,127) | (13,620) | (33,109) | (280,585) |
| (Decrease) increase in trade payables | 16,235 | (19,535) | 5,632 | 47,729 |
| (Decrease) increase in accrued income taxes and | | | | |
| accrued expenses and other | 27,310 | (13,592) | 11,173 | 94,686 |
| Increase in accrued pension and severance costs | 1,667 | 8,374 | 7,806 | 66,153 |
| Other, net | 5,743 | 7,740 | 16,498 | 139,814 |
| Net cash provided by operating activities | 102,728 | 105,138 | 185,742 | 1,574,085 |
| **Cash Flows from Investing Activities:** | | | | |
| Proceeds from sales of property, plant and equipment | 1,120 | 756 | 245 | 2,076 |
| Expenditures for property, plant and equipment | (73,040) | (75,231) | (71,984) | (610,034) |
| Payments for purchases of available-for-sale securities | (23,395) | (10,025) | (52,219) | (442,534) |
| Proceeds from sales of available-for-sale securities | 66,778 | 24,568 | 24,513 | 207,737 |
| (Increase) decrease in time deposits | 6,797 | (477) | 944 | 8,000 |
| Payments for acquisition of Lanier Worldwide, Inc., net of cash acquired | (28,103) | — | — | — |
| Other, net | (10,354) | (21,012) | 302 | 2,560 |
| Net cash used in investing activities | (60,197) | (81,421) | (98,199) | (832,195) |
| **Cash Flows from Financing Activities:** | | | | |
| Proceeds from long-term loans | 33,183 | 71,075 | 58,194 | 493,169 |
| Repayment of long-term loans | (114,701) | (79,640) | (23,133) | (196,042) |
| (Decrease) increase in short-term borrowings, net | 5,565 | (39,414) | (73,393) | (621,975) |
| Proceeds from issuance of long-term debt securities | — | 103,500 | 11,000 | 93,220 |
| Repayment of long-term debt securities | (2,990) | (10,000) | (11,723) | (99,347) |
| Dividend payments | (7,964) | (8,322) | (10,176) | (86,237) |
| Payment for purchase of treasury stock | — | (1,054) | (17,281) | (146,449) |
| Other, net | (1,475) | 90 | (631) | (5,347) |
| Net cash provided by (used in) financing activities | (88,382) | 36,235 | (67,143) | (569,008) |
| **Effect of Exchange Rate Changes on Cash and Cash Equivalents** | 975 | 2,474 | (1,329) | (11,263) |
| **Net Increase (Decrease) in Cash and Cash Equivalents** | (44,876) | 62,426 | 19,071 | 161,619 |
| **Cash and Cash Equivalents at Beginning of Year** | 152,622 | 107,746 | 170,172 | 1,442,135 |
| **Cash and Cash Equivalents at End of Year** | ¥107,746 | ¥170,172 | ¥189,243 | $1,603,754 |
| **Supplemental Disclosures of Cash Flow Information:** | | | | |
| Cash Paid during the Year for— | | | | |
| Interest | ¥ 13,749 | ¥ 9,418 | ¥ 7,300 | $ 61,864 |
| Income taxes | 57,192 | 53,129 | 52,154 | 441,983 |

The accompanying notes to consolidated financial statements are an integral part of these statements.

# Notes to Consolidated Financial Statements

Ricoh Company, Ltd. and Consolidated Subsidiaries

## 1. NATURE OF OPERATIONS

Ricoh Company, Ltd. (the "Company"), was established in 1936, and is head-quartered in Tokyo, Japan. The Company and its consolidated subsidiaries ("Ricoh" as a consolidated group) is a worldwide supplier of office automation equipment, including copiers, facsimile machines, data processing systems, print-ers and related supplies. Ricoh is also well known for its state-of-the-art electronic devices, digital photographic equipment, and other products.

Ricoh distributes its products primarily through domestic (Japanese) and for-eign sales subsidiaries. Overseas, Ricoh owns and distributes not only Ricoh brand products but also other brands, such as Gestetner, Lanier and Savin.

Ricoh manufactures its products primarily in 15 plants in Japan and 7 plants overseas, which are located in the United States, United Kingdom, France, and China.

## 2. SIGNIFICANT ACCOUNTING AND REPORTING POLICIES

The accompanying consolidated financial statements of Ricoh have been prepared in conformity with accounting principles generally accepted in the United States of America. Significant accounting and reporting policies are summarized below:

### (a) Basis of Presentation

The accompanying consolidated financial statements for the three years ended March 31, 2003 are presented in Japanese yen, the functional currency of the Company and its domestic subsidiaries. The translation of Japanese yen into U.S. dollar equivalents for the year ended March 31, 2003 is included solely for the convenience of readers outside Japan and has been made using the exchange rate of ¥118 to US$1, the approximate rate of exchange prevailing at the Federal Reserve Bank of New York on March 31, 2003.

The books of the Company and its domestic subsidiaries are maintained in conformity with Japanese accounting principles and practices, while foreign sub-sidiaries maintain their books in conformity with the standards of their country of domicile.

The accompanying consolidated financial statements reflect necessary adjustments, not recorded in the books, to present them in conformity with accounting principles generally accepted in the United States of America.

### (b) Principles of Consolidation

The accompanying consolidated financial statements include the accounts of Ricoh. Investments in entities in which Ricoh has the ability to exercise signifi-cant influence over the entities' operating and financial policies (generally 20 to 50 percent ownership) are accounted for on an equity basis. All significant inter-company balances and transactions have been eliminated in consolidation.

The accounts of certain consolidated subsidiaries have been included on the basis of fiscal periods ended within three months prior to March 31.

### (c) Revenue Recognition

Ricoh generates revenue principally through the sale of equipment, supplies and related services under separate contractual arrangements for each. Generally, Ricoh recognizes revenue when (1) it has a firm contract, (2) the product has been shipped to and accepted by the customer or the service has been provided, (3) the sales price is fixed or determinable and (4) amounts are reasonably assured of collection.

Most equipment sales require that Ricoh install the product. As such, revenue is recognized at the time of delivery and installation at the customer location. Equipment revenues are based on established prices by product type and model and are net of discounts and trade-in allowances. A sales return is accepted only when the equipment is defective and does not meet Ricoh's product performance specifications. Other than installation, there are no customer acceptance clauses in the sales contract.

Service revenues result primarily from maintenance contracts that are nor-mally entered into at the time the equipment is sold. Standard service fee prices are established depending on equipment classification and include a cost value for the estimated services to be performed based on historical experience plus a profit margin thereon. As a matter of policy, Ricoh does not discount such prices. On a monthly basis, maintenance service revenues are earned and recognized by Ricoh and billed to the customer in accordance with the contract and include a fixed monthly fee plus a variable amount based on usage. The length of the con-tract ranges up to five years, however, most contracts are cancelable at any time by the customer upon a short notice period.

### (d) Foreign Currency Translation

For foreign operations with functional currencies other than Japanese yen, assets and liabilities are translated at the exchange rates in effect at each fiscal year-end, and income and expenses are translated at the average rates of exchange prevail-ing during each fiscal year. The resulting translation adjustments are included as a part of accumulated other comprehensive income (loss) in shareholders' investment.

All foreign currency transaction gains and losses are included in other income and expense in the period incurred.

### (e) Cash Equivalents

Cash and cash equivalents include highly liquid investments with maturities of three months or less at the date of purchase.

Beginning April 1, 2002, Ricoh changed its policy concerning which short-term investments are treated as cash equivalents in its consolidated balance sheets and statements of cash flows. Cash equivalents formerly included certifi-cates of deposit and time deposits with maturities of three months or less at the date of purchase. In addition to the above, Ricoh decided to include in cash equivalents other short-term investment securities which are available-for-sale at any time, present insignificant risk of changes in value due to being readily con-vertible into cash and have an original maturity of three months or less, such as money management funds and free financial funds. Ricoh believes this change is preferable, since it expects to utilize such short-term investment securities more significantly in its operating cash management activities. In relation to this change, Ricoh has restated its consolidated balance sheets and consolidated state-ments of cash flows for prior years. The effect of this change on previously reported amounts was to increase cash and cash equivalents by ¥40,784 million, ¥43,289 million and ¥27,664 million with corresponding decreases to marketable securities as of March 31, 2000, 2001 and 2002, respectively, and to decrease net cash used in investing activities by ¥2,531 million and to increase by ¥15,629 million, respectively, for the years ended March 31, 2001 and 2002.

**(f) Derivative Financial Instruments and Hedging Activities**

As discussed further in Note 15, Ricoh manages its exposure to certain market risks, primarily foreign currency and interest rate risks, through the use of derivative instruments. As a matter of policy, Ricoh does not enter into derivative contracts for trading or speculative purposes. On April 1, 2001 Ricoh adopted SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," and SFAS No. 138, "Accounting for Certain Derivative Instruments and Certain Hedging Activities," which require that all derivative instruments be recorded on the balance sheets at their respective fair values. In accordance with the transition provisions of SFAS No. 133, Ricoh recorded a cumulative effect adjustment, net of tax, resulting in a decrease in net income of ¥66 million and a decrease in other comprehensive income (loss) of ¥1,864 million at April 1, 2001.

In accordance with SFAS No. 133, Ricoh, when it enters into a derivative contract, makes a determination as to whether or not for accounting purposes the derivative is part of a hedging relationship. In general, a derivative may be designated as either (1) a hedge of the fair value of a recognized asset or liability or an unrecognized firm commitment ("fair value hedge"), (2) a hedge of the variability of the expected cash flows associated with an existing asset or liability or a forecasted transaction ("cash flow hedge"), or (3) a foreign currency fair value or cash flow hedge ("foreign currency hedge"). Ricoh formally documents all relationships between hedging instruments and hedged items, as well as its risk-management objective and strategy for undertaking various hedge transactions. This process includes linking all derivatives that are designated as fair values, cash flow, or foreign currency hedges to specific assets and liabilities on the consolidated balance sheet or to specific firm commitments or forecasted transactions.

For derivative contracts that are designated and qualify as fair value hedges including foreign currency fair value hedges, the derivative instrument is marked-to-market with gains and losses recognized in current period earnings to offset the respective losses and gains recognized on the underlying exposure. For derivative contracts that are designated and qualify as cash flow hedges including foreign currency cash flow hedges, the effective portion of gains and losses on these contracts is reported as a component of accumulated other comprehensive income (loss) and reclassified into earnings in the same period the hedged item or transaction affects earnings. Any hedge ineffectiveness on cash flow hedges is immediately recognized in earnings. For all derivative instruments that are not designated as part of a hedging relationship and for designated derivative instruments that do not qualify for hedge accounting, the contracts are recorded at fair value with the gain or loss recognized in current period earnings.

Prior to April 1, 2001, gains and losses on qualifying hedges of existing assets or liabilities were included in the carrying amounts of those assets or liabilities and were ultimately recognized in income as part of those carrying amounts. Gains and losses related to qualifying hedges of firm commitments and anticipated transactions were deferred and recognized in income, or as adjustments of carrying amounts, when the hedged transaction occurred.

**(g) Allowance for Doubtful Trade Receivables and Finance Receivables**

Ricoh records allowances for doubtful receivables that are based upon historical experience and specific customer collection issues. The estimated amount of probable credit losses in its existing receivables is determined from the write-off history, adjusted to reflect current economic conditions and specific allowances for receivables including nonperforming leases, impaired loans or other accounts of which Ricoh has concluded it will be unable to collect all amounts due according to original terms of the lease or loan agreement. Account balances are charged-off against the allowances when collection is considered remote.

**(h) Securities**

Ricoh conforms with SFAS No. 115, "Accounting for Certain Investments in Debt and Equity Securities," which requires all investments in debt and marketable equity securities to be classified as either held-to-maturity, trading, or available-for-sale securities. As of March 31, 2002 and 2003, all of Ricoh's investments in debt and marketable equity securities are classified as available-for-sale securities. Those available-for-sale securities are reported at fair value with unrealized gains and losses, net of related taxes, excluded from earnings and reported in accumulated other comprehensive income (loss). Available-for-sale securities, which mature or are expected to be sold in one year, are classified as current assets.

Individual securities classified as available-for-sale securities are reduced to their then fair value for any declines in market value determined to be other than temporary. These impairment losses are charged against earnings at the time that a decline has been determined to be other than temporary based primarily on the financial condition of the issuer and the extent and length of time of the decline. Investments whose market values have declined below cost that extends for nine months are automatically written-down to their then fair value in all cases.

The cost of the securities sold is computed based on the average cost of each security held at the time of sale.

Non-marketable equity securities owned by Ricoh primarily relate to less than 20% owned companies and are stated at cost.

