Teresa M. Corbin (SBN 132360)
Christopher Kelley (SBN 166608)
Erik K. Moller (SBN 147674)
HOWREY SIMON ARNOLD & WHITE, LLP
301 Ravenswood Avenue
Menlo Park, California  94025
Telephone:  (650) 463-8100
Facsimile:  (650) 463-8400

Attorneys for Plaintiff SYNOPSYS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SYNOPSYS, INC.,<br><br>   Plaintiff,<br><br> vs.<br><br>RICOH COMPANY, LTD,<br><br>   Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. C03-02289 MJJ

**DECLARATION OF LOUIS L. CAMPBELL IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SANCTIONS**

I, Louis L. Campbell, hereby declare as follows:

I am an attorney at law, licensed to practice in the state of California and an associate at the law firm of Howrey Simon Arnold & White, LLP ("Howrey"), attorney of record for defendants Aeroflex, Inc., AMI Semiconductor, Inc., Matrox Electronic Systems, Ltd., Matrox Graphics, Inc., Matrox International Corp., and Matrox Tech, Inc. (collectively "Defendants") in the Ricoh v. Aeroflex, et al litigation and for plaintiff Synopsys, Inc. ("Synopsys") in the Synopsys v. Ricoh litigation.  The matters set forth in this declaration are based upon my personal knowledge, except where otherwise indicated, and if called as a witness, I could and would testify competently thereto.

  1.  I had principal responsibility for the preparation of a subpoena that was served on Dr. Donald Thomas on June 26, 2003.  My secretary, Ms. Wendy Hobbs, carried out the details of

**HOWREY**
**SIMON**
**ARNOLD &**
**WHITE**

DECLARATION OF LOUIS CAMPBELL IN SUPPORT OF PLAINTIFF'S OPPOSITOIN
TO DEFENDANT'S MOTION FOR SANCTIONS
Case: C03-02289 MJJ

1

1   arranging for a process server serve the subpoena on Dr. Thomas.

2       2.      It is generally understood among the attorneys and staff at the Menlo Park office of

3   Howrey Simon Arnold & White that discovery, including process directed to third parties, is to be

4   served on opposing counsel.  Based on this, I did not specifically instruct Ms. Hobbs to serve opposing

5   counsel with a copy of the process served on Dr. Thomas.

6       3.      It was never my intention to prevent or delay a copy of this subpoena from being served

7   on Ricoh's counsel.

8       4.      Despite my best intentions, a copy of this subpoena was not sent to Ricoh's counsel.

9   However, I did not know this fact until July 22.  During the interim period between June 26 to July 22,

10  I worked under the assumption that Ricoh was fully aware of the Dr. Thomas subpoena.

11      5.      On July 22, 2003, as soon as I received confirmation that Dr. Thomas had adopted the

12  terms that we had proposed for a consulting relationship, I then sent a letter via facsimile to Edward

13  Meilman, counsel for Ricoh, stating that we had retained Dr. Thomas and were taking his deposition

14  off calendar.  It was my belief at this point in time that Ricoh had been served notice of Dr. Thomas'

15  subpoena on or about the time that the subpoena was being served on Dr. Thomas.

16      6.      I have been informed that on July 22, 2003, Edward Meilman, counsel for Ricoh, had a

17  telephone conversation with Mr. Kelley, my supervising partner.  During this telephone call Mr.

18  Meilman informed Mr. Kelley that Ricoh had not received a copy of the June 26, 2003 subpoena that

19  had been served on Dr. Thomas.  After verifying this fact, on July 23, 2003 Mr. Kelley sent a copy of

20  the subpoena and deposition notice that had been served on Dr. Thomas to Ricoh's counsel.

21      7.      I have spoken with Dr. Thomas on only one occasion and that was July 23, 2003.  The

22  remainder of our communication was in the form of voice mails setting up the July 23 call, e-mails, or

23  by letter.  Dr. Thomas never discussed the content of his conversations with Ricoh or characterized

24  any view that he may have expressed about Ricoh's patent.  To the extent that I had any expectation

25  that Dr. Thomas might have a negative opinion of Ricoh's patent, that expectation was based

26  exclusively on two things:

27      1) The fact that Dr. Thomas had ended his relationship with Ricoh and had offered to work for

28  Synopsys; and

**HOWREY
SIMON
ARNOLD &
WHITE**

2

DECLARATION OF LOUIS CAMPBELL IN SUPPORT OF PLAINTIFF'S OPPOSITOIN
TO DEFENDANT'S MOTION FOR SANCTIONS
Case No. C03-02289 MJJ

2) My own review of the Ricoh patent and the relevant prior art, including Dr. Thomas' own prior research.

8.      Dr. Thomas never performed any substantive work under the aborted consulting agreement and has received absolutely no payment from Synopsys, the Delaware defendants, Howrey, or any of their employees or agents.

9.      Ricoh has alleged that I intended to mislead Dr. Thomas when I replied to his July 7, 2003 email in which he asked, among other things, "have they [Ricoh] listed me as a consultant?"  On that same day I responded, "They have not listed you as a consultant in this case."  I based my response to him on my review of Ricoh's initial disclosure statement, which does not identify Dr. Thomas.  I did not interpret his question as asking whether he had been identified by Ricoh on a pre-trial list of testifying experts.

10.     Attached as Exhibit A is a true and correct copy of the transcript of the August 14, 2003, deposition of Dr. Donald E. Thomas, Jr. ("Dr. Thomas").

11.     Attached as Exhibit B is a true and correct copy of emails between Dr. Thomas and Defendants' counsel that were produced pursuant to the July 30, 2003, order of Judge Sleet of the Delaware Federal District Court.

12.     Attached as Exhibit C is a true and correct copy of the transcript of the August 28, 2003 teleconference between Judge Sleet and counsel for the parties in this action.

13.     Attached as Exhibit D is a true and correct copy of the transcript of the July 30, 2003 teleconference between Judge Sleet and counsel for the parties in this action.

14.     Attached as Exhibit E is a true and correct copy of a letter dated August 5, 2003 from Mr. Kelley, counsel for Defendants, to Mr. Hoffman, counsel for Ricoh, enclosing the communications found in Exhibit B.

15.     Attached as Exhibit F is a true and correct copy of a facsimile dated July 17, 2003 from Mr. Campbell, counsel for Defendants, to Mr. Meilman, counsel for Ricoh, notifying Ricoh of Defendants' retention of Dr. Thomas as an expert and taking the noticed deposition off calendar.

16.     Attached as Exhibit G is a true and correct copy of a letter dated August 20, 2003 from Mr. Whetzel, counsel for Ricoh, to Mr. DiGiovanni, counsel for Defendants, enclosing a declaration

HOWREY
SIMON
ARNOLD &
WHITE

3

DECLARATION OF LOUIS CAMPBELL IN SUPPORT OF PLAINTIFF'S OPPOSITOIN
TO DEFENDANT'S MOTION FOR SANCTIONS
Case No. C03-02289 MJJ

1 | of Mr. Monsey regarding Ricoh's communications with Dr. Thomas.

2 |        17.    Attached as Exhibit H is a true and correct copy of an order from Judge Sleet dated July

3 | 31, 2003.

4 |        18.    Attached as Exhibit I is a true and correct copy of a letter dated July 23, 2003 from

5 | Christopher L. Kelley to Gary Hoffman responding to Mr. Hoffman's letters of July 22, 2003 to Terry

6 | Corbin and Dr. Thomas.

7 |     I declare under penalty of perjury under the laws of the United States of America that the

8 | foregoing is true and correct to the best of my knowledge.  Executed on December 16, 2003, at Menlo

9 | Park, California.

10

11 |                   /s/ Louis Campbell

12 |                     Louis Campbell

**HOWREY SIMON ARNOLD & WHITE**

DECLARATION OF LOUIS CAMPBELL IN SUPPORT OF PLAINTIFF'S OPPOSITOIN
TO DEFENDANT'S MOTION FOR SANCTIONS
Case No. C03-02289 MJJ

# EXHIBIT A

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF DELAWARE

3

4    RICOH COMPANY, LTD.,              )

5                     Plaintiff,      )   CIVIL ACTION

6          vs.                        )   No. 03-103-GMS

7    AEROFLEX INCORPORATED, AMI       )

8    SEMICONDUCTOR, INC., MATROX      )

9    ELECTRONIC SYSTEMS, LTD.,        )

10   MATROX GRAPHICS INC., MATROX     )

11   INTERNATIONAL CORP., and         )

12   MATROX TECH, INC.,               )

13                     Defendants.    )

14

15

16        REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED

17        WITHOUT THE AUTHORIZATION OF THE CERTIFIED

18                          AGENCY

19

20

21

22        DEPOSITION OF DONALD E. THOMAS, JR.

23             Thursday, August 14, 2003

24

25

1

2                DEPOSITION OF DONALD E. THOMAS, JR.

3    taken pursuant to the Federal Rules of Civil Procedure,

4    before Lisa Ann Bauer, Certified Realtime

5    Reporter-Notary Public in and for the Commonwealth of

6    Pennsylvania, on Thursday, August 14, 2003, at the

7    offices of Buckler & Associates Court Reporters, 1805

8    Law & Finance Building, 429 Fourth Avenue, Pittsburgh,

9    Pennsylvania 15219, commencing at 9:00 o'clock a.m.

10                         - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1                A P P E A R A N C E S

 2                       - - -

 3   On behalf of the Plaintiff:

 4          Kenneth W. Brothers, Esquire

 5          Dickstein Shapiro Morin & Oshinsky, LLP

 6          2101 L Street NW

 7          Washington, DC  20037

 8

 9   On behalf of the Defendants:

10          Francis DiGiovanni, Esquire

11          Connolly Bove Lodge & Hutz, LLP

12          1220 Market Street

13          Wilmington, DE  19899

14

15                       - - -

16

17                     I N D E X

18   WITNESS               EXAMINATION BY              PAGE

19   DONALD E. THOMAS      Mr. Brothers

20                         Mr. DiGiovanni

21

22

23

24

25
```

Page 4

```
 1                                          MARKED FOR
 2   EXHIBITS                               IDENTIFICATION
 3   Thomas Deposition Exhibit 1
 4   Thomas Deposition Exhibit 2
 5   Thomas Deposition Exhibit 3
 6   Thomas Deposition Exhibit 4
 7   Thomas Deposition Exhibit 5
 8   Thomas Deposition Exhibit 6
 9   Thomas Deposition Exhibit 7
10   Thomas Deposition Exhibit 8
11   Thomas Deposition Exhibit 9
12   Thomas Deposition Exhibit 10
13   Thomas Deposition Exhibit 11
14                       - - -
15
16
17
18
19
20
21
22
23
24
25
```

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 5

1                    P R O C E E D I N G S
2                    (9:00 o'clock a.m.)
3                    DONALD E. THOMAS, JR.
4     the deponent, having been first duly sworn, was deposed
5     and testified as follows:
6                         EXAMINATION
7     BY MR. BROTHERS:
8         Q.    State your complete name, please.
9         A.    Donald E. Thomas, Jr.
10        Q.    Your business address, please?
11        A.    Carnegie Mellon University, 5000 Forbes Avenue,
12    ECE Department, Pittsburgh, PA 15213.
13        Q.    Your home address?
14        A.    1611 Tier Drive, Pittsburgh 15241.
15        Q.    Dr. Thomas, my name is Ken Brothers.  We met
16    before the start of the deposition.  I represent Ricoh
17    in this action.
18              Do you understand that the court has entered
19    an order with respect to your deposition today?
20        A.    I have just received that, yes.
21        Q.    When did you receive a copy of that order?
22        A.    I think that that is -- is that this item?
23        Q.    Yes.  Let me mark a copy of the original letter
24    which you brought with you.  I am marking as Thomas
25    Deposition Exhibit 1 a copy of a letter dated

Page 6

```
 1   August 8th, 2003.
 2        A.    Received by me on August 12th.
 3               (Thomas Deposition Exhibit 1
 4          was marked for identification.)
 5   BY MR. BROTHERS:
 6        Q.    So was it sent by regular mail to you?  You
 7   have the envelope with you and it was regular mail; is
 8   that correct?
 9        A.    Yes.
10        Q.    When you received what we've marked as Thomas
11   Exhibit 1, did you read it?
12        A.    Yes.
13        Q.    Did you understand at that time, as set forth
14   in paragraph 1, that pending further order of this
15   court, neither defendants nor their counsel shall have
16   any communication with you regarding the merits of this
17   case?
18        A.    Yes.
19        Q.    Had anybody told you that prior to your receipt
20   of Thomas Exhibit 1?
21        A.    No, no.
22        Q.    The letter on the first page of Thomas
23   Exhibit 1 is from an attorney named Erik Moller with
24   the Howrey law firm.
25               Do you know who Mr. Moller is?
```

1      A.    I have never met personally any of these

2  people.

3      Q.    Have you spoken with Mr. Moller?

4      A.    No.  I think the only one I've spoken with is

5  Mr. Campbell, Louis Campbell.

6      Q.    You have not spoken with Chris Kelly of the

7  Howrey firm?

8      A.    I don't think so.

9      Q.    Have you spoken with Terry Corbin of the Howrey

10  firm?

11      A.    I don't think I've spoken with anybody but

12  Mr. Campbell.

13      Q.    Have you ever spoken with Frank DiGiovanni or

14  anyone else?

15      A.    I don't believe so.

16      Q.    Do you understand whether or not anybody is

17  representing you at your deposition today?

18      A.    I don't know whether Mr. DiGiovanni is or not.

19  I obviously appeared with no counsel on my own.

20      Q.    One other item with respect to Thomas

21  Exhibit 1.  Do you understand that as set forth in

22  paragraph 3, the subject of today's deposition is

23  limited to all communications with defendants, their

24  attorneys, or Synopsys regarding the 432 patent?

25      A.    Yes.

Deposition of:
Donald E. Thomas, Jr.                                    August 14, 2003

Page 8

1        Q.    I would ask you, during your deposition today,

2    to refrain from discussing any other issues,

3    specifically including any communications you may have

4    had with counsel for Ricoh.

5              Is that agreeable?

6        A.    Yes.

7              MR. DiGIOVANNI:  I, too, would like to

8    state on the record that I would like to caution the

9    witness to refrain from stating the substance of any

10   of the communications you've had with counsel for

11   Ricoh.

12             (Thomas Deposition Exhibit 2

13        was marked for identification.)

14   BY MR. BROTHERS:

15       Q.    Thomas Exhibit 2 is a copy of a notice of

16   subpoena and subpoena dated August 8th, 2003.

17       A.    This one isn't to me.

18       Q.    Let me direct your attention to the third page

19   of Thomas Exhibit 2.

20       A.    Okay, fine.  All right.

21       Q.    Do you recognize --

22       A.    Yes, yes.

23       Q.    -- the subpoena?

24       A.    Yes.

25       Q.    This was a subpoena you received last Friday?

Page 9

1     A.    Right here.

2     Q.    You have the original of the subpoena in front

3  of you?

4     A.    Yes.

5     Q.    And when you received the subpoena, did you

6  review it?

7     A.    Yes.

8     Q.    And in response to the document specifications

9  that are set forth beginning at page 8, did you do a

10  search for responsive documents?

11    A.    Yes.

12    Q.    And were those the documents that you dropped

13  off at this office, this court reporter office here in

14  Pittsburgh, last Monday?

15    A.    Yes.

16    Q.    What did you do to locate documents that were

17  responsive to the subpoena?

18    A.    Well, I thought back over the last end months,

19  whatever that is back to March, what communications

20  I've had and then made my own notes about that.  Most

21  of them -- in fact, all except for one phone call, from

22  what I can recollect -- were, in fact, all in e-mail,

23  and so I went back through -- through all my e-mail

24  that's saved in my in box, the e-mail that's saved in

25  my sent folder, the e-mail that was in my deleted

Page 10

1    folder, and anything from Howrey that had to do with

2    this, I copied back into a special folder and printed

3    all those out, and that's what you have there.

4        Q.   Did you have only one telephone conversation

5    with the Howrey firm?

6        A.   Well, to the best of my recollection -- now,

7    there might have been a second one with Louis Campbell

8    because we had trouble getting in touch with each

9    other, but I think that there was only one.  And I

10   point out that as I said in the documents I presented

11   here, I don't keep telephone records of what goes on,

12   and so unless they happen to be referenced in the

13   e-mails -- and in fact, one was -- that's the one I

14   remembered having.

15       Q.   Did you make any notes during that telephone

16   conversation?

17       A.   No.

18       Q.   Did you exchange any voice mails with anybody

19   from Howrey?

20       A.   I think I might have had a voice mail -- I

21   can't remember if I've had a voice mail from Howrey or

22   not.  I think most of the conversations I've had with

23   them have been through e-mail.

24       Q.   But sitting here today, you don't remember

25   whether or not you left voice mails for Mr. Campbell or

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 11

1    anybody else at Howrey?

2        A.    If I did, it was what I said in my e-mails.

3        Q.    And sitting here today, you don't remember

4    whether Mr. Campbell or anybody else from Howrey left

5    you any voice mails?

6        A.    That's right.

7        Q.    Were the only methods of communication between

8    you and the Howrey firm e-mails, the one telephone

9    conversation or possibly two that you had with

10   Mr. Campbell, and possible voice mails?

11       A.    And the letter that was in here.

12       Q.    The retainer letter from Howrey?

13       A.    That's right.

14       Q.    Aside from that?

15       A.    And I -- that's right.  To the best of my

16   knowledge, I do want to point out that in here, back in

17   here, there was something referring to a fax, but I

18   only received the cover.  I didn't receive the content.

19   There was an e-mail in there referring to that.

20       Q.    Aside from that single fax cover sheet, did you

21   receive any other fax transmissions from Howrey?

22       A.    No.  Only as I seem to get a copy of the letter

23   and then a fax -- a fax and then I get the physical

24   copy of the letter.  So there were things that were

25   sent, but the letter came.  There was a duplicate.

Page 12

1     Q.    As to which letter are you referring, the

2  retainer letter?

3     A.    Well, for instance, the retainer letter, yeah.

4     Q.    Did you ever learn from Mr. Campbell of any

5  communications that he had with attorneys -- other

6  attorneys at Howrey?

7     A.    No.  Some of the e-mails say I spoke with my

8  colleagues, but there was never anything more than

9  that.  Or my colleagues want to set up a meeting.

10     Q.    He never reported to you any information from

11  any of his colleagues?

12     A.    That's right.

13     Q.    In response to the subpoena, I'd like to

14  identify some of the documents that you produced and

15  mark them.

16     A.    Sure.

17          (Thomas Deposition Exhibit 3

18          was marked for identification.)

19  BY MR. BROTHERS:

20     Q.    Exhibit 3 is a compilation of documents that

21  you had identified as being responsive to Items 1, 2,

22  3, and 4.  I will note that our firm, after receiving

23  the originals from you, added the numbers down at the

24  bottom, which we call Bates numbers, and I will also

25  note that we removed approximately eight or ten pages

1  that related to communications between yourself and

2  counsel for Ricoh.

3      A.    Fine.

4      Q.    Because they were beyond the scope of the

5  subpoena and beyond the scope of the court order.

6          So for identification, I will identify

7  Exhibit 3 as comprising PTH000002 through 57, with the

8  exception of pages 3, 4, 6, page 30 has been redacted,

9  31 and 32 have been removed, and 35 through 40 have

10  been removed.  And Mr. Thomas was sent a letter and a

11  privilege log with respect to those pages.

12              MR. DiGIOVANNI:  Mr. DiGiovanni.

13              MR. BROTHERS:  I'm sorry.

14  Mr. DiGiovanni.

15              MR. DiGIOVANNI:  That's correct.

16  BY MR. BROTHERS:

17      Q.    Looking through the documents that comprise

18  Exhibit 3, do you recognize these as the e-mails that

19  you printed out as I have described them?

20      A.    They appear to be, yes.

21      Q.    So you were the one that selected all of these

22  e-mails from your computer system and printed them out?

23      A.    Yes.

24      Q.    And you wrote the first page of Exhibit 3, that

25  text that appears there?

 1    A.    The following pages?

 2    Q.    Yes.

 3    A.    Yes.

 4    Q.    Before we get into the specifics of Exhibit 3,

 5  I'll just identify the remaining pages that you

 6  produced.

 7              (Thomas Deposition Exhibit 4

 8         was marked for identification.)

 9  BY MR. BROTHERS:

10    Q.    Exhibit 4 comprises a copy of your calendar,

11  and I'll ask you to verify that.  Is Exhibit 4, in

12  fact, a copy of your calendar that you produced

13  responsive to the subpoena?

14    A.    Yes.  It appears to be.

15              (Thomas Deposition Exhibit 5

16         was marked for identification.)

17  BY MR. BROTHERS:

18    Q.    Exhibit 5, is that a copy of the notes that you

19  prepared with respect to Item 9?

20    A.    Yes, that appears to be.

21    Q.    Did you look for copies of your phone bills?

22    A.    It wasn't clear to me that you were asking for

23  phone bills.

24    Q.    So you didn't look for them?

25    A.    So I did not look for them.

Page 15

```
 1                  (Thomas Deposition Exhibit 6
 2             was marked for identification.)
 3   BY MR. BROTHERS:
 4        Q.   Exhibit 6, is that a copy of your transmittal
 5   letter summarizing the documents that you've produced?
 6        A.   Yes, that appears to be.
 7        Q.   With the exception of those few pages that were
 8   communications between you and counsel for Ricoh, have
 9   we identified all of the documents that you produced
10   responsive to the subpoena that we marked as Exhibit 2?
11        A.   Yes, these appear to be.
12        Q.   Did you assume that counsel for the defendants,
13   the Howrey firm, had informed counsel for Ricoh about
14   the subpoena that you received back in June?
15        A.   I had made that assumption, yes.
16        Q.   Why had you made that assumption?
17        A.   I don't know.  I don't know anything about how
18   courts work, okay?  So I just assumed that if there was
19   really some litigation going on, some trial in process
20   or being developed, I assumed that that would have been
21   communicated.
22        Q.   Did counsel for the defendants, the Howrey
23   firm, in fact, ever tell you that they hadn't given a
24   copy of that subpoena or otherwise given notice of that
25   subpoena to counsel for Ricoh?
```

Page 16

1      A.    I don't remember that.  They may have.

2      Q.    Do you remember asking about that in one of

3  your e-mails?

4      A.    Oh, yes, I did ask.  That's right.  I did ask,

5  and it may, in fact, be in there.  I can take a look,

6  if you want.

7      Q.    But sitting here today, you have no

8  recollection of the Howrey firm ever telling you that

9  they told counsel for Ricoh about that June subpoena?

10      A.    Well, we can look at the records here.

11      Q.    And I'm happy to do that and we will go through

12  those.  I'm just asking for your current recollection

13  as you sit here.

14      A.    Well, the recollection is here on these sheets,

15  so that should have been somewhere in July.  (Witness

16  reviews documents.)

17      Q.    Let me direct your attention to the numbers

18  starting with page 26 down at the bottom.

19      A.    Okay.

20      Q.    Do you recognize that as -- and looking at the

21  top, an e-mail from you dated July 7th to Louis

22  Campbell?

23      A.    Yeah, uh-huh.

24      Q.    In which you wrote, "I assume that they know

25  that you subpoenaed me for documentation and

1    deposition."

2      A.    Right.

3      Q.    "Have they listed me as a consultant?"

4      A.    Yes, I wrote that, yes.

5      Q.    And looking at the next page, which is a

6    response from Mr. Campbell to you, do you see that he

7    did not answer your question with respect to whether

8    the Howrey firm had given Ricoh's counsel notice of the

9    subpoena and deposition?

10     A.    Okay, yes.

11     Q.    And he just said, "They have not listed you as

12   a consultant in this case."

13          Do you see that?

14     A.    Correct.

15          MR. DiGIOVANNI:  Objection to form,

16   foundation.

17   BY MR. BROTHERS:

18     Q.    Did you ever think about why Mr. Campbell did

19   not respond to your inquiry about whether the Howrey

20   firm had told Ricoh's counsel about the subpoena they

21   had served on you?

22          MR. DiGIOVANNI:  Objection to form and

23   foundation.

24          MR. BROTHERS:  You can answer.

25     A.    Actually, no, because I was more surprised by

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 18

1   the fact that I was not listed as a consultant in this

2   case, and that overrode any other thoughts about this,

3   why wasn't I.

4       Q.   Did you have the understanding that at this

5   stage of the litigation there was no obligation upon

6   counsel for any party to identify who their consultants

7   were?

8       A.   I am not privy to that knowledge.

9       Q.   So did you give thought, one way or the other,

10  as to whether the time had come to disclose

11  consultants?

12              MR. DiGIOVANNI:  Objection to form.

13              THE WITNESS:  Go ahead and answer.

14              MR. BROTHERS:  Yes.

15      A.   I had assumed that since I was asked in March

16  that lists had been made up of who was going to be a

17  consultant for whom, and that was the conversation that

18  I had where I said I would not testify for Ricoh.  So I

19  had assumed that consultant lists were being made up.

20  Did I know that they were being made up or did I know

21  that they were or were not published?  No, I'm not

22  privy to any of that.  Literally, my involvement in

23  this is pretty much limited to the time where I got

24  these e-mails and, you know, I'm not spending any time

25  on this case other than...

1    Q.    I would again caution you not to disclose any
2    communications that you may have had between yourself
3    and counsel for Ricoh.
4    A.    Okay.
5    Q.    And so I would ask and move to strike that
6    portion of the last answer.
7          When Mr. Campbell wrote to you, quote, "They
8    have not listed you as a consultant in this case," how
9    did you understand that?
10   A.    I understood it as it was written, that this
11   case is proceeding and I'm not listed.  I'm not
12   employed by anybody specifically for this case.
13   Q.    So did you understand from Mr. Campbell's
14   answer that lists of consultants had been exchanged?
15   A.    I assumed.
16   Q.    And you further understood from Mr. Campbell's
17   answer that those lists that you assumed had been
18   exchanged did not identify you as a consultant for any
19   party?
20   A.    Based on what was written here, yes.
21   Q.    And that assumption that you made was based
22   upon the response you got from Mr. Campbell; is that
23   correct?
24   A.    Yes.  And let me add to that that I have not
25   received any further communication from them.

Deposition of:
Donald E. Thomas, Jr.                                    August 14, 2003

Page 20

1    Q.    And with respect to further communication from

2    Ricoh, were you expecting a communication from Ricoh

3    because of your assumption that the Howrey firm had

4    given counsel for Ricoh notice of your subpoena and

5    deposition?

6    A.    Not specifically, no.  Maybe I should say not

7    directly.  My assumption there was based on the notion

8    that I'm starting to receive subpoenas, so something

9    must be happening in this case.  So why have I not

10   received anything from Ricoh?  And so it's just a

11   general observation on my part.

12   Q.    And going back to the point we discussed

13   earlier, with respect to the subpoena that you received

14   from the Howrey firm, did you expect that the Howrey

15   firm had given notice to Ricoh's counsel of that

16   subpoena?

17            MR. DiGIOVANNI:  Objection to form.

18            MR. BROTHERS:  You can answer.

19   A.    I think that I had -- yes, I had assumed that

20   Ricoh would have known of this.  Again, nobody is

21   saying anything to me, okay?  Two months after any

22   communication -- actually, four months after any

23   communication, I get a subpoena totally out of the

24   blue.

25   Q.    Let me represent to you, sir, that, in fact,

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 21

1    the Howrey firm did not give notice of that subpoena to

2    you until the 22nd of July and prior to that time --

3        A.    Which subpoena are we talking about now?

4        Q.    The subpoena from the Howrey firm that you

5    received in late June that triggered the communications

6    between you and Mr. Campbell, some of those that we

7    were talking to, that the Howrey firm did not give

8    notice to counsel for Ricoh in any way of that subpoena

9    until July 22nd.

10       A.    Okay.

11              MR. DiGIOVANNI:    Objection.    It's not a

12    question.

13    BY MR. BROTHERS:

14       Q.    With that representation in mind, does it cause

15    you to question what Mr. Campbell was telling you in

16    early July with respect to your assumption that notice

17    had been given by the Howrey firm of your subpoena to

18    counsel for Ricoh?

19              MR. DiGIOVANNI:    Objection to form.

20       A.    I thought we determined from the e-mail that

21    that was not stated.

22       Q.    My question is somewhat different.    My question

23    is, with the representation in mind that the Howrey

24    firm did not give notice to counsel for Ricoh of your

25    subpoena until July 22nd, does that cause you to

1    reconsider what Mr. Campbell is telling you in early

2    July when you wrote him --

3       A.    Which e-mail am I supposed to look at here now?

4       Q.    The e-mails that we have looked at on pages 26

5    and 27 of July 7th in which you inquired with respect

6    to whether the Howrey firm had given notice of your

7    deposition.

8             Does that cause you to consider whether or not

9    the Howrey firm was being candid with you?

10            MR. DiGIOVANNI:  Objection to form.

11      A.    You're asking for my response now?

12      Q.    Yes.

13      A.    I would say no.  And the reason is that I don't

14   know the procedures, okay, of litigation.  I don't know

15   when somebody is supposed to tell somebody something,

16   you know.  These are unknown things to me.  So should

17   he have done that?  I don't know.  So I had assumed,

18   okay, but I didn't know whether that is supposed to

19   happen or not.

20      Q.    Let's go back to the start of your e-mail

21   communications.  Looking at the second page of

22   Exhibit 3, which is Bates numbered page 5, was this

23   communication, which is an e-mail to you from Lou

24   Campbell, dated March 31st, 2003, was this the first

25   communication from the Howrey firm with respect to this

1    matter?

2        A.    Yes, with respect to any matter.

3        Q.    You had never done any --

4        A.    No.

5        Q.    -- prior work for the Howrey firm before?

6        A.    No.

7        Q.    Did you understand from reading this e-mail,

8    which has reference to the fact that Mr. Campbell

9    serves as counsel to Synopsys and several of its

10   customers who have been charged with infringing a

11   patent, did you understand that litigation was then

12   pending?

13       A.    Let me look at my own copies of all of this,

14   because that was a record for me of when things

15   happened, okay?  If I understood the question right, I

16   don't think I knew at that time that a case had been

17   filed, and there is two issues here.  Although I had

18   received a phone call, it was a voice mail and we had

19   never talked, Ricoh and I had never talked.

20       Q.    I would again caution you to set aside and not

21   talk about communications between counsel for Ricoh.

22       A.    So the answer really is, no, I did not know

23   that there was litigation, and nor did I know that

24   Synopsys was involved.

25       Q.    And my question is specifically directed to the

Deposition of:
Donald E. Thomas, Jr.                                    August 14, 2003

Page 24

1    second paragraph of the e-mail, which refers to

2    Synopsys and its customers having been charged with

3    infringement.

4           When you read that, did you understand that

5    there was litigation?

6       A.   Oh, this mail told me it?

7       Q.   Yes.

8       A.   Right.  I'm sorry.  I thought you asked if I

9    knew it before.  This mail told me it.  I saw it there

10   and said, okay, this has happened.

11      Q.   So as of March 31st when you received this

12   e-mail, you understood that there was litigation

13   pending?

14      A.   (Nodding head affirmatively.)

15      Q.   You have to answer audibly.

16      A.   That is the assumption that I took from this.

17   That's what I read from this.

18      Q.   Did you further understand from this e-mail

19   that the Howrey firm was interested in retaining you as

20   a consultant?

21      A.   Yes.

22      Q.   The next page of Exhibit 3, which is Bates

23   numbered 7, is that your response?

24      A.   There wasn't anything taken out between there,

25   was there?

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 25

1      Q.    In the original documents that you provided to

2   us, there was an intervening page which was a

3   communication between yourself and counsel for Ricoh,

4   which we have removed.

5      A.    Okay.  So let me make sure I'm understanding

6   where we are in time here.  Okay.  So your question on

7   this is...?

8      Q.    Looking at page 7 --

9      A.    You want to know if this was my response.  Yes,

10  this was my response to Mr. Campbell.

11     Q.    You wrote in your response of April 1st,

12  2003, quote, "I am interested, but I'm quite busy

13  today."

14         Why were you interested?

15     A.    Because, in fact, I wasn't sure whether this

16  was something different or the same, having to do with

17  previous work, and so I wanted to at least express, you

18  know, the interest to him that I will get back to you,

19  and I look at it more as a courtesy of, you know,

20  saying, yes, I'll talk to you, but I can't right now.

21         And then part of the reason that it says I'm

22  quite busy was that I felt, you know, maybe this is

23  the same thing I was talking, you know, seven months

24  prior about, and if that's the case, I needed to check

25  that out, and I didn't want to say that right up

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 26

1    front.  I just wanted to say I'm quite busy, let me
2    get back to you.
3        Q.    And the response from Mr. Campbell as shown in
4    the next page was, in essence, we look forward to
5    hearing from you, understanding the ball was in your
6    court to get back?
7        A.    That's right.  I just looked at it as a
8    courteous response.
9        Q.    Looking at the next page, there is a follow-up
10   response two days later, April 3rd, from
11   Mr. Campbell.
12           Is it fair to say that you had not gotten back
13   with Mr. Campbell in the intervening two days?
14       A.    That's right.  He was tapping his foot and
15   saying why haven't I responded.
16       Q.    Had you spoken to the Howrey firm in the
17   meantime?
18       A.    No.
19       Q.    Now, there is a reference to a teleconference
20   on Wednesday, the first day we are all free.
21           How, as you understand it, did Mr. Campbell
22   know that was the first day you were all free if there
23   weren't any intervening communications?
24       A.    The "we" is referring to the lawyers in this
25   case.  I have talked to the other lawyers on this case

1   and we would like to set up.

2       Q.   So that's not referring to your schedule?

3       A.   That's right.

4       Q.   Did he ever identify the other lawyers?

5       A.   No.  I mean, there are later -- later on, there

6   are letters that have other names, obviously.

7       Q.   The next communication is on page 11, which is

8   your response to Mr. Campbell's e-mail of April 3rd,

9   response of April 4th.

10      A.   Yes.  I don't think there is anything in the

11  middle there, yes, so this should be it.

12      Q.   Now, in this e-mail of April 4th, you tell

13  Mr. Campbell that you have done some consulting on the

14  topic before for the firm of Dickstein Shapiro Morin

15  and Oshinsky LLP, and then you say, quote, "This was

16  mainly as an expert to help them read through and

17  understand various papers of the time (approximately

18  1984).  This activity was mostly last summer and I

19  hadn't heard from them since early fall, but when I

20  received your e-mail, I thought I should look into

21  whether this was tied in.  It appears that it is and

22  I'm not sure how/if to produce.  If we can proceed, I

23  can make some time available on Wednesday, 4/9.

24  Sometime before noon and 2 Eastern time could be worked

25  out.  I'm going to try to figure out what to do here.

Page 28

```
 1    Any thoughts/comments would be appreciated," end of

 2    quote.

 3             Did I read that correctly?

 4       A.   Yes.

 5       Q.   Why did you think it was appropriate to

 6    disclose that you had previously done some consulting

 7    for the Dickstein firm on this topic?

 8       A.   At that point, I wasn't sure whether these, in

 9    fact, were the same, were related, and I felt I needed

10    to say enough to let him know, well, I have had some

11    work in this field recently and I wanted to give at

12    least the nature of it so that he would be able to say,

13    as, in fact, I think he did in the next e-mail where he

14    responded where that is, indeed, the same.  And in

15    fact, until that point, I didn't really know that that

16    was the same.

17       Q.   Why did you think it was appropriate for you to

18    tell counsel for the defendants and Synopsys, the

19    Howrey firm, that you had been doing consulting for the

20    Dickstein firm?  Why even raise it?

21       A.   Well, as I just said, I was looking for a way

22    to say, I have had work in this field before and I was

23    trying to give him enough information to be able to

24    connect the dots for me and say, yes, this is the same

25    thing, and I -- you know, you don't want me to say what
```

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 29

1    other e-mail I sent, but I sent other e-mail to

2    somebody else asking the same question.

3        Q.    Did you see any problem with consulting for the

4    Dickstein firm at the same time that you were

5    consulting for the Howrey firm on the same matter?

6        A.    If it's on the same matter, then, obviously, I

7    can't consult for both.

8        Q.    Why?

9        A.    That would be a conflict of interest.

10       Q.    How would it be a conflict of interest?

11              MR. DiGIOVANNI:    Objection to form,

12   foundation.

13       A.    As far as I'm concerned, I can consult for one

14   or I can consult for the other, but I can't consult for

15   both.  I don't feel that that would be right.

16       Q.    Can you tell me why?

17       A.    Possible conflict in terms of confidential

18   information.

19       Q.    Aside from a possible conflict with regard to

20   confidential information, would there be any other

21   reason why it wouldn't be right, in your mind?

22       A.    To me, that's the main reason.  I mean, you

23   know, I signed an agreement that was still in effect,

24   you know, even though no work had been done for a

25   while, but it essentially said I should not talk about

1    what was going on there, and I didn't feel that what I

2    said here was giving away any confidences.  Again, I

3    was trying to make sure he understood, you know, where

4    I was coming from, where I had been, so that he could

5    decide and tell me whether, in fact, that's the same or

6    that's different.

7        Q.    Why were you asking the Howrey firm for advice

8    on whether or if you could proceed?

9        A.    Because I didn't know exactly what to do.  It

10   may have, in fact, been something different, and so I

11   was looking for somebody to say, yes, this is the same,

12   no, this is different.

13       Q.    During this time period, April 2003, did anyone

14   from the Howrey firm ever ask you if you had signed a

15   confidentiality agreement with counsel for Ricoh?

16       A.    During which time frame?

17       Q.    April 2003.

18       A.    Nobody -- no, I was not asked that.

19       Q.    Did anyone --

20       A.    They do know that I was doing consulting for

21   them.

22       Q.    But nobody asked if you had signed a

23   confidentiality agreement with counsel?

24       A.    No.  All the communication is right here.

25       Q.    And you never told the Howrey firm that you had

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 31

1    signed a confidentiality agreement with counsel for

2    Ricoh?

3        A.   No, I didn't.  My communications are right

4    here.  My assumption is that's a given that I would

5    be -- every time I've worked with a lawyer, there has

6    always been a confidentiality agreement.

7        Q.   Are all of your communications in March and

8    April 2003 between you and the Howrey firm in the

9    e-mails that you produced?

10       A.   Yes.

11       Q.   There were no letters, faxes, or telephone

12   calls during that time period?

13       A.   That's right.

14       Q.   Did anyone from the Howrey firm in the March

15   and April 2003 time period ever ask you if you had

16   formed or given any opinions to counsel for Ricoh?

17       A.   No.

18       Q.   Looking at Mr. Campbell's response of

19   April 7 -- this is on page 13 -- his initial response

20   is, "We are looking into this to see if it would be

21   proper for you to talk to us at this time.  Let's hold

22   off on Wednesday for now."

23            Do you see that?

24       A.   Uh-huh.  And I understand that to be a response

25   to my e-mail saying I heard you.

Page 32

1    Q.   Did you have any understanding why it might not

2  be proper for you to talk with the Howrey firm?

3          MR. DiGIOVANNI:  Objection to form.

4    A.   Well, to talk with them about exactly what,

5  okay?  I know it is not proper to talk about the

6  details, you know, of what we were discussing the

7  previous summer.  I understand that for sure, yes.

8    Q.   The next response from Mr. Campbell is dated

9  Tuesday, April 8th.  This is on page 17.  I'll just

10  note you have two copies of the prior e-mail.

11    A.   Yeah, there is two copies.

12    Q.   Do you see the e-mail that's set forth on page

13  17, dated April 8th, 2003 from Mr. Campbell to you?

14    A.   Yes.

15    Q.   Do you recall this as being the next

16  communication between the two of you on the subject?

17    A.   Yes, yes.

18    Q.   Let me read that into the record.  I'll ask you

19  if I read it right.

20         From Mr. Campbell to you, quote:  "Thank you

21  for your interest in this matter, but Dickstein

22  Shapiro Morin & Oshinsky LLP is, indeed, the counsel

23  for the opposing side in this matter.  This means that

24  there is most likely a conflict if we would talk to

25  you in detail about the matter.  So, unfortunately, it

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 33

1    appears that we cannot go forward, but I thank you

2    very much for your interest, and if things change or

3    we happen to run into this technology in an unrelated

4    matter, I will get back in touch with you.  However,

5    one thing you can do for us is to let us know about

6    anyone else who is knowledgeable in this technology or

7    its development, whether or not they were

8    contemporaneously involved with its development.

9    Sincerely, Louis L. Campbell," end of quote.

10            Did I read that correctly?

11    A.    Yes.

12    Q.    When you read the first sentence, did that

13    confirm your prior assumption that, in fact, the

14    Dickstein firm was on the other side of the Howrey firm

15    in this matter?

16    A.    Yes.

17    Q.    When you received this e-mail, were you

18    disappointed?

19    A.    Actually, no.  It was one less thing I would

20    need to do that week.  I mean, I'll be quite blunt

21    about it.  I'm a little guy sitting between two big

22    corporations.  The last thing I need to do is this.

23    Q.    The second sentence, quote, "This means that

24    there is most likely a conflict if we would talk to you

25    in detail about the matter", end of quote.

1          What understanding, if any, did you have from

2     that?

3     A.    I thought it was pretty straightforward that

4     since you're on opposing sides of this that it would be

5     a conflict for me to work with them at the same time

6     that I worked with Ricoh.

7     Q.    Did you understand why the Howrey firm could

8     not, as they put it, quote, "talk to you in detail

9     about the matter," end of quote?

10          MR. DiGIOVANNI:  Objection to form.

11    A.    Well, my understanding of detail comes from the

12    comment, actually, that I made just a few minutes ago.

13    I would not feel it was appropriate to talk about the

14    details that we had discussed the previous summer.

15    Q.    Did you understand from this e-mail that you

16    could not consult with the Howrey firm because it would

17    be a conflict of interest?

18    A.    At the same time as I would be consulting with

19    Ricoh.

20    Q.    Do you believe it is appropriate to have been

21    retained as an expert for one side and then resign and

22    go to work for other side?

23          MR. DiGIOVANNI:  Objection to form.  And

24    we're now getting into the subject matter that's

25    beyond the court ordered scope of this deposition.

```
 1                MR. BROTHERS:   You can answer.
 2      A.    I feel that my work for Ricoh was in patent
 3   analysis.   I taught them certain things as if they had
 4   come to a classroom and I taught them something.   They
 5   would ask a question, I would explain something.   If
 6   somebody else asked me those same questions, as people
 7   have done over the years and people will over other
 8   years, I would feel free to answer those questions.
 9      Q.    I don't think you answered my question, so I'll
10   move to strike your answer and ask it as a general
11   principle, without regard to the specific facts of this
12   case.
13           Do you believe it appropriate to have
14   consulted for one side in the litigation matter and
15   then resigned and gone to work for the other side?
16                MR. DiGIOVANNI:   Same objection.   It's
17   beyond the scope of the deposition notice entered by
18   the Court.
19      A.    As long as I do not tell the new company what
20   had transpired as part of the previous agreement or the
21   previous consulting.   Do you want me to amplify on
22   that?
23      Q.    No.
24           In the March and April time frame when you
25   were communicating with Howrey, did you tell them that
```

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 36

1    you were still under contract with counsel for Ricoh

2    for consulting services?

3      A.   No.  I don't think that that's stated in March

4    or April or any of these e-mails, although let me look

5    here.  (Witness reviews documents.)

6           No, I did not say that to them.

7      Q.   You understood from Mr. Campbell's April 8th,

8    2003 e-mail that it would be a conflict if Howrey was

9    to talk to you in detail about the matter so you could

10   not consult for them; is that right?

11          MR. DiGIOVANNI:  Objection to form.

12     A.   That's what I read them saying here, yes.

13     Q.   But Howrey did not sever all communications

14   with you, did they?  They continued to talk with you

15   over the next few weeks?

16          MR. DiGIOVANNI:  Objection to form.

17     A.   Yes, considering there are e-mail records here.

18     Q.   Did you ever discuss with Mr. Kowalksi your

19   communications with the Howrey firm and anything with

20   respect to the 432 patent?

21          MR. DiGIOVANNI:  I'm going to insert an

22   objection here.  This is far beyond the scope of the

23   deposition as ordered by the Court.

24          MR. BROTHERS:  I disagree.  On page 23 of

25   Exhibit 3 it references Mr. Thomas' communications

1    with Ted Kowalski, and it ties in directly with his

2    communications with Howrey.  Let me put it another

3    way.

4    BY MR. BROTHERS:

5        Q.    Did you ever talk with the Howrey firm with

6    respect to your communications with Mr. Kowalski with

7    respect to the 432 patent?

8        A.    My contacts with Ted in the sense of nominating

9    him as a person who knows about this material, as well

10    as Alice Parker, were only for the notion of trying to

11    suggest other people that know this material.  And, in

12    fact, any dumb bunny would be able to come up with

13    those names, because Ted Kowalski wrote the thesis for

14    which this was -- that's the main issue.  I had trouble

15    tracking down Ted because I hadn't talked to him in a

16    number of years, but when I finally did, I told him

17    that there was some litigation going on and that he

18    might be contacted.  Well, it turned out he had already

19    been contacted.

20        Q.    Were your only communications I guess in the

21    April and May time frame with the Howrey firm with

22    respect to Mr. Kowalski, as well as Alice Parker, those

23    that are reflected in the e-mails?

24        A.    Yes.

25        Q.    There were no phone conferences or voice mails

1    during that time frame?

2        A.    No, no.

3        Q.    We also received e-mails from the Howrey firm,

4    and I'll mark as Exhibit 7 an e-mail that did not

5    appear in your files but did appear in the e-mails that

6    the Howrey firm sent to us.

7                    (Thomas Deposition Exhibit 7

8            was marked for identification.)

9    BY MR. BROTHERS:

10       Q.    I'll ask you to look at Exhibit 7 and see if

11   you recognize it.

12       A.    (Witness reviews document.)  Actually, yes, I

13   do.  I'm not exactly sure why this was not in any of my

14   files.  I read mail from a number of different places

15   and sometimes networks mess things up, so I might have

16   lost this e-mail.  Yes, I do recognize this as being

17   sent to me and having read it.

18       Q.    Exhibit 7 appears to be -- well, let me

19   withdraw and restate.

20            Is Exhibit 7 a copy of an e-mail that responds

21   to your e-mail that is set forth on Bates page 23 of

22   Exhibit 3?

23       A.    Right.  It's the e-mail that's shown right

24   directly on the bottom, yes.

25       Q.    Am I correct that you searched only your work

1.  computer for e-mails?

2      A.    Sometimes I work from home, but I use an IMAP

3   server, and what that means is that all the e-mails are

4   stored centrally in one location, so even from home, I

5   have to be online to be able to receive those e-mails

6   from that central server.  Sometimes from home, there

7   are problems in the communications and so sometimes

8   things get lost, and that might have been what happened

9   here.  I don't know.  I don't have an explanation for

10  why I don't have this e-mail.  Sometimes electronics

11  don't work as planned.

12      Q.    So is it fair to say that you searched only

13  your work computer system for responsive e-mails?

14      A.    That's correct, and that is because with an

15  IMAP server, that is where all the files are stored.

16  They are not stored locally on any machine.

17      Q.    Having reviewed Exhibit 7, is it apparent to

18  you that your search didn't reveal all of the e-mails?

19      A.    That's right.  This one was not there.

20      Q.    Now, was the next communication between you and

21  the Howrey firm the subpoena that you received?

22      A.    From April --

23      Q.    We were looking at e-mails dated May 6th and

24  Mr. Campbell's response, which was marked as Exhibit 7.

25      A.    Yes, that's correct.  There were no other

Page 40

1      contacts.

2         Q.   I will mark as Exhibit 8 a copy of that

3      subpoena.

4                  (Thomas Deposition Exhibit 8

5            was marked for identification.)

6      BY MR. BROTHERS:

7         Q.   Exhibit 8 is a copy of a subpoena dated

8      June 25th, 2003, which was faxed to the Dickstein

9      firm on July 23, 2003.

10              When did you receive this subpoena,

11     Dr. Thomas?

12        A.   I don't know the actual date.  I don't have

13     that in my memory.  I could look at a calendar and

14     maybe come up with a date.  I would assume that whoever

15     served it on me recorded that it was served.  That

16     should be in the record somewhere.

17        Q.   I'll direct you to the last page of Exhibit 8,

18     which references down at the bottom a service date of

19     June 26, if that helps refresh your recollection at

20     all.

21        A.   Okay.

22        Q.   When you received this subpoena, what did you

23     do?

24        A.   I read through it a couple of times and noted

25     the dates, future dates for my calendar, and if I

1    remember correctly, that might have been a Thursday or

2    a Friday, and I think I read it -- reread it over the

3    weekend to think about it and try to put my head around

4    the whole thing of what really was being asked for and

5    to start planning how to produce all of this

6    information, which, in fact, was a considerable amount

7    of information.

8        Q.    The response, the e-mail that we have in

9    Exhibit 3 on page No. 24, was this your first inquiry

10   or communication to the Howrey firm after you received

11   the subpoena from the Howrey firm?

12       A.    Yes.   To the best of my knowledge, yes.

13             MR. DiGIOVANNI:  I'm sorry.  What was the

14   reference to the document?

15             MR. BROTHERS:  Page No. 24 on Exhibit 3.

16             MR. DiGIOVANNI:   Thanks.

17   BY MR. BROTHERS:

18       Q.    What were you asking the Howrey firm to do on

19   July 7th?

20       A.    Well, as it states there, I was starting to get

21   concerned about the reimbursement issue here and, also,

22   in some sense, my time.   It certainly does state here

23   that I'm commanded to appear and at the time specified,

24   and it wasn't clear -- after having produced, you know,

25   this much -- I'm indicating about ten inches worth of

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 42

```
 1    documentation, double sided, that I was going to send

 2    in with regards to this -- I realized this was going to

 3    take a considerable amount of my time to respond to

 4    this.

 5              And so I was asking, first of all, what about

 6    reimbursements for any of this, for my assistant, who

 7    tracked most of the information down, for all the

 8    copying that was done for it, and also, even the fact

 9    that I would have to show up somewhere and somebody

10    ought to pay my parking, right, and do I get anything

11    for the fact that a couple of companies want to sue

12    each other.

13       Q.   So were you looking for reimbursement not only

14    for your out-of-pocket expenses, but also the amount of

15    time you had spent?

16       A.   I was hoping there might be some reimbursement

17    for that, yes.

18       Q.   Was Mr. Campbell's response --

19       A.   Because I did say personal time.

20       Q.   Was Mr. Campbell's response, is that what is

21    shown on page 25 of Exhibit 3?

22       A.   I think so, yeah, yeah.  I don't think there is

23    anything in the middle there, yes.

24       Q.   How did you understand or how did you interpret

25    Mr. Campbell's response?
```

Deposition of:
Donald E. Thomas, Jr.                                    August 14, 2003

Page 43

 1          MR. DiGIOVANNI:  Objection to form.

 2      A.   May I ask a question?  When you say objection

 3   to form, what do you mean?

 4          MR. DiGIOVANNI:  Do you want to explain

 5   or I can explain.

 6          MR. BROTHERS:  Sure.  There is no judge

 7   here, and so objections are made and if the judge

 8   later decides that there is a basis for the objection,

 9   when somebody says objection to form, it's because he

10   thinks that there is a problem with the way I phrased

11   the question and it's my choice to either rephrase the

12   question or to think to myself, the judge can decide

13   later whether the question is proper or not.  In

14   depositions, unless you're specifically instructed not

15   to answer a question, whether an objection is made

16   shouldn't affect whether or not you answer the

17   question.

18          THE WITNESS:  I just want to know what

19   form meant.

20          MR. BROTHERS:  It's lawyerspeak for

21   Mr. DiGiovanni telling me he thinks there is a problem

22   with the question, and that's something that judges

23   can sort out later, if they so choose.

24   BY MR. BROTHERS:

25      Q.   Anyway, do you have the question in mind?

1      A.    Can you restate the question again?

2      Q.    Sure, sure.  How did you understand

3   Mr. Campbell's response of July 7th to your e-mail

4   inquiry of July 2nd?

5            MR. DiGIOVANNI:  Objection to form.

6      A.    Well, I think it's pretty obvious from the

7   e-mail, you know, that if I'm no longer consultant to

8   Ricoh, then they would consider -- if Ricoh is not

9   going to serve as my counsel, then, in fact, Howrey

10  would consider paying for these expenses.

11     Q.    Did you interpret Mr. Campbell's response as an

12  invitation to sever your consulting relationship with

13  Ricoh?

14     A.    No, no.  It clearly states in there you should

15  contact Ricoh in certain situations.

16     Q.    Your response on page 26 is something that we

17  looked at earlier in the deposition, but now that we

18  have it in context, why did you think it appropriate

19  for you to tell the Howrey firm that in March of 2003

20  you told Ricoh's counsel that you wouldn't be an expert

21  witness for them during trial?

22           MR. DiGIOVANNI:  Objection to form, and I

23  consider that to be outside the scope of the

24  deposition as ordered by the Court.

25           MR. BROTHERS:  You may answer.

1      A.   I was trying at that point to let them know
2    that I didn't feel like I was working for anybody in
3    this, and I can't say anything more because I'm not
4    allowed to talk about the various conversations and
5    what I told Ricoh the previous summer or the previous
6    March when I talked to them.  But seeing that you know
7    what those conversations are and you also know that
8    between March and this particular time, as it states
9    here, there were no conversations, as far as I was
10   concerned, I wasn't employed by anybody, you know, and
11   the fact that there was no termination date on the
12   contract of the previous summer was of no issue to me
13   at all.  I just hadn't been contacted for anything
14   intellectual since the previous summer, and so as far
15   as I was concerned, I wasn't even part of this anymore.
16     Q.   My question is a little bit different.  My
17   question is, why did you think it was appropriate for
18   you to tell the Howrey firm about what you wrote in
19   this e-mail, quote, "I told them I wouldn't be an
20   expert witness for them during trial," end of quote.
21          Why did you think that was appropriate to tell
22   the Howrey firm?
23          MR. DiGIOVANNI:  Same objection, form and
24   beyond the scope of the deposition as ordered by the
25   Court.

1    A.   I felt it was appropriate to say something like

2    this because I was being viewed by them as somebody

3    actively working for the other side, which, in fact,

4    I'm not and I wasn't.

5    Q.   You then wrote, quote, "They" -- and are you

6    there referring to Ricoh's counsel?

7    A.   Yes.

8    Q.   "So they have not offered to serve as my

9    counsel during the deposition," end of quote.

10        There you were assuming that Ricoh's counsel

11   knew about Howrey's request for your deposition,

12   correct?

13   A.   Yes, that's correct.

14   Q.   Neither Mr. Campbell nor anybody else from the

15   Howrey firm in July of 2003 told you that they had not

16   provided the Dickstein firm or any other counsel for

17   Ricoh with a copy of your subpoena until July 23rd,

18   did they?

19        MR. DiGIOVANNI:   Objection to form.

20   A.   No, I did not know that.

21   Q.   The response from Mr. Campbell in which he

22   wrote, "I take it from your e-mail that you do not

23   believe yourself to be in an ongoing consulting

24   relationship with Ricoh," end of quote, is it accurate

25   that as of July 7, 2003, you were still under contract

```
 1   with counsel for Ricoh?
 2              MR. DiGIOVANNI:  Objection, calls for a
 3   legal conclusion.
 4      A.   As the contract -- or actually, yeah, it's
 5   called a contract, which you haven't produced here, did
 6   not have an official ending date.  It could have been
 7   ten years later and I would still be under that.  Now,
 8   it's only four months later, okay, so, legally, yes.
 9   But had I been contacted about anything intellectual
10   regarding anything having to do with consulting?  Not
11   for, at this point, essentially 11 months.  So, no.
12              Do you understand?  Yes, officially there was
13   no termination date until I sent the letter, and I
14   should have sent that letter in March, which is what I
15   later state, okay?  But de facto, there had been no
16   communication.  As far as I was concerned, it was all
17   over.
18      Q.   As of July 7th, 2003, you still had a valid,
19   binding consulting agreement with counsel for Ricoh,
20   didn't you?
21      A.   Yes.
22              MR. DiGIOVANNI:  Objection to form.
23   Again, we're beyond the scope of the deposition as
24   ordered by the Court.
25   BY MR. BROTHERS:
```

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 48

```
 1      Q.   Looking at your response on July 8th, was
 2  that the first time that you told counsel for Howrey
 3  that you were under a consulting contract with counsel
 4  for Ricoh and that that contract had never been
 5  terminated?
 6               MR. DiGIOVANNI:  Objection to form.
 7      A.   Well, they knew earlier here that I had been a
 8  consultant for Ricoh, okay, because that's in the
 9  earlier e-mails.  That it had never been terminated,
10  that's the first time I said that there on July 8th.
11      Q.   Is your July 8th e-mail marked as page 28 of
12  Exhibit 3, is that the first time that you had ever
13  made reference to a consulting contract in your
14  communications with Howrey, a consulting contract
15  between you and counsel for Ricoh?
16      A.   That's the first time I had used the word
17  contract.  However, on July 7th, for instance, I
18  talked about consultation.  And normally, consultation
19  has a contract to go with it, but that's the first time
20  I used the word contract, yes.
21      Q.   Was your e-mail of July 8th intended to
22  inform the Howrey firm that as of July 8th, you still
23  had an active contract with counsel for Ricoh, but you
24  were intending to terminate it?
25      A.   Yes.  That's what that e-mail says.
```

1      Q.    Looking now at page 33, is this Mr. Campbell's

2   response to your e-mail that we were just looking at

3   and which is actually reprinted right below it?

4      A.    I think so, yeah.  This is page 33?

5      Q.    Yes.

6      A.    Yes, yes.  That was the response.

7      Q.    You understood Mr. Campbell to be inviting you

8   to send to him an estimate of your costs after you had

9   terminated the agreement with Ricoh?

10     A.    Yes.

11     Q.    Did you ever have an understanding as to why

12  the Howrey firm told you to first terminate your

13  consulting agreement with counsel for Ricoh before

14  sending to Howrey a cost estimate?

15           MR. DiGIOVANNI:  Objection to form.

16     A.    Well, as we had talked about on the previous

17  mail, he felt that if I was -- if Ricoh was

18  representing me, then they should be paying for this,

19  and so since I'm no longer with Ricoh, he'll pay for

20  it.

21     Q.    Were you of the opinion on July 8th that it

22  would be improper for you to consult for both counsel

23  for the defendants represented by the Howrey firm and

24  counsel for Ricoh, the Dickstein firm, at the same

25  time?

Page 50

1           MR. DiGIOVANNI:  Objection to form and

2    objection because the question is beyond the court

3    ordered scope of the deposition.

4    A.    Well, as I stated before, I have problems with

5    consulting for both sides at the same time.

6           MR. DiGIOVANNI:  You can take a break, if

7    you'd like, at any point.  All you have to say is you

8    need to take a break.

9           MR. BROTHERS:  Let's take a break.

10          (Recess.)

11          (Thomas Deposition Exhibit 9

12       was marked for identification.)

13   BY MR. BROTHERS:

14   Q.    Exhibit 9 appears to be another e-mail that was

15   not in the materials that you provided.  If you look at

16   page 33 of Exhibit 3, you'll note that the next e-mail

17   in that exhibit is a July 10th e-mail, so Exhibit 9

18   is a July 9th e-mail from you to Lou Campbell.

19          I'll just ask you to verify if, in fact, you

20   recognize Exhibit 9 as I've described.

21   A.    Yes, yes.

22   Q.    When you wrote to Mr. Campbell that you hadn't

23   heard an acknowledgment back from Ricoh yet, were you

24   referring Mr. Campbell to your intention of terminating

25   your consulting agreement with Ricoh?

```
 1    A.   Yes.
 2    Q.   The next page in Exhibit 3, page 41, this
 3  e-mail is in a little bit different form, so I want to
 4  spend a little bit of time with that.
 5         Is the bottom portion of Exhibit 41 the
 6  text --
 7              MR. DiGIOVANNI:  Page 41?
 8              MR. BROTHERS:  I'm sorry.  Page 41.
 9  Thank you.
10  BY MR. BROTHERS:
11    Q.   Is the bottom portion of page 41 of Exhibit 3
12  starting with the words "the agreement with Ricoh" and
13  ending with your signature, is that the content of an
14  e-mail that you sent to Lou Campbell on Thursday,
15  July 10th?
16    A.   I think that this is one -- there are a couple
17  of cases.  I think this is one -- where I didn't have
18  the original of this e-mail as a separate file on my
19  system.  I just had it as a response.  So let me try to
20  find this here, because I made some notes here myself.
21  (Witness reviews documents.)  Maybe I didn't find this.
22  Let me just go back to this, then.
23         So your question is, let's see, on page 41 we
24  have the mail from Campbell, and then as part of that
25  mail, there is an original message with a "from Don
```

1   Thomas" in it, and within that, there is another one

2   which is from Lou Campbell.

3       Q.    Right.

4       A.    And this actually shows three e-mails in a row

5   here.

6       Q.    And my question to you is, with respect to the

7   text at the bottom starting with "the agreement with

8   Ricoh" and ending with your signature, is that the

9   content of an e-mail that you sent on Thursday,

10  July 10th, 2003, at 6:26 a.m., as noted in the

11  original message text box?

12      A.    To make sure I'm understanding the e-mail here,

13  it appears that -- I think what you said is true, so

14  this message from me to Louis Campbell on Thursday,

15  July 10th, this full message down here on the bottom

16  includes an inserted quote from a previous e-mail and

17  then begins "The agreement with Ricoh has been

18  terminated." So, yes, that was sent on July 10th,

19  6:26 a.m.

20      Q.    And then Mr. Campbell responded to that with

21  the e-mail shown at the very top?

22      A.    Yes, July 10th, 8:03 p.m. Eastern.

23      Q.    Let's look, then, at the content of your e-mail

24  to Lou Campbell on July 10th at 6:26 a.m.

25          Was that the first time that you told counsel

1   for Howrey that you had terminated -- I'm sorry.

2   Let's try that all over again.

3        Was your e-mail of July 10th at 6:26 a.m.

4   the first time that you told the Howrey firm that you

5   had terminated your consulting agreement with Ricoh

6   through the Dickstein firm?

7   A.   Yes, I believe that to be true.  I don't think

8   there are any other e-mails here in the midst.

9   Q.   Down at the bottom, your last sentence is,

10  quote, "I think I can be of great help to the defense,"

11  end of quote.

12       What did you mean by that?

13  A.   Sometimes you have to justify your obnoxiously

14  high rates.  So part of it, I think, is to say, you

15  know, I might charge you a lot of money here per hour,

16  but I think I'm well suited for this type of litigation

17  and for this particular topic, and so I wanted to state

18  that.

19  Q.   When you wrote that you thought you could be of

20  great help to the defense, did you have in mind at all

21  the fact that you had just terminated your consulting

22  relationship with counsel for the plaintiffs when you

23  wrote that?

24       MR. DiGIOVANNI:  Objection to form.

25  A.   No.  It's really as written here, here is what

1    I charge and I think I would be a good person.

2       Q.    When you terminated your consulting

3    relationship with Ricoh and told that to the Howrey

4    firm, you knew that the lawsuit was pending, didn't

5    you?

6       A.    Yes, because that was established in March.

7       Q.    As shown in the next page, Mr. Campbell sent

8    you two e-mails.  The first one on page 41 said, we,

9    referring to the Howrey firm, would be willing to

10   pursue a consulting relationship, and then he quickly

11   sent you another e-mail expressing greater enthusiasm.

12          Do you remember receiving those two e-mails?

13      A.    Yes.

14      Q.    How did you interpret receiving those two

15   e-mails?

16          MR. DiGIOVANNI:  Objection to form.

17      A.    I look at it as a follow-on to the previous

18   e-mails that they would be interested in having me as a

19   consultant, and then in the second one, he felt he

20   wasn't polite or enthusiastic enough and wanted to

21   express a little bit more, that's all.

22      Q.    Were you a little bit flattered that the Howrey

23   firm was enthusiastic or had enthusiasm about their

24   relationship with you?

25          MR. DiGIOVANNI:  Objection to form.

1    A.    That's generally true of anybody that I could

2    call up and pay that amount of money about it.  Yes, of

3    course, it is flattering.

4    Q.    Your response, as shown on page 43 of

5    Exhibit 3, you say, quote, "Yes, I'd be interested in

6    pursuing a consulting relationship (with enthusiasm)."

7         Was that a follow-on to his second e-mail?

8    A.    Yes.  Just a slight bit of humor.  In

9    engineering, we do that.

10              (Thomas Deposition Exhibit 10

11         was marked for identification.)

12   BY MR. BROTHERS:

13   Q.    Exhibit 10 is another e-mail from the Howrey

14   firm which didn't make it into your compilation.

15   You'll see on looking at page 43 of Exhibit 3, you have

16   Lou Campbell's e-mail saying, great, let me know when

17   you get back from vacation, and then Exhibit 10 is your

18   vacation information and mailing information.

19         Do you recognize Exhibit 10 as a response --

20   A.    Yes, I did send this.  I can tell you

21   explicitly this one got lost because of being sent from

22   home and having troubles with the server.

23   Q.    While you were on vacation, was that when

24   Mr. Campbell sent you the engagement letter that is

25   contained --

Page 56

1      A.    I think it did arrive while I was on vacation.

2      Q.    Let's look at that --

3      A.    Thursday, the 17th.  Yes, I was on vacation.

4      Q.    Looking at page 44, this is an e-mail from

5   somebody with an e-mail address of hobbsw@howrey.com.

6   I'll note that this is not an e-mail that Howrey

7   produced.  This is just one that we got from you.

8            Did you get this engagement letter through

9   both e-mail and Federal Express?

10     A.    Yes.

11     Q.    When did you read the cover letter and the

12  engagement letter?  Was that after you came back from

13  vacation?

14     A.    Oh, yes.  I don't have any cell phone or any

15  electronic access on this vacation, so, no.  It was

16  after the vacation and the vacation ended sometime on

17  Sunday, which would have been July 20, I guess.

18     Q.    The cover letter dated July 17th, a portion

19  of it says, quote, on the next page -- this is Bates

20  No. 45 of Exhibit 3, the second paragraph -- "Once we

21  have a signed copy of this letter, we will notify Ricoh

22  that you have entered into a consulting agreement with

23  us and put the July 31, 2003 deposition on hold."

24            Do you see that?

25     A.    Yes.

1    Q.   Did you understand from that that prior to this

2  time, the Howrey firm had not informed counsel for

3  Ricoh of their communications with you?

4              MR. DiGIOVANNI:  Objection to form.

5    A.   Can you ask that again?

6    Q.   Sure.

7              Did you understand from that sentence in the

8  cover letter that I read in which Mr. Campbell said

9  once you've signed the letter, we'll notify Ricoh that

10  you've entered into a consulting relationship with us

11  and put the deposition on hold, did you understand

12  from that that prior to this time, the Howrey firm had

13  not told counsel for Ricoh about their communications

14  with you?

15              MR. DiGIOVANNI:  Objection to form.

16    A.   No.  No, I did not take that from this.  They

17  could have notified Ricoh of conversations.  This is

18  talking about the actual consulting agreement.  So I

19  don't read that into it.

20    Q.   Before you signed the consulting agreement, did

21  you read it?

22    A.   Yes.

23    Q.   Looking at the consulting agreement which

24  comprises pages 46 through 48 of Exhibit 3, let me

25  direct your attention to the fourth full paragraph on

Page 58

```
 1   the second page.  This is on page 47.  It is the
 2   paragraph beginning --
 3        A.   Oh, 47?
 4        Q.   Yes.
 5        A.   "The following obligations..."?
 6        Q.   Yes.  If you can review that to yourself and
 7   let me know when you're done, please.
 8        A.   (Witness reviews document.)  Okay.
 9        Q.   How did you understand that paragraph to apply
10   to you?
11             MR. DiGIOVANNI:  Objection to form and
12   also objection that the question is beyond the court
13   ordered scope of the deposition.
14        A.   I take this to mean that they are going to talk
15   to me about certain topics and that what's in those
16   topics is going to be confidential and I should hold
17   them in strict confidence.
18        Q.   Did you understand that the fact that attorneys
19   for the defendants would talk to you about certain
20   topics would, in and of itself, be confidential?
21             MR. DiGIOVANNI:  Same objections.
22        A.   You mean what they say to me would be
23   confidential?
24        Q.   Yes.
25        A.   Yes.
```

1        Q.   Did you understand that you were not to reveal

2   to anybody else either what the Howrey attorneys told

3   you or what you told the Howrey attorneys?

4                MR. DiGIOVANNI:  Same objections.

5        A.   Yes.

6        Q.   The sixth paragraph on that page starting with

7   "You agree during the time you are acting as our

8   consultant on behalf of Synopsys, Inc., you will not

9   act as consultant for or on behalf of Ricoh or any

10  Ricoh affiliate (more than 25 percent owned or

11  controlled by Ricoh) and will agree not to give expert

12  testimony adverse to Synopsys, Inc.," and then the rest

13  of that.

14               Tell me when you're done reviewing that,

15  please.

16       A.   (Witness reviews document.)  Uh-huh.

17       Q.   Did you ever have an understanding why you

18  could not act as a consultant for or on behalf of Ricoh

19  at the same time you were acting as a consultant on

20  behalf of Synopsys?

21       A.   Well, I've said in the past that I understand

22  why I cannot act as both, as a consultant for both.

23       Q.   And was that understanding that you had

24  expressed earlier in the deposition the same basis for

25  your agreeing to this condition?

1              MR. DiGIOVANNI:  Same objections as I had
2      made, form and beyond the scope of the deposition
3      ordered by the Court.
4         A.    Despite all of that, I'm not exactly sure what
5      you're asking there.
6         Q.    You referenced in your last answer to what you
7      had said earlier about not being able to consult for
8      both Ricoh and Synopsys at the same time.
9         A.    Right.
10        Q.    And my question to you is, when you signed this
11     consulting agreement with the Howrey firm on behalf of
12     Synopsys, did you understand that the reason why you
13     could not also consult for Ricoh is that it would be a
14     conflict of interest?
15        A.    Yes.
16             MR. DiGIOVANNI:  Same objections.
17     BY MR. BROTHERS:
18        Q.    There is the phrase in that sentence that you,
19     quote, "will agree not to give expert testimony adverse
20     to Synopsys, Inc.," close quote.
21             Do you see that?
22        A.    Uh-huh.
23        Q.    Did you understand that by signing this
24     agreement, your opinions were now subject to somebody
25     else's approval?

1           MR. DiGIOVANNI:  Objection to form and

2    beyond the scope.

3      A.   If I didn't agree with Synopsys, then I would

4    not want to be a consultant for that side and so I

5    would resign.

6      Q.   Had you already formed opinions with respect to

7    Synopsys and your retention by Synopsys as of this

8    time?

9      A.   You're asking me to reveal conversations that I

10   had with Ricoh's attorneys.

11     Q.   I am not asking you to reveal those

12   communications.  I am simply asking you a yes or no

13   question, whether you had -- as of the date that you

14   signed this consulting agreement for Synopsys, whether

15   you had formed opinions prior to July 21st, 2003 with

16   respect to the subject matter?  You can answer that yes

17   or no.

18           MR. DiGIOVANNI:  Objection to form.

19   Also, objection beyond the scope and the witness can

20   answer that in any way he pleases, not necessarily yes

21   or no.

22           MR. BROTHERS:  Maybe I'm wrong.  Either

23   you had formed opinions or you hadn't formed opinions.

24   If it's something else, please tell me.

25     A.   I have some opinions, yes.  They are general

1    opinions.  They are not detailed opinions.

2       Q.   And those were opinions that you had formed

3    prior to July 21st, 2003 when you signed this

4    agreement, correct?

5               MR. DiGIOVANNI:  Same objection.

6       A.   Yes.  And it's actually a basis for the comment

7    I made in March to counsel.

8       Q.   The last sentence of that sixth paragraph

9    states, quote, "We will not ask you to disclose what

10   information or opinions you supplied to Ricoh's counsel

11   and you should not reveal any Ricoh confidential

12   information that may have been supplied to you," end of

13   quote.

14              Do you see that?

15      A.   Yes.

16      Q.   Prior to your signing this agreement, did you

17   discuss in any way with the Howrey firm whether or not

18   you had received any Ricoh confidential information?

19      A.   No.  There is no reference in those e-mails to

20   any such material.  No, I have not.

21      Q.   And there were no other communications other

22   than e-mails prior to July 21st, 2003 between you and

23   the Howrey firm?

24      A.   That's correct, to the best of my knowledge.

25      Q.   So is it fair to say that prior to your signing

1    the retention agreement with the Howrey firm, nobody

2    from the Howrey firm ever asked and you never told them

3    whether or not you had received any Ricoh confidential

4    information?

5        A.    That's right.  They had not asked.

6              MR. DiGIOVANNI:  Objection to form.

7        A.    They had not asked.

8        Q.    And you had not told them?

9        A.    And I had not told them.  I had not offered any

10   information.

11       Q.    The third page of the agreement below your

12   signature, it says, "Seen and agreed to:  Synopsys

13   Corporation."

14             Did you ever talk with anyone from Synopsys?

15       A.    Regarding this, no.

16       Q.    Did you understand that you were being retained

17   as a consultant by the Howrey firm on behalf of

18   Synopsys Corporation?

19       A.    Yes, based on having that there, as well as

20   other references in here.

21       Q.    On the subpoena that Howrey sent you that we

22   marked as Exhibit 8, there is a reference to Ricoh

23   Company versus Aeroflex, Incorporated?

24       A.    Et al.

25       Q.    Et al.  Did you ever have any of the

Page 64

1    understandings as to who Aeroflex, Incorporated, or the

2    rest of the et al. are?

3        A.    No one has ever explained that to me.  If you

4    want to, you can.

5        Q.    Did you assume that Synopsys Corporation was

6    one of the defendants in the lawsuit which had led to

7    your subpoena?

8        A.    Or were tied in.  As far as I know, they are

9    investors in Synopsys.  I don't understand.  I don't

10   know, but there were a number of places where Synopsys

11   has come up as the -- Synopsys, I think, is a phrase in

12   some of this.  It says Synopsys and their customers.

13       Q.    Did you understand that you were being retained

14   by Synopsys' customers, as opposed to just Synopsys?

15       A.    As far as I could tell, it was just Synopsys.

16       Q.    Did you sign the agreement and fax it back to

17   the Howrey firm on July 21st?

18       A.    Yes.  I think I mailed it, but I can't

19   remember.

20       Q.    The next document is page 49 of Exhibit 3,

21   which is an e-mail from you to Lou Campbell dated

22   July 23 in which you reference a phone message from

23   Louis Campbell.

24             Do you remember what that phone message was?

25       A.    It was a request for a meeting, and this is

Page 65

1    responding to, you know, so when can we talk.  He

2    called me to ask for a meeting and said what times are

3    good.

4        Q.    In the second paragraph of your e-mail, you

5    say, "I didn't receive the letter that you mentioned."

6    Would that have been a letter he mentioned in the voice

7    mail?

8        A.    I think that that letter ended up being the

9    letter from Ricoh.

10       Q.    I understand.  My question is, how did you know

11   about a letter if it wasn't in Mr. Campbell's voice

12   mail?

13       A.    It had to have been.  We'll talk about the

14   letter or something.  I don't remember the voice mail,

15   but this e-mail in response was a direct response to

16   that phone message, so I just sat down and answered the

17   phone message.

18       Q.    Was the voice mail that Mr. Campbell left you

19   more than just Dr. Thomas, this is Lou Campbell, please

20   give me a call, goodbye?

21       A.    No.  This e-mail is responding to it.  We want

22   to talk to you, and he had to have brought up this

23   letter.  And so he was asking for a time when we could

24   meet on the telephone to talk about things.

25       Q.    So in the voice mail from Mr. Campbell, he

1    talked about both wanting you to call him, wanting to

2    have a meeting, and a letter relating to anything in

3    particular?

4              MR. DiGIOVANNI:   Objection to form.

5      A.    I'm pretty sure that it was just a letter,

6    because I had no idea what the letter -- what he meant

7    by that.

8      Q.    You reference to Mr. Campbell forwarding to

9    Mr. Hoffman an e-mail that you had sent to Mr. Oliver.

10             Had you previously discussed with Mr. Campbell

11   any of your communications with Mr. Oliver?

12     A.    Wait.   I'm lost in all this.   So Mr. Hoffman

13   called and said are you -- do you want me to tell you

14   this, what Mr. Hoffman said?

15     Q.    I don't.

16     A.    Then in response to what Mr. Hoffman said, I

17   forwarded the e-mails that have been taken out that

18   were -- some of them were actually in here, but having

19   to do with, you know, I want to terminate the contract.

20   So that is my response, saying that I had talked to a

21   Mr. Hoffman and I had forwarded the information

22   regarding my terminating the contract to Mr. Oliver.   I

23   re-sent all of those e-mails to Mr. Hoffman.

24     Q.    Did you forward to Mr. Campbell any of the

25   e-mails that you had had with anybody at the Dickstein

1    firm?

2       A.    No.

3       Q.    Had you previously told Mr. Campbell who

4    Mr. Oliver was?

5       A.    I'm not sure if I had or not.  If it's in these

6    e-mails that I had mentioned that name, I think that

7    might have been the first time that that name came up.

8    I think that name might actually have been in the

9    letter.

10      Q.    The letter that you hadn't seen?

11      A.    At this point, yeah.

12      Q.    So Mr. Campbell would have described to you the

13   content of that letter?

14      A.    No, he didn't.

15            MR. DiGIOVANNI:  Objection to form.

16      A.    No, he didn't.  No.  I'm not sure whether I

17   ever mentioned the name Mr. Oliver previous.

18      Q.    Do you recall, in fact, getting a letter from

19   Mr. Hoffman?

20      A.    Yes.

21      Q.    Your next e-mail, page 50, says, "I just

22   received the fax of the letter to me."

23            What letter is that?

24      A.    This letter that's being referenced right here.

25   At 8:51 on page 49, I hadn't received the letter.  At

1    9:30, July 23rd, I received the letter.

2      Q.   At the bottom of your first e-mail of

3    8:51 a.m., you write, quote, "Sounds like I may have

4    stirred up a mess."

5           What did you mean by that?

6      A.   That's some more of that engineering humor.

7      Q.   What kind of mess did you think you may have

8    stirred up?

9                 MR. DiGIOVANNI:  Objection to the form

10   and objection as beyond the scope of this deposition

11   as ordered by the Court.

12     A.   The mess that has led to this hearing, to this

13   deposition.

14                (Thomas Deposition Exhibit 11

15        was marked for identification.)

16   BY MR. BROTHERS:

17     Q.   Exhibit 11 is a letter dated July 22nd to you

18   from Mr. Hoffman.  Is this the letter that you were

19   referencing in your e-mails of July 23rd marked on

20   pages 49 and 50?

21     A.   Yes.

22     Q.   Did you talk about this letter at any time with

23   Mr. Campbell?

24     A.   No, I don't think I did.  Only in the sense

25   that I have received this letter.  I'm not even sure I

Page 69

1    even said that to him.  Yeah, I did.  I just received a

2    fax of the letter.

3        Q.    So the e-mail on page 50 of Exhibit 3, when you

4    said "I just received the fax of the letter to me,"

5    that is the letter we've marked as Exhibit 11?

6        A.    That's right.

7        Q.    Aside from that single e-mail, did you have any

8    other communications with Mr. Campbell or anyone else

9    from the Howrey firm about anything in Exhibit 11?

10               MR. DiGIOVANNI:    Objection to form.

11       A.    I don't remember talking about this to

12   Mr. Campbell.  If I said anything, it's pointing out

13   that, again, there was confidential information that I

14   can't give to him, but I certainly didn't read the

15   letter to him.  And even though I don't know all of

16   these names down here, including Mr. DiGiovanni here,

17   who I see now is on the list, I assumed that these were

18   people that were in the Howrey firm.

19       Q.    Was it apparent to you, since Mr. Campbell had

20   left you a message specifically mentioning a letter,

21   that he was talking about the letter we've marked as

22   Exhibit 11?

23       A.    Oh, I assumed that it was this letter, yes,

24   yes.

25       Q.    Do you believe that you told Mr. Campbell that

1    there was confidential information that you had

2    received from counsel for Ricoh that you could not

3    disclose to him?

4              MR. DiGIOVANNI:  Objection to form.

5        A.   Actually, he asked that question later of me,

6    and that's in the e-mails.

7        Q.   And what did you tell him?

8        A.   I told him that -- that's the e-mail on page

9    52.

10             MR. DiGIOVANNI:  What page is that?

11             THE WITNESS:  52.

12   BY MR. BROTHERS:

13       Q.   Let me narrow the question, because that e-mail

14   is dated on the 24th and you had previously told me

15   that you had a phone conversation with Mr. Campbell on

16   the 23rd.

17       A.   Right, 23rd, that's right.

18       Q.   So did you tell Mr. Campbell during that phone

19   conversation on the 23rd that you had received

20   confidential information from Ricoh and that you

21   couldn't disclose it to him?

22             MR. DiGIOVANNI:  Objection to form.

23       A.   He asked if I had received confidential

24   information, and I said the information that I received

25   was under these categories of patents, published

1    articles, whether conferences, journals, or theses, and

2    one that appears to be a rough draft of corporate

3    literature.  I said those are the things that I

4    received.  I didn't tell him what the titles were, what

5    the content was.  I just told him that those were the

6    things that I received, which I think are, you know,

7    typically -- typical of anybody doing patent analysis,

8    which is what I was hired to do, what I received.  It's

9    a question of whether these are -- these things are, in

10    fact, as far as I know, published, published documents

11    publicly available probably under IEEE, Institute of

12    Electrical and Electronic Engineers, or ACM,

13    Association of Computing Machinery, or under the

14    Carnegie Mellon report series, which is published and

15    available to anybody for basic cost.

16    Q.    Tell me about the telephone conversation that

17    you had on July 23rd.  Who participated in that

18    conversation?

19    A.    I think it was just Mr. Campbell and me.

20    Q.    Did you understand that any other Howrey

21    attorneys were listening in but not talking?

22    A.    I don't remember that.  I don't remember that

23    being stated.  It's possible that he might have stated

24    that, but I don't remember talking with anybody else.

25    Q.    Do you remember that Mr. Campbell was on a

1    speaker phone?

2        A.   No, I don't.  Some people use speaker phones

3    whether or not there is someone else in the office.

4        Q.   How long did that telephone conversation on

5    July 23rd last?

6        A.   I don't think it went for -- I think on the

7    order of five minutes.  I didn't time it.

8        Q.   This was the first time you had actually spoken

9    in a telephone conversation with anyone from Howrey?

10       A.   I think so, yes.

11       Q.   Tell me, as best you can, what was said during

12   that conversation, what you said to Mr. Campbell and

13   what he said to you.

14       A.   Well, we talked about this letter, and he was

15   concerned about what I had received that was

16   confidential, and he wanted to understand what of

17   confidentiality I had received, and so he had asked me

18   for an explanation of that, I assume so that he could

19   understand what response they might have to the letter

20   here that's in question.  And, actually, after the

21   phone conversation, he e-mailed a clarification that he

22   only wanted to know the specific categories, as opposed

23   to anything in detail.

24           And I do remember in that e-mail -- or, sorry,

25   in that phone conversation -- saying, well, I'll have

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 73

1    to go back and look to see exactly what they sent me.

2    And, actually, as far as I can tell, everything that

3    was sent was sent in a PDF file electronically, and so

4    I looked at all the titles to those and remembered for

5    myself what was there and made up this list for him.

6    And so that's why it was actually sent probably the

7    next day, if I remember right.  Yeah, the next day.

8       Q.   So the conversation you had with Mr. Campbell

9    took place prior to your receipt of the e-mail on page

10   51 of Exhibit 3; is that right?

11      A.   Yes.

12      Q.   And Mr. Campbell sent you that e-mail as a

13   clarification of the telephone conversation that you

14   had?

15              MR. DiGIOVANNI:   Objection, form,

16   foundation.

17      A.   Yes.

18      Q.   And you responded to that e-mail the next day?

19      A.   Right.

20      Q.   As shown on page 52?

21      A.   I wanted to do some due diligence to look at

22   what's there, so, yes.

23      Q.   Going back to the telephone conversation on

24   July 23rd, was that the first time that anybody from

25   the Howrey firm asked you about whether you had

1   received any confidential information and to

2   characterize your communications with counsel for

3   Ricoh?

4              MR. DiGIOVANNI:  Objection to foundation,

5   form, misrepresentation.

6      A.   This was the only time -- this was the first

7   time that I had been asked for a characterization of

8   what was confidential.

9      Q.   Did you try to be sensitive during the

10  telephone conversation with Mr. Campbell on July 23rd

11  to not reveal to him any confidential information you

12  may have received from counsel for Ricoh?

13     A.   That's correct, and it's why I essentially

14  deferred to say I'll answer you later so that I can

15  look this up and be sure of what I'm saying.

16     Q.   Did you, during that telephone conversation,

17  believe that you had, in fact, received confidential

18  information from Ricoh and declined to share that with

19  Mr. Campbell?

20     A.   I didn't share any information with him about

21  confidential material.

22     Q.   My question is a little bit different.  During

23  that telephone conversation with Mr. Campbell on

24  July 23rd, were you mentally aware that you should

25  not share with Mr. Campbell any confidential

1    information that you obtained as a result of your prior

2    consulting relationship with Ricoh?

3        A.    Yes, yes.

4                MR. DiGIOVANNI:    I'm going to object.

5    It's beyond the scope of this deposition as ordered by

6    the Court.

7    BY MR. BROTHERS:

8        Q.    In your opinion, during your consulting

9    relationship for Ricoh, did you obtain confidential

10    information from Ricoh?    I just want you to tell me yes

11    or no, if you can.

12                MR. DiGIOVANNI:    Objection to form,

13    foundation, and beyond the scope of the deposition.

14        A.    I don't particularly look at patents or

15    published articles as being confidential, because

16    everybody, in fact, can look at them.    Now, the fact

17    that they brought them to my attention is confidential,

18    and so I did not talk about any of the details or, as

19    I've showed here, not even what the titles are or

20    anything like that.    It's really just the general

21    category of what was given.    So there was no corporate

22    literature, you know, in support of Patent 432, you

23    know, earlier writings of the man or anything like that

24    that actually wrote that.    Nothing like that was given

25    to me.    Everything I received was public.

Page 76

1      Q.    Did Mr. Campbell ever ask you to describe to

2    him any of the conversations that you had with Ricoh's

3    counsel?

4      A.    No.

5      Q.    Do you believe that the conversations that you

6    had with Ricoh's counsel are confidential information?

7      A.    The conversations I had with Ricoh's counsel?

8    Oh, yes.

9      Q.    Did you tell Mr. Campbell that you believed

10   that the conversations that you had with Ricoh's

11   counsel were confidential information?

12     A.    I did not say that to him.

13     Q.    And he did not ask?

14     A.    He did not ask and it wasn't part of the

15   conversation.  He was quite careful.

16     Q.    Is there any doubt in your mind, Dr. Thomas,

17   that as a result of your consulting relationship with

18   Ricoh, you received confidential information from

19   Ricoh's counsel?

20          MR. DiGIOVANNI:  Objection to form,

21   foundation, beyond the scope.

22     A.    I feel that the fact that they were bringing

23   these articles to my attention was confidential.

24     Q.    And the fact and content of your conversations

25   with Ricoh's counsel, were those also confidential

1    information?

2              MR. DiGIOVANNI:  Objection to form.

3       A.    Yes.

4       Q.    Did you discuss with Mr. Campbell the fact that

5    Ricoh has asserted that you had a conflict of interest

6    that would preclude you from consulting with the Howrey

7    firm?

8       A.    We discussed that briefly in conjunction with

9    this letter.  I'm talking about the letter of July 22,

10   Exhibit 11.

11      Q.    Directing your attention to page 55 of

12   Exhibit 3, it's an e-mail from Mr. Campbell dated

13   July 28th, and I'll ask you to review that to

14   yourself and let me know when you're done.

15      A.    Page 55?

16      Q.    Yes.

17      A.    (Witness reviews document.)  Okay.

18      Q.    Had you discussed with the Howrey firm the fact

19   that you might not be able to continue consulting with

20   them?

21              MR. DiGIOVANNI:  Objection to form.

22      A.    No, but I think that that was understood from

23   some of these other e-mails that there may be a finding

24   that I cannot consult.  That's what's stated in here,

25   you know, if I cannot continue consulting for Howrey,

Deposition of:
Donald E. Thomas. Jr.                                    August 14, 2003

Page 78

1    why, then, they will re-issue the subpoena for the

2    information -- or not the information, but for the

3    deposition.

4         Q.    Now, the last sentence of Mr. Campbell's

5    July 28th, 2003 e-mail to you says, in essence, if

6    the court rules you -- the last two sentences.  Quote,

7    "If the Court rules that you cannot consult with

8    defendants, we will reschedule the deposition for a

9    date of mutual convenience.  At that deposition, we

10   will seek testimony regarding the character of prior

11   art logic synthesis systems and their relevance to the

12   validity of Ricoh's patents," end of quote.

13           Do you see that?

14   A.    Yes.

15   Q.    Is the subject matter of that deposition the

16   same thing that you had already told Mr. Campbell was

17   the subject matter of your consulting for Ricoh?

18           MR. DiGIOVANNI:  Objection to form.

19   A.    I certainly didn't use those words logic

20   synthesis, I wouldn't think.

21   Q.    Do you understand that the subject matter of

22   your proposed deposition as described by Mr. Campbell

23   covered the same topics that you had previously told

24   him was the subject matter of your consulting for

25   Ricoh?

1              MR. DiGIOVANNI:  Objection to form.

2      A.    Yes.  I know this is the same topic area.

3              MR. BROTHERS:  I have no further

4    questions.

5              (Recess.)

6                      EXAMINATION

7    BY MR. DiGIOVANNI:

8      Q.    I do have a clarification, in fact, to that

9    very last question, follow-up to that last question.

10   I'm not sure I understood the answer to that.

11     A.    So we're on the record, then?

12     Q.    We're on the record.  When you gave your last

13   answer in this deposition, were you stating that you

14   told Mr. Campbell at some point that the subject of

15   your consultation with Ricoh pertained to the character

16   of prior art logic synthesis systems and their

17   relevance to the validity of Ricoh's patents?

18     A.    I don't think I ever used that phrase with him,

19   prior art logic synthesis systems.  I never said that

20   to him, okay?  What I had said to him was in the

21   e-mails of March, the March time frame.

22             MR. DiGIOVANNI:  Thank you.  That's all I

23   have.

24                      EXAMINATION

25   BY MR. BROTHERS:

1    Q.    Had you completed your answer, Dr. Thomas?

2    A.    Essentially, yes.

3    Q.    When you reviewed the July 28th e-mail and

4    read that last sentence, did you conclude that the

5    proposed subject matter of your deposition was

6    essentially the same thing that you had previously been

7    doing for Ricoh, as you had told Mr. Campbell back in

8    March and April?

9              MR. DiGIOVANNI:  Objection to form.

10   A.    That's right.  I think that what's going on

11   here is that I never said exactly what I had dealt with

12   with Ricoh about and he never said what the exact issue

13   in the trial was, but it's clear that I had talked to

14   Ricoh about that topic before and that I was

15   knowledgeable in that field, and so there is this body

16   of knowledge here that he happens to be characterizing

17   that way that he's referring to, but I never used that

18   specific phrase with him.

19   Q.    And was it your interpretation of the last

20   sentence of the July 28th e-mail from Mr. Campbell

21   that even if you were not permitted to consult with the

22   Howrey firm that they would still take your deposition

23   and that deposition would be on the subject matter that

24   you had previously provided consulting work to counsel

25   for Ricoh?

1    A.    Or at least in that field, yes, of knowledge.

2    Q.    If not the exact same thing; is that right?

3          MR. DiGIOVANNI:  Objection to form.

4    A.    It's hard to say that it would be the exact

5    same thing.  These are very difficult issues.

6    Q.    But certainly the same subject matter?

7    A.    Same subject.  I helped invent the subject.

8          MR. BROTHERS:  No further questions on

9    cross.

10         MR. DiGIOVANNI:  I have none.

11         MR. BROTHERS:  For stipulations, we are

12   happy to agree that the witness can read and sign

13   before any notary, not necessarily the original court

14   reporter.  Other than that, follow the Federal Rules.

15         Fair enough.

16         MR. DiGIOVANNI:  I agree with that.

17         MR. BROTHERS:  Dr. Thomas, you'll be

18   given an opportunity to review and make any

19   corrections to the transcript 30 days after you

20   receive it.  The court reporter -- let's go off the

21   record.

22         (Discussion off the record.)

23         MR. BROTHERS:  We have agreed that the

24   court reporter will send the official transcript

25   directly to the witness and the witness will have 30

Page 82

```
 1   days to read and sign, and, Dr. Thomas, you would then
 2   send it back to the court reporter and she will take
 3   care of getting it to the attorneys.
 4           Fair enough?
 5               THE WITNESS:  Yes.
 6               MR. BROTHERS:  I don't have any more.
 7               THE WITNESS:  I have to have a notary?
 8               MR. BROTHERS:  Typically, for
 9   verification, it's a notarized page, although some may
10   be a declaration, but we have agreed you can read and
11   sign before any notary, not this specific court
12   reporter, and the court reporter will give you a
13   letter explaining all this.
14               (Witness excused.)
15               (Signature not waived.)
16               (Deposition concluded at 11:25
17       o'clock a.m.)
18                       - - -
19
20
21
22
23
24
25
```

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 83

1        DEPOSITION OF DONALD E. THOMAS, JR.
2             CHANGES AND/OR CORRECTIONS
3
4   PAGE 9 LINE 18 NOW READS: A. Well, I thought
5   back over the last end months
6   SHOULD READ: Well, I thought back over the
7   last "n" months
8   REASON FOR CHANGE: recorder confused "n" with "end"
9   PAGE     LINE     NOW READS: _____
10  _____
11  SHOULD READ: _____
12  _____
13  REASON FOR CHANGE: _____
14  PAGE     LINE     NOW READS: _____
15  _____
16  SHOULD READ: _____
17  _____
18  REASON FOR CHANGE: _____
19  PAGE     LINE     NOW READS: _____
20  _____
21  SHOULD READ: _____
22  _____
23  REASON FOR CHANGE: _____
24
25

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 84

1

2

3

4

5

6        I, DONALD E. THOMAS, JR., having read the

7    foregoing deposition, certify that all corrections to

8    the deposition that I desire to make, together with my

9    reasons for such corrections, appear on the preceding

10   page, and I further certify that the foregoing

11   deposition is a true record of my testimony.

12

13

14

15                                    DONALD E. THOMAS, JR.

16

17

18                                    9-22-03

19                                    DATE

20

21

22

23

24

25                                                         lab

85

## DONALD E. THOMAS, JR.

- - - -

1

2

3    C E R T I F I C A T I O N

4

5        I hereby certify pursuant to F.R.C.P. No.

6    30(f)(1), that the witness, **DONALD E. THOMAS, JR.**, was

7    duly sworn by me and that the foregoing deposition is a

8    true record of the testimony of the witness.

9        The foregoing certification does not apply to

10   any reproduction of this transcript in any respect

11   unless under the direct control and/or direction of the

12   certifying reporter.

13

14

15

16   _Lisa Ann Bauer_

17   Lisa Ann Bauer

18   Notary Public

19                              Notarial Seal
                                Lisa Ann Bauer, Notary Public
                                Hampton Twp., Allegheny County
                                My Commission Expires Apr. 13, 2007
20                              Member, Pennsylvania Association Of Notaries

21   My Commission expires April 13, 2007.

22

23

24

25

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

**A**

able 28:12,23 37:12
  39:5 60:7 77:19
access 56:15
accurate 46:24
acknowledgment 50:23
ACM 71:12
act 59:9,18,22
acting 59:7,19
action 1:5 5:17
active 48:23
actively 46:3
activity 27:18
actual 40:12 57:18
add 19:24
added 12:23
address 5:10,13 56:5
advice 30:7
Aeroflex 1:7 63:23
  64:1
affect 43:16
affiliate 59:10
affirmatively 24:14
AGENCY 1:18
ago 34:12
agree 59:7,11 60:19
  61:3 81:12,16
agreeable 8:5
agreed 63:12 81:23
  82:10
agreeing 59:25
agreement 29:23 30:15
  30:23 31:1,6 35:20
  47:19 49:9,13 50:25
  51:12 52:7,17 53:5
  56:22 57:18,20,23
  60:11,24 61:14 62:4
  62:16 63:1,11 64:16
ahead 18:13
al 63:24,25 64:2
Alice 37:10,22
allowed 45:4
AMI 1:7
amount 41:6 42:3,14
  55:2
amplify 35:21
analysis 35:3 71:7
and/or 83:2 85:11
Ann 2:4 85:17
answer 17:7,24 18:13
  19:6,14,17 20:18
  23:22 24:15 35:1,8
  35:10 43:15,16 44:25
  60:6 61:16,20 74:14

79:10,13 80:1
answered 35:9 65:16
anybody 6:19 7:11,16
  10:18 11:1,4 19:12
  45:2,10 46:14 55:1
  59:2 66:25 71:7,15
  71:24 73:24
anymore 45:15
Anyway 43:25
apparent 39:17 69:19
appear 23:20 15:11
  38:5,5 41:23 84:9
appeared 7:19
appears 13:25 14:14,20
  15:6 27:21 33:1
  38:18 50:14 52:13
  71:2
apply 58:9 85:9
appreciated 28:1
appropriate 25:17
  34:13,20 35:13 44:18
  45:17,21 46:1
approval 60:25
approximately 12:25
  27:17
April 25:11 26:10 27:8
  27:9,12 30:13,17
  31:8,15,19 32:9,13
  35:24 36:4,7 37:21
  39:22 80:8 85:21
area 79:2
arrive 56:1
art 78:11 79:16,19
articles 71:1 75:15
  76:23
aside 11:14,20 23:20
  29:19 69:7
asked 18:15 24:8 30:18
  30:22 35:6 41:4 63:2
  63:5,7 70:5,23 72:17
  73:25 74:7
asking 14:22 16:2,12
  22:11 29:2 30:7
  41:18 42:5 60:5 61:9
  61:11,12 65:23
asserted 77:5
assistant 42:6
Associates 2:7
Association 71:13
assume 15:12 16:24
  40:14 64:5 72:18
assumed 15:18,20
  18:15,19 19:15,17
  20:19 22:17 69:17,23
assuming 46:10

assumption 15:15,16
  19:21 20:3,7 21:16
  24:16 31:4 33:13
attention 8:18 16:17
  57:25 75:17 76:23
  77:11
attorney 6:23
attorneys 7:24 12:5,6
  58:18 59:2,3 61:10
  71:21 82:5
audibly 24:15
August 1:23 2:6 6:1,2
  8:16
AUTHORIZATION
  1:17
available 27:23 71:11
  71:15
Avenue 2:8 5:11
aware 74:24
a.m 2:9 5:2 52:10,19,24
  53:3 68:3 82:17

**B**

back 9:18,19,23 10:2
  11:16 15:14 20:12
  22:20 25:18 26:2,6
  26:12 33:4 50:23
  51:22 55:17 56:12
  64:16 73:1,23 80:7
  82:2
ball 26:5
based 19:20,21 20:7
  63:19
basic 71:15
basis 43:8 59:24 62:6
Bates 12:24 22:22
  24:22 38:21 56:19
Bauer 2:4 85:17
beginning 9:9 58:2
begins 52:17
behalf 3:3,9 59:8,9,18
  59:20 60:11 63:17
believe 7:15 34:20
  35:13 46:23 53:7
  69:25 74:17 76:5
believed 76:9
best 10:6 11:15 41:12
  62:24 72:11
beyond 13:4,5 34:25
  35:17 36:22 45:24
  47:23 50:2 58:12
  60:2 61:2,19 68:10
  75:5,13 76:21
big 33:21
bills 14:21,23

binding 47:19
bit 45:16 51:3,4 54:21
  54:22 55:8 74:22
blue 20:24
blunt 33:20
body 80:15
bottom 12:24 16:18
  38:24 40:18 51:5,11
  52:7,15 53:9 68:2
Bove 3:11
box 9:24 52:11
break 50:6,8,9
briefly 77:8
bringing 76:22
Brothers 3:4,19 5:7,15
  6:5 8:14 12:19 13:13
  13:16 14:9,17 15:3
  17:17,24 18:14 20:18
  21:13 35:1 36:24
  37:4 38:9 40:6 41:15
  41:17 43:6,20,24
  44:25 47:25 50:9,13
  51:8,10 55:12 60:17
  61:22 68:16 70:12
  75:7 79:3,25 81:8,11
  81:17,23 82:6,8
brought 5:24 65:22
  75:17
Buckler 2:7
Building 2:8
bunny 37:12
business 5:10
busy 25:12,22 26:1

**C**

C 3:1 5:1 85:3,3
calendar 14:10,12
  40:13,25
call 9:21 12:24 23:18
  55:2 65:20 66:1
called 47:5 65:2 66:13
calls 31:12 47:2
Campbell 7:5,5,12 10:7
  10:25 11:4,10 12:4
  16:22 17:6,18 19:7
  19:22 21:6,15 22:1
  22:24 23:8 25:10
  26:3,11,13,21 27:13
  32:8,13,20 35:9
  46:14,21 49:7 50:18
  50:22,24 51:14,24
  52:2,14,20,24 54:7
  55:24 57:8 64:21,23
  65:18,19,25 66:8,10
  66:24 67:3,12 68:23

69:8,12,19,25 70:15
  70:18 71:19,25 72:12
  73:8,12 74:10,19,23
  74:25 76:1,9 77:4,12
  78:16,22 79:14 80:7
  80:20
Campbell's 19:13,16
  27:8 31:18 36:7
  39:24 42:18,20,25
  44:3,11 49:1 55:16
  65:11 78:4
candid 22:9
care 82:3
careful 76:15
Carnegie 5:11 71:14
case 6:17 17:12 18:2,25
  19:8,11,12 20:9
  23:16 25:24 26:25,25
  35:12
cases 51:17
categories 70:25 72:22
category 75:21
cause 21:14,25 22:8
caution 8:8 19:1 23:20
cell 56:14
central 39:6
centrally 39:4
certain 35:3 44:15
  58:15,19
certainly 41:22 69:14
  78:19 81:6
certification 85:9
Certified 1:17 2:4
certify 84:7,10 85:5
certifying 85:12
change 53:2 83:8,13,18
  83:23
CHANGES 83:2
character 78:10 79:15
characterization 74:7
characterize 74:2
characterizing 80:16
charge 53:15 54:1
charged 23:10 24:2
check 25:24
choice 43:11
choose 43:23
Chris 7:6
Civil 1:5 2:3
clarification 72:21
  73:13 79:8
classroom 35:4
clear 14:22 41:24 80:13
clearly 44:14
close 60:20

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 2

colleagues 12:8,9,11
come 18:10 35:4 37:12
    40:14 64:11
comes 34:11
coming 30:4
commanded 41:23
commencing 2:9
comment 34:12 62:6
Commission 85:21
Commonwealth 2:5
communicated 15:21
communicating 35:25
communication 6:16
    11:7 19:25 20:1,2,22
    20:23 22:23,25 25:3
    27:7 30:24 32:16
    39:20 41:10 47:16
communications 7:23
    8:3,10 9:19 12:5 13:1
    15:8 19:2 21:5 22:21
    23:21 26:23 31:3,7
    36:13,19,25 37:2,6
    37:20 39:7 48:14
    57:3,13 61:12 62:21
    66:11 69:8 74:2
companies 42:11
company 1:4 35:19
    63:23
compilation 12:20
    55:14
complete 5:8
completed 80:1
comprise 13:17
comprises 14:10 57:24
comprising 13:7
computer 13:22 39:1
    39:13
Computing 71:13
concerned 29:13 41:21
    45:10,15 47:16 72:15
conclude 80:4
concluded 82:16
conclusion 47:3
condition 59:25
conferences 37:25 71:1
confidence 58:17
confidences 30:2
confidential 29:17,20
    58:16,20,23 62:11,18
    63:3 69:13 70:1,20
    70:23 72:16 74:1,8
    74:11,17,21,25 75:9
    75:15,17 76:6,11,18
    76:23,25
confidentiality 30:15

30:23 31:1,6 72:17
confirm 33:13
conflict 29:9,10,17,19
    32:24 33:24 34:5,17
    36:8 60:14 77:5
conjunction 77:8
connect 28:24
Connolly 3:11
consider 22:8 44:8,10
    44:23
considerable 41:6 42:3
considering 36:17
consult 29:7,13,14,14
    60:7,13 77:24 78:7
    80:21
consultant 17:3,12
    18:1,17,19 19:8,18
    24:20 44:7 48:8
    54:19 59:8,9,18,19
    59:22 61:4 63:17
consultants 18:6,11
    19:14
consultation 48:18,18
    79:15
consulted 35:14
consulting 27:13 28:6
    28:19 29:3,5 30:20
    34:18 35:21 36:2
    44:12 46:23 47:10,19
    48:3,13,14 49:13
    50:5,25 53:5,21 54:2
    54:10 55:6 56:22
    57:10,18,20,23 60:11
    61:14 75:2,8 76:17
    77:6,19,25 78:17,24
    80:24
contact 44:15
contacted 37:18,19
    45:13 47:9
contacts 37:8 40:1
contained 55:25
contemporaneously
    33:8
content 11:18 51:13
    52:9,23 67:13 71:5
    76:24
context 14:18
continue 17:19,25
continued 36:14
contract 36:1 45:12
    46:25 47:4,5 48:3,4
    48:13,14,17,19,20,23
    66:19,22
control 85:11

controlled 59:11
convenience 78:9
conversation 10:4,16
    11:9 18:17 70:15,19
    71:16,18 72:4,9,12
    72:21,25 73:8,13,23
    74:10,16,23 76:15
conversations 10:22
    45:4,7,9 57:17 61:9
    76:2,5,7,10,24
copied 10:2
copies 14:21 23:13
    32:10,11
copy 5:21,23,25 8:15
    11:22,24 14:10,12,18
    15:4,24 38:20 40:2,7
    46:17 56:21
copying 42:8
Corbin 7:9
CORP 1:11
corporate 71:2 75:21
Corporation 63:13,18
    64:5
corporations 33:22
correct 6:8 13:15 17:14
    19:23 38:25 39:14,25
    46:12,13 62:4,24
    74:13
corrections 81:19 83:2
    84:7,9
correctly 28:3 33:10
    41:1
cost 49:14 71:15
costs 49:8
counsel 6:15 7:19 8:4
    8:10 13:2 15:8,12,13
    15:22,25 16:9 17:8
    17:20 18:6 19:3,20
    20:15 21:8,18,24
    23:9,21 25:3 28:18
    30:15,23 31:1,16
    32:22 36:1 44:9,20
    46:6,9,10,16 47:1,19
    48:2,3,15,23 49:13
    49:22,24 52:25 53:22
    57:2,13 62:7,10 70:2
    74:2,12 76:3,6,7,11
    76:19,25 80:24
couple 44:20 42:11
    51:16
course 55:3
court 1:1 2:7 5:18 6:15
    9:13 13:5 26:6 34:25
    35:18 36:23 44:24
    45:25 47:24 50:2

58:12 60:3 68:11
    75:6 78:6,7 81:13,20
    81:24 82:2,11,12
courteous 26:8
courtesy 25:19
courts 15:18
cover 11:18,20 56:11
    56:18 57:8
covered 78:23
cross 81:9
current 16:12
customers 23:10 24:2
    64:12,14

**D**

D 3:17 5:1
date 40:12,14,18 45:11
    47:6,13 61:13 78:9
    84:19
dated 5:25 8:16 16:21
    22:24 32:8,13 39:23
    40:7 56:18 64:21
    68:17 70:14 77:12
dates 40:25,25
day 26:20,22 73:7,7,18
days 26:10,13 81:19
    82:1
DC 3:7
de 3:13 47:15
dealt 80:11
decide 30:5 43:12
decides 43:8
declaration 82:10
declined 54:18
defendants 1:13 3:9
    6:15 7:23 15:12,22
    28:18 49:23 58:19
    64:6 78:8
defense 53:10,20
deferred 74:14
DELAWARE 1:2
deleted 9:25
Department 5:12
deponent 5:4
deposed 5:4
deposition 1:22 2:2 4:3
    4:4,5,6,7,8,9,10,11
    4:12,13 5:16,19,25
    6:3 7:17,22 8:1,12
    12:17 14:7,15 15:1
    17:1,9 20:5 22:7
    34:25 35:17 36:23
    38:7 40:4 44:17,24
    45:24 46:9,11 47:23
    50:3,11 55:10 56:23

57:11 58:13 59:24
    60:2 68:10,13,14
    75:5,13 78:3,8,9,15
    78:22 79:13 80:5,22
    80:23 82:16 83:1
    84:7,8,11 85:7
depositions 43:14
describe 76:1
described 13:19 50:20
    67:12 78:22
desire 84:8
Despite 60:4
detail 32:25 33:25 34:8
    34:11 36:9 72:25
detailed 62:1
details 32:6 34:14
    75:18
determined 21:20
developed 15:20
development 33:7,8
Dickstein 3:5 27:14
    28:7,20 29:4 32:21
    33:14 40:8 46:16
    49:24 53:6 66:25
different 21:22 25:16
    30:6,10,12 38:14
    45:16 51:3 74:22
difficult 81:5
DiGiovanni 3:10,20
    7:13,18 8:7 13:12,12
    13:14,15 17:15,22
    18:12 20:17 21:11,19
    22:10 29:11 32:3
    34:10,23 35:16 36:11
    36:16,21 41:13,16
    43:1,4,21 44:5,22
    45:23 46:19 47:2,22
    48:6 49:15 50:1,6
    51:7 53:24 54:16,25
    57:4,15 58:11,21
    59:4 60:1,16 61:1,18
    62:5 63:6 66:4 67:15
    68:9 69:10,16 70:4
    70:10,22 73:15 74:4
    75:4,12 76:20 77:2
    77:21 78:18 79:1,7
    79:22 80:9 81:3,10
    81:16
diligence 73:21
direct 8:18 16:17 40:17
    57:25 65:15 85:11
directed 23:25
Directing 77:11
direction 85:11
directly 20:7 37:1

S.E. Manno & Associates, Inc.
888-819-8282

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 3

| | | | | |
|---|---|---|---|---|
| 38:24 81:25 | electronic 1:9 56:15 | expenses 42:14 44:10 | 71:10 74:17 75:16,16 | 72:8 73:24 74:6 |
| **disagree** 36:24 | 71:12 | **expert** 27:16 34:21 | 76:22,24 77:4,18 | **five** 72:7 |
| **disappointed** 33:18 | **electronically** 73:3 | 44:20 45:20 59:11 | 79:8 | **flattered** 54:22 |
| **disclose** 18:10 19:1 | **electronics** 39:10 | 60:19 | **facto** 47:15 | **flattering** 55:3 |
| 28:6 62:9 70:3,21 | **else's** 60:25 | **expires** 85:21 | **facts** 35:11 | **folder** 9:25 10:1,2 |
| **discuss** 36:18 62:17 | **employed** 19:12 45:10 | **explain** 35:5 43:4,5 | **fair** 26:12 39:12 62:25 | **follow** 81:14 |
| 77:4 | **ended** 56:16 65:8 | **explained** 64:3 | 81:15 82:4 | **following** 14:1 58:5 |
| **discussed** 20:12 34:14 | **engagement** 55:24 56:8 | **explaining** 82:13 | **fall** 27:19 | **follows** 5:5 |
| 66:10 77:8,18 | 56:12 | **explanation** 39:9 72:18 | **far** 29:13 36:22 45:9,14 | **follow-on** 54:17 55:7 |
| **discussing** 8:2 32:6 | **engineering** 55:9 68:6 | **explicitly** 55:21 | 47:16 64:8,15 71:10 | **follow-up** 26:9 79:9 |
| **Discussion** 81:22 | **Engineers** 71:12 | **express** 25:17 54:21 | 73:2 | **foot** 26:14 |
| **DISTRICT** 1:1,2 | **entered** 5:18 35:17 | 56:9 | **fax** 11:17,20,21,23,23 | **Forbes** 5:11 |
| **doeument** 9:8 38:12 | 56:22 57:10 | **expressed** 59:24 | 64:16 67:22 69:2,4 | **foregoing** 84:7,10 85:7 |
| 41:14 58:8 59:16 | **enthusiasm** 54:11,23 | **expressing** 54:11 | **faxed** 40:8 | 85:9 |
| 64:20 77:17 | 55:6 | **e-mail** 9:22,23,24,25 | **faxes** 31:11 | **form** 17:15,22 18:12 |
| **documentation** 16:25 | **enthusiastic** 54:20,23 | 10:23 11:19 16:21 | **Federal** 2:3 56:9 81:14 | 20:17 21:19 22:10 |
| 42:1 | **envelope** 6:7 | 21:20 22:3,20,23 | **feel** 29:15 30:1 34:13 | 29:11 32:5 34:10,23 |
| **documents** 9:10,12,16 | **Erik** 6:23 | 23:7 24:1,12,18 27:8 | 35:2,8 45:2 76:22 | 36:11,16 43:1,3,9,19 |
| 10:10 12:14,20 13:17 | **Esquire** 3:4,10 | 27:12,20 28:13 29:1 | **felt** 25:22 28:9 46:1 | 44:5,22 45:23 46:19 |
| 15:5,9 16:16 25:1 | **essence** 26:4 78:5 | 29:1 31:25 32:10,12 | 49:17 54:19 | 47:22 48:6 49:15 |
| 36:5 51:21 71:10 | **essentially** 29:25 47:11 | 33:17 34:15 36:8,17 | **field** 28:11,22 80:15 | 50:1 51:3 53:24 |
| **doing** 28:19 30:20 71:7 | 74:13 80:2,6 | 38:4,16,20,21,23 | 81:1 | 54:16,25 57:4,15 |
| 80:7 | **established** 54:6 | 39:10 41:8 44:3,7 | **figure** 27:25 | 58:11 60:2 61:1,18 |
| **Don** 51:25 | **estimate** 49:8,14 | 45:19 46:22 48:11,21 | **file** 51:18 73:3 | 63:6 66:4 67:15 68:9 |
| **Donald** 1:22 2:2 3:19 | et 63:24,25 64:2 | 48:25 49:2 50:14,16 | **filed** 23:17 | 69:10 70:4,22 73:15 |
| 5:3,9 83:1 84:6,15 | **everybody** 75:16 | 50:17,18 51:3,14,18 | **files** 38:5,14 39:15 | 74:5 75:12 76:20 |
| 85:6 | **exact** 80:12 81:2,4 | 52:9,12,16,21,23 | **finally** 37:16 | 77:2,21 78:18 79:1 |
| **dots** 28:24 | **exactly** 30:9 32:4 38:13 | 53:3 54:11 55:7,13 | **Finance** 2:8 | 80:9 81:3 |
| **double** 42:1 | 60:4 73:1 80:11 | 55:16 56:4,5,6,9 | **find** 51:20,21 | **formed** 31:16 61:6,15 |
| **doubt** 76:16 | **EXAMINATION** 3:18 | 64:21 65:4,15,21 | **finding** 77:23 | 61:23,23 62:2 |
| **Dr** 5:15 40:11 65:19 | 5:6 79:6,24 | 66:9 67:21 68:2 69:3 | **fine** 8:20 13:3 | **forth** 6:13 7:21 9:9 |
| 76:16 80:1 81:17 | **exception** 13:8 15:7 | 69:7 70:8,13 72:24 | **firm** 6:24 7:7,10 10:5 | 32:12 58:21 |
| 82:1 | **exchange** 10:18 | 73:9,12,18 77:12 | 11:8 12:22 15:13,23 | **forward** 26:4 33:1 |
| **draft** 71:2 | **exchanged** 19:14,18 | 78:5 80:3,20 | 16:8 17:8,20 20:3,14 | 66:24 |
| **Drive** 5:14 | **excused** 82:14 | **e-mailed** 72:21 | 20:15 21:1,4,7,17,24 | **forwarded** 66:17,21 |
| **dropped** 9:12 | **exhibit** 4:3,4,5,6,7,8,9 | **e-mails** 10:13 11:2,8 | 22:6,9,25 23:5 24:19 | **forwarding** 66:8 |
| **due** 73:21 | 4:10,11,12,13 5:25 | 12:7 13:18,22 16:3 | 26:16 27:14 28:7,19 | **foundation** 17:16,23 |
| **duly** 5:4 85:7 | 6:3,11,20,25 7:21 | 18:24 22:4 31:9 36:4 | 28:20 29:4,5 30:7,14 | 29:12 73:16 74:4 |
| **dumb** 37:12 | 8:12,15,19 12:17,20 | 37:23 38:3,5 39:1,3,5 | 30:25 31:8,14 32:2 | 75:13 76:21 |
| **duplicate** 11:25 | 13:7,18,24 14:4,7,10 | 39:13,18,23 48:9 | 33:14,14 34:7,16 | **four** 20:22 47:8 |
| | 14:11,15,18 15:1,4 | 52:4 53:8 54:8,12,15 | 36:19 37:5,21 38:3,6 | **fourth** 2:8 57:25 |
| **E** | 15:10 22:22 24:22 | 54:18 62:19,22 66:17 | 39:21 40:9 41:10,11 | **frame** 30:16 35:24 |
| **E** 1:22 2:2 3:1,1,17,19 | 36:25 38:4,7,10,18 | 66:23,25 67:6 68:19 | 41:13 44:19 45:18,22 | 37:21 38:1 79:21 |
| 5:1,1,3,9 83:1 84:6 | 38:20,22 39:17,24 | 70:6 77:23 79:21 | 46:15,16 48:22 49:12 | **Francis** 3:10 |
| 84:15 85:3,6 | 40:2,4,7,17 41:9,15 | | 49:23,24 53:4,6 54:4 | **Frank** 7:13 |
| **earlier** 20:13 44:17 | 42:21 48:12 50:11,14 | **F** | 54:9,23 55:14 57:2 | **free** 26:20,22 35:8 |
| 48:7,9 59:24 60:7 | 50:16,17,17,20 51:2 | **F** 85:3 | 57:12 60:11 62:17,23 | **Friday** 8:25 41:2 |
| 75:23 | 51:5,11 55:5,10,13 | **fact** 9:21,22 10:13 | 63:1,2,17 64:17 67:1 | **front** 9:2 26:1 |
| **early** 21:16 22:1 27:19 | 55:15,17,19 56:20 | 14:12 15:23 16:5 | 69:9,18 73:25 77:7 | **full** 52:15 57:25 |
| **Eastern** 27:24 52:22 | 57:24 63:22 64:20 | 18:1 20:25 23:8 | 77:18 80:22 | **further** 6:14 19:16,25 |
| **ECE** 5:12 | 68:14,17 69:3,5,9,22 | 25:15 28:9,13,15 | **first** 5:4 6:22 13:24 | 20:1 24:18 79:3 81:8 |
| **effect** 29:23 | 73:10 77:10,12 | 30:5,10 33:13 37:12 | 22:24 26:20,22 33:12 | 84:10 |
| **eight** 12:25 | **EXHIBITS** 4:2 | 41:6 42:8,11 44:9 | 41:9 42:5 48:2,10,12 | **future** 40:25 |
| **either** 43:11 59:2 61:22 | **expect** 20:14 | 45:11 46:3 50:19 | 48:16,19 49:12 52:25 | **F.R.C.P** 85:5 |
| **Electrical** 71:12 | **expecting** 20:2 | 53:21 58:13 67:18 | 53:4 54:8 67:7 68:2 | |

Deposition of:
Donald E. Thomas, Jr.

| G | | | |
|---|---|---|---|
| **G** 5:1 | 66:21,23 67:19 68:18 | 41:7 42:7 55:18,18 | 46:17,25 47:18 48:1 | **lawyerspeak** 43:20 |
| **general** 20:11 35:10 | **hold** 31:21 56:23 57:11 | 62:10,12,18 63:4,10 | 48:10,11,17,21,22 | **learn** 12:4 |
| 61:25 75:20 | 58:16 | 66:21 69:13 70:1,20 | 49:21 50:17,18 51:15 | **led** 64:6 68:12 |
| **generally** 55:1 | **home** 5:13 39:2,4,6 | 70:24,24 74:1,11,18 | 52:10,15,18,22,24 | **left** 10:25 11:4 65:13 |
| **getting** 10:8 34:24 | 55:22 | 74:20 75:1,10 76:6 | 53:5 56:17,18,23 | 69:20 |
| 67:18 82:5 | **hoping** 42:16 | 76:11,18 77:1 78:2,2 | 61:15 62:3,22 64:17 | **legal** 47:3 |
| **give** 18:9 21:1,7,24 | **hour** 53:15 | **informed** 15:13 57:2 | 64:22 68:1,17,19 | **legally** 47:8 |
| 28:11,23 59:11 60:19 | **Howrey** 6:24 7:7,9 | **infringement** 24:3 | 71:17 72:5 73:24 | **letter** 5:23,25 6:22 |
| 65:20 69:14 82:12 | 10:1,5,19,21 11:1,4,8 | **infringing** 23:10 | 74:10,24 77:9,13 | 11:11,12,22,24,25 |
| **given** 15:23,24 17:3 | 11:12,21 12:6 15:13 | **initial** 31:19 | 78:5 80:3,20 | 12:1,2,3 13:10 15:5 |
| 20:4,15 21:17 22:6 | 15:22 16:8 17:8,19 | **inquired** 22:5 | **June** 15:14 16:9 21:5 | 47:13,14 55:24 56:8 |
| 31:4,16 75:21,24 | 20:3,14,14 21:1,4,7 | **inquiry** 17:19 41:9 | 40:8,19 | 56:11,12,18,21 57:8 |
| 81:18 | 21:17,23 22:6,9,25 | 44:4 | **justify** 53:13 | 57:9 65:5,6,8,9,11,14 |
| **giving** 30:2 | 23:5 24:19 26:16 | **insert** 36:21 | | 65:23 66:2,5,6 67:9 |
| **go** 16:11 18:13 22:20 | 28:19 29:5 30:7,14 | **inserted** 52:16 | | 67:10,13,18,22,23,24 |
| 33:1 34:22 48:19 | 30:25 31:8,14 32:2 | **instance** 12:3 48:17 | **K** | 67:25 68:1,17,18,22 |
| 51:22 73:1 81:20 | 33:14 34:7,16 35:25 | **Institute** 71:11 | **keep** 10:11 | 68:25 69:2,4,5,15,20 |
| **goes** 10:11 | 36:8,13,19 37:2,5,21 | **instructed** 43:14 | **Kelly** 7:6 | 69:21,23 72:14,19 |
| **going** 15:19 18:16 | 38:3,6 39:21 41:10 | **intellectual** 45:14 47:9 | **Ken** 5:15 | 77:9,9 82:13 |
| 20:12 27:25 30:1 | 41:11,18 44:9,19 | **intended** 48:21 | **Kenneth** 3:4 | **letters** 27:6 31:11 |
| 36:21 37:17 42:1,2 | 45:18,22 46:15 48:2 | **intending** 48:24 | **kind** 68:7 | **let's** 22:20 31:21 50:9 |
| 44:9 58:14,16 73:23 | 48:14,22 49:12,14,23 | **intention** 50:24 | **knew** 26:16 24:9 46:11 | 51:23 52:23 53:2 |
| 75:4 80:10 | 53:1,4 54:3,9,22 | **interest** 25:18 29:9,10 | 48:7 54:4 | 56:2 81:20 |
| **good** 54:1 65:3 | 55:13 56:6 57:2,12 | 32:21 33:2 34:17 | **know** 6:25 7:18 15:17 | **limited** 7:23 18:23 |
| **goodbye** 65:20 | 59:2,3 60:11 62:17 | 60:14 77:5 | 15:17 16:24 18:20,20 | **LINE** 83:4,9,14,19 |
| **gotten** 26:12 | 62:23 63:1,2,17,21 | **interested** 24:19 25:12 | 18:24 22:14,14,16,17 | **Lisa** 2:4 85:17 |
| **GRAPHICS** 1:10 | 64:17 69:19,18 71:20 | 25:14 54:18 55:5 | 22:18 23:22,23 25:9 | **list** 69:17 73:5 |
| **great** 53:10,20 55:16 | 72:9 73:25 77:6,18 | **INTERNATIONAL** | 25:18,19,22,23 26:22 | **listed** 17:3,11 18:1 19:8 |
| **greater** 54:11 | 77:25 80:22 | 1:11 | 28:10,15,25 29:23,24 | 19:11 |
| **guess** 37:20 56:17 | **Howrey's** 46:11 | **interpret** 42:24 44:11 | 30:3,9,20 32:5,6 33:5 | **listening** 71:21 |
| **guy** 33:21 | **how/if** 27:22 | 54:14 | 37:11 39:9 40:12 | **lists** 18:16,19 19:14,17 |
| | **humor** 55:8 68:6 | **interpretation** 80:19 | 41:24 43:18 44:7 | **Literally** 18:22 |
| **H** | **Hutz** 3:11 | **intervening** 25:2 26:13 | 45:1,6,7,10 46:20 | **literature** 71:3 75:22 |
| **happen** 10:12 22:19 | | 26:23 | 53:15 55:16 58:7 | **litigation** 15:19 18:5 |
| 33:3 | **I** | **invent** 81:7 | 64:8,10 65:1,10 | 22:14 23:11,23 24:5 |
| **happened** 23:15 24:10 | **idea** 66:6 | **investors** 64:9 | 66:19 69:15 71:6,10 | 24:12 35:14 37:17 |
| 39:8 | **identification** 4:2 6:4 | **invitation** 44:12 | 72:22 75:22,23 77:14 | 53:16 |
| **happening** 20:9 | 8:13 12:18 13:6 14:8 | **inviting** 49:7 | 77:25 79:2 | **little** 33:21 43:16 51:3 |
| **happens** 80:16 | 14:16 15:2 38:8 40:5 | **involved** 23:24 33:8 | **knowledge** 11:16 13:8 | 51:4 54:21,22 74:22 |
| **happy** 16:11 81:12 | 50:12 55:11 68:15 | **involvement** 18:22 | 41:12 62:24 80:16 | **LLP** 3:5,11 27:15 |
| **hard** 81:4 | **identified** 12:21 15:9 | **issue** 37:14 41:21 45:12 | 81:1 | 32:22 |
| **head** 24:14 41:3 | **identify** 12:14 13:6 | 80:12 | **knowledgeable** 33:6 | **locally** 39:16 |
| **heard** 27:19 31:25 | 14:5 18:6 19:18 27:4 | **issues** 8:2 23:17 81:5 | 80:15 | **locate** 9:16 |
| 50:23 | **IEEE** 71:11 | **item** 5:22 7:20 14:19 | **known** 20:20 | **location** 39:4 |
| **hearing** 26:5 68:12 | **IMAP** 39:2,15 | **Items** 12:21 | **knows** 37:9 | **Lodge** 3:11 |
| **help** 27:16 53:10,20 | **improper** 49:22 | | **Kowalksi** 36:18 | **log** 13:11 |
| **helped** 81:7 | **inches** 41:25 | **J** | **Kowalski** 37:1,6,13,22 | **logic** 78:11,19 79:16,19 |
| **helps** 40:19 | **includes** 52:16 | **journals** 71:1 | | **long** 35:19 72:4 |
| **he'll** 49:19 | **including** 8:3 69:16 | **Jr** 1:22 2:2 5:3,9 83:1 | **L** | **longer** 44:7 49:19 |
| **high** 53:14 | **Incorporated** 1:7 63:23 | 84:6,15 85:6 | **L** 3:6 33:9 | **look** 14:21,24,25 16:5 |
| **hired** 71:8 | 64:1 | **judge** 43:6,7,12 | **lab** 84:25 | 16:10 22:3 23:13 |
| **hobbsw@howrey.com** | **indicating** 41:25 | **judges** 43:22 | **late** 21:5 | 23:19 26:4 27:20 |
| 56:5 | **inform** 48:22 | **July** 16:15,21 21:2,9,16 | **law** 2:3 6:24 | 36:4 38:10 40:13 |
| **Hoffman** 66:9,12,14,16 | **information** 12:10 | 21:25 22:2,5 40:9 | **lawsuit** 54:4 64:6 | 50:15 52:23 54:17 |
| | 28:23 29:18,20 41:6 | 41:19 44:3,4 46:15 | **lawyer** 31:5 | 56:2 73:1,21 74:15 |
| | | | **lawyers** 26:24,25 27:4 | |

75:14,16
looked 22:4 26:7 44:17 73:4
looking 13:17 16:20 17:5 22:21 25:8 26:9 28:21 30:11 31:18,20 39:23 42:13 48:1 49:1,2 55:15 56:4 57:23
lost 38:16 39:8 55:21 66:12
lot 53:15
Lou 22:23 50:18 51:14 52:2,24 55:16 64:21 65:19
Louis 7:5 10:7 16:21 33:9 52:14 64:23

**M**
machine 39:16
Machinery 71:13
mail 6:6,7 10:20,21 23:18 24:6,9 38:14 49:17 51:24,25 65:7 65:12,14,18,25
mailed 64:18
mailing 55:18
mails 10:18,25 11:5,10 37:25
main 29:22 37:14
man 75:23
March 9:19 18:15 22:24 24:11 31:7,14 35:24 36:3 44:19 45:6,8 47:14 54:6 62:7 79:21,21 80:8
mark 5:23 12:15 38:4 40:2
marked 4:1 6:4,10 8:13 12:18 14:8,16 15:2 15:10 38:8 39:24 40:5 48:11 50:12 55:11 63:22 68:15,19 69:5,21
Market 3:12
marking 5:24
material 37:9,11 62:20 74:21
materials 50:15
MATROX 1:8,10,10 1:12
matter 23:1,2 29:5,6 32:21,23,25 33:4,15 33:25 34:9,24 35:14 36:9 61:16 78:15,17

mean 27:5 29:22 33:20 43:3 53:12 58:14,22 68:5
means 32:23 33:23 39:3
meant 43:19 66:6
meet 65:24
meeting 12:9 64:25 65:2 66:2
Mellon 5:11 71:14
memory 40:13
mentally 74:24
mentioned 65:5,6 67:6 67:17
mentioning 69:20
merits 6:16
mess 38:15 68:4,7,12
message 51:25 52:11 52:14,15 64:22,24 65:16,17 69:20
met 5:15 7:1
methods 11:7
middle 27:11 42:23
midst 53:8
mind 21:14,23 29:21 43:25 53:20 76:16
minutes 34:12 72:7
misrepresentation 74:5
Moller 6:23,25 7:3
Monday 9:14
money 53:15 55:2
months 9:18 20:21,22 25:23 47:8,11
Morin 3:5 27:14 32:22
move 19:5 35:10
mutual 78:9

**N**
N 3:1,17 5:1 85:3
name 5:8,15 67:6,7,8 67:17
named 6:23
names 27:6 37:13 69:16
narrow 70:13
nature 28:12
necessarily 61:20 81:13
need 33:20,22 50:8
needed 25:24 28:9
neither 75:6 81:8
networks 38:15
never 7:1 12:8,10 23:3 23:19,19 30:25 48:4

78:21,24 80:5,23 81:6
mean 27:5 29:22 33:20

48:9 63:2 79:19
80:11,12,17
new 35:19
Nodding 24:14
nominating 37:8
noon 27:24
normally 43:18
notarized 82:9
notary 81:13 82:7,11 85:18
note 12:22,25 32:10 50:16 56:6
noted 40:24 52:10
notes 9:20 10:15 14:18 51:20
notice 8:15 15:24 17:8 20:4,15 21:1,8,16,24 22:6 35:17
notified 57:17
notify 56:21 57:9
notion 20:7 37:10
number 37:16 38:14 64:10
numbered 22:22 24:23
numbers 12:23,24 16:17
NW 3:6

**O**
O 5:1 85:3
object 75:4
objection 17:15,22 18:12 20:17 21:11,19 22:10 29:11 32:3 34:10,23 35:16 36:11 36:16,22 43:1,2,8,9 43:15 44:5,22 45:23 46:19 47:2,22 48:6 49:15 50:1,2 53:24 54:16,25 57:4,15 58:11,12 61:1,18,19 62:5 63:6 66:4 67:15 68:9,10 69:10 70:4 70:22 73:15 74:4 75:12 76:20 77:2,21 78:18 79:1 80:9 81:3
objections 43:7 58:21 59:4 60:1,16
obligation 18:5
obligations 58:5
obnoxiously 53:13
observation 20:11
obtain 75:9
obtained 75:1
obvious 44:6

obviously 7:19 27:6 29:6
offered 46:8 63:9
office 9:13,15 72:5
offices 2:7
official 47:6 81:24
officially 47:12
Oh 16:4 24:6 56:14 58:3 69:23 76:8
okay 8:20 15:18 16:19 17:10 19:4 20:21 21:10 22:14,18 23:15 24:10 25:5,6 52:5 40:21 47:8,15 48:8 58:8 77:17 79:20
Oliver 66:9,11,22 67:4 67:17
once 56:20 57:9
ongoing 46:23
online 39:5
opinion 49:21 75:8
opinions 31:16 60:24 61:6,15,23,23,25 62:1,1,2,10
opportunity 81:18
opposed 64:14 72:22
opposing 32:23 34:4
order 5:19,21 6:14 13:5 72:7
ordered 34:25 36:23 44:24 45:24 47:24 50:3 58:13 60:3 68:11 75:5
original 5:23 9:2 25:1 51:18,25 52:11 81:13
originals 12:23
Oshinsky 3:5 27:15 32:22
ought 42:10
outside 44:23
out-of-pocket 42:14
override 18:2
owned 59:10
o'clock 2:9 5:2 82:17

**P**
P 3:1,1 5:1
PA 5:12
page 3:18 6:22 8:18 9:9 13:8,24 16:18 17:5 22:21,22 24:22 25:2 25:8 26:4,9 27:7 31:19 32:9,12 36:24 38:21 40:17 41:9,15 42:21 44:16 48:11

49:1,4 50:16 51:2,2,7 51:8,11,23 54:7,8 55:4,15 56:4,19 58:1 58:1 59:6 63:11 64:20 67:21,25 69:3 70:8,10 73:9,20 77:11,15 82:9 83:4,9 83:14,19 84:10
pages 12:25 13:8,11 14:1,5 15:7 22:4 57:24 68:20
papers 27:17
paragraph 6:14 7:22 24:1 56:20 57:25 58:2,9 59:6 62:8 65:4
Parker 37:10,22
parking 42:10
part 20:11 25:21 35:20 45:15 51:24 53:14 76:14
participated 71:17
particular 45:8 53:17 66:3
particularly 75:14
party 18:6 19:19
patent 7:24 23:11 35:2 36:20 37:7 71:7 75:22
patents 70:25 75:14 78:12 79:17
pay 42:10 49:19 55:2
paying 44:10 49:18
PDF 73:3
pending 6:14 23:12 24:13 54:4
Pennsylvania 2:6,9
people 7:2 35:6,7 37:11 69:18 72:2
percent 59:10
period 30:13 31:12,15
permitted 80:21
person 37:9 54:1
personal 42:19
personally 7:1
pertained 79:15
phone 9:21 14:21,23 23:18 37:25 56:14 64:22,24 65:16,17 70:15,18 72:1,21,25
phones 72:2
phrase 60:18 64:11 79:18 80:18
phrased 43:10
physical 11:23
Pittsburgh 2:8 5:12,14

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 6

9:14
place 73:9
places 58:14 64:10
Plaintiff 1:5 3:3
plaintiffs 53:22
planned 39:11
planning 41:5
please 5:8,10 58:7
 59:15 61:24 65:19
pleases 61:20
point 10:10 11:16
 20:12 28:8,15 45:1
 47:11 50:7 67:11
 79:14
pointing 69:12
polite 54:20
portion 19:6 51:5,11
 56:18
possible 11:10 29:17,19
 71:23
possibly 11:9
preceding 84:9
preclude 77:6
prepared 14:19
presented 10:10
pretty 18:23 34:3 44:6
 66:5
previous 25:17 32:7
 34:14 35:20,21 45:5
 45:5,12,14 49:16
 52:16 54:17 67:17
previously 28:6 66:10
 67:3 70:14 78:23
 80:6,24
principle 35:11
printed 10:2 13:19,22
prior 6:19 21:2 23:5
 25:24 32:10 53:13
 57:1,12 61:15 62:3
 62:16,22,25 73:9
 75:1 78:10 79:16,19
privilege 13:11
privy 18:3,22
probably 71:11 73:6
problem 29:3 43:10,21
problems 39:7 50:4
Procedure 2:3
procedures 22:14
proceed 27:22 30:8
proceeding 19:11
process 5:19
produce 27:22 41:5
produced 12:14 14:6
 14:12 15:5,9 31:9
 41:24 47:5 56:7

PROHIBITED 1:16
proper 31:21 32:2,5
 43:13
proposed 78:22 80:5
provided 25:1 46:16
 50:15 80:24
PTH000002 13:7
public 2:5 75:25 85:18
publicly 71:11
published 18:21 70:25
 71:10,10,14 75:15
pursuant 2:3 85:5
pursue 54:10
pursuing 55:6
put 34:8 37:2 41:3
 56:23 57:11
p.m 52:22

Q

question 17:7 21:12,15
 21:22,22 23:15,25
 25:6 29:2 35:5,9 43:2
 43:11,12,13,15,17,22
 43:25 44:1 45:16,17
 50:2 51:23 52:6
 58:12 60:10 61:13
 65:10 70:5,13 71:9
 72:20 74:22 79:9,9
questions 35:6,8 79:4
 81:8
quickly 54:10
quite 25:12,22 26:1
 33:20 76:15
quote 19:7 25:12 27:15
 28:2 32:20 33:9,23
 33:25 34:8,9 45:19
 45:20 46:5,9,24
 52:16 53:10,11 55:5
 56:19 60:19,20 62:9
 62:13 68:3 78:6,12

R

R 3:1 5:1 85:3
raise 28:20
rates 53:14
read 6:11 24:4,17
 27:16 28:3 32:18,19
 33:10,12 36:12 38:14
 38:17 40:24 41:2
 56:11 57:8,19,21
 69:14 80:4 81:12
 82:1,10 83:6,11,16
 83:21 84:6
reading 23:7
READS 83:4,9,14,19

realized 42:2
really 15:19 23:22
 28:15 41:4 53:25
 75:20
Realtime 2:4
reason 22:13 25:21
 29:21,22 60:12 83:8
 83:13,18,23
reasons 84:9
recall 32:15 67:18
receipt 6:19 73:9
receive 5:21 11:18,21
 20:8 39:5 40:10 65:5
 81:20
received 5:20 6:2,10
 8:25 9:5 11:18 15:14
 19:25 20:10,13 21:5
 23:18 24:11 27:20
 33:17 38:5 39:21
 40:22 41:10 62:18
 63:3 67:22,25 68:1
 68:25 69:1,4 70:2,19
 70:23,24 71:4,6,8
 72:15,17 74:1,12,17
 75:25 76:18
receiving 12:22 54:12
 54:14
Recess 50:10 79:5
recognize 8:21 13:18
 16:20 38:11,16 50:20
 55:19
recollect 9:22
recollection 10:6 16:8
 16:12,14 40:19
reconsider 22:1
record 8:23 14:23:18
 40:16 79:11,12 81:21
 81:22 84:11 85:8
recorded 40:15
records 10:11 16:10
 36:17
redacted 13:8
reference 23:8 26:19
 41:14 48:13 62:19
 63:22 64:22 66:8
referenced 10:12 60:6
 67:24
references 36:25 40:18
 63:20
referencing 68:19
referring 11:17,19 12:1
 26:24 27:2 46:6
 50:24 54:9 80:17
refers 24:1
reflected 37:23

refrain 8:2,9
refresh 40:19
regard 29:19 35:11
regarding 6:16 7:24
 47:10 63:15 66:22
 78:10
regards 42:2
regular 6:6,7
reimbursement 41:21
 42:13,16
reimbursements 42:6
related 13:1 28:9
relating 66:2
relationship 44:12
 46:24 53:22 54:3,10
 54:24 55:6 57:10
 75:2,9 76:17
relevance 74:11 79:17
remaining 14:5
remember 10:21,24
 11:3 16:1,2 41:1
 54:12 64:19,24 65:14
 69:11 71:22,22,24,25
 72:24 73:7
remembered 10:14
 73:4
removed 12:25 13:9,10
 25:4
rephrase 43:11
report 71:14
reported 12:10
reporter 9:13 81:14,20
 81:24 82:2,12,12
 85:12
Reporters 2:7
Reporter-Notary 2:5
represent 5:16 20:25
representation 21:14
 21:23
represented 49:23
representing 7:17
 49:18
reprinted 49:3
reproduction 1:16
 85:10
request 46:11 64:25
reread 41:2
reschedule 78:8
resign 34:21 61:5
resigned 35:15
respect 5:19 7:20 13:11
 14:19 17:7 20:1,13
 21:16 22:5,25 23:2
 36:20 37:6,7,22 52:6
 61:6,8 85:10

respond 17:19 42:3
responded 26:15 28:14
 52:20 73:18
responding 65:1,21
responds 38:20
response 9:8 12:13
 17:6 19:22 22:11
 24:23 25:9,10,11
 26:3,8,10 27:8,9
 31:18,19,24 32:8
 39:24 41:8 42:18,20
 42:25 44:5,11,16
 46:21 48:1 49:2,6
 51:19 55:4,19 65:15
 65:15 66:16,20 72:19
responsive 9:10,17
 12:21 14:13 15:10
 39:13
rest 59:12 64:2
restate 38:19 44:1
result 75:1 76:17
retained 34:21 63:16
 64:13
retainer 1:12 12:2,3
retaining 24:19
retention 61:7 63:1
reveal 39:18 59:1 61:9
 61:11 62:11 74:11
review 9:6 58:6 77:13
 81:18
reviewed 39:17 80:3
reviewing 59:14
reviews 16:16 36:5
 38:12 51:21 58:8
 59:16 77:17
re-issue 78:1
re-sent 66:23
Ricoh 1:4 5:16 8:4,11
 13:2 15:8,13,25 16:9
 18:18 19:3 20:2,2,4
 20:10,20 21:8,18,24
 23:19,21 25:3 30:15
 31:2,16 34:6,19 35:2
 36:1 44:8,8,13,15
 45:5 46:17,24 47:1
 47:19 48:4,8,15,23
 49:9,13,17,19,24
 50:23,25 51:12 52:8
 52:17 53:5 54:3
 56:21 57:3,9,13,17
 59:9,10,11,18 60:8
 60:15 62:11,18 63:3
 63:22 65:9 70:2,20
 74:3,12,18 75:2,9,10
 76:18 77:5 78:17,25

S.E. Manno & Associates, Inc.
888-819-8282

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 7

79:15 80:7,12,14,25
Ricoh's 17:8,20 20:15
  44:20 46:6,10 61:10
  62:10 76:2,6,7,10,19
  76:25 78:12 79:17
right 8:20 9:1 11:6,13
  11:15 12:12 16:4
  17:2 23:15 24:8
  25:20,25 26:7,14
  27:3 29:15,21 30:24
  31:3,13 32:19 36:10
  38:23,23 39:19 42:10
  49:3 52:3 60:9 63:5
  67:24 69:6 70:17,17
  73:7,10,19 80:10
  81:2
rough 71:2
row 52:4
rules 2:3 78:6,7 81:14
run 33:3

**S**

S 3:1 5:1
sat 65:16
saved 9:24,24
saw 24:9
saying 20:21 25:20
  26:15 31:25 36:12
  55:16 66:20 72:25
  74:15
says 25:21 43:9 48:25
  56:19 63:12 64:12
  67:21 78:5
schedule 27:2
scope 13:4,5 34:25
  35:17 36:22 44:23
  45:24 47:23 50:3
  58:13 60:2 61:2,19
  68:10 75:5,13 76:21
search 9:10 39:18
searched 38:25 39:12
second 10:7 22:21 24:1
  33:23 54:19 55:7
  56:20 58:1 65:4
see 17:6,13 29:3 31:20
  31:23 32:12 38:10
  51:23 55:15 56:24
  60:21 62:14 69:17
  73:1 78:13
seeing 45:6
seek 78:10
seen 63:12 67:10
selected 13:21
SEMICONDUCTOR
  1:8

send 42:1 49:8 55:20
  81:24 82:2
sending 49:14
sense 37:8 41:22 68:24
sensitive 74:9
sent 6:6 9:25 11:25
  13:10 29:1,1 38:6,17
  47:13,14 51:14 52:9
  52:18 54:7,11 55:21
  55:24 63:21 66:9
  73:1,3,3,6,12
sentence 35:12,23 53:9
  57:7 60:18 62:8 78:4
  80:4,20
sentences 78:6
separate 51:13
series 71:14
serve 44:9 46:8
served 17:21 40:15,15
server 39:3,6,15 55:22
serves 23:9
service 40:18
services 36:2
set 6:13 7:21 9:9 12:9
  23:20 27:1 32:12
  38:21
seven 25:23
sever 36:13 44:12
Shapiro 3:5 27:14
  32:22
share 74:18,20,25
sheet 11:20
sheets 16:14
show 42:9
showed 75:19
shown 26:3 38:23
  42:21 52:21 54:7
  55:4 73:20
shows 52:4
side 32:23 33:14 34:21
  34:22 35:14,15 46:3
  61:4
sided 42:1
sides 34:4 50:5
sign 64:16 81:12 82:1
  82:11
signature 51:13 52:8
  63:12 82:15
signed 29:23 30:14,22
  31:1 56:21 57:9,20
  60:10 61:14 62:3
signing 60:23 62:16,25
simply 61:12
Sincerely 33:9
single 11:20 69:7

sir 20:25
sit 16:13
sitting 10:24 11:3 16:7
  33:21
situations 44:15
sixth 59:6 62:8
slight 55:8
somebody 22:15,15
  29:2 30:11 35:6 42:9
  43:9 46:2 56:5 60:24
somewhat 21:22
sorry 13:13 24:8 41:13
  51:8 53:1 72:24
sort 43:23
Sounds 68:3
speaker 72:1,2
special 10:2
specific 35:11 72:22
  80:18 82:11
specifically 8:3 19:12
  20:6 23:25 43:14
  69:20
specifications 9:8
specifics 14:4
specified 41:23
spend 51:4
spending 13:24
spent 42:15
spoke 12:7
spoken 7:3,4,6,9,11,13
  26:16 72:8
stage 18:5
start 5:16 22:20 41:5
starting 16:18 20:8
  41:20 51:12 52:7
  59:6
state 5:8 8:8 41:22
  47:15 53:17
stated 21:21 36:3 50:4
  71:23,23 77:24
states 1:1 41:20 44:14
  45:8 62:9
stating 8:9 79:13
stipulations 81:11
stirred 68:4,8
stored 39:4,15,16
straightforward 34:3
Street 3:6,12
strict 58:17
strike 19:5 35:10
subject 7:22 32:16
  34:24 60:24 61:16
  78:15,17,21,24 79:14
  80:5,23 81:6,7,7
subpoena 8:16,16,23

8:25 9:2,5,17 12:13
  13:5 14:13 15:10,14
  15:24,25 16:9 17:9
  17:20 20:4,13,16,23
  21:1,3,4,8,17,25
  39:21 40:3,7,10,22
  41:11 46:17 63:21
  64:7 78:1
subpoenaed 16:25
subpoenas 20:8
substance 8:9
sue 42:11
suggest 37:11
suited 53:16
summarizing 15:5
summer 27:18 32:7
  34:14 45:5,12,14
Sunday 56:17
supplied 62:10,12
support 75:22
supposed 22:3,15,18
sure 12:16 25:5,15
  27:22 28:8 30:3 32:7
  38:13 43:6 44:2,2
  52:12 57:6 60:4 66:5
  67:5,16 68:25 74:15
  79:10
surprised 17:25
sworn 5:4 85:7
Synopsys 7:24 23:9,24
  24:2 28:13 59:8,12
  59:20 60:8,12,20
  61:3,7,7,14 63:12,14
  63:18 64:5,9,10,11
  64:12,14,14,15
synthesis 78:11,20
  79:16,19
system 13:22 39:13
  51:19
systems 1:9 78:11
  79:16,19

**T**

T 85:3,3
take 16:5 42:3 46:22
  50:6,8,9 57:16 58:14
  80:22 82:2
taken 2:3 24:24 66:17
talk 23:21 25:20 29:25
  31:21 32:2,4,5,24
  33:24 34:8,13 36:9
  36:14 37:5 45:4
  58:14,19 63:14 65:1
  65:13,22,24 68:22
  75:18

talked 23:19,19 26:25
  37:15 45:6 48:18
  49:16 66:1,20 72:14
  80:15
talking 21:3,7 25:23
  57:18 69:11,21 71:21
  71:24 77:9
tapping 26:14
taught 35:3,4
TECH 1:12
technology 33:5,6
Ted 37:1,8,13,15
teleconference 26:19
telephone 10:4,11,15
  11:8 31:11 65:24
  71:16 72:4,9 73:13
  73:23 74:10,16,25
tell 15:23 22:15 27:12
  28:18 29:16 30:5
  35:19,25 44:19 45:18
  45:21 55:20 59:14
  61:24 64:15 66:13
  70:7,18 71:4,16
  72:11 73:2 75:10
  76:9
telling 16:8 21:15 22:1
  43:21
ten 12:25 41:25 47:7
terminate 48:24 49:12
  66:19
terminated 48:5,9 49:9
  52:18 53:1,5,21 54:2
terminating 50:24
  66:22
termination 45:11
  47:13
terms 29:17
Terry 7:9
testified 5:5
testify 18:18
testimony 59:12 60:19
  78:10 84:11 85:8
text 13:25 51:6 52:7,11
  79:22
Thanks 41:16
theses 71:1
thesis 37:13
thing 25:23 28:25 33:5
  33:19,22 41:4 78:16
  80:6 81:2,5
things 11:24 22:16
  23:14 33:2 35:3
  38:15 39:8 65:24
  71:3,6,9

S.E. Manno & Associates, Inc.
888-819-8282

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 8

| | | | |
|---|---|---|---|
| think 5:22 7:4,8,11 | 25:13 | 60:23 63:16 64:9,13 | Wednesday 26:20 | 1 4:3 5:25 6:3,11,14,20 |
| 10:9,20,22 17:18 | today's 7:22 | 65:10 71:20 72:16,19 | 27:23 31:22 | 6:23 7:21 12:21 |
| 20:19 23:16 27:10 | told 6:19 16:9 17:20 | 78:21 | week 33:20 | 1st 25:11 |
| 28:5,13,17 35:9 36:3 | 24:6,9 30:25 37:16 | understanding 18:4 | weekend 41:3 | 10 4:12 55:10,13,17,19 |
| 41:2,3 42:22,22 | 44:20 45:5,19 46:15 | 25:5 26:5 32:1 34:1 | weeks 36:15 | 10th 50:17 51:15 52:10 |
| 43:12 44:6,18 45:17 | 48:2 49:12 52:25 | 34:11 49:11 52:12 | went 9:23 72:6 | 52:15,18,22,24 53:3 |
| 45:21 49:4 51:16,17 | 53:4 54:3 57:13 59:2 | 59:17,23 | weren't 26:23 | 11 4:13 27:7 47:11 |
| 52:13 53:7,10,14,16 | 59:3 63:2,8,9 67:3 | understandings 64:1 | we'll 57:9 65:13 | 68:14,17 69:5,9,22 |
| 54:1 56:1 64:11,18 | 69:25 70:3,8,14 71:5 | understood 19:10,16 | we're 34:24 47:23 | 77:10 |
| 65:8 67:6,8 68:7,24 | 78:16,23 79:14 80:7 | 23:15 24:12 30:3 | 79:11,12 | 11:25 82:16 |
| 71:6,19 72:6,6,10 | top 16:21 52:21 | 36:7 49:7 77:22 | we've 6:10 69:5,21 | 12th 6:2 |
| 77:22 78:20 79:18 | topic 27:14 28:7 53:17 | 79:10 | willing 54:9 | 1220 3:12 |
| 80:10 | 79:2 80:14 | unfortunately 32:25 | Wilmington 3:13 | 13 31:19 85:21 |
| thinks 43:10,21 | topics 58:15,16,20 | UNITED 1:1 | withdraw 38:19 | 14 1:23 2:6 |
| third 8:18 63:11 | 78:23 | University 5:11 | witness 3:18 8:9 16:15 | 15213 5:12 |
| Thomas 1:22 2:2 3:19 | totally 20:23 | unknown 22:16 | 18:13 36:5 38:12 | 15219 2:9 |
| 4:3,4,5,6,7,8,9,10,11 | touch 10:8 33:4 | unrelated 33:3 | 43:18 44:21 45:20 | 15241 5:14 |
| 4:12,13 5:3,9,15,24 | tracked 42:7 | use 39:2 72:2 78:19 | 51:21 58:8 59:16 | 1611 5:14 |
| 6:3,10,20,22 7:20 | tracking 37:15 | | 61:19 70:11 77:17 | 17 32:9,13 |
| 8:12,15,19 12:17 | transcript 1:16 81:19 | | 81:12,25,25 82:5,7 | 17th 56:3,18 |
| 13:10 14:7,15 15:1 | 81:24 85:10 | V | 82:14 85:6,8 | 1805 2:7 |
| 36:25 38:7 40:4,11 | transmissions 11:21 | vacation 55:17,18,23 | word 48:16,20 | 1984 27:18 |
| 50:11 52:1 55:10 | transmittal 15:4 | 56:1,3,13,15,16,16 | words 51:12 78:19 | 19899 3:13 |
| 65:19 68:14 76:16 | transpired 35:20 | valid 47:18 | work 15:18 23:5 25:17 | |
| 80:1 81:17 82:1 83:1 | trial 15:19 44:21 45:20 | validity 78:12 79:17 | 28:11,22 29:24 34:5 | 2 |
| 84:6,15 85:6 | 80:13 | various 27:17 45:4 | 34:22 35:2,15 38:25 | 2 4:4 8:12,15,19 12:21 |
| thought 9:18 18:9 | triggered 21:5 | verification 82:9 | 39:2,11,13 80:24 | 15:10 27:24 |
| 21:20 24:8 27:20 | trouble 10:8 37:14 | verify 14:11 50:19 | worked 27:24 31:5 | 2nd 44:4 |
| 34:3 53:19 | troubles 55:22 | versus 63:23 | 34:6 | 20 56:17 |
| thoughts 18:2 | true 52:13 53:7 55:1 | viewed 46:2 | working 45:2 46:3 | 2003 1:23 2:6 6:1 8:16 |
| thoughts/comments | 84:11 85:8 | voice 10:18,20,21,25 | worth 41:25 | 22:24 25:12 30:13,17 |
| 28:1 | try 27:25 41:3 51:19 | 11:5,10 23:18 37:25 | wouldn't 29:21 44:20 | 31:8,15 32:13 36:8 |
| three 52:4 | 53:2 74:9 | 65:6,11,14,18,25 | 45:19 78:20 | 40:8,9 44:19 46:15 |
| Thursday 1:23 2:6 41:1 | trying 28:23 30:3 37:10 | vs 1:6 | write 68:3 | 46:25 47:18 52:10 |
| 51:14 52:9,14 56:3 | 45:1 | | writings 75:23 | 56:23 61:15 62:3,22 |
| tied 27:21 64:8 | Tuesday 32:9 | W | written 19:10,20 53:25 | 78:5 |
| Tier 5:14 | turned 37:18 | W 3:4 | wrong 61:22 | 20037 3:7 |
| ties 37:1 | two 11:9 20:21 23:17 | Wait 66:12 | wrote 13:24 16:24 17:4 | 2007 85:21 |
| time 6:13 18:10,23,24 | 26:10,13 32:10,11,16 | waived 82:15 | 19:7 22:2 25:11 | 21st 61:15 62:3,22 |
| 21:2 23:16 25:6 | 33:21 54:8,12,14 | want 11:16 12:9 16:6 | 37:13 45:18 46:5,22 | 64:17 |
| 27:17,23,24 29:4 | 78:6 | 25:9,25 28:25 35:21 | 50:22 53:19,23 75:24 | 2101 3:6 |
| 30:13,16 31:5,12,15 | type 53:16 | 42:11 43:4,18 51:3 | | 22 77:9 |
| 31:21 34:5,18 35:24 | typical 71:7 | 61:4 64:4 65:21 | X | 22nd 21:2,9,25 68:17 |
| 37:21 38:1 41:22,23 | typically 71:7 82:8 | 66:13,19 71:10 | X 3:17 | 23 36:24 38:21 40:9 |
| 42:3,15,19 45:8 48:2 | | wanted 25:17 26:1 | | 64:22 |
| 48:10,12,16,19 49:25 | U | 28:11 53:17 54:20 | Y | 23rd 46:17 68:1,19 |
| 50:5 51:4 52:25 53:4 | uh-huh 16:23 31:24 | 72:16,22 73:21 | yeah 12:3 16:23 32:11 | 70:16,17,19 71:17 |
| 57:2,12 59:7,19 60:8 | 59:16 60:22 | wanting 66:1,1 | 42:22,22 47:4 49:4 | 72:5 73:24 74:10,24 |
| 61:8 65:23 67:7 | understand 5:18 6:13 | Washington 3:7 | 67:11 69:1 73:7 | 24:9,15 |
| 68:22 72:7,8 73:24 | 7:16,21 19:9,13 23:7 | wasn't 14:22 18:3 | years 35:7,8 37:16 47:7 | 24th 70:14 |
| 74:6,7 79:21 | 23:11 24:4,18 26:21 | 24:24 25:15 28:8 | | 25 42:21 59:10 |
| times 40:24 65:2 | 27:17 31:24 32:7 | 41:24 45:10,15 46:4 | 0 | 25th 40:8 |
| titles 71:4 73:4 75:19 | 34:7,15 42:24 44:2 | 54:20 65:11 76:14 | 03-103-GMS 1:6 | 26 16:18 22:4 40:19 |
| today 5:19 7:17 8:1 | 47:12 57:1,7,11 58:9 | way 18:9 21:8 28:21 | | 44:16 |
| 10:24 11:3 16:7 | 58:18 59:1,21 60:12 | 37:3 43:10 61:20 | 1 | 27 22:5 |
| | | 62:17 80:17 | | |

S.E. Manno & Associates, Inc.
888-819-8282

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 9

**28** 48:11
**28th** 77:13 78:5 80:3
  80:20

---
**3**
---
**3** 4:5 7:22 12:17,20,22
  13:7,8,18,24 14:4
  22:22 24:22 36:25
  38:22 41:9,15 42:21
  48:12 50:16 51:2,11
  55:5,15 56:20 57:24
  64:20 69:3 73:10
  77:12
**3rd** 26:10 27:8
**30** 13:8 81:19,25
**30(f)(1)** 85:6
**31** 13:9 56:23
**31st** 22:24 24:11
**32** 13:9
**33** 49:1,4 50:16
**35** 13:9

---
**4**
---
**4** 4:6 12:22 13:8 14:7
  14:10,11
**4th** 27:9,12
**4/9** 27:23
**40** 13:9
**41** 51:2,5,7,8,11,23
  54:8
**429** 2:3
**43** 55:4,15
**432** 7:24 36:20 37:7
  75:22
**44** 56:4
**45** 56:20
**46** 57:24
**47** 58:1,3
**48** 57:24
**49** 64:20 67:25 68:20

---
**5**
---
**5** 4:7 14:15,18 22:22
**50** 67:21 68:20 69:3
**5000** 5:11
**51** 73:10
**52** 70:9,11 73:20
**55** 77:11,15
**57** 13:7

---
**6**
---
**6** 4:8 13:8 15:1,4
**6th** 39:23
**6:26** 52:10,19,24 53:3

---
**7**
---
**7** 4:9 24:23 25:8 31:19
  38:4,7,10,18,20
  39:17,24 46:25
**7th** 16:21 22:5 41:19
  44:3 47:18 48:17

---
**8**
---
**8** 4:10 9:9 40:2,4,7,17
  63:22
**8th** 6:1 8:16 32:9,13
  36:7 48:1,10,11,21
  48:22 49:21
**8:03** 52:22
**8:51** 67:25 68:3

---
**9**
---
**9** 4:11 14:19 50:11,14
  50:17,20
**9th** 50:18
**9:00** 2:9 5:2
**9:30** 68:1

**EXHIBIT 1**



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

August 8, 2003

Dr. Donald E. Thomas
Carnegie Mellon
ECE Department
Pittsburgh, PA 15213

RE:    *Ricoh Company, Ltd. v. Aeroflex Incorporated, et al.; C.A. No. 3-103-GMS*

Dear Dr. Thomas:

Enclosed is an Order entered by the Court. In accordance with paragraph 1 of the Order, we are not permitted to communicate with you until further notice.

Very Truly Yours,

Erik K. Moller

EKM/gj

Enclosure

cc:    Edward A. Meilman
       Gary M. Hoffman
       Francis DiGiovanni



BRUSSELS    CHICAGO    HOUSTON    IRVINE    LONDON    LOS ANGELES    MENLO PARK    SAN FRANCISCO    WASHINGTON, DC

RECEIVED TIME    OCT. 29.    9:35AM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RICOH COMPANY, LTD.,

                    Plaintiff,

             v.

AEROFLEX INCORPORATED, AMI
SEMICONDUCTOR, INC., MATROX
ELECTRONIC SYSTEMS LTD.,
MATROX GRAPHICS INC., MATROX
INTERNATIONAL CORP., and
MATROX TECH, INC.,

                    Defendants.

C.A. No. 03-103-GMS

```
  _____
 |       FILED          |
 |  _____    |
 | |  JUL 3 1 2003  |   |
 | |_____|   |
 |  U.S. DISTRICT COURT |
 |  DISTRICT OF DELAWARE|
 |_____|
```

## ORDER

The Court, having considered the issue of whether to preclude Dr. Donald

E. Thomas from providing expert consulting services to defendants and their counsel,

IT IS HEREBY ORDERED AS FOLLOWS:

    1.    Pending further Order of this Court, neither defendants nor their

counsel shall have any communication with Dr. Thomas regarding the merits of this

case or the patent in suit unless counsel for plaintiff is present or consents in writing.

    2.    No later than August 6, 2003, Defendants and their counsel are

ordered to disclose all communications with or relating to Dr. Thomas and to produce

all documents sent to, prepared by, or received from Dr. Thomas. Any documents

withheld on the basis of the attorney-client privilege or the work-product doctrine

should be produced to the Court for an in camera inspection, and Defendants shall provide Plaintiff with a detailed privilege log.

3.    No later than August 18, 2003, Dr. Thomas shall sit for a deposition limited to all communications with defendants, their attorneys or Synopsys regarding the '432 patent, with that deposition to not be used for any purpose other than in connection with resolution of issues relating to the retention of Dr. Thomas.

4.    On or before August 31, 2003, plaintiff may file with the Court a two page letter, exclusive of exhibits, identifying any issues remaining in dispute relating to the retention of Dr. Thomas and the relief sought in connection therewith. Defendants shall file within five (5) days from the date of service of the opening letter an answering letter of no more than two pages, exclusive of exhibits. Plaintiff may then file a reply letter of no more than two pages, exclusive of exhibits, within three (3) days from the date of service of the answering letter.

5.    Plaintiff shall arrange a telephonic conference with the Court to be scheduled for a date after completion of the submissions described above.

IT IS SO ORDERED this 31st day of ____July____, 2003.

United States District Judge

EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RICOH COMPANY, LTD.,                    )
                                        )
            Plaintiff,                  )
                                        )    C.A. No. 03-103-GMS
      v.                                )
                                        )
AEROFLEX INCORPORATED, AMI              )
SEMICONDUCTOR, INC., MATROX             )
ELECTRONIC SYSTEMS LTD.,                )
MATROX GRAPHICS INC., MATROX            )
INTERNATIONAL CORP. and                 )
MATROX TECH, INC.,                      )
                                        )
            Defendant.                  )

## NOTICE OF SUBPOENA

TO:   Francis DiGiovanni, Esq.             Teresa M. Corbin, Esq.
      Connolly Bove Lodge & Hutz, LLP      Howrey Simon Arnold & White LLP
      1220 Market Street                   301 Ravenswood Avenue
      P.O. Box 2207                        Menlo Park, California 94025
      Wilmington, Delaware 19899

      Alan H. MacPherson, Esq.
      MacPherson Kwok Chen & Heid LLP
      2001 Gateway Place
      Suite 195E
      San Jose, California 95014

      PLEASE TAKE NOTICE that on August 8, 2003, the attached subpoena was served on Dr.

Donald E. Thomas, Carnegie Mellon University, ECE Dept., 5000 Forbes Avenue, Pittsburgh, PA

15213.

                                        Robert W. Whetzel (#2288)
                                        Steven J. Fineman (#4025)
                                        Richards, Layton & Finger
                                        One Rodney Square
                                        P.O. Box 551
                                        Wilmington, DE 19899
                                        (302) 651-7700
                                        Attorneys for Plaintiff Ricoh Company, Ltd.

8/14/03
DEPOSITION EXHIBIT
Thomas 2
Lisa Ann Bunec, CRR

RLF1-2633998-1

OF COUNSEL:
Gary M. Hoffman
Eric Oliver
DICKSTEIN SHAPIRO MORIN &
   OSHINSKY LLP
2101 L Street NW
Washington, D.C. 20037-1526
(202) 828-2228

Edward A. Meilman
DICKSTEIN SHAPIRO MORIN &
   OSHINSKY LLP
1177 Avenue of the America
New York, New York 10036
(212) 896-5471

Dated: August 8, 2003

Issued by the
# UNITED STATES DISTRICT COURT

W. _____ DISTRICT OF _____ Pennsylvania

Ricoh Company, Ltd.

                   Plaintiff

Aeroflex Inc. et al.,

                   Defendants

## SUBPOENA IN A CIVIL CASE

CASE NUMBER:[1] 03-0123-3MS
District of Delaware

TO: Dr. Donald E. Thomas
Carnegie Mellon University, ECE Dept.
5000 Forbes Avenue, Pittsburgh, PA 15213

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Buckler and Associates, 429 4th Avenue, Suite 1505, Pittsburgh, PA 15219 | August 14, 2003 9:00 a.m. |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Schedule A

| PLACE | DATE AND TIME |
|---|---|
| Buckler and Associates, 429 4th Avenue, Suite 1505, Pittsburgh, PA 15219 | August 12, 2003 9:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| [signature]    Attorney for Plaintiff | 8/5/03 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Michael A. Weinstein, Dickstein Shapiro Morin and Oshinsky, LLP
2101 L Street, NW, Washington, DC 20037 (202) 785-9700

[1] If action is pending in district other than district of issuance, state district under case number.

1

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
     Date

_____
Signature of Server

_____
Address of Server

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SCHEDULE A

## INSTRUCTIONS

The attached Stipulated Protective Order governs the disclosure of confidential information in this litigation. Plaintiff recognizes that some of the documents called for below may be subject to the Stipulated Protective Order.

## DEFINITIONS

a) **Communication.** The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

b) **Document.** The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including, without limitation, electronic or computerized data or data compilations. A draft or non-identical copy is a separate document within the meaning of this term. A document includes, but is not limited to: any written, printed, typed, recorded, computerized, electronic, taped, graphic or other matter, in what ever form, electronic mail, materials stored on computer hard drive, disks, diskettes, tapes, or other computer media, or any other information stored electronically or magnetically. Unless otherwise specified, these requests are limited to the '432 patent and/or the claims and defenses of Ricoh v. Aeroflex et al. and/ or Synopsys v. Ricoh. Unless specifically indicated, the term document explicitly excludes any document received from or provided to Dickstein Shapiro unless the document was provided to Howrey, Synopsys, a Defendant, or any third person not Dickstein Shapiro.

2

c) **Communication.** The term "Communication" includes, without limitation, communications by whatever means transmitted (e.g., whether oral, written, electronic, or other methods used), as well as any note memorandum or other record thereof.

d) **Regarding, referring to, relating to, concerning.** The terms "regarding," "referring to," "relating to," and "concerning" includes, without limitation, reflecting, concerning, containing, pertaining, referring, relating to, indicating, showing, describing, evidencing, discussing, mentioning, embodying, or computing.

e) **Synopsys, Inc.** The term "Synopsys, Inc." as well as its abbreviated name (e.g., "Synopsys") or a pronoun referring to the foregoing means the Delaware corporation known as Synopsys, Inc and having place of business at 700 E. Middlefield Road, Mountain View, California, and, where applicable, its officers, directors, employees, agents, independent contractors, partners, corporate parent, subsidiaries or affiliates.

f) **Howrey Simon Arnold & White LLP.** The term "Howrey Simon Arnold & White LLP" as well as its abbreviated name (e.g., "Howrey") or a pronoun referring to the foregoing means the Law Firm known as Howrey Simon Arnold & White LLP and having places of business including, but not limited to, 301 Ravenswood Ave. Menlo Park, CA 94025, 525 Market Street, Suite 3600, San Francisco, CA 94105-2708, and 1299 Pennsylvania Ave. NW, Washington, DC 20004, and, where applicable, its officers, directors, employees, agents, independent contractors, investigators, partners, corporate parent, subsidiaries or affiliates.

g) **Dickstein Shapiro Morin & Oshinksy LLP.** The term "Dickstein Shapiro Morin & Oshinsky, LLP" as well as its abbreviated name (e.g., "Dickstein Shapiro") or a pronoun referring to the foregoing means the Law Firm known as Dickstein Shapiro

3

1649885 v2; 2@TTH2).DOC

Morin & Oshinsky, LLP and having a place of business at 2101 L Street, NW, Washington DC 20037, and, where applicable, its officers, directors, employees, agents, independent contractors, partners, corporate parent, subsidiaries or affiliates.

h) **Parties.** The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, agents, independent contractors, partners, corporate parent, subsidiaries or affiliates.

i) Where a document request does not request a response limited to a specific named defendant, the request shall be construed as seeking knowledge and information concerning any and all of the defendants named in this action, including Aeroflex Incorporated, AMI Semiconductor, Inc., Matrox Electronic Systems Ltd., Matrox Graphics Inc., Matrox International Corp., and Matrox Tech, Inc.

j) **Person.** The term "person" is defined as any natural person or any business, legal or governmental entity or association.

k) **Concerning.** The term "concerning" means relating to, referring to, describing, evidencing or constituting.

l) **All/Each.** The terms "all" and "each" shall be construed as all and each.

m) **And/Or.** The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a discovery request all responses that might otherwise be construed to be outside of its scope.

n) **Number.** The use of the singular form of any word includes the plural and vice versa.

o) **Patent-in-suit.** As used herein, "patent-in-suit" or "'432 patent" refers to United States Letters Patent Number 4,922,432

4

p) **ASIC.** As used herein, "ASIC" refers to any integrated circuit that is designed for a specific application, including but not limited to integrated circuits that are referred to or otherwise denoted in Synopsys' communications as an "application specific integrated circuit" or "ASIC," and other integrated circuits designed to perform a desired function in a specific application, but not including standard, general purpose integrated circuits such as microprocessors and memory chips.

q) **ASIC Product.** The term "ASIC Product" refers to any ASIC or integrated circuit product or item that is designed for a specific application, and/or a product or item that includes such an integrated circuit product that is manufactured, used, sold, offered for sale, imported, or distributed by, on behalf of, or otherwise at the direction of defendant.

r) **ASIC Design System.** As used herein, "ASIC Design System" refers to any and all software, hardware, database library or other components making up or otherwise contributing to systems, modules, tools or products which have been sold, offered for sale, or distributed, provided, or made available by, or on behalf of, or otherwise at the direction of Synopsys on or after May 1, 1990 (unless another date is specifically identified in the document request) for use in the computer-aided design of any ASIC Product (as defined above). ASIC Design Systems include but are not limited to the Synopsys software, hardware, database libraries or other components known as Design Compiler, Knowledge Consultant, Behavioral Compiler, Module Compiler, DesignWare Library/DesignWare Foundation Library, CoCentric System C Compiler, HDL Compiler, and DC Shell. As used herein, ASIC Design System shall not include software, hardware, database libraries or other components that have not been sold,

5

distributed, or provided directly or indirectly by or on behalf of Synopsys to or for defendants.

s) **ASIC Method.** As used herein, "ASIC Method" refers to any and all steps or other activities making up or otherwise contributing to methods and/or processes that use ASIC Design Systems in the computer-aided design of any ASIC Product (as defined above).

t) **Design.** The term "design" as used herein refers to any and all acts of creation, development, translation, formulation, transformation, synthesis, or other realization of desired integrated circuit functionality in an ASIC (as defined above).

u) **Privilege.** Where a claim of privilege is asserted in objecting to any means of discovery or disclosure and an answer is not provided on the basis of such assertion, (1) identify the nature of the privilege (including but not limited to work product) which is being claimed and, if the privilege is governed by state law, indicate the state's privilege rule being invoked; and

Provide the following information:

(1) For documents: identify the nature of the documents and such other information sufficient for plaintiff to contest the claim of privilege pursuant to FRCP 45(d)(2), including (i) the type of document, e.g., letter or memorandum; (ii) the general subject matter of the document (iii) the date of the document, (iv) where appropriate, the author of the document, the addressees of the document, and any other recipients shown in the document, and, where not apparent, the relationship of the author, addressees, and recipients to each other; and (v)

6

any other person to whom the document was displayed or to whom any
of its contents were revealed;

(2) For oral communications: identify the nature of the
communication and such other information sufficient for plaintiff to
contest the claim of privilege pursuant to FRCP 45(d)(2), including (i) the
name of the person making the communication and the names of persons
present while the communication was made and, where not apparent, the
relationship of the persons present to the person making the
communication; (ii) the date and place of communication; (iii) the general
subject matter of the communication and (iv) any other person to whom
any aspect of the communication was revealed.

(3) When referring to a person, identify to the extent known the
person's full name, present or last known address, and when referring to a
natural person, additionally, the present or last known place of
employment. Once a person has been identified in accordance with this
subparagraph, only the name of that person need be listed in response to
subsequent discovery requesting the identification of that person. In any
response where more than one individual is identified, identify which
three individuals have the most knowledge or information concerning the
subject and among those three individuals, identify the individual having
the most knowledge and the individual having the least knowledge
concerning the subject.

7

(4) When referring to documents, identify to the extent known the (i) type of document (ii) general subject matter; (iii) date of the document and (iv) author(s), addressee(s) and recipient(s)

v) **Destroyed Documents.** Where a document has been destroyed or alleged to have been destroyed, state the date thereof and the reason for its destruction, identify each person having knowledge of its destruction, identify each person responsible for its destruction, provide the information set forth in paragraph j)(1) above and describe the content of the document to the extent possible.

w) **Limitations.** Each discovery request shall be construed independently and no discovery request shall limit the scope of any other discovery request.

## DOCUMENTS TO BE PRODUCED

1. Produce all documents, including, but not limited to, any emails, and notes, received from, or provided to, Howrey.

2. Produce all documents, including, but not limited to, any emails and notes, regarding, related to, referring to, or concerning any teleconference or any other communication with Howrey.

3. Produce all documents, including, but not limited to, any emails, and notes, received from, or provided to, any person acting on behalf of any of the Defendants in the instant case and any person acting on behalf of Synopsys.

8

4.  Produce all documents, including, but not limited to, any emails and notes, regarding, related to, referring to, or concerning any teleconference or any other communication with any person acting on behalf of any of the Defendants in the instant case and any person acting on behalf of Synopsys.

5.  Produce all documents, including, but not limited to, any emails and notes, regarding, related to, referring to, or concerning any personal and work calendar, or other system used, for tracking, recording, or memorializing events for the time period May 29, 2002 to August 1, 2003, including, but not limited to: tasks to be or that have been performed; past and future appointments; and past or further conferences (telephonic or otherwise).

6.  Produce all documents, including, but not limited to, any emails and notes, from May 29, 2002 to August 1, 2003 regarding, related to, referring to, or concerning Design Compiler, or any other product or tool of Synopsys.

7.  Produce all documents, including, but not limited to, any emails and notes, from May 29, 2002 to August 1, 2003 regarding, related to, referring to, or concerning any ASIC design system and any ASIC design method.

8.  Produce all documents, including, but not limited to, any emails and notes, regarding, related to, referring to, or concerning any bill or financial

9

1645985 v2; 3@17U2I.DOC

arrangement for work performed related to any ASIC design system and any

ASIC design method, including but not limited to any Synopsys product or

tool.

9. Produce all telephone record documents for the time period from May 29, 2002

to August 1, 2003 regarding, related to, referring to, or concerning each of your

work, home, and mobile phone.

10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RICOH COMPANY, LTD.,                    )
                                        )
        Plaintiff,                      )
                                        )        C.A. No. 03-103-GMS
                                        )
    v.                                  )
                                        )
AEROFLEX INCORPORATED, AMI              )
SEMICONDUCTOR, INC., MATROX             )
ELECTRONIC SYSTEMS LTD.,                )
MATROX GRAPHICS INC., MATROX            )
INTERNATIONAL CORP. and                 )
MATROX TECH, INC.                       )
                                        )
        Defendants.                     )



## STIPULATED PROTECTIVE ORDER

WHEREAS the parties are or may be competitors and believe that confidential information about certain of its research and development activities and other confidential information concerning its activities constitute very valuable commercial information that, if disclosed to competitors or others, would significantly harm it, and

WHEREAS each of the parties expects certain documents, things, and information that are or will be encompassed by discovery demands made to each other or to non-parties constitute trade secret or other confidential research, development, or commercial information within the meaning of Rule 26(c) of the Federal Rules of Civil Procedure.

Each of the parties hereby stipulates that the following Stipulated Protective Order may be entered by the Court.

1

RLF1-2505322-1

1.      All Confidential Information produced or exchanged in the course of this litigation shall be used solely for the purpose of preparation and trial of this litigation and for no other purpose whatsoever, and shall not be disclosed to any person except in accordance with the terms hereof.

2.      "Confidential Information," as used herein, means any information of any type, kind or character that is designated as "Confidential" by any of the supplying or receiving parties, whether it be a document, information contained in a document, information revealed during a deposition, information revealed in an interrogatory answer or otherwise. In designating information as "Confidential," a party will make such designation only as to that information that it in good faith believes contains "Confidential Information."

3.      (a) "Confidential Information" includes, but is not limited to, (i) proprietary technical information and specifications, (ii) trade secrets (iii) confidential know-how, and (iv) proprietary business and financial information and any other non-public information, the disclosure of which is likely to have the effect of causing significant competitive harm to the disclosing party or party from which the information was obtained. Nothing in this paragraph shall be construed to limit the description of "Confidential Information" set forth in paragraph 2.

(b) Nothing shall be regarded as "Confidential Information" if it is information that:

(i) is in the public domain at the time of disclosure, as evidenced by a written document;

(ii) becomes part of the public domain through no fault of the other party, as evidenced by a written document;

(iii) was in the receiving party's rightful and lawful possession at the time of disclosure, as evidenced by a written document; or

2

RLF1-2506322-1

(iv) is lawfully received by the receiving party from a third party at a later date without restriction as to disclosure, provided such third party has the right to make such disclosure to the receiving party.

4. "Qualified Persons," as used herein means:

(a) To the Court and its officers and staff, including court reporters;

(b) Outside attorneys of record for the parties in this litigation and employees of such attorneys to whom it is necessary that the material be shown for purposes of this litigation;

(c) Outside experts, consultants, advisors or investigators (collectively referred to hereafter as "experts") who have signed an undertaking pursuant to paragraph 5 but only after compliance with the provisions of paragraph 5 below;

(d) To non-party support services including, but not limited to, court reporters, outside copy services, document imaging and database services, design services who have signed confidentiality agreements, jury consultants who have signed confidentiality agreements, mock jurors who have signed confidentiality agreements, and language translators who have signed confidentiality agreements (including support staff) as may be reasonably necessary in connection with the preparation or conduct of this action;

(e) Anyone to whom the parties consent in writing;

(f) If this Court so elects, any other person may be designated as a Qualified Person by order of this Court, after notice and opportunity to be heard to all parties.

5. Prior to the disclosure of any "Confidential Information" to any expert under Paragraph 4(c), counsel for the Party seeking to make the disclosure shall: (i) deliver a copy of this Protective Order as entered to such person, explain its terms to such person, and secure the signature of such person on a written undertaking in the form attached hereto as Exhibit A, and (ii) transmit by facsimile and mail to counsel for the other Parties a copy of the signed Exhibit A,

3

accompanied by a curriculum vitae, at least ten (10) calendar days before any "Confidential Information" designated under this Protective Order is to be disclosed to the signator. The curriculum vitae should identify the general area(s) of expertise of the expert, provide a brief job history, specify all employment, expert or consulting engagements by the expert within the past five (5) years, and state all present or prior relationships between the expert and any entity directly or indirectly involved in this litigation or providing an indemnity to any such entity, its subsidiaries or its affiliates. Any Party may object to the proposed disclosure to an expert within the ten (10) calendar day period following the transmittal of Exhibit A and the curriculum vitae, by stating specifically in writing the reasons why the Party believes such expert should not receive designated "Confidential Information". If during that ten (10) calendar day period, a Party makes such a written objection, there shall be no disclosure of "Confidential Information" to the expert absent mutual agreement of the Parties, waiver of the objection as stated below, or further order of the Court. After a Party objects to the proposed disclosure to an expert, the objecting Party shall move, by noticed motion or by *ex parte* application, for an order that disclosure not be made to such expert within five (5) business days following the date that the objection is made, or the Party's objection shall be deemed waived and disclosure may be made to the expert. The burden shall be on the objecting Party to establish why the disclosure should not be made. Each Party shall maintain a file of all such signed copies of Exhibit A. However, it shall not be necessary for administrative, secretarial or clerical personnel working for such Qualified Person to sign a written undertaking.

      6.      (a) Documents produced in this action may be designated by any party or parties as "Confidential" by marking each page of the document(s) with the designation "Confidential"

4

(b) In lieu of marking the original of a document, if the original is not produced, the designating party may mark the copies that are produced or exchanged. Originals shall be preserved for inspection.

(c) If the document is not in paper form, the producing person or entity shall use other such reasonable means as necessary to identify clearly the document or information as "Confidential."

7.    Discovery responses or other litigation materials may be designated by any party or parties as "Confidential" by marking each page of the response with the designation "Confidential."

8.    The designation of information disclosed during a deposition as "Confidential" shall be made either by a statement on the record at the deposition or within twenty (20) calendar days after receipt by counsel of a copy of the deposition transcript. Such designation will be applied to only those portions of the deposition transcript that include a specific question and response or series of questions and responses containing "Confidential Information." The deposition transcript shall be printed in consecutive pages (whether or not some pages are designated as "Confidential") with a marking on the cover of the deposition transcript indicating the "Confidential" designation contained therein. Unless previously designated otherwise, all deposition transcripts shall be treated as "Confidential" in their entirety prior to the end of the twenty (20) calendar day period following receipt by counsel of a copy of the deposition transcript.

9.    "Confidential Information" shall not be disclosed or made available by the receiving party to persons other than Qualified Persons except that nothing herein is intended to prevent individuals who are in-house counsel or a member of the professional legal department

5

of the Parties from having access to pleadings, briefs and exhibits or declarations filed with the Court and expert reports, including exhibits, that are designated as "Confidential."

10.    (a) Documents to be inspected shall be treated as "Confidential" although such documents need not be marked as "Confidential" prior to inspection. At the time of copying for the receiving parties, any documents containing "Confidential Information" shall be stamped prominently "Confidential" by the producing party.

(b) Nothing herein shall prevent disclosure beyond the terms of this Order if such party designating the information as "Confidential" consents to such disclosure or if the Court, after notice to all effected parties, orders such disclosures. Nothing herein shall prevent any counsel of record from utilizing "Confidential Information" in the examination or cross-examination of any person who is indicated on the document as being an author, source or recipient of the "Confidential Information," irrespective of which party produced such information. Nothing herein shall prevent any counsel of record from utilizing "Confidential Information" in the examination or cross-examination of any person who is a current or former officer, director or employee of the party so designating the information as "Confidential" or of the party that produced the information or of a related entity.

11.    If a party inadvertently discloses any document or thing containing information that it deems confidential without designating it as "Confidential," the disclosing party shall promptly upon discovery of such inadvertent disclosure inform the receiving party in writing, and the receiving party and all Qualified Persons possessing such information shall thereafter treat the information as "Confidential" under this Order. To the extent such information may have been disclosed to persons other than Qualified Persons described in this document, the receiving party shall make every reasonable effort to retrieve the information promptly from such persons and to avoid any further disclosure to and by such persons.

5

12.    A party shall not be obligated to challenge the propriety of a designation as "Confidential" at the time made, and a failure to do so shall not preclude a subsequent challenge thereto. Nor will the failure to object be construed as an admission that any particular "Confidential Information" contains or reflects currently valuable trade secrets or confidential commercial information. In the event that any party to this litigation disagrees at any stage of these proceedings with the designation by the designating party of any information as "Confidential," or the designation of any person as a Qualified Person, the parties shall first try to resolve such dispute in good faith on an informal basis, such as production of redacted copies. If the parties are unsuccessful in informally resolving any dispute regarding the designation of any document or information as "Confidential," the Court shall resolve all such disputes. It shall be the burden of the party making any designation to establish that the information so designated is "Confidential" within the meaning of this Protective Order. The "Confidential Information" that is the subject of the dispute shall be treated as originally designated pending resolution of the dispute.

13.    The parties may, by written stipulation filed and approved by the Court, amend this Order, and any party may seek an order of this Court modifying this Protective Order. The parties agree to meet and confer prior to seeking to modify this Protective Order. In addition, the Court may modify this Protective Order in the interest of justice or otherwise at the Court's discretion.

14.    In the event a party wishes to use any "Confidential Information" in any affidavits, briefs, memoranda of law, or other papers filed with the Court in this litigation, such "Confidential Information" used therein shall be filed under seal with the Court.

15.    The Clerk of this Court is directed to maintain under seal all documents and transcripts of deposition testimony and answers to interrogatories, admissions and other

7

RLF1-2506322-1

pleadings filed under seal with the Court in this litigation that have been designated, in whole or in part, as "Confidential" by a party to this action.

16. If a Party intends to offer into evidence or otherwise disclose in open court any "Confidential Information" designated by another person or entity, counsel for such Party shall notify the designating person or entity that the Party intends to disclose "Confidential Information" in open court prior to the disclosure, so that the designating person or entity may confer with the Court concerning appropriate procedures for protecting its "Confidential Information."

17. In the event any person or party that has possession, custody, or control of any information designated as "Confidential" pursuant to the terms of this Protective Order receives a subpoena or other process or order to produce such information, such person or party shall notify by mail within five (5) business days of the Party's receipt of the request, the counsel for the party or persons claiming confidential treatment of the documents sought by such subpoena or other process or order, shall furnish such counsel with a copy of said subpoena or other process or order, and shall cooperate with respect to any procedure sought to be pursued by the party whose interests may be affected. The party asserting the "Confidential" treatment shall have the burden of defending against such subpoena, process or order. The person or party receiving the subpoena or process or order shall be entitled to comply with it except: (a) to the extent the party asserting the "Confidential" treatment is successful in obtaining an order modifying or quashing it; and (b) in complying with the process or order shall, at a minimum, seek to obtain "Confidential" treatment of the "Confidential Information" before producing it in the other proceeding or action.

18. If the discovery process calls for the production of information that a Party or Non-Party does not wish to produce because the Party or Non-Party believes its disclosure would

8

RLF1-2606322-1

breach an agreement with another person or entity to maintain such information in confidence, the disclosing Party or Non-Party promptly shall give written notice to the other person or entity that its information is subject to discovery in this litigation, and shall provide such person or entity with a copy of this Protective Order. When such written notice is given to the person or entity, the disclosing Party or Non-Party will advise the potential receiving Party that such notice has been given. The person or entity whose information may be subject to discovery shall have ten (10) business days from receipt of the written notice in which to seek relief from the Court, if the person or entity so desires. If the ten (10) business days elapse without the person or entity seeking relief from the Court, the requested information shall be produced in accordance with the terms of this Protective Order.

19.     In the event that additional persons or entities become Parties, none of such Parties' counsel, experts or consultants retained to assist said counsel, shall have access to "Confidential Information" produced by or obtained from any other producing person or entity until said Party has executed and filed with the Court its agreement to be fully bound by this Protective Order.

20.     This Protective Order shall apply to the parties and any non-party from whom discovery may be sought and who desires protection for the discovery sought. Thus, any non-party requested or required to produce or disclose information in this proceeding, through subpoena or otherwise, may designate such information pursuant to the terms of this Protective Order.

21.     (a) Nothing herein requires disclosure of information, documents or things which the disclosing entity contends is protected from disclosure by the attorney-client privilege or the work-product exception. Nothing herein shall preclude any party from moving this Court for an order directing the disclosure of such information, documents or things.

9

RLF1-2506322-1

(5) In the event that any privileged attorney-client or work product documents or things are inadvertently produced for inspection and/or provided, the disclosing party shall identify such documents or things within five (5) days of when it discovers that the privileged materials were inadvertently produced for inspection and/or provided, and either (1) copies shall not be provided, or (2) if copies have already been provided, all copies in the receiving party's possession shall be promptly returned (and not relied upon) by the receiving party. Nothing in this paragraph shall prevent the receiving party from contending that the identified materials are not privileged, that the material was not inadvertently produced, or that privilege was waived for reasons other than mere inadvertent production of the material.

22.    Within ninety (90) days after conclusion of this litigation and any and all appeals thereof, any document and all reproductions of "Confidential" documents produced by a party that are in the possession of any Qualified Person shall be returned to the producing party or, with the consent of the producing party, destroyed. If destroyed, counsel for the receiving party shall certify to counsel for the producing party compliance with this paragraph within fourteen (14) calendar days of such destruction. Outside counsel for each party may maintain in its files one copy of all material produced as well as all materials filed with or otherwise presented to the Court, deposition and trial transcripts, and work product (regardless of whether such materials contain or refer to "Confidential" materials). If counsel retains such materials, the materials which contain Confidential Information shall be accessible only by Qualified Persons defined in paragraph 4(b) above. As far as the provisions of any protective orders entered in this action restrict the communication and use of the documents produced thereunder, such orders shall continue to be binding after the conclusion of this litigation including any subsequent appeals or later proceedings, except that (a) there shall be no restriction on documents that are used as exhibits in Court unless such exhibits were filed under seal, and (b) a party may seek the written

10

RLF1-2506322-1

permission of the producing party or order of the Court with respect to dissolution or modification of such protective orders. The Court shall retain jurisdiction to enforce the performance of said obligations.

23. This Order shall not bar any attorney herein in the course of rendering advice to his client with respect to this litigation from conveying to any party client his evaluation in a general way of "Confidential Information" produced or exchanged herein; provided, however, that in rendering such advice and otherwise communicating with his client, the attorney shall not disclose the specific contents of any "Confidential Information" produced by another party herein, which disclosure would be contrary to the terms of this Protective Order.

24. This Protective Order may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

SO ORDERED this 9th day of June, 2003.

UNITED STATES DISTRICT JUDGE

11

RLF1-2606122-1

AGREED:

By: _____

Robert W. Whetzel (#2288)
Steven J. Fineman (#4025)
Richards, Layton & Finger, P.A.
One Rodney Square
Post Office Box 551
Wilmington, Delaware 19899
(302) 651-7700

Gary M. Hoffman
Eric Oliver
DICKSTEIN SHAPIRO MORIN &
   OSHINSKY LLP
2101 L Street NW
Washington, D.C. 20037-1526
(202) 828-4879

Edward A. Meilman
DICKSTEIN SHAPIRO MORIN &
   OSHINSKY LLP
1177 Avenue of the America
New York, New York 10036
(212) 896-5471


Counsel for Plaintiff,
Ricoh Company Ltd.


Francis DiGiovanni (#3189)
Connolly Bove Lodge
   & Hutz LLP
1220 Market Street
P.O. Box 2207
Wilmington, DE 19801
(302) 658-9141
Attorneys for Defendants

OF COUNSEL:
Teresa M. Corbin
Howrey Simon Arnold & White, LLP
301 Ravenswood Ave.
Menlo Park, CA 94025
(650) 463-8100
Attorneys for Defendants

Alan H. MacPherson
MacPherson Kwok Chen & Heid LLP
2001 Gateway Place, Suite 1952
San Jose, CA 95014
(408) 392-9250
Attorney for AMI Semiconductor, Inc.


12

RLF1-2506122-1

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RICOH COMPANY, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 03-103-GMS |
| v. | ) | |
| | ) | |
| AEROFLEX INCORPORATED, AMI | ) | |
| SEMICONDUCTOR, INC., MATROX | ) | |
| ELECTRONIC SYSTEMS LTD., | ) | |
| MATROX GRAPHICS INC., MATROX | ) | |
| INTERNATIONAL CORP. and | ) | |
| MATROX TECH, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## UNDERTAKING

My name is _____. I hereby acknowledge that I have been provided with a copy of, have read, and am fully familiar with, the terms of the Stipulated Protective Order entered in this action on _____, 2003. I agree to be bound by, and to comply fully with, the terms of the Protective Order. I agree not to disclose or disseminate any "Confidential Information," as defined by the Stipulated Protective Order, except as permitted therein.

I hereby submit myself to the jurisdiction of the United States District Court for the District of Delaware in connection with the enforcement of the Protective Order.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on _____, 2003.

_____

13

RLF1-2605122-1

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of August, 2003, true and correct copies of the foregoing were caused to be served on counsel of record at the following addresses as indicated:

**BY HAND DELIVERY:**
Francis DiGiovanni, Esq.
Connolly Bove Lodge & Hutz, LLP
1220 Market Street
P.O. Box 2207
Wilmington, Delaware 19899
Attorneys for Defendants

**VIA FEDERAL EXPRESS**
Teresa M. Corbin, Esq.
Howrey Simon Arnold & White LLP
301 Ravenswood Avenue
Menlo Park, California 94025
Attorneys for Defendants

**VIA FEDERAL EXPRESS**
Alan H. MacPherson, Esq.
MacPherson Kwok Chen & Heid LLP
2001 Gateway Place
Suite 195E
San Jose, California 95014
Attorneys for AMI Semiconductor, Inc.

Steven J. Fineman (#4025)

RLF1-2580018-2

**EXHIBIT 3**

The following pages are in response to item 1.  (And also 2, 3, 4)



PTH000002

From: Campbell_L@howrey.com
to: Mon Mar 31, 2003 4:52:35 PM US/Eastern
_r_thomas@ece.cmu.edu
Subject: VLSI Design Automation Assistant

Dear Mr. Thomas:

I am writing in connection with your work on the VLSI Design Automation
Assistant and more generally with regard to your early work in the field of
logic synthesis.

I am serving as counsel to Synopsys and several of its customers in
connection, who have been charged with infringing a patent relating to
specific logic synthesis techniques. Part of our work is to determine the
state of the art of logic synthesis in the mid to late 1980s. It appears
that your work may be particularly relevant to our investigation.

I would be grateful if you would be willing to discuss your work with us.
In addition we are looking for consultants with expertise in the logic
synthesis area in order to assist us in gathering relevant technical
information in connection with our case. Please let me know if you do
consulting work or know of other persons in this area who serve as
consultants.  Please contact me by reply e-mail or at (650) 463-8135.

Thank you for your assistance.


Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-0498 (fax)
Campbell_L@howrey.com

_this communication is for the named recipient only and may contain
information that is privileged, confidential and exempt from disclosure
under applicable law.  If you are not the intended recipient, you are hereby
notified that any unauthorized use, dissemination, distribution or copying
of this communication is strictly prohibited.  If you are not the intended
recipient, please delete the document without opening any attachments,
destroy any hard copies you may have printed and immediately notify Howrey
Simon Arnold & White that you received this e-mail in error._

PTH000005

From: Don Thomas <dthomas@ece.cmu.edu>
Date: Tue Apr 1, 2003 5:23:36 AM US/Eastern
To: Campbell_@howrey.com
Subject: Re: VLSI Design Automation Assistant

I'll be back in touch with you about this, but probably sometime tomorrow (Wed). I am interested but am quite busy today.
–Don Thomas–


On Monday, March 31, 2003, at 04:52 PM, Campbell_@howrey.com wrote:

Dear Mr. Thomas:

I am writing in connection with your work as the VLSI Design Automation Assistant and more generally with regard to your early work in the field of logic synthesis.

I am serving as counsel to Synopsys and several of its customers in connection, who have been charged with infringing a patent relating to specific logic synthesis techniques. Part of our work is to determine the state of the art of logic synthesis in the mid to late 1980s. It appears that your work may be particularly relevant to our investigation.

I would be grateful if you would be willing to discuss your work with us. In addition we are looking for consultants with expertise in the logic synthesis area in order to assist us in gathering relevant technical information in connection with our case. Please let me know if you do consulting work or know of other persons in this area who serve as consultants. Please contact me by reply e-mail or at (650) 463-8135.

Thank you for your assistance.


Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
(650-463-8135 (phone)
650-463-8400 (fax)
Campbell_@howrey.com

This communication is for the named recipient only and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited. If you are not the intended recipient, please delete the document without opening any attachments, destroy any hard copies you may have printed and immediately notify Howrey Simon Arnold & White that you received this e-mail in error.

PTH000007

From: Campbell.L@howrey.com
Date: Tue Apr 1, 2003 12:42:09 PM US/Eastern
To: thomas@ece.cmu.edu
Subject: RE: VLSI Design Automation Assistant

We look forward to hearing from you.

——Original Message——
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Tuesday, April 01, 2003 5:36 AM
To: Campbell.L@howrey.com
Subject: Re: VLSI Design Automation Assistant

I'll be back in touch with you about this, but probably sometime
tomorrow (Wed). I am interested but am quite busy today.
-Don Thomas-

On Monday, March 31, 2003, at 04:52 PM, Campbell.L@howrey.com wrote:

Dear Mr. Thomas:

I am writing in connection with your work on the VLSI Design Automation
Assistant and more generally with regard to your early work in the
field of
logic synthesis.

I am serving as counsel to Synopsys and several of its customers in
connection, who have been charged with infringing a patent relating to
specific logic synthesis techniques. Part of our work is to determine
the
state of the art of logic synthesis in the mid to late 1980s. It
appears
that your work may be particularly relevant to our investigation.

I would be grateful if you would be willing to discuss your work with
us.
In addition we are looking for consultants with expertise in the logic
synthesis area in order to assist us in gathering relevant technical
information in connection with our case. Please let me know if you do
consulting work or know of other persons in this area who serve as
consultants.  Please contact me by reply e-mail or at (650) 463-8135.

Thank you for your assistance.

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-0480 (fax)
Campbell.L@howrey.com

This communication is for the named recipient only and may contain
information that is privileged, confidential and exempt from disclosure
under applicable law.  If you are not the intended recipient, you are
hereby
notified that any unauthorized use, dissemination, distribution or
copying
of this communication is strictly prohibited.  If you are not the
intended
recipient, please delete the document without opening any attachments,
destroy any hard copies you may have printed and immediately notify
Howrey
Simon Arnold & White that you received this e-mail in error.

PTH000008

From: Campbell.L@howrey.com
Date: Thu Apr 3, 2003 7:38:32 PM US/Eastern
To: thomas@ece.cmu.edu
Subject: RE: VLSI Design Automation Assistant

Hello,

Well, it would seem you have been very busy. But, that's alright, I have
also been far too busy to focus on this.

I've talked with the other lawyers on this case, and we'd like to set up a
teleconference with you on Wednesday (the first day we are all free). Are
you available any time after 9 a.m. PT (noon ET) on Wednesday?


-----Original Message-----
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Tuesday, April 01, 2003 5:30 AM
To: Campbell.L@howrey.com
Subject: Re: VLSI Design Automation Assistant


I'll be back in touch with you about this, but probably sometime
tomorrow (Wed). I am interested but am quite busy today.
-Don Thomas-


On Monday, March 31, 2003, at 04:52 PM, Campbell.L@howrey.com wrote:

Dear Mr. Thomas:

I am writing in connection with your work on the VLSI Design Automation
Assistant and more generally with regard to your early work in the
field of
logic synthesis.

I am serving as counsel to Synopsys and several of its customers in
connection, who have been charged with infringing a patent relating to
specific logic synthesis techniques. Part of our work is to determine
the
state of the art of logic synthesis in the mid to late 1980s. It
appears
that your work may be particularly relevant to our investigation.

I would be grateful if you would be willing to discuss your work with
us.
In addition we are looking for consultants with expertise in the logic
synthesis area in order to assist us in gathering relevant technical
information in connection with our case. Please let me know if you do
consulting work or know of other persons in this area who serve as
consultants. Please contact me by reply e-mail or at (650) 463-8135.

Thank you for your assistance.


Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
Campbell.L@howrey.com

This communication is for the named recipient only and may contain
information that is privileged, confidential and exempt from disclosure
under applicable law. If you are not the intended recipient, you are
hereby
notified that any unauthorized use, dissemination, distribution or
copying
of this communication is strictly prohibited. If you are not the

PTH000009

intended
recipient, please delete the document without opening any attachments,
destroy any hard copies you may have printed and immediately notify
Howrey
Simon Arnold & White that you received this e-mail in error.

PTH000010

From: Don Thomas <dthomas@ece.cmu.edu>
Date: Fri Apr 4, 2003 9:00:10 AM US/Eastern
To: Campbell.@howrey.com
Subject: Re: VLSI Design Automation Assistant

Sorry for not getting back to you. I was busy but was also waiting for another contact.

I have done some consulting on the topic before for the firm of Dickstein Shapiro Morin & Oshinsky LLP. This was mainly as an expert to help them read through and understand various papers of the time (approx 1984).

This activity was mostly last summer and I hadn't heard from them since early Fall. But, when I received your email, I thought I should look into whether this was tied in.

It appears that it is and I'm not sure how/if to proceed. If we can proceed, I can make some time available on Wed 4/9. Some time between noon and 2 (ET) could be worked out.

I'm going to try to figure out what to do here. Any thoughts/comments appreciated.
–Don Thomas–

On Thursday, April 3, 2003, at 07:38 PM, Campbell.@howrey.com wrote:

Hello,

Well, it would seem you have been very busy. But, that's alright, I have also been far too busy to focus on this.

I've talked with the other lawyers on this case, and we'd like to set up a teleconference with you on Wednesday (the first day we are all free). Are you available any time after 9 a.m. PT (noon ET) on Wednesday?

———Original Message———
From: Don Thomas [mailto:dthomas@ece.cmu.edu]
Sent: Tuesday, April 01, 2003 3:30 AM
To: Campbell.@howrey.com
Subject: Re: VLSI Design Automation Assistant

I'll be back in touch with you about this, but probably sometime tomorrow (Wed). I am interested but am quite busy today.
–Don Thomas–

On Monday, March 31, 2003, at 04:52 PM, Campbell.@howrey.com wrote:

Dear Mr. Thomas:

I am writing in connection with your work on the VLSI Design Automation Assistant and more generally with regard to your early work in the field of logic synthesis.

I am serving as counsel to Synopsys and several of its customers in connection, who have been charged with infringing a patent relating to specific logic synthesis techniques. Part of our work is to determine the state of the art of logic synthesis in the mid to late 1980s. It appears that your work may be particularly relevant to our investigation.

I would be grateful if you would be willing to discuss your work with us. In addition we are looking for consultants with expertise in the logic synthesis area in order to assist us in gathering relevant technical information in connection with our case. Please let me know if you do consulting work or know of other persons in this area who serve as

PTH000011

commitments. Please contact me by reply e-mail or at (650) 463-4133.

Thank you for your assistance.

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-4133 (phone)
650-463-3400 (fax)
CampbellL@howrey.com

This communication is for the named recipient only and may contain
information that is privileged, confidential and exempt from disclosure
under applicable law.  If you are not the intended recipient, you are
hereby
notified that any unauthorized use, dissemination, distribution or
copying
of this communication is strictly prohibited.  If you are not the
intended
recipient, please delete the document without opening any attachments,
destroy any hard copies you may have printed and immediately notify
Howrey
Simon Arnold & White that you received this e-mail in error.

PTH000012

From: Campbell.@howrey.com
Date: Mon Apr 7, 2003  4:02:17  PM US/Eastern
To: thomas@ece.cmu.edu
Subject: RE: VLSI Design Automation Assistant

We are looking into this to see if it would be proper for you to talk to us
at this time.  Let's hold off on Wednesday for now.

-----Original Message-----
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Friday, April 04, 2003 8:00 AM
To: Campbell.@howrey.com
Subject: Re: VLSI Design Automation Assistant


Sorry for not getting back to you.  I was busy but was also waiting for
another contact.

I have done some consulting on the topic before for the firm of
Bickstein Shapiro Morin & Oshinsky LLP. This was mainly as an expert
to help them read through and understand various papers of the time
(approx 1984).

This activity was mostly last summer and I hadn't heard from them since
early Fall. But, when I received your email, I thought I should look
into whether this was tied in.

It appears that it is and I'm not sure how/if to proceed.  If we can
proceed, I can make some time available on Wed 4/9.  Some time between
noon and 2 (ET) could be worked out.

I'm going to try to figure out what to do here.  Any thoughts/comments
appreciated.
-Don Thomas-



On Thursday, April 3, 2003, at 07:36 PM, Campbell.@howrey.com wrote:

Hello,

Well, it would seem you have been very busy.  But, that's alright. I
have
also been far too busy to focus on this.

I've talked with the other lawyers on this case, and we'd like to set
up a
teleconference with you on Wednesday (the first day we are all free).
Are
you available any time after 9 a.m. PT (noon ET) on Wednesday?

-----Original Message-----
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Tuesday, April 01, 2003 3:30 AM
To: Campbell.@howrey.com
Subject: Re: VLSI Design Automation Assistant


I'll be back in touch with you about this, but probably sometime
tomorrow (Wed). I am interested but am quite busy today.
-Don Thomas-


On Monday, March 31, 2003, at 04:52 PM, Campbell.@howrey.com wrote:

Dear Mr. Thomas:

PTH000013

I am writing in connection with your work on the VLSI Design Automation Assistant and more generally with regard to your early work in the field of logic synthesis.

I am serving as counsel to Synopsys and several of its customers in connection, who have been charged with infringing a patent relating to specific logic synthesis techniques. Part of our work is to determine the state of the art of logic synthesis in the mid to late 1980s. It appears that your work may be particularly relevant to our investigation.

I would be grateful if you would be willing to discuss your work with us. In addition we are looking for consultants with expertise in the logic synthesis area in order to assist us in gathering relevant technical information in connection with our case. Please let me know if you do consulting work or know of other persons in this area who serve as consultants.  Please contact me by reply e-mail or at (650) 463-8135.

Thank you for your assistance.


Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-0408 (fax)
CampbellL@howrey.com

This communication is for the named recipient only and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited.  If you are not the intended recipient, please delete the document without opening any attachments, destroy any hard copies you may have printed and immediately notify Howrey Simon Arnold & White that you received this e-mail in error.

PTH000014

From: Campbell.L@howrey.com
Date: Mon Apr 7, 2003 4:02:17 PM US/Eastern
To: thomas@ece.cmu.edu
Subject: RE: VLSI Design Automation Assistant

We are looking into this to see if it would be proper for you to talk to us
at this time.  Let's hold off on Wednesday for now.

-----Original Message-----
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Friday, April 04, 2003 6:00 AM
To: Campbell.L@howrey.com
Subject: Re: VLSI Design Automation Assistant


Sorry for not getting back to you.  I was busy but was also waiting for
another contact.

I have done some consulting on the topic before for the firm of
Bickstein Shapiro Morin & Oshinsky LLP.  This was mainly as an expert
to help them read through and understand various papers of the time
(approx 1984).

This activity was mostly last summer and I hadn't heard from them since
early Fall.  But, when I received your email, I thought I should look
into whether this was tied in.

It appears that it is and I'm not sure how/if to proceed.  If we can
proceed, I can make some time available on Wed 4/9.  Some time between
noon and 2 (ET) could be worked out.

I'm going to try to figure out what to do here.  Any thoughts/comments
appreciated.
-Don Thomas-



On Thursday, April 3, 2003, at 07:38 PM, Campbell.L@howrey.com wrote:

  Hello,

  Well, it would seem you have been very busy.  But, that's alright.  I
  have
  also been far too busy to focus on this.

  I've talked with the other lawyers on this case, and we'd like to set
  up a
  teleconference with you on Wednesday (the first day we are all free).
  Are
  you available any time after 9 a.m. PT (noon ET) on Wednesday?


  -----Original Message-----
  From: Don Thomas [mailto:thomas@ece.cmu.edu]
  Sent: Tuesday, April 01, 2003 2:30 AM
  To: Campbell.L@howrey.com
  Subject: Re: VLSI Design Automation Assistant


  I'll be back in touch with you about this, but probably sometime
  tomorrow (Wed).  I am interested but am quite busy today.
  -Don Thomas-


  On Monday, March 31, 2003, at 04:52 PM, Campbell.L@howrey.com wrote:

  | Dear Mr. Thomas:

PTH000015

I am writing in connection with your work on the VLSI Design Automation
Assistant and more generally with regard to your early work in the field of
logic synthesis.

I am serving as counsel to Synopsys and several of its customers in
connection, who have been charged with infringing a patent relating to
specific logic synthesis techniques. Part of our work is to determine the
state of the art of logic synthesis in the mid to late 1980s. It appears
that your work may be particularly relevant to our investigation.

I would be grateful if you would be willing to discuss your work with
us.
In addition we are looking for consultants with expertise in the logic
synthesis area in order to assist us in gathering relevant technical
information in connection with our case. Please let me know if you do
consulting work or know of other persons in this area who serve as
consultants. Please contact me by reply e-mail or at (650) 463-8135.

Thank you for your assistance.

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
Campbell_@howrey.com

This communication is for the named recipient only and may contain
information that is privileged, confidential and exempt from disclosure
under applicable law. If you are not the intended recipient, you are hereby
notified that any unauthorized use, dissemination, distribution or copying
of this communication is strictly prohibited. If you are not the intended
recipient, please delete the document without opening any attachments,
destroy any hard copies you may have printed and immediately notify Howrey
Simon Arnold & White that you received this e-mail in error.

PTH000016

From: CampbellL@howrey.com
Date: Tue Apr 8, 2003  12:57:22 PM US/Eastern
To: thomas@eca.cmu.edu
Subject: RE: VLSI Design Automation Assistant

Thank you for your interest in this matter, but, Dickstein Shapiro Morin &
Oshinsky LLP is indeed the counsel for the opposing side in this matter.
This means that there is most likely a conflict if we would talk to you in
detail about the matter.  So, unfortunately, it appears that we cannot go
forward.  But, I thank you very much for your interest and if things change
or we happen to run into this technology in an unrelated matter, I will get
back in touch with you.  However, one thing you can do for us, is to let us
know about anyone else who is knowledgeable in this technology or its
development, whether or not they were contemporaneously involved with its
development.

Sincerely,

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
CampbellL@howrey.com

This communication is for the named recipient only and may contain
information that is privileged, confidential and exempt from disclosure
under applicable law.  If you are not the intended recipient or the employee
or agent responsible for delivering this communication to the intended
recipient; you are hereby notified that any unauthorized use, dissemination,
distribution or copying of this communication is strictly prohibited.  If
you are not the intended recipient, please delete the document without
opening any attachments, destroy any hard copies you may have printed and
immediately notify Howrey Simon Arnold & White that you received this e-mail
in error.

PTH000017

From: Don Thomas <thomas@ece.cmu.edu>
Date: Thu Apr 10, 2003 9:56:11 AM US/Eastern
To: Campbell.@howrey.com
Subject: Re: VLSI Design Automation Assistant

I suggest trying Ted Kowalski (Thaddeus J.) who was a PhD student of mine in the early 80's. Wrote his thesis about a knowledge based expert system to do VLSI design. Last I knew, he worked for Lucent Tech.
~Don Thomas~

On Tuesday, April 8, 2003, at 12:57 PM, Campbell.@howrey.com wrote:

Thank you for your interest in this matter, but, Dickstein Shapiro Morin & Oshinsky LLP is indeed the counsel for the opposing side in this matter. This means that there is most likely a conflict if we would talk to you in detail about the matter. So, unfortunately, it appears that we cannot go forward. But, I thank you very much for your interest and if things change or we happen to run into this technology in an unrelated matter, I will get back in touch with you. However, one thing you can do for us, is to let us know about anyone else who is knowledgeable in this technology or its development, whether or not they were contemporaneously involved with its development.

Sincerely,

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8125 (phone)
650-463-8400 (fax)
Campbell.@howrey.com

This communication is for the named recipient only and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient or the employee or agent responsible for delivering this communication to the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited. If you are not the intended recipient, please delete the document without opening any attachments, destroy any hard copies you may have printed and immediately notify Howrey Simon Arnold & White that you received this e-mail in error.

PTH000018

From: Campbell.L@howrey.com
Date: Thu May 1, 2003  1:19:24 PM US/Eastern
To: thomas@cs.cmu.edu
Subject: Ted Kowalski's contact information

Dear Dr. Thomas:

I'm trying to contact Ted Kowalski.  Do you have any contact information for him?

Thanks for your help,

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
Campbell.L@howrey.com

This communication is for the named recipient only and may contain
information that is privileged, confidential and exempt from disclosure
under applicable law.  If you are not the intended recipient or the employee
or agent responsible for delivering this communication to the intended
recipient, you are hereby notified that any unauthorized use, dissemination,
distribution or copying of this communication is strictly prohibited.  If
you are not the intended recipient, please delete this document without
opening any attachments, destroy any hard copies you may have printed and
immediately notify Howrey Simon Arnold & White that you received this e-mail
in error.

PTH000019

From: Don Thomas <dthomas@ece.cmu.edu>
Date: Thu May 1, 2003  1:47:47 PM US/Eastern
To: CampbellL@howrey.com
Subject: Re: Ted Kowalski's contact information

I'll check around.  I haven't talked with him in about 10 years, but I have a few leads.
--Don--

On Thursday, May 1, 2003, at 01:15 PM, CampbellL@howrey.com wrote:

Dear Dr. Thomas:

I'm trying to contact Ted Kowalski.  Do you have any contact information for
him?

Thanks for your help,

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8128 (phone)
650-463-8400 (fax)
CampbellL@howrey.com

This communication is for the named recipient only and may contain
information that is privileged, confidential and exempt from disclosure
under applicable law.  If you are not the intended recipient or the employee
or agent responsible for delivering this communication to the intended
recipient, you are hereby notified that any unauthorized use, dissemination,
distribution or copying of this communication is strictly prohibited.  If
you are not the intended recipient, please delete the document without
opening any attachments, destroy any hard copies you may have printed and
immediately notify Howrey Simon Arnold & White that you received this e-mail
in error.

PTH000020

From: Campbell_@howrey.com
Date: Thu May 1, 2003  1:45:51 PM US/Eastern
To: thomas@ece.cmu.edu
Subject: RE: Ted Kowalski's contact information

Thank you


-----Original Message-----
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Thursday, May 01, 2003 10:46 AM
To: Campbell_@howrey.com
Subject: Re: Ted Kowalski's contact information


I'll check around.  I haven't talked with him in about 10 years, but I
have a few leads.
--Don--

On Thursday, May 1, 2003, at 01:15  PM, Campbell_@howrey.com wrote:

Dear Dr. Thomas:

I'm trying to contact Ted Kowalski.  Do you have any contact
information for
him?

Thanks for your help,

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
Campbell_@howrey.com


This communication is for the named recipient only and may contain
information that is privileged, confidential and exempt from disclosure
under applicable law.  If you are not the intended recipient or the
employee
or agent responsible for delivering this communication to the intended
recipient, you are hereby notified that any unauthorized use,
dissemination,
distribution or copying of this communication is strictly prohibited.
If
you are not the intended recipient, please delete the document without
opening any attachments, destroy any hard copies you may have printed
and
immediately notify Howrey Simon Arnold & White that you received this
e-mail
in error.

PTH000021

From: Don Thomas <thomas@ece.cmu.edu>
Date: Sat May 3, 2003  11:13:57  AM US/Eastern
To: Campbell_@howrey.com
Subject: Re: Ted Kowalski's contact information
Reply-To: thomas@ece.cmu.edu

I heard from Ted that you were able to reach him at AT&T.  Hope he works
out for you.
  -Don-


Campbell_@howrey.com wrote:

Dear Dr. Thomas:

I'm trying to contact Ted Kowalski.  Do you have any contact information for
him?

Thanks for your help,

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
Campbell_@howrey.com


This communication is for the named recipient only and may contain
information that is privileged, confidential and exempt from disclosure
under applicable law.  If you are not the intended recipient or the employee
or agent responsible for delivering this communication to the intended
recipient, you are hereby notified that any unauthorized use, dissemination,
distribution or copying of this communication is strictly prohibited.  If
you are not the intended recipient, please delete the document without
opening any attachments, destroy any hard copies you may have printed and
immediately notify Howrey Simon Arnold & White that you received this e-mail
is error.

PTH000022

From: Don Thomas <thomas@ece.cmu.edu>
Date: Tue May 6, 2003  3:43:58  PM US/Eastern
To: Campbell_@howrey.com
Subject: Re: Ted Kowalski's contact information

Ted and I spoke and it appears that you were able to be in touch with him, and that he said no.

The other person that comes to mind is Prof Alice Parker at USC.

mailto:Alice Parker <parker@eve.usc.edu>

Even though she didn't participate in Ted's work, she was in the synthesis research area at the time and certainly understands how the tools work.

Hope this helps.
--Don Thomas--


On Thursday, May 1, 2003, at 01:15  PM, Campbell_@howrey.com wrote:

Dear Dr. Thomas:

I'm trying to contact Ted Kowalski.  Do you have any contact information for him?

Thanks for your help,

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-6136 (phone)
650-463-6400 (fax)
Campbell_@howrey.com

This communication is for the named recipient only and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If you are not the intended recipient or the employee or agent responsible for delivering this communication to the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited.  If you are not the intended recipient, please delete the document without opening any attachments, destroy any hard copies you may have printed and immediately notify Howrey Simon Arnold & White that you received this e-mail in error.

PTH000023

From: Don Thomas <thomas@eco.cmu.edu>
Date: Wed Jul 2, 2003 3:51:52 AM US/Eastern
To: Campbell.@howrey.com
Subject: Subpoena

Mr. Campbell,

I received the subpoena for information and later my appearance. I'm in the process of tracking down the information you requested.

The question I have regards reimbursement.

There's a fair amount of copying that is being done. I have a stack of docs about 6-8 inches high (that's probably it, but there may be more) — mostly double sided copying. I have an assistant spending a fair amount of time collecting this and copying. And, of course I have to take what might be a fair amount of personal time for the deposition. What are your reimbursement policies?
-Don Thomas-

PTH000024

From: "Campbell, Louis" <Campbell.L@howrey.com>
Date: Mon Jul 7, 2003 4:17:08 PM US/Eastern
To: "thomas@ece.cmu.edu" <thomas@ece.cmu.edu>
Subject: Subpoena costs

Dear Dr. Thomas:

If you are no longer a consultant for Ricoh and Ricoh will not serve as your
counsel during the deposition nor work with you prior to the deposition, we
may be willing to pay your costs for copying documents and time spent at the
deposition. If you are no longer working with Ricoh, please send us an
estimate of the costs associated with the discovery we have requested.

On the other hand, if you are still in a consulting relationship with Ricoh,
you should contact Ricoh about covering your costs.

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
Campbell.L@howrey.com

This communication is for the named recipient only and may contain
information that is privileged or confidential. If you are not the intended
recipient please delete the document, destroy any hard copies, and
immediately notify the sender that you received this email in error.

PTH000025

From: Don Thomas <thomas@ece.cmu.edu>
Date: Mon Jul 7, 2003 <3:34 PM US/Eastern
To: "Campbell, Louis" <Campbell_@howrey.com>
Cc: Don Thomas <thomas@ece.cmu.edu>
Subject: Re: Subpoena costs

Dear Mr. Campbell,

Thank you for the reply.

I have not been contacted by Ricoh (Dickstein Shapiro...) for consultation since last summer. I spoke with them briefly on the phone this March, when you sent your original email to me. I told them I wouldn't be an expert witness for them during trial.

They have not offered to serve as my counsel during the deposition, and I assume that they know that you subpoenaed me for documentation and deposition. Have they listed me as a consultant?
--Don Thomas--



On Monday, July 7, 2003, at 04:17 PM, Campbell, Louis wrote:

Dear Dr. Thomas:

If you are no longer a consultant for Ricoh and Ricoh will not serve as your counsel during the deposition nor work with you prior to the deposition, we may be willing to pay your costs for copying documents and time spent at the deposition. If you are no longer working with Ricoh, please send us an estimate of the costs associated with the discovery we have requested.

On the other hand, if you are still in a consulting relationship with Ricoh, you should contact Ricoh about covering your costs.


Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8133 (phone)
650-463-8400 (fax)
Campbell_@howrey.com

This communication is for the named recipient only and may contain information that is privileged or confidential. If you are not the intended recipient please delete the document, destroy any hard copies, and immediately notify the sender that you received this email in error.

PTH000026

From: Campbell.L@howrey.com
Date: Mon Jul 7, 2003 6:57:53 PM US/Eastern
To: thomas@ece.cmu.edu
Subject: RE: Subpoena costs

I take it from your email that you do not believe yourself to be in an
ongoing consulting relationship with Ricoh. They have not listed you as a
consultant in this case. If my assumption is correct, please send us an
estimate of your costs.

-----Original Message-----
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Monday, July 07, 2003 1:54 PM
To: Campbell, Louis
Cc: Don Thomas
Subject: Re: Subpoena costs

Dear Mr. Campbell,

Thank you for the reply.

I have not been contacted by Ricoh (Dickstein Shapiro...) for
consultation since last summer. I spoke with them briefly on the phone
this March, when you sent your original email to me. I told them I
wouldn't be an expert witness for them during trial.

They have not offered to serve as my counsel during the deposition, and
I assume that they know that you subpoenaed me for documentation and
deposition. Have they listed me as a consultant?
-Don Thomas-

On Monday, July 7, 2003, at 04:17 PM, Campbell, Louis wrote:

Dear Dr. Thomas:

If you are no longer a consultant for Ricoh and Ricoh will not serve
as your
counsel during the deposition nor work with you prior to the
deposition, we
may be willing to pay your costs for copying documents and time spent
at the
deposition. If you are no longer working with Ricoh, please send us an
estimate of the costs associated with the discovery we have requested.

On the other hand, if you are still in a consulting relationship with
Ricoh,
you should contact Ricoh about covering your costs.

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
Campbell.L@howrey.com

This communication is for the named recipient only and may contain
information that is privileged or confidential. If you are not the
intended
recipient please delete the document, destroy any hard copies, and
immediately notify the sender that you received this email in error.

PTH000027

From: Don Thomas <thomas@ece.cmu.edu>
Date: Tue Jul 8, 2003  9:02:30 AM US/Eastern
To: Campbell_2@howrey.com
Subject: Re: Subpoena costs

That's right, I don't see an ongoing relationship at this point.

Let me explain that I was hired early last summer for ten hours of work. That was later extended by another ten. The second ten was never fully charged out. Also, the contract was never terminated either. But I've heard nothing from them since late last summer, except for when I told them I wouldn't be a witness for them.

I'll send them a note officially terminating that agreement.
—Don Thomas—

On Monday, July 7, 2003, at 06:57 PM, Campbell_2@howrey.com wrote:

> I take it from your email that you do not believe yourself to be in an
> ongoing consulting relationship with Ricoh. They have not listed you as a
> consultant in this case. If my assumption is correct, please send us an
> estimate of your costs.
>
> ———Original Message———
> From: Don Thomas [mailto:thomas@ece.cmu.edu]
> Sent: Monday, July 07, 2003 1:54 PM
> To: Campbell, Louis
> Cc: Don Thomas
> Subject: Re: Subpoena costs
>
>
> Dear Mr. Campbell,
>
> Thank you for the reply.
>
> I have not been contacted by Ricoh (Dickstein Shapiro...) for
> consultation since last summer.  I spoke with them briefly on the phone
> this March, when you sent your original email to me.  I told them I
> wouldn't be an expert witness for them during trial.
>
> They have not offered to serve as my counsel during the depositions, and
> I assume that they know that you subpoenaed me for documentation and
> deposition.  Have they listed me as a consultant?
> —Don Thomas—
>
>
>
> On Monday, July 7, 2003, at 04:17 PM, Campbell, Louis wrote:
>
>> Dear Dr. Thomas:
>>
>> If you are no longer a consultant for Ricoh and Ricoh will not serve
>> as your
>> counsel during the depositions nor work with you prior to the
>> depositions, we
>> may be willing to pay your costs for copying documents and time spent
>> at the
>> deposition. If you are no longer working with Ricoh, please send us an
>> estimate of the costs associated with the discovery we have requested.
>>
>> On the other hand, if you are still in a consulting relationship with
>> Ricoh,
>> you should contact Ricoh about covering your costs.
>>
>>
>> Louis L. Campbell
>>
>> Howrey Simon Arnold & White, LLP
>> 301 Ravenswood Avenue

PTH000028

Menlo Park, CA 94025
650-463-6125 (phone)
650-463-6488 (fax)
Campbell_@howrey.com

This communication is for the named recipient only and may contain
information that is privileged or confidential. If you are not the
intended
recipient please delete the document, destroy any hard copies, and
immediately notify the sender that you received this email in error.

PTH000029

From: Don Thomas <thomas@ece.cmu.edu>
Date: Tue Jul 1, 2003  3:12:08 PM US/Eastern
To: "Oliver, Eric" <Oliver1@esmo.com>
Subject: Re: Consulting Agreement Extension

Dear Mr. Oliver,
As nothing more has happened with regard to this agreement in almost a year, I consider that the agreement is now ended.

Thanks
-Don Thomas-

[REDACTED]

PTH000030

From: "Campbell, Louis" <Campbell.L@howrey.com>
Date: Tue Jul 8, 2003  5:29:30 PM US/Eastern
To: "Don Thomas" <thomas@ece.cmu.edu>
Subject: RE: Subpoena costs

Ok. Please send an estimate of your costs after you have terminated the agreement with Ricoh.

——Original Message——
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Tuesday, July 08, 2003 6:03 AM
To: Campbell.L@howrey.com
Subject: Re: Subpoena costs

That's right, I don't see an ongoing relationship at this point.

Let me explain that I was hired early last summer for ten hours of work. That was later extended by another ten. The second ten was never fully charged out. Also, the contract was never terminated either. But I've heard nothing from them since late last summer, except for when I told them I wouldn't be a witness for them.

I'll send them a note officially terminating that agreement.
–Don Thomas–

On Monday, July 7, 2003, at 06:57 PM, Campbell.L@howrey.com wrote:

> I take it from your email that you do not believe yourself to be in an
> ongoing consulting relationship with Ricoh. They have not listed you
> as a
> consultant in this case. If my assumption is correct, please send us
> an
> estimate of your costs.
>
> ——Original Message——
> From: Don Thomas [mailto:thomas@ece.cmu.edu]
> Sent: Monday, July 07, 2003 1:54 PM
> To: Campbell, Louis
> Cc: Don Thomas
> Subject: Re: Subpoena costs
>
>
> Dear Mr. Campbell,
>
> Thank you for the reply.
>
> I have not been contacted by Ricoh (Dickstein Shapiro...) for
> consultation since last summer. I spoke with them briefly on the phone
> this March, when you sent your original email to me. I told them I
> wouldn't be an expert witness for them during trial.
>
> They have not offered to serve as my counsel during the deposition, and
> I assume that they know that you subpoenaed me for documentation and
> deposition. Have they listed me as a consultant?
> –Don Thomas–
>
>
>
> On Monday, July 7, 2003, at 04:17 PM, Campbell, Louis wrote:
>
>> Dear Dr. Thomas:
>>
>> If you are no longer a consultant for Ricoh and Ricoh will not serve
>> as your
>> counsel during the deposition nor work with you prior to the
>> deposition, we

PTH000033

may be willing to pay your costs for copying documents and time spent
at the
depositions. If you are no longer working with Ricoh, please send us
an
estimate of the costs associated with the discovery we have requested.

On the other hand, if you are still in a consulting relationship with
Ricoh,
you should contact Ricoh about covering your costs.

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
Campbell_L@howrey.com

This communication is for the named recipient only and may contain
information that is privileged or confidential. If you are not the
intended
recipient please delete the document, destroy any hard copies, and
immediately notify the sender that you received this email in error.

PTH000034

From: Campbell_L@howrey.com
Date: Thu Jul 10, 2003 8:32:41 PM US/Eastern
To: thomas@ece.cmu.edu
Subject: RE: Subpoena costs

We will be sending you a check for $60 and pay your standard consulting rate for time at the deposition.

If you would be interested, we would be willing to pursue a consulting relationship.

-----Original Message-----
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Thursday, July 10, 2003 6:26 AM
To: Campbell, Louis
Subject: Re: Subpoena costs

On Tuesday, July 8, 2003, at 08:29 PM, Campbell, Louis wrote:

> Ok. Please send an estimate of your costs after you have terminated
> the
> agreement with Ricoh.

The agreement with Ricoh (through Dickstein Shapiro Morin & Oshinsky LLP) has been terminated.

You should be receiving the subpoenaed material this morning. I sent it a day early in case there were some questions. I leave for a week's vacation on Saturday.

As for copy charges, I figure there's at least 1000 pages times two sides times $.03. That would be $60. A check made out to "Carnegie Mellon University" for $60 and sent to me would find its way to our administrative support account.

The Fed-Ex was payed for by your charge number — thank you.

It is hard to estimate the costs for the deposition on July 31 as I don't know how long this might take. My recent charges for background consulting of this type have been at $250/hour. I think I can be of great help to the defense.
-Don-

PTH000041

From: "Campbell, Louis" <Campbell.@howrey.com>
Date: Thu Jul 10, 2003 12:47:23 PM US/Eastern
To: "Don Thomas" <thomas@ece.cmu.edu>
Subject: RE: Subpoena costs

My last email should have read: if you would be willing, we would be
interested in pursuing a consulting relationship with you. The prior
wording loses some of the desired enthusiasm.

——Original Message——
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Thursday, July 10, 2003 6:26 AM
To: Campbell, Louis
Subject: Re: Subpoena costs


On Tuesday, July 8, 2003, at 08:29  PM, Campbell, Louis wrote:

> Ok.  Please send an estimate of your costs after you have terminated
> the
> agreement with Ricoh.


The agreement with Ricoh (through Dickstein Shapiro Morin & Oshinsky
LLP ) has been terminated.

You should be receiving the subpoenaed material this morning.  I sent
it a day early in case there were some questions.  I leave for a week's
vacation on Saturday.

As for copy charges, I figure there's at least 1000 pages times two
sides times $.03.  That would be $60.  A check made out to "Carnegie
Mellon University" for $60 and sent to me would find its way to our
administrative support account.

The Fed-Ex was payed for by your charge number — thank you.

It is hard to estimate the costs for the deposition on July 31 as I
don't know how long this might take.  My recent charges for background
consulting of this type have been at $250/hour.  I think I can be of
great help to the defense.
  —Don—

PTH000042

From: "Campbell, Louis" <Campbell.L@howrey.com>
Date: Fri Jul 11, 2003 8:14:32 PM US/Eastern
To: "Don Thomas" <thomas@ece.cmu.edu>
Subject: RE: Subpoena costs

Great!  Let me know when you get back from your vacation and we will get
started.

——Original Message——
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Friday, July 11, 2003 6:11 AM
To: Campbell.L@howrey.com
Cc: Don Thomas
Subject: Re: Subpoena costs

Yes, I'd be interested in pursuing a consulting relationship (with
enthusiasm).  Thanks you for your consideration.
-Don Thomas-


On Thursday, July 10, 2003, at 08:03 PM, Campbell.L@howrey.com wrote:

We will be sending you a check for $60 and pay your standard
consulting rate
for time at the deposition.

If you would be interested, we would be willing to pursue a consulting
relationship.

——Original Message——
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Thursday, July 10, 2003 6:26 AM
To: Campbell, Louis
Subject: Re: Subpoena costs


On Tuesday, July 8, 2003, at 08:29 PM, Campbell, Louis wrote:

Ok.  Please send an estimate of your costs after you have terminated
the
agreement with Ricoh.


The agreement with Ricoh (through Dickstein Shapiro Morin & Oshinsky
LLP ) has been terminated.

You should be receiving the subpoenaed material this morning.  I sent
it a day early in case there were some questions.  I leave for a week's
vacation on Saturday.

As for copy charges, I figure there's at least 1000 pages times two
sides times $.03.  That would be $60.  A check made out to "Carnegie
Mellon University" for $60 and sent to me would find its way to our
administrative support account.

The Fed-Ex was payed for by your charge number – thank you.

It is hard to estimate the costs for the deposition on July 31 as I
don't know how long this might take.  My recent charges for background
consulting of this type have been at $250/hour.  I think I can be of
great help to the defense.
-Don-

PTH000043

From: bobbse@tenergy.com
Sent: Thu Jul 17, 2003  7:53:32 PM US/Eastern
To: thomas@sca.cmu.edu
Subject: 07-17-03 Cover letter and Engagement Letter

Dr. Thomas-

I work with Louis Campbell. Louis had me send you a cover letter and an engagement letter for your signature. I neglected to enclose a copy of the letter for you to sign and keep for your information and files. As such, please see the attachments to this e-mail. The original of each letter should arrive tomorrow via Federal Express Overnight. If you have any questions or concerns you can e-mail or call me at 989465-6132.

Thank you.

07.17.03 Campbell to D... (46.2 KB)  07.17.03 Campbell to D... (179 KB)

(Next Pages)

**PTH000044**



301 Ravenswood Avenue
Menlo Park, CA 34025-3434
Phone 550.463.3100
Fax 550.463.3400
A Limited Liability Partnership

Direct Dial 550.463.3135
File 06816.0060.000000

July 17, 2003

_VIA FEDERAL EXPRESS_

Donald E. Thomas, Ph.D.
ECE Department
Carnegie Mellon University
Pittsburgh, Pennsylvania 15213

Re:    Ricoh Co. v. Aeroflex, Inc., et al, Case No. 03-103-GMS.
       Our ref. # 06816.0060.000000

Dear Professor Thomas:

        I hope you had an enjoyable vacation.

        Enclosed with this letter is an engagement letter. Please sign and return the enclosed engagement letter and feel free to make a photocopy of it for your files. We will send a photocopy of the fully executed agreement to you, when we have obtained all the signatures on the engagement letter.

        Once we have a signed copy of this letter, we will notify Ricoh that you have entered into a consulting agreement with us and we will put the July 31, 2003 deposition on hold. So, it is imperative that you return the signed engagement letter as soon as you are able.

        Please feel free to call me directly at (650) 463-8135 if you have any questions or concerns.

                                    Very truly yours,

                                    _Louis Campbell_

                                    Louis Campbell

LC:wmh
Enclosure

PTH000045

BRUSSELS    CHICAGO    HOUSTON    IRVINE    LONDON    LOS ANGELES    MENLO PARK    SAN FRANCISCO    WASHINGTON, DC

**HOWREY** ATTORNEYS AT LAW

HOWREY SIMON ARNOLD & WHITE

301 Ravenswood Avenue
Menlo Park, CA 94025-3434
Phone 650.463.3100
Fax 650.463.3400
A Limited Liability Partnership

July 17, 2003

**_VIA FEDERAL EXPRESS_**

Donald E. Thomas, Ph.D.
ECE Department
Carnegie Mellon University
Pittsburgh, Pennsylvania 15213

Re:    Intellectual Property Dispute Involving Synopsys, Inc.

Dear Professor Thomas:

   As we previously discussed, Synopsys, Inc. has engaged us to represent them with respect to patent matters arising in connection with the assertion made by Ricoh Corp. that Synopsys's customers are practicing claims of U.S. patent number 4,922,432. Ricoh has made these allegations in connection with a lawsuit filed by Ricoh against several Synopsys customers in U.S. District Court for the District of Delaware.

   We are very pleased to confirm your engagement as an expert consultant in connection with this dispute on behalf of Synopsys, Inc. This letter will serve to describe the terms of your engagement and the professional services Howrey Simon Arnold & White LLP would like you to perform for us in connection with our legal representation of Synopsys in this matter.

   The scope of this work may include analyzing U.S. patent 4,922,432, evaluating claim construction, infringement, validity and enforceability issues regarding this patent, providing an explanation of historical issues surrounding prior art synthesis systems, analyzing specific prior art references and assisting us with the preparation of factual issues for presentation to the Court.

   Your work on this matter will be done in response to directions given by Howrey attorneys working on this case. If you are in doubt about what we have asked you to do at any time or whether any particular expenses are authorized, please contact us. Should the need arise for outside assistance or for the purchase of any item in connection with any assignment from us, please let us know in advance.

PTH000046

BRUSSELS    CHICAGO    HOUSTON    IRVINE    LONDON    LOS ANGELES    MENLO PARK    SAN FRANCISCO    WASHINGTON, DC



Donald E. Thomas, Ph.D.
July 17, 2003
Page 2

You will be paid at your standard hourly billing rate ($250/hour) for consulting services we authorize you to perform. You will be reimbursed for travel and other expenses related to this work for us. We expect the services to be performed by you alone or by persons working with you who you identify in advance to us and whom we approve.

Please submit your bills monthly, or at mutually convenient intervals, for services and disbursements to my attention at the address above.

This agreement will continue until terminated. This agreement may be terminated at will, upon written notice, by you or us, but such notice of termination will not prejudice your right to compensation for work performed or expenses incurred, if authorized prior to termination, or our right of receipt of work performed by you under the agreement.

The following obligations, however, will survive the termination of this agreement. It is understood and agreed that your work under this agreement is for us and is done at our direction as attorneys in aid of litigation, and that all activities performed by you under this agreement, including, but not limited to, all communications, whether written or oral, between you and any attorney or other employee of the firm, or between you and any Synopsys employee or agent, are confidential and privileged matters which you will maintain in confidence and secrecy and not reveal to any other person or use for any purpose other than in connection with this case, except as authorized by us or required by law. You will promptly inform us of any contact or communication regarding this case from any other person, including, but not limited to attorneys or representatives of Ricoh.

In addition, in connection with work on this case, you and anyone working with you, may be required to sign protective orders governing the treatment of confidential information of others.

You agree that during the time you are acting as our consultant on behalf of Synopsys, Inc. you will not act as a consultant for, or on behalf of, Ricoh or any Ricoh affiliate (more than 25% owned and controlled by Ricoh) and will agree not to give expert testimony adverse to Synopsys, Inc. We understand that you previously consulted for Ricoh's counsel regarding design synthesis technology of the 1980s. We will not ask you to disclose what information or opinions you supplied to Ricoh's counsel and you should not reveal any Ricoh confidential information that may have been supplied to you.

You are, of course, a professional independent contractor and not an employee or agent of this law firm, our clients or any of their affiliated

PTH000047



companies. This agreement is a personal services contract and may not be assigned or transferred in whole or in part by either party without prior written consent of the other party.

We look forward to working with you on this project. Please signify your agreement to the above terms by signing and dating a copy of this letter in the space provided below, and returning the signed copy to me.

Very truly yours,

*Louis Campbell*

Louis L. Campbell

LC:wmh

Seen and agreed to:

Dr. Donald E. Thomas                    Date: July 21, 2003

Seen and agreed to:
Synopsys Corporation

By_____                    Date: _____, 2003

PTH000048

From: Ben Thomas <bthomas@ece.cmu.edu>
Date: Wed Jul 23, 2003  8:51:36  AM US/Eastern
To: "Campbell, Lewis" <Campbell_L@howrey.com>
Subject: Phone message regarding consulting

I got your phone message and will call later this morning or today.  I'm in a meeting from about 10-1 today.  Let me know if there's a better time than others to call.  Or you could try me outside of these times (412-268-3545).

I didn't receive the letter that you mentioned.  However, I did get a rather abrupt phone call from a Mr. Hoffman yesterday regarding whether my consulting arrangement had been terminated.  I forwarded to him the email I had sent to Mr. Oliver regarding this.

Sounds like I may have stirred up a mess.
  --Ben Thomas--

PTH000049

From: Don Thomas <thomas@ece.cmu.edu>
Date: Wed Jul 23, 2003 8:22:18 AM US/Eastern
To: "Campbell, Louis" <Campbell.L@howrey.com>
Cc: Don Thomas <thomas@ece.cmu.edu>
Subject: Fwd: Phone message regarding consulting

I just received the fax of the letter to me.
–Don Thomas–


Begin forwarded message:

From: Don Thomas <thomas@ece.cmu.edu>
Date: Wed Jul 23, 2003 8:51:56 AM US/Eastern
To: "Campbell, Louis" <Campbell.L@howrey.com>
Subject: Phone message regarding consulting

I got your phone message and will call later this morning or today. I'm in a meeting from about 10–1 today. Let me know if there's a better time than others to call. Or you could try me outside of these times (412-268-3543).

I didn't receive the letter that you mentioned. However, I did get a rather abrupt phone call from a Mr. Hoffman yesterday regarding whether my consulting arrangement had been terminated. I forwarded to him the email I had sent to Mr. Oliver regarding this.

Sounds like I may have stirred up a mess.
–Don Thomas–

PTH000050

From: "Campbell, Louis" <Campbell.L@howrey.com>
Date: Wed Jul 23, 2003  4:27:02 PM US/Eastern
To: "thomas@ece.cmu.edu" <thomas@ece.cmu.edu>
Subject: review of documents

I just thought of a clarification about your review of the pdfs you
received.  I only want to know if they were published.  It is important that
you do not tell me any specifics about these pdfs such as title, author,
dates, etc.

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
Campbell.L@howrey.com

This communication is for the named recipient only and may contain
information that is privileged or confidential.  If you are not the intended
recipient please delete the document, destroy any hard copies, and
immediately notify the sender that you received this email in error.

PTH000051

From: Don Thomas <thomas@ece.cmu.edu>
Date: Thu Jul 24, 2003  8:58:11 AM US/Eastern
To: "Campbell, Louis" <Campbell.@howrey.com>
Cc: Don Thomas <thomas@ece.cmu.edu>
Subject: Re: review of documents

The documents I received from OSMO fall under the categories of:

* patents

* published articles, whether conference, journal, or thesis

* and one that appears to be a rough draft of corporate literature (includes sections like "company overview" and "XXX services and products").
  -Don Thomas-


On Wednesday, July 23, 2003, at 04:27 PM, Campbell, Louis wrote:

I just thought of a clarification about your review of the pdfs you
received.  I only want to know if they were published.  It is important that
you do not tell me any specifics about these pdfs such as title, author,
dates, etc.

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
Campbell.@howrey.com

This communication is for the named recipient only and may contain
information that is privileged or confidential.  If you are not the intended
recipient please delete the document, destroy any hard copies, and
immediately notify the sender that you received this email in error.


PTH000052

From: "Campbell, Louis" <Campbell.L@howrey.com>
Date: Thu Jul 24, 2003  12:23:46  PM US/Eastern
To: "Don Thomas" <thomas@ece.cmu.edu>
Subject: RE: review of documents

Thanks

-----Original Message-----
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Thursday, July 24, 2003 3:36 AM
To: Campbell, Louis
Cc: Don Thomas
Subject: Re: review of documents


The documents I received from OSMO fall under the categories of:

* patents

* published articles, whether conference, journal, or thesis

* and one that appears to be a rough draft of corporate literature
(includes sections like "company overview" and "XXX services and
products").
-Don Thomas-



On Wednesday, July 23, 2003, at 04:37  PM, Campbell, Louis wrote:

I just thought of a clarification about your review of the pdfs you
received.  I only want to know if they were published.  It is
important that
you do not tell me any specifics about these pdfs such as title,
author,
dates, etc.

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
Campbell.L@howrey.com


This communication is for the named recipient only and may contain
information that is privileged or confidential.  If you are not the
intended
recipient please delete the document, destroy any hard copies, and
immediately notify the sender that you received this email in error.

PTH000053

From: Don Thomas <dthomas@ecn.com.edu>
Date: Mon Jul 28, 2003  12:03:41 PM US/Eastern
To: "Campbell, Louis" <Campbell_L@howrey.com>
Subject: Deposition on July 31

Is the deposition still going to occur on July 31?
–Don Thomas–

PTH000054

From: Campbell.L@howrey.com
Date: Mon Jul 28, 2003  2:28:29  PM US/Eastern
To: thomas@ece.cmu.edu
Cc: KelleyC@howrey.com, hoffmanp@dsmo.com, mellmane@dsmo.com
Subject: Deposition on July 31

Dear Dr. Thomas:

     I received your email of today inquiring as to whether your deposition noticed for July 31st, would still proceed.

     Given your agreement to consult on behalf of defendants we have withdrawn the deposition date scheduled.  As you know, Ricoh, has asserted that you have a conflict of interest that would preclude you from consulting with defendants.  This is a question that may be resolved by the District Court in Delaware.  If the Court rules that you cannot consult with defendants we will re-schedule the deposition for a date of mutual convenience.  At that deposition we will seek testimony regarding the character of prior art logic synthesis systems and their relevance to the validity of Ricoh's patents.

Sincerely,

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025.
650-463-8133 (phone)
650-463-8400 (fax)
Campbell.L@howrey.com

PTH000055

From: Don Thomas <dthomas@sco.cmu.edu>
Date: Tue Jul 29, 2003  9:09:25 AM US/Eastern
To: kelly@howrey.com
Subject: Correspondence of 7/25

Dear Mr. Kelley,
I received your fax of 7/25 referring, on the cover sheet, to a correspondence of 7/25. I did not receive that correspondence. Please forward if appropriate.

~Don Thomas~

PTH000056

From: Don Thomas <dthomas@ece.cmu.edu>
Date: Thu Aug 7, 2003  3:04:22  PM US/Eastern
To: Campbell_J@surrey.com
Cc: Don Thomas <dthomas@ece.cmu.edu>
Subject: Ted Kowalski

Mr. Campbell,

I spoke with Ted (my former student who did the work on the Design Automation Assistant "DAA") about a month ago. As it turns out, he mentioned that he would be retiring from ATT. That might open him up for being a consultant. You might want to re-contact him.

--Don Thomas--

PTH000057

**EXHIBIT 4**

**The following pages are in response to item 5.**



8-14-03
DEPOSITION EXHIBIT
Thomas 4
Lisa Ann Bauer, CRR

**PTH000058**

## Weekly page

**Week 13**

### Donald Thomas

**Mar. 30, 2003**

**Days 89-93**

| | Mon. 31 | Tue. 1 | Wed. 2 | Thu. 3 | Fri. 4 |
|---|---|---|---|---|---|
| 7am | | | | | |
| 30 | | | | | |
| 8am | | | | | |
| 30 | | | | | |
| 9am | | | | | |
| 30 | | | | | |
| 10am | | | 10:00 am - 11:30 am ✓ Don Thomas Group Meeting, *Location*: HH 2114 | | |
| 30 | | 10:30 am - 12:00 pm ✓ 18 360, *Location*: PH A18C | | 10:30 am - 12:00 pm ✓ 18 360, *Location*: PH A18C | 10:30 am - 12:00 pm ✓ ... |
| 11am | | | | | |
| 30 | | | | | |
| 12pm | | | | | |
| 30 | | | | | |
| 1pm | | | | | |
| 30 | | | | | |
| 2pm | | | | | |
| 30 | | | | | |
| 3pm | | | | | |
| 30 | | | | | |
| 4pm | | | | | |
| 30 | | | | | |
| 5pm | | | | | |
| 30 | | | | | |
| 6pm | | | | | |
| 30 | | | | | |
| 7pm | | | | | |
| 30 | | | | | |
| 8pm | | | | | |
| 30 | | | | | |

**PTH000059**



**Weekly page**            **Donald Thomas**            **Apr. 6, 2003**

Week 14                                                                 Days 96–100

| | Mon. 7 | Tue. 8 | Wed. 9 | Thu. 10 | Fri. 11 |
|---|---|---|---|---|---|

Tue. 8: 10:30 am – 12:00 pm, 18-360. *Location:* PH A1SC.

Wed. 9: 10:00 am – 11:30 am, Don Thomas Group Meeting. *Location:* HH 2114.

Thu. 10: 10:30 am – 12:00 pm, 18-360. *Location:* PH A1SC.

Fri. 11: 10:30 am – 11:00 am

PTH000060



**Weekly page**                  **Donald Thomas**                **Apr. 13, 2003**

Week 15                                                                 Days 103–107

| | Mon. 14 | Tue. 15 | Wed. 16 | Thu. 17 | Fri. 18 |
|---|---|---|---|---|---|

Monday, Mon. 14: 9:00 am – 12:00 pm — Bill Dougherty Thesis. Location: HB D210

Tuesday, Tue. 15: 10:30 am – 12:00 pm — 18-360. Location: PH A18C.

Wednesday, Wed. 16: 10:00 am – 11:30 am — Don Thomas Group Meeting. Location: HH 2114.

Thursday, Thu. 17: 10:30 am – 12:00 pm — 18-360. Location: PH A18C.

Thursday, Thu. 17: 4:30 pm – 5:00 pm

**PTH000061**

**Weekly page**

Week 16

## Donald Thomas

**Apr. 20, 2003**

Days 110-114

| | Mon. 21 | Tue. 22 | Wed. 23 | Thu. 24 | Fri. 25 |
|---|---|---|---|---|---|
| 7am | | | | | |
| 30 | | | | | |
| 8am | | | | | |
| 30 | | | | | |
| 9am | | | | | |
| 30 | | | | | |
| 10am | 10:00 - 12:30 pm ☑ Qual - Vikas Chandra. Location: HH B206, Don is Chairman. | | 10:00 am - 11:30 am ☑ Don Thomas Group Meeting. Location: HH 2114. | | |
| 30 | | 10:30 am - 12:00 pm ☑ 18-360. Location: PH A18C. | | 10:30 - 12:00 pm ☑ 18-360. Location: PH A18C. | |
| 11am | | | | | |
| 30 | | | | | |
| 12pm | | | | | |
| 30 | | | | | |
| 1pm | | | | | |
| 30 | | | | 1:30 pm - 4:00 pm ☑ Zhong Xiu Qual. Location: HH B206. | |
| 2pm | 2:00 pm - 3:00 pm ☑ Special Faculty Appointments Mtg. | | | | |
| 30 | | | | | |
| 3pm | | | | | |
| 30 | | | | | |
| 4pm | | | | | |
| 30 | | | | | |
| 5pm | | | | | |
| 30 | | | | | |
| 6pm | | | | | |
| 30 | | | | | |
| 7pm | | | | | |
| 30 | | | | | |
| 8pm | | | | | |
| 30 | | | | | |
| | ☞ Noppanunt Utamaphethai Defense TENTATIVE. | | | | |

**PTH000062**

**Weekly page**                      **Donald Thomas**                      **Apr. 27, 2003**

Week 17                                                                    Days 117-121

| | Mon. 28 | Tue. 29 | Wed. 30 | Thu. 1 | Fri. 2 |
|---|---|---|---|---|---|
| 7am | | | | | |
| 30 | | | | | |
| 8am | | | | | |
| 30 | | | | | 9:30 am - 4:00 pm ⚙ |
| 9am | | | | | GM Lab Meeting - Carnegie |
| 30 | | | | | RM & Holiday Inn Select. |
| 10am | | | 10:00 am - 11:30 am ⚙ | | |
| 30 | 10:00 am - 12:00 pm ⚙ | | Don Thomas Group | | |
| | Dong Wang Thesis. | 10:30 am - 12:00 pm ⚙ | Meeting. *Location:* HH | 10:30 am - 12:00 pm ⚙ | |
| 11am | *Location:* ???? | 18-360. *Location:* PH A18C. | 2114. | 18-360 - 3rd Exam. | |
| 30 | | | | *Location:* PH A18C. | |
| 12pm | | | | | |
| 30 | | | | | |
| 1pm | | | | 12:30 pm - 2:00 pm ⚙ | |
| 30 | | | | lunch w Wayne Wolf. | |
| 2pm | | | | | |
| 30 | | | | | |
| 3pm | | | | | |
| 30 | | | | | |
| 4pm | | | | | |
| 30 | | | | | |
| 5pm | | | | | |
| 30 | | | | | |
| 6pm | | | | | |
| 30 | | | | | |
| 7pm | | | | | |
| 30 | | | | | |
| 8pm | | | | | |
| 30 | | | | ✈ Wayne Wolf Visit. | |

**PTH000063**

## Weekly page
**Week 18**

**Donald Thomas**

**May. 4, 2003**
**Days 124-128**

| | Mon. 5 | Tue. 6 | Wed. 7 | Thu. 8 | Fri. 9 |
|---|---|---|---|---|---|
| 7am | | | | | |
| 30 | | | | | |
| 8am | | | | | |
| 30 | | | | | |
| 9am | | | 9:00 am - 4:00 pm ⏱ Sr. Faculty Meeting. *Location:* Holiday Inn Select - Oakland. | | |
| 30 | | | | | |
| 10am | | | | 10:00 am - 11:30 am ⏱ Don Thomas Group | 10:00 am - 10:30 am ⏱ | |
| 30 | | | | | |
| 11am | | | | | |
| 30 | | | | | |
| 12pm | | | | | 12:00 pm - 2:00 pm ⏱ Review Papers RM RH 351. |
| 30 | | | | | |
| 1pm | | | | | |
| 30 | | | | | |
| 2pm | | | | 2:00 pm - 4:00 pm ⏱ Review Papers RM RH 351. | |
| 30 | | | | | |
| 3pm | | | | | |
| 30 | | | | | |
| 4pm | 4:00 pm - 5:30 pm ⏱ NAE new member party for R. Bryant. *Location:* Newell-Simon Hall Atrium. | | | | |
| 30 | | | | | |
| 5pm | | | | | |
| 30 | | | | | |
| 6pm | | | | | |
| 30 | | | | | |
| 7pm | | | | | |
| 30 | | | | | |
| 8pm | | | | | |
| 30 | | | | | |
| | | | ☎ Senior Faculty Meeting Time/Room? | | |

Steltor

PTH000064

RECEIVED TIME   OCT. 29.   9:35AM



**Weekly page**

**Donald Thomas**

**May. 11, 2003**

Week 19

Days 131-135

| | Mon. 12 | Tue. 13 | Wed. 14 | Thu. 15 | Fri. 16 |
|---|---|---|---|---|---|
| 7am | | | | | |
| 30 | | | | | |
| 8am | | | | | |
| 30 | | | | | |
| 9am | 9:00 am - 12:00 pm | 9:00 am - 3:00 pm | | | |
| 30 | Hei Xu Thesis proposal. | Checking Final Exam 2114 | | | |
| | Location: ????? | 9-11:30am & | | | |
| 10am | | | 10:00 am - 11:30 am | | |
| 30 | | | Don Thomas Group | | |
| 11am | | | Meeting. Location: HH | | |
| 30 | | | 2114. | | |
| 12pm | | | | | |
| 30 | | | | | |
| 1pm | 1:00 pm - 4:30 pm    18- | | | | |
| 30 | 360 Final Exam - HH | | | | |
| | B103 | | | | |
| 2pm | | | 2:00 pm - 2:30 pm | | |
| 30 | | | | | |
| 3pm | | | | | |
| 30 | | | | | |
| 4pm | | | | | |
| 30 | | | | | |
| 5pm | | | | | |
| 30 | | | | | |
| 6pm | | | | | |
| 30 | | | | | |
| 7pm | | | | | |
| 30 | | | | | |
| 8pm | | | | | |
| 30 | | | | | |

PTH000065

RECEIVED TIME    OCT. 29.    9:35AM

## Weekly page

**Donald Thomas**

**May. 18, 2003**

Week 20

Days 138-142

| | Mon. 19 | Tue. 20 | Wed. 21 | Thu. 22 | Fri. 23 |
|---|---|---|---|---|---|
| 7am | | | | | |
| 30 | | | 7:30 am - 10:00 am ⊘ Jury Duty. | | |
| 8am | | | | | |
| 30 | | | | | |
| 9am | | | | | |
| 30 | | | | | 9:30 am - 10:30 am ⊘ Teleconference 'ACM SigBED |
| 10am | | | | | |
| 30 | | 10:30 am - 11:00 am ⊘ | 10:30 am - 12:00 pm ⊘ Don Thomas Group Meeting. *Location:* HH 2114. | | |
| 11am | | | | | |
| 30 | | | | | |
| 12pm | | | | | |
| 30 | | | | | |
| 1pm | | | | | |
| 30 | | | | | |
| 2pm | | 2:00 pm - 3:00 pm ⊘ Meeting in HH2114 | 2:00 pm - 2:30 pm ⊘ | | |
| 30 | | | | | |
| 3pm | | | | | |
| 30 | | | | | |
| 4pm | | | | | |
| 30 | | | | | |
| 5pm | | | | | |
| 30 | | | | | |
| 6pm | | | | | |
| 30 | | | | | |
| 7pm | | | | | |
| 30 | | | | | |
| 8pm | | | | | |
| 30 | | | | | |

PTH000066

RECEIVED TIME OCT. 29. 9:35AM



**Weekly page**                     **Donald Thomas**                  **May. 25, 2003**

Week 21                                                               Days 145-149

| | Mon. 26 | Tue. 27 | Wed. 28 | Thu. 29 | Fri. 30 |
|---|---|---|---|---|---|
| 7am | | | | | |
| 8am | | | | | |
| 9am | | | | | |
| 10am | | | | | |
| 11am | | 10:30 am - 11:00 am | 10:30 am - 12:00 pm Don Thomas Group Mtg. HH 2114. | | |
| 12pm | | | | | |
| 1pm | | | | | |
| 2pm | | | 2:00 pm - 2:30 pm / 2:30 pm - 3:00 pm | | |
| 3pm | | 2:45 pm - 4:15 pm eye appointment. | | | |
| 4pm | | | | | |
| 5pm | | | | | |
| 6pm | | | | | |
| 7pm | | | | | |
| 8pm | | | | | |
| | Memorial Day. | | | | |



**Weekly page**    **Donald Thomas**    Jun. 1, 2003

Week 22    Days 152-156

| | Mon. 2 | Tue. 3 | Wed. 4 | Thu. 5 | Fri. 6 |
|---|---|---|---|---|---|
| 7am | | | | | |
| 8am | | | | | |
| 9am | | | | | |
| 10am | | 10:30 am - 11:00 am | 10:30 am - 12:00 pm Don Thomas Group Mtg. BH 2114. | | |
| 11am | | | | | |
| 12pm | | | | | |
| 1pm | | | | | |
| 2pm | | | 2:00 pm - 2:30 pm | | |
| 3pm | | | | | |
| 4pm | | | | | |
| 5pm | | | | | |
| 6pm | | 6:00 pm - 9:30 pm Friends Reception Anaheim Mararrett Hotel. Orange Cty Ballroom. | | | |
| 7pm | | | | | |
| 8pm | | | | | |
| | ⚲ DAC Conference. | ⚲ DAC Conference. | ⚲ DAC Conference. | ⚲ DAC Conference. | ⚲ DAC Conference. |

PTH000068

**Weekly page**

**Donald Thomas**

**Jun. 8, 2003**

Week 23

Days 159-163



PTH000069

## Weekly page

**Week 24**

**Donald Thomas**

**Jun. 15, 2003**

**Days 166-170**

| | Mon. 16 | Tue. 17 | Wed. 18 | Thu. 19 | Fri. 20 |
|---|---|---|---|---|---|
| 7am | | | | | |
| 30 | | | | | |
| 8am | | 8:00 am - 9:00 am ✆ mt. w/ Indira Nair. *Location:* Wean Hall 609. | | | |
| 30 | | | | | |
| 9am | | | | | |
| 30 | | | | | |
| 10am | 10:00 am - 11:00 am ✆ IBM Conf. Call 877-931-1098 Passcode 174044. | | | | |
| 30 | | 10:30 am - 11:00 am ✆ | 10:30 am - 12:00 pm ✆ Don Thomas Group Mtg. HH 2114 | | |
| 11am | | | | | |
| 30 | | | | | |
| 12pm | | | | | |
| 30 | | | | | |
| 1pm | | 1:00 pm - 4:00 pm ✆ Noppenant Utamaphath [. *Location:* HH 1112. | | | |
| 30 | | | | | |
| 2pm | | | 2:00 pm - 2:30 pm ✆ | | 2:00 pm - 3:30 pm ✆ 540, 760, etc. Curriculum Meeting. *Location:* HH |
| 30 | | | | | |
| 3pm | | | | | |
| 30 | | | | | |
| 4pm | | | | | |
| 30 | | | | | |
| 5pm | | | | | |
| 30 | | | | | |
| 6pm | | | | | |
| 30 | | | | | |
| 7pm | | | | | |
| 30 | | | | | |
| 8pm | | | | | |
| 30 | | | | | |

PTH000070

**Weekly page**                    **Donald Thomas**              **Jun. 22, 2003**

Week 25                                                           Days 173-177

| | Mon. 23 | Tue. 24 | Wed. 25 | Thu. 26 | Fri. 27 |
|---|---|---|---|---|---|
| 7am | | | | | |
| 30 | | | | | |
| 8am | | | | | |
| 30 | | | | | |
| 9am | | | | | |
| 30 | | | | | |
| 10am | | | | | |
| 30 | | 10:30 am - 11:00 am ☉ | 10:30 am - 12:00 pm ☉ Don Thomas Group Mtg HH 2114 | | |
| 11am | | | | | |
| 30 | | | | | |
| 12pm | | | | | |
| 30 | | | | | |
| 1pm | | | | | |
| 30 | | | | | |
| 2pm | | | 2:00 pm - 2:30 pm ☉ | | |
| 30 | | | | | |
| 3pm | | | | | |
| 30 | | | | | |
| 4pm | | | | | |
| 30 | | | | | |
| 5pm | | | | | |
| 30 | | | | | |
| 6pm | | | | | |
| 30 | | | | | |
| 7pm | | | | | |
| 30 | | | | | |
| 8pm | | | | | |
| 30 | | | | | |
| | | | | | ✈ Jaci 1/2 Day PTO. Leaving @ noon. |

Sinlour                    Printed for Jacqueline Claudin (Aug. 11, 2003 @ 9:18 am)              page 4

**PTH000071**



**Weekly page**                    **Donald Thomas**                    **Jun. 29, 2003**

Week 26                                                                 Days 180-184

|        | Mon. 30 | Tue. 1 | Wed. 2 | Thu. 3 | Fri. 4 |
|--------|---------|--------|--------|--------|--------|
| 7am    |         |        |        |        |        |
| 30     |         |        |        |        |        |
| 8am    |         |        |        |        |        |
| 30     |         |        |        |        |        |
| 9am    |         |        |        |        |        |
| 30     |         |        |        |        |        |
| 10am   |         |        |        |        |        |
| 30     |         | 10:30 am – 11:00 am | 10:30 am – 12:00 pm Don Thomas Group Mtg. DH 2114 |        |        |
| 11am   |         |        |        |        |        |
| 30     |         |        |        |        |        |
| 12pm   |         |        |        |        |        |
| 30     |         |        |        |        |        |
| 1pm    |         |        |        |        |        |
| 30     |         |        |        |        |        |
| 2pm    |         |        | 2:00 pm – 2:30 pm |        |        |
| 30     |         |        |        |        |        |
| 3pm    |         |        |        |        |        |
| 30     |         |        |        |        |        |
| 4pm    |         |        |        |        |        |
| 30     |         |        |        |        |        |
| 5pm    |         |        |        |        |        |
| 30     |         |        |        |        |        |
| 6pm    |         |        |        |        |        |
| 30     |         |        |        |        |        |
| 7pm    |         |        |        |        |        |
| 30     |         |        |        |        |        |
| 8pm    |         |        |        |        |        |
| 30     |         |        |        |        | Independence Day. |

PTH000072



**Weekly page**
Week 27

**Donald Thomas**

Jul. 6, 2003
Days 187-191

| | Mon. 7 | Tue. 8 | Wed. 9 | Thu. 10 | Fri. 11 |
|---|---|---|---|---|---|
| 7am | | | | 7:00 am - 8:30 am ◷ Send Subpoened INFO to Lawyers. | |
| 30 | | | | | |
| 8am | | | | | |
| 30 | | | | | |
| 9am | | | | | |
| 30 | | 9:30 am - 10:30 am ◷ mt. w/ ladic. | | | |
| 10am | | | | | |
| 30 | 10:30 am - 11:30 am ◷ Mt w. Ed Schlesinger, Location Rh 1109. | 10:30 am - 11:00 am ◷ | 10:30 am - 12:00 pm ◷ Don Thomas Group Mtg. HH 2114 | | |
| 11am | | | | | |
| 30 | | | | | |
| 12pm | | | | | |
| 30 | | | | | |
| 1pm | | | | | |
| 30 | | | | | |
| 2pm | | | | | |
| 30 | | | 2:00 pm - 2:30 pm ◷ | | |
| 3pm | | | | | |
| 30 | | | 3:00 pm - 4:00 pm ✕ one - one w. Pradeep BEING RESCHEDULED. | | |
| 4pm | | | | | |
| 30 | | | | | |
| 5pm | | | | | |
| 30 | | | | | |
| 6pm | | | | | |
| 30 | | | | | |
| 7pm | | | | | |
| 30 | | | | | |
| 8pm | | | | | |
| 30 | | | | | |

**PTH000073**

RECEIVED TIME OCT. 29. 9:35AM

**Weekly page**                     **Donald Thomas**                    Jul. 13, 2003
Week 29                                                                  Days 194-198

| | Mon. 14 | Tue. 15 | Wed. 16 | Thu. 17 | Fri. 18 |
|---|---|---|---|---|---|
| 7am | | | | | |
| 30 | | | | | |
| 8am | | | | | 8:00 am - 9:00 am  ⊘   Dr. |
| 30 | | | | | Alix |
| 9am | | | | | |
| 30 | | | | | |
| 10am | | | | | |
| 30 | | 10:30 am - 11:00 am ⊘ | 10:30 am - 12:00 pm ⊘ | | |
| 11am | | | Don Thomas Group Mtg HH 2114 | | |
| 30 | | | | | |
| 12pm | | | | | |
| 30 | | | | | |
| 1pm | | | | | |
| 30 | | | | | |
| 2pm | | | | | |
| 30 | | | 2:00 pm - 2:30 pm ⊘ | | |
| 3pm | | | | | |
| 30 | | | | | |
| 4pm | | | | | |
| 30 | | | | | |
| 5pm | | | | | |
| 30 | | | | | |
| 6pm | | | | | |
| 30 | | | | | |
| 7pm | | | | | |
| 30 | | | | | |
| 8pm | | | | | |
| 30 | | | | | |

PTH000074

**Weekly page**

Week 30

**Donald Thomas**

**Jul. 27, 2003**

Days 208-212

| | Mon. 28 | Tue. 29 | Wed. 30 | Thu. 31 | Fri. 1 |
|---|---|---|---|---|---|
| 7am | | | | | |
| 30 | | | | | |
| 8am | | | | | |
| 30 | | | | 8:30 am - 11:00 am ☑ | |
| 9am | | | | ARF Court Reporting | |
| 30 | | | | CANCELLED. *Location:* | |
| 10am | | | | 436 Blvd. of the Allies | |
| 30 | | 10:30 am - 11:00 am ☑ | 10:30 am - 12:00 pm ☑ | | |
| 11am | | | Don Thomas Group Mtg. | | |
| 30 | | | BH 2114. | | |
| 12pm | | | | | |
| 30 | | | | | |
| 1pm | | | | | |
| 30 | | | | | |
| 2pm | | | 2:00 pm - 2:30 pm ☑ | | |
| 30 | | | 2:30 pm - 3:00 pm ☑ | | |
| 3pm | | | | | |
| 30 | | | | | |
| 4pm | | | | | |
| 30 | | | | | |
| 5pm | | | | | |
| 30 | | | | | |
| 6pm | | | | | |
| 30 | | | | | |
| 7pm | | | | | |
| 30 | | | | | |
| 8pm | | | | | |
| 30 | | | | | |

PTH000076

**Weekly page**          **Donald Thomas**          **Aug. 3, 2003**

Week 31                                                               Days 215-219

| | Mon. 4 | Tue. 5 | Wed. 6 | Thu. 7 | Fri. 8 |
|---|---|---|---|---|---|
| 7am | | | | | |
| 8am | | | | | |
| 9am | 8:30 am - 5:00 pm<br>GM CMU Collaborative<br>Lab Meeting<br>Location: ???? | | | | |
| 10am | | | | | |
| 11am | | 10:30 am - 11:00 am | 10:30 am - 12:00 pm<br>Don Thomas Group Mtg.<br>HH-2114. | | |
| 12pm | | | | | |
| 1pm | | | | | |
| 2pm | | | 2:00 pm - 2:30 pm | | |
| 3pm | | | 2:30 pm - 3:00 pm | | |
| 4pm | | | | | |
| 5pm | | | | | |
| 6pm | | | | | |
| 7pm | | | | | |
| 8pm | | | | Jaci PTO. | |

Stelter                   Printed for Jacqueline Chraska (Aug. 11, 2003 @ 9:18 am)               page 10

PTH000077

**EXHIBIT 5**

Item 9: I do not have phone records for the dates listed.

On or about 7-23-2003: I spoke with Mr. Louis Campbell of Howrey. The call was in regards to the letter sent by Mr. Gary Hoffman. Mr. Campbell wanted to know the nature of the material I received from DMSO, i.e., was there anything confidential in it. Responses are seen in the emails of that time.



PTH000078

**EXHIBIT 6**

This is the response to a subpoena in Case Number 03-0183-GAS.

Ricoh Company, Ltd., Plaintiff
Mr. Michael A. Weinstein, DNSO, Attorney for Plaintiff

Delivered to Buckler and Associates
429 4th Ave. Suite 1805
Pgh, PA 15219

From: Dr. Donald E. Thomas
Carnegie Mellon University
5000 Forbes Ave. ECE Dept
Pgh, PA 15213

Date: 8-11-2003

Dear Mr. Weinstein
Enclosed please find the material subpoenaed. The comments on this page support the information there.

General comments:
I do not keep phone logs of calls made or received. So the responses to items requesting such information is as best I can remember.

Comments on:

Item 1:
I have printed a copy of the email that I have had to/from Howrey. It starts with two that are with DNSO; these are included to set the stage. It also includes a letter dated July 17, 2003. To the best of my knowledge, these are all of the communications or interchange of documents that I have had, outside of DNSO, with anyone regarding the '432 patent.

Items 2, 3, 4: See item 1.

Item 5: There are no meetings on the weekly calendar kept for me regarding the '432 patent. Weekly calendar information is attached for late March through August 8, 2003. These dates correspond to the dates during which I had contact with Howrey. There were no other meetings regarding the '432 patent before that.

Item 6: There are no documents regarding the '432 patent concerning Design Compiler or any other product or tool of Synopsys. Note that I have used these tools in my research and courses I teach from time to time. However, none of this regards the '432 patent.

Item 7: There are no documents regarding the '432 patent concerning ASIC design systems or methods. Note that my research is in this field and I also teach classes in this field. However, none of this regards the '432 patent.

Item 8: None.

Item 9: I do not have phone records for the dates listed. However, I spoke with Mr. Louis Campbell on (or about) July 29, 2003. The call was in regards to the letter sent by Mr. Gary Hoffman. Mr. Campbell wanted to know the nature of the material I received from DNSO, i.e., was there anything confidential in it. Responses are seen in the emails of that time.

Submitted by:

Donald E. Thomas



8/14/03
DEPOSITION EXHIBIT
Thomas 6
Ellen Ann Bauer, CRR

PTH000001

**EXHIBIT 7**

From:     Campbell, Louis
Sent:     Tuesday, May 06, 2003 2:41 PM
To:       'Don Thomas'
Subject:  RE: Ted Kowalski's contact information

Thanks.  We have already contacted Alice Parker on our own initiative and
it looks like she will be able to help us.  It's good to know that she
comes recommended from you as well.

-----Original Message-----
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Tuesday, May 06, 2003 12:44 PM
To: CampbellL@howrey.com
Subject: Re: Ted Kowalski's contact information

Ted and I spoke and it appears that you were able to be in touch with
him, and that he said no.

The other person that comes to mind is Prof Alice Parker at USC.

mailto:Alice Parker <parker@eve.usc.edu>

Even though she didn't participate in Ted's work, she was in the
synthesis research area at the time and certainly understands how the
tools work.

Hope this helps.
-Don Thomas-


On Thursday, May 1, 2003, at 01:15  PM, CampbellL@howrey.com wrote:

> Dear Dr. Thomas:
>
> I'm trying to contact Ted Kowalski.  Do you have any contact
> information for
> him?
>
> Thanks for your help,
>
> Louis L. Campbell
>
> Howrey Simon Arnold & White, LLP
> 301 Ravenswood Avenue
> Menlo Park, CA 94025
> 650-463-8135 (phone)
> 650-463-8400 (fax)
> CampbellL@howrey.com
>
> This communication is for the named recipient only and may contain



> information that is privileged, confidential and exempt from disclosure
> under applicable law. If you are not the intended recipient or the
> employee
> or agent responsible for delivering this communication to the intended
> recipient, you are hereby notified that any unauthorized use,
> dissemination,
> distribution or copying of this communication is strictly prohibited.
> If
> you are not the intended recipient, please delete the document without
> opening any attachments, destroy any hard copies you may have printed
> and
> immediately notify Howrey Simon Arnold & White that you received this
> e-mail
> in error.

07-31 ORDER
23

**EXHIBIT 8**

AO 88 (Rev. 11/54) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT

__WESTERN__ DISTRICT OF __PENNSYVANIA__

RICOH COMPANY, LTD.

## SUBPOENA IN A CIVIL CASE

v.

AEROFLEX INCORPORATED, et al.

Case Number: 03-103-GMS

TO: Donald Thomas, Ph.D.
Carnegie Mellon, ECE Department
Pittsburgh, PA 15213

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| AKF Court Reporting and Videotech Services, Inc., 436 Boulevard Of The Allies, Pittsburgh, PA 15219 | July 31, 2003 9:00 a.m. |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

SEE ATTACHMENT A

| PLACE | DATE AND TIME |
|---|---|
| HOWREY SIMON ARNOLD & WHITE, LLP 301 Ravenswood Avenue Menlo Park, CA 94025 | July 11, 2003 5:00 p.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| YOOTS CAMPBELL, ESQ.: ATTORNEY FOR DEFENDANT | JUNE 25, 2003 |

ISSUING OFFICER'S NAME, ADDRESS AND TELEPHONE NUMBER
HOWREY SIMON ARNOLD & WHITE, LLP      (650) 463-8100
301 Ravenswood Avenue, Menlo Park, CA 94025

(See Rule 45, Federal Rules of Civil Procedure, parts C & D on reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

AO-88

8/14/03
DEPOSITION EXHIBIT
Thomas 8
Lisa Ann Bauer, CRR

AO 88 (Rev. 11/99) Subpoena in a Civil Case

## PROOF OF SERVICE

| DATE | PLACE |
|------|-------|
| | |

SERVED

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|------------------------|-------------------|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|------------------------|-------|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                    DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to

the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or the commanding party to contest the claim.

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## ATTACHMENT A

## DEFINITIONS

1.  The term "DAA" means the VLSI Design Automation Assistant system described, in part, in the article, "The VLSI Design Automation Assistant: An IBM System / 370 Design," found in the February 1984 edition of IEEE Design & Test of Computers from pages 60-69 (attached to this subpoena as exhibit A).

2.  The term "SAW" means the System Architect's Workbench system described, in part, in the article, "The System Architect's Workbench," found in the Proceedings of the 25th Design Automation Conference from page 337-343 (attached to this subpoena as exhibit B).

3.  The term "document" means any writing or other tangible thing from which data or information can be obtained (translated if necessary through detection devices into reasonably usable form), and which is known to you, or in your custody, possession, or control, whether printed, recorded, reproduced by any process, or written or produced by hand, whether or not claimed to be privileged or exempt from production for any reason. Set forth below is a list of examples of writings and tangible things which are included within this definition. The list is not an exclusive definition of the writings and tangible things included within this definition, but is intended to aid you in answering the document requests that follow. Examples of writings and tangible things included within this definition of document are as follows:

> Documents: letters, tape recordings, reports, agreements, communications including intercompany communications, correspondence, telegrams, memoranda, summaries, forecasts, photographs, models, statistical statements, graphs, laboratory and engineering reports and notebooks, charts, plans drawings, minutes or records of meetings including directors' meetings minutes or records of conferences, expressions or statements of policy, lists of persons attending meetings or conferences, customer lists, reports and/or summaries of interviews, reports and/or summaries of investigations, opinions or reports of consultants, appraisals, records, reports or summaries of negotiations, brochures,

- 3 -

pamphlets, advertisements, circulars, trade letters, press releases, drafts of any documents, revisions of drafts of any documents, canceled checks, bank statements, invoices, receipts and originals of promissory notes, surveys, computer printouts, computer disks and storage.

In addition to the items on the foregoing list, any comment or notation appearing on any of the documents described above, and not a part of the original text, is considered a separate document and any draft or preliminary form of any document is also considered a separate document.

4. The term "documents relating to" means documents discussing, containing, showing, evidencing or referring to in any way, either directly or indirectly, and is meant to include among other documents, documents underlying, supporting now or previously attached or appended to, or used in the preparation of any documents called for by each request.

5. The words "communication" or "communications" are used in the broadest possible sense and mean, without limitation, any transmittal and receipt of information, whether such was by chance, prearranged, formal or informal, and specifically include conversations in person, conversations by telephone, telegrams, letters or memoranda, formal statements, press releases and newspaper articles.

6. The terms "party" or "person" shall mean any natural person, sole proprietorship, partnership, limited partnership, corporation, joint venture, trust, association, or other entity as well as all current and former officers, directors, agents, salespeople, representatives, employees, attorneys, and others acting or purporting to act on behalf of such party or person.

7. The word "identify" when used with respect to a person shall mean to state for each person: name, last known business and residence address and telephone numbers; job title(s) and dates of association with the designated company; last known employer; and, where appropriate to the extent of the interrogatory, the basis for such person's knowledge and the years for which such person is believed to have knowledge.

- 4 -

8.  The terms "relate," "relating," or "relating to" include referring to, alluding to, or responding to, concerning, connected with, commenting on, regarding, discussing, showing, describing, reflecting, analyzing, constituting, including, mentioning, in respect of, about, or in any way logically or factually connected with the matter described in the Interrogatory.

9.  The terms "and" and "or" shall be given such meaning as to bring the greatest scope to the request in question and shall not be given a meaning that would exclude information from a Interrogatory.

## INSTRUCTIONS

1.  Any recipient of this set of Requests who withholds any documents covered by this set of Requests by reason of a claim of privilege, or who objects to any part of any request for production, shall furnish to Synopsys a list identifying each such document for which the privilege is claimed or to which the objection relates, together with the following information:

(a)  The reason(s) for each objection or claim of privilege;

(b)  The identity of each person having knowledge of the actual basis, if any, on which the privilege or other ground for objection is based;

(c)  The exact name and title of the document;

(d)  The date of, and all serial or identification numbers appearing on the document;

(e)  The identity of each person wrote, signed, initiated, dictated, or otherwise participated in the creation of the document;

(f)  The general subject matter of the document;

(g)  The identity of each person who was an addressee of and/or who received the document or a copy thereof;

(h)  The identity of each person having custody or control of the document or a copy thereof;

(i)  The specific location of any file or files where the document, or any copy thereof, is normally or presently kept, and the identity of the custodian thereof;

(j)  The paragraph of this Request to which the document relates; and

(k)  In the case of any withheld document relates in any way to a meeting or to any other conversation, all participants in the meeting or conversation are to be identified.

2.  In the event that any document called for by this set of Requests is known to have been destroyed (either as a result of a document destruction policy or otherwise), those documents or class of documents are to be identified as follows: addressor, addressee, indicated or blind copies, date, subject matter, number of pages, attachments or appendices, all person to whom distributed, shown, or explained, date of destruction, persons authorizing destruction, and persons destroying the document.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

Documents related to the conception, design and development of the DAA system, including articles, presentations, manuals, design notes, patents and copies of the source code for the DAA system.

### REQUEST FOR PRODUCTION NO. 2:

Research notes, notebooks, or other documents containing the work records of persons involved in the development of the DAA system, including Donald Thomas and his collaborators.

### REQUEST FOR PRODUCTION NO. 3:

Documents referring to or describing the incorporation of the algorithms or technology of the DAA system, in whole or in part, in any other design synthesis system or other piece of software.

### REQUEST FOR PRODUCTION NO. 4:

Documents, if any, describing or referring to the use of the DAA software in the design of electrical systems or devices (whether those systems or devices were fabricated or not) including documents sufficient to establish the first dates of use of the DAA software.

## REQUEST FOR PRODUCTION NO. 5:

Documents related to the conception, design and development of the SAW system, including articles, presentations, manuals, design notes, patents and copies of the source code for the SAW system.

## REQUEST FOR PRODUCTION NO. 6:

Research notes, notebooks, or other documents containing the work records of persons involved in the development of the SAW system, including Donald Thomas and his collaborators.

## REQUEST FOR PRODUCTION NO. 7:

Documents referring to or describing the incorporation of the algorithms or technology of the SAW system, in whole or in part, in any other design synthesis system or other piece of software.

## REQUEST FOR PRODUCTION NO. 8:

Documents, if any, describing or referring to the use of the SAW software in design of electrical devices or systems (whether those devices or systems were fabricated or not) including documents sufficient to establish the first dates of use of the SAW software.

-7-

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| RICOH COMPANY, LTD., | ) | **Civil Action No. 03-103-GMS** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AEROFLEX INCORPORATED, AMI | ) | |
| SEMICONDUCTOR, INC., MATROX | ) | |
| ELECTRONIC SYSTEMS, LTD., MATROX | ) | |
| GRAPHICS INC., MATROX | ) | |
| INTERNATIONAL CORP. and MATROX | ) | |
| TECH, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF SUBPOENA FOR DOCUMENTS AND NOTICE OF DEPOSITION OF DONALD THOMAS, Ph.D. PURSUANT TO FED. R. CIV. P. 45

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

YOU ARE HEREBY NOTIFIED that, pursuant to Federal Rules of Civil Procedure 45, defendants AEROFLEX INCORPORATED, AMI SEMICONDUCTOR, INC., MATROX ELECTRONIC SYSTEMS, LTD., MATROX GRAPHICS INC., MATROX INTERNATIONAL CORP. and MATROX TECH, INC. ("Defendants") have served Donald Thomas, Ph.D. the attached subpoena for production of documents and deposition testimony.

Donald Thomas, Ph.D. is required to produce the documents in his custody, possession, or control specified in Attachment A by 5:00 p.m. on Friday, July 11, 2003, at the offices of Howrey Simon Arnold & White, 301 Ravenswood Ave, Menlo Park CA 94025.

Defendants, by and through their attorneys, will take the deposition upon oral examination of Donald Thomas, Ph.D. The deposition will commence on Thursday, July 31, 2003 at 9:00 a.m. at the offices of AKF Court Reporting and Videotech Services, Inc. located at

436 Boulevard Of The Allies, Pittsburgh, PA 15219 and will continue from day to day until completed.

The oral examination may be videotaped and transcribed stenographically, and will take place before an officer who is duly authorized to administer oaths. Defendants reserve the right to use the videotape testimony at trial.

Dated: June 25, 2003                      Respectfully submitted,

                                          HOWREY SIMON ARNOLD & WHITE, LLP


                                          By: _____
                                              Louis Campbell
                                              Attorneys for Defendants
                                              AEROFLEX INCORPORATED, AMI
                                              SEMICONDUCTOR, INC., MATROX
                                              ELECTRONIC SYSTEMS, LTD., MATROX
                                              GRAPHICS INC., MATROX
                                              INTERNATIONAL CORP. and MATROX
                                              TECH, INC.

-2-

pamphlets, advertisements, circulars, trade letters, press releases, drafts of any documents, revisions of drafts of any documents, canceled checks, bank statements, invoices, receipts and originals of promissory notes, surveys, computer printouts, computer disks and storage.

In addition to the items on the foregoing list, any comment or notation appearing on any of the documents described above, and not a part of the original text, is considered a separate document and any draft or preliminary form of any document is also considered a separate document.

4. The term "documents relating to" means documents discussing, containing, showing, evidencing or referring to in any way, either directly or indirectly, and is meant to include among other documents, documents underlying, supporting now or previously attached or appended to, or used in the preparation of any documents called for by each request.

5. The words "communication" or "communications" are used in the broadest possible sense and mean, without limitation, any transmittal and receipt of information, whether such was by chance, prearranged, formal or informal, and specifically include conversations in person, conversations by telephone, telegrams, letters or memoranda, formal statements, press releases and newspaper articles.

6. The terms "party" or "person" shall mean any natural person, sole proprietorship, partnership, limited partnership, corporation, joint venture, trust, association, or other entity as well as all current and former officers, directors, agents, salespeople, representatives, employees, attorneys, and others acting or purporting to act on behalf of such party or person.

7. The word "identify" when used with respect to a person shall mean to state for each person: name, last known business and residence address and telephone numbers; job title(s) and dates of association with the designated company; last known employer; and, where appropriate to the extent of the interrogatory, the basis for such person's knowledge and the years for which such person is believed to have knowledge.

- 4 -

8.  The terms "relate," "relating," or "relating to" include referring to, alluding to, or responding to, concerning, connected with, commenting on, regarding, discussing, showing, describing, reflecting, analyzing, constituting, including, mentioning, in respect of, about, or in any way logically or factually connected with the matter described in the Interrogatory.

9.  The terms "and" and "or" shall be given such meaning as to bring the greatest scope to the request in question and shall not be given a meaning that would exclude information from a Interrogatory.

## INSTRUCTIONS

1.  Any recipient of this set of Requests who withholds any documents covered by this set of Requests by reason of a claim of privilege, or who objects to any part of any request for production, shall furnish to Synopsys a list identifying each such document for which the privilege is claimed or to which the objection relates, together with the following information:

(a) The reason(s) for each objection or claim of privilege;

(b) The identity of each person having knowledge of the actual basis, if any, on which the privilege or other ground for objection is based;

(c) The exact name and title of the document;

(d) The date of, and all serial or identification numbers appearing on the document;

(e) The identity of each person wrote, signed, initiated, dictated, or otherwise participated in the creation of the document;

(f) The general subject matter of the document;

(g) The identity of each person who was an addressee of and/or who received the document or a copy thereof;

(h) The identity of each person having custody or control of the document or a copy thereof;

(i) The specific location of any file or files where the document, or any copy thereof, is normally or presently kept, and the identity of the custodian thereof;

(j)  The paragraph of this Request to which the document relates; and

(k)  In the case of any withheld document relates in any way to a meeting or to any other conversation, all participants in the meeting or conversation are to be identified.

2.  In the event that any document called for by this set of Requests is known to have been destroyed (either as a result of a document destruction policy or otherwise), those documents or class of documents are to be identified as follows: addressor, addressee, indicated or blind copies, date, subject matter, number of pages, attachments or appendices, all person to whom distributed, shown, or explained, date of destruction, persons authorizing destruction, and persons destroying the document.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

Documents related to the conception, design and development of the DAA system, including articles, presentations, manuals, design notes, patents and copies of the source code for the DAA system.

### REQUEST FOR PRODUCTION NO. 2:

Research notes, notebooks, or other documents containing the work records of persons involved in the development of the DAA system, including Donald Thomas and his collaborators.

### REQUEST FOR PRODUCTION NO. 3:

Documents referring to or describing the incorporation of the algorithms or technology of the DAA system, in whole or in part, in any other design synthesis system or other piece of software.

### REQUEST FOR PRODUCTION NO. 4:

- 6 -

Documents, if any, describing or referring to the use of the DAA software in the design of electrical systems or devices (whether those systems or devices were fabricated or not) including documents sufficient to establish the first dates of use of the DAA software.

## REQUEST FOR PRODUCTION NO. 5:

Documents related to the conception, design and development of the SAW system, including articles, presentations, manuals, design notes, patents and copies of the source code for the SAW system.

## REQUEST FOR PRODUCTION NO. 6:

Research notes, notebooks, or other documents containing the work records of persons involved in the development of the SAW system, including Donald Thomas and his collaborators.

## REQUEST FOR PRODUCTION NO. 7:

Documents referring to or describing the incorporation of the algorithms or technology of the SAW system, in whole or in part, in any other design synthesis system or other piece of software.

## REQUEST FOR PRODUCTION NO. 8:

Documents, if any, describing or referring to the use of the SAW software in design of electrical devices or systems (whether those devices or systems were fabricated or not) including documents sufficient to establish the first dates of use of the SAW software.

- 7 -

Louis Campbell, Esq.                        (650) 463-8100
Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025-0000
                                            06816-0060.000000
          Defendants

United Sates District Court - Western District of Pennsylvania

Pittsburgh, PA

Ricoh Company, Inc.

Aeroflex Incorporated, et al.

| PROOF OF SERVICE | DATE: | | TIME: | DEPT/DIV: | CASE NUMBER: |
|---|---|---|---|---|---|
| | | 14 | | | 03-103 GMS |

## UNITED STATES DISTRICT COURT
### DECLARATION OF SERVICE

THE UNDERSIGNED, DECLARE UNDER PENALTY OF PERJURY THAT I WAS ON THE DATE HEREIN REFERRED TO
OVER THE AGE OF 18 YEARS AND NOT A PARTY TO THE WITHIN ENTITLED ACTION. I SERVED THE:

Subpoena in a Civil Case (Attachment A); Notice of Subpoena for Documents and
Notice of Deposition of Donald Thomas, Ph.D. Pursuant to Fed.R.Civ.P.45
(Attachment A)

ON: DONALD THOMAS, Ph.D.

IN THE ABOVE MENTIONED ACTION BY DELIVERING TO AND LEAVING WITH THE ABOVE NAMED PERSON A COPY
THEREOF, AT:

Carnegie Mellon University - ECE Department
Pittsburgh, PA 15213-0000
(BUSINESS)

ON: June 26, 2003
AT: 04:30 pm

Registration No.: 14
County:

I declare under penalty of perjury under the laws of the United States
of America that the foregoing information contained in the return of
service and statement of service fees is true and correct and that this
declaration was executed on June 27, 2003.

Signed: _Charles Blue_

EXHIBIT 9

From:        Don Thomas [thomas@ece.cmu.edu]
Sent:        Wednesday, July 09, 2003 3:55 AM
To:          Campbell, Louis
Subject:     Re: Subpoena costs

I will get you an estimate — haven't heard acknowledgment back yet
from Ricoh yet.

I just sent the subpoenaed documentation out via Fed Ex for delivery
tomorrow.  I'm on vacation next week.
-Don Thomas-


On Tuesday, July 8, 2003, at 08:23 PM, Campbell, Louis wrote:

> Ok.  Please send an estimate of your costs after you have terminated
> the
> agreement with Ricoh.
>
> -----Original Message-----
> From: Don Thomas [mailto:thomas@ece.cmu.edu]
> Sent: Tuesday, July 08, 2003 6:03 AM
> To: Campbelll@howrey.com
> Subject: Re: Subpoena costs
>
>
> That's right, I don't see an ongoing relationship at this point.
>
> Let me explain that I was hired early last summer for ten hours of
> work.  That was later extended by another ten.  The second ten was
> never fully charged out.  Also, the contract was never terminated
> either.  But I've heard nothing from them since late last summer,
> except for when I told them I wouldn't be a witness for them.
>
> I'll send them a note officially terminating that agreement.
> -Don Thomas-
>
>
>
>
> On Monday, July 7, 2003, at 06:57 PM, Campbelll@howrey.com wrote:
>
>> I take it from your email that you do not believe yourself to be in an
>> ongoing consulting relationship with Ricoh.  They have not listed you
>> as a
>> consultant in this case.  If my assumption is correct, please send us
>> an
>> estimate of your costs.
>>
>> -----Original Message-----
>> From: Don Thomas [mailto:thomas@ece.cmu.edu]

07-31 ORDER
33



DEPOSITION EXHIBIT
Thomas 9
Lisa Ann Bauer, CRR

>> Sent: Monday, July 27, 2003 1:34 PM
>> To: Campbell, Louis
>> Cc: Don Thomas
>> Subject: Re: Subpoena costs
>>
>>
>> Dear Mr. Campbell,
>>
>> Thank you for the reply.
>>
>> I have not been contacted by Ricoh (Dickstein Shapiro...) for
>> consultation since last summer.  I spoke with them briefly on the
>> phone
>> this March, when you sent your original email to me.  I told them I
>> wouldn't be an expert witness for them during trial.
>>
>> They have not offered to serve as my counsel during the deposition,
>> and
>> I assume that they know that you subpoenaed me for documentation and
>> deposition.  Have they listed me as a consultant?
>> -Don Thomas-
>>
>>
>>
>>
>>
>> On Monday, July 7, 2003, at 04:17  PM, Campbell, Louis wrote:
>>
>>> Dear Dr. Thomas:
>>>
>>> If you are no longer a consultant for Ricoh and Ricoh will not serve
>>> as your
>>> counsel during the deposition nor work with you prior to the
>>> deposition, we
>>> may be willing to pay your costs for copying documents and time spent
>>> at the
>>> deposition.  If you are no longer working with Ricoh, please send us
>>> an
>>> estimate of the costs associated with the discovery we have
>>> requested.
>>>
>>> On the other hand, if you are still in a consulting relationship with
>>> Ricoh,
>>> you should contact Ricoh about covering your costs.
>>>
>>>
>>> Louis L. Campbell
>>>
>>> Howrey Simon Arnold & White, LLP
>>> 301 Ravenswood Avenue
>>> Menlo Park, CA 94025
>>> 650-463-8135 (phone)
>>> 650-463-8400 (fax)
>>> CampbellL@howrey.com
>>>

**07-31 ORDER**
**34**

>>> This communication is for the named recipient only and may contain
>>> information that is privileged or confidential. If you are not the
>>> intended
>>> recipient please delete the document, destroy any hard copies, and
>>> immediately notify the sender that you received this email in error.
>>>
>>>
>

**07-31 ORDER**
**35**

EXHIBIT 10

> > To: Campbell, Louis
> > Subject: Re: Subpoena costs
> >
> >
> >
> > On Tuesday, July 8, 2003, at 08:29 PM, Campbell, Louis wrote:
> >
> >> Ok.  Please send an estimate of your costs after you have terminated
> >> the
> >> agreement with Ricoh.
> >
> >>
> >
> >
> > The agreement with Ricoh (through Dickstein Shapiro Morin & Oshinsky
> > LLP ) has been terminated.
> >
> > You should be receiving the subpoenaed material this morning.  I sent
> > it a day early in case there were some questions.  I leave for a week's
> > vacation on Saturday.
> >
> > As for copy charges, I figure there's at least 1000 pages times two
> > sides times $.03.  That would be $60.  A check made out to "Carnegie
> > Mellon University" for $60 and sent to me would find its way to our
> > administrative support account.
> >
> > The Fed-Ex was payed for by your charge number -- thank you.
> >
> > It is hard to estimate the costs for the deposition on July 31 as I
> > don't know how long this might take.  My recent charges for background
> > consulting of this type have been at $250/hour.  I think I can be of
> > great help to the defense.
> > -Don-
> >
> >
> >
> >

07-31 ORDER
44

EXHIBIT 11

# DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

2101 L Street NW • Washington, DC 20037-1526
Tel (202) 785-9700 • Fax (202) 887-0689
Writer's Direct Dial: (202) 828-2228
E-Mail Address: HoffmanG@dsmo.com

July 22, 2003

BY FACSIMILE ((412) 268-1374) AND U.S. MAIL

Dr. Donald E. Thomas
Carnegie Mellon University
ECE Dept.
5000 Forbes Avenue
Pittsburgh, PA 15213

Re:    <u>Ricoh v. Aeroflex et al.</u>

Dear Dr. Thomas:

We have been informed that you have been engaged by Howrey & Simon, which firm represents the defendants in the present litigation, in the above case contrary to the interests of Ricoh. As you are aware, our firm previously engaged you as a consultant in this matter and you have already begun to provide your services on behalf of Ricoh. During the course of such representation, you received confidential and privileged information as acknowledged by the agreement you signed.

We object to your subsequent engagement by Howrey & Simon.

We demand that you cease and desist all activities not performed on behalf of Ricoh in connection with and/or related to this matter as it is a violation of your agreement with Ricoh and Dickstein Shapiro.

Very truly yours,

Gary M. Hoffman

GMH/MAW

Cc:   Edward Meilman, Esq.
Christopher Kelly, Esq. (via facsimile)

1177 Avenue of the Americas • New York, NY 10036-2714
Tel (212) 835-1400 • Fax (212) 997-9880
www.DicksteinShapiro.com

1841991 v1: ZBWD01!.DOC



8/14/03
DEPOSITION EXHIBIT
Thomas 11
Lisa Ann Bauer, CRR

July 22, 2003
Page 2


Erik Moller, Esq. (via facsimile)
Robert Whetzel, Esq. (via facsimile)
Francis DiGiovanni, Esq. (via facsimile)

# EXHIBIT B

| From: | Don Thomas [thomas@ece.cmu.edu] |
|-------|--------------------------------|
| Sent: | Tuesday, April 01, 2003 5:30 AM |
| To: | CampbellL@howrey.com |
| Subject: | Re: VLSI Design Automation Assistant |

I'll be back in touch with you about this, but probably sometime
tomorrow (Wed). I am interested but am quite busy today.
-Don Thomas-


On Monday, March 31, 2003, at 04:52 PM, CampbellL@howrey.com wrote:

> Dear Mr. Thomas:
>
> I am writing in connection with your work on the VLSI Design Automation
> Assistant and more generally with regard to your early work in the
> field of
> logic synthesis.
>
> I am serving as counsel to Synopsys and several of its customers in
> connection, who have been charged with infringing a patent relating to
> specific logic synthesis techniques.  Part of our work is to determine
> the
> state of the art of logic synthesis in the mid to late 1980s.  It
> appears
> that your work may be particularly relevant to our investigation.
>
> I would be grateful if you would be willing to discuss your work with
> us.
> In addition we are looking for consultants with expertise in the logic
> synthesis area in order to assist us in gathering relevant technical
> information in connection with our case.  Please let me know if you do
> consulting work or know of other persons in this area who serve as
> consultants.   Please contact me by reply e-mail or at (650) 463-8135.
>
> Thank you for your assistance.
>
>
> Louis L. Campbell
>
> Howrey Simon Arnold & White, LLP
> 301 Ravenswood Avenue
> Menlo Park, CA 94025
> 650-463-8135 (phone)
> 650-463-8400 (fax)
> CampbellL@howrey.com
>
> This communication is for the named recipient only and may contain
> information that is privileged, confidential and exempt from disclosure
> under applicable law.  If you are not the intended recipient, you are
> hereby

> notified that any unauthorized use, dissemination, distribution or
> copying
> of this communication is strictly prohibited.  If you are not the
> intended
> recipient, please delete the document without opening any attachments,
> destroy any hard copies you may have printed and immediately notify
> Howrey
> Simon Arnold & White that you received this e-mail in error.
>

| From: | Campbell, Louis |
|---|---|
| Sent: | Tuesday, April 01, 2003 9:42 AM |
| To: | 'Don Thomas' |
| Subject: | RE: VLSI Design Automation Assistant |

We look forward to hearing from you.

-----Original Message-----
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Tuesday, April 01, 2003 5:30 AM
To: CampbellL@howrey.com
Subject: Re: VLSI Design Automation Assistant


I'll be back in touch with you about this, but probably sometime
tomorrow (Wed).  I am interested but am quite busy today.
-Don Thomas-


On Monday, March 31, 2003, at 04:52 PM, CampbellL@howrey.com wrote:

> Dear Mr. Thomas:
>
> I am writing in connection with your work on the VLSI Design Automation
> Assistant and more generally with regard to your early work in the
> field of
> logic synthesis.
>
> I am serving as counsel to Synopsys and several of its customers in
> connection, who have been charged with infringing a patent relating to
> specific logic synthesis techniques.  Part of our work is to determine
> the
> state of the art of logic synthesis in the mid to late 1980s.  It
> appears
> that your work may be particularly relevant to our investigation.
>
> I would be grateful if you would be willing to discuss your work with
> us.
> In addition we are looking for consultants with expertise in the logic
> synthesis area in order to assist us in gathering relevant technical
> information in connection with our case.  Please let me know if you do
> consulting work or know of other persons in this area who serve as
> consultants.   Please contact me by reply e-mail or at (650) 463-8135.
>
> Thank you for your assistance.
>
>
> Louis L. Campbell
>
> Howrey Simon Arnold & White, LLP
> 301 Ravenswood Avenue

**07-31 ORDER**
**03**

```
> Menlo Park, CA 94025
> 650-463-8135 (phone)
> 650-463-8400 (fax)
> CampbellL@howrey.com
>
> This communication is for the named recipient only and may contain
> information that is privileged, confidential and exempt from disclosure
> under applicable law.  If you are not the intended recipient, you are
> hereby
> notified that any unauthorized use, dissemination, distribution or
> copying
> of this communication is strictly prohibited.  If you are not the
> intended
> recipient, please delete the document without opening any attachments,
> destroy any hard copies you may have printed and immediately notify
> Howrey
> Simon Arnold & White that you received this e-mail in error.
>
```

| | |
|---|---|
| **From:** | Campbell, Louis |
| **Sent:** | Thursday, April 03, 2003 4:39 PM |
| **To:** | 'Don Thomas' |
| **Subject:** | RE: VLSI Design Automation Assistant |

Hello,

Well, it would seem you have been very busy.  But, that's alright, I have also been far too busy to focus on this.

I've talked with the other lawyers on this case, and we'd like to set up a teleconference with you on Wednesday (the first day we are all free).  Are you available any time after 9 a.m. PT (noon ET) on Wednesday?


-----Original Message-----
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Tuesday, April 01, 2003 5:30 AM
To: CampbellL@howrey.com
Subject: Re: VLSI Design Automation Assistant


I'll be back in touch with you about this, but probably sometime tomorrow (Wed).  I am interested but am quite busy today.
-Don Thomas-


On Monday, March 31, 2003, at 04:52 PM, CampbellL@howrey.com wrote:

> Dear Mr. Thomas:
>
> I am writing in connection with your work on the VLSI Design Automation
> Assistant and more generally with regard to your early work in the
> field of
> logic synthesis.
>
> I am serving as counsel to Synopsys and several of its customers in
> connection, who have been charged with infringing a patent relating to
> specific logic synthesis techniques.  Part of our work is to determine
> the
> state of the art of logic synthesis in the mid to late 1980s.  It
> appears
> that your work may be particularly relevant to our investigation.
>
> I would be grateful if you would be willing to discuss your work with
> us.
> In addition we are looking for consultants with expertise in the logic
> synthesis area in order to assist us in gathering relevant technical
> information in connection with our case.  Please let me know if you do
> consulting work or know of other persons in this area who serve as
> consultants.   Please contact me by reply e-mail or at (650) 463-8135.

```
>
> Thank you for your assistance.
>
>
> Louis L. Campbell
>
> Howrey Simon Arnold & White, LLP
> 301 Ravenswood Avenue
> Menlo Park, CA 94025
> 650-463-8135 (phone)
> 650-463-8400 (fax)
> CampbellL@howrey.com
>
> This communication is for the named recipient only and may contain
> information that is privileged, confidential and exempt from disclosure
> under applicable law.  If you are not the intended recipient, you are
> hereby
> notified that any unauthorized use, dissemination, distribution or
> copying
> of this communication is strictly prohibited.  If you are not the
> intended
> recipient, please delete the document without opening any attachments,
> destroy any hard copies you may have printed and immediately notify
> Howrey
> Simon Arnold & White that you received this e-mail in error.
>
```

07-31 ORDER
06

| | |
|---|---|
| **From:** | Don Thomas [thomas@ece.cmu.edu] |
| **Sent:** | Friday, April 04, 2003 6:00 AM |
| **To:** | CampbellL@howrey.com |
| **Subject:** | Re: VLSI Design Automation Assistant |

Sorry for not getting back to you.  I was busy but was also waiting for another contact.

I have done some consulting on the topic before for the firm of Dickstein Shapiro Morin & Oshinsky LLP.  This was mainly as an expert to help them read through and understand various papers of the time (approx 1984).

This activity was mostly last summer and I hadn't heard from them since early Fall.  But, when I received your email, I thought I should look into whether this was tied in.

It appears that it is and I'm not sure how/if to proceed.  If we can proceed, I can make some time available on Wed 4/9.  Some time between noon and 2 (ET) could be worked out.

I'm going to try to figure out what to do here.  Any thoughts/comments appreciated.
-Don Thomas-


On Thursday, April 3, 2003, at 07:38 PM, CampbellL@howrey.com wrote:

> Hello,
>
> Well, it would seem you have been very busy.  But, that's alright, I
> have
> also been far too busy to focus on this.
>
> I've talked with the other lawyers on this case, and we'd like to set
> up a
> teleconference with you on Wednesday (the first day we are all free).
> Are
> you available any time after 9 a.m. PT (noon ET) on Wednesday?
>
>
> -----Original Message-----
> From: Don Thomas [mailto:thomas@ece.cmu.edu]
> Sent: Tuesday, April 01, 2003 5:30 AM
> To: CampbellL@howrey.com
> Subject: Re: VLSI Design Automation Assistant
>
>

> I'll be back in touch with you about this, but probably sometime
> tomorrow (Wed).   I am interested but am quite busy today.
> -Don Thomas-
>
>
>
> On Monday, March 31, 2003, at 04:52 PM, CampbellL@howrey.com wrote:
>
>> Dear Mr. Thomas:
>>
>> I am writing in connection with your work on the VLSI Design
>> Automation
>> Assistant and more generally with regard to your early work in the
>> field of
>> logic synthesis.
>>
>> I am serving as counsel to Synopsys and several of its customers in
>> connection, who have been charged with infringing a patent relating to
>> specific logic synthesis techniques.  Part of our work is to determine
>> the
>> state of the art of logic synthesis in the mid to late 1980s.  It
>> appears
>> that your work may be particularly relevant to our investigation.
>>
>> I would be grateful if you would be willing to discuss your work with
>> us.
>> In addition we are looking for consultants with expertise in the logic
>> synthesis area in order to assist us in gathering relevant technical
>> information in connection with our case.  Please let me know if you do
>> consulting work or know of other persons in this area who serve as
>> consultants.   Please contact me by reply e-mail or at (650) 463-8135.
>>
>> Thank you for your assistance.
>>
>>
>> Louis L. Campbell
>>
>> Howrey Simon Arnold & White, LLP
>> 301 Ravenswood Avenue
>> Menlo Park, CA 94025
>> 650-463-8135 (phone)
>> 650-463-8400 (fax)
>> CampbellL@howrey.com
>>
>> This communication is for the named recipient only and may contain
>> information that is privileged, confidential and exempt from
>> disclosure
>> under applicable law.  If you are not the intended recipient, you are
>> hereby
>> notified that any unauthorized use, dissemination, distribution or
>> copying
>> of this communication is strictly prohibited.  If you are not the
>> intended
>> recipient, please delete the document without opening any attachments,
>> destroy any hard copies you may have printed and immediately notify

>> Manager
>> Arnold & White that you received this e-mail in error.
>>

**From:** Campbell, Louis
**Sent:** Monday, April 07, 2003 1:02 PM
**To:** 'Don Thomas'
**Subject:** RE: VLSI Design Automation Assistant

We are looking into this to see if it would be proper for you to talk to us at this time. Let's hold off on Wednesday for now.

-----Original Message-----
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Friday, April 04, 2003 6:00 AM
To: CampbellL@howrey.com
Subject: Re: VLSI Design Automation Assistant

Sorry for not getting back to you. I was busy but was also waiting for another contact.

I have done some consulting on the topic before for the firm of Dickstein Shapiro Morin & Oshinsky LLP. This was mainly as an expert to help them read through and understand various papers of the time (approx 1984).

This activity was mostly last summer and I hadn't heard from them since early Fall. But, when I received your email, I thought I should look into whether this was tied in.

It appears that it is and I'm not sure how/if to proceed. If we can proceed, I can make some time available on Wed 4/9. Some time between noon and 2 (ET) could be worked out.

I'm going to try to figure out what to do here. Any thoughts/comments appreciated.
-Don Thomas-

On Thursday, April 3, 2003, at 07:38 PM, CampbellL@howrey.com wrote:

> Hello,
>
> Well, it would seem you have been very busy. But, that's alright, I
> have
> also been far too busy to focus on this.
>
> I've talked with the other lawyers on this case, and we'd like to set
> up a
> teleconference with you on Wednesday (the first day we are all free).
> Are

**07-31 ORDER**
**10**

> you available any time after 9 a.m. PT (noon ET) on Wednesday?
>
>
> -----Original Message-----
> From: Don Thomas [mailto:thomas@ece.cmu.edu]
> Sent: Tuesday, April 01, 2003 5:30 AM
> To: CampbellL@howrey.com
> Subject: Re: VLSI Design Automation Assistant
>
>
> I'll be back in touch with you about this, but probably sometime
> tomorrow (Wed).  I am interested but am quite busy today.
> -Don Thomas-
>
>
>
> On Monday, March 31, 2003, at 04:52 PM, CampbellL@howrey.com wrote:
>
>> Dear Mr. Thomas:
>>
>> I am writing in connection with your work on the VLSI Design
>> Automation
>> Assistant and more generally with regard to your early work in the
>> field of
>> logic synthesis.
>>
>> I am serving as counsel to Synopsys and several of its customers in
>> connection, who have been charged with infringing a patent relating to
>> specific logic synthesis techniques.  Part of our work is to determine
>> the
>> state of the art of logic synthesis in the mid to late 1980s.  It
>> appears
>> that your work may be particularly relevant to our investigation.
>>
>> I would be grateful if you would be willing to discuss your work with
>> us.
>> In addition we are looking for consultants with expertise in the logic
>> synthesis area in order to assist us in gathering relevant technical
>> information in connection with our case.  Please let me know if you do
>> consulting work or know of other persons in this area who serve as
>> consultants.   Please contact me by reply e-mail or at (650) 463-8135.
>>
>> Thank you for your assistance.
>>
>>
>> Louis L. Campbell
>>
>> Howrey Simon Arnold & White, LLP
>> 301 Ravenswood Avenue
>> Menlo Park, CA 94025
>> 650-463-8135 (phone)
>> 650-463-8400 (fax)
>> CampbellL@howrey.com
>>
>> This communication is for the named recipient only and may contain

>> information that is privileged, confidential and exempt from
>> disclosure
>> under applicable law.  If you are not the intended recipient, you are
>> hereby
>> notified that any unauthorized use, dissemination, distribution or
>> copying
>> of this communication is strictly prohibited.  If you are not the
>> intended
>> recipient, please delete the document without opening any attachments,
>> destroy any hard copies you may have printed and immediately notify
>> Howrey
>> Simon Arnold & White that you received this e-mail in error.
>>

**From:** Campbell, Louis
**Sent:** Tuesday, April 08, 2003 9:57 AM
**To:** 'Don Thomas'
**Subject:** RE: VLSI Design Automation Assistant

Thank you for your interest in this matter, but, Dickstein Shapiro Morin & Oshinsky LLP is indeed the counsel for the opposing side in this matter. This means that there is most likely a conflict if we would talk to you in detail about the matter. So, unfortunately, it appears that we cannot go forward. But, I thank you very much for your interest and if things change or we happen to run into this technology in an unrelated matter, I will get back in touch with you. However, one thing you can do for us, is to let us know about anyone else who is knowledgeable in this technology or its development, whether or not they were contemporaneously involved with its development.

Sincerely,

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
CampbellL@howrey.com

This communication is for the named recipient only and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient or the employee or agent responsible for delivering this communication to the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited. If you are not the intended recipient, please delete the document without opening any attachments, destroy any hard copies you may have printed and immediately notify Howrey Simon Arnold & White that you received this e-mail in error.

| From: | Don Thomas [thomas@ece.cmu.edu] |
|---|---|
| Sent: | Thursday, April 10, 2003 6:59 AM |
| To: | Campbell, Louis |
| Subject: | Re: VLSI Design Automation Assistant |

I suggest trying Ted Kowalski (Thaddeus J.) who was a PhD student of
mine in the early 80's.  Wrote his thesis about a knowledge based
expert system to do VLSI design.  Last I knew, he worked for Lucent
Tech.
-Don Thomas-


On Tuesday, April 8, 2003, at 12:57 PM, CampbellL@howrey.com wrote:

> Thank you for your interest in this matter, but, Dickstein Shapiro
> Morin &
> Oshinsky LLP is indeed the counsel for the opposing side in this
> matter.
> This means that there is most likely a conflict if we would talk to
> you in
> detail about the matter.  So, unfortunately, it appears that we cannot
> go
> forward.  But, I thank you very much for your interest and if things
> change
> or we happen to run into this technology in an unrelated matter, I
> will get
> back in touch with you.  However, one thing you can do for us, is to
> let us
> know about anyone else who is knowledgeable in this technology or its
> development, whether or not they were contemporaneously involved with
> its
> development.
>
> Sincerely,
>
> Louis L. Campbell
>
> Howrey Simon Arnold & White, LLP
> 301 Ravenswood Avenue
> Menlo Park, CA 94025
> 650-463-8135 (phone)
> 650-463-8400 (fax)
> CampbellL@howrey.com
>
> This communication is for the named recipient only and may contain
> information that is privileged, confidential and exempt from disclosure
> under applicable law.  If you are not the intended recipient or the
> employee
> or agent responsible for delivering this communication to the intended
> recipient, you are hereby notified that any unauthorized use,
> dissemination,
> distribution or copying of this communication is strictly prohibited.
> If
> you are not the intended recipient, please delete the document without
> opening any attachments, destroy any hard copies you may have printed
> and
> immediately notify Howrey Simon Arnold & White that you received this
> e-mail
> in error.

**07-31 ORDER**
**14**

From:       Campbell, Louis
Sent:       Thursday, May 01, 2003 10:15 AM
To:         'thomas@ece.cmu.edu'
Subject:    Ted Kowalski's contact information

Dear Dr. Thomas:

I'm trying to contact Ted Kowalski. Do you have any contact information for him?

Thanks for your help,

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
CampbellL@howrey.com

This communication is for the named recipient only and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient or the employee or agent responsible for delivering this communication to the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited. If you are not the intended recipient, please delete the document without opening any attachments, destroy any hard copies you may have printed and immediately notify Howrey Simon Arnold & White that you received this e-mail in error.

**From:**       Don Thomas [thomas@ece.cmu.edu]
**Sent:**       Thursday, May 01, 2003 10:48 AM
**To:**         CampbellL@howrey.com
**Subject:**    Re: Ted Kowalski's contact information

I'll check around.  I haven't talked with him in about 10 years, but I
have a few leads.
-Don-

On Thursday, May 1, 2003, at 01:15  PM, CampbellL@howrey.com wrote:

> Dear Dr. Thomas:
>
> I'm trying to contact Ted Kowalski.  Do you have any contact
> information for
> him?
>
> Thanks for your help,
>
> Louis L. Campbell
>
> Howrey Simon Arnold & White, LLP
> 301 Ravenswood Avenue
> Menlo Park, CA 94025
> 650-463-8135 (phone)
> 650-463-8400 (fax)
> CampbellL@howrey.com
>
> This communication is for the named recipient only and may contain
> information that is privileged, confidential and exempt from disclosure
> under applicable law.  If you are not the intended recipient or the
> employee
> or agent responsible for delivering this communication to the intended
> recipient, you are hereby notified that any unauthorized use,
> dissemination,
> distribution or copying of this communication is strictly prohibited.
> If
> you are not the intended recipient, please delete the document without
> opening any attachments, destroy any hard copies you may have printed
> and
> immediately notify Howrey Simon Arnold & White that you received this
> e-mail
> in error.
>

| | |
|---|---|
| **From:** | Campbell, Louis |
| **Sent:** | Thursday, May 01, 2003 10:48 AM |
| **To:** | 'Don Thomas' |
| **Subject:** | RE: Ted Kowalski's contact information |

Thank you


-----Original Message-----
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Thursday, May 01, 2003 10:48 AM
To: CampbellL@howrey.com
Subject: Re: Ted Kowalski's contact information


I'll check around.  I haven't talked with him in about 10 years, but I
have a few leads.
-Don-

On Thursday, May 1, 2003, at 01:15  PM, CampbellL@howrey.com wrote:

> Dear Dr. Thomas:
>
> I'm trying to contact Ted Kowalski.  Do you have any contact
> information for
> him?
>
> Thanks for your help,
>
> Louis L. Campbell
>
> Howrey Simon Arnold & White, LLP
> 301 Ravenswood Avenue
> Menlo Park, CA 94025
> 650-463-8135 (phone)
> 650-463-8400 (fax)
> CampbellL@howrey.com
>
> This communication is for the named recipient only and may contain
> information that is privileged, confidential and exempt from disclosure
> under applicable law.  If you are not the intended recipient or the
> employee
> or agent responsible for delivering this communication to the intended
> recipient, you are hereby notified that any unauthorized use,
> dissemination,
> distribution or copying of this communication is strictly prohibited.
> If
> you are not the intended recipient, please delete the document without
> opening any attachments, destroy any hard copies you may have printed
> and
> immediately notify Howrey Simon Arnold & White that you received this

**07-31 ORDER**
**17**

> e-mail
> in error.
>

| From: | Don Thomas [thomas@ece.cmu.edu] |
|---|---|
| Sent: | Saturday, May 03, 2003 8:16 AM |
| To: | CampbellL@howrey.com |
| Subject: | Re: Ted Kowalski's contact information |

I heard from Ted that you were able to reach him at AT&T.  Hope he works
out for you.
-Don-


CampbellL@howrey.com wrote:

>
> Dear Dr. Thomas:
>
> I'm trying to contact Ted Kowalski.  Do you have any contact information
for
> him?
>
> Thanks for your help,
>
> Louis L. Campbell
>
> Howrey Simon Arnold & White, LLP
> 301 Ravenswood Avenue
> Menlo Park, CA 94025
> 650-463-8135 (phone)
> 650-463-8400 (fax)
> CampbellL@howrey.com
>
> This communication is for the named recipient only and may contain
> information that is privileged, confidential and exempt from disclosure
> under applicable law.  If you are not the intended recipient or the
employee
> or agent responsible for delivering this communication to the intended
> recipient, you are hereby notified that any unauthorized use,
dissemination,
> distribution or copying of this communication is strictly prohibited.  If
> you are not the intended recipient, please delete the document without
> opening any attachments, destroy any hard copies you may have printed and
> immediately notify Howrey Simon Arnold & White that you received this e-
mail
> in error.

| From: | Don Thomas [thomas@ece.cmu.edu] |
|---|---|
| Sent: | Tuesday, May 06, 2003 12:44 PM |
| To: | CampbellL@howrey.com |
| Subject: | Re: Ted Kowalski's contact information |

Ted and I spoke and it appears that you were able to be in touch with him, and that he said no.

The other person that comes to mind is Prof Alice Parker at USC.

mailto:Alice Parker <parker@eve.usc.edu>

Even though she didn't participate in Ted's work, she was in the synthesis research area at the time and certainly understands how the tools work.

Hope this helps.
-Don Thomas-


On Thursday, May 1, 2003, at 01:15  PM, CampbellL@howrey.com wrote:

> Dear Dr. Thomas:
>
> I'm trying to contact Ted Kowalski.  Do you have any contact
> information for
> him?
>
> Thanks for your help,
>
> Louis L. Campbell
>
> Howrey Simon Arnold & White, LLP
> 301 Ravenswood Avenue
> Menlo Park, CA 94025
> 650-463-8135 (phone)
> 650-463-8400 (fax)
> CampbellL@howrey.com
>
> This communication is for the named recipient only and may contain
> information that is privileged, confidential and exempt from disclosure
> under applicable law.  If you are not the intended recipient or the
> employee
> or agent responsible for delivering this communication to the intended
> recipient, you are hereby notified that any unauthorized use,
> dissemination,
> distribution or copying of this communication is strictly prohibited.
> If
> you are not the intended recipient, please delete the document without
> opening any attachments, destroy any hard copies you may have printed
> and

**07-31 ORDER**
**20**

```
> immediately notify Howrey Simon Arnold & White that you received this
> e-mail
> in error.
>
```

| From: | Campbell, Louis |
| --- | --- |
| Sent: | Tuesday, May 06, 2003 2:41 PM |
| To: | 'Don Thomas' |
| Subject: | RE: Ted Kowalski's contact information |

Thanks.  We have already contacted Alice Parker on our own initiative and it looks like she will be able to help us.  It's good to know that she comes recommended from you as well.

-----Original Message-----
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Tuesday, May 06, 2003 12:44 PM
To: CampbellL@howrey.com
Subject: Re: Ted Kowalski's contact information

Ted and I spoke and it appears that you were able to be in touch with him, and that he said no.

The other person that comes to mind is Prof Alice Parker at USC.

mailto:Alice Parker <parker@eve.usc.edu>

Even though she didn't participate in Ted's work, she was in the synthesis research area at the time and certainly understands how the tools work.

Hope this helps.
-Don Thomas-


On Thursday, May 1, 2003, at 01:15  PM, CampbellL@howrey.com wrote:

> Dear Dr. Thomas:
>
> I'm trying to contact Ted Kowalski.  Do you have any contact
> information for
> him?
>
> Thanks for your help,
>
> Louis L. Campbell
>
> Howrey Simon Arnold & White, LLP
> 301 Ravenswood Avenue
> Menlo Park, CA 94025
> 650-463-8135 (phone)
> 650-463-8400 (fax)
> CampbellL@howrey.com
>
> This communication is for the named recipient only and may contain

**07-31 ORDER**
**22**

```
> information that is privileged, confidential and exempt from disclosure
> under applicable law.  If you are not the intended recipient or the
> employee
> or agent responsible for delivering this communication to the intended
> recipient, you are hereby notified that any unauthorized use,
> dissemination,
> distribution or copying of this communication is strictly prohibited.
> If
> you are not the intended recipient, please delete the document without
> opening any attachments, destroy any hard copies you may have printed
> and
> immediately notify Howrey Simon Arnold & White that you received this
> e-mail
> in error.
>
```

| | |
|---|---|
| **From:** | Don Thomas [thomas@ece.cmu.edu] |
| **Sent:** | Wednesday, July 02, 2003 6:51 AM |
| **To:** | CampbellL@howrey.com |
| **Subject:** | Subpoena |

Mr. Campbell,

I received the subpoena for information and later my appearance.  I'm in the process of tracking down the information you requested.

The question I have regards reimbursement.

There's a fair amount of copying that is being done.  I have a stack of docs about 6-8 inches high (that's probably it, but there may be more) -- mostly double sided copying.  I have an assistant spending a fair amount of time collecting  this and copying.  And, of course I have to take what might be a fair amount of personal time for the deposition. What are your reimbursement policies?
-Don Thomas-

| | |
|---|---|
| **From:** | Campbell, Louis |
| **Sent:** | Monday, July 07, 2003 1:17 PM |
| **To:** | 'thomas@ece.cmu.edu' |
| **Subject:** | Subpoena costs |

Dear Dr. Thomas:

If you are no longer a consultant for Ricoh and Ricoh will not serve as your counsel during the deposition nor work with you prior to the deposition, we may be willing to pay your costs for copying documents and time spent at the deposition. If you are no longer working with Ricoh, please send us an estimate of the costs associated with the discovery we have requested.

On the other hand, if you are still in a consulting relationship with Ricoh, you should contact Ricoh about covering your costs.

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
CampbellL@howrey.com

This communication is for the named recipient only and may contain information that is privileged or confidential. If you are not the intended recipient please delete the document, destroy any hard copies, and immediately notify the sender that you received this email in error.

| | |
|---|---|
| **From:** | Don Thomas [thomas@ece.cmu.edu] |
| **Sent:** | Monday, July 07, 2003 1:54 PM |
| **To:** | Campbell, Louis |
| **Cc:** | Don Thomas |
| **Subject:** | Re: Subpoena costs |

Dear Mr. Campbell,

Thank you for the reply.

I have not been contacted by Ricoh (Dickstein Shapiro...) for
consultation since last summer. I spoke with them briefly on the phone
this March, when you sent your original email to me. I told them I
wouldn't be an expert witness for them during trial.

They have not offered to serve as my counsel during the deposition, and
I assume that they know that you subpoenaed me for documentation and
deposition. Have they listed me as a consultant?
-Don Thomas-

On Monday, July 7, 2003, at 04:17 PM, Campbell, Louis wrote:

> Dear Dr. Thomas:
>
> If you are no longer a consultant for Ricoh and Ricoh will not serve
> as your
> counsel during the deposition nor work with you prior to the
> deposition, we
> may be willing to pay your costs for copying documents and time spent
> at the
> deposition.  If you are no longer working with Ricoh, please send us an
> estimate of the costs associated with the discovery we have requested.
>
> On the other hand, if you are still in a consulting relationship with
> Ricoh,
> you should contact Ricoh about covering your costs.
>
>
> Louis L. Campbell
>
> Howrey Simon Arnold & White, LLP
> 301 Ravenswood Avenue
> Menlo Park, CA 94025
> 650-463-8135 (phone)
> 650-463-8400 (fax)
> CampbellL@howrey.com
>
> This communication is for the named recipient only and may contain

```
> information that is privileged or confidential.  If you are not the
> intended
> recipient please delete the document, destroy any hard copies, and
> immediately notify the sender that you received this email in error.
>
>
```

| From: | Campbell, Louis |
|---|---|
| Sent: | Monday, July 07, 2003 3:58 PM |
| To: | 'Don Thomas' |
| Subject: | RE: Subpoena costs |

I take it from your email that you do not believe yourself to be in an
ongoing consulting relationship with Ricoh.  They have not listed you as a
consultant in this case.  If my assumption is correct, please send us an
estimate of your costs.

-----Original Message-----
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Monday, July 07, 2003 1:54 PM
To: Campbell, Louis
Cc: Don Thomas
Subject: Re: Subpoena costs


Dear Mr. Campbell,

Thank you for the reply.

I have not been contacted by Ricoh (Dickstein Shapiro...) for
consultation since last summer.  I spoke with them briefly on the phone
this March, when you sent your original email to me.  I told them I
wouldn't be an expert witness for them during trial.

They have not offered to serve as my counsel during the deposition, and
I assume that they know that you subpoenaed me for documentation and
deposition.  Have they listed me as a consultant?
-Don Thomas-




On Monday, July 7, 2003, at 04:17  PM, Campbell, Louis wrote:

> Dear Dr. Thomas:
>
> If you are no longer a consultant for Ricoh and Ricoh will not serve
> as your
> counsel during the deposition nor work with you prior to the
> deposition, we
> may be willing to pay your costs for copying documents and time spent
> at the
> deposition.  If you are no longer working with Ricoh, please send us an
> estimate of the costs associated with the discovery we have requested.
>
> On the other hand, if you are still in a consulting relationship with
> Ricoh,
> you should contact Ricoh about covering your costs.

**07-31 ORDER**
**28**

```
>
>
> Louis L. Campbell
>
> Howrey Simon Arnold & White, LLP
> 301 Ravenswood Avenue
> Menlo Park, CA 94025
> 650-463-8135 (phone)
> 650-463-8400 (fax)
> CampbellL@howrey.com
>
> This communication is for the named recipient only and may contain
> information that is privileged or confidential.  If you are not the
> intended
> recipient please delete the document, destroy any hard copies, and
> immediately notify the sender that you received this email in error.
>
>
```

| | |
|---|---|
| **From:** | Don Thomas [thomas@ece.cmu.edu] |
| **Sent:** | Tuesday, July 08, 2003 6:03 AM |
| **To:** | CampbellL@howrey.com |
| **Subject:** | Re: Subpoena costs |

That's right, I don't see an ongoing relationship at this point.

Let me explain that I was hired early last summer for ten hours of
work. That was later extended by another ten. The second ten was
never fully charged out. Also, the contract was never terminated
either. But I've heard nothing from them since late last summer,
except for when I told them I wouldn't be a witness for them.

I'll send them a note officially terminating that agreement.
-Don Thomas-

On Monday, July 7, 2003, at 06:57 PM, CampbellL@howrey.com wrote:

> I take it from your email that you do not believe yourself to be in an
> ongoing consulting relationship with Ricoh. They have not listed you
> as a
> consultant in this case. If my assumption is correct, please send us
> an
> estimate of your costs.
>
> -----Original Message-----
> From: Don Thomas [mailto:thomas@ece.cmu.edu]
> Sent: Monday, July 07, 2003 1:54 PM
> To: Campbell, Louis
> Cc: Don Thomas
> Subject: Re: Subpoena costs
>
>
> Dear Mr. Campbell,
>
> Thank you for the reply.
>
> I have not been contacted by Ricoh (Dickstein Shapiro...) for
> consultation since last summer. I spoke with them briefly on the phone
> this March, when you sent your original email to me. I told them I
> wouldn't be an expert witness for them during trial.
>
> They have not offered to serve as my counsel during the deposition, and
> I assume that they know that you subpoenaed me for documentation and
> deposition. Have they listed me as a consultant?
> -Don Thomas-
>
>
>

**07-31 ORDER**
**30**

```
>
>
> On Monday, July 7, 2003, at 04:17 PM, Campbell, Louis wrote:
>
>> Dear Dr. Thomas:
>>
>> If you are no longer a consultant for Ricoh and Ricoh will not serve
>> as your
>> counsel during the deposition nor work with you prior to the
>> deposition, we
>> may be willing to pay your costs for copying documents and time spent
>> at the
>> deposition.  If you are no longer working with Ricoh, please send us
>> an
>> estimate of the costs associated with the discovery we have requested.
>>
>> On the other hand, if you are still in a consulting relationship with
>> Ricoh,
>> you should contact Ricoh about covering your costs.
>>
>>
>> Louis L. Campbell
>>
>> Howrey Simon Arnold & White, LLP
>> 301 Ravenswood Avenue
>> Menlo Park, CA 94025
>> 650-463-8135 (phone)
>> 650-463-8400 (fax)
>> CampbellL@howrey.com
>>
>> This communication is for the named recipient only and may contain
>> information that is privileged or confidential.  If you are not the
>> intended
>> recipient please delete the document, destroy any hard copies, and
>> immediately notify the sender that you received this email in error.
>>
>>
```

| From: | Campbell, Louis |
|---|---|
| Sent: | Tuesday, July 08, 2003 5:30 PM |
| To: | 'Don Thomas' |
| Subject: | RE: Subpoena costs |

Ok.  Please send an estimate of your costs after you have terminated the agreement with Ricoh.

-----Original Message-----
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Tuesday, July 08, 2003 6:03 AM
To: CampbellL@howrey.com
Subject: Re: Subpoena costs


That's right, I don't see an ongoing relationship at this point.

Let me explain that I was hired early last summer for ten hours of work.  That was later extended by another ten.  The second ten was never fully charged out.  Also, the contract was never terminated either.  But I've heard nothing from them since late last summer, except for when I told them I wouldn't be a witness for them.

I'll send them a note officially terminating that agreement.
-Don Thomas-



On Monday, July 7, 2003, at 06:57  PM, CampbellL@howrey.com wrote:

> I take it from your email that you do not believe yourself to be in an
> ongoing consulting relationship with Ricoh.  They have not listed you
> as a
> consultant in this case.  If my assumption is correct, please send us
> an
> estimate of your costs.
>
> -----Original Message-----
> From: Don Thomas [mailto:thomas@ece.cmu.edu]
> Sent: Monday, July 07, 2003 1:54 PM
> To: Campbell, Louis
> Cc: Don Thomas
> Subject: Re: Subpoena costs
>
>
> Dear Mr. Campbell,
>
> Thank you for the reply.
>
> I have not been contacted by Ricoh (Dickstein Shapiro...) for
> consultation since last summer.  I spoke with them briefly on the phone

> this March, when you sent your original email to me.  I told them I
> wouldn't be an expert witness for them during trial.
>
> They have not offered to serve as my counsel during the deposition, and
> I assume that they know that you subpoenaed me for documentation and
> deposition.  Have they listed me as a consultant?
> -Don Thomas-
>
>
>
>
>
> On Monday, July 7, 2003, at 04:17  PM, Campbell, Louis wrote:
>
>> Dear Dr. Thomas:
>>
>> If you are no longer a consultant for Ricoh and Ricoh will not serve
>> as your
>> counsel during the deposition nor work with you prior to the
>> deposition, we
>> may be willing to pay your costs for copying documents and time spent
>> at the
>> deposition.  If you are no longer working with Ricoh, please send us
>> an
>> estimate of the costs associated with the discovery we have requested.
>>
>> On the other hand, if you are still in a consulting relationship with
>> Ricoh,
>> you should contact Ricoh about covering your costs.
>>
>>
>> Louis L. Campbell
>>
>> Howrey Simon Arnold & White, LLP
>> 301 Ravenswood Avenue
>> Menlo Park, CA 94025
>> 650-463-8135 (phone)
>> 650-463-8400 (fax)
>> CampbellL@howrey.com
>>
>> This communication is for the named recipient only and may contain
>> information that is privileged or confidential.  If you are not the
>> intended
>> recipient please delete the document, destroy any hard copies, and
>> immediately notify the sender that you received this email in error.
>>
>>

| From: | Don Thomas [thomas@ece.cmu.edu] |
|---|---|
| Sent: | Wednesday, July 09, 2003 8:55 AM |
| To: | Campbell, Louis |
| Subject: | Re: Subpoena costs |

I will get you an estimate -- haven't heard acknowledgment back yet
from Ricoh yet.

I just sent the subpoenaed documentation out via Fed Ex for delivery
tomorrow.  I'm on vacation next week.
-Don Thomas-


On Tuesday, July 8, 2003, at 08:29  PM, Campbell, Louis wrote:

> Ok.  Please send an estimate of your costs after you have terminated
> the
> agreement with Ricoh.
>
> -----Original Message-----
> From: Don Thomas [mailto:thomas@ece.cmu.edu]
> Sent: Tuesday, July 08, 2003 6:03 AM
> To: CampbellL@howrey.com
> Subject: Re: Subpoena costs
>
>
> That's right, I don't see an ongoing relationship at this point.
>
> Let me explain that I was hired early last summer for ten hours of
> work.  That was later extended by another ten.  The second ten was
> never fully charged out.  Also, the contract was never terminated
> either.  But I've heard nothing from them since late last summer,
> except for when I told them I wouldn't be a witness for them.
>
> I'll send them a note officially terminating that agreement.
> -Don Thomas-
>
>
>
>
> On Monday, July 7, 2003, at 06:57  PM, CampbellL@howrey.com wrote:
>
>> I take it from your email that you do not believe yourself to be in an
>> ongoing consulting relationship with Ricoh.  They have not listed you
>> as a
>> consultant in this case.  If my assumption is correct, please send us
>> an
>> estimate of your costs.
>>
>> -----Original Message-----
>> From: Don Thomas [mailto:thomas@ece.cmu.edu]

**07-31 ORDER**
33

>> Sent: Monday, July 07, 2003 1:54 PM
>> To: Campbell, Louis
>> Cc: Don Thomas
>> Subject: Re: Subpoena costs
>>
>>
>> Dear Mr. Campbell,
>>
>> Thank you for the reply.
>>
>> I have not been contacted by Ricoh (Dickstein Shapiro...) for
>> consultation since last summer.  I spoke with them briefly on the
>> phone
>> this March, when you sent your original email to me.  I told them I
>> wouldn't be an expert witness for them during trial.
>>
>> They have not offered to serve as my counsel during the deposition,
>> and
>> I assume that they know that you subpoenaed me for documentation and
>> deposition.  Have they listed me as a consultant?
>> -Don Thomas-
>>
>>
>>
>>
>>
>> On Monday, July 7, 2003, at 04:17  PM, Campbell, Louis wrote:
>>
>>> Dear Dr. Thomas:
>>>
>>> If you are no longer a consultant for Ricoh and Ricoh will not serve
>>> as your
>>> counsel during the deposition nor work with you prior to the
>>> deposition, we
>>> may be willing to pay your costs for copying documents and time spent
>>> at the
>>> deposition.  If you are no longer working with Ricoh, please send us
>>> an
>>> estimate of the costs associated with the discovery we have
>>> requested.
>>>
>>> On the other hand, if you are still in a consulting relationship with
>>> Ricoh,
>>> you should contact Ricoh about covering your costs.
>>>
>>>
>>> Louis L. Campbell
>>>
>>> Howrey Simon Arnold & White, LLP
>>> 301 Ravenswood Avenue
>>> Menlo Park, CA 94025
>>> 650-463-8135 (phone)
>>> 650-463-8400 (fax)
>>> CampbellL@howrey.com
>>>

**07-31 ORDER**
**34**

```
>>> This communication is for the named recipient only and may contain
>>> information that is privileged or confidential.  If you are not the
>>> intended
>>> recipient please delete the document, destroy any hard copies, and
>>> immediately notify the sender that you received this email in error.
>>>
>>>
>
```

**From:**     Don Thomas [thomas@ece.cmu.edu]
**Sent:**     Thursday, July 10, 2003 6:26 AM
**To:**       Campbell, Louis
**Subject:**  Re: Subpoena costs

On Tuesday, July 8, 2003, at 08:29  PM, Campbell, Louis wrote:

> Ok.  Please send an estimate of your costs after you have terminated
> the
> agreement with Ricoh.
>
>

The agreement with Ricoh (through Dickstein Shapiro Morin & Oshinsky
LLP ) has been terminated.

You should be receiving the subpoenaed material this morning.  I sent
it a day early in case there were some questions.  I leave for a week's
vacation on Saturday.

As for copy charges, I figure there's at least 1000 pages times two
sides times $.03.  That would be $60.  A check made out to "Carnegie
Mellon University" for $60 and sent to me would find its way to our
administrative support account.

The Fed-Ex was payed for by your charge number -- thank you.

It is hard to estimate the costs for the deposition on July 31 as I
don't know how long this might take.  My recent charges for background
consulting of this type have been at $250/hour.  I think I can be of
great help to the defense.
-Don-

| From: | Campbell, Louis |
|---|---|
| Sent: | Thursday, July 10, 2003 5:04 PM |
| To: | 'Don Thomas' |
| Subject: | RE: Subpoena costs |

We will be sending you a check for $60 and pay your standard consulting rate for time at the deposition.

If you would be interested, we would be willing to pursue a consulting relationship.

-----Original Message-----
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Thursday, July 10, 2003 6:26 AM
To: Campbell, Louis
Subject: Re: Subpoena costs


On Tuesday, July 8, 2003, at 08:29 PM, Campbell, Louis wrote:

> Ok.  Please send an estimate of your costs after you have terminated
> the
> agreement with Ricoh.
>
>


The agreement with Ricoh (through Dickstein Shapiro Morin & Oshinsky LLP ) has been terminated.

You should be receiving the subpoenaed material this morning.  I sent it a day early in case there were some questions.  I leave for a week's vacation on Saturday.

As for copy charges, I figure there's at least 1000 pages times two sides times $.03.  That would be $60.  A check made out to "Carnegie Mellon University" for $60 and sent to me would find its way to our administrative support account.

The Fed-Ex was payed for by your charge number -- thank you.

It is hard to estimate the costs for the deposition on July 31 as I don't know how long this might take.  My recent charges for background consulting of this type have been at $250/hour.  I think I can be of great help to the defense.
-Don-

**07-31 ORDER**
37

| | |
|---|---|
| From: | Campbell, Louis |
| Sent: | Thursday, July 10, 2003 6:47 PM |
| To: | 'Don Thomas' |
| Subject: | RE: Subpoena costs |

My last email should have read: If you would be willing, we would be interested in pursuing a consulting relationship with you.  The prior wording loses some of the desired enthusiasm.

-----Original Message-----
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Thursday, July 10, 2003 6:26 AM
To: Campbell, Louis
Subject: Re: Subpoena costs


On Tuesday, July 8, 2003, at 08:29  PM, Campbell, Louis wrote:

> Ok.  Please send an estimate of your costs after you have terminated
> the
> agreement with Ricoh.
>
>


The agreement with Ricoh (through Dickstein Shapiro Morin & Oshinsky LLP ) has been terminated.

You should be receiving the subpoenaed material this morning.  I sent it a day early in case there were some questions.  I leave for a week's vacation on Saturday.

As for copy charges, I figure there's at least 1000 pages times two sides times $.03.  That would be $60.  A check made out to "Carnegie Mellon University" for $60 and sent to me would find its way to our administrative support account.

The Fed-Ex was payed for by your charge number -- thank you.

It is hard to estimate the costs for the deposition on July 31 as I don't know how long this might take.  My recent charges for background consulting of this type have been at $250/hour.  I think I can be of great help to the defense.
-Don-

**From:**      Don Thomas [thomas@ece.cmu.edu]
**Sent:**      Friday, July 11, 2003 6:11 AM
**To:**        CampbellL@howrey.com
**Cc:**        Don Thomas
**Subject:**   Re: Subpoena costs


Yes, I'd be interested in pursuing a consulting relationship (with
enthusiasm).  Thanks you for your consideration.
-Don Thomas-


On Thursday, July 10, 2003, at 08:03  PM, CampbellL@howrey.com wrote:

> We will be sending you a check for $60 and pay your standard
> consulting rate
> for time at the deposition.
>
> If you would be interested, we would be willing to pursue a consulting
> relationship.
>
> -----Original Message-----
> From: Don Thomas [mailto:thomas@ece.cmu.edu]
> Sent: Thursday, July 10, 2003 6:26 AM
> To: Campbell, Louis
> Subject: Re: Subpoena costs
>
>
>
> On Tuesday, July 8, 2003, at 08:29  PM, Campbell, Louis wrote:
>
>> Ok.  Please send an estimate of your costs after you have terminated
>> the
>> agreement with Ricoh.
>>
>>
>
>
> The agreement with Ricoh (through Dickstein Shapiro Morin & Oshinsky
> LLP ) has been terminated.
>
> You should be receiving the subpoenaed material this morning.  I sent
> it a day early in case there were some questions.  I leave for a week's
> vacation on Saturday.
>
> As for copy charges, I figure there's at least 1000 pages times two
> sides times $.03.  That would be $60.  A check made out to "Carnegie
> Mellon University" for $60 and sent to me would find its way to our
> administrative support account.
>
> The Fed-Ex was payed for by your charge number -- thank you.
>

**07-31 ORDER**
39

> It is hard to estimate the costs for the deposition on July 31 as I
> don't know how long this might take.  My recent charges for background
> consulting of this type have been at $250/hour.  I think I can be of
> great help to the defense.
> -Don-
>
>
>
>

| | |
|---|---|
| **From:** | Campbell, Louis |
| **Sent:** | Friday, July 11, 2003 5:15 PM |
| **To:** | 'Don Thomas' |
| **Subject:** | RE: Subpoena costs |

Great!  Let me know when you get back from your vacation and we will get
started.

-----Original Message-----
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Friday, July 11, 2003 6:11 AM
To: CampbellL@howrey.com
Cc: Don Thomas
Subject: Re: Subpoena costs


Yes, I'd be interested in pursuing a consulting relationship (with
enthusiasm).  Thanks you for your consideration.
-Don Thomas-



On Thursday, July 10, 2003, at 08:03  PM, CampbellL@howrey.com wrote:

> We will be sending you a check for $60 and pay your standard
> consulting rate
> for time at the deposition.
>
> If you would be interested, we would be willing to pursue a consulting
> relationship.
>
> -----Original Message-----
> From: Don Thomas [mailto:thomas@ece.cmu.edu]
> Sent: Thursday, July 10, 2003 6:26 AM
> To: Campbell, Louis
> Subject: Re: Subpoena costs
>
>
> On Tuesday, July 8, 2003, at 08:29  PM, Campbell, Louis wrote:
>
>> Ok.  Please send an estimate of your costs after you have terminated
>> the
>> agreement with Ricoh.
>>
>>
>
>
> The agreement with Ricoh (through Dickstein Shapiro Morin & Oshinsky
> LLP ) has been terminated.
>
> You should be receiving the subpoenaed material this morning.  I sent

**07-31 ORDER**
**41**

> it a day early in case there were some questions.  I leave for a week's
> vacation on Saturday.
>
> As for copy charges, I figure there's at least 1000 pages times two
> sides times $.03.  That would be $60.  A check made out to "Carnegie
> Mellon University" for $60 and sent to me would find its way to our
> administrative support account.
>
> The Fed-Ex was payed for by your charge number -- thank you.
>
> It is hard to estimate the costs for the deposition on July 31 as I
> don't know how long this might take.  My recent charges for background
> consulting of this type have been at $250/hour.  I think I can be of
> great help to the defense.
> -Don-
>
>
>
>

07-31 ORDER
42

| | |
|---|---|
| **From:** | Don Thomas [thomas@ece.cmu.edu] |
| **Sent:** | Friday, July 11, 2003 7:46 PM |
| **To:** | Campbell, Louis |
| **Subject:** | Re: Subpoena costs |

I will be back Monday (for sure) the 21st(?).

If you need to send me anything via regular US mail, my home address is best
1611 Tier Drive, Pittsburgh, PA 15241

Fed-Ex goes to the office (except Saturday delivery which goes to home)
5000 Forbes Ave, ECE Dept, Carnegie Mellon Univ, Pittsburgh, PA 15213

Office:
Ph: 412-268-3545
Fx: 412-268-1374

I'll send email when I return.
-Don Thomas-

"Campbell, Louis" wrote:
>
> Great!  Let me know when you get back from your vacation and we will get
> started.
>
> -----Original Message-----
> From: Don Thomas [mailto:thomas@ece.cmu.edu]
> Sent: Friday, July 11, 2003 6:11 AM
> To: CampbellL@howrey.com
> Cc: Don Thomas
> Subject: Re: Subpoena costs
>
> Yes, I'd be interested in pursuing a consulting relationship (with
> enthusiasm).  Thanks you for your consideration.
> -Don Thomas-
>
> On Thursday, July 10, 2003, at 08:03  PM, CampbellL@howrey.com wrote:
>
> > We will be sending you a check for $60 and pay your standard
> > consulting rate
> > for time at the deposition.
> >
> > If you would be interested, we would be willing to pursue a consulting
> > relationship.
> >
> > -----Original Message-----
> > From: Don Thomas [mailto:thomas@ece.cmu.edu]
> > Sent: Thursday, July 10, 2003 6:26 AM

**07-31 ORDER**
**43**

> > To: Campbell, Louis
> > Subject: Re: Subpoena costs
> >
> >
> >
> > On Tuesday, July 8, 2003, at 08:29  PM, Campbell, Louis wrote:
> >
> >> Ok.  Please send an estimate of your costs after you have terminated
> >> the
> >> agreement with Ricoh.
> >>
> >>
> >
> >
> > The agreement with Ricoh (through Dickstein Shapiro Morin & Oshinsky
> > LLP ) has been terminated.
> >
> > You should be receiving the subpoenaed material this morning.  I sent
> > it a day early in case there were some questions.  I leave for a week's
> > vacation on Saturday.
> >
> > As for copy charges, I figure there's at least 1000 pages times two
> > sides times $.03.  That would be $60.  A check made out to "Carnegie
> > Mellon University" for $60 and sent to me would find its way to our
> > administrative support account.
> >
> > The Fed-Ex was payed for by your charge number -- thank you.
> >
> > It is hard to estimate the costs for the deposition on July 31 as I
> > don't know how long this might take.  My recent charges for background
> > consulting of this type have been at $250/hour.  I think I can be of
> > great help to the defense.
> > -Don-
> >
> >
> >
> >



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

July 17, 2003

DIRECT DIAL 650.463.8135
FILE 06816.0060.000000

**_VIA FEDERAL EXPRESS_**

Donald E. Thomas, Ph.D.
ECE Department
Carnegie Mellon University
Pittsburgh, Pennsylvania 15213

Re:    Ricoh Co. v. Aeroflex, Inc., et al. Case No. 03-103-GMS.
       Our ref. # 06816.0060.000000

Dear Professor Thomas:

      I hope you had an enjoyable vacation.

      Enclosed with this letter is an engagement letter.  Please sign and return the enclosed engagement letter and feel free to make a photocopy of it for your files.  We will send a photocopy of the fully executed agreement to you, when we have obtained all the signatures on the engagement letter.

      Once we have a signed copy of this letter, we will notify Ricoh that you have entered into a consulting agreement with us and we will put the July 31, 2003 deposition on hold.  So, it is imperative that you return the signed engagement letter as soon as you are able.

      Please feel free to call me directly at (650) 463-8135 if you have any questions or concerns.

               Very truly yours,

               *Louis Campbell*

               Louis Campbell

LC:wmh
Enclosure

**07-31 ORDER**
**45**

BRUSSELS   CHICAGO   HOUSTON   IRVINE   LONDON   LOS ANGELES   MENLO PARK   SAN FRANCISCO   WASHINGTON, DC



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

July 17, 2003

**_VIA FEDERAL EXPRESS_**

Donald E. Thomas, Ph.D.
ECE Department
Carnegie Mellon University
Pittsburgh, Pennsylvania 15213

Re:     Intellectual Property Dispute Involving Synopsys, Inc.

Dear Professor Thomas:

　　　　As we previously discussed, Synopsys, Inc. has engaged us to represent them with respect to patent matters arising in connection with the assertion made by Ricoh Corp. that Synopsys's customers are practicing claims of U.S. patent number 4,922,432.  Ricoh has made these allegations in connection with a lawsuit filed by Ricoh against several Synopsys customers in U.S. District Court for the District of Delaware.

　　　　We are very pleased to confirm your engagement as an expert consultant in connection with this dispute on behalf of Synopsys, Inc.  This letter will serve to describe the terms of your engagement and the professional services Howrey Simon Arnold & White LLP would like you to perform for us in connection with our legal representation of Synopsys in this matter.

　　　　The scope of this work may include analyzing U.S. patent 4,922,432, evaluating claim construction, infringement, validity and enforceability issues regarding this patent, providing an explanation of historical issues surrounding prior art synthesis systems, analyzing specific prior art references and assisting us with the preparation of factual issues for presentation to the Court.

　　　　Your work on this matter will be done in response to directions given by Howrey attorneys working on this case.  If you are in doubt about what we have asked you to do at any time or whether any particular expenses are authorized, please contact us.  Should the need arise for outside assistance or for the purchase of any item in connection with any assignment from us, please let us know in advance.

BRUSSELS    CHICAGO    HOUSTON    IRVINE    LONDON    LOS ANGELES    MENLO PARK    SAN FRANCISCO    WASHINGTON, DC



Donald E. Thomas, Ph.D.
July 17, 2003
Page 2

You will be paid at your standard hourly billing rate ($250/hour) for consulting services we authorize you to perform. You will be reimbursed for travel and other expenses related to this work for us. We expect the services to be performed by you alone or by persons working with you who you identify in advance to us and whom we approve.

Please submit your bills monthly, or at mutually convenient intervals, for services and disbursements to my attention at the address above.

This agreement will continue until terminated. This agreement may be terminated at will, upon written notice, by you or us, but such notice of termination will not prejudice your right to compensation for work performed or expenses incurred, if authorized prior to termination, or our right of receipt of work performed by you under the agreement.

The following obligations, however, will survive the termination of this agreement. It is understood and agreed that your work under this agreement is for us and is done at our direction as attorneys in aid of litigation, and that all activities performed by you under this agreement, including, but not limited to, all communications, whether written or oral, between you and any attorney or other employee of the firm, or between you and any Synopsys employee or agent, are confidential and privileged matters which you will maintain in confidence and secrecy and not reveal to any other person or use for any purpose other than in connection with this case, except as authorized by us or required by law. You will promptly inform us of any contact or communication regarding this case from any other person, including, but not limited to attorneys or representatives of Ricoh.

In addition, in connection with work on this case, you and anyone working with you, may be required to sign protective orders governing the treatment of confidential information of others.

You agree that during the time you are acting as our consultant on behalf of Synopsys, Inc. you will not act as a consultant for, or on behalf of, Ricoh or any Ricoh affiliate (more than 25% owned and controlled by Ricoh) and will agree not to give expert testimony adverse to Synopsys, Inc. We understand that you previously consulted for Ricoh's counsel regarding design synthesis technology of the 1980s. We will not ask you to disclose what information or opinions you supplied to Ricoh's counsel and you should not reveal any Ricoh confidential information that may have been supplied to you.

You are, of course, a professional independent contractor and not an employee or agent of this law firm, our clients or any of their affiliated



Donald E. Thomas, Ph.D.
July 17, 2003
Page 3

companies. This agreement is a personal services contract and may not be assigned or transferred in whole or in part by either party without prior written consent of the other party.

We look forward to working with you on this project. Please signify your agreement to the above terms by signing and dating a copy of this letter in the space provided below, and returning the signed copy to me.

Very truly yours,

*Louis Campbell*

Louis L. Campbell

LC:wmh

Seen and agreed to:

Dr. Donald E. Thomas

Date: July 21, 2003

Seen and agreed to:
Synopsys Corporation

By_____     Date: _____, 2003

| | |
|---|---|
| **From:** | Don Thomas [thomas@ece.cmu.edu] |
| **Sent:** | Wednesday, July 23, 2003 5:52 AM |
| **To:** | Campbell, Louis |
| **Subject:** | Phone message regarding consulting |

I got your phone message and will call later this morning or today.
I'm in a meeting from about 10-1 today.   Let me know if there's a
better time than others to call.  Or you could try me outside of these
times (412-268-3545).

I didn't receive the letter that you mentioned.  However, I did get a
rather abrupt phone call from a Mr. Hoffman yesterday regarding whether
my consulting arrangement had been terminated.  I forwarded to him the
email I had sent to Mr. Oliver regarding this.

Sounds like I may have stirred up a mess.
-Don Thomas-

| | |
|---|---|
| **From:** | Don Thomas [thomas@ece.cmu.edu] |
| **Sent:** | Wednesday, July 23, 2003 6:32 AM |
| **To:** | Campbell, Louis |
| **Cc:** | Don Thomas |
| **Subject:** | Fwd: Phone message regarding consulting |

I just received the fax of the letter to me.
-Don Thomas-

Begin forwarded message:

> From: Don Thomas <thomas@ece.cmu.edu>
> Date: Wed Jul 23, 2003  8:51:56  AM US/Eastern
> To: "Campbell, Louis" <CampbellL@howrey.com>
> Subject: Phone message regarding consulting
>
> I got your phone message and will call later this morning or today.
> I'm in a meeting from about 10-1 today.   Let me know if there's a
> better time than others to call.  Or you could try me outside of these
> times (412-268-3545).
>
> I didn't receive the letter that you mentioned.  However, I did get a
> rather abrupt phone call from a Mr. Hoffman yesterday regarding
> whether my consulting arrangement had been terminated.   I forwarded to
> him the email I had sent to Mr. Oliver regarding this.
>
> Sounds like I may have stirred up a mess.
> -Don Thomas-
>
>

| From: | Campbell, Louis |
|-------|------------------|
| Sent: | Wednesday, July 23, 2003 1:37 PM |
| To: | 'thomas@ece.cmu.edu' |
| Subject: | review of documents |

I just thought of a clarification about your review of the pdfs you received. I only want to know if they were published. It is important that you do not tell me any specifics about these pdfs such as title, author, dates, etc.

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
CampbellL@howrey.com

This communication is for the named recipient only and may contain information that is privileged or confidential. If you are not the intended recipient please delete the document, destroy any hard copies, and immediately notify the sender that you received this email in error.

| | |
|---|---|
| **From:** | Don Thomas [thomas@ece.cmu.edu] |
| **Sent:** | Thursday, July 24, 2003 5:56 AM |
| **To:** | Campbell, Louis |
| **Cc:** | Don Thomas |
| **Subject:** | Re: review of documents |

The documents I received from DSMO fall under the categories of:

* patents

* published articles, whether conference, journal, or thesis

* and one that appears to be a rough draft of corporate literature (includes sections like "company overview" and "XXX services and products").
~Don Thomas~


On Wednesday, July 23, 2003, at 04:37 PM, Campbell, Louis wrote:

> I just thought of a clarification about your review of the pdfs you
> received. I only want to know if they were published. It is
> important that
> you do not tell me any specifics about these pdfs such as title,
> author,
> dates, etc.
>
> Louis L. Campbell
>
> Howrey Simon Arnold & White, LLP
> 301 Ravenswood Avenue
> Menlo Park, CA 94025
> 650-463-8135 (phone)
> 650-463-8400 (fax)
> CampbellL@howrey.com
>
> This communication is for the named recipient only and may contain
> information that is privileged or confidential. If you are not the
> intended
> recipient please delete the document, destroy any hard copies, and
> immediately notify the sender that you received this email in error.
>
>

**07-31 ORDER**
**52**

**From:**        Don Thomas [thomas@ece.cmu.edu]
**Sent:**        Monday, July 28, 2003 9:04 AM
**To:**          Campbell, Louis
**Subject:**     Deposition on July 31

Is the deposition still going to occur on July 31?
-Don Thomas-

| From: | Campbell, Louis |
|---|---|
| Sent: | Monday, July 28, 2003 11:28 AM |
| To: | 'Don Thomas' |
| Cc: | Kelley, Chris; 'hoffmang@dsmo.com'; 'mellmane@dsmo.com' |
| Subject: | Deposition on July 31 |

Dear Dr. Thomas:

    I received your email of today inquiring as to whether your deposition noticed for July 31st, would still proceed.

    Given your agreement to consult on behalf of defendants we have withdrawn the deposition date scheduled. As you know, Ricoh, has asserted that you have a conflict of interest that would preclude you from consulting with defendants. This is a question that may be resolved by the District Court in Delaware. If the Court rules that you cannot consult with defendants we will re-schedule the deposition for a date of mutual convenience. At that deposition we will seek testimony regarding the character of prior art logic synthesis systems and their relevance to the validity of Ricoh's patents.

Sincerely,

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
CampbellL@howrey.com

# EXHIBIT C

CondenseIt™                                                    August 28, 2003

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          IN AND FOR THE DISTRICT OF DELAWARE
 3                        - - -
 4   RICOH COMPANY, LTD.,           :
 5          Plaintiff,              :  Civil Action
 6      v.                          :
 7   AEROFLEX INCORPORATED, AMI     :
     SEMICONDUCTOR, INC.,           :
 8   MATROX ELECTRONIC SYSTEMS      :
     LTD., MATROX INC., GRAPHICS    :
 9   MATROX INTERNATIONAL CORP.,    :
     and MATROX TECH, INC.,         :
10                                  :
11          Defendants.             :  No. 03-103-GMS
12                        - - -
13                 Wilmington, Delaware
14             Thursday, August 28, 2003
                       11:00 a.m.
15               Telephone Conference
16                        - - -
17   BEFORE: HONORABLE GREGORY M. SLEET, U.S.D.C.J.
18   APPEARANCES:
19          ROBERT W. WHETZEL, ESQ., and
            STEVEN J. FINEMAN, ESQ.,
20          Richards, Layton & Finger
                   -and-
21          GARY M. HOFFMAN, ESQ.,
            EDWARD A. MEILMAN, ESQ., and
22          KENNETH W. BROTHERS, ESQ.,
            Dickstein Shapiro Morin & Oshinsky LLP
23          (Washington, D.C.)
24                 Counsel for Plaintiff
25
```

```
 1   APPEARANCES CONTINUED:
 2          FRANCIS DIGIOVANNI, ESQ.,
            Connolly Bove Lodge & Hutz LLP
 3                 -and-
 4          TERESA M. CORBIN, ESQ.,
            CHRISTOPHER KELLEY, ESQ., and
 5          ERIC OLIVER, ESQ.,
            Howrey Simon Arnold & White, LLP
 6          (Menlo Park, California)
 7                 Counsel for Defendants
 8
 9
10          THE COURT:  Good morning, counsel.
11          MR. WHETZEL:  Good morning, Your Honor.  Bob
12   Whetzel from Richards Layton for plaintiff Ricoh.  With me is
13   my colleague here at Richards Layton Steven Fineman.  Also on
14   the call for Ricoh are Howrey, Gary Hoffman, Ed Meilman and
15   Ken Brothers, my co-counsel.  I suspect Mr. Hoffman will be
16   our principal spokesperson this morning.
17          THE COURT:  Good morning, all.
18          Per defendants.
19          MR. DIGIOVANNI:  Frank DiGiovanni from Connolly
20   Bove.  Also on the line from Howrey Simon in California are
21   Teresa Corbin and Chris Kelley and Eric Oliver.
22          THE COURT:  Who is going to handle the argument
23   today?
24          MR. DIGIOVANNI:  I will be arguing the first of
25   the agenda items, and I believe Mr. Kelley will be arguing
```

```
 1   the remainder.
 2          MR. HOFFMAN:  Your Honor, on behalf of Ricoh, Mr.
 3   Brothers will be arguing the first item.  I will be handling
 4   items 2, 3, 6 and 5.  And Mr. Meilman will be handling items
 5   4 and 7.
 6          THE COURT:  Okay.  I will try to keep that in your
 7   in mind.
 8          Let's start with item 1.
 9          MR. BROTHERS:  Your Honor, on item 1, there is
10   differences of opinion between the parties with respect to the
11   obligations of the order that the Court entered on July
12   31st --
13          MR. DIGIOVANNI:  Your Honor, I don't mean to
14   interrupt.  I don't do that.  But we are the ones, the
15   defendants are the ones --
16          THE COURT:  Are you the movant on that one?
17          MR. DIGIOVANNI:  Yes, we are.
18          THE COURT:  Let's start with the movant.
19          MR. BROTHERS:  I am sorry.  Both parties are
20   seeking relief, just to be clear.
21          THE COURT:  So both of you, you each view
22   yourselves as movants?
23          MR. BROTHERS:  Yes, Your Honor.
24          MR. DIGIOVANNI:  Yes, Your Honor.
25          On behalf of defendants, we did place the call
```

```
 1   and initiated the conference.  We consider ourselves primary
 2   movants on this issue.
 3          MR. BROTHERS:  Your Honor, we can both have our
 4   say.
 5          THE COURT:  Mr. Brothers, continue.
 6          MR. BROTHERS:  Thank you.
 7          The order of July 31st, the second paragraph
 8   requires the defendants and their counsel to disclose all
 9   communications with or relating to Dr. Thomas and to produce
10   all documents sent to, prepared by, or received from Dr.
11   Thomas.  And then it continues, Any documents withheld on the
12   basis of attorney-client privilege or work product doctrine
13   should be submitted to the Court for an in camera inspection
14   and defendants shall provide plaintiffs with a detailed
15   privilege log.
16          We received part of those documents.  We received
17   the e-mails and letters between the Howrey firm and Dr.
18   Thomas.  But defendants and their counsel have refused to
19   produce anything else, namely, any internal communications on
20   an in camera basis to the Court and to give a privilege log
21   to the other side.  We believe that is clearly required by
22   the order.
23          The history of this gives some basis for our
24   concern.
25          Dr. Thomas was deposed on August 14th.  The
```

Teleconference - Judge Sleet

Page 5

1 witness contradicted the representations of Mr. Kelley during
2 the hearing on the 30th on multiple points, which gives us
3 concern as to what the complete story is.
4       For example, you will recall that the Howrey firm
5 served Dr. Thomas with a subpoena in late June but never
6 provided it to counsel for plaintiffs or filed any notices
7 with the Court. And although Mr. Kelley said during the
8 hearing that Dr. Thomas had called them and said he wasn't
9 working for Ricoh, in fact, what these documents that were
10 produced and Dr. Thomas' testimony show is that Dr. Thomas
11 specifically told the Howrey firm that he was under contract,
12 a consulting contract, with counsel for Ricoh, that Dr.
13 Thomas specifically asked Howrey if they had given the
14 subpoena to counsel for Ricoh, and Howrey led him to believe
15 that the subpoena had been given and that the names of
16 experts had been disclosed in the litigation, and that
17 counsel for Ricoh had not named Dr. Thomas as an expert, so
18 Dr. Thomas assumed that we didn't want him as an expert,
19 which wasn't the case. And then the Howrey firm said,
20 according to Dr. Thomas' testimony, if you sever your
21 contract with Ricoh, then we can hire you and we can pay
22 you. And that's what Dr. Thomas did.
23       A second inconsistency was that Mr. Kelley said
24 very explicitly during the hearing that before Dr. Thomas was
25 hired, they asked him if he had received any confidential

Page 6

1 information or discussed case strategy or other types of
2 information with Ricoh, and that Dr. Thomas had said, no, he
3 hadn't.
4       That is simply not the case.
5       Dr. Thomas was retained. The retention letter
6 was sent on July 17. He signed it on July 21st. The first
7 time any such communications of that nature came up was after
8 we found out about it and objected, and then suddenly there
9 was a flurry of telephone calls and e-mails between the
10 Howrey firm and Dr. Thomas saying, what confidential
11 information did you have? Tell us about it. And there was a
12 phone conference on the 23rd of July and followup e-mails.
13       Dr. Thomas testified at his deposition that there
14 was no question that he had received confidential information
15 from counsel for Ricoh. And he identified a couple of
16 categories of that.
17       During this flurry of information, after counsel
18 for Ricoh had objected, Dr. Thomas had described the
19 categories of that confidential information.
20       Now, Howrey refuses to produce those internal
21 e-mails. We had requested them even prior to the hearing,
22 and the Howrey firm understood we were looking for them.
23 There is a reference by Mr. Kelley in the transcript that, I
24 think it's on Page 14 or so, that he understood we were
25 looking for that information.

Page 7

1       After all of this, the defendants say, well,
2 maybe we are not going to use Dr. Thomas as an expert after
3 all, but we still want to go forward and take his deposition
4 on the very subjects which were the subject matter on his
5 consulting with Ricoh.
6       They obviously believe that Dr. Thomas is going
7 to give them favorable opinions. Dr. Thomas testified that
8 as a result of his consulting with Ricoh he had formed
9 opinions. What is the basis for their expectation?
10       We need to go forward and try and resolve this.
11 We think the sole basis is that Dr. Thomas has given Howrey
12 some basis to believe that the testimony he is going to give,
13 the opinion testimony that they are seeking, is going to be
14 favorable, and that was developed solely as a result of his
15 confidential consulting with counsel for Ricoh.
16       The issue before the Court not only is the
17 interpretation of Paragraph 2 of the July 31st order. The
18 Court is also aware that we are to file followup letters that
19 will relate to the disqualification of Thomas and any other
20 remedies that might be available. We think it advisable that
21 the Court is provided with this information so it has the
22 full picture of what the appropriate remedy should be.
23       THE COURT: Okay. Mr. DiGiovanni.
24       MR. DIGIOVANNI: First of all, there is no
25 contradiction between what Mr. Kelley represented on the July

Page 8

1 30th teleconference and Dr. Thomas' deposition. Dr. Thomas
2 was very clear that he was asked by the Howrey Simon
3 attorney, the one single attorney that he talked to for the
4 five-minute period he actually talked to him, do you have any
5 confidential information? And if so, what type of
6 information is it? And Dr. Thomas responded two days later
7 in an e-mail, just listing three short types of information
8 he had: patents, publications, and financial information.
9 None of it was confidential.
10       And all of those e-mails, that e-mail, and there
11 were about six or seven other e-mails, have been produced.
12 And those are the entire universe of documents that went back
13 and forth between Howrey Simon and Dr. Thomas.
14       If you go back to the teleconference on July
15 30th, the request that was made by Mr. Hoffman was that, you
16 ordered that the defendants be required to disclose all the
17 communications that they have had with Dr. Thomas, and
18 produce all the documents to us that have gone back and
19 forth. The Court subsequently ordered Ricoh's counsel to
20 prepare an order outlining the requests that you have made
21 and I will sign it.
22       But what happened later that day or maybe it was
23 the next day, July 31st, counsel submitted an order that
24 included an additional phrase, some additional language, Your
25 Honor, which actually went beyond what they were supposed to

CondenseIt™                                                              August 28, 2003

**Page 9**

1  submit. So that became this July 31st order.
2       The language of the order --
3       THE COURT: Is that the sentence that says any
4  documents withheld on the basis of attorney-client --
5       MR. DIGIOVANNI: No, Your Honor.
6       THE COURT: Which language is it?
7       MR. DIGIOVANNI: In the same paragraph. Paragraph
8  2, the first sentence, it says, No later than August 6, 2003
9  defendants and their counsel are ordered to, right where it
10  says disclose, it says disclose all communications with or
11  relating to Dr. Thomas. That clause was brand-new. That was
12  not part of what Your Honor ordered on that teleconference,
13  this disclose all communications with or relating to Dr.
14  Thomas. The second clause of that, ordered to produce all
15  documents sent to, prepared by or received from Dr. Thomas,
16  that's what we talked about on the teleconference. That's
17  what we did there. We have produced every single piece of
18  paper, all e-mails that were sent back and forth between
19  counsel and Dr. Thomas. It didn't amount to much. It was
20  only about six or seven e-mails.
21       We also gave them a cover letter to those
22  e-mails. It described the communications, and it also
23  described the type of internal communications that we had
24  amongst attorneys, between attorney and clients. We noted of
25  course those were privileged, that those weren't required

**Page 10**

1  under the production portion of Paragraph 2, because
2  Paragraph 2 says, when it talks about producing documents, it
3  says, produce all documents sent to, prepared by or received
4  from. Then it goes on to talk about documents, any documents
5  withheld, et cetera, et camera. So we didn't withhold any
6  documents on the basis of privilege. So there was nothing to
7  put on a privilege log. There was nothing to produce in
8  camera.
9       The issue is what does this mean, disclose all
10  communications with or relating to Dr. Thomas? And what
11  counsel for Ricoh is saying is that means that all documents
12  relating to Dr. Thomas had to be produced. That is
13  completely inconsistent with the second phrase, where it
14  talks about the exact scope of production of documents. Our
15  reading of it was, we disclosed in our cover letter precisely
16  what we were supposed to produce, precisely what kind of
17  communications went on.
18       Of course, we didn't produce them. The order
19  doesn't require it. It would never make sense to produce
20  privileged documents, even in camera. An in camera review is
21  often done to determine if there is a privilege, not to
22  actually review some privileged documents to find a basis for
23  a claim. But in any event, the order doesn't call for it,
24  before you even getting into the law regarding in camera
25  review.

**Page 11**

1       It is also important, Your Honor, that once we
2  received the declaration of Christopher Monti (phonetic),
3  this is the declaration that Mr. Hoffman talked about on the
4  July 30th conference, once we received that, which, by the
5  way, was one week ago, we had to wait until one week ago to
6  get it, once we took the deposition of Dr. Thomas to find out
7  if, indeed, he received confidential information, once we had
8  those two pieces of information, two days later we said,
9  okay, we are not going to retain Dr. Thomas as an expert.
10  And we are not a hundred-percent convinced that he did
11  receive confidential information.
12       But we told them, all right, we are not going to
13  use him as an expert, fully expecting that would end
14  everything. But they said, no, they went to try to
15  disqualify counsel even though there isn't a shred of
16  information, shred of evidence anywhere stating that Dr.
17  Thomas provided to counsel for defendants any sort of
18  confidential information. In fact, Dr. Thomas,
19  unequivocally, testified that he had one conversation with
20  attorneys for defendants for five minutes. And here is his
21  quote. He says, I didn't share any information with him --
22  this is talking about the one attorney -- about confidential
23  material.
24       That is it.
25       THE COURT: Okay. Mr. Brothers, Mr. DiGiovanni

**Page 12**

1  asserts that that clause that he has identified in Paragraph
2  2, all communications with or relating to, goes beyond the
3  letter and spirit of the discussion and subsequent order
4  entered by the Court orally on July 30th.
5       I don't have the transcript in front of me. I
6  don't have total recall. I don't really wish to engage in an
7  extended debate as to what was intended. But Mr.
8  DiGiovanni's reflections do seem to comport with my
9  recollection of that conversation. Go ahead.
10       MR. BROTHERS: Yes. I do have the copy of the
11  transcript in front of me. On Page 9 it references, Line 17
12  through 22, this aspect of the request. And I will read that
13  quote. And this relates to the second paragraph. Quote.
14  That the defendants be required to disclose all
15  communications that they have had with Dr. Thomas and produce
16  all the documents to us that have gone back and forth. If
17  they feel that any documents are privileged or work product,
18  then they can be submitted in camera. But we should get a
19  log so we can sort that out.
20       Prior to that, Mr. Hoffman had noted, on Page 8,
21  we didn't know the details of what had been discussed, and
22  then later on, Mr. Kelley acknowledged that we were seeking
23  the nature of that communications with Dr. Thomas.
24       The issue here is twofold. First, it is not only
25  the communications back and forth between Dr. Thomas and

Teleconference - Judge Sleet

Page 9 - Page 12

CondenseIt™                                            August 28, 2003

**Page 13**

1 counsel for the defendants. But second, the issue is what
2 did the Howrey firm know and when did it know it with respect
3 to the confidential information that Dr. Thomas had obtained
4 from counsel for Ricoh.
5      There are inconsistencies between Dr. Thomas'
6 testimony and what Mr. Kelley was representing.
7      Now, we ought to be very cautious here. We have
8 not sought to disqualify the Howrey firm. What we are trying
9 to do is get information so that an appropriate determination
10 can be made. What Mr. DiGiovanni has said is, well, we
11 thought by dropping Dr. Thomas that would be the end of it.
12 But they still want to go ahead and take his deposition on
13 the very topics that Mr. Thomas had provided his confidential
14 consulting to counsel for Ricoh. And they just want to sweep
15 under the carpet these inconsistencies and hope that the
16 whole issue will go away.
17      At this point, we don't think that that is
18 appropriate. We think it is appropriate, an appropriate
19 inquiry can be made, but before that can happen, all of the
20 factual information needs to be collected.
21      Prior to our even having the conference with Your
22 Honor on the 30th, we had sent a letter to the Howrey firm,
23 saying, this is what we want. So they knew that we were
24 looking for not only the communications with Dr. Thomas, but
25 the internal communications on an in camera basis if the

**Page 14**

1 privilege was not going to be waived, so that the Court could
2 make this determination, because ultimately, that may be the
3 critical issue, the determination of what is in the order and
4 our interpretation.
5      THE COURT: Counsel, let me just ask. The
6 determination being whether the documents at issue are
7 privileged or not.
8      MR. BROTHERS: I am sorry. The determination
9 would be twofold. First, whether the documents would be
10 privileged. But second, if the documents reflect that in
11 fact Howrey had received confidential information from Dr.
12 Thomas, as we believe is likely, based on their continued
13 pursuit of his deposition, so that they can get his opinions,
14 then an appropriate determination should be made.
15      It is important to note that Howrey recognized at
16 the outset that Dr. Thomas was consulting for counsel for
17 Ricoh —
18      THE COURT: Let me interrupt again. So that
19 appropriate determination being whether the Howrey firm
20 should be disqualified or not. Is that what you mean?
21      MR. BROTHERS: That is a decision that we may
22 well ask the Court to make. We are not asking it at this
23 time. We don't know what those documents may show. And we
24 may not ever see those actual documents. But we think that
25 it may be appropriate for the Court to see what is in there

**Page 15**

1 so it can make an appropriate determination.
2      We want to be very careful. We are not at this
3 point saying the Howrey firm must be disqualified, because we
4 don't have all the facts from the Howrey side. We have it
5 from Dr. Thomas' side. But we don't have all of the
6 information.
7      THE COURT: Now, let me ask this: Do I
8 understand correctly that Dr. Thomas is more or less out of
9 this litigation at this point?
10      MR. BROTHERS: Counsel for defendants have
11 verbally informed us that they do not intend to retain him as
12 an expert. However, they have said that they intend to go
13 forward and take his deposition, which will include, they
14 say, the opinions that he developed as a result of his
15 consulting for Ricoh.
16      MR. DiGIOVANNI: Your Honor, that is not
17 accurate, with all due deference to Mr. Brothers. We never
18 said we were going to inquire as to any opinion in a
19 third-party deposition of Dr. Thomas, of any opinions he
20 formed while working with Ricoh, which he did for 12 or 14
21 hours. We never said that.
22      We will take his deposition, as we would any
23 other third party. His assignment was very important at the
24 time this invention was being developed. There is no way
25 that Ricoh can lock him up, in other words, put a cage around

**Page 16**

1 him so we can't even get to him in this litigation. He is
2 still a fact witness. Ricoh may have talked to 15 or 20
3 witnesses and hired them for 12 hours. That doesn't mean
4 they can lock them up and prevent them from being part of
5 this litigation. We are entitled to take his deposition as a
6 third party. We will not inquire into conversations between
7 Dr. Thomas and Ricoh. We will not do that. We know we
8 can't, and we wouldn't, anyway.
9      THE COURT: Mr. Brothers, what do you say to
10 that?
11      MR. BROTHERS: Well, there are three things in
12 response, Your Honor. First, on the 28th of July, the Howrey
13 firm sent Dr. Thomas an e-mail, saying if the Court rules
14 that we can't use you as a consulting expert, we are going to
15 take your deposition on the things that we have been talking
16 about. And Dr. Thomas testified, when I asked him about
17 that, he said, that looks just like the things that I was
18 consulting with Ricoh about. And it does. And in the
19 communications that we have had with counsel for the
20 defendant, they have said we are precluded from asking Dr.
21 Thomas about those issues.
22      It seems to be a bit of a moving target, based on
23 what Mr. DiGiovanni is telling me today. But the fact is
24 that Dr. Thomas had in-depth consultations with counsel for
25 Ricoh, and he testified he formed opinions as a result of

Teleconference - Judge Sleet

Page 13 - Page 16

CondenseIt™                                                   August 28, 2003

**Page 17**

1  that. That opinion evidence, because they are going to ask
2  him to compare the patent to the prior art, that's
3  information that is all flowing directly from his consulting
4  work. As a result of the conduct of counsel for defendants,
5  Dr. Thomas has become a tainted witness. And it will be very
6  difficult to sort out what is tainted and what is not
7  tainted.
8        MS. CORBIN: Your Honor, I am the lead counsel in
9  this case for defendants.
10       If I could clarify the situation. The concern we
11  have about what we see as the problem with the order, the
12  language that Mr. DiGiovanni culled out, which was disclosure
13  of all communications with, and it's particularly the "or
14  relating to Dr. Thomas" part which goes to Howrey's internal
15  work product and communications with its client, because the
16  fact remains that Dr. Thomas developed one of the major and
17  key pieces of what we believe is invalidating prior art to
18  this patent, that was the genesis in the first place of
19  serving him with a third-party subpoena, to get the testimony
20  necessary to identify all the aspects of that particular
21  prior art and the timing of its development and so on.
22       Going back to the order, this is our concern.
23  The "or relating to" aspect would require us to provide in
24  camera for the Court, which if the Court really wants to see
25  it, we would do that, but it would require us to gather up

**Page 18**

1  all the information and internal documentation we have about
2  that particular prior art and the fact that, as we learned,
3  Dr. Thomas was probably the most relevant witness who
4  developed that prior art, and would be the most relevant
5  person from whom to get the information as to the timing and
6  the particular aspects of that technology.
7        I do believe that those underlying facts cannot
8  be -- we are still entitled to discover those. The fact that
9  they hired him for 12 hours of consulting work can't shield
10  what is a major piece of prior art and take that prior art
11  essentially out of the case.
12       THE COURT: I agree with that.
13       MR. HOFFMAN: Your Honor, I am lead counsel for
14  Ricoh. If I could respond, since Ms. Corbin has?
15       THE COURT: Go ahead.
16       MR. HOFFMAN: I would appreciate the Court's
17  indulgence.
18       First of all, on the issue of what the scope is
19  and the timing, that is easily dealt with just by saying that
20  it is a document, internal communications regarding the
21  retention of Dr. Thomas and also putting on a date that
22  starts with the first contact with Dr. Thomas.
23       Let me go to the more significant issue here.
24  Howrey & Simon and the defendants here knew from
25  day one, once they contacted Dr. Thomas, that he was already

**Page 19**

1  consulting for Ricoh. There is an e-mail where they said to
2  Dr. Thomas, there appears to be a conflict and consequently
3  we cannot use you.
4        Subsequently, they decided to change their mind
5  and send him a consulting agreement, encourage him to break
6  his agreement, terminate his agreement with Ricoh, and to
7  send him a consulting agreement, which he signed. After he
8  signed it, and after we complained, they went back and asked
9  him about the confidential information and whether or not he
10  got confidential information from Ricoh.
11       We didn't create this problem. Howrey & Simon
12  had a simple thing that they could have done if they chose
13  to. That is, once he indicated, Dr. Thomas said, hey, I am
14  consulting for Ricoh. Thank you very much, nice talking to
15  you, have a good day, goodbye. They chose not to.
16       They chose to go forward with this. And they
17  chose to do it until we found out about the subpoena, which
18  was only after they engaged him, not beforehand, contrary to
19  what they led him to believe, and only after they engaged him
20  already did we complain and did they finally do the checking.
21       They created the problem. We didn't create
22  this. What we are trying to do is to seek the information
23  and to place the information before the Court so that
24  appropriate relief, whatever that may be, can be fashioned.
25  As Mr. Brothers indicated, we are not seeking

**Page 20**

1  disqualification today, I don't know that we will ever seek
2  disqualification. There may be and I hope there would be
3  other relief less than that that would be appropriate here.
4        But the first thing we need to do is to find out
5  how deep the poison runs. There is clearly a problem, one of
6  their creation. We are just trying to sort it out so that we
7  can seek from the Court appropriate relief.
8        Those documents that we are indicating that they
9  should list on a privilege log and send to the Court are not
10  coming to us at this point. These are not documents we are
11  saying at this point -- eventually, we may get there, once we
12  see what is on the log.
13       THE COURT: Let me ask this, Mr. Hoffman: The
14  communications relating to, is it your position that those
15  communications may reveal, I think the words tainted witness
16  were used before, that is, they may impact in some way upon
17  this potential witness' credibility as that credibility or
18  his testimony pertains to the merits of the case?
19       MR. HOFFMAN: It may relate to that. It may
20  relate to the issue of what is the appropriate relief. It
21  may relate to the issue of the fruits of the poisonous tree,
22  as the cliche goes. There is an overall issue as to what
23  should be the appropriate relief that is fashioned here.
24       THE COURT: Right now, I don't have a motion
25  before me asking for relief in that regard. I think what you

Teleconference - Judge Sleet                              Page 17 - Page 20

**Page 21**

1  are suggesting is how -- it has been discussed earlier
2  whether the Howrey firm should be disqualified or not.
3  Should that be my principal concern at this point? I think
4  it was Mr. Brothers who may have used the words tainted
5  witness. I think you are entitled to challenge this witness'
6  credibility before the finder of fact, as that credibility
7  pertains to his opinions regarding the merits of whatever it
8  is he is going to be testifying regarding the actual
9  substance of this litigation. Isn't the retention or the
10 disqualification of the Howrey firm, at least at this
11 juncture, an ancillary issue?
12        MR. HOFFMAN: It is an ancillary issue at this
13 point. But part of the other issues, Your Honor, in trying
14 to fashion relief, is, there is other forms of potential
15 relief. And we haven't sorted out what we are going to ask
16 for yet ourselves. But, for example, we may ask the Court to
17 say, listen, Howrey & Simon know that this witness had
18 confidential information. They shouldn't be allowed to do
19 through the back door -- obtain his opinions that he formed
20 as a result of consulting with us. He should just be
21 someone, because of the problem that they created, should
22 just be off everyone's list, period. There is other
23 witnesses familiar with the prior art. He is not the only
24 one.
25        That is number one. It may be that there is

**Page 22**

1  other sanctions. It may be that the individuals who got
2  certain information on Howrey & Simon should not be involved
3  in the case, there should be a Chinese Wall around them.
4  That is another possibility. It does not disqualify the
5  firm. There may be a possibility that the whole firm should
6  be disqualified.
7        Right now, all we are looking for at this time is
8  a list of those communications on a privilege log.
9        MR. CORBIN: Your Honor --
10       THE COURT: Don't interrupt, counsel, please.
11       MS. CORBIN: I am sorry.
12       MR. HOFFMAN: Most people quite often provide a
13 list of privileged documents, anyway. Normally, once the
14 litigation starts, you don't continue. But this is a special
15 situation. And we are asking that the Court -- the way we
16 believe the order read, we ask that the Court require the
17 Howrey & Simon firm and defendants to provide a list of the
18 privileged documents. We also ask that the limited number of
19 documents -- I can't imagine there is many in this
20 category -- be provided to the Court, so that when the Court
21 has the issues laid before it, we can ask for what relief we
22 think is appropriate and the Court can fashion relief that it
23 believes is appropriate.
24       THE COURT: Ms. Corbin, what is the extent of the
25 potential production at issue here?

**Page 23**

1        MS. CORBIN: I wouldn't be able to address that.
2  I wouldn't have personal knowledge at this point.
3        THE COURT: Is there someone who can give the
4  Court that information?
5        MR. KELLEY: I can give you an estimate. I think
6  there is a handful of e-mails.
7        THE COURT: Let's produce them for the Court.
8        MS. CORBIN: Your Honor, my point is -- I don't
9  know whether it is apparent to the Court or not -- we seem to
10 be somewhat making points to cross-purposes here.
11       We did produce all of the exchange of e-mail and
12 any written documentation of an exchange between Howrey and
13 Dr. Thomas to the other side. And as well, Dr. Thomas'
14 deposition was taken. The testimony and those documents show
15 that no confidential information, if Dr. Thomas has any, was
16 ever communicated to Howrey & Simon. And I just want to make
17 clear, because I haven't heard, and I don't believe it's
18 Ricoh's position, that the contrary facts are the case. If
19 so, they haven't stated that.
20       THE COURT: I think they have stated that. Maybe
21 I misunderstood.
22       MS. CORBIN: That is why I wanted to clarify.
23       THE COURT: Let's clarify that.
24       MS. CORBIN: I think what they are complaining
25 about is that he had confidential information and we knew at

**Page 24**

1  some point, he had mentioned to us that he had consulted for
2  this short time with them and we proceeded anyway.
3        THE COURT: Let's get clarification on that. Mr.
4  Brothers.
5        MR. BROTHERS: Yes. Your Honor, we believe,
6  based on the inconsistencies between what Mr. Kelley said
7  during the hearing and Mr. Thomas' testimony, as well as the
8  intent of defendants to continue to pursue Dr. Thomas'
9  testimony, leads us to believe that something more than
10 innocent communications occurred. We don't know when those
11 are and we don't know the extent to them. We know that there
12 was at least one phone call in which the questions were
13 asked.
14       THE COURT: So in other words, Mr. Brothers. It
15 is at least your position that it may have been the case
16 that -- and I don't want to put words in your mouth, but for
17 purposes of clarifying the record and answering Ms. Corbin's
18 question -- is it your assertion that there is the
19 possibility that they may have known of the confidential
20 relationship and proceeded anyway?
21       MR. BROTHERS: Well, certainly, as I understand
22 it, everybody agrees they knew of the confidential
23 relationship. They elected to proceed anyway.
24       THE COURT: And that in fact confidential
25 information had been received by Dr. Thomas?

CondenseIt™                                                   August 28, 2003

**Page 25**

1   MR. BROTHERS: Dr. Thomas has testified that in
2   fact confidential information was received.
3   MS. CORBIN: was received, not transmitted to
4   Howrey Simon.
5   THE COURT: I am sorry. I should have gone that
6   additional step.
7   Is it your position, Mr. Brothers, that it was
8   transmitted?
9   MR. BROTHERS: We believe that there is an
10  inference that supports that. But we don't have the internal
11  Howrey documents that would presumably reflect on that, and
12  Dr. Thomas said he could not recall with specificity the
13  contents of his telephone conversation.
14  THE COURT: I thought, Ms. Corbin, I understood
15  counsel to take the position they have just articulated.
16  MS. CORBIN: My confusion is, Your Honor, they
17  have now taken a deposition and they have all the documents.
18  And they still say they have this inference. But they don't
19  have any statements that he made or any evidence from the
20  document exchange that any confidential information was
21  actually transmitted.
22  THE COURT: What is the basis for drawing the
23  inference, Mr. Brothers? That is what is being questioned
24  here.
25  MR. BROTHERS: There are three specific pieces of

**Page 26**

1   evidence, Your Honor. First is the fact that the questions
2   were asked during the telephone conversation what
3   confidential information was there, and there was the inquiry
4   following our complaint, and then there was a followup e-mail
5   to that saying -- and I read it as kind of a self-serving or
6   "let's protect ourselves" e-mail -- saying, we talked about
7   this in the phone call and I want you just to give me a
8   general list of the documents that were talked about.
9   Dr. Thomas didn't testify specifically, he
10  couldn't remember the specifics of the phone conversation.
11  But based on their, Howrey's continued pursuit of Dr. Thomas
12  and the e-mail following this exchange, saying we want to
13  take your deposition on in essence the same things that you
14  consulted with for counsel for plaintiff, that leads us to
15  believe that there is going to be favorable testimony coming
16  out of that. And what is the basis for that? We think that
17  there is only one answer to that. They have got some idea
18  from Dr. Thomas as a result of his consulting with Ricoh
19  about what those opinions were going to be. And that is the
20  confidential information.
21  In any event, Your Honor has ordered the Howrey
22  firm to produce those handful of internal documents. I would
23  ask that, because the order of July 31st provides that by
24  August 31st, we may file a two-page letter, I would just ask
25  that that be postponed until 10 days after the submission of

**Page 27**

1   the privilege log and internal documents.
2   THE COURT: That is an acceptable process. We
3   will follow that recommendation.
4   Mr. Corbin and Mr. DiGiovanni, are you clear as
5   to what your responsibilities are?
6   MR. DIGIOVANNI: Your Honor, actually, I am
7   somewhat confused with regard to the scope of production.
8   The only documents -- we described those few letters to
9   Ricoh -- the only documents that we have other than the
10  documents that went back and forth to Dr. Thomas, which were
11  all produced, are documents among the attorneys, the Howrey
12  Simon attorneys, there was some e-mail correspondence
13  including myself, regarding Dr. Thomas and these issues
14  regarding Dr. Thomas. So every single e-mail communication
15  or other communication has at least as a recipient or the
16  author an attorney. So there is no doubt that all these
17  documents are privileged.
18  THE COURT: Sure.
19  MR. DIGIOVANNI: It sounds like they are trying
20  to break the privilege. However, there is no such exception
21  to the privilege that would allow them to break. For
22  example, in an instance where you have the crime/fraud
23  exception, the U.S. Supreme Court and the Third Circuit have
24  said there has to be at least a prima facie case established
25  before that can even be broken. There has to be a reasonable

**Page 28**

1   basis to even inquire into these privileged documents to
2   even in camera review.
3   It is our position Ricoh has not even come close
4   to establishing that, especially because we have taken the
5   deposition of Dr. Thomas and he said, quote, I didn't share
6   any information with him -- the one attorney he talked to --
7   about confidential material. So we are somewhat confused as
8   to what the possible inquiry can be, because this is
9   privileged information.
10  THE COURT: I understand what it is. I know the
11  crime/fraud exception, counsel.
12  Mr. Brothers, do you have a position on the
13  crime/fraud exception? Do you want to say something about
14  that?
15  MR. HOFFMAN: Your Honor, if I can just briefly
16  respond. First of all, to return to one of the points in
17  history because it lays the foundation for this. There was a
18  representation to the Court that Dr. Thomas had told the
19  Howrey people that he received no confidential information
20  from Ricoh.
21  THE COURT: I remember that.
22  MR. HOFFMAN: In fact, the Court made a comment
23  about relying on Dr. Thomas' legal opinion when that was
24  indicated. Dr. Thomas, during his deposition, though,
25  testified that he did receive confidential information from

Teleconference - Judge Sleet

**Page 29**

1 Ricoh, obviously, inconsistent with the representations.
2 There is a number of representations that have been made to
3 the Court that are inconsistent -- I am sorry,
4 representations to the Court that are inconsistent with the
5 documents we have obtained to date and also Dr. Thomas'
6 testimony.
7      Your Honor, I think that the whole issue of
8 making certain representations to the Court that they know
9 are inconsistent and these documents that we are asking be
10 turned over to the Court may further our belief, support our
11 belief, does create an issue of potential fraud upon the
12 Court.
13      THE COURT: I think it does. The Court is going
14 to order the production of the July 30 transcript for its
15 inspection at the same time that it reviews the documents
16 that I have just ordered be produced.
17      MR. KELLEY: I want to raise one point.
18      THE COURT: We are done with this point.
19      MS. CORBIN: So I can understand the scope...
20      THE COURT: Let's make sure we understand the
21 scope.
22      MS. CORBIN: You would like every internal
23 document in Howrey that makes reference to Dr. Thomas.
24      THE COURT: Yes. As I understand it, we are
25 talking about a handful of documents.

**Page 30**

1      UNIDENTIFIED SPEAKER: Your Honor, is there a
2 time cutoff for this?
3      THE COURT: Ms. Corbin, is that correct?
4      MS. CORBIN: I can't make any personal
5 representation to that. There may be documents that address
6 that particular piece of prior art.
7      THE COURT: I think it was Mr. Kelley who
8 indicated it would be a relatively few number of documents.
9 Is that correct, Mr. Kelley?
10      MR. KELLEY: Yes, Your Honor.
11      MR. DIGIOVANNI: Your Honor, I am not sure about
12 the time cutoff, because I believe Mr. Hoffman had stated he
13 was interested in the internal documents regarding the
14 retention of Dr. Thomas.
15      MR. HOFFMAN: Your Honor, if I can just respond,
16 I can simplify things by proposing a time cutoff. I believe
17 the subpoena was sent out to Dr. Thomas early July --
18      UNIDENTIFIED SPEAKER: Late June.
19      MR. HOFFMAN -- late June, from whatever that
20 date of that subpoena is going forward, coming to the
21 present.
22      THE COURT: Is that understood on the other
23 side?
24      MS. CORBIN: Yes, thank you, Your Honor.
25      MR. DIGIOVANNI: Your Honor, if we are talking

**Page 31**

1 about documents relating to Dr. Thomas through today, this
2 would include the e-mails leading up to this teleconference
3 regarding strategy,
4      MR. HOFFMAN: I apologize, Your Honor.
5      THE COURT: We don't need that. Through the date
6 of the July 30th telephone conference with the Court.
7      Are we now clear on time parameters?
8      UNIDENTIFIED SPEAKER: It would be June 26th,
9 2003, to July 30th, 2003.
10      THE COURT: Ms. Corbin, do you understand the
11 time, and Mr. DiGiovanni, do you understand the time
12 parameters?
13      MR. CORBIN: It would capture our communications
14 with each other in preparation for that call.
15      THE COURT: Well, I don't want that, either.
16 That is not the intent of the Court, to include that,
17 either. Let's be a little more specific. Mr. Hoffman.
18      MR. HOFFMAN: Your Honor, it would be with
19 respect to the issue whether or not to retain Dr. Thomas.
20 what Dr. Thomas discussed with them, what was communicated --
21 in other words, internal discussions about what were the
22 communications with Dr. Thomas, whether or not they should or
23 should not retain him. If it will simplify things, Your
24 Honor, nor that we not capture their internal communications
25 regarding preparing for the telephone conference with the

**Page 32**

1 Court, why don't we drop it back a few days prior -- Your
2 Honor, we are not looking for things relating to the strategy
3 in preparing for the telephone conference.
4      MR. BROTHERS: I was trying to make clear that
5 the phone conference was on July 30th and recapping that
6 phone conference, then there were additional e-mails to and
7 from Dr. Thomas up through the date of the hearing. So,
8 obviously, to the extent that an e-mail was sent to or
9 received from Dr. Thomas and forwarded to others with the
10 comments about substance and Dr. Thomas' retention and about
11 what was said, then I think all of those are appropriate to
12 include.
13      THE COURT: I agree.
14      MS. CORBIN: So, Your Honor, are you saying
15 through the date of the deposition? I missed what whoever
16 was speaking last just mentioned.
17      MR. BROTHERS: I believe the subpoena was issued
18 on June 25th or 26th. And the hearing was on July 30th, in
19 which the Court said no further communications with Dr.
20 Thomas. So it would be that 34-day period.
21      MR. CORBIN: Excluding any internal
22 communications from Howrey in preparation for that conference
23 call with the Court.
24      THE COURT: Correct.
25      MS. CORBIN: I have that in mind now, Your

**Page 33**

1  Honor.  Thank you.
2       THE COURT: Okay. Great.
3       MR. HOFFMAN: Your Honor, I presume you want to
4  proceed in order?
5       THE COURT: Yes, sir.
6       MR. HOFFMAN: Yes, sir.  The second topic is a
7  request of Ricoh.  We served the subpoena that was issued out
8  of Delaware, out of this Court, on Synopsys.  Synopsys is not
9  a party to the litigation.  However, Ms. Corbin has
10  previously indicated to the Court back at the time of the
11  scheduling conference that their position is Synopsys is a
12  real party in interest here.
13      We served the subpoena for documents.  Synopsys
14  has objected to every part of that subpoena, to all the
15  categories.  To date, they have produced as far as anything
16  other than some prior art, they have produced approximately I
17  think it's less than 100 pages of documents.
18      What we are trying to discover in general from
19  Synopsys is information about the software, the systems that
20  they have provided to the defendants.  As the Court may
21  recall, and it's also set forth in defendants' motion to
22  dismiss, part of the issue here regarding the defendants'
23  activities relating to their utilization of Design Compiler.
24  There is also another program called Behavioral Compiler,
25  which may also play a part here.

**Page 34**

1       What we indicate, in fact, they have asked for us for
2  our basics, some of our infringement positions, and we have
3  set forth a basic explanation of why we think they infringe.
4  It is very general at this point, granted.  But it does in
5  that indicate that part of it involves the use of Design
6  Compiler.  Synopsys has indicated that they are willing to
7  give us some non-confidential, publicly available documents
8  on Design Compiler and Behavioral Compiler, but nothing
9  confidential.
10      We have obviously pushed for more.  We want the
11  confidential documents on both products.  And also we want to
12  know what other products did they provide to the defendants,
13  because there are other products that may come into play
14  here.
15      Synopsys has raised a number of objections.  The
16  first objection that they have raised is that the documents
17  should not have to be produced twice, because that would be
18  duplication, and consequently, they will produce them in the
19  California action and not here.
20      And I start with that one, Your Honor, because in
21  essence during the scheduling conference, Ms. Corbin sought a
22  stay of discovery in this action.  And the Court
23  appropriately indicated that, no, discovery was going to go
24  forward.  What Synopsys is doing here and the defendants are
25  doing here in essence is saying that, no, discovery is not

**Page 35**

1  going to go forward.  We are only going to produce the
2  documents in California.
3       We agree, they don't have to be produced twice.
4  But there is no reason not to produce them here.
5       They have also objected on the basis that the
6  documents are confidential.  Well, Your Honor, there is a
7  protective order.  Howrey & Simon, who represents both
8  Synopsys and the defendants, was involved in negotiating the
9  protective order.  They were involved in working out the
10  details of it.  Clearly, they can be produced underneath the
11  protective order.
12      Next, Your Honor, something I had not mentioned
13  Synopsys has not objected on any type of basis that there is
14  no jurisdiction of this Court over this issue, over the
15  subpoena.  So it is appropriate here, the subpoena.
16      The only issue is what subject matter, what
17  documents do they need to produce.  They have also complained
18  or objected that we haven't explained our patent infringement
19  theory.  This also comes up with the objections that have
20  been raised.  Mr. Meilman will get into that later on when we
21  address that topic.
22      We have indicated to them, in fact, they have
23  stated that the issue of infringement relates to the
24  utilization of Design Compiler.  We are fully aware of that
25  So for them to tell the Court, we don't -- to object on the

**Page 36**

1  basis we don't understand what you are charging with
2  infringement at the same time they are telling the Court
3  that, ok, what's being charged with infringement is
4  utilization of Design Compiler is simply disingenuous.
5       They have also objected, indicated that the
6  documents can be obtained from the defendants and we would be
7  better off obtaining it directly from the defendants since
8  they are parties to the litigation.
9       Well, first of all, Your Honor, not all the
10  documents can be.  But more importantly here, the defendants
11  in turn, turn around and say, through the same attorneys,
12  Your Honor, saying that, well, we can't provide you the
13  documents because it's the confidential information of
14  Synopsys.  Well, Your Honor, obviously, the information can
15  be provided.  It can be provided underneath the protective
16  order.
17      We next have an objection that the documents,
18  some of the documents are in the public record and can be
19  obtainable from other sources.  Well, to say, well, some of
20  the documents I have are publicly available and you can
21  obtain them, well, who knows what documents they are?  If
22  they gave us a list, here is the dates of the documents, here
23  is where you can obtain them, fine.  But if they have the
24  documents, whether they are publicly available from other
25  sources or not, they should still be obligated to provide

Page 37    August 28  2003

1 them.

2    They also object that apparently some of the
3 documents are confidential information of third parties,
4 unidentified third parties. We have asked them to identify
5 them, these allegedly third parties. They have refused to do
6 that.

7    In essence, what we are getting, what appears to
8 us, Your Honor, is a stonewalling of discovery, a decision to
9 say that basically we are just not going to provide discovery
10 until the Court requires us to. That's the way it looks. Or
11 until the case the case is in California, we are not going to
12 give you discovery. We are not going to provide it in the
13 Delaware action.

14    THE COURT: Okay. Who is going to handle this?

15    MR. KELLEY: Your Honor, I am.

16    Mr. Hoffman just recited several issues that
17 relate to objections that were recorded in our responses to
18 the interrogatories. But it doesn't address the real issue
19 here, which is the breadth -- I said interrogatories, I meant
20 document requests -- which is the breadth of the document
21 requests. If you look at these -- am I talking over
22 someone?

23    THE COURT: No.

24    MR. KELLEY: They have asked for -- I will go to
25 some specific language in a minute. They have asked for

Page 38

1 every engineering document relating to any product produced
2 by Synopsys. Now, Synopsys is a third party, may be required
3 to produce some documents in this litigation. But the basis
4 for that production has to be that there is a need to get
5 this information from the third party and that the evidence
6 is directly related to a real critical issue in the case that
7 can't be attained from some other source.

8    It's not proper for them to submit document
9 requests that ask us for every engineering document relating
10 to every product that Synopsys has produced. That is the
11 real issue here. Not about the nature of our objections,
12 about whether a document is confidential or not. If they are
13 willing to focus their document requests on the real critical
14 issues, the key part of the Synopsys product that they think
15 is relevant to their theory of infringement, which, as Mr.
16 Hoffman just admitted, they haven't really spelled out in any
17 kind of detail, then that would be a legitimate basis for a
18 document request.

19    Let's cut to some of the text from the document
20 requests.

21    The order that we would ask the Court to issue is
22 a protective order relating to Document Requests 2 through
23 5. Let me just tell you, read to you a little bit, and I
24 won't do this for all of them, because it will become
25 tedious. but let me just read to you from No. 5. It says.

Page 39

1    Produce all documents concerning all hardware, software,
2 libraries, core databases for use in ASIC design systems and
3 then goes on and on, about including technical reference
4 manuals, technical bulletins, user manuals, installation
5 manuals, training manuals, sourcecodes, tutorials, et  .
6 et cetera.

7    The real issue here is that these are just not
8 crafted as the kind of discovery that one might reasonably
9 expect one could get from a third party to a case. They are
10 not limited in any manner to the products at issue. They are
11 not limited in any manner to the key parts of the product
12 that they are going to contend infringe.

13    The only thing that they have identified in their
14 interrogatory answers to date as being the basis of their
15 infringement allegations is two steps, two steps that are
16 performed by the defendants in this case. The first is
17 providing input to Design Compiler, and the second using
18 Design Compiler to take the library cells and create some
19 output that will be used to produce an output for (inaudible)
20 ASIC a chip. That is all they have identified.

21    If they are willing to restrict their document
22 requests to specific things relating to those steps and
23 relating to the product that they say defendants are using in
24 an infringing manner, then we would have a basis to produce
25 documents. They aren't entitled to a fishing expedition  f

Page 40

1 every engineering documents in Synopsys' possession.

2    And I would go on to state, Your Honor, there are
3 a number of documents, document requests, that we have
4 produced documents, agreed to produce documents in response
5 to. This is not an exercise in stonewalling. And we have
6 given them some manuals that describe how, what kind of
7 inputs Design Compiler can accept, and describe exactly the
8 steps involved or the state, describe that Design Compiler is
9 used to select library cells in order to produce an output
10 for ASIC design.

11    THE COURT: You have described, counsel, some
12 parameters. Let's see if they are acceptable to counsel for
13 Ricoh.

14    MR. HOFFMAN: Your Honor, first of all, the
15 documents that they have produced is less than 100 pages.

16    THE COURT: I don't want to go over that. What I
17 am interested in knowing is how you react to the objection
18 which Mr. Kelley says is really at essence here, that is the
19 scope, that your request is overly broad.

20    MR. HOFFMAN: Your Honor, what we have indicated
21 to them is that -- and then I would like to go to what is
22 actually the Request No. 5, because it was not properly read.

23    THE COURT: I don't want to do that. What I want
24 to get to is an agreement. I am really not interested in
25 batting this ping-pong ball back and forth across this

CondenseIt™                                                August 28, 2003

**Page 41**

1  table. I want to get to an agreement rather quickly.
2      MR. HOFFMAN: Yes. Your Honor, what we have
3  indicated is we will agree to limit our request to No. 1,
4  Design Compiler documents, Behavioral Compiler documents.
5  And they have agreed -- that is just the starting point, and
6  I will go on from there. But they have agreed to produce
7  documents relating to those products, but only the
8  non-confidential documents.
9      THE COURT: Well, let's talk about that then.
10  Insofar as, Mr. Kelley, counsel has now defined what I hope
11  you will agree is a proper scope, what about the production
12  of confidential information pursuant to the terms of your
13  protective order?
14      MR. KELLEY: Is that a question for me, Your
15  Honor?
16      THE COURT: Yes, sir.
17      MR. KELLEY: The reason that we mentioned
18  confidentiality in the objection is that as a third party
19  confidentiality is one of the considerations that is
20  mentioned in the case law about weighing that burden on the
21  third party versus the need in the case.
22      THE COURT: We are trying to reduce the burden.
23  I do understand your complaint regarding the burden.
24      MR. KELLEY: I apologize. The next point, what
25  they have identified as being the basis of infringement,

**Page 42**

1  namely, that the user provide certain inputs to Design
2  Compiler and that that Design Compiler takes those inputs and
3  selects library cells to produce the output, that they can
4  get from public documentation. There really is no need to go
5  into our sourcecode describing exactly in great detail how
6  those functions are performed or into the internal
7  engineering documents describing every aspect of that. If
8  that is what they need from us, they have already got that.
9  And I will correct Mr. Hoffman. We have already produced
10  several hundred pages of manuals.
11      THE COURT: Let's just deal with this discrete
12  issue, this discrete range of documents, Mr. Hoffman. Do you
13  agree that there are alternate sources?
14      MR. HOFFMAN: No, there are not, Your Honor. The
15  information is going to be in the confidential documents. It
16  is going to be in the sourcecode. It is going to be in the
17  other information that comes out of Synopsys or comes out of
18  the defendants.
19      There is many other parts of this claim, such as
20  discussions of expert systems, discussions or rules. Some of
21  those are going to be parts of the (inaudible) of Design
22  Compiler or Behavioral Compiler.
23      So consequently, just inputting information, yes,
24  that is part of the process here, there is no question that
25  is part of the process. But then it's how the system

**Page 43**

1  operates is another part of the process, and some of that is
2  not fully available. The details that we want for trial to
3  prove our case, obviously, we have enough information to
4  bring the case and to allege, quite appropriately allege,
5  that that information and that operation is present. But we
6  are entitled to further information to further establish and
7  prove our case.
8      Synopsys, they keep on saying they are a third
9  party. Yet at other times they keep on saying they are the
10  real party in interest and they are the true party here.
11      THE COURT: I don't hear any objection to the
12  relevance, that it's not discoverable. It's a question of
13  sourcing, where you can get it from, whether you can get it
14  from alternate sources and how to protect it.
15      MR. HOFFMAN: There is a protective order and we
16  cannot get this from --
17      THE COURT: What I am going at is, it seems to
18  me, counsel, if you remove for a moment -- and I know this is
19  difficult to do -- your adversarial hats and think more in
20  the spirit of cooperation, because there is no apparent
21  disagreement as to the relevance of this information, the
22  discoverability of this information, then you could probably
23  come to a point of agreement as to how it should be
24  produced. Is that just beyond your capability? Or what are
25  we talking about here?

**Page 44**

1      MS. CORBIN: Your Honor, I think that now they
2  have the identified Design Compiler, Behavioral Compiler --
3  Design Compiler alone, just for point of reference for the
4  Court, is the largest product at Synopsys, accounts for more
5  than 20 percent of its revenue. They still want all
6  engineering documents relating to Design Compiler. We still
7  have a huge problem with respect to overbreadth.
8      THE COURT: I can understand why you would have a
9  problem with that. And it seems to me the plaintiff should
10  be able to narrow their request somewhat.
11      MR. HOFFMAN: Your Honor, if Synopsys is willing
12  to give us the confidential information, they are willing to
13  give us the sourcecode limited to the scope of
14  documents, going back to 1996, so we are not talking about
15  everything that is there, all documents that they have ever
16  had, we are willing to work with them in trying to work out
17  some other limitations. But to say, well, tell us the
18  details of exactly which parts of Design Compiler you are
19  alleging to infringe and give us a detailed claim chart so
20  that then we can decide whether or not we will give you
21  anything is putting the cart before the horse. What they are
22  asking is prove your case and then we will decide if we will
23  give you discovery.
24      THE COURT: Obviously, you don't have to do it all.
25      MS. CORBIN: Your Honor, the sourcecode, since I

Teleconference - Judge Sleet

Page 41 - Page 44

**Page 45**

1 has been mentioned twice now, is of particular import, I
2 think, because that is the most sensitive information about a
3 particular product, it contains a lot of information. If
4 what they need is an understanding of the inputs that these
5 particular customers input to Design Compiler when they use
6 it, there are other ways to get to that information besides
7 having the sourcecode, which is the most sensitive
8 information in the company, regarding their key product.
9      THE COURT:  Well, inevitably, counsel, in all of
10 these cases, and you know that from your vast experience in
11 this area, there is always information, oftentimes
12 extraordinarily sensitive information like this that is at
13 issue and that needs to be shared in order for the litigation
14 to proceed forward. That is why we have protective orders.
15 That is why there is a body of law that has grown up around
16 this issue. But it is incumbent upon counsel to recognize
17 the need to cooperate, and if necessary, to craft new
18 language that will enable this type of information to be
19 shared at appropriate levels. If it is for attorneys' eyes
20 only -- I think you understand where I am going with this.
21      If there is truly an alternate source that will
22 enable the plaintiff to prosecute its claims in a timely
23 fashion from which it can receive this information, I would
24 be interested in knowing and having the discussion right now
25 as to what that source is and whether it is acceptable to the

**Page 46**

1 plaintiff.
2      MS. CORBIN:  Can you address that, please, Chris
3 Kelley?
4      MR. KELLEY:  Yes, absolutely. That is where I
5 was intending to go.
6      Your Honor, the issue here is that -- of course,
7 they have stated to this Court -- and I don't want to get
8 into the motion to stay or transfer -- but they have stated
9 that their beef is not with Synopsys. That it's by
10 defendants that are infringing. They are now suggesting that
11 Synopsys is a third party and as a party to this case has the
12 same obligations in discovery.
13      If you look at the way the interrogatory is
14 drafted, they identify the two things that would have some
15 connection with the user, namely, putting some stuff in at
16 the top of the process and getting something out at the
17 bottom. And they didn't mention anything about all the other
18 the stuff, which of course I think they are going to argue
19 are all internal to Design Compiler.
20      Their theory of infringement really is these
21 defendants use Design Compiler. If that is the case, which
22 they haven't come flat out and stated today, they should have
23 sued Synopsys. Instead, they elected to sue Synopsys'
24 customers. Now they are trying to back-door, attack
25 Synopsis' product by getting this very broad discovery.

**Page 47**

1      I think the progression here is, to the extent
2 they really believe their case of infringement rests on
3 something the defendants are doing and there is some
4 peripheral material that is in the exclusive possession of
5 Synopsys, that is the kind of discovery they should get. But
6 what I think we are going to find out when we actually have
7 this meeting -- and I think that's the proper way to proceed.
8 is for the proper parties to get together and work out
9 exactly what they need and what we can give them. how we can
10 get them the information they need. I think what we are
11 going to find is everything they need relating exclusively to
12 stuff done by Design Compiler, nothing to what these two
13 defendants here are doing except using Design Compiler.
14 providing the regular inputs that Design Compiler normally
15 takes in and at the end of the process say thank you very
16 much for the output, I am going to take this off to go make
17 the chip.
18      THE COURT:  It is not necessary for you to
19 respond, Mr. Hoffman. The Court has instructed the parties
20 to get together and discuss this matter. If you are still at
21 an impasse after that discussion, obviously, we will have to
22 revisit this.
23      Let's go on to No. 3.
24      MR. HOFFMAN:  No. 3. Your Honor --
25      MR. KELLEY:  Your Honor, I think this is our

**Page 48**

1 item.
2      THE COURT:  Yes.
3      MR. KELLEY:  This is a relatively simple matter.
4 On the patent at issue, there are two inventors, Mr.
5 Kobayashi and Mr. Shindo. Ricoh has already agreed to make
6 Mr. Kobayashi available for deposition in Japan. That is
7 going forward.
8      At a fairly early point during discovery, we
9 asked them whether they were representing Shindo. I am not
10 going to get this exactly right. They said, no. We will see
11 if they will work with us. Give us your subpoena and we will
12 see if he will accept it, not formally, accept service, but
13 he will respond to it.
14      We haven't yet received from them a commitment.
15 any final word as to, one, whether Mr. Shindo will accept
16 this -- will cooperate in discovery. and two, whether they
17 intend to use him during trial, appear as a witness.
18      Both Mr. Shindo and Mr. Kobayashi, to our
19 knowledge, live in Japan. We have asked them if they would
20 bring Mr. Shindo to the United States. They have said, no,
21 you have to go to Japan to take his deposition if you want to
22 take his deposition. That's assuming of course that he at
23 some point determines to cooperate.
24      The problem we are facing, given the close of
25 discovery in January, the facilities for deposition, which I

**CondenseIt™**                              **August 28, 2003**

### Page 49

1  assume everyone on the phone is familiar with, depositions in
2  Japan must takes place either at the embassy or one of the
3  consulates. The Tokyo Embassy is already completely booked.
4  There is a little opportunity, some space in the Osaka
5  Consulate, which, to our understanding, that is actually
6  where Mr. Shindo lives, is Osaka.
7      What we would like from the Court is some
8  deadline as to when they actually have to have a final word
9  as to whether Mr. Shindo is going to cooperate or not. Then
10  either to make him available in Japan in accordance -- with
11  one of the windows of opportunity that we have, at the Osaka
12  Embassy, or bring him to the United States for deposition
13  here.
14      THE COURT: Okay.
15      MR. KELLEY: We can depose him in advance of
16  trial.
17      THE COURT: Can we get an answer to the question,
18  counsel?
19      MR. HOFFMAN: Yes. Mr. Shindo, who is a third
20  party, we don't represent him, we have attempted to contact
21  him through numerous ways. He does not respond to any of our
22  requests to see if he would be willing to accept the
23  subpoena.
24      We have asked him to sit for a deposition and
25  produce documents. He does not respond. He is so far, by

### Page 50

1  lack of response, at least implicitly is indicating he is not
2  going to cooperate. He has been gone from Ricoh over ten
3  years now. It is our belief that he is not going to
4  cooperate. Obviously, if he is not going to cooperate, he is
5  not going to show up at trial or anything else.
6      Both plaintiff and the defendants had listed Mr.
7  Shindo as someone who might have information. He is one of
8  the inventors. I presume he has some information. But no
9  one can force him as a third party to cooperate or to appear
10  for a deposition. We have been unsuccessful in doing that.
11  Consequently, we can't produce him.
12      With Dr. Kobayashi, he lives in Japan. He is
13  also not employed by Ricoh. We asked him. He came back and
14  said, yes, he would be willing to voluntarily appear. And
15  that deposition is set up in September, late September.
16      THE COURT: Mr. Kelley, what would you have
17  counsel do in this situation?
18      MR. KELLEY: I understand the difficult situation
19  he is in. This is the first time I heard he hadn't
20  responded. What I guess I would like is a drop-dead date, if
21  you will forgive the phrase, by which we will know he is
22  either going to cooperate by this date or there is not going
23  to be an opportunity for him to appear at trial. It seems to
24  me that should be sometime before the close of discovery, not
25  the final day of discovery.

### Page 51

1      MR. HOFFMAN: That is fine, Your Honor. We would
2  be willing to do that by the end of the year.
3      THE COURT: The drop-dead date is the end of
4  discovery.
5      MR. KELLEY: The complicating factor is if he is
6  going to be deposed in Japan.
7      THE COURT: No. I understand. Obviously, there
8  are challenges that would have to be overcome. For instance,
9  on the last day of discovery, you get word that he is
10  available, the Court will be flexible, perhaps, in all
11  likelihood, and permit the parties an additional period of
12  time in which to complete his deposition. But we can
13  certainly deal with that at the time. At least theoretically
14  the drop-dead date is the last day of discovery.
15      MR. HOFFMAN: we have asked the defendants to
16  produce all documents -- let me read it to you, a single
17  document request in this regard: Produce all documents and
18  tangible things identified in Section B, Items 1 through 8,
19  of defendants' initial disclosure dated and served on or
20  about May 30, 2003.
21      This is where they listed the documents that they
22  are going to rely upon in support of their case. We asked
23  them to produce the documents. Part of the response is,
24  defendants further object to this request as unduly
25  burdensome in seeking discovery of information not reasonably

### Page 52

1  calculated to lead to the discovery of admissible evidence.
2  Defendants further object to this document request as unduly
3  burdensome and on the basis that it seeks detailed discovery
4  regarding operations of defendants that has no relevance to
5  defendants' ASIC products or methods.
6      Your Honor, these are the documents that they
7  listed, the categories of documents they listed in their
8  initial disclosure.
9      The purpose of the initial disclosure, obviously,
10  is either done over the documents, list the categories so the
11  other side can go ahead and request them. We requested
12  them. They came back and have said, no, they are not
13  relevant. We tried to work it out with them. The response
14  was, and this is from Mr. Mower (phonetic), defendant
15  identified eight categories of documents that were likely to
16  be relevant to this dispute. Defendants did not suggest, as
17  your letter implies, that any documents that go into that
18  that fall into these categories were relevant.
19      Well, Your Honor, if they listed them, you only
20  list what you think is relevant. If it is relevant, we are
21  entitled to them. If they didn't list any -- if the
22  documents they listed are not relevant, then why did they
23  list them in their initial disclosure?
24      THE COURT: I agree. What is the defendants'
25  response to this?

Teleconference - Judge Sleet                             Page 49 - Page 52

Condenseit™            August 28, 2003

**Page 53**

1   MR. KELLEY: Your Honor, the categories that are
2 identified are relatively generic phrases. Product design,
3 development materials, marketing, promotional materials.
4 Sales and accounting statements. You get the gist. Sort of
5 generic classifications of documents.
6   When we prepared this, this is in the initial
7 disclosure statement, we did not have any idea what their
8 theory of infringement was. All we had was the complaint,
9 which doesn't provide any detail other than you infringe. We
10 did note what our invalidity arguments were going to be and
11 we started collecting that information as quickly as
12 possible. In fact, we have produced the thousands of
13 documents that plaintiffs sometimes refer to in their papers
14 are all prior art articles that we have produced. So we have
15 produced the materials we knew about in describing those
16 categories at that time. We immediately started producing
17 that stuff.
18   Since then, we have agreed to go ahead and get
19 the materials relating to -- and here's where the parties
20 have had some negotiation in the past few days leading up
21 though this call, not ultimately successful but some
22 narrowing of the differences -- we have agreed to produce, to
23 go get documents relating to ASIC products which were
24 developed in a process where there was some logic synthesis.
25 Logic synthesis is the kind of operation performed by Design

**Page 54**

1 Compiler and other product.
2   And we wanted to further restrict the documents
3 to documents that had some bearing on the use of, the steps
4 which they have identified in their interrogatory, providing
5 input to the logic synthesis to Design Compiler and using
6 Design Compiler to map library cells to produce an output
7 file.
8   They have agreed that their document requests,
9 which asks for every information, all documents about every
10 ASIC, should properly, they have agreed to narrow their
11 request, just in the last few days, to ASIC, whether there
12 was some logic synthesis, i.e., having something to do with
13 the process that is described in their patent. So then the
14 remaining difference, really, in the document requests is
15 whether they get every document that the defendants have on
16 that ASIC or if they get the documents that are relevant to
17 the claimed process.
18   THE COURT: I have to say, this is the first time
19 that I have ever had to deal with an issue involving
20 production related to initial disclosures. I find it
21 extraordinary. Counsel --
22   MS. CORBIN: Your Honor, I think that the problem
23 was that the initial disclosure was inartfully drafted.
24   THE COURT: Perhaps. But what you need --
25   MS. CORBIN: The problem may be, there was a

**Page 55**

1 subset of documents.
2   THE COURT: Ms. Corbin, I am going to talk over
3 you. You can't talk over me. I know we are on this bridge
4 line and sometimes we talk over one another, and that's okay.
5   But you are going to have to go back and finish
6 your conversation about this. counsel. I am not going to
7 spend any more time on this.
8   Let's move on to No. 5.
9   MR. MEILMAN: Your Honor, actually, you have
10 heard part of the discussion on the document requests.
11 Actually, the interrogatory, No. 7. they are also related.
12   THE COURT: Let's talk about them both then.
13   MR. MEILMAN: Right after the Rule 16 conference
14 in May, we served these document requests and interrogatories
15 on defendants about a month later. And as Mr. Kelley
16 indicated, we have been trying to resolve our differences
17 ever since. We have gotten some information in documents.
18 But it's been dribbled in piece by piece.
19   As Mr. Kelley has told you, that they keep
20 objecting on the grounds that we haven't told them our
21 infringement theory. In essence, what they are doing is they
22 want us to give them our Markman construction before they
23 decide what they are going to give us. That's something that
24 was raised during the Rule 16 conference, and the Court
25 refused to push the Markman conference before any discover

**Page 56**

1   As Mr. Kelley indicated, we have narrowed the
2 definition of what we want, well, the patent in suit is
3 directed to a computer aided design process for making
4 application specific integrated circuits, what has been
5 referred to in this conference call as an ASIC.
6   We have asked them, we have narrowed our request
7 to processes for making ASICs by a computer-aided design
8 process using logic synthesis, development of those
9 processes, what equipment they have used, and any literature
10 they have had about that.
11   Last Friday, they have told us they will provide
12 us details about their current process (inaudible)
13 development. As to two of the three defendants, they have a
14 plant in the U.S. But as Mr. Kelley indicated, they want to
15 restrict that to Design Compiler because we indicated we knew
16 they used Design Compiler in at least some of their
17 processes.
18   Yesterday, they backtracked, as far as I
19 understand it, and said we will give you only details as to
20 some of these subsreps in the process.
21   They have told us that one of the defendants.
22 Matrox Tech, did design work in Florida, but we will be
23 getting no information about that because it closed its plant
24 in 2000 and those records don't seem to be located.
25   Then there is an issue on questions of responsive

RECEIVED TIME   SEP. 2.   8:57AM

CondenseIt™                                                      August 28, 2003

**Page 57**

1  by the Matrox defendants done in Canada. We have been told
2  that there are additional process steps those defendants
3  carry out which makes the foreign production provisions of
4  Title 35 U.S.C. 271(g) inapplicable. As you may guess, the
5  minute they said that to us, we said. What are those steps?
6  And we have been refused disclosure on that.
7          Yesterday I got a call from Mr. -- I got a letter
8  from Mr. Kelley indicating that if we want, they will make
9  people available with knowledge about their design work for
10 deposition, but we are not going to get any interrogatory or
11 document request.
12         Basically, on the definition of the products --
13 the processes that we wish to have disclosure on, we believe
14 that limiting that to the computer-aided design process with
15 logic synthesis is narrow enough to give us the discovery we
16 want. We know as to some processes the defendants use Design
17 Compiler. What we don't know is whether they have any other
18 products that they have gotten from other suppliers.
19         We have asked them, do you have those? And
20 produce the documents. We have asked both in general and
21 specifically as to one of their -- one of the companies we
22 know provides equipment called Cadence. And basically, we
23 are told we are not going to get an answer. As to other
24 things, when they don't have any documents or it has not been
25 applicable, we have been told that. But as to the generally,

**Page 58**

1  are you using somebody else's equipment, are you using
2  Cadence's equipment, we are getting no answer at all.
3          I think that's basically -- that whole approach
4  filters down to everything that is in dispute pretty much on
5  the interrogatories and document requests. As Mr. Kelley
6  said, it is a question of what we are entitled to as far as
7  breadth goes.
8          THE COURT: Okay.
9          MR. MEILMAN: It may very well be there are no
10 other alternate products that the defendants are using. But
11 I think we are entitled to know that.
12         THE COURT: Okay. Let's hear from the other
13 side.
14         MR. KELLEY: Your Honor, let me talk about the
15 271(g) issue in a minute. Let me deal with the document
16 requests first.
17         The fight that we have been having over the last,
18 it's been about three or four weeks the parties have been
19 discussing this in earnest, is these document requests. Once
20 again, let me just read this: Produce all documents -- I am
21 reading from No. 5, Document Request No. 5: Produce all
22 documents concerning the conception, design, development,
23 manufacture, or sale of each of the defendants' ASIC
24 products. Then it goes on and gives some examples sort of
25 thing.

**Page 59**

1          There are several. The ones we have objected to
2  and said these are too broad are that kind of thing. They
3  haven't (inaudible) with all products and anything having to
4  do with the design of that product.
5          Now, Mr. Meilman just said that, he said CAD
6  process. As far as I know, that is the first time I have
7  heard them say, what we really need is stuff about the CAD
8  process. Although I am not sure whether he meant -- well,
9  the thing that is relevant here is logic synthesis. It's not
10 the specification, the engineering specification describing
11 what the product was going to do that was formulated back
12 when people were kicking around ideas about what a good
13 product for the company would be. So that's what we have
14 been fighting about now.
15         Ricoh just a few days ago said we will limit the
16 products, as I mentioned, we will limit the products to those
17 products that use logic synthesis.
18         Now, I think the remaining issue is whether the
19 scope of these document requests should be restricted to
20 documents describing the use of logic synthesis or relating
21 to logic synthesis for those products, and not anything
22 having to do with the specification of the product,
23 engineering, planning meetings, memos about how, we have got
24 bugs, our design isn't working, because none of that has
25 anything to do with the claim.

**Page 60**

1          THE COURT: Is that an acceptable limitation,
2  Ricoh?
3          MR. HOFFMAN: Your Honor, what we are looking
4  for, as Mr. Meilman, I thought, had indicated, is the
5  documents that relate to the process for manufacturing these
6  ASICs in the designing of the ASICs using systems that have
7  logic synthesis in them. We are not looking for things
8  relating to debugging of the ASICs themselves. We are not
9  looking for things on other types of -- there is some
10 categories -- and I would have to go back to exactly what Mr.
11 Kelley said -- other things that were pre the designing of
12 these ASICs using the particular types of processes that are
13 involved in the claims and in the patent here of ASIC
14 designing processes using logic synthesis.
15         That is what we are looking for. We have told
16 them that. To date, they have produced less than a thousand
17 pages of documents.
18         THE COURT: Is that a different way of saying
19 that you are in agreement with the limitation that has just
20 been proposed? Or are you broadening?
21         MR. HOFFMAN: No. I think we are in general
22 agreement of some of the things. Mr. Kelley rattled off a
23 number of things.
24         THE COURT: So did you. So, counsel, my question
25 to you is, now having heard one another speak, and speaking

CondenseIt™                                                      August 28, 2003

**Page 61**

1  to one another through me, do you think that you can put a
2  finer point on these requests and resolve the objections?
3  Because the Court has now inverted an hour and a half of its
4  time on matters. quite frankly, in a manner in which it quite
5  frankly believes could have been better invested.
6       Are we at a point in this discussion as to Items
7  5 and 7 where counsel can be released to your own devices and
8  work it out?
9       MR. KELLEY: I believe.
10      MR. HOFFMAN: I believe, also, Your Honor.
11      If I can just ask one question. because I think
12  it may help in advancing a number of these things that we are
13  trying to work out. We would hope that, and would like a
14  commitment from counsel for the defendants and for Synopsys
15  to work out all these matters. to work diligently over the
16  next week, between now and the end of next week to work out
17  all these matters, so we can get these documents.
18      THE COURT: So ordered, yes.
19      MR. HOFFMAN: And also that the defendants will
20  not object and tell us we can't give it to you, these
21  documents, because it is the confidential information of
22  Synopsys.
23      THE COURT: You have to work through your
24  protective order.
25      MR. HOFFMAN: We will be underneath the

**Page 62**

1  protective order, the documents.
2       THE COURT: I think that's a given, counsel.
3       MR. HOFFMAN: Thank you, Your Honor. I
4  appreciate it.
5       THE COURT: Okay.
6       MR. MEILMAN: Your Honor, Mr. Kelley was about to
7  start raising some material on the Matrox people in Canada.
8  I don't want to get that swept under the rug.
9       MR. HOFFMAN: Your Honor, that also probably ties
10 in with Topic No. 8 that they have raised.
11      THE COURT: Topic No. 8 is a non-matter for the
12 Court. I am not going to grant permission to file a letter
13 in support of the seeking of permission to file summary
14 judgment at this time, no.
15      MR. HOFFMAN: I presume we are also entitled then
16 to get discovery out of the people in Canada.
17      THE COURT: I don't see why not.
18      MR. KELLEY: Can I address that issue briefly?
19      THE COURT: Yes.
20      MR. KELLEY: They are seeking discovery -- this
21 claim relates to the logic synthesis process. What they want
22 is the discovery of logic synthesis work done in Canada.
23      THE COURT: Counsel, you are breaking up on us.
24      MR. KELLEY: It seems to me, I know we don't want
25 to get into the issue of whether they are going to prevail on

**Page 63**

1  their 271(g) theory. But that's unusual, to try to apply a
2  U.S. patent to seek discovery on work done outside the United
3  States, on things done outside the United States is very
4  unusual.
5       THE COURT: What is the thinking there, Ricoh?
6       MR. HOFFMAN: Your Honor, if a process of
7  manufacturing a product is carried on outside the United
8  States where that process would infringe a process patent
9  inside the United States, then there is a basis for
10 allegation of infringement, the charge of infringement, just
11 holding it down to a summary format.
12      The Bayer case they are relying upon is talking
13 about something entirely different. It was talking about
14 strictly -- and I have part of the claim here -- a need for
15 determining whether a substance is an inhibitor or
16 activator.
17      That is not what we are talking about here. We
18 are not talking about a method of determining whether or
19 not -- determination of whether a piece of information is in
20 one category or another. We are talking about part of a
21 manufacturing process, and 271 clearly covers that situation,
22 where the products do flow into the United States, that then
23 is infringement of that process patent.
24      This is a manufacturing process. So it's our
25 position we are entitled to it.

**Page 64**

1       THE COURT: Does counsel disagree with counsel's
2  statement regarding the current state of the law?
3       MR. KELLEY: Yes, Your Honor. The Bayer case
4  makes it absolutely clear that the manufacturing process,
5  this is the exact question addressed by the Federal Circuit
6  the manufacturing process, in order to fall within 271(g),
7  the claimed process has to be one using manufacturing the
8  device, the actual physical things that are going to be
9  imported.
10      MR. HOFFMAN: This is all part of the
11 manufacturing process, Your Honor. And what they are trying
12 to do is say, well, since we disagree and we think that we
13 are entitled to summary judgment, we are not going to give
14 you discovery. And we are entitled to that discovery and to
15 show that it is part of the manufacturing process for
16 manufacturing the products that then flow into the United
17 States.
18      THE COURT: Mr. Kelley.
19      MR. KELLEY: Your Honor, if I may finish my
20 point. The case makes it absolutely clear that there has to
21 be a physical good produced under this process. What their
22 claim process produces is a -- a net list. that is then used
23 to produce -- it is sort off to a foundry that actually
24 produces the devices. It is not used in the process of
25 manufacturing the goods. The Federal Circuit decision make

**Page 65**

1  it quite clear that the process set out has to talk about the
2  actual process, the mechanical physical process of creating
3  the thing that is going to be imported.
4       THE COURT: Let's see if your opponent agrees
5  with that statement. Do you agree that the case stands for
6  that proposition, counsel?
7       MR. HOFFMAN: No, I don't, Your Honor. The case
8  stands for the proposition -- that is why I read a portion --
9  it stands for the proposition that when all that is
10  determined by the process is a piece of information that is
11  never used in the manufacturing operation, it has nothing to
12  do with manufacturing a product, it is just determining
13  information, that that is not covered by 271.
14       What we have here in this case is one or a series
15  of the steps, the initial steps in designing a product that
16  is -- as part of the manufacturing operation, design and
17  operation, the manufacturing of a product that is imported
18  into the United States. That is very different. That is not
19  what the Bayer case is dealing with.
20       THE COURT: Counsel for Matrox.
21       MR. KELLEY: If I am correct about this, then we
22  don't have to have half of the discovery in this case, and if
23  Mr. Mollman is correct, then we do. What I propose is we
24  brief this question because we are having lawyer argument.
25       THE COURT: What I am going to do first is read

**Page 66**

1  Bayer. That might be of some assistance to this issue. Let
2  me take a look. If I feel I need further elucidation on this
3  subject, I will let you further address it in some fashion,
4  whether it be in the form of some limited briefing or further
5  discussion, I don't know exactly at this point. But we will
6  defer No. 8 while the Court takes an opportunity to read the
7  case.
8       MR. HOFFMAN: In the interim, Your Honor, if we
9  can begin to sort out discovery issues with the defendants,
10  with Matrox on this issue, so at least we can resolve the
11  scope and other issues so we can begin to get discovery from
12  them.
13       MR. KELLEY: We are in fact going forward with
14  discovery. We are in the process of collecting that
15  information about where we do our design work and the general
16  design flow stuff. I am not sure what more is wanted. He
17  wanted the same sort of discovery for Matrox that we had for
18  the other defendants.
19       MR. HOFFMAN: Yes, Your Honor.
20       MR. KELLEY: It seems to me it will take -- I
21  understand the Court has a busy schedule. But he seems to be
22  asking that we do this very discovery that I am suggesting
23  could be avoided.
24       THE COURT: I think that is correct. What I am
25  going to order is, as far as the Matrox defendants are

**Page 67**

1  concerned, we are going to defer engaging that process. Mr.
2  Hoffman, for a brief period of time, while I take a look at
3  the case, if necessary, get the benefit of further thoughts
4  from counsel.
5       Let's deal with No. 6. Have we dealt with No.
6  6?
7       MR. MEILMAN: Your Honor, just we use the term
8  Matrox defendants. One of the Matrox defendants was Matrox
9  Tech, which had a plant and was doing work in Florida. I
10  take it that as far as their objections as to activity in
11  Canada, Your Honor's order does not apply to Matrox Tech.
12       THE COURT: Are we in agreement with that?
13       MR. KELLEY: Yes, Your Honor. We are in the
14  process of collecting those documents for that work like we
15  are doing for every other -- the other non-Matrox defendants.
16       THE COURT: Then we are in agreement, counsel.
17       MR. MEILMAN: Thank you, Your Honor.
18       MR. HOFFMAN: Your Honor, since it may help avoid
19  a future dispute or arguments, Mr. Kelley has indicated they
20  are collecting documents. Does he have a date by which he
21  believes they will be produced?
22       THE COURT: Mr. Kelley?
23       MR. KELLEY: We are doing a rolling production.
24  We are getting stuff as quickly as we can get it. We
25  produced documents just a few days ago.

**Page 68**

1       MR. HOFFMAN: Will we have all of them produced
2  by mid-September, Mr. Kelley?
3       MR. KELLEY: I would hope so.
4       THE COURT: No. 6, what do we have left with
5  regard to No. 6?
6       MR. HOFFMAN: We would like to take that off.
7       THE COURT: That is fine with the Court,
8  counsel. You don't need to explain.
9       Counsel, I will take a look at the Bayer case.
10  You will hear from me one way or the other shortly.
11       (Counsel say "thank you.")
12       THE COURT: Take care.
13       (Teleconference concluded at 12:40 p.m.)
14       - - -
15  Reporter: Kevin Maurer
16
17
18
19
20
21
22
23
24
25

**CondenseIt™**

-and - cago

| | | | |
|---|---|---|---|
| -and [1] 1:19    2:3 | 48:12  48:12  48:15 | alone [1] 44:3 | aspect [1] 12:12 | behalf [1] 3:25 |
| 00 [1] 1:13 | 49:22 | alternate [1] 42:13 | 17:23  42:7 | Behavioral [1] 34:4  34:12 |
| 03-103-GMS [1] 1:10 | acceptable [1] 27:2 | 43:14  43:21  58:10 | aspects [1] 17:20 | 34:8  41:4  44:12 |
| 1 [4] 3:8  3:9 | 40:12  45:25  60:1 | always [1] 45:11 | 18:6 | belief [1] 29:10 |
| 41:3  51:18 | accordance [1] 49:10 | AMI [1] 1:7 | assertion [1] 24:18 | 29:11  50:3 |
| 10 [1] 26:25 | according [1] 5:20 | among [1] 27:11 | asserts [1] 12:1 | believes [1] 2:3 |
| 100 [1] 33:17  40:15 | accounting [1] 53:4 | amongst [1] 9:24 | assignment [1] 15:23 | 61:5  67:21 |
| 11 [1] 1:13 | accounts [1] 44:4 | amount [1] 9:19 | assistance [1] 66:1 | benefit [1] 67:1 |
| 12 [4] 15:20  16:3 | accurate [1] 15:17 | ancillary [1] 21:11 | assume [1] 49:1 | better [1] 6:7 |
| 18:9  68:13 | acknowledged [1] 12:22 | 21:12 | assumed [1] 5:18 | 61:5 |
| 14 [4] 6:24  15:20 | action [4] 1:4 | answer [4] 26:17 | assuming [1] 48:22 | between [1] 5:10 |
| 14th [1] 4:25 | 34:19  34:22  37:13 | 49:17  57:23  58:2 | attack [1] 46:24 | 4:17  6:9  7:24 |
| 15 [1] 16:2 | activator [1] 63:16 | answering [1] 24:17 | attained [1] 38:7 | 8:13  9:18  9:24 |
| 16 [1] 55:13  55:24 | activities [1] 33:23 | answers [1] 39:14 | attempted [1] 49:20 | 12:25  13:5  16:6 |
| 17 [1] 6:6  12:11 | activity [1] 67:10 | anyway [1] 16:8 | attorney [2] 8:3  9:24 | 23:12  24:6  61:16 |
| 1996 [1] 44:14 | actual [4] 14:24 | 22:13  24:2  24:20 | 8:3  9:24  11:22 | beyond [1] 12:2  43:24 |
| 2 [7] 3:4  7:17 | 21:8  64:6  65:2 | 24:23 | 27:16  28:6 | bit [1] 16:32  33:3 |
| 9:8  10:1  10:2 | additional [1] 8:24 | apologize [2] 31:4 | attorney-client [1] 4:12  9:4 | Bob [1] 2:11 |
| 12:2  38:22 | 8:24  25:6  32:6 | 41:24 | attorneys [3] 9:24 | body [1] 45:15 |
| 20 [2] 16:2  44:5 | 51:11  57:2 | apparent [2] 23:9 | 11:20  27:11  17:20 | boiling [1] 63:11 |
| 2000 [1] 56:24 | address [1] 23:1 | 43:20 | 56:11 | booked [1] 49:1 |
| 2003 [5] 1:13  9:8 | 30:5  35:21  37:18 | appear [2] 48:17 | attorneys' [1] 45:19 | bottom [1] 46:17 |
| 31:9  31:9  51:20 | 46:2  62:18  66:3 | 30:9  50:14  50:23 | August [4] 1:13 | Bove [2] 2:2  2:20 |
| 21st [1] 6:6 | addressed [1] 64:5 | APPEARANCES [1] | 4:25  9:24  26:24 | brand-new [1] 9:11 |
| 22 [1] 12:12 | admissible [1] 52:1 | 1:17  2:1 | author [1] 27:16 | breadth [1] 7:19 |
| 23rd [1] 6:12 | admitted [1] 38:16 | applicable [1] 57:25 | available [1] 7:20 | 37:20  58:7 |
| 25th [1] 32:18 | advance [1] 49:15 | application [1] 56:4 | 34:7  36:20  36:24 | break [1] 19:8 |
| 26th [1] 31:8  32:18 | advancing [1] 61:12 | apply [2] 63:1 | 43:2  48:6  49:10 | 27:20  27:21 |
| 27 [6] 57:4  58:15 | adversarial [1] 43:19 | 67:11 | 51:10  57:9 | breaking [1] 42:13 |
| 63:1  63:21  64:6 | advisable [1] 7:20 | appreciate [2] 18:16 | avoid [1] 67:18 | bridge [1] 5:4 |
| 65:13 | AEROFLEX [1] | 62:4 | avoided [1] 66:23 | brief [2] 65:24  67:1 |
| 28 [1] 1:13 | 1:7 | approach [1] 58:3 | aware [1] 7:18 | briefing [1] 66:1 |
| 28th [1] 16:12 | again [1] 14:18 | appropriate [2] 7:22  3:9  13:18 | 35:24 | briefly [1] 28:15 |
| 3 [3] 3:4  47:23 | 58:20 | 13:18  13:18  14:14 | away [1] 13:16 | 62:18 |
| 47:24 | agenda [1] 2:25 | 14:19  14:25  15:1 | B [1] 51:18 | bring [2] 43:4  48:10 |
| 30 [2] 29:14  51:20 | ago [4] 11:5  11:5 | 19:24  20:3  20:7 | back-door [1] 46:24 | 49:12 |
| 30th [6] 5:2  8:1 | 59:15  67:25 | 20:20  20:23  22:22 | backtracked [1] 56:18 | broad [2] 40:19 |
| 8:15  11:4  12:4 | agree [11] 18:12  32:13 | 22:23  32:11  45:19 | ball [1] 40:25 | 46:25  59:2 |
| 13:22  31:6  31:9 | 35:3  41:3  41:11 | appropriately [1] | based [4] 14:12 | broadening [1] 40:10 |
| 32:5  32:18 | 42:13  52:24  65:5 | 34:33  35:15  43:4 | 16:22  24:6  26:11 | broken [2] 17:5 |
| 31st [7] 3:12  4:7 | agreed [1] 40:4 | area [1] 45:11 | basic [1] 34:3 | Brothers [31] 1:21 |
| 7:17  8:23  9:7 | 41:5  41:6  48:5 | argue [1] 46:18 | basics [1] 34:2 | 2:15  3:3  3:9 |
| 26:23  26:24 | 53:18  53:22  54:8 | arguing [3] 2:24 | basis [2] 4:12 | 3:19  3:23  4:3 |
| 34-day [1] 32:20 | 54:10 | 2:25  3:3 | 4:20  4:23  7:9 | 4:5  4:6  11:15 |
| 35 [1] 57:4 | agreement [11] 19:5 | argument [1] 2:22 | 7:11  7:12  9:4 | 12:10  14:8  14:11 |
| 40 [1] 68:13 | 19:6  19:6  19:7 | 63:24 | 10:6  10:22  13:25 | 15:10  15:17  16:1 |
| 5 [7] 3:5  38:23 | 40:24  41:1  43:23 | arguments [3] 53:10 | 25:22  26:16  28:1 | 16:11  19:25  21:4 |
| 38:25  40:22  55:8 | 60:19  60:22  67:12 | 67:19 | 35:5  35:13  36:1 | 24:4  24:5  24:13 |
| 58:21  58:21  61:7 | 67:16 | Arnold [1] 2:5 | 38:3  38:17  39:14 | 24:21  25:1  25:12 |
| 6 [4] 3:4  9:8 | agrees [1] 24:22 | art [11] 17:2  17:17 | 39:24  41:25  52:3 | 25:9  25:23  25:15 |
| 67:5  67:6  68:4 | 65:4 | 17:21  18:2  18:4 | 63:9 | 28:12  32:4  42:17 |
| 68:5 | ahead [1] 12:9 | 18:10  18:14  21:23 | batting [1] 40:25 | bugs [1] 59:24 |
| 7 [1] 3:5  55:11 | 13:12  18:15  52:11 | 30:6  33:16  53:14 | Bayer [1] 63:12 | bulletins [1] 9:4 |
| 61:7 | 53:18 | articles [1] 53:14 | 64:3  65:19  66:1 | burden [1] 41:20 |
| 8 [1] 3:4  12:20 | aided [1] 56:3 | articulated [1] 25:15 | 68:9 | 41:22  41:23 |
| 51:18  62:10  62:11 | allegation [1] 63:10 | ASIC [11] 39:2 | bearing [1] 54:3 | burdensome [1] 24:15 |
| 66:6 | allegations [1] 39:15 | 39:20  40:10  52:5 | became [1] 9:1 | 52:3 |
| 9 [1] 12:11 | allege [1] 43:4 | 53:23  54:10  54:11 | become [1] 17:5 | busy [1] 66:21 |
| a.m [1] 1:13 | 43:4 | 54:16  56:5  58:23 | 38:24 | CAD [2] 59:5  59:1 |
| able [1] 23:1  44:10 | allegedly [1] 37:5 | 60:13 | beef [1] 46:9 | Cadence [1] 7:2 |
| absolutely [1] 46:4 | alleging [1] 44:19 | ASICs [5] 56:7 | beforehand [1] 19:18 | Cadence's [1] 8:7 |
| 64:4  64:20 | allow [1] 27:21 | 60:6  60:8  60:8 | begin [1] 66:9 | cago [1] 15:25 |
| 42:17  40:7 | allowed [1] 21:18 | 60:12 | 66:11 | |
| | asks [1] 54:9 | | | |

**CondenseIt™**

calculated [1]        5:21
California [5]         2:5
  2:20    34:19    35:2
  37:11
calls [1] 6:9
camera [10]           4:13
  4:20    10:8    10:20
  10:20   10:24   12:18
  13:25   17:24   28:2
Canada [5]            57:1
  62:7    62:16   62:22
  67:11
cannot [2]           18:7
  19:3    43:16
capability [1]       43:24
capture [2]          31:13
  31:24
care [1] 68:12
careful [1]          15:2
carpot [1]           13:15
carried [1]          63:7
carry [1] 57:3
cart [1]  44:21
case [34] 5:19        6:1
  6:4     17:9    18:11
  20:18   23:2    23:18
  24:15   27:24   37:11
  37:11   38:6    39:9
  39:16   41:20   41:21
  43:3    43:4    43:7
  44:22   46:11   46:21
  47:2    51:22   63:12
  64:3    64:20   65:5
  65:7    65:14   65:19
  65:22   66:7    67:3
  68:9
cases [1]45:10
categories [5]       6:16
  6:19    33:15   52:7
  52:10   52:15   52:18
  53:1    53:16   60:10
category [1]         22:20
  63:20
cautious [1]         13:7
cells [4] 39:18      40:9
  42:5    54:6
certain [3]          22:2
  29:8    42:1
certainly [2]        24:21
  51:13
cetera [4]           10:5
  10:5    39:5    39:6
challenge [1]        21:5
challenges [1]       51:8
change [1]           19:4
charge [1]           63:10
charged [1]          36:3
charging [1]         36:1
chart [1] 44:19
checking [1]         55:6
Chinese [1]          22:3
chip [2] 39:20       47:17
chose [4]            19:12
  19:15   19:16   19:17
Chris [1]            2:21

46:2
Christopher [2] 2:4
  11:2
Circuit [1]          27:23
  64:5    64:25
circuits [1]         56:4
Civil [1] 1:4
claim [7]            10:23
  42:19   44:19   59:25
  62:21   63:14   64:22
claimed [1]          54:17
  64:7
claims [2]           45:22
  60:13
clarification [1]
  24:3
clarify [3]          17:10
  23:22   23:23
clarifying [1]       24:17
classifications [1]
  53:5
clause [1]           9:11
  9:14    12:1
clear [31] 3:20      8:2
  23:17   27:4    31:7
  32:4    64:4    64:20
  65:1
clearly [4]          4:21
  20:5    35:10   63:21
cliche [1]           20:22
client [1]           17:15
clients [1]          9:24
close [3] 23:3       48:24
  50:24
closed [1]           56:23
co-counsel [2]       2:15
colleague [1]        2:13
collected [1]        13:20
collecting [1]       53:11
  66:14   67:14   67:20
coming [1]           20:10
  26:15   30:20
comment [1]          28:22
comments [1]         32:10
commitment [1]
  48:14   61:14
communicated [2]
  23:16   31:20
communication [1]
  27:14   27:15
communications [29]
  4:9     4:19    6:7
  8:17    9:10    9:13
  9:22    9:23    10:10
  10:17   12:2    12:13
  12:23   12:23   13:24
  13:25   16:19   17:13
  17:15   18:20   20:14
  20:15   22:8    24:10
  31:13   31:22   31:24
  32:19   32:22
companies [1]        57:21
company [2]          1:4
  45:8    39:13
compare [1]          17:2

Compiler [34]        33:23
  33:24   34:6    34:8
  34:8    35:24   36:4
  39:17   39:18   40:7
  40:8    41:4    41:4
  42:2    42:2    42:22
  42:22   44:2    44:2
  44:3    44:6    44:18
  45:5    46:19   46:21
  47:12   47:13   47:14
  54:1    54:5    54:6
  56:15   56:16   57:17
complain [1]         19:20
complained [2] 19:8
  35:17
complaining [1]
  23:24
complaint [2]        26:4
  41:23   53:8
complete [2]         5:3
  51:12
completely [2] 10:13
  49:3
complicating [1]
  51:5
comport [1]          12:8
computer [1]         56:3
computer-aided [1]
  56:7    57:14
conception [1]      58:22
concern [3]          4:24
  5:3     17:10   17:22
  21:3
concerned [1]        67:1
concerning [2]       39:1
  58:22
concluded [1]       68:13
conduct [1]          17:4
conference [17] 11:14
  4:1     6:12    11:4
  13:21   31:6    31:25
  32:3    32:5    32:6
  32:22   33:11   34:21
  55:13   55:24   55:25
  56:5
confidential [29]
  5:25    6:10    6:14
  6:19    7:15    8:5
  8:9     11:7    11:11
  11:18   11:22   13:3
  13:13   14:11   19:5
  19:10   21:18   23:15
  23:25   24:19   24:22
  24:24   25:2    25:20
  26:3    26:20   28:7
  28:19   28:25   34:9
  34:11   35:6    36:13
  37:3    38:12   41:12
  42:15   44:12   61:21
confidentiality [1]
  41:18   41:19
conflict [1]         19:2
confused [1]         27:7
  28:7
confusion [1]        25:16
connection [1]      46:15
Connolly [1]         2:2
  2:19

consequently [4]
  19:2    34:18   42:23
  50:11
consider [1]         4:1
considerations [1]
  41:19
construction [1]
  55:22
Consulate [1]        49:5
consulates [1]       49:3
consultations [1]
  16:24
consulted [3]        24:1
  26:14
consulting [17]      5:12
  7:5     7:8     7:15
  13:14   14:16   15:15
  16:14   16:18   17:3
  18:9    19:1    19:5
  19:7    19:14   21:20
  26:18
contact [1]          18:22
  49:20
contacted [1]        18:25
contains [1]         45:3
contend [1]          39:12
contents [1]         25:13
continue [1]         4:5
  22:14   24:8
continued [2]        2:1
  14:12   26:11
continues [1]        5:11
contract [1]         5:11
  5:12    5:21
contradicted [1]
  5:1
contradiction [1]
  7:25
contrary [2]         19:18
  23:18
conversation [1]
  11:19   12:9    25:13
  26:2    26:10   55:6
conversations [1]
  16:6
convinced [1]       11:10
cooperate [1]       45:17
  48:16   48:23   49:9
  50:2    50:4    50:4
  50:9    50:22
cooperation [1] 43:20
copy [1] 12:10
Corbin [28]          2:3
  2:21    17:8    18:14
  22:9    22:11   22:24
  23:1    23:8    23:22
  23:24   25:3    25:14
  25:16   27:4    29:19
  29:22   30:3    30:4
  30:24   31:10   32:14
  33:4    32:21   32:25
  33:9    34:21   44:1
  44:25   46:2    54:22
  54:25   55:2
Corbin's [1]        24:17
core [1] 39:2

consequently - Court

CORP [1]             1:9
correct [7]          30:4
  30:9    32:24   42:9
  65:21   65:23   66:24
correctly [1]        15:8
correspondence [1]
  27:12
counsel [37]         1:24
  2:6     2:10    2:8
  4:18    5:6     3:1
  5:14    5:17    6:13
  6:17    7:15    8:11
  8:23    9:9     9:11
  10:11   11:15   1:17
  13:1    13:4    13:14
  14:5    14:16   15:10
  16:19   16:24   17:1
  17:8    18:13   22:10
  22:15   26:13   28:11
  40:1    40:12   41:11
  43:18   45:9    45:16
  49:18   50:17   54:11
  55:6    60:24   56:17
  61:14   62:2    62:13
  64:1    65:6    65:9
  67:4    67:16   68:8
  68:9    68:11
counsel's [1]        6:4:1
couple [1]           6:1:5
course [2]           9:22
  10:18   46:6    46:18
  48:22
Court [166]          1:1
  2:10    2:17    2:2:1
  3:6     3:11    3:9:0
  3:18    3:21    4:5
  4:13    4:20    3:7
  7:16    7:18    7:2:1
  7:23    8:19    9:3
  9:6     11:25   12:1
  14:1    14:5    14:18
  14:22   14:25   15:7
  16:9    16:13   17:14
  17:24   18:12   18:15
  19:23   20:7    20:9
  20:13   20:24   21:16
  22:10   22:15   22:16
  22:20   22:20   22:12
  22:24   23:3    23:11
  23:7    23:7    23:9
  23:20   23:23   24:1
  24:14   24:24   25:5
  25:14   25:22   27:7
  27:18   27:23   28:10
  28:18   28:21   28:12
  29:3    29:4    29:6
  29:10   29:12   29:13
  29:13   29:18   29:20
  29:24   30:3    30:7
  30:22   31:15   31:17
  31:10   31:15   31:16
  32:1    32:13   32:19
  32:23   32:24   33:1
  33:4    33:8    33:10
  33:20   34:22   35:14
  35:25   36:2    37:10
  37:14   37:23   38:11
  40:11   40:16   40:3
  41:9    41:16   41:2
  42:11   43:11   43:17
  44:4    44:8    44:24
  45:9    46:7    47:18

CondenseIt™                                                                 Court's - Dr

47:19  48:2  49:7
49:14  49:17  50:16
51:3  51:7  51:10
52:24  54:18  54:24
55:2  55:12  55:24
57:8  58:12  60:1
60:18  60:24  61:3
61:18  61:23  62:2
62:5  62:11  62:12
62:17  62:19  62:23
63:5  64:1  64:18
63:4  65:20  65:25
66:6  66:21  66:24
67:12  67:16  67:22
68:4  68:7  68:7
68:12
**Court's** [1]  18:16
**cover** [2]  9:21
10:15
**covered** [1]  65:13
**covers** [1]  63:21
**craft** [1] 45:17  39:8
**create** [4]  19:11
19:21  29:11  39:18
**created** [1]  19:21
21:21
**creating** [1]  65:2
**creation** [1]  20:6
**credibility** [4]  20:17
20:17  21:6  21:6
**crime/fraud** [3] 27:22
28:11  28:13
**critical** [1]  14:3
38:6  38:13
**cross-purposes** [1]
23:10
**culled** [1]  17:12
**current** [2]  56:12
64:2
**customers** [2]  45:5
46:24
**cut** [1]  38:19
**cutoff** [2]  30:2
30:12  30:16
**D.C** [1]  1:22
**databases** [1]  39:2
**date** [14] 18:21  29:5
30:20  31:5  32:7
32:15  33:15  39:14
50:20  50:22  51:3
51:14  60:16  67:20
**dated** [1]  51:19
**dates** [1] 36:22
**days** [4] 8:6  11:8
26:25  32:1  53:20
54:11  59:15  67:25
**deadline** [1]  49:8
**deal** [3]  42:11  51:13
54:19  58:15  67:5
**dealing** [1]  65:19
**dealt** [2] 18:19  67:5
**debate** [1]  12:7
**debugging** [1]  60:8
**decide** [1]  44:20
44:22  55:23

**decided** [1]  19:4
**decision** [2]  14:21
37:8  64:25
**declaration** [1] 11:2
11:3
**deep** [1] 20:5
**defendant** [1]  16:20
**defendants** [58] 1:10
2:6  2:18  3:15
3:25  4:8  4:14
4:18  7:1  8:16
9:9  11:17  11:20
12:14  13:1  15:10
17:4  17:9  18:24
22:17  24:8  33:20
34:12  34:24  35:8
36:6  36:7  36:10
39:16  39:23  42:18
46:10  46:21  47:3
47:13  50:6  51:15
51:24  52:2  52:4
52:14  52:16  54:15
55:15  56:13  56:21
57:1  57:2  57:16
58:10  61:14  61:19
66:9  66:18  66:25
67:8  67:8  67:15
**defendants'** [v] 33:21
33:22  51:19  52:5
52:24  58:23
**defer** [2] 66:6  67:1
**deference** [1]  15:17
**defined** [1]  41:10
**definition** [1]  56:2
57:12
**Delaware** [1]  1:2
1:12  33:8  37:13
**depose** [1]  49:15
**deposed** [1]  4:25
51:6
**deposition** [27] 6:13
7:4  8:1  11:4
13:12  14:13  15:13
15:19  15:22  16:5
16:15  23:14  25:17
26:13  28:5  28:24
32:15  48:6  48:21
48:22  48:25  49:12
49:24  50:10  50:15
51:12  57:10
**depositions** [1] 49:1
**describe** [1]  40:6
40:7  40:8
**described** [6]  6:18
9:22  9:23  27:8
40:11  54:13
**describing** [1]  42:5
42:7  53:15  59:10
59:20
**design** [43]  33:23
34:5  34:8  35:24
36:4  39:2  39:17
39:18  40:7  40:8
40:10  41:4  42:1
42:12  42:41  44:2
44:3  44:6  44:18
45:5  46:19  46:21
47:12  47:13  47:14
53:2  53:25  54:5

54:6  56:3  56:7
56:15  56:16  56:22
57:9  57:14  57:16
58:22  59:4  59:24
65:16  66:15  66:16
**designing** [4]  60:6
60:11  60:14  65:15
**detail** [3]  38:17
42:5  53:9
**detailed** [1]  4:14
44:19  52:3
**details** [9]  12:21
35:10  43:2  44:18
56:12  56:19
**determination** [9]
13:9  14:1  14:3
14:6  14:8  14:14
14:19  15:1  63:19
**determine** [1]  10:21
**determined** [1] 65:10
**determines** [1] 48:23
**determining** [3] 63:15
63:18  68:13
**developed** [6]  7:14
15:14  15:24  17:16
18:4  53:24
**development** [3]
17:21  53:3  56:8
56:13  58:22
**device** [1]  64:8
**devices** [2]  61:7
64:24
**Dickstein** [1]  1:21
**difference** [3]  3:10
54:14
**differences** [3] 53:22
55:16
**different** [3]  60:18
63:13  65:18
**difficult** [1]  17:6
43:19  50:18
**DiGiovanni** [7]
2:2  2:19  2:19
2:24  3:13  3:17
3:24  7:23  7:24
9:5  9:7  11:25
13:10  15:16  16:23
17:12  27:4  27:6
27:19  30:11  30:25
31:11
**DiGiovanni's** [1]
12:8
**diligently** [1]  61:15
**directed** [1]  56:3
**directly** [1]  17:3
36:7  38:6
**disagree** [1]  64:1
64:12
**disagreement** [1]
42:21
**disclose** [1]  4:8
8:16  9:10  9:10
9:13  10:9  12:14
**disclosed** [1]  5:16
10:15
**disclosure** [3]  17:12
51:19  52:8  52:9

52:23  53:7  54:23
57:6  57:13
**disclosures** [1] 54:20
**discover** [1]  18:8
33:18
**discoverability** [1]
43:22
**discoverable** [1]
43:12
**discovery** [36]  34:22
34:23  34:25  37:8
37:9  37:12  39:8
44:23  46:12  46:25
47:5  48:8  48:16
48:25  50:24  50:25
51:4  51:9  51:14
51:25  52:1  52:3
55:25  57:15  62:16
62:20  62:22  63:2
64:14  64:14  65:22
66:9  66:11  66:14
66:17  66:22
**discrete** [1]  42:11
42:12
**discuss** [1]  47:20
**discussed** [4]  6:1
12:21  21:1  31:20
**discussing** [1]  58:19
**discussion** [1]  12:3
45:24  47:21  55:10
61:6  66:5
**discussions** [3] 31:21
42:20  42:20
**disingenuous** [1]
36:4
**dismiss** [1]  33:22
**dispute** [2]  52:16
58:4  67:19
**disqualification** [4]
7:19  20:1  20:2
21:10
**disqualified** [4] 14:20
15:3  21:2  22:6
**disqualify** [1]  11:15
13:8  22:4
**DISTRICT** [2]  1:1
1:2
**doctrine** [1]  4:12
**document** [24]  18:12
25:20  29:23  37:20
37:20  38:1  38:8
38:9  38:12  38:13
38:18  38:19  39:22
39:21  40:3  51:17
52:2  54:8  54:14
54:15  55:10  55:14
57:11  58:5  59:15
58:19  58:21  59:19
**documentation** [1]
18:1  23:12  42:4
**documents** [113]
4:10  4:11  4:16
5:9  8:12  8:18
9:4  9:15  10:4
10:3  10:4  10:4
10:6  10:11  10:14
10:20  10:22  12:16
12:17  14:6  14:9

14:10  14:23  14:14
20:8  20:10  .2:13
22:18  22:19  23:14
25:11  25:17  26:8
26:22  27:1  27:8
27:9  27:10  27:11
27:17  28:1  29:5
29:9  29:15  29:15
30:5  30:8  40:13
31:1  33:13  33:17
34:7  34:11  34:16
35:2  35:6  35:17
36:6  36:10  36:13
36:17  36:18  36:30
36:21  36:22  36:14
37:3  38:3  39:1
39:25  40:1  40:1
40:4  40:4  40:15
41:4  41:4  41:1
41:8  42:7  42:12
42:15  44:6  44:16
44:15  49:25  51:16
51:17  51:21  51:13
52:6  52:7  52:10
52:15  52:17  52:21
53:5  53:13  53:13
54:2  54:3  54:4
54:16  55:1  55:17
57:20  57:24  58:20
58:22  59:20  60:5
60:17  61:17  61:17
62:1  67:14  67:20
67:25
**doesn't** [5]  10:19
10:23  16:3  7:18
53:9
**done** [18]  11:1
10:21  19:12  19:18
47:12  52:10  57:1
62:22  63:2  63:1
**door** [1]  21:19
**doubt** [1]  7:16
**down** [1]  8:4
63:11
**Dr** [96]  4:9  4:9
4:17  4:25  4:5
5:8  5:10  5:19
5:12  5:17  5:18
5:20  5:22  5:24
6:2  6:5  6:14
6:13  6:18  7:2
7:6  7:7  7:14
8:1  8:1  8:6
8:13  8:17  8:21
9:13  9:15  9:17
10:10  10:12  11:1
11:9  11:16  11:18
12:15  12:23  12:25
13:3  13:5  13:11
13:24  14:11  14:16
15:5  15:8  15:19
16:7  16:13  16:16
16:20  16:24  17:1
17:14  17:16  18:5
18:21  18:22  18:25
19:2  19:13  21:13
23:13  23:15  24:5
24:25  25:1  25:12
26:9  26:11  26:18
27:10  27:13  27:14
28:5  28:18  28:13
28:24  29:5  29:13

**CondenseIt™**                                      drafted - Hoffman

| | | | | |
|---|---|---|---|---|
| 30:14  30:17  31:1 | 43:6  52:21  58:6 | extraordinary [1] | 20:4  26:1  28:16 | general [6]  26:8 |
| 31:19  31:20  31:22 | 58:11  62:15  63:25 | 54:21 | 34:16  36:9  39:16 | 33:18  34:4  37:10 |
| 32:7  32:9  32:10 | 64:13  64:14 | eyes [1]  45:19 | 40:14  50:19  54:18 | 60:21  66:15 |
| 32:19  50:12 | equipment [2]  56:9 | facie [1]  27:24 | 58:16  59:6  65:25 | generally [1]  57:25 |
| drafted [2]  46:14 | 57:22  58:1  58:2 | facilities [1]  48:25 | fishing [1]  39:25 | generic [2]  53:2 |
| 54:23 | Eric [2]  2:4  2:21 | facing [1]  48:24 | five [1]  11:20 | 53:5 |
| drawing [1]  25:22 | especially [1]  28:4 | fact [17]  5:9  11:18 | five-minute [1]  8:4 | genesis [1]  17:18 |
| dribbled [1]  55:18 | ESQ [9]  1:18  1:18 | 14:11  16:2  16:23 | flat [1]  46:22 | gist [1]  53:4 |
| drop [1]  32:1 | 1:20  1:20  1:21 | 17:16  18:2  18:8 | flexible [1]  51:10 | given [6] |
| drop-dead [2]  50:20 | 2:2  2:3  2:4 | 21:6  24:24  25:2 | Florida [1]  56:22 | 5:15  7:11  40:4 |
| 51:3  51:14 | 2:4 | 26:1  28:22  34:1 | 67:9 | 20:22  39:3  58:7 |
| dropping [1]  13:11 | essence [6]  26:13 | 35:22  53:12  66:13 | flow [2]  63:22  64:16 | 58:24 |
| due [1]  15:17 | 34:21  34:25  37:7 | factor [1]  51:5 | 66:16 | gone [4]  R1:8  12:16 |
| duplication [2]  34:18 | 40:18  55:21 | facts [2]  15:4  18:7 | flowing [1]  17:3 | 25:5  50:2 |
| during [11]  5:1 | essentially [1]  18:11 | 21:18 | flurry [1]  6:9 | good [6]  2:10  2:11 |
| 5:7  5:24  6:17 | establish [1]  43:6 | factual [1]  13:20 | 6:17 | 2:17  19:15  39:12 |
| 24:7  26:2  28:24 | established [1]  27:24 | fairly [1]  48:8 | focus [1]  38:13 | 64:21 |
| 34:21  48:8  48:17 | establishing [1] 28:4 | fall [1]  64:6 | follow [1]  27:3 | goodbye [1]  19:15 |
| 55:24 | estimate [1]  23:5 | familiar [1]  21:23 | following [1]  26:4 | goods [1]  14:15 |
| e-mail [11]  8:7 | et [4]  10:5  10:5 | 49:1 | 26:12 | grant [2]  62:12 |
| 8:10  16:13  19:1 | 39:5  39:6 | far [7]  33:15  49:25 | followup [2]  6:12 | granted [1]  4:1 |
| 23:11  26:4  26:6 | event [1]  10:23 | 56:18  58:6  59:6 | 7:18  26:4 | GRAPHICS [1] 11:8 |
| 26:12  27:12  27:14 | 26:21 | 66:25  67:10 | force [1]  50:9 | great [2]  33:2  42:5 |
| 32:8 | eventually [1]  20:11 | fashion [2]  21:14 | foreign [1]  57:3 | GREGORY [1] |
| e-mails [12]  4:17 | everybody [1]  24:22 | 22:22  45:23  66:3 | forgive [1]  50:21 | grounds [1]  25:10 |
| 6:9  8:12  6:21 | everyone's [1]  21:12 | fashioned [2]  19:24 | form [1]  66:4 | grown [1]  45:15 |
| 8:10  8:11  9:18 | evidence [1]  11:16 | 20:23 | formally [1]  48:12 | guess [2]  50:10 |
| 9:20  9:22  23:6 | 17:1  25:19  26:1 | favorable [1]  7:7 | format [1]  63:11 | 57:4 |
| 31:2  32:6 | 38:5  52:1 | 7:14  26:15 | formed [4] | half [1]  61:3  65:12 |
| early [2] 30:17  48:8 | exact [1] 10:14  64:5 | Federal [1]  64:5 | 15:20  16:25  21:19 | handful [1] |
| earnest [1]  58:19 | exactly [1]  40:7 | 64:25 | 21:14 | 26:22  29:25 |
| easily [1]  18:19 | 42:5  44:18  47:9 | fell [1]  52:18 | forms [1]  21:14 | handle [2]  2:7 |
| Ed [1]  2:14 | 48:10  60:10  66:5 | few [2]  27:8  30:8 | formulated [1]  59:11 | 57:14 |
| EDWARD [1]  1:20 | example [1]  5:4 | 32:1  53:20  54:11 | forth [9]  8:13  8:19 | handling [2]  2:3 |
| eight [1] 52:15 | 21:16  27:22 | 59:15  67:25 | 9:18  12:16  12:25 | 3:4 |
| either [6]  31:15 | examples [1]  58:24 | fight [1] 58:17 | 27:10  33:21  34:3 | hardware [1]  2:9 |
| 31:17  49:2  49:10 | except [1]  47:13 | fighting [1]  59:14 | 40:25 | hats [1]  43:19 |
| 50:22  52:10 | exception [6]  27:20 | file [3]  7:18  26:24 | forward [1]  7:3 | hear [2]  43:11  58:12 |
| elected [1]  24:23 | 27:23  28:11  28:13 | 54:7  62:12  62:13 | 7:10  15:13  19:16 | 68:10 |
| 46:23 | exchange [1]  23:11 | filed [1]  5:6 | 30:20  34:24  35:1 | heard [2]  23:17 |
| ELECTRONIC [1] | 23:12  25:20  26:12 | filters [1]  58:4 | 43:14  48:7  66:13 | 50:19  55:10  59:1 |
| 1:8 | Excluding [1]  32:21 | final [2] 48:15  49:8 | forwarded [1]  32:9 | 60:25 |
| elucidation [1]  66:2 | exclusive [1]  47:4 | 50:25 | found [2]  6:8 | hearing [7]  2:2 |
| embassy [1]  49:2 | exclusively [1]  47:11 | finally [1]  19:20 | 19:17 | 5:8  5:24  6:21 |
| 49:3  49:12 | exercise [1]  40:5 | financial [1]  8:8 | foundation [1]  28:17 | 24:7  32:7  32:18 |
| employed [1]  50:13 | expect [1]  39:9 | finder [1]  21:6 | foundry [1]  64:23 | help [1]  61:12  67:18 |
| enable [2]  45:18 | expectation [1]  7:9 | fine [2]  36:23  51:1 | four [2] 58:18 | hey [1]  19:13 |
| 45:22 | expecting [1]  11:13 | 68:7 | FRANCIS [1]  2:2 | hire [1]  5:2 |
| encourage [1]  19:5 | expedition [1]  39:25 | Fineman [1]  1:18 | Frank [1]  2:19 | hired [2] 5:25  16:4 |
| end [4]  11:13  13:11 | experience [1]  45:10 | 2:13 | frankly [1]  61:4 | 18:9 |
| 47:15  51:2  51:3 | expert [1]  5:17 | finer [1] 61:2 | 61:5 | history [1]  2:21 |
| 61:16 | 5:18  7:2  11:9 | Finger [1]  1:19 | fraud [1]  29:11 | 28:17 |
| engage [1]  12:6 | 11:13  15:12  16:14 | finish [1]  55:5 | Friday [1]  56:11 | Hoffman [34]  1:21 |
| engaged [1]  19:18 | 42:20 | 64:19 | front [2] 12:5  12:11 | 2:14  2:15  4:2 |
| 19:19 | experts [1]  5:16 | firm [20] 4:17  5:4 | fruits [1]  20:21 | 8:15  11:3  2:20 |
| engaging [1]  67:1 | explain [1]  68:8 | 5:11  5:19  6:10 | full [1]  7:22 | 18:13  18:16  19:10 |
| engineering [7] 38:1 | explained [1]  35:18 | 6:22  13:2  13:8 | fully [2]  11:13  35:24 | 20:19  21:12  22:12 |
| 38:9  40:1  42:7 | explanation [1]  34:3 | 13:22  14:19  15:0 | 43:2 | 28:15  28:22  30:12 |
| 44:8  59:10  59:23 | explicitly [1]  5:24 | 16:13  21:2  21:10 | functions [1]  42:6 | 30:15  30:19  31:1 |
| entered [1]  3:11 | extended [1]  12:7 | 22:5  22:5  22:17 | future [1]  67:19 | 31:17  31:18  33:1 |
| 12:4 | extent [1]  22:24 | 26:22 | g [4]  57:4  58:15 | 33:6  37:16  38:16 |
| entire [1]  63:13 | 24:11  32:8  47:1 | first [29] 2:24  3:3 | 63:1  64:6 | 40:14  40:20  41:4 |
| entitled [12]  16:5 | extraordinarily [1] | 6:6  7:24  9:8 | Gary [1]  1:20  2:14 | 42:9  42:12  42:14 |
| 18:11  21:25  39:25 | 45:12 | 12:24  14:9  16:12 | gather [1]  17:25 | 43:15  44:11  47:10 |
| | | 17:18  18:18  18:22 | | |

CondenseIt™           Honor - lawyer

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 47:24 | 49:19 | 51:11 | | 41:25 | 44:2 | 51:18 | 18:1 | 18:5 | 19:9 | 40:17 | 40:24 | 45:24 |

Columns (left to right):

**Column 1:**
47:24 49:19 51:11
51:15 60:3 60:21
61:10 61:19 61:13
62:3 62:9 62:15
63:6 64:10 65:7
66:8 66:19 67:2
67:18 68:1
**Honor** [22]   2:11
3:2 3:9 3:13
3:23 3:24 4:3
8:25 9:5 9:12
11:1 13:22 15:16
16:12 17:8 18:13
21:13 22:9 23:8
24:5 25:16 26:1
26:21 27:6 28:15
20:7 30:1 30:10
30:11 30:15 30:24
30:25 31:4 31:18
31:24 32:2 32:14
33:1 33:3 34:20
35:6 35:12 36:9
36:12 36:14 37:8
37:15 40:2 40:14
40:20 41:2 41:15
42:14 44:1 44:11
44:25 46:6 47:24
47:25 51:1 52:6
52:19 53:1 54:22
55:9 58:14 60:3
61:10 62:3 62:6
62:9 63:6 64:3
64:11 64:19 65:7
66:8 66:19 67:7
67:13 67:17 67:18
**Honor's** [1]   67:11
**HONORABLE** [1]
1:16
**hope** [5] 13:15   20:2
41:10 61:13 63:5
**horse** [1]   44:21
**hour** [1] 61:3
**hours** [1]   15:21
16:3 18:9
**Howrey** [46]   2:5
2:20 4:17 5:4
5:11 5:13 5:14
5:19 6:10 6:20
6:22 7:11 8:2
8:13 13:2 13:8
13:22 14:11 14:15
14:19 15:3 15:4
16:12 18:24 19:11
21:2 21:10 21:17
22:2 22:17 23:12
23:16 25:4 25:11
26:21 27:11 28:19
29:23 32:22 35:7
**Howrey's** [2] 17:14
26:11
**bugs** [1] 44:7
**hundred** [1]   42:10
**hundred-percent** [1]
11:10
**Hutz** [1] 2:2
**i.e.** [1]   54:12
**idea** [2] 26:17   53:7
**ideas** [1] 59:12
**identified** [10]   6:15
37:9 39:13 39:20

**Column 2:**
41:25 44:2 51:18
52:15 53:2 54:4
**identify** [1]   17:20
37:4 46:14
**imagine** [1]   22:19
**immediately** [1]
53:16
**impact** [1]   20:16
**impasse** [1]   47:21
**implicitly** [1] 50:1
**implies** [1] 52:17
**import** [1]   45:1
**important** [1] 11:1
14:15 15:23
**importantly** [1] 36:10
**imported** [1]   64:9
65:3 65:17
**in-depth** [1]   16:24
**inapplicable** [1]
57:4
**inartfully** [1]   54:23
**inaudible** [1]   39:19
42:21 56:12 59:3
**INC** [1] 1:7   1:8
1:9
**include** [6]   15:13
31:2 31:16 32:12
**included** [1]   8:24
**including** [2]   27:13
39:3
**inconsistencies** [3]
13:5 13:15 24:6
**inconsistency** [1]
5:23
**inconsistent** [5]
10:13 29:1 29:3
29:4 29:9
**INCORPORATED** [1]
1:7
**incumbent** [1] 45:16
**indeed** [1]   11:7
**indicate** [1]   34:1
34:5
**indicated** [17] 19:13
19:25 28:24 30:8
33:10 34:6 34:23
35:22 36:5 40:20
41:3 55:16 56:1
56:14 56:15 60:4
67:19
**indicating** [1]   20:8
50:1 57:8
**individuals** [1] 22:1
**indulgence** [1] 18:17
**inevitably** [1] 45:9
**inference** [2]   25:10
25:18 25:23
**information** [26]
6:1 6:2 6:11
6:14 6:17 6:19
6:25 7:21 8:5
8:6 8:7 8:8
11:7 11:8 11:11
11:16 11:18 11:21
13:3 13:9 13:20
14:11 15:6 17:3

**Column 3:**
18:1 18:5 19:9
19:10 19:22 19:23
21:18 22:2 23:4
23:15 23:25 24:25
25:2 25:20 26:3
26:20 28:6 28:9
28:19 28:25 33:19
36:13 36:14 37:3
38:5 41:12 42:15
42:17 42:23 43:3
43:5 43:6 43:21
43:22 44:12 45:2
45:3 45:6 45:8
45:11 45:12 45:18
45:23 47:10 50:7
50:8 51:25 53:11
51:21 56:17 56:25
61:21 63:19 65:10
65:13 66:15 66:15
**informed** [1]   15:11
**infringe** [1]   34:3
39:12 44:19 53:9
63:8
**infringement** [5]
34:2 35:18 35:23
36:2 36:3 38:15
39:15 41:25 46:20
47:2 53:8 55:21
63:10 63:10 63:23
**infringing** [1] 39:24
46:10
**inhibitor** [1]   63:15
**initial** [1]   51:19
52:8 52:9 52:23
53:6 54:20 54:23
65:15
**initiated** [1]   4:1
**innocent** [1]   24:10
**input** [2] 39:17   45:5
54:5
**inputs** [1]   40:7
42:1 42:2 45:4
47:14
**inputting** [1]   42:23
**inquire** [1]   15:18
16:6 28:1
**inquiry** [1]   13:19
26:3 28:8
**inside** [1]   63:9
**insofar** [1]   41:10
**inspection** [1]   4:13
29:15
**installation** [1] 39:4
**instance** [1]   27:22
51:8
**instead** [1]   46:23
**instructed** [1]   47:19
**integrated** [1]   56:4
**intend** [2]   15:11
15:12 48:17
**intended** [1]   12:7
**intending** [1]   46:5
**intent** [2]   24:8
31:16
**interest** [2]   33:12
43:10
**interested** [4]   30:13

**Column 4:**
40:17 40:24 45:24
**interim** [1]   66:8
**internal** [1]   4:19
6:20 9:23 13:25
17:14 18:1 18:20
25:10 26:22 27:1
29:22 30:13 31:21
31:24 32:21 42:6
46:19
**INTERNATIONAL**
[1]   1:9
**interpretation** [2]
7:17 14:4
**interrogatories** [4]
37:18 37:19 55:14
58:5
**interrogatory** [2]
39:14 46:13 54:4
55:11 57:10
**interrupt** [1]   3:14
14:18 22:10
**invalidating** [1]
17:17
**invalidity** [1]   53:10
**invention** [1]   15:24
**inventors** [1]   48:4
50:8
**invested** [1]   61:3
61:5
**involved** [5]   22:2
35:8 35:9 40:8
60:13
**involves** [1]   34:5
**involving** [1]   54:19
**issue** [42]   4:2
7:16 10:9 12:24
13:1 13:16 14:3
14:6 18:18 18:23
20:20 20:21 20:22
21:11 21:12 22:25
29:7 29:11 31:19
33:22 35:14 35:16
35:23 37:18 38:6
38:11 38:21 39:7
39:10 42:12 45:13
45:16 46:6 48:4
54:19 56:25 58:15
59:18 62:18 62:25
66:1 66:10
**issued** [2]   32:17
33:7
**issues** [1]   16:21
21:13 22:21 27:13
37:18 38:14 66:9
66:11
**item** [1] 3:3   3:8
3:9 48:1
**items** [1]   2:25
3:4 3:4 51:18
61:6
**J** [1]   1:18
**January** [1]   48:25
**Japan** [7]   48:6
48:19 48:21 49:2
49:10 50:12 51:6
**judgment** [2]   62:14
64:13
**July** [20] 3:11   4:7

**Column 5:**
6:6 6:6 6:11
7:17 7:25 8:14
8:23 9:1 11:5
12:4 16:12 26:23
29:14 30:17 31:6
31:9 32:5 32:18
**juncture** [1]   21:11
**June** [8] 5:5   30:18
30:19 31:8 32:19
**jurisdiction** [2] 5:14
**keep** [4] 3:6   43:8
43:9 55:19
**Kelley** [59]   2:4
2:21 2:25 2:1
5:7 5:23 6:24
7:25 12:22 13:5
23:5 24:6 29:17
30:7 30:9 30:10
37:15 37:24 40:18
41:10 41:14 46:1
41:24 46:3 46:7
47:25 48:3 49:15
50:16 50:18 51:5
53:1 55:15 55:19
56:1 56:14 57:4
58:5 58:14 60:11
60:22 61:9 62:0
62:18 62:20 62:24
64:3 64:18 64:19
65:21 66:13 66:17
67:13 67:19 67:22
67:23 68:2 68:1
68:6
**Ken** [1] 2:15
**KENNETH** [1] 1:21
**Kevin** [1] 1:23
**key** [4] 17:17   48:14
39:11 45:8
**kicking** [1]   59:12
**kind** [9] 10:16   6:4
38:17 39:8 6:9
47:5 53:25 9:7
**know** [1]   3:23
18:24 21:17 23:25
24:22 53:15 56:15
**knowing** [1]   40:17
45:24
**knowledge** [2] 23:4
48:19 57:9
**known** [1]   6:11
**knows** [1]   6:11
**Kobayashi** [3]   48:3
48:6 48:18 50:12
**lack** [1] 50:1
**laid** [1] 22:21
**language** [4]   8:21
9:2 9:6 17:17
37:25 45:18
**largest** [1]   64:1
**last** [9] 32:16   54:1
51:14 54:11 56:13
58:17
**late** [1] 5:5   30:18
30:19 50:15
**law** [4] 10:24   41:20
45:15 64:2
**lawyer** [1]   65:24

Teleconference - Judge Sleet                   Index Page 5

**Condensit™**

**lays - opponent**

**Column 1**

lays [1] 28:17
Layton [2] 1:19
  2:12  2:13
lead [2] 17:8  18:13
  52:1
leading [2] 31:2
  53:20
loads [x] 24:9  26:14
learned [1] 18:2
loast [2] 21:10  24:12
  24:15  27:15  27:24
  50:1  51:13  56:16
  66:10
led [1] 5:14  19:19
left [1] 68:4
legal [1] 28:23
legitimate [1] 38:17
less [5] 15:2  20:3
  33:17  40:15  60:16
letter [r] 6:5  9:21
  10:15  12:3  13:22
  26:24  52:17  57:7
  62:12
letters [3] 4:17
  7:18  27:8
levels [1] 45:19
libraries [1] 39:2
library [4] 39:18
  40:9  42:3  54:6
likelihood [1] 51:11
likely [2] 14:12
  52:15
limit [3] 41:3  59:15
  59:16
limitation [1] 60:1
  60:19
limitations [1] 44:17
limited [5] 22:18
  39:10  39:11  44:13
  66:4
limiting [1] 57:14
line [2] 2:20  12:11
  55:4
list [12] 20:9  21:22
  22:8  22:13  22:17
  26:8  36:22  52:10
  52:20  52:21  52:23
  64:22
listed [6] 50:6
  51:21  52:7  52:7
  52:19  52:22
listen [1] 21:17
listing [1] 8:7
literature [1] 56:9
litigation [10] 5:16
  15:9  16:1  16:5
  21:9  22:14  33:9
  36:8  38:3  45:13
live [1] 48:19
lives [2] 49:6  50:12
LLP [3] 1:21  2:2
  2:5
located [1] 56:24
lock [1] 15:25  16:4
Lodge [1] 2:2

**Column 2**

log [2] 4:13  4:20
  10:7  12:19  20:9
  20:12  22:8  27:1
logic [4] 53:24
  53:25  54:5  54:12
  56:8  57:15  59:9
  59:17  59:20  59:21
  60:7  60:14  62:21
  62:22
look [5] 37:21  46:13
  66:2  67:2  68:9
looking [9] 6:22
  6:25  13:24  22:7
  32:2  60:3  60:7
  60:9  60:15
looks [1] 16:17
  37:10
LTD [2] 1:4  1:8
M [3] 1:16  1:20
  2:3
major [1] 17:16
  18:10
makes [5] 29:23
  57:3  64:4  64:20
  64:25
manner [2] 39:10
  39:11  39:24  61:4
manuals [2] 39:4
  39:4  39:5  39:5
  40:6  42:10
manufacture [1]
  58:23
manufacturing [15]
  60:5  63:7  63:21
  63:24  64:4  64:6
  64:7  64:11  64:15
  64:16  64:25  65:11
  65:12  65:16  65:17
map [1] 54:6
marketing [1] 53:3
Markman [2] 55:22
  55:25
material [4] 11:23
  28:7  47:4  62:7
materials [2] 53:3
  53:3  53:15  53:19
Matrox [1] 1:8
  1:8  1:9  1:9
  56:22  57:1  62:7
  65:20  66:10  66:17
  66:25  67:8  67:8
  67:8  67:11
matter [1] 7:4
  35:16  47:20  48:3
matters [1] 61:4
  61:15  61:17
Maurer [1] 68:15
may [36] 14:2  14:21
  14:23  14:24  14:25
  16:2  19:24  20:2
  20:11  20:15  20:16
  20:19  20:19  20:21
  21:4  21:16  21:25
  22:1  22:5  24:15
  24:19  26:24  29:10
  30:5  33:20  33:25
  34:13  38:2  51:20
  52:25  53:14  57:4

**Column 3**

58:9  61:12  64:19
  67:18
mean [4] 3:13  10:9
  14:20  16:3
means [1] 10:11
meant [2] 37:19
  59:8
mechanical [1] 65:2
meeting [1] 47:7
meetings [2] 59:23
Mcilman [12] 1:20
  2:14  3:4  35:20
  55:9  55:13  58:9
  59:5  60:4  62:6
  63:23  67:7  67:17
memos [1] 59:23
Mcnlo [1] 2:5
mention [1] 46:17
mentioned [7] 24:1
  32:16  35:12  41:17
  41:20  45:1  59:16
merits [1] 20:18
  21:7
Messrs [1] 2:14
method [1] 63:18
methods [1] 52:5
mid-September [1]
  68:2
might [4] 7:20
  39:8  50:7  64:9
mind [3] 3:7  19:4
  32:25
minute [1] 37:25
  57:5  58:15
minutes [1] 11:20
missed [1] 32:15
misunderstood [1]
  23:21
moment [1] 43:18
month [1] 55:15
Monti [1] 11:2
Morin [1] 1:21
morning [4] 2:10
  2:11  2:16  2:17
most [8] 18:3  18:4
  22:12  45:2  45:7
motion [1] 20:24
  33:21  46:8
mouth [1] 24:16
movant [1] 3:16
  3:18
movants [1] 3:22
  4:2
move [1] 55:8
moving [1] 16:22
Mower [1] 52:14
Ms [21] 17:8  18:14
  22:9  22:11  22:24
  23:1  23:8  23:22
  23:24  24:17  25:3
  25:14  25:16  27:4
  29:19  29:22  30:3
  30:4  30:24  31:10
  31:13  32:14  33:21
  32:25  33:9  34:21

**Column 4**

44:1  44:25  46:2
  54:22  54:25  55:2
multiple [1] 5:2
must [2] 15:3  49:2
named [1] 5:17
namely [2] 4:19
  42:1  46:15
names [1] 5:15
narrow [2] 44:10
  54:10  57:15
narrowed [1] 56:1
  56:6
narrowing [1] 53:22
nature [1] 6:7
  12:23  38:11
necessary [4] 17:20
  45:17  47:18  67:3
need [1] 7:10
  20:4  31:5  35:17
  38:4  41:21  42:4
  42:8  45:4  45:17
  47:9  47:10  47:11
  54:24  59:7  63:14
  66:2  68:8
needs [1] 13:20
  45:13
negotiating [1] 35:8
negotiation [1] 53:20
net [1] 64:22
never [5] 5:5
  10:19  15:17  15:21
  65:11
new [1] 45:17
next [2] 8:23  35:12
  36:17  41:24  61:16
  61:16
nice [1] 19:14
non-confidential [1]
  34:7  41:8
non-Matrox [1] 67:15
non-starter [1] 62:11
none [2] 8:9  59:24
nor [1] 31:24
normally [1] 22:13
  47:14
note [2] 14:15  53:10
noted [2] 9:24
  12:20
nothing [5] 10:6
  10:7  34:8  47:12
  65:11
notices [1] 5:6
now [22] 6:20  13:7
  15:7  20:24  22:7
  23:17  31:7  32:25
  38:2  41:10  44:1
  45:1  45:24  46:10
  46:24  50:3  59:5
  59:14  59:18  60:5
  61:3  61:16
number [7] 21:25
  22:18  29:2  30:8
  34:15  40:3  60:23
  61:12
numerous [1] 49:21
object [5] 35:25

**Column 5**

37:2  51:24  :2
  61:20
objected [1] 6:8
  6:18  33:14  35:5
  35:13  35:18  36:5
  59:1
objecting [1] 55:20
objection [5] 34:16
  36:17  40:17  41:18
  43:11
objections [6] 34:5
  35:19  37:17  58:11
  61:2  67:10
obligated [1] 66:5
obligations [2] 41:1
  46:12
obtain [1] 41:10
  36:21  36:23
obtainable [1] 6:19
obtained [5] 3:1
  29:5  36:6
obtaining [1] 6:7
obviously [11] 3:6
  29:1  32:8  44:10
  36:14  43:3  44:14
  47:21  50:4  51:7
  52:9
occurred [1] 41:10
off [5] 21:22  36:7
  47:16  60:22  64:13
  68:6
often [2] 10:21  42:12
oftentimes [1] 54:1
Oliver [2] 34
  2:21
once [2] 11:1  11:1
  11:6  11:7  18:5
  19:13  20:11  23:3
  58:19
one [27] 3:16  3:3
  11:5  11:5  11:19
  11:22  17:16  18:25
  20:5  21:24  21:25
  24:12  26:17  26:18
  28:16  29:17  44:30
  39:8  39:9  41:19
  48:15  49:2  49:11
  50:7  50:9  51:1
  56:21  57:21  57:11
  60:25  61:1  61:11
  63:20  64:7  65:14
  67:8  68:10
ones [1] 3:14
  59:1
operates [1] 43:4
operation [5] 43:5
  53:25  65:11  65:16
  65:17
operations [1] 2:1
opinion [5] 2:1
  7:13  15:18  17:1
  28:23
opinions [5] 7:9
  9:9  14:13  15:14
  15:19  16:25  21:1
  21:19  26:19
opponent [1] 45:1

Teleconference - Judge Sleet

**CondenseIt™**

**opportunity - raised**

opportunity [4] 49:4
49:11  50:23  66:6
orally [1]  12:4
order [33]  3:11
4:7  4:22  7:17
8:20  8:23  9:1
9:2  10:18  10:23
12:3  14:3  17:11
17:22  22:16  26:23
29:14  33:4  35:7
35:9  35:11  36:16
38:21  38:22  40:9
41:13  43:15  45:13
61:24  62:15  64:6
66:25  67:11
ordered [1]  R:16
8:19  9:9  9:12
9:14  26:21  29:16
61:18
orders [1]  45:14
Osaka [3]  49:4
49:6  49:11
Oshinsky [1]  1:21
ought [1]  13:7
ourselves [1]  4:1
21:16  26:6
outlining [1]  8:20
output [6]  39:19
39:19  40:9  42:3
47:16  54:6
outset [1]  14:16
outside [1]  63:2
63:3  63:7
overall [1]  20:22
overbreadth [1] 44:7
overcome [1]  51:8
overly [1]  40:19
own [1] 61:7
p.m [1]  68:13
Page [1] 6:24  12:11
12:20
pages [4]  33:17
40:15  42:10  60:17
paper [1]  9:18
papers [1]  53:13
paragraph [1]  4:7
7:17  9:7  9:1
10:1  10:2  12:1
12:13
parameters [1]  31:7
31:12  40:12
Park [1] 2:5
part [20] 4:16  9:12
16:4  17:14  21:13
33:14  33:22  33:25
34:5  38:14  42:24
42:25  43:1  51:23
55:10  63:14  63:20
64:10  64:15  65:16
particular [3]  17:20
18:2  18:6  30:6
45:1  45:3  45:5
60:12
particularly [1] 17:13
parties [11]  3:10
3:19  36:8  37:3
37:4  37:5  47:2

47:19  51:11  53:19
58:18
parts [4] 39:11  42:19
42:21  44:18
party [16]  15:23
16:6  33:9  33:12
38:2  38:5  39:9
41:18  41:21  43:9
43:10  43:10  46:11
46:11  49:20  50:9
past [1]  53:20
patent [10]  17:2
17:18  35:18  48:4
54:13  56:2  60:13
63:2  63:8  63:23
patents [1]  8:8
pay [1]  5:21
people [1]  22:12
28:19  57:9  59:12
62:7  62:16
percent [1]  44:5
performed [1]  39:16
42:6  53:25
perhaps [1]  51:10
54:24
period [6]  8:4
21:22  32:20  51:11
67:2
peripheral [1]  47:4
permission [2] 62:12
62:13
permit [1]  51:11
person [1]  18:5
personal [1]  23:2
30:4
pertains [1]  20:18
21:7
phono [7]  6:12
24:12  26:7  26:10
32:5  32:6  49:1
phonetic [1]  11:2
52:14
phrase [1]  8:24
10:13  50:21
phrases [1]  53:2
physical [1]  64:8
64:21  65:2
picture [1]  7:22
piece [7]9:17  18:10
30:6  55:18  55:18
63:19  65:10
pieces [1]  11:8
17:17  25:25
ping-pong [1]  40:25
place [41]2:5  17:18
19:23  49:2
plaintiff [1]  1:5
1:23  2:12  26:14
44:9  45:22  46:1
50:6
plaintiffs [1]  4:14
5:6  53:13
planning [1]  59:23
plant [3]56:14  56:23
67:9
play [2] 33:25  34:13

point [23]  13:17
15:3  15:9  20:10
20:11  21:3  21:13
23:2  23:8  24:1
29:17  29:18  34:4
41:5  41:24  43:23
44:3  48:8  48:23
61:2  61:6  64:20
66:5
points [1]  5:2
23:10  28:16
poison [1]  20:5
poisonous [1]  20:21
portion [1]  10:1
65:8
position [8]  20:14
23:18  24:15  25:7
25:15  28:3  28:12
33:11  63:25
positions [1]  34:2
possession [2]  40:1
47:4
possibility [1]  22:4
22:5  24:19
possible [1]  28:8
53:12
postponed [1]  26:25
potential [2]  20:17
21:14  22:25  29:11
pre [1]  60:11
precisely [1]  10:15
10:16
precluded [1]  16:20
preparation [1] 31:14
32:22
prepare [1]  8:20
prepared [1]  4:10
9:15  10:3  53:6
preparing [1]  31:25
32:3
present [2]  30:21
43:5
presumably [1] 25:11
presume [1]  33:3
50:8  62:15
pretty [1]  58:4
prevail [1]  62:25
prevent [1]  16:4
previously [1]  33:10
prima [1]  27:24
primary [1]  4:1
principal [2]  2:16
21:3
privilege [12]  4:12
4:15  4.20  10.6
10:7  10:21  14:1
20:9  22:8  27:1
27:20  27:21
privileged [11] 9:25
10:20  10:22  12:17
14:7  14:10  22:13
22:18  27:17  28:1
28:9
problem [1]  17:11
19:11  19:21  20:5
21:21  44:7  44:9

48:24  54:22  54:25
proceed [1]  24:23
33:4  45:14  47:7
proceeded [1]  24:2
24:20
process [46]  27:2
42:24  42:25  43:1
44:16  47:15  53:24
54:13  54:17  56:3
56:9  56:12  56:20
57:2  57:14  59:6
59:8  60:5  62:21
63:6  63:8  63:8
63:21  63:23  63:24
64:4  64:6  64:7
64:11  64:15  64:21
64:22  64:24  65:1
65:2  65:2  65:10
66:14  67:1  67:14
processes [1]  56:7
56:9  56:12  57:13
57:16  60:12  60:14
produce [37]  4:9
4:19  6:20  8:18
9:14  10:3  10:7
10:16  10:18  10:19
12:15  23:7  23:11
26:22  34:18  35:1
35:4  35:17  38:3
39:1  39:19  39:24
40:4  40:9  41:6
42:3  49:25  50:11
51:16  51:17  51:23
53:22  54:6  57:20
58:20  58:21  64:23
produced [21]  4:12
8:11  9:17  10:12
27:11  29:16  33:15
33:16  34:17  35:3
35:10  38:1  38:10
40:4  40:15  42:9
43:24  53:12  53:14
53:15  60:16  64:21
67:21  67:25  68:1
produces [2]  64:22
64:24
producing [2]  10:2
53:16
product [21]  4:12
12:17  17:15  38:1
38:10  38:14  39:23
44:4  45:3  45:8
46:25  53:2  54:1
59:4  59:11  59:13
59:22  63:7  65:12
production [10] 10:1
10:14  22:25  27:7
29:14  38:4  41:11
54:20  57:3  67:23
products [19]  34:11
34:12  34:13  39:10
39:11  41:7  52:5
53:23  57:12  57:18
58:10  58:24  59:3
59:16  59:16  59:17
59:21  63:22  64:16
program [1]  33:24
progression [2] 47:1

promotional [1]
53:3
proper [4]  58:8
41:11  47:7  47:8
properly [1]  40:12
54:10
propose [1]  65:13
proposed [1]  10:10
proposing [1]  50:16
proposition [2] 65:1
65:8  65:9
prosecute [1]  45:12
protect [1]  45:12
43:14
protective [10]  5:1
35:9  35:11  36:15
38:22  41:13  45:15
45:14  61:24  62:1
prove [3]  43:1
43:7  44:22
provide [12]  4:11
17:23  23:12  23:17
34:12  36:12  36:15
37:9  37:12  42:1
53:9  56:11
provided [1]  1:6
7:21  11:17  13:13
22:20  33:20  36:15
36:15
provides [2]  6:13
57:22
providing [1]  59:17
47:14  54:4
provisions [1]  37:4
42:4
public [2]  6:18
42:4
publications [1]
8:8
publicly [3]  54:1
36:20  36:24
purpose [1]  62:1
purposes [1]  34:17
pursuant [1]  16:2
pursue [1]  45:8
pursuit [2]  14:13
26:11
push [1] 55:25
pushed [1]  34:10
put [4]  10:17  55:15
24:16  61:1
putting [1]  18:11
44:21  46:15
questioned [1]  55:23
questions [3]  24:12
26:1  56:25
quickly [2]  41:1
53:11  67:24
quite [2]22:12  43:1
61:4  61:14  65:1
quote [4]  11:11
12:13  13:12  28:5
raise [1] 29:17
raised [5]  34:15
34:16  35:20  35:4
62:10

**raising** [1] 62:7
**range** [1] 42:12
**rather** [1] 41:1
**rattled** [1] 60:22
**react** [2] 40:17
**read** [11] 12:12 22:16 26:5 38:23 38:25 40:22 51:16 58:20 65:8 65:25 66:6
**reading** [1] 10:15 58:21
**real** [7] 33:12 37:18 38:6 38:11 38:13 39:7 43:10
**really** [16] 12:6 17:24 38:16 40:18 40:24 42:4 46:20 47:2 54:14 59:7
**reason** [2] 35:4 41:17
**reasonable** [1] 27:25
**reasonably** [1] 39:8 51:25
**recapping** [1] 32:5
**receive** [1] 11:11 28:25 45:23
**received** [7] 4:10 4:16 4:16 5:25 6:14 9:15 10:3 11:2 11:4 11:7 14:11 24:25 25:2 25:3 28:19 32:9 48:14
**recipient** [1] 27:15
**recited** [1] 37:16
**recognize** [1] 45:16
**recognized** [1] 14:15
**recollection** [1] 12:9
**recommendation** [1] 27:3
**record** [2] 24:17 36:18
**recorded** [1] 37:17
**records** [1] 56:24
**reduce** [1] 41:22
**refer** [2] 53:13
**reference** [4] 6:23 29:23 39:3 44:3
**references** [1] 12:11
**referred** [1] 56:5
**reflect** [1] 14:10 25:11
**reflections** [1] 12:8
**refused** [4] 4:18 37:5 53:25 57:6
**refuses** [1] 6:20
**regard** [3] 20:25 27:7 51:17 68:5
**regarding** [14] 10:24 18:20 21:7 21:8 27:13 27:14 30:13 31:3 31:25 33:22 41:23 45:8 62:4 64:2
**regular** [1] 47:14

**relate** [6] 7:19 20:19 20:20 20:21 37:17 60:5
**related** [1] 38:6 54:20 55:11
**relates** [1] 12:13 35:23 62:21
**relating** [24] 4:9 9:11 9:13 10:10 10:12 12:2 17:14 17:23 20:14 31:1 32:2 33:23 38:1 38:9 38:22 39:22 39:23 41:7 44:6 47:11 53:19 53:23 59:20 60:8
**relationship** [1] 24:20 24:23
**relatively** [1] 30:8 48:3 53:2
**released** [1] 61:7
**relevance** [1] 43:12 43:21 52:4
**relevant** [11] 18:3 18:4 38:15 52:13 52:16 52:18 52:20 52:20 52:22 54:24 59:9
**relief** [11] 3:20 19:24 20:3 20:7 20:20 20:23 20:25 21:14 21:15 22:21 22:22
**rely** [1] 51:22
**relying** [1] 28:23 65:12
**remainder** [1] 3:1
**remaining** [2] 54:14 59:18
**remains** [1] 17:16
**remedies** [1] 7:20
**remedy** [4] 7:22
**remember** [1] 26:10 28:21
**remove** [1] 43:18
**Reporter** [1] 68:15
**represent** [1] 49:20
**representation** [1] 28:18 30:5
**representations** [3] 5:1 29:1 29:2 29:4 29:8
**represented** [1] 7:25
**representing** [1] 13:6 48:9
**represents** [1] 35:7
**request** [16] 8:15 12:12 33:7 38:18 40:19 40:22 41:3 44:10 51:17 51:24 52:2 52:11 54:11 56:6 57:11 58:21
**requested** [2] 6:21 52:11
**requests** [19] 8:20 37:20 37:21 38:9 38:13 38:20 38:22

39:22 40:3 49:22 54:8 54:14 55:10 55:14 58:5 58:16 58:19 59:19 61:2
**require** [1] 10:19 17:23 17:25 22:16
**required** [2] 4:21 8:16 9:25 12:14 38:2
**requires** [2] 4:8 37:10
**resolve** [4] 7:10 55:16 61:2 66:10
**respect** [1] 3:10 13:2 31:19 44:7
**respond** [7] 18:14 28:16 30:15 47:19 48:13 49:21 49:25
**responded** [2] 8:6 50:20
**response** [1] 16:12 40:4 50:1 51:23 52:13 52:25
**responses** [2] 37:17 56:25
**responsibilities** [1] 27:5
**restrict** [1] 39:21 54:2 56:15
**restricted** [1] 59:19
**rests** [1] 47:2
**result** [1] 7:8 7:14 15:14 16:25 17:4 21:20 26:18
**retain** [1] 11:9 15:11 31:19 31:23
**retained** [1] 6:5
**retention** [1] 6:5 18:21 21:9 30:14 32:10
**return** [1] 28:16
**reveal** [1] 20:15
**revenue** [1] 44:5
**review** [1] 10:20 10:22 10:25 28:2
**reviews** [1] 29:15
**revisit** [1] 47:22
**Richards** [1] 1:19 2:12 2:13
**Ricoh** [44] 1:4 2:12 2:14 3:2 5:9 5:12 5:14 5:17 5:21 6:2 6:15 6:18 7:5 7:8 7:15 10:11 13:4 13:14 14:17 15:15 15:20 15:25 19:6 16:7 16:18 16:25 18:14 19:1 19:6 19:10 19:14 26:18 28:20 29:1 33:7 40:13 48:5 50:2 50:13 59:15 60:2 63:5
**Ricoh's** [1] 8:19 23:18

**right** [7] 9:9 11:12 20:24 22:7 45:24 48:10 55:13
**ROBERT** [1] 1:18
**rolling** [1] 67:23
**roster** [1] 3:6
**rug** [1] 62:8
**Rule** [2] 55:13 55:24
**rules** [1] 16:13 42:17
**runs** [1] 20:5
**sale** [1] 58:23
**Sales** [1] 53:4
**sanctions** [1] 22:1
**says** [9] 9:3 9:8 9:10 9:10 10:2 10:3 11:21 38:25 40:18
**schedule** [1] 66:21
**scheduling** [1] 33:11 34:21
**scope** [10] 10:14 18:18 27:7 29:19 29:21 40:19 41:11 44:13 59:19 66:11
**second** [5] 4:7 5:23 9:14 10:10 12:13 13:1 14:10 33:6 39:17
**Section** [1] 51:18
**see** [11] 14:24 14:25 17:11 17:24 20:12 40:12 48:10 48:12 49:22 62:17 65:4
**seek** [4] 19:22 20:1 20:7 63:2
**seeking** [1] 3:20 7:13 12:22 19:25 51:25 62:13 62:20
**seeks** [1] 52:3
**seem** [2] 12:8 23:9 56:24
**select** [1] 40:9
**selects** [1] 42:3
**self-serving** [1] 26:5
**SEMICONDUCTOR** [1] 1:7
**send** [2] 19:5 19:7 20:9
**sense** [1] 10:19
**sensitive** [1] 45:2 45:7 45:12
**sent** [10] 4:10 6:6 9:15 9:18 10:3 13:22 16:13 30:17 32:9 64:23
**sentence** [2] 9:3 9:8
**September** [2] 50:15 50:15
**series** [1] 65:14
**served** [1] 5:5 33:7 33:13 51:19 55:14
**service** [1] 48:12
**serving** [1] 17:19

**set** [4] 33:21 50:15 65:1
**seven** [1] 8:11
**sever** [1] 55:20
**several** [2] 37:16 42:10 59:1
**shall** [1] 4:14
**Shapiro** [1] 5:21
**share** [2] 11:21
**shared** [1] 45:19
**shield** [1]
**Shiado** [1] 48:9 48:15 48:18 48:20 49:6 49:19 50:7
**short** [2] 8:7
**shortly** [1] 48:10
**show** [5] 5:10 23:14 30:5
**shred** [1] 11:16
**side** [7] 4:21 15:5 23:13 52:11 58:13
**sign** [1] 8:21
**signed** [1] 19:7 19:8
**significant** [1] 18:23
**Simon** [15] 2:20 8:2 18:24 19:11 22:2 22:17 25:4 27:12
**simple** [1] 19:12 48:3
**simplify** [2] 31:23
**simply** [1] 6:4 36:4
**single** [4] 9:17 27:14 51:16
**sit** [1] 49:24
**situation** [1] 17:10 22:15 50:17 63:21
**six** [2] 8:11
**SLEET** [1] 1:16
**software** [1] 39:1
**sole** [1] 7:11
**solely** [1] 7:14
**someone** [4] 21:21 23:3 37:22 50:4
**sometime** [1] 50:4
**sometimes** [1] 33:13 55:4
**somewhat** [4] 23:10 27:7 28:7 44:10
**sorry** [5] 3:19 14:8 22:11 25:5 66:9
**sort** [1] 11:17 12:19 17:6 20:6 58:24 66:9 66:17

CondenseIt™                                                          sorted - United

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| sorted [1] | 21:15 | 36:25 44:5 44:6 | 46:23 | | 41:21 43:8 46:11 | topics [1] | 13 13 |
| sought [2] | 13:8 | 47:20 | synthesis [14] | 53:24 | 49:19 50:9 | total [1] | 12:6 |
| | 34:21 | stonewalling [1] | 53:25 54:5 54:12 | | third-party [2] 15:19 | training [1] | 39:5 |
| sounds [1] | 27:19 | 37:8 40:5 | 56:8 57:15 59:9 | | 17:19 | transcript [4] | 6:23 |
| source [3] | 38:7 | story [1] 5:3 | 59:17 59:20 59:21 | | Thomas [25] 4:9 | 12:5 12:11 29:14 |
| 45:21 45:25 | | strategy [3] 6:1 | 60:7 60:14 62:21 | | 4:11 4:18 4:25 | transfer [1] | 46:5 |
| sourcecode [3] 42:5 | | 31:3 32:2 | 62:22 | | 5:5 5:8 5:10 | transmitted [2] 5 4 |
| 42:16 44:13 44:25 | | strictly [1] 63:14 | system [1] | 42:25 | 5:13 5:17 5:18 | 25:8 25:21 |
| 45:7 | | stuff [7] 46:15 46:18 | systems [1] | 1:8 | 5:22 5:24 6:2 | tree [1] | 20:21 |
| sourcecodes [1]39:5 | | 47:12 53:17 59:7 | 33:19 39:2 42:20 | | 6:5 6:10 6:13 | trial [5] 43:2 48 17 |
| sources [4] | 36:19 | 66:16 67:24 | 60:6 | | 6:18 7:2 7:6 | 49:16 50:5 50 3 |
| 36:25 42:13 43:14 | | subject [1] 7:4 | table [1] 41:1 | | 7:7 7:11 7:19 | tried [1] 52:13 |
| sourcing [1] | 43:13 | 35:16 66:3 | tainted [2] i7:5 | | 8:1 8:6 8:13 | true [1] 43:10 |
| space [1] | 49:4 | subjects [1] 7:4 | 17:6 17:7 20:15 | | 8:17 9:11 9:14 | truly [1] 45:21 |
| speak [1] | 60:25 | submission [3] 26:25 | 21:4 | | 9:15 9:19 10:10 | try [3] 3:6 30 |
| SPEAKER [3] 30:1 | | submit [1] 9:1 | takes [4] 42:2 47:15 | | 10:12 11:6 11:9 | 11:14 63:1 |
| 30:18 31:8 | | 38:8 | 49:2 66:6 | | 11:17 11:18 12:15 | trying [1] 13 4 |
| speaking [3] | 32:16 | submitted [1] 4:13 | talks [1] 10:2 10:14 | | 12:23 12:25 13:5 | 19:22 20:6 23 13 |
| 60:25 | | 8:23 12:18 | tangible [1] 51:18 | | 13:11 13:13 13:24 | 27:19 32:4 33 18 |
| special [1] | 22:14 | subpoena [19] 5:5 | target [1] 16:22 | | 14:12 14:16 15:8 | 41:22 44:16 56 7 4 |
| specific [5] | 25:25 | 5:14 5:15 17:19 | Tech [11] 1:9 56:22 | | 15:19 16:7 16:13 | 55:16 61:23 14 11 |
| 31:17 32:13 39:22 | | 19:17 30:17 30:20 | 67:9 67:11 | | 16:16 16:21 16:24 | turn [2] 36:11 61 |
| 56:4 | | 32:17 33:7 33:13 | technical [2] 39:3 | | 17:5 17:14 17:16 | turned [1] 29 10 |
| specifically [4] 5:11 | | 33:14 35:15 35:15 | 39:4 | | 18:5 18:21 18:23 | tutorials [1] 39 8 |
| 3:13 26:9 57:21 | | 48:11 49:23 | technology [1] 18:6 | | 18:25 19:2 19:11 | twice [1] 4 17 |
| specification [1] | | subsequent [1] 12:3 | tedious [1] 38:25 | | 23:13 23:15 24:25 | 35:3 45:1 |
| 39:10 59:10 59:22 | | subsequently [1] | teleconference [6] | | 25:1 25:12 26:9 | two [10] 8:6 |
| specificity [1] 25:12 | | 8:19 19:4 | 8:1 8:14 9:12 | | 26:11 26:18 27:10 | 11:8 39:15 39 15 |
| specifics [1] | 26:10 | subset [1] 55:1 | 9:16 31:2 68:13 | | 27:13 27:14 28:5 | 46:14 47:12 48 4 |
| spelled [1] | 38:16 | substance [1] 21:9 | telephone [3] 1:14 | | 28:18 28:24 29:23 | 48:16 56:13 |
| spend [1] | 55:7 | 32:10 63:15 | 24:9 25:13 26:2 | | 30:14 30:17 31:1 | two-page [1] 16 14 |
| spirit [1] | 12:3 | substeps [1] 56:20 | 31:6 31:25 32:3 | | 31:19 31:20 31:22 | twofold [1] 12 4 |
| 43:20 | | successful [1] 53:21 | tolling [1] 16:23 | | 32:7 32:9 32:20 | 14:9 |
| spokesperson [1] | | such [3] 6:7 27:20 | 36:2 | | Thomas' [11] 5:10 | typo [4] 8:5 0 2 4 |
| 2:16 | | 42:19 | ten [1] 50:2 | | 5:20 8:1 13:5 | 35:13 45:18 |
| stands [3] | 65:5 | suddenly [1] 6:8 | Teresa [2] 2:3 | | 15:5 23:13 24:7 | types [4] 6 2 |
| 65:8 65:9 | | sue [1] 46:23 | 2:21 | | 24:8 28:25 29:5 | 8:7 60:9 60 13 |
| start [4] 3:8 3:18 | | sued [1] 46:23 | term [1] 67:7 | | 32:10 | U.S [2] 27:23 6 14 |
| 34:20 62:7 | | suggest [1] 52:16 | terminate [1] 19:6 | | thought [2] 13:11 | 63:2 |
| started [1] | 53:11 | suggesting [1] 21:1 | terms [1] 41:12 | | 25:14 60:4 | U.S.C [1] 7 1 |
| 53:16 | | 46:10 66:22 | testified [7] 6:13 | | thoughts [1] 67:3 | U.S.D.C.J [1] 1 1 |
| starting [1] | 41:5 | suit [1] 56:2 | 7:7 11:9 16:16 | | thousand [1] 60:16 | ultimately [2] 14 1 |
| starts [1] | 18:22 | summary [2] 62:13 | 16:25 25:1 28:25 | | thousands [1] 53:12 | 53:21 |
| 22:14 | | 63:11 64:13 | testify [1] 26:9 | | three [3] 8:7 16:11 | under [5] 1 3 |
| state [3] 40:2 | | suppliers [1] 57:18 | testifying [1] 21:8 | | 25:25 56:13 58:18 | 10:1 13:15 62 4 |
| 64:2 | | support [1] 29:10 | testimony [11] 5:10 | | through [2] 12:12 | 64:21 |
| statement [1] | 53:7 | 51:22 62:13 | 5:20 7:12 7:13 | | 21:19 31:1 31:5 | underlying [1] 18 4 |
| 64:2 65:5 | | supports [1] 25:10 | 13:6 17:19 20:18 | | 32:7 32:15 36:11 | underneath [1] 5 10 |
| statements [2] 53:1 | | supposed [1] 8:25 | 23:14 24:7 24:9 | | 38:22 49:21 51:18 | 36:15 61:25 |
| 53:4 | | 10:16 | 26:15 29:6 | | 61:1 61:23 | understand [16] 15 5 |
| States [19] 1:1 | | Supreme [1] 27:23 | text [1] 38:19 | | Thursday [1] 1:13 | 24:21 28:10 9 19 |
| 48:20 49:12 63:3 | | suspect [1] 2:15 | thank [1] 4:6 | | ties [1] 62:9 | 29:20 29:24 310 |
| 63:3 63:8 63:9 | | sweep [1] 13:14 | 19:14 30:24 33:1 | | timely [1] 45:22 | 31:11 36:1 41 13 |
| 63:22 64:17 65:18 | | swept [1] 62:8 | 47:15 62:3 67:17 | | times [1] 43:9 | 44:8 45:20 50 18 |
| stating [1] | 11:16 | Synopsis' [1] 46:25 | 68:11 | | timing [2] 17:21 | 51:7 56:19 60 21 |
| stay [3] 34:22 46:8 | | Synopsys [3] 33:8 | themselves [1] 60:8 | | 18:5 18:19 | understood [4] 0 2 1 |
| step [1] 25:6 | | 53:8 33:11 33:13 | theoretically [1] | | Title [1] 57:4 | 6:24 25:14 30 21 |
| steps [9] 39:15 39:15 | | 33:19 34:6 34:15 | 51:13 | | today [2] 2:23 | unduly [1] 1 4 |
| 39:22 40:8 54:3 | | 35:14 35:13 35:13 | theory [1] 35:19 | | 16:23 20:1 31:1 | 52:2 |
| 57:2 57:5 65:15 | | 36:14 38:2 38:2 | 38:15 46:20 53:8 | | 46:22 | unequivocally [1] |
| 65:15 | | 38:10 38:14 42:17 | 55:21 63:1 | | together [2] 47:8 | 11:19 |
| Steven [1] 1:18 | | 43:8 44:4 44:11 | thinking [1] 63:5 | | 47:20 | unidentified [4] |
| 2:13 | | 46:9 46:11 46:23 | third [19] 15:23 | | Tokyo [1] 49:3 | 30:1 30:18 1 |
| still [3] 7:3 13:12 | | 47:5 61:14 61:22 | 16:6 25:23 37:3 | | too [1] 59:2 | 37:4 |
| 18:18 25:18 | | Synopsys' [1] 40:1 | 37:6 37:5 38:2 | | took [1] 11:6 | United [10] 1 1 |
| | | | 38:5 39:9 41:18 | | top [1] 16:13 | |
| | | | | | topic [5] 33:6 35:21 | |
| | | | | | 62:10 62:11 | |

48:20   49:12   63:2
63:3    63:7    63:9
63:22   64:16   65:18
**universe** [1]      8:12
**unsuccessful** [1]
50:10
**unusual** [1]      63:1
63:4
**up** [13]    6:7    15:25
164    17:25    31:2
32:7    35:19    45:15
50:5    50:15   53:20
62:23
**used** [9] 20:16    21:4
39:19   40:9    56:9
56:16   64:22   64:24
65:11
**user** [1]  39:4    42:1
46:15
**using** [13]          39:17
39:23   47:13   54:5
56:8    58:1    58:1
58:10   60:6    60:12
60:14   64:7
**utilization** [2]   33:23
35:24   36:4
**v** [1]     1:6
**vast** [1]  45:10
**verbally** [1]      15:11
**versus** [1]       41:21
**view** [1] 3:21
**voluntarily** [1] 50:14
**W** [2]     1:18    1:21
**wait** [1]  11:5
**waived** [1]       14:1
**Wall** [1] 22:3
**wants** [1]        17:24
**Washington** [1] 1:22
**ways** [2] 45:6    49:21
**week** [3] 11:5    11:5
61:16   61:16
**weeks** [1]        58:18
**weighing** [1]     41:20
**Whattal** [2]      1:18
2:11    2:12
**White** [1]        2:5
**whole** [5]        13:16
22:5    29:7    58:3
**willing** [9]      34:6
38:13   39:21   44:11
44:12   44:16   49:22
50:14   51:2
**Wilmington** [1] 1:12
**windows** [1]      49:11
**wish** [2] 12:6    57:13
**withheld** [2]     4:11
9:4     10:5
**withhold** [1]     10:5
**within** [1]       64:6
**witness** [9]      5:1
16:2    17:5    18:3
20:15   21:5    21:17
48:17
**witness'** [2]     20:17
21:5

**witnesses** [3]    16:3
21:23
**word** [3] 48:15   49:8
51:9
**words** [6]        15:25
20:15   21:4    24:14
24:16   31:21
**written** [1]      23:12
**year** [1] 51:2
**years** [1] 50:3
**Yesterday** [2]    56:18
57:7
**yet** [3]  21:16   43:9
48:14
**yourselves** [1]  3:22

RECEIVED TIME  SEP. 2.    8:57AM

# EXHIBIT D

1

1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                        - - -

4   RICOH COMPANY, LTD.,            :      CIVIL ACTION
                                    :
5           Plaintiff              :
                                    :
6       vs.                        :
                                    :
7   AEROFLEX INCORPORATED, AMI      :
    SEMICONDUCTOR INC., MATROX      :
8   ELECTRONIC SYSTEMS LTD., MATROX :
    GRAPHICS INC., MATROX          :
9   INTERNATIONAL CORP., and MATROX :
    TECH, INC.,                    :
10                                  :
            Defendants             :      NO. 03-0103 (GMS)
11
                             - - -
12
                             Wilmington, Delaware
13                           Wednesday, July 30, 2003
                             11:35 o'clock, a.m.
14                           ***Telephone conference

15                           - - -

16  BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

17                           - - -

18  APPEARANCES:

19          RICHARDS, LAYTON & FINGER, P.A.
            BY:  ROBERT W. WHETZEL, ESQ. and
20               STEVEN FINEMAN, ESQ.

21                  -and-

22

23                           Valerie J. Gunning
24                           Official Court Reporter

25

2

1    APPEARANCES (Continued):

2                    DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP
                     BY:   GARY M. HOFFMAN, ESQ. and
3                          EDWARD A. MEILMAN, ESQ.
                           (Washington, D.C.)
4
                           Counsel for Plaintiff
5

6                    CONNOLLY, BOVE, LODGE & HUTZ LLP
                     BY:   FRANCIS DiGIOVANNI, ESQ.
7
                           -and-
8
                     HOWREY SIMON ARNOLD & WHITE LLP
9                    BY:   CHRISTOPHER L. KELLEY, ESQ. and
                           TERESA M. CORBIN, ESQ.
10                         (Menlo Park, California)

11                         Counsel for Defendants

12                              - - -

13

14

15               P R O C E E D I N G S

16

17               (REPORTER'S NOTE:  The following telephone

18    conference was held in chambers, beginning at 11:35 a.m.)

19

20               THE COURT:  Good morning.  Why don't we start

21    with introductions, beginning with Ricoh?

22               MR. WHETZEL:   Good morning, your Honor.  This is

23    Bob Whetzel for Ricoh.  Steve Fineman is on the line with me

24    in my office.  We also have Gary Hoffman and Ed Meilman from

25    the Dickstein Shapiro firm, representing Ricoh.

1          THE COURT:  And who's going to carry the argument
2   today?
3          MR. WHETZEL:  Primarily Mr. Hoffman.
4          MR. HOFFMAN:  Good morning, your Honor.
5          THE COURT:  Good morning.
6          And for defendant?
7          MR. DiGIOVANNI:  Good morning, your Honor.  Frank
8   DiGiovannia from Connolly Bove.
9          With me on the line in California are Terry
10  Corbin and Chris Kelley from Howrey Simon.
11         THE COURT:  All right.
12         MR. DiGIOVANNI:  And I believe Chris Kelley is
13  going to carry the primary argument, your Honor.
14         THE COURT:  Great.  Good morning.  Have we
15  accounted for everyone?  I hope that we have.
16         All right.  I think that this is -- bear with me
17  just a second here.  Yes.  This is Ricoh's request; is that
18  correct?
19         MR. HOFFMAN:  That is correct, your Honor.
20         THE COURT:  Let me address just one objection
21  that I have.  I'm sure everyone is aware that in a letter
22  of July 29, there's an objection to the last sentence or
23  last paragraph in the July 28 -- the Ricoh letter of
24  July 28.
25         As I understand it, that dispute, that

4

1    discovery dispute is between plaintiff and a nonparty

2    named Synopsis; is that correct?

3            MR. HOFFMAN;  it is, your Honor, although

4    the attorneys representing Synopsis and the attorneys

5    representing the defendants are the same attorneys.

6            THE COURT:  Okay.  In what district is that

7    dispute taking place?  What Court has jurisdiction over

8    that?

9            MR. HOFFMAN:  Your Honor, there's really no one.

10   Well, let me back up.

11           The subpoena that led to that was served

12   out of Delaware, and they have, Synopsis has filed

13   objections, so the subpoena is before the District

14   of Delaware.

15           THE COURT:  Where was the subpoena served?

16   In Delaware?

17           MR. HOFFMAN:  In Delaware.

18           THE COURT:  Is that where Synopsis is located?

19           MR. HOFFMAN:  Synopsis is incorporated in

20   Delaware, headquartered out in California.

21           THE COURT:  All right.  Well, a couple of

22   things.  I'm not sure that whatever district in California,

23   District Court wherever Synopsis is located wouldn't be the

24   district where that would be resolved.  The point that's made

25   in the objection regarding the amenability of Synopsis to the

5

1   discovery process outlined in my Court may or may not be

2   well-taken, I'm not sure, but it does not seem that that

3   issue has really been teed up correctly for the Court, so I

4   am not going to entertain it today.  If it's still extant at

5   some point in the future and you want to raise it with the

6   Court, you can do it according to the process outlined in the

7   schedule.  Okay?

8           MR. HOFFMAN:  Okay, your Honor.

9           Should we proceed by filing a motion, a discovery

10  motion in connection with that?  We're more than willing to

11  proceed that way.

12          THE COURT:  No, I'm not going to permit a

13  motion.  It's just that you are not compliant with the time

14  line as it's pointed out by the defendants.

15          What I require is that you give me a letter 48

16  hours in advance of the teleconference and that rule has not

17  been complied with.  You know, just quite apart from whether

18  Synopsis should be subject to, as a nonparty, to this Court's

19  outlined process for resolving discovery disputes.

20          Do you understand what I'm saying?

21          MR. HOFFMAN:  Yes, I do, your Honor.

22          THE COURT:  Okay.  Great.  Then why don't we deal

23  with the issue that's on the table for today.

24          MR. HOFFMAN:  Okay.  Your Honor, the issue

25  involves a Dr. Thomas, who's a professor at Carnegie Mellon

6

1   University.

2           In May of 2002, we engaged Dr. Thomas, a

3   consulting expert on behalf of Ricoh, in the preparatory

4   work that we were doing leading up to the present lawsuit.

5           Dr. Thomas, in May of 2002, had signed a

6   confidentiality agreement with us.  And from May of 2002

7   through April of 2003, there were numerous telephone

8   conversations with Dr. Thomas, at least eight telephone

9   conferences with him, numerous written communications.  We

10  sent him many documents.  We had discussions with him and

11  disclosed to him both certain opinions we had, litigation

12  strategy and also obtained from him various opinions that he

13  had with respect to issues involving claim construction,

14  infringement, validity and various strategies for the

15  litigation.

16          We filed the lawsuit in January of 2003,

17  so the discussions commenced before the lawsuit was filed,

18  and there were also some conferences after the lawsuit

19  was filed.

20          Some of this, your Honor, there is a declaration

21  that I've given -- that we've provided, that Mr. Whetzel

22  has that can be provided outlining these various

23  communications without getting into the substance,

24  obviously, since they're privileged and confidential

25  communications.

1          In April of 2003, after the lawsuit was filed,

2   Dr. Thomas informed us that while he did not want to be a

3   testifying expert, he could continue to consult for us.

4          On July 8th, Dr. Thomas sent us an e-mail

5   terminating his agreement, indicating he did not want to

6   continue working on the matter.

7          On July 22, we received a communication from

8   defendant's counsel informing us that they were not going to

9   proceed with a deposition of Dr. Thomas.  That was noticed

10  for July 31, since they had engaged Dr. Thomas as a

11  consultant.

12         We had two major problems that we immediately

13  raised.  Number one, we had never received any subpoena

14  that had been served on Dr. Thomas, nor notice of deposition,

15  nor the subpoena for documents that they had served on

16  Dr. Thomas.  We found out subsequently when they sent it

17  to us that they had served that on him apparently in

18  June, before he terminated his relationship with us.

19  Also, there was nothing filed with the Court indicating

20  that any such subpoena was filed.  There's nothing on the

21  docket sheets.  Neither Mr. Whetzel's office nor my office

22  received it.

23         We also immediately objected to it because

24  Dr. Thomas had been a consultant for us and he received

25  during that consulting period confidential information,

8

1   attorney work product information, concepts of some of our

2   litigation strategy, concepts of some of the claim

3   interpretation issues, provided us with opinions on claim

4   interpretation and opinions on infringement issues as well as

5   validity issues.

6         So we immediately objected to the defendants

7   using Dr. Thomas as an expert and we requested that they

8   cease all communications with him and that they also send us

9   copies of all the correspondence with Dr. Thomas and all

10  documents that they received from Dr. Thomas.

11        So far all that they've indicated is that they're

12  willing not to consult with him while this matter is pending

13  before the Court if we brought the matter quickly to the

14  Court within two weeks, which we've done.

15        They have not said -- in fact, they have said

16  that they will continue to talk with Dr. Thomas.  They've

17  also not produced any documents to us.

18        So at this point we don't know what documents

19  Dr. Thomas has given to the defendants.  We don't know what

20  has been, the details of what has been discussed, except that

21  obviously he's someone that should not be used by the other

22  side as an expert, as a consultant of any type, since he has

23  confidential information of ours.

24        The defendants have indicated that they were

25  aware that he had consulted for us but felt that since, as I

1  understand their position, the only information he had was

2  with respect to prior art and validity opinions, that nothing

3  was protected, and after researching it they felt they were

4  free to go forward.

5        Obviously, the consulting arrangement we had

6  with Dr. Thomas extended beyond validity, into infringement,

7  claim construction and trial strategy, but even if it was

8  only on validity issues and validity opinions, they still --

9  it would still be inappropriate for them to use him as a

10 consultant.

11       What we're asking for, your Honor, is we're

12 trying to get further information on the following:

13       Number one, that there be no further

14 communications with Dr. Thomas regarding the merits of the

15 case or the patent in suit unless counsel for all parties are

16 present or consent to such communications in writing.

17       That the defendants be required to disclose all

18 the communications that they've had with Dr. Thomas and

19 produce all the documents to us that have gone back and

20 forth.  If they feel that any documents are privileged or

21 work product, then they can be submitted in-camera, but we

22 should get a log so we can sort that out.

23       We also would like to take his deposition, but

24 we're also concerned about taking his deposition.  If the

25 first question is please state your name for the record and

1    he proceeds to disclose everything we ever told him or

2    discussed with him, obviously we have a problem.

3            So what I'd like to do is to take his deposition,

4    but on a basis where the only use that can be made of that

5    transcript is, or of the deposition transcript, is for

6    resolving this matter.

7            Then, once we obtain more information, then we

8    can come back and see what, if anything else, needs to be

9    done besides disqualifying Dr. Thomas from working with the

10   defendants.

11           It's an unusual problem, your Honor.

12           THE COURT:  I should say.

13           MR. HOFFMAN:  It's unfortunate it exists and we

14   need to bring it before the Court.

15           THE COURT:  All right.

16           MR. HOFFMAN:  But obviously once we found out

17   late last week that this had occurred, we felt we needed to

18   immediately bring it before the Court.

19           THE COURT:  Okay.  Thank you, Mr. Hoffman.

20           Is it Mr. Kelley?

21           MR. KELLEY:  Yes.

22           THE COURT:  Okay.

23           MR. KELLEY:  Yes, your Honor.

24           Defendants do not understand what the purpose of

25   the release that Ricoh is asking for would serve.  We've

1   already committed in a letter dated July 25th that to not

2   have substantive communications with Dr. Thomas, except on

3   two specific issues, and one, the first issue was just

4   procedural matters relating to the -- to his response to our

5   subpoena, the documents he might produce.

6           And while we're talking about that subject,

7   I will add that we have received documents from Dr. Thomas.

8   We've Bates-stamped all of them.  Copies have been made and

9   I believe copies should be on their way as we speak to

10  Ricoh.

11          So that problem should be resolved forthwith.

12          The subpoena that we sent him was directed

13  exclusively to prior art issues.  I have not looked at the

14  documents, but that's my understanding what he produced to

15  us.  If there are any kind of communications that he has

16  received from them, we did not ask for those and we did not

17  receive any such communications.

18          So I know that the second -- second topic that we

19  indicated we would -- we wanted to reserve the possibilities

20  of talking to Dr. Thomas about was this:  If Ricoh, in the

21  process of trying to establish that there is a conflict of

22  interest, puts on some evidence that they communicated

23  confidential information to Dr. Thomas, we wanted at least to

24  have the opportunity to invite Dr. Thomas to respond, so that

25  we didn't have a situation where only one side was able to

1  put on their evidence on this issue.

2          And let me back up now and give you a little bit

3  of the history of this.

4          When this case was first filed, we went out and

5  started trying to find who was a suitable expert for us and

6  among the names that came up was Dr. Thomas.  We contacted

7  him at that time and he told us then that he had worked with

8  counsel for Ricoh about a year prior to that.  And so at that

9  point we decide not to pursue it, because we didn't know if

10  they were going to go back to him or not and use him in an

11  ongoing matter in the litigation.

12          We then subpoenaed him in in order to get the

13  information that he has about the prior art system because he

14  is actually one of the leading luminaries in this field and

15  worked on a system that we believe will be very relevant to

16  prior art when we get to the merits of the case.

17          That subpoena, unfortunately, because of a

18  screw-up in our office, did not get distributed to plaintiff

19  and was not filed with the Court.

20          We have gone back.  When we discovered this,

21  we've gone back and made sure that that won't happen again.

22  But that was an oversight.  And the fact that it was an

23  oversight is demonstrated by the fact that as soon as we had

24  retained Dr. Thomas, we immediately sent a letter to Ricoh

25  saying, Oh, we've taken this deposition that we noticed off

1    calendar and we're giving you notice that we've retained

2    Dr. Thomas.

3                So we were not trying to hide the ball here.  It

4    was just an accidental mistake, but copies were not sent to

5    plaintiff of the original subpoena.

6                So let me get to the second thing that counsel

7    for plaintiff wants, and that is that they want to get into,

8    they want to discover what materials we have provided to

9    Dr. Thomas or what the nature of our communications with

10   Dr. Thomas has been.

11               And the point that we want to make here first

12   is that until plaintiff establishes that there is, in fact, a

13   conflict of interest that would prevent Dr. Thomas from

14   working for us as a consultant, there really is no basis to

15   get into that secondary examination of what communications

16   we had with him.

17               THE COURT:  You don't think --

18               MR. KELLEY:  We had in passing.

19               THE COURT:  Mr. Kelley, you say until the

20   plaintiff establishes that there's a conflict of interest.

21   I'm just trying to understand that, where we are in terms of

22   that prima facie showing.

23               You indicate that when you communicated with

24   Dr. Thomas, you learned at that time that plaintiff's counsel

25   had worked with him a year prior on another case or this

1  case?

2          MR. KELLEY:  Well, we didn't get into that.  I

3  presumed it was in preparation for this matter, had something

4  to do with this patent.

5          THE COURT:  And that on its face in your view

6  would not present at least the potential for the appearance

7  of a conflict?

8          MR. KELLEY:  That's why we did not pursue it

9  at that time.  I understand the question of the Court.

10          THE COURT:  Okay.

11          MR. KELLEY:  Let me give you a little bit more

12  history, then.

13          THE COURT:  Okay.

14          MR. KELLEY:  When we sent the subpoena to

15  Don Thomas, he called us back.  We didn't hear from his

16  counsel.  He didn't give it to plaintiff and say, You folks

17  deal with it, I'm working for you.  He called us back and

18  indicated to us he wasn't working with them and indicated

19  that he was interested in working with us.

20          And so we, not wanting to tread into the subject

21  matter, we were put in this situation.  We're very interested

22  in working with Dr. Thomas given that he's a leading luminary

23  in the field, but also we're concerned about this prior work

24  he had done.

25          So what we asked:  Have you received anything

1  confidential from Ricoh, did you talk to them about case

2  strategy?  We understand those are the two kinds of things

3  that create a conflict of interest.  And he assured us he had

4  not.

5          Whether he did, obviously counsel for plaintiff

6  is indicating that he did receive that information.  Sitting

7  here, I have no idea who's correct on that dispute.  But

8  having asked Dr. Thomas, well, if what he said is true, we

9  should be able to use his services under the relevant case

10 law and so what we did is say we're interested in retaining

11 you, but we're going to notify the other side.  We're not

12 going to do anything about the fact we want to work with

13 you.  We're not going to consult with you.  We're not going

14 ask to ask for your opinions yet.  We are going to give them

15 notice we want to enter into this relationship, which is how

16 we ended up where we are today.

17         Yes, I was aware that we were certainly aware

18 there was a possibility that he might have a conflict of

19 interest, but he had indicated he had not received any such

20 information that would create a conflict.  If that's true, we

21 wanted to get into that consulting relationship.

22         THE COURT:  Well, that's his legal opinion?

23         MR. KELLEY:  It's not his legal opinion.  We have

24 to walk a little carefully.  I didn't say please tell us what

25 you received so we can make an independent evaluation, but

1    what we did say is, if you get anything that's confidential,

2    any kind of confidential information, did you folks talk

3    about case strategy?

4              THE COURT:  Well, that may be in the eye of

5    beholder, perhaps, Mr. Kelley.  Yes, no, maybe?

6              MR. KELLEY:  Certainly, and I guess that is what

7    I would suggest:  Is that since I have no way of knowing

8    exactly what happened and what transpired, this is a point on

9    which Ricoh has the burden to produce some evidence

10   indicating that, in fact, there were communications that

11   would be the basis for disqualification.

12             THE COURT:  So you want the Court to require

13   Mr. Hoffman to submit an affidavit to that effect?

14             MR. KELLEY:  Well --

15             THE COURT:  What is it that you require in the

16   way of proof, Mr. Kelley?

17             MR. KELLEY:  Well, the case law talks about, it

18   indicates the burden is on the plaintiff, suggesting there is

19   a conflict of interest.

20             THE COURT:  Okay.

21             MR. KELLEY:  And procedurally how to go about

22   doing that, I suppose this affidavit, which I have not seen

23   that Mr. Hoffman talks about, would be one way to get that in

24   evidence into the records or to present it to the Court.

25             THE COURT:  Okay.  I have not seen it either.  In

1  fact, I've forgotten exactly how it was described.

2          What type of affidavit was this, Mr. Hoffman?

3          MR. HOFFMAN:  What it is, your Honor, is a

4  four-page affidavit by one of the attorneys in my office who

5  was the primary contact with Dr. Thomas.

6          It sets forth, without disclosing the details of

7  the conversations, it sets forth the dates of various

8  contacts.  It attaches a copy of the confidentiality

9  agreement, indicates how long the telephone conferences

10  were.  It does not have all the telephone conferences, but

11  many of them or most of them.

12          It identifies the type of topics discussed during

13  those conferences, identifies various e-mails that were sent

14  or received by Dr. Thomas, sent to him or received from him,

15  including the fact that he provided comments on claim

16  interpretation in e-mails and comments on infringement issues

17  in e-mails and lays out in 24 paragraphs various activities

18  that occurred, starting prior to the litigation, in May of

19  2002 through April 4, 2003, and then the fact that on July 8,

20  2003, he, Dr. Thomas terminated the agreement with us.

21          The first we learned that he had been engaged by

22  the defendants was when we received a letter from the

23  defendants on July 22, I believe it was, indicating that they

24  were not proceeding with a deposition subject, you know,

25  based on the subpoena, because they had already engaged him

1    as an expert.  They did not contact us and say we're

2    contemplating engaging him, do you have any objection.

3              Immediately we sent them a letter objecting and,

4    your Honor, what the response was was that there's no problem

5    because all that he had done was, in their opinion, okay, was

6    discuss prior art with us and provided validity opinions and

7    therefore that's not a problem.

8              They then state, and this is a letter from them

9    on July 23:  After we objected to this, we have reviewed the

10   relevant case law, and given the particular circumstances of

11   the work performed by Dr. Thomas, we conclude he may perform

12   consulting work or appear as an expert on behalf of

13   defendants without giving rise to a conflict of interest.

14             In order, however, to allow you to seek judicial

15   resolution of this dispute, we will refrain from consulting

16   with Dr. Thomas for a period of two weeks.

17             This is not a situation where they said, Oh, you

18   know, we're contemplating hiring him, do you have any

19   objection.  This was one where they had engaged him and then

20   only after we complained did they say, Well, we'll give you

21   two weeks to go to court.

22             There are many leading experts in this area, your

23   Honor.  Dr. Thomas is hardly unique.

24             We're entitled to find out what else he disclosed

25   to them.  Obviously, according to what Mr. Kelley is saying,

1  Dr. Thomas was less than candid with them in the nature of

2  the disclosure.

3           The declaration I can have hand-carried over to

4  your Honor.  It could be there within a half-hour.

5           THE COURT:  Well, hold on a second.

6           Mr. Kelley, given the description of the

7  declaration, if it exists, and I have no reason to believe

8  that Mr. Hoffman is being any less than candid as an officer

9  of this Court and I'm sure you don't question his candor,

10  would that satisfactory, based upon the research you've done,

11  the prima facie burden that he carries?

12           MR. HOFFMAN:  Well, your Honor, I mean I have not

13  seen it.

14           THE COURT:  Whether you've seen it or not, I've

15  just said given the description, we've all heard it --

16           MR. KELLEY:  I understand.  What I'm trying to

17  get at is this:  If he's -- it's my understanding from the

18  case law, if he offers an opinion, right, says, Well, I've

19  looked at your patent, I've looked at the prior art and I

20  conclude, you know, that your patent is invalid, that's a

21  discoverable opinion.  It's an opinion that he had.  There's

22  nothing -- they can't keep us from gaining access to that

23  opinion by saying, Oh, Dr. Thomas is our expert and we're not

24  going to produce him.  That's the sort of thing we're

25  entitled to discover.

1        Likewise, his characterization or understanding

2   of the prior art.  So what I heard from Mr. Hoffman was a lot

3   of times and circumstances.  I didn't hear the sort of

4   communication that would, in fact, create a conflict of

5   interest.  Namely --

6             THE COURT:  You don't want to answer my question,

7   do you, Mr. Kelley?

8             MR. KELLEY:  I'm sorry.  What was that?

9             THE COURT:  I said you don't want to answer my

10  question, do you?

11            MR. KELLEY:  No.  I'm trying to get at it.

12            THE COURT:  You're going all around Robin Hood's

13  barn, Mr. Kelley.

14            Based upon the description of the contents of the

15  affidavit, does it at least satisfy the -- cross the prima

16  facie threshold that would warrant the Court ordering the

17  taking of a deposition or some further process?  That's all

18  I'm trying to get you to talk about.

19            A VOICE:  Your Honor --

20            THE COURT:  I don't want to hear from anybody

21  else; I want to hear from Mr. Kelley.

22            MR. KELLEY:  All I heard was they sent him

23  something on such and such a date and it depends on what

24  that something is.

25            THE COURT:  All right.  If you are going to be

21

1    disingenuous with the Court in your response, I have a simple

2    answer for that.

3             Mr. Hoffman, prepare an order outlining the

4    request that you have just made and I will sign it.  Fax it

5    over.

6             MR. HOFFMAN:  Thank you very much, your Honor.

7             THE COURT:  That's the end of this discussion.

8             MR. HOFFMAN:  Thank you very much, your Honor.

9             THE COURT:  Good day.

10            (Telephone conference concluded at 12:00 p.m.)

11                    - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT E



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

CHRISTOPHER L. KELLEY
PARTNER
650.463.8113
kelleyc@howrey.com

August 5, 2003

**VIA FACSIMILE AND U.S. MAIL**

Gary M. Hoffman, Esq.
Dickstein Shapiro Morin & Oshinsky, LLP
2102 L Street NW
Washington, DC 20037-1526

Re:     *Ricoh Company, Ltd. v. Aeroflex Incorporated, et al.*
         Civil Action No. 03-103-GMS

Dear Mr. Hoffman:

Pursuant to the Court's order of July 31, we are hereby producing copies of all written communication between Don Thomas and this law firm, which is serving as counsel for defendants in the above captioned case and for Synopsys in an action in the Northern District of California. We have also enclosed a copy of a consulting agreement sent to Dr. Thomas.

There have been no face-to-face meetings between counsel for defendants and Dr. Don Thomas. There has been only one direct telephone communication, on July 23, between counsel for defendants and Dr. Thomas. Prior to that phone call there was an exchange of non-substantive voice messages between Mr. Louis Campbell, an attorney with Howrey Simon Arnold & White, and Dr. Thomas. Mr. Campbell and Dr. Thomas were the only participants on the July 23 call. Mr. Campbell informed Dr. Thomas that he wanted to verify that Dr. Thomas had not received confidential information from Ricoh or its counsel. Mr. Campbell also stated that he did not want to know the specifics of what materials had been supplied by Ricoh or its counsel, but only the general character of these materials. Mr. Campbell then asked if Dr. Thomas had received anything confidential from Ricoh or its counsel. Dr. Thomas stated that he did not think he had but that he was not entirely certain. Mr. Campbell asked Dr. Thomas to investigate to determine the answer to this question. Mr. Campbell then asked whether Dr. Thomas had received any information related to case strategy. Dr. Thomas said he had not. Nothing further regarding Dr. Thomas' earlier work for Ricoh or its counsel was discussed. Mr.



Gary M. Hoffman, Esq.
August 6, 2003
Page 2

Campbell and Dr. Thomas also discussed reimbursement of Dr. Thomas' costs for copying documents produced pursuant to defendants' subpoena.

Very truly yours,

Christopher L. Kelley

CLK:gg
Enclosures

# EXHIBIT F



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

DIRECT DIAL 650.463.8135
FILE 06816.0060.000000

July 17, 2003

**BY FACSIMILE**

Edward Meilman
Dickstein Shapiro Morin & Oshinsky LLP
1177 Avenue of the Americas
New York, NY 10036-2714

      Re: *Ricoh Company Ltd. v. Aeroflex Incorporated, et al.*
        Civil Action No. 03-103-GMS

Dear Mr. Meilman:

      This letter is to inform you that we have retained Dr. Donald Thomas as a consultant. We are, therefore, taking the deposition of Dr. Thomas, currently scheduled for July 31, 2003, off calendar.

      Should you have any questions, please call me at (650)463-8135.

                Very truly yours,

                Louis Campbell

LC:wmh

BRUSSELS   CHICAGO   HOUSTON   IRVINE   LONDON   LOS ANGELES   MENLO PARK   SAN FRANCISCO   WASHINGTON, DC



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 ● FAX: 650.463.8400301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434

## FACSIMILE COVER SHEET

**DATE:** July 22, 2003

**TO:**

**NAME:** Edward A. Meilman, Esq.

**COMPANY:** Dickstein Shapiro Morin & Oshinsky LLP

**FAX NUMBER:** (212) 997-9880    **PHONE NUMBER:** (212) 835-1400

**CITY:** New York

**FROM:**

**NAME:** Louis Campbell, Esq.

**DIRECT DIAL NUMBER:** (650) 463-8113    **USER ID:** 5172

**NUMBER OF PAGES, INCLUDING COVER:** 2    **CHARGE NUMBER:** 06816.0060.000000

☐ ORIGINAL WILL FOLLOW VIA:

☐ REGULAR MAIL    ☐ OVERNIGHT DELIVERY    ☐ HAND DELIVERY    ☐ OTHER:

☒ ORIGINAL WILL NOT FOLLOW

**SUPPLEMENTAL MESSAGE:**

Please see attached letter.  Thank you.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

# EXHIBIT G

**RICHARDS, LAYTON & FINGER**

A PROFESSIONAL ASSOCIATION

ONE RODNEY SQUARE

P.O. BOX 551

WILMINGTON, DELAWARE 19899

(302) 651-7700

FAX (302) 651-7701

www.RLF.COM

ROBERT W. WHETZEL
DIRECTOR

DIRECT DIAL
(302) 651-7634

August 20, 2003

**VIA HAND DELIVERY**

Francis DiGiovanni, Esq.
Connolly Bove Lodge & Hutz, LLP
1220 Market Street
P.O. Box 2207
Wilmington, Delaware 19899

     Re:    **Ricoh Company, Ltd. v. Aeroflex Incorporated, et al.
Civil Action No. 03-103-GMS**

Dear Frank:

    Enclosed please find the Declaration of Christopher A. Monsey, produced in accordance with the Stipulation and Proposed Order that was executed and filed with the Court earlier today.

Very truly yours,

Robert W. Whetzel

RWW/lmg

Enclosure

cc:   Gary Hoffman, Esq. (By Facsimile)

RLF1-2638428-1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RICOH COMPANY, LTD.,                    )
                                        )
                 Plaintiff,             )
                                        )
          v.                            )        C.A. No. 03-103-GMS
                                        )
AEROFLEX INCORPORATED, AMI              )
SEMICONDUCTOR, INC., MATROX             )
ELECTRONIC SYSTEMS LTD.,                )
MATROX GRAPHICS INC., MATROX            )
INTERNATIONAL CORP., and                )
MATROX TECH, INC.,                      )
                                        )
                 Defendants.            )
                                        )

## DECLARATION OF CHRISTOPHER A. MONSEY

1. My name is Christopher Monsey. I am an attorney with the law firm of
Dickstein Shapiro Morin & Oshinsky LLP, counsel for Ricoh Company,
Limited ("Ricoh"). I am over the age of 21 and am competent to make this
declaration. Based on my personal knowledge and information, I hereby
declare to all of the facts in this declaration.

2. In May of 2002, I contacted Dr. Donald E. Thomas, a professor of electrical
and computer engineering at Carnegie Mellon University in Pittsburgh, and
ascertained that he was available and interested in acting as a consultant for
Ricoh and my law firm. We generally discussed the subject matter of the
underlying technology, and I explained that we were interested in having
him examine the patent at issue, discuss possible claim interpretations,
review and comment upon potential prior art, and help analyze whether
various defendants were infringing Ricoh's patent. We agreed upon a billing
rate.

3. After I had ascertained that Dr. Thomas was available and interested in acting
as a consultant for Ricoh and my law firm, but before I disclosed any
confidential information, I asked Dr. Thomas to sign a confidentiality
agreement. On May 29, 2002, I sent to Dr. Thomas by facsimile a one-page
confidentiality agreement that states as follows:

> I, Donald E. Thomas, am a candidate to serve as a consultant
> for Dickstein Shapiro Morin & Oshinsky LLP, Washington, D.C.
> ("DSMO") and Ricoh Company, Ltd. ("Ricoh") in connection
> with patent-related litigation. I recognize that the discussions
> relating to my being retained as a consultant have advanced to a

stage where the disclosure of sensitive, confidential and/or
privileged information is necessary for the discussions to further
advance.

I therefore agree that any information received by me during
the discussions and/or consulting services concerning the affairs
of Ricoh, including but not limited to patent and trade secret
information, system testing or experimentation conducted by
Ricoh, and/or information concerning infringement investigations
conducted by Ricoh, will be held by me in confidence and will not
be revealed to any other persons, firms or organizations.

I realize that in the course of these discussions, DSMO may
provide me with materials containing information of the type
described above. All information and materials provided to me
will be held by me in confidence and will not be revealed to any
other persons, firms or organizations. At the termination of either
our discussions and/or any subsequent consulting services, I
agree to return all such materials and all copies thereof to DSMO.

It has been agreed that I will be compensated for any work I
am requested by DSMO to do, up to a maximum of ten hours of
consulting, at my regular hourly rate for consulting services, and
for my out-of-pocket expenses in connection with these
discussions. I understand that a subsequent consulting
agreement may be entered into for continued services relating to
the matters discussed above.

4. Dr. Thomas signed and returned the confidentiality agreement the same day.
   A copy of the confidentiality agreement signed by Dr. Thomas is attached as
   Exhibit 1. Also on May 29, 2002, Eric Oliver, a Dickstein Shapiro partner,
   countersigned the confidentiality agreement and sent it to Dr. Thomas.
   Exhibit 2 is a copy of Eric Oliver's May 29, 2002 cover letter.

5. After I had received the signed confidentiality agreement from Dr. Thomas, I
   sent him the '432 patent and an additional reference exceeding 50 pages in
   length, and an instruction letter. I asked Dr. Thomas to analyze the reference
   and compare it to the '432 patent.

6. On June 2, 2002, Dr. Thomas sent me a two page email reporting on the
   results of his analysis and discussing the impact of the reference upon the
   '432 patent.

7. On June 5, 2002, I had a 90 minute telephone conversation with Dr. Thomas
   discussing his analysis in greater detail. During that conversation, I
   discussed Ricoh's confidential infringement positions and certain potential
   prior art. During this conversation, Dr. Thomas expressed his opinions with
   respect to the validity of the '432 patent.

8. On June 6, 2002, I sent an additional document of 12 pages to Dr. Thomas
   and asked for his analysis compared to the '432 Patent.

2

9. On June 7, 2002, Dr. Thomas sent a one-page email reporting on his analysis. I had a follow up phone conversation with Dr. Thomas the same day regarding his analysis. After our conversation, I sent Dr. Thomas two additional document of approximately 50 pages and asked for his further analysis.

10. On June 10, 2002, I had a 20 minute phone conversation with Dr. Thomas regarding those documents. I discussed my work product relating to affirmative defenses of invalidity and non-infringement that the defendants might attempt to raise.

11. On June 17, 2002, I had an 80 minute conversation with Dr. Thomas, in which he reported on the results of his analysis. During this conversation, I further disclosed confidential and privileged information, and Dr. Thomas expressed several opinions with respect to the proper claim construction, validity and infringement of the '432 patent. After that conversation, I sent Dr. Thomas an additional document of more than 10 pages and requested his analysis.

12. On June 18, 2002, I sent Dr. Thomas an email specifically asking for his opinions on the infringement issues that are presented in this litigation. On June 19, 2002, Dr. Thomas responded with a one-page email in which he expressed several opinions and proposed alternative theories.

13. On June 21, 2002, I had a one hour conversation with Dr. Thomas in which we further discussed my attorney work product and his opinions regarding claim construction, validity and infringement. Dr. Thomas also sent me a follow-up email on June 21, 2002, communicating further opinions. After that conversation I sent him more than 100 pages of additional material for his analysis.

14. On June 24, 2002, I had a 30 minute phone conversation with Dr. Thomas. On June 26, 2002, I had a 55 minute conversation with Dr. Thomas. During both of these conversations, I further disclosed my legal analysis regarding Ricoh's litigation strategy, and he expressed further opinions regarding claim construction, validity and infringement.

15. Through these confidential discussions, Dr. Thomas became well-informed of the heart of Ricoh's case strategy.

16. The May 29, 2002 confidentiality agreement provided that Dr. Thomas was authorized to spend 10 hours doing his analysis. During our conversation on June 26, 2002, Dr. Thomas said that he had exceeded 10 hours. On June 28, 2002, my firm authorized Dr. Thomas to spend an additional ten hours of consulting work.

17. Dr. Thomas billed and was paid by my firm for time and expenses for his consulting work on the '432 patent.

18. On July 12, 2002, I asked Dr. Thomas for more information with respect to potential prior art. The same day, he sent me a 160 page document.

3

19. On September 24, 2002, Dr. Thomas sent me at my request a 50 page document.

20. Between September 2002 and April 2003, my firm completed its analysis of the '432 patent and defendants' infringing activities, and prepared and filed the complaint. I kept Dr. Thomas informed of these activities, and told him that we wanted to having him act as a consulting expert.

21. During the week of March 2, 2003, I contacted Dr. Thomas but he was out of town. I left a message, which Dr. Thomas returned on March 10, 2003 in the form of an email acknowledging that I had called him the previous week; he indicated a call time in his email. I contacted Dr. Thomas on March 11, 2003 and March 12, 2003.

22. I again called Dr. Thomas on April 1, 2003 regarding this litigation and his consulting activities; this telephone call lasted about seven minutes.

23. On April 4, 2003, Dr. Thomas informed me that he did not want to be a testifying expert in this action, but said he could continue acting as a non-testifying expert.

24. On July 8, 2003, Dr. Thomas terminated his agreement with Ricoh and my firm. At no time did Dr. Thomas disclose that he had communicated substantively with or agreed to consult for counsel for defendants.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 28, 2003.

_Christopher A. Monsey_
Christopher A. Monsey

1644732 v1; Z8P401.DOC

# CONFIDENTIALITY AGREEMENT

I, Donald E. Thomas, am a candidate to serve as a consultant for Dickstein Shapiro Morin & Oshinsky LLP, Washington, D.C. ("DSMO") and Ricoh Company, Ltd. ("Ricoh") in connection with patent related litigation. I recognize that the discussions relating to my being retained as a consultant have advanced to a stage where the disclosure of sensitive, confidential and/or privileged information is necessary for the discussions to further advance.

I therefore agree that any information received by me during the discussions and/or consulting services concerning the affairs of Ricoh, including but not limited to patent and trade secret information, system testing or experimentation conducted by Ricoh, and/or information concerning infringement investigations conducted by Ricoh, will be held by me in confidence and will not be revealed to any other persons, firms or organizations.

I realize that in the course of these discussions, DSMO may provide me with materials containing information of the type described above. All information and materials provided to me will be held by me in confidence and will not be revealed to any other persons, firms or organizations. At the termination of either our discussions and/or any subsequent consulting services, I agree to return all such materials and all copies thereof to DSMO.

It has been agreed that I will be compensated for any work I am requested by DSMO to do, up to a maximum of ten hours of consulting, at my regular hourly rate for consulting services, and for my out-of-pocket expenses in connection with these discussions. I understand that a subsequent consulting agreement may be entered into for continued services relating to the matters discussed above.

_____    Date: __5-27-02__
Donald E. Thomas

_____    Date: _____
Eric Oliver
Dickstein Shapiro Morin & Oshinsky LLP

148884 v1; VY8601.DOC

# DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

2101 L Street NW • Washington, DC 20037-1526
Tel (202) 785-9700 • Fax (202) 887-0689

Writer's Direct Dial: (202) 861-9185
E-Mail Address: OliverE@DSMO.com

May 29, 2002

**VIA FACSIMILE AND UPS**
**(412) 288-1574**

Dr. Donald E. Thomas
1611 Tier Drive
Pittsburgh, PA 15241

Re:   Patent Analysis

Dear Dr. Thomas

Please accept our thanks for agreeing to provide your services concerning our patent analysis. We look forward to speaking with you in connection with our analysis. As we discussed, you will be reimbursed for your time and expenses associated with your efforts on our behalf for consulting at your rate of $ 200.00 per hour up to ten hours in connection with the current project. We will authorize additional time as necessary to further our analysis.

We have received your signed confidentiality agreement. We are enclosing a signed agreement for your records. We are also enclosing copies of certain documents involved in the present matter for your review. We request that you review the enclosed documents and determine if the elements of patent claim 1 and claim 13 are disclosed in each document.

We look forward to hearing your opinion concerning this matter. If you have any questions or comments, please contact us at your convenience.

Very truly yours,

Eric Oliver

EO/CAM
Enclosures

1177 Avenue of the Americas • 41st Floor • New York, New York 10036-2714
Tel (212) 835-1400 • Fax (212) 997-9880
www.legalsummaries.com

140888 v1 VPN891.DOC

# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RICOH COMPANY, LTD.,                          )
                                              )
                          Plaintiff,          )
                                              )
              v.                              )         C.A. No. 03-103-GMS
                                              )
AEROFLEX INCORPORATED, AMI                    )
SEMICONDUCTOR, INC., MATROX                   )
ELECTRONIC SYSTEMS LTD.,                      )
MATROX GRAPHICS INC., MATROX                  )
INTERNATIONAL CORP., and                      )
MATROX TECH, INC.,                            )
                                              )
                          Defendants.         )
                                              )

**ORDER**

> FILED
>
> JUL 3 1 2003
>
> U.S. DISTRICT COURT
> DISTRICT OF DELAWARE

The Court, having considered the issue of whether to preclude Dr. Donald

E. Thomas from providing expert consulting services to defendants and their counsel,

IT IS HEREBY ORDERED AS FOLLOWS:

1.      Pending further Order of this Court, neither defendants nor their

counsel shall have any communication with Dr. Thomas regarding the merits of this

case or the patent in suit unless counsel for plaintiff is present or consents in writing.

2.      No later than August 6, 2003, Defendants and their counsel are

ordered to disclose all communications with or relating to Dr. Thomas and to produce

all documents sent to, prepared by, or received from Dr. Thomas.  Any documents

withheld on the basis of the attorney-client privilege or the work-product doctrine

should be produced to the Court for an in camera inspection, and Defendants shall provide Plaintiff with a detailed privilege log.

3.    No later than August 18, 2003, Dr. Thomas shall sit for a deposition limited to all communications with defendants, their attorneys or Synopsys regarding the '432 patent, with that deposition to not be used for any purpose other than in connection with resolution of issues relating to the retention of Dr. Thomas.

4.    On or before August 31, 2003, plaintiff may file with the Court a two page letter, exclusive of exhibits, identifying any issues remaining in dispute relating to the retention of Dr. Thomas and the relief sought in connection therewith. Defendants shall file within five (5) days from the date of service of the opening letter an answering letter of no more than two pages, exclusive of exhibits. Plaintiff may then file a reply letter of no more than two pages, exclusive of exhibits, within three (3) days from the date of service of the answering letter.

5.    Plaintiff shall arrange a telephonic conference with the Court to be scheduled for a date after completion of the submissions described above.


IT IS SO ORDERED this 31st day of ___July___, 2003.

_____
United States District Judge



301 Ravenswood Avenue
Menlo Park, CA 94025-3434
Phone 650.463.8100
Fax 650.463.8400
A Limited Liability Partnership

Christopher L. Kelley
Partner
650.463.8113
kelleyc@howrey.com

July 23, 2003

**VIA FACSIMILE AND U.S. MAIL**

Gary M. Hoffman, Esq.
Dickstein Shapiro Morin & Oshinsky, LLP
2102 L Street NW
Washington, DC 20037-1526

Re:   *Ricoh Company, Ltd. v. Aeroflex Incorporated, et al.*
      Civil Action No. 03-103-GMS

Dear Mr. Hoffman:

   We received your letters of July 22 to Terry Corbin and Dr. Donald Thomas.

   Before we considered retaining Dr. Thomas as a consultant, we made investigation to determine that this would not create any conflict of interest for Dr. Thomas. We understand that some time in the past your firm retained Dr. Thomas to provide technical information about historical design synthesis systems. There is nothing confidential or otherwise protectible about technical characterizations of the prior art or, if such opinions were offered, about Dr. Thomas' conclusions about the validity of the patent in suit. Dr. Thomas was not given any confidential information and was not consulted on questions of litigation strategy. We further understand that Dr. Thomas' consulting work ended at some point prior to the initiation of the present suit.

   We have reviewed the relevant case law, and, given the particular circumstances of the work performed by Dr. Thomas, we conclude that he may perform consulting work, or appear as an expert witness, on behalf of the defendants without giving rise to a conflict of interest. In order, however, to allow you to seek judicial resolution of this dispute we will refrain from consulting with Dr. Thomas for a period of two weeks. If you do not pursue appropriate remedies from the Court during that period we will conclude that you have elected to waive whatever conflict of interest you contend would be created by Dr. Thomas' work on behalf of defendants.

   Please call me at (650) 463-8113 if you have any further questions.

Very truly yours,

Christopher L. Kelley

CLK:gg
cc: Dr. Donald Thomas

BRUSSELS   CHICAGO   HOUSTON   IRVINE   LONDON   LOS ANGELES   MENLO PARK   SAN FRANCISCO   WASHINGTON, DC

✷ ✷ ✷  COMMUNICATION RESULT REPORT ( JUL. 23. 2003  3:26PM ) ✷ ✷ ✷

                                                                      TTI

TRANSMITTED/STORED  JUL. 23. 2003   3:24PM
FILE MODE        OPTION              ADDRESS                RESULT        PAGE
--------------------------------------------------------------------------------
3833 MEMORY TX                       2#296#912028870689     OK            2/2

--------------------------------------------------------------------------------
REASON FOR ERROR
E-1) HANG UP OR LINE FAIL                    E-2) BUSY
E-3) NO ANSWER                               E-4) NO FACSIMILE CONNECTION



**HOWREY**
ATTORNEYS AT LAW

301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 ● FAX: 650.463.8400

## FACSIMILE COVER SHEET

**DATE:**  July 23, 2003

**TO:**   **NAME:**  Gary M. Hoffman, Esq.

**COMPANY:**  Dickstein Shapiro Morin & Oshinsky LLP

**FAX NUMBER**  (202) 887-0689       **PHONE NUMBER:**  (202) 785-9700

**CITY:**  Washington, DC

**FROM:**  **NAME:**  Christopher L. Kelley, Esq.

**DIRECT DIAL NUMBER:**  (650) 463-8113    **USER ID:**  5172

**NUMBER OF PAGES, INCLUDING COVER:**  2   **CHARGE NUMBER:**  06816.0060.000000

☒ ORIGINAL WILL FOLLOW VIA:

  ☒ REGULAR MAIL   ☐ OVERNIGHT DELIVERY   ☐ HAND DELIVERY   ☐ OTHER:

☐ ORIGINAL WILL NOT FOLLOW

SUPPLEMENTAL MESSAGE:

Re:  Ricoh Company, Ltd. v. Aeroflex Incorporated, et al.

PLEASE SEE CORRESPONDENCE DATED JULY 23, 2003

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 • FAX: 650.463.8400

## FACSIMILE COVER SHEET

**DATE:**  July 23, 2003

**TO:**  **NAME:**  Gary M. Hoffman, Esq.

**COMPANY:**  Dickstein Shapiro Morin & Oshinsky LLP

**FAX NUMBER**  (202) 887-0689    **PHONE NUMBER:**  (202) 785-9700

**CITY:**  Washington, DC

**FROM:**  **NAME:**  Christopher L. Kelley, Esq.

**DIRECT DIAL NUMBER:**  (650) 463-8113    **USER ID:**  5172

**NUMBER OF PAGES, *INCLUDING* COVER:**  2    **CHARGE NUMBER:**  06816.0060.000000

☒ **ORIGINAL WILL FOLLOW VIA:**

☒ REGULAR MAIL    ☐ OVERNIGHT DELIVERY    ☐ HAND DELIVERY    ☐ OTHER: _____

☐ **ORIGINAL WILL NOT FOLLOW**

**SUPPLEMENTAL MESSAGE:**

Re:  Ricoh Company, Ltd. v. Aeroflex Incorporated, et al.

PLEASE SEE CORRESPONDENCE DATED JULY 23, 2003

*THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.*