Gary M. Hoffman (*Pro Hac Vice*)
Kenneth W. Brothers(*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
 & OSHINSKY, LLP
2101 L Street, NW
Washington, DC  20037-1526
Phone (202) 785-9700
Fax (202) 887-0689

Edward A. Meilman (*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
 & OSHINSKY, LLP
1177 Avenue of the Americas
New York, New York  10036-2714
Phone (212) 835-1400
Fax (212) 997-9880

Jeffrey B. Demain, State Bar No. 126715
Jonathan Weissglass, State Bar No. 185008
ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
177 Post Street, Suite 300
San Francisco, California  94108
Phone  (415) 421-7151
Fax (415) 362-8064

Attorneys for Ricoh Company, Ltd.


# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| SYNOPSYS, INC., | ) **CASE NO. C-03-2289-MJJ** |
| | ) |
| Plaintiff, | ) **DECLARATION OF MICHAEL WEINSTEIN** |
| | ) **IN SUPPORT OF RICOH'S NOTICE OF** |
| vs. | ) **MOTION AND MOTION FOR APPROVAL** |
| | ) **OF PROTECTIVE ORDER AND** |
| RICOH COMPANY, LTD., | ) **SUPPORTING BRIEF** |
| | ) |
| Defendant. | ) **Date:  February 10, 2004** |
| | **Time:  9:30 a.m.** |
| | **Courtroom:  11** |

Michael A. Weinstein declares as follows:

1.      My name is Michael A. Weinstein, an attorney with the law firm of Dickstein, Shapiro, Morin & Oshinsky, LLP, counsel for Ricoh Company Limited ("Ricoh").  I am over the age of 21 and am competent to make this declaration.  Based on my personal knowledge and information, I hereby declare to all the facts in this declaration

2.      Attached hereto as Ex. 1 is a true and correct copy of the Stipulated Protective Order from *Ricoh v. Aeroflex et al* dated 6/9/03.

3.      Attached hereto as Ex. 2 is a true and correct copy of the DSMO Letter from E. Meilman to E. Moller dated 11/3/03

4.      Attached hereto as Ex. 3 is a true and correct copy of the Howrey Letter, with attachment, from C. Kelley to E. Meilman dated 11/7/03

5.      Attached hereto as Ex. 4 is a true and correct copy of the DSMO Letter from E. Meilman to E. Moller dated 11/20/03.

6.      Attached hereto as Ex. 5 is a true and correct copy of the Howrey Letter from E. Moller to E. Meilman dated 12/7/03.

7.      Attached hereto as Ex. 6 is a true and correct copy of Howrey Letter, with attachments, from E. Moller to E. Meilman dated 11/13/03.

8.      Attached hereto as Ex. 7 is a composite exhibit which are true and correct copies of print-outs of websites discussing SURF dated 1/6/04.  The source of each web page print out is indicated on the bottom of each printed page.

9.      Attached hereto as Ex. 8 is a true and correct copy of the Stipulated Protective order form from the North District of California website.

10.     Attached hereto as Ex. 9 is a true and correct copy of  the transcript of Case Management Conference in *Ricoh v. Aeroflex et al* dated 5/16/03.

11.   Counsel for Ricoh met and conferred with counsel for Synopsys in November and December, 2003 and discussed, among other issues, a designation of a secure facility to safeguard software source code.  However, the parties were unable to reach an agreement designating a secure facility.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Signed at Washington, D.C. on January 6, 2004.

/s__ Michael A. Weinstein _
Michael A. Weinstein

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RICOH COMPANY, LTD.,                    )
                                        )
        Plaintiff,                      )
                                        )       C.A. No. 03-103-GMS
        v.                              )
                                        )
AEROFLEX INCORPORATED, AMI              )
SEMICONDUCTOR, INC., MATROX             )
ELECTRONIC SYSTEMS LTD.,                )
MATROX GRAPHICS INC., MATROX            )
INTERNATIONAL CORP. and                 )
MATROX TECH, INC.                       )
                                        )
        Defendants.                     )



FILED

JUN - 9 2003

~ ~TRICT COURT
~ ~ ~ ~ OF DELAWARE

## STIPULATED PROTECTIVE ORDER

WHEREAS the parties are or may be competitors and believe that confidential information about certain of its research and development activities and other confidential information concerning its activities constitute very valuable commercial information that, if disclosed to competitors or others, would significantly harm it, and

WHEREAS each of the parties expects certain documents, things, and information that are or will be encompassed by discovery demands made to each other or to non-parties constitute trade secret or other confidential research, development, or commercial information within the meaning of Rule 26(c) of the Federal Rules of Civil Procedure.

Each of the parties hereby stipulates that the following Stipulated Protective Order may be entered by the Court:

1

1.      All Confidential Information produced or exchanged in the course of this litigation shall be used solely for the purpose of preparation and trial of this litigation and for no other purpose whatsoever, and shall not be disclosed to any person except in accordance with the terms hereof.

2.      "Confidential Information," as used herein, means any information of any type, kind or character that is designated as "Confidential" by any of the supplying or receiving parties, whether it be a document, information contained in a document, information revealed during a deposition, information revealed in an interrogatory answer or otherwise.  In designating information as "Confidential," a party will make such designation only as to that information that it in good faith believes contains "Confidential Information."

3.      (a) "Confidential Information" includes, but is not limited to, (i) proprietary technical information and specifications, (ii) trade secrets (iii) confidential know-how, and (iv) proprietary business and financial information and any other non-public information, the disclosure of which is likely to have the effect of causing significant competitive harm to the disclosing party or party from which the information was obtained.  Nothing in this paragraph shall be construed to limit the description of "Confidential Information" set forth in paragraph 2.

(b) Nothing shall be regarded as "Confidential Information" if it is information that:

(i) is in the public domain at the time of disclosure, as evidenced by a written document;

(ii) becomes part of the public domain through no fault of the other party, as evidenced by a written document;

(iii) was in the receiving party's rightful and lawful possession at the time of disclosure, as evidenced by a written document; or

2

(iv) is lawfully received by the receiving party from a third party at a later date without restriction as to disclosure, provided such third party has the right to make the disclosure to the receiving party.

4.    "Qualified Persons," as used herein means:

(a) To the Court and its officers and staff, including court reporters;

(b) Outside attorneys of record for the parties in this litigation and employees of such attorneys to whom it is necessary that the material be shown for purposes of this litigation;

(c) Outside experts, consultants, advisors or investigators (collectively referred to hereafter as "experts") who have signed an undertaking pursuant to paragraph 5 but only after compliance with the provisions of paragraph 5 below;

(d) To non-party support services including, but not limited to, court reporters, outside copy services, document imaging and database services, design services who have signed confidentiality agreements, jury consultants who have signed confidentiality agreements, mock jurors who have signed confidentiality agreements, and language translators who have signed confidentiality agreements (including support staff) as may be reasonably necessary in connection with the preparation or conduct of this action;

(e) Anyone to whom the parties consent in writing;

(f) If this Court so elects, any other person may be designated as a Qualified Person by order of this Court, after notice and opportunity to be heard to all parties.

5.    Prior to the disclosure of any "Confidential Information" to any expert under Paragraph 4(c), counsel for the Party seeking to make the disclosure shall: (i) deliver a copy of this Protective Order as entered to such person, explain its terms to such person, and secure the signature of such person on a written undertaking in the form attached hereto as Exhibit A, and (ii) transmit by facsimile and mail to counsel for the other Parties a copy of the signed Exhibit A,

3

accompanied by a curriculum vitae, at least ten (10) calendar days before any "Confidential Information" designated under this Protective Order is to be disclosed to the signator. The curriculum vitae should identify the general area(s) of expertise of the expert, provide a brief job history, specify all employment, expert or consulting engagements by the expert within the past five (5) years, and state all present or prior relationships between the expert and any entity directly or indirectly involved in this litigation or providing an indemnity to any such entity, its subsidiaries or its affiliates. Any Party may object to the proposed disclosure to an expert within the ten (10) calendar day period following the transmittal of Exhibit A and the curriculum vitae, by stating specifically in writing the reasons why the Party believes such expert should not receive designated "Confidential Information". If during that ten (10) calendar day period, a Party makes such a written objection, there shall be no disclosure of "Confidential Information" to the expert absent mutual agreement of the Parties, waiver of the objection as stated below, or further order of the Court. After a Party objects to the proposed disclosure to an expert, the objecting Party shall move, by noticed motion or by *ex parte* application, for an order that disclosure not be made to such expert within five (5) business days following the date that the objection is made, or the Party's objection shall be deemed waived and disclosure may be made to the expert. The burden shall be on the objecting Party to establish why the disclosure should not be made. Each Party shall maintain a file of all such signed copies of Exhibit A. However, it shall not be necessary for administrative, secretarial or clerical personnel working for such Qualified Person to sign a written undertaking.

      6.     (a) Documents produced in this action may be designated by any party or parties as "Confidential" by marking each page of the document(s) with the designation "Confidential."

4

(b) In lieu of marking the original of a document, if the original is not produced, the designating party may mark the copies that are produced or exchanged. Originals shall be preserved for inspection.

(c) If the document is not in paper form, the producing person or entity shall use other such reasonable means as necessary to identify clearly the document or information as "Confidential."

7.    Discovery responses or other litigation materials may be designated by any party or parties as "Confidential" by marking each page of the response with the designation "Confidential."

8.    The designation of information disclosed during a deposition as "Confidential" shall be made either by a statement on the record at the deposition or within twenty (20) calendar days after receipt by counsel of a copy of the deposition transcript. Such designation will be applied to only those portions of the deposition transcript that include a specific question and response or series of questions and responses containing "Confidential Information." The deposition transcript shall be printed in consecutive pages (whether or not some pages are designated as "Confidential") with a marking on the cover of the deposition transcript indicating the "Confidential" designation contained therein. Unless previously designated otherwise, all deposition transcripts shall be treated as "Confidential" in their entirety prior to the end of the twenty (20) calendar day period following receipt by counsel of a copy of the deposition transcript.

9.    "Confidential Information" shall not be disclosed or made available by the receiving party to persons other than Qualified Persons except that nothing herein is intended to prevent individuals who are in-house counsel or a member of the professional legal department

5

of the Parties from having access to pleadings, briefs and exhibits or declarations filed with the Court and expert reports, including exhibits, that are designated as "Confidential."

10.    (a) Documents to be inspected shall be treated as "Confidential" although such documents need not be marked as "Confidential" prior to inspection. At the time of copying for the receiving parties, any documents containing "Confidential Information" shall be stamped prominently "Confidential" by the producing party.

(b) Nothing herein shall prevent disclosure beyond the terms of this Order if each party designating the information as "Confidential" consents to such disclosure or if the Court, after notice to all effected parties, orders such disclosures. Nothing herein shall prevent any counsel of record from utilizing "Confidential Information" in the examination or cross-examination of any person who is indicated on the document as being an author, source or recipient of the "Confidential Information," irrespective of which party produced such information. Nothing herein shall prevent any counsel of record from utilizing "Confidential Information" in the examination or cross-examination of any person who is a current or former officer, director or employee of the party so designating the information as "Confidential" or of the party that produced the information or of a related entity.

11.    If a party inadvertently discloses any document or thing containing information that it deems confidential without designating it as "Confidential," the disclosing party shall promptly upon discovery of such inadvertent disclosure inform the receiving party in writing, and the receiving party and all Qualified Persons possessing such information shall thereafter treat the information as "Confidential" under this Order. To the extent such information may have been disclosed to persons other than Qualified Persons described in this document, the receiving party shall make every reasonable effort to retrieve the information promptly from such persons and to avoid any further disclosure to and by such persons.

6

12.    A party shall not be obligated to challenge the propriety of a designation as "Confidential" at the time made, and a failure to do so shall not preclude a subsequent challenge thereto. Nor will the failure to object be construed as an admission that any particular "Confidential Information" contains or reflects currently valuable trade secrets or confidential commercial information. In the event that any party to this litigation disagrees at any stage of these proceedings with the designation by the designating party of any information as "Confidential," or the designation of any person as a Qualified Person, the parties shall first try to resolve such dispute in good faith on an informal basis, such as production of redacted copies. If the parties are unsuccessful in informally resolving any disputes regarding the designation of any document or information as "Confidential," the Court shall resolve all such disputes. It shall be the burden of the party making any designation to establish that the information so designated is "Confidential" within the meaning of this Protective Order. The "Confidential Information" that is the subject of the dispute shall be treated as originally designated pending resolution of the dispute.

13.    The parties may, by written stipulation filed and approved by the Court, amend this Order, and any party may seek an order of this Court modifying this Protective Order. The parties agree to meet and confer prior to seeking to modify this Protective Order. In addition, the Court may modify this Protective Order in the interest of justice or otherwise at the Court's discretion.

14.    In the event a party wishes to use any "Confidential Information" in any affidavits, briefs, memoranda of law, or other papers filed with the Court in this litigation, such "Confidential Information" used therein shall be filed under seal with the Court.

15.    The Clerk of this Court is directed to maintain under seal all documents and transcripts of deposition testimony and answers to interrogatories, admissions and other

7

pleadings filed under seal with the Court in this litigation that have been designated, in whole or in part, as "Confidential" by a party to this action.

16.     If a Party intends to offer into evidence or otherwise disclose in open court any "Confidential Information" designated by another person or entity, counsel for such Party shall notify the designating person or entity that the Party intends to disclose "Confidential Information" in open court prior to the disclosure, so that the designating person or entity may confer with the Court concerning appropriate procedures for protecting its "Confidential Information."

