DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

*2101 L Street NW • Washington, DC 20037-1526*
*Tel (202) 785-9700 • Fax (202) 887-0689*

*Writer's Direct Dial: (212) 429-2184*
*E-Mail Address: BrothersK@dsmo.com*

July 23, 2004

**VIA E-FILE and VIA FACSIMILE**

Hon. Edward M. Chen
United States District Court
Northern District of California
450 Golden Gate Avenue
San Francisco, CA  94102

> Re:  Ricoh Co., Ltd. v. Aeroflex, et al. – No. C-03-4669 MJJ (EMC)
>      Synopsys, Inc., v. Ricoh Co., Ltd. – No. C-03-2289 MJJ (EMC)

Dear Magistrate Chen:

We represent Ricoh in the above-captioned actions, and submit this response to the July 22, 2004 letter submitted by counsel for Synopsys, the Aeroflex et al. defendants, and Dr. Thaddeus J. Kowalski (collectively, "Defendants"). We regret that Defendants refused to cooperate in the submission of a joint letter.[1]

Defendants' request for a protective order should be denied for the following reasons:

Under the pretrial schedule (D.I. 191)[2] and Patent L.R. 4-4, discovery relating to claim construction issues, including expert depositions, must be completed by August 12, 2004. Defendants have made clear that their claim construction theories are dependent upon extensive extrinsic evidence, and especially the declaration of their testifying expert, Dr. Kowalski. Defendants' counsel had first suggested on June 14, 2004, that they may rely on Dr. Kowalski's testimony. During a meet and confer on July 8, 2004, concerning the joint claim construction submission, counsel for Defendants made clear that they were going to submit a report from Dr. Kowalski with their portion of the joint claim construction, then due on July 13. During that July 8 conference, Defendants' counsel agreed to accept service of a subpoena directed to Dr. Kowalski, and the subpoena was served the next day. (Ex. 2, Weinstein 7/9/04 letter to Moller.)

---

[1]  Defendants originally proposed a joint submission today (Friday, July 23, 2004) and proposed to provide Ricoh with their written statement on Wednesday (see Def. Ex. D), but failed to send their draft as promised. See Ex. 1, Brothers 7/22/04 letter to Mavrakakis and Whitt. During the meet and confer on Thursday, July 22, Defendants changed their position, insisted the letter be filed that day, and demanded Ricoh's written position within three hours and without seeing Defendants' written statement. When Ricoh refused to agree to this unreasonable demand, Defendants' counsel stated they would not comply with the Court's instructions that the parties submit a joint letter, and would submit an *ex parte* letter. They also refused to e-mail the final version of their letter and exhibits to Ricoh's counsel.

[2]  All Docket Item cites are to Ricoh Co., Ltd. v. Aeroflex, et al. – No. C-03-4669 MJJ (EMC).

*1177 Avenue of the Americas • New York, NY 10036-2714*
*Tel (212) 835-1400 • Fax (212) 997-9880*
*www.DicksteinShapiro.com*

1798976 v1; 12K3K01!.DOC

Hon. Edward M. Chen
July 23, 2004
Page 2

Counsel also agreed to make Dr. Kowalski available for a deposition on August 11, 2004. (*Id.*)[3]
On July 16, Defendants filed and served a 25 page expert declaration from Dr. Kowalski.
(Ex. 3.) The Kowalski declaration comprises 73 numbered paragraphs and attaches 36 exhibits
numbering more than 700 pages. All of these documents have been placed before the Court and
incorporated into Defendants' claim constructions and hence have been placed in issue by the
Defendants. (See D.I. 220-226.)

     Defendants do not dispute that, under Fed. R. Civ. P. 26(b)(4), Ricoh is entitled to
depose Dr. Kowalski. As of July 8, all parties understood that an expert -- such as Dr. Kowalski
-- would be obligated to produce his relevant documents and sit for a deposition. Indeed,
Defendants concede that at that time they "would not have opposed the taking of expert
discovery for the purposed of claim construction." (Def. 7/22/04 letter to Court, D.I. 227, at p.
2.)

     Defendants apparently now believe that they should not be obligated to comply with
the subpoena, or with Fed. R. Civ. P. 26(b)(4), or with patent L.R. 4-4, because, during a
telephone hearing with Judge Jenkins on July 14, the Court said that, unless it later ruled
otherwise, the Court would not receive extrinsic evidence to construe the claims of the patent-in-
suit. (Ex. 4, 7/14/04 Hearing Tr., at 8 ("I have never and don't anticipate having live witness
testimony from any expert at a claims construction hearing."); *id.* at 12 ("I'm not going to
receive any expert testimony on construction of these terms.").) Notably, Defendants do not cite,
quote, or provide the transcript of that hearing to the Court, because it directly contradicts their
arguments.

     During the hearing, when Defendants insisted on submitting expert testimony in spite
of the Court's statements, Judge Jenkins explained that, if a party submitted extrinsic evidence
such as an expert declaration, then expert depositions should be taken prior to the claim
construction hearing, and the Court would thereafter decide whether it would rely on any
extrinsic evidence:

> [I]f you feel that there's going to be a need for expert testimony, you disclose the
> experts who are going to testify with respect to the claims in dispute. You normally
> take those depositions prior in time so each side has had a chance to examine those
> experts. Then you submit declarations, written declarations, which I then will
> determine whether I can consider or not, but no live testimony, no live examination.
> That's done in depositions prior in time. . . . It's not efficient to take live witness
> testimony in a claims construction hearing when you folks can do that up front. . . .
> We wouldn't bring those people in for live witness testimony on top of what they've
> already put in their reports. I just don't know whether that's going to be needed not,
> you know. It's difficult for me to tell you that, but I can tell you, despite what the

---

[3] Defendants claim that the Kowalski subpoena is improper because of the noticed location the deposition.
Defendants never conditioned their acceptance of the subpoena upon the location of the deposition. As reflected in
the cover letter, counsel for the parties never discussed a location for the deposition, and Ricoh noticed the
deposition in Dr. Kowalski's home district in New Jersey. *See* Ex. 2.

Hon. Edward M. Chen
July 23, 2004
Page 3

local rule says, that the exchange of expert opinions and reports and depositions ought to occur prior in time.

(Ex. 4, 7/14/04 Hearing Tr., at p. 8-11.) Defendants insisted that they be permitted to submit their extrinsic evidence "to make my record", and the Court responded: "You are the one that's setting this up by doing what you think the law says you have a right do and you need to do." (*Id.* at p. 14.) When Defendants' counsel repeatedly stated its intention to file extrinsic evidence, the Court responded: "I'm not going to consider it in the first instance, but you can submit it." (*Id.* at 15.) Contrary to Defendants' letter, Judge Jenkins in no way intimated that, if Defendants insisted on submitting expert testimony, Ricoh would be precluded from taking appropriate discovery contemplated by Fed. R. Civ. P. 26(b)(4) and Patent L.R. 4-4. Instead, the Court repeatedly stated that, if a party elected to rely upon extrinsic expert evidence for claim construction, then discovery of any such expert should be done prior to the Markman hearing.

Based upon Judge Jenkins' ruling, Ricoh did not submit any extrinsic evidence with its portion of the joint claim construction statement (D.I. 220), which was filed on July 16. Defendants, however, decided to disregard the Court's guidance, and they submitted to the Court and repeatedly relied upon Dr. Kowalski's declaration as well as a large volume of additional extrinsic evidence. (D.I. 221-226) Ricoh expressly reserved its right to seek discovery of this extrinsic evidence. (D.I. 220, at p. 2)[4]

Defendants made a deliberate decision to file and rely upon an expert report knowing Judge Jenkins would allow expert discovery; yet now having put the materials before the Court, they seek to preclude discovery on the expert report that is the lynchpin of their claim construction theories. Such discovery is expressly contemplated in the pretrial schedule and Patent Local Rules. Before Defendants filed and served the Kowalski declaration and other extrinsic evidence, Judge Jenkins placed them on notice that if they filed such extrinsic evidence, the Court would require expert discovery. (Ex. 4, at pp. 8-12.) Before Defendants served the extrinsic evidence, Ricoh told them that if they submitted such extrinsic evidence, Ricoh would seek appropriate discovery. (D.I. 220, at p. 2.) Having had fair notice, Defendants chose to proceed. Now having submitted their expert report to the Court, Defendants cannot shield their expert from discovery. The Defendants made their decision and should live with the consequences.

Defendants' assertion that permitting discovery at this stage would be improper because it may expose their expert to multiple depositions is baseless, for at least six reasons. First, Defendants have placed at issue the opinions of Dr. Kowalski, and under Judge Jenkins' procedures, Ricoh is entitled to take his deposition. Second, Ricoh does not seek multiple depositions of Dr. Kowalski, but one deposition. Third, there would be no basis for a subsequent deposition unless Dr. Kowalski submitted a subsequent expert report, so Defendants control the process. Fourth, there is little unexpected burden associated with expert depositions, as they are the expected result of expert reports. Fifth, deferring the deposition can only serve to delay

---

[4] If the Court decides that it will consider Defendants' extrinsic evidence, then Ricoh reserves its right to submit its own expert declaration and other extrinsic evidence.

Hon. Edward M. Chen
July 23, 2004
Page 4

unnecessarily the claim construction hearing. Finally, any additional expert discovery relating to claims construction would be under the direct guidance of the Court.

Not only is Defendants' motion inconsistent with Rule 26(b)(4) and Patent L.R. 4-4, but it is contrary to the guidance of this Court's June 17 Order, which compelled discovery on the claim terms at issue:

> At this juncture, unless and until the parties reach an agreement to take these claims out of the litigation, this Court must assume that they will be subject to the claims construction, and hence the work in preparation therefore cannot be delayed lest the entire case schedule be disrupted.

(6/17/04 Order, D.I. 204, at p. 2, lines 7-10.) If anything, providing discovery of Dr. Kowalski and the extrinsic evidence is even more compelling, because the parties have narrowed their focus to claims 13-17 of the '432 patent, which is the exclusive focus of Dr. Kowalski's report, and because Judge Jenkins has ordered that such discovery be completed prior to the Markman hearing.

Also improper is Defendants' attempt to get a second bite at the apple by refusing to serve any objections to Ricoh's subpoena, and reserving the right to seek yet another protective order on that basis. Defendants' objections were due by no later than today, July 23, but they have failed to object. Defendants could have submitted any objections prior to presenting the issue to the Court, and their failure to make any objections constitutes a waiver of those objections. If this Court sustains the subpoena, Defendants should be obligated to produce all documents related to the report, including all communications with Defendants and their counsel. In short, having elected to place Dr. Kowalski's opinions at issue and submit them to the Court, Defendants cannot preclude Ricoh from obtaining expert discovery as contemplated by the Federal and Patent Local Rules.

We are available for a telephonic hearing at the Court's pleasure.

Very truly yours,

DICKSTEIN SHAPIRO MORIN &
OSHINSKY

By:  /s/ Kenneth W. Brothers
      Gary M. Hoffman
      Kenneth W. Brothers (202) 429-2184
      Attorneys for Ricoh Company, Ltd.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| RICOH COMPANY, LTD., | ) |
|       Plaintiff, | )   **CASE NO. C-03-4669-MJJ (EMC)** |
| | ) |
|   vs. | )   **CASE NO. C-03-2289-MJJ (EMC)** |
| | ) |
| AEROFLEX INCORPORATED, et al., | ) |
|       Defendants | ) |
| | ) |
| SYNOPSYS, INC., | ) |
|       Plaintiff, | )   **[PROPOSED] ORDER REGARDING** |
| | )   **SUBPOENA ON DR. THADDEUS** |
|   vs. | )   **KOWALSKI** |
| | ) |
| RICOH COMPANY, LTD., | ) |
|       Defendant | ) |

Upon consideration of the Parties' respective letters dated July 22 and 23, 2004, and the telephonic status conference conducted on _____, it is HEREBY ORDERED:

THAT Dr. Kowalski shall produce documents and be deposed in accordance with the subpoena served by Ricoh on 7/9/04.

IT IS SO ORDERED.

