Gary M. Hoffman (*Pro Hac Vice*)
Kenneth W. Brothers(*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
 & OSHINSKY, LLP
2101 L Street, NW
Washington, DC  20037-1526
Phone (202) 785-9700
Fax (202) 887-0689

Edward A. Meilman (*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
 & OSHINSKY, LLP
1177 Avenue of the Americas
New York, New York  10036-2714
Phone (212) 835-1400
Fax (212) 997-9880

Jeffrey B. Demain, State Bar No. 126715
Jonathan Weissglass, State Bar No. 185008
ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
177 Post Street, Suite 300
San Francisco, California  94108
Phone  (415) 421-7151
Fax (415) 362-8064

Attorneys for Ricoh Company, Ltd.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| RICOH COMPANY, LTD., | ) |
|  | ) |
| Plaintiff, | ) **CASE NO. CV 03-4669-MJJ (EMC)** |
|  | ) |
| vs. | ) **Consolidated with** |
|  | ) |
| AEROFLEX ET AL, | ) **CASE NO. CV 03-2289-MJJ (EMC)** |
|  | ) |
| Defendants. | ) **DECLARATION OF MICHAEL WEINSTEIN** |
|  | ) **IN SUPPORT OF RICOH'S OPPOSITION** |
|  | ) **TO DEFENDANTS' MOTION FOR** |
|  | ) **PARTIAL SUMMARY JUDGMENT** |
| SYNOPSYS, INC., | ) |
|  | ) |
| Plaintiff, | ) **Date:  November 1, 2005** |
|  | ) **Time:  9:30 a.m.** |
| vs. | ) **Courtroom:  11** |
|  | ) |
| RICOH COMPANY, LTD., | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

CASE NO. CV 03-4669 (EMC) MJJ and CV 03-2289 MJJ (EMC)
DECLARATION OF MICHAEL WEINSTEIN IN SUPPORT OF RICOH'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

DSMDB.1971463.1

Michael A. Weinstein declares as follows:

1.    My name is Michael A. Weinstein, an attorney with the law firm of Dickstein, Shapiro, Morin & Oshinsky, LLP, counsel for Ricoh Company, Ltd. ("Ricoh").  I am over the age of 21 and am competent to make this declaration.  Based on my personal knowledge and information, I hereby declare to all the facts in this declaration

2.    Discovery yet to be meaningfully produced includes the identification of who is performing the logic synthesis on the ASIC defendants' products.

3.    Discovery yet to be meaningfully produced includes the identification of all of the details regarding the inputs, logic synthesis, and outputs as used by the ASIC defendants, or someone on their behalf.

4.    Discovery yet to be meaningfully produced includes the source code for all of the versions of logic synthesis programs used by the defendants in performing the logic synthesis process that are accused of infringing the '432 patent.

5.    Discovery yet to be meaningfully produced includes detailed manuals explaining defendants, or someone on their behalf, production operation relating to the process of using all of the versions of the logic synthesis software.

6.    Discovery yet to be meaningfully produced includes internal guides and procedure manuals for manufacturing the defendants' ASICs when using all of the logic synthesis systems.

7.    Discovery yet to be meaningfully produced includes the identification of all of products and libraries the defendants, or someone on their behalf, use in performing the logic synthesis processes.

8.    Discovery yet to be meaningfully produced includes the identification of where defendants, or someone on their behalf, perform the logic synthesis process.

9.    Discovery yet to be meaningfully produced includes the identification of which companies and where the remaining portions of the manufacturing of the defendants' ASICs is done.

10.    Discovery yet to be meaningfully produced includes documents showing the operation flow and connection between the logic synthesis and the use of the output in the subsequent steps in the manufacturing process of the Defendants' ASICs.

11.    Discovery yet to be meaningfully produced includes the activities of the defendants in carrying out and/or directing the steps of the manufacture of the chips from initial input into the design portion of the operation through the final output of the completed ASIC.

12.    The ASIC defendants are refusing to provide meaningful document discovery until mid October, and to date have refused to schedule any depositions at all.

13.    Ricoh has served on each of the defendants discovery requests seeking the information relating to the above paragraphs 2-11.

14.    Attached hereto as Ex. 1 is a true and correct copy of British Patent No. 1 445 914, cited as prior art in the '432 patent.

15.    Attached hereto as Ex. 2 is a true and correct copy of excerpt from PowerPoint presentation used by counsel for Synopsys and ASIC defendants during their Markman arguments on Dec. 15, 2005, the relevant portion of which was as prepared by their expert Dr. Kowalski

16.    Attached hereto as Ex. 3 is a true and correct copy of excerpts from Yanda, Heynes & Miller, *Demystifying Chipmaking* (Elsevier 2005)

17.    Attached hereto as Ex. 4 is a true and correct copy of the deposition transcript of Michael S. Heynes of July 27, 2005.

18.    Attached hereto as Ex. 5 is a true and correct copy of *AT&T Corp. v. Microsoft Corp.*, 2004 WL 406640 (S.D.N.Y. 2004), *aff'd,* 414 F.3d 1366 (Fed. Cir. 2005).

19.    Attached hereto as Ex. 6 is a true and correct copy of U.S. Patent No. 4,922,432.

20.    Attached hereto as Ex. 7 is a true and correct copy of the deposition transcript of Edward Dwyer of February 3, 2004 (designated confidential by counsel for the ASIC defendants and Synopsys).

21.      Attached hereto as Ex. 8 is a true and correct copy of the declaration of Ricoh's expert V. Thomas Rhyne of February 24, 2004.

22.      Attached hereto as Ex. 9 is a true and correct copy of excerpts from Heynes & Miller, *Integrated Circuit Manufacturing Synopsis* (Semiconductor Services 3d ed. 2002)

23.      Attached hereto as Ex. 10 is a true and correct copy of the deposition transcript of V. Thomas Rhyne of April 14, 2004.

24.      Attached hereto as Ex. 11 is a true and correct copy of the declaration of Ricoh employee Takamitsu Yamada of February 6, 2004.

25.      Attached hereto as Ex. 12 is a true and correct copy of the deposition transcript of Synopsys employee Eric Olson of August 2, 2005.

26.      Attached hereto as Ex. 13 is a true and correct copy of excerpts from Design Compiler User Guide v.2003.12.

27.      Attached hereto as Ex. 14 is a true and correct copy of excerpts from Chip Synthesis Workshop – Lab Guide (designated confidential by Synopsys).


        I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Signed at Washington, D.C. on August 23, 2005.


                              /s    Michael A. Weinstein_
                              Michael A. Weinstein

# PATENT SPECIFICATION

(11) **1 445 914**

(21) Application No. 37953/74    (22) Filed 30 Aug. 1974

(31) Convention Application No. 401 303

(32) Filed 27 Sept. 1973 in

(33) United States of America (US)

(44) Complete Specification published 11 Aug. 1976

(51) INT CL² G06F 15/20

(52) Index at acceptance G4A  5B 9X U

(19) 

(72) Inventors WILLIAM FRANCIS COLTON, BELA GOGOS, WILLIAM ROSENBLUTH and DOUGLAS HUBERT RUTHERFORD

## (54) IMPROVEMENTS RELATING TO APPARATUS FOR PRODUCING GRAPHICAL DATA DESCRIPTIVE OF AN INTEGRATED CIRCUIT DESIGN

(71)    We, INTERNATIONAL BUSINESS MACHINES CORPORATION, a Corporation organized and existing under the laws of the State of New York in the United States of America, of Armonk, New York 10504, United States of America, do hereby declare the invention, for which we pray that a patent may be granted to us, and the method by which it is to be performed, to be particularly described in and by the following statement:—

This invention relates to apparatus for producing graphical data descriptive of integrated circuit semiconductor chip design. It is concerned in improving the design of semiconductor chips by means of design automation techniques to produce chip design data that may be used to control machines which make photolithographic masks used to manufacture the semiconductor chips.

The use of design automation for making large scale integrated (LSI) chips and the advantages thereof are disclosed in "Computer", Vol. 5, No. 3 pages 18—52, published by the IEEE Computer Society and in the complete Specifications of our copending Applications for Letters Patent Nos. 25812/73 and 58461/72 (Serial Nos. 1 414 018 and 1 405 508 respectively. LSI devices can be generally classed as "non-random" and "random" types. A "non-random" LSI device is characterized by an array of duplicate circuits such as might be used in a memory device or a read-only store (ROS). A "random" LSI device is characterized by the lack of any repetitive uniformity of circuits on a chip. The circuits, and functions performed thereby, may vary on a single chip. An example would be a chip containing combinational and sequential logic for use in the control section of a computer. Quite obviously, designing random LSI chips is a difficult task and it is within such an art

that design automation techniques are particularly advantageous and it is the general area which the present invention improves.

Before the invention is explained in detail a general design process will be described. A prerequisite to making a given device is the existence of a given technology in which the process of making the device is established and the electrical characteristics of the circuits and packaging are known. Design criteria or rules for the technology are established. With the knowledge of such rules, a chip designer performs the complex task of translating logical functions to be performed in a system into actual physical LSI devices that perform the functions. To do this, the designer interacts with and is aided by a design automation (DA) system. The theory for use of any DA system is that there are many operations which are subject to algorithmic analysis and control which can be best done by a computer while there are other functions that require human skill to be performed effectively or best. In designing random type LSI chips, a chip designer is "best" at deciding what functions, and circuits to perform such functions, are to be placed on a given chip and where elements should be generally placed. A chip designer can place many relatively small diverse functions on a given chip or he may break up a function and place it on different chips. The chip designer produces an output that is partially descriptive of a chip. This output is fed as an input to a DA system which performs its functions to provide an output that is used to control the physical process of making the LSI device. This would entail making photolithographic masks.

In the design process there are two mutually exclusive techniques, "free form" design and "rules driven" design. The

former technique is unrestricted and characterized by efficient silicon or chip utilization but has a long design cycle (e.g., three to six months) and requires manual checking. The latter technique is restricted and characterized by a fast design cycle (e.g., two to four weeks) and automatic checking but may produce inefficient silicon utilization.

A specific example of the restricted "rules driven" technique used in connection with FET (field effect transistor) LSI devices is disclosed in the aforementioned complete Specification of our Application for Letters Patent No. 58461/72 (Serial No. 1 405 508). In accordance with such "rules driven" technique, the metallization areas, diffusion areas, power and signal busses, I/O pads and FET devices are laid out on an orthogonal grid pattern in accordance with relatively rigid or restricted rules, whereby the maximum use can be made of the DA system to provide a fast design cycle.

An object of the present invention is to provide an apparatus that combines both "free form" and "rules driven" techniques.

According to the invention, apparatus for producing graphical data descriptive of an integrated circuit design comprises first means adapted to store graphical descriptions of freeform designs, second means adapted to store topological data and electrical characteristics of rules restricted designs, means adapted to enter information denoting the location and relationship of a freeform design to a rules restricted design, means adapted to generate a graphical description of said rules restricted design, and means adapted to merge the generated graphical description of said rules restricted design with the graphical description of said freeform design stored in said first means to form said graphical data descriptive of an integrated circuit design.

In the embodiment to be described below, a library of predesigned graphical descriptions that describe circuits designed by the free form technique is stored within the design automation system. A chip designer would design the layout of a chip including both "free form" and "rules driven" portions. An input is fed to the DA system which specifies the rules driven design in the established manner and specifies the free form design by defining the library description thereof, and the relative placement of the design on the chip. The system in response to such input generates a graphical description of the rules driven design without doing any automatic checking of the internal connections etc of the free form design. The generated description or topology is then merged with the free form description or topology from the library to form a complete chip description from which is derived data for making photolithographic masks.

The invention will now be particularly described, by way of example, with reference to the accompanying drawings, in which:—

Figure 1 is a general flowchart showing the overall design process,

Figure 2 is a general flowchart showing the overall chip design process of Figure 1 in more detail,

Figure 3 is a diagrammatic layout of a chip design providing an example useful in understanding the invention,

Figure 4 is a more detailed flowchart,

Figures 5a to f illustrate various descriptive data related to the example shown in Figure 3, and

Figure 6 is a general flowchart summarizing the steps in the design process.

Referring now to Figure 1, in accordance with the overall or general process, a chip designer provides an input to a chip design system 10, the details of which will be discussed hereafter. The input of the chip designer incorporates both free form data for achieving efficient silicon utilization and incorporates rules driven data for taking maximum advantage of the speed and efficiency of the chip design system 10. The output of chip design step 10 is a graphical language description 11 of the eventual chip design. This description is fed as an input to a language processor 12 that provides an output for controlling the operation of an artwork generator 13 used to produce the masks for making the actual physical LSI chip. This overall process is disclosed in the aforementioned complete Specification of our Application for Letters Patent 58461/72 (Serial No. 1 405 508). A difference is that the chip design system 10 is modified and the addition of the freeform input by the chip designer.

Referring now to Figure 2, at the start of the process, the chip designer would provide input information 14 to the FET automated design system (FADS) 16. To do this, the designer, with knowledge of the functions to be incorporated into a chip, selects the desired circuits and devices from those available to him within the given technology, including those designs that are rules driven and those that represent a freeform design. The chip designer would ordinarily work with a graphical layout of the chip, such as illustrated in FIG. 3, which includes an image of the general grid structure including the power busses and I/O pads. Upon this layout, the designer would then

place the respective circuits. Stored within the system is a book library 18 which is a file of technology data describing the electrical characteristics of circuits, topology thereof and the images. The exact or specific information would be dependent upon the functions to be performed by the system which can vary from system to system. The information in the library may be divided into three types of books or collections of data. Types 1 and 2 respectively represent circuits that are specified by formulae so that the system calculates devices, shapes and locations, or may specify standard circuits conforming to the given rules. The third book type would be those providing the freeform topology.

Let us consider now in a little more detail the process used by the chip designer. The chip designer might first layout in a block diagram form the logical functions to be included within the chip as, for example, through the use of And and Or blocks. This would be the logic representations of the functions to be eventually created and performed within an actual chip. Next, the chip designer would select a chip image such as that shown in FIG. 3 and beging a layout of the various circuits to be included. He would first determine what devices or circuits are necessary to perform the logic functions and then would begin relative placement of these devices on the chip image. In the illustrated example, the chip image has 48 terminals and a bus network that divides the chip into four active areas in the form of columns or bays. A given circuit would be generally located in one of these bays. Also, the designer would decide which relative row of a given bay the circuit should go in, the relative row being the degree of vertical stacking of circuits within a given bay. This process is known as a placement of the devices on the image. Later, FADS 16 will determine exact placement. The relative placement can be done by assigning XY coordinates to the chip image which XY coordinate might for example, by convention, be considered to be the location of the lower lefthand corner of any given area of diffusion, contact, or metallization. Through use of the chips designer's skill, the various functions would be implemented within circuits and would attempt to provide maximum efficient use of the active area of a chip. The input information 14 is then generally divided into two aspects. The first is that connected with the description of the logic in accordance with the rules of the system and the second would be the description identifying the freeform device and its location and orientation.

FADS 16 is constructed in accordance with standard DA techniques and comprises a series of DA programs that are loaded in and executed on a general purpose computer such as a Model 158 of IBM (Registered Trade Mark) System/370. The language of the program can be any general programming language such as PL/1 which act upon the data provided by the graphical programming language to produce the design of the chip. In general, FADS 16 would, using input data 14 and information from library 18, construct an image of the circuits on the chip, except for the freeform, and convert any relative placements of the input into exact placements. The freeform itself would be treated as an area which has signal and power terminals to be accounted for, but the FADS system would do no internal checking of the freeform design to see that it worked. In other words, it would be the responsibility of the designer to make certain that the freeform design operated correctly. When FADS 16 has completed its processing, the result is output 20 which contains a partial description of the chip design for the rules design portion thereof, along with an identification of the freeforms to be incorporated. This partial chip description is then fed through a merge process 22.

Freeform identification of output 20 is used to obtain from library 18 the freeform description which in the merge process 22 is combined with the partial description from the output 20 to form a total chip description or graphical language description 11.

In the beginning of the design process, the chip designer would select a chip image layout on which to begin placing the various circuits and devices. Such a layout is shown in FIG. 3 which schematically illustrates a partially completed LSI chip 24. Such a device is constructed in accordance with the manner pointed out in the aforementioned Specification and generally comprises a silicon wafer having diffusions therein, such as 28, described in more detail below, forming part of the conductive pattern on the wafer and acting as part of the circuit devices. Two layers of thick and thin oxides are placed on top of the wafer and any metallization is done on top of the oxide layers. Contacts 30 provide vertical electrical connection between diffusion and metallization zones. It is to be understood that in a given technology system there might be several different images or basic images available to a designer that vary according to the number of I/O pads and chip size. In the illustrated chip 24, there are forty-eight I/O pads P1—P48 located around the periphery,

each pad being rectangular in shape and comprising metallization and diffusion. These pads are designed to be connected to external terminals for providing signals and power to chip 24. Thus, pad P1 is designed to power the substrate and it would include a contact leading from the upper metallization layer down to a diffusion area on the substrate. Pads P45 and P4 are designed to be connected to an external ground connection and are also connected to metallization busses GL and GR for providing a ground network on the left and right sides of the chip. Pads P21 and P28 are designed to be connected to voltage sources to provide main voltage busses MVL and MVR for the left and right sides of chip 24. Pad P22 is designed to be connected to a source of control voltage and is also connected to a control bus CV whereby a voltage applied to this bus will allow the circuits on the chip to be operated. Bus CV includes bifurcated arms extending parallel to busses MVL and MVR and having legs lying along each side of each bus in the manner pointed out in the above applications. The various vertical busses in the specific examples shown in FIG. 3 divide the active area of the chip into four columns in which the circuits and wiring are to be placed.

To illustrate the invention, FIG. 3 shows a rules design circuit CKT1 and a freeform or predesigned circuit CKT2. These circuits are shown merely for the purpose of illustrating the invention. In the case of the design of an actual chip, there would be many more circuits included to utilize the active area of the chip as effectively as possible. Circuit CKT1 is an FET device used to invert an output signal appearing from CKT2. CKT2 is a binary counter of conventional logic instruction having an input terminal BO1, and an output terminal ZO2. The function of the counter is to produce an output signal on the output terminal ZO2 upon receiving four input pulses or signals at input terminal BO1. Input terminal BO1 is connected by a network 101 to I/O pad P41. Output terminal ZO2 is connected by network 102 to the metal cap AO1 of CKT1. Diffusion rails 28 and 29 underlie cap AO1 but are separated therefrom by oxide layers. Rail 28 is connected via network 103 to I/O pad P36. The binary counter CKT2 is also provided with two power connectors PO1 and PO2 respectively connected to busses GL and MVL.

The flowchart of FIG. 4 is an expansion of FADS 16, Figure 2. Once the chip designer has completed the layout of the entire chip, the information can be translated into data that serves as an input to the FADS system. In general, there are four steps or operations in this system, the result of which is to produce the rules description 40 described above. Each step has an input from external information and from the output of a preceding step and each step provides partial information or generates a portion of the rules description 40, as pointed out in more detail hereafter. Within this diagram, while the various forms of external data input are shown schematically as coming from a punched card deck, it is to be understood that the input can be by any other standard input method associated with a data processing system. In general, as indicated previously, FADS 16 is designed primarily to handle the rules restricted design but is modified to recognize the existence of freeform designs.

The first function is chip image generation 38, the purpose of which is to allow the designer to select and, modify if he so desires, a standard image available to the system. The output of this step would include a description of such an image that would eventually be incorporated into the description 40. To obtain this output, three inputs are provided. The first input 32 identifies any part number and engineering change level associated with a given LSI chip 24. A second input 34 defines the basic image type to be used by the designer. The input can be information similar to that shown in FIG. 5f which includes a first field identifying the image and a second field identifying any particular columns where such a choice is available. Within this particular example, the image shown in FIG. 3 is a "default image" so designated in FIG. 5f, having four columns of active areas. A third type of input 36 provides an image description of the manner in which the basic image is to be modified for use by the designer if he so chooses. Such modifications might come about by bending the power busses. In the example, no modification is necessary.

The second operation 42 is to perform the functions of initial device sizing and data checking. The designer defines the logic to be implemented and the performance required from the logic. The system then calculates the device sizes required for each circuit to meet its specified performance. In general, the logic is described in terms of nets or grouping of circuit LSTs (logic service terminals) and I/O pads which must be connected to implement the logic function. Performance or speed requirements are indicated to the system by specifying the input waveform and/or capacitive loading present at the I/O pads and the performance of each circuit. During this operation, the system validates the designer's input and may perform a

number of checks including the following: each circuit has been equated to a book type; master logic list (MLL) is consistent with circuit data; fan-in to a circuit; number of outputs dotted; total fan-in to dotted circuits; load device has been specified for one circuit in a dotted net. It should be obvious that many of these checks are equated to only the rules restricted design and the checks are merely to make certain that the design conforms at least to certain ones of the rules checked for in this operation.

Operation 42, in addition to receiving as an input the output from the preceding step 38 receives a first input 44 called the pad spec or specification shown in detail in FIG. 5d. With reference to such Figure, the pad spec includes two fields for correlating the logical I/O numbers used by a designer to distinguish an I/O pad with an actual physical I/O pad number. The physical I/O number is optional and if the designer does not specify a particular one, the system will determine or specify one. In the particular example, the two physical pads P41 and P36 are also considered to be the same logical I/O pad numbers. The waveform field might be used to specify any special characteristics of a waveform. Where the field is not used, the pad is not a primary driver and receiver. The rise time specifies for example in nanoseconds the time of the rising input waveform where the pad is a primary input or has an off chip dot connection. In the example, it is assumed that the waveform associated with pad 41 has a rise time of 100 nanoseconds and fall time of 200 nanoseconds. The remaining field is the capacitance load expressed for example in picofarads, as seen by the circuit which is driving the I/O pad and should be specified if the I/O pad is primary output or has an off chip dot.

Another input to step 42 is MLL 48 shown in FIG. 5c. In general, the MLL describes the set of connection required to implement the desired logic. Each connection or net must be assigned a unique positive integer by the designer. The net is composed of two types of connections, circuit LSTs and I/O pads. The first field is the net number which in the particular example involves three nets numbered 101, 102 and 103. Next will come a series of paired fields identifying a circuit number and LST ID, the number of these fields being repeated for as many as are associated with a given net. A negative circuit number indicates an I/O pad, a positive number indicates an LST. For the specific example, shown in FIG. 3, FIG. 5c includes the specific or exemplary information shown.

The next input 46 to step 42 is the circuit data information as in Figure 5A, used to uniquely identify circuit blocks on the logic diagram and attach physical attributes to it and to specify circuit specifications or data in accordance with any terms defined within the associated book library. This data is initially supplied to step 42 without any placement information and is later modified to include the placement information as an input to a succeeding step as described below. The first column specifies the circuit number which in the example is 1. The next field identifies the book number which equates the circuit number to a logic function and topology stored in a book library 18. The next three columns or fields of column row and order are used to identify the relative placement of the circuit on the chip. In the example, the chip has four columns with the left column being numbered 1. The row refers to the relative vertical stacking within a given column where circuit 2 occupies the first row and circuit 1 occupies the second row. This is really relative and spaces may be skipped in between. The system will eventually determine the exact placement. Order refers to the number of circuits within a given row in a column and there may be more than one device although in the example, only one device AO1 is shown and this would have an order of 1. The next field orientation refers to the basic orientation as stored in the book library and whether it is to be mirror imaged about the X or Y axes. The remaining fields relate to certain circuit specifications or data which can be filled in or left blank in which case the default parameters would be used.

The remaining input to step 42 is freeform data 50 shown in detail in FIG. 5b. The first field identifies the circuit number. The next field identifies the book number which in this example is an arbitrary number 401 that would identify the associated topological and electrical characteristic information within book library 18. The X location and Y location would refer to the relative coordinates for the lower lefthand corner of the outline of circuit 2. The active area of the chip may be arbitrarily divided up into grid units each grid unit representing for example 0.025 microinches. The orientation of 1 indicates that it is to use the basic orientation within the book with no mirror imaging around the X or Y axes. This information is then used by the system to more or less outline or create a hole within which the processing relative to the other circuits proceed without any attempt to be made to check what is within the outline. The specific topology of the circuit is obtained

from the library as well as the locations of the terminals thereon so that the specification of the location of the corner of the circuit along with its orientation, is used to specify the location and also indirectly the geometry of the circuit.

The third operation 52 is one of circuit placement and this requires the designer to assign logic circuits to positions on the chip. The assignment is done in terms of relative coordinates which are automatically transformed to absolute coordinates by the system, the data or assignment being included as placement data 54 associated with the circuit data. This information is described previously relative to FIG. 5a wherein in step 54, the information enclosed in parenthesis is added.

The output from the circuit placement operation 52 includes a wire list 56 that indicates the coordinates for each LST which must be wired to implement the logic. It could also include any information for modifying the device size and delay that's based upon any revised loading or electrical parameters derived from the placement data. The chip designer would then utilize this wire list to produce an input 58 containing digit data information shown in FIG. 5e. the first field contains the net number corresponding to the same net number in MLL 48. The second field can be used to distinguish a code between whether the specifications are digitized on wiring channels or in grid units. The next three fields define the X, Y and Z coordinates for the starting point of the first line segment, the Z coordinate corresponding to the chip layer or mask level in which the wiring starts. The width field can be used by putting a zero therein to indicate that a standard width of metallization or diffusion is to be used or it can specify the actual width. The remaining fields, and there can be more than one dependent upon how many changes there are in the line segment, can be used to first define the direction of movement in either positive or negative X or Y direction from the starting point or a vertical direction and the steps field will specify the number of grid units or wiring channels along which the line segment will extend. If the direction is specified as indicating a change between layers, the steps field can then be used to specify a type of contact for accomplishing the change. The X and Y coordinates define the location of the wire or LST relative to the origin of the chip.

The final step 60 of the process is a wire routing operation that utilizes the digit data and output from step 52 to route wires to interconnect all the circuit LSTs and I/O pads. The wire routing step checks to see that the logical circuit LSTs coded in the

MLL are matched against gates placed in the digitization. It also checks for net continuity, intersection nd critical spacing. The final output of the wiring routing step 60 is placed in 40 and completes the description of the chip except for the specific information stored in the book library describing the internals of the freeform design. With the design completed, various other tests such as delay calculations, may be performed to aid the designer and help ensure the accuracy of the completed design.

Referring now to FIG. 6, the overall steps in the design process are summarized in flowchart form. Initially, step 70 involves the predesign of those circuits associated with the rules restricted design. Step 72 involves predesigning the freeform designs and organizing the data into books. As indicated previously, the system will operate on the rules books 70 to perform as many DA functions relative thereto as possible whereas the number of functions performed on the freeform books 72 is restricted in that no checks are made by the automated design system relative to any of the internal workings of the devices. These predesigns are converted into data acceptable to the data processing system and, in step 74, they are stored within the system in books containing the topological data and electrical characteristics of the circuits and graphical descriptions of the freeform designs. Thereafter, step 76 generates the graphical description of the image, rules circuits and wiring, such graphical description of the freeform design being already stored in book form. Next, step 78, the description from step 76 is merged with the description of the freeform design as obtained from the library, the merger producing the graphical description of the total device. Thereafter, the appropriate photolithographic masks are made in step 80 for use in the step 82 to actually produce an LSI device.

WHAT WE CLAIM IS:—

1. Apparatus for producing graphical data descriptive of an integrated circuit design comprising first means adapted to store graphical descriptions of freeform designs, second means adapted to store topological data and electrical characteristics of rules restricted designs, means adapted to enter information denoting the location and relationship of a freeform design to a rules restricted design, means adapted to generate a graphical description of said rules restricted design, and means adapted to merge the generated graphical description of said rules restricted design with the graphical description of said freeform design stored in said first means

to form said graphical data descriptive of an integrated circuit design.

2. Apparatus as claimed in claim 1, wherein said entering means comprises means adapted to specify the relative location on said freeform design of signal and power terminals, and means adapted to specify conductive networks interconnecting said terminals with said rules restricted design.

3. Apparatus as claimed in claim 2 comprising means adapted to store topological information providing relative orientations of any design in the form of mirror images about Cartesian axes, and means adapted to specify the desired orientation of said freeform design.

4. Apparatus as claimed in claim 1, comprising means adapted to specify the location of said freeform design relative to an origin on said chip of a grid unit locating coordinates.

5. Apparatus as claimed in any preceding claim, comprising means adapted to store a graphical description of at least one image for said integrated circuit design defining the topology of power busses and input-output pads.

6. Apparatus for producing graphical data descriptive of an integrated circuit design, substantially as herein described with reference to the accompanying drawings.

JOHN BLAKE,
Chartered Patent Agent,
Agent for the Applicants.

Printed for Her Majesty's Stationery Office by the Courier Press, Leamington Spa, 1976.
Published by the Patent Office, 25 Southampton Buildings, London, WC2A 1AY, from
which copies may be obtained.

1445914    COMPLETE SPECIFICATION

6  SHEETS    *This drawing is a reproduction of
the Original on a reduced scale*
Sheet 1

# FIG. 1



# FIG. 2



1445914    COMPLETE SPECIFICATION
6 SHEETS    *This drawing is a reproduction of
the Original on a reduced scale*
Sheet 2

# FIG. 3



1445914    COMPLETE SPECIFICATION
6 SHEETS    *This drawing is a reproduction of the Original on a reduced scale*
Sheet 3

# FIG. 4

1445914    COMPLETE SPECIFICATION
6 SHEETS    *This drawing is a reproduction of
the Original on a reduced scale*
Sheet 4

## FIG. 5a



| CIRCUIT NUMBER | BOOK NUMBER | COLUMN | ROW | ORDER | ORIENTATION | LOAD DEVICE | LOAD WIDTH | FUNCTION | SUB-FUNCTION | SPECIFICATION | SPECIFIED LST | DELAY LST |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | (1) | (2) | (1) | (1) | | | | | | | |

CIRCUIT DATA

## FIG. 5b



| CIRCUIT NUMBER | BOOK NUMBER | X LOCATION | Y LOCATION | ORIENTATION |
|---|---|---|---|---|
| 2 | 401 | 10 | 50 | 1 |

FREEFORM DATA

## FIG. 5c

| NET NUMBER | CIRCUIT NUMBER | LST ID | CIRCUIT | LST ID | CIRCUIT | LST ID |
|---|---|---|---|---|---|---|
| 101 | 2 | B01 | -1 | P41 | | |
| 102 | 2 | Z02 | 1 | A01 | | |
| 103 | 1 | Z01 | -101 | P36 | | |

MASTER LOGIC LIST (MLL)

1445914    COMPLETE SPECIFICATION

6 SHEETS    *This drawing is a reproduction of the Original on a reduced scale*

Sheet 5

## FIG. 5d



| LOGICAL I/O | PHYSICAL I/O | WAVEFORM | RISE TIME | FALL TIME | CAPACITANCE |
|---|---|---|---|---|---|
| P41 | P41 | | 100 | 200 | |
| P36 | P36 | | | | 5 |

PAD DATA

## FIG. 5e



| NET NUMBER | CODE | X START | Y START | Z START | WIDTH | DIRECTION | STEPS |
|---|---|---|---|---|---|---|---|
| 101 | 1 | a | b | c | o | | |
| 102 | 1 | d | e | f | o | | |
| 103 | 1 | s | n | i | o | | |

DIGIT DATA

## FIG. 5f



| DEFAULT IMAGE | COLUMNS = N |
|---|---|

IMAGE TYPE

1445914     COMPLETE SPECIFICATION
6 SHEETS     *This drawing is a reproduction of the Original on a reduced scale*
Sheet 6

# FIG. 6



ASIC BACKGROUND | ASIC DESIGN | '432 METHODOLOGY | CLAIMS CONSTRUCTION ESTOPPEL | CLAIMS CONSTRUCTION

# Claim 13

PREAMBLE TERM ⑫

13. A computer-aided design process for designing an application specific integrated circuit which will perform a desired function comprising

432 Patent 16:34-36

## Dispute: Ricoh seeks to add "during the manufacture" to Claim 13

- Avoid dismissal for use by foreign defendants (35 U.S.C. §271(g))
- Attempt to enlarge measure of damages based on chips



46

# *Demystifying Chipmaking*

## *by Richard F. Yanda, Michael Heynes and Anne K. Miller*



ELSEVIER

AMSTERDAM • BOSTON • HEIDELBERG • LONDON
NEW YORK • OXFORD • PARIS • SAN DIEGO
SAN FRANCISCO • SINGAPORE • SYDNEY • TOKYO

Newnes is an imprint of Elsevier



Newnes

Newnes is an imprint of Elsevier
30 Corporate Drive, Suite 400, Burlington, MA 01803, USA
Linacre House, Jordan Hill, Oxford OX2 8DP, UK

Copyright © 2005, Elsevier Inc. All rights reserved.

No part of this publication may be reproduced, stored in a retrieval system, or
transmitted in any form or by any means, electronic, mechanical, photocopying,
recording, or otherwise, without the prior written permission of the publisher.

Permissions may be sought directly from Elsevier's Science & Technology Rights
Department in Oxford, UK: phone: (+44) 1865 843830, fax: (+44) 1865 853333,
e-mail: permissions@elsevier.com.uk. You may also complete your request on-line via
the Elsevier homepage (http://elsevier.com), by selecting "Customer Support" and then
"Obtaining Permissions."

 Recognizing the importance of preserving what has been written,
Elsevier prints its books on acid-free paper whenever possible.

**Library of Congress Cataloging-in-Publication Data**

(Application submitted.)

**British Library Cataloguing-in-Publication Data**
A catalogue record for this book is available from the British Library.

ISBN: 0-7506-7760-0

For information on all Newnes publications
visit our Web site at www.books.elsevier.com

04  05  06  07  08  09    10  9  8  7  6  5  4  3  2  1

Printed in the United States of America

Working together to grow
libraries in developing countries

www.elsevier.com  |  www.bookaid.org  |  www.sabre.org

ELSEVIER    BOOK AID International    Sabre Foundation

# *Foreword*

Welcome! This is the story of how the vast majority of integrated circuits are made—call them "computer chips," if you like, although a host of other electronic components are made in much the same way. Everyone who is curious about how such tiny, yet powerful, devices are made will enjoy the story. This book will also serve as a valuable update to those who may be unaware of how drastically the state-of-the-art processes have changed in recent years.

The most glamorous (and expensive) part of the chipmaking process is the focus of this book. A chip will be built: each step is described, in order, until the whole chip is completed, from the design phase, to growing the silicon ingots, to the final testing of the packaged part.

The building of a chip is a fascinating process that will certainly impress and astonish everyone who is new to the story or who is out of touch with current procedures. Read on!

*xi*

*Chapter 2: Support Technologies*

**Definition**: *Tapeout* is the process of turning the layout (chip artwork) into separate layers that will be made into photomasks (see Section 5). The term comes from the procedure used early in the history of the industry when the final step in the design process was to download the layers onto reel-to-reel tapes. The tapes would then be delivered to the mask maker. Today, tapeout essentially consists of sending an encrypted file of the fully verified IC using file transfer protocol (FTP) to the mask vendor.

only a small portion of the wafer. Multiple exposures are required to transfer the pattern to the entire wafer. These tools have replaced those using photomasks because the image on the reticle can be optically reduced, producing a smaller sized image.

*Definition: The Quartz Glass* discussed here is fused silica, a high purity form of silicon dioxide ($SiO_2$).

The reticle is made by patterning a chrome-coated substrate of quartz glass plate. The glass must be defect-free, extremely flat and highly polished. But, more important, it must be transparent to the ultraviolet light wavelengths used to expose the photoresist. All of these requirements are well satisfied by quartz glass.

A thin layer of chromium coats the plate on one side. A glue layer is often needed to ensure that the chrome sticks to the glass and an antireflective coating is needed on top. The total thickness of these films is only about 100 nm.

## 5.3 Pattern Transfer

*Definition: Photoresist (Resist)* is a light-sensitive or e-beam sensitive plastic material. Its function is similar to that of the film in a camera, a likeness that will become clear in the next few paragraphs.

The chrome is coated with a thin layer of photoresist. The resist is sensitive to exposure to either an electron beam or a laser. Most ultra large scale integration (ULSI) reticles are produced using an electron beam in a direct-write electron beam system.

Now it is time to utilize the digital code provided by the design group. That code is loaded into the computer that controls the direct-write tool. The layout artwork is reproduced in the resist by the tool, the e-beam is scanned back-and-forth across the resist and the platen on which the glass plate is mounted moves up and down. This intricate control scheme transfers the image into the resist. Exposure to the e-beam or laser energy causes a chemical change in the photoresist.

The pattern is invisible immediately after exposure to the e-beam. A developer solution is needed to dissolve the exposed resist, leaving behind the desired pattern in the resist. Now the chrome is covered with a template that will allow the pattern to be transferred to it.

The next step is to etch the pattern into the chrome. An acid is used that does not attack the resist but easily removes the exposed chrome. A thorough rinse is required after etch, followed by a photoresist strip process to remove the template. The reticle is now complete.

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                NORTHERN DISTRICT OF CALIFORNIA
 3                   SAN FRANCISCO DIVISION
 4                         --oOo--
 5   RICOH COMPANY, LTD.,         )
                                  )
 6        Plaintiff,              )
                                  )
 7   vs.                          )   No. C03-04669 MJJ (EMC)
                                  )
 8   AEROFLEX, et al.,            )
                                  )
 9        Defendant.              )
                                  )
10   _____
11   SYNOPSYS, INC.,              )
                                  )
12        Plaintiff,              )
                                  )
13   vs.                          )   No. C03-2289 MJJ (EMC)
                                  )
14   RICOH COMPANY, LTD.,         )
                                  )
15        Defendant.              )
                                  )
16   _____
17
18                       DEPOSITION OF
19
20                    MICHAEL S. HEYNES
21
22                      JULY 27, 2005
23
24   REPORTER:  JUDIE A. NICHOLAS, CSR 12229    JOB 1-2271
25
```

**TRAVEL TRANSCRIPT**



Page 2

1       IN THE UNITED STATES DISTRICT COURT
2       NORTHERN DISTRICT OF CALIFORNIA
3          SAN FRANCISCO DIVISION
4             --oOo--
5  RICOH COMPANY, LTD.,  )
6     Plaintiff,  )
7  vs.  )  No. C03-04669 MJJ (EMC)
8  AEROFLEX, et al.,  )
9     Defendant.  )
10 _____
11            --oOo--
12
13      BE IT REMEMBERED that, pursuant to Notice, and
14 on Tuesday, July 27, 2005, commencing at 10:19 a.m.
15 thereof, at 177 Post Street, San Francisco, CA, before
16 me, JUDIE A. NICHOLAS, a Certified Shorthand Reporter,
17 personally appeared
18      MICHAEL S. HEYNES,
19 called as a witness by the Plaintiff, who, having been
20 first duly sworn, was examined and testified as follows:
21      DICKSTEIN SHAPIRO MORIN & OSHINSKY, 2101 L
22 Street NW, Washington DC 20037-1526, represented by Eric
23 Oliver, Attorney at Law, appeared as counsel on behalf
24 of the Plaintiff.
25      Howrey, 525 Market Street, Suite 3600, San

Page 3

1  Francisco, CA 94105-2708, represented by Jaclyn C. Fink,
2  Attorney at Law, appeared as counsel on behalf of the
3  Defendant.
4           --oOo--
5       EXAMINATION BY MR. OLIVER
6     MR. OLIVER: Q. Good morning, Mr. Heynes.
7     A. Good morning.
8     **Q. Would you please state your name, your full**
9  **name, and your address for the record?**
10    A. Michael S. Heynes, 1501 West Hillsdale
11 Boulevard, No. 111, in San Mateo, California 94402.
12    (Exhibit 50 marked for identification.)
13    **Q. I've set before you what has been marked as**
14 **Plaintiff's Exhibit 50. Do you recognize that?**
15    A. Yes.
16    **Q. What is that?**
17    A. This is an e-mail that I sent to Jackie Fink
18 after the first conversation I had with her, and it was
19 just a couple of my thoughts concerning the ASIC -- the
20 structure of the ASIC integrated circuit market.
21    **Q. If you could just speak up a little bit louder.**
22    A. Oh, okay.
23    **Q. Says here, "After our conversation yesterday,"**
24 **which would have been June 6th, 2005, "I was thinking**
25 **about ASICs."**

Page 4

1     **What was your conversation?**
2     MS. FINK: Objection to the extent that it
3  calls for privileged information.
4     MR. OLIVER: Just to clarify, is he not an
5  expert, designated as an expert?
6     MS. FINK: Yes.
7     MR. OLIVER: So you're claiming that there's
8  some type of privilege in connection with this --
9     MS. FINK: It could be work product.
10    MR. OLIVER: Or work product?
11    MS. FINK: (Nodded affirmatively.)
12    MR. OLIVER: Just to be clear, were you
13 representing him at that time, June 6th?
14    MS. FINK: We had -- actually, at that point,
15 we hadn't yet signed a retention letter.
16    MR. OLIVER: Either way, you weren't
17 representing him --
18    MS. FINK: No.
19    MR. OLIVER: -- in a legal capacity, so, just
20 to be clear, any conversation you had with him on June
21 6th could not have been a privileged conversation.
22    MS. FINK: Okay.
23    MR. OLIVER: Q. Do you remember the question?
24    A. You were asking the nature of our conversation.
25    **Q. Yes.**

Page 5

1     A. And I don't remember much about it. It was a
2  very -- it was our first phone conversation, and it was
3  a very general conversation.
4     **Q. Did you initiate the conversation?**
5     A. Jackie called me.
6     **Q. Do you know why she called you?**
7     A. She was looking for someone with expertise in
8  the integrated circuit fabrication area.
9     **Q. Just the fabrication area?**
10    A. Yes.
11    **Q. Do you know how she found you?**
12    A. It was a referral from someone else that she
13 had called before.
14    **Q. Do you know the name of the person who referred**
15 **you?**
16    A. Yes. I was referred by Ann Miller of a company
17 called Semiconductor Services, which is a small training
18 and consulting company.
19    **Q. Do you know if she contacted anyone else after**
20 **she contacted you?**
21    MS. FINK: Objection. Calls for speculation.
22    THE WITNESS: I'm sorry.
23    MR. OLIVER: Q. You can answer if you know.
24    A. Not that I know.
25    **Q. When were you retained to be an expert in this**

Deposition of:
Michael S. Heynes

July 27, 2005

Page 6

1  case?
2     A. That was the -- I think probably the day after
3  this conversation, and Jackie sent me a letter of
4  agreement for me to sign.
5     Q. The day after the June 6th conversation?
6     A. I think so.
7     Q. Were you retained solely for the preparation of
8  the declaration that you signed and was filed -- or at
9  least was signed on June 14th, 2005?
10    A. I don't know that that's all that Jackie had in
11 mind for me.
12    Q. Have you done anything else for -- I guess
13 Synopsis is the person who actually retained you, is
14 that correct, as opposed to Jackie's law firm?
15    A. Indirectly.
16    Q. So you worked for Howrey, but Synopsis is the
17 ultimate --
18    A. Yes. Yes.
19    Q. Okay. Well, have you done anything else
20 besides your work on the declaration?
21    A. No.
22    Q. Is there anything else -- any future plans to
23 use you, that you know of?
24    A. Not that I know of.
25    Q. In the third paragraph you use the phrase,

Page 7

1  "Another approach is to fab wafers with a standard chip
2  design." What are you referring to in that paragraph?
3     A. This is a technology which is used where
4  standard wafers are processed up to the metallization
5  level, and those wafers will have the whole range of
6  different kinds of cells and devices on them, and they
7  can be wired together to produce essentially an infinite
8  number of different functions. And at the time that I
9  wrote this e-mail, I didn't know very much at all about
10 the nature of this particular case, and apparently the
11 ASICs involved here are not of these gate array types,
12 but a complete custom design, basically. ASICs used to
13 be called custom design.
14    Q. You have attached a CV which appears as the
15 second and third pages of this exhibit. Is that the
16 same CV that was attached to your declaration?
17    A. Yes.
18    Q. You mention calling Katie Yanda. Who is Katie
19 Yanda?
20    A. She's the wife of a man who is one of the three
21 authors of the book that's referred to in the
22 declaration.
23    Q. She was the wife of --
24    A. Of Richard Yanda, actually -- Richard F. Yanda,
25 who is one of the three authors of the book that's

Page 8

1  mentioned, and she has worked in the industry for a long
2  time, in the design area.
3     Q. Was she also an author of that book?
4     A. No.
5     Q. Why did you call her?
6     A. I called her to let her know that she may get a
7  call from Jackie.
8     Q. Did you refer her to Jackie?
9     A. Yes.
10    Q. Why did you refer her?
11    A. Because she was someone I knew who was very
12 familiar with the design activity.
13    Q. As opposed to the fabrication process?
14    A. Fabrication activity, right.
15    Q. Has she written her own books?
16    A. No. Not to my knowledge.
17    Q. Turning to the second and third pages of the
18 document -- or of the Exhibit 50, I'd like to step
19 through your work experience.
20       Currently you work as a consultant, is that
21 correct?
22    A. Yes.
23    Q. Do you do any consulting work for Synopsis?
24    A. No.
25    Q. Do you any work -- consulting work for any of

Page 9

1  the ASIC defendants in this case, which are Aeroflex,
2  Matrox and AMIS?
3     A. No.
4     Q. You know who all those companies are, is that
5  correct?
6     A. Vaguely, yes. Not well.
7     Q. Have you ever worked for any of those
8  companies?
9     A. No. Who was the last one you mentioned?
10    Q. AMI Semiconductor?
11    A. Oh, I have worked for AMI Semiconductor twenty
12 years ago.
13    Q. Is that what you have down as -- let's see if
14 it's on here.
15    A. Yes, that would be in the previous position
16 section. Manager, CMOS Technology Development, American
17 Microsystems.
18    Q. Yes, American Microsystems. We'll get to that
19 in a minute.
20       As a consultant, what are your duties?
21    A. Mostly, in recent times, it's been training.
22 I've written many training classes and presented them to
23 a variety of different audiences, from equipment
24 companies particularly, and sometimes to semiconductor
25 companies, chip-making companies.

3 (Pages 6 to 9)

Deposition of:
Michael S. Heynes

July 27, 2005

Page 10

1    Q. And what aspect — I assume this involves
2  semiconductor of processing?
3    A. Yes.
4    Q. Manufacturing processing?
5    A. Yes. Sometimes overall wafer fabrication,
6  sometimes relatively specialized material. I've done a
7  lot of work for Lam Research, one of the major equipment
8  company makers, on etch processes for etching the
9  patterns on silicon wafers, and so those classes were
10  focused on the use of Lam's equipment in wafer
11  fabrication.
12    Q. So you don't do any design or engineering
13  consultation, is that correct?
14    MS. FINK: Objection.
15    THE WITNESS: Sorry.
16    MS. FINK: Lack of foundation. Mischaracterizes
17  his prior testimony.
18    THE WITNESS: I can answer?
19    MS. FINK: Yes.
20    THE WITNESS: Nothing connected with the
21  design. I know very little about design engineering.
22  I'm a process engineer.
23    MR. OLIVER: Q. Have you ever had any duties
24  in any job capacity with respect to designing of
25  integrated circuits?

Page 11

1    A. No.
2    Q. With designing of any type of circuits?
3    A. No.
4    Q. You were with Lam Research?
5    A. Yes, I was with Lam Research as an employee for
6  a few years, and then continued on a consulting basis
7  with them.
8    Q. What did you do at Lam Research?
9    A. That was all training. They wanted someone who
10  had experience in the overall wafer fabrication area,
11  because the people who work in the equipment business
12  generally don't understand well how their equipment is
13  used in fabricating wafers.
14    Q. What is their equipment?
15    A. Their principal product is plasma etchers.
16    Q. And what does one do with plasma etching?
17    A. They etch -- those machines can etch many kinds
18  of materials to form the patterns in the surface of the
19  silicon wafers.
20    Q. And they didn't understand how that fed into
21  the overall process, is that what you're saying?
22    A. Yes.
23    Q. Did you do anything else there?
24    A. No.
25    Q. When you were with -- prior to that you were

Page 12

1  with Teledyne Components?
2    A. Yes.
3    Q. What did you do there?
4    A. That was a small division of Teledyne
5  Corporation, which has a number of divisions in the
6  various technology areas, and they made small volumes of
7  specialized chips. And, again, my responsibility there
8  was in wafer fabrication.
9    Q. What, in particular, did you do?
10    A. I was doing improvement of an existing CMOS
11  technology wafer fabrication process. That took a lot
12  of time.
13    Q. When you say you worked on an improvement,
14  exactly what was your responsibility?
15    A. The wafers that they were fabricating were
16  yielding rather poorly, not many good chips per wafer,
17  in other words, and I was looking at wafers to try to
18  find out why they had these yield problems, and, also,
19  looking at the various process steps through the
20  fabrication cycle, I was looking for places where I
21  could improve what are called individual process
22  modules, where perhaps the thicknesses or other
23  characteristics of the materials were not as well
24  controlled as they should be.
25    Q. So if you found an area which could be

Page 13

1  improved, what did you do?
2    A. I would do a number of experiments on that
3  particular process to establish a new way of running
4  that process, and write a specification for it, and
5  train technicians and operators to run the process and
6  follow the specification.
7    Q. In the previous position section, you worked
8  for Gain Electronics.
9    A. Uh-huh.
10    Q. When did you work for Gain Electronics?
11    A. That would have been about 1988 to 1990.
12    Q. And what did you do at Gain Electronics?
13    A. This was a very different technology, because I
14  was working with gallium arsenide.
15    Q. So what did you do there?
16    A. The nature of the work I was doing was similar
17  to my silicon experience. I was working on etching
18  patterns, I was working on chemical vapor deposition
19  processes for the deposition of things like silicon
20  nitride layers. Those are two principal areas where I
21  worked. This was a small startup company and just
22  getting wafer fabrication going.
23    Q. Were you again responsible for determining why
24  yields were low?
25    A. At the point I was working there, it was a new

Premier Litigation Service Bureau, Inc.
Tel: 215-938-6342    Fax: 215-938-6346

Page 14

1  company. They were not yet making circuits at all.
2  They were developing a process, a technology.
3      Q. Were you in charge of that process?
4      A. Not in that case, not the whole process. The
5  way I have been -- with silicon in several companies, I
6  had these rather specialized, relatively individual
7  contributor responsibilities for those certain process
8  steps, like the chemical vapor deposition and etching
9  processes and plasma-activated machines.
10     Q. So when you say you worked in those aspects,
11  what did you actually do?
12     A. Taking test wafers, and in some cases just bare
13  wafers, putting them in a chemical vapor deposition
14  machine, depositing layers of silicon nitride on them
15  and then evaluating those layers with uniformity across
16  the wafers, the optical characteristics of the wafer's
17  refractive index notably, which is an indication of the
18  structure of the silicon nitride material.
19     Q. Then you were with American Microsystems, is
20  that also known as AMI?
21     A. This is going back in time. Before -- AMI was
22  before Gain Electronics.
23     Q. I'm sorry. Yes.
24     So, American Microsystems, that's also known as
25  AMI, is that correct?

Page 15

1      A. Yes.
2      Q. And when did you work there?
3      A. Roughly, from 1990 to 1995.
4      Q. And what did you do at AMI?
5      A. That's where I was responsible for -- most of
6  the time I was there -- for an overall wafer fabrication
7  technology development. The company already had a CMOS
8  technology which was outdated, and my principal task was
9  to develop a next generation CMOS fabrication cycle is a
10  way of expressing it.
11     Q. Did you deal in any way with the design phase?
12     A. No.
13     Q. Did you interact with any design engineers?
14     A. A little.
15     Q. When you say a little, what do you mean?
16     A. I was -- the responsibility I would have would
17  be in taking masks for a CMOS process and running them
18  through our new CMOS wafer fabrication cycle, and the
19  design engineers would be interested to know when are
20  the wafers coming out.
21     Q. So your interaction involved reporting to them?
22     A. Keeping them informed past the progress of
23  wafers which were in fabrication and passing them on for
24  a test.
25     Q. Since 1985, have you ever had any interaction

Page 16

1  with AMI or anyone in AMI?
2      A. No. I had one person from AMI in a class at
3  Lam on one occasion, a man I never met before. He was a
4  young man I never met. That's the only contact I've had
5  with AMI since.
6      Q. Have you ever had any contact with anyone from
7  Aeroflex?
8      A. No. No.
9      Q. Have you had any contact with anyone from
10  either Matrox Electronic Systems, Matrox Graphics,
11  Matrox International Corp. or Matrox Tech?
12     A. No, I had never heard of them.
13     Q. In forming your opinions for your declaration,
14  did you do any analysis of any design work, or any work
15  whatsoever from any of the ASIC defendants, those being
16  Aeroflex, Matrox, or AMI?
17     A. No. No. I have no knowledge in that area to
18  do such work.
19     Q. Why did you refer Katie Yanda to Jackie?
20     A. She was someone I knew who had worked in the
21  design area for a long time.
22     Q. Yes. But I meant did Jackie express an
23  interest in finding someone who had design experience?
24     A. Yes, she had asked me if I could refer her to
25  someone who had that background.

Page 17

1      Q. Do you know if Jackie or anyone at Jackie's law
2  firm had contacted Katie Yanda?
3      A. No.
4      Q. When did you work at Microtechnology?
5      A. That would have been before --
6      Q. Do you have an approximate time?
7      A. That would be about '78 to '80.
8      Q. And what did you do at Microtechnology?
9      A. Again, I was running wafers through a CMOS
10  fabrication process.
11     Q. What did you do at Nortec Electronics?
12     A. I was doing some process development, the kind
13  that I described for Gain Electronics, individual
14  process modules which needed developing from scratch or
15  needed improving, and also putting together complete
16  process runsheets as they call it, the complete cycle of
17  steps that wafers need to go through in wafer
18  fabrication. It's called process integration.
19     Q. And what year was -- what year did you work at
20  Nortec Electronics?
21     A. That went from about 1970 to 1978.
22     Q. Is it safe to say you did similar work
23  involving fabrication processing for the companies
24  listed in your early work section?
25     A. Yes.

5 (Pages 14 to 17)

Deposition of:
Michael S. Heynes

July 27, 2005

Page 18

1    Q. Is there any other companies that you may have
2 worked for that are not listed anywhere on this CV?
3    A. My very first job in the U.S -- I completed my
4 education in England. My first job in the U.S. was with
5 a company called Clevite.
6    Q. How do you spell that?
7    A. C-l-e-v-i-t-e. In the Boston area.
8    Q. When did you work there?
9    A. I came to the U.S. in 1960 and worked there
10 until about '64.
11    Q. Did you work also in the fabrication process?
12    A. Yes. Actually, my first job there was in
13 crystal growing. My first responsibility was growing
14 crystals, silicon crystals, and doing a process called
15 epitaxial deposition. It's a technique for putting a
16 layer of silicon on an existing silicon wafer.
17    Q. How many books have you written, or
18 co-authored?
19    A. That's the only book of a textbook style. I
20 have a number of publications in the academic
21 literature, maybe seven or eight articles in the
22 academic literature on semiconductor processing
23 diffusion, some chemical vapor deposition, some MRS
24 technology and related material.
25    Q. Did you author a book called Semiconductor

Page 19

1 Technology, Glossary of Terms?
2    A. No, I didn't. I wrote an article for a
3 magazine which may have had that title, come to think of
4 it, but there's hundreds of those glossaries around, and
5 I've written several of them for several jobs.
6    Q. I see. So it may not have been a book, it may
7 have been just a publication?
8    A. Yes, that was an article in some electronics
9 magazine.
10    Q. And was that with Ann Miller?
11    A. No. No, that was way -- a long time ago.
12    Actually, there was one article more recently
13 which was -- that was not a glossary, that was more of a
14 general -- very general outline of MRS technology.
15    I was at Nortec when I wrote that glossary
16 article, so that goes back to the seventies.
17    Q. Did you write that yourself?
18    A. Yes.
19    Q. Did you write a book entitled Integrated
20 Circuit Manufacturing Synopsis?
21    A. I helped write some sections of it. It's a
22 small -- very small book, a dozen pages or something
23 like that. It's a very broad outline of the whole of
24 the semiconductor industry, essentially.
25    Q. What the book about?

Page 20

1    A. It's a very high level view of the whole
2 semiconductor industry, of semiconductor chip
3 fabrication.
4    Q. Was Ann Miller a co-author?
5    A. Yes.
6    Q. What was your role in writing the book?
7    A. Actually, it was an updating activity which I
8 participated in. She already had this synopsis written
9 and was using it, and it needed updating because of
10 changes in the process technologies.
11    Q. So you worked on the updating of the book?
12    A. Yes.
13    Q. So I presume you read it and you found it to be
14 accurate, is that correct?
15    A. I must have.
16    Q. Do you know of anything that was incorrect?
17    A. I may have -- certainly not that I remember
18 now. I may have disagreed with Ann at some point, and
19 she may not have -- she was -- it was her book to
20 publish and I was helping her to put it together.
21    Q. I see.
22    A. I may have disagreed with her on some points,
23 and she may or may not have taken my suggestions.
24    Q. As to the Demystifying Chip Making book, that
25 was -- you were the principal of that book? That's

Page 21

1 correct?
2    A. Yes. I'm not the first mentioned author. I
3 should explain that. Rick Yanda likes to write, I
4 don't, so I was main source of information for most
5 of the material in the book and he put the words
6 together.
7    Q. I see.
8    A. I --
9    Q. So that's why you, on your CV, call yourself a
10 principal contributor?
11    A. Yes.
12    Q. So it's really, you believe, your work?
13    A. Yes. I wrote many sections and gave those
14 drafts to Rick, and this is intended to be an
15 introductory book, and my writing style is rather terse
16 and academic, so Rick modified it to make it easier for
17 the less educated people to read.
18    Q. So you're pointing to Jackie when you say that?
19    A. Jackie said it was very clear.
20    Q. I see.
21    A. So Rick did the write thing with my terse
22 academic stuff.
23    Q. So you found that book to be accurate, is that
24 true?
25    A. In the areas where I have expertise, with one

Premier Litigation Service Bureau, Inc.
Tel: 215-938-6342    Fax: 215-938-6346

Page 22

1  exception. There was something I disagreed with Rick
2  Yanda on which I wanted to change, at least one thing
3  that I know of, and he chose not to change it.
4      Q. What is that?
5      A. This had to do with a P-N junction, and the
6  electrical charges in it. This is device physics.
7      Q. So you disagreed with that and he did not
8  change it?
9      A. Right.
10     Q. Was there anything else that you disagreed
11 with?
12     A. Not that I remember.
13     Q. Now, this Rick that we've been talking about is
14 Richard Yanda?
15     A. Yanda.
16     Q. Husband of Katie Yanda?
17     A. Yes.
18     Q. Who is Richard Yanda?
19     A. He's worked the industry for, I suppose, 20
20 years or something like that. Yeah, probably about 20
21 years.
22     Q. Would you consider him an expert in the field?
23     A. He's an expert in a relative limited area. He
24 is more expert, for example, in plasma etching than I
25 am, because he had spent many years at Lam in field

Page 23

1  engineering, helping customers fix their problems.
2      Q. Would you say he has experience in the
3  manufacturing of integrated circuits?
4      A. Yes, he's worked in fabrication. At Lam he was
5  not working in a wafer fabrication operation, since Lam
6  was an equipment builder, but, in the course of his job,
7  he would be working inside fabs of various chip-making
8  companies, and he had also worked, in a more general
9  sense, in the chip making company. Enmass was one
10 company. And maybe Cypress, I'm not sure.
11     Q. Do you know if he has had any experience in the
12 design phase of chip making?
13     A. I don't know. I don't think so.
14     Q. And we spoke about Ann Miller previously. Who
15 was Ann Miller?
16     A. Ann is a woman who worked in the industry for a
17 number of years, and then she had worked for companies
18 like KLA, and she hadn't been an employee of Intel but
19 she had been assigned there by her company which was
20 making materials for lithography, but she bought a
21 training company called Semiconductor Services from
22 Peter Van Sant, who is a well known book writer, an
23 introductory book on wafer fabrication.
24     Q. What was her experience in the industry?
25     A. The years that she had spent working at Intel,

Page 24

1  as I say, on assignment from a company that was a
2  company, a chemical supplier, and her years at KLA,
3  which was an equipment company.
4      Q. I have this title of a book it's called
5  Semiconductor Terminology, Graphic Glossary of Terms, by
6  Michael Heynes, PhD, and Ann Miller, Fourth Edition,
7  2002, 45 dollars.
8      Is that your book or publication?
9      A. Yes. She had a -- I'd forgotten that glossary
10 was part of the title there. That's the one that you
11 were talking about earlier.
12     Q. Yes.
13     A. I didn't recognize the glossary was in the
14 title of that. I haven't looked at it for at least two
15 years.
16     She had a book of that name which she and other
17 collaborators had put together. I found many technical
18 errors in it, and worked collaborating with her on a
19 major updating.
20     Q. And so the 2002 edition, or version, is the
21 current edition?
22     A. Yes.
23     Q. And you believe that is now accurate? You've
24 corrected the errors that you felt were there, is that
25 correct?

Page 25

1      MS. FINK: Objection. Misstates his prior
2  testimony.
3      THE WITNESS: Again, I made suggestions, in
4  some cases which perhaps Ann did not necessarily follow
5  in the final draft.
6      (Exhibit 51 marked for identification.)
7      MR. OLIVER: Q. I've put before you what has
8  been marked as Plaintiff's Exhibit 51, which is a Notice
9  of Subpoena for your deposition. Have you seen this
10 document before?
11     A. Yes.
12     Q. Who gave you this document?
13     A. Jackie sent it to me about the end of last
14 week.
15     Q. Did she tell you that you would be required to
16 produce documents as listed in the subpoena?
17     A. Yes.
18     Q. Did you do so?
19     A. Yes.
20     Q. Did you have any notes that should have been
21 produced?
22     A. No.
23     Q. You didn't make any notes?
24     A. I actually -- when Jackie and I talked
25 yesterday, you know, Monday, I had made a couple of

7 (Pages 22 to 25)

Page 26

1  margin notes on one of the documents, and she said I
2  have to take that and give it to you, I guess.
3      Q.  Did you do that?
4      A.  Yes.  I gave it to Jackie.
5      Q.  Do you remember which document that was?
6      A.  It was my declaration.
7      MR. OLIVER:  Jackie, I don't remember seeing
8  any handwritten notes in the documents that were
9  produced to me.
10     MS. FINK:  I can look for that and produce it.
11     MR. OLIVER:  This is the copy that I
12 received.  Do you want to take a look at that?
13     MS. FINK:  I think we may have sent these
14 before that, but I can look to see if I have it.
15     THE WITNESS:  Like I said, it wasn't until
16 Monday.
17     MR. OLIVER:  I see.  Okay.  So you'll --
18     MS. FINK:  I will look.
19     MR. OLIVER:  If we have any other questions,
20 we'll have to somehow work out the details getting
21 answers to them.
22     Q.  Were there any other notes that you had
23 made at any time?
24     A.  No.  This is a relatively simple thing to
25 review.

Page 27

1      Q.  What you were asked to do?
2      A.  Initially, Jackie sent me a copy of the patent
3  and the construction, and I reviewed those documents.
4  Those were the principal documents that I looked at.
5      Q.  What did she ask you to do with respect to
6  those documents?
7      A.  To look through the patent and see how it
8  related to my expertise.
9      Q.  Did you generate any invoices?
10     A.  Yes.  Yes, I generated one invoice for the end
11 of June to Synopsis.
12     Q.  Did you include that in the material that was
13 to be produced?
14     A.  No.
15     Q.  Let's take a look at the list, just to be
16 complete.  In this Exhibit 51, attached to the subpoena
17 there's a Request For Production on page 6.
18     A.  Since that was not a technical document, I
19 didn't think of it.
20     Q.  This is page six.  I don't know how far into
21 the document it is.
22     Request number one with is all documents and
23 things received from or provided to or on behalf of the
24 defendants, Howrey, and Synopsis related to your
25 declaration.

Page 28

1      Did you produce those items?
2      A.  I believe so, with that exception.
3      Q.  That exception being what?
4      A.  The invoice.
5      Q.  I believe that's in another category, but that
6  certainly also falls in that first one.
7      All communications, that's Production Request
8  Number 2.  Did you produce all communications?
9      A.  Yes.  Yes.  There's the file which you were
10 looking at there.
11     Q.  Production Request Number 3, it's all documents
12 you reviewed, analyzed and considered in connection with
13 your declaration.  Other than the patent and the claim
14 construction, did you consider anything else?
15     A.  No, I don't think so.
16     Q.  Did you read any textbooks in connection with
17 the declaration?
18     A.  No.
19     Q.  Did you consult with anyone?
20     A.  No.
21     Q.  Did you talk with anyone whatsoever?
22     A.  Not that I recall.
23     Q.  Did you talk with any -- with Jackie or any
24 other attorneys when preparing your declaration?
25     A.  Yes.

Page 29

1      Q.  Okay.  Who did you speak with?
2      A.  With Jackie.
3      Q.  Just Jackie?
4      A.  Yes.
5      Q.  And Request Number 4 asks for draft notes,
6  memoranda, worksheets, calculations, e-mails, faxes,
7  phone messages, correspondence and invoices.  With the
8  exception of invoices, did you --
9      A.  It was there, wasn't it?
10     Q.  Did you produce everything, other than the
11 invoices?
12     A.  Yes.  Yes.
13     Q.  How much time did you spend in preparing the
14 declaration?
15     A.  Most of that time was spent with Jackie.  It
16 was approximately four hours.  Maybe an hour in
17 preparation before -- reviewing the documents before I
18 came in to see Jackie.
19     Q.  All things related to preparation, creation,
20 drafting, revision and/or finalization of the
21 declaration is Request Number 5.  Did you go through
22 many drafts of the declaration?
23     A.  With Jackie, we worked through the draft, and I
24 called for quite a lot of modifications as we went
25 through it.

8 (Pages 26 to 29)

Deposition of:
Michael S. Heynes                                July 27, 2005

Page 30

1    Q. Who did the first draft?
2    A. Jackie had a kind of outline based on her
3  research work on wafer fabrication and put together a
4  general outline of what wafer fabrication was about, and
5  then I worked with her to modify it and bring it to the
6  point where I agreed with everything that was there.
7    Q. So she had done research on wafer fabrication?
8    A. Yes. Yes. She had read the book.
9    Q. The book being —
10   A. She had been reading the book Chip Making
11  Demystified.
12   Q. And the last request is all things related to
13  the 432 patent, the file history, and any art cited.
14       Did you review the file history of the 432
15  patent?
16   A. No.
17   Q. Did you review any art cited in the prosecution
18  of the 432 patent?
19   A. No. The patent is all design software where I
20  have very little understanding.
21   Q. You have what type of understanding?
22   A. I have little understanding of the software of
23  the design activity.
24   Q. Does that mean you have little understanding of
25  the patent?

Page 31

1       MS. FINK: Objection. Misstates his prior
2  testimony.
3       THE WITNESS: I understand the overview of what
4  the patent is about. I understand the general
5  statements it makes on the purpose of the software and
6  what the end result is of the software.
7    Q. As far as the details —
8    A. The details of how the software is put together
9  and the jargon and — the software jargon which is in
10  the patent — is outside my area of expertise.
11   Q. Did you read the claims of the patent?
12   A. Yes.
13   Q. Which claims did you read?
14   A. I read all of them.
15   Q. Did you understand them?
16   A. Some of them. Some of the general statements I
17  understood. Again, the ones relating to software
18  details I did not understand, or only in the most
19  general way.
20   Q. Did you remember a Claim 13?
21   A. Yes, I remember a Claim 13.
22   Q. Let me give you what has been previously marked
23  as Kobayashi Exhibit 9. And if you can turn to the end
24  of the patent, there's a Claim 13 in Column 16. Do you
25  see that?

Page 32

1    A. Yes.
2    Q. Do you recall reviewing that claim?
3    A. Yes.
4    Q. Did you understand that claim?
5    A. In a rough way, yes. Not in detail because,
6  again, this is all about software.
7    Q. What did you mean, in a rough way?
8    A. Well, the initial — "A computer-aided design
9  process for designing an application specific integrated
10  circuit which will perform the desired function,
11  comprising." I certainly understand that sentence, and
12  I understand what storing data consists of, but I'm not
13  quite sure what — an expert system knowledge basis,
14  that's software jargon, and so on, so — I understand,
15  as I say, in general what it is about, but the software
16  aspect of it I don't understand very much of.
17   Q. Did you review Claim 14?
18   A. Yes.
19   Q. Did you understand Claim 14?
20   A. Yes.
21   Q. What is your understanding of Claim 14?
22   A. It's a process which has been described in the
23  previous claim for generating from the netlist the mask
24  data, the next step from the netlist, generating the
25  mask data which is required to produce actually masks,

Page 33

1  not integrated circuits.
2    Q. What did you mean by that?
3       MS. FINK: Objection. Vague and ambiguous.
4       MR. OLIVER: Q. The last part where you said
5  mask data, which is required to produce masks, not
6  integrated circuits, what did you mean when you say
7  that?
8    A. Mask data alone does not enable you to produce
9  an integrated circuit.
10   Q. Why is that?
11   A. Because to make an integrated circuit, you need
12  masks.
13   Q. True, but the claim just says mask data
14  required to produce an integrated circuit. In other
15  words, before you can produce an integrated circuit, you
16  need mask data, is that correct?
17   A. Yes.
18   Q. I'm going to give you what has been marked as
19  Plaintiff's Exhibit 52. Have you seen what is Exhibit
20  52 before?
21   A. Yes.
22   Q. What is it?
23   A. This is my declaration.
24   Q. It's the declaration you were talking about
25  previously.

9 (Pages 30 to 33)

Deposition of:
Michael S. Heynes

July 27, 2005

Page 34

1        Previously you had testified that, in preparing
2  this declaration, Jackie had an outline for you, is that
3  correct?
4        A. Yes.
5        Q. Did you yourself write most of the text in this
6  declaration?
7        A. Much of what Jackie had written was acceptable
8  to me, but I made many modifications. I did not do the
9  original writing of the outline. Obviously, Jackie did
10 that.
11       Q. When you say outline, you mean she had given
12 you a first draft of the declaration?
13       MS. FINK: Objection. Asked and answered.
14       THE WITNESS: She had put together an outline
15 based upon what she had learned from her research and
16 reading the book and other sources.
17       MR. OLIVER: Q. When you say outline and then
18 you describe what she did, it sounds like she did a
19 first draft in detail.
20       A. She had some detail --
21       Q. An outline to me is just bullet points. Is it
22 safe to say she did more than just a bullet point
23 outline?
24       A. Yes. There was some paragraph writing, but a
25 lot of bullet points, which we modified, expanded, when

Page 35

1  we worked together.
2        Q. Did Jackie explain to you what this declaration
3  would be used for?
4        A. Yes.
5        Q. What did she explain to you?
6        A. I don't recall in detail.
7        Q. What do you recall?
8        A. I don't think she explained, actually, in a lot
9  of detail. It was a document which was to express the
10 way that I saw the industry working. My work experience
11 is what I've relied on in reviewing this material and
12 working with this material, the way I have seen the
13 industry work.
14       Q. Did she tell you what the purpose of the
15 declaration was?
16       A. I don't think I can define that.
17       Q. Did she tell you it dealt with chip
18 manufacturing?
19       A. Oh, yes, of course.
20       Q. Did she tell you anything in particular about
21 chip manufacturing that you needed to describe in the
22 declaration?
23       A. Would you rephrase that?
24       Q. Did she tell you what aspects of chip
25 manufacturing she wanted to have you describe in the

Page 36

1  declaration?
2        A. Yes. She wanted me to cover, essentially, the
3  whole of wafer fabrication.
4        Q. All of your experience has been — in terms of
5  wafer fabrication, is that true?
6        MS. FINK: I'll object. Vague and ambiguous.
7  As contrasted to what?
8        MR. OLIVER: Q. Previously -- let me clarify.
9  Previously we discussed your work experience.
10       A. Yes.
11       Q. And you detailed all of your work —
12       A. Yes.
13       Q. — in terms of wafer fabrication, is that
14 correct?
15       A. Yes. I was trying to think if there were any
16 exceptions to that. That's why I paused. I think that
17 is true, it has all been wafer fabrication.
18       Q. In your mind, manufacturing of ASICs or ICs in
19 general starts with wafer fabrication, is that true?
20       A. Yes.
21       Q. So you've never used any design tools, is that
22 correct?
23       A. Correct.
24       Q. You've never used Design Compiler?
25       A. No.

Page 37

1        Q. You've never created any circuit schematics?
2        A. No.
3        Q. You've never used RTL or VHDL?
4        A. No.
5        Q. But you are familiar with some of the terms, is
6  that correct, such as netlist and mask data.
7        MS. FINK: Objection. Compound.
8        THE WITNESS: Actually, I -- mask data is -- I
9  didn't know what a netlist was until I read the patent,
10 actually. I knew when I read through the definition of
11 what it was, I said, oh, that's what it's called.
12       MR. OLIVER: Q. So what is your understanding
13 of the term "netlist"?
14       A. Netlist is a list of the cells required for a
15 given integrated circuit and information on how those
16 cells are to be wired together to produce the required
17 final function.
18       Q. Was — where did you get this understanding of
19 the term?
20       A. From the patent.
21       Q. Did you get —
22       A. It's defined in the patent.
23       Q. Is there any other source that provided you
24 with any information to inform you with respect to this
25 —

10 (Pages 34 to 37)

Page 38

1  A. No.
2  Q. -- definition?
3  A. No.
4  Q. Did Jackie give you any input?
5  A. No. I had heard that term before and just
6  didn't know what it was until I saw it defined here.
7  Q. Would you be able to step through the
8  manufacturing process, beginning with the initial design
9  of an IC, all the way through to the final packaging?
10  A. Well, design is not manufacturing.
11  Q. Well --
12  A. Design is part of development. It's not
13  manufacturing.
14  Q. Well, would you be able to summarize for us the
15  steps along the way from design through final packaging
16  of an IC?
17  MS. FINK: Objection. Exceeds the scope of his
18  declaration. He didn't declare as to --
19  THE WITNESS: Yes. I don't have the expertise
20  to go through the design cycle and present that.
21  Certainly, I can do it through wafer fabrication for
22  complex processes like CMOS.
23  MR. OLIVER: Q. But you understand there is a
24  design phase --
25  A. Yes.

Page 39

1  Q. -- that produces a netlist, as you read in the
2  patent, is that correct?
3  A. Yes. Yes.
4  Q. Do you have an understanding what happens to
5  that netlist on its way to manufacturing of an IC?
6  MS. FINK: Same objection. He didn't opine as
7  to any of the design steps.
8  THE WITNESS: Only what I read in the patent,
9  that the netlist -- from the netlist, one can make --
10  produce data for making masks.
11  MR. OLIVER: Q. Can you say that --
12  A. From the netlist, you can create data for
13  making masks.
14  Q. But you're not familiar with that process, is
15  that what you're saying?
16  A. No. No.
17  Q. Are you familiar with the term "mask data"?
18  A. Well, it's self-explanatory. I understand what
19  it means.
20  Q. What is your understanding?
21  A. This is electronic information which can be
22  used to make a mask.
23  Q. What does the mask data represent?
24  MS. FINK: Objection. Vague and ambiguous as
25  to what you mean by represent.

Page 40

1  MR. OLIVER: Q. Are you able to answer the
2  question?
3  A. No, I don't know how to answer that question.
4  Q. Let me ask this. Is mask data a complete
5  representation of the ultimate circuit on the ASIC?
6  A. No.
7  MS. FINK: Objection. Vague and ambiguous as
8  to what you mean by complete representation.
9  THE WITNESS: No. No. It's part of the design
10  phase, and when you talk about a complete integrated
11  circuit, you then talk about wafer fabrication as well.
12  MR. OLIVER: Q. Can you identify the
13  electronic components in the ultimate ASIC in the same
14  -- in the mask data?
15  MS. FINK: Same objection. Vague and
16  ambiguous.
17  THE WITNESS: Not easily.
18  MR. OLIVER: Q. So mask data is not a layout
19  of --
20  A. The data is just a bunch of digital
21  information, electronic digital information.
22  Q. So the mask data does not represent the layout
23  art work, is that right?
24  MS. FINK: Objection. Mischaracterizes his
25  prior testimony.

Page 41

1  MR. OLIVER: Q. Do you need the question read
2  back?
3  A. Yeah. Yeah.
4  MR. OLIVER: Do you mind reading the question
5  back?
6  (The question was read by the reporter.)
7  THE WITNESS: From the mask data, you can
8  produce a mask layout.
9  MR. OLIVER: Q. From the mask data, you can
10  produce --
11  A. You can produce a mask which shows you the
12  layout.
13  Q. And what is the layout?
14  A. The layout is the term we use for the geometry
15  of the patents required on the circuit.
16  Q. Is the layout a representation of the ultimate
17  ASIC or IC that's being produced?
18  A. The layout that's produced would be for one
19  patent level to be formed on the wafers. It does not
20  represent a final form in any way.
21  Q. So are you saying there's multiple layouts?
22  MS. FINK: Objection. Mischaracterizes his
23  prior testimony.
24  THE WITNESS: The term is used both for a
25  singular patent and for multiple patents, and different

11 (Pages 38 to 41)

Page 42

1 people use the term a little differently probably.
2     MR. OLIVER: Q. What does a layout engineer
3 do?
4     MS. FINK: Objection. Calls for speculation.
5     To the extent that you know, you can answer.
6     THE WITNESS: The layout engineer lays out the
7 expected geometry required for mask levels. I'm not
8 able to define it well.
9     MR. OLIVER: Q. Does he produce mask data?
10     A. I don't know if there's another step following
11 that.
12     **Q. Does the layout engineer draw a picture of the**
13 **actual finished device as seen from the top?**
14     MS. FINK: Objection. Calls for speculation.
15     THE WITNESS: To some extent. In CAD
16 equipment, computer aided design equipment, there are
17 images on the screen of layouts, of patent geometries.
18     MR. OLIVER: Q. Are you familiar with the term
19 tape-out?
20     A. Yes.
21     **Q. What is tape-out?**
22     A. Tape-out is — it goes back to the days when
23 the electronic data was on big reels of tape, and that
24 tape would be sent to mask makers to make the mask set
25 for it.

Page 43

1     **Q. Is the mask data part of the tape-out?**
2     A. The mask data is on the tape.
3     **Q. It is the tape-out, right?**
4     A. It's the tape-out.
5     **Q. What do they do today? You said previously**
6 **they had these big tapes. Now what do they do?**
7     A. Yes. Actually, today they don't use the tapes
8 anymore, the data is communicated electronically.
9     **Q. To where?**
10     A. To the mask making shop.
11     **Q. So this data — the mask data is sent or fed to**
12 **the mask —**
13     A. The shop where the masks are going to be made,
14 which is —
15     **Q. A mask vendor.**
16     A. Yes, a mask vendor, which is usually separate
17 from the design activity and the fabrication activity.
18 It might be on the other side of the world.
19     **Q. So the mask data or the tape-out is fed into**
20 **some mask vendor.**
21     A. Yes.
22     **Q. Is that correct?**
23     A. Yes.
24     **Q. Is the tape-out the process of turning the**
25 **layout or chip art work into separate layers that will**

Page 44

1 be made into photo masks?
2     A. Yes.
3     **Q. Did you say wafer fabrication is an essential**
4 **part of ASIC production?**
5     A. It is ASIC production.
6     **Q. So you would say it's —**
7     A. Design is not production. Making masks —
8     **Q. I didn't ask you anything about that. I said**
9 **is wafer fabrication an essential part of ASIC**
10 **production.**
11     MS. FINK: Objection. Asked and answered.
12     MR. OLIVER: Q. Is that a yes or no?
13     A. It is ASIC production.
14     **Q. So it's directly related to —**
15     A. It is manufacturing. It is the manufacturing
16 of a part.
17     **Q. Okay, so the wafer fabrication is directly**
18 **related to the manufacture of an IC, correct?**
19     A. It is the manufacture of an IC.
20     **Q. Is the use of a mask an essential part of ASIC**
21 **production?**
22     A. Yes, it is.
23     **Q. Is it directly related to the manufacture of an**
24 **IC?**
25     A. Yes, it is.

Page 45

1     **Q. Is the use of mask data an essential part of**
2 **the ASIC production?**
3     A. It's not part of production.
4     **Q. Why not?**
5     A. It is part of design.
6     **Q. Why?**
7     A. Because mask data does not enable you to make
8 wafers. You don't go directly from mask data to wafers.
9     **Q. Is that the only reason?**
10     A. I'm trying to think if there is — repeat the
11 question so I know exactly how you worded it.
12     **Q. Is the use of mask data essential to ASIC**
13 **production?**
14     MS. FINK: I'll object. Vague and ambiguous as
15 to what you mean by essential.
16     THE WITNESS: No.
17     MR. OLIVER: Q. So, if you wanted to produce
18 an ASIC, you could do without the use of mask data?
19     A. No. The mask data is necessary for the
20 production of masks.
21     **Q. I see. And so for an ASIC to be manufactured,**
22 **you do or you do not need mask data?**
23     A. You need masks, and masks are made from mask
24 data.
25     **Q. From your understanding of the term netlist, do**

Page 46

1  you need a netlist to make mask data?
2      A. Yes, I believe so.
3      Q. Would you say the use of a netlist is essential
4  in the making of mask data?
5      A. Repeat that?
6      Q. Would you say that the use of a netlist is
7  essential to the making of mask data?
8      A. It may be in this particular package of
9  software. There are other ways of making mask data.
10     Q. When you say in this particular package of
11 software, what do you mean?
12     A. The subject of the patent.
13     Q. And the patent being the 432 patent?
14     A. Yes.
15     Q. Would you say that the netlist is essential to
16 the making of a mask?
17     MS. FINK: Objection. Vague and ambiguous as
18 to what you mean by essential.
19     THE WITNESS: There are other ways of making a
20 mask besides using a netlist.
21     MR. OLIVER: Q. What are those ways?
22     A. A skilled engineer can put together the cells
23 required and devise the wiring without this netlist.
24     Q. And how do you know that?
25     A. Because I've been in the industry a long time,

Page 47

1  and this is -- this particular software has not been
2  used.
3      Q. I thought you said you didn't have any
4  experience in the design phase.
5      A. I don't.
6      Q. Is making -- is using a netlist part of the
7  design phase?
8      A. In -- as far as this particular approach to
9  making a design is concerned, yes.
10     Q. And so your last question was based on what?
11 If you have no experience in that field, how can you
12 make that statement?
13     A. Because I know from a long time ago, for
14 example, that design engineers would manually take cells
15 needed for a function and devise a wiring pattern to
16 achieve the function they're looking for. And, to my
17 knowledge, it's very superficial.
18     Q. Did you know that even when it's done manually,
19 that people would call that collection of cells a
20 netlist?
21     A. I don't know.
22     Q. Okay. Let's assume that for the purposes of
23 our -- this next question.
24     A. Assume that that was called a netlist?
25     Q. If that is called a netlist, would you say that

Page 48

1  is essential to the making of a mask?
2      MS. FINK: Objection. Incomplete hypothetical.
3      THE WITNESS: The assembly of the cells, the
4  choosing of the cells and the wiring of them together,
5  is essential to make the design.
6      MR. OLIVER: Q. The design of the mask?
7      A. Yes.
8      Q. Or the design of the IC?
9      A. The design of the mask.
10     MS. FINK: We've going about an hour, can we
11 take a break?
12     MR. OLIVER: Would you like to take a break?
13     THE WITNESS: Yeah. Yeah. Stretch a couple of
14 minutes.
15     (A break was taken.)
16     MR. OLIVER: Q. Let's try to recreate the
17 question again. We're back on the record.
18     Would you say that a netlist is essential to
19 the making of mask data?
20     A. No, because mask data could be made other ways.
21 It could be generated manually.
22     Q. As we discussed before, if the netlist was
23 generated manually, would you then say that a netlist is
24 essential to the making of mask data?
25     MS. FINK: Objection. Already asked and

Page 49

1  answered, and lacks foundation. He didn't say that you
2  created netlist data.
3      THE WITNESS: Repeat the question, please.
4      MR. OLIVER: Q. Assuming that a netlist could
5  be produced manually, would a netlist be essential to
6  the making of mask data?
7      MS. FINK: Same objection.
8      THE WITNESS: I don't know. I'm not
9  sufficiently familiar with the manipulation of the data.
10     MR. OLIVER: Q. So is it fair to say, then,
11 that you wouldn't know if a netlist is essential to the
12 production of an ultimate ASIC or IC?
13     MS. FINK: Objection. Mischaracterizes his
14 prior testimony.
15     THE WITNESS: Yeah. I -- I don't know. I
16 don't think so.
17     MR. OLIVER: Q. When with you say "I don't
18 think so", what do you mean?
19     A. Because I think there would be other ways of
20 getting there, of doing the job.
21     Q. Doing what job?
22     A. Than having a netlist.
23     Q. What are those other ways?
24     MS. FINK: Objection. Asked and answered.
25     THE WITNESS: I don't know, because I don't

13 (Pages 46 to 49)

Deposition of:
Michael S. Heynes                                                July 27, 2005

Page 50

1  have sufficient familiarity with the design technology.
2      MR. OLIVER: Q. So you wouldn't know one way
3  or another if a netlist is essential to the making of an
4  ASIC.
5      MS. FINK: Objection. Asked and answered.
6      THE WITNESS: No.
7      MR. OLIVER: Can we go off the record for a
8  sec.
9      (There was an off-the-record discussion.)
10         (A break was taken.)
11     MR. OLIVER: Q. Just a few more questions.
12     Your declaration does cover both the design and
13 the production phases and so I just wanted to get an
14 overview from you of -- to summarize that entire
15 process, at least to the best of your understanding.
16     Starting with the input of the -- an input
17 description of the ASIC to be designed. What happens?
18     MS. FINK: Objection. Lack of foundation. His
19 declaration does not cover the design phase.
20     THE WITNESS: I merely refer to ASIC design and
21 manufacturing as separate phases.
22     MR. OLIVER: Q. But you have an understanding
23 of the design phase from your experience?
24     A. Only very superficially.
25     Q. Okay. To the best of your understanding, the

Page 51

1  input of a description of an ASIC to be designed is fed
2  into a design software tool; is that your understanding?
3      MS. FINK: Objection. Exceeds the scope of
4  this deposition and his declaration.
5      THE WITNESS: Yes. As far as I know.
6      MR. OLIVER: Q. And that produces a netlist.
7  Is that your understanding?
8      MS. FINK: Objection. Same objection. Calls
9  for speculation.
10     THE WITNESS: I'm not sure. I've lost track
11 what has throughout the whole design cycle.
12     MR. OLIVER: Q. And the netlist is fed into a
13 tool that creates the mask data, is that correct?
14     MS. FINK: Same objections.
15     THE WITNESS: Yes. That is stated in the
16 patent, and that's all I know.
17     MR. OLIVER: Q. And the mask data is used to
18 produce a mask, is that correct?
19     A. Yes, mask data is used to produce a mask.
20     Q. The mask data is fed into what we -- what we
21 discussed, something that receives the tape-out, and the
22 tape-out is used to create a mask, is that correct?
23     A. Yes.
24     Q. And at that point you would be very familiar
25 with what happens in the remainder of the flow, is that

Page 52

1  correct?
2      A. Yes.
3      Q. So could you summarize what happens at that
4  point? What happens to the mask?
5      MS. FINK: Objection. Vague and ambiguous as
6  to "what happens to".
7      THE WITNESS: The tape-out is used by a mask
8  vendor to produce the masking plates, which is a very
9  long process, a very elaborate process. Then those
10 plates would be -- they'd be carefully examined,
11 measurements made, defects looked for, and those plates
12 would then be sent to the wafer fabrication facility and
13 used to make the silicon chips.
14     MR. OLIVER: Q. Then what happens to the
15 chips?
16     MS. FINK: Objection. Vague and ambiguous.
17     THE WITNESS: Yeah. At the end of the wafer
18 fabrication cycle, the chips are tested on the wafer.
19 There are many chips on most wafers, hundreds, thousands
20 in some cases, and chips can be electrically evaluated
21 while sitting on the wafer. There are special tools
22 with very fine probes for making contact with the chips,
23 and many measurements can be made at that stage to test
24 the chip you have just made.
25     MR. OLIVER: Q. And if you find out there's

Page 53

1  something wrong with the chip you just made, do you have
2  to re-do the netlist?
3      A. I can't answer that question. I don't know if
4  that would be necessary. It would depend on the nature
5  of the defect, is my guess.
6      Q. Assuming there's no defect found in the wafer
7  fabrication process, would you have to re-do the
8  netlist?
9      MS. FINK: Objection. Calls for speculation.
10 He didn't opine as to design.
11     THE WITNESS: I don't know.
12     MR. OLIVER: Q. Would you have to re-do the
13 mask data?
14     MS. FINK: Objection. Calls for speculation.
15     THE WITNESS: Probably. It may be needed; it
16 may not.
17     MR. OLIVER: Q. When would it not be needed?
18     A. If the -- if there was a problem with the data
19 which resulted in the mask maker making plates with the
20 incorrect geometries.
21     Q. So if there was a malfunction with the chip
22 that was made and there was no problems with either the
23 mask or the wafer fabrication process, would you have to
24 re-do the mask data?
25     MS. FINK: Same objection. Incomplete

14 (Pages 50 to 53)

Deposition of:
Michael S. Heynes

July 27, 2005

Page 54

1  hypothetical. Calls for speculation.
2      THE WITNESS: I don't know.
3      MR. OLIVER: Q. Is there any other
4  possibility?
5      A. Repeat the beginning of that -- the question
6  there again.
7      **Q. If there was a malfunction with the IC or ASIC**
8  **that was made, assuming there is no problem with the**
9  **wafer fabrication or any problem with the mask itself --**
10     A. Yes.
11     **Q. -- would you have to re-do the mask data?**
12     MS. FINK: Same objections.
13     THE WITNESS: I don't know. I'm trying to
14 think of other things which could create a problem. I
15 can't think of other possibilities, but I think there
16 are other possibilities where the mask data would not
17 need to be redone.
18     MR. OLIVER: Q. Such as what?
19     A. You had -- you said -- assume there was no
20 problem with the masks, then -- they're perfect, as the
21 mask data indicated they should be, and the wafer
22 fabrication was normal, then mask data would need to be
23 redone probably.
24     **Q. And I think we discussed before that, to get**
25 **mask data, you would have to produce a netlist either**

Page 55

1  **through some design software or manually, is that**
2  **correct.**
3      MS. FINK: Objection. Misstates his prior
4  testimony. He didn't say that.
5      MR. OLIVER: Q. Let me ask you directly. If
6  you needed to re-do a mask, you would be required to do
7  a netlist, whether the netlist was generated manually or
8  through some design software, is that correct?
9      MS. FINK: Objection. Misstates his testimony.
10 He didn't say you had to have a netlist.
11     THE WITNESS: Probably not. Probably you would
12 not need to redo the netlist.
13     MR. OLIVER: Q. If you were to re-do a mask
14 data, you're saying you won't need to re-do a netlist?
15     A. That's possible.
16     **Q. How is that possible?**
17     A. Because of the conversion from the netlist to
18 the mask data.
19     **Q. Can you explain that in detail?**
20     MS. FINK: Objection. Vague and ambiguous.
21     MR. OLIVER: Are you objecting to the answer or
22 the question?
23     MS. FINK: I would be objecting to the
24 question.
25     THE WITNESS: There can be many problems with a

Page 56

1  mask that's been made from the mask data, but it doesn't
2  mean that there's something wrong with the netlist. The
3  netlist, as we discussed earlier, is having the right
4  cells with the wiring defined between those cells to get
5  the function that you need, so the -- in that sense, the
6  wiring -- the circuit schematic should be okay. It
7  doesn't mean the mask data will produce the good
8  circuit. So you may not need to re-do the netlist.
9      MR. OLIVER: Q. I see.
10     A. The wiring may be okay, but perhaps some of the
11 dimensions that were converted from the netlist cells,
12 perhaps those dimensions are not correct in the final
13 version.
14     **Q. So, assuming that the creation of the mask data**
15 **from the original netlist was correct, would you then**
16 **say that -- if you needed to change the mask data, you**
17 **would have to change the netlist?**
18     MS. FINK: Objection. Incomplete hypothetical.
19     THE WITNESS: That would depend on what was
20 wrong with the mask data.
21     MR. OLIVER: Q. Assuming there was nothing
22 wrong with the translation of the netlist into the mask
23 data, knowing that you would have to change the mask
24 data because of a malfunction in the ultimate ASIC that
25 was made, would you agree that the netlist would have to

Page 57

1  be changed?
2      MS. FINK: Same objection. Incomplete
3  hypothetical.
4      THE WITNESS: Yeah. I don't know that that
5  interaction between the netlist and the mask data -- and
6  understand it well enough to know if you would have to
7  go back to the netlist or not.
8      MR. OLIVER: Q. But you know that the netlist
9  is fed into a tool that goes into the mask data, is that
10 correct?
11     A. Yes.
12     MR. OLIVER: Okay. Subject to the production
13 of the documents which were not previously produced, I
14 believe that I have no more questions at this time, and
15 hopefully we won't have to call you back.
16     THE WITNESS: Okay.
17     MR. OLIVER: Thank you very much.
18     (The deposition concluded at 12:16 p.m.)
19
20     I declare under penalty of perjury that the
21 foregoing is true and correct. Subscribed at
22 _____, California, this _____ day of
23 _____, 2005.
24
25                    _____
                          Michael Heynes

15 (Pages 54 to 57)

Page 58

1  STATE OF CALIFORNIA        )
2                             ) ss.
3  COUNTY OF SAN FRANCISCO    )
4
5           CERTIFICATE OF REPORTER
6
7      I, JUDIE A. NICHOLAS, a Certified Shorthand
8  Reporter, hereby certify that the witness in the
9  foregoing deposition was by me duly sworn to tell the
10 truth, the whole truth and nothing but the truth in the
11 within-entitled cause;
12     That said deposition was taken down in shorthand by
13 me, a disinterested person, at the time and place
14 therein stated, and that the testimony of the said
15 witness was thereafter reduced to typewriting, by
16 computer, under my direction and supervision.
17     I further certify that I am not of counsel or
18 attorney for either or any of the parties to the said
19 deposition, nor in any way interested in the event of
20 this cause, and that I am not related to any of the
21 parties thereto.
22     DATED: _____, 2005
23
24     _____
25     Judie A. Nicholas, CSR 12229

Premier Litigation Service Bureau, Inc.
Tel: 215-938-6342    Fax: 215-938-6346

Westlaw.

Not Reported in F.Supp.2d                                         Page 1
Not Reported in F.Supp.2d, 2004 WL 406640 (S.D.N.Y.), 71 U.S.P.Q.2d 1118
**(Cite as: 2004 WL 406640 (S.D.N.Y.))**

**H**

**Motions, Pleadings and Filings**

United States District Court,
S.D. New York.
AT & T CORP., Plaintiff,
v.
MICROSOFT CORPORATION, Defendant.
**No. 01 Civ.4872(WHP).**

March 5, 2004.

**Background:** Owner of reissue patent for speech encoding technology brought patent infringement action, and alleged infringer asserted claims for declaratory judgment of noninfringement, invalidity, and unenforceability. Alleged infringer moved for partial summary judgment, seeking to exclude sales of goods incorporating foreign-replicated copies of its alleged infringing software from any damages award.

 **Holdings:** The District Court, Pauley, J., held that:
 (1) alleged infringer's export of master disks containing its operating system software constituted supplying of "component" under patent statute, and
 (2) foreign-replicated copies of alleged infringer's operating system software constituted components supplied from United States under patent statute.
 Motion denied.

West Headnotes

**[1] Patents** 259(3)
291k259(3) Most Cited Cases
That master disks used by software company to ship its allegedly infringing operating system software to foreign manufacturers to install foreign-replicated copies of software onto foreign-assembled computers were not themselves incorporated into end product abroad did not insulate company from liability under statute treating as patent infringement the assembly of any component of patented invention, supplied from United States, into product outside of United States. 35 U.S.C.A. § 271(f).

**[2] Patents** 259(3)
291k259(3) Most Cited Cases
Manufacture

Software can be a component of a patented invention or infringing device, within meaning of statute extending United States patent laws to products manufactured abroad from domestically made components. 35 U.S.C.A. § 271(f).

**[3] Patents** 259(3)
291k259(3) Most Cited Cases
Software company's export of master disk containing its allegedly infringing operating system software constituted supplying of "component" under statute treating as patent infringement the assembly of any component of patented invention, supplied from United States, into product outside of United States, notwithstanding company's contention that "component" did not include intangible information and thus did not apply to software. 35 U.S.C.A. § 271(f).

**[4] Patents** 259(3)
291k259(3) Most Cited Cases
Manufacture
Foreign-replicated copies of company's allegedly infringing operating system software constituted "components" supplied from United States, for purposes of liability under patent statute treating as infringement the supplying of infringing components from United States for incorporation abroad into finished product that would infringe patent if assembled in United States, given that software, or object code, was originally manufactured in United States and copied abroad for efficiency reasons, and was not created abroad. 35 U.S.C.A. § 271(f).

**Patents** 328(4)
291k328(4) Most Cited Cases
32,580. Cited.

 Jonathan G. Graves, Frank V. Pietrantonio, Brian M. Koide, Cooley Godward, LLP, Reston, VA, for Plaintiff.

 Stephen C. Neal, Cooley Godward, LLP, Palo Alto, CA, for Plaintiff.

 Robert D. Kaplan, Hallie B. Levin, Friedman Kaplan Seiler & Adelman LLP, New York, NY, for Plaintiff.

 Laura A. Kaster, Dina Mack, AT & T Corp., Bedminster, NJ, for Plaintiff, of counsel.

 Dale M. Heist, David R. Bailey, Paul B. Milcetic,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 2
Not Reported in F.Supp.2d, 2004 WL 406640 (S.D.N.Y.), 71 U.S.P.Q.2d 1118
**(Cite as: 2004 WL 406640 (S.D.N.Y.))**

Woodcock, Washburn, Kurtz, MacKiewicz & Norris
LLP, Philadelphia, Pennsylvania, for Defendant.

James H. Carter, Sullivan & Cromwell, New York,
NY, for Defendant.

T. Andrew Culbert, Microsoft Corporation,
Redmond, WA, for Defendant, of Counsel.

*MEMORANDUM AND ORDER*

PAULEY, J.

*1 On June 4, 2001, plaintiff AT & T Corp. ("AT &
T") filed this patent infringement action alleging that
certain of defendant Microsoft Corporation's
("Microsoft") products containing speech codecs
[FN1] infringe its United States Reissue Patent No.
32,580 (the "580 patent"). [FN2] Currently before
this Court is Microsoft's motion for partial summary
judgment [FN3] to exclude sales of goods
incorporating foreign-replicated copies of its
infringing Windows software [FN4] from any
damages award, pursuant to 35 U.S.C. § 271(f). For
the reasons set forth below, Microsoft's motion is
denied.

> FN1. "A speech codec is a software program
> that is capable of coding--converting a
> speech signal into a more compact code--
> and decoding-- converting the more compact
> code back into a signal that sounds like the
> original speech signal." Amended Complaint
> ("Am.Compl.") ¶ 14.

> FN2. Familiarity with this Court's prior
> Memoranda and Orders is presumed. *See,
> e.g., AT & T Corp. v. Microsoft Corp.,* 01
> Civ. 4872(WHP), 2003 WL 21459573
> (S.D.N.Y. June 24, 2003) (construing claims
> in the 580 patent); *AT & T Corp. v.
> Microsoft Corp.,* 01 Civ. 4872(WHP)
> (S.D.N.Y. Sept. 3, 2003) (amending
> construction of the term "representative");
> *AT & T Corp. v. Microsoft Corp.,* 290
> F.Supp.2d 409 (S.D.N.Y.2003) (granting
> partial summary judgment limiting damages
> pursuant to the patent marking statute, 35
> U.S.C. § 287(a)); *AT & T Corp. v.
> Microsoft Corp.,* 01 Civ. 4872(WHP), 2004
> WL 188078 (S.D.N.Y. Feb. 2, 2004)
> (granting partial summary judgment
> prohibiting Microsoft from asserting the
> defenses of equitable estoppel and implied
> license); *AT & T Corp. v. Microsoft Corp.,*

> 01 Civ. 4872(WHP), 2004 WL 232725
> (S.D.N.Y. Feb. 9, 2004) (granting partial
> summary judgment prohibiting Microsoft
> from asserting the defense and counterclaim
> of inequitable conduct); *AT & T Corp. v.
> Microsoft Corp.,* 01 Civ. 4872(WHP), 2004
> WL 292321 (S.D.N.Y. Feb. 17, 2004)
> (denying partial summary judgment on
> invalidity); *AT & T Corp. v. Microsoft
> Corp.,* 01 Civ. 4872(WHP), 2004 WL
> 309150 (S.D.N.Y. Feb. 19, 2004) (amending
> construction for term "excitation").

> FN3. Microsoft originally styled this motion
> as one *in limine* to exclude evidence of
> foreign sales. On March 4, 2004, the parties
> stipulated in open court to convert the
> motion to one for partial summary
> judgment. (Trial Transcript, dated March 4,
> 2004 ("Trial Tr .") at 1063-64.)

> FN4. For purposes of this motion only, this
> Court assumes that the object code and
> software at issue infringe AT & T's 580
> patent.

This case presents a novel issue regarding the
application of Section 271(f) with profound
ramifications for Microsoft and other United States
software manufacturers. In the end, the issue of
liability under Section 271(f) for foreign replication
of infringing software supplied from the United
States is a question of law ripe for review by the
Federal Circuit.

*BACKGROUND*

The facts underlying this motion are not in dispute,
and are drawn from a Stipulated Statement of Facts,
dated March 4, 2004, and marked as Court Exhibit 1.
(Trial Tr. at 1064.) Microsoft conceives, writes,
compiles, tests, debugs and creates a master version
of its Windows operating system software in
Redmond, Washington. Microsoft makes a limited
number of "golden master" disks in the United States
on which the machine-readable object code [FN5]
for the Windows operating system software is stored.
Some golden master disks are shipped abroad to
foreign computer manufacturers, known as foreign
"original equipment manufacturers," or "OEMs".
Pursuant to licensing agreements with Microsoft,
those foreign OEMs use the golden master disks to
install foreign-replicated copies of the Windows
operating system software onto foreign-assembled
computers. While each OEM receives a single golden
master disk, that disk is never installed on a computer

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 3
Not Reported in F.Supp.2d, 2004 WL 406640 (S.D.N.Y.), 71 U.S.P.Q.2d 1118
**(Cite as: 2004 WL 406640 (S.D.N.Y.))**

sold to consumers. Instead, the golden master disk is used by the OEM to obtain and then replicate object code to install on foreign-assembled computers.

> FN5. According to Microsoft Corporation, its software engineers develop a source code, which is the "human readable form of the software." The source code is put through a compiler which transforms it into object code. Object code is merely the "machine readable version" of the source code in the form of ones and zeros. The object code is then burned onto the golden master disk by a laser for easier transport abroad. (Transcript of Oral Argument, dated December 12, 2003 ("Tr.") at 5-6.) *See also Microsoft Corp. v. Comm'r of Internal Revenue,* 311 F.3d 1178, 1181, 1187 (9th Cir.2002) (describing golden masters).

Microsoft also ships golden master disks to Microsoft-authorized foreign "replicators" who make copies of the Windows operating system software object code and ship those foreign-replicated copies to foreign computer manufacturers.

Additionally, Microsoft supplies its Windows operating system object code from the United States to certain foreign OEMs and authorized foreign replicators by sending them a single encrypted electronic transmission of the object code that was created in the United States. The foreign OEMs and replicators decrypt the transmission and install copies of the object code for the Windows operating system software onto computer hardware to form computer systems, and optionally create CDs or other media containing a foreign-replicated copy of the object code.

During the time relevant to this action, the golden master disks and the encrypted electronic transmissions that Microsoft sends overseas included copies of the accused codecs that infringe AT & T's 580 patent. Microsoft acknowledges that it ships the golden masters and sends the encrypted electronic transmissions containing the infringing object code with the intent and knowledge that the software will be installed on foreign-manufactured computers. Microsoft further acknowledges that it ships the golden masters and encrypted electronic transmissions containing the infringing object code with the intent that the foreign OEMs and authorized replicators will make copies of the object code for the Windows operating system and install those copies onto computer hardware. This computer hardware is manufactured overseas and the completed systems containing the object code created in the United States are then sold to end-users overseas. The parties agree that, other than the object code contained on the golden master disks and the encrypted electronic transmissions of Windows object code, Microsoft does not supply any other "component" from the United States for assembly abroad. Additionally, Microsoft acknowledges that the copying of the software from the golden master disks and the encrypted electronic transmissions overseas is an essential part of the manufacturing process abroad for computers containing Windows. (Tr. at 9.)

**\*2** AT & T alleges that Microsoft's foreign sales of its Windows software containing the allegedly infringing codecs constitute acts of infringement under 35 U.S.C. § 271(f) that trigger liability and damages. Microsoft contends that Section 271(f) does not attach liability to foreign-replicated copies of its object code because it falls outside the purview of Section 271(f)'s prohibition on foreign assembly of infringing goods. Specifically, Microsoft argues that the object code or software contained on the golden master disks is merely "intangible information," and thus not a "component" as contemplated by Section 271(f). Additionally, Microsoft argues in its reply brief that Section 271(f) does not attach liability to foreign-replicated copies of the software or object code because the copies themselves are not "supplied from" the United States. Microsoft's arguments are without merit.

I. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v.. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 559 (2d Cir.1997). The movant may meet this burden by demonstrating a lack of evidence to support the nonmovant's case on a material issue on which the nonmovant has the burden of proof. *Celotex,* 477

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 406640 (S.D.N.Y.), 71 U.S.P.Q.2d 1118
(Cite as: 2004 WL 406640 (S.D.N.Y.))

Page 4

U.S. at 323.

To defeat a summary judgment motion, the nonmoving party must do "more than simply show that there is some metaphysical doubt as to the material facts." _Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)._ Indeed, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." _Fed.R.Civ.P. 56(e); accord Matsushita Elec., 475 U.S. at 587._ In evaluating the record to determine whether there is a genuine issue as to any material fact, the "evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." _Liberty Lobby, 477 U.S. at 255; accord Schering Corp. v. Geneva Pharms., 339 F.3d 1373, 1377 (Fed.Cir.2003)._

**II. _Section 271(f) of the Patent Act_**

Section 271(f) of the Patent Act was enacted to prevent infringers from escaping liability under United States patent law by manufacturing or supplying a component of a patented invention from the United States and exporting it for combination into an end product overseas. _Imagexpo, L.L.C. v. Microsoft Corp.,_ No. Civ. A. 3:02CV751, 2003 WL 23147556, at *1 (E.D.Va. Aug.19, 2003); _accord_ 35 U.S.C. § 271(f); _Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.,_ 955 F.Supp. 220, 232 (S.D.N.Y.1997) (citing _Windsurfing Int'l, Inc. v. Fred Ostermann GmbH,_ 668 F.Supp. 812, 820-21 (S.D.N.Y.1987), _aff'd,_ 1 F.3d 1214 (Fed.Cir.1993)); H.R. 6286, Patent Law Amendments Act of 1984, Congressional Record, Oct. 1, 1984, 28069 at H10525-6 ("Legislative History") (Section 271(f) "prevent[s] copiers from avoiding U.S. patents by supplying components of a patented product in this country so that the assembly of the components may be completed abroad."). Components supplied from foreign countries and incorporated into foreign-assembled products do not implicate Section 271(f). _Aerogroup Int'l,_ 955 F.Supp. at 232. Section 271(f) states:

*3 (1) Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

(2) Whoever without authority supplies or causes to be supplied in or from the United States any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use, where such component is uncombined in whole or in part, knowing that such component is so made or adapted and intending that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

35 U.S.C. § 271(f).

Under paragraph (1) components may be staple articles or commodities of commerce which are also suitable for substantial non-infringing use, but under paragraph (2) the components must be especially made or adapted for use in the invention. _See Bristol-Myers Squibb v. Rhone-Poulenc Rorer, Inc.,_ 95 Civ. 8833 (RPP), 2001 WL 1263299, at *4-5 (S.D.N.Y. Oct. 19, 2001). Additionally, paragraph (2) requires the infringer to have an intent that a component "will be combined outside of the United States in a manner that would infringe if the combination occurred within the United States." 35 U.S.C. § 271(f)(2). "Actual combination or assembly of the components by the alleged infringer [is] not required" to trigger liability under Section 271(f). _Waymark Corp. v. Porta Sys. Corp.,_ 334 F.3d 1358, 1361 (Fed.Cir.2003). Here, it is undisputed that Microsoft's object code is especially made and supplied from the United States for use in its Windows operating system, that Microsoft intended the components to be combined outside of the United States, and that Microsoft intended that the infringing object code be directly incorporated as an essential part of the foreign-manufactured computers. (Court Ex. 1; Tr. at 9.)

Congress enacted Section 271(f) in response to _Deepsouth Packing Co. v. Laitram Corp., 406 U.S. 518, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972),_ where the Supreme Court recognized a "loophole" in infringement law allowing copiers to escape liability by finalizing assembly of products outside the United States. _See_ H.R. 6286, Patent Law Amendments Act of 1984, Congressional Record, Oct. 1, 1984, 28069, H10525-6. In _Deepsouth,_ the Supreme Court held that manufacturing components of a patented invention in the United States, but assembling those components into the patented invention outside the United States, was not "making," and thus did not constitute infringement under Section 271(a) of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2004 WL 406640 (S.D.N.Y.), 71 U.S.P.Q.2d 1118
**(Cite as: 2004 WL 406640 (S.D.N.Y.))**

Patent Act. 406 U.S. at 527-28. In the wake of *Deepsouth,* Congress enacted Section 271(f) to prevent infringers from exploiting that loophole. *See* H.R. 6286, Patent Law Amendments Act of 1984, Congressional Record, Oct. 1, 1984, 28069, H10525-6. The legislative history of Section 271(f) reads in pertinent part:

> *4 Part of the subcommittee's job is to secure for the owners of intellectual property, including patent holders, a workable, efficient, and vigorous set of laws to protect their creations.... [W]ithout enactment of these housekeeping-oriented measures, *the patent system would not be responsive to the challenges of a changing world* and the public would not benefit from the release of creative genius.... Section 101 [of the Bill] makes two major changes in the patent law in order to avoid encouraging manufacturing outside the United States.... [Section 271(f) ] will prevent *copiers* from avoiding U.S. patents by supplying components of a patented product in this country so that the assembly of the components may be completed abroad. This proposal responds to [*Deepsouth* ] concerning the need for a legislative solution to close a loophole in patent law.

H.R. 6286, Patent Law Amendments Act of 1984, Congressional Record, Oct. 1, 1984, 28069, H10525 (emphasis added).

Section 271(f) bridges the *Deepsouth* synapse by including as infringement under the Patent Act the assembly of any component of a patented invention, supplied from the United States, into a product assembled outside of the United States. 35 U.S.C. § 271(f). Microsoft does not dispute the construction of Section 271(f), but argues that: (1) its object code or software is not a "component" under Section 271(f); and (2) its foreign-replicated copies are not "supplied from" the United States. Otherwise, Microsoft acknowledges that its actions satisfy the requirements of Section 271(f). (Court Ex. 1.)

III. *Software as a Component*

[1] Microsoft argues that foreign-replicated copies of its Windows operating system software cannot be statutory "components" supplied from the United States to form foreign-assembled computer systems because "the infringing Windows operating system software stored on the golden master disks [and sent electronically] is intangible information," and the golden master disk is "simply a medium for transmission of the software information," and is never incorporated into an end product abroad. (MS Br. at 1; Court Ex. 1.) The object code or software

that is contained on each golden master disk or transmitted electronically, as opposed to the golden master disk or method of encrypted transmission itself, is at the heart of the parties' dispute and this Court's analysis. It is undisputed that the infringing software is intentionally shipped abroad for incorporation into foreign-assembled computers. (Court Ex. 1.) Indeed, the golden master disk simply recognizes the economic efficiencies in shipping Microsoft's software abroad, and does not alone insulate Microsoft from liability under Section 271(f). *See Eolas Techs. Inc. v. Microsoft Corp.,* 99 C 0626, 2004 WL 170334, at *3-5 (N.D.Ill. Jan.15, 2004).

[2][3] Microsoft argues that its infringing software must be a "physical product" to constitute a "component" under Section 271(f). As noted, Section 271(f) precludes exportation of certain "component(s)" of patented inventions. 35 U.S.C. § 271(f). Microsoft contends that infringing software transported by golden master disk or through electronic transmission is merely "intangible information," and thus not a "component" as contemplated by Section 271(f). It is well-established, however, that software can be a component of a patented invention or infringing device. *See, e.g., In re Alappat,* 33 F.3d 1526, 1545 (Fed.Cir.1994) ("[A] computer operating pursuant to software may represent patentable subject matter, provided, of course, that the claimed subject matter meets all the other requirements of Title 35."); *Imagexpo, L.L.C. v. Microsoft Corp.,* No. Civ.A 3:02CV751, 2003 WL 23147556 (E.D.Va. Aug.19, 2003) (in examining Microsoft NetMeeting units exported overseas on golden master disks, holding that Microsoft's "code is a patentable apparatus" and that the golden master and code constitute "components" under Section 271(f)); *Eolas Techs. Inc. v. Microsoft Corp.,* 274 F.Supp.2d 972, 973 (N.D.Ill.2003) (holding that the software in a computer product "is, in law, the legal equivalent of a piece of computer hardware and not the legal equivalent of a chemical formula"); *NTP, Inc. v. Research In Motion, Ltd.,* 261 F.Supp.2d 423, 431 (E.D.Va.2002) (noting that defendant supplied "application programs" that are "components combined with [an] Intel processor outside the United States" and especially adapted for use in the infringing product); United States Patent & Trademark Office Manual of Patent Examining Procedure (the "MPEP") § 2106, at 2100-13 (8th ed.2003) (noting that a computer program has functional and structural elements, can be recited as part of a claim, statutory manufacture or machine,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 6
Not Reported in F.Supp.2d, 2004 WL 406640 (S.D.N.Y.), 71 U.S.P.Q.2d 1118
(Cite as: 2004 WL 406640 (S.D.N.Y.))

and noting that "[w]hen a computer program is recited in conjunction with a physical structure, such as a computer memory, Office personnel should treat the claim as a *product* claim.") (emphasis added); *see also Southwest Software, Inc. v. Harlequin Inc.,* 226 F.3d 1280, 1287-88, 1298-99 (Fed.Cir.2000). Indeed, Microsoft acknowledges that software is patentable (Tr. at 10; MS Reply at 1), and it argued successfully to the Ninth Circuit that its golden master disks that contain the object code at issue here were tangible export property for tax purposes. *Microsoft Corp. v. Comm'r of Internal Revenue,* 311 F.3d 1178, 1185 (9th Cir.2002) (holding that the software or object code contained on the golden master disks was "export property," that only contemplates tangible property, and finding "computer software reproductions similar to 'films, tapes, [and] records' ") (alteration in original). Tellingly, Microsoft retreated from this argument in its reply brief and at oral argument.

*5 Microsoft urges this Court to narrowly interpret the term "component" in Section 271(f) to exclude software or object code. However, there is no limitation of the term "components," either in the statutory text or in the legislative history, to machines or other structural combinations. *W.R. Grace & Co. v. Intercat, Inc.,* 60 F.Supp.2d 316, 320-21 (D.Del.1999) (finding 271(f) liability for supply of chemical composition from the United States for combination with other materials abroad); *see also Moore U .S.A. Inc. v. Standard Register Co.,* 144 F.Supp.2d 188, 195 (W.D.N.Y.2001) (finding paper, glue and blueprints for making envelopes "components" under 271(f)); *Lubrizol Corp. v. Exxon Corp.,* 696 F.Supp. 302, 325 (N.D.Ohio 1988) (same for supply of lubricant additive for combination in a lubricant composition outside the United States). Further, there is nothing in the legislative history of Section 271(f) or in any jurisprudence interpreting it to say that software cannot be a component under Section 271(f). *W.R. Grace,* 60 F.Supp.2d at 321 ("A contrary holding ... would be tantamount to legislating additional language to a statute."). Indeed, excluding protection for inventions using software "would not be responsive to the challenges of a changing world," as software and computers have become an essential part of society and business since the enactment of Section 271(f). H.R. 6286, Patent Law Amendments Act of 1984, Congressional Record, Oct. 1, 1984, 28069, H10525.

Microsoft cites to several cases in support of its contention that software cannot be a component under Section 271(f). (MS Br. at 9-10.) Those cases

are distinguishable, as they all involve design or method patents, which have no components, or instructions for assembly of products abroad, which is not a component. *See, e.g., Standard Havens Prods., Inc. v. Gencor Indus., Inc.,* 953 F.2d 1360, 1374 (Fed.Cir.1991) (holding 271(f) inapplicable to a method patent for producing asphalt, "not the apparatus for implementing that process"); *Enpat, Inc. v. Microsoft Corp.,* 6 F.Supp.2d 537, 538-39 (E.D.Va.1998) (finding no 271(f) liability for a method patent with no components where the patent only described steps required to accomplish a task); *Pellegrini v. Analog Devices, Inc.,* C.A. No. 02-11562-RWZ, 2003 WL 21026797, at *1 (D.Mass. May 7, 2003) (finding no 271(f) liability for exportation of instruction for foreign disposal of computer chips); *Aerogroup Int'l,* 955 F.Supp. at 231-32 (Section 271(f) inapplicable for a design patent for a shoe sole where the patent claimed no "components" and the soles were manufactured abroad).

Notably, the two other courts that have considered the precise issue before this Court have held that Microsoft's export of its golden master disks containing infringing code constitutes the supply of a "component" under Section 271(f). *Eolas Techs. Inc. v. Microsoft Corp.,* 274 F.Supp.2d 972 (N.D.Ill.2003), *reconsideration denied,* 2004 WL 170334, at *3-5 (N.D.Ill. Jan.15, 2004); *Imagexpo LLC v. Microsoft Corp.,* 2003 WL 23147556 (E.D.Va. Aug.19, 2003). Additionally, in *NTP, Inc. v. Research in Motion, Ltd.,* 261 F.Supp.2d 423, 436-37 (E.D.Va.2002), a district court granted summary judgment of infringement pursuant to Section 271(f), finding that the defendant's transmission network for its Blackberry wireless email/paging devices manufactured in Canada fell within Section 271(f) because it incorporated domestically-supplied components, such as Microsoft's Exchange Server software, that the defendant combined outside the United States. Microsoft only distinguishes these cases by noting that they were decided before *Bayer AG v. Housey Pharms., Inc.,* 340 F.3d 1367 (Fed.Cir.2003). (Tr. at 18; MS Reply Br. at 6.)

*6 Microsoft argues that *Bayer* compels a finding that it is not liable for infringement and damages for foreign sales of computers containing the infringing software. In *Bayer,* the Federal Circuit addressed the term "component" in Section 271(g) of the Patent Act. *Bayer,* 340 F.3d at 1376- 77. Section 271(g) prohibits importation into the United States of products produced by "patented manufacturing processes, i.e., methods of actually making or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 2004 WL 406640 (S.D.N.Y.), 71 U.S.P.Q.2d 1118
(Cite as: 2004 WL 406640 (S.D.N.Y.))

creating a product as opposed to methods of gathering information about, or identifying a substance worthy of further development." *Bayer, 340 F.3d at 1370.* In dicta, the Federal Circuit stated that the term "component" in Section 271(g) "appears to contemplate a physical product." *Bayer, 340 F.3d at 1376-77.* However, Microsoft wrenches the Federal Circuit's comment out of its context; it is not the clear statement of law on Section 271(f) liability that Microsoft would have this Court adopt.

In *Bayer,* the Federal Circuit held that Section 271(g) does not proscribe the transmission of "information" into the United States. 340 F.3d at 1371. The "information" in *Bayer,* however, was markedly different than the software or object code at issue here. The information in *Bayer* was data generated from a patented method to identify whether a given substance had a particular property, namely, whether that substance activated or inhibited protein activity in a cell. *Bayer, 340 F.3d at 1369.* This data could be used to identify effective drugs for treating diseases. The patentee alleged that Bayer used the patented process outside the United States, subsequently imported into the United States *the data generated from that process,* identified effective drugs from that data, and manufactured those drugs in the United States. *Bayer, 340 F.3d at 1369-70.* The Federal Circuit held that importation of the data generated from the patented process did not infringe under Section 271(g) because that Section is directed towards articles of manufacture, and not data or "information" used to identify those articles. *Bayer, 340 F.3d at 1370.* Indeed, the data produced from the patented process abroad was not directly used to manufacture the drugs at issue in the United States. *Bayer, 340 F.3d at 1369-70.*

*Bayer'* s holding does not advance this Section 271(f) analysis because: (1) *Bayer* only applies to Section 271(g); [FN6] and (2) the "information" or "data processing" that resulted from a patented process in *Bayer* is completely unrelated to the software or object code at issue here. For example, here the software or object code itself is an essential part of the end product and component-assembly abroad. In contrast, in *Bayer* the resulting data created by a patented process was transferred to the United States from abroad and was ultimately used to identify drugs which were then manufactured in the United States. *Bayer, 340 F.3d at 1368-69.* Thus, in *Bayer,* the transmitted "data" at issue was not incorporated into the end-product; it was the result of a patented process, not part of it. In this action, the object code at issue actually contains the patented

codecs, which are not derived from a similar method patent, and the infringing code is sent overseas to be incorporated directly into the end-product abroad.

> FN6. Indeed, the only mention of Section 271(f) in *Bayer* is a passing reference to Congress's intent to avoid encouragement of manufacturing infringing goods outside the United States. *Bayer, 340 F.3d at 1371.*

*7 Citing the dicta in *Bayer,* Microsoft argues that the object code contained on the golden master is intangible information, and thus cannot trigger liability under Section 271(f). Microsoft's argument, however, relies heavily on the presumption that the object code on the golden master disks and in the encrypted transmissions is the type of intangible information or data from a patented process that did not trigger Section 271(g) liability in *Bayer.* As noted above, this Court rejects that presumption.

IV. *Foreign-Replicated Copy as a Component*

[4] In its reply brief, Microsoft advances the argument that a foreign-replicated copy of the infringing software does not constitute a "component" supplied from the United States, and thus cannot trigger Section 271(f) liability. This Court heard AT & T's response at oral argument, and agrees with its position.

Microsoft contends that since the object code eventually incorporated into the foreign computers is *replicated abroad,* those foreign-replicated copies cannot be considered to be a component "supplied from" the United States. Specifically, Microsoft argues that the foreign-replicated copies cannot "be said to have been 'supplied' from the U.S. even though they never touched U.S. soil." (MS Reply Br. at 1.) Essentially, Microsoft seeks to equate replication of the object code abroad with the manufacturing or "supply" of it from abroad. Microsoft's argument ignores the undisputed fact that the object code is originally manufactured in the United States, and supplied from the United States to foreign replicators or OEMs with the intention of incorporating such software into foreign-assembled computers. (Court Ex. 1.) The fact that Microsoft ships one golden master disk or sends one electronic transmission with the infringing object code to each foreign OEM, rather than shipping one CD for each computer for efficiency purposes, cannot shield Microsoft from the letter and intent of the statute--to prohibit circumvention of infringement of a United States patent by supplying certain infringing

components from the United States, and shipping them abroad for incorporation into a finished product that would infringe if assembled in the United States. [FN7] *See* 35 U.S.C. 271(f); H.R. 6286, Patent Law Amendments Act of 1984, Congressional Record, Oct. 1, 1984, 28069, H10525; *Imagexpo,* 2003 WL 23147556; *Eolas Techs.,* 2004 WL 170334, at *3-5.

> FN7. Indeed, at oral argument, Microsoft acknowledged that if individual disks with the infringing Windows operating system object code were sent abroad for incorporation into each foreign-assembled computer (rather than one golden master disk), Microsoft would be liable for infringement under Section 271(f). (Tr. at 16, 28.) Under this scenario, Microsoft would be liable for direct infringement under Section 271(f). *NTP,* 261 F.Supp.2d at 436-37.

In support of its argument, Microsoft analogizes its software to a "mold" for tires that is exported to a foreign plant to make tires there for combination with foreign-made cars. Microsoft argues that its software, like the foreign-molded tires, cannot be said to be components of the patented combination "supplied" from the United States because Section 271(f) looks to the place from which the "component" in question was made and supplied. Unlike the tires that are manufactured from a mold, however, the software here has already been manufactured in, and supplied from, the United States and is only copied abroad-- the software is not a mold for the creation of another separate type of component. Indeed, there is no evidence before this Court that the foreign-incorporated object code or software is being created anew from instructions concerning a process for creating code abroad. *See Enpat,* 6 F.Supp.2d at 538-39 (finding no 271(f) liability for a method patent with no components where the patent only described steps required to accomplish a task); *Pellegrini,* 2003 WL 21026797, at *1 (finding no 271(f) liability for exportation of instruction for foreign disposal of computer chips). Further, Microsoft's tire mold is devoid of any content until rubber is poured into it and a separate and distinct object, a tire, is created. Here, again, the software itself is the component, or the "tire," rather than a mold.

**\*8** As noted in *Imagexpo,* the golden master or electronic transmission at issue here contains object code that becomes an essential component of the finished computer product. "In other words, the overseas replicator [or OEMs] do[ ] not simply construct the computer product using a plan, design, or recipe supplied by Microsoft. Instead, the functional nucleus of the finished computer product is driven by the code, which is transmitted through the golden master." *Imagexpo,* 2003 WL 23147556. This Court agrees and finds Microsoft's "tire mold" analogy unpersuasive.

## V. *Policy Argument*

Finally, Microsoft advances a "doomsday" policy argument to buttress its position, namely that if Section 271(f) liability attaches to foreign distribution of its infringing software, it "would simply pick up [its] manufacturing operation for the golden master, go [one] hundred miles north to Vancouver, set up the operation in Vancouver, [and] burn [its] golden master CDs [there]." (Tr. at 21-22.) Microsoft asserts that this would be the only option to "reduce by two-thirds our exposure in all of these patent cases" relating to Section 271(f) liability for worldwide sales. [FN8] (Tr. at 22.) Additionally, Microsoft complains that, unlike United States-based companies, foreign software companies do not face Section 271(f) liability, and can sell software world-wide without incurring the same liability in the United States. (Tr. at 22.) While this Court appreciates Microsoft's concerns about a paradigm shift for United States software manufacturers, those concerns are better addressed through manufacture of non-infringing goods or Congressional action, rather than a judicial engraftment on Section 271(f) of the Patent Act.

> FN8. Notably, Microsoft's policy argument does not address distribution of the infringing software through electronic transmission.

### CONCLUSION

For the reasons set forth above, defendant Microsoft Corporation's motion for partial summary judgment pursuant to 35 U.S .C. § 271(f) is denied.

Not Reported in F.Supp.2d, 2004 WL 406640 (S.D.N.Y.), 71 U.S.P.Q.2d 1118

**Motions, Pleadings and Filings (Back to top)**

- 1:01cv04872                              (Docket)
(Jun. 04, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# United States Patent [19]

## Kobayashi et al.

[11] Patent Number: 4,922,432

[45] Date of Patent: May 1, 1990

[54] **KNOWLEDGE BASED METHOD AND APPARATUS FOR DESIGNING INTEGRATED CIRCUITS USING FUNCTIONAL SPECIFICATIONS**

[75] Inventors: **Hideaki Kobayashi**, Columbia, S.C.; **Masahiro Shindo**, Osaka, Japan

[73] Assignees: **International Chip Corporation**, Columbia, S.C.; **Ricoh Company, Ltd.**, Tokyo, Japan

[21] Appl. No.: **143,821**

[22] Filed: **Jan. 13, 1988**

[51] Int. Cl.⁵ ............................................. G06F 15/60

[52] U.S. Cl. ...................................... 364/490; 364/489; 364/488; 364/521

[58] Field of Search ................................. 364/488–491, 364/521, 300, 513

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,635,208 | 1/1987 | Coleby et al. | 364/491 |
| 4,638,442 | 1/1987 | Bryant et al. | 364/489 |
| 4,648,044 | 3/1987 | Hardy et al. | 364/513 |
| 4,651,284 | 3/1987 | Watanabe et al. | 364/491 |
| 4,656,603 | 4/1987 | Dunn | 364/488 |
| 4,658,370 | 4/1987 | Erman et al. | 364/513 |
| 4,675,829 | 6/1987 | Clemenson | 364/513 |
| 4,700,317 | 10/1987 | Watanabe et al. | 364/521 |
| 4,703,435 | 10/1987 | Darringer et al. | 364/488 |
| 4,803,636 | 2/1989 | Nishiyama et al. | 364/491 |

### FOREIGN PATENT DOCUMENTS

1445914  8/1976  United Kingdom ................ 364/490

### OTHER PUBLICATIONS

"Verifying Compiled Silicon", by E. K. cheng, VLSI Design, Oct. 1984, pp. 1–4.

"CAD System for IC Design", by M. E. Daniel et al., IEEE Trans. on Computer–Aided Design of Integrated Circuits & Systems, vol. CAD–1, No. 1, Jan. 1982, pp. 2–12.

"An Overview of Logic Synthesis System", by L. Trevillyan, 24th ACM/IEEE Design Automation Conference, 1978, pp. 166–172.

"Methods Used in an Automatic Logic Design Generator", by T. D. Friedman et al., IEEE Trans. on Computers, vol. C–18, No. 7, Jul. 1969, pp. 593–613.

"Experiments in Logic Synthesis", by J. A. Darringer, IEEE ICCC, 1980.

"A Front End Graphic Interface to First Silicon Compiler", by J. H. Nash, EDA 84, Mar. 1984.

"quality of Designs from An Automatic Logic Generator", by T. D. Friedman et al., IEEE 7th DA Conference, 1970, pp. 71–89.

"A New Look at Logic Synthesis", by J. A. Darringer et al., IEEE 17th D. A. Conference 1980, pp. 543–548.

Trevillyan–Trickey, H., Flamel: *A High Level Hardward Compiler*, IEEE Transactions On Computer Aided Design, Mar. 1987, pp. 259–269.

Parker et al., The *CMU Design Automation System—An Example of Automated Data Path Design*, Proceedings Of The 16th Design Automation Conference, Las Vegas, Nev., 1979, pp. 73–80.

*An Engineering Approach to Digital Design*, William I. Fletcher, Prentice–Hall, Inc., pp. 491–505.

*Primary Examiner*—Felix D. Gruber
*Assistant Examiner*—V. N. Trans
*Attorney, Agent, or Firm*—Bell, Seltzer, Park & Gibson

[57] **ABSTRACT**

The present invention provides a computer-aided design system and method for designing an application specific integrated circuit which enables a user to define functional architecture independent specifications for the integrated circuit and which translates the functional architecture independent specifications into the detailed information needed for directly producing the integrated circuit. The functional architecture independent specifications of the desired integrated circuit can be defined at the functional architecture independent level in a flowchart format. From the flowchart, the system and method uses artificial intelligence and expert systems technology to generate a system controller, to select the necessary integrated circuit hardware cells needed to achieve the functional specifications, and to generate data and control paths for operation of the integrated circuit. This list of hardware cells and their interconnection requirements is set forth in a netlist. From the netlist it is possible using known manual techniques or existing VLSI CAD layout systems to generate the detailed chip level topological information (mask data) required to produce the particular application specific integrated circuit.

**20 Claims, 12 Drawing Sheets**



RCL002929

**U.S. Patent**    May 1, 1990    Sheet 1 of 12    **4,922,432**



*Fig. 1a.*
*FUNCTIONAL LEVEL*

*Fig. 1b.*
*STRUCTURAL LEVEL*



*Fig. 1c.*
*PHYSICAL LAYOUT LEVEL*

RCL002930



_Fig. 2._



_Fig. 3._

RCL002931



*Fig.4.*



*Fig.5.*



_Fig.6._



_Fig.9._

RCL002933



RCL002934

Fig. 8.

RCL002935



Fig. 10.

Case 5:03-cv-02289-JW    Document 254-7    Filed 08/23/2005    Page 9 of 26



CMP (A, B)
COMPARE A TO B AND SET
EQ, LT, OR GT SIGNAL

ADD (A, B, C)
C = A + B

DECR (A)
A = A - 1

—— DATA PATH
------- CONTROL SIGNAL (SIGNAL BIT)

*Fig. 11.*

RCL002937



FIG. 12.

RCL002938



Fig. 13.

RCL002939



FIG. 14.

RCL002940



*Fig. 15.*

RCL002941

4,922,432

## 1

### KNOWLEDGE BASED METHOD AND APPARATUS FOR DESIGNING INTEGRATED CIRCUITS USING FUNCTIONAL SPECIFICATIONS

### FIELD AND BACKGROUND OF THE INVENTION

This invention relates to the design of integrated circuits, and more particularly relates to a computer-aided method and apparatus for designing integrated circuits.

An application specific integrated circuit (ASIC) is an integrated circuit chip designed to perform a specific function, as distinguished from standard, general purpose integrated circuit chips, such as microprocessors, memory chips, etc. A highly skilled design engineer having specialized knowledge in VLSI circuit design is ordinarily required to design a ASIC. In the design process, the VLSI design engineer will consider the particular objectives to be accomplished and tasks to be performed by the integrated circuit and will create structural level design specifications which define the various hardware components required to perform the desired function, as well as the interconnection requirements between these components. A system controller must also be designed for synchronizing the operations of these components. This requires an extensive and all encompassing knowledge of the various hardware components required to achieve the desired objectives, as well as their interconnection requirements, signal level compatibility, timing compatibility, physical layout, etc. At each design step, the designer must do tedious analysis. The design specifications created by the VLSI design engineer may, for example, be in the form of circuit schematics, parameters or specialized hardware description languages (HDLs).

From the structural level design specifications, the description of the hardware components and interconnections is converted to a physical chip layout level description which describes the actual topological characteristics of the integrated circuit chip. This physical chip layout level description provides the mask data needed for fabricating the chip.

Due to the tremendous advances in very large scale integration (VLSI) technology, highly complex circuit systems are being built on a single chip. With their complexity and the demand to design custom chips at a faster rate, in large quantities, and for an ever increasing number of specific applications, computer-aided design (CAD) techniques need to be used. CAD techniques have been used with success in design and verification of integrated circuits, at both the structural level and at the physical layout level. For example, CAD systems have been developed for assisting in converting VLSI structural level descriptions of integrated circuits into the physical layout level topological mask data required for actually producing the chip. Although the presently available computer-aided design systems greatly facilitate the design process, the current practice still requires highly skilled VLSI design engineers to create the necessary structural level hardware descriptions.

There is only a small number of VLSI designers who possess the highly specialized skills needed to create structural level integrated circuit hardware descriptions. Even with the assistance of available VLSI CAD tools, the design process is time consuming and the probability of error is also high because of human in-

## 2

volvements. There is a very significant need for a better and more cost effective way to design custom integrated circuits.

### SUMMARY OF THE INVENTION

In accordance with the present invention a CAD (computer-aided design) system and method is provided which enables a user to define the functional requirements for a desired target integrated circuit, using an easily understood functional architecture independent level representation, and which generates therefrom the detailed information needed for directly producing an application specific integrated circuit (ASIC) to carry out those specific functions. Thus, the present invention, for the first time, opens the possibility for the design and production of ASICs by designers, engineers and technicians who may not possess the specialized expert knowledge of a highly skilled VLSI design engineer.

The functional architecture independent specifications of the desired ASIC can be defined in a suitable manner, such as in list form or preferably in a flowchart format. The flowchart is a highly effective means of describing a sequence of logical operations, and is well understood by software and hardware designers of varying levels of expertise and training. From the flowchart (or other functional specifications), the system and method of the present invention translates the functional architecture independent specifications into structural an architecture specific level definition of an integrated circuit, which can be used directly to produce the ASIC. The structural level definition includes a list of the integrated circuit hardware cells needed to achieve the functional specifications. These cells are selected from a cell library of previously designed hardware cells of various functions and technical specifications. The system also generates data paths among the selected hardware cells. In addition, the present invention generates a system controller and control paths for the selected integrated circuit hardware cells. The list of hardware cells and their interconnection requirements may be represented in the form of a netlist. From the netlist it is possible using either known manual techniques or existing VLSI CAD layout systems to generate the detailed chip level geometrical information (e.g. mask data) required to produce the particular application specific integrated circuit in chip form.

The preferred embodiment of the system and method of the present invention which is described more fully hereinafter is referred to as a Knowledge Based Silicon Compiler (KBSC). The KBSC is an ASIC design methodology based upon artificial intelligence and expert systems technology. The user interface of KBSC is a flowchart editor which allows the designer to represent VLSI systems in the form of a flowchart. The KBSC utilizes a knowledge based expert system, with a knowledge base extracted from expert ASIC designers with a high level of expertise in VLSI design to generate from the flowchart a netlist which describes the selected hardware cells and their interconnection requirements.

### BRIEF DESCRIPTION OF THE DRAWINGS

The invention will be better understood by reference to the detailed description which follows, taken in connection with the accompanying drawings, in which

RCL002942

4,922,432

3

FIG. 1a illustrates a functional level design representation of a portion of a desired target circuit, shown in the form of a flowchart;

FIG. 1b illustrates a structural level design representation of an integrated circuit;

FIG. 1c illustrates a design representation of a circuit at a physical layout level, such as would be utilized in the fabrication of an integrated circuit chip;

FIG. 2 is a block schematic diagram showing how integrated circuit mask data is created from flowchart descriptions by the KBSC system of the present invention;

FIG. 3 is a somewhat more detailed schematic illustration showing the primary components of the KBSC system;

FIG. 4 is a schematic illustration showing how the ASIC design system of the present invention draws upon selected predefined integrated circuit hardware cells from a cell library;

FIG. 5 is an example flowchart defining a sequence of functional operations to be performed by an integrated circuit;

FIG. 6 is a structural representation showing the hardware blocks and interconnection requirements for the integrated circuit defined in FIG. 5;

FIG. 7 is an illustration of the flowchart editor window;

FIG. 8 is an illustration of the flowchart simulator window;

FIG. 9 is an illustration of the steps involved in cell list generation;

FIG. 10 is an example flowchart for a vending machine system;

FIG. 11 illustrates the hardware components which correspond to each of the three macros used in the flowchart of FIG. 10;

FIG. 12 is an initial block diagram showing the hardware components for an integrated circuit as defined in the flowchart of FIG. 10;

FIG. 13 is a block diagram corresponding to FIG. 12 showing the interconnections between blocks;

FIG. 14 is a block diagram corresponding to FIG. 13 after register optimization; and

FIG. 15 is a block diagram corresponding to FIG. 14 after further optimization.

## DETAILED DESCRIPTION OF ILLUSTRATIVE EMBODIMENTS

FIGS. 1a, 1b and 1c illustrate three different levels of representing the design of an integrated circuit. FIG. 1a shows a functional (or behavioral) representation architecture independent in the form of a flowchart. A flowchart is a graphic representation of an algorithm and consists of two kinds of blocks or states, namely actions and conditions (decisions). Actions are conventionally represented in the flowchart by a rectangle or box, and conditions are represented by a diamond. Transitions between actions and conditions are represented by lines with arrows. FIG. 1b illustrates a structural (or logic) level representation of an integrated circuit. In this representation, blocks are used to represent integrated architecture specific circuit hardware components for performing various functions, and the lines interconnecting the blocks represent paths for the flow of data or control signals between the blocks. The blocks may, for example, represent hardware components such as adders, comparators, registers, system controllers, etc. FIG. 1c illustrates a physical layout level representation

4

of an integrated circuit design, which provides the detailed mask data necessary to actually manufacture the devices and conductors which together comprise integrated circuit.

As noted earlier, the design of an integrated circuit at the structural level requires a design engineer with highly specialized skills and expertise in VLSI design. In the KBSC system of the present invention, however, integrated circuits can be designed at a functional level because the expertise in VLSI design is provided and applied by the invention. Allowing the designer to work with flowcharts instead of logic circuit schematics simplifies the task of designing custom integrated circuits, making it quicker, less expensive and more reliable. The designer deals with an algorithm using simple flowcharts at an architecture independent functional (behavioral) level, and needs to know only the necessary logical steps to complete a task, rather than the specific means for accomplishing the task. Designing with flowcharts requires less work in testing because flowcharts allow the designer to work much closer to the algorithm. On the other hand, previously existing VLSI design tools require the designer to represent an algorithm with complex circuit schematics at a structural level, therefore requiring more work in testing. Circuit schematics make it harder for the designer to cope with the algorithm function which needs to be incorporated into the target design because they intermix the hardware and functional considerations. Using flowcharts to design custom integrated circuits will allow a large number of system designers to access VLSI technology, where previously only a small number of designers had the knowledge and skills to create the necessary structural level hardware descriptions.

The overall system flow is illustrated in FIG. 2. The user enters the functional specifications of the circuit into the knowledge based silicon compiler (KBSC) 10 in the form of a flowchart 11. The KBSC 10 then generates a netlist 15 from the flowchart. The netlist 15 includes a custom generated system controller, all other hardware cells required to implement the necessary operations, and interconnection information for connecting the hardware cells and the system controller. The netlist can be used as input to any existing VLSI layout and routing tool 16 to create mask data 18 for geometrical layout.

### System Overview

The primary elements or modules which comprise the KBSC system are shown in FIG. 3. In the embodiment illustrated and described herein, these elements or modules are in the form of software programs, although persons skilled in the appropriate art will recognize that these elements can easily be embodied in other forms, such as in hardware.

Referring more particularly to FIG. 3, it will be seen that the KBSC system 10 includes a program 20 called EDSIM, which comprises a flowchart editor 21 for creating and editing flowcharts and a flowchart simulator 22 for simulation and verification of flowcharts. Actions to be performed by each of the rectangles represented in the flowchart are selected from a macro library 23. A program 30 called PSCS (path synthesizer and cell selector) includes a data and control path synthesizer module 31, which is a knowledge based system for data and control path synthesis. PSCS also includes a cell selector 32 for selecting the cells required for system design. The cell selector 32 selects from a cell

RCL002943

4,922,432

5                                                                    6

library 34 of previously designed hardware cells the appropriate cell or cells required to perform each action and condition represented in the flowchart. A controller generator 33 generates a custom designed system controller for controlling the operations of the other hardware cells. The knowledge base 35 contains ASIC design expert knowledge required for data path synthesis and cell selection. Thus, with a functional flowchart input, PSCS generates a system controller, selects all other hardware cells, generates data and control paths, and generates a netlist describing all of this design information.

The KBSC system employs a hierarchal cell selection ASIC design approach, as is illustrated in FIG. 4. Rather than generating every required hardware cell from scratch, the system draws upon a cell library 34 of previously designed, tested and proven hardware cells of various types and of various functional capabilities with a given type. The macro library 23 contains a set of macros defining various actions which can be specified in the flowchart. For each macro function in the macro library 23 there may be several hardware cells in the cell library 34 of differing geometry and characteristics capable of performing the specified function. Using a rule based expert system with a knowledge base 35 extracted from expert ASIC designers, the KBSC system selects from the cell library 34 the optimum cell for carrying out the desired function.

Referring again to FIG. 3, the cells selected by the cell selector 32, the controller information generated by the controller generator 33 and the data and control paths generated by the data/control path synthesizer 31 are all utilized by the PSCS program 30 to generate the netlist 15. The netlist is a list which identifies each block in the circuit and the interconnections between the respective inputs and outputs of each block. The netlist provides all the necessary information required to produce the integrated circuit. Computer-aided design systems for cell placement and routing are commercially available which will receive netlist data as input and will lay out the respective cells in the chip, generate the necessary routing, and produce mask data which can be directly used by a chip foundry in the fabrication of integrated circuits.

## System Requirements

The KBSC system can be operated on a suitable programed general purpose digital computer. By way of example, one embodiment of the system is operated in a work station environment such as Sun3 and VAXStation-II/GPX Running UNIX Operating System and X Window Manager. The work station requires a minimum of 8 megabytes of main storage and 20 megabytes of hard disk space. The monitor used is a color screen with 8-bit planes. The software uses C programming language and INGRES relational data base.

The human interface is mainly done by the use of pop up menus, buttons, and a special purpose command language. The permanent data of the integrated circuit design are stored in the data base for easy retrieval and update. Main memory stores the next data temporarily, executable code, design data (flowchart, logic, etc.), data base (cell library), and knowledge base. The CPU performs the main tasks of creating and simulating flowcharts and the automatic synthesis of the design.

### Flowchart Example

To describe the mapping of a flowchart to a netlist, consider an example flowchart shown in FIG. 5, which is of part of a larger overall system. In this illustrative flowchart, two variables, VAL1 and VAL2 are compared and if they are equal, they are added together. In this instance, the first action (Action 1) involves moving the value of variable VAL1 to register A. The second action comprises moving the value of variable VAL2 to register B. Condition 1 comprises comparing the values in registers A and B. Action 3 comprises adding the values of registers A and B and storing the result in register C.

In producing an integrated circuit to carry out the function defined in FIG. 5, the KBSC maps the flowchart description of the behavior of the system to interconnection requirements between hardware cells. The hardware cells are controlled by a system controller which generates all control signals. There are two types of variables involved in a system controller:

(1) Input variables: These are generated by hardware cells, and/or are external input to the controller. These correspond to conditions in the flowchart.

(2) Output variables: These are generated by the system controller and correspond to actions in the flowchart.

FIG. 6 illustrates the results of mapping the flowchart of FIG. 5 onto hardware cells. The actions and the conditions in the flowchart are used for cell selection and data and control path synthesis. The VAL1 register and VAL2 register and the data paths leading therefrom have already been allocated in actions occurring before Action 1 in our example. Action 1 causes generation of the data register A. Similarly, Action 2 causes the allocation of data register B. The comparator is allocated as a result of the comparison operation in Condition 1. The comparison operation is accomplished by (1) selecting a comparator cell, (2) mapping the inputs of the comparator cell to registers A and B, (3) generating data paths to connect the comparator with the registers A and B and (4) generating input variables corresponding to equal to, greater than, and less than for the system controller. Similarly the add operation in Action 3 causes selection of the adder cell, mapping of the adder parameters to the registers and creating the data paths.

Following this methodology, a block list can be generated for a given flowchart. This block list consists of a system controller and as many other blocks as may be required for performing the necessary operations. The blocks are connected with data paths, and the blocks are controlled by the system controller through control paths. These blocks can be mapped to the cells selected from a cell library to produce a cell list.

### Interactive Flowchart Editor and Simulator

The creation and verification of the flowchart is the first step in the VLSI design methodology. The translation from an algorithm to an equivalent flowchart is performed with the Flowchart Editor 21 (FIG. 3). The verification of the edited flowchart is performed by the Flowchart Simulator 22 The Flowchart Editor and Simulator are integrated into one working environment for interactive flowchart editing, with a designer friendly interface.

EDSIM is the program which contains the Flowchart Editor 21 and the Flowchart Simulator 22. It also provides functions such as loading and saving flow-

RCL002944

4,922,432

7

charts. EDSIM will generate an intermediate file, called a statelist, for each flowchart. This file is then used by the PSCS program 30 to generate a netlist.

## Flowchart Editor

The Flowchart Editor 21 is a software module used for displaying, creating, and editing the flowchart. This module is controlled through the flowchart editing window illustrated in FIG. 7. Along with editing functions the Flowchart Editor also provides checking of design errors.

The following is a description of the operations of the Flowchart Editor. The main editing functions include, create, edit, and delete states, conditions, and transitions. The create operation allows the designer to add a new state, condition, or transitions to a flowchart. Edit allows the designer to change the position of a state, condition or transition, and delete allows the designer to remove a state, condition or transition from the current flowchart. States which contain actions are represented by boxes, conditions are represented by diamonds, and transitions are represented by lines with arrows showing the direction of the transition.

Edit actions allows the designer to assign actions to each box. These actions are made up of macro names and arguments. An example of arguments is the setting and clearing of external signals. A list of basic macros available in the macro library 23 is shown in Table 1.

TABLE 1

| Macro | Description |
|---|---|
| ADD (A,B,C) | C = A + B |
| SUB (A,B,C) | C = A − B |
| MULT (A,B,C) | C = A * B |
| DIV (A,B,C) | C = A div B |
| DECR (A) | A = A − 1 |
| INCR (A) | A = A + 1 |
| CLR (A) | A = 0 |
| REG (A,B) | B = A |
| CMP (A,B) | Compare A to B and set EQ,LT,GT signals |
| CMP0 (A) | Compare A to 0 and set EQ,LT,GT signals |
| NEGATE (A) | A = NOT (A) |
| MOD (A,B,C) | C = A Modulus B |
| POW (A,B,C) | C = A B |
| DC2 (A,S1,S2,S3,S4) | Decode A into S1,S2,S3,S4 |
| EC2 (S1,S2,S3,S4,A) | Encode S1,S2,S3,S4 into A |
| MOVE (A,B) | B = A |
| CALL sub-flowchart (A,B, . . .) | Call a sub-flowchart. Pass A,B . . . |
| START (A,B, . . .) | Beginning state of a sub-flowchart |
| STOP (A,B . . .) | Ending state of a sub-flowchart |

The Flowchart Editor also provides a graphical display of the flowchart as the Flowchart Simulator simulates the flowchart. This graphical display consists of boxes, diamonds, and lines as shown in FIG. 7. All are drawn on the screen and look like a traditional flowchart. By displaying the flowchart on the screen during simulation it allows the designer to design and verify the flowchart at the same time.

## Flowchart Simulator

The Flowchart Simulator 22 is a software module used for simulating flowcharts. This module is controlled through the simulator window illustrated in FIG. 8. The Flowchart Simulator simulates the transitions between states and conditions in a flowchart. The following is a list of the operations of the Flowchart Simulator:

edit data—Change the value of a register or memory.

8

set state—Set the next state to be simulated.

set detail or summary display—Display summary or detail information during simulation.

set breaks—Set a breakpoint.

clear breaks—Clear all breakpoints.

show breaks—Display current breakpoints.

step—Step through one transition.

execute—Execute the flowchart.

stop—Stop executing of the flowchart. history ON or history OFF—Set history recording on or off.

cancel—Cancel current operation.

help—Display help screen.

close—Close the simulator window.

The results of the simulation are displayed within the simulator window. Also the editor window will track the flowchart as it is being simulated. This tracking of the flowchart makes it easy to edit the flowchart when an error is found.

## Cell Selection

The Cell Selector 32 is a knowledge based system for selecting a set of optimum cells from the cell library 34 to implement a VLSI system. The selection is based on functional descriptions in the flowchart, as specified by the macros assigned to each action represented in the flowchart. The cells selected for implementing a VLSI system depend on factors such as cell function, fabrication technology used, power limitations, time delays etc. The cell selector uses a knowledge base extracted from VLSI design experts to make the cell selection.

To design a VLSI system from a flowchart description of a user application, it is necessary to match the functions in a flowchart with cells from a cell library. This mapping needs the use of artificial intelligence techniques because the cell selection process is complicated and is done on the basis of a number of design parameters and constraints. The concept used for cell selection is analogous to that used in software compilation. In software compilation a number of subroutines are linked from libraries. In the design of VLSI systems, a functional macro can be mapped to library cell.

FIG. 4 illustrates the concept of hierarchical cell selection. The cell selection process is performed in two steps:

(1) selection of functional macros

(2) selection of geometrical cells

A set of basic macros is shown in Table 1. A macro corresponds to an action in the flowchart. As an example, consider the operation of adding A and B and storing the result in C. This function is mapped to the addition macro ADD(X, Y, Z). The flowchart editor and flowchart simulator are used to draw the rectangles, diamonds and lines of the flowchart, to assign a macro selected from the macro library 23 to each action represented in the flowchart, and to verify the functions in flowcharts. The flowchart is converted into an intermediate form (statelist) and input to the Cell Selector.

The Cell Selector uses a rule based expert system to select the appropriate cell or cells to perform each action. If the cell library has a number of cells with different geometries for performing the operation specified by the macro, then an appropriate cell can be selected on the basis of factors such as cell function, process technology used, time delay, power consumption, etc.

The knowledge base of Cell Selector 32 contains information (rules) relating to:

(1) selection of macros

(2) merging two macros

RCL002945

4,922,432

**9**

(3) mapping of macros to cells

(4) merging two cells

(5) error diagnostics

The above information is stored in the knowledge base 35 as rules.

## Cell List Generation

FIG. 9 shows the cell list generation steps. The first step of cell list generation is the transformation of the flowchart description into a structure that can be used by the Cell Selector. This structure is called the statelist. The blocklist is generated from the statelist by the inference engine. The blocklist contains a list of the functional blocks to be used in the integrated circuit. Rules of the following type are applied during this stage.

    map arguments to data paths
    map actions to macros
    connect these blocks

Rules also provide for optimization and error diagnostics at this level.

The cell selector maps the blocks to cells selected from the cell library 34. It selects an optimum cell for a block. This involves the formulation of rules for selecting appropriate cells from the cell library. Four types of information are stored for each cell. These are:

(1) functional level information: description of the cell at the register transfer level.

(2) logic level information: description in terms of flip-flops and gates.

(3) circuit level information: description at the transistor level.

(4) Layout level information: geometrical mask level specification.

The attributes of a cell are:

    cell name
    description
    function
    width
    height
    status
    technology
    minimum delay
    typical delay
    maximum delay
    power
    file
    designer
    date
    comment
    inspector

In the cell selection process, the above information can be used. Some parameters that can be used to map macros to cells are:

(1) name of macro

(2) function to be performed

(3) complexity of the chip

(4) fabrication technology

(5) delay time allowed

(6) power consumption

(7) bit size of macro data paths

## Netlist Generation

The netlist is generated after the cells have been selected by PSCS. PSCS also uses the macro definitions for connecting the cell terminals to other cells. PSCS uses the state-to-state transition information from an intermediate form representation of a flowchart (i.e. the

**10**

statelist) to generate a netlist. PSCS contains the following knowledge for netlist generation:

(1) Data path synthesis

(2) Data path optimization

(3) Macro definitions

(4) Cell library

(5) Error detection and correction

The above information is stored in the knowledge base 35 as rules. Knowledge engineers help in the formulation of these rules from ASIC design experts. The macro library 23 and the cell library 34 are stored in a database of KBSC.

A number of operations are performed by PSCS. The following is a top level description of PSCS operations:

(1) Read the flowchart intermediate file and build a statelist.

(2) current_context=START

(3) Start the inference engine and load the current context rules.

(4) Perform one of the following operations depending upon current_context:

(a) Modify the statelist for correct implementation.

(b) Create blocklist, macrolist and data paths.

(c) Optimize blocklist and datapath list and perform error checks.

(d) Convert blocks to cells.

(e) Optimize cell list and perform error checks.

(f) Generate netlist.

(g) Optimize netlist and perform error checks and upon completion Goto 7.

(5) If current_context has changed, load new context rules.

(6) Goto 4.

(7) Output netlist file and stf files and Stop.

In the following sections, operations mentioned in step 4 are described. The Rule Language and PSCS display are also described.

## Rule Language

The rule language of PSCS is designed to be declarative and to facilitate rule editing. In order to make the expert understand the structure of the knowledge base, the rule language provides means for knowledge representation. This will enable the format of data structures to be stated in the rule base, which will enable the expert to refer to them and understand the various structures used by the system. For example, the expert can analyze the structure of wire and determine its components. The expert can then refer these components into rules. If a new object has to be defined, then the expert can declare a new structure and modify some existing structure to link to this new structure. In this way, the growth of the data structures can be visualized better by the expert. This in turn helps the designer to update and append rules.

The following features are included in the rule language:

(i) Knowledge representation in the form of a record structure.

(ii) Conditional expressions in the antecedent of a rule.

(iii) Facility to create and destroy structure in rule actions.

(iv) The assignment statement in the action of a rule.

(v) Facility for input and output in rule actions.

(vi) Provide facility to invoke C functions from rule actions.

The rule format to be used is as follows:

RCL002946

4,922,432

11

12

| The rule format to be used is as follows: |
| --- |

```
Rule
If {    <number> <context>

        <if-clause>
}
Then {
        <then-clause>
}
where   <number>              rule number
        <context>             context in which this rule is
                              active
        <if-clause>           the condition part of the rule
        <then-clause>         the action part of the rule
```

### Inference Strategy

The inference strategy is based on a fast pattern matching algorithm. The rules are stored in a network and the requirement to iterate through the rules is avoided. This speeds up the execution. The conflict resolution strategy to be used is based on the following:

(1) The rule containing the most recent data is selected.

(2) The rule which has the most complex condition is selected.

(3) The rule declared first is selected.

### Rule Editor

PSCS provides an interactive rule editor which enables the expert to update the rule set. The rules are stored in a database so that editing capabilities of the database package can be used for rule editing. To perform this operation the expert needs to be familiar with the various knowledge structures and the inferencing process. If this is not possible, then the help of a knowledge engineer is needed.

PSCS provides a menu from which various options can be set. Mechanisms are provided for setting various debugging flags and display options, and for the overall control of PSCS.

Facility is provided to save and display the blocklist created by the user. The blocklist configuration created by the user can be saved in a file and later be printed with a plotter. Also the PSCS display can be reset to restart the display process.

| PSCS Example Rules: | |
| --- | --- |
| Rule 1 | |
| IF | no blocks exist |
| THEN | generate a system controller. |
| Rule 2 | |
| IF | a state exists which has a macro AND this macro has not been mapped to a block |
| THEN | find a corresponding macro in the library and generate a block for this macro. |
| Rule 3 | |
| IF | there is a transition between two states AND there are macros in these states using the same argument |
| THEN | make a connection from a register corresponding to the first macro to another register corresponding to the second macro. |
| Rule 4 | |
| IF | a register has only a single connection from another register |
| THEN | combine these registers into a single register. |
| Rule 5 | |
| IF | there are two comparators AND input data widths are of the same size AND |

| -continued | |
| --- | --- |
| PSCS Example Rules: | |
| | one input of these is same AND the outputs of the comparators are used to perform the same operation. |
| THEN | combine these comparators into a single comparator. |
| Rule 6 | |
| IF | there is a data without a register |
| THEN | allocate a register for this data. |
| Rule 7 | |
| IF | all the blocks have been interconnected AND a block has a few terminals not connected |
| THEN | remove the block and its terminals, or issue an error message. |
| Rule 8 | |
| IF | memory is to be used, but a block has not been created for it |
| THEN | create a memory block with data, address, read and write data and control terminals. |
| Rule 9 | |
| IF | a register has a single connection to a counter |
| THEN | combine the register and the counter; remove the register and its terminals. |
| Rule 10 | |
| IF | there are connections to a terminal of a block from many different blocks |
| THEN | insert a multiplexor; remove the connections to the terminals and connect them to the input of the multiplexor; connect the output of the multiplexor to the input of the block. |

Additional rules address the following points:
remove cell(s) that can be replaced by using the outputs of other cell(s)
reduce multiplexor trees
use fan-out from the cells, etc.

### Soft Drink Vending Machine Controller Design Example

The following example illustrates how the previously described features of the present invention are employed in the design of an application specific integrated circuit (ASIC). In this illustrative example the ASIC is designed for use as a vending machine controller. The vending machine controller receives a signal each time a coin has been deposited in a coin receiver. The coin value is recorded and when coins totalling the correct amount are received, the controller generates a signal to dispense a soft drink. When coins totalling more than the cost of the soft drink are received, the controller dispenses change in the correct amount.

This vending machine controller example is patterned after a textbook example used in teaching digital system controller design. See Fletcher, William I., *An Engineering Approach to Digital Design*, Prentice-Hall, Inc., pp. 491–505. Reference may be made to this textbook example for a more complete explanation of this vending machine controller requirements, and for an understanding and appreciation of the complex design procedures prior to the present invention for designing the hardware components for a controller.

FIG. 10 illustrates a flowchart for the vending machine controller system. This flowchart would be entered into the KBSC system by the user through the flowchart editor. Briefly reviewing the flowchart, the controller receives a coin present signal when a coin is received in the coin receiver. State0 and cond0 define a waiting state awaiting deposit of a coin. The symbol CP represents "coin present" and the symbol !CP repre-

4,922,432

13

sents "coin not present". State1 and cond1 determine when the coin has cleared the coin receiver. At state20, after receipt of a coin, the macro instruction ADD3.1 (lc, cv, sum) instructs the system to add lc (last coin) and cv (coin value) and store the result as sum. The macro instruction associated with state21 moves the value in the register sum to cv. The macro CMP.1 at state22 compares the value of cv with PR (price of soft drink) and returns signals EQ, GT and LT. The condition cond2 tests the result of the compare operation CMP.1. If the result is "not greater than" (!GT.CMP.1), then the condition cond3 tests to see whether the result is "equal" (EQ.CMP.1). If the result is "not equal" (!EQ.CMP.1), then control is returned to state0 awaiting the deposit of another coin. If cond3 is EQ, then state4 generates a control signal to dispense a soft drink (droppop) and the macro instruction CLR.1(cv) resets cv to zero awaiting another customer.

If the total coins deposited exceed the price, then state30 produces the action "returncoin". Additionally, the macro DECR.1 (cv) reduces the value of cv by the amount of the returned coin. At state31 cv and PR are again compared. If cv is still greater than PR, then control passes to state30 for return of another coin. The condition cond5 tests whether the result of CMP.2 is EQ and will result in either dispensing a drink (droppop) true or branching to state0 awaiting deposit of another coin. The macros associated with the states shown in FIG. 10 correspond to those defined in Table 1 above and define the particular actions which are to be performed at the respective states.

Appendix A shows the intermediate file or "statelist" produced from the flowchart of FIG. 10. This statelist is produced as output from the EDSIM program 20 and is used as input to the PSCS program 30 (FIG. 3).

FIG. 11 illustrates for each of the macros used in the flowchart of FIG. 10, the corresponding hardware blocks. It will be seen that the comparison macro CMP (A,B) results in the generation of a register for storing value A, a register for storing value B, and a comparator block and also produces control paths to the system controller for the EQ, LT, and GT signals generated as a result of the comparison operation. The addition macro ADD (A,B,C) results in the generation of a register for each of the input values A and B, a register for A B the output value C, and in the generation of an adder block. The macro DECR (A) results in the generation of a counter block. The PSCS program 30 maps each of the macros used in the flowchart of FIG. 10 to the corresponding hardware components results in the generation of the hardware blocks shown in FIG. 12. In generating the illustrated blocks, the PSCS program 30 relied upon rules 1 and 2 of the above listed example rules.

FIG. 13 illustrates the interconnection of the block of FIG. 12 with data paths and control paths. Rule 3 was used by the data/control path synthesizer program 31 in mapping the data and control paths.

FIG. 14 shows the result of optimizing the circuit by applying rule 4 to eliminate redundant registers. As a result of application of this rule, the registers R2, R3, R7, R8, and R9 in FIG. 13 were removed. FIG. 15 shows the block diagram after further optimization in which redundant comparators are consolidated. This optimization is achieved in the PSCS program 30 by application of rule 5.

Having now defined the system controller block, the other necessary hardware blocks and the data and con-

14

trol paths for the integrated circuit, the PSCS program 30 now generates a netlist 15 defining these hardware components and their interconnection requirements. From this netlist the mask data for producing the integrated circuit can be directly produced using available VLSI CAD tools.

```
name rpop;
data path @ic<0:5>, cv<0:5>, sum<0:5>, @pr<0:5>;
{
state4 :: state0;
state30 :: state31;
state21 :: state22;
state20 :: state21;
state0 :: !cp state0;
state0 :: cp state1;
state1 :. cp state1;
state1 :: !cp state20;
state22 :: GT.CMP.1 state30;
state22 :: !GT.CMP.1*EQ.CMP.1 state4;
state22 :: !GT.CMP.1*!EQ.CMP.1 state0;
state31 :: GT.CMP.2 state30;
state31 :: !GT.CMP.2*EQ.CMP.2 state4;
state31 :: !GT.CMP.2*!EQ.CMP.2 state0;
state30 :: returncoin;
state30 :: DECR.1(cv);
state4 :: droppop;
state4 :: CLR.1(cv);
state31 :: CMP.2(cv,pr);
state22 :: CMP.1(cv,pr);
state21 :: MOVE.1(sum,cv);
state20 :: ADD3.1(ic,cv,sum);
}
```

That which I claimed is:

1. A computer-aided design system for designing an application specific integrated circuit directly from architecture independent functional specifications for the integrated circuit, comprising

a macro library defining a set of architecture independent operations comprised of actions and conditions;

input specification means operable by a user for defining architecture independent functional specifications for the integrated circuit, said functional specifications being comprised of a series of operations comprised of actions and conditions, said input specification means including means to permit the user to specify for each operation a macro selected from said macro library;

a cell library defining a set of available integrated circuit hardware cells for performing the available operations defined in said macro library;

cell selection means for selecting from said cell library for each macro specified by said input specification means, appropriate hardware cells for performing the operation defined by the specified macro, said cell selection means comprising an expert system including a knowledge base containing rules for. selecting hardware cells from said cell library and inference engine means for selecting appropriate hardware cells from said cell library in accordance with the rules of said knowledge base; and

netlist generator means cooperating with said cell selection means for generating as output from the system a netlist defining the hardware cells which are needed to achieve the functional requirements of the integrated circuit and the connections therebetween.

2. The system as defined in claim 1 wherein said input means comprises means specification for receiving user

RCL002948

4,922,432

15                                                                    16

input of a list defining the series of actions and condi-
tions.

3. The system as defined in claim 1 additionally in-
cluding mask data generator means for generating from
said netlist the mask data required to produce an inte-
grated circuit having the specified functional require-
ments.

4. The system as defined in claim 1 wherein said input
means comprises flowchart editor means specification
for creating a flowchart having elements representing
said series of actions and conditions.

5. The system as defined in claim 4 additionally in-
cluding flowchart simulator means for simulating the
functions defined in the flowchart to enable the user to
verify the operation of the integrated circuit.

6. The system as defined in claim 1 additionally in-
cluding data path generator means cooperating with
said cell selection means for generating data paths for
the hardware cells selected by said cell selection means.

7. The system as defined in claim 6 wherein said data
path generator means comprises a knowledge base con-
taining rules for selecting data paths between hardware
cells and inference engine means for selecting data paths
between the hardware cells selected by said cell selec-
tion means in accordance with the rules of said knowl-
edge base and the arguments of the specified macros.

8. The system as defined in claim 6 additionally in-
cluding control generator means for generating a con-
troller and control paths for the hardware cells selected
by said cell selection means.

9. A computer-aided design system for designing an
application specific integrated circuit directly from a
flowchart defining architecture independent functional
requirements of the integrated circuit comprising

a marco library defining a set of architecture indepen-
dent operations comprised of actions and condi-
tions;

flowchart editor means operable by a user for creat-
ing a flowchart having elements representing said
architecture independent operations;

said flowchart editor means including macro specifi-
cation means for permitting the user to specify for
each operation represented in the flowchart a
macro selected from said macro library;

a cell library defining a set of available integrated
circuit hardware cells for performing the available
operations defined in said macro library;

cell selection means for selecting form said cell li-
brary for each specified macro, appropriate hard-
ware cells for performing the operation defined by
the specified macro, said cell selection means com-
prising an expert system including a knowledge
base containing rules for selecting hardware cells
from said cell library and inference engine means
for selecting appropriate hardware cells from said
cell library in accordance with the rules of said
knowledge base; and

data path generator means cooperating with said cell
selection means for generating data paths for the
hardware cells selected by said cell selector means,
said data path generator means comprising a
knowledge base containing rules for selecting data
paths between hardware cells and inference engine
means for selecting data paths between hardware
cells selected by said cell selection means in accor-
dance with the rules of said knowledge base and
the arguments of the specified macros.

10. The system as defined in claim 9 additionally
including control generator means for generating a
controller and control paths for the hardware cells
selected by said cell selection means.

11. A computer-aided design system for designing an
application specific integrated circuit directly from a
flowchart defining architecture independent functional
requirements of the integrated circuit, comprising

flowchart editor means operable by a user for creat-
ing a flowchart having boxes representing architec-
ture independent actions, diamonds representing
architecture independent conditions, and lines with
arrows representing transitions between actions
and condition and including means for specifying
for each box or diamond, a particular action or
condition to be performed;

a cell library defining a set of available integrated
circuit hardware cells for performing actions and
conditions;

a knowledge base containing rules for selecting hard-
ware cells from said cell library and for generating
data and control paths for hardware cells; and

expert system means operable with said knowledge
base for translating the flowchart defined by said
flowchart editor means into a netlist defining the
necessary hardware cells and data and control
paths required in an integrated circuit having the
specified functional requirements.

12. The system as defined in claim 11 including mask
data generator means for generating from said netlist
the mask data required to produce an integrated circuit
having the specified functional requirements.

13. A computer-aided design process for designing an
application specific integrated circuit which will per-
form a desired function comprising

storing a set of definitions of architecture indepen-
dent actions and conditions;

storing data describing a set of available integrated
circuit hardware cells for performing the actions
and conditions defined in the stored set;

storing in an expert system knowledge base a set of
rules for selecting hardware cells to perform the
actions and conditions;

describing for a proposed application specific inte-
grated circuit a series of architecture independent
actions and conditions;

specifying for each described action and condition of
the series one of said stored definitions which cor-
responds to the desired action or condition to be
performed; and

selecting from said stored data for each of the speci-
fied definitions a corresponding integrated circuit
hardware cell for performing the desired function
of the application specific integrated circuit, said
step of selecting a hardware cell comprising apply-
ing to the specified definition of the action or con-
dition to be performed, a set of cell selection rules
stored in said expert system knowledge base and
generating for the selected integrated circuit hard-
ware cells, a netlist defining the hardware cells
which are needed to perform the desired function
of the integrated circuit and the interconnection
requirements therefor.

14. A process as defined in claim 13, including gener-
ating from the netlist the mask data required to produce
an integrated circuit having the desired function.

4,922,432

## 17

15. A process as defined in claim 13 including the further step of generating data paths for the selected integrated circuit hardware cells.

16. A process as defined in claim 15 wherein said step of generating data paths comprises applying to the selected cells a set of data path rules stored in a knowledge base and generating the data paths therefrom.

17. A process as defined in claim 16 including the further step of generating control paths for the selected integrated circuit hardware cells.

18. A knowledge based design process for designing an application specific integrated circuit which will perform a desired function comprising

storing in a macro library a set of macros defining architecture independent actions and conditions;

storing in a cell library a set of available integrated circuit hardware cells for performing the actions and conditions;

storing in a knowledge base set of rules for selecting hardware cells from said cell library to perform the actions and conditions defined by the stored macros;

describing for a proposed application specific integrated circuit a flowchart comprised of elements representing a series of architecture independent

## 18

actions and conditions which carry out the function to be performed by the integrated circuit;

specifying for each described action and condition of said series a macro selected from the macro library which corresponds to the action or condition; and

applying rules of said knowledge base to the specified macros to select from said cell library the hardware cells required for performing the desired function of the application specific integrated circuit and generating for the selected integrated circuit hardware cells, a netlist defining the hardware cells which are needed to perform the desired function of the integrated circuit and the interconnection requirements therefor.

19. A process as defined in claim 18 also including the steps of

storing in said knowledge base a set of rules for creating data paths between hardware cells, and

applying rules of said knowledge base to the specified means to create data paths for the selected hardware cells.

20. A process as defined in claim 19 also including the steps of generating a controller and generating control paths for the selected hardware cells.

* * * * *

RCL002950

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.  : 4,922,432                    Page 1 of 4

DATED       : May 1, 1990

INVENTOR(S) : Hideaki Kobayashi, et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

ON TITLE PAGE:                    under the section "References Cited" under "Other Publications":

"Verifying Compiled Silicon", by E. K. cheng, VLSI Design, Oct. 1984, pp. 1-4." should be -- "Verifying Compiled Silicon", by E. K. Cheng, VLSI Design, Oct. 1984, pp. 1-4." --.

"quality of Designs from An Automatic Logic Generator", by T. D. Friedman et al., IEEE 7th DA Conference, 1970, pp. 71-89." should be -- "Quality of Designs from An Automatic Logic Generator", by T. D. Friedman et al., IEEE 7th DA Conference, 1970, pp. 71-89. --.

"Trevillyan-Trickey, H., Flamel: *A High Level Hardward Compiler*, IEEE Transactions On Computer Aided Design, Mar. 1987, pp. 259-269." should be -- Trevillyan-Trickey, H., Flamel: *A High Level Hardware Compiler*, IEEE Transactions On Computer Aided Design, Mar. 1987, pp. 259-269. --.

In the abstract:

Every occurrence of "functional architecture independent" should be -- architecture independent functional --.

Column 1, line 19, "a" should be -- an --.

RCL002951

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO. : 4,922,432                    Page 2 of 4

DATED      : May 1, 1990

INVENTOR(S) : Hideaki Kobayashi, et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 2, line 10, "functional architecture independent" should be -- architecture independent functional --.

Column 2, line 21, "functional architecture independent" should be -- architecture independent functional --.

Column 2, lines 29-30, "functional architecture independent" should be -- architecture independent functional --.

Column 2, line 31, "structural" should be after "specific".

Column 3, lines 51-52, "representation" should be after "architecture independent".

Column 3, lines 61-62, "integrated" should be after "specific".

Column 6, line 62, after "22" insert -- . --.

Column 7, line 43 (in Table 1), "C = A B" should be -- C = A^B --.

Column 8, line 9 should end with the word "flowchart" and "history" should begin on the next line.

RCL002952

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO. : 4,922,432                    Page 3 of 4

DATED       : May 1, 1990

INVENTOR(S) : Hideaki Kobayashi, et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 10, line 23, "data paths" should be
-- datapaths --.

Column 10, line 68, delete "The rule format to be used is
as follows:".

Column 12, line 54, "Enqineering" should be
-- Engineering --.

Column 13, line 55, "block" should be -- blocks --.

<u>In the Claims</u>:

Column 14, line 68, before "means" (first occurrence)
insert -- specification --; after "means" (second
occurrence) delete "specification".

Column 15, line 9, before "means" (first occurrence)
insert -- specification --; after "means" (second
occurrence) delete "specification".

Column 15, line 35, after "circuit" insert -- , --.

Column 15, line 36, "marco" should be -- macro --.

Column 15, line 49, "form" should be -- from --.

RCL002953

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.  : 4,922,432                    Page 4 of 4

DATED       : May 1, 1990

INVENTOR(S) : Hideaki Kobayashi, et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:


Column 16, line 14, "condition" should be
-- conditions --.

Column 17, line 19, after "base" insert -- a --.


Signed and Sealed this

Fourteenth Day of January, 1992


*Attest:*


HARRY F. MANBECK, JR.

*Attesting Officer*              *Commissioner of Patents and Trademarks*

RCL002954

Gary M. Hoffman (*Pro Hac Vice*)
Kenneth W. Brothers(*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
  & OSHINSKY, LLP
2101 L Street, NW
Washington, DC  20037-1526
Phone (202) 785-9700
Fax (202) 887-0689

Edward A. Meilman (*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
  & OSHINSKY, LLP
1177 Avenue of the Americas
New York, New York  10036-2714
Phone (212) 835-1400
Fax (212) 997-9880

Jeffrey B. Demain, State Bar No. 126715
Jonathan Weissglass, State Bar No. 185008
ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
177 Post Street, Suite 300
San Francisco, California  94108
Phone  (415) 421-7151
Fax (415) 362-8064

Attorneys for Ricoh Company, Ltd.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| RICOH COMPANY, LTD., | ) |
| Plaintiff, | ) |
| vs. | ) |
| AEROFLEX ET AL, | ) |
| Defendants. | ) |
|  | ) |
| SYNOPSYS, INC., | ) |
| Plaintiff, | ) |
| vs. | ) |
| RICOH COMPANY, LTD., | ) |
| Defendants. | ) |

**CASE NO. CV 03-4669-MJJ (EMC)**

**Consolidated with**

**CASE NO. CV 03-2289**

**NOTICE OF MANUAL FILING**

1  Please take notice that Plaintiff Ricoh Company, Ltd., is filing the following documents on this
2  date in paper form only:

3  1. Ricoh's Opposition to Defendants' Motion for Partial Summary Judgment.

4  2. Deposition transcript of Edward Dwyer of February 3, 2004 (Exhibit 7 to the Declaration
5  of Michael Weinstein in Support of Ricoh's Opposition to Defendants' Motion for
6  Partial Summary Judgment).

7  3. Chip Synthesis Workshop – Lab Guide (Exhibit 14 to the Declaration
8  of Michael Weinstein in Support of Ricoh's Opposition to Defendants' Motion for
9  Partial Summary Judgment).

10  Because the above documents include and refer to materials produced in discovery and
11  designated confidential by the ASIC Defendants and Synopsys, a request to file these documents under
12  seal will be filed contemporaneously.

Dated: August 23, 2005                Respectfully submitted,

Ricoh Company, Ltd.

By: /s/ Kenneth W. Brothers

Gary M. Hoffman
Kenneth W. Brothers
Eric Oliver
DICKSTEIN SHAPIRO MORIN &
    OSHINSKY  LLP
2101 L Street NW
Washington, D.C.  20037-1526
Telephone: (202) 785-9700
Facsimile: (202) 887-0689

Edward A. Meilman
DICKSTEIN SHAPIRO MORIN &
    OSHINSKY  LLP
1177 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 896-5471
Facsimile:  (212) 997-9880

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jeffrey B. Demain, State Bar No. 126715
Jonathan Weissglass, State Bar No. 185008
Altshuler, Berzon, Nussbaum, Rubin & Demain
177 Post Street, Suite 300
San Francisco, California  94108
Phone:  (415) 421-7151
Fax:  (415) 362-8064


Attorneys for Ricoh Company, Ltd.

DSMDB.1971749.1DSMDB.1971749.1

1

**PROOF OF SERVICE**

2

**CASE:**        *Ricoh Company, Ltd. v. Aeroflex Incorporated, et al.*
               *Synopsys, Inc. v. Ricoh Company, Ltd.*

3

4

**CASE NOS.:** U.S. District Court, N.D. Cal., Nos. C03-4669 and C03-2289 MJJ

5

    I am employed in the City and County of San Francisco, California. I am over the age of eighteen years and not a party to the within action; my business address is 177 Post Street, Suite 300, San Francisco, California 94108. On August 23, 2005, I served the following document(s):

6

7

    Ricoh's Opposition to Motion for Partial Summary Judgment.

8

    Deposition transcript of Edward Dwyer of February 3, 2004 (Exhibit 7 to the Declaration of Michael Weinstein in Support of Ricoh's Opposition to Defendants' Motion for Partial Summary Judgment).

9

10

    Chip Synthesis Workshop - Lab Guide (Exhibit 14 to the Declaration of Michael Weinstein in Support of Ricoh's Opposition to Defendants' Motion for Partial Summary Judgment).

11

12

on the parties, through their attorneys of record, by sending true copies thereof as shown below for service as designated below:

13

14

<u>By Electronic Mail:</u> I caused such document(s) to be served via electronic mail (email) on the parties in this action by transmitting a true copy to the following email address(es):

15

16

**ADDRESSEE**                                    **PARTY**

17

    Teresa M. Corbin, Esq.                        Defendants
    Jaclyn Fink, Esq.

18

    Howrey Simon Arnold & White LLP
    525 Market Street, Suite 3600

19

    San Francisco, CA 94105-2708
    CorbinT@howrey.com

20

    finkj@howrey.com

21

22

23

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this August 23, 2005, at San Francisco, California.

24

25

                        _____/s/_____
                               Edward Lin

26

27

28

Proof of Service
*Ricoh Co., Ltd. v. Aeroflex, Inc.*
*Synopsys, Inc. v. Ricoh Co., Ltd.*
N.D. Cal. Case Nos.C-03-4669 and C03-2289

1  Gary M. Hoffman (*Pro Hac Vice*)
   Kenneth W. Brothers (*Pro Hac Vice*)
2  DICKSTEIN SHAPIRO MORIN
     & OSHINSKY, LLP
3  2101 L Street, NW
   Washington, DC  20037-1526
4  Phone (202) 785-9700
   Fax (202) 887-0689

5  Edward A. Meilman (*Pro Hac Vice*)
6  DICKSTEIN SHAPIRO MORIN
     & OSHINSKY, LLP
7  1177 Avenue of the Americas
   New York, New York  10036-2714
8  Phone (212) 835-1400
   Fax (212) 997-9880

9  Jeffrey B. Demain, State Bar No. 126715
   Jonathan Weissglass, State Bar No. 185008
10 ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
   177 Post Street, Suite 300
11 San Francisco, California  94108
   Phone  (415) 421-7151
12 Fax (415) 362-8064

13 Attorneys for Ricoh Company, Ltd.

14

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| RICOH COMPANY, LTD, | Case No. C03-4669 (Judge Jenkins) |
| Plaintiff, | |
| vs. | DECLARATION OF |
| | DR. V. THOMAS RHYNE |
| AEROFLEX, INC. ET AL. | |
| Defendants. | |

DR. V. THOMAS RHYNE declares as follows:

1.    I have been retained by Ricoh Company, Ltd. ("Ricoh") as a technical expert in the above-styled litigation. I am over the age of 21 and am competent to make this declaration. Based on my personal knowledge and information, I hereby declare to all the facts in this declaration.

2.    I have studied, taught, and practiced electrical engineering for over forty years. I hold degrees from Mississippi State University (BSEE with Honors, 1962), the University of Virginia (MEE, 1964), and the Georgia Institute of Technology (Ph.D. in EE, 1967). I have been a registered Professional Engineer in the State of Texas since 1969. I am also a Registered Patent Agent.

3.    I taught electrical engineering, computer engineering, computer architecture, and computer science at the undergraduate and graduate levels full-time at Texas A&M University from 1967 to 1983 and part-time at the University of Texas from 1983 to 1990. My twenty-plus years of industrial experience includes work for the Electric Power Research Institute, Texas Instruments, Control Data Corporation, NASA, Texas Digital Systems, Inc. (a company I co-founded to produce microprocessor-based computer peripherals in 1976), the Microelectronics and Computer Technology Corporation (MCC), and Motorola, Inc.

4.    I have extensive experience with computer technology and computer networking, including design, teaching, and use experience with a variety of computer systems, computer networks, and networking components. I have participated in the design of several computer systems and microprocessors, and have designed systems that made use of those devices as control elements. I am an experienced programmer in a variety

of programming languages as well as assembly-level language on a number of different computers and microprocessors. I have also chaired and otherwise participated in a number IEEE and ISO/IEC standards committees.

5. While at MCC, between 1983 and 1995, I was intimately involved in computer aided design (CAD) for large, complex integrated circuits and the use of expert systems technology in that area of application as well as other areas of application.

6. My experience and qualifications have been recognized by the Texas Society of Professional Engineers (Young Engineer of the Year in Texas, 1973), the American Society for Engineering Education (Terman Awardee as the "Outstanding Young Electrical Engineering Educator in the U.S.," 1980), the Institute of Electrical and Electronics Engineers (IEEE Fellow, 1990), and the Accreditation Board for Engineering and Technology (ABET Fellow, 1992). I am the author of thirty technical papers, have presented papers at thirty-seven conferences, and have authored an award winning textbook adopted at over thirty-five U.S. and international universities.

7. I have extensive experience with the accreditation of engineering and computer science programs in the U.S. and abroad, an activity which has provided me an excellent opportunity to become and remain familiar with the program curricula, faculties, and graduates from a large number of U.S. and international colleges and universities. I represented the IEEE for five years on the Engineering Accreditation Commission, and for six years on the Board of Directors of the Accreditation Board for Engineering and Technology (ABET). I also was appointed by the National Research Council to chair the Panel of Assessment for the Electronics and Electrical Engineering Laboratory of the

U.S. National Institute of Standards and technology. I served on that Panel for seven years.

8. I retired from full-time work in 1997, although I have worked part-time as a consulting engineer for the past thirty years, including work in the field of application-specific system design.

9. I have reviewed U.S. Patent No. 4,922,432 ("the '432 patent") and believe that it describes and claims an integral portion of the manufacturing process utilized in the semiconductor industry for the manufacture of application specific integrated circuit (ASIC) products.

10. From my own design work, and my experience and knowledge of the work of others in the field, I believe the following process steps are an essential part of the manufacture of ASIC products:

    A. Describing a series of functions that are to be performed by the desired ASIC product to be manufactured.

    B. Performing logic synthesis to identify the logic blocks needed to achieve the desired functionality.

    C. Selecting the circuit components in a desired technology that are to be used to implement the synthesized logic blocks.

    D. Producing a description of the circuit components as well as their respective connections in the form of a netlist.

    E. Creating from the netlist a layout of the circuit components (and their interconnections) that fits within the area of the silicon die to be used for the ASIC product.

    F. Formulating as mask data a complete representation of the integrated circuit

CASE NOS. C-03-4669 MJJ

DECLARATION OF DR. V. THOMAS RHYNE

for fabrication on the silicon die.

G. Using the mask data to create the set of multiple masks required for producing the circuit layout on the silicon die to form the ASIC product.

11. Based on my personal knowledge and experience in the semiconductor industry, I believe that the process described and claimed in the '432 patent would be considered in the industry to be an essential portion of the synthesis-based manufacture of an ASIC product.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Signed at Austin, TX on February 24, 2004.



V. Thomas Rhyne, Ph.D., P.E., R.P.A.

CASE NOS. C-03-4669 MJJ

DECLARATION OF DR. V. THOMAS RHYNE

# Integrated Circuit Manufacturing Synopsis

**Michael Heynes, Ph.D.**

**Anne K. Miller**

**Published by:**

**Semiconductor Services**

**735 Hillcrest Way**

**Redwood City, California 94062-3428**

**ISBN number 1-887574-05-0**

**Third Edition 2002**

**Copyright Semiconductor Services 2002**

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system or transmitted in any form or by any means, electronic, mechanical, photocopying or otherwise without prior written permission of the publisher.

immediately and no additional work, time or materials are invested in wafers which are unlikely to yield good die.

An important factor in managing a production line is predictability. Managers need to know the volume of product that can be produced in the future in order to plan shipments to customers and to anticipate capacity requirements which involve facilities, equipment and personnel.

Thus, considerable effort is expended in characterizing a production line in terms of expected yields correlated to various process parameters including defect levels. This is done to spot deviations quickly and rectify them before serious yield loss occurs. Statistical Process Control (SPC) is used for this and yield improvement purposes.

The IC design itself can be a problem. Some designs have little tolerance for unavoidable process variations. Product test and design engineers must often modify the design to achieve an acceptable yield.

© *Semiconductor Services*

# V. Thomas  Rhyne
## April 14, 2004
### Volume 1
### Ricoh Company, LTD. v. Aeroflex Incorporated, et al

## Condensed Transcript and Word Index
## prepared by:

## Ken Owen & Associates
## 801 West Avenue
## Austin, Texas  78701
## 512.472.0880
## kenowen@swbell.net

Page 1

```
1
2
3
4              UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
5               SAN FRANCISCO DIVISION
6  RICOH COMPANY, LTD.,        )Case No. CV 03-04669 MJJ (EMC)
           Plaintiff,          )
7                              )
   VS.                         )
8                              )
   AEROFLEX, INCORPORATED, AMI )
9  SEMICONDUCTOR, INC., MATROX )
   ELECTRONIC SYSTEMS, LTD.,   )
10 MATROX GRAPHICS, INC.,      )
   MATROX INTERNATIONAL CORP., )
11 and MATROX TECH, INC.,      )
           Defendants.         )
12
         *****************************************
13
                  ORAL DEPOSITION OF
14
                  V. THOMAS RHYNE
15
                   APRIL 14, 2004
16
         *****************************************
17
     ORAL DEPOSITION OF V. THOMAS RHYNE, produced as a witness
18 at the instance of the Defendants, and duly sworn, was taken
   in the above-styled and numbered cause on the 14th of April,
19 2004, from 8:58 A.M. to 11:51 A.M., before Kathleen Casey
   Collins, CSR, in and for the State of Texas, reported by
20 machine shorthand, at the Intercontinental Stephen F. Austin
   Hotel, 701 Congress Avenue, Stateboard Room, Austin, Travis
21 County, Texas, pursuant to the Federal Rules of Civil
   Procedure.
22
23
24
25
```

Page 2

1    A P P E A R A N C E S
2   FOR THE PLAINTIFF:
3   DICKSTEIN SHAPIRO MORIN & OSHINSKY, LLP
      BY: MS. DeANNA D. ALLEN
4   2101 L Street, NW
    Washington, DC  20037-1526
5
6   FOR THE DEFENDANTS:
7   HOWREY SIMON ARNOLD & WHITE, LLP
      BY: MR. CHRISTOPHER KELLEY
8   301 Ravenswood Avenue
    Menlo Park, California  94025
9
10              * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              I N D E X
2   Appearances........................................2
3   WITNESS:  V. THOMAS RHYNE
4      Examination by Mr. Kelley.....................4
5      Examination by Ms. Allen....................104
6      Further Examination by Mr. Kelley...........105
7              * * *
8        E X H I B I T   I N D E X
9   EXHIBIT NO.   DESCRIPTION           PAGE MKD.
10  1       Declaration.                    4
11  2       EDA Design Process Overview;     24
            Typical Chip Design Flow
12          (1 of 2 and 2 of 2.)
13              * * *
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                    V. THOMAS RHYNE,
2   having being first duly sworn, testified as follows:
3              EXAMINATION
4   BY MR. KELLEY:
5      Q.  Good morning, Dr. Rhyne.
6      A.  Good morning.
7      Q.  Let me just start by getting what background do you
8   have that you understand is -- that you think is relevant to
9   the sort of subject matter of your -- Well, let me back up.
10         Am I correct in understanding that your -- that
11  your Declaration talks about the semiconductor process?
12     A.  That's one way to characterize it.  I'm not sure it
13  uses those terms.
14     Q.  Well, let me get you to characterize it so that we
15  can use those terms.
16     A.  Why don't you give me a copy of it.
17     Q.  Okay.
18     A.  I think it pretty well speaks for itself.
19         MR. KELLEY:  Let's mark this as Rhyne 1.
20         (Exhibit No. 1 marked)
21         MS. ALLEN:  What's the question?
22     Q.  In Paragraph 10, the first line says, "From my own
23  design work, and my experience and knowledge of the work of
24  others in the field, I believe the following process steps are
25  an essential part of the manufacture of ASIC products."

Page 5

1         So the question that I have is what background
2   do you have that is relevant to the question of process steps
3   involved in the manufacture of ASIC products?
4      A.  Well, I attempted to set forth in the paragraphs
5   primarily 2 through 8 where I've worked and what my experience
6   has been.  I think maybe if you want to ask me about specific
7   areas within those portions of the Declaration, I can expand
8   on it.  But all of that work -- I guess I can't say all of it,
9   but much of that work has related to the manufacture of ASICs.
10     Q.  Okay.  I guess we should take it step-by-step.  Did
11  you -- have you been involved -- have you been involved in a
12  team that designed an ASIC that was then manufactured and
13  produced at any point during your career?
14     A.  Yes.
15     Q.  Okay.  And what -- In Paragraph 3, you call out
16  several things from teaching to different positions you've
17  held.  Can you identify which of those positions involved ASIC
18  design or manufacture?
19     A.  Sure.  I taught that subject at Texas A&M under the
20  rubric I guess you'd say of VLSI design and computer-aided
21  design.
22     Q.  Okay.
23     A.  I did ASIC design at Texas Instruments on two
24  different occasions when I worked for them.  And I was
25  involved in ASIC design and manufacture at Motorola, which is

2 (Pages 2 to 5)

V. THOMAS RHYNE * April 14, 2004

Page 6

1 the last one listed in Paragraph No. 3. I've worked on
2 computer-aided design, working directly with participating
3 companies who did ASIC design and actually manufactured ASICs,
4 during the time I was at the Microelectronics and Computer
5 Technology Corporation, as well. So pretty much a very high
6 percentage of the work that was listed by company name in
7 Paragraph 3.
8    Q. Okay. You mentioned manufacturing in connection
9 with Motorola. Was there something about your job at Motorola
10 that had an element relating to manufacture that was different
11 than -- because you only mentioned it in connection with Texas
12 Instruments? Did you get more heavily involved in the
13 manufacturing of ASICs when you were at Motorola?
14        MS. ALLEN: Object; vague and compound.
15    A. I don't know that I separate those two parts in
16 terms of the overall process of manufacture of an ASIC. But I
17 was more closely aligned, while at Motorola, with the actual
18 semiconductor part of the overall manufacturing process, the
19 clean rooms and that part of that. That was part of my
20 responsibility.
21    Q. Did Motorola have its own foundry when you were
22 there?
23    A. Yeah. There were several that were running here in
24 Austin. There were others in other places, but I was -- I was
25 familiar with the ones here in Austin.

Page 7

1    Q. So you had some involvement with the foundries in
2 Austin?
3    A. I did.
4    Q. All right. What was the year? What year are we
5 talking about when you were at Motorola?
6    A. I joined Motorola in 1995 and was with them until
7 almost '98. So it was about three years.
8    Q. Okay. And what was your position? What was your
9 title at Motorola?
10    A. I think it's on my resume. I was in something
11 called strategic technology, which -- and I don't remember the
12 exact title --
13    Q. Okay.
14    A. -- but I believe it's on my resume.
15        MR. KELLEY: Do you have a copy of his resume
16 so we could get that?
17        MS. ALLEN: We may have one in our files, but
18 we should be able to get one.
19        MR. KELLEY: I'd appreciate it.
20    Q. (Mr. Kelley continuing) So you're not exactly sure
21 what the title was, but it was something to do with strategic
22 technology. What was that about?
23    A. Strategic technology dealt with any situation in
24 which Motorola exchanged intellectual property with another
25 technology department, and so it covered a lot of different

Page 8

1 aspects of that.
2        But one of the key things that I thought was
3 relevant to your earlier question was there were a number of
4 joint foundries that were operated by Motorola in conjunction
5 with other partners; and I was involved in the management of
6 those joint relationships, as well as the placement of some
7 specific ASICs into those foundries for manufacture.
8    Q. Have you ever used -- Well, let be back up.
9        Are you familiar term with the term "logic
10 synthesis" or "design synthesis"?
11    A. Yes.
12    Q. And are you familiar with the tools that are used
13 for logic synthesis?
14    A. To some degree, yeah. I was probably much more
15 familiar with them back in the 1980s and early '90s when I was
16 there working in the CAD business, which I understand is a
17 relevant time frame. But I am still -- I still keep up with
18 that field to some degree.
19    Q. Okay. When you were at MCC, did you use any of
20 those logic synthesis tools or --
21    A. Well, we were actually developing logic synthesis
22 tools there. But I did use -- I used computer-aided design
23 systems, which -- which worked through the design process.
24 And I -- we did have some -- for example, the Berkeley tool
25 set and some other things that included synthesis tools, and I

Page 9

1 had some experience with that.
2    Q. Okay. What other tool sets were you familiar with
3 back at the time, whether you used them or not, that had some
4 logic synthesis component?
5    A. We had on site the Mentor Graphics computer-aided
6 design system. We had opportunities there to experiment with
7 the Cadence design systems, which was sort of evolving.
8 Cadence was formed during the time frame when I was at MCC.
9        And then there was a period when I worked with
10 a computer-aided design frameworks -- framework standards
11 laboratory at MCC, and that involved working with 20 or 25 of
12 the computer-aided design companies and their products in a
13 number of technology demonstration efforts that went on within
14 that community.
15    Q. Do you remember what the name of the Cadence logic
16 synthesis tool was?
17    A. No.
18    Q. Okay. But their -- But both Cadence and Mentor
19 Graphics had a logic synthesis component to their CAD packages
20 at that time?
21    A. I -- I can't tell you for sure whether they had
22 something that today I would call a logic synthesis tool or
23 not, and their tools were evolving over that almost 10 -- more
24 than 10-year period when I was working with them. So I -- I
25 can't tell you for sure whether the CAD system that we had for

3 (Pages 6 to 9)

Page 10

1  Mentor or the one version that I worked with from Cadence had
2  a synthesis tool.
3       But there were synthesis tools around MCC. I
4  had experience with them. And, as I said, we were attempting
5  to develop synthesis tools ourselves. And then during that
6  standards process, we had synthesis tools involved in the
7  technology demonstration projects that I talked about. But
8  I'm not sure I could name any particular name that was
9  assigned to them.
10      Q. Were you -- What was your role then? You mentioned
11  that MCC was trying to develop its own synthesis tools. What
12  was your role in the synthesis tool product there?
13      A. Probably more as a manager than a direct technical
14  contributor. I was aware that there were people who were
15  looking at both logical and physical synthesis. I knew what
16  their work was doing. I had oversight to that. And then I
17  particularly directed the -- what came to be known as the
18  framework effort that provided a number of enabling
19  technologies for the synthesis tools that actually operate in
20  a design mode.
21      Q. You mentioned this framework effort. Can you tell
22  me -- You said this included enabling technologies for
23  synthesis. How did -- Can you give me some more information
24  about that?
25      A. Sure. Things like distributed design databases,

Page 11

1  human interfaces, graphics. We worked a lot on standard
2  representations of critical design data.
3      Q. Am I correct in understanding these were things that
4  could be used in the design process high level down to a lower
5  level so that they could be used in synthesis, but they might
6  also be relevant to a schematic design or a layout? Is that
7  why it's called a framework or isn't it?
8      MS. ALLEN: Objection; compound, vague,
9  ambiguous.
10     A. Well, framework was the terminology within the CAD
11  industry for an attempt to provide a standard set of
12  interfaces that would allow people trying to develop
13  computer-aided design systems to pick and choose tools at
14  various parts of the design process from different vendors so
15  that they would not necessarily be trapped, say, into only the
16  set of tools that Mentor offered or Cadence offered but,
17  rather, could either use in-house developed tools or whatever
18  at various stages of the overall design process to accomplish
19  the different parts of that process without having to do a lot
20  of interfacing work themselves.
21     Q. So you were -- you were trying to define some
22  standard interfaces in the process below where people could
23  change from one tool to a different manufacturer -- or sellers
24  to different product lines, basically?
25     A. That's not a bad way of characterizing it. But I

Page 12

1  think the whole industry was talking about it. I'm not sure
2  that the integrated CAD vendors particularly thought that was
3  a good idea. But there was a major effort within the
4  industry, and it was primarily coordinated by a laboratory
5  that I set up at MCC. In fact, that effort has continued on
6  today. So it's attempting to carry that concept forward.
7      Q. You mentioned -- A few questions ago, you mentioned
8  logical synthesis and physical synthesis. Can you tell me
9  what logical synthesis is and what physical synthesis?
10     A. Well, I think kind of --
11     MS. ALLEN: I just want to object as compound
12  and vague.
13     A. I'll take your two questions in two pieces --
14     Q. That would be great.
15     A. -- and resolve the compound.
16     Q. Okay.
17     A. I think I recall. If I forget the second one, you
18  can --
19     Q. Okay.
20     A. You asked about what I understood logic synthesis to
21  mean, and I don't think that's a term that has a very precise
22  meaning. But generally it involves moving from one
23  representation within the design process to another
24  representation where what you're dealing with is the logical
25  blocks, if you will; and depending on what your style is,

Page 13

1  those blocks could be as simple as gates and flipflops or be
2  as complicated as a complete and substantiated core processor.
3      Physical is where you move down the design and
4  manufacturing hierarchy to the point where you actually -- the
5  old phrase used to be pushing polygons - I don't know if you
6  recall that - where you're -- you're beginning or maybe ending
7  up by dealing with the physical characteristics of what will
8  be produced in silicon and the methods of the manufacturing
9  process.
10     Q. Okay. Going back here to the early '90s when you
11  were at MCC, am I correct in understanding that at that time
12  people were designing ASICs sometimes using synthesis tools
13  and sometimes not?
14     A. Okay. Two --
15     MS. ALLEN: Objection; compound.
16     A. The first thing, I was at MCC, again, from the early
17  '80s on through the early '90s, and so you misspoke a little
18  bit --
19     Q. Okay.
20     A. -- and as I say, that was a very dynamic period in
21  the development of design tools.
22     But the answer to your question is yes. People
23  designed without using what I would call a synthesis tool;
24  just a manual effort based on their own skills. It may be a
25  whole team of people required to do that. But then throughout

KEN OWEN & ASSOCIATES * 800-829-6963 * 512-472-0880 * kenowen@swbell.net

Page 14

1 that period and subsequently, synthesis began to be more
2 commonly used because better synthesis tools came to be
3 available.
4    Q. And maybe you could just briefly explain how you
5 would design ASICs without using synthesis.
6       MS. ALLEN: Objection. It's outside the scope
7 of the Declaration.
8    A. I think the way I, or people who practice that art,
9 would probably start in the early days with a schematic, make
10 a logical schematic and translate that schematic then into
11 maybe a transistor circuit schematic. There was a lot of ways
12 to represent that. And then eventually move to a physical
13 design process where they would lay out those transistors and
14 their interconnections and then move on through to the mass
15 development.
16       I think -- I think those are terms that
17 probably are well understood in the art, and so I'm assuming
18 those are understood by you.
19    Q. Okay. The patent talks about technology binding, I
20 think. Is that a phrase you're familiar with?
21    A. I don't --
22       MS. ALLEN: Objection. It's outside the scope
23 of the Declaration.
24    A. And I'm not prepared to really discuss the metes and
25 bounds of what the patent may or may not say today. But what

Page 15

1 was the two words that you --
2    Q. Well, let me back up. Setting aside the patent -- I
3 mean, I was just trying to use the terminology and it's not
4 necessary. Are you familiar with the phrase "technology
5 binding"?
6       MS. ALLEN: Again, objection. It's outside the
7 scope of the Declaration. To the extent it's calling for an
8 interpretation, I would invoke attorney/client privilege -- or
9 work product privilege. Excuse me.
10    A. It's not a term that I think I've used commonly, but
11 I think I can assign a meaning to it but --
12       MS. ALLEN: Well, let me -- let me ask this:
13 Even though I think you may be impinging on things that might
14 be attorney/client work product privilege, can we just have a
15 sort of standing agreement if I don't instruct him not to
16 answer that you're not going to use his answer as any claim of
17 waiver or something like that?
18       MR. KELLEY: It is what it is. No, you're not
19 going to get any agreement from me. If you want to tell him
20 not to answer, you can tell him not to answer it. That
21 decision is on your hands. I'm not going to agree to that.
22       MS. ALLEN: Well, I would just object to
23 the extent it's outside what you relied upon to opine in your
24 Declaration that you not give any interpretation of --
25       MR. KELLEY: Well, I understand -- I'm sorry.

Page 16

1 But I understand your concern is that I'm trying to get into
2 claim construction, and I'm not trying to do that.
3    Q. (Mr. Kelley continuing) So let me just -- let me
4 just say my understanding of technology binding and you can
5 agree or disagree or let's use this as a definition.
6 Technology binding involves taking a logical function and
7 saying this is the specific library cell or -- that I'm going
8 to use to make that function and actually incorporating that
9 information into the design.
10       MS. ALLEN: Again, I object. It's outside the
11 scope of the Declaration.
12    Q. Do you understand what I'm talking about if we use
13 that definition?
14    A. I think it's pretty vague. If you want to use that
15 as a basis for further questioning, feel free. I'll try to
16 understand it.
17       MS. ALLEN: You have no obligation to
18 speculate.
19    Q. Well, the issue I'm trying to get at is here you
20 were describing how people designed ASICs without using
21 logical synthesis. All I'm trying to find out is when they --
22 when they did design without using synthesis, was one of the
23 things they had to do is go in and say, "Well, I'm going to --
24 Here's my cells. Here's my technology options that are
25 available to me. I'm going to implement this function using

Page 17

1 that cell or this function using that cell"?
2       MS. ALLEN: Objection; vague, compound.
3    A. I think in the design process that you tended to
4 move through various representations of the product, and there
5 were -- there are points at which you have to become -- well,
6 where the representation becomes more specific as to some
7 technology issue. There are a lot of different layers as to
8 what that technology binding may be, and so that's why I say I
9 think your definition is a little vague, but I'm not
10 disagreeing with it. I'm just not accepting it as being truly
11 characteristic -- characteristic of my understanding or my
12 prior experience of how people designed absent synthesis.
13    Q. Okay. Well, let me ask you -- let me ask the
14 question this way: In order to -- or what we're talking about
15 now is design not using logic synthesis; and in order to do
16 that, somehow the design had to be mapped into a target
17 technology. Is that correct?
18       MS. ALLEN: Objection; compound and outside the
19 scope of the Declaration.
20    A. I gather what -- when you're saying design without
21 synthesis, I'm going to use the phrase "manual design" --
22    Q. That's fine with me.
23    A. -- computer-aided manual design. And my problem is
24 I'm not sure what you mean by "technology," because there are
25 different layers to the technology linkage during the

5 (Pages 14 to 17)

Page 18

1 manufacturing process. So I'm not sure what technology
2 linkage you're talking about. It's not just a single point at
3 which the technology affects you. There are multiple points.
4    Q. All right. Well, let's talk about this. What's the
5 term -- What does the term "tapeout" mean?
6    A. In the industry, it is commonly used to mean the
7 point at which -- it even dates back to the old magnetic tape.
8 It's the point at which you had a tape that you could deliver
9 in some ways to the next stage of the process of manufacturing
10 the chip. But it generally applied to the point at which you
11 had actually completely bounded down to the point where you
12 were ready to pass it over to, say, a foundry, which would --
13 depending on the nature of what the -- what the representation
14 on the tape was of the product, it could actually define the
15 masks, or it could define enough about the physical device --
16 physical characteristics of the device that masks could then
17 be made. I think there were different -- different rules of
18 what would be on the so-called tape. But it's -- it's a late
19 stage in the design and manufacturing process.
20    Q. Okay. So with regard -- backing up from -- from
21 tapeout, how do I -- how do I get -- how do I produce this
22 mask information or other information that's going to be on my
23 tape?
24    A. I don't know. That question is too vague for me to
25 know how to answer.

Page 19

1    Q. Okay. What is a netlist?
2       THE REPORTER: A what?
3       MR. KELLEY: Netlist, all one word.
4    A. A netlist is commonly understood to be a set of
5 what's called building blocks or components I think is a term
6 I used at a couple points here in my Declaration and the
7 interconnections between them and -- and, also, the outside
8 world, if you think about the boundaries of the device that's
9 being produced in accordance with the representation of that
10 netlist.
11    Q. Okay. Is one of the things that a designer might
12 construct a netlist of library cells that are available using
13 a certain technology that a foundry can implement?
14    A. That certainly would be a way of representing the
15 device that's being designed and manufactured.
16    Q. Okay. Are there -- Let me back up. Let me start
17 this again. Could then -- Could you then use that information
18 to produce the tapeout information?
19    A. You could, yes.
20    Q. Okay. Are there other ways of getting the tapeout
21 information?
22       MS. ALLEN: Objection; ambiguous. It's outside
23 the scope of the Declaration.
24    A. I believe that there are.
25    Q. Okay. What are those?

Page 20

1    A. Well, the only other one that --
2       MS. ALLEN: Objection; outside the scope of the
3 Declaration.
4    A. The only other thing that comes to mind is that
5 there are physical representations of the physical layout that
6 were used at some stages in the design, and there were ways to
7 pass that physical layout, which is not exactly a netlist.
8 It's a different representation but in a tapeout fashion. As
9 I said earlier, it could also be mask. There are other ways
10 to exchange mask information.
11    Q. Okay. How -- how would a designer typically get to
12 physical layout? I presume they're not going to start --
13 they're not going to start the design by drawing geometries on
14 a piece of paper. Is that correct?
15    A. Again, there's a hierarchy that developed over, you
16 know, 20 years or so here. In the early days, people did
17 exactly that; although, the level of complexity was limited,
18 of course, by the ability to deal with the physical devices.
19    I mean, basically, throughout all of this
20 hierarchy, people have started with some high level -- higher
21 level representation for design and transformed it into
22 another representation that was, in a sense, a lower level;
23 and at some point, they began to impact the technologies that
24 were going to eventually be used to manufacture the actual
25 silicon. So they would just move from stage to stage, from

Page 21

1 representation to representation. The lower level
2 representations would become more affected by the particular
3 choices in technologies that were going to be used to build it
4 at the end of the process.
5    Q. Okay. But those choices of technologies, throughout
6 the '80s and '90s, people -- when some of the ASICs were being
7 built, those choices were being made manually?
8       MS. ALLEN: Is that a question?
9       MR. KELLEY: It is a question.
10    Q. Is that true or not?
11       MS. ALLEN: Objection; compound and vague and
12 outside the scope of the Declaration.
13    A. Yeah. You've got -- again, I don't know how -- I
14 mean, my guess is they're probably still doing it manually
15 today. Not everybody is using synthesis. But as long as
16 we're talking about the manual process, then they would be
17 making those bindings, if you will, or those changes in
18 representation from stage to stage manually.
19    Q. Okay. Do you know what a mask house is?
20    A. I couldn't hear you.
21    Q. I'm sorry. Do you know what a mask house is?
22    A. I think I do.
23    Q. What do you -- what do you understand it to mean?
24    A. A company that makes masks for -- for use in the
25 manufacture of integrated circuits.

6 (Pages 18 to 21)

Page 22

1    Q. A mask house is separate from the foundry, or are
2 they tied to the foundry, or is it a little bit of both?
3    A. My experience is it could be either way. Some
4 foundries provide mask manufacture as part of their services.
5 Others accept information or the actual masks as part of the
6 foundry process. So I'm not aware that there's any set split
7 between those two procedures.
8    Q. But one possible flow is you have these designers in
9 an organization of one company, a mask house is a second
10 company, and the foundry is a third and separate company. Is
11 that correct?
12        MS. ALLEN: Objection; ambiguous and compound.
13    A. As best I understand the proposed organization, I
14 think that could be the case. I couldn't necessarily give you
15 a specific set of examples. I can neither confirm or deny
16 that that's been -- that's been the practice.
17    Q. There -- am I correct that there are certainly
18 companies that do not have their own foundry and have a
19 separate third-party foundry -- a separate foundry to do
20 their --
21    A. I believe --
22    Q. -- application?
23    A. I believe that's true.
24    Q. Okay. And those businesses could use a mask house
25 separate from the foundry. Is that correct?

Page 23

1    A. I believe --
2        MS. ALLEN: Objection; ambiguous.
3    A. Again, "mask house" is a term that you've come up
4 with. I think that there are a variety of places that you can
5 go to to have the next stage in the manufacturing process
6 implemented; and by that stage, I mean going ahead and making
7 the masks from the data that you've gotten to a certain point.
8        Again, I think of it, as I told you earlier, as
9 a set of representations that you move through. There's a
10 point at which a representation is the mask set itself.
11 Somebody has to make that mask from whatever the prior
12 representation is. I think you can contract with people to do
13 that.
14    Q. Okay. Are the -- do you know are the engineers and
15 the folks who do the mask making, are they the same people who
16 do the design in logical synthesis, or are these a separate
17 group of engineers typically?
18        MS. ALLEN: Objection; ambiguous and outside
19 the scope of the Declaration.
20    A. I guess there probably are people who can carry the
21 process from beginning to end, but I also think there are
22 specialists at each stage of the process that know how to do
23 that as an art and provide that art to the overall process.
24    Q. Do you know which -- which arrangement is more
25 common, that somebody could do all of it from the high level

Page 24

1 end of the design spec all of the way down to doing the mask
2 making themselves or contracting?
3    A. Well, given the complexities of the processes that
4 are used today and the nature of the kinds of masks today, and
5 I'm not really prepared to opine on this in any detail back in
6 the '80s, I think it would be unlikely that a single
7 individual would have the skillset to go from -- from the top
8 all of the way down through the manufacture of the mask.
9    Q. Okay.
10    A. It's a very complicated art today and was becoming
11 even more complicated during the time frame I was working at
12 MCC and Motorola.
13        MR. KELLEY: Let me mark this as Rhyne No. 2.
14        (Exhibit No. 2 marked)
15    Q. I'm interested in the second and third page in this
16 document.
17    A. Could you tell me what --
18        MS. ALLEN: Yeah. Objection to this exhibit.
19 It's outside the scope of the Declaration.
20    A. Could you tell me what this exhibit is?
21    Q. Well, it's a flowchart. If you'll look at Page 2
22 and 3, you will --
23    A. Where did it come from? Is it attorney developed
24 or --
25    Q. No. I'm just going to show you it. I just want you

Page 25

1 to look at the typical chip design flow on here and tell me if
2 this -- just take a look at it, and I'm going to want to talk
3 about some of the terms on it. You don't have to adopt it as
4 a design flow or your understanding as a design flow, but I
5 want -- I want to talk about whether -- what some of these
6 terms mean, and I want your understanding of how a typical
7 chip design flow works, if it's similar to this, or what some
8 of these terms mean. Tell me when you've had a chance to look
9 at it.
10        MS. ALLEN: And I object to this as outside the
11 scope of the Declaration.
12    A. Do you have a time frame for this? I don't know --
13 I think I've heard of the EDA Consortium, but I don't know
14 what time frame this is. I see a "99." Can you give me a
15 feel for when this was developed?
16    Q. The answer to your question is no, I'm not familiar
17 with when it was developed.
18    A. So it could be anywhere from 1950 to 2004?
19    Q. It could be; although, I see there's some products
20 here that probably didn't exist in 1950.
21    A. Well, go ahead and ask your questions. I'll just
22 note for the record that I haven't seen this before, and I may
23 or may not be able to provide you any cogent input to your
24 questions.
25    Q. Sure. What I want to find out is if you've -- do

7 (Pages 22 to 25)

Page 26

1  you see that there's sort of a organized nine different --
2  they've identified nine different steps. And, obviously, any
3  process can be broken down into a number of pieces. But I
4  wanted to know if you've heard of the term "physical
5  verification" before?
6      A. Well, first off, I don't --
7          MS. ALLEN: Objection --
8          THE WITNESS: I'm sorry. Go ahead, Ms. Allen.
9          MS. ALLEN: I just want to object to the
10 representation of the exhibit. But go ahead and answer the
11 question.
12     A. You threw me when you said nine steps. I didn't
13 understand that.
14     Q. I see 10. You're right.
15         MS. ALLEN: I still object to the
16 representation of the exhibit, but go ahead.
17     A. So reask your question.
18     Q. Sure. Have you heard of the phrase "physical
19 verification" before?
20     A. Yes.
21     Q. Okay. And what is it? What is physical
22 verification?
23         MS. ALLEN: I object. It's outside the scope
24 of the Declaration.
25         MR. KELLEY: You know, I'm just going to

Page 27

1  address that briefly. His Declaration is about process flow,
2  the EDA process and what's required, and "logic
3  design/synthesis" is right up there on the left side, and he's
4  saying that this is part of manufacturing. So it seems to me
5  that the EDA process is directly involved in his Declaration.
6          Now, I just wanted to state that for the
7  record. You can agree or disagree. It doesn't seem to me
8  that it's outside the scope of his Declaration at all.
9          MS. ALLEN: I object to the exhibit as being
10 outside the scope of the Declaration. Clearly we don't agree
11 but --
12         MR. KELLEY: Go ahead and say it.
13     A. I don't recall your question before the colloquy.
14     Q. The question was what is physical verification?
15     A. I do recall that. Well, as -- as whomever made this
16 hierarchical representation of --
17         MS. ALLEN: You have no obligation to speculate
18 on this, but answer the question.
19     A. They basically have identified the kinds of things I
20 would have identified in the parenthetical after the two words
21 "physical verification," as design rule checking, layout rule
22 checking and logic versus schematic checking. So those are
23 the kinds of things that are associated with physical
24 verification.
25     Q. So those are -- Well, what is design rule checking?

Page 28

1      A. After you've made a physical layout, there are
2  design rules that you specify for a given process as certain
3  things that you can and cannot do. There are geometries that
4  might be separated by a certain amount, line widths that must
5  be a certain size, reservations for particular structures like
6  vias. And the design rule check is a tool that searches
7  through the representation of the physical layout to see that
8  all of those rules are satisfied. It tells you if you have
9  any places where you have made a physical design that would be
10 a problem when you try to build this thing, given the process,
11 or not.
12     Q. Okay. What is logical rule checking?
13         MS. ALLEN: I have the same series of
14 objections.
15     A. I interpreted the "LRC" as "layout rule checking,"
16 and I would have said it's very similar. I guess there may
17 be -- you may be correct. Again, I'm not sure what whoever it
18 was that did this thing meant by that. But I took that to be
19 layout rule checking, and that's what I would have considered
20 it to be.
21         MS. ALLEN: Again, you have no obligation to
22 speculate.
23         THE WITNESS: I understand.
24     A. It would be similar to design rule checking as in
25 the physical layout for the device.

Page 29

1      Q. What about -- layout versus schematic was what you
2  understood "LVS" to be?
3      A. I think so.
4      Q. Okay.
5      A. My understanding of that was that that was an
6  attempt to extract from the layout a circuit, sometimes called
7  circuit extraction, and compare that circuit against a
8  schematic representation of the circuitry should have been to
9  ensure that when implemented in physical form that this device
10 will have the appropriate circuitry.
11     Q. Have you heard the phrase "geometry manipulation"
12 before?
13     A. I don't --
14         MS. ALLEN: Objection. It's outside the scope
15 of the Declaration.
16     A. I don't recall that particular phrase, no.
17     Q. Okay. Have you heard -- have you ever heard of any
18 of these acronyms that are shown under "Geometry
19 Manipulation," as "RET," "OPC," "PSM" and "SB" used in
20 connection with ASIC design?
21         MS. ALLEN: Objection. It's outside the scope.
22     A. No.
23     Q. Have you heard the phrase "analysis" -- or the term
24 "analysis - slash - extraction" used in connection with chip
25 design or any of those others under "Analysis/Extraction" used

8 (Pages 26 to 29)

V. THOMAS RHYNE * April 14, 2004

Page 30

1 in connection with ASIC processing?
2    A.  I've heard those terms.
3        MS. ALLEN:  Same objection.
4    Q.  What does "analysis" mean?
5    A.  Well, it can mean a hundred-thousand things.  It's
6 some form of analyzing the device at some stage of
7 representation.
8    Q.  And why would you analyze the device in the ASIC
9 design process?
10    A.  Again, many different reasons.
11        MS. ALLEN:  And you have no obligation to
12 speculate as to this exhibit.
13    Q.  What does extraction mean in the context of ASIC
14 design?
15        MS. ALLEN:  Same objection.  It's outside the
16 scope, and you have no obligation to speculate.
17    A.  Extraction -- and I gave you an example of a form of
18 extraction, and I used it in circuit extraction.
19        Generally, I associate it with taking a given
20 representation and sort of backtracking to see if it compares
21 with a higher-level representation of the product so that you
22 can be sure that when you move from one representation to the
23 next that you did it in a way that maintained the design
24 integrity.
25    Q.  So is it like layout versus schematic kind of in

Page 31

1 that regard?
2    A.  I --
3        MS. ALLEN:  I'm sorry.  Can you repeat the
4 question.
5        MR. KELLEY:  Is it like layout versus schematic
6 in that regard I believe was the question.
7        MS. ALLEN:  Same objection.  It's outside the
8 scope.  You're not obligated to speculate as to this exhibit.
9    A.  I characterized to you earlier that I view layout
10 versus schematic comparable.  If that's what the consortium
11 meant by it, I -- you know, it's a form of extraction.
12    Q.  Are there other forms of extraction that you're
13 familiar with?
14    A.  There --
15        MS. ALLEN:  Objection; outside the scope of the
16 Declaration.
17    A.  There are other steps that people have used in my
18 experience that I might call extraction.  I'm not sure whether
19 they would or not.
20    Q.  Okay.  And what were -- what are these kind of steps
21 we're talking about?
22    A.  Any type of verification, as I just explained to
23 you, where you take a representation at a lower level and
24 backtrack to see if that representation still comports
25 properly with the preceding representation.

Page 32

1    Q.  Okay.  So am I correct that that kind of
2 verification can be done only when I'm -- when I've actually
3 got my physical geometries defined?
4    A.  No.
5    Q.  Okay.  So when else can it be done?
6    A.  Well, again, whoever did this, if you go back up to
7 the third step from the left, they talk about formal
8 verification.  In a sense, that's a form of extraction.  It's
9 comparing two representations to make sure that they -- that
10 they properly agree.
11        You can do verification without doing
12 extraction; but one way to do verification is to do extraction
13 and compare, as I say, two different representations at
14 different levels of the process to see if they agree.
15    Q.  Okay.  In formal verification, what are the two
16 different -- what are the two different representations that
17 are being compared?
18        MS. ALLEN:  Same objection.
19        Could I just do a standing objection so I don't
20 keep -- I'm happy to do that.
21        MR. KELLEY:  If you want to object -- if you
22 want to object and you really think this is outside the scope,
23 keep objecting.  I think your objection is frivolous, but
24 that's okay.
25        MS. ALLEN:  Well, my objection stands.  It's

Page 33

1 outside the scope of the Declaration.  You have no obligation
2 to speculate as to this exhibit.
3    A.  Well, they've placed "Formal Verification" here at
4 the logic stage; and when you say "formal verification,"
5 that's generally a mathematical process where somebody goes in
6 and looks at the forms of the representation.
7        Generally, that two-word term is used at a
8 higher level where you are dealing with more abstract
9 representations at a -- block level or a transfer level or
10 maybe even in a functional description and you're trying to
11 see that when you move from a functional description to a
12 transfer level description are those two really the same over
13 some universe of input and output characteristics.  So that's
14 what I would think it would mean relative to the term "formal
15 verification."
16    Q.  Okay.  Have you heard the phrase "design planning"
17 used in connection with the ASIC process -- in the process of
18 ASIC design?
19        MS. ALLEN:  Objection; outside the scope.
20 There's no need to speculate what this exhibit is.
21    Q.  Set aside the exhibit.  Have you heard the phrase?
22    A.  I don't think I've ever heard that called out as a
23 step.
24    Q.  The question was slightly different.  Have you ever
25 heard that phrase?  So you haven't heard it called out as a

9 (Pages 30 to 33)

V. THOMAS RHYNE * April 14, 2004

Page 34

1 separate step. Have you ever -- have you ever heard anyone
2 use that phrase to refer to something during the process of
3 ASIC design?
4    A. I'm sure in my experience somebody said, "Well, I'm
5 planning my design" at some point. But I don't -- again, I
6 don't -- I don't assign any specific meaning to that two-word
7 term in the sense that I do some of the other terms --
8    Q. Okay.
9    A. -- that show up in this exhibit.
10    Q. You're not -- are you familiar with CAD tools that
11 are identified in -- a family of CAD tools that would be
12 identified as design planning tools?
13    A. Well, I'm familiar with some of the tools that are
14 listed below this. Again, that's why I asked you about a time
15 frame. Some of these tools seem pretty recent, at least in my
16 experience. So I'm assuming that this thing is actually
17 fairly recent in its hierarchy and not necessarily relevant
18 back to the view of the EDA industry in the mid '80s and early
19 '90s. But I'm familiar with those types of tools that are
20 shown below it on this exhibit.
21    Q. Which tools are you familiar with?
22    A. I think I've actually heard of the tool Chip
23 Architect. It talks about floor planning. Certainly, people
24 did floor planning as part of the movement from representation
25 to representation. The other tools that are listed there I'm

Page 35

1 not familiar with. They look like brand names that somebody
2 produces.
3       But I understand that -- what I gather whoever
4 wrote this intended to represent by this block labeled "Design
5 Planning." I probably would have, in my view, moved it
6 further down in the process -- 
7    Q. Okay.
8    A. -- but it's okay. I mean, certainly people do that,
9 and I did that. I just don't know that I ever thought of it
10 as being a particular step in the process.
11    Q. You don't think that, what, floor planning is a
12 particular step, or you don't think of the words "design
13 planning" as a particular step?
14    A. I just think I did a floor plan as part of the
15 physical process. Okay. So I would have tended to lump that
16 in with probably a -- if I had to do it, some form of physical
17 representation, or I might have actually done the floor
18 planning at the very beginning to try to understand the size
19 of the die that I wanted to use. It's hard to do that until
20 you have an understanding for what the actual process that you
21 want to use is.
22    Q. Are you familiar with the phrase "emulation" in
23 connection with ASIC design?
24    A. Yes.
25       MS. ALLEN: Objection; outside the scope of the

Page 36

1 Declaration. You don't need to speculate.
2    Q. What is it?
3    A. It's used at many different levels. But it's an
4 attempt to get a computer to model the behavior of some
5 representation of the product.
6    Q. Is emulation an essential part of ASIC design? Can
7 you do without it?
8       MS. ALLEN: Objection; vague.
9    A. I don't know of any valid approach that would not
10 make use of emulation.
11    Q. We were discussing physical verification. I mean,
12 is that an essential part of ASIC design or --
13    A. I'm sorry. Your voice is low.
14    Q. I apologize.
15    A. I couldn't hear you.
16    Q. We discussed physical verification under which we
17 talked about DRC, LRC and LVS. Is that an essential part of
18 ASIC design?
19    A. Again, I guess you could imagine a design process
20 that didn't do it, but I think it would be an invalid process.
21 I think it -- it is an essential step.
22    Q. Am I correct that it's essential because if you
23 didn't do those things, you wouldn't have any ability to
24 predict whether you had a good design that would actually
25 operate?

Page 37

1    A. That's, you know --
2       MS. ALLEN: Objection. It's outside the scope
3 of the Declaration.
4    A. Again, you'd be flying blind. You would just be
5 assuming that something was okay without checking to make sure
6 it was as okay as it could be by using such verifications.
7    Q. We also talked about formal verification. Would you
8 regard that as an essential step in the ASIC design process?
9       MS. ALLEN: Same objection; outside the scope.
10    A. At least during the period that I was working - and
11 by that I mean the '83 to, say, '95 time frame - formal
12 verification was only beginning to be available. So clearly
13 there were lots and lots of ASICs that were done without any
14 formal verification tools available.
15       Now that some reasonably solid formal
16 verification tools and techniques are around, I can't think of
17 any reason to avoid using them. If I were managing a design
18 process today, I probably would consider them to be very
19 important.
20       That's a long way of saying I don't know
21 whether to say that's essential or not; but it certainly --
22 those tools, since they're available, I would recommend to
23 anybody who is considering doing an ASIC that they be
24 utilized.
25    Q. So it's good judgment to use them; but if you didn't

10 (Pages 34 to 37)

Page 38

1  use them, you might get it not operating at the other end of
2  the process?
3       MS. ALLEN: Object; compound and to the extent
4  it mischaracterizes prior testimony.
5       A. What I said to you is that I know of lots and lots
6  of ASICs that were designed by myself and others absent the
7  use of formal verification because it wasn't -- it wasn't
8  commonly available. It was still kind of an abstract,
9  university, academic concept at various points in my career.
10  But now that it's here, it's certainly very useful in assuring
11  that the goal of trying to make the silicon that you make will
12  actually work the way you want it to from the beginning.
13       Q. Okay. Am I -- I'm not asking you to adopt this
14  drawing. But to the extent that they show "Physical
15  Verification" as a step that followed after "Logic
16  Design/Synthesis," is that typically -- would it make any
17  sense to do physical verification before logic design
18  synthesis?
19       A. I don't think it would.
20       Q. The same question about floor planning let's say?
21       A. I think I said earlier that you might actually have
22  in mind a die size, for economic and technical reasons, almost
23  from the beginning of the process. So you could do floor
24  planning, at least done at a high level, in the early stage to
25  sort of size the overall goal.

Page 39

1       Q. But after synthesis, you would return to the floor
2  plan and make further revisions or do more floor planning at a
3  more detailed level?
4       A. Well, I think I would tend to think of floor
5  planning as a continuously evolving process as you get further
6  down the sequence of representations that I just referred to
7  you earlier. As you become more bound to specific
8  technologies and strengths, that might force you to modify the
9  floor plan or to realize it in some other way to become more
10  clear. So I would say that that is an evolutionary process.
11       Q. Okay. So am I correct in understanding that floor
12  planning is something that you probably return to at multiple
13  points during the ASIC design process?
14       A. You can argue that the place in route is a form of
15  floor planning. So, yeah, I think that's something under
16  consideration throughout the process until you get maybe
17  almost to the end.
18       Q. So some of those that consist of floor planning are
19  likely to occur after logic synthesis?
20       MS. ALLEN: I missed the question.
21       Q. Some of the places where you do floor planning are
22  likely to occur after logic synthesis?
23       A. I think, again, you may not even address it until
24  after the logic synthesis and --
25       Q. What about --

Page 40

1       A. Let me finish my answer.
2       Q. I'm sorry.
3       A. Or you may elect to have addressed it earlier but be
4  forced into doing some sort of modification of the original
5  contracted form.
6       Q. Okay. What about simulation? Where does that fit
7  into this process?
8       A. You can simulate --
9       MS. ALLEN: It's the same objection. It's
10  outside the scope. And you don't need to speculate as to this
11  exhibit.
12       A. I'm not addressing relative to the exhibit.
13       Q. I'm not asking you to.
14       A. I took that question to be just based on my
15  knowledge of the art.
16       You can simulate at almost every level.
17       Q. Is it correct that it is probably -- that you're
18  going to simulate after -- after logic synthesis? Although
19  you may simulate before that, no design engineer is going to
20  not keep simulating after logic synthesis?
21       MS. ALLEN: Objection. It calls for
22  speculation. It's compound and vague.
23       A. They may use some -- some form of simulation at a
24  later stage.
25       Q. Are you familiar with any designs of ASICs where

Page 41

1  simulation wasn't used after -- after logic synthesis?
2       A. Well, the reason I'm -- I said "some form" is, you
3  know, when you think of the higher levels, you probably are
4  simulating the entirety of the device. As you get further
5  down into the physical binding, it may be prohibitive to
6  simulate the entirely of the device at a low level or an
7  integrated circuit level or even a physical level. So you may
8  simulate key pieces of the device or you may abstract in and
9  maybe do a timing analysis that's -- a critical path type of
10  analysis that, in a sense, is a form of simulation to estimate
11  critical path delays and things of that nature.
12       Q. You say "in a sense." I mean, you assume the sense
13  that I'm only simulating part of the circuit, right, as
14  opposed to the whole chip?
15       A. Yes. I mean, there may be people who have
16  competence and resources such that they can do a detailed
17  physical simulation of a modern, multi-million transistor
18  chip. At the time that I was working in the field, that would
19  not have been practical. So you would have used, say, an
20  integrated circuit simulator like SPICE only on portions of
21  the device where you felt it was important to model at that
22  level to get an understanding of the physical character of the
23  product, but maybe you used a higher level of simulator that
24  worked off of a hardware description language like Verilog or
25  the HDL to simulate functionally at the top level.

11 (Pages 38 to 41)

V. THOMAS RHYNE * April 14, 2004

Page 42

1  Q.  Am I correct that one of the important things
2  about -- or one of the important approaches of simulation is
3  to determine the timing of signals and whether this is going
4  to operate with -- with real circuit timing, signal timings,
5  as the design gets increasingly more specific about the
6  technology used?
7        MS. ALLEN: Objection; compound. This is
8  outside the scope of the Declaration.
9    A.  I probably wouldn't necessarily agree with that
10  statement. That's different from disagreeing with it. But
11  there's a lot of simulation that has little or nothing to do
12  with detailed timing analysis but addresses more
13  functionality, and there are ways to do timing assessments
14  without doing what might conventionally be called simulation.
15  Q.  All right. So I understand it, one of the purposes
16  of simulation is a functional -- a functional testing of the
17  circuit. Is another element of simulation doing a timing --
18  timing analysis?
19        MS. ALLEN: Same objections.
20    A.  I don't disagree with that. I'm not buying into
21  that statement in that there are ways to do timing assessment
22  that might not be thought of as being simulation per se.
23  Q.  Okay. And what are those things?
24    A.  Critical path analysis that are more modeling in a
25  sense where you make estimates of what kind of delays along

Page 43

1  the path there are going to be.
2  Q.  Where would that critical path assessment take
3  place? I mean, is that going to be something that's going to
4  come before synthesis or after synthesis?
5    A.  It's probably -- Again, you're trying to separate a
6  fairly amorphous set of processes into you go to Step A and
7  then Step B and then Step C, and it's almost like you'll never
8  revisit Step B, at least the way I'm interpreting your
9  question.
10        I think you can do some estimates of timing at
11  a fairly early stage; but then as you get to the point where
12  your design is more bound to the physical characteristics of
13  the technology in which it's going to be implemented, you do
14  better estimates of timing and based on those, you may have to
15  go back up to a much higher stage and redesign. So that's why
16  I'm saying I don't -- I don't think it's -- it's not as cut
17  and dried as you seem to be --
18  Q.  So --
19    A.  -- implying in your question.
20  Q.  So I might do some timing analysis before synthesis,
21  but it's also the case that I'm likely to do some timing
22  analysis after synthesis. Is that correct?
23    A.  I think that's possible and maybe even likely.
24  Q.  Would it be good design practice not to do any kind
25  of timing analysis after logic synthesis?

Page 44

1    A.  I wouldn't think so.
2  Q.  Are you familiar with the phrase "GDS-II"? It's
3  actually not on -- I don't believe it's on that.
4        MS. ALLEN: Objection. It's outside the scope
5  of the Declaration.
6    A.  Is there a question?
7  Q.  Yeah. Are you familiar with the phrase "GDS-II"?
8    A.  I think so.
9  Q.  What is GDS-II?
10    A.  It's been a while since I've worked with that term,
11  but it seems to me that dates back to an early physical design
12  system produced by a company called Calma. That's C-a-l-m-a.
13  And they came out with a language -- I used to remember what
14  GDS -- it was like "geometric design specification" or
15  something like that, and then they came out with GDS-II. But
16  it was a geometric or physical layout state of representation
17  standard, and I think it may still be in use. I think there
18  are a couple of others that may have supplanted it. But
19  that's my recollection as to what the GDS-II is.
20  Q.  So it's a format that would be used in transferring
21  data that -- or transferring design data that's described in
22  terms of geometries?
23    A.  That's my recollection. My recollection is that it
24  came out of what I previously referred to as the
25  polygon-pushing school of design. So it was one of several

Page 45

1  ways of representing the detailed geometric data for the
2  physical design.
3  Q.  Are you familiar with the acronym MEBES?
4    A.  Oh, gosh.
5        MS. ALLEN: Same objection; outside the scope
6  of the Declaration. You don't need to guess or speculate,
7  either.
8    A.  I have some recollection of that, Mr. Kelley, but I
9  don't -- as Ms. Allen has cautioned me, I would be speculating
10  to tell you what I think. I mean, I have something in mind,
11  but I haven't -- I haven't seen that term in quite a while,
12  but it's -- I think it's -- it's a term of the more physical
13  end of the art.
14  Q.  Okay. Let me get you to go back to Exhibit 1, your
15  Declaration.
16    A.  Okay.
17        MS. ALLEN: What did you say?
18        MR. KELLEY: I was muttering to myself because
19  I wasn't -- I couldn't find it, but I found it.
20        MS. ALLEN: Okay.
21  Q.  Page -- Well, there's no page number. It's Page 4,
22  the one that's got the Paragraph 10. I'm interested and I
23  wanted to talk to you about lines -- well, everything in
24  Paragraph 10. But Line 10 to 13 reads as follows: "From my
25  own design work, and my experience and knowledge of the work

12 (Pages 42 to 45)

V. THOMAS RHYNE * April 14, 2004

Page 46

1 of others in the field, I believe the following process steps
2 are an essential part of the manufacture of ASIC products."
3 And then you go on and you identify "A" through "G" as process
4 steps.
5        Am I correct that this is not a complete list
6 of essential process steps in the manufacture of ASIC
7 products?
8    A.  Well, I take your question to mean are there other
9 steps that would be considered essential?
10   Q.  Yeah, that's correct.
11   A.  I mean, I'll kind of give you the same kind of
12 answer President Bush gave last night.  When he was asked
13 "Have you made any mistakes," he said, "I'm sure I have, but I
14 don't know what they would be."
15       I think the better way for me to answer that
16 would be is if you wanted to propose another step that you
17 have and in some cases would I consider those to be essential
18 or not.
19       I think this is a reasonably good parsing of
20 the sequence of the steps that people use, but I don't know
21 that I've attempted to identify every other step that someone
22 might use at some stage or even characterize it as a separate
23 step.  So I don't know how to answer your question.
24   Q.  Okay.  Well, let me just go to Step G, which reads,
25 "Using the mask data to create the set of multiple masks

Page 47

1 required for producing the circuit layout on the silicon die
2 to form the ASIC product."
3    A.  Okay.
4    Q.  I take in that step you're talking about creating
5 masks.  Right?
6    A.  Yes.
7    Q.  You don't mention — You don't then go into the
8 various steps involved at the foundry to create the ASIC.  Is
9 that correct?
10   A.  That's true.  So I haven't ended up with silicon.
11 So I guess "H" would be — and I stopped here, would be the
12 actual fabrication of the silicon in the foundry —
13   Q.  Okay.
14   A.  — or the fab.  It doesn't have to be a foundry.
15   Q.  Is there any reason you didn't go to "H"?
16   A.  I'm sorry?
17   Q.  Is there any reason you didn't include "H"?
18   A.  Not particularly.  I just stopped with mask data to
19 make the masks.
20   Q.  Masks are — Well, can you briefly describe what
21 masks are?
22   A.  Well, again, I tried to allude to you earlier that
23 the mask technology has become increasingly complex as
24 physical sizes have gotten smaller and processes have become
25 more complicated.  But you — you tend to use a series of

Page 48

1 lithographic steps.  You tend to use light.  There are other
2 technologies.  But you can think of it as photography.
3        The masks are a series of images which control
4 the flow of light to a properly prepared surface on the
5 silicon and, as a result, allow certain physical and chemical
6 changes to take place in a sequence of steps, each mask
7 controlling what's going to happen at a particular stage in
8 the manufacturing process.
9        I can expand on that if you would like me to or
10 you can ask me further questions.
11   Q.  No.  That's fine.
12       Masks are used multiple times, correct, in
13 making multiple ASICs — or making multiple copies of the
14 same ASIC?
15   A.  They can be.
16   Q.  It would be —
17   A.  I'm sorry?
18   Q.  Never mind.  Strike that.
19       They can be.  I mean, isn't it — isn't that
20 what typically is done?
21   A.  That's typically — part of the reason that I gave
22 you a "can be" is that there's step and repeat approaches in
23 which they're used multiple times even in making a single
24 wafer, and then there are full masks that are projected only
25 once.  There's been, again, an evolution of the technology

Page 49

1 over the years as to which of those techniques are used.  But
2 you would expect a set of masks to be capable of being used
3 over the lifetime of the manufacture.
4    Q.  Now, the mask itself isn't, you know, incorporated
5 into the final ASIC that's delivered to the customer.  Is that
6 correct?
7        MS. ALLEN:  Objection; vague.
8    A.  I have no idea what you just said.
9    Q.  Yeah.  The mask — the physical mask itself is not
10 incorporated into the ASIC that actually is produced by this
11 process, is it?
12       MS. ALLEN:  It's still vague.  The objection is
13 it's outside the scope of the Declaration.
14   A.  Do you mean do they deliver the mask?
15   Q.  Uh-huh.
16   A.  Well, I guess it could be part of what the customer
17 asked for when they got their products from a fab, that the
18 masks were returned to them.  Again, I — I don't even —
19   Q.  Well —
20   A.  — there must be a meaning to your question and I
21 can't figure it out.
22   Q.  Let me clarify.  I'm sorry.
23       The ASIC, the semiconductor — the
24 semiconductor device, the ASIC, doesn't actually include —
25 the package doesn't incorporate part of the mask, does it?

13 (Pages 46 to 49)

V. THOMAS RHYNE * April 14, 2004

Page 50

1    MS. ALLEN: Objection. It's vague.
2    A. Well, I mean, in a sense it's represented in the
3  masks because those are used. But the physical masks
4  themselves would be kept at the foundry, if that's what you're
5  talking about.
6    Q. So the mask is a representation of the design that's
7  formed in the ASIC. Is that correct?
8    A. Yes.
9    Q. Okay. But the mask itself physically is something
10  separate from the ASIC. Is that correct?
11    A. Well, that's -- I think that's true. That's like
12  saying that - I don't know - like a negative is not exactly
13  the same thing as the print that's made from the negative and
14  delivered to somebody who wanted to see the picture. Again, I
15  find that question to be so nonsensical I have trouble
16  understanding it.
17    Q. Well, actually, it's not nonsensical. I think it's
18  just really simple. I agree it's kind of simple-minded.
19    All I'm trying to point out is that there are
20  two physically different things. The mask has a physical or
21  existence separate from the ASICs that are produced from it.
22  Is that true or not?
23    A. Yes, that's true. They both represent the same
24  thing. I mean, I tend to think of the masks, as I mentioned
25  earlier, as a hierarchy -- a hierarchy of the representation.

Page 51

1  They are a representation, but they are physically separate
2  from the die itself that -- that is the representation of the
3  ASIC itself.
4    Q. There are some multiple masks that are used in
5  forming an ASIC. Right? There's not just one mask. Is that
6  correct?
7    A. Typically, there's a set of masks.
8    Q. And each mask corresponds to a different layer or
9  part of the fab process. Isn't that correct?
10    MS. ALLEN: Again, objection. It's outside the
11  scope of the Declaration.
12    A. Yeah. These days it's really kind of hard to talk
13  about layers because there are a whole lot of processes
14  that -- it's not as simple as it used to be back in the '70s
15  and the early '80s. But each mask represents a point in the
16  overall manufacturing process maybe is a better way to put it.
17    Q. So -- so each mask contains some information about
18  the design, but it's certainly not all of the information
19  about how the design is going to work. Is that correct?
20    A. That's true. It's the totality of the mask set that
21  represents the design in that form of representation.
22    Q. Let me skip back up to Step A, which is
23  "Describing a series of functions that are to be performed by
24  the desired ASIC product to be manufactured."
25    How would somebody building an ASIC do this

Page 52

1  describing? I mean, what does that physically correspond to?
2  What acts does that correspond to?
3    A. Over the years, there have been a variety of ways to
4  do that. Today a very common one would be a higher -- a
5  hardware description language like Verilog or the HDL. But
6  there are flowcharts, and there are timing diagrams. There --
7  It could be a schematic diagram at some high level, a transfer
8  level diagram.
9    Q. How about a design spec?
10    A. I tend to think of -- Well, it could be if it was
11  tightly enough written. It could be if it were functional or
12  structural in its characteristics enough that it gave a clear
13  binding as to what the result would be.
14    Q. So you said the metric for determining whether --
15  these words here are describing a series of functions. Is it
16  its completeness and its detail, or what -- how are you -- how
17  are you identifying what's -- what is describing a series of
18  functions and what is not quite?
19    MS. ALLEN: Objection. That's vague, and I
20  think it's misstating his prior testimony.
21    A. You asked me about a design spec. I didn't have a
22  design spec in mind when I wrote Step A. I tended to think in
23  terms of the types of descriptive tools that I had experience
24  with or that I was aware of people using today. And I had in
25  mind, for example, and probably the best example I can give

Page 53

1  you, is hardware description language that you would define
2  what the device is supposed to look like functionally. I know
3  you're aware from my prior experience with you personally, you
4  can do that description either functionally or structurally or
5  in some combination of both. That's what I had in mind, that
6  stage of the process.
7    Q. Okay. So -- so you weren't intending with "A" to
8  capture timing diagrams or -- or engineering specs?
9    A. No, I wasn't trying to exclude those. I was just
10  giving you a good example of what a design spec is. I think
11  flowcharts are an excellent way or state diagrams or tables.
12  There have been a variety of tools that designers have had
13  available over the years in order to do the initial
14  description of that.
15    Q. So those are all possible in describing the series
16  of functions. And when you said -- you say in your
17  Declaration that the step is essential, are you saying that
18  it's essential that one write HDL, or are you saying that it's
19  essential that one provide some kind of description, whether
20  you do that using HDL or flowcharts or a similar state table
21  that you mentioned that you -- which of those two is it?
22    MS. ALLEN: Objection; compound and vague.
23    A. Yeah. You know, you've given me a universe of two
24  things to answer the question. Within the scope of that
25  universe, it would be the second answer. I did not intend to

14 (Pages 50 to 53)

Page 54

1 restrict it to HDL usage.
2     Q. So HDL usage itself isn't necessarily essential, but
3 it is essential that one describe a series of functions in
4 some manner?
5     A. In some manner that's sufficiently clear and
6 complete to allow Step B to take place.
7     Q. Okay. Step B is "Performing logic synthesis to
8 identify the logic blocks needed to achieve the desired
9 functionality."
10         Does this encompass what we've here referred to
11 as the manual technology binding, or is "B" limited to
12 computer -- computer-aided logic?
13         MS. ALLEN: It's compound. I object.
14     A. I think it's fair to say that I had in mind -- let's
15 characterize it as a preferred embodiment when I thought
16 through this sequence.
17         In the context of your question, however, I
18 think people can, and did, and probably still do, logic
19 synthesis in a manual fashion. But certainly my preferred
20 embodiment concept, Mr. Kelley, was that they would do this
21 with a computer-aided design tool, commonly called a logic
22 synthesizer; but I don't think that that's necessarily the
23 only way it could be done.
24     Q. So they can do it by hand or using a computer. Is
25 that correct?

Page 55

1     A. Yeah. I think they could do this stage. They could
2 essentially manually do the same thing that the logical
3 synthesis computer-aided design tool will do. They could map
4 from the functional description in Step A to the logic blocks
5 that are needed to achieve that design functionality.
6     Q. Back when I was a working engineer, we used to come
7 up with schematics and put AND gates and OR gates and so forth
8 to create a circuit description.
9         I take it that if somebody wanted to build a
10 circuit that way and not use logic synthesis that way, it
11 would be manual logic synthesis within the meaning of that
12 language that you've described in Step B. Is that correct?
13     A. Under the rubric that I've used in Step B, which is
14 logic synthesis, and I've defined what I meant by that in the
15 rest of Step B, that could be done with a computer-aided tool
16 or it could be done manually.
17     Q. Okay.
18     A. But that's an essential part of the manufacturing
19 process.
20     Q. What -- what is -- what is your understanding of the
21 phrase "mask data"?
22     A. It's data that can be used to manufacture the mask.
23 It would be the geometric characteristics of the mask.
24     Q. Okay. You indicated earlier that -- and we talked
25 about whether something should be included and whether there

Page 56

1 should be steps that are above "A" in the process that might
2 be included. Let me float a couple by you and get your
3 reaction to whether you think they qualify as essential -- an
4 essential part of the manufacture of ASIC products.
5         MS. ALLEN: I object that it's misstating prior
6 testimony.
7     Q. Here's one. How about assessing customer interest
8 in the possibilities of the product? Is that an essential
9 part of the manufacture of the ASIC product?
10     A. I wouldn't think it was, but I think it's important.
11 You probably wouldn't want to spend a lot of money building
12 something for which there's no market. But I personally don't
13 think that's essential.
14     Q. Okay. How about doing a product -- doing an
15 initial -- you know, a high-level design of the product --
16         MS. ALLEN: Objection --
17     Q. -- an initial engineering statement of what the
18 product is going to be?
19         MS. ALLEN: Objection; ambiguous.
20     A. You've changed horses in the midstream of the
21 question. Why don't you try that again.
22     Q. Yeah. How about doing a high-level specification to
23 start with to determine what the functionality of the product
24 is going to be?
25     A. Again, I think I've been involved in products where,

Page 57

1 when we started, we may not have even had a clear idea of what
2 we were trying to do. I don't know that that's essential.
3 It's certainly important to do that. As a manager, I would
4 expect that to be done. But I don't think of that as being an
5 essential part of the manufacturing process.
6     Q. What about purchasing the tools for the designers
7 and the equipment -- the CAD equipment the designers are going
8 to use? Is that an essential part of the manufacturing
9 process?
10     A. I wouldn't consider that -- Again, it's something
11 that one assumes as a given, that there's a floor and some
12 computer facilities and desks and things. I don't consider
13 that as part of the manufacturing process for the ASIC design
14 itself.
15     Q. It's -- But is it essential that those things have
16 happened?
17     A. I mean, you're going to have to clarify.
18         MS. ALLEN: Objection. I don't understand.
19     A. Yeah. You don't have to purchase them. You can
20 lease them or borrow them. If you've got -- if you're going
21 to do -- if you're going to use a tool to do a step, you've
22 got to have access to the tool.
23     Q. So is it essential to have somehow arranged for
24 access to the tool?
25     A. That question is --

15 (Pages 54 to 57)

V. THOMAS RHYNE * April 14, 2004

Page 58

1      MS. ALLEN: Objection. I think the question is
2  sort of ambiguous and almost calling for unfair inferences. I
3  don't want to give speaking objections. I'll just leave it at
4  that.
5      A.  I would not consider it to be an essential part of
6  the manufacturing process, but I would consider it essential
7  that you have in place the resources necessary to start the
8  process.
9      Q.  Okay.  So arranging for the tools is -- it's
10  essential, but it's not part of the manufacturing process.  Is
11  that correct?
12      A.  I would assume that the individuals that are
13  necessary to do it would be in place and that the skill sets
14  would be there.  Those are not things that I listed in my set
15  of essential parts of the manufacture of an ASIC product.
16      Q.  That's what I'm trying to get at.  Am I correct that
17  the reason that you didn't list them is because it's not part
18  of the manufacturing process?
19      A.  I don't -- I mean, the document is my opinion,
20  and that's what my opinion is.  You're asking me is it
21  essential that the earth exists and that we have oxygen and
22  electricity and -- I mean, those are all things that have to
23  be in place before you start the manufacturing process.  So
24  are they essential?  In a sense, they are, but I don't
25  consider them to be an essential part of the process.  It's a

Page 59

1  precursor.
2      Again, I don't even -- that question is so
3  nonsensical to me that I have trouble even understanding how
4  to answer it.
5      Q.  Well, what I'm trying to get at is a distinction
6  between an essential part of the process and -- or essential
7  to the -- to the process -- essential precursor to the process
8  and whether they're an essential part of a manufacturing
9  process.  And I take it that you are saying those things are
10  necessary, yes, but they're not part of the manufacturing
11  process?
12      A.  That's a reasonable understanding of what my opinion
13  is, yes.  There are -- there are things that you have to have
14  in place in order to accomplish the steps that are the
15  essential parts of the process, but I don't think of those as
16  being part of the process of manufacturing an ASIC product.  I
17  just assume those as a given at the start of the process.
18      Q.  Are you familiar with the phrase "ASIC design"?
19      MS. ALLEN:  Excuse me?
20      MR. KELLEY:  ASIC design.
21      A.  I think so.
22      Q.  Is that distinguished, in your understanding, in any
23  way from ASIC manufacture?
24      A.  I think in the context of my Declaration that I've
25  included the two together as being the totality of the

Page 60

1  manufacture of the product.
2      Q.  You included the two together.  So you've used them
3  as synonyms?
4      A.  I think if you were to break out the steps that are
5  here that some of the earlier ones would be a design-oriented
6  step in the overall manufacturing process.  But I've kind of
7  combined them into my understanding of what I've referred to
8  in Paragraph 10 as the manufacture of ASIC products.
9      Q.  Have you heard people draw a distinction between
10  design and manufacture?
11      A.  I think I have.
12      Q.  And here you didn't draw that distinction; you put
13  the two together, that something was design and it was also
14  manufacture.  Is that correct?
15      A.  Yes.  I considered that if one sets out to
16  manufacture an ASIC product that one has to do the design
17  steps at the early stage of the overall manufacturing process
18  in order to be able to reach the end of the process and
19  actually physically make the device.  So I characterized the
20  entirety of those steps as the process of manufacturing the
21  ASIC product.  That's a reasonable characterization.
22      Q.  Is there any reason you didn't distinguish between
23  design and manufacturing?
24      A.  I was asked to deal with the overall totality of the
25  manufacture of an ASIC.  I consider those, both the design

Page 61

1  stages in that process and the final foundry-type stages, to
2  all be essential parts of the manufacture of the products.
3  The way the question was asked of me I felt it was appropriate
4  to combine those into the steps that are shown in the
5  Declaration.
6      Q.  Okay.  If it was important to the issue for the
7  Court to distinguish between design and manufacture, would --
8  would you -- would your Declaration shed any light on where
9  that line should be drawn?
10      MS. ALLEN:  Objection --
11      A.  I have -- Go ahead.
12      MS. ALLEN:  Objection.  That question is vague
13  and ambiguous, and it somewhat calls for speculation as to
14  what's going to be important.  Go ahead.
15      A.  I have to understand whatever question the Court was
16  trying to address in a better terminology than the way you
17  phrased it.  I don't understand what importance there was
18  associated with it.
19      Q.  Let me ask it this way:  There's nothing in the
20  Declaration, as written, that addresses that distinction.  Is
21  that correct?
22      A.  I think that's incorrect.
23      Q.  Okay.  Tell me what -- what part of the Declaration
24  addresses the distinction between design and manufacture.
25      A.  Paragraph -- Well, you've stated in your question an

16 (Pages 58 to 61)

Page 62

1  assumption that the Declaration rebuts, which is that it's
2  appropriate to separate the manufacture of an ASIC into a
3  design phase that's completely separate from a manufacturing
4  phase. So, as I said in Paragraph 10, I think that when one
5  considers the totality of the manufacturing process, while it
6  has stages that are design oriented, the beginning -- really,
7  they play into the overall manufacturing process. So I don't
8  see a separation here.
9      Q.  Okay.  But what I'm -- what I'm asking you is if
10 you're wrong about that and it is important to distinguish
11 between design and manufacture, is there anything in your
12 Declaration that would help draw that distinction?
13     A.  Well, I don't think I'm wrong about that, and so I
14 don't -- I don't know how to address that.  The Court should
15 consider the Declaration within its four corners for what I've
16 said here, and I would be happy to answer -- answer any
17 questions that the Court may have to clarify it.  I think my
18 opinion is here.  If the Court elects to reject that opinion,
19 that's their decision.  I don't know how to speculate as to
20 what would happen there.  I don't have an answer for you.
21     Q.  Okay.  Do you have -- you mentioned -- I'll have to
22 paraphrase.  You mentioned there were some things, I think,
23 earlier in the process that were more design oriented, I think
24 you said.  Is that correct?
25     A.  You asked me earlier had I heard of a distinction

Page 63

1  being made between design and manufacture.  I think if one
2  looked at the earlier stages here where I've talked about
3  describing a series of functions, et cetera, that those are
4  stages that people would say are being done by designers.
5  Although, certainly mask design is a stated design art.  Those
6  would be stages that would -- would be more design oriented in
7  the overall manufacturing process.  That's about the best I
8  can --
9      Q.  Well --
10     A.  -- answer your question.
11     Q.  When you say "those stages," which stages are you
12 referring to?
13     A.  Oh, probably -- Well, it's hard to say.  I mean, you
14 can apply the rubric "design" to every one of these stages,
15 every one.  You can do functional design, logical design,
16 circuit design.  There's an aspect of design to form the
17 netlist.  There's an aspect of layout design.  You can do mask
18 design.  So really I guess maybe I need to clarify what I've
19 said earlier.  I think any of these stages could be
20 characterized as design within the overall manufacturing
21 process.
22     Q.  How about "G"?  Does it make sense to talk about "G"
23 as design?
24     A.  Yeah.  I think there are people who would say that
25 even once you have the mask data that there would be some

Page 64

1  design steps.  I think mask manufacture has become somewhat of
2  a black art in modern technology.  I haven't -- I'd have to go
3  back and try to look and see, in the relevant time frame,
4  how -- how automatic the ability to use mask data to create
5  the masks themselves was back in that time frame.  I'm not
6  prepared to give you a detailed answer on how automatic that
7  step would be in the appropriate time frame.
8      Q.  I'm not -- I guess the process flows are going to be
9  different over the time frame from '80 to the current.  Is
10 that correct?
11     A.  Yes.
12     Q.  Okay.
13     A.  And in any one of these steps, I think things may
14 have changed a bit.  I mean, certainly the nature of the masks
15 has changed as the process technology as changed dramatically.
16     Q.  Do you think what people would characterize as
17 design oriented has changed over that point in time?
18     A.  No, I don't have an opinion about that.  As I said,
19 I think, really, when you look at each one of these steps,
20 they all involve design within the step itself.
21     Q.  We had added -- I think sort of informally we had
22 added an "H," which was manufacture of the ASIC itself at the
23 fab.  Is --
24     A.  Yeah.
25     Q.  -- that correct?

Page 65

1      A.  That's correct.
2      Q.  Is that design oriented?
3      A.  Well, it's been my experience that at the fab stage,
4  people find out that there are problems with the device,
5  either in its manufacture or functional performance or timing,
6  and, as a result, a design revision may be forced upon that.
7  So, in a sense, there are some aspects that relate to design.
8      Q.  There's some aspects that relate to design.  But
9  would you -- would you characterize the fab process as being
10 design oriented?
11     A.  There are people who do nothing in their lives
12 except design the layout of fabs.  But relative to the design
13 of the ASIC process itself, I probably wouldn't think of that
14 as being part of what I would tend to characterize as design.
15 But that may be, in part, because of my own view of the art.
16         I've -- While I've spent time in fabs and all,
17 that's something I -- I probably have not contributed to
18 personally as a designer.  So I would have to take my answer
19 from my own point of view.  Other people might actually
20 consider that to be part of the design process.
21     Q.  Have you ever --
22     A.  There are issues like design centering which attempt
23 to make sure that, over the range of parameters of the
24 manufacturing process, the design will still operate.  So I
25 think there are design aspects there.  It's just that I

17 (Pages 62 to 65)

V. THOMAS RHYNE * April 14, 2004

Page 66

1 personally am not as familiar with it as I am the overall
2 process.
3    Q.  Have you -- have people that you work with and
4 encounter, have they -- have those folks ever referred to some
5 ASIC fab and a foundry as -- as design that you can recall?
6        MS. ALLEN:  Just can you repeat the question.
7 I'm sorry.
8        MR. KELLEY:  Sure.
9    Q.  Professional folks, the people that you've
10 encountered in your professional career, have -- are you
11 familiar with any instance in which those folks, or anyone
12 that you've encountered, has referred to semiconductor
13 manufacturing at the fab as being part of a design process?
14    A.  Well, I mentioned to you this characteristic called
15 design centering where you interact with the fab people to try
16 to understand what the range of parameters in their process is
17 and how tightly they're controlled and how they think things
18 are going to happen during the process.  And I certainly
19 have -- am aware -- it's not something I personally have done
20 a lot, but people interact with the fabrication engineers at
21 the foundries and fabs and may, in fact, go back and modify
22 their design of the physical characteristics of the ASIC, if
23 not even the functional or logical characteristics, to try to
24 get better yields and better performance over the range of
25 process parameters.  That's a long way of saying I think so to

Page 67

1 your question.
2    Q.  Okay.  Design, other than in the context of design
3 centering, have you heard people refer to the process of
4 making a semiconductor as -- as semiconductor design, in
5 your --
6    A.  I don't --
7    Q.  -- experience?
8    A.  I don't think so.
9    Q.  Okay.
10    A.  I don't have any prior -- any other recollection of
11 that other than that aspect of it.
12    Q.  Okay.  Design centering is something that happens
13 before the ASIC is actually fabricated, isn't it?  Is that
14 correct?
15    A.  I think it can happen before or during.  I mean, as
16 you run processes and you begin to understand, you can yield
17 data and other types of information, and you can use -- use
18 what you're finding to go back and try to recenter the process
19 if you find out that's it's not working.  And I think --
20 again, I think of all of these steps can interact, at least in
21 the sense that at any stage, you may be forced to go back to a
22 previous stage and do some modification.
23    Q.  Maybe I didn't understand what design centering is.
24 Is design centering actually changing my circuit design?
25    A.  Not necessarily a circuit design.  You might.  But

Page 68

1 you may change your physical layout --
2    Q.  Okay.
3    A.  -- to try to achieve, over a broader range of
4 process areas, acceptable functionality and timing.
5    Q.  So I am going to change my mask.  Is that correct?
6    A.  It could.  Yes, it could -- it could affect the
7 characteristics of the mask.  That, to some degree, is why I
8 was telling you earlier that while I know something about the
9 details of Step G, that's an area that I personally don't have
10 as much experience with as I do others.  And it may be that
11 there are other adjustments that experienced mask design
12 engineers can make for the same set of mask data that they can
13 actually produce different sets of physical masks based on
14 their knowledge of how they can improve the -- the yield when
15 those masks are used to make this ASIC product.
16    Q.  So design centering would be -- and you had
17 mentioned earlier that there were design elements to Step G,
18 which is making the mask.  I take it that design centering
19 might be one of those -- one of those elements.  Is that what
20 you're suggesting?
21        MS. ALLEN:  Objection.  That misstates his
22 prior testimony.
23    A.  I would -- I think that in this legal context, I
24 shouldn't speculate about something about which I only know a
25 little bit.  It -- the answer -- best answer I can give to you

Page 69

1 is it might be, and that's not a very useful answer.  So
2 that's the answer that you can accept.  It might be.  I'm not
3 a mask design engineer personally.  So it could.
4    Q.  You don't know one way or the other whether
5 design --
6        MS. ALLEN:  Objection; asked and answered.  I'm
7 sorry.  I'll let you finish.
8    Q.  You don't know, one way or the other, whether design
9 centering is going to impact the process of -- that's
10 described in Step G or not.  Is that correct?
11    A.  I don't know with --
12        MS. ALLEN:  I will keep my objection; asked and
13 answered.
14    A.  I don't know with assurance.  I think it might.
15 That's the best answer I can give you.  I can't exclude it.
16 But I think somebody who is a mask design engineer would be a
17 better person to ask about that.  And I think that issue will
18 change dramatically over this period of time that we're
19 talking about.
20    Q.  Design centering isn't something that's going to
21 affect Step H, the actual fab of the ASIC?  I mean, you were
22 using information that we know about how these processes work,
23 but I don't actually change the process as a result of design
24 centering.  Is that right?
25        MS. ALLEN:  Objection as to -- I think you

18 (Pages 66 to 69)

Page 70

1　might be misstating his testimony.
2　　　　MR. KELLEY: Well, that's why I'm asking yes or
3　no. I want to make sure I got it right or not.
4　　　　MS. ALLEN: And I think the question is a
5　little vague and ambiguous.
6　　A. Well, I don't know if I would characterize changing
7　the process as a direct result of something. I wouldn't call
8　it personally design centering. But I do know that the
9　process may be tuned up - I've had experience with that - to
10　try to increase yields primarily from a timing point of view.
11　So I think that -- that there are aspects of the manufacturing
12　process, even at this mythical Step H, that can be adjusted to
13　try to achieve the best possible product at the end of the
14　manufacturing process.
15　　Q. Have you ever heard anyone refer to that kind of
16　fine tuning as design centering?
17　　A. I don't think I've heard it referred to as design
18　centering. I mean, maybe they do. I don't know. I -- That's
19　not what I refer to as design centering. But it
20　certainly is an aspect of the overall manufacturing process.
21　　Q. Have you ever heard anyone refer to that kind of
22　tuning as ASIC design?
23　　A. I think -- The answer I can give you is I think they
24　would be comfortable with including it as a -- a portion of
25　the overall manufacturing process for the ASIC.

Page 71

1　　Q. Do you mean just folks who are at the foundries
2　generally would be comfortable with that?
3　　A. As part of the manufacturing process. Whether they
4　would call that part of the design process or not, I think
5　that would be -- it depends on how you explain to them the
6　nature of the question.
7　　Q. Okay. But you've never heard anybody at the fab
8　refer to that kind of tuning as design centering?
9　　A. I can't say that I have. I can't say that I
10　haven't. Okay. As I said, I would agree that it's part of
11　the overall manufacturing process. Whether I remember ever
12　hearing anybody say, "Oh, that's part of the design," I don't
13　recall.
14　　　　MR. KELLEY: Do you want to take a little
15　break?
16　　　　THE WITNESS: Sure.
17　　　　(RECESS TAKEN)
18　　Q. (Mr. Kelley continuing) I want to talk about 10(B),
19　this performing logic synthesis step. You identified it as an
20　essential part of the manufacturing?
21　　A. Yes.
22　　Q. Am I correct that it's essential that you do logic
23　synthesis, but it might be computer logic synthesis or it
24　might be hand synthesis, what we called manual synthesis, I
25　guess? Is that correct?

Page 72

1　　A. I certainly had in mind, as I characterized it
2　earlier, Mr. Kelley, as a preferred embodiment, something like
3　a logic synthesis tool, because I'm familiar with those tools.
4　But I think it could be done manually, as well, as I said
5　earlier.
6　　Q. And in Paragraph 9, you said that you have looked at
7　the '432 patent?
8　　A. Yes.
9　　Q. And you believe that it describes and claims an
10　integral portion of the manufacturing process utilized in the
11　semiconductor industry for the manufacture of application
12　specific integrated circuit - ASIC - products.
13　　　　Do you have any view today as to whether the
14　scope of the claims of the '432 patent extend to manual
15　synthesis that we've certainly talked about?
16　　A. I don't have any opinion about that at all. I
17　haven't studied the claims to the point that wherein I would
18　be able to form an opinion and give you an answer to that.
19　　Q. Okay. So it might be or it might not be, as far as
20　you know today?
21　　A. I have no opinion either way.
22　　Q. Okay. So then I take it you also don't have an
23　opinion as to whether the '432 patent describes and claims an
24　essential part of the manufacturing of the ASIC products --
25　Let me strike the question.

Page 73

1　　　　I'll formulate it this way: You don't know
2　whether in order -- as an essential part of the manufacture of
3　ASIC products, one has to do what is described in the '432
4　patent?
5　　A. I don't have any --
6　　　　MS. ALLEN: Could you repeat the question.
7　　　　MR. KELLEY: Can you read it back.
8　　　　(Requested portion was read)
9　　　　MS. ALLEN: Objection. It's vague and
10　compound. You can answer it.
11　　A. I thought I understood, but let me -- since you've
12　raised the objection as vague, let me think through it. Let
13　me play -- If you don't mind, I'll play your question back and
14　see if this is right.
15　　Q. Anything you like.
16　　A. Okay. What I think you're asking me is given that
17　I've given you a set, in Paragraph 10, of essential steps, do
18　I consider -- whatever may be claimed as inventive in the
19　'432 patent, do I consider that that's an essential -- that
20　that process is essential to making any ASIC?
21　　Q. Uh-huh.
22　　A. I don't have an opinion on that today. I haven't
23　studied the claims to that degree.
24　　Q. Have you -- In your professional career, have you
25　ever heard anyone discuss the distinction between design and

19 (Pages 70 to 73)

V. THOMAS RHYNE * April 14, 2004

Page 74

1  manufacture?
2      A.  I think probably so, yeah.
3      Q.  And in those discussions, did people -- whether they
4  did this formally or informally, did they identify some --
5  some method by which you would identify it and say that's the
6  one for manufacturing and that's the one for design?
7      A.  No.
8      Q.  Okay.  So what, sitting here today, do you remember
9  about those conversations about the distinction between design
10  and manufacturing?
11      A.  I think there are people who do design with no goal
12  to ever have it manufactured, you know, like teaching or
13  something like that, that they just -- that they maybe stopped
14  with Steps A -- maybe even Step A and that's all they do and
15  they would say that they were doing ASIC design.
16      Q.  Okay.  Any other context for the words "design" and
17  "manufacture" that you remember?
18      A.  No.
19      Q.  Do you remember any occasion on which someone
20  writing a -- Well, strike the question.
21          Let me ask it this way:  Do you remember any
22  occasion on which someone doing what would be encompassed
23  within Step A in Paragraph 10 said that they were
24  performing -- told you that they were performing a
25  manufacturing step or used manufacturing to describe something

Page 75

1  that falls within the scope of Step A?
2      A.  I think it would depend upon the nature of the
3  conversation, and I probably have had instances that would go
4  both ways.
5      Q.  Okay.  Let's talk about instances where, in fact,
6  you do recall that they used the word "manufacture" or
7  "manufacturing" to describe the activities in Step 10(A).
8      A.  I think if somebody had been asked as much as I was
9  asked to define the totality of the process of manufacturing
10  the product, they would have included Step A under the rubric
11  manufacturing.
12      Q.  Okay.  But now I'm asking about specific instances
13  that you may recall.
14      A.  I think that I've been through this hierarchical
15  characterization before.  We worked with this kind of concept
16  as part of the design methodology management projects at MCC,
17  for example.
18      Q.  You did design methodology management?
19      A.  Yes.
20      Q.  Was that -- was that the term that was applied to
21  the program or --
22      A.  We had an effort that was attempting to understand
23  the methodology people used to create products from beginning
24  to end, and we called it design methodology management.  But
25  if you had -- what we were dealing with were the steps that

Page 76

1  you went through to the manufacture of a product.
2          So, again, you're trying to for, some reason,
3  in some way, draw a distinction between two things that
4  clearly overlap in everybody of this art's minds, and there's
5  just -- I don't -- as I've said a number of times, I don't
6  even understand trying to make that distinction.
7          There are things that people might, in some
8  context, call design.  There's things that in some kind of
9  context people say it's manufacturing.  But if you look at
10  what is called the manufacture of an ASIC, all of those steps
11  fit together as being part of what's necessary to be done to
12  manufacture that ASIC product.
13      Q.  But you've described certain things that would be
14  more design oriented than -- than other things and so on.
15  What I'm wondering is there a continuum here?  If one -- Can
16  we start at these higher levels that "A" and "B" are more
17  designed oriented and things later on in the process are more
18  manufacturing oriented?  Is it continuum, or are they -- I
19  think you said they weren't synonyms.  Are they synonyms of
20  each other?
21      A.  I don't think -- I don't think I said that before.
22  Now that you've asked me, I wouldn't think of them as being
23  totally synonymous.
24          But I've given you a couple of points.  First,
25  I said that someone can apply the term "design" to almost

Page 77

1  every one of these steps, if not all of them.  Now, what
2  people might say in a casual sense is one thing; but what
3  people would understand to be the process of manufacturing a
4  circuit -- an ASIC in a legal context or in a formal context
5  is different.  And I believe, if asked the question what are
6  the essential steps in manufacturing an ASIC product, that
7  this is a reasonable answer.  I think that it would be an
8  answer that would be understood and not disagreed with by the
9  people in the field.
10      Q.  Okay.  Now I want to focus on actual conversations
11  that you recall, if you recall any.  And my question is do you
12  recall anyone using the word "manufacturing" to describe
13  something that they did that would fall within the scope of
14  10(A)?
15      A.  I don't have any recollection of ever trying to
16  apply the term "manufacturing" individually to these -- to
17  that early step, no.  I don't have -- I can't say I haven't,
18  but I don't have any recollection of that.
19      Q.  Okay.  I'll ask the same question about 10(B).  Do
20  recall any instance where someone doing something that would
21  fit within the scope of 10(B) referred to what they were doing
22  as manufacturing?
23      A.  I think that they would -- you know, I don't have
24  any specific recollection of any conversation with anybody.
25  That's the answer to the question.  Either way, I don't have a

V. THOMAS RHYNE * April 14, 2004

Page 78

1  recollection of having such a conversation.
2   Q.  Do you have any — Are you familiar with any
3  articles in textbooks that would use — that you could point
4  to to say that they used manufacturing to refer to something
5  in the scope of 10(A) or 10(B)?
6   A.  I come back to the original answer I gave you. If
7  people were attempting to define -- and I haven't searched my
8  textbook library or the Internet or anything to try to confirm
9  your question.  But I think people would understand that these
10  are steps, all of them, "A" through "G", that are part of the
11  manufacturing process.  If the question is asked in that way,
12  I think that then people would say, "Yeah, that's a step in
13  the manufacturing process."  Did they ever call individually
14  Step C manufacturing an ASIC, I don't recall either way that
15  anybody does that.  And I can't cite to you any dictionary
16  definition or textbooks that would say either way.  I've never
17  studied it.  I don't know.
18   Q.  And the same is true for 10(A) and/or 10(B); you
19  can't cite any textbooks or definitions or articles that —
20  that would call those manufacturing?
21   A.  Well, in part, that is because I've made no effort
22  to find any such citations --
23   Q.  Sure.
24   A.  -- and so I'm unprepared to give you an answer.
25   Q.  Okay.

Page 79

1   A.  That's not a negative answer.  It's an answer that
2  says that I haven't looked for those.
3   Q.  Understood.
4   Did you — You say you looked at the patent.
5  Did you look at the patent to see how it used words — words
6  that are used that are described in the patent?
7   MS. ALLEN:  Objection.  I think you need to
8  point to exactly what you're talking about because I think
9  it's vague.
10   A.  I think the answer is no.  I read the patent.  I
11  read the file history.  I looked at the -- at the claims at
12  one time probably six or seven months ago.  But in preparing
13  the steps in Paragraph 10, I did that independently of any
14  statements that were made in the patent.
15   Q.  I'm going to ask you a couple of questions.  I'm
16  going to make a formal statement.  It may or may not be
17  helpful.  One of the things that the Court may want to look at
18  is the Court — is whether something is used directly in
19  manufacturing or indirectly in manufacturing.  I've been
20  talking about questions that are an attempt to get at that
21  question.
22   Do you understand any distinction between
23  saying that something is used to directly manufacture or
24  something is used indirectly in manufacturing?
25   A.  I don't understand the context of that statement.  I

Page 80

1  don't understand that concept at all.
2   Q.  So if it became important in the resolution of some
3  issue before the Court as to whether something is used
4  directly in manufacturing or indirectly in manufacturing,
5  would you have — would you have any opinion on that?
6   MS. ALLEN:  Objection.  The question is vague.
7  It calls for speculation.
8   A.  I'd have to understand the context of the question
9  the Court is trying to resolve, and I don't have enough
10  context now to know what distinction the Court may be trying
11  to make between directly and indirectly.  I don't have enough
12  background to answer.
13   Q.  Okay.  Do you — is it true that the steps in "A"
14  through "G" are — some of them are more close in time to the
15  actual formation of the ASIC at the foundry than other steps?
16   MS. ALLEN:  Objection; vague and compound.
17   A.  Well, they build upon top of each other.  If it were
18  a pure process where you did Step A and stopped doing "A" and
19  then did Step B and didn't go back and reconsider Step A in
20  this hierarchical flow of — this cursory flow, then -- then
21  you would expect these to be performed chronologically in
22  sequence.  So the latter steps would be closer to the actual
23  manufacture than the earlier steps.  By their nature, you
24  wouldn't have the results of the earlier step to do the — you
25  can't do Step B until you've done Step A.  So you have to do

Page 81

1  "A" first.  They -- they all flow together.  I keep saying
2  they're essential.  You have to do them all in order to reach
3  the end of the process.
4   Q.  Okay.  And am I — It sounded like you were saying
5  that in order to do Step G, I have to have done Step F, and in
6  order to do Step F, I have to have done Step E, and likewise
7  all of the way back up to Step A.  Is that correct?
8   A.  Yes.  That's my — that's my view of how these steps
9  flow.  Now, you may -- as I say, you may go back up.  There
10  may be reverse flows in the process where what you get when
11  you try to do Step E forces you to do something that may be
12  all of the way back up to even Step A.  But if you take it as
13  a one-way flow, then, yes, you have to do the previous step to
14  get the results.  I mentioned this hierarchy of
15  representations.  The representation you get at the end of one
16  step is used as the representation for the next step.
17   Q.  Okay.  So then am I correct in assuming that if
18  we're talking about the next step — you don't say anything
19  about the foundry right now and it being produced.  Step A is
20  going to be the most remote in time in terms of if I look at
21  when — when the last time I did it, Step A would be the one
22  that happened furthest away back in the past.  Is that
23  correct?
24   MS. ALLEN:  Objection; vague and compound.
25   A.  As long as one -- and I think I've already answered

21 (Pages 78 to 81)

Page 82

1 that. As long as those steps are considered to be performed
2 in a sequence and not recursed, then that would be true.
3      Q. But even if they are recursed, I'm still going to go
4 back and do all of the steps that fell after -- after the step
5 that was recursed. Is that correct?
6      A. I think there might be ways that you could go back
7 and maybe even skip a step, if you were clever enough, when
8 you're trying to make a late modification to the design for
9 some purpose. You don't necessarily have to do every one.
10      You know, I don't -- It's probably better just
11 to not offer you an answer on that. I'd have to look at a
12 particular design flow and exactly what happened to know
13 whether somebody did it formally or just sort of fixed it at
14 the end. It's hard to say.
15      Q. Well, sitting here today, are you aware of any way
16 you could go back to doing logic synthesis at Step B and not
17 do Step C, Step D, Step E, Step F and Step G?
18      A. I don't really have an answer for that. I mean,
19 that's -- someone may -- I don't have an answer to that.
20      Q. So you don't -- you don't know whether they could,
21 and you don't know if they couldn't?
22      A. I don't know whether they might find some way to
23 make a change in the -- in the top-level functionality and
24 implement that directly by modifying the netlist without doing
25 anything else.

Page 83

1      I think that could be done. As to whether I've
2 ever actually done it myself, probably I've made some late
3 design fixes almost at the mask level in the early days. But
4 without clearly understanding -- I would understand that this
5 had an effect on the functionality. I might even have gone
6 back and run Step A to do a function resimulation. But I'm
7 not sure I always did all of those steps late in the design
8 review process. But in terms of it, I had to do them all at
9 least in the initial flow. Beyond that, I'm not -- I don't
10 really have a solid answer to give you.
11      Q. That would be a somewhat unusual flow, to go all of
12 the way back up to logic synthesis and not to Step C, D, E, F
13 and G. Is that correct?
14      A. I think it would be unusual not to flow through the
15 process. That is correct. I'm just telling you there may be
16 ways to shortcut it late in the game, but that would be the
17 exception. And I'm not even sure I can cite to you a specific
18 example. But as a manager, I wouldn't want that to happen.
19      Q. We had -- we talked about tapeout earlier. Does
20 tapeout fit between one of these steps or maybe after these
21 steps in "A" through "G"? What is the relationship between
22 tapeout in these steps?
23      MS. ALLEN: Objection; compound.
24      Q. Well, let's just try the last question. What is the
25 relationship between tapeout in these Steps A through G?

Page 84

1      A. Well, it would be late, and it could be between
2 step -- at least in my personal experience, it would be
3 between Step F and Step G --
4      Q. Okay.
5      A. The tape would contain the geometric data designing
6 the physical layout in a manner that the masks could be
7 created.
8      Q. And is it common for the folks who are doing Step G
9 to be different than the steps doing -- the folks doing
10 Steps A through F?
11      A. You already asked me that, and I think that might
12 vary depending on time frame.
13      Q. All right. Let's talk about the present.
14      MS. ALLEN: You don't need to speculate.
15      A. Well, I wouldn't be speculating.
16      I think today, at least based on my experience
17 at Motorola and other related semiconductor companies, it
18 would be uncommon for the same person to do Step A and do
19 Step G, for example.
20      Q. Okay. What about in the late '80s?
21      A. I think that would depend, to some degree, on the
22 complexity of the device being manufactured. The same person,
23 in those days, might have done everything in "A" through "F."
24 I knew people who were also knowledgeable about mask
25 fabrication who could have easily sat down and done Step A.

Page 85

1 But I don't know that that's true today because the mask
2 technology has become so much more complicated.
3      Q. Was that common, though, back even in the late '80s,
4 for someone -- an individual to do all of Steps A through G?
5      A. I would think even then it would be uncommon --
6      Q. Who are the --
7      A. -- at least for an ASIC of significance, I might
8 say. Even that term has varied over the years. But it
9 would -- unless the ASIC were particularly simple and the
10 process were particularly simple, they would --
11      Q. And we touched on this earlier, but the origin of
12 the phrase "tapeout" is what?
13      A. I think it dates back -- My recollection is it dates
14 to the magnetic tape that was produced, say, at the output of
15 one of those machines when somebody had a magnetic tape in
16 their hand and they passed it to the next stage in the
17 manufacturing process.
18      Q. And why were -- why were they putting it on a
19 magnetic tape? What was the rationale for putting it on a
20 magnetic tape?
21      A. To move it to the next facility that was going to be
22 doing the manufacturing.
23      Q. So, generally, Step G would have been performed at a
24 different facility than the earlier steps. Is that correct?
25      A. It could have all --

22 (Pages 82 to 85)

Page 86

1    MS. ALLEN: Objection; foundation.
2    A.  It could have all been in the same company, but it
3  would take -- they'd refer to that like maybe as a mask shop
4  would be the place where the photographic processes were done
5  to make what they radicals.  The images that were produced at
6  that time were on glass.  You would go -- It's very much like
7  you would go into a photographic darkroom to make a print.  So
8  you had to -- But I think that same concept is applicable,
9  really, in a sense between any of these steps.
10    Q.  Well, is it called -- I mean, what -- is it being
11  called tapeout because I'm taping it out, or how does -- where
12  does the "out" part come from?
13    A.  I just think it was an output.  They produced the
14  tape as an output at that stage of the process.  But I
15  think -- my experience is that you had tapes if one were far
16  enough back in the magnetic tape domain, as opposed to, say,
17  transmitting it through the Internet or something today, that
18  you would produce representations that could have been
19  represented on a magnetic tape or floppy disks or something
20  between any of these steps.
21    Q.  That was --
22    A.  Computer readable representations could have been
23  produced.
24    Q.  And I take it that was, in part, sort of part of the
25  purpose of the work that you're doing at MIC, to have these

Page 87

1  interfaces with -- in different points in the design process.
2  Is that correct?
3    A.  MCC.
4    Q.  I'm sorry.
5    A.  No, no problem.  MIC is another one.  I have no
6  problem with that.
7        Yes.  We were trying to come up with
8  standardized representations and databases that could store
9  and allow easy retrieval of those representations so that
10  those sequence of representations could be passed from tool to
11  tool in a way that you didn't have to go in and write a lot of
12  data reorganization software, which had been the prior art.
13        In those days, each tool often had its own
14  input and output format, and it would be incompatible with
15  another tool from another vendor.  So if you took the output
16  representation from one vendor, you had to go through a rework
17  process to convert it.
18        MS. ALLEN: Can we go off the record for one
19  second.
20        MR. KELLEY:  Sure.
21        (RECESS TAKEN)
22        MR. KELLEY:  Back on the record.
23    Q.  (Mr. Kelley continuing) Have you ever seen -- Have
24  you ever heard anyone use the term "tapeout" to describe any
25  of these -- you know, either the passage of data from one step

Page 88

1  to another in Steps A through -- between Steps A through F?
2    A.  No.
3    Q.  So there was a similar concept that could be -- that
4  worked, but that term wasn't applied?
5    A.  The simple answer is that term -- No.  That was my
6  answer.  No, I haven't heard of it.
7    Q.  Okay.  I'll take it.
8        Have you ever worked in an area that touched on
9  artificial intelligence or expert systems?
10    A.  Yes.
11    Q.  What was -- what was that?
12    A.  Well, MCC was a hotbed of that technology from the
13  time I went all of the way through.  And the last three years
14  that I was there, I managed a group that was focused on expert
15  systems and neural maps and those kinds of AI technologies in
16  various business applications.  And when I -- I was working
17  at -- earlier in the '80s up through the early '90s, we
18  attempted to use some expert system technology to control
19  sequencing through tools as a part of the -- that methodology
20  management effort I was working on.
21    Q.  What was the application of the later work?
22    A.  There were lots of applications:  Fraud detection on
23  the use of like Visa cards; image detection like medical
24  imaging; data mining, recognizing data relationships in large
25  databases; transformation of Legacy databases to more modern

Page 89

1  formats; just general knowledge capture.
2        That's about the only things that I can recall.
3  I'm sure there were some other applications that the people
4  that were working under me were working on focus applications
5  with those basic -- those basic technologies.
6    Q.  Was any of that work related to CAD?
7    A.  The earlier work that I mentioned of attempting to
8  use expert -- the technology and methodology management was.
9        I'm trying to think if the later work would
10  have been.  I think by that time, the CAD program had pretty
11  well -- the computer-aided design program had pretty well come
12  to an end.  That's one of the reasons that I was over managing
13  the AI group.  So I doubt if that had any direct relationship.
14    Q.  Well, back in the earlier work when you were working
15  with CAD and stuff, what kind of -- you know, what element of
16  the program was -- involved artificial intelligence or expert
17  systems?
18    A.  I don't understand.
19    Q.  Yeah.  That's too general of a question.
20        Were you using a commercial expert system tool?
21    A.  You know, I've thought of that.  I think we looked
22  at some commercial tools, and I'm not -- I don't even remember
23  the names of them.  But I think we basically took an inference
24  engine that had been developed in a different part of MCC and
25  used it to -- it and some support technologies to capture and

23 (Pages 86 to 89)

V. THOMAS RHYNE * April 14, 2004

Page 90

1  run the rules that we were trying to exercise.
2      Q.  Okay.  And what is an inference engine?
3      A.  Well, I think it's something that runs rules,
4  that -- it evaluates expert rules.
5      Q.  And what are rules?
6      A.  Well --
7          MS. ALLEN:  Objection.  It's overly broad.  Go
8  ahead.
9      A.  Well, again, I haven't addressed any kind of expert
10  system context in my Declaration, and so I'm going to give you
11  an answer that's totally outside of the context of the
12  '432 patent.
13     Q.  Sure.
14     A.  Those are commonly some way of making, typically, an
15  "if then" statement that some expert in a domain would
16  understand and expressing that expert knowledge as a logical
17  relationship.
18     Q.  Okay.  Is one of the functions of the inference
19  engine to determine what rules to -- to evaluate or to apply?
20         MS. ALLEN:  Again, objection.  It's overly
21  broad and outside the context of the Declaration --
22     A.  I can't give you --
23         MS. ALLEN:  -- outside the scope.
24     A.  I can't give you a definite answer.  I think that
25  there are ways of writing the rules such that one rule can

Page 91

1  control the invocation of another rule.  Sometimes that could
2  be within the scope of what the inference engine does, and
3  sometimes it wouldn't be.  That's how I would characterize
4  rules.
5      Q.  What does the inference engine do other than
6  identifying rules and applying rules?
7          MS. ALLEN:  Again, objection.  It's outside the
8  scope of the Declaration and overly broad.
9      A.  It just runs the rules and identifies the
10  consequences that would -- against some current state, and it
11  identifies the consequences of running those rules, and
12  whatever those outputs from that are have to be implemented.
13     Q.  Okay.  The question that got us into this was
14  whether you had used artificial intelligence or expert systems
15  in your work, and we've talked now about expert systems.
16         Was there some other thing that might fall
17  within the rubric of artificial intelligence other than expert
18  systems that you have worked with?
19     A.  In a CAD context?
20     Q.  Yes.
21         MS. ALLEN:  Again, it's outside the scope of
22  the Declaration and overly broad.
23     A.  I think the program may have been using some of that
24  technology in some of their synthesis work, but I wasn't
25  directly personally involved in either managing or

Page 92

1  contributing to that.  So the answer is I don't have any
2  personal experience at MCC in that other than the methodology
3  management that I referred to earlier that I recall.
4      Q.  Who worked up the first draft of your Declaration,
5  Rhyne 1?
6      A.  In terms of actually having it first typed, someone
7  at Ms. Allen's law firm did.  But it was based on some
8  telephone conversations where I essentially narrated to them
9  the steps that are shown in Paragraph 10.  And in terms of the
10  front information, I think that they took that, with some
11  verbal modifications that I made during that phone call, from
12  a previous report that I have done in another case.
13     Q.  With regard to Paragraph 10, Steps A through G, did
14  you break them down in this manner --
15     A.  Yes.
16     Q.  -- as "A" through "G" in this phone call?
17     A.  Yes, I did.  I essentially dictated those steps to
18  them.
19     Q.  Is there any reason that you didn't put in Step H at
20  the time?
21     A.  As --
22         MS. ALLEN:  Objection to the whole mythical --
23  objection to the whole -- objection to foundation, I guess.
24     A.  I understand the objection.
25         By Step H, you're referring to the final stages

Page 93

1  that would be done with the silicon.  No.  I think I told you
2  earlier I just stopped at the point where the masks were
3  available.  There's no particular reason.
4      Q.  So there was no particular reason why you stopped?
5      A.  I don't think so.  That's just what I said I thought
6  were the essential steps.  And you pointed out to me, and I
7  agree with you, that it's certainly essential at the last part
8  of the process to make one, but I just stopped there.
9      Q.  Was the fact that you stopped with the mask data in
10  any way related to the fact that the claims talked about mask
11  data?
12     A.  It may have been at the time, but I have no clear
13  recollection.  It's been months since I did this thing.  I
14  just thought when I went through it -- again, it's been months
15  since I've dealt with the claims.  So I can't tell you for
16  sure that there's such a linkage, but I can't deny that that
17  might have been part of why.  I just don't remember.
18     Q.  Were you trying to match up "A" through "G" with
19  what was described in the subject matter of the patent and the
20  claims thereof?
21     A.  No.  I told you that earlier.  I really have not
22  looked at the patent.  So I think my recollection of the
23  patent, at the point that we were doing this in February, was
24  just in terms of its general applicability to the synthesis
25  process to make the chip, and that's about all that was.  I

24 (Pages 90 to 93)

V. THOMAS RHYNE * April 14, 2004

Page 94

1 did not go back and review claims within the patent to try to
2 match them at all.
3       MR. KELLEY: Okay. Why don't we take a brief
4 break.
5       THE WITNESS: Okay.
6       (RECESS TAKEN)
7    Q. (Mr. Kelley continuing) Okay. So getting back to
8 the Declaration, and I apologize if this -- I think this is a
9 little bit different than what we talked about before, but I
10 just want to make sure I understand.
11       In terms of these Steps 10(A) through (G),
12 you're identifying, as you say, process steps that are an
13 essential part of the manufacture of ASIC products.
14       Is there anything that one might characterize
15 as design that falls after describing a series of the
16 functions that are to be performed by the desired ASIC product
17 manufactured that wouldn't be -- using your definition of
18 "manufacturing" that you used here, wouldn't be appropriately
19 also characterized as manufacturing?
20       MS. ALLEN: Objection; ambiguous.
21    A. I can't parse that statement.
22    Q. Okay. Let's break it down. I'm paraphrasing, but I
23 think what you had said was that there was a lot of overlap
24 between design and manufacturing, as you understood the terms
25 and as you used them in your Declaration. Is that -- is that

Page 95

1 correct?
2       MS. ALLEN: Objection --
3    A. That's not really correct, no.
4    Q. Okay. Did you draw any distinction between design
5 and manufacturing when you wrote this Declaration?
6    A. Every one of these steps, as I say in Paragraph 10's
7 preamble, are an essential part of the manufacturing process.
8 They're all manufacturing steps.
9    Q. Okay.
10    A. Now, you took me outside the context of this
11 statement and said, "Well, you know, don't people refer to
12 some of these stages as design," and I didn't disagree with
13 you.
14    Q. Is there anything that -- that you're aware of --
15 Well, let me back -- try that question again.
16       Step A, I think, related to describing in some
17 manner -- either using HDL or a spec or timing diagrams or
18 something like that, describing the circuit to be designed in
19 sufficient detail. Is that one? We specified its basic
20 operation. Is that correct?
21    A. You said "circuit." I would prefer to say "ASIC,"
22 because circuit falls -- but the product, yes, that -- that
23 is -- that's what I consider to be an essential first step.
24 You have to --
25    Q. And once --

Page 96

1    A. -- describe what it's going to do.
2    Q. Once you've done that first step, is there anything
3 that one might -- that folks might characterize as design that
4 you wouldn't also say properly is included within the term
5 "manufacturing"?
6       MS. ALLEN: Objection; vague.
7    A. Again, I don't understand. All of these terms --
8 all of these steps and terms, if you want to call them terms,
9 fall within the terminology of manufacturing.
10    Q. The question I'm trying to get at is, setting aside
11 these terms, is there something else that one might do after
12 one has done Step A that would be characterized as design but
13 not manufacturing?
14       MS. ALLEN: Objection; overly broad, vague,
15 ambiguous.
16    A. You know, some day, Mr. Kelley, I hope we get an
17 opportunity for you to explain to me what your real questions
18 are here, because I've got tell you, as one of pretty good
19 level of skill in this art, I don't even understand how to --
20 how to make this distinction. As clearly I've explained it to
21 you, all I can do is restate it.
22       Every one of these steps are essential parts of
23 the manufacture of the ASIC product. Some of them are
24 commonly outside of that concept referred to as the design
25 stages, but all of them are essential parts to manufacture the

Page 97

1 product. So all of them can be called manufacturing, and
2 there's design associated with every one of them. So I don't
3 know --
4    Q. Okay. But --
5    A. -- how to make that distinction.
6    Q. The question I'm trying to get at is are there
7 things that could be called design that take place after
8 Step A that you haven't mentioned here?
9    A. You asked me earlier --
10       MS. ALLEN: Objection; vague and ambiguous,
11 overly broad.
12    A. You asked me earlier would -- you know, was this a
13 complete list of every essential step, were there other steps.
14 There may be. As I told you, I -- if you want to name
15 something, and you tried two or three things on me like going
16 out and buying the computers and -- so I can't give you an
17 answer to that abstractly. There may be something.
18       But if it's essential as a step to eventually
19 end up with the physical ASIC, then I think it's part of the
20 manufacture. Whether you refer to that as also being
21 something that could be characterized as design, it may be. I
22 don't know.
23       These are the steps that came to mind when I
24 was asked to list essential steps, and these are the ones that
25 I have in mind. I don't have any others that I've held back.

25 (Pages 94 to 97)

V. THOMAS RHYNE * April 14, 2004

Page 98

1    Q.   Now, I think you -- I take it, then, that there is
2    no step that's essential to a design that wouldn't also be
3    essential to the manufacture of the ASIC.  Is that correct?
4         MS. ALLEN:  Objection; foundation, and it
5    misstates prior testimony and is compound.
6    A.   I think they just go hand-in-hand.  Okay.  You have
7    to design it as part of the manufacture process.  And so
8    the -- in the context of the question I was asked, what are
9    the steps -- the process steps that are an essential part of
10   the manufacturing of an ASIC, these are steps that are both
11   design and manufacturing, but they're all essential.  You
12   can't -- you can't leave one of these out and end up with an
13   appropriate product at the end.
14   Q.   Okay.  So that sounded like a "yes," that there
15   is -- that if anything is an essential design step, it's also
16   an essential manufacturing step?
17   A.   I haven't addressed the question of what is an
18   essential design step whatsoever.  I have no -- you've not
19   asked -- you haven't used that -- that phrase, to the best of
20   my knowledge, today.  So I -- And the Declaration doesn't deal
21   with whatever one might consider to be an essential design
22   step.  It deals only with an essential part of the
23   manufacturing.
24   Q.   But are you aware, sitting here today, of anything
25   that might be required as a design step that you wouldn't also

Page 99

1    include as a manufacturing step?
2    A.   Not --
3         MS. ALLEN:  Objection; vague.  It's, I think,
4    outside the scope of the Declaration.
5    A.   With -- within any of these steps, there's really
6    substeps.  I haven't attempted to lay out all of the process
7    of logic synthesis or all of the process that one would go
8    through in selecting components in the desired technology at
9    this time.
10        So there are aspects of doing the steps shown
11   in Paragraph 10 that are not specifically identified; but in
12   terms of rolling them up into the top level, I think I've got
13   everything here that -- that I think of when I was asked to
14   lay out the essential steps in the manufacture.
15   Q.   Understood.  So I'm -- but I'm not getting at the
16   question of whether -- you know, how much detail there is and
17   is there more detail.  Obviously, one can provide more detail.
18        What I'm asking you is there something --
19   sitting here today, are you aware of something that you would
20   call an essential design step but say that's not part of the
21   manufacture?
22   A.   No.  I'd have to -- but I'd be far more comfortable
23   in giving you an answer if I was offered a candidate as to
24   what that might be.  It's kind of like when you asked me
25   earlier could I provide you any references to books.  It's a

Page 100

1    case of where I haven't thought about what one might try to
2    identify.  I feel that this is a complete and sufficient list.
3    I think it's right.  I don't think it's in error.
4    Q.   You're not aware -- We said that admittedly we could
5    add more detail to some of these things, but I'm not asking
6    you about detail.  You're not aware of a design step that's
7    not included in here that's essential?
8    A.   I think I've already answered that.  I don't -- I
9    don't have anything to add to this.  I think it's as complete
10   as I feel is appropriate for the purposes that it was
11   intended.
12   Q.   What is -- What is RTL?
13        MS. ALLEN:  Objection.  It's outside the scope
14   of the Declaration.
15   A.   It actually has two meanings, one that's not as
16   common any more, which was resistor transistor logic.
17   Q.   Right.
18   A.   But I think in this context, it's register transfer
19   logic.  It's one form of representing the structural -- the
20   structural design of a system.  It also could be done in a
21   language fashion.  That are some RTL description languages.
22   Q.   What distinguishes RTL from some other formats, some
23   other -- what's characteristic of an RTL description --
24        MS. ALLEN:  Objection --
25   Q.   -- of a design?

Page 101

1         MS. ALLEN:  Objection.  It's outside the scope
2    of the Declaration.  I think we're going to be getting into
3    attorney/client work product, and I'd have to -- to the extent
4    it's outside the Declaration and what the witness relied on to
5    prepare the Declaration, I think it's something he shouldn't
6    answer.
7         THE WITNESS:  Are you directing me not to
8    answer that question?
9         MS. ALLEN:  I mean, if there's something in
10   your Declaration that relies on that, fine.  I'm not trying to
11   keep that from Mr. Kelley.  But other than that --
12        MR. KELLEY:  Well, we talked about RTL earlier
13   in the testimony, what RTL is --
14        MS. ALLEN:  But to the extent his Declaration
15   didn't rely on that or his opinions in the Declaration don't
16   rely on the level of detail you're trying to get into, I think
17   it's attorney/client product -- excuse me, attorney/client
18   privilege or work product information.
19        MR. KELLEY:  RTL is attorney/client work
20   product?
21        MS. ALLEN:  I think trying to get his opinions
22   on it, to the extent they don't relate to the Declaration, is
23   going too far, yes.
24        MR. KELLEY:  I'm trying to ask him to define a
25   term he used.  I'm not going to argue with you anymore.  You

26 (Pages 98 to 101)

Page 102

1 either instruct him not to answer or you don't. It's your
2 call.
3          MS. ALLEN: Yes, I've instructed him not to
4 answer.
5     Q. Are you not —
6     A. I'll follow that instruction.
7     Q. Real quick, can you explain to me your understanding
8 of the term "RTL"?
9          MS. ALLEN: I have the same objection. I think
10 he's given an answer, and that's as far as I think is
11 appropriate to go.
12          THE WITNESS: So you're again directing me not
13 to answer that question?
14          MS. ALLEN: Yes. The answer you've already
15 given -- that you've already given is fine.
16          MR. KELLEY: He did not give me a definition of
17 RTL. He hasn't. So if you're not going let him answer that,
18 that's where we're going to be. I'm asking --
19          MS. ALLEN: That's where we are.
20          MR. KELLEY: Okay.
21     A. Now, I'm going to correct something. I did give you
22 a definition of it. The question you asked me was a different
23 question that had to do with what distinguished it from other
24 forms, and that's the question that she's directed me not to
25 answer. So your statement was incorrect.

Page 103

1     Q. I stand corrected. You are correct. I wanted you
2 to expand on the definition.
3     A. I understand, and I've been directed not to do it
4 and I won't.
5     Q. Okay. Can you tell me what cases you've worked on
6 since 2000?
7     A. Probably not. I can provide you that information.
8     Q. Why don't we do it that way.
9     A. I can make -- I can make a stab at it, but I doubt
10 if I will get them all.
11     Q. Why bother. I'd just like to get —
12          MS. ALLEN: I can give you his CV.
13          MR. KELLEY: Well, I want to know what he's
14 worked on in the last couple of years.
15     A. My CV will not provide you that information. But
16 I -- I have, as an example, a recent report -- a four-year
17 kind of report with that stuff in it. Unless her firm directs
18 me not to do it, I can certainly provide that to them and they
19 to you.
20     Q. That's what I'd like. I'd like to see that and a
21 copy of your most recent CV.
22     A. I wasn't aware that you had not been provided it.
23          MS. ALLEN: Well, we didn't have one, either,
24 in connection with this litigation so...
25          MR. KELLEY: I think that's it. I think we're

Page 104

1 done.
2          THE WITNESS: Thanks.
3          MS. ALLEN: I may have one or two questions,
4 but I just need a minute to think about it.
5          MR. KELLEY: Okay.
6          MS. ALLEN: Oh, also, are you okay with him
7 signing at home or wherever he is comfortable signing?
8          MR. KELLEY: Yes.
9                    EXAMINATION
10 BY MS. ALLEN:
11     Q. Dr. Rhyne, I'd like to point you to Rhyne 1, which
12 is your Declaration, Paragraph 10. It's Subparagraph D,
13 "Producing a description of the circuit components as well as
14 their respective connections in the form of a netlist."
15          Do you see that?
16     A. Yes.
17     Q. Would it be accurate to describe a netlist that is
18 output as a result of that step as a tapeout? Could a netlist
19 be described as a tapeout?
20          MR. KELLEY: Objection to the form of the
21 question.
22     A. As I told Mr. Kelley earlier, it could be; although,
23 I don't think that's a common use of the phrase "tapeout."
24 But if it was produced on tape and is the next step in the
25 process, it could be called tapeout.

Page 105

1     Q. Thank you.
2     A. Certainly, in a design reference, tape is usually a
3 computer readable form.
4          MS. ALLEN: No further questions.
5          MR. KELLEY: I have one.
6                    FURTHER EXAMINATION
7 BY MR. KELLEY:
8     Q. I just want to confirm that you've never heard
9 anyone use that term to refer to the output or Step D, have
10 you?
11     A. If I were an attorney, I would say "asked and
12 answered." But the answer is again -- and I'll make you
13 happy, Mr. Kelley, is I have not heard that term used as
14 tapeout at that stage.
15     Q. Thank you very much.
16     A. All right. Thanks.

27 (Pages 102 to 105)

Page 106

WITNESS' CORRECTIONS AND SIGNATURE

1

Please indicate changes on this sheet of paper,
2 giving the change, page number, line number and
reason for the change.  Please sign each page of the
3 changes.

The reason for making changes are:
4 (1)    To clarify the record;
(2)    To conform to the facts;
5 (3)    To correct transcription errors.
6 PAGE/LINE    CORRECTION    REASON FOR CHANGE

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____
17    I, V. THOMAS RHYNE, have read the foregoing deposition
and hereby affix my signature that same is true and correct,
18 except as noted above.
19    This _____ day of _____, 2004.
20

21         _____
         V. THOMAS RHYNE
22
23
24
25

Page 108

1         UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF CALIFORNIA
2           SAN FRANCISCO DIVISION
3 RICOH COMPANY, LTD.,      )Case No. CV 03-04669 MJJ (EMC)
     Plaintiff,     )
4                   )
  VS.               )
5                   )
  AEROFLEX, INCORPORATED, AMI  )
6 SEMICONDUCTOR, INC., MATROX  )
  ELECTRONIC SYSTEMS, LTD.,  )
7 MATROX GRAPHICS, INC.,     )
  MATROX INTERNATIONAL CORP.,  )
8 and MATROX TECH, INC.,     )
     Defendants.     )
9
10       REPORTER'S CERTIFICATE
  DEPOSITION OF V. THOMAS RHYNE
11 April 14, 2004
12
      I, Kathleen Casey Collins, Certified Shorthand Reporter
13 in and for the State of Texas, hereby certify to the
  following:
14
      That the witness, V. THOMAS RHYNE, was duly sworn by the
15 officer and that the transcript of the oral deposition is a
  true record of the testimony given by the witness;
16
      That the deposition transcript was submitted on _____,
17 2004, to the witness or the attorney for the witness for
  examination, signature and return to me by
18 _____, 2004;
19    That $_____ is the deposition officer's charges to the
  Defendants for preparing the original deposition transcript
20 and any copies of exhibits;
21    I further certify that I am neither counsel for,
  related to, nor employed by any of the parties or
22 attorneys in the action in which this proceeding was
  taken, and further that I am not financially or
23 otherwise interested in the outcome of the action.
24
25

Page 107

1 THE STATE OF _____ )
2 COUNTY OF _____ )
3
4     BEFORE ME, _____, on

  this day personally appeared V. THOMAS RHYNE,
5
  known to me (or proved to me under oath or through
6
7 _____) (description of
8 identity card or other document) to be the person
9 whose name is subscribed to the foregoing instrument
10 and acknowledge to me that they executed the same
11 for the purposes and consideration therein expressed.
12    Given under my hand and seal of office this
13 _____ day of _____, 2004.
14
15 _____
  NOTARY PUBLIC IN AND FOR
16
  STATE OF _____
17
18 My Commission Expires:
19 _____.
20
21
22
23
24
25

Page 109

1    Further certification requirements will be
  certified to after they have occurred.
2
3    Certified to by me this _____ day of April,
  2004.
4
5
6     KATHLEEN CASEY COLLINS
      Texas CSR NO. 2018
7     Expiration date: 12/31/04
      Ken Owen & Associates
8     Firm Certificate No. 115
      801 West Avenue
9     Austin, Texas  78701
      (512) 472-0880
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

28 (Pages 106 to 109)

V. THOMAS RHYNE * April 14, 2004

Page 110

1        FURTHER CERTIFICATION
2        The original deposition was/was not returned to
the deposition officer on _____;
3
         If returned, the attached Corrections and
4   Signature page contains any changes and the reasons
    therefor;
5
         If returned, the original deposition was
6   delivered to _____, Custodial
    Attorney;
7
         That $_____ is the deposition officer's
8   charges to the Defendants for preparing the original
    deposition transcript and any copies of exhibits;
9
         Certified to me this _____ day of
10  _____, 2004.
11
12
13                     _____
                       KATHLEEN CASEY COLLINS
14                     Texas CSR NO. 2018
                       Expiration date: 12/31/04
15                     Ken Owen & Associates
                       Firm Certificate No. 115
16                     801 West Avenue
                       Austin, Texas  78701
17                     (512) 472-0880
18
19
20
21
22
23
24
25

KEN OWEN & ASSOCIATES * 800-829-6936 * 512-472-0880 * kenowen@swbell.net

Gary M. Hoffman (*Pro Hac Vice*)
Kenneth W. Brothers(*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
  & OSHINSKY, LLP
2101 L Street, NW
Washington, DC  20037-1526
Phone (202) 785-9700
Fax (202) 887-0689

Edward A. Meilman (*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
  & OSHINSKY, LLP
1177 Avenue of the Americas
New York, New York  10036-2714
Phone (212) 835-1400
Fax (212) 997-9880

Jeffrey B. Demain, State Bar No. 126715
Jonathan Weissglass, State Bar No. 185008
ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
177 Post Street, Suite 300
San Francisco, California  94108
Phone (415) 421-7151
Fax (415) 362-8064

Attorneys for Ricoh Company, Ltd.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| RICOH COMPANY, LTD, <br><br> Plaintiff, <br><br> vs. <br><br><br> AEROFLEX, INC. ET AL. <br> Defendants. | Case No. C03-4669 (Judge Jenkins) <br><br><br> DECLARATION OF <br> TAKAMITSU YAMADA |

CASE NOS. C-03-4669 MJJ

DECLARATION OF TAKAMITSU YAMADA

Takamitsu Yamada declares as follows:

1.  My name is Takamitsu Yamada, and I am an Assistant Manager of Ricoh Company, Ltd ("Ricoh"). I am over the age of 21 and am competent to make this declaration. Based on my personal knowledge and information, I hereby declare to all the facts in this declaration.

2.  As an Assistant Manager, I am responsible for managing steps involved in the manufacture of Application Specification Integrated Circuits ("ASICs"). The specific steps that I am involved in and aware of begin with the development of written specifications describing such ASICs and extend through to the production of a netlist of hardware cells (and the interconnection requirements therefore) which perform the intended functions of the manufactured ASIC, the creation of mask works from the netlist, and the fabrication of the ASIC using the mask works.

3.  In my experience, a typical process used to manufacture an ASIC begins with the creation of a written specification describing the desired functions to be performed by the ASIC. Ricoh, for example, has written specifications for ASICs that Ricoh intends to sell to others. From the written specifications, circuit components (referred to as "hardware cells") and the interconnection requirements therefore are synthesized. The circuit components are selected so as to perform the functions and adhere to any limitations (referred to as "constraints") set forth in the written specifications.

4.  As part of the ASIC manufacturing process, the synthesized hardware cells can then be optimized to produce a more efficient ASIC design. A verification step may also be performed on the ASIC design to verify that this optimized design performs the same functions as the pre-optimized design. The selected hardware cells, including any

CASE NOS. C-03-4669 MJJ Page 1

DECLARATION OF TAKAMITSU YAMADA

optimized hardware cells, and the manner in which these cells are interconnected are provided in a netlist. Among the tools that Ricoh utilizes in carrying out this portion of the manufacturing process is the Synopsys Design Compiler Family of tools, HDL Compiler tools, VHDL Compiler tools, and the DesignWare/Building Block IP Family.

5. As the ASIC manufacturing process continues, the netlist is placed and routed. In other words, the netlist is fed into the next manufacturing tool for the layout (or placement) of the netlist hardware cells, one relative to another, in the ASIC. The paths of the interconnection requirements between these netlist cells are routed (e.g., the paths that the hardware cell interconnection requirements follow from one hardware cell to another is determined).

6. The inputted netlist, as placed and routed, is used in the next step in the manufacturing process to build a three-dimensional representation (referred to as a "mask"). In a further step in the manufacturing process, a prototype of the ASIC is fabricated according to the mask and tested. Once acceptable, the mask is utilized in the subsequent fabrication steps of the process of manufacturing the ASIC.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Signed at Kanagawa, Japan on February 6, 2004.

*Takamitsu Yamada*

Takamitsu Yamada

CASE NOS. C-03-4669 MJJ Page 2

DECLARATION OF TAKAMITSU YAMADA



Page 1

```
 1                 IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
 2                     SAN FRANCISCO DIVISION
       -------------------------------------------------------

 3
       RICOH COMPANY, LTD.,                )
 4                                         )
                   Plaintiff,              )
 5     v.                                  )  No. CO3-04669 MJJ (EMC)
                                           )
 6     AEROFLEX INCORPORATED, AMI          )
       SEMICONDUCTOR, INC., MATROX         )
 7     ELECTRONIC SYSTEMS, LTD., MATROX    )
       ELECTRONIC SYSTEMS, LTD., MATROX    )
 8     GRAPHICS, INC., MATROX              )
       INTERNATIONAL CORP. and MATROX      )
 9     TECH., INC.,                        )
                                           )
10                 Defendants.             )
                                           )
11     SYNOPSYS, INC.,                     )
                                           )
12                 Plaintiff,              )
                                           )  No. C03-2289 MJJ (EMC)
13     v.                                  )
                                           )
14     RICOH COMPANY, LTD.,                )
                                           )
15                 Defendant.              )
       -------------------------------------------------------
16            DEPOSITION UPON ORAL EXAMINATION OF
                          ERIK OLSON
17     -------------------------------------------------------
                         9:00 a.m.
18                    August 2, 2005
                 CLARION SEA-TAC AIRPORT HOTEL
19                  3000 South 176th Street
                 Seattle, Washington  98188
20
21            REPORTED BY:  Judith A. Robinson, CCR #2171
22

23

24

25
```

TRAVEL
TRANSCRIPT

Page 2

```
 1        A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF
     AND DEFENDANT,
 4   RICOH COMPANY, LTD.:   DEANNA ALLEN
                            DICKSTEIN SHAPIRO MORIN &
 5                          OSHINSKY
                            2101 L Street Northwest
 6                          Washington D.C.  20037
                            Phone  (202) 828-4821
 7                          Fax    (202) 887-0689
                            Email allend@dsmo.com
 8
 9                          MICHAEL WEINSTEIN
                            DICKSTEIN SHAPIRO MORIN &
10                          OSHINSKY
                            2101 L Street Northwest
11                          Washington D.C.  20037
                            Phone  (202) 828-4821
12                          Fax    (202) 887-0689
                            Email  WeinsteinM@dsmo.com
13   FOR THE PLAINTIFF,
     SYNOPSYS, INC.
14   AND THE WITNESS:       JACLYN C. FINK
                            HOWREY, LLP
15                          525 Market Street, Suite #3600
                            San Francisco, California  94105
16                          Phone  (415) 848-4916
                            Fax    (415) 848-4999
17                          Email  finkj@howrey.com
18
19
20
21
22
23
24
25
```

Page 3

```
 1   I N D E X
 2
 3   EXAMINATION BY:                PAGE
 4   Ms. Allen              4-52
 5
 6   EXHIBITS
 7   53 ........ The Declaration Of Erik Olson, Dated August 9,
     2005 ................................... 4
 8
     54 ....... An Email From Erik Oliver To Erik Olson, Dated
 9   June 9, 2005 ........................... 33
10   55 ...... An Email From Erik Oliver To Erik Olson, Dated
     June 14, 2005 ......................... 37
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1        SEATTLE, WASHINGTON; TUESDAY, AUGUST 2ND, 2005
              9:00 A.M.
 2              --oOo--
          (Whereupon, The Declaration Of Erik Olson,
 3   Dated August 9, 2005 was marked Exhibit-53 for
     identification.)
 4   ERIK OLSON,             witness herein, having
                             been duly sworn on oath
 5                           was examined and
                             testified as follows:
 6        E X A M I N A T I O N
     BY MS. ALLEN:
 7   Q.  Mr. Olson, can you please say and spell your name?
 8   A.  My name is Erik Olson; E-R-I-K, O-L-S-O-N.
 9   Q.  Can you state your address, please?
10   A.  Yeah.  4510 167th Avenue Southeast, Issaquah,
11   Washington.
12   Q.  Is that your home?
13   A.  Home address.
14   Q.  Can you state your work address?
15   A.  I have to look on my card but I can do that.
16   Q.  Can you just state the city?
17   A.  It's Bellevue, Washington.
18   Q.  Tell me about your post high school educational
19   background.  Where did you go to school?
20   A.  I went to the University of Minnesota on the
21   Duluth campus.
22   Q.  What did you study there?
23   A.  Computer science and engineering.
24   Q.  Did you receive degrees in either computer science
25   and computer engineering?
```

Page 5

```
 1   A.  Both.
 2   Q.  What kind of degree was it?
 3   A.  Bachelor of science degrees in both.
 4   Q.  When did you receive the bachelor of science in
 5   computer science?
 6   A.  Bachelor of science in computer science was 1988.
 7   Q.  What about computer engineering?
 8   A.  1988.
 9   Q.  Okay.  Was the bachelor of science the highest
10   degree you attained?
11   A.  That's correct.
12   Q.  Did you do any post-graduate study?
13   A.  No.
14   Q.  Mr. Olson, I want to talk about your work
15   experience.
16       Can you tell me what your current position is?
17   A.  I'm a director of physical implementation
18   engagements.
19   Q.  What does a director of physical implementation
20   engagements do?
21   A.  I manage a small team of tool experts to help
22   complete tool engagements for our sales team.
23   Q.  And who is your employer?
24   A.  My employer is Synopsys.
25   Q.  You said you manage a small team.  Is your
```

2 (Pages 2 to 5)

Deposition of:
Erik Olson

August 2, 2005

Page 6

1  position primarily managerial then?
2      A.  That's correct.  My position is management.
3      Q.  Can you say for me one more time what a director
4  of physical implementation engineering does?
5          MS. FINK:  Objection.  Asked and answered.
6  BY MS. ALLEN:
7      Q.  She can read back the answer.  It's up to you.
8      A.  I have a small team of engineers that run tool
9  engagements to help sell our tools.
10     Q.  And what kind of tools are those?
11     A.  What kind of tools do my team run specifically?
12     Q.  Yes.
13     A.  They run what's generally known as back end tools.
14  Specifically, they run Physical Compiler and Astro.
15     Q.  When you say, "tool engagements," what does, "tool
16  engagements" mean?
17     A.  Physical Compiler and Astro are commonly known as
18  some of our tools we sell.  When customers choose to look at
19  our tools and look to purchase they evaluate.  This is a
20  presales trial of our tools.
21     Q.  You said your role now is primary managerial.
22         Have you ever in your career performed hands-on as
23  your primary job function?
24     A.  Yes, I have.
25     Q.  Can you tell me about that?

Page 7

1      A.  The last time I was directly responsible for
2  hands-on tool engagements was 1997.
3      Q.  Was that in the same area that you're currently
4  managing?
5      A.  No.  It was not.
6      Q.  Okay.  What area was that?
7          MS. FINK:  Objection.  Vague and ambiguous as
8  to area.
9  BY MS. ALLEN:
10     Q.  Can you describe the work you were doing in 1997?
11     A.  In 1997, I was an application consultant,
12  supporting primarily the Design Compiler tool.
13     Q.  All of this was work done for Synopsys as well?
14     A.  That's correct.
15     Q.  Now, you mentioned that your current position is
16  located in Washington.  Is that near the Seattle area where
17  your current position is?
18     A.  My current position is in Bellevue, Washington.
19  That's near Seattle.  That's correct.
20     Q.  Is there a name for the facility located in
21  Bellevue?
22     A.  Commonly, it's known as The Summit.  If you like,
23  I can get my card in my briefcase and give you the address.
24  I'm sorry.  I don't have it memorized.
25     Q.  What is done at The Summit?  Are you comfortable

Page 8

1  with me calling it, "The Summit"?
2      A.  Sure.
3      Q.  What kind of work is done at The Summit?
4      A.  Do you mean Synopsys work in particular?
5      Q.  Yes.
6      A.  Synopsys has an office of about 15 people.  And
7  it's a mix of sales, support and a handful of R&D.
8      Q.  Does your position fall under sales, support or
9  R&D?
10     A.  My position is in the support organization.
11     Q.  Now, you mentioned that -- well, let me ask this:
12         Are there other companies -- is The Summit a
13  Synopsys facility or a general facility?
14     A.  We lease space in The Summit.
15     Q.  Now, the companies that lease space, are they
16  companies that you work with in your job function?  Or are
17  they --
18     A.  No.  There's no companies I work with, aside from
19  Synopsys that are also in this building.
20     Q.  So these would be unrelated.  I'm trying to figure
21  out if they're unrelated.
22     A.  They are unrelated.
23     Q.  Okay.  Now, the sales in R&D that's performed at
24  The Summit location, are those also within the physical
25  implementation engineering function or related to the

Page 9

1  physical implementation engineering function?
2          MS. FINK:  Objection.  Vague and ambiguous as
3  to "related."
4          THE WITNESS:  The sales operations in this
5  office sell the physical implementation tools, as well as
6  the rest of the Synopsys tool portfolio.
7  BY MS. ALLEN:
8      Q.  And by, "physical implementation tools," you're
9  referring to Physical Compiler tool and Astro; is that
10  correct?
11     A.  Yes.  That's generally correct.
12     Q.  Are there any other tools that you're referring to
13  then as physical implementation engineering?
14     A.  The only other tool that could be described as a
15  physical implementation tool would be JupiterXT.  It's also
16  known as JXT.
17     Q.  What is JupiterXT?
18     A.  JupiterXT is a design planning tool.
19     Q.  What is Astro?
20     A.  Place and route tool.
21     Q.  And Physical Compiler?
22     A.  Physical Compiler is a physical synthesis tool.
23     Q.  What do you mean by, "physical synthesis"?
24     A.  It combines synthesis mainly and specifically, in
25  this case, optimization and placement.

3 (Pages 6 to 9)

Deposition of:
Erik Olson

August 2, 2005

Page 10

1    Q.  I'm going to give you what has been premarked as
2  Exhibit 53 and a copy for Ms. Fink as well.  Yours is the
3  one with the label on it, Mr. Olson.
4       Do you recognize what has been marked as Exhibit
5  53?
6    A.  Yes.  I recognize this.
7    Q.  And can you tell me what this is?
8    A.  This is a declaration that I did as asked by my
9  company.
10    Q.  Okay.  And can you turn to page 2 of the
11  declaration, paragraph one, where you describe yourself as
12  director of applications consultant at Synopsys?
13       Now, is that the same as physical implementation
14  engineering?
15    A.  Physical implementation engineering is a group
16  within the applications consulting group.
17    Q.  Your position is limited to physical
18  implementation engineering or are you a director of the
19  overall consulting?
20    A.  My position is limited to the physical
21  implementation engagements.
22    Q.  Can you describe for me what other areas of
23  application consulting there are?
24    A.  Uh-huh.  The other areas of application consulting
25  are verification of engagements.  And there are regional

Page 11

1  managers and then the regional management structures
2  underneath those.
3    Q.  But it would all be related to either physical
4  implementation engineering and verification of --
5    A.  No.
6    Q.  Tell me what regional managers --
7    A.  The regional managers own a particular geographic
8  region.
9    Q.  And can you tell me what -- you say they own a
10  particular geographic region.  What does that mean?
11    A.  They are responsible for the support of customers
12  in that geographic region.
13    Q.  Is that for application consulting tools or other
14  tools as well?
15    A.  For all Synopsys tools.
16    Q.  Okay.  Are there -- so applications consulting is
17  -- let me ask it this way:
18       Physical implementation engineering is under the
19  umbrella of "Applications Consulting"?
20    A.  That's correct.
21    Q.  Now, is there any department or group under
22  "Physical Implementation Engineering"?
23    A.  No.  There's not.
24    Q.  Now, do you know if there's any department above
25  "Applications Consulting"?

Page 12

1    A.  Yes.  There are -- there is.  Applications
2  Consulting is part of a larger group called Worldwide
3  Application Services.
4    Q.  Can you describe for me what Worldwide Application
5  Services does?
6    A.  In simple terms, Worldwide Application Services is
7  responsible for the support of customers of the Synopsys
8  tools.
9    Q.  And again, that would be all Synopsys tools?
10    A.  That's correct.
11    Q.  Mr. Olson, are you familiar with the term, ASIC?
12    A.  The acronym, Application Specific Integrated
13  Circuit.
14    Q.  Can you tell me what an Application Specific
15  Integrated Circuit is?
16    A.  In general terms, an ASIC is a semi custom-
17  designed, silicon-based circuit to perform a specialized
18  function.
19    Q.  Are you familiar with the term, logic synthesis?
20    A.  I am familiar with that.
21    Q.  Can you tell me a general description of what that
22  means?
23    A.  It means 2 things.  It means translation from a
24  higher level language description and then optimization.
25    Q.  Are you familiar with computer-aided logic

Page 13

1  synthesis tools?
2       MS. FINK:  Objection.  Vague and ambiguous as
3  to what you mean by, "familiar with."
4       THE WITNESS:  I'd like you to define that
5  term, I guess.
6  BY MS. ALLEN:
7    Q.  Are you familiar with Design Compiler?
8    A.  Yes.
9    Q.  What about HDL Verilog?  V-E-R-I-L-O-G.
10    A.  I am familiar with HDL Compiler for Verilog.
11    Q.  What about VHDL Compiler?
12    A.  Yes.
13    Q.  These are all Synopsys tools?
14    A.  These are all Synopsys tools.  That's correct.
15    Q.  I believe you mentioned earlier, that you had at
16  least one job function that related to Design Compiler.  But
17  I'll ask the question:
18       Have you used Design Compiler in context with your
19  work for Synopsys?
20       MS. FINK:  Objection.  Vague and ambiguous as
21  to time.
22  BY MS. ALLEN:
23    Q.  At any time, from the time you started at
24  Synopsys?
25    A.  From 1991 to '97, I supported and used Design

Premier Litigation Service Bureau, Inc.
Tel: 215-938-6342    Fax: 215-938-6346

Page 14

1  Compiler.
2      Q.  How about HDL for Verilog?  Have you used that
3  tool?
4      A.  From 1991 to '97 I used that.
5      Q.  What about VHDL Compiler?
6      A.  Same time frame.
7      Q.  When did you start working with Synopsys?
8      A.  I was hired by Synopsys on August 12, 1991.
9      Q.  What did you do before you started at Synopsys?
10     A.  I was a design engineer at General Electric.
11     Q.  Can you describe what your job function as a
12  design engineer was at G.E.?
13     A.  At G.E., when I was a design engineer, I designed
14  hardware boards.  I also worked with ASICs and FPGAs.
15     Q.  Your work involve logic synthesis at that time?
16     A.  No, it did not.
17     Q.  Mr. Olson, in preparing your declaration Exhibit
18  53, did you review any documents?
19     A.  No.  I did not review any documents in preparing
20  my declaration.
21     Q.  Okay.  So are you aware of the patent that's at
22  issue in this case?
23     A.  I'm only aware of it through my attorney.
24     Q.  But you haven't read it or reviewed it?
25     A.  I have never seen the patent that's at stake here.

Page 15

1      Q.  And are you aware the Court gave a claim
2  construction?  In other words, an order giving definitions
3  of what some of the terms in the patent meant?
4      A.  I'm aware of the claim construction through my
5  attorney.
6      Q.  But you've never read the claim construction?
7      A.  I have never read the claim construction.
8      Q.  Okay.  Let's talk more about Exhibit 53.
9          I want to ask you a little bit about paragraph 4
10  where you describe back end design steps.
11         Your current position with Synopsys, is that
12  position related to back end design or something else?
13     A.  My current position is as a manager for a small
14  group of what could be termed as back end designers.
15     Q.  Okay.  Now, would you consider back end design to
16  be part of the logic synthesis?
17     A.  Back end design is a vague term.  But I do not
18  define that to be involved with logic synthesis.
19     Q.  Is that because it hosts the optimization phase?
20  I'm going back to your definition you gave of logic
21  synthesis.
22         MS. FINK:  Objection.  Mischaracterizes his
23  prior testimony.
24  BY MS. ALLEN:
25     Q.  I believe you previously testified that logic

Page 16

1  synthesis involves translation and optimization.  And if any
2  of that is not correct, just tell me what you mean or what
3  you intended.  And so my question to you is:
4          Is back end design then something that happens
5  after optimization?
6      A.  Back end design happens after logic synthesis.
7  Logic synthesis is translation, plus optimization.
8      Q.  Now then, looking at your -- your declaration,
9  Exhibit 53, paragraph 3 describes what you call front end
10  design.
11         Now, in a process flow, does front end design then
12  precede back end design?
13     A.  In a typical ASIC design flow, front end design
14  precedes back end design.
15     Q.  Can you describe for me then what front end design
16  is?
17     A.  Front end design is a somewhat vague term.
18  Typically, I understand it to mean to capture the
19  functionality required in the ASIC or the design
20  verification of that functionality and then logic synthesis
21  of that description.
22     Q.  Have you ever been responsible for front end
23  design in your professional career?
24     A.  The work I did at General Electric would generally
25  be considered front end design.  However, at that time we

Page 17

1  did not use logic synthesis and we created our descriptions
2  by hand.
3      Q.  So was it a manual front end design process?
4      A.  At that time, that was the front end process.
5  There was no such thing as logic synthesis.
6      Q.  What about any of your work for Synopsys?  Did
7  that involve front end design work?
8      A.  My job at Synopsys, from 1991 to '97, involved
9  supporting front end design but not actually doing front end
10  design.
11     Q.  When you say, "supporting front end design," tell
12  me what you mean.
13     A.  Synopsys is a provider of EDA tools who sells
14  these tools for customers.  They use them to do the job
15  tasks.  They supported them and aid them in getting the
16  design tasks done using the Synopsys tools.
17     Q.  Now, what is the output of the front end design
18  phase?
19     A.  What are -- so there are typically more than one
20  output of a front end design phase.
21     Q.  What are the outputs of a front end design phase?
22     A.  Typically, the outputs of a front end design phase
23  that I understand it, would be a gate level netlist,
24  potentially some test patterns, and timing requirements.
25  It's typically captured in what's known as an SDC file.

Deposition of:
Erik Olson

August 2, 2005

Page 18

1  Q. Do you know what is done with the test patterns on
2  the front end phase?
3       MS. FINK: Objection. Calls for speculation.
4  BY MS. ALLEN:
5  Q. Now, if you don't know, that's fine.
6  A. Typically, the test patterns are used when the
7  chip is to be tested or verified.
8  Q. Is that part of front end design or part of
9  another phase, the test org. verification of a chip? You
10  mean the actual ASIC, don't you?
11  A. I think you need to restate the question. I don't
12  understand.
13  Q. Let me just ask you this:
14       The testing and verification that you described,
15  is that part of the front end design phase or part of a
16  different phase?
17  A. As I understand, the testing and verification can
18  mean many different things. The testing of the -- the --
19  the design can involve verifying the functions correctly.
20  That's not really part of the design phase as such. It's
21  more of an analysis phase.
22  Q. What about the timing? Is that also part of an
23  analysis phase?
24  A. The timing requirements as captured in an SDC file
25  are used for both design phases or implementation phase as

Page 19

1  it's sometimes referred to and analysis.
2  Q. You mentioned a gate level netlist. Can you
3  describe what you mean by that?
4  A. I understand a gate level netlist is a description
5  of hardware components and their connection.
6  Q. I asked you about paragraph 5 of Exhibit 53, your
7  declaration. You gave a definition of a netlist where you
8  state:
9       "I understand that the Court has defined a netlist
10  as "a description of the hardware components (and their
11  interconnections) needed to manufacture the ASIC as used by
12  subsequent processes, e.g., mask development, foundry, etc."
13       Where did you get that understanding from?
14       MS. FINK: Objection, to the extent it calls
15  for attorney/client privilege information. So if you got
16  that information from one of your attorneys, then you should
17  not answer.
18       THE WITNESS: I guess that's privileged.
19       MS. ALLEN: Let me ask this:
20  Is Mr. Olson being offered as an expert witness?
21       MS. FINK: He's being offered as a fact
22  witness.
23       MS. ALLEN: Okay.
24  BY MS. ALLEN:
25  Q. Regarding paragraph 5, you did not review the

Page 20

1  Court's claim order to come up with that understanding. Is
2  that true?
3  A. I did not.
4  Q. Okay. I'm going to ask you about your familiarity
5  with libraries that are used with Synopsys, logic Synopsys
6  tools.
7       Are you familiar with the term, "technology
8  library"?
9       MS. FINK: Objection. Vague and ambiguous as
10  to what you mean by, "familiar with."
11  BY MS. ALLEN:
12  Q. Have you ever heard of the term, "technology
13  library"?
14  A. I have heard of the term, "technology library" in
15  context with the Synopsys Design Compiler.
16  Q. Do you know what a technology library is? If you
17  don't, I'm not asking you to guess. I'm just asking if you
18  know?
19  A. I understand your question. In terms of Synopsys
20  Design Compilers, specifically, a technology library is a
21  description of the functionality and timing of a library set
22  from a particular foundry and/or ASIC vendor.
23  Q. Did you say, from a particular foundry or ASIC
24  vendor? Does a foundry or ASIC vendor supply the ASIC
25  library?

Page 21

1  A. Yes. A foundry or ASIC supplier would supply that
2  technology library for logic synthesis.
3  Q. You mentioned you had heard the term in context
4  with Design Compiler. Does Design Compiler use technology
5  libraries?
6  A. Design Compiler uses a format commonly known as
7  Liberty, to describe technology libraries that are used then
8  in the logic synthesis step with Design Compiler.
9  Q. Do you have any understanding of how a Design
10  Compiler uses technology libraries in --
11       MS. FINK: I'm going to object to this whole
12  line of questioning as exceeding the scope of his
13  declaration.
14       THE WITNESS: I'm not an expert. I do not
15  understand exactly how this works.
16  BY MS. ALLEN:
17  Q. Okay. Do you understand why technology libraries
18  is needed during the logic synthesis phase?
19       MS. FINK: Same objection.
20       THE WITNESS: Logic synthesis is translation,
21  plus optimization. The library is the final result that is
22  optimized and the output from it.
23  BY MS. ALLEN:
24  Q. When you say, "it's the final result and it's
25  optimized in output," what do you mean by "output"?

6 (Pages 18 to 21)

Deposition of:
Erik Olson

August 2, 2005

Page 22

1    A.  I'm sorry.  I wasn't complete in my answer then.
2    From the Design Compiler tool operation, the output is
3    typically a gate level netlist comprised of the hardware
4    components from that technology library, plus the method for
5    their interconnection.
6    **Q.  Now, the netlist that is output that you just**
7    **described, is that the same netlist that you refer to in**
8    **Exhibit 53 as part of the front end designs at paragraph 3**
9    **subsection 4, "Synthesis of the Description Into a Netlist"?**
10    A.  Can you repeat that question?
11    **Q.  Sure.  At paragraph 3, section 4, you also**
12    **describe a netlist there.**
13    **Is that the -- the netlist you described -- is the**
14    **netlist you described as being output from the Design**
15    **Compiler, is that the same netlist that you're describing at**
16    **paragraph 3 subpart 4, the netlist, the synthesis of the**
17    **description into the netlist?**
18    MS. FINK:  Objection.  Vague and ambiguous.
19    THE WITNESS:  As I understand the question,
20    what -- what you're asking is, if what I described as the
21    output netlist from Design Compiler, if that's the same as
22    --
23    BY MS. ALLEN:
24    **Q.  The front end design netlist?**
25    A.  The front end section, 3, 4, that would be

Page 23

1    correct.  So Design Compiler specifically outputs in
2    netlist.  And in general terms, the front end design logic
3    synthesis would also output in netlist.
4    **Q.  Okay.  Now, this netlist that is output, is it**
5    **then fed into the back end phase of design that you describe**
6    **in your declaration?**
7    MS. FINK:  Objection.  Calls for speculation.
8    He doesn't know what the customers necessarily do with it.
9    BY MS. ALLEN:
10    **Q.  I'm not referring to a particular customer.**
11    A.  Right.
12    **Q.  But the process flow that you're describing in**
13    **your declaration the back end design stats, does it receive**
14    **-- does the back end design phase receive a netlist?**
15    A.  In general terms in the process I described in my
16    declaration, the back end design phase generally starts with
17    a gate level netlist.  Typically, that's from a front end
18    phase.
19    **Q.  And what is the output of the back end design**
20    **phase that you describe in your declaration at paragraph 4?**
21    A.  As I describe in my declaration, the output of the
22    -- the general term back end design is mask data.
23    **Q.  And what is mask data?**
24    A.  As I understand it, mask data is used by the mask
25    generation machines to create photo mask.

Page 24

1    **Q.  Tell me what a photo mask is.**
2    A.  I'm not an expert on photo mask.  But as I
3    understand it, these are used in the silicon fabrication to
4    construct the various layers of the ASIC.
5    **Q.  Have you ever heard the word, "tape out," or**
6    **words, depending on how you spell it?**
7    A.  I have heard of the word or phrase, "tape out."
8    **Q.  Do you know what it is?**
9    A.  As I understand it, it's generally meant to be a
10    handout point from a design team.  Could be at any phase of
11    the design to the next section of the design or phase of the
12    design.
13    **Q.  So then, could a netlist be on a tape out or be**
14    **handed off as a tape out?**
15    A.  Typically, the phrase, "tape out" is meant to
16    signify when a design has completed a back end phase.
17    **Q.  So then would mask data be handed off in the form**
18    **of a tape out?**
19    A.  Typically, for a tape out, that is communication
20    of -- of geometric information mask data.  That could be
21    used to create mask data information.  Typically the format
22    is GDS2.
23    **Q.  It's typically in the form of GDS2.  Does it**
24    **typically contain mask data then?**
25    A.  As I understand the process, the GDS2 is then used

Page 25

1    by the -- the generators of the mask, what are called mask
2    shops, to create the mask themselves.
3    **Q.  Let me make sure I understand.  I'm not sure your**
4    **answer responds to the question.**
5    **The GDS2, does that represent the mask data that**
6    **--**
7    MS. FINK:  Objection.  Asked and answered.
8    THE WITNESS:  The GDS2 represents the
9    geometric description of the design.
10    BY MS. ALLEN:
11    **Q.  Well, let me then ask this:**
12    **The back end design phase, you indicated the**
13    **output of that was mask data?**
14    A.  The back end design phase typically ends with GDS2
15    and that is communicated to the people who are responsible
16    for making the mask.  It's not directly mask data.
17    **Q.  Is there any relationship between mask data and**
18    **GDS2?**
19    MS. FINK:  Objection.  Vague and ambiguous as
20    to, "any relationship."
21    THE WITNESS:  As I understand it, I'm not an
22    expert in that.  But the GDS2 is a process by the mask data
23    shops, if you will, into the mask data that's used to create
24    mask.
25    BY MS. ALLEN:

7 (Pages 22 to 25)

Deposition of:
Erik Olson

August 2, 2005

Page 26

1    Q.  So is it your understanding, that the GDS2 is
2  created before the mask data is generated or after?
3    A.  My understanding is, the GDS2 is created before
4  the mask data.
5    Q.  How is the mask data handed off from the back end
6  design phase?
7        MS. FINK:  Objection.  Calls for speculation.
8        THE WITNESS:  The mask data is not handed off
9  from the back end design phase.
10  BY MS. ALLEN:
11    Q.  What's the next thing that happens to the mask
12  data at the -- after it's generated?
13        After the mask data is generated, what is the next
14  thing that happens to it?
15    A.  After the mask data is generated, it's then used
16  to create the actual photo mask.
17    Q.  Let's take a look at 7G, which is page 5 of your
18  declaration.
19    A.  (Witness complies.)
20    Q.  Do you have any understanding of what equipment is
21  used to make the photo mask?
22    A.  I do not know specifically.
23    Q.  Okay.  Can you explain for me then what in your --
24  in your declaration, Exhibit 53, paragraph 7G, it describes
25  mask data preparation and it mentions used by electron beam

Page 27

1  machines to make the photo mask.
2    A.  That's my general understanding of how photo masks
3  are created.
4    Q.  By using an electron beam machine?
5    A.  My general understanding, is that's how the photo
6  masks are created, yes.
7    Q.  Now, do you have any understanding whether the
8  mask data is provided to the electron beam machine, in order
9  to make the photo mask?
10        MS. FINK:  Objection, "provided to."
11  BY MS. ALLEN:
12    Q.  Is it input into the electron beam machine?
13    A.  I don't know.
14    Q.  According to your declaration at paragraph 3, the
15  front end design phase generates a netlist.  Is that an
16  accurate representation?
17        MS. FINK:  Objection.  The document speaks
18  for itself.
19        THE WITNESS:  The front end -- as I
20  understand the front end design phase, one of the outputs
21  would be a netlist.
22  BY MS. ALLEN:
23    Q.  And that netlist is input to the back end design
24  phase?
25    A.  In general terms.  Again, the term, "back end

Page 28

1  design" is somewhat vague.
2    Q.  Just using your term in your declaration.
3    A.  Generally, the netlist is handed over and
4  communicated to the back end design team of the phase and
5  used for subsequent steps.
6    Q.  Okay.  And as a result of the back end design
7  phase, mask data is generated?
8    A.  That's not correct.
9    Q.  So in your declaration where it describes the back
10  end phase in the last step, there is generation of mask
11  data, can you explain?
12    A.  Yeah.  Let me clarify.  Typically, the output of
13  the back end design phase is what's -- it's a GDS2 file.
14  That contains geometric information on various layers that
15  are used.  That information is then communicated to another
16  phase of the design.  Sometimes it's in -- it could be
17  loosely grouped with the back end where the mask data is
18  created.
19    Q.  So the back end design phase generates output this
20  GDS2; is that correct?
21    A.  That is typically correct.
22    Q.  And after that, the mask data is generated?
23    A.  That is -- as I understand it, that's correct --
24    Q.  Okay.
25    A.  -- with some additional processing steps.

Page 29

1    Q.  Okay.  Now, you mentioned earlier in your
2  declaration at paragraph one, that you have been involved in
3  the design of ASIC since 1989.  You could go back and look
4  up in paragraph one.  I'm quoting from the third line,
5  beginning with the words, "Involved in the design of ASIC
6  since 1989."
7        Do you know whether in 1989, when you began being
8  involved in ASIC, in the design of ASIC, do you know if
9  people were using netlist to generate mask data or synthesis
10  flow that involved generation of a netlist, which was later
11  processed to generate mask data in the 1989 time frame?
12        MS. FINK:  Objection.  Vague and ambiguous
13  and may call for speculation.
14        THE WITNESS:  I think your question was --
15  there's 2 questions there.
16  BY MS. ALLEN:
17    Q.  I can break it up.
18    A.  Please.
19    Q.  In 1989, do you know if there were synthesis
20  process flows in which netlists were generated?
21        MS. FINK:  Objection.  Vague and ambiguous as
22  to, "synthesis process flows."
23  BY MS. ALLEN:
24    Q.  Do you not understand what I mean by, "synthesis
25  process flows"?

8 (Pages 26 to 29)

Deposition of:
Erik Olson

August 2, 2005

Page 30

1  A. My understanding in 1989, there were -- actually,
2  I don't know. I don't know.
3  Q. So you don't know whether in 1989 people were
4  generating that list as part of ASIC design processes?
5  A. Can you restate the question?
6  Q. Do you know whether in 1989, if people were
7  generating netlist as part of ASIC design?
8  A. In 1989, people were using netlist as part of the
9  ASIC design flow.
10  Q. Do you know whether in that 1989 time period,
11  whether netlists were used in the generation of mask data?
12  MS. FINK: Objection. Vague and ambiguous as
13  to, "used."
14  THE WITNESS: At that time?
15  BY MS. ALLEN:
16  Q. Do you not understand what I mean by "used"?
17  A. Netlist data can never be directly used to
18  generate mask data.
19  Q. In the process flow. In other words, in a person
20  designing an ASIC generating a netlist, the information in
21  the netlist, do you know if it could be passed onto the next
22  phase of the netlist, with the result being mask data
23  generated?
24  A. Yes. At that time ASICs were, of course using
25  masks to be created. And from a netlist standpoint people,

Page 31

1  you know, could use netlists and do much subsequent
2  processing to create the mask data prep.
3  Q. Okay.
4  A. That was one way of creating mask data
5  information.
6  Q. Okay. Let's come back to your declaration.
7  Now, in just walking through this, after you've
8  generated the mask data and it's handed off or passed on to
9  the next phase of the process, the back end design, based on
10  your testimony today, the output of that is generally GDS2?
11  A. The general -- in general terms, the output of
12  back end design is GDS2.
13  Q. And in a next phase mask data is generated?
14  A. As I understand it, mask data is generated
15  subsequent after a number of processing steps to the
16  creation of the GDS2.
17  Q. And then the mask data is used to make the photo
18  mask?
19  A. As I understand it, the mask data is used
20  potentially with some processing to make the photo mask.
21  Q. And the photo masks are used to build up the ASIC
22  layer-by-layer?
23  A. I'm not an expert in the actual manufacturing
24  phase. But my general understanding is, the photo masks are
25  used to create ASIC in the manufacturing phase.

Page 32

1  Q. I'm going to ask you a little bit about your
2  preparation for the deposition.
3  When were you -- when were you first contacted
4  regarding your declaration?
5  A. I'm not clear of the day. But it was either late
6  May or early June of this year I was contacted.
7  Q. Do you remember who contacted you?
8  MS. FINK: Objection, to the extent it calls
9  for any disclosure of attorney/client privileged
10  information. So any information communicated to you by
11  Counsel you shouldn't answer, in terms of who contacted you
12  at that time.
13  THE WITNESS: Let me see if I understand it.
14  MS. FINK: You can say who contacted you but
15  don't say what they said.
16  THE WITNESS: Thank you. I was contacted by
17  Erik Oliver.
18  BY MS. ALLEN:
19  Q. And Erik Oliver, can you tell me your
20  understanding of who he is?
21  A. He's in some part of the synthesis legal
22  department.
23  Q. Okay. I'm going to -- because I understand that
24  you're claiming privilege. I need to make my record so I
25  need to ask my questions. I'm not trying to sneak any

Page 33

1  questions in on you. I'm forewarning you. I'm going to ask
2  my questions.
3  Let me first have marked as the next exhibit.
4  We're up to Exhibit 54.
5  (Whereupon, An Email From Erik Oliver To Erik
6  Olson, Dated June 9, 2005 was marked Exhibit-54 for
7  identification.)
8  BY MS. ALLEN:
9  Q. Do you recognize Exhibit 54?
10  A. I recognize it.
11  Q. Can you tell me what it is, please?
12  A. Exhibit 54 is an Email from Erik Oliver to me.
13  Q. Can you tell me the subject matter of the Email?
14  MS. FINK: Objection. The document speaks
15  for itself.
16  THE WITNESS: The subject matter was a
17  coworking session that was intended to create this
18  declaration.
19  BY MS. ALLEN:
20  Q. Now, in the first line of the Email Mr. Oliver
21  states:
22  "Thanks for helping out with this project."
23  Can you tell me what, "this project" is?
24  A. As I understand what he meant by this phrase, he
25  meant this declaration.

Premier Litigation Service Bureau, Inc.
Tel: 215-938-6342    Fax: 215-938-6346

Deposition of:
Erik Olson

August 2, 2005

Page 34

1  Q. You say a coworking session. Can you tell me who
2  was involved in the coworking session?
3  A. The people involved in this session were myself,
4  Erik Oliver, and I believe it was Terry. It might have been
5  Jacky. Sorry.
6  Q. So either Terry Corbin or Jacky Fink?
7  A. And outside Counsel.
8  Q. When you say, "outside Counsel," are you referring
9  to Ms. Fink and Ms. Corbin?
10  A. I think it was Ms. Fink.
11  Q. Okay. When he states, "We will VNC into my
12  machine" and he gives what it looks like some sort of log-on
13  or pass information, can you tell me what that means?
14  A. VNC is a -- is a technology that allows one
15  computer user to see another computer user's desktop screen.
16  Q. So did you actually have had coworking session?
17  A. Yes. We had coworking session using VNC and a
18  conference call.
19  Q. And during this coworking session using VNC, were
20  you seeing what was going on on Mr. Oliver's machine or some
21  person's machine?
22  A. During the session, he was viewing Erik Oliver's
23  desktop screen and the work he was doing on that screen.
24  Q. Now, did this coworking session involve drafting
25  your declaration?

Page 35

1  A. This session involved creating the declaration.
2  Q. So you did not actually type up your declaration
3  yourself?
4  A. Erik Oliver typed up the declaration on his
5  machine. I told Erik what, you know what to type up and
6  what to say.
7  Q. So is the declaration all your words, or did some
8  that come from someone else? You can look at it.
9  A. Most of the declaration are my words verbatim.
10  Q. Can you tell me what parts are not your words
11  verbatim?
12  A. The parts I recognize as not my words verbatim are
13  paragraph 5, the Court description. That pertains to the
14  Court description. Again, I haven't seen any of the Court
15  documents.
16  Q. Okay.
17  A. But this is a standard term, no --
18  Q. When you say, "this is a standard term," do you
19  mean the definition?
20  A. Yes. I mean, standard definition for netlist.
21  Q. Okay. Anything else you recognize as not your
22  words verbatim?
23  A. I don't recognize anything else in the declaration
24  there that are not my words verbatim.
25  Q. So you -- did you then dictate this declaration as

Page 36

1  it exists here today during this coworking session that's
2  described in Exhibit 54?
3  A. Yes. I generally dictated this declaration during
4  the coworking session.
5  Q. When you say, "generally dictated," what do you
6  mean by "generally"?
7  A. During the coworking session, it was not -- it was
8  a discussion. Of course, this did not come out of my mouth
9  fully formed in this exact format.
10  Q. Okay. Let me ask this then:
11  Were there other meetings or sessions in which you
12  did provide the language here, "fully formed," to use your
13  term, as we see it here today?
14  A. I think what you're asking is, were there more
15  sessions that we revised or improved that?
16  Q. You can answer that.
17  A. I believe we had one subsequent meeting to review
18  the declaration one more time.
19  Q. You said most of these are your words verbatim?
20  A. Uh-huh.
21  Q. But then you said, you didn't dictate it to him.
22  These are not your words, "fully formed"?
23  A. Sure.
24  Q. There's a disconnect for me there. If these were
25  your words verbatim, tell me what that means.

Page 37

1  Do you mean you told him what to say and he typed
2  it up? Or did you give him general topics and he flushed
3  out language for you?
4  A. The working process for creating this declaration
5  was, I gave him the general topics. We discussed what I
6  meant by that. He asked clarifying questions. And then I
7  provided and clarified the words in the sentences, the
8  information.
9  Q. So the result of the coworking session that's
10  described in Exhibit 54, at some point did you review a
11  declaration that resulted from that coworking session?
12  A. I believe my recollection is that we did another
13  coworking session on Erik's computer and reviewed the
14  declaration.
15  Q. Now, the declaration that you reviewed that is
16  part of that second coworking session on Erik's computer, is
17  it identical to the declaration that you have here or were
18  there changes made?
19  A. I -- I do not remember.
20  (Whereupon, An Email From Erik Oliver To Erik
21  Olson, Dated June 14, 2005 was marked Exhibit-55 for
22  identification.)
23  BY MS. ALLEN:
24  Q. Let's take a look at what has been marked Exhibit
25  55.

10 (Pages 34 to 37)

Deposition of:
Erik Olson

August 2, 2005

Page 38

1      **Do you recognize Exhibit 55?**
2      A.  I recognize Exhibit 55.
3      **Q.  Can you tell me what it is?**
4      A.  It's an Email from Erik Oliver to Jacky and Terry
5   and a courtesy copy to me.
6      **Q.  Can you tell me what the subject matter of Exhibit**
7   **55 is?**
8           MS. FINK:  Objection.  The document speaks
9   for itself.
10          THE WITNESS:  The Email on Exhibit 55 states
11  that Erik Olson is pasting and getting a final declaration
12  signed.
13  BY MS. ALLEN:
14     **Q.  And the last paragraph is the one-sentence**
15  **paragraph in Exhibit 55 and begins with the words,**
16  **"ERIK OLSON."**
17          **Was that a message to you?**
18          MS. FINK:  Objection, speculation.  The
19  document speaks for itself.
20  BY MS. ALLEN:
21     **Q.  Did you understand that to be a message to you?**
22     A.  Yes.
23     **Q.  Can you tell me what you understood that message**
24  **to be?**
25     A.  I understood from reading this Email that the

Page 39

1   team, I'm not sure who the team was, that we made some small
2   changes since our -- since we had talked, I assume the first
3   time in doing this coworking section.  They would then send
4   me the final version of the declaration on that date.
5      **Q.  How many of those coworking sessions were you**
6   **involved in?**
7      A.  My recollection is not perfect.  I remember the
8   first one we spent a long time working on this declaration.
9   We might have done one more.  But my recollection is not
10  clear on that.
11     **Q.  So does that mean at least 1, possibly 2?**
12     A.  It means for sure 1 and possibly 2.
13     **Q.  And that first coworking section, do you recall**
14  **whether or not any of the language that we see here today in**
15  **your current declaration was drafted then during that**
16  **session?**
17     A.  If I understand your question correctly, what
18  you're asking was, is any of the language that is in the
19  declaration drafted on that first meeting?  Is that correct?
20     **Q.  Uh-huh.**
21     A.  Yes.
22     **Q.  Yes.  We both answered that at the same time.  Yes**
23  **to your question to me and you say yes.**
24          **Now, was it the declaration as we see it here?  Or**
25  **was it a draft form of the declaration that was drafted that**

Page 40

1   first?
2           MS. FINK:  Objection.  Vague and ambiguous as
3   to your description there.
4   BY MS. ALLEN:
5      **Q.  I'm just trying to clarify what was drafted during**
6   **that first coworking session.  It's not that final**
7   **declaration we see here; is that correct?**
8           MS. FINK:  Objection.  Mischaracterizes his
9   prior testimony.
10          THE WITNESS:  We did in the first coworking
11  session the majority of the language that's captured in this
12  declaration.
13  BY MS. ALLEN:
14     **Q.  Do you recall what was not captured during that**
15  **first coworking section?**
16     A.  In terms of exact words, I do not recall.  In
17  terms of general ideas, everything that was in that first
18  working draft is in this or first coworking session, I
19  should say, is in this declaration.
20          MS. FINK:  Could we take a break?
21          MS. ALLEN:  Sure.
22          (Off the record.)
23  BY MS. ALLEN:
24     **Q.  A little earlier, Mr. Olson, we discussed you**
25  **providing the address of the Synopsys facility where you're**

Page 41

1   **currently employed.  Can you give us that address now?**
2      A.  Yes, I can.  The address is, 10885 Northeast
3   Fourth Street, Suite #200, Bellevue, Washington 98104.
4      **Q.  Can I ask you, do you know why that facility is**
5   **located in Washington versus near Synopsys headquarters in**
6   **Mountain View?**
7           MS. FINK:  Objection.  Calls for speculation.
8   I don't think he decided it should be there.
9           THE WITNESS:  Synopsys, like many other
10  software sales companies, has field sales offices near the
11  customers.  Primarily, this is a field sales office.
12  BY MS. ALLEN:
13     **Q.  Thank you.  Now, just before the break, we were**
14  **walking through the preparation of your declaration.**
15          **Take a step back for a moment to Exhibit 54, the**
16  **Email from Erik Oliver to you regarding helping with the**
17  **declaration project.**
18          **Was this Email your first communication regarding**
19  **providing the declaration or did you have one before?**
20     A.  Specifically providing the declaration, I believe
21  this is the first Email I have.  Although, I'd have to
22  review my records on that.  I did get a phone call from Erik
23  before he Emailed me.
24     **Q.  And did he tell you the nature of what he wanted**
25  **during that phone call?**

11 (Pages 38 to 41)

Deposition of:
Erik Olson

August 2, 2005

Page 42

1    MS. FINK: Objection, to the extent it calls
2  for attorney/client privileged information. So you can
3  answer yes or no.
4    THE WITNESS: Your question is, did he tell
5  me -- can you restate the question, please?
6  BY MS. ALLEN:
7    Q.  Well, let me ask you this:
8    What did he tell you during that phone call?
9    MS. FINK: Objection, to the extent it calls
10 for attorney/client privileged information. You should not
11 tell her what he said.
12    THE WITNESS: I guess that's privileged
13 information.
14 BY MS. ALLEN:
15    Q.  Can you tell me who participated in that first
16 phone call?
17    MS. FINK: Objection. Asked and answered.
18    THE WITNESS: The first phone call was just
19 myself and Erik Oliver.
20 BY MS. ALLEN:
21    Q.  Can you tell me when your next communication
22 regarding the declaration happened after the phone call?
23    A.  The first communication after the declaration
24 could working session.
25    Q.  Well the next communication after the phone call?

Page 43

1  In other words when was the next time you were contacted or
2  you contacted someone?
3    A.  I don't know.
4    Q.  Was there another communication after the phone
5  call? Was there another communication between the first
6  phone call and the Email that's Exhibit 54?
7    MS. FINK: Objection. Asked and answered.
8  He said he doesn't remember.
9    THE WITNESS: I don't remember any other
10 phone calls.
11 BY MS. ALLEN:
12    Q.  No other types of communication?
13    A.  The only other communication would have been
14 setting up the meeting.
15    Q.  Okay. And the meeting that's described in Exhibit
16 54, at this meeting you did not dictate the content of your
17 declaration. Is that true? I want to understand you?
18    MS. FINK: Objection asked and answered.
19    THE WITNESS: In this coworking social that I
20 had with Erik and Jacky, I did not type the declaration.
21 Erik was working within Microsoft Word and typing the
22 sentences as I stated the general flow that you see in the
23 declaration.
24 BY MS. ALLEN:
25    Q.  When you say as you stated, the general flow, did

Page 44

1  you state the sentences verbatim or general topics and Erik
2  typed the sentences?
3    A.  First, we went through the general steps that
4  would constitute ASIC design process in loose terms. Then
5  he divided that up into smaller steps. I think that would
6  roughly translate to the paragraphs that you see here. And
7  then we refined the sentences.
8    Q.  Who came up with the term, "front end design"?
9    A.  Who originally came up with that?
10    Q.  As it worked its way into the declaration?
11    A.  I don't remember. It's a very common term.
12    Q.  You don't remember if it was you or someone else?
13    A.  I don't remember if I introduced the term to the
14 conversation or if Erik or Jacky did.
15    Q.  Okay.
16    A.  It's a commonplace term.
17    Q.  What about the term, "back end design"? Do you
18 remember who introduced that term into the conversation?
19    A.  I do not remember who introduced that term into
20 the conversation.
21    Q.  During this first working session, did you take
22 any notes at all?
23    A.  I did not take any notes.
24    Q.  Do you have any knowledge if anyone else did?
25    A.  I have no knowledge of anyone else taking notes

Page 45

1  from this first working session.
2    Q.  Okay. Do you remember whether you had a
3  subsequent communication after this first working session?
4  Any form of communication regarding the declaration?
5    A.  In terms of communication, clearly yes. There's
6  an Email in Exhibit 55.
7    Q.  Was that the next communication you had after the
8  coworking session?
9    A.  I don't know if it was or not. I believe all the
10 subsequent communication was done primarily through Email
11 and all the Emails have been turned over. I would have to
12 refer to the Emails to give you an exact answer.
13    Q.  In Exhibit 55, the Email from Erik Oliver to you
14 discussed, "We've made small changes since we talked. We'll
15 get you the final sometime today."
16    You were not involved in the revisions or making
17 those small changes; is that correct?
18    A.  Again, my recollection isn't perfect on this. I
19 believe that I had a phone call with Erik regarding some
20 clarifications.
21    Q.  Do you know what small changes he's referring to?
22    A.  I don't know specifically what small changes he's
23 referring to.
24    Q.  Do you know whether or not you saw a draft of the
25 declaration before the small changes were made?

12 (Pages 42 to 45)

Page 46

1    A.  The way this document was created was primarily in
2  the first working session, coworking section, I think is
3  what we've been call it.  We did all the work within the
4  Microsoft Word environment.  After that was completed, you
5  know, that was the majority of the work done on the
6  declaration.
7    Q.  So the majority of the work was done on the
8  declaration?
9    A.  The majority of the work for the declaration or on
10  the declaration was completed at that time is my
11  recollection.
12    Q.  The first coworking session?
13    A.  Said another way, during the first coworking
14  session, we created -- I created the majority of what you
15  see in the declaration.
16    Q.  When you say, "you created," tell me what you
17  mean.
18    A.  I mean I dictated it.  When I say, "created," we
19  went through the general flow of this process.  We parsed it
20  up into different paragraphs and refined sentences to
21  clearly capture ideas.
22    Q.  And the sentences in the declaration, are those
23  your words or your general topics as Erik Oliver translated
24  into his words?
25      MS. FINK:  Objection.  Asked and answered

Page 47

1  already.
2      THE WITNESS:  The words in the document, I
3  would say the vast majority are my words.
4  BY MS. ALLEN:
5    Q.  Okay.
6    A.  Erik might have suggested a different word here or
7  there or corrected my grammar.
8    Q.  During this coworking session, were you ever --
9  strike that.
10      During this coworking session, did anyone ever
11  tell you what should be included in the declaration?
12      MS. FINK:  Objection, to the extent it calls
13  for attorney/client privileged information.  You can answer
14  yes or no.  That's all.  Or I don't know.
15      THE WITNESS:  I don't know.
16  BY MS. ALLEN:
17    Q.  In any of your communications, in addition to this
18  first coworking session, did anyone ever tell you what
19  should be included in the declaration?
20      MS. FINK:  Same objection.
21      THE WITNESS:  I don't know.
22  BY MS. ALLEN:
23    Q.  Okay.  During any of your communications regarding
24  your declaration, did you take any notes?
25    A.  I -- as I answered before, I took no notes during

Page 48

1  any of the communications.
2    Q.  Do you have any knowledge of anyone else taking
3  notes during any of the communications?
4    A.  I have no knowledge of anyone taking any notes
5  during the communications.
6    Q.  Okay.  Do you know if anyone other than you
7  reviewed the declaration after it was finalized?
8    A.  I have no knowledge of anyone else.  I don't know.
9    Q.  Do you have any knowledge of any drafts that are
10  not identical to the one you signed existing?
11    A.  No.
12    Q.  Are you aware of a company called, Aeroflex, Inc.?
13    A.  I am aware of Aeroflex.
14    Q.  Have you ever met or communicated with anyone
15  acting on behalf of Aeroflex, Inc., in connection with your
16  declaration?
17    A.  I have not met with anyone representing Aeroflex
18  under any circumstances.
19    Q.  Under no circumstances, declaration or otherwise?
20    A.  That's correct.
21    Q.  What about AMI Semiconductor?  Have you heard of
22  them?
23    A.  Yes.
24    Q.  Have you ever communicated with anyone acting on
25  behalf of AMI Semiconductor, in connection with your

Page 49

1  declaration?
2    A.  No.
3    Q.  In connection with anything related to this
4  litigation?
5    A.  No.
6    Q.  What about Matrox Electronic System?  Have you
7  ever heard of them?
8    A.  I have heard of Matrox.
9    Q.  There are a whole series of Matrox companies.  I
10  can go through each one of them.  But I'll tell you which
11  ones they are.  In addition to Matrox Electronics, there's
12  Matrox Graphics, Matrox International and Matrox Tech.
13      Do you group them under the umbrella, Matrox?
14    A.  I have heard of them grouped under Matrox.  I
15  haven't heard of each of these individual companies.
16    Q.  Have you ever heard of any discussions with anyone
17  representing any Matrox entity?
18    A.  No.
19    Q.  Regarding this declaration or otherwise?
20    A.  No.
21      MS. FINK:  Objection.  Asked and answered.
22  BY MS. ALLEN:
23    Q.  Did you study or review the ASIC processes or any
24  Matrox entity for your declaration?
25    A.  I did not.

13 (Pages 46 to 49)



Page 50

1    Q.   Did you study or review the ASIC design processes
2    of Aeroflex, Inc. in preparation for your declaration?
3    A.   I did not.
4    Q.   Did you study or review the ASIC design of AMI
5    Semiconductor in preparation for your declaration?
6    A.   I did not.
7    Q.   Have you had discussions with anyone other than
8    your attorneys regarding your declaration?
9    A.   Yes.
10   Q.   Can you tell me who that is or who those people
11   are?
12   A.   I discussed this -- the fact that I was doing this
13   declaration with my direct manager, Deidre Hanford.   We did
14   not discuss any of the content or anything around that.
15   Q.   Did Ms. Hanford review the declaration, to your
16   knowledge?
17   A.   She did not, to my knowledge, review the
18   declaration.
19   Q.   Was Ms. Hanford involved in the declaration, to
20   your knowledge?
21   A.   She was not involved in the declaration, to my
22   knowledge.
23   Q.   Did you discuss the declaration with anyone else,
24   other than Ms. Hanford and your attorneys?
25   A.   Not that I remember.

Page 51

1    Q.   And were your discussions with Ms. Hanford limited
2    to the fact that you were doing a declaration and that's no
3    content of the subject matter of the declaration?
4    MS. FINK:   Objection.   Asked and answered.
5    THE WITNESS:   That's correct.   I informed her
6    I was doing the declaration and we did not discuss the
7    content at all.
8    BY MS. ALLEN:
9    Q.   Did you tell her anything else about the
10   declaration, other than you were going to do one?
11   A.   Not about the declaration specifically, no.
12   Q.   How about anything else related to your work on
13   this declaration project?
14   A.   Not that I recall.
15   Q.   Did you consult any documents in preparation of
16   the declaration?
17   A.   I did not consult any documents in preparation for
18   this declaration.
19   Q.   Were any documents provided to you?
20   A.   No documents were provided to me for this
21   declaration.
22   Q.   Did you know if you received a subpoena in
23   connection with your papers here today?
24   A.   I did receive one.
25   Q.   Did you review the subpoena?

Page 52

1    A.   I glanced at the subpoena.
2    Q.   Did you understand the subpoena to be requesting
3    that you turn over any documents or things as listed in the
4    --
5    A.   I didn't understand that the subpoena was
6    requesting all documents related to this.
7    Q.   And you had none to provide?
8    A.   I had none to provide, except for the exhibit or
9    declaration, Exhibit 53.
10   MS. ALLEN:   Can we take a break for about 2
11   minutes?
12   (Off the record.)
13   BY MS. ALLEN:
14   Q.   Mr. Olson, when you said you communicated with
15   Ms. Hanford, how did that communication take place?   Was it
16   in person?
17   A.   Phone call.   We communicated via phone call.
18   MS. ALLEN:   I have no more questions for
19   Mr. Olson.   I think we have differences about attorney/
20   client privilege issues.   But I have no more questions at
21   this time.
22   THE WITNESS:   Okay.
23   (Whereupon, the deposition of Erik Olson was
24   concluded at 11:30 a.m.)
25

Page 53

1    S I G N A T U R E
2
3    I declare under penalty of perjury under the laws
     of the State of Washington that I have read my within
4    deposition.   And the same is true and accurate, save and
     except for changes and/or corrections, if any, as indicated
5    by me on the change sheet page hereof.
     Signed in ...................., Washington, on the
6    ............. Day of .............., 2005.
7
8    _____
     Erik Olson
9    Taken: August 2, 2005
10
11
12
13
14
15
16
17
18
19
20   Judith A. Robinson, CCR
21
22
23
24
25

Page 54

```
 1              C E R T I F I C A T E
 2   STATE OF WASHINGTON   )
     COUNTY OF KING        )  ss.
 3                         )
          I, Judith A. Robinson, Certified Court Reporter
 4   and an officer of the Court under my commission as a Notary
     Public for the State of Washington, hereby certify that the
 5   foregoing deposition upon oral examination of said witness
     was transcribed under my direction;
 6        That the witness was duly sworn by me to testify
     truthfully; that the transcript of the deposition is a full,
 7   true, and correct transcript to the best of my ability; that
     I am neither attorney for, nor a relative or employee of any
 8   of the parties to the action or any attorney or Counsel
     employed by the parties hereto, nor financially interested
 9   in its outcome.
          IN WITNESS WHEREOF, I have hereunto set my hand
10   and seal.

11        _____
          NOTARY PUBLIC in and for the
12        State of Washington, residing
          in Seattle.
13        My Commission expires November 4,
          2008, CCR License #2171.
14
15
16
17
18
19
20
21
22
23
24
25
```

Design Compiler User Guide

# Preface

This preface includes the following sections:

- What's New in This Release

- About This Manual

- Customer Support

E-mail your comments about Synopsys documentation to docs@synopsys.com

SP90378

vV-2003.12                                    Design Compiler User Guide

# 4

# Working With Libraries

This chapter presents basic library information. Design Compiler uses technology, symbol, and synthetic or DesignWare libraries to implement synthesis and to display synthesis results graphically. You must know how to carry out a few simple library commands so that Design Compiler uses the library data correctly.

This chapter contains the following sections:

- Selecting a Semiconductor Vendor

- Understanding the Library Requirements

- Specifying Libraries

- Loading Libraries

- Listing Libraries

- Reporting Library Contents

E-mail your comments about Synopsys documentation to docs@synopsys.com

SP90462

Design Compiler User Guide

- Specifying Library Objects

- Directing Library Cell Usage

- Removing Libraries From Memory

- Saving Libraries

E-mail your comments about Synopsys documentation to docs@synopsys.com

**SP90463**

Design Compiler User Guide

---

# Selecting a Semiconductor Vendor

One of the first things you must do when designing a chip is to select the semiconductor vendor and technology you want to use. Consider the following issues during the selection process:

- Maximum frequency of operation

- Physical restrictions

- Power restrictions

- Packaging restrictions

- Clock tree implementation

- Floorplanning

- Back-annotation support

- Design support for libraries, megacells, and RAMs

- Available cores

- Available test methods and scan styles

---

# Understanding the Library Requirements

Design Compiler uses these libraries:

- Technology libraries

- Symbol libraries

- DesignWare libraries

This section describes these libraries.

E-mail your comments about Synopsys documentation to docs@synopsys.com

SP90464

Design Compiler User Guide

## Technology Libraries

Technology libraries contain information about the characteristics and functions of each cell provided in a semiconductor vendor's library. Semiconductor vendors maintain and distribute the technology libraries.

Cell characteristics include information such as cell names, pin names, area, delay arcs, and pin loading. The technology library also defines the conditions that must be met for a functional design (for example, the maximum transition time for nets). These conditions are called design rule constraints.

In addition to cell information and design rule constraints, technology libraries specify the operating conditions and wire load models specific to that technology.

Design Compiler requires the technology libraries to be in .db format. In most cases, your semiconductor vendor provides you with .db formatted libraries. If you are provided with only library source code, see the Library Compiler documentation for information about generating technology libraries.

Design Compiler uses technology libraries for these purposes:

• Implementing the design function

The technology libraries that Design Compiler maps to during optimization are called target libraries. The target libraries contain the cells used to generate the netlist and definitions for the design's operating conditions.

E-mail your comments about Synopsys documentation to docs@synopsys.com

SP90465

The target libraries that are used to compile or translate a design become the local link libraries for the design. Design Compiler saves this information in the design's `local_link_library` attribute. For information about attributes, see "Working With Attributes" on page 5-51.

- Resolving cell references

    The technology libraries that Design Compiler uses to resolve cell references are called link libraries. In addition to technology libraries, link libraries can also include design files. The link libraries contain the descriptions of cells (library cells as well as subdesigns) in a mapped netlist.

    Link libraries include both local link libraries (`local_link_library` attribute) and system link libraries (`link_library` variable).

    For more information about resolving references, see "Linking Designs" on page 5-14.

- Calculating timing values and path delays

    The link libraries define the delay models that are used to calculate timing values and path delays. For information about the various delay models, see the Library Compiler documentation.

- Calculating power consumed

    For information about calculating power consumption, see the *Power Compiler Reference Manual*.

E-mail your comments about Synopsys documentation to docs@synopsys.com

SP90466

## Symbol Libraries

Symbol libraries contain definitions of the graphic symbols that represent library cells in the design schematics. Semiconductor vendors maintain and distribute the symbol libraries.

Design Compiler uses symbol libraries to generate the design schematic. You must use Design Vision or Design Analyzer to view the design schematic.

When you generate the design schematic, Design Compiler performs a one-to-one mapping of cells in the netlist to cells in the symbol library.

## DesignWare Libraries

A DesignWare library is a collection of reusable circuit-design building blocks (components) that are tightly integrated into the Synopsys synthesis environment.

DesignWare components that implement many of the built-in HDL operators are provided by Synopsys. These operators include +, -, *, <, >, <=, >=, and the operations defined by if and case statements.

You can develop additional DesignWare libraries at your site by using DesignWare Developer, or you can license DesignWare libraries from Synopsys or from third parties. To use licensed DesignWare components, you need a license key.

SP90467

# Specifying Libraries

You use dc_shell variables to specify the libraries used by Design Compiler. Table 4-1 lists the variables for each library type as well as the typical file extension for the library.

*Table 4-1    Library Variables*

| Library type | Variable | Default | File exten-sion |
|---|---|---|---|
| Target library | target_library | {"your_library.db"} | .db |
| Link library | link_library | {"*", "your_library.db"} | .db |
| Symbol library | symbol_library | {"your_library.sdb"} | .sdb |
| DesignWare library | synthetic_library, | {} | .sldb |

## Using a Library Search Path

You can specify the library location by using either the complete path or only the file name. If you specify only the file name, Design Compiler uses the search path defined in the search_path variable to locate the library files. By default, the search path includes the current working directory and $SYNOPSYS/libraries/syn. Design Compiler looks for the library files, starting with the leftmost directory specified in the search_path variable, and uses the first matching library file it finds.

For example, assume that you have technology libraries named my_lib.db in both the lib directory and the vhdl directory. If the search path contains (in order) the lib directory, the vhdl directory, and the default search path, Design Compiler uses the my_lib.db file found in the lib directory, because it encounters the lib directory first.

E-mail your comments about Synopsys documentation to docs@synopsys.com

SP90468

Design Compiler User Guide

You can use the `which` command to see which library files Design Compiler finds (in order).

```
dc_shell> which my_lib.db
{"/usr/lib/my_lib.db", "/usr/vhdl/my_lib.db"}
```

## Specifying Technology Libraries

To specify technology libraries, you must specify the target library and link library.

Design Compiler uses the target library to build a circuit. During mapping, Design Compiler selects functionally correct gates from the target library. It also calculates the timing of the circuit, using the vendor-supplied timing data for these gates.

You use the `target_library` variable to specify the target library.

The syntax for dcsh mode is

```
target library = my tech.db
```

The syntax for dctcl mode is

```
set target_library my_tech.db
```

Design Compiler uses the link library to resolve design references. You use the `link_library` variable to specify a list of libraries that Design Compiler can use to resolve design references.

The syntax for dcsh mode is

```
link_library = {* my_tech.db}
```

E-mail your comments about Synopsys documentation to docs@synopsys.com

**SP90469**

The syntax for dctcl mode is

```
set link library {* my tech.db}
```

Note that you specify the same value for the target library and the link library (except when you are performing technology translation). For the link library, you should also specify the asterisk character (*), which makes Design Compiler also search the designs in memory when it is resolving cell references. If the `link_library` variable has no asterisk, the designs loaded in memory are not searched. As a result, designs might not be found during linking and might be unresolved.

When Design Compiler attempts to locate a library file, it first searches the memory. Next, it searches the library files specified in the `link_library` variable and lastly, it searches the paths defined in the `search_path` variable.

When you specify the files in the `link_library` variable, consider that Design Compiler searches these files from left to right when it resolves references, and it stops searching when it finds a reference. If you specify the link library as `{"*" lsi_10k.db}`, the designs in memory are searched before the lsi_10k library.

For more information about resolving references, see "Linking Designs" on page 5-14.

Note that Design Compiler uses the first technology library found in the `link_library` variable as the main library. Design Compiler uses the main library to obtain default values and settings used in the absence of explicit specifications for operating conditions, wire load

E-mail your comments about Synopsys documentation to docs@synopsys.com

SP90470

Design Compiler User Guide

selection group, wire load mode, and net delay calculation. Design Compiler obtains the following default values and settings from the main library:

- Unit definitions

- Operating conditions

- K-factors

- Wire load model selection

- Input and output voltage

- Timing ranges

- RC slew trip points

- Net transition time degradation tables

Note that if other libraries have units different from the main library units, Design Compiler converts all units to those that the main library uses.

## Specifying DesignWare Libraries

You do not need to specify the standard synthetic library, standard.sldb, that implements the built-in HDL operators. The software automatically uses this library.

If you are using additional DesignWare libraries, you must specify these libraries by using the `synthetic_library` variable (for optimization purposes) and the `link_library` variable (for cell resolution purposes).

For more information about using DesignWare libraries, see the *DesignWare User Guide*.

HOME    CONTENTS    INDEX    /    4-10

SP90471

## Loading Libraries

Design Compiler uses binary libraries (.db format for technology libraries and .sdb format for symbol libraries) and automatically loads these libraries when needed.

If your library is not in the appropriate binary format, use the `read_lib` command to compile the library source. The `read_lib` command requires a Library-Compiler license.

To manually load a binary library, use the `read_file` command.

```
dc_shell> read_file my_lib.db
dc_shell> read_file my_lib.sdb
```

## Listing Libraries

Design Compiler refers to a library loaded in memory by its name. The library statement in the library source defines the library name.

To list the names of the libraries loaded in memory, use the `list_libs` command.

```
dc_shell> list_libs
my_lib    my_symbol_lib
```

To list the path and file name information along with the names, use the `list -libraries` command (dcsh mode only).

```
dc_shell> list -libraries
Library          File          Path
-------          ----          ----
my_lib           my_lib.db     /synopsys/libraries
my_symbol_lib    my_lib.sdb    /synopsys/libraries
```

HOME    CONTENTS    INDEX    /    4-11

E-mail your comments about Synopsys documentation to docs@synopsys.com

SP90472

Design Compiler User Guide

# Reporting Library Contents

Use the `report_lib` command to report the contents of a library. The `report_lib` command can report the following data:

- Library units

- Operating conditions

- Wire load models

- Cells (including cell exclusions, preferences, and other attributes)

# Specifying Library Objects

Library objects are the vendor-specific cells and their pins.

The Design Compiler naming convention for library objects is

*[file:] library/cell [/pin]*

*file*

> The file name of a technology library followed by a colon (:). If you have multiple libraries loaded in memory with the same name, you must specify the file name.

*library*

> The name of a library in memory, followed by a slash (/).

*cell*

> The name of a library cell.

*pin*

> The name of a cell's pin.

E-mail your comments about Synopsys documentation to docs@synopsys.com

SP90473

Design Compiler User Guide

For example, to set the `dont_use` attribute on the AND4 cell in the my_lib library, enter

```
dc_shell> set_dont_use my_lib/AND4
```

To set the `disable_timing` attribute on the Z pin of the AND4 cell in the my_lib library, enter one of the following commands (depending on your shell mode):

```
dc_shell> set_disable_timing find(pin, my_lib/AND4/Z)
```

```
dc_shell-t> set_disable_timing [get_pins my_lib/AND4/Z]
```

# Directing Library Cell Usage

When Design Compiler maps a design to a technology library, it selects components (library cells) from that library. You can influence the choice of components (library cells) by

- Excluding cells from the target library

- Specifying cell preferences

## Excluding Cells From the Target Library

Use the `set_dont_use` command to exclude cells from the target library. Design Compiler does not use these excluded cells during optimization.

E-mail your comments about Synopsys documentation to docs@synopsys.com

SP90474

Design Compiler User Guide

This command affects only the copy of the library that is currently
loaded into memory and has no effect on the version that exists on
disk. However, if you save the library, the exclusions are saved and
the cells are permanently disabled.

For example, to prevent Design Compiler from using the high-drive
inverter INV_HD, enter

```
dc_shell> set_dont_use MY_LIB/INV_HD
Performing set_dont_use on library cell 'MY_LIB/INV_HD'.
1
```

Use the `remove_attribute` command to reinclude excluded cells
in the target library.

```
dc_shell> remove_attribute MY_LIB/INV_HD dont_use
Performing remove_attribute on library cell 'MY_LIB/INV_HD'.
1
```

## Specifying Cell Preferences

Use the `set_prefer` command to indicate preferred cells. You can
issue this command with or without the `-min` option.

Use the command without the `-min` option if you want Design
Compiler to prefer certain cells during the initial mapping of the
design.

- Set the preferred attribute on particular cells to override the
  default cell identified by the library analysis step. This step occurs
  at the start of compilation to identify the starting cell size for the
  initial mapping.

- Set the preferred attribute on cells if you know the preferred
  starting size of the complex cells or the cells with complex timing
  arcs (such as memories and banked components).

E-mail your comments about Synopsys documentation to docs@synopsys.com

SP90475

You do not normally need to set the preferred attribute as part of your regular compile methodology because a good starting cell is automatically determined during the library analysis step.

Because nonpreferred gates can be chosen to meet optimization constraints, the effect of preferred attributes might not be noticeable after optimization.

For example, to set a preference for the low-drive inverter INV_LD, enter

```
dc_shell> set_prefer MY_LIB/INV_LD
Performing set_prefer on library cell 'MY_LIB/INV_LD'.
1
```

Use the `remove_attribute` command to remove cell preferences.

```
dc_shell> remove_attribute MY_LIB/INV_LD preferred
Performing remove_attribute on library cell 'MY_LIB/INV_LD'.
1
```

Use the `-min` option if you want Design Compiler to prefer fewer (but larger-area) buffers or inverters when it fixes hold-time violations. Normally, Design Compiler gives preference to smaller cell area over the number of cells used in a chain of buffers or inverters. You can change this preference by using the `-min` option, which tells Design Compiler to minimize the number of buffers or inverters by using larger area cells.

For example, to set a `hold_preferred` attribute for the inverter IV, enter

```
dc_shell> set_prefer -min class/IV
Performing set_prefer on library cell 'class/IV'.
1
```

E-mail your comments about Synopsys documentation to docs@synopsys.com

SP90476

vV-2003.12                                        Design Compiler User Guide

Use the `remove_attribute` command to remove the
`hold_preferred` cell attribute.

```
dc_shell> remove_attribute class/IV hold_preferred
Performing remove_attribute on library cell 'class/IV'.
{"class/IV"}
```

# Removing Libraries From Memory

The `remove_design` command removes libraries from dc_shell
memory. If you have multiple libraries with the same name loaded
into memory, you must specify the path as well as the library name.
Use the `list -libraries` command to see the path for each
library in memory (dcsh mode only).

# Saving Libraries

The `write_lib` command saves (writes to disk) a compiled library
in Synopsys database, EDIF, or VHDL format.

E-mail your comments about Synopsys documentation to docs@synopsys.com

**SP90477**

Gary M. Hoffman (*Pro Hac Vice*)
Kenneth W. Brothers(*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
 & OSHINSKY, LLP
2101 L Street, NW
Washington, DC  20037-1526
Phone (202) 785-9700
Fax (202) 887-0689

Edward A. Meilman (*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
 & OSHINSKY, LLP
1177 Avenue of the Americas
New York, New York  10036-2714
Phone (212) 835-1400
Fax (212) 997-9880

Jeffrey B. Demain, State Bar No. 126715
Jonathan Weissglass, State Bar No. 185008
ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
177 Post Street, Suite 300
San Francisco, California  94108
Phone  (415) 421-7151
Fax (415) 362-8064

Attorneys for Ricoh Company, Ltd.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| RICOH COMPANY, LTD., | ) |
| Plaintiff, | ) |
| vs. | ) |
| AEROFLEX ET AL, | ) **CASE NO. CV 03-4669-MJJ (EMC)** |
| Defendants. | ) **Consolidated with** |
|  | ) **CASE NO. CV 03-2289** |
|  | ) **NOTICE OF MANUAL FILING** |
| SYNOPSYS, INC., | ) |
| Plaintiff, | ) |
| vs. | ) |
| RICOH COMPANY, LTD., | ) |
| Defendants. | ) |

Please take notice that Plaintiff Ricoh Company, Ltd., is filing the following documents on this date in paper form only:

1. Ricoh's Opposition to Defendants' Motion for Partial Summary Judgment.

2. Deposition transcript of Edward Dwyer of February 3, 2004 (Exhibit 7 to the Declaration of Michael Weinstein in Support of Ricoh's Opposition to Defendants' Motion for Partial Summary Judgment).

3. Chip Synthesis Workshop – Lab Guide (Exhibit 14 to the Declaration of Michael Weinstein in Support of Ricoh's Opposition to Defendants' Motion for Partial Summary Judgment).

Because the above documents include and refer to materials produced in discovery and designated confidential by the ASIC Defendants and Synopsys, a request to file these documents under seal will be filed contemporaneously.

Dated: August 23, 2005

Respectfully submitted,

Ricoh Company, Ltd.

By: /s/ Kenneth W. Brothers

Gary M. Hoffman
Kenneth W. Brothers
Eric Oliver
DICKSTEIN SHAPIRO MORIN &
    OSHINSKY  LLP
2101 L Street NW
Washington, D.C.  20037-1526
Telephone: (202) 785-9700
Facsimile: (202) 887-0689

Edward A. Meilman
DICKSTEIN SHAPIRO MORIN &
    OSHINSKY  LLP
1177 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 896-5471
Facsimile:  (212) 997-9880

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jeffrey B. Demain, State Bar No. 126715
Jonathan Weissglass, State Bar No. 185008
Altshuler, Berzon, Nussbaum, Rubin & Demain
177 Post Street, Suite 300
San Francisco, California  94108
Phone:  (415) 421-7151
Fax:  (415) 362-8064


Attorneys for Ricoh Company, Ltd.

DSMDB.1971749.1DSMDB.1971749.1

1

**PROOF OF SERVICE**

2

**CASE:**        *Ricoh Company, Ltd. v. Aeroflex Incorporated, et al.*
                    *Synopsys, Inc. v. Ricoh Company, Ltd.*

3

4

**CASE NOS.:** U.S. District Court, N.D. Cal., Nos. C03-4669 and C03-2289 MJJ

5

     I am employed in the City and County of San Francisco, California.  I am over the age of eighteen years and not a party to the within action; my business address is 177 Post Street, Suite 300, San Francisco, California 94108.  On August 23, 2005, I served the following document(s):

6

7

     Ricoh's Opposition to Motion for Partial Summary Judgment.

8

     Deposition transcript of Edward Dwyer of February 3, 2004 (Exhibit 7 to the Declaration of Michael Weinstein in Support of Ricoh's Opposition to Defendants' Motion for Partial Summary Judgment).

9

10

     Chip Synthesis Workshop - Lab Guide (Exhibit 14 to the Declaration of Michael Weinstein in Support of Ricoh's Opposition to Defendants' Motion for Partial Summary Judgment).

11

12

on the parties, through their attorneys of record, by sending true copies thereof as shown below for service as designated below:

13

14

<u>By Electronic Mail:</u> I caused such document(s) to be served via electronic mail (email) on the parties in this action by transmitting a true copy to the following email address(es):

15

16

          **ADDRESSEE**                                **PARTY**

17

          Teresa M. Corbin, Esq.                        Defendants
          Jaclyn Fink, Esq.

18

          Howrey Simon Arnold & White LLP
          525 Market Street, Suite 3600

19

          San Francisco, CA 94105-2708
          CorbinT@howrey.com

20

          finkj@howrey.com

21

22

23

     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this August 23, 2005, at San Francisco, California.

24

25

                _____/s/_____
                       Edward Lin

26

27

28

Proof of Service
*Ricoh Co., Ltd. v. Aeroflex, Inc.*
*Synopsys, Inc. v. Ricoh Co., Ltd.*
N.D. Cal. Case Nos.C-03-4669 and C03-2289