**(i) Inventories**

Inventories are mainly stated at the lower of average cost or net realizable values. Inventory costs include raw materials, labor and manufacturing overheads.

**(j) Property, Plant and Equipment**

For the Company and its domestic subsidiaries, depreciation of property, plant and equipment is computed principally by using the declining-balance method over the estimated useful lives. Most of the foreign subsidiaries have adopted the straight-line method for computing depreciation, which currently accounts for approximately 41% of the consolidated depreciation expense. The depreciation period generally ranges from 5 years to 50 years for buildings and 2 years to 12 years for machinery and equipment.

Effective rates of depreciation for the years ended March 31, 2001, 2002 and 2003 are summarized below:

|  | 2001 | 2002 | 2003 |
|---|---|---|---|
| Buildings | 8.0% | 8.3% | **8.1%** |
| Machinery and equipment | 36.6 | 40.6 | **41.0** |

Certain leased buildings, machinery and equipment are accounted for as capital leases in conformity with SFAS No. 13, "Accounting for Leases." The aggregate cost included in plant and equipment and related accumulated depreciation as of March 31, 2002 and 2003 were as follows:

|  | Millions of yen | | Thousands of U.S. dollars |
|---|---|---|---|
|  | 2002 | 2003 | 2003 |
| Aggregate cost | ¥6,578 | ¥7,339 | $62,195 |
| Accumulated depreciation | 3,965 | 4,036 | 34,203 |

The related future minimum lease payments and the present value of the net minimum lease payments as of March 31, 2003 were ¥4,676 million ($39,627 thousand) and ¥4,237 million ($35,907 thousand), respectively.

Ordinary maintenance and repairs are charged to expense as incurred. Major replacements and improvements are capitalized. When properties are retired or otherwise disposed of, the property and related accumulated depreciation accounts are relieved of the applicable amounts, and any differences are included in earnings.

### (k) Goodwill and Other Intangible Assets

In June 2001, the Financial Accounting Standards Board ("FASB") issued SFAS No. 141, "Business Combinations," and SFAS No. 142, "Goodwill and Other Intangible Assets." SFAS No. 141 requires the use of only the purchase method of accounting for business combinations and refines the definition of intangible assets acquired in a purchase business combination. SFAS No. 142 eliminates the amortization of goodwill and instead requires annual impairment testing thereof. SFAS No. 142 also requires acquired intangible assets with a definite useful life to be amortized over their respective estimated useful lives and reviewed for impairment in accordance with SFAS No. 144. Any acquired intangible asset determined to have an indefinite useful life is not amortized, but instead is tested for impairment based on its fair value until its life would be determined to no longer be indefinite.

Ricoh fully adopted the provisions of SFAS No. 141 and SFAS No. 142 as of April 1, 2002. Goodwill acquired in business combinations completed before July 1, 2001, was amortized until March 31, 2002. In connection with the transitional impairment evaluation, SFAS No. 142 required Ricoh to perform an assessment of whether there was an indication that goodwill was impaired as of April 1, 2002. To accomplish this, Ricoh (1) identified its reporting units, (2) determined the carrying value of each reporting unit by assigning the assets and liabilities, including the existing goodwill and intangible assets, to those reporting units, and (3) determined the fair value of each reporting unit. Ricoh completed the transitional assessment by September 30, 2002, and determined there was no indication that goodwill had been impaired as of April 1, 2002. Ricoh also completed the annual assessment for the year ended March 31, 2003 and determined that no goodwill impairment charge was necessary.

Prior to the adoption of SFAS No. 142, Ricoh classified the cost in excess of fair value of the net assets of companies acquired in purchase transactions as goodwill, and the goodwill was being amortized on a straight-line method over the estimated periods benefited, not to exceed 20 years.

### (l) Pension and Retirement Allowances Plans

The measurement of pension costs and liabilities is determined in accordance with SFAS No. 87, "Employers' Accounting for Pensions." Under SFAS No. 87, changes in the amount of either the projected benefit obligation or plan assets resulting from actual results different from that assumed and from changes in assumptions can result in gains and losses not yet recognized in the consolidated financial statements. Amortization of an unrecognized net gain or loss is included as a component of the net periodic benefit plan cost for a year if, as of the beginning of the year, that unrecognized net gain or loss exceeds 10 percent of the greater of (1) the projected benefit obligation or (2) the fair value of that plan's assets. In such case, the amount of amortization recognized is the resulting excess divided by the average remaining service period of active employees expected to receive benefits under the plan. The expected long-term rate of return on plan assets used for pension accounting is determined based on the historical

long-term rate of return on plan assets. The discount rate is determined based on the rates of return of high-quality fixed-income investments currently available and expected to be available during the period to maturity of the pension benefits.

### (m) Income Taxes

Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences and carryforwards are expected to be realized or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

Income taxes are provided for undistributed earnings of foreign subsidiaries.

### (n) Research and Development Expenses and Advertising Costs

Research and development expenses and advertising costs are expensed as incurred.

### (o) Shipping and Handling Costs

Shipping and handling costs, which mainly include transportation to customers, are included in selling, general and administrative expenses in the consolidated statements of income.

### (p) Impairment or Disposal of Long-Lived Assets

In August 2001, the FASB issued SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets." SFAS No. 144 develops a single accounting model, based on the framework established in SFAS No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of" for long-lived assets to be disposed of by sale, and broadens the scope of what constitutes a business to be disposed of that should be reported as a discontinued operation. The new standard was adopted on April 1, 2002, and did not have a material effect on Ricoh's consolidated financial position or results of operations.

SFAS No. 144 requires that long-lived assets and acquired intangible assets with a definite life are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset or group of assets may not be recoverable. Recoverability of assets to be held and used is assessed by comparing the carrying amount of an asset or asset group to the expected future undiscounted net cash flows of the asset or group of assets. If an asset or group of assets is considered to be impaired, the impairment charge to be recognized is measured as the amount by which the carrying amount of the asset or group of assets exceeds fair value. Long-lived assets meeting the criteria to be considered as held for sale are reported at the lower of their carrying amount or fair value less costs to sell.

Prior to the adoption of SFAS No. 144, Ricoh accounted for long-lived assets in accordance with SFAS No. 121.

### (q) Earnings Per Share

Basic net income per common share is calculated by dividing net income by the weighted-average number of shares outstanding during the period. The calculation of diluted net income per common share is similar to the calculation of basic net income per share, except that the weighted-average number of shares outstanding includes the additional dilution from potential common stock equivalents such as convertible bonds.

### (r) Non-cash Transactions

The following non-cash transactions have been excluded from the consolidated statements of cash flows:

| | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2003 |
| Conversion of convertible bonds | ¥ 1,088 | ¥35,620 | ¥32,905 | $278,856 |
| Capital lease obligations incurred | 289 | 445 | 1,697 | 14,381 |
| Assets and liabilities of Lanier Worldwide, Inc., in 2001: | | | | |
| Fair value of assets acquired | 134,586 | — | — | — |
| Liabilities assumed | 104,623 | — | — | — |
| Retirement of treasury stock | — | — | 13,328 | 112,949 |

### (s) Use of Estimates

Management of the Company has made a number of estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses, including impairment losses of long-lived assets and the disclosures of fair value of financial instruments and contingent assets and liabilities, to prepare these financial statements in conformity with generally accepted accounting principles. Actual results could differ from those estimates.

The Company has identified five areas where it believes assumptions and estimates are particularly critical to the consolidated financial statements. These are revenue recognition, determination of the allowance for doubtful receivables, impairment on long-lived assets and goodwill, realizability of deferred tax assets and pension accounting.

### (t) New Accounting Standards

In June 2001, the FASB issued SFAS No. 143, "Accounting for Asset Retirement Obligations." This statement addresses financial accounting and reporting for obligations associated with the retirement of tangible long-lived assets and the associated asset retirement costs. The new standard will be adopted on April 1, 2003, and is not expected to have a material effect on Ricoh's consolidated financial position or results of operations.

In April 2002, the FASB issued SFAS No. 145, "Rescission of FASB Statements No. 4, 44 and 64, Amendment of FASB Statement 13 and Technical Corrections." SFAS No. 145 requires gains and losses on extinguishments of debt to be classified as gains or losses from continuing operations rather than as extraordinary items as previously required under SFAS No. 4, unless the gains and losses meet the criteria to be classified as extraordinary pursuant to APB 30. SFAS No. 145 also amends SFAS No. 13, "Accounting for Leases," to eliminate an inconsistency between the required accounting for sale-lease back transactions and the required accounting for certain lease modifications that have economic effects that are similar to sale-lease back transactions. The rescission of SFAS No. 4 is effective for transactions occurring after May 15, 2002. The provisions of SFAS No. 145 related to SFAS No. 13 are effective for transactions occurring after May 15, 2002. The adoption of these provisions had no impact on Ricoh's consolidated financial position or results of operations.

In July 2002, the FASB issued SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities." The Statement requires that a liability for costs associated with exit or disposal activities be recognized in the period in which the costs are incurred if a reasonable estimate of fair value can be made. Under current accounting guidance, a liability can be recognized when management has committed to an exit plan. The requirements under SFAS No. 146 are effective prospectively for exit or disposal activities initiated after December 31, 2002. Restatement of previously issued financial statements is not permitted. The adoption of this Statement did not have a material effect on Ricoh's consolidated financial position or results of operations.

In November 2002, the Emerging Issue Task Force ("EITF") reached a final consensus on EITF 00-21, "Revenue Arrangements with Multiple Deliverables." EITF 00-21 addresses certain aspects of the accounting for revenue arrangements with multiple deliverables by a vendor. The Issue outlines an approach to determine when a revenue arrangement for multiple deliverables should be divided into separate units of accounting and, if separation is appropriate, how the arrangement consideration should be allocated to the identified accounting units. The consensus reached in the Issue will be effective for Ricoh in its financial statements beginning July 1, 2003. Ricoh will adopt EITF00-21 in the quarter beginning July 1, 2003. Ricoh is currently determining the impact, if any, of the adoption of EITF 00-21 on Ricoh's consolidated financial position and results of operations.

In November 2002, the FASB issued Interpretation No. 45 (FIN 45), "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness to Others, an interpretation of FASB Statements No. 5, 57 and 107 and a rescission of FASB Interpretation No. 34." This Interpretation elaborates on the disclosures to be made by a guarantor in its financial statements about its obligations under guarantees issued. The Interpretation also clarifies that a guarantor is required to recognize, at inception of a guarantee, a liability for the fair value of the obligation undertaken. The initial recognition and measurement provisions of the Interpretation are applicable to guarantees issued or modified after December 31, 2002. The Interpretation has not had a material effect on Ricoh's consolidated financial position or results of operations.

In January 2003, the FASB issued Interpretation No. 46 (FIN 46), "Consolidation of Variable Interest Entities ("VIEs")," which addresses consolidation by business enterprises of variable interest entities that either: (1) do not have sufficient equity investment at risk to permit the entity to finance its activities without additional subordinated financial support, or (2) the equity investors lack an essential characteristic of a controlling financial interest. Ricoh does not anticipate the adoption of this Interpretation will have any impact on its financial position or results of operations as it presently does not have investments in VIEs.

### (u) Reclassification

Certain reclassifications have been made to the prior years' consolidated financial statements to conform the presentation used for the year ended March 31, 2003.

## 3. ACQUISITION

In January 2001, Ricoh completed a take-over bid for Lanier Worldwide, Inc. ("Lanier"), for cash of ¥29,963 million. As a result of this acquisition, Lanier became a wholly owned subsidiary that distributes Lanier brand name office equipment products in the global marketplace. The acquisition was accounted for using the purchase method of accounting. The cash purchase price has been allocated on Ricoh's balance sheets to the tangible and intangible net assets and resulted in goodwill of ¥25,496 million. The results of operations for Lanier for the post-acquisition period for the two months ended March 31, 2001, and years thereafter are included in the accompanying consolidated statements of income. The following unaudited pro forma information presents the consolidated results of operations for the year ended March 31, 2001, as if the acquisition had occurred as of the beginning of that year:

|  | Millions of yen |
|---|---|
|  | 2001 |
| Net sales | ¥1,624,036 |
| Net income | 49,474 |

|  | Yen |
|---|---|
|  | 2001 |
| Net income per share of common stock— |  |
| Basic | ¥71.43 |
| Diluted | 66.03 |

The pro forma results of operations are not necessarily indicative of the actual results of operations that would have occurred had the acquisition been made at the beginning of the year or the results that may occur in the future.

In December 2002, Ricoh acquired the remaining outstanding shares of Shanghai Ricoh Facsimile Co., Ltd. ("Shanghai Ricoh") for ¥1,745 million ($14,788 thousand). The acquisition of the remaining 45% interest in Shanghai Ricoh was accounted for using the purchase method of accounting and resulted in goodwill of ¥778 million ($6,593 thousand).