17.     In the event any person or party that has possession, custody, or control of any information designated as "Confidential" pursuant to the terms of this Protective Order receives a subpoena or other process or order to produce such information, such person or party shall notify by mail within five (5) business days of the Party's receipt of the request, the counsel for the party or persons claiming confidential treatment of the documents sought by such subpoenas or other process or order, shall furnish such counsel with a copy of said subpoena or other process or order, and shall cooperate with respect to any procedure sought to be pursued by the party whose interests may be affected. The party asserting the "Confidential" treatment shall have the burden of defending against such subpoena, process or order. The person or party receiving the subpoena or process or order shall be entitled to comply with it except: (a) to the extent the party asserting the "Confidential" treatment is successful in obtaining an order modifying or quashing it; and (b) in complying with the process or order shall, at a minimum, seek to obtain "Confidential" treatment of the "Confidential Information" before producing it in the other proceeding or action.

18.     If the discovery process calls for the production of information that a Party or Non-Party does not wish to produce because the Party or Non-Party believes its disclosure would

8

breach an agreement with another person or entity to maintain such information in confidence, the disclosing Party or Non-Party promptly shall give written notice to the other person or entity that its information is subject to discovery in this litigation, and shall provide such person or entity with a copy of this Protective Order. When such written notice is given to the person or entity, the disclosing Party or Non-Party will advise the potential receiving Party that such notice has been given. The person or entity whose information may be subject to discovery shall have ten (10) business days from receipt of the written notice in which to seek relief from the Court, if the person or entity so desires. If the ten (10) business days elapse without the person or entity seeking relief from the Court, the requested information shall be produced in accordance with the terms of this Protective Order.

19.    In the event that additional persons or entities become Parties, none of such Parties' counsel, experts or consultants retained to assist said counsel, shall have access to "Confidential Information" produced by or obtained from any other producing person or entity until said Party has executed and filed with the Court its agreement to be fully bound by this Protective Order.

20.    This Protective Order shall apply to the parties and any non-party from whom discovery may be sought and who desires protection for the discovery sought. Thus, any non-party requested or required to produce or disclose information in this proceeding, through subpoena or otherwise, may designate such information pursuant to the terms of this Protective Order.

21.    (a) Nothing herein requires disclosure of information, documents or things which the disclosing entity contends is protected from disclosure by the attorney-client privilege or the work-product exception. Nothing herein shall preclude any party from moving this Court for an order directing the disclosure of such information, documents or things.

9

(b) In the event that any privileged attorney-client or work product documents or things are inadvertently produced for inspection and/or provided, the disclosing party shall identify such documents or things within five (5) days of when it discovers that the privileged materials were inadvertently produced for inspection and/or provided, and either (1) copies shall not be provided, or (2) if copies have already been provided, all copies in the receiving party's possession shall be promptly returned (and not relied upon) by the receiving party. Nothing in this paragraph shall prevent the receiving party from contending that the identified materials are not privileged, that the material was not inadvertently produced, or that privilege was waived for reasons other than mere inadvertent production of the material.

22.     Within ninety (90) days after conclusion of this litigation and any and all appeals thereof, any document and all reproductions of "Confidential" documents produced by a party that are in the possession of any Qualified Person shall be returned to the producing party or, with the consent of the producing party, destroyed. If destroyed, counsel for the receiving party shall certify to counsel for the producing party compliance with this paragraph within fourteen (14) calendar days of such destruction. Outside counsel for each party may maintain in its files one copy of all material produced as well as all materials filed with or otherwise presented to the Court, deposition and trial transcripts, and work product (regardless of whether such materials contain or refer to "Confidential" materials). If counsel retains such materials, the materials which contain Confidential Information shall be accessible only by Qualified Persons defined in paragraph 4(b) above. As far as the provisions of any protective orders entered in this action restrict the communication and use of the documents produced thereunder, such orders shall continue to be binding after the conclusion of this litigation including any subsequent appeals or later proceedings, except that (a) there shall be no restriction on documents that are used as exhibits in Court unless such exhibits were filed under seal, and (b) a party may seek the written

10

permission of the producing party or order of the Court with respect to dissolution or modification of such protective orders. The Court shall retain jurisdiction to enforce the performance of said obligations.

23.    This Order shall not bar any attorney herein in the course of rendering advice to his client with respect to this litigation from conveying to any party client his evaluation in a general way of "Confidential Information" produced or exchanged herein; provided, however, that in rendering such advice and otherwise communicating with his client, the attorney shall not disclose the specific contents of any "Confidential Information" produced by another party herein, which disclosure would be contrary to the terms of this Protective Order.

24.    This Protective Order may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

SO ORDERED this ___9th___ day of ___June___, 2003.

_____
UNITED STATES DISTRICT JUDGE

11

AGREED:

By: _____

Robert W. Whetzel (#2288)
Steven J. Fineman (#4025)
Richards, Layton & Finger, P.A.
One Rodney Square
Post Office Box 551
Wilmington, Delaware 19899
(302) 651-7700

Gary M. Hoffman
Eric Oliver
DICKSTEIN SHAPIRO MORIN &
  OSHINSKY LLP
2101 L Street NW
Washington, D.C. 20037-1526
(202) 828-4879

Edward A. Meilman
DICKSTEIN SHAPIRO MORIN &
  OSHINSKY LLP
1177 Avenue of the America
New York, New York 10036
(212) 896-5471


Counsel for Plaintiff,
Ricoh Company Ltd.

Francis DiGiovanni (#3189)
Connolly Bove Lodge
  & Hutz LLP
1220 Market Street
P.O. Box 2207
Wilmington, DE 19801
(302) 658-9141
Attorneys for Defendants

OF COUNSEL:
Teresa M. Corbin
Howrey Simon Arnold & White, LLP
301 Ravenswood Ave.
Menlo Park, CA 94025
(650) 463-8100
Attorneys for Defendants

Alan H. MacPherson
MacPherson Kwok Chen & Heid LLP
2001 Gateway Place, Suite 195E
San Jose, CA 95014
(408) 392-9250
Attorney for AMI Semiconductor, Inc.

12

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RICOH COMPANY, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 03-103-GMS |
| v. | ) | |
| | ) | |
| AEROFLEX INCORPORATED, AMI | ) | |
| SEMICONDUCTOR, INC., MATROX | ) | |
| ELECTRONIC SYSTEMS LTD., | ) | |
| MATROX GRAPHICS INC., MATROX | ) | |
| INTERNATIONAL CORP. and | ) | |
| MATROX TECH, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## UNDERTAKING

My name is _____. I hereby acknowledge that I have been provided with a copy of, have read, and am fully familiar with, the terms of the Stipulated Protective Order entered in this action on _____, 2003. I agree to be bound by, and to comply fully with, the terms of the Protective Order. I agree not to disclose or disseminate any "Confidential Information," as defined by the Stipulated Protective Order, except as permitted therein.

I hereby submit myself to the jurisdiction of the United States District Court for the District of Delaware in connection with the enforcement of the Protective Order.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on _____, 2003.

_____

13

**EXHIBIT 2**

DICKSTEIN  SHAPIRO  MORIN  &  OSHINSKY  LLP

*1177 Avenue of the Americas • New York, New York 10036-2714*
*Tel (212) 835-1400 • Fax (212) 997-9880*
*Writer's Direct Dial: (212) 896-5471*
*E-Mail Address: MeilmanE@dsmo.com*

November 3, 2003

**BY FACSIMILE AND U.S. MAIL**

Erik K. Moller, Esq.
Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA  94025-3434

Re:    *Ricoh Company Ltd. v. Aeroflex Incorporated, et al.*
        *Snyopsys, Inc  v. Ricoh Company Ltd.*
        <u>Our Ref.: R2180.0171</u>

Dear Mr. Moller:

        In response to your telefax of October 31, 2003, we do not see the need to negotiate a Protective Order when our two firms have already done so and a court has issued it, Judge Jenkins has already ordered Synopsys to proceed under the issued Order and Synopsys has done so.  That Order provides the parties with the appropriate protection of confidential information.  There is no reason it should not apply to both actions.  Nevertheless, if you want to us to consider changes in the Order already in place, please send us a marked up copy with your proposed changes and indicate why the changes are appropriate.

                        Very truly yours,

                        Edward A. Meilman

EAM/rr

cc:    Gary Hoffman, Esq.
        Kenneth Brothers, Esq.
        Jeffrey Demain, Esq.

85597 v1; 1%1P01!.DOC

**EXHIBIT 3**

**HOWREY**
HOWREY SIMON ARNOLD & WHITE
ATTORNEYS AT LAW

301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A Limited Liability Partnership

CHRISTOPHER L. KELLEY
PARTNER
650.463.8113
kelleyc@howrey.com

November 7, 2003

**VIA FACSIMILE AND U.S. MAIL**

Edward A. Meilman
Dickstein Shapiro Morin & Oshinsky, LLP
1177 Avenue of the Americas
New York, NY 10036-2714

Re:  *Ricoh Company, Ltd. v. Aeroflex Incorporated, et al.*
      Civil Action No. 03-103-GMS

Dear Edward:

I am writing in response to your letters of November 5. We propose a meet and confer to address the issues raised in these letters. We are available at 11 AM Pacific Coast Time (2 PM Eastern) on Tuesday, November 11. If this time is unacceptable, please propose an alternative time.

With respect to the subpoena on Synopsys, we informed you in our letter of October 22 that the notice of deposition of Synopsys was ineffective because you made no attempt to confer with us regarding a reasonable date for the deposition in advance of your notice. This is a basic requirement under N.D. Cal, Local Rule 30-1. If you intend to take the position that Rule 30 does not apply to depositions of third-parties and that the Northern District does not intend counsel to coordinate with third-parties prior to setting depositions, please let us know immediately. We have a contrary construction and we will need to seek the intervention of the Court if you stand by your position. In addition to this basic procedural requirement, we also believe that the topics identified in your notice are improper for a number of reasons set out in our previous letters. In addition, this deposition should be taken in connection with Synopsys' declaratory judgment action, especially given that the Delaware defendants have moved the Court to stay Ricoh's patent infringement action. We intend to discuss these issues in the proposed meet and confer in order to avoid the need to seek a motion to quash.

With regard to the protective order, you once again assert that "Judge Jenkins already ordered Synopsys to proceed under the Order issued by the Court in the *Ricoh v. Aeroflex* case." We suppose that you are referring to the fact that Judge Jenkins accepted a stipulation of the parties that an agreement presented by Synopsys at the August 19 hearing would be protected from dissemination pursuant to the protective order in place in Delaware. See 8/19/2003 Tr. at 13:4-20. It seems to us to be pure fantasy to assert that the Court's statement on page 13 constituted a ruling that the *Ricoh v. Aeroflex* order ought to govern all subsequent discovery in

BRUSSELS   CHICAGO   HOUSTON   IRVINE   LONDON   LOS ANGELES   MENLO PARK   SAN FRANCISCO   WASHINGTON, DC

**HOWREY**
ATTORNEYS AT LAW

Edward A. Meilman
November 7, 2003
Page 2

the *Synopsys v. Ricoh* matter. If this is, in fact, your position please state so plainly so that we
can inquire directly of the Court as to whether that was its intent.

Your letter tries to make a great deal of the fact that this law firm is representing the
defendants in the *Ricoh v. Aeroflex* case as well as Synopsys. That fact, however, is irrelevant to
the question of whether the protections that were adequate to protect production from the Ricoh
v. Aeroflex defendants are adequate to protect the production of highly confidential source code
from Synopsys in the *Synopsys v. Ricoh* case.

As you observe in your letter, the protective order proposed by Synopsys is not merely a
version of the *Ricoh v. Aeroflex* order with additional content. It is, in fact, based on the model
Stipulated Protective Order on the Northern District's website. It is not critical to us whether the
parties base their protective order on the *Ricoh v. Aeroflex* order or the Northern District's model
order, as modified in Synopsys' original proposal. Synopsys does, however, wish to include a
provision dealing with the disclosure of source code. I am attaching a copy of the relevant
language that we wish to incorporate to address the production of source code.

Very truly yours,

Christopher L. Kelley

CLK:gg
cc: Gary M. Hoffman, Esq.

**HOWREY**
ATTORNEYS AT LAW

# ATTACHMENT

## Disclosure of Source Code

(a)    Unless otherwise ordered by the Court or permitted in writing by the Producing Party, a Receiving Party's access to a Producing Party's discoverable source code is limited to inspection at a secured facility provided by the Producing Party. Such inspection may be conducted only by:

(1)    the Receiving Party's Outside Counsel of record in this action; and,

(2)    one (1) expert (as defined in this Order) of the Receiving Party to whim disclosure is reasonably necessary for this litigation and who has signed the "Agreement to Be Bound by Protective Order" (Exhibit __) and who has been approved pursuant to the "Procedures for Approving Disclosure of 'CONFIDENTIAL' information or Items to 'Experts'" as set forth in paragraph __;

(b)    After any such inspection and upon the written request of the Receiving Party's Outside Counsel, the Responding Party, within a reasonable time, shall furnish hard-copy printouts of relevant source code files specifically identified in the Receiving Party's Outside Counsel's written request. Such hard-copy printouts shall be designated "CONFIDENTIAL" under this protective order;

(c)    Any notes taken or any other information created by Outside Counsel or the expert of the Receiving Party at or based on any such inspection shall be treated as "CONFIDENTIAL" under this protective order;

(d)    Each Producing Party designates and provides the following facilities for production of their discoverable source code via inspection in the present action:

(1)    All source code production by Synopsys in this action will be limited to inspection at its Secured User Research Facility (SURF). SURF is Synopsys' physically

and electronically secured area for providing access to Synopsys' source code.  SURF is located at Synopsys' Corporate campus in Mountain View, CA.

      (2)     All source code provided by Ricoh will be produced _____.