Dated: _____

_____
HON. EDWARD M. CHEN

DICKSTEIN
SHAPIRO
MORIN &
OSHINSKY
LLP

1799513 v1; 12K$H01!.DOC

EXHIBIT 1

DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

2101 L Street NW • Washington, DC 20037-1526
Tel (202) 785-9700 • Fax (202) 887-0689
Writer's Direct Dial: (202) 429-2184
E-Mail Address: BrothersK@dsmo.com

July 22, 2004

**BY FACSIMILE AND U.S. MAIL**
<u>(650) 463-8400</u>

Tom Mavrakakis, Esq.
Jayna R. Whitt, Esq.
Howrey Simon Arnold & White LLP
301 Ravenswood Ave.
Menlo Park, CA  94025

Re:    *Synopsys, Inc. v. Ricoh Company, Ltd.*
       *Ricoh Company, Ltd v. Aeroflex Inc., et al.*
       Our Ref.:  R2180.0171

Dear Counsel:

        We are in receipt of Ms. Whitt's letter of July 21, 2004, to Mike Weinstein, which arrived yesterday evening after business hours in Washington, D.C.  We are further advised that Ms. Whitt left a voicemail for Mr. Weinstein sometime after 7 p.m. yesterday evening.  Both of your communications anticipated a response 'that afternoon.'  Mr. Weinstein presently is out of the office.  Ms. Whitt's letter and phone call continues an unfortunate practice by your office of attempting to take advantage of the time difference between the West and East coasts.

        Magistrate Judge Chen has directed the parties to have a verbal meet and confer before presenting him with discovery disputes, and no such meet and confer has occurred, as Ms. Whitt concedes in her letter.  We do not intend to disregard the Court's instructions, as you demand that we do.  We understand that Ms. Whitt is away from her office today and tomorrow and in light of that, we are agreeable to having a meet and confer at any reasonable time today or tomorrow between 9:30 a.m. and 5 p.m. ET, upon 2 hours advance notice.  Please call my direct line at 202-429-2184.

        We note that the return date for the documents is scheduled for July 30, and the agreed-upon date for the deposition is August 11, so we do not agree that a letter must be sent to Judge Chen by tomorrow.  If the letter is submitted on Monday or Tuesday, it should provide sufficient time for the Court to hear and resolve the matter.

        We disagree on your proposed timing and conditions for the submission of the joint letter.  In any event, you have failed to meet your own schedule, for you did not send us a proposed draft last night as promised.  As we have already advised you, once we receive your proposed draft, we will quickly respond, but until we see your draft we cannot agree to any artificial (and prejudicial) deadlines.  We should also continue to honor the parties' past practice of letting all parties review and respond to

*1177 Avenue of the Americas • New York, NY 10036-2714*
*Tel (212) 835-1400 • Fax (212) 997-9880*
*www.DicksteinShapiro.com*

Tom Mavrakakis, Esq.
Jayna R. Whitt, Esq.
July 22, 2004
Page 2

any additional comments or arguments from the other side.  That past practice is in fact effectively dictated by Judge Chen's direction to present the parties' positions only once and without any provision for a "rely brief".  If you elect to unilaterally submit your own letter, and disregard the Court's requirements and the parties' past practices , we cannot prevent it, but will advise the Court of your sharp practice.

Sincerely,

Kenneth W. Brothers

KWB/edb
Enclosure

cc:    Gary Hoffman, Esq.
       Edward Meilman, Esq.
       Michael A. Weinstein, Esq.
       Jeffrey Demain, Esq.

**EXHIBIT 2**

D I C K S T E I N   S H A P I R O   M O R I N   & O S H I N S K Y   L L P

2101 L Street NW • Washington, DC 20037-1526
Tel (202) 785-9700 • Fax (202) 887-0689
Writer's Direct Dial: (202) 828-4821
E-Mail Address: WeinsteinM@dsmo.com

July 9, 2004

**Via E-Mail and Fed-Ex**

Erik Moller, Esq.
Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA  94025-3434

      RE:    *Ricoh v. Aeroflex*
              *Synopsys v. Ricoh*
              Your Ref.:  06816.0060.000000
              Our Ref.:  R2180.0171

Dear Erik:

        Pursuant to your conversation with Ken Brothers yesterday, enclosed please find a copy of the Notice of Deposition and Production of documents for Dr. Thaddeus Kowalski.  You stated that you would accept service of the subpoena on his behalf.

        We have noticed the deposition for Newark but would prefer to hold in our New York offices.  Please let us know if that is acceptable.

                           Very truly yours,

                           Michael A. Weinstein

cc:   Gary Hoffman, Esq.
       Edward A. Meilman, Esq.
       Kenneth Brothers, Esq.
       Jeffrey Demain, Esq.

1177 Avenue of the Americas • New York, NY 10036-2714
Tel (212) 835-1400 • Fax (212) 997-9880
www.DicksteinShapiro.com

EXHIBIT 3

1  Teresa M. Corbin (SBN 132360)
   Christopher Kelley (SBN 166608)
2  Thomas C. Mavrakakis (SBN 147674)
   Erik K. Moller (SBN 177927)
3  HOWREY SIMON ARNOLD & WHITE, LLP
   301 Ravenswood Avenue
4  Menlo Park, CA 94025
   Telephone: (650) 463-8100
5  Facsimile: (650) 463-8400

6  Attorneys for Defendants AEROFLEX INCORPORATED, et al.
   and SYNOPSYS, INC.

7

8                UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10                 SAN FRANCISCO DIVISION

11  RICOH COMPANY, LTD.,                 ) Case No. CV 03-04669 MJJ (EMC)
            Plaintiffs,                  )
12                                       )
                                         )
13          v.                           )
                                         )
14  AEROFLEX INCORPORATED, AEROFLEX      )
    COLORADO SPRINGS, AMI                )
15  SEMICONDUCTOR, INC., MATROX          )
    ELECTRONIC SYSTESM, LTD., MATROX     )
16  GRAPHICS, INC., MATROX               )
    INTERNATIONAL CORP., and MATROX      )
17  TECH, INC.,                          )
            Defendants.                  )
                                         )
18  ─────────────────────────────────    )
                                         )
19  SYNOPSYS, INC.,                      ) Case No. CV-03-02289 MJJ (EMC)
            Plaintiff,                   )
20                                       )
                                         )
21          vs.                          ) **DECLARATION AND SUMMARY OF**
                                         ) **OPINIONS OF DR. THADDEUS J.**
22  RICOH COMPANY, LTD.,                 ) **KOWALSKI ON CONSTRUCTION OF**
    a Japanese corporation,              ) **DISPUTED CLAIM TERMS OF UNITED**
            Defendant.                   ) **STATES PATENT NO. 4,922,432**
23                                       )
                                         )
24

25

26

27

28

HOWREY
SIMON
ARNOLD &
WHITE

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)
Declaration and Summary of Opinions of Dr. Thaddeus

1
2

**DECLARATION AND SUMMARY OF OPINIONS OF DR. THADDEUS J. KOWALSKI
ON CONSTRUCTION OF DISPUTED CLAIM TERMS
OF UNITED STATES PATENT NO. 4,922,432**

3    I.    **INTRODUCTION AND EXPERT QUALIFICATIONS**

4        1.    My name is Thaddeus J. Kowalski, Ph.D. I have prepared this report in connection with

5    my role as an expert witness on behalf of Synopsys, Inc. and Aeroflex, Inc., Aeroflex Colorado

6    Springs, Inc., AMI Semiconductor Inc., Matrox Electronic Systems, Ltd., Matrox Graphics Inc.,

7    Matrox International Corp., and Matrox Tech, Inc. in Case Nos. C-03-2289-MJJ and C-03-4669-MJJ

8    (collectively "Synopsys and Defendants") regarding United States Patent No. 4,922,432 ("the '432

9    patent"). I have summarized in this section my educational background, career history, publications,

10   and other pertinent qualifications. A copy of my current resume is also attached as Attachment 1 to

11   Exhibit A to the Joint Claim Construction and Prehearing Statement.[1]

12       2.    I am the owner of Software Practices and Technology, LLC, a premier provider of

13   technology evaluations, merger and acquisition evaluations, business turnarounds, business and

14   technology strategy, and software and process development. Previously, I was the Vice President and

15   Chief Technology Officer for Advanced Real-Time Communications Architecture and Strategy at

16   AT&T Labs. I was responsible for incubation of new business services. While at AT&T, I led R&D

17   efforts in support of numerous business and consumer initiatives.

18       3.    I hold a master's degree in computer engineering as well as a doctorate in electrical

19   engineering from Carnegie Mellon University. I authored a book on design automation, authored a

20   book on rule-based programming, filed two dozen significant patents, published almost a hundred

21   journal articles, and have given over two hundred technical presentations. As a researcher in Bell

22   Telephone Laboratories I made significant contributions in the areas of artificial intelligence, operating

23   systems, computer-aided design, programming and text-processing environments, speech processing,

24   and real-time systems. I am also a member of the "Vulcans" engineering honor-service society, Eta

25   Kappa Nu, and Phi Beta Kappa.

26

27   _____
     [1] Referenced attachments are attached to Exhibit A of the Joint Claim Construction and Prehearing Statement.

28

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

2

HOWREY
SIMON
ARNOLD &
WHITE

1          4.       For more than 15 years, from about 1980 to 1996, I was involved in the field of

2    computer-aided design of integrated circuits. During those years I spent significant time in both the

3    commercial research and academic environments. While I worked at Bell Telephone Laboratories I

4    was also a Ph.D. student at Carnegie-Mellon University. Bell Telephone Laboratories is known

5    through out the world for its groundbreaking work in computer-aided and VLSI design. Carnegie-

6    Mellon was one of the two best Universities in the country in artificial intelligence and computer-aided

7    design. My thesis work involved using rule-based expert system techniques to create a seminal expert

8    system that took an algorithmic description using hardware description languages (HDLs) and created

9    VLSI chips. After completing my thesis, I broadened and extended that work for nearly 10 years at

10   Bell Telephone Laboratories. My work was known worldwide and called the Design Automation

11   Assistant. This worldwide reputation in computer-aided design and verification led to the supervision

12   of six Ph.D. students in four countries. In addition to my thesis and about a hundred journal articles, I

13   published ``An Artificial Intelligence Approach to VLSI Design,'' which was reprinted four times. I

14   also coauthored a book on advanced rule-based programming techniques entitled ``Rule Based

15   Programming.''

16          5.       Through this experience, as detailed above and as set forth in my resume I have

17   acquired expertise in the areas of the creation of computer-aided design tools to assist in the design of

18   integrated circuits and rule-based expert systems.

19   II.     **BACKGROUND TECHNOLOGY**

20          6.       I expect to provide background testimony regarding the state of the art of computer-

21   aided design tools for designing integrated circuits using knowledge-based expert systems.

22          7.       The processes of designing and manufacturing application specific integrate circuits

23   (ASIC) are distinct processes that are both broad and complex. To make it easier to understand and

24   give background, I will provide a description of the steps and processes to provide a helpful context. It

25   is also my understanding from Synopsys' and Defendants' litigation counsel that Ricoh is claiming that

26   the computer-aided design processes of the '432 patent are steps in manufacturing ASICs. In my

27   expert opinion this is incorrect. Dr. Kobayashi, in a subsequent article, also has recognized that the

28

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)                    3
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

HOWREY
SIMON
ARNOLD &
WHITE

1 process of designing ASICs is separate from the processes for manufacturing an ASIC (CAD Tool

2 Integration for ASIC Design: at 364-365 [Attachment 21]).

3    8.    I will first explore the processes of designing ASICs and then briefly outline the

4 processes of manufacturing ASICs. Designing ASICs can be described in two major steps, *i.e.*,

5 specification capture followed by design synthesis and verification.  Specification capture starts with a

6 customer's need and a set of constraints.  A designer will decide if the constraints will allow the

7 customer's need to be realized as software on a general-purpose processor or as an application specific

8 integrated circuit.  If the constraints guide the designer to an ASIC design, a designer will typically

9 codify the algorithm for the ASIC using some system to capture the operations and logical flows that

10 show how to sequence the operations and specify them.  The designer can also provide more detailed

11 data that explicitly groups a sequence of operations to individual clock cycles.  Next, the captured

12 specification is synthesized and verified during design synthesis and verification.  This step

13 encompasses all the design phases, which successively map the captured specification into the

14 photomask data.  This step can be further subdivided into system, architecture, register transfer, logic,

15 transistor, and layout levels.  As the specification is mapped through these levels, technology,

16 functional partitioning, module specification, and logic specification decisions are made.  The logic is

17 then placed and routed.  The layout information is verified for consistency, correctness, and timing.

18 The layout information is then rendered in a common physical design format so that the photomasks

19 can be manufactured.

20    9.    Before the manufacturing processes can begin a complex and costly process of creating

21 photomasks is undertaken.  This process transforms the physical design information into detailed

22 instructions for the machine that creates the areas of light and dark on the photomasks.  The

23 photomasks are used over and over again in the manufacturing processes to create the transistor parts,

24 circuit elements, insulating layers, and metallization paths necessary to fabricate the ASIC.

25    10.    Manufacturing ASICs can be described in two major steps, *i.e.*, fabrication and the step

26 of testing and verification.  The fabrication process can be further subdivided into hundreds of phases.