## 4. FINANCE RECEIVABLES

Finance receivables as of March 31, 2002 and 2003 are comprised primarily of lease receivables and installment loans.

Ricoh's products are leased to domestic customers primarily through Ricoh Leasing Company, Ltd., a majority-owned domestic subsidiary and to overseas customers primarily through certain overseas subsidiaries. These leases qualify and are accounted for as sales-type leases in conformity with SFAS No. 13. Sales revenue from sales-type leases is recognized at the inception of the leases.

Information pertaining to Ricoh's lease receivables as of March 31, 2002 and 2003 is as follows:

|  | Millions of yen | | Thousands of U.S. dollars |
|---|---|---|---|
|  | 2002 | 2003 | 2003 |
| Minimum lease payments receivable | ¥460,380 | ¥486,165 | $4,120,042 |
| Estimated non-guaranteed residual value | 1,976 | 2,209 | 18,720 |
| Unearned income | (50,576) | (49,039) | (415,584) |
| Allowance for doubtful receivables | (12,926) | (13,573) | (115,025) |
| Net lease receivables | ¥398,854 | ¥425,762 | $3,608,153 |

As of March 31, 2003, the minimum lease payments receivable due in each of the next five years and thereafter are as follows:

| Years ending March 31 | Millions of yen | Thousands of U.S. dollars |
|---|---|---|
| 2004 | ¥157,672 | $1,336,203 |
| 2005 | 132,590 | 1,123,644 |
| 2006 | 98,457 | 834,381 |
| 2007 | 64,847 | 549,551 |
| 2008 | 26,907 | 228,026 |
| 2009 and thereafter | 5,692 | 48,237 |
| Total | ¥486,165 | $4,120,042 |

Ricoh Leasing Company, Ltd., has also extended certain other types of loans as part of its business activities, which are primarily residential housing loans to individuals in Japan secured by the underlying real estate properties. Loan terms range from 15 years to 30 years with monthly repayments. The total balances of these loans, net of allowance for doubtful receivables, as of March 31, 2002 and 2003 were ¥48,975 million and ¥50,531 million ($428,229 thousand), respectively. Loan activities for the years ended March 31, 2001, 2002 and 2003 were as follows:

|  | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
|  | 2001 | 2002 | 2003 | 2003 |
| Extension of new loans | ¥10,916 | ¥8,638 | ¥11,559 | $97,958 |
| Repayment of outstanding loans | 6,393 | 7,554 | 9,993 | 84,686 |

Ricoh sold finance lease receivables with pretax gains of ¥175 million and ¥225 million for the years ended March 31, 2001 and 2002, respectively, through securitization transactions. Servicing assets or liabilities related to securitization transactions initiated were not recorded because the servicing fees adequately compensated Ricoh. Ricoh's retained interests are subordinate to investors' interests. Their value is subject to credit and interest rate risk on the sold financial assets. The investors and Special Purpose Entities have no recourse to Ricoh's other assets for failure of debtors to pay.

Key economic assumptions used in measuring the fair value of retained interests related to securitization transactions completed during the years ended March 31, 2002 and 2003 were as follows:

|  | 2002 | 2003 |
|---|---|---|
| Expected credit losses | 0.75%–1.35% | 0.75%–1.35% |
| Discount rate | 0.89%–3.00% | 0.89%–3.00% |

The impacts of 10% and 20% adverse changes to the key economic assumptions on the fair value of retained interests as of March 31, 2003 are presented below.

|  | Millions of yen | Thousands of U.S. dollars |
|---|---|---|
|  | 2003 | 2003 |
| Carrying value of retained interests (included in lease deposits and other in the consolidated balance sheets) | ¥10,596 | $89,797 |
| Expected credit losses: |  |  |
| +10% | 119 | 1,008 |
| +20% | 237 | 2,008 |
| Discount rate: |  |  |
| +10% | 47 | 398 |
| +20% | 86 | 729 |

The hypothetical scenario does not reflect expected market conditions and should not be used as a prediction of future performance. As the figures indicate, changes in fair value may not be linear. Also, in the above table, the effect of a variation in a particular assumption on the fair value of the retained interest is calculated without changing any other assumption; in reality, changes in one factor may result in changes in another, which might magnify or counteract the sensitivities.

The following table summarizes certain cash flows received from and paid to the Special Purpose Entities for all securitization activity for the years ended March 31, 2001, 2002 and 2003:

|  | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
|  | 2001 | 2002 | 2003 | 2003 |
| Proceeds from new securitization | ¥29,869 | ¥25,000 | ¥ — | $ — |
| Servicing fees received | 32 | 39 | 37 | 314 |
| Repurchases of delinquent or ineligible assets | 3,277 | 5,138 | 5,750 | 48,729 |

Amounts of delinquencies, net credit losses, and components of all receivables managed and securitized as of March 31, 2002 and 2003, and for the years then ended, are as follows:

|  | Millions of yen | | | | | |
|---|---|---|---|---|---|---|
|  | 2002 | | | 2003 | | |
|  | Total principal amount of receivables | Principal amount of receivables 4 months or more past due | Net credit losses | Total principal amount of receivables | Principal amount of receivables 4 months or more past due | Net credit losses |
| Principal amount outstanding | ¥491,791 | ¥977 | ¥3,937 | ¥504,252 | ¥1,175 | ¥3,893 |
| Less: receivables securitized | (80,011) | | | (64,917) | | |
| Receivables held in portfolio | ¥411,780 | | | ¥439,335 | | |

|  | Thousands of U.S. dollars | | |
|---|---|---|---|
|  | 2003 | | |
|  | Total principal amount of receivables | Principal amount of receivables 4 months or more past due | Net credit losses |
| Principal amount outstanding | $4,273,322 | $9,958 | $32,992 |
| Less: receivables securitized | (550,144) | | |
| Receivables held in portfolio | $3,723,178 | | |

## 5. SECURITIES

Marketable securities and investment securities as of March 31, 2002 and 2003 consist of the following:

|  | Millions of yen | | Thousands of U.S. dollars |
|---|---|---|---|
|  | 2002 | 2003 | 2003 |
| Marketable securities: |  |  |  |
| Available-for-sale securities | ¥22,935 | ¥   107 | $   907 |
| Investment securities: |  |  |  |
| Available-for-sale securities | ¥23,337 | ¥64,602 | $547,475 |
| Non-marketable equity securities | 5,549 | 7,371 | 62,466 |
|  | ¥28,886 | ¥71,973 | $609,941 |

The current and noncurrent security types of available-for-sale securities, and the respective cost, gross unrealized holding gains, gross unrealized holding losses and fair value as of March 31, 2002 and 2003 are as follows:

|  | Millions of yen | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
|  | 2002 | | | | 2003 | | | | |
|  | Cost | Gross unrealized holding gains | Gross unrealized holding losses | Fair value | Cost | | Gross unrealized holding gains | Gross unrealized holding losses | Fair value |
| Current: |  |  |  |  |  |  |  |  |  |
| Corporate debt securities | ¥21,338 | ¥1,205 | ¥12 | ¥22,531 | ¥ | 107 | ¥   — | ¥   — | ¥   107 |
| Other | 404 | — | — | 404 |  | — | — | — | — |
|  | ¥21,742 | ¥1,205 | ¥ 12 | ¥22,935 | ¥ | 107 | ¥   — | ¥   — | ¥   107 |
| Noncurrent: |  |  |  |  |  |  |  |  |  |
| Equity securities | ¥ 7,457 | ¥6,025 | ¥469 | ¥13,013 | ¥ 6,328 | | ¥5,148 | ¥ 519 | ¥10,957 |
| Corporate debt securities | 20 | 6 | — | 26 | 45,020 | | 5 | 195 | 44,830 |
| Other | 10,612 | 205 | 519 | 10,298 | 9,459 | | 10 | 654 | 8,815 |
|  | ¥18,089 | ¥6,236 | ¥988 | ¥23,337 | ¥60,807 | | ¥5,163 | ¥1,368 | ¥64,602 |

|  | Thousands of U.S. dollars | | | |
|---|---|---|---|---|
|  | 2003 | | | |
|  | Cost | Gross unrealized holding gains | Gross unrealized holding losses | Fair value |
| Current: |  |  |  |  |
| Corporate debt securities | $   907 | $   — | $   — | $   907 |
| Other | — | — | — | — |
|  | $907 | $   — | $   — | $   907 |
| Noncurrent: |  |  |  |  |
| Equity securities | $ 53,628 | $43,627 | $ 4,399 | $ 92,856 |
| Corporate debt securities | 381,525 | 42 | 1,652 | 379,915 |
| Other | 80,161 | 85 | 5,542 | 74,704 |
|  | $515,314 | $43,754 | $11,593 | $547,475 |

The table presented in the preceding paragraph and other information in this note were restated to reflect the change in policy for short-term investments treated as cash equivalents (see Note 2 (e)).

Other non-current securities mainly include investment trusts consisting of investment in marketable debt and equity securities.

The contractual maturities of debt securities classified as available-for-sale as of March 31, 2003, regardless of their balance sheet classification, are as follows:

|  | Millions of yen | | Thousands of U.S. dollars | |
|---|---|---|---|---|
|  | Cost | Fair value | Cost | Fair value |
| Due within one year | ¥   107 | ¥   107 | $   907 | $   907 |
| Due after one year through five years | 45,020 | 44,830 | 381,525 | 379,915 |
|  | ¥45,127 | ¥44,937 | $382,432 | $380,822 |

Proceeds from the sales of available-for-sale securities were ¥66,778 million, ¥24,568 million and ¥24,513 million ($207,737 thousand) for the years ended March 31, 2001, 2002 and 2003, respectively.

The gross realized gains on sales of available-for-sale securities were ¥2,898 million for the year ended March 31, 2001, and there were no significant realized gains on sales of available-for-sale securities for the years ended March 31, 2002 and 2003. There were no significant realized losses on sales of available-for-sale securities for the three years ended March 31, 2003. The losses on securities of ¥2,739 million and ¥2,260 million ($19,153 thousand) for the years ended March 31, 2002 and 2003, respectively, were charged to other expense for declines in market value of available-for-sale securities where the decline was determined to be other than temporary.

In March 2000, the Company contributed certain marketable equity securities, not including those of its subsidiaries and affiliated companies, to an employee retirement benefit trust fully administered and controlled by an independent bank trustee, with no cash proceeds thereon. The transfer of the available-for-sale securities was accounted for as a sale in accordance with SFAS No. 125, "Accounting for Transfer and Servicing of Financial Assets and Extinguishments of Liabilities" and accordingly the recorded pension liability was reduced by the fair market value amount of the transferred securities. The fair value of these securities at the time of contribution was ¥20,760 million. The net unrealized gains on these available-for-sale securities amounting to ¥13,095 million continues to be included in "Accumulated other comprehensive income (loss)" on the consolidated balance sheets and will only be reflected in realized gains in the statements of income upon the future sale of the transferred securities by the trustee.

## 6. INVESTMENTS IN AND ADVANCES TO AFFILIATES

The investments in and advances to affiliates primarily relate to 20% to 50% owned companies. Included in these companies is COCA-COLA WEST JAPAN COMPANY, LIMITED, a 21.1% owned affiliate. The common stock of this company is publicly traded. The carrying value of the investment in this company was equal to its underlying book value and amounted to ¥37,529 million ($318,042 thousand) as of March 31, 2003. The quoted market value of this company was ¥33,577 million ($284,551 thousand) as of March 31, 2003.

Ricoh's equity in the underlying net book values of the other 20% to 50% owned companies is approximately equal to their individual carrying values.