**EXHIBIT 4**

DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

*1177 Avenue of the Americas • New York, NY 10036-2714*
*Tel (212) 835-1400 • Fax (212) 997-9880*
*Writer's Direct Dial: (212) 896-5471*
*E-Mail Address: MeilmanE@dsmo.com*

November 20, 2003

**BY FACSIMILE AND U.S. MAIL**

Erik K. Moller, Esq.
Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025-3434

    Re:  *Synopsys, Inc. v. Ricoh Company, Ltd.*
        Case No. CV 03-02289 MJJ

        *Ricoh Company, Ltd. v. Aeroflex Inc., et al.*
        Case No. CV 03-04669 MMJ
        <u>Our Ref.: R2180.0171</u>

Dear Erik:

    With regard to the protective order, we believe that the following additional
provision recording source code is appropriate:

    Unless otherwise ordered by the Court or permitted in writing by the
producing party, all source code produced or exchanged in the course of this litigation
shall be Confidential Information and access thereto shall be limited to the outside
attorneys of record for the parties in this litigation and employees of such attorneys to
whom it is necessary that the material be shown for the purposes of this litigation and
not more than three (3) outside experts who have signed an undertaken pursuant to
paragraph 5 but only after compliance with the provision of paragraph 5. Any notes or
other information created as a consequence of such access shall also be Confidential
Information under this protective order. Working copies of the source code shall be
maintained by the receiving party in a secure facility which, in the case of Synopsys
means Synopsys' Secured User Research Facility (SURF) and in the case of Ricoh, means
a locked office at the law firm of Dickstein Shapiro Morin & Oshinsky, LLP and which
contains a computer which is not a part of any network and on which the source code
can be loaded.

Erik K. Moller, Esq.
November 20, 2003
Page 2


        We believe that the secured facility we are offering is even more secure that
Synopsys' SURF facility.


                                Very truly yours,

                                Edward A. Meilman


EAM/rra

cc:    Gary Hoffman, Esq.
       Kenneth Brothers, Esq.
       Jeffrey Demain, Esq.

**EXHIBIT 5**

DEC. 7. 2003  4:20PM                                    NO. 4606  P. 2/2



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

December 7, 2003


**VIA FACSIMILE AND U.S. MAIL**

Edward A. Meilman
Dickstein Shapiro Morin & Oshinsky, LLP
1177 Avenue of the Americas
New York, NY  10036-2714


Re:    *Synopsys, Inc. v. Ricoh Company, Ltd.*,
       Case No. C 03-2289 MJJ

Dear Ed:

       This letter follows our discussion during the meet and confer teleconference on
December 1, 2003 regarding the terms for the production of the source code for Synopsys'
Design Compiler product in this action.

       We stated that Synopsys could make arrangements at one of its East Coast facilities to
provide Ricoh with more convenient access to the source code for Synopsys' Design Compiler
product. You asked us to inquire as to the conditions for the production of the source code at
such a facility. Synopsys can make arrangements to provide you with a secured location at its
facility in Bethesda, Maryland. We would provide a computer that would be loaded with the
source code to be produced by Synopsys and suitable software for review of this code. Synopsys
will allow Ricoh to make hardcopy of specific portions of the source code. The hardcopy can
then be reviewed, pursuant to the protective order, outside of the facility. You would have
access to the Bethesda facility during regular business hours without need to make any special
arrangements.

       In addition, we continue to offer the use of Synopsys' SURF facility at its campus in
Mountain View, at which you would have 24/7 access.

                                        Very truly yours,

                                        Erik K. Moller

EKM:gg
cc:    Gary M. Hoffman
       Jeffrey B. Demain


AMSTERDAM    BRUSSELS    CHICAGO    HOUSTON    IRVINE    LONDON    LOS ANGELES    MENLO PARK    SAN FRANCISCO    WASHINGTON, DC

**EXHIBIT 6**



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

*VIA FACSIMILE and*
    *FIRST CLASS U.S. MAIL*

November 13, 2003

Edward A. Meilman
Dickstein Shapiro Morin & Oshinsky, LLP
1177 Avenue of the Americas
New York, NY 10036-2714

Re:    *Synopsys, Inc. v Ricoh Company, Ltd.*, Case No. CV 03-02289 MJJ and
       *Ricoh Company, Ltd. v. Aeroflex Inc., et al.*, Case No. CV 03-04669 MMJ

Dear Ed:

During today's telephone conference you referred to the fact that your firm has previously put into place secure facilities compliant with government requirements for reviewing secret defense documents, but you did not provide us with much detail about the particular security systems you employed. In order to give us a fair understanding of what you are proposing, it would be helpful if you could be more specific about your proposal. It is our understanding that facilities qualified to receive and possess classified information must comply with requirements from the National Industrial Security Program administered by the Department of Defense. Those requirements are set out in the "National Industrial Security Program Operating Manual," which is available from the Department of Defense. *See* www.dss.mil/isec/nispom.pdf. This document is rather extensive. It would be useful if you could identify what provisions from this manual you would propose to implement.

To give you some idea of the nature of our proposal, I am enclosing a copy of a brochure describing Synopsys' SURF facility.

Very Truly Yours.

Erik K. Moller

EKM/gj

cc:    Gary M. Hoffman ✓
       Jeffrey Demain

AMSTERDAM    BRUSSELS    CHICAGO    HOUSTON    IRVINE    LONDON    LOS ANGELES    MENLO PARK    SAN FRANCISCO    WASHINGTON, DC



# Secure User Research Facility

## S.U.R.F. Features

Restricted badge-secured access

15 private offices with key-code locks, hard walls and secured ceilings

Up to 15 separate networks with multiple nodes on each network

Configuration allows any number of networks to be merged into a single shared network

Firewall can be configured to permit or deny data flow between Synopsys and customers' or partner's networks

Separate fire and security systems

Shredders and confidential trash bins

Synopsys' Secure Information Program ensures that our technology leadership is matched by Intellectual Property protection leadership. Synopsys' SECURE USER RESEARCH FACILITY (S.U.R.F.) is an example of our commitment to safeguarding intellectual property.

S.U.R.F. is located on our corporate campus in Mountain View. It provides our business partners and customers a secure working environment separate from other Synopsys activities. Our customers and partners have used S.U.R.F. for tool-interoperability projects and other special situations

For more information please contact: Julie McManus, Secure Information Program Coordinator at (650) 584-5140. For legal questions, please contact Roger Klein, Deputy General Counsel at (650) 584-4058.

**EXHIBIT 7**

Synopsys **SURF – Lab Configuration**



# Synopsys **SURF Lab**



**Location:**
**700 E. Middlefield Rd.**
**Building A**
**Mountain View, CA**

## SYNOPSYS®

FIRST FLOOR PLAN
**BUILDING A**

**SYNOPSYS®**    Partners

PRODUCTS & SOLUTIONS    PROFESSIONAL SERVICES    EDUCATION & SUPPORT    CORPORATE    PARTNERS

SURF Program

What's New: TAP-in
TAP-in News
TAP-in Events
TAP-in Articles
Open Source Comments
Contact TAP-in

# Synopsys Secure User Research Facility

## Description

- Secure and Convenient Access
    - 24 hour access to S.U.R.F. facility via keycard with PIN.
- Work Environment Isolated from Other Users
    - Equipment configured "standalone." No network access.
    - Private offices walled with secure ceilings.
    - Independently accessible via keycode lock
    - Shredders and confidential trash bins available.
    - Lab configuration
- Maintenance and Support
    - Selected Synopsys tools installed on lab machines. Releases periodically updated.
    - Synopsys tools and flows fully supported on-site.
- Location

## S.U.R.F. Qualification Criteria

The S.U.R.F. lab facilities at Synopsys are available to qualified EDA vendors, approved by Synopsys to test and enhance EDA interoperability with Synopsys tools for the benefit of our mutual customers.

The EDA vendors applying to S.U.R.F. must adhere to all security requirements and guarantee Synopsys IP protection.

The following criteria must be met:

- There is a clear customer demand for the flow(s).
- Synopsys IP protection is guaranteed.
- Vendor adheres to all security requirements.
- Access is approved by Synopsys.

## How Do I Apply?

1. Contact S.U.R.F. program manager at Synopsys:
   Karen Bartleson
   tel: (650) 584.4840
   fax: (650) 584.4102
   email: karenb@synopsys.com

2. Submit and fax the complete Access Agreement, Usage Agreement, and the Nondisclosure Agreement (NDA) documents to the S.U.R.F. program manager. You will then be contacted to complete the registration process and your application will be reviewed.

3. Upon arrival on the first day, S.U.R.F. coordinator will:
   o Escort you to security
      o Receive photo ID and access codes
   o Guide you to S.U.R.F. area
      o Test badges to ensure accessibility
   o Lead you to private office
      o Test access codes to ensure accessibility
      o Tour area to become familiar with what's available
   o Verify S.U.R.F. equipment and required software functionality with you
      o Ensure everything is working
   o Leave you alone to do your work in your private office
      o Application Engineer and system administrator available by contacting S.U.R.F. coordinator

Trademarks/Copyright ©2004 Synopsys, Inc. All Rights Reserved. - Privacy Policy - Last Modified: Feb 14, 2002

## ACCESS CONTROL & SECURITY SYSTEMS

# A High-Tech Fortress

By PETER CASSIDY

**Access Control & Security Systems, Sep 1, 2003**

Ten years ago, Synopsys Inc. decided it needed a secure means of working out conflicts in its chip-design software. The company wanted to protect its intellectual property (IP) — and that of its customers. A central asset in the world of semi-conductor design, IP is often the backbone of a company's proprietary secrets and its most valued ideas and data.

To protect intellectual property during product development, Synopsis decided to erect its own miniature industrial "Camp David" right on its Mountain View, Calif. campus. The facility would provide a neutral venue for IP-rich discussions, and customers could be assured no IP would be kept or recorded by Synopsys or third parties.

According to director of quality and interoperability Karen Bartleson, customers were previously faced with the hard choice of working around a problem or exposing their IP to Synopsis — some of it involving trade secrets not yet protected by patents.

"We had to come up with a way to deal with customers, protect them, solve their problems and secure their intellectual property," says Bartleson.

To ensure Synopsis and its customers could work together while keeping control of their IP, Synopsys created a Secure User Research Facility (SURF), a set of technically isolated office spaces. There are 16 different SURF offices, each one completely isolated and off the network, with its own printers and computers and locking doors secured by smart cards and keypads that are controlled by the visiting customers' and business partners' pass codes.

The facility enables customers' engineers to arrive with their software and mount it on the isolated computers and work with Synopsys engineers, secure in the knowledge that their software will be wiped off the non-networked computers when they leave.

The SURF solution demonstrates the enduring relationship between physical security and information security. By creating a solution constructed of off-the-shelf technologies and security protocols, Synopsys was able to satisfy its customers that a critical security issue had been resolved.

The SURF is a secured, 24-hour accessible location for electronic design automation (EDA), tool interoperability development and testing with selected Synopsys products and design flows. The SURF is generally available to EDA vendors to address customer interoperability issues with on-site application engineering and system administration support. SURF can be used by two types of companies:

- Non-EDA companies that have purchased Synopsys products: *i.e.*, commercial customers (designers); and
- Qualified EDA companies looking to validate tool interoperability.

The EDA vendors applying to SURF must adhere to all security requirements. The following criteria must be met:

- There is a clear customer demand for the flow(s);
- Synopsys IP protection is guaranteed; and
- Access is approved by Synopsys product teams and the legal department.

To access the SURF, a company representative completes an Access Agreement application, a Usage Agreement, and a Non-Disclosure Agreement (NDA), and submits them to the SURF program manager.

The Usage Agreement restricts use to what is specified in exhibit "A". An "audit" capability in the agreement is defined to enforce the restriction while simultaneously protecting any intellectual property brought into the SURF area.

The application is then reviewed by the SURF program manager who validates the proposed tool interoperability test plan, and secures authorization from Synopsys' legal department and the involved product marketing teams.

On a day-to-day basis, the SURF offices are administrated by the Synopsys security department. Once the SURF office is assigned to a customer/EDA vendor, that customer is in charge of authorizing access to his SURF office/lab via coordination with the Synopsys Security Department. The Access Agreement commits the Lab User to the "rules" of the SURF area.

It also records who is allowed to gain entry to the private office. In the case of multiple users, each person must be listed on the Access Agreement to gain entry.

The entry and usage protocols of SURF are straight-forward, allowing for ease of use and administration. Based on the user's need (hardware, platform, memory, disk space, etc.) the Strategic Market Development team SURF coordinator assigns an office/lab to the qualified EDA vendor.

To maintain physical access control to the SURF facility, the Synopsys security department provides photo smart cards protected by pass codes for each individual user. A Synopsys security officer programs the keypad with a unique seven-digit numeric code for each SURF user, and the seven-digit code is provided to the user in a sealed envelope.

Designated movement around the Synopsys campus is strictly enforced. SURF users' smart cards are bright orange, indicating access only to the SURF facility. All other areas are off limits to SURF users.

Users come and go through the outside entrance for the duration of their lab use. During business hours (Monday - Friday, 8 a.m. to 5 p.m.) lab users can also come through the lobby of Building A to get into the lab. There is no need to check back in each time entry is desired.

To eliminate any chance of unauthorized access each time a company is assigned to a SURF lab office, a security officer resets the codes and assigns new unique seven-digit codes to the SURF lab user(s). The SURF area is monitored by security cameras and guards.

The SURF badges and access codes to the private offices are reset at the end of a designated period. This will occur automatically so extensions to scheduled time must be prepared and executed with enough advance notice to prevent code expiration and are subject to open and available lab time.