27 Highlights of these phases include:  creating transistor parts, circuits elements, insulating layers, and

28

HOWREY
SIMON
ARNOLD &
WHITE

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

4

1  metallization paths by depositing layers of metal, oxide, and polysilicon on a substrate. Other

2  highlights include thermal oxidation, lithography, etching, ion implantation, thermal redistribution,

3  insulation, and metallization. The last step of the manufacturing processes tests and verifies the chip

4  for environmental, stress, and defect problems.

5  III.    **INFORMATION CONSIDERED IN FORMING OPINIONS**

6       11.    In forming the opinions set forth in this report, I have considered and reviewed the text

7  of the '432 patent (attached to the Joint Claim Construction Statement as Attachment 2); the history of

8  the prosecution of the application that led to the issuance of the '432 patent (attached to the Joint Claim

9  Construction Statement as Attachment 3); and the prior art references that were before the patent office

10  during the prosecution of the '432 patent (a few of which are attached to the Joint Claim Construction

11  Statement as Attachments 4, 6-15, and 35. I also considered the related '016 patent (Attachment 5)

12  and '669 patent (Attachment 23), which also relate to rule-based expert systems and lists Dr.

13  Kobayashi (an inventor on the '432 patent) as an inventor. I also considered the November 1989

14  article authored by Dr. Kobayashi (Attachment 22), which in my expert opinion, describes the same

15  basic KBSC system described in the '432 patent. Finally, I have also considered the dictionaries,

16  technical dictionaries, technical treatises and textbooks, and technical articles identified in Synopsys'

17  and Defendants' portion of the Joint Claim Construction Chart. The relevant portions of these are

18  provided in Attachments 16-21 and 24-34.

19  IV.    **OPINION AS TO LEVEL OF SKILL OF ONE OF ORDINARY SKILL IN THE ART**

20       12.    It is my understanding from Synopsys' and Defendants' litigation counsel that the

21  proper construction of disputed claim terms requires determining the meaning of those disputed claim

22  terms through the eyes of a person of ordinary skill in the art, *i.e.*, the pertinent scientific area, at the

23  time the application for the '432 patent was filed, *i.e.*, January 1988. It is also my understanding from

24  Synopsys' and Defendants' litigation counsel that the level of skill of a person of skill in the art may be

25  determined based on one or more of the following factors: the educational level of the inventor; the

26  type of problems encountered in the art; prior art solutions to those problems; the rapidity with which

27

28

HOWREY
SIMON
ARNOLD &
WHITE

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

5

1  innovations are made; sophistication of the technology; and the educational level of active workers in

2  the field.

3        13.     For purposes of interpreting the claims of the '432 patent, the pertinent scientific area is

4  the creation of computer-aided design tools to assist in the design of integrated circuits. Typically,

5  individuals of ordinary skill in this field would have a college degree (B.S. or M.S.) in a discipline

6  such as Computer Science, Electrical Engineering, or Electrical and Computer Engineering and/or

7  significant hands-on experience in creating large-scale software systems for assisting in the design of

8  integrated circuits. In addition, individuals of ordinary skill in this field would have significant

9  knowledge in programming, databases, user interfaces, and some knowledge of digital integrated

10  circuit design.

11  **V.     OPINIONS AS TO MEANING OF DISPUTED CLAIM TERMS IN THE '432 PATENT**

12        14.     It is also my understanding from Synopsys' and Defendants' litigation counsel that the

13  claim terms should be construed in light of the intrinsic evidence of record, including the patent

14  specification, drawings in the patent, the prosecution (or file) history, and prior art cited in the patent or

15  file history. I have reviewed and relied upon materials listed in Section III. Using these resources, my

16  knowledge of the field into which the patented invention falls and my own familiarity with the

17  literature on computer-aided design tools to assist in the design of integrated circuits both prior to and

18  after the filing date of the patent, and my familiarity with the level of ordinary skill in the art at the

19  time the patent was filed, I have formed an opinion as to how one of ordinary skill in the art would

20  have interpreted the claim terms at the time the application for the '432 patent was filed. My opinion

21  as to each of the terms identified to me as being at least potentially in dispute by the parties to this case

22  are provided in the following paragraphs.

23        15.     The proper construction and support as to each of the terms identified to me as being at

24  least potentially in dispute by the parties to this case are provided in Synopsys' and Defendants'

25  portion of the Joint Claim Construction Chart. I arrived at these constructions through discussions

26  between Synopsys' and Defendants' litigation counsel and myself. These constructions are also

27  provided in the following paragraphs with some additional comments or discussion, where appropriate.

28

HOWREY
SIMON
ARNOLD &
WHITE

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

A.    **"A computer-aided design process for designing"**

16.    The meaning of this phrase is "a process that uses a computer for designing, as distinguished from a computer-aided manufacturing process, which uses a computer to direct and control the manufacturing process."  This definition is not only supported by the definitions for computer-aided design (CAD) and computer-aided manufacturing (CAM) provided by Synopsys and Defendants, but is also supported by the dictionary definitions provided for those terms by Ricoh (IBM Dictionary at 129-130 [Attachment 16]; IEEE Dictionary at 180 [Attachment 19]).  It is also consistent with the ordinary dictionary definitions for "designing" and "manufacturing" (Webster's Ninth New Collegiate Dictionary at 343, 725 [Attachment 20]).

17.    Neither the '432 patent's specification nor its file history alters the ordinary meaning of this phrase.  In fact, the '432 patent specification is consistent with and supports the ordinary meaning as set forth in the previous paragraph ('432 patent: 1:9-12 [Attachment 2]).

18.    I disagree with the definition proposed by Ricoh for this phrase:  "During the manufacture of a desired application specific integrated circuit (ASIC) chip that is designed to perform a specific purpose, a process of designing the desired ASIC using a computer."  In particular, I disagree with Ricoh's attempt to equate or include computer-aided design processes for designing ASIC's with manufacturing ASICs.  Designing an ASIC is a predicate process that creates the plan to make an ASIC.  Specifically, the claimed processes of the '432 patent only produces the list of the necessary parts and their required interconnections and then uses that list to pictorially represent the physical placement of these necessary parts and the routing of their required interconnections.  After additional complex processes, this information is eventually used to make the photomasks, or masks, that are used in the processes that manufacture the ASIC.  The goal of the design process is to only have to make these masks once because of their cost, which for present day ASICs is about one million dollars.  Manufacturing an ASIC entails the processes that physically implement the plan each time the ASIC is manufactured.  Unlike the design processes, which are performed once, the processes that manufacture ASICs are repeated each time an ASIC is manufactured.

HOWREY
SIMON
ARNOLD &
WHITE

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

7

1    **B.    "application specific integrated circuit"**

2    19.    The meaning of this phrase is "an interconnected miniaturized electronic circuit on a

3    single piece of semiconductor material designed to perform a specific function, as distinguished from

4    standard, general purpose integrated circuits, such as microprocessors, memory chips, etc." The '432

5    patent specifically defines this phrase as "an integrated circuit chip designed to perform a specific

6    function, as distinguished from standard, general purpose integrated circuits, such as microprocessors,

7    memory chips, etc." ('432 patent: 1:13-17 [Attachment 2]).  Synopsys' and Defendants' definition for

8    this phrase is the same but merely expands on this definition by providing a definition for "integrated

9    circuit."

10    20.    I disagree with Ricoh's definition, "an integrated circuit chip designed to perform a

11    specific function," because it fails to explicitly exclude "general purpose integrated circuits, such as

12    microprocessors, memory chips, etc." Ricoh's definition is contrary to the '432 patent, which provides

13    the ordinary meaning for this phrase ('432 patent: 1:13-17 [Attachment 2]).

14    **C.    "actions and conditions"**

15    21.    "Actions and conditions" refer to "logical operations" or more specifically "logical

16    steps and decisions."  This is consistent with the definitions for "operations" provided by Synopsys and

17    Defendants in their portion of the Joint Claim Construction Chart (IBM dictionary: at 479 [operations]

18    [Attachment 16]).  It is also consistent with the '432 patent's specification ('432 patent: 2:24-27; 4:15-

19    19; 6:3-14; 8:47-51 [Attachment 2]).  The limitation that these logical steps and decisions be

20    "represented as rectangles and diamonds in the flowchart" is dictated by the '432 patent's file history.

21    In particular, the '432 patent's file history unambiguously limits the input format to a flowchart format

22    ('432 patent's file history: April 1989 Amendment at 9, 11; October 1989 Examiner Interview

23    Summary; November 1989 Amendment at 6-7 [Attachment 3]).  This is also consistent with the fact

24    that the only adequately described input format in the '432 patent is the flowchart format ('432 patent:

25    3:50-59; 4:61-63; 7:20-23 [Attachment 2]).  Although the '432 patent mentions a list type format ('432

26    patent: 2:21-24 [Attachment 2]) and appears to show a statelist in Appendix A ('432 patent: 14:7-30

27    [Attachment 2]), there is no description explaining that format in the '432 patent.  In fact, such

28

HOWREY
SIMON
ARNOLD &
WHITE
Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

8

1  explanation for the list format was only added in the later-filed, and related, '016 patent ('016 patent:

2  7:32-9:52 [Attachment 5]).

3      D.    **"architecture independent"**

4      22.    The phrase "architecture independent" was not in the originally filed application for the

5  '432 patent. It was added to the application for the '432 patent in the abstract, the specification, and

6  the claims as part of the April 1989 Amendment in the '432 patent's file history (April 1989

7  Amendment at pages 1-8 [Attachment 3]). This phrase is vague and imprecise and does not have a

8  clear meaning. In addition, the '432 patent also does not provide a definition for this phrase.

9      23.    "Architecture independent" is narrowly defined in the '432 patent's file history by the

10  patent applicant's referencing and incorporating of the prior art '435 patent (Darringer et al.). Based

11  on the file history and the '435 patent this phrase means: "not including (*i.e.*, excluding) a register

12  transfer level (RTL) description or any other description that is hardware architecture dependent. An

13  RTL description consists of: 1) defining the inputs, outputs, and any registers of the proposed ASIC;

14  and, 2) describing for a single clock cycle of the ASIC how the ASIC outputs and any registers are set

15  according to the values of the ASIC inputs and the previous values of the registers; an RTL description

16  defines any control needed for the ASIC" ('432 patent's file history: November 1989 Amendment at 7

17  [Attachment 3]). Specifically, the prior art '435 patent does describe an input specification that

18  includes logical operations, *i.e.*, actions and conditions ('435 patent: Fig. 4; 4:26-32; 5:27-35

19  [Attachment 4]). The '432 patent claims were claimed by the patent applicant to be different from the

20  '435 patent because, among other things, the phrase "architecture independent" was added to the

21  claims. The patent applicant also stated that the prior art '435 patent's input specification included a

22  register-transfer level description and therefore, that the '435 input specification was hardware

23  architecture dependent, in contrast to the patent applicant's architecture independent specification

24  (April 1989 Amendment at 8-10, 13; November 1989 Amendment at 7 [Attachment 3]).

25      24.    In other words, the input specification of the prior art '435 patent was claimed to be

26  different from the input specification of the '432 patent because, unlike the prior art '435 patent, the

27

28

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

HOWREY
SIMON
ARNOLD &
WHITE

9

1    input specification of the '432 patent only consists of logical operations and excludes a register-

2    transfer level description.

3          25.    I disagree with Ricoh's proposed definition for "architecture independent actions and

4    conditions" and Ricoh's incorporation of that definition into the definition of the phrase "a set of

5    definitions of architecture independent actions and conditions." Ricoh's definition provides:

6    "functional or behavioral aspects of a portion of a circuit (or circuit segment) that does not imply any

7    set architecture, structure, or implementing technology." First, Ricoh's proposed definition fails to

8    acknowledge the limitations from patent applicants statements in the '432 patent's file history. As

9    discussed in Paragraphs 21 and 23, these statements limit the input specification and therefore, the

10   "actions and conditions" to a flowchart format. Second, Ricoh's proposed definition fails to recognize

11   that "architecture independent" was narrowly defined in the '432 patent's file history as excluding a

12   register-transfer level description as defined in the prior art '435 patent. Without the file history

13   statement, the phrase "architecture independent" is vague and imprecise and is not defined in the '432

14   patent. Third, Ricoh appears to equate "architecture independent" with the equally imprecise and

15   vague phrase "does not imply any set architecture, structure, or implementing technology" and which

16   is also contrary to the definition claimed in the '432 patent's file history and not supported by any

17   description in the '432 patent's specification. Finally, Ricoh's definition uses the vague and imprecise

18   phrase "functional or behavioral aspects of a portion of a circuit," which is neither consistent with nor

19   supported by the description in the '432 patent (2:24-27; 4:15-19; 6:3-14; 8:47-51 [Attachment 2]).