Summarized financial information for all affiliates as of March 31, 2002 and 2003 and for the years ended March 31, 2001, 2002 and 2003 is as follows:

### Financial Position

| | Millions of yen | | Thousands of U.S. dollars |
|---|---|---|---|
| | 2002 | 2003 | 2003 |
| Assets— | | | |
| Current assets | ¥122,974 | ¥124,156 | $1,052,169 |
| Other assets | 141,148 | 139,357 | 1,180,992 |
| | ¥264,122 | ¥263,513 | $2,233,161 |
| Liabilities and shareholders' investment— | | | |
| Current liabilities | ¥ 41,852 | ¥ 40,954 | $ 347,068 |
| Other liabilities | 13,972 | 13,176 | 111,661 |
| Shareholders' investment | 208,298 | 209,383 | 1,774,432 |
| | ¥264,122 | ¥263,513 | $2,233,161 |

### Operations

| | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2003 |
| Sales | ¥263,804 | ¥288,992 | ¥338,035 | $2,864,703 |
| Costs and expenses | 254,137 | 277,950 | 327,139 | 2,772,364 |
| Net income | ¥ 9,667 | ¥ 11,042 | ¥ 10,896 | $ 92,339 |

The significant transactions of Ricoh with these affiliates for the years ended March 31, 2001, 2002 and 2003, and the related account balances at March 31, 2002 and 2003 are summarized as follows:

| | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2003 |
| Transactions— | | | | |
| Sales | ¥20,952 | ¥25,413 | ¥26,510 | $224,661 |
| Purchases | 13,673 | 15,584 | 19,808 | 167,864 |
| Dividend income | 1,008 | 1,133 | 1,236 | 10,475 |

The unrealized profits regarding the above transactions were eliminated in the consolidated financial statements.

| | Millions of yen | | Thousands of U.S. dollars |
|---|---|---|---|
| | 2002 | 2003 | 2003 |
| Account balances— | | | |
| Receivables | ¥8,513 | ¥6,434 | $54,525 |
| Payables | 2,858 | 1,604 | 13,593 |

As of March 31, 2003, consolidated retained earnings included undistributed earnings of 20% to 50% owned companies accounted for by the equity method in the amount of ¥38,913 million ($329,771 thousand).

## 7. GOODWILL AND OTHER INTANGIBLE ASSETS

Information for intangible assets subject to amortization and for intangible assets not subject to amortization is as follows:

| | Millions of yen | | | | | |
|---|---|---|---|---|---|---|
| | 2002 | | | 2003 | | |
| | Gross carrying amount | Accumulated amortization | Net carrying amount | Gross carrying amount | Accumulated amortization | Net carrying amount |
| Other intangible assets subject to amortization | | | | | | |
| Software | ¥20,956 | ¥(7,315) | ¥13,641 | ¥31,764 | ¥(12,763) | ¥19,001 |
| Trade name and customer base | 14,427 | (1,897) | 12,530 | 13,463 | (3,217) | 10,246 |
| Other | 12,843 | (3,217) | 9,626 | 13,633 | (4,192) | 9,441 |
| Total | 48,226 | (12,429) | 35,797 | 58,860 | (20,172) | 38,688 |
| Other intangible assets not subject to amortization | | | 1,801 | | | 1,332 |
| Total other intangible assets | | | ¥37,598 | | | ¥40,020 |

| | Thousands of U.S. dollars | | |
|---|---|---|---|
| | 2003 | | |
| | Gross carrying amount | Accumulated amortization | Net carrying amount |
| Other intangible assets subject to amortization | | | |
| Software | $269,186 | $(108,161) | $161,025 |
| Trade name and customer base | 114,094 | (27,263) | 86,831 |
| Other | 115,534 | (35,525) | 80,009 |
| Total | 498,814 | (170,949) | 327,865 |
| Other intangible assets not subject to amortization | | | 11,288 |
| Total other intangible assets | | | $339,153 |

The aggregate amortization expense of other intangible assets subject to amortization for the year ended March 31, 2003 was ¥6,993 million ($59,263 thousand). The future amortization expense for each of the five years relating to intangible assets currently recorded in the consolidated balance sheets is estimated to be the following at March 31, 2003:

| Years ending March 31 | Millions of yen | Thousands of U.S. dollars |
|---|---|---|
| 2004 | ¥8,140 | $68,983 |
| 2005 | 6,985 | 59,195 |
| 2006 | 5,451 | 46,195 |
| 2007 | 3,243 | 27,483 |
| 2008 | 1,993 | 16,890 |

The changes in the carrying amounts of goodwill for the year ended March 31, 2003, were as follows:

| | Millions of yen | Thousands of U.S. dollars |
|---|---|---|
| Balance at beginning of year | ¥29,687 | $251,585 |
| Goodwill acquired during the year | 1,176 | 9,966 |
| Foreign exchange impact | (2,754) | (23,339) |
| Balance at end of year | ¥28,109 | $238,212 |

As of March 31, 2003, all the carrying value of goodwill was allocated to the office equipment segment.

The following table reconciles previously reported net income and net income per share for the years ended March 31, 2001 and 2002, as if the provisions of SFAS No. 142 had been in effect.

| | Millions of yen | |
|---|---|---|
| | 2001 | 2002 |
| Net income | | |
| Reported net income | ¥53,228 | ¥61,614 |
| Goodwill amortization | 736 | 2,514 |
| Adjusted net income | 53,964 | 64,128 |

| | Yen | |
|---|---|---|
| | 2001 | 2002 |
| Net income per share | | |
| Reported net income per share—basic | ¥ 76.85 | ¥ 88.27 |
| Goodwill amortization | 1.06 | 3.60 |
| Adjusted net income per share—basic | 77.91 | 91.87 |
| Reported net income per share—diluted | 71.02 | 82.46 |
| Goodwill amortization | 0.98 | 3.34 |
| Adjusted net income per share—diluted | 72.00 | 85.80 |

## 8. INCOME TAXES

Income before income taxes, minority interests and equity in earnings of affiliates and provision for income taxes for the years ended March 31, 2001, 2002 and 2003 are as follows:

| | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2003 |
| Income before income taxes, minority interests and equity in earnings of affiliates— | | | | |
| Domestic | ¥77,820 | ¥ 95,723 | ¥ 84,946 | $ 719,881 |
| Foreign | 19,945 | 18,227 | 38,524 | 326,475 |
| | ¥97,765 | ¥113,950 | ¥123,470 | $1,046,356 |
| Provision for income taxes— | | | | |
| Current: | | | | |
| Domestic | ¥45,684 | ¥ 43,564 | ¥ 50,103 | $ 424,602 |
| Foreign | 7,822 | 8,801 | 13,080 | 110,847 |
| | 53,506 | 52,365 | 63,183 | 535,449 |
| Deferred: | | | | |
| Domestic | (10,380) | (3,524) | (9,043) | (76,636) |
| Foreign | 386 | 2,306 | (2,156) | (18,271) |
| | (9,994) | (1,218) | (11,199) | (94,907) |
| Consolidated provision for income taxes | ¥43,512 | ¥ 51,147 | ¥ 51,984 | $ 440,542 |

Total income taxes are allocated as follows:

| | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2003 |
| Provision for income taxes | ¥43,512 | ¥51,147 | ¥51,984 | $ 440,542 |
| Shareholders' investment: | | | | |
| Foreign currency translation adjustments | (1,252) | 2,062 | (826) | (7,000) |
| Unrealized gains (losses) on securities | 629 | (582) | (1,130) | (9,576) |
| Unrealized losses on derivatives | — | (146) | (9) | (76) |
| Minimum pension liability adjustment | (15,818) | (11,760) | (30,811) | (261,110) |
| | ¥27,071 | ¥40,721 | ¥19,208 | $ 162,780 |

The Company and its domestic subsidiaries are subject to National Corporate tax of 30%, an inhabitant tax of approximately 6% and a deductible Enterprise tax approximately 10%, which in the aggregate resulted in the normal statutory tax rate of approximately 42%. The normal statutory tax rate differs from the effective tax rate for the years ended March 31, 2001, 2002 and 2003 as a result of the following:

| | 2001 | 2002 | 2003 |
|---|---|---|---|
| Normal tax rate | 42% | 42% | 42% |
| Nondeductible expenses | 2 | 1 | 1 |
| Tax benefits not recognized on operating losses of certain consolidated subsidiaries | 0 | 3 | 3 |
| Utilization of net operating loss carryforward not previously recognized | (2) | (0) | (4) |
| Tax credit for increased research and development expense | (0) | (0) | (1) |
| Effect of change in enacted tax rate | — | — | 2 |
| Other, net | 3 | (1) | (1) |
| Effective tax rate | 45% | 45% | 42% |

Nondeductible expenses include directors' bonuses and entertainment expenses.

Based on an enacted change in the Japanese tax laws in March, 2003, the normal statutory tax rate will be reduced to approximately 40% effective April 1, 2004, and such rate has been used in calculating the future expected tax effects of temporary differences and carryforwards that will be realized or settled after March 31, 2004.

The tax effects of temporary differences and carryforwards giving rise to the consolidated deferred income tax assets and liabilities as of March 31, 2002 and 2003 are as follows:

|  | Millions of yen | | Thousands of U.S. dollars |
|---|---|---|---|
|  | 2002 | 2003 | 2003 |
| Assets: | | | |
| Accrued expenses | ¥ 17,866 | ¥ 26,184 | $ 221,898 |
| Depreciation | 4,640 | 4,014 | 34,017 |
| Accrued pension and severance costs | 41,523 | 84,230 | 713,814 |
| Net operating losses carryforward | 19,080 | 13,839 | 117,280 |
| Other | 28,222 | 31,460 | 266,610 |
|  | 111,331 | 159,727 | 1,353,619 |
| Less—Valuation allowance | (11,300) | (9,193) | (77,907) |
|  | ¥100,031 | ¥150,534 | $1,275,712 |
| Liabilities: | | | |
| Sales-type leases | ¥ (4,964) | ¥ (7,112) | $ (60,271) |
| Undistributed earnings of foreign subsidiaries and affiliates | (12,291) | (12,801) | (108,483) |
| Net unrealized holding gains on available-for-sale securities | (8,932) | (8,957) | (75,907) |
| Other | (9,757) | (11,361) | (96,280) |
|  | ¥(35,944) | ¥(40,231) | $ (340,941) |
| Net deferred tax assets | ¥ 64,087 | ¥110,303 | $ 934,771 |

Net deferred tax assets as of March 31, 2002 and 2003 are included in the consolidated balance sheets as follows:

|  | Millions of yen | | Thousands of U.S. dollars |
|---|---|---|---|
|  | 2002 | 2003 | 2003 |
| Deferred income taxes and other (Current Assets) | ¥ 35,508 | ¥ 41,993 | $ 355,873 |
| Lease deposits and other (Non-Current Assets) | 59,732 | 99,204 | 840,712 |
| Accrued expenses and other (Current Liabilities) | (561) | (241) | (2,043) |
| Deferred income taxes (Long-Term Liabilities) | (30,592) | (30,653) | (259,771) |
|  | ¥ 64,087 | ¥110,303 | $ 934,771 |

The net changes in the total valuation allowance for the years ended March 31, 2001, 2002 and 2003 were increases of ¥246 million and ¥2,897 million and a decrease of ¥2,107 million ($17,856 thousand), respectively.

In assessing the realizability of deferred tax assets, Ricoh considers whether it is more likely than not that some portion or all of the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible. Ricoh considers the scheduled reversal of deferred tax liabilities, projected future taxable income, and tax planning strategies in making this assessment. Based upon the level of historical taxable income and projections for future taxable income over the periods in which the deferred tax

assets are deductible, Ricoh believes it is more likely than not that the benefits of these deductible differences, net of the existing valuation allowance will be realized. The amount of the deferred tax asset considered realizable, however, would be reduced if estimates of future taxable income during the carryforward period are reduced.

As of March 31, 2003, certain subsidiaries had net operating losses carried forward for income tax purposes of approximately ¥36,434 million ($308,763 thousand) which were available to reduce future income taxes, if any. Approximately ¥26,225 million ($222,246 thousand) of the operating losses expire within a five-year period while the remainder principally have an indefinite carryforward period.

## 9. SHORT-TERM BORROWINGS AND TRADE NOTES RECEIVABLE DISCOUNTED WITH BANKS

Short-term borrowings as of March 31, 2002 and 2003 consist of the following:

|  | Weighted average interest rate | | Millions of yen | | Thousands of U.S. dollars |
|---|---|---|---|---|---|
|  | 2002 | 2003 | 2002 | 2003 | 2003 |
| Borrowings, principally from banks | 1.3% | 1.8% | ¥103,784 | ¥28,258 | $239,474 |
| Commercial paper | 1.5 | 0.9 | 57,310 | 56,220 | 476,441 |
|  | | | ¥161,094 | ¥84,478 | $715,915 |

41

The Company and certain of its subsidiaries enter into the contracts with financial institutions regarding lines of credit and overdrawing, and hold the issuing programs of commercial paper and medium-term notes. The unused lines of credit amounted to ¥580,785 million and ¥613,884 million ($5,202,407 thousand) as of March 31, 2002 and 2003, respectively, of which ¥194,658 million and ¥234,704 million ($1,989,017 thousand) related to commercial paper and ¥147,388 million and ¥144,280 million ($1,222,712 thousand) related to medium-term notes programs at prevailing interest rates.