The bottom line: Once the SURF private room is assigned to a company, that company owns the room. If the company brings a customer or a Synopsys employee to its private room, the guest must be escorted, and if necessary, must have completed the appropriate non-disclosure agreements.

Electronically speaking, the security of SURF users' data is ensured through isolation and a self-service data scrubbing protocol built into the system. It can only really be neutralized through fairly extreme neglect. SURF offices are not on any network. Users can't get e-mail at a SURF facility — it is completely offline.

Each time a SURF coordinator assigns a new company to the SURF private room, he or she re-images the Sun Solaris machine with default images, installs necessary Synopsys software and keys, and creates a new user name and home directory. SURF users load whatever software tools they have brought with them for interoperability testing onto the lab equipment.

When a user is through with his project at the campus, Synopsys security strongly recommends that the IP is deleted from the hard disks before handing over the room after completion of the project. In addition, the SURF lab coordinator deletes the user name and directory, and reformats the hard disk before assigning the room to another company.

Although it has been very successful for resolving user operability issues, Bartleson says, it has also become a venue for important interoperability summits between Synopsys and its competitors.

As the industry matured, Bartleson says, interoperability became a bigger issue for customers using a number of software products to manage and inform their designs. With SURF, Synopsys and its competitors had the use of a venue to respond safely to customer demand that its software work together.

© 2004, PRIMEDIA Business Magazines & Media Inc. All rights reserved. This article is protected by United States copyright and other intellectual property laws and may not be reproduced, rewritten, distributed, redisseminated, transmitted, displayed, published or broadcast, directly or indirectly, in any medium without the prior written permission of PRIMEDIA Business Corp.

**EXHIBIT 8**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  | |
|---|---|
| Plaintiff, | No. C |
|  | STIPULATED PROTECTIVE ORDER |
| v. | |
| Defendant. | |

17    1. PURPOSES AND LIMITATIONS

18         Disclosure and discovery activity in this action are likely to involve production of confidential,

19    proprietary, or private information for which special protection from public disclosure and from use

20    for any purpose other than prosecuting this litigation would be warranted.   Accordingly, the parties

21    hereby stipulate to and petition the court to enter the following Stipulated Protective Order.   The

22    parties acknowledge that this Order does not confer blanket protections on all disclosures or

23    responses to discovery and that the protection it affords extends only to the limited information or

24    items that are entitled under the applicable legal principles to treatment as confidential.   The parties

25    further acknowledge, as set forth in Section 10, below, that this Stipulated Protective Order creates

26    no entitlement to file confidential information under seal; Civil Local Rule 79-5 sets forth the

27    procedures that must be followed and reflects the standards that will be applied when a party seeks

28    permission from the court to file material under seal.

1

2. <u>DEFINITIONS</u>

     2.1    <u>Party</u>: any party to this action, including all of its officers, directors, employees, consultants, retained experts, and outside counsel (and their support staff).

     2.2    <u>Disclosure or Discovery Material</u>: all items or information, regardless of the medium or manner generated, stored, or maintained (including, among other things, testimony, transcripts, or tangible things) that are produced or generated in disclosures or responses to discovery in this matter.

     2.3    <u>"Confidential" Information or Items</u>: information (regardless of how generated, stored or maintained) or tangible things that qualify for protection under standards developed under F.R.Civ.P. 26(c).

     2.4    <u>"Highly Confidential – Attorneys' Eyes Only" Information or Items</u>: extremely sensitive "Confidential Information or Items" whose disclosure to another Party or non-party would create a substantial risk of serious injury that could not be avoided by less restrictive means.

     2.5    <u>Receiving Party</u>: a Party that receives Disclosure or Discovery Material from a Producing Party.

     2.6    <u>Producing Party</u>: a Party or non-party that produces Disclosure or Discovery Material in this action.

     2.7.    <u>Designating Party</u>: a Party or non-party that designates information or items that it produces in disclosures or in responses to discovery as "Confidential" or "Highly Confidential — Attorneys' Eyes Only."

     2.8    <u>Protected Material</u>: any Disclosure or Discovery Material that is designated as "Confidential" or as "Highly Confidential – Attorneys' Eyes Only."

     2.9.    <u>Outside Counsel</u>: attorneys who are not employees of a Party but who are retained to represent or advise a Party in this action.

     2.10    <u>House Counsel</u>: attorneys who are employees of a Party.

     2.11    <u>Counsel</u> (without qualifier): Outside Counsel and House Counsel (as well as their support staffs).

2.12    <u>Expert</u>: a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action and who is not a past or a current employee of a Party or of a competitor of a Party's and who, at the time of retention, is not anticipated to become an employee of a Party or a competitor of a Party's.   This definition includes a professional jury or trial consultant retained in connection with this litigation.

2.13    <u>Professional Vendors</u>: persons or entities that provide litigation support services (e.g., photocopying; videotaping; translating; preparing exhibits or demonstrations; organizing, storing, retrieving data in any form or medium; etc.) and their employees and subcontractors.

3. <u>SCOPE</u>

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also any information copied or extracted therefrom, as well as all copies, excerpts, summaries, or compilations thereof, plus testimony, conversations, or presentations by parties or counsel to or in court or in other settings that might reveal Protected Material.

4. <u>DURATION</u>

Even after the termination of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs.

5. <u>DESIGNATING PROTECTED MATERIAL</u>

5.1 <u>Exercise of Restraint and Care in Designating Material for Protection</u>.   Each Party or non-party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards.  A Designating Party must take care to designate for protection only those parts of material, documents, items, or oral or written communications that qualify – so that other portions of the material,

3

1   documents, items, or communications for which protection is not warranted are not swept

2   unjustifiably within the ambit of this Order.

3          Mass, indiscriminate, or routinized designations are prohibited.  Designations that are

4   shown to be clearly unjustified, or that have been made for an improper purpose (e.g., to

5   unnecessarily encumber or retard the case development process, or to impose unnecessary expenses

6   and burdens on other parties), expose the Designating Party to sanctions.

7          If it comes to a Party's or a non-party's attention that information or items that it

8   designated for protection do not qualify for protection at all, or do not qualify for the level of

9   protection initially asserted, that Party or non-party must promptly notify all other parties that it is

10  withdrawing the mistaken designation.

11         5.2 Manner and Timing of Designations.  Except as otherwise provided in this Order

12  (see, e.g., second paragraph of section 5.2(a), below), or as otherwise stipulated or ordered, material

13  that qualifies for protection under this Order must be clearly so designated before the material is

14  disclosed or produced.

15         Designation in conformity with this Order requires:

16         (a) for information in documentary form (apart from transcripts of depositions

17  or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL"

18  or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" at the top of each page that

19  contains protected material.  If only a portion or portions of the material on a page qualifies for

20  protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making

21  appropriate markings in the margins) and must specify, for each portion, the level of protection being

22  asserted (either "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES

23  ONLY").

24         A Party or non-party that makes original documents or materials available for

25  inspection need not designate them for protection until after the inspecting Party has indicated which

26  material it would like copied and produced.   During the inspection and before the designation, all of

27  the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL –

28  ATTORNEYS' EYES ONLY."   After the inspecting Party has identified the documents it wants

1 | copied and produced, the Producing Party must determine which documents, or portions thereof,
2 | qualify for protection under this Order, then, before producing the specified documents, the
3 | Producing Party must affix the appropriate legend ("CONFIDENTIAL" or "HIGHLY
4 | CONFIDENTIAL – ATTORNEYS' EYES ONLY") at the top of each page that contains Protected
5 | Material. If only a portion or portions of the material on a page qualifies for protection, the
6 | Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate
7 | markings in the margins) and must specify, for each portion, the level of protection being asserted
8 | (either "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY").

9 |               (b) <u>for testimony given in deposition or in other pretrial or trial proceedings,</u>
10 | that the Party or non-party offering or sponsoring the testimony identify on the record, before the
11 | close of the deposition, hearing, or other proceeding, all protected testimony, and further specify any
12 | portions of the testimony that qualify as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES
13 | ONLY." When it is impractical to identify separately each portion of testimony that is entitled to
14 | protection, and when it appears that substantial portions of the testimony may qualify for protection,
15 | the Party or non-party that sponsors, offers, or gives the testimony may invoke on the record (before
16 | the deposition or proceeding is concluded) a right to have up to 20 days to identify the specific
17 | portions of the testimony as to which protection is sought and to specify the level of protection being
18 | asserted ("CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY").
19 | Only those portions of the testimony that are appropriately designated for protection within the 20
20 | days shall be covered by the provisions of this Stipulated Protective Order.

21 |               Transcript pages containing Protected Material must be separately bound by
22 | the court reporter, who must affix to the top of each such page the legend "CONFIDENTIAL" or
23 | "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," as instructed by the Party or non-
24 | party offering or sponsoring the witness or presenting the testimony.

25 |               (c) <u>for information produced in some form other than documentary, and for</u>
26 | <u>any other tangible items,</u> that the Producing Party affix in a prominent place on the exterior of the
27 | container or containers in which the information or item is stored the legend "CONFIDENTIAL" or
28 | "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." If only portions of the information

1  or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected

2  portions, specifying whether they qualify as "Confidential" or as "Highly Confidential – Attorneys'

3  Eyes Only."

4        5.3 <u>Inadvertent Failures to Designate</u>.  If timely corrected, an inadvertent failure to

5  designate qualified information or items as "Confidential" or "Highly Confidential – Attorneys' Eyes

6  Only" does not, standing alone, waive the Designating Party's right to secure protection under this

7  Order for such material.  If material is appropriately designated as "Confidential" or "Highly

8  Confidential – Attorneys' Eyes Only" after the material was initially produced, the Receiving Party,

9  on timely notification of the designation, must make reasonable efforts to assure that the material is

10  treated in accordance with the provisions of this Order.

11

12        6. <u>CHALLENGING CONFIDENTIALITY DESIGNATIONS</u>

13        6.1  <u>Timing of Challenges</u>.  Unless a prompt challenge to a Designating Party's

14  confidentiality designation is necessary to avoid foreseeable substantial unfairness, unnecessary

15  economic burdens, or a later significant disruption or delay of the litigation, a Party does not waive its

16  right to challenge a confidentiality designation by electing not to mount a challenge promptly after the

17  original designation is disclosed.

18        6.2  <u>Meet and Confer.</u>  A Party that elects to initiate a challenge to a Designating

19  Party's confidentiality designation must do so in good faith and must begin the process by conferring

20  directly (in voice to voice dialogue; other forms of communication are not sufficient) with counsel for

21  the Designating Party.  In conferring, the challenging Party must explain the basis for its belief that

22  the confidentiality designation was not proper and must give the Designating Party an opportunity to

23  review the designated material, to reconsider the circumstances, and, if no change in designation is

24  offered, to explain the basis for the chosen designation.  A challenging Party may proceed to the next

25  stage of the challenge process only if it has engaged in this meet and confer process first.

26

27        6.3  <u>Judicial Intervention</u>.  A Party that elects to press a challenge to a confidentiality

28  designation after considering the justification offered by the Designating Party may file and serve a

1  motion under Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if applicable) that

2  identifies the challenged material and sets forth in detail the basis for the challenge.  Each such motion

3  must be accompanied by a competent declaration that affirms that the movant has complied with the

4  meet and confer requirements imposed in the preceding paragraph and that sets forth with specificity

5  the justification for the confidentiality designation that was given by the Designating Party in the meet

6  and confer dialogue.

7        The burden of persuasion in any such challenge proceeding shall be on the Designating

8  Party.  Until the court rules on the challenge, all parties shall continue to afford the material in

9  question the level of protection to which it is entitled under the Producing Party's designation.

10

11  7. ACCESS TO AND USE OF PROTECTED MATERIAL

12        7.1 Basic Principles.  A Receiving Party may use Protected Material that is disclosed

13  or produced by another Party or by a non-party in connection with this case only for prosecuting,

14  defending, or attempting to settle this litigation.   Such Protected Material may be disclosed only to

15  the categories of persons and under the conditions described in this Order.  When the litigation has

16  been terminated, a Receiving Party must comply with the provisions of section 11, below (FINAL

17  DISPOSITION).

18        Protected Material must be stored and maintained by a Receiving Party at a location

19  and in a secure manner that ensures that access is limited to the persons authorized under this Order.

20        7.2   Disclosure of "CONFIDENTIAL" Information or Items.  Unless otherwise

21  ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose

22  any information or item designated CONFIDENTIAL only to:

23        (a) the Receiving Party's Outside Counsel of record in this action, as well as

24  employees of said Counsel to whom it is reasonably necessary to disclose the information for this

25  litigation and who have signed the "Agreement to Be Bound by Protective Order" that is attached

26  hereto as Exhibit A;

27        (b) the officers, directors, and employees (including House Counsel) of the

28  Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed

7

1   the "Agreement to Be Bound by Protective Order" (Exhibit A);

2              (c) experts (as defined in this Order) of the Receiving Party to whom

3   disclosure is reasonably necessary for this litigation and who have signed the "Agreement to Be

4   Bound by Protective Order" (Exhibit A);

5              (d) the Court and its personnel;

6              (e) court reporters, their staffs, and professional vendors to whom disclosure is

7   reasonably necessary for this litigation and who have signed the "Agreement to Be Bound by

8   Protective Order" (Exhibit A);

9              (f) during their depositions, witnesses in the action to whom disclosure is

10  reasonably necessary and who have signed the "Agreement to Be Bound by Protective Order"

11  (Exhibit A).  Pages of transcribed deposition testimony or exhibits to depositions that reveal

12  Protected Material must be separately bound by the court reporter and may not be disclosed to

13  anyone except as permitted under this Stipulated Protective Order.