20         26.    I also do not agree with Ricoh's definition for the word "storing" in a number of the

21   claim steps: "placing in computer memory." In particular, "storing" means "placing data in any

22   storage device" that is accessible by the processor in the computer system (IBM Dictionary of

23   Computing at 654 [Attachment 16]).

24         E.    **"a set of definitions of architecture independent actions and conditions"**

25         27.    This entire phrase, incorporating the above definitions, means: "a set of named

26   descriptions defining the functionality and arguments for the available logical steps and decisions that

27   may be specified in the flowchart; and excluding a register transfer level description." This is

28

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

HOWREY
SIMON
ARNOLD &
WHITE

1    consistent with the '432 patent's specification ('432 patent: 4:61-63; 5:20-22; 6:3-14; 7:25-50; 8:47-

2    51[Attachment 2]).

3        28.    I disagree with Ricoh's definition for this entire claim step.  That disagreement stems

4    from Ricoh's incorporations of its definitions for "storing" and "architecture independent actions and

5    conditions" as discussed in Paragraphs 25-26.

6        F.    **"hardware cells"**

7        29.    "Hardware cells" refers to the "logic blocks for which the functional level (e.g., register

8    transfer level), logic level (e.g., flip flop and gate level), circuit level (e.g., transistor level), and layout

9    level (e.g., geometrical mask level) descriptions are all defined."  This definition is consistent with the

10   '432 patent's requirement that "previously designed, tested, and proven hardware cells" are defined in

11   the cell library ('432 patent: 5:15-20 [Attachment 2]).  The '432 specification and the other steps in

12   claims 13-17 also require that the hardware cells must be defined with the following types of

13   information: functional level, logic level, circuit level, and layout level ('432 patent: 2:34-39; 3:59-67;

14   9:24-51; 16:60-68 [Attachment 2]).

15       30.    My disagreement with Ricoh's definition for this term, "previously designed circuit

16   components or structure that have specific physical and functional characteristics used as building

17   blocks for implementing an ASIC to be manufactured" includes the use of the phrase "specific

18   physical and functional characteristics."  The '432 patent's described method for designing an

19   application integrated circuit requires the hardware cells in the cell library to be previously designed,

20   tested, and proven logic blocks ('432 patent: 5:15-20 [Attachment 2]).  This means that those hardware

21   cells must be defined with the following types of information: functional level, logic level, circuit

22   level, and layout level ('432 patent: 2:34-39; 3:59-67; 9:24-51; 16:60-68 [Attachment 2]).  I also

23   disagree with the use of the phrase "for implementing an ASIC to be manufactured."  As explained in

24   Paragraphs 16-18, the '432 patent claims 13-17 encompass computer-aided design processes for

25   designing an ASIC and not manufacturing them.

26

27

28

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)    11
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

HOWREY
SIMON
ARNOLD &
WHITE

G.    **"data describing a set of available integrated circuit hardware cells for performing the actions and conditions defined in the stored set"**

31.    This claim phrase means "a set of named integrated circuit hardware cells that includes at least one hardware cell for each stored definition that may be specified for the available logical steps and decisions; where each named hardware cell has corresponding descriptions at the functional level (e.g., register transfer level), logic level (e.g., flip-flop and gate level), circuit level (e.g., transistor level), and layout level (e.g., geometrical mask level) that are all defined." The '432 patent specification requires that there be one or more defined hardware cells corresponding to each of the stored definitions that may be specified ('432 patent: Fig. 4; 5:23-25 [Attachment 2]). The '432 specification and the other steps in claims 13-17 also require that the data describing the hardware cells must define the following types of information: functional level, logic level, circuit level, and layout level ('432 patent: 2:34-39; 3:59-67; 9:24-51; 16:60-68 [Attachment 2]).

32.    I disagree with Ricoh's proposed definition, "a library of cell information that describe hardware cells capable of performing the different architecture independent actions and conditions placed in the library of definitions," because Ricoh fails to include a requirement that there is at least one corresponding hardware cell description for each of the stored definitions that may be specified. Similar to its definition for hardware cell, Ricoh's definition again fails to specify what constitutes the "data describing" the available hardware cells as I explained in Paragraph 33.

H.    **"expert system"**

33.    The meaning of an expert system is: "software executing on a computer system that attempts to embody the knowledge of a human expert in a particular field and then uses that knowledge to simulate the reasoning of such an expert to solve problems in that field. This system is comprised of a knowledge base containing rules, working memory containing the problem description, and an inference engine. It solves problems through the selective application of the rules in the knowledge base to the problem description, as distinguished from conventional software, which uses a predefined step-by-step procedure (algorithm) to solve problems." This ordinary meaning is apparent from the texts, dictionaries, and articles from that time period as well as the Dr. Kobayashi's own

HOWREY
SIMON
ARNOLD &
WHITE

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

12

1  article from the same time his application for the '432 patent was pending (Computer Aided VLSI

2  Design Vol.1 No. 4: 351, 377-381, 383, 388-389 [Attachment 22]; '669 patent: Abstract, 1:13-16,

3  2:28-33, 4:31-62; 5:21-38, 5:58-68, 6:1-7:68, 17:62 [Attachment 23]; Understanding Expert Systems:

4  7-10, 29-30, 40, 42, 74-78, 99-110 [Attachment 24]; An Artificial Intelligence Approach To VLSI

5  Design: at 9-15 [Attachment 25]; Artificial Intelligence Terminology: at 6 [algorithm], 10 [antecedent],

6  53 [consequent], 86-87 [expert system], 127 [inference engine], 140 [knowledge based system], 204

7  [production system], 223 [rule base, rule-based system], 281 [working memory] [Attachment 26];

8  Microsoft Press Computer Dictionary: at 136 [expert system] [Attachment 27]; IBM Dictionary of

9  Computing: 591 [rule interpreter, rule-based system] [Attachment 16]; The VLSI Design Automation

10  Assistant: at 34 [Attachment 28]; A Rule-Based Logic Circuit Synthesis System for CMOS Gate

11  Arrays: at 597 [Attachment 29]; Expert Systems: A Non-Programmer's Guide: 8-10, 16 [Attachment

12  30]; Expert Systems: Tools and Applications: at 269 [Attachment 31]; Expert Systems: Principles and

13  Case Studies: at 11-12 [Attachment 32]; Knowledge-Based Systems: The View in 1986: at 16

14  [Attachment 33]).  In particular, Mr. Kobayashi's article states that there are only "two different types

15  of approaches to automatic logic synthesis: algorithmic and rule-based.  IF-THEN-type rules rather

16  than algorithmic programming languages are used in the latter approach to synthesize logic circuits"

17  (Computer Aided VLSI Design Vol.1 No. 4: at 351 [Attachment 22]).  Mr. Kobayashi also states that

18  the KBSC method described in this article and in his patent "is clearly distinguished from other logic

19  synthesis systems in terms of its flowchart input form and rule-based approach to automatic data-path

20  and control logic synthesis" (Computer Aided VLSI Design Vol.1 No. 4: at 389 [Attachment 22]).

21      34.    The '432 patent's specification and the claims also support this ordinary meaning for

22  the term expert system ('432 patent: 2:58-63; 5:6-8; 8:58-60; 10:39-11:26; 14:50-59; 15:53-

23  58[Attachment 2]).

24      35.    The '432 patent's file history and the prior art references referred to in that file history

25  also dictate this definition for the term "expert system" (April 1989 Amendment at 9-11, 15, 17;

26  October 1989 Examiner Interview Summary; November 1989 Amendment at 7, 9 [Attachment 3];

27  '435 patent: 7:32-9:35 [Attachment 4]; An Overview of Logic Synthesis Systems: at 170 [Attachment

28

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)          13
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

HOWREY
SIMON
ARNOLD &
WHITE

1  7]; The CMU Design Automation System: at 75-77 [Attachment 8]). In particular, the patent applicant

2  states numerous times and the patent examiner agreed in the '432 patent's file history that a rule-based

3  expert system was required for translating the flowchart into a netlist. I would also like to point out

4  that in the 1988 time frame the terms "expert system," "rule-based expert system," "knowledge based

5  expert system," and "production system" were all used interchangeably to refer to an "expert system"

6  as defined in Paragraph 33.

7       I.     **"knowledge base"**

8       36.     The meaning of the term "knowledge base" is "the portion of the expert system

9  containing a set of rules embodying the expert knowledge for the particular field." This ordinary

10  meaning is apparent from the texts from the 1988 time period as well as Dr. Kobayashi's own related

11  '669 patent, which was filed about the same time as his application for '432 patent was filed ('669

12  patent: Abstract [Attachment 23]).

13       37.     The '432 patent's specification and the claims also support this ordinary meaning for

14  the term knowledge base ('432 patent: 10:39-11:15 [Attachment 2]).

15       38.     The '432 patent's file history and the prior art references referred to in that file history

16  also dictate this definition for the term "knowledge base" ('432 patent's file history: April 1989

17  Amendment at 9-11, 15, 17; October 1989 Examiner Interview Summary; November 1989

18  Amendment at 7, 9 [Attachment 3]; '435 patent: 7:32-9:35 [Attachment 4]).

19       39.     I disagree with Ricoh's definition for the term "expert system knowledge base," which

20  provides: "database used to store expert knowledge of highly skilled VLSI designers." First, Ricoh's

21  definition fails to acknowledge that a knowledge base is just one portion of the rule-based expert

22  system; specifically, the portion containing the IF-THEN rules embodying the expert knowledge ('432

23  patent: 14:50-59; 15:53-58 [Attachment 2]). The file history requires that a rule-based expert system

24  be used (April 1989 Amendment at 9-11, 15, 17; October 1989 Examiner Interview Summary;

25  November 1989 Amendment at 7, 9 [Attachment 3]). Second, Ricoh's definition fails to include a

26  definition for "expert system" and all of the necessary portions required for such a system based upon

27  the ordinary meaning of "expert system" set forth in Paragraph 33. Third, Ricoh's definition is

28

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

HOWREY
SIMON
ARNOLD &
WHITE

1    inaccurate because it fails to require that the knowledge base store the expert knowledge in the form of

2    IF-THEN rules. This is contrary to the '432 patent specification, the other claims, the '432 patent's

3    file history, and the inventors own article and his related patent from that period (Computer Aided

4    VLSI Design Vol.1 No. 4: 351, 377-381, 383, 388-389 [Attachment 22]; '669 patent: Abstract, 1:13-

5    16, 2:28-33, 4:31-62; 5:21-38, 5:58-68, 6:1-7:68, 17:62 [Attachment 23]).

6        40.    Ricoh's definition also contradicts the patent applicant's own claims that the prior art

7    '435 patent (Darringer et al.) differed because it did not provide a "knowledge base of any kind" or a

8    "rule-based expert system" ('432 patent's file history: April 1989 Amendment at 9-10 [Attachment 3]).

9    The prior art '435 patent contained "expert knowledge of highly skilled VLSI designers," which is

10    referred to as transforms ('435 patent: 7:32-9:35 [Attachment 4]). Ricoh's definition is too broad

11    because it would encompass the "transforms" described in the prior art '435 patent, which the patent

12    applicant claimed were not a knowledge base.

13        J.    **"a set of rules for selecting hardware cells to perform the actions and conditions"**

14        41.    The meaning of this phrase is: "a set of rules, each having an antecedent portion (IF)

15    and a consequent portion (THEN), embodying the knowledge of expert designers for application

16    specific integrated circuits, which enables the expert system to map the specified stored definitions for

17    each logical step and decision represented in the flowchart to a corresponding stored hardware cell

18    description." This definition is consistent with the ordinary meaning of the term "rules" when

19    referring to the rules that are contained in the knowledge base of a rule-based expert system (Expert

20    Systems: A Non-Programmer's Guide: 8-10, 16 [Attachment 30]; Expert Systems: Principles and Case

21    Studies: at 11-12 [Attachment 32]). The definition is also consistent with the inventor's article

22    published while the '432 patent application was pending (Computer Aided VLSI Design Vol.1 No. 4:

23    351, 377-381, 383, 388-389 [Attachment 22]). In particular, the quote from Paragraph 33 of the Dr.

24    Kobayashi's article shows that the KBSC method described there and in the '432 patent was limited to

25    using IF-THEN type rule to codify the expert knowledge of ASIC designers.

26

27

28

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

HOWREY
SIMON
ARNOLD &
WHITE

1    42.    The definition of this phrase is also consistent with the '432 patent's specification and

2    required by the other claimed steps and other claims ('432 patent: 2:58-63; 8:20-30; 8:58-9:62; 10:39-

3    11:26; 14:50-59; 15:53-58; 16:34-65 [Attachment 2]).

4    43.    The '432 patent's file history and the prior art references, in that file history, also dictate

5    the definition for this phrase ('432 patent's file history: April 1989 Amendment at 9-11, 15, 17;

6    October 1989 Examiner Interview Summary; November 1989 Amendment at 7, 9 [Attachment 3];

7    '435 patent: 7:32-9:35 [Attachment 4]; An Overview of Logic Synthesis Systems: at 170 [Attachment

8    7]; The CMU Design Automation System: at 75-77 [Attachment 8]).