## 10. LONG-TERM INDEBTEDNESS

Long-term indebtedness as of March 31, 2002 and 2003 consists of the following:

| | Conversion price | Millions of yen | | Thousands of U.S. dollars |
|---|---|---|---|---|
| | (Per share) | 2002 | 2003 | 2003 |
| Convertible bonds— | | | | |
| 0.35%, payable in yen, due March 2003 | ¥1,210.00 | ¥ 29,886 | ¥ — | $ — |
| 0.4%, payable in yen, due September 2002 issued by a consolidated subsidiary | 1,594.40 | 4,163 | — | — |
| Total convertible bonds | | 34,049 | — | — |
| Bonds— | | | | |
| 2.075%, straight bonds, payable in yen, due April 2005 | | 40,000 | 40,000 | 338,983 |
| 0.87%, straight bonds, payable in yen, due March 2007 | | 35,000 | 35,000 | 296,610 |
| 1.34%, straight bonds, payable in yen, due March 2009 | | 25,000 | 25,000 | 211,864 |
| 0.9%, straight bonds, payable in yen, due June 2003 issued by a consolidated subsidiary | | 5,000 | 5,000 | 42,373 |
| 1.1%, straight bonds, payable in yen, due February 2004 issued by a consolidated subsidiary | | 10,000 | 9,910 | 83,983 |
| 1.17%, straight bonds, payable in yen, due June 2004 issued by a consolidated subsidiary | | 10,000 | 10,000 | 84,746 |
| 0.73%, straight bonds, payable in yen, due June 2006 issued by a consolidated subsidiary | | 10,000 | 10,000 | 84,746 |
| 0.7%, straight bonds, payable in yen, due June 2007 issued by a consolidated subsidiary | | — | 10,000 | 84,746 |
| 2.1%, straight bonds, payable in yen, due October 2009 issued by a consolidated subsidiary | | 10,000 | 10,000 | 84,746 |
| Medium-term notes, 0.21% weighted average, due through 2005 issued by a consolidated subsidiary | | 39,162 | 24,000 | 203,389 |
| Total bonds | | 184,162 | 178,910 | 1,516,186 |
| Unsecured loans— | | | | |
| Banks and insurance companies, 1.62% weighted average, due through 2011 | | 170,537 | 210,042 | 1,780,017 |
| Secured loans— | | | | |
| Banks, insurance companies and other financial institution, 1.45% weighted average, due through 2020 | | 4,799 | 2,553 | 21,636 |
| Capital lease obligations (see Note 2 (j)) | | 3,113 | 4,237 | 35,907 |
| Total | | 396,660 | 395,742 | 3,353,746 |
| SFAS No. 133 fair value adjustment | | 3,649 | 4,395 | 37,246 |
| Less—Current maturities included in current liabilities | | (67,314) | (54,235) | (459,619) |
| | | ¥332,995 | ¥345,902 | $2,931,373 |

Secured loans are collateralized by land, buildings and lease receivables with a book value of ¥8,432 million ($71,458 thousand) as of March 31, 2003.

All bonds outstanding as of March 31, 2003 are redeemable at the option of Ricoh at 100% of the principal amounts under certain conditions as provided in the applicable agreements.

Bonds are subject to certain covenants such as restrictions on certain additional secured indebtedness, as defined in the agreements. Ricoh presently is in compliance with such covenants as of March 31, 2003.

Certain loan agreements provide, among other things, that the lender may request the Company to submit proposals for appropriations of earnings (including payment of dividends) to the lender for its review and approval prior to presentation to the shareholders. The Company has never been requested to submit such proposals for approval. In addition, as is customary in Japan, substantially all of the bank borrowings are subject to general agreements with each bank which provide, among other things, that the banks may request additional security for these loans if there is reasonable and probable cause and may treat any

security furnished to the banks as well as cash deposited as security for all present and future indebtedness. The Company has never been requested to submit such additional security.

The aggregate annual maturities of long-term indebtedness subsequent to March 31, 2003 are as follows:

| Years ending March 31 | Millions of yen | Thousands of U.S. dollars |
|---|---|---|
| 2004 | ¥ 54,482 | $ 461,712 |
| 2005 | 85,966 | 728,525 |
| 2006 | 125,776 | 1,065,898 |
| 2007 | 56,027 | 474,805 |
| 2008 | 27,236 | 230,814 |
| 2009 and thereafter | 46,255 | 391,992 |
| Total | ¥395,742 | $3,353,746 |

## 11. PENSION AND RETIREMENT ALLOWANCES PLANS

The Company and certain of its subsidiaries have various trusted contributory and noncontributory employees pension fund plans covering substantially all of their employees. Under the plans, employees are entitled to lump-sum payments at the time of termination or retirement, or to pension payments. Under the terms of the domestic employer pension fund ("EPF") plan, the government mandated welfare pension insurance benefit is included and commingled with the primary corporate benefit provided by Ricoh. The amounts of lump-sum or

pension payments under the plans are generally determined on the basis of length of service and remuneration at the time of termination. These contributory and non contributory plans are funded in conformity with governmental regulations. The plan assets consist principally of interest-bearing bonds and listed equity securities.

The changes in the benefit obligation and plan assets of the defined benefit plans for the years ended March 31, 2002 and 2003 are as follows:

|  | Millions of yen | | Thousands of U.S. dollars |
|---|---|---|---|
|  | 2002 | 2003 | 2003 |
| Change in benefit obligation: |  |  |  |
| Benefit obligation at beginning of year | ¥ 424,176 | ¥ 452,562 | $ 3,835,271 |
| Service cost | 15,636 | 16,943 | 143,585 |
| Interest cost | 13,693 | 14,292 | 121,119 |
| Plan participants' contributions | 1,585 | 1,105 | 9,364 |
| Amendments | — | (10,924) | (92,576) |
| Actuarial loss | 8,309 | 64,852 | 549,593 |
| Settlement | (3,005) | (2,009) | (17,026) |
| Benefits paid | (12,558) | (13,197) | (111,839) |
| Foreign exchange impact | 4,726 | (1,349) | (11,432) |
| Benefit obligation at end of year | ¥ 452,562 | ¥ 522,275 | $ 4,426,059 |
|  |  |  |  |
| Change in plan assets: |  |  |  |
| Fair value of plan assets at beginning of year | ¥ 274,323 | ¥ 268,377 | $ 2,274,381 |
| Actual return on plan assets | (11,715) | (36,838) | (312,186) |
| Employer contribution | 12,680 | 14,281 | 121,026 |
| Plan participants' contributions | 1,585 | 1,105 | 9,364 |
| Settlement | (2,858) | (1,636) | (13,864) |
| Benefits paid | (9,767) | (9,246) | (78,356) |
| Foreign exchange impact | 4,129 | (697) | (5,907) |
| Fair value of plan assets at end of year | ¥ 268,377 | ¥ 235,346 | $ 1,994,458 |
|  |  |  |  |
| Funded status | ¥(184,185) | ¥(286,929) | $(2,431,601) |
| Unrecognized net actuarial loss | 143,448 | 245,632 | 2,081,627 |
| Unrecognized prior service cost | — | (10,081) | (85,432) |
| Unrecognized net asset at transition, net of amortization | (2,953) | (2,414) | (20,458) |
| Net amount recognized | ¥ (43,690) | ¥ (53,792) | $ (455,864) |
|  |  |  |  |
| Amounts recognized in the balance sheets consist of: |  |  |  |
| Prepaid benefit cost | ¥ 1,262 | ¥ 61 | $ 517 |
| Accrued benefit liability | (113,685) | (207,948) | (1,762,271) |
| Intangible assets | — | 199 | 1,687 |
| Accumulated other comprehensive income, gross of tax | 68,733 | 153,896 | 1,304,203 |
| Net amount recognized | ¥ (43,690) | ¥ (53,792) | $ (455,864) |

|  | 2002 | 2003 |  |
|---|---|---|---|
| Weighted average assumptions |  |  |  |
| Discount rate | 3.3% | 2.6% |  |
| Rate of increase in compensation levels | 3.4% | 3.4% |  |
| Expected long-term rate of return on plan assets | 4.8% | 3.6% |  |

The Japanese domestic plans represented approximately 88% of the above total projected benefit obligation as of March 31, 2003. The weighted-average discount rate, rate of increase in compensation and expected long-term rate of return on plan assets of the domestic pension plans were 3.0%, 3.3% and 4.4%, respectively, for the year ended March 31, 2002 and 2.2%, 3.4% and 2.9%, respectively, for the year ended March 31, 2003.

The net periodic benefit costs of the defined benefit plans for the three years ended March 31, 2003 consisted of the following components:

|  | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
|  | 2001 | 2002 | 2003 | 2003 |
| Service costs | ¥15,449 | ¥15,636 | ¥16,943 | $143,585 |
| Interest costs | 11,706 | 13,693 | 14,292 | 121,119 |
| Expected return on plan assets | (13,410) | (13,031) | (9,763) | (82,737) |
| Net amortization | 1,123 | 4,707 | 5,081 | 43,059 |
| Settlement loss | — | 183 | (35) | (297) |
| Net periodic benefit cost | ¥14,868 | ¥21,188 | ¥26,518 | $224,729 |

In accordance with the provisions of SFAS 87, Ricoh recorded an adjustment for minimum pension liability at March 31, 2002 and 2003. This liability represents the excess of the accumulated benefit obligations over the fair value of plan assets and severance costs already recognized before recording the minimum pension liability. This excess is primarily attributable to a substantial reduction in the discount rate used in pension calculation and loss on plan assets. A corresponding amount was recognized as an intangible asset to the extent of the unrecognized prior service cost, and the balance was recorded as a component of accumulated other comprehensive income (loss), net of tax.

The projected benefit obligations, accumulated benefit obligations, and fair value of plan assets for the pension plans with accumulated benefit obligations in excess of plan assets were ¥335,517 million, ¥280,930 million and ¥208,712 million, respectively, as of March 31, 2002 and ¥453,996 million ($3,847,085 thousand), ¥387,481 million ($3,283,737 thousand) and ¥218,058 million ($1,847,949 thousand), respectively, as of March 31, 2003.

Employees of certain domestic subsidiaries not covered by the EPF plan and directors of the Company are primarily covered by unfunded retirement allowances plans. The payments to directors are subject to shareholders' approval.

As noted above, the domestic EPF plan is composed of (1) a corporate defined benefit portion established by Ricoh and (2) a substitutional portion based on benefits prescribed by the government (similar to social security benefits in the United States). Ricoh has been exempted from contributing to the Japanese Pension Insurance ("JPI") program that would otherwise have been required if it had not elected to fund the government substitutional portion of the benefit through an EPF arrangement. The plan assets of the EPF are invested and managed as a single portfolio for the entire EPF and are not separately attributed to the substitutional and corporate portions. The substitutional portion represents approximately 39% of the total projected benefit obligation of the EPF as of March 31, 2003. In June 2001, the Japanese pension law was amended to permit an employer to elect to transfer

the entire substitutional portion benefit obligation from the EPF to the government together with a specified amount of plan assets pursuant to a government formula. After such transfer, the employer would be required to make periodic contributions to JPI, and the Japanese government would be responsible for all benefit payments. The corporate portion of the EPF would continue to exist exclusively as a corporate defined benefit pension plan. In this regard, Ricoh has elected to transfer the substitutional portion of its EPF to the government. The process of separating the substitutional portion from the corporate portion includes several phases. In January 2003, Ricoh received government approval of exemption from the obligation for benefits related to future employee service with respect to the substitutional portion of its EPF and is proceeding with the remaining steps to effectuate the transfer which is presently expected to be completed by the end of calendar year 2003. Ricoh will account for the transfer in accordance with EITF 03-2 "Accounting for the Transfer to the Japanese Government of the Substitutional Portion of Employee Pension Fund Liabilities." As specified in EITF 03-2, the entire separation process is to be accounted for at the time of completion of the transfer to the government of the benefit obligation and related plan assets as a settlement in accordance with SFAS No. 88 "Employers' Accounting for Settlements and Curtailments of Defined Benefit Pension Plans and for Termination Benefits." Accordingly, there has been no effect on Ricoh's consolidated financial statements for the fiscal year ended March 31, 2003. The aggregate effect of this separation will be determined based on the Company's total pension benefits obligation as of the date the transfer is completed and the amount of plan assets required to be transferred. Based on the Company's current estimates as to the total amount of such pension benefits obligation and the amount of plan assets required to be transferred, Ricoh's management does not presently expect that this separation will have a significant effect on Ricoh's financial condition or results of operation. However, the final amount of the impact could be significantly different depending on any change in the amounts of the pension benefit obligation or plan assets to be transferred.

## 12. SHAREHOLDERS' INVESTMENT

The Japanese Commercial Code provides that an amount equal to at least 10% of cash dividends and other distributions from retained earnings paid by the Company and its domestic subsidiaries be appropriated as a legal reserve. No further appropriation is required when the total amount of the legal reserve and additional paid-in capital equals 25% of common stock. Legal reserves included in retained earnings as of March 31, 2002 and 2003 were ¥16,815 million and ¥16,903 million ($143,246 thousand), respectively, and are restricted from being used as dividends.