14             (g) the author of the document or the original source of the information.

15         7.3 Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY"

16  Information or Items.  Unless otherwise ordered by the court or permitted in writing by the

17  Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY

18  CONFIDENTIAL – ATTORNEYS' EYES ONLY" only to:

19             (a) the Receiving Party's Outside Counsel of record in this action, as well as

20  employees of said Counsel to whom it is reasonably necessary to disclose the information for this

21  litigation and who have signed the "Agreement to Be Bound by Protective Order" that is attached

22  hereto as Exhibit A;

23             [(b) – *Optional – as deemed appropriate in case-specific circumstances*:

24  House Counsel of a Receiving Party (1) who has no involvement in competitive decision-making or in

25  patent prosecutions involving _____ [specify subject matter areas], (2) to whom

26  disclosure is reasonably necessary for this litigation,  and (3) who has signed the "Agreement to Be

27  Bound by Protective Order" (Exhibit A);

28             (c) Experts (as defined in this Order) (1) to whom disclosure is reasonably

8

1  necessary for this litigation, (2) who have signed the "Agreement to Be Bound by Protective Order"

2  (Exhibit A), [*Optional*: and (3) as to whom the procedures set forth in paragraph 7.4, below, have

3  been followed];

4              (d) the Court and its personnel;

5              (e) court reporters, their staffs, and professional vendors to whom disclosure is

6  reasonably necessary for this litigation and who have signed the "Agreement to Be Bound by

7  Protective Order" (Exhibit A); and

8              (f) the author of the document or the original source of the information.

9  [ *Optional*: 7.4 <u>Procedures for Approving Disclosure of "HIGHLY CONFIDENTIAL –</u>

10  <u>ATTORNEYS' EYES ONLY" Information or Items to "Experts"</u>

11             (a) Unless otherwise ordered by the court or agreed in writing by the

12  Designating Party, a Party that seeks to disclose to an "Expert" (as defined in this Order) any

13  information or item that has been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES

14  ONLY" first must make a written request to the Designating Party that (1) identifies the specific

15  HIGHLY CONFIDENTIAL information that the Receiving Party seeks permission to disclose to the

16  Expert, (2) sets forth the full name of the Expert and the city and state of his or her primary

17  residence, (3) attaches a copy of the Expert's current resume, (4) identifies the Expert's current

18  employer(s), (5) identifies each person or entity from whom the Expert has received compensation for

19  work in his or her areas of expertise or to whom the expert has provided professional services at any

20  time during the preceding five years, and (6) identifies (by name and number of the case, filing date,

21  and location of court) any litigation in connection with which the Expert has provided any

22  professional services during the preceding five years.

23             (b) A Party that makes a request and provides the information specified in the

24  preceding paragraph may disclose the subject Protected Material to the identified Expert unless,

25  within seven court days of delivering the request, the Party receives a written objection from the

26  Designating Party.  Any such objection must set forth in detail the grounds on which it is based.

27             (c) A Party that receives a timely written objection must meet and confer with

28  the Designating Party (through direct voice to voice dialogue) to try to resolve the matter by

1  agreement.  If no agreement is reached, the Party seeking to make the disclosure to the Expert may

2  file a motion as provided in Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if

3  applicable) seeking permission from the court to do so.   Any such motion must describe the

4  circumstances with specificity, set forth in detail the reasons for which the disclosure to the Expert is

5  reasonably necessary, assess the risk of harm that the disclosure would entail and suggest any

6  additional means that might be used to reduce that risk.  In addition, any such motion must be

7  accompanied by a competent declaration in which the movant describes the parties' efforts to resolve

8  the matter by agreement (i.e., the extent and the content of the meet and confer discussions) and sets

9  forth the reasons advanced by the Designating Party for its refusal to approve the disclosure.

10         In any such proceeding the Party opposing disclosure to the Expert shall bear

11  the burden of proving that the risk of harm that the disclosure would entail (under the safeguards

12  proposed) outweighs the Receiving Party's need to disclose the Protected Material to its Expert.

13

14         8. PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER

15  LITIGATION.

16         If a Receiving Party is served with a subpoena or an order issued in other litigation

17  that would compel disclosure of any information or items designated in this action as

18  "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," the

19  Receiving Party must so notify the Designating Party, in writing (by fax, if possible) immediately and

20  in no event more than three court days after receiving the subpoena or order.  Such notification must

21  include a copy of the subpoena or court order.

22         The Receiving Party also must immediately inform in writing the Party who caused the

23  subpoena or order to issue in the other litigation that some or all the material covered by the

24  subpoena or order is the subject of this Protective Order.   In addition, the Receiving Party must

25  deliver a copy of this Stipulated Protective Order promptly to the Party in the other action that

26  caused the subpoena or order to issue.

27         The purpose of imposing these duties is to alert the interested parties to the existence

28  of this Protective Order and to afford the Designating Party in this case an opportunity to try to

1  protect its confidentiality interests in the court from which the subpoena or order issued. The

2  Designating Party shall bear the burdens and the expenses of seeking protection in that court of its

3  confidential material – and nothing in these provisions should be construed as authorizing or

4  encouraging a Receiving Party in this action to disobey a lawful directive from another court.

5

6      9. <u>UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL</u>

7      If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected

8  Material to any person or in any circumstance not authorized under this Stipulated Protective Order,

9  the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized

10  disclosures, (b) use its best efforts to retrieve all copies of the Protected Material, (c) inform the

11  person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d)

12  request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that

13  is attached hereto as Exhibit A.

14

15      10. <u>FILING PROTECTED MATERIAL.</u>  Without written permission from the Designating

16  Party or a court order secured after appropriate notice to all interested persons, a Party may not file

17  in the public record in this action any Protected Material.  A Party that seeks to file under seal any

18  Protected Material must comply with Civil Local Rule 79-5.

19

20      11. <u>FINAL DISPOSITION.</u>  Unless otherwise ordered or agreed in writing by the Producing

21  Party, within sixty days after the final termination of this action, each Receiving Party must return all

22  Protected Material to the Producing Party.  As used in this subdivision, "all Protected Material"

23  includes all copies, abstracts, compilations, summaries or any other form of reproducing or capturing

24  any of the Protected Material.  With permission in writing from the Designating Party, the Receiving

25  Party may destroy some or all of the Protected Material instead of returning it.   Whether the

26  Protected Material is returned or destroyed, the Receiving Party must submit a written certification to

27  the Producing Party (and, if not the same person or entity, to the Designating Party) by the sixty day

28  deadline that identifies (by category, where appropriate) all the Protected Material that was returned

1 | or destroyed and that affirms that the Receiving Party has not retained any copies, abstracts,

2 | compilations, summaries or other forms of reproducing or capturing any of the Protected Material.

3 | Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings,

4 | motion papers, transcripts, legal memoranda, correspondence or attorney work product, even if such

5 | materials contain Protected Material.  Any such archival copies that contain or constitute Protected

6 | Material remain subject to this Protective Order as set forth in Section 4 (DURATION), above.

7 |

8 | 12. MISCELLANEOUS

9 |       12.1   Right to Further Relief.  Nothing in this Order abridges the right of any person

10 | to seek its modification by the Court in the future.

11 |       12.2   Right to Assert Other Objections.  By stipulating to the entry of this Protective

12 | Order no Party waives any right it otherwise would have to object to disclosing or producing any

13 | information or item on any ground not addressed in this Stipulated Protective Order.   Similarly, no

14 | Party waives any right to object on any ground to use in evidence of any of the material covered by

15 | this Protective Order.

16 |

17 | IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

18 | DATED: _____     _____

19 |                                 Attorneys for Plaintiff

20 | DATED: _____     _____

21 |                                 Attorneys for Defendant

22 | PURSUANT TO STIPULATION, IT IS SO ORDERED.

23 | DATED: _____     _____

24 |                                 [name of judge]<br>United States District/Magistrate Judge

25 |

26 |

27 |

28 |

12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>EXHIBIT A</u>

<u>ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND</u>

I, _____ [print or type full name], of _____ [print or type full address], declare under penalty of perjury that I have read in its entirety and understand the Stipulated Protective Order that was issued by the United States District Court for the Northern District of California on [date] in the case of _____ **[insert formal name of the case and the number and initials assigned to it by the court]**.   I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt.   I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the Northern District of California for the purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action.

I hereby appoint _____ [print or type full name] of _____ [print or type full address and telephone number] as my California agent for service of process in connection with this action or any proceedings related to enforcement of this Stipulated Protective Order.

Date: _____

City and State where sworn and signed: _____

Printed name: _____
                            [printed name]

Signature: _____
                        [signature]

**EXHIBIT 9**

1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                           - - -

4    RICOH COMPANY, LTD.,              :    CIVIL ACTION
                                       :
5              Plaintiff              :
                                       :
6              vs.                    :
                                       :
7    AEROFLEX INCORPORATED, AMI       :
     SEMICONDUCTOR, INC., MATROX      :
8    ELECTRONIC SYSTEMS LTD.,         :
     MATROX GRAPHICS INC., MATROX     :
9    INTERNATIONAL CORP., and         :
     MATROX TECH, INC.,               :
10                                     :
               Defendants             :    NO. 03-103 (GMS)
11

12                          - - -

13                                 Wilmington, Delaware
                                   Friday, May 16, 2003
14                                 2:00 o'clock, p.m.

15                          - - -

16   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

17                          - - -

18   APPEARANCES:

19              RICHARDS, LAYTON & FINGER, P.A.
                BY:  ROBERT W. WHETZEL, ESQ. and
20                   STEVEN J. FINEMAN, ESQ.

21                      -and-

22

23

24                                 Valerie J. Gunning
                                   Official Court Reporter
25

```
 1   APPEARANCES (Continued):

 2              DICKSTEIN, SHAPIRO, MORIN & OSHINSKY
                BY:  GARY M. HOFFMAN, ESQ. and
 3                   EDWARD A. MEILMAN, ESQ.
                     (Washington, D.C.)
 4
                     Counsel for Plaintiff
 5

 6              CONNOLLY, BOVE, LODGE & HUTZ LLP
                BY:  FRANCIS DiGIOVANNI, ESQ.
 7
                          -and-
 8
                HOWREY, SIMON, ARNOLD & WHITE
 9              BY:  TERESA M. CORBIN, ESQ.
                     (Menlo Park, California)
10
                     Counsel for Defendants
11

12              MacPHERSON, KWOK, CHEN & HEID LLP
                BY:  ALAN H. MacPHERSON, ESQ. (VIA TELEPHONE)
13                   (San Jose, California)

14                   Counsel for Defendat AMI Semiconductor

15                        -  -  -

16

17

18

19

20

21

22

23

24

25
```

```
 1
 2                      P R O C E E D I N G S
 3
 4              (Proceedings commenced in chambers, beginning at
 5   2:00 p.m.)
 6
 7              THE COURT:  Good afternoon.
 8              MR. WHETZEL:  Your Honor, may I introduce
 9   Gary Hoffman from Dickstein Shapiro and his partner,
10   Ed Meilman.
11              MR. DiGIOVANNI:  This is Teresa Corbin of Howrey
12   Simon in California.
13              And we also expected to have --
14              THE COURT:  We have him on the phone.
15              MR. DiGIOVANNI:  Alan MacPherson representing
16   AMI.
17              THE COURT:  Yes.
18              Your name, counsel?
19              MR. FINEMAN:  Steve Fineman from Richards
20   Layton.
21              MR. WHETZEL:  I'm sorry, your Honor.
22              THE COURT:  That's all right.
23              Mr. MacPherson?
24              MR. MacPHERSON:  Yes.
25              THE COURT:  Hi.  Everyone is here.  This is Judge
```

1  Sleet.  We're going to get right into the business of

2  scheduling.

3         I have received the joint status report and the

4  competing proposals for schedule and I have taken the liberty

5  of making some modifications.

6         My approach to scheduling is not altogether

7  rigid, and I will discuss matters with counsel and make

8  adjustments that I think are appropriate to make, depending

9  upon what counsel advise me and whether I'm convinced that

10  the adjustment should be made.

11         So with that sort of a proviso, why don't we

12  begin.

13         You pretty much don't agree on anything with

14  regard to actual scheduling other than the cutoff, and that's

15  not totally agreed for discovery.  I think plaintiff proposes

16  that all discovery be completed by the March 15, '04 date.

17  The defendants resist that proposition and want to stage

18  discovery, which the Court is inclined to do.

19         But if the plaintiff really feels -- plaintiff on

20  this side --

21         MR. HOFFMAN:  Yes, your Honor.

22         THE COURT:  -- feels adamant about this, I'm

23  willing to hear you on it.

24         MR. HOFFMAN:  Well, we had thought it was

25  appropriate, looking at it again this morning, your Honor,

1    we're willing to stage discovery.

2            We would like to start the opening expert reports

3    a little bit earlier.  The defendants have proposed April

4    9th.  We would suggest April 2 and rebuttal April 16th and

5    the expert reports.

6            THE COURT:  Well, the opening actually based on

7    the schedule I have crafted here would be 3/22.

8            MR. HOFFMAN:  Okay.

9            THE COURT:  With the rebuttals being 4/23.

10           Let me jump to the back end of this schedule.

11   This case is going to come to trial on October 11 of '04.

12   Okay?

13           We will have a pretrial order due date of 8/16

14   and we will have a pretrial conference here in this building

15   on September the 13th at 9:30, commencing at 9:30.

16           We can now go back to the beginning.  That will

17   at least help give you some context for what we're going to

18   talk about here.

19           MS. CORBIN:  Right.

20           THE COURT:  Go ahead.

21           MS. CORBIN:  Your Honor, I think there are some

22   things that I should apprise the Court of.