9    44.    I disagree with Ricoh's definition for this phrase: "a plurality of rules for selecting

10    among the hardware cells placed in the hardware cell library, wherein the rules comprise the expert

11    knowledge of highly skilled VLSI designers formulated as prescribed procedures." First, Ricoh's

12    definition of "rule" is contrary to the ordinary meaning for that term when applied to rule-based expert

13    systems (Expert Systems: A Non-Programmer's Guide: 8-10, 16 [Attachment 30]; Expert Systems:

14    Principles and Case Studies: at 11-12 [Attachment 32]). Second, Ricoh's definition for "rule" is also

15    inconsistent with the '432 patent's file history. Specifically, Ricoh's definition for "rule" provides:

16    "the expert knowledge of highly skilled VLSI designers formulated as prescribed procedures." This

17    contradicts patent applicant's claims that the prior art '435 patent (Darringer et al.) differed because it

18    did not provide a "knowledge base of any kind" or a "rule-based expert system" ('432 patent's file

19    history: April 1989 Amendment at 9-10 [Attachment 3]). The prior art '435 patent does contain

20    "expert knowledge of highly skilled VLSI designers formulated as prescribed procedures" ('435

21    patent: 7:32-9:35 [Attachment 4]). The '435 patent refers to the expert knowledge of highly skilled

22    VLSI designers as "transforms" and the prescribed procedures as "scenarios." Ricoh's definition is too

23    broad because it would encompass the "transforms" and "scenarios" described in the prior art '435

24    patent, which the patent applicant claimed were not a knowledge base.

25    45.    I also disagree with Ricoh's definition for this phrase because Ricoh does not require

26    that the set of "rules" be for mapping the specified stored definitions for each logical step and decision

27    represented in the flowchart to a corresponding stored hardware cell description. This is inconsistent

28

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

HOWREY
SIMON
ARNOLD &
WHITE

1    with the '432 patent specification, claim 13, and the other claims ('432 patent: 2:58-63; 8:20-30; 8:58-

2    9:62; 10:39-11:26; 14:50-59; 15:53-58; 16:34-65 [Attachment 2]).

3        K.     **"describing for a proposed application specific integrated circuit a series of**

4           **architecture independent actions and conditions"**

5      46.      The meaning of this phrase is: "the designer represents a sequence of logical steps

6    (rectangles) and decisions (diamonds), and the transitions (lines with arrows) between them in a

7    flowchart format for a proposed application specific integrated circuit." This definition is consistent

8    with the '432 patent's only adequately described input specification. This definition is dictated by the

9    claim language in claim 13 and the patent applicant's statements in the '432 patent's file history ('432

10    patent: Figs. 1a, 5, &7; 2:21-27; 3:20-22; 3:50-59; 4:5-22; 4:35-38; 7:12-23; 16:34-65 [Attachment 2];

11    '432 patent's file history: April 1989 Amendment at 9, 11; October 1989 Examiner Interview

12    Summary; November 1989 Amendment at 6-7 [Attachment 3]).

13      47.      This definition is also consistent with the dictionary definitions of the words "series,"

14    "sequence," and "describing" (Webster's Ninth New Collegiate Dictionary at 1074, 1073, 343

15    [Attachment 20]).

16      48.      I disagree with Ricoh's definition for this claim step, which provides: "a user describing

17    an input specification containing the desired functions to be performed by the designed ASIC." First,

18    Ricoh's definition incorrectly provides that the "desired functions to be performed" are contained in

19    this step. This is contrary to the '432 patent's specification and the claim language. Second, Ricoh's

20    definition ignores the words "series" and "conditions" and fails to acknowledge that this step is for

21    describing, or representing, the sequence of logical steps and decisions and the transitions between

22    them. This definition is also contrary to the '432 patent's specification and the claim language. Third,

23    Ricoh's definition does not provide for the limitation required by the '432 patent's file history that the

24    sequence of logical steps and decisions and the transitions between them must be represented or

25    described in a flowchart format ('432 patent's file history: April 1989 Amendment at 9, 11; October

26    1989 Examiner Interview Summary; November 1989 Amendment at 6-7 [Attachment 3]).

27

28

HOWREY
SIMON
ARNOLD &
WHITE

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

17

1      49.    Ricoh's definition is also incorrect because it leaves out critical information.

2  Specifically, describing the sequence of the steps and decisions is necessary for producing the control

3  signals required for the ASIC. This sequence information for the steps and decisions is critical because

4  these steps and decisions are required to be "architecture independent," excluding a register-transfer

5  level description.

6      L.      **"specifying for each described action and condition of the series one of said stored**

7              **definitions"**

8      50.    The meaning of this phrase is: "the designer assigns one definition from the set of

9  stored definitions for each of the described logical steps and decisions represented in the flowchart."

10  This definition is consistent with the '432 patent's only adequately described input format and dictated

11  by the claim language in claim 13 ('432 patent: Fig. 5; 3:20-22; 4:61-63; 5:20-22; 7:24-25; 8:23-26;

12  8:51-56 [Attachment 2]).

13      51.    I disagree with Ricoh's definition for this claim step: "specifying for each desired

14  function to be performed by the desired ASIC one of the definitions of the architecture independent

15  actions and conditions stored in the library of definitions that is associated with the desired function."

16  First, Ricoh's definition reiterates the same inaccuracies from the previous describing step.  Second,

17  Ricoh's definition contradicts the '432 patent's specification by failing to acknowledge that the

18  designer separately assigns the stored definitions to each logical step and decision.  In addition, the

19  claim language clearly provides that this assigning step must occur after the series of logical steps and

20  decisions have been described (or represented).

21      52.    I also disagree with Ricoh's definition for "specifying": "mapping or associating a

22  desired function to be performed by the manufactured ASIC with a definition from the library of

23  definitions."  The claim language and the '432 patent specification make clear that this step is

24  performed by the user assigning the stored definitions to each of the described logical steps and

25  decisions ('432 patent: Fig. 5; 3:20-22; 4:61-63; 5:20-22; 7:24-25; 8:23-26; 8:51-56 [Attachment 2]).

26  This "specifying" step is part of input specification provided by the user for the desired ASIC to be

27  designed and cannot be performed by the system described in the '432 patent.  Ricoh's definition is

28

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

HOWREY
SIMON
ARNOLD &
WHITE

1    also contrary to the dictionary definitions of "specify" and "specification" Webster's Ninth New

2    Collegiate Dictionary at 1132 [Attachment 20]).  Finally, I also disagree with Ricoh's adding of the

3    phrase "performed by a manufactured ASIC."  As explained in Paragraphs 16-18, the '432 patent

4    claims 13-17 encompass computer-aided design processes for designing an ASIC and not

5    manufacturing them.

6         M.    **"which corresponds to the desired action or condition to be performed"**

7        53.    The meaning of this phrase is: "each specified definition must correspond to the

8    intended step or decision to be performed."  This definition is consistent with the ordinary meaning of

9    the terms, the '432 patent specification, and required by the language of the claims ('432 patent: Fig. 5;

10   3:20-22; 4:61-63; 5:20-22; 7:24-25; 8:23-26; 8:51-56; 16:34-65 [Attachment 2]).

11       54.    Ricoh's definition, which is provided in Paragraph 51, is incorrect because it replaces

12   "correspond to" with the phrase "associated with."  The claim language and the '432 patent

13   specification and the ordinary meaning of these terms all require that the definitions assigned must

14   correspond to (or match) what is intended for each logical step or decision (Webster's Ninth New

15   Collegiate Dictionary at 110 [associate], 293 [correspond] [Attachment 20]).

16       N.    **"selecting from said stored data for each of the specified definitions a**

17                     **corresponding integrated circuit hardware cell for performing the desired function**

18                      **of the application specific integrated circuit"**

19       55.    The meaning of this phrase is: "mapping the specified stored definitions for each logical

20   step and decision represented in the flowchart to a corresponding stored hardware cell description."

21   This definition is consistent with the '432 patent's only adequately described system and dictated by

22   the claim language in claim 13 ('432 patent: Fig. 4; 3:16-19; 4:66-5:3; 5:22-29; 8:31-37; 8:58-60; 9:52-

23   60; 16:34-65 [Attachment 2]) '432 patent file history:  April 1989 Amendment at 10 [Attachment 3].

24

25

26

27

28

HOWREY
SIMON
ARNOLD &
WHITE

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

19

O.    **"said step of selecting a hardware cell comprising applying to the specified definition of the action or condition to be performed, a set of cell selection rules stored in said expert system knowledge base"**

56.    The meaning of this phrase is: "the mapping of the specified definitions to the stored hardware cell descriptions must be performed by an expert system having an inference engine for selectively applying a set of rules, each rule having an antecedent portion (IF) and a consequent portion (THEN), embodying the knowledge of expert designers for application specific integrated circuits, which enables the expert system to map the specified stored definitions for each logical step and decision represented in the flowchart to a corresponding stored hardware cell description." This definition is consistent with the '432 patent's only adequately described system and dictated by the claim language in claim 13 and the patent applicant's statements in the '432 patent's file history ('432 patent: Abstract; 2:58-63; 5:6-8; 8:29-37; 8:58-60; 9:8-13; 11:16-26; 16:34-65 [Attachment 2]; '432 patent's file history: April 1989 Amendment at 8-11, 17; October 1989 Examiner Interview Summary; November 1989 Amendment at 4, 6-7, 9 [Attachment 3]; '435 patent: 7:32-9:35 [Attachment 4]).

57.    Ricoh's combined definition for both N and O provides: "selecting from the plurality of hardware cells in the hardware cell library a hardware cell for performing the desired function of the desired ASIC through the application of the rules." This definition is not correct and leaves out numerous requirements. First, Ricoh's definition fails to require that the mapping be performed for "each specified definition." This is required by both the claim language itself and the '432 patent specification. Second, Ricoh's definition also fails to limit how the "mapping" is performed. Specifically, that the mapping must be accomplished using a rule-based expert system ("432 patent's file history: April Amendment at 10 [Attachment 3]). Third, Ricoh's definition is contrary to the ordinary meaning of "expert system" and the statements in the '432 patent's file history because it fails to require that the applying of the "set of cell selection rules" in the knowledge base of the rule-based expert system is performed by that rule-based expert system's inference engine (Paragraphs 33-35).

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)    20
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

HOWREY
SIMON
ARNOLD &
WHITE

P.    **"netlist"**

58.    The meaning of this phrase is: "a structural description that includes a custom controller type hardware cell and all other hardware cells required to implement the application specific integrated circuit's operations and any necessary interconnections including the necessary control and data path information for connecting the hardware cells and the controller." This definition is consistent with the '432 patent's only adequately described system as well as the claims ('432 patent: Abstract; 1:17-37; 2:39-44; 4:39-43; 5:8-12; 5:30-40; 9:62-10:9; 12:31-35; 13:55-14:3; 16:34-65 [Attachment 2]).

59.    Ricoh's definition, which is: "a description of the hardware components (and their interconnections) needed to manufacture the ASIC as used by subsequent processes, e.g., mask development, foundry, etc." is not correct.  First, Ricoh's definition fails to require that there is a description for the controller type hardware cell, which is needed to provide the control for the other needed hardware cells as required by the '432 patent specification.  Second, the '432 patent also clearly requires that the netlist must provide the structural description of the control paths and data paths that connect the controller type hardware cell and the other needed hardware cells.

60.    I also disagree with the use of the phrase "needed to manufacture the ASIC as used by subsequent processes, e.g., mask development, foundry, etc." As explained in Paragraphs 16-18, the '432 patent claims 13-17 encompass computer-aided design processes for designing an ASIC and not manufacturing them.

Q.    **"generating for the selected integrated circuit hardware cells, a netlist defining the hardware cells which are needed to perform the desired function of the integrated circuit"**

61.    The meaning of this phrase is: "producing a list of the needed hardware cells by eliminating any mapped hardware cells that are redundant or otherwise unnecessary and producing a custom controller type hardware cell for providing the needed control for those other hardware cells." This definition is consistent with the '432 patent's only adequately described system and dictated by

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

HOWREY
SIMON
ARNOLD &
WHITE

1  the claim language in claim 13 ('432 patent: Abstract; 1:17-37; 2:39-44; 4:39-43; 5:8-12; 5:30-40;

2  9:62-10:9; 13:55-14:3; 16:34-65 [Attachment 2]).