Semiannual cash dividends are approved by the shareholders after the end of

each fiscal period or are declared by the Board of Directors after the end of each interim six-month period. Such dividends are payable to shareholders of record at the end of each such fiscal or interim six-month period. At the general meeting to be held on June 26, 2003, the shareholders will be asked to approve the declaration of a cash dividend (¥7 per share) on the common stock totaling ¥5,198 million ($44,051 thousand), which will be paid to shareholders of record as of March 31, 2003. The declaration of this dividend has not been reflected in the consolidated financial statements as of March 31, 2003.

The Japanese Commercial Code provides that at least one-half of the proceeds from shares issued is included in common stock. In conformity therewith, the Company has divided the principal amount of bonds converted into common stock between common stock and additional paid-in capital.

The amount of retained earnings legally available for dividend distribution is that recorded in the Company's non-consolidated books and amounted to ¥268,687 million ($2,277,008 thousand) as of March 31, 2003.

The Japanese Commercial Code allows the Company to purchase treasury stock for any reason at any time by the resolution of the Board of Directors up to the limi-

tation approved by the shareholders. On June 27, 2002, the shareholders of the Company approved the purchase of treasury stock up to 8 million shares for a maximum total cost of ¥20,000 million during the period up to the resolution of the subsequent Ordinary General Shareholders' Meeting, to be held on June 26, 2003. In accordance with this approval, the Company repurchased 8 million shares and retired 7 million shares during the year ended March 31, 2003. The retirement of common stock reduced retained earnings during the year ended March 31, 2003 by ¥13,328 million ($112,949 thousand).

## 13. OTHER COMPREHENSIVE INCOME (LOSS)

Tax effects allocated to each component of other comprehensive income (loss) are as follows:

| | Millions of yen | | |
| --- | --- | --- | --- |
| | Before-tax amount | Tax expense | Net-of-tax amount |
| **2001:** | | | |
| Foreign currency translation adjustments | ¥ (2,992) | ¥ 1,252 | ¥ (1,740) |
| Unrealized gains (losses) on securities: | | | |
| Unrealized holding gains (losses) arising during the year | (3,440) | (1,842) | (5,282) |
| Less—Reclassification adjustment for (gains) losses realized in net income | (2,898) | 1,213 | (1,685) |
| Net unrealized gains (losses) | (6,338) | (629) | (6,967) |
| Minimum pension liability adjustment | (37,797) | 15,818 | (21,979) |
| Other comprehensive income (loss) | ¥ (47,127) | ¥ 16,441 | ¥ (30,686) |
| | | | |
| **2002:** | | | |
| Foreign currency translation adjustments | ¥ 8,578 | ¥ (2,062) | ¥ 6,516 |
| Unrealized gains (losses) on securities: | | | |
| Unrealized holding gains (losses) arising during the year | (4,212) | 1,781 | (2,431) |
| Less—Reclassification adjustment for (gains) losses realized in net income | 2,864 | (1,199) | 1,665 |
| Net unrealized gains (losses) | (1,348) | 582 | (766) |
| Unrealized losses on derivatives: | | | |
| Cumulative effect of accounting change | (3,206) | 1,342 | (1,864) |
| Unrealized holding gains (losses) arising during the year | 2,061 | (871) | 1,190 |
| Less—Reclassification adjustment for (gains) losses realized in net income | 792 | (325) | 467 |
| Net unrealized gains (losses) | (353) | 146 | (207) |
| Minimum pension liability adjustment | (27,891) | 11,760 | (16,131) |
| Other comprehensive income (loss) | ¥ (21,014) | ¥ 10,426 | ¥ (10,588) |
| | | | |
| **2003:** | | | |
| Foreign currency translation adjustments | ¥ 181 | ¥ 826 | ¥ 1,007 |
| Unrealized gains (losses) on securities: | | | |
| Unrealized holding gains (losses) arising during the year | (5,348) | 2,065 | (3,283) |
| Less—Reclassification adjustment for (gains) losses realized in net income | 2,234 | (935) | 1,299 |
| Net unrealized gains (losses) | (3,114) | 1,130 | (1,984) |
| Unrealized losses on derivatives: | | | |
| Unrealized holding gains (losses) arising during the year | (634) | 277 | (357) |
| Less—Reclassification adjustment for (gains) losses realized in net income | 654 | (268) | 386 |
| Net unrealized gains (losses) | 20 | 9 | 29 |
| Minimum pension liability adjustment | (80,220) | 30,811 | (49,409) |
| Other comprehensive income (loss) | ¥(83,133) | ¥32,776 | ¥ (50,357) |

| | Thousands of U.S. dollars | | |
| | Before-tax amount | Tax expense | Net-of-tax amount |
|---|---|---|---|
| **2003:** | | | |
| Foreign currency translation adjustments | $    1,534 | $    7,000 | $    8,534 |
| Unrealized gains (losses) on securities: | | | |
| Unrealized holding gains (losses) arising during the year | (45,322) | 17,500 | (27,822) |
| Less—Reclassification adjustment for (gains) losses realized in net income | 18,932 | (7,924) | 11,008 |
| Net unrealized gains (losses) | (26,390) | 9,576 | (16,814) |
| Unrealized losses on derivatives: | | | |
| Unrealized holding gains (losses) arising during the year | (5,373) | 2,348 | (3,025) |
| Less—Reclassification adjustment for (gains) losses realized in net income | 5,542 | (2,271) | 3,271 |
| Net unrealized gains (losses) | 169 | 77 | 246 |
| Minimum pension liability adjustment | (679,830) | 261,110 | (418,720) |
| Other comprehensive income (loss) | $(704,517) | $277,763 | $(426,754) |

Changes in accumulated other comprehensive income (loss) are as follows:

| | Millions of yen | | | | |
| | Foreign currency translation adjustments | Unrealized gains on securities | Unrealized losses on derivatives | Minimum pension liability adjustment | Accumulated other comprehensive income (loss) |
|---|---|---|---|---|---|
| **2001:** | | | | | |
| Beginning balance | ¥    (19,801) | ¥  18,299 | ¥        — | ¥    (1,600) | ¥    (3,102) |
| Change during the year | (1,740) | (6,967) | — | (21,979) | (30,686) |
| Ending balance | ¥    (21,541) | ¥  11,332 | ¥        — | ¥  (23,579) | ¥  (33,788) |
| **2002:** | | | | | |
| Beginning balance | ¥    (21,541) | ¥  11,332 | ¥        — | ¥  (23,579) | ¥  (33,788) |
| Cumulative effect of accounting change | | | (1,864) | | (1,864) |
| Change during the year | 6,516 | (766) | 1,657 | (16,131) | (8,724) |
| Ending balance | ¥    (15,025) | ¥  10,566 | ¥    (207) | ¥  (39,710) | ¥  (44,376) |
| **2003:** | | | | | |
| Beginning balance | ¥  (15,025) | ¥ 10,566 | ¥    (207) | ¥  (39,710) | ¥  (44,376) |
| Change during the year | 1,007 | (1,984) | 29 | (49,409) | (50,357) |
| Ending balance | ¥  (14,018) | ¥  8,582 | ¥    (178) | ¥  (89,119) | ¥  (94,733) |

| | Thousands of U.S. dollars | | | | |
|---|---|---|---|---|---|
| **2003:** | | | | | |
| Beginning balance | $(127,331) | $89,543 | $(1,754) | $(336,526) | $(376,068) |
| Change during the year | 8,534 | (16,814) | 246 | (418,720) | (426,754) |
| Ending balance | $(118,797) | $ 72,729 | $(1,508) | $(755,246) | $(802,822) |

## 14. PER SHARE DATA

Dividends per share shown in the consolidated statements of income are computed based on dividends paid for the year.

The following table sets forth the computation of basic and diluted earnings per share showing the reconciliation of the numerators and denominators used for the computation.

| | Thousands of shares | | | |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | |
| Weighted average common shares outstanding | 692,617 | 698,025 | 726,660 | |
| Effect of dilutive securities: | | | | |
| Convertible bonds— | | | | |
| 1.8%, payable in yen, due March 2002 | 1,636 | 997 | — | |
| 1.5%, payable in yen, due March 2002 | 33,070 | 28,195 | — | |
| 0.35%, payable in yen, due March 2003 | 24,703 | 24,699 | 23,250 | |
| Diluted common shares outstanding | 752,026 | 751,916 | 749,910 | |

| | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2003 |
| Net income applicable to common shareholders | ¥53,228 | ¥61,614 | ¥72,513 | $614,517 |
| Effect of dilutive securities: | | | | |
| Convertible bonds— | | | | |
| 1.8%, payable in yen, due March 2002 | 14 | 10 | — | — |
| 1.5%, payable in yen, due March 2002 | 295 | 258 | — | — |
| 0.35%, payable in yen, due March 2003 | 119 | 119 | 86 | 729 |
| Other | (249) | — | — | — |
| Diluted net income | ¥53,407 | ¥62,001 | ¥72,599 | $615,246 |

| | Yen | | | U.S. dollars |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2003 |
| Earnings per share: | | | | |
| Basic | ¥ 76.85 | ¥ 88.27 | ¥ 99.79 | $ 0.85 |
| Diluted | 71.02 | 82.46 | 96.81 | 0.82 |

## 15. DERIVATIVE FINANCIAL INSTRUMENTS

### Risk Management Policy

Ricoh enters into various derivative financial instrument contracts in the normal course of business in connection with the management of its assets and liabilities.

Ricoh uses derivative instruments to reduce risk and protect market value of assets and liabilities in conformity with Ricoh's policy. Ricoh does not use derivative financial instruments for trading or speculative purposes, nor is it a party to leveraged derivatives.

All derivative instruments are exposed to credit risk arising from the inability of counterparties to meet the terms of the derivative contracts. However, Ricoh does not expect any counterparties to fail to meet their obligations because these counterparties are financial institutions with satisfactory credit ratings. Ricoh utilizes a number of counterparties to minimize the concentration of credit risk.

### Foreign Exchange Risk Management

Ricoh conducts business on a global basis and holds assets and liabilities denominated in foreign currencies. Ricoh enters into foreign exchange contracts and foreign currency options to hedge against the potentially adverse impacts of foreign currency fluctuations on these assets and liabilities denominated in foreign currencies.

### Interest Rate Risk Management

Ricoh enters into interest rate swap agreements to hedge against the potential adverse impacts of changes in fair value or cash flow fluctuations on interest of its outstanding debt.

### Fair Value Hedges

Changes in the fair value of derivative instruments and the related hedged items designated and qualifying as fair value hedges are included in other (income) expenses on the consolidated statements of income. There is no hedging ineffectiveness nor are net gains or losses excluded from the assessment of hedge effectiveness for the years ended March 31, 2002 and 2003 as the critical terms of the interest rate swap match the terms of the hedged debt obligations.

## Cash Flow Hedges

Changes in the fair value of derivative instruments designated and qualifying as cash flow hedges are included in accumulated other comprehensive income (loss) on the consolidated balance sheets. These amounts are reclassified into earnings as interest on the hedged loans is paid. There is no hedging ineffectiveness nor are net gains or losses excluded from the assessment of hedge effectiveness for the years ended March 31, 2002 and 2003 as the critical terms of the interest rate swap match the terms of the hedged debt obligations. Ricoh expects that it will reclassify into earnings through other (income) expenses during the

next 12 months approximately ¥149 million ($1,263 thousand) of the balance of accumulated other comprehensive loss as of March 31, 2003.

## Undesignated Derivative Instruments

Derivative instruments not designated as hedging instruments are held to reduce the risk relating to the variability in exchange rates on assets and liabilities denominated in foreign currencies. Changes in the fair value of these instruments are included in other (income) expenses on the consolidated statements of income.

## 16. COMMITMENTS AND CONTINGENT LIABILITIES

As of March 31, 2003, Ricoh had outstanding contractual commitments for acquisition or construction of plant, equipment and other assets aggregating ¥2,234 million ($18,932 thousand).

As of March 31, 2003, Ricoh was also contingently liable as guarantor for employees' housing loans of ¥461 million ($3,907 thousand).

Ricoh made rental payments totaling ¥39,956 million, ¥46,426 million and ¥50,218 million ($425,576 thousand) for the years ended March 31, 2001, 2002

and 2003, respectively, under operating lease agreements for office space and machinery and equipment, which are primarily cancelable and renewable.

As of March 31, 2003, the Company and certain of its subsidiaries were parties to litigation involving routine matters, such as patent rights. In the opinion of management, the ultimate liability, if any, resulting from such litigation will not materially affect the consolidated financial position or the results of operations of Ricoh.