23           THE COURT:  Okay.

24           MS. CORBIN:  In addition to representing the

25   defendants in this suit, I am representing Synopsis, which

1    is a company that is in the design synthesis business also

2    in California.

3              THE COURT:  Not a party to this action?

4              MS. CORBIN:  They're not a party to this

5    action.  They filed a suit in the Northern District of

6    California yesterday against Ricoh, basically on one of

7    the same patents, the one patent that's in this suit.

8              THE COURT:  The '432 patent?

9              MS. CORBIN:  Yes.  Essentially, it had

10   come to our attention that the statement had been made

11   to Mr. MacPherson, and this is the only indication

12   we have because we cannot glean anything about the

13   infringement allegations from the complaint that the

14   bases of the complaint is really these defendants use of a

15   product called Design Compiler that Synopsis manufactures

16   and sells.

17              It came to our attention and then again late

18   last week that, in fact, RICO was engaged in a worldwide

19   campaign of sending letters to our customers.  We got copies

20   of some of those letters which RICO had sent to additional of

21   the customers and indicated in the letter that that should be

22   kept confidential, but it has come to Synopsis' attention,

23   and they felt that it was critical to take the bull by the

24   horns if that, in fact, is the case, that the genesis of this

25   case is a Synopsis part.

1          And they are in California and a large number of

2    the players, witnesses and the documents are there as well.

3          And the letters that have been going out to the

4    other customers mention another patent that is a continuation

5    in part of the patent we have in suit here.  Synopsis does

6    intend and had hoped to do that by today, but probably will

7    not happen until Monday to file the motion to stay and/or

8    transfer this customer case.

9          THE COURT:  To stay the case out in California?

10          MS. CORBIN:  No.  To stay this case or to

11    transfer this case to California.

12          THE COURT:  On what basis are they going

13    to file a motion in this case?  I'm not certain that I

14    exactly --

15          MS. CORBIN:  I'm sorry.  The defendants, the

16    defendants in this case would file a motion to stay.

17          THE COURT:  You said Synopsis.

18          MS. CORBIN:  I apologize.  I'm representing those

19    parties as well, and they feel that if the genesis of this

20    complaint is really the Design Compiler part of Synopsis,

21    that that issue could be handled in California and would

22    resolve the issues here.

23          THE COURT:  Sure.  Sure.  I understand.

24          Well, we can talk about this a little bit.  It

25    strikes me that there's no prejudice to either party since I

1    have you all here in embarking on a schedule in any event

2    because discovery has to be done.

3              MS. CORBIN:  I wanted to apprise you of the

4    facts.  I would have mentioned it in the status report.  At

5    that time it had been unresolved.

6              THE COURT:  Certainly the Court recognizes should

7    the motion to transfer be filed and should I rule that the

8    case should be transferred, it will then come under the

9    rules -- this is in the Northern District?

10             MS. CORBIN:  Yes.

11             THE COURT:  Which rules are very different

12   from this Court's and you would embark upon an entirely

13   new schedule, but I don't think you'd be any the worse

14   for wear.

15             MS. CORBIN:  Absolutely.  I think we should

16   proceed.

17             THE COURT:  Okay.  Counsel, anything further to

18   that?

19             MR. HOFFMAN:  I guess there's no point in getting

20   into a debate over the lawsuit that they just filed.

21   Obviously, I just became aware of it.  However, we've made no

22   threats against Synopsis.  We'll be moving to dismiss the

23   lawsuit.

24             THE COURT:  Why am I not surprised?

25             MR. HOFFMAN:  There's no reason for my trying to

1    explain the issues at this point.  That will be an issue that

2    will be out there in California.

3            THE COURT:  Well, apparently.

4            Okay.  So with that, we can now go ahead and see

5    what we can come up with here.

6            I see a difference in the Rule 26(a) time that

7    you've -- deadline you've set.  I had picked 5:30.

8            Is there a particular reason the defendants feel

9    June 13 is more appropriate than 5:30?  I thought we should

10   let's get on with it.

11           MS. CORBIN:  If the Court is inclined that way,

12   we will do our best to do that.

13           THE COURT:  I'm inclined to do that.  I tried to

14   sort of pick a compromise date as to amendment and joinder

15   and I selected July 30.  I don't know if anybody feels real

16   strongly about that one way or the other.

17           MR. HOFFMAN:  That's fine, your Honor.

18           THE COURT:  All right.  As to the election and

19   the production, the election of reliance on advice of counsel

20   and production of those opinions, the defendant proposes ten

21   days after the Markman.  That's the first time I've seen that

22   type of proposal on this.

23           I'm not quite certain why you would want --

24   the Markman, by the way -- well, we'll just move along

25   in some order here, but perhaps you could tell me why you

1    feel that.

2            MS. CORBIN:  Well, primarily it's just the

3    reason, your Honor, that to rely on advice of counsel in a

4    waiver of the privilege.

5            The privilege is important, so if the defendants

6    feel that they would not choose to do that if it were not

7    necessary to waive that privilege and that it's hard to know

8    at the beginning of this case, you know, what the allegations

9    are, but once there was a claim construction sort of defining

10   the scope of this patent, then the defendants could make an

11   informed judgment on that basis as to whether they really

12   wanted to waive their privilege or not.

13           THE COURT:  I don't think that, for you

14   to make an order, and I will let plaintiff make his

15   own argument, but I'm having difficulty, a little bit

16   of difficulty with understanding why you couldn't make

17   an informed judgment prior to the Court's disposition of

18   the Markman question.  I mean, it seems to me that if we

19   get far along enough in discovery, in the discovery process,

20   I mean, that's really the basis from which you are going to

21   make that call one way or it shouldn't have anything to do

22   with the call that I make on, you know, the construction of

23   elements.

24           MR. HOFFMAN:  Your Honor, you stated our

25   concern.  We agree.

1         THE COURT:  Now, I'm going to distress you

2  a little bit, both of you, because I'm going to set that

3  date, by the way, at 12/9, which I think gives counsel

4  ample time.

5         MS. CORBIN:  Discovery?

6         THE COURT:  No.

7         MS. CORBIN:  Oh.

8         THE COURT:  I'm shifting on you a little bit.

9         MS. CORBIN:  Okay.

10         THE COURT:  The deadline for advice on reliance.

11         MS. CORBIN:  Okay.

12         THE COURT:  But only a month after will be

13  the fact discovery cutoff.  That gives you a little less

14  than eight months.

15         This is a one-patent case.  I see no reason

16  why counsel can't, with a diligent effort, get this

17  case discovered by January the 9th, but I will hear

18  from you.

19         MS. CORBIN:  That's fact discovery?

20         THE COURT:  Yes.  Fact discovery.

21         MR. HOFFMAN:  That's fine with us, your Honor.

22         THE COURT:  Did you want to be heard further on

23  that?

24         MS. CORBIN:  You know, your Honor, if that's what

25  you feel, we will do our best to accommodate that --

1          THE COURT:  I don't want to set unrealistic

2     dates.

3          MS. CORBIN:  To the extent we're unable to

4     accomplish everything we need, if we could come back to

5     court.

6          THE COURT:  There's not going to be a lot of

7     room.

8          MS. CORBIN:  Okay.

9          THE COURT:  There's not going to be a

10    lot of room.  It's a fairly tight schedule as I see

11    it.  That date is based on the Court's considerable

12    experience even in the short time that I've been here

13    in this area and understanding generally how long it

14    takes to do things.

15          I am willing, if you were to tell me there's

16    going to be a lot of foreign discovery and there are

17    going to be language problems, something along those

18    lines, I might hear you, but I just don't see the need

19    to spend ten months discovering in a one-patent

20    case.

21          MS. CORBIN:  Well, your Honor, that was

22    part of the issue that I would get into, the phase when

23    we talk about the appropriate scheduling, Markman and the

24    claims construction.

25          Part of our reason, the defendants' reason for

1    wanting an early hearing on that is that we do believe that

2    resolution of that issue has the potential to eliminate a

3    large amount of third-party discovery related to the prior

4    art system.

5              THE COURT:  I'm going to give you a Markman

6    earlier than the one you've asked for.

7              MS. CORBIN:  Oh, okay.  But we do have the

8    inventors here and it's not completely clear to us yet, but

9    it appears to us they're both in Japan.  So we do have some

10   foreign language issues and some international depositions

11   and then, depending on where we end up with the claims

12   construction, there really are a large number of people in

13   this field who are involved in the early eighties in

14   developing design synthesis software.

15             THE COURT:  To the extent that there needs

16   to be an extension of the fact discovery deadline to

17   accommodate the deposition of some individuals, to the

18   extent that that won't impact the case-dispositive

19   motion schedule, I'm willing to be flexible.

20             MS. CORBIN:  Okay.

21             THE COURT:  Right up to the time of trial,

22   quite frankly, and even after, if necessary.  But this is a

23   parochial concern --

24             MS. CORBIN:  Okay.

25             THE COURT:  -- that I have, that you should all

1  have.  That is, giving the Court sufficient time to

2  appropriately address any dispositive motions that I permit

3  to be filed.

4        MS. CORBIN:  All right.  We'll do our best

5  to live with January 9.

6        THE COURT:  All right.  Then that gets us

7  into Markman and to that process.

8        I'm going to require that you meet and

9  confer by the 9th day of January for the purpose of

10  identifying elements in dispute and narrowing that

11  field of conflict.

12        That's just a deadline.  You can meet before

13  then, whatever.

14        MR. HOFFMAN:  Okay.

15        THE COURT:  And, by the way, I'm going to

16  impose on plaintiff to prepare this schedule, because there

17  are going to be some dates that you will probably need to

18  work out on your own.

19        MR. WHETZEL:  We would be glad to, your Honor.

20        THE COURT:  I'd like the exchange of initial

21  claim charts to be completed by January the 16th.  This is

22  going to be rather rigorous here.  I would like final claim

23  charts, joint final submission by the close of business a

24  week later, January 23.  And that should include citations to

25  the intrinsic record.

1        Just to talk a little bit about Markman, the

2   process, I'm going to be interested to hear from you as to

3   how much time you think it's going to take, but I know that

4   it's early in the process.  I wouldn't imagine that we need

5   to set aside more than a day.  I don't take extrinsic

6   evidence in my Markman process.

7        MR. HOFFMAN:  We would agree with your Honor.

8   A day, maximum, should be fine.

9        THE COURT:  Okay.  Do you agree.

10        MS. CORBIN:  Yes, I agree.

11        THE COURT:  All right.  Then that helps.

12        I would like the Markman briefing process to be

13   completed by February the 6th.  An opening and an answer, or

14   you can simultaneously exchange.  You need to join the

15   issues.  I would suggest an opening and an answer.

16        We'll hold our Markman hearing on February the

17   20th, beginning at 9:30.

18        MS. CORBIN:  Your Honor, if I could?

19        THE COURT:  Yes.

20        MS. CORBIN:  So in your schedule, January 9th,

21   the Markman process will begin the same day as the fact

22   discovery closes?

23        THE COURT:  Yes.

24        MS. CORBIN:  Which does not address, and

25   that was the argument I was trying to make, the issue

1  that we have, in that we thought that starting that

2  process earlier may eliminate a large part of what would

3  be third-party discovery, and that was why in the defendants'

4  proposal, we had started that process in August of this

5  year and had hoped to get to that well in advance of the

6  close of discovery so that we could make a decision and

7  not be bothering these third parties with depositions

8  and document production and so on should it prove to be

9  unnecessary.

10         THE COURT:  Well, you still both -- I mean, you

11  want to have your Markman hearing?

12         MS. CORBIN:  Yes.

13         THE COURT:  I'm sorry.  I'm incorrect.  On

14  October 17th.  We can talk about that.

15         I am really generally not amenable anymore

16  to doing early Markmans.  I've been told that early Markmans

17  will -- you know, Judge, we'll settle the case, we'll -- it

18  will do this for the case, it will do that and, inevitably,

19  I've been very disappointed with that.  And I don't want to

20  be disappointed again because it just makes me unhappy and

21  you don't want me to be unhappy.

22         MS. CORBIN:  No.

23         THE COURT:  But I will -- if counsel want to talk

24  about that with me and you convince me that, you know, Judge,

25  it's really going to help us, this will really help us set

1   the direction of the case, may dispose of it, I'm not

2   unwilling to address Markman early.  But I'm also not willing

3   to have the discovery process continues and have you come

4   back and say, Judge, there's additional discovery.  We need

5   to reopen the Markman process.  We've changed our position.

6   And it may be a perfectly legitimate, not dilatory tactic,

7   request.

8           MS. CORBIN:  Right.  Although I would say to

9   your Honor that discovery is really not so relevant to

10  Markman, since the Markman is, as you said, based on the

11  intrinsic evidence and the --

12          THE COURT:  I have lawyers coming in and

13  talking about prosecution history all the time and prior

14  art and things of that nature in Markman.  They do,

15  but --

16          MS. CORBIN:  The file history is available

17  to everybody presently.

18          THE COURT:  It is.

19          MS. CORBIN:  And presumably, the prior art as

20  well.

21          MR. HOFFMAN:  Your Honor, one of the reasons why,

22  in this case -- we agree with what your Honor is saying, but

23  in addition in this case, so far we've identified one claim.

24  There are 20 claims in the patent.  We've identified at least

25  one claim that we believe infringe, that we have alleged

1    infringe.   There may be many other claims.   We won't know

2    until we get discovery.

3              You know, Claim 13, I've identified this to

4    Ms. Corbin, is being infringed.   That's our position at

5    least.

6              There are a total of five independent claims,

7    20 claims total.   If we have an early Markman before

8    we've taken discovery, we're going to wind up with two

9    Markman hearings.   It just does not make any sense in

10    this case.