3      62.     Ricoh's definition, which is: "generating a netlist that identifies the hardware cells

4  needed to perform the function of the desired ASIC and the necessary parameters for connecting the

5  respective inputs and outputs of each hardware cell, the netlist is passed to the next subsequent step in

6  the process for manufacturing the desired ASIC" is not correct. First, contrary to the claim language,

7  "for the selected cells," Ricoh's definition fails to require that generation step must follow the prior

8  step of selecting (mapping) the hardware cell descriptions and therefore, performed using those

9  selected (mapped) hardware cell descriptions. Instead, Ricoh's definition, contrary to the claim

10  language and the '432 patent's specification, provides that the generation step is performed without

11  any connection to this prior step. Second, Ricoh's definition does not require that the controller type

12  hardware cell be generated. This is also contrary to the requirements in the '432 patent's specification

13  and the definition of "netlist" as required by the '432 patent's specification. Third, again contrary to

14  the '432 patent's specification and the claim language, Ricoh's definition fails to require that the

15  "hardware cells which are needed" are the selected (mapped) hardware cell descriptions that remain

16  after any unnecessary or redundant hardware cell descriptions have been eliminated.

17      R.     **"generating...interconnection requirements therefor"**

18      63.     The meaning of this phrase is: "producing the necessary structural control paths and

19  data paths for the needed hardware cells and the custom controller." This definition is consistent with

20  and required by the claim language and the '432 patent's specification ('432 patent: Abstract; Figs. 6

21  & 13-15; 1:17-37; 2:39-44; 3:23-25; 3:40-45; 4:39-43; 5:8-12; 5:30-40; 9:62-10:9; 13:55-14:3; 16:34-

22  65 [Attachment 2]).

23      64.     I do not agree with the Ricoh's definition and specifically the part that provides: "the

24  necessary parameters for connecting the respective inputs and outputs of each hardware cell." The

25  "interconnection requirements" for the needed hardware cells netlist must include the structural control

26  paths and data paths connecting those cells. Otherwise, it would not be a netlist as defined in

27  Paragraph 58.

28

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

HOWREY
SIMON
ARNOLD &
WHITE

S.      **"generating from the netlist the mask data required to produce an integrated**
        **circuit having the desired function"**

65.     The meaning of this phrase is: "producing, from the structural netlist, the detailed layout level geometrical information required for manufacturing the set of photomasks that are used by the processes that directly manufacture the application specific integrated circuit." This definition is consistent with the ordinary meaning of the phrase "mask data" and is also consistent with the minimal information provided by the '432 patent specification on what is meant by "mask data" ('432 patent: Abstract; Fig. 1c; 1:42-44; 1:54-58; 2:44-49; 4:44-46; 5:40-46; 14:4-6; 16:34-68 [Attachment 2]).

66.     Ricoh's definition, which is: "producing from the netlist of hardware cells to be included in the designed ASIC mask data which can be directly used by a chip foundry in the fabrication of the ASIC" is not correct. First, Ricoh's definition does not define "mask data." Second, "mask data" is only the information or data that can be used by other complex processes for making photomasks for the designed application specific integrated circuit. Mask data cannot be used to fabricate or manufacture an application specific integrated circuit.

T.      **"generating data paths for the selected integrated circuit hardware cells"**

67.     The meaning of this phrase is: "producing the necessary structural descriptions of the data paths for the selected hardware cells." This definition is consistent with the ordinary meaning and is also consistent with the '432 patent specification ("432 patent: Abstract; 2:39-40; 4:63-66; 5:6-12; 5:30-37; 6:29-31; 6:37-43; 6:50-53; 9:62-10:9; 13:55-14:3; 16:34-17:3 [Attachment 2]).

68.     Ricoh's definition, which is: "producing signal lines for carrying data to the hardware cells" is not correct. First, Ricoh's definition ignores the claim language "for the selected integrated circuit hardware cells." Second, the processes of the '432 patent are for producing design data and not the physical "signal lines for carrying data" (IEEE Standard Dictionary at 898 [signal line] [Attachment 19]). As explained in Paragraphs 16-18, the '432 patent claims 13-17 encompass computer-aided design processes for designing an ASIC and not manufacturing them.

HOWREY
SIMON
ARNOLD &
WHITE

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

1        U.     **"said step of generating data paths comprises applying to the selected cells a set of**

2               **data path rules stored in a knowledge base and generating the data paths**

3               **therefrom"**

4        69.     The meaning of this phrase is: "the generating step must be performed by at least an

5 expert system having an inference engine for selectively applying a set of rules, each having an

6 antecedent portion (IF) and a consequent portion (THEN), embodying the knowledge of expert

7 designers for application specific integrated circuits, which enables the expert system to produce the

8 necessary data paths for the mapped hardware cells." This definition is consistent with the '432

9 patent's only adequately described system and dictated by the claim language in this claim and the

10 patent applicant's statements in the '432 patent's file history ('432 patent: Abstract; 5:6-12; 9:62-10:9;

11 13:55-14:3 [Attachment 2]; '432 patent's file history: April 1989 Amendment at 9-11, 15, 17; October

12 1989 Examiner Interview Summary; November 1989 Amendment at 7, 9 [Attachment 3]; '435 patent:

13 7:32-9:35 [Attachment 4]; An Overview of Logic Synthesis Systems: at 170 [Attachment 7]; The

14 CMU Design Automation System: at 75-77 [Attachment 8]).

15        70.     Ricoh's definition provides: "wherein the step of producing signal lines for carrying

16 data comprises applying rules, which are placed in computer memory, to produce the signal lines for

17 carrying data to the hardware cells." This definition is not correct and leaves out numerous

18 requirements. First, Ricoh's definition incorporates the same incorrect statements about the "data

19 paths" from the definition of claim 15, which I explained in Paragraph 68. Second, Ricoh's definition

20 also fails to limit how the "mapping" is performed. Specifically, that the mapping must be

21 accomplished using a rule-based expert system ('432 patent's file history: April Amendment at 10

22 [Attachment 3]). Third, Ricoh's definition is contrary to the ordinary meaning of "expert system" and

23 the statements in the '432 patent's file history because it fails to require that the applying of the "set of

24 data path rules" in the knowledge base of the rule-based expert system is performed by that rule-based

25 expert system's inference engine. Fourth, Ricoh's definition fails to require that the "rules" are stored

26 in the knowledge base of the rule-based expert system.

27

28

HOWREY
SIMON
ARNOLD &
WHITE

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

24

1    V.    **"generating control paths for the selected integrated circuit hardware cells"**

2    71.    The meaning of this phrase is: "producing the necessary structural descriptions of the

3    control paths for the selected hardware cells." This definition is consistent with the ordinary meaning

4    and is also consistent with the '432 patent specification ('432 patent: Abstract; Figs. 1b & 13-15; 1:17-

5    37; 2:40-42; 3:59-65; 4:39-43; 4:63-65; 5:3-12; 5:30-36; 6:18-27; 11:49-51; 13:51-14:3 [Attachment

6    2]).

7    72.    Ricoh's definition: "producing signal lines for carrying control signals to the hardware

8    cells" is not correct. First, Ricoh's definition ignores the claim language "for the selected integrated

9    circuit hardware cells." Second, the processes of the '432 patent are for producing design data and not

10    physical "signal lines for carrying control signals." As explained in Paragraphs 16-18, the '432 patent

11    claims 13-17 encompass computer-aided design processes for designing an ASIC and not

12    manufacturing them.

13    73.    I declare under penalty of perjury under the laws of the United States of America that

14    the foregoing is true and correct.

15

16    Executed on July 13, 2004, at Summit, New Jersey.

17

18

19    _____/s/ Thaddeus J. Kowalski_____
                Thaddeus J. Kowalski
20

21

22

23

24

25

26

27

28

Case Nos. CV 03-04669 and CV 03-02289 MJJ (EMC)    25
Declaration and Summary of Opinions of Dr. Thaddeus
J. Kowalski on Construction of Disputed Claim Terms
of US Patent No. 4,922,432

HOWREY
SIMON
ARNOLD &
WHITE

EXHIBIT 4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARTIN J. JENKINS, JUDGE

```
RICOH COMPANY, LTD.,           )
                               )
              PLAINTIFF,       )
                               )
    VS.                        )    NO. C 03-4469 MJJ
                               )       C 03-2289 MJJ
AEROFLEX INCORPORATED,         )
ET AL.,                        )    WEDNESDAY, JUNE 14, 2004
                               )    SAN FRANCISCO, CALIFORNIA
              DEFENDANTS.      )
_____)
SYNOPSYS, INC.,                )
                               )
              PLAINTIFF,       )
                               )
    VS.                        )
                               )
RICOH COMPANY, LTD.,           )
                               )
              DEFENDANT.       )
_____)
```

REPORTER'S TRANSCRIPT OF TELEPHONIC PROCEEDINGS

APPEARANCES:

FOR RICOH                    DICKSTEIN, SHAPIRO, MORIN &
                                 OSHINSKY, LLP
                             2101 L STREET, NW
                             WASHINGTON, DC  20037
                        BY:  KENNETH W. BROTHERS, ESQUIRE


(FURTHER APPEARANCE ON FOLLOWING PAGE)


REPORTED BY:                 JOAN MARIE COLUMBINI, CSR 5435
                             OFFICIAL COURT REPORTER

            COMPUTERIZED TRANSCRIPTION BY ECLIPSE


                    JOAN MARIE COLUMBINI, CSR
                    OFFICIAL COURT REPORTER
                         415-255-6842


                            Page 1

APPEARANCES CONTINUED:

FOR SYSNOPSYS        HOWREY, SIMON, ARNOLD & WHITE, LLP
                        301 RAVENSWOOD AVENUE
                        MENLO PARK, CALIFORNIA  94025
          BY: THOMAS C. MAVRAKAKIS, ESQUIRE
                        ERIK K. MOLLER, ESQUIRE