## 17. DISCLOSURES ABOUT THE FAIR VALUE OF FINANCIAL INSTRUMENTS

### (a) Cash and cash equivalents, Time deposits, Trade receivables, Short-term borrowings, Current maturities of long-term indebtedness, Trade payables and Accrued expenses

The carrying amounts approximate fair values because of the short maturities of these instruments.

### (b) Marketable securities and Investment securities

The fair value of the marketable securities and investment securities is principally based on quoted market price.

### (c) Installment loans

The fair value of installment loans is based on the present value of future cash flows using the current rate for similar instruments of comparable maturity.

### (d) Long-term indebtedness

The fair value of each of the long-term indebtedness instruments is based on the quoted price in the most active market or the present value of future cash flows

associated with each instrument discounted using the current borrowing rate for similar instruments of comparable maturity.

### (e) Interest rate swap agreements

The fair value of interest rate swap agreements is estimated by obtaining quotes from brokers.

### (f) Foreign currency contracts and Foreign currency options

The fair value of foreign currency contracts and foreign currency options used for hedging purposes is estimated by obtaining quotes from brokers.

The estimated fair value of the financial instruments as of March 31, 2002 and 2003 is summarized as follows:

|  | Millions of yen | | | | Thousands of U.S. dollars | |
|  | 2002 | | 2003 | | 2003 | |
|  | Carrying amount | Estimated fair value | Carrying amount | Estimated fair value | Carrying amount | Estimated fair value |
|---|---|---|---|---|---|---|
| Marketable securities and Investment securities | ¥ 51,821 | ¥ 51,821 | ¥ 72,080 | ¥ 72,080 | $ 610,847 | $ 610,847 |
| Installment loans | 48,975 | 49,319 | 50,531 | 50,783 | 428,229 | 430,364 |
| Long-term indebtedness | (332,995) | (337,670) | (345,902) | (351,305) | (2,931,373) | (2,977,161) |
| Interest rate swap agreements, net | 4,081 | 4,081 | 3,985 | 3,985 | 33,771 | 33,771 |
| Foreign currency contracts, net | (8,304) | (8,304) | (594) | (594) | (5,034) | (5,034) |
| Foreign currency options, net | (314) | (314) | (466) | (466) | (3,949) | (3,949) |

### Limitations

Fair value estimates are made at a specific point in time, based on relevant market information and information about the financial instrument. These estimates are subjective in nature and involve uncertainties and matters of significant

judgment and therefore cannot be determined with precision. Changes in assumptions could significantly affect the estimates.

## 18. SEGMENT INFORMATION

The operating segments presented below are the segments of Ricoh for which separate financial information is available and for which a measure of profit or loss is managed regularly by Ricoh's management in deciding how to allocate resources and in assessing performance. The accounting policies of the segments are substantially the same as those described in the summary of significant accounting policies, as discussed in Note 2.

Ricoh's operating segments are comprised of office equipment, including copiers and related supplies, communications and information systems, and others, including optical equipment and electronic devices.

The following tables present certain information regarding Ricoh's operating segments and operations by geographic areas for the three years in the period ended March 31, 2003.

### (a) Operating Segment Information

| | 2001 | 2002 | 2003 | Thousands of U.S. dollars 2003 |
|---|---|---|---|---|
| | | Millions of yen | | |
| Sales— | | | | |
| Office equipment | ¥1,338,374 | ¥1,485,389 | ¥1,520,574 | $12,886,220 |
| Other | 205,095 | 190,815 | 220,539 | 1,868,975 |
| Intersegment transaction | (5,207) | (3,864) | (2,755) | (23,348) |
| Consolidated | ¥1,538,262 | ¥1,672,340 | ¥1,738,358 | $14,731,847 |
| | | | | |
| Operating expenses— | | | | |
| Office equipment | ¥1,195,834 | ¥1,304,079 | ¥1,329,776 | $11,269,288 |
| Other | 191,909 | 187,424 | 222,772 | 1,887,898 |
| Intersegment transaction | (5,218) | (3,893) | (2,726) | (23,102) |
| Unallocated expense | 50,632 | 55,035 | 54,882 | 465,102 |
| Consolidated | ¥1,433,157 | ¥1,542,645 | ¥1,604,704 | $13,599,186 |
| | | | | |
| Operating income— | | | | |
| Office equipment | ¥ 142,540 | ¥ 181,310 | ¥ 190,798 | $ 1,616,932 |
| Other | 13,186 | 3,391 | (2,233) | (18,924) |
| Elimination | (50,621) | (55,006) | (54,911) | (465,347) |
| Consolidated | ¥ 105,105 | ¥ 129,695 | ¥ 133,654 | $ 1,132,661 |
| | | | | |
| Other expenses | ¥ (7,340) | ¥ (15,745) | ¥ (10,184) | $ (86,305) |
| | | | | |
| Income before income taxes, minority interests and equity in earnings of affiliates | ¥ 97,765 | ¥ 113,950 | ¥ 123,470 | $ 1,046,356 |

|  | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
|  | 2001 | 2002 | 2003 | 2003 |
| **Total assets—** | | | | |
| Office equipment | ¥1,179,499 | ¥1,219,723 | ¥1,198,706 | $10,158,525 |
| Other | 180,164 | 185,158 | 176,296 | 1,494,034 |
| Elimination | (9,116) | (6,991) | (6,908) | (58,542) |
| Corporate assets | 354,244 | 435,038 | 516,828 | 4,379,898 |
| Consolidated | ¥1,704,791 | ¥1,832,928 | ¥1,884,922 | $15,973,915 |
| **Expenditure for segment assets—** | | | | |
| Office equipment | ¥ 61,836 | ¥ 68,513 | ¥ 65,720 | $ 556,949 |
| Other | 10,235 | 5,633 | 7,213 | 61,127 |
| Corporate assets | 1,258 | 1,530 | 1,023 | 8,670 |
| Consolidated | ¥ 73,329 | ¥ 75,676 | ¥ 73,956 | $ 626,746 |
| **Depreciation—** | | | | |
| Office equipment | ¥ 52,908 | ¥ 64,426 | ¥ 60,687 | $ 514,297 |
| Other | 7,598 | 7,448 | 6,917 | 58,619 |
| Corporate assets | 1,636 | 1,908 | 1,954 | 16,559 |
| Consolidated | ¥ 62,142 | ¥ 73,782 | ¥ 69,558 | $ 589,475 |

Unallocated expense represents expenses for corporate headquarters.

Intersegment sales are not separated by operating segment because they are immaterial.

Corporate assets consist primary of cash and cash equivalents and marketable securities maintained for general corporate purposes.

## (b) Geographic Information

Sales which are attributed to countries based on location of customers and long-lived assets for the years ended March 31, 2001, 2002 and 2003 are as follows:

|  | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
|  | 2001 | 2002 | 2003 | 2003 |
| **Sales—** | | | | |
| Japan | ¥ 930,433 | ¥ 902,655 | ¥ 896,022 | $ 7,593,407 |
| The Americas | 252,698 | 341,747 | 343,940 | 2,914,746 |
| Europe | 247,449 | 311,312 | 354,477 | 3,004,042 |
| Other | 107,682 | 116,626 | 143,919 | 1,219,652 |
| Consolidated | ¥1,538,262 | ¥1,672,340 | ¥1,738,358 | $14,731,847 |
| **Long-lived assets—** | | | | |
| Japan | ¥ 244,506 | ¥ 257,752 | ¥ 251,214 | $ 2,128,932 |
| The Americas | 70,809 | 77,269 | 71,850 | 608,898 |
| Europe | 37,557 | 38,320 | 34,062 | 288,661 |
| Other | 12,694 | 12,897 | 11,742 | 99,509 |
| Consolidated | ¥ 365,566 | ¥ 386,238 | ¥ 368,868 | $ 3,126,000 |

Ricoh's long-lived assets consist of property, plant and equipment, goodwill, other intangible assets and lease deposits and other.

## (c) Additional Information

The following information shows net sales and operating income recognized by geographic origin for the years ended March 31, 2001, 2002 and 2003. In addition to the disclosure requirements under SFAS No. 131, "Disclosure about Segments of an Enterprise and Related Information," Ricoh discloses this information as supplemental information in light of the disclosure requirements of the Japanese Securities and Exchange Law, which a Japanese public company is subject to.

| | Millions of yen | | | Thousands of U.S. dollars |
| | 2001 | 2002 | 2003 | 2003 |
|---|---|---|---|---|
| Sales— | | | | |
| Japan | | | | |
| External customers | ¥ 954,125 | ¥ 938,946 | ¥ 954,310 | $ 8,087,373 |
| Intersegment | 279,802 | 309,745 | 320,596 | 2,716,915 |
| Total | 1,233,927 | 1,248,691 | 1,274,906 | 10,804,288 |
| The Americas | | | | |
| External customers | 252,029 | 338,016 | 333,935 | 2,829,958 |
| Intersegment | 4,470 | 8,937 | 5,620 | 47,627 |
| Total | 256,499 | 346,953 | 339,555 | 2,877,585 |
| Europe | | | | |
| External customers | 254,548 | 309,086 | 352,943 | 2,991,042 |
| Intersegment | 3,246 | 4,265 | 3,019 | 25,585 |
| Total | 257,794 | 313,351 | 355,962 | 3,016,627 |
| Other | | | | |
| External customers | 77,560 | 86,292 | 97,170 | 823,474 |
| Intersegment | 39,571 | 60,655 | 72,664 | 615,797 |
| Total | 117,131 | 146,947 | 169,834 | 1,439,271 |
| Elimination of intersegment sales | (327,089) | (383,602) | (401,899) | (3,405,924) |
| Consolidated | ¥1,538,262 | ¥1,672,340 | ¥1,738,358 | $14,731,847 |
| | | | | |
| Operating expenses— | | | | |
| Japan | ¥1,150,353 | ¥1,142,522 | ¥1,188,760 | $ 10,074,237 |
| The Americas | 247,521 | 335,521 | 325,228 | 2,756,169 |
| Europe | 246,498 | 301,152 | 337,693 | 2,861,805 |
| Other | 110,937 | 139,874 | 159,864 | 1,354,780 |
| Elimination of intersegment sales | (322,152) | (376,424) | (406,841) | (3,447,805) |
| Consolidated | ¥1,433,157 | ¥1,542,645 | ¥1,604,704 | $13,599,186 |
| | | | | |
| Operating income— | | | | |
| Japan | ¥ 83,574 | ¥ 106,169 | ¥ 86,146 | $ 730,051 |
| The Americas | 8,978 | 11,432 | 14,327 | 121,415 |
| Europe | 11,296 | 12,199 | 18,269 | 154,822 |
| Other | 6,194 | 7,073 | 9,970 | 84,492 |
| Elimination of intersegment profit | (4,937) | (7,178) | 4,942 | 41,881 |
| Consolidated | ¥ 105,105 | ¥ 129,695 | ¥ 133,654 | $ 1,132,661 |
| | | | | |
| Other expenses | ¥ (7,340) | ¥ (15,745) | ¥ (10,184) | $ (86,305) |
| | | | | |
| Income before income taxes, minority interests and equity in earnings of affiliates | ¥ 97,765 | ¥ 113,950 | ¥ 123,470 | $ 1,046,356 |
| | | | | |
| Total assets— | | | | |
| Japan | ¥1,042,557 | ¥1,084,387 | ¥1,064,857 | $ 9,024,212 |
| The Americas | 209,638 | 228,743 | 201,359 | 1,706,432 |
| Europe | 163,542 | 172,408 | 174,541 | 1,479,161 |
| Other | 63,438 | 61,549 | 70,458 | 597,102 |
| Elimination | (128,628) | (149,197) | (143,121) | (1,212,890) |
| Corporate assets | 354,244 | 435,038 | 516,828 | 4,379,898 |
| Consolidated | ¥1,704,791 | ¥1,832,928 | ¥1,884,922 | $15,973,915 |

Intersegment sales between geographic areas are made at cost plus profit. Operating income by geographic area is sales less expense related to the area's operating revenue.

No single customer accounted for 10% or more of the total revenues for the periods ended March 31, 2000, 2001 and 2002.