11              THE COURT:   Go ahead.

12              MS. CORBIN:   Well, the whole -- the

13    complaint -- the patent as a whole only has four

14    independent claims, but using Claim 13 specifically,

15    because that's the one you reference that you said

16    was the basis at least at this point in time for the

17    allegation of infringement, we believe there are claim

18    elements there which if defined as commensurate with the

19    scope of what is described in the specification would be

20    straightforward, and if the Court were to conclude that,

21    then it would eliminate, as we're saying, a large part

22    of this third-party discovery.

23              If, in fact, plaintiff is going to read

24    that specification or it's going to be its position to

25    this Court that that claim is broader and covers all types

1    of design synthesis, then we are really going to have to do

2    heavy duty third-party discovery, and many parties were

3    developing this design synthesis software in the early

4    eighties.

5            We believe if they construe it on the broader

6    construction, we'll have to engage in this third-party

7    discovery from quite a number of individuals and companies

8    that were developing that material so we can mount our

9    defense and show the Court that if construed in that broader

10   way, that was already in the public domain in the early

11   1980's, well in advance of the filing of the application that

12   resulted in this patent.

13           And that was really our concern because, you

14   know, we conduct third-party discovery all the time but we

15   try to tailor it.

16           Obviously, these defendants will have to do

17   it the best they can to mount their defense and it will

18   entail a large expense and time consumption of parties and

19   companies that really have no interest in the outcome of

20   this suit.

21           THE COURT:  Counsel, your opponent says in

22   addition to bothering people unnecessarily, you are going

23   to spend a lot of money you may not need to spend.

24           MR. HOFFMAN:  Your Honor, I think throughout

25   all of this we're going to be able to focus issues and I

1    hope keep things under control.

2            Both sides have agreed on 240 hours on the

3    number of depositions that the parties can do.

4            THE COURT:  All right.

5            MR. HOFFMAN:  What we're going to do is wind

6    up with multiple Markman hearings, which really makes no

7    sense at all.

8            There are five independent claims.  We just wind

9    up with having to deal with other claims later on as we get

10   additional discovery.

11           The arguments I hear Ms. Corbin making are

12   arguments every defendant can make in every single case.

13   They're no different -- this is no different than any other

14   case.

15           THE COURT:  If you go through the process and

16   you determine jointly that you need to -- that it would make

17   sense to come to the Court and ask for an early Markman with

18   assurances that we're not going to come back and revisit

19   Markman, I will certainly consider that request and see if we

20   can insert you somewhere.  But right now I do have this

21   nagging concern about having to duplicate effort and I really

22   don't want to leave that potential for duplication out

23   there.

24           But I understand what you are saying and I

25   certainly am a proponent of saving money.

1          MS. CORBIN:  It's just not my experience,

2   your Honor, that I've ever had two Markman hearings in

3   any case I've been involved in.  So it's often the case,

4   and often in the Northern District, we have earlier Markman

5   hearings, and I have found in my experience that it is

6   helpful in at least narrowing the scope for both the

7   fact and the expert discovery, but primarily this third-party

8   discovery, which we know here in this particular case is

9   going to be a big issue.

10          THE COURT:  With all due respect to the

11  Northern District, and they certainly are vastly experienced

12  in this area, not more experienced than we are, but vastly

13  experienced, we have a different view.  I have a different

14  view of the approach to patent cases than was taken in the

15  Northern District generally.

16          I respect their view, but it does not suit what

17  we believe to be the needs and the approach of litigants and

18  the Court in this district.

19          MS. CORBIN:  Okay.

20          THE COURT:  But, again, if it seems that

21  they are compelling reasons that serve the interests

22  of all, and I do include the Court in that, to have an

23  earlier Markman process and an earlier Markman hearing

24  than the one the Court is presently going to set, I will

25  consider that.

1          MS. CORBIN:  Okay.

2          THE COURT:  Okay?

3          MR. HOFFMAN:  Your Honor, if I can just turn back

4   to one point.

5          THE COURT:  Yes.

6          MR. HOFFMAN:  I believe the hearing date you set

7   was February 20th.

8          THE COURT:  Yes.

9          MR. HOFFMAN:  Unfortunately, I don't have

10  my calendar in front of me, but I believe that's a that's

11  the week I'm supposed to be on vacation.  I booked a

12  vacation with a number of other couples, my wife and

13  myself.

14         THE COURT:  All right.

15         MR. HOFFMAN:  If it would be possible to move

16  that one week later, I'd appreciate it, just as a personal

17  item.

18         THE COURT:  Gail, would you see if a week

19  later --

20         MR. HOFFMAN:  Yes.  I believe the vacation --

21  and I can check afterwards, your Honor, and let you know, but

22  if that may be a flexibility.

23         THE COURT:  I suspect we can do that.

24         Go ahead.

25         MS. CORBIN:  It's a different point, so I didn't

1   want to --

2              THE COURT:  All right.

3              MS. CORBIN:  My only thought, sticking on the

4   Markman, is that since the Court is not inclined to give us

5   the earlier date, I still believe what the plaintiffs

6   themselves had presented was to have an exchange of the

7   proposed claim constructions and the meet and confer on that

8   and sort of the joint -- so you would at least have a

9   document.

10             It wouldn't be the briefing.  It wouldn't

11  be the Markman hearing, but it would be a document that

12  set forth the parties' positions and their support for

13  their constructions and to have that in advance of the

14  day the discovery is closing I believe would be very

15  advantageous.

16             THE COURT:  I have no difficulty with that.

17             MR. HOFFMAN:  I'm sorry, your Honor.

18             THE COURT:  Go ahead.

19             MR. HOFFMAN:  What I would propose, I can work

20  out with Ms. Corbin an informal exchange for some time in

21  September that we can exchange initial positions.  You know,

22  outside of the schedule, I'll be more than glad to work out

23  something with her.

24             THE COURT:  I will go even further to suggest

25  that -- you're talking about the January 16 exchange date?

1        MS. CORBIN:  Yes.

2        THE COURT:  Counsel are free to move that up.

3        MS. CORBIN:  Okay.

4        THE COURT:  And have it reflected in the

5   schedule.

6        MR. HOFFMAN:  All right.

7        THE COURT:  That was a deadline.

8        MS. CORBIN:  Okay.

9        THE COURT:  For me.

10        MR. HOFFMAN:  Okay.

11        THE COURT:  Now, I have taken, I don't

12   think it's unique any longer, I think it's probably

13   well-known, a different position on summary judgment,

14   my summary judgment process in patent cases now than

15   most cases simply because it's not a reflection, it does

16   not mean that I don't like the patent bar.  It just

17   means that these motions can be burdensome.  They're

18   complex.  They involve the challenge initially of lay

19   persons like myself getting up to speed on the technology,

20   and because of the way I do my approach to scheduling, we

21   sort of have to get up to speed twice.

22        Judge Robinson, as you know, I think she's

23   brilliant.  She does it one time.  But I'm not yet quite

24   there.

25        So what I require and will require in this case

1    is that by the 8th day of March, you will have submitted

2    letters to me in support of or in opposition to the filing of

3    case-dispositive motions.  So you can agree on your own

4    schedule for the exchange of those letters.

5              The letter should not exceed five pages.  They're

6    letter briefs.  And that's the process for that.

7              We'll hold a teleconference to discuss those

8    letters on the 23rd day of March at 9:30.

9              You're in California.  That's going to be

10   a little early for you.  Why don't we set that for --

11   Gail, would you check 11:00 o'clock on the 23rd of

12   March?

13             DEPUTY CLERK:  Okay.

14             THE COURT:  Mr. MacPherson, have you been hearing

15   all of this?

16             MR. MacPHERSON:  Yes.  I can hear this, your

17   Honor, very well.

18             THE COURT:  All right.

19             MR. MacPHERSON:  Except for the last letter

20   brief.  Your voice faded.

21             THE COURT:  I'm sorry.  March 23.

22             MR. MacPHERSON:  The one before that.  By March

23   8th you submit letters, and then that whole sentence got

24   missed.

25             THE COURT:  And then we'll talk about them on the

1  23rd of March.

2          MR. MacPHERSON:  Those letters, though, to

3  summarize the basis for summary judgment motions?

4          THE COURT:  Yes.  Whichever party is advancing

5  the proposition that they should be permitted to file,

6  and certainly there's the opportunity to resist that

7  proposition.

8          MR. MacPHERSON:  Yes.  They're just the outline

9  of what would be presented.

10          THE COURT:  I call them letter briefs; you can

11  call them whatever.  But that's right.  It's not the brief

12  itself.

13          MR. MacPHERSON:  Okay.

14          MR. HOFFMAN:  Your Honor, on that, would

15  there be one letter from the person advancing it and also

16  a letter opposing it?

17          THE COURT:  Yes.

18          MR. HOFFMAN:  Okay.  So we'd have to work that

19  out?

20          THE COURT:  Yes.  You need to work out an

21  exchange schedule on your own for that process.

22          MR. HOFFMAN:  Okay.

23          THE COURT:  All I'm concerned about is that they

24  get here by the 8th.

25          The dispositive deadline will be April

1    the 2nd.  You should anticipate that I will rule

2    one way or the other on the teleconference.  There's

3    not going to be a post- teleconference writing unless

4    there's something that really has me scratching my head.

5    But I will get to you within a few days, even if that's

6    the case.

7             By the way, you'll get your Markman ruling

8    within -- no later than 30 days after the hearing.  And

9    the reason that I can promise you that is because

10   you're not going to get a well-analyzed opinion.  What

11   I'm going to do is issue an order, and it's the process

12   that I employ until the Federal Circuit tells me to stop

13   doing it because, as you know, there's de novo review

14   above and I have been for the last almost five years

15   now informally polling patent counsel and they're

16   telling me that they really are not interested in

17   what I have to say.  That's fine.  They were very nice

18   about it.

19             But I really -- at this stage -- go ahead,

20   Ms. Corbin.

21             MS. CORBIN:  That's your practice and that's

22   fine.  I'd be surprised because that wouldn't be my opinion

23   about the reasoning of the Court.

24             THE COURT:  I know some of the judges on the

25   Federal Circuit do want to hear from us.  I feel that those

1   who don't haven't said it.  I wonder whether, in terms of

2   trying to get decisions to our litigants, it seems to me to

3   make sense.  What you really are interested in is how I'm

4   going to instruct that jury.

5               MR. HOFFMAN:  Yes.

6               THE COURT:  So that's my practice at this

7   point.

8               Let's see.  So opening expert reports will

9   be due the 22nd of March; rebuttals a month later, on

10  the 23rd of April; and the cutoff for expert discovery

11  will be June 23.

12              Does that give you adequate time to complete

13  that process?

14              MS. CORBIN:  Yes.  Yes, your Honor.

15              THE COURT:  Okay.  Now, I also convene, in

16  patent cases and other complex civil cases, getting you on

17  the phone not long before the pretrial conference.

18              On June 30 will be this particular -- I'm

19  sorry -- July the 7th at 9:30.  I'm going to call it

20  a Daubert/status conference, and I say Daubert because

21  I want the opportunity to discuss with you in advance of

22  the pretrial conference any Daubert issues that you

23  think might be extant, and we can do that at the

24  teleconference or we could call it a Daubert/motion

25  in limine conference.  Whatever you want -- however you

1   want to style it is fine.

2                  I want you to meet and confer on that by the

3   30th of June and then get me an agenda by July 2nd.   It

4   shouldn't take you long to file an agenda over here by July

5   2nd as to the Daubert issues and/or in limine issues that we

6   need to talk about.

7                  Of course, you will have the opportunity,

8   and that's provided in my schedule, in my pretrial

9   order form.   The process for preparing and filing

10  motions in limine is set out.

11                 It essentially requires -- I limit you

12  to ten a side and it requires you to get them in, I

13  think it's ten days in advance of the pretrial order

14  due date, or is it the pretrial conference?   Pretrial

15  order due date.

16                 MR. HOFFMAN:   Your Honor, if I can just

17  back up for one second?

18                 THE COURT:   Yes.

19                 MR. HOFFMAN:   The conference on July 7th I

20  believe you had indicated was at 9:30?

21                 THE COURT:   Yes.   Let's back that up again to

22  11:00 o'clock.   I will put that on at 11:00 o'clock.   Thank

23  you.

24                 MR. DiGIOVANNI:   Your Honor, with regard to

25  the agenda, do you just want simple, one sentence, or do

1    you want argument?

2            THE COURT:   I don't really want argument

3    on it.

4            That reminds me.  Let's just chat for a

5    moment about how you get discovery disputes before

6    the Court.

7            I've now adopted a process, it's a three-

8    tier process, where you initiate your complaint with the

9    Court about the other side's behavior in a telephone call to

10   Althea Brown here and she will give you a date for a

11   teleconference.

12           48 hours in advance of that date, submit to

13   me a non-argumentative, no more than two-page agenda letter.

14   I really do mean non-argumentative.  And we'll get on the

15   phone and talk about it.

16           And if it's -- it's the type of matter

17   that it seems to me needs some additional elaboration,

18   I will let you write a two-page letter, an opening,

19   answer and reply, or release you immediately to engage in

20   motions practice.  Probably not going to happen, motions

21   practice.  But those three tiers of dispute resolution

22   are available to you.

23           I encourage you, I urge you, I implore you,

24   please try to work out your own discovery disputes.  It

25   really does require significant work, given the number of

1  patent cases, particularly patent cases that each judge in

2  this district is carrying, and given the fact that we have

3  one Magistrate Judge and she does not do discovery disputes.