JOAN MARIE COLUMBINI, CSR
OFFICIAL COURT REPORTER
415-255-6842

Page 2

1               PROCEEDINGS; WEDNESDAY, JUNE 14, 2004

2

3          THE COURT:  WHO DO I HAVE ON THE LINE?

4          MR. BROTHERS:  THIS IS KEN BROTHERS WITH DICKSTEIN,

5   SHAPIRO REPRESENTING RICOH.

6          MR. MAVRAKAKIS:  AND TOM MAVRAKAKIS AND ERIK MOLLER

7   OF HOWREY SIMON REPRESENTING SYNOPSYS AND THE DEFENDANTS.

8          THE COURT:  ANYONE ELSE?

9          MR. BROTHERS:  THERE'S NO ONE ON OUR END.  THIS IS

10  KEN BROTHERS.

11         MR. MAVRAKAKIS:  YOUR HONOR, I DON'T KNOW IF WE

12  HAVE A COURT REPORTER, BUT I'VE HOOKED UP THE ABILITY TO

13  RECORD THIS IF YOU WISH, BUT I LEAVE THAT TO YOUR DISCRETION.

14         THE COURT:  WE HAVE A REPORTER.

15         MR. MAVRAKAKIS:  OKAY.

16         THE COURT:  OKAY.  THIS IS -- YOU SENT ME A LETTER

17  DATED JULY 9TH, RAISING TWO SEPARATE, BUT I SUSPECT FROM YOUR

18  VIEW, PROBABLY INTERRELATED ISSUES.  ONE HAS TO DO WITH THE

19  TUTORIAL THAT I'VE SCHEDULED.  THE OTHER ONE HAS TO DO WITH

20  THE CLAIMS CONSTRUCTION HEARING THAT I'VE SCHEDULED.

21         THERE SEEMS TO BE SOME MISUNDERSTANDING, AND

22  PROBABLY BECAUSE, NORMALLY, WHEN I SET UP A CLAIMS

23  CONSTRUCTION HEARING AND SET UP A SCHEDULE, THE TUTORIAL

24  ASPECTS OF IT ALMOST ALWAYS INVOLVES THE PRESENTATION OF

25  EXPERT TESTIMONY BUT NO QUESTIONING, NO EXAMINING, SAVE AND

1    EXCEPT BY THE COURT.

2            AND, NORMALLY, WHAT I ASK FOR, AND THIS HAS WORKED

3    FOR SEVEN YEARS, IS THAT THE PATENT AT ISSUE, THE PATENT THAT

4    IS ALLEGEDLY INFRINGED, THAT YOU PROVIDE A TUTORIAL JUST

5    EXPLAINING HOW THAT PRODUCT WORKS.  THAT'S ALL.  NO OTHER

6    AUGMENTATION, NO REFERENCE TO ACCUSED PRODUCTS, NOTHING OF

7    THAT NATURE.  IT'S A VERY PLAINTIFF PRESENTATION.

8            ALL SIDES ARE PRESENT.  IT'S NOT RECORDED.  IT'S

9    NOT -- NO RECORD IS MADE OF THAT, SAVE AND EXCEPT IF YOU WANT

10   TO PRESENT SOME EXHIBITS THAT WOULD HELP ME FOLLOW THROUGH THE

11   EXPLANATION OF HOW THE PRODUCT WORKS.

12           THAT'S ALL THAT HAPPENS AT THE TUTORIAL.

13           ARE THERE ANY QUESTIONS ABOUT THAT?

14           MR. BROTHERS:  THIS IS KEN BROTHERS.  NOT FOR US.

15   WE UNDERSTOOD IT WOULD BE A NON-ADVERSARIAL PRESENTATION AT

16   THE TUTORIAL THAT WOULD FOCUS ON THE PATENT IN SUIT.

17           MR. MAVRAKAKIS:  AND, YOUR HONOR, THIS IS TOM

18   MAVRAKAKIS.  SO WOULD THAT MEAN THAT WE WOULD SPLIT TIME AND

19   EACH SIDE WOULD HAVE --

20           THE COURT:  WHY IS THERE A NEED TO SPLIT TIME?

21           YOU SEE, HERE'S THE ISSUE:  IT'S NOT ADVERSARIAL.

22           MR. MAVRAKAKIS:  OKAY.

23           THE COURT:  TO THE EXTENT THAT YOU HAVE SOME

24   CONCERN -- I GUESS THE POINT WOULD BE THIS:  DO YOU THINK THAT

25   YOUR -- YOU WANT TO PUT ON SOMEBODY WHO WILL EXPLAIN HOW THE

1    PRODUCT WORKS, AND THAT'S GOING TO BE DIFFERENT THAN THE OTHER

2    SIDE?  THE PURPOSE OF IT IS NOT TO CREATE ISSUES.  THE PURPOSE

3    OF IT IS JUST TO WALK THROUGH HOW IT WORKS.

4              IS THERE A DISAGREEMENT ABOUT THAT?

5              MR. MAVRAKAKIS:  WELL, I THINK THAT THERE MAY BE

6    SOME DISAGREEMENT, YOUR HONOR --

7              THE COURT:  WHAT IS IT?

8              MR. MAVRAKAKIS:  -- BETWEEN THE PARTIES ABOUT WHAT

9    THE PATENT DESCRIBES AND DISCLOSES.

10             THE COURT:  NO, NO, WE'RE NOT TALKING ABOUT

11   DISCLOSURES IN TERMS OF INTERPRETATION OF TERMS, JUST HOW IT

12   WORKS.  THAT'S ALL.

13             MR. MAVRAKAKIS:  HOW THE --

14             THE COURT:  IT'S A 3-D SORT OF DIMENSIONAL

15   PRESENTATION VISUALLY OF HOW IT OPERATES.

16             MR. MAVRAKAKIS:  WHEN YOU SAY "HOW IT OPERATES,"

17   YOU'RE REFERRING TO THE EMBODIMENT IN THE PATENT?

18             THE COURT:  I'M REFERRING TO HOW WHATEVER THE

19   PATENT TEACHES, HOW THAT ACTUALLY IN THREE-DIMENSIONAL REAL

20   TIME WORKS.  NOTHING MORE.

21             I THINK YOU HAVE A DIFFERENT VIEW OF WHAT

22   TRANSPIRES AT THE TUTORIAL.  THIS IS NOT A PLACE TO ARGUE

23   WHETHER OR NOT THE LANGUAGE IN CLAIMS CAN BE INTERPRETED IN

24   DIFFERENT WAYS.  THAT'S FAR REMOVED FROM WHAT I'M ACTUALLY

25   GOING TO SEE.

1          MANY TIMES, FOR EXAMPLE, YOU KNOW, I'VE HAD PATENTS

2    THAT INVOLVE THE SELECTION OF ICONS AND THE STORING OF

3    INFORMATION OF DATA, AND THEY JUST BRING IN A PRESENTATION

4    THAT SHOWS VISUALLY HOW THE PATENT DOES THAT, NOTHING MORE.

5          MR. MAVRAKAKIS:  AND YOU'RE SAYING THAT SHOULD BE

6    DONE BY THE PLAINTIFF AND NOT DEFENDANT?

7          THE COURT:  THAT'S NORMALLY HOW IT'S DONE.  BUT IF

8    YOU WANT TO PUT ON SOMETHING THAT ESTABLISHES, IN YOUR VIEW,

9    HOW IT WORKS, SO BE IT.  I CAN'T SEE WHERE THERE SHOULD BE

10   SIGNIFICANT DISPARITIES FOR THAT.

11         MR. MAVRAKAKIS:  MAYBE THE PARTIES SHOULD MEET AND

12   CONFER AND TRY TO COME UP --

13         THE COURT:  NORMALLY, THEY DO.  NORMALLY, THEY MEET

14   AND CONFER AND SHOW EACH OTHER WHAT THEIR RESPECTIVE SIDE IS

15   GOING TO PUT ON.

16         MR. MAVRAKAKIS:  OKAY.  SO YOU ENVISION SOMETHING

17   LIKE A POWER POINT PRESENTATION THAT JUST SHOWS --

18         THE COURT:  THAT'S WHAT PEOPLE HAVE DONE IN THE

19   PAST.  I DON'T KNOW ABOUT THIS PATENT.  I DON'T KNOW WHAT THE

20   BEST WAY WOULD BE.  BUT THAT'S WHAT PEOPLE HAVE DONE IN THE

21   PAST SEVEN YEARS I HAVE BEEN HERE, WITHOUT INCIDENT.

22         MR. MAVRAKAKIS:  RIGHT.  I UNDERSTAND THAT, YOUR

23   HONOR.

24         THE COURT:  I DON'T KNOW THAT YOU DO, BUT IF

25   THERE'S A PROBLEM -- I MEAN, IT STRIKES ME THAT THE PRESENTING

JOAN MARIE COLUMBINI, CSR
OFFICIAL COURT REPORTER
415-255-6842

Page 6

1    SIDE -- I'M NOT SAYING YOU CANNOT.  IF YOU WANT TO PRESENT

2    SOMEONE WHO WILL ARTICULATE HOW THE PRODUCT WORKS, THE PATENT

3    IN SUIT, SO BE IT.  I DON'T HAVE A PROBLEM WITH THAT.  BUT

4    EACH OF YOU SHOULD EXCHANGE PRIOR IN TIME WHAT IT IS YOU PLAN

5    TO PRESENT AND THE INDIVIDUAL WHO IS GOING TO MAKE THE

6    PRESENTATION SO THAT YOU'RE FAMILIAR WITH IT.  I THINK THAT'S

7    FINE.

8           MR. MAVRAKAKIS:  OKAY.  I MEAN, I THINK -- YEAH, I

9    MEAN, I THINK THAT'S WHAT I ENVISIONED AT THE CLAIM

10   CONSTRUCTION TUTORIAL, IS EACH SIDE WOULD HAVE AN EXPERT

11   PRESENT BACKGROUND INFORMATION ABOUT THE PATENT EMBODIMENT,

12   HOW IT WORKS.

13          AND WE'RE CERTAINLY WILLING TO MEET AND CONFER WITH

14   THE OTHER SIDE AND COME TO SOME SORT OF AGREEMENT AS TO A

15   SCHEDULE FOR EXCHANGING OUR RESPECTIVE PRESENTATIONS, AND AT

16   THAT TIME WE COULD EVEN MEET AND CONFER AND TRY AND SEE IF

17   MAYBE WE CAN AGREE TO ONE PRESENTATION.  DOES THAT SOUND --

18          THE COURT:  I HAVE NEVER HAD THAT PROBLEM BEFORE,

19   WHAT YOU'RE RAISING.  NO ONE HAS EVER TURNED THIS INTO AN

20   ADVERSARY SORT OF ISSUE-ORIENTED PRESENTATION, BUT IF THAT'S

21   WHAT YOU WANT TO DO, I DON'T HAVE A PROBLEM WITH IT.

22          ALL I WANT TO DO IS GET A BETTER UNDERSTANDING SO

23   YOU DON'T HAVE TO SPEND AN HOUR OR TWO IN YOUR PRESENTATION AT

24   THE CLAIMS CONSTRUCTION HEARING SHOWING ME YOUR VIEW OF HOW IT

25   WORKS.

1                MR. MAVRAKAKIS:  I UNDERSTAND.

2                THE COURT:  THAT'S WHAT IT INTENDS TO OBVIATE.

3                NOW, THE SECOND PROBLEM OR THE SECOND ISSUE -- LET

4     ME JUST GIVE YOU SORT OF MY GENERAL RULES OF HOW THESE THINGS

5     OCCUR.

6                FIRST, I HAVE NEVER AND DON'T ANTICIPATE HAVING

7     LIVE WITNESS TESTIMONY FROM ANY EXPERT AT A CLAIMS

8     CONSTRUCTION HEARING.

9                MR. MAVRAKAKIS:  OKAY.

10               THE COURT:  SECONDLY, IT'S DIFFICULT -- AND THIS IS

11    PROBABLY WHERE THE AMBIGUITY CAME IN.  IT'S ALWAYS DIFFICULT

12    FOR ME TO TELL WHETHER I'M GOING TO NEED TO HAVE EXPERT

13    DECLARATIONS, THE USE OF EXTRINSIC EVIDENCE IN CONSTRUING THE

14    TERMS OF THE PATENT.  IT'S HARD TO KNOW THAT WITHOUT DELVING

15    INTO THE BRIEFS, WHICH I'M NOT ABLE TO DO THAT WHEN I SET THE

16    SCHEDULE.

17               SO, NORMALLY, WHAT I DO IS SET IT UP SO THAT IF YOU

18    FOLKS REALLY DRIVE THE VEHICLE, IF YOU FEEL THAT THERE'S GOING

19    TO BE A NEED FOR EXPERT TESTIMONY, YOU DISCLOSE THE EXPERTS

20    WHO ARE GOING TO TESTIFY WITH RESPECT TO THE CLAIMS IN

21    DISPUTE.  YOU NORMALLY TAKE THOSE DEPOSITIONS PRIOR IN TIME SO

22    EACH SIDE HAS HAD A CHANCE TO EXAMINE THOSE EXPERTS.  THEN YOU

23    SUBMIT DECLARATIONS, WRITTEN DECLARATIONS, WHICH I THEN WILL

24    DETERMINE WHETHER I CAN CONSIDER OR NOT, BUT NO LIVE

25    TESTIMONY, NO LIVE EXAMINATION.  THAT'S DONE IN DEPOSITIONS

1    PRIOR IN TIME.

2              MR. MAVRAKAKIS:  YOUR HONOR --

3              THE COURT:  SO IT WAS NOT YOUR FAULT.  THERE'S SOME

4    BUILT-IN AMBIGUITY, BECAUSE AT THE TIME THAT THE HEARING IS

5    SET, REALLY UP TO TWO OR THREE WEEKS BEFORE THE HEARING, I

6    HAVEN'T READ THE BRIEFS, SO I CAN'T MAKE THAT DETERMINATION.

7    IT'S NOT YOUR FAULT.  BUT THAT'S HOW I CONDUCT THEM.

8              MR. MAVRAKAKIS:  YOUR HONOR, THIS IS TOM

9    MAVRAKAKIS.  COULD I ASK A QUESTION OF CLARIFICATION?

10              THE COURT:  SURE.

11              MR. MAVRAKAKIS:  THE THING THAT I GET CONCERNED

12    ABOUT, AND I'VE DONE A FEW OF THESE UNDER THE LOCAL RULES, IS

13    THAT, YOU KNOW, THE JOINT CLAIM CONSTRUCTION CHART IS SUPPOSED