## 19. SUPPLEMENTARY INFORMATION TO THE STATEMENTS OF INCOME

The following amounts were charged to selling, general and administrative expenses for the years ended March 31, 2001, 2002 and 2003:

|  | Millions of yen | | | Thousands of U.S. dollars |
|---|---|---|---|---|
|  | 2001 | 2002 | 2003 | 2003 |
| Research and development costs | ¥78,239 | ¥80,799 | ¥83,551 | $708,059 |
| Advertising costs | 18,592 | 16,868 | 16,958 | 143,712 |
| Shipping and handling costs | 11,123 | 13,332 | 12,582 | 106,627 |

## 20. SUBSEQUENT EVENTS

On December 17, 2002, the Company entered into a definitive share exchange agreement with Tohoku Ricoh Co., Ltd (Tohoku Ricoh), a domestic subsidiary of the Company, in order to convert Tohoku Ricoh into a wholly owned subsidiary. Under the terms of the agreement, 0.345 of one share of the Company's common stock was granted in exchange for each share of Tohoku Ricoh's common stock.

The Company completed the share exchange on April 1, 2003, using 2,239,533 shares of treasury stock it held as of March 31, 2003, with a cost value of ¥4,264 million ($36,136 thousand).

## Independent Auditors' Report

To the Shareholders and the Board of Directors
of Ricoh Company, Ltd.:

We have audited the accompanying consolidated balance sheets of Ricoh Company, Ltd. (a Japanese corporation) and subsidiaries as of March 31, 2002 and 2003, and the related consolidated statements of income, shareholders' investment and cash flows for each of the years in the three-year period ended March 31, 2003, expressed in yen. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Ricoh Company, Ltd. and subsidiaries as of March 31, 2002 and 2003, and the results of their operations and their cash flows for each of the years in the three-year period ended March 31, 2003, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 2 to the consolidated financial statements, the Company changed its policy concerning which short-term investments are treated as cash equivalents.

Also, as discussed in Note 2 to the consolidated financial statements, the Company and its subsidiaries adopted the provisions of Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets," effective April 1, 2002 and the provisions of Statement of Financial Accounting Standards No. 133, "Accounting for Derivative Instruments and Hedging Activities," effective April 1, 2001.

The accompanying consolidated financial statements as of and for the year ended March 31, 2003 have been translated into United States dollars solely for the convenience of the reader. We have recomputed the translation and, in our opinion, the consolidated financial statements, expressed in yen, have been translated into dollars on the basis set forth in Note 2 to the consolidated financial statements.

*K P M G*

Tokyo, Japan
April 30, 2003

# Ricoh's Global Network

As of March 31, 2003

## Japan

### Production
Tohoku Ricoh Co., Ltd.
Hasama Ricoh, Inc.
Ricoh Optical Industries Co., Ltd.
Ricoh Unitechno Co., Ltd.
Ricoh Elemex Corporation
Ricoh Keiki Co., Ltd.
Ricoh Microelectronics Co., Ltd.

### Sales and Other
Ricoh Tohoku Co., Ltd.
Ricoh Chubu Co., Ltd.
Ricoh Kansai Co., Ltd.
Ricoh Chugoku Co., Ltd.
Ricoh Kyushu Co., Ltd.
Tokyo Ricoh Co., Ltd.
Osaka Ricoh Co., Ltd.
NBS Ricoh Co., Ltd.
Ricoh Technosystems Co., Ltd.
Ricoh Leasing Company, Ltd.
Ricoh Logistics System Co., Ltd.

## The Americas

### Production
*Mexico*
Ricoh Industrial de Mexico, S.A.
de C.V.
*United States*
Ricoh Electronics, Inc.

### Sales and Other
*Argentina*
Ricoh Argentina S.A.
*Brazil*
Gestetner do Brazil S.A.
*Canada*
Ricoh Canada Inc.
*Chile*
Lanier de Chile, S.A.
*Colombia*
Gestetner Colombia S.A.
Lanier Colombia, S.A.
*Costa Rica*
Lanier de Costa Rica, S.A.
*Dominican Republic*
Lanier Dominicana, S.A.
*El Salvador*
Lanier de El Salvador, S.A. de C.V.
*Guatemala*
Lanier de Guatemala, S.A.

*Mexico*
Ricoh Mexicana, S.A. de C.V.
*Panama*
Lanier de Panama, S.A.
*Puerto Rico*
NRG Distribution Corporation
Lanier Puerto Rico, Inc.
*United States*
Ricoh Corporation
Ricoh Finance Corporation
Ricoh Innovations, Inc.
Ricoh Latin America, Inc.
Savin Corporation
Lanier Worldwide, Inc.
*Uruguay*
Gestetner Limitada
Ricoh South America Distribution
Center S.A.
*Venezuela*
Ricoh de Venezuela S.A.

## Europe, Africa, and the Middle East

### Production
*France*
Ricoh Industrie France S.A.
*United Kingdom*
Ricoh UK Products Ltd.
Ricoh Wellingborough Products
Ltd.
GR Advanced Materials Ltd.

### Sales and Other
*Austria*
Ricoh Austria GmbH
Gestetner Buromaschinen-
Verkaufsgesellschaft m.b.H
Lanier Bürosysteme GmbH & Co.
KG
*Belgium*
Lanier Belgium N.V./S.A.
NRG Belgium S.A.
*Denmark*
NRG Scandinavia A/S
*Finland*
Ricoh Finland Oy
*France*
Ricoh France S.A.
NRG France S.A.
Rex-Rotary S.A.

*Germany*
Ricoh Deutschland GmbH
NRG Deutschland GmbH
Lanier Deutschland GmbH & Co.
KG
*Guernsey*
NRG International Limited
*Hungary*
Ricoh Hungary Kft.
*Ireland*
NRG Ireland Limited
*Israel*
Gestetner (Israel) Limited
*Italy*
Ricoh Italia S.p.A.
NRG Italia S.p.A.
Lanier Italia, S.p.A.
*Netherlands*
Ricoh Europe B.V.
Ricoh Nederland B.V.
Ricoh Finance Nederland B.V.
Kulk & Kramer Kantoorsystemen
BV
NRG Benelux BV
Lanier CV
*Norway*
Ricoh Norge A.S.
*Poland*
Ricoh Polska Sp.zo.o.
*Russia*
Mitsui-Ricoh CIS Ltd.
*South Africa*
NRG Gestetner South Africa (Pty)
Ltd.
*Spain*
Ricoh España S.A.
NRG Group Spain S.A.
Lanier España S.A.
*Sweden*
NRG Scandinavia AB
*Switzerland*
Lanier (Schweiz) AG
*United Kingdom*
Ricoh UK Ltd.
NRG Group PLC
Midland Copying Consultants
Limited
NRG Group UK Limited
Lanier United Kingdom Ltd.

## Asia and Oceania

### Production
*China*
Ricoh Asia Industry (Shenzhen)
Ltd.
Ricoh Dianzhuang (Shenzhen)
Electronics Co., Ltd.
Ricoh International (Shanghai)
Co., Ltd.
Shanghai Ricoh Facsimile Co., Ltd.
*Korea*
Sindo Ricoh Co., Ltd.
*Taiwan*
Taiwan Ricoh Co., Ltd.

### Sales and Other
*Australia*
Ricoh Australia Pty. Ltd.
Lanier (Australia) Pty. Ltd.
Hanimex Pty, Limited
Rabbit Photo Holdings Limited
*China*
Ricoh China Co., Ltd.
Ricoh Electronic Technology Ltd.
(China)
Ricoh Electronic Technology Ltd.
(Beijing)
*Hong Kong*
Ricoh Hong Kong Ltd.
Ricoh Asia Industry Ltd.
Ricoh Component (H.K.) Ltd.
*India*
Ricoh India Limited
Gestetner (India) Limited
*Malaysia*
Ricoh Malaysia Sdn. Bhd.
*New Zealand*
Ricoh New Zealand Limited
Hanimex (NZ) Limited
Camera House Limited
Viko New Zealand Limited
*Philippines*
Ricoh Philippines, Inc.
*Singapore*
Ricoh Asia Pacific Pte. Ltd.
Ricoh Singapore Pte Ltd.
Lanier Singapore Pte. Ltd.
*Thailand*
Ricoh Thailand Ltd.

# Senior Management
As of June 26, 2003



**Hiroshi Hamada**
Chairman



**Masamitsu Sakurai**
President, Chief Executive Officer
and Chief Operating Officer



**Haruo Kamimoto**
Deputy President



**Tatsuo Hirakawa**
Deputy President

## Board of Directors

**Chairman**
Hiroshi Hamada

**President, Chief Executive Officer and Chief Operating Officer**
Masamitsu Sakurai

**Deputy Presidents**
Haruo Kamimoto*
Tatsuo Hirakawa*

**Executive Managing Directors**
Naoto Shibata*
Koichi Endo*
Masami Takeiri*
Masayuki Matsumoto*

**Managing Directors**
Makoto Hashimoto*
Katsumi Yoshida*
Kiyoshi Sakai*
Shiroh Kondoh*
Kazuo Togashi*
Kazunori Azuma*

**Directors**
Josei Itoh
   (Chairman of Nippon Life Insurance Company)
Nobuo Mii
   (Managing Partner of IGNITE Group)

## Corporate Auditors

Hisaaki Koga
Hideyuki Takamatsu
Kenji Matsuishi
Takehiko Wada

## Executive Officers

**Executive Vice Presidents**
Terumoto Nonaka
Tadatoshi Sakamaki
Etsuo Kobayashi
Hiroshi Tategami
Zenji Miura

**Senior Vice Presidents**
Kenji Hatanaka
Hideko Kunii
Kunio Taniguchi
Hiroshi Kobayashi
Hiroshi Tsuruga
Kiyoto Nagasawa
Yutaka Ebi
Hiroo Matsuda
Hiroshi Adachi
Kohji Sawa

## Group Executive Officers

**Senior Vice Presidents**
Itsuo Kawaji
Takashi Nakamura
Yuji Inoue
Peter E. Hart
Masami Yoneyama
Bernard Decugis
Yoichi Shirahata
Norihisa Goto

*Concurrently serving as Executive Vice Presidents

# Corporate Data

## Ricoh Company, Ltd.

**Corporate Headquarters**
15-5, Minami-Aoyama 1-chome,
Minato-ku, Tokyo 107-8544, Japan
Tel: (81) 3-3479-3111
Fax: (81) 3-3403-1578

**Date of Establishment**
February 6, 1936

**Number of Shares Authorized**
993,000,000 shares

**Number of Shares Issued (as of March 31, 2003)**
744,912,078 shares

**Stock Listings**
Tokyo, Osaka, Nagoya, Fukuoka,
Sapporo, Amsterdam, Frankfurt, Paris

**Independent Public Accountants**
KPMG

**Transfer Agent for Common Stock**
The Chuo Mitsui Trust and Banking Co., Ltd.
33-1, Shiba 3-chome,
Minato-ku, Tokyo 105-8574, Japan

**Depositary and Agent for American Depositary Receipts**
The Bank of New York
101 Barclay Street, 22 West
New York, NY 10286, U.S.A.
Tel: 212-815-2042
US toll free: 1-888-269-2377
Website: http://www.bankofny.com/adr

**Listing in the Amsterdam Security Account**
**System on Euronext Amsterdam**
Nominee Amsterdam Stock Exchange

**Depositaries and Agents for Global Bearer Certificates**
Clearstream Banking Aktiengesellschaft
Commerzbank Aktiengesellschaft

**Clearing House and Sponsoring Banks for Listing on**
**Euronext Paris**
Euroclear France
Crédit Lyonnais
Banque Nomura France

For further information and additional copies of our annual report and other
publications, please write to the Public Relations Department at our corporate
headquarters.



**RICOH CORPORATION**

5 Dedrick Place, West Caldwell,
New Jersey 07006, U.S.A.
Tel: (1) 973-882-2000
Fax: (1) 973-882-2506
Website: http://www.ricoh-usa.com/

**RICOH EUROPE B.V.**

Groenelaan 3,
P.O. Box 114, 1186 AA
Amstelveen, Netherlands
Tel: (31) 20-5474111
Fax: (31) 20-5474154
Website: http://www.ricoh-europe.com/

**RICOH ASIA PACIFIC PTE. LTD.**

#15-01/02 The Heeren, 260 Orchard Road,
Singapore 238855
Tel: (65) 830-5888
Fax: (65) 830-5830
Website: http://www.ricoh.com.sg/

**RICOH CHINA CO., LTD.**

29/F., Lippo Plaza,
No. 222 Huai Hai Zhong Road,
Lu Wan District, Shanghai, China
Tel: (86) 21-5396-6888
Fax: (86) 21-5396-5860
Website: http://www.ricoh.com.cn/

**RICOH COMPANY, LTD.**

15-5, Minami-Aoyama 1-chome,
Minato-ku, Tokyo 107-8544, Japan
Tel: (81) 3-3479-3111
Fax: (81) 3-3403-1578
Website: http://www.ricoh.com/





The covers and pages 1 to 16 and 53 to 56 of this publication were printed on
100%-recycled paper; the paper on pages 17 to 52 is 60%-recycled.

Printed in Japan
0307