4  We do our own in one form or another.

5        We each have a different process, but one form or

6  another, we do them.  So it can take up an inordinate amount

7  of the district judge's time, which I'm trying to guard

8  against, which is why I've gone to the telephone process.

9  Hopefully, there's a little trepidation in dialing that

10 phone.

11       Okay.  That's that.  I think we've accounted

12 for all of the important dates in the life of the

13 case.

14       MR. HOFFMAN:  If we could just go back to

15 the date of the Markman hearing.

16       THE COURT:  Yes.

17       DEPUTY CLERK:  Judge, it will be March 2nd at

18 9:30.

19       MR. HOFFMAN:  Thank you very much.

20       THE COURT:  Glad you reminded me of that.

21       Let's see.  Well, let's talk for a moment about,

22 or maybe more than a moment, about -- we're going to move the

23 trial date one day.  I've been advised that October 11 is

24 Columbus Day; that's a Federal holiday.

25       Now, counsel have, I think jointly suggested that

1   the Court should set aside 12 days of its calendar to try

2   this case.  Why is that?

3              Start with plaintiff.

4              MR. HOFFMAN:  Basically, your Honor, we

5   had proposed ten.  Defendants asked for more.  12.  We

6   said fine.

7              We had thought it would potentially take ten

8   trial days.  It may take less than that.

9              THE COURT:  It will.

10             MR. HOFFMAN:  In all candor.

11             MS. CORBIN:  I could live with the ten.  It just

12  seems like there's five defendants already and it's unclear,

13  if there are to be any other parties in the case, and we do

14  think there are going to be a large number of witnesses in

15  the prior art area.

16             THE COURT:  Well, it is really five defendants?

17  We have Matrox in different --

18             MS. CORBIN:  Different entities.

19             I can't answer that question, your Honor.  I

20  just know four of the Matrox entities, separate entities,

21  each one have been sued.  Whether that continues to trial, I

22  don't know.

23             THE COURT:  I understand.  I understand that,

24  whether it continues.

25             Are we going to have different Matrox personnel?

```
 1    I mean, are there really different entities?
 2                    MS. CORBIN:  Yes, there are different distinct
 3    entities.
 4                    THE COURT:  That are functioning, operating
 5    companies?
 6                    MS. CORBIN:  Yes.  As I understand it, not
 7    all of those entities, and I didn't write down, so I
 8    can't indicate right now, some of those entities are not
 9    involved and do not use design synthesis tools in their
10    business, and so I don't really know at this point in time
11    why they're in this case.
12                    THE COURT:  Okay.  Well, when you say a large
13    number of witnesses, and I think you were specific to say
14    prior art witnesses, what do you mean?  What do you
15    anticipate?
16                    MS. CORBIN:  Well --
17                    THE COURT:  Or --
18                    MS. CORBIN:  You mean number?
19                    THE COURT:  Yes.
20                    MS. CORBIN:  Well, there were at least
21    six, seven, possibly eight venues in the early eighties,
22    where this type of design synthesis software was being
23    developed.
24                    Some of those people now have found themselves,
25    a lot of them back in California, working for one of the
```

1  Synopsis competitors and/or have gone into academia and those

2  folks are found at U.C. Berkley, Stanford and the University

3  of Southern California.

4          I can't put a number on, at this point on how

5  many of those people we would find critical to be able to

6  come forward and describe, you know, their process that they

7  were engaged in at that time.

8          THE COURT:  So you base your estimate,

9  it's principally on these witnesses, the prior art

10 witnesses is what you think is going to drive, from your

11 perspective?

12         MS. CORBIN:  From the defendants' point of view,

13 I think there will be a large number of the witnesses, plus

14 if it turns out this is really about Design Compiler, you

15 know, whatever witnesses are going to be testifying as to

16 that part.

17         THE COURT:  Okay.

18         MR. HOFFMAN:  Your Honor, I guess our approach,

19 we just gave an outside estimate on the ten days.  In all

20 candor, as I indicated, I think it's probably likely to take

21 less than that.

22         THE COURT:  Yes.  I'm going to set it down for

23 seven days.

24         MS. CORBIN:  Okay.

25         THE COURT:  That will, I think, give us ample

1    time to get it done.  It will carry us over a weekend.

2    Actually two days, since we're starting on Tuesday.

3                MS. CORBIN:  What is your trial schedule, your

4    Honor?

5                THE COURT:  We start at 9:00 o'clock.  We try to

6    keep to the schedule as best we can.  We go to 1:00 for

7    lunch.  We take a morning break of 15 minutes.  We come back

8    after an hour for lunch.  Then I let the jury go at 4:30.  We

9    have another 15-minute break in the afternoon.

10               Now, theoretically, I think that gives you six

11   hours a day, but it really never works out that way.

12               MS. CORBIN:  Right.

13               THE COURT:  It's more like five and a half, five

14   and 15, somewhere in that neighborhood.  I try to keep myself

15   and everybody else as much on schedule as possible, but we

16   all know that things happen.

17               MS. CORBIN:  And is that a four-day week or

18   five-day week?

19               THE COURT:  Five-day week.

20               MS. CORBIN:  Five-day week?

21               THE COURT:  Yes.  And you'll be on timers,

22   so you'll be principally responsible for keeping your own

23   time.

24               I may this time place a limit on the openings

25   and closings.  I had a bad experience recently where I

1  just thought the openings -- they were fine openings.  It

2  was principally the closings.  They were very well done,

3  but they were just a lot longer than they needed or

4  anybody wanted, I'm sure including the defense counsel

5  actually.

6          So I'm thinking about that and we'll talk

7  about that at the pretrial conference and we'll talk

8  about -- we will have a working pretrial conference.  It

9  will, in all likelihood, take a better part of the day, so

10 you should be prepared for that.

11         Be prepared at the pretrial conference to

12 talk to me about jury instructions.  I will have read your

13 jury instructions beforehand.  I know that's the last thing

14 that counsel want to talk about at the pretrial conferences

15 is jury instructions, but they are so critical.  They are

16 critical in any case, but particularly in patent cases, and

17 they're so hard fought and it's a contentious process and I

18 can tell you now, let me preview for you, I'm going to beat

19 you up about them.  I know you don't want to agree, but

20 you're going to agree.  Believe me, you will.  We'll get to a

21 good set of jury instructions that everybody feels good about

22 so we can have a properly instructed jury, but just a preview

23 for you.

24         Let's see.  I think that, from a scheduling point

25 of view, pretty much does it.  I'm interested in

1    understanding whether there have been any efforts to settle

2    this case, any discussion along those lines, if there's an

3    interest in having this matter referred to our Magistrate

4    Judge.

5              Are you considering another ADR approach or

6    something?

7              MR. HOFFMAN:  From the plaintiff's viewpoint,

8    your Honor, we're always interested in talking about

9    settlement.  Our interest is licensing.  We're not trying to

10   stop anyone.  We're interested in licensing the patent.  So

11   we'd be willing to sit down and talk about settlement, you,

12   you know, with the defendants here.

13             THE COURT:  No proposals have been exchanged

14   yet?

15             MR. HOFFMAN:  No.

16             THE COURT:  Are businesspeople talking to one

17   another?

18             MR. HOFFMAN:  Not as of this time, your Honor,

19   but I would be more than glad to set up a meeting.

20             MS. CORBIN:  Synopsis businesspeople attempted to

21   speak with the business folks at RICO, but we have not been

22   able to move that forward.

23             MR. HOFFMAN:  Well, your Honor, Synopsis is not a

24   defendant here.  We have not made any allegations against

25   Synopsis, nor do we intend to make any allegations against

1  Synopsis.

2            MS. CORBIN:  But is it correct, the basis of the

3  infringement allegations is the compiler part that Synopsis

4  makes?

5            MR. HOFFMAN:  That is a part of it.  It's

6  the utilization of design compilers, part of the

7  basis.

8            But our interest is we are willing to sit

9  down and talk to the defendants here.

10            THE COURT:  Okay.

11            MS. CORBIN:  It does not seem likely, if that's

12  the basis of the infringement allegation, your Honor, that a

13  settlement could really move forward in the absence of

14  Synopsis.  The customers are going to be looking to Synopsis

15  if that's the basis of the infringement claim to get them out

16  of this situation and so it seems to me the real party in

17  interest is, any way you look at it, involving Synopsis in

18  terms of a settlement posture.

19            MR. HOFFMAN:  If the defendants are represented,

20  we have no objection to Synopsis being included in that

21  discussion.  But our interest is to license the users, the

22  people who actually make the semiconductors.

23            THE COURT:  Okay.  Well, let me -- go ahead.

24            MS. CORBIN:  The one other thing, your Honor, and

25  this only came to light to us at the very end of last week

1    and we were continuing to conduct our investigation, but we

2    had indicated in our status report about amending the

3    pleadings.  We will want to amend the pleadings once we've

4    lined that up to allege equitable estoppel because it is now

5    our understanding that RICO had approached Synopsis about

6    taking licenses to these patents for the Design Compiler

7    software well over a decade ago and they refused to do so at

8    that time and they dropped it and they never brought it up

9    agaom.

10           In fact, RICO and Synopsis have been business

11   parties to business deals from then till now, including, I

12   think, Ricoh is a subscriber customer, licensee under this

13   Design Compiler part.

14           So it would be these defendants' positions, once

15   they're able to fully investigate that, that any allegations

16   that are based on Design Compiler should be equitably

17   estopped.

18           THE COURT:  It does seem that Synopsis should be

19   at the table somewhere somehow.  Maybe not at this table, but

20   I will leave that to you folks.

21           I would suggest that you have me include a

22   referral in the scheduling order to the Magistrate Judge.

23   You can then contact her or she'll contact you.  She's very

24   flexible.  And she'll work with you.  If you ultimately

25   decide that you are not going to use her good offices, then

1    you don't.

2                MS. CORBIN:  Right.

3                THE COURT:  But if you decided it would benefit

4    the process, you do.

5                MS. CORBIN:  Is that a referral to be taken up at

6    a later time?

7                THE COURT:  I would include it in the scheduling

8    order.  Either you will jointly contact her or she'll reach

9    out to you.  She'll say, you know, what's the status of

10   things.  She's not going to order you to do anything at this

11   point.  You might pencil in a date or something.  Maybe you

12   don't.

13               MS. CORBIN:  Okay.

14               THE COURT:  She'll say we'll set a time and we'll

15   talk again.

16               MS. CORBIN:  Okay.

17               THE COURT:  But at some point as you move along

18   in the discovery process, it may occur to you that you want a

19   neutral to get involved.  You are not going to find a more

20   able neutral for free, for sure, but even if you paid for

21   one, you're not going to find a more able one, neutral.  She

22   deals with complex patent matters all the time.  She's a very

23   good neutral.

24               MS. CORBIN:  Yes, I've heard.

25               THE COURT:  And I would suggest that you have me

1   include it in the scheduling order.

2           MR. HOFFMAN:  We very much welcome having that,

3   your Honor.

4           THE COURT:  My form of order is around.   In

5   fact, we're getting ready to put another one on the

6   web specific to patents, but there's something around

7   somewhere.

8           DEPUTY CLERK:  It's on the web now.

9           THE COURT:  It just went up, I guess.  That's

10  good.

11          Counsel, is there anything else we need to talk

12  about?

13          MR. HOFFMAN:  I guess the only other question we

14  would have, your Honor, is on the interrogatories.  Under

15  your rules we understand it's 50 interrogatories.  We would

16  just ask that that be made per side.

17          THE COURT:  I generally don't get involved.   I

18  really don't.  I think the Federal Rules are more than

19  adequate to go over the discovery process.

20          MR. HOFFMAN:  Fine, your Honor.

21          MS. CORBIN:  I guess the only other thing,

22  your Honor, the defense proposal had been, and I guess

23  a letter came to the Court because I didn't understand

24  that we weren't in agreement.  The defendants had originally

25  proposed fewer deposition hours.  Plaintiffs had wanted

1  240.

2         Part of our agreement to that, evidently, we

3  didn't have a meeting of the minds minds and I was unaware

4  of it, on our side we expect we're going to have to take

5  depositions in Japan through a translator.  My experience, it

6  has been customary to have those hours count.  You can't move

7  any faster if you are translating.

8         THE COURT:  Sounds reasonable.

9         MR. HOFFMAN:  Your Honor, I think there

10  will be very few depositions in Japan, but be that as it

11  may, they had raised this issue and that was part of the

12  reason why we changed it from 160 to 240.  We took that

13  into account.

14         If there's more time, I will work that out

15  with Ms. Corbin.  I think that's an issue we can resolve

16  later.

17         THE COURT:  Are you satisfied?

18         MS. CORBIN:  To the extent if I need it, I'm

19  going to be able to count those as 30 minutes instead of --

20  every hour as 30 minutes, that's fine.

21         MR. HOFFMAN:  Your Honor, I would hope that

22  neither side would say it's 240 hours, you cannot have 241 or

23  242.  If anyone needs some additional time, I would think

24  that's something we'll be able to work out.

25         THE COURT:  I guess that should be adequate.

1           MS. CORBIN:  We'll work it out.

2           THE COURT:  All right.  I hope you don't need to

3    resort to me.  If there's an emergency, you can dial up

4    chambers if I'm available and you have a discovery dispute.

5    If you are in a deposition or something, I have been known to

6    get on the phone.  I don't like to do it, but in emergencies,

7    where you're really at an impasse, I will.  But I will yell

8    at you first.  Okay.

9           MR. HOFFMAN:  Fair enough.

10          THE COURT:  All right, counsel.  Have a good

11   weekend.

12          MR. MacPHERSON:  Thank you, your Honor.

13          (Conference concluded at 2:45 p.m.)

14                      -  -  -

15

16

17

18

19

20

21

22

23

24

25