14    TO SET OUT THE RECORD.

15              THE COURT:  RIGHT.

16              MR. MAVRAKAKIS:  -- THAT BOTH PARTIES HAVE

17    EVERYTHING THEY NEED TO WRITE THEIR BRIEFS.

18              AND WHAT HAS HAPPENED IS THAT THE WORDS OF THE

19    RULES SAY TESTIMONY AT THE CLAIM CONSTRUCTION HEARING -- AND,

20    YOU KNOW, I'VE LIVED AND BEEN SANDBAGGED, YOU KNOW, TWO WEEKS

21    BEFORE MY OPPOSITION IS DUE WITH THE 50-PAGE EXPERT

22    DECLARATION, AND THEN, YOU KNOW, THE PARTY IS TELLING ME THAT,

23    WELL, THE EXPERT IS NOT AVAILABLE, AND THEN I HAVE TO FILE MY

24    OPPOSITION WITHOUT HAVING THE CHANCE TO, YOU KNOW, TAKE THE

25    DEPOSITION OF THIS EXPERT THAT'S NOW FILED A 50-PAGE

1   DECLARATION.

2           THE COURT:  I DON'T KNOW WHERE YOU HAVE BEEN.  I

3   WOULDN'T ALLOW THAT TO HAPPEN.  THERE WOULD BE NO SANDBAGGING.

4           MR. MAVRAKAKIS:  OKAY.  BECAUSE THE RULE SAYS --

5           THE COURT:  IT DOESN'T MATTER WHAT THE RULE SAYS.

6   I KNOW WHAT THE RULE SAYS.  I'M TELLING YOU HOW I DO IT.

7           MR. MAVRAKAKIS:  OKAY.

8           THE COURT:  IT'S NOT EFFICIENT TO TAKE LIVE WITNESS

9   TESTIMONY IN A CLAIMS CONSTRUCTION HEARING WHEN YOU FOLKS CAN

10  DO THAT UP FRONT.

11          I UNDERSTAND YOU HAVE CONCERNS, AND THEY MAKE SENSE

12  TO ME, ABOUT THE TIMING OF GETTING INFORMATION TO MAKE SURE

13  YOU'VE HAD A CHANCE TO REALLY FULLY EXAMINE THE OPINIONS THAT

14  ARE GOING TO BE GIVEN AND THE BASIS THEREFORE.  AND, NORMALLY,

15  WHAT HAPPENS IS ONCE YOU GET A CHANCE TO SEE WHAT THE DISPUTED

16  TERMS ARE, WHAT THE BASIS IN THE PATENT IS FOR THE PROPOSED

17  CLAIMS INTERPRETATIONS, WHETHER OR NOT, YOU KNOW, THAT WILL

18  PEND ON EXPERT TESTIMONY OR NOT, THEN USUALLY THERE'S ENOUGH

19  TIME IN THAT SCHEDULE FOR YOU TO TAKE THE DEPOSITIONS OF THOSE

20  PEOPLE, ALSO, IF YOU FEEL LIKE YOU NEED TO, AND THAT'S WHAT I

21  WOULD SUGGEST TO YOU IN THIS CASE.

22          BUT WE WOULDN'T BRING THOSE PEOPLE IN FOR LIVE

23  WITNESS TESTIMONY ON TOP OF WHAT THEY'VE ALREADY PUT IN THEIR

24  REPORTS.  I JUST DON'T KNOW WHETHER THAT'S GOING TO BE NEEDED

25  OR NOT, YOU KNOW.  IT'S DIFFICULT FOR ME TO TELL YOU THAT, BUT

1    I CAN TELL YOU, DESPITE WHAT THE LOCAL RULE SAYS, THAT THE

2    EXCHANGE OF EXPERT OPINIONS AND REPORTS AND DEPOSITIONS OUGHT

3    TO OCCUR PRIOR IN TIME.

4              MR. MAVRAKAKIS:  SO ACCORDING -- SO, IN OTHER

5    WORDS, THE EXPERTS' SUMMARY OPINIONS, EVEN IF THE EXPERT

6    TESTIMONY IS GOING TO BE PROVIDED IN WRITTEN FORM ONLY IN

7    DECLARATION, SHOULD BE EXCHANGED AT THE TIME OF THE JOINT

8    CLAIM CONSTRUCTION CHART?

9              THE COURT:  I THINK YOU SHOULD -- WE BUILD THAT IN

10   SO NOBODY IS SANDBAGGED.

11             MR. BROTHERS:  YOUR HONOR, THIS IS KEN BROTHERS.  I

12   GUESS I'M A LITTLE BIT UNCLEAR WITH RESPECT TO THE TIMING FOR

13   THE WHOLE PROCESS.

14             YOU HAD EARLIER REFERENCED THAT SOME OF THESE, THE

15   EXPERT DECLARATIONS, BE PROVIDED IN CONJUNCTION WITH THE

16   BRIEFING SCHEDULE, WHICH IS IN LATE AUGUST AND SEPTEMBER, BUT

17   IS IT YOUR -- THE COURT'S DESIRE THAT --

18             THE COURT:  IT STRIKES ME THAT IF YOU'RE GOING TO

19   RELY -- AND I JUST DON'T KNOW, BUT IF -- IS IT SAFE TO ASSUME

20   THAT EACH OF YOU BELIEVES THAT THE COURT NEEDS TO RESORT TO

21   EXTRINSIC EVIDENCE INCLUDING THE OPINIONS OF EXPERTS TO

22   CONSTRUE THE TERMS HERE?

23             MR. BROTHERS:  WELL, RICOH HAD UNDERSTOOD YOUR

24   EARLIER COMMENTS TO BE THAT THE COURT WOULD NOT RECEIVE EXPERT

25   TESTIMONY AT THE CLAIM CONSTRUCTION HEARING.

1              THE COURT:  I NORMALLY DON'T.

2              MR. BROTHERS:  BECAUSE OF THAT, WE WERE PROCEEDING

3    TO CONSTRUE THE CLAIMS WITHOUT RELIANCE UPON AN EXPERT, WHEN

4    IT BECAME CLEAR TO RICOH THAT SYNOPSYS AND THE DEFENDANTS WERE

5    INTENDING TO PROVIDE EXPERT TESTIMONY, AND WE IDENTIFIED THE

6    DIFFERENCE IN OPINIONS BECAUSE IT WAS --

7              THE COURT:  LET ME JUST -- MAYBE IT'S MORE

8    FUNDAMENTAL THAN EVEN I THINK.  VICTRONICS SAYS THE COURT

9    DOESN'T GO TO THAT EVIDENCE IF IT DOESN'T HAVE TO.

10             MR. BROTHERS:  THAT'S CORRECT.

11             THE COURT:  SO THAT'S MY RULE OF THUMB, THAT THERE

12   HAS TO BE A SHOWING AS TO WHY THE COURT CAN'T CONSTRUE THE

13   TERMS BASED ON THE INTRINSIC EVIDENCE.  WE DON'T GO TO

14   EXTRINSIC EVIDENCE UNLESS THAT'S NECESSARY.

15             MR. BROTHERS:  IT WOULD BE RICOH'S VIEW THAT NO

16   EXTRINSIC EVIDENCE WOULD BE NECESSARY; HOWEVER, IF OUR --

17             THE COURT:  THEN LET'S DO THIS THEN:  I THINK THIS

18   IS THE ONLY WAY TO RESOLVE IT, AND IT WILL SAVE YOU FOLKS SOME

19   TIME AND MONEY.

20             I'M NOT GOING TO RECEIVE ANY EXPERT TESTIMONY ON

21   CONSTRUCTION OF THESE TERMS.  IF ONCE I GET INTO THE BRIEFS

22   AND IN THE HEARING IT APPEARS TO ME I NEED THAT ASSISTANCE,

23   I'LL SET UP A TIME FOR THAT.

24             MR. BROTHERS:  VERY GOOD, YOUR HONOR.

25             MR. MAVRAKAKIS:  YOUR HONOR, THIS IS TOM

                    JOAN MARIE COLUMBINI, CSR
                      OFFICIAL COURT REPORTER
                          415-255-6842

1    MAVRAKAKIS.  I THINK THAT THERE -- AND OUR POSITION IS THAT

2    THERE ARE TERMS OF ART IN THIS PATENT THAT DO REQUIRE

3    TESTIMONY AND EXTRINSIC EVIDENCE.

4            THE COURT:  YOU MIGHT BE RIGHT, BUT I'M NOT GOING

5    TO MAKE THAT DETERMINATION TODAY.  I'LL HAVE TO READ THE

6    BRIEFS MYSELF AND SEE IF I COME TO THAT CONCLUSION.

7            MR. MAVRAKAKIS:  I UNDERSTAND THAT.

8            THE COURT:  THAT WILL SAVE YOU GUYS SOME TIME AND

9    EFFORT.

10           MR. MAVRAKAKIS:  AND THERE'S SOME CASE LAW THAT

11   SAYS WHEN YOU HAVE TERMS OF ART, THAT IT'S ERROR NOT TO

12   CONSIDER THIS EXPERT TESTIMONY TO MAKE SURE.

13           THE COURT:  WHAT ARE YOU TRYING TO TELL ME?  WHAT

14   ARE YOU TRYING TO TELL ME?  I HAVE NOT -- YOU CONTINUE TO

15   ENGAGE IN THIS MANTRA, AND I'VE TOLD YOU I HAVEN'T READ THE

16   BRIEFS.  YOU MAY BE RIGHT.  I MAY HAVE TO PULL IT OFF THE

17   TABLE AND SAY, YOU KNOW, HE'S ABSOLUTELY RIGHT, IT'S A TERM OF

18   ART, I NEED ASSISTANCE, BUT I CAN'T DO THAT TODAY.

19           MR. MAVRAKAKIS:  MY ONLY CONCERN, YOUR HONOR, IS

20   THAT I INTEND TO SUBMIT A DECLARATION.  SO MY CONCERN IS THAT

21   EVERYTHING IS ON EQUAL FOOTING SO IF WE HAVE TO --

22           THE COURT:  I'M TELLING YOU NOW I'M NOT GOING TO

23   CONSIDER IT UNTIL I SEE A NEED FOR IT.  YOU MAY BE DOING THAT,

24   AND IT MAY BE IRRELEVANT.

25           MR. MAVRAKAKIS:  I UNDERSTAND THAT.

 1                THE COURT:  OKAY.

 2                MR. MAVRAKAKIS:  I UNDERSTAND.  I'D LIKE TO MAKE MY

 3     RECORD THAT WAY, BUT MY ONLY CONCERN IS THAT IF I'M GOING TO

 4     SEE AN EXPERT DECLARATION FROM THE OTHER SIDE, THAT I SEE IT

 5     IN A TIMELY MANNER.

 6                THE COURT:  YOU ARE THE ONE THAT'S SETTING THIS

 7     ISSUE UP BY DOING WHAT YOU THINK THE LAW SAYS YOU HAVE A RIGHT

 8     TO DO AND YOU NEED TO DO.  BUT THE FACT OF THE MATTER IS IF I

 9     ULTIMATELY AGREE WITH YOU, THEN I WOULD HAVE TO GIVE THE OTHER

10     SIDE SOME TIME TO RESPOND, AND, OF COURSE, YOU'D HAVE A CHANCE

11     TO RESPOND TO WHAT THEY PROVIDE, AND IT JUST WILL ELONGATE THE

12     PROCESS.

13                MR. BROTHERS:  THIS IS KEN BROTHERS.  WITH THE

14     UNDERSTANDING THAT RICOH -- IF THE JUDGE FEELS THAT EXPERT

15     TESTIMONY MAY BE NEEDED, THAT RICOH COULD BE GIVEN AN

16     OPPORTUNITY TO RESPOND.

17                THE COURT:  ABSOLUTELY.

18                MR. BROTHERS:  YES, WE ARE PREPARED TO PROCEED AT

19     PRESENT WITHOUT SUBMITTING ANY EXTRINSIC EVIDENCE AND

20     PROCEEDING AS THE COURT SUGGESTED.

21                THE COURT:  RIGHT.  AND IF WE GET TO THAT ISSUE,

22     THEN I'LL DEAL WITH IT IN A WAY THAT'S FAIR TO BOTH SIDES.

23                MR. MAVRAKAKIS:  OKAY.

24                SO, YOUR HONOR, JUST ONE MORE POINT OF

25     CLARIFICATION.  IF I WANT TO PUT IN EXPERT TESTIMONY IN THE

1    FORM OF A DECLARATION, THEN I SHOULD DO SO IN MY -- IN SUPPORT

2    OF MY OPPOSITION.

3            THE COURT:  IF THAT'S WHERE YOU THINK IT

4    APPROPRIATELY GOES, SO BE IT.  I TOLD YOU I'M NOT GOING TO

5    CONSIDER IT IN THE FIRST INSTANCE, BUT YOU CAN SUBMIT IT.

6            MR. MAVRAKAKIS:  OKAY.

7            THE COURT:  ALL RIGHT.

8            MR. BROTHERS:  THANK YOU, YOUR HONOR.

9            THE COURT:  ALL RIGHT.

10           (PROCEEDINGS ADJOURNED.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

I, JOAN MARIE COLUMBINI, OFFICIAL REPORTER FOR THE
UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY
CERTIFY THAT THE FOREGOING PROCEEDINGS IN C 03-4660 MJJ AND
03-03-2289, RICOH COMPANY LTD. V. AEROFLEX, ET AL., AND
SYNOPSYS, INC. V. RICOH COMPANY, LTD., PAGES NUMBERED 1
THROUGH 15, WERE REPORTED BY ME, A CERTIFIED SHORTHAND
REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION
INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND
TRUE RECORD OF SAID PROCEEDINGS AT THE TIME OF FILING.

THE INTEGRITY OF THE REPORTER'S CERTIFICATION OF
SAID TRANSCRIPT MAY BE VOID UPON REMOVAL FROM THE COURT FILE.

_____

JOAN MARIE COLUMBINI, CSR 5435

JOAN MARIE COLUMBINI, CSR
OFFICIAL COURT REPORTER
415-255-6842