```
 1  Teresa M. Corbin (SBN 132360)
    corbint@howrey.com
 2  Christopher Kelley (SBN 166608)
    kelleyc@howrey.com
 3  Jaclyn C. Fink (SBN 217913)
    finkj@howrey.com
 4  HOWREY LLP
    525 Market Street, Suite 3600
 5  San Francisco, California 94105
    Telephone: (415) 848-4900
 6  Facsimile:  (415) 848-4999

 7  Attorneys for Plaintiff SYNOPSYS, INC.
    and for Defendants AEROFLEX INCORPORATED,
 8  AMI SEMICONDUCTOR, INC., MATROX
    ELECTRONIC SYSTEMS, LTD., MATROX
 9  GRAPHICS, INC., MATROX INTERNATIONAL
    CORP., MATROX TECH, INC. and AEROFLEX COLORADO SPRINGS, INC.
10
```

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RICOH COMPANY, LTD.,<br><br>       Plaintiff,<br><br>vs.<br><br>AEROFLEX INCORPORATED, et al.,<br><br>       Defendants.<br>_____<br>SYNOPSYS, INC.,<br><br>       Plaintiff,<br><br>vs.<br><br>RICOH COMPANY, LTD.,<br><br>       Defendant. | Case No. C03-04669 MJJ (EMC)<br><br>Case No. C03-2289 MJJ (EMC)<br><br>**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT UNDER 35 U.S.C. §271(g)**<br><br>Date: November 1, 2005<br>Time: 9:30 a.m.<br>Courtroom: 11, 19th Floor<br>Judge: Martin J. Jenkins |

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

II. RICOH'S OPPOSITION CONFIRMS THAT THE CUSTOMER DEFENDANTS' SUMMARY JUDGMENT MOTION IS RIPE FOR DECISION. ..................................................................................................................... 2

    A. Ricoh Fails To Raise A Genuine Issue For Trial Precluding Summary Judgment. ........................................................................................ 2

    B. Additional Discovery Is Not Warranted. ............................................................. 4

        1. Ricoh agreed that the Customer Defendants' motion requires only the discovery already taken. ............................................ 4

        2. Ricoh fails to show that Rule 56(f) warrants additional delay or discovery. ......................................................................... 4

III. THE CUSTOMER DEFENDANTS CORRECTLY AND ACCURATELY REPRESENTED THIS COURT'S CLAIM CONSTRUCTION RULING. ............................................................................................ 6

IV. THE CLAIMED METHODS ARE NOT USED DIRECTLY IN THE MANUFACTURE OF ASICS. .............................................................................................. 8

    A. Only One Substantive Issue Is Before The Court – Whether The Claimed Methods Are Directly Used In The Manufacture Of ASICs. ................................................................................................................... 8

    B. "Used Directly In The Manufacture" Means Used In The Physical Transformation Of Raw Materials Into ASICs. ................................................ 8

    C. Section 271(G) Is Inapplicable Here Because The Claimed Processes Are Not Part Of An ASIC Manufacturing Process. ........................ 9

V. CONCLUSION ............................................................................................................. 12

## TABLE OF AUTHORITIES

**CASES**

*Bayer AG v. Housey Pharm., Inc.*, 340 F.3d 1367 (Fed. Cir. 2003) .................................. 8, 9, 10, 11

*Bio-Technology General Corp. v. Genentech, Inc.*, 80 F.3d 1553 (Fed. Cir. 1996) ................. 8, 9, 10, 11

*Celotex Corp v. Catrett*, 477 U.S. 317 (1986) .................................................................. 2

*Tinoco v. Belshe*, 916 F. Supp. 974 (N.D. Cal. 1995) ........................................................ 2

**STATUTES**

35 U.S.C. Section 271(g) ............................................................................................ passim

**RULES**

Fed. R. Civ. P. 56(e) .................................................................................................... 4

## I. INTRODUCTION

The parties agree that the Court must decide whether the claimed ASIC design processes are "used directly in the manufacture" of ASICs. The parties fundamentally disagree about what "used directly in the manufacture" means.

Defendants Aeroflex Incorporated ("Aeroflex"), AMI Semiconductor, Inc. ("AMI"), Matrox Electronic Systems, Ltd. ("Matrox Electronics"), Matrox Graphics, Inc. ("Matrox Graphics"), Matrox International Corp. ("Matrox International"), Matrox Tech, Inc. ("Matrox Tech") and Aeroflex Colorado Springs, Inc. ("UTMC") (collectively the "Customer Defendants") contend it means used in the actual, physical processes of transforming raw material into a finished product. The Customer Defendants further contend it cannot apply to a design process that results in only data and information, even if that data and information bears a relationship to the manufactured ASIC, as long as the information and data is not used in the actual acts of transforming raw material into a product.

Ricoh on the other hand contends that "used directly..." means virtually any step in a straight-line leading from product conception to the physical product. The process' relationship to the acts of transforming raw material into a finished product is immaterial as long as a finished product ultimately results from the information and data.

The parties' disagreement largely stems from their choice of standards. The Customer Defendants contend that legal definitions, as discussed and applied by the Federal Circuit, control the issue. Ricoh, however, contends that industry definitions, purportedly exemplified by its expert testimony and its interpretation of "evidence," controls.

The Customer Defendants show that "used directly in manufacture" has a legal definition, independent of industry definitions and expert testimony, meaning immediately involved in the actual acts of transforming raw material into a physical product. There is no dispute that the claimed design methods immediately produce only data and information. Thus, Section 271(g) cannot apply to the claimed design methods here. No amount of additional discovery can change this conclusion. Accordingly, the Customer Defendants' motion is ripe for decision and the Court should grant this summary judgment motion.

II.  **RICOH'S OPPOSITION CONFIRMS THAT THE CUSTOMER DEFENDANTS' SUMMARY JUDGMENT MOTION IS RIPE FOR DECISION.**

  A.  **Ricoh Fails To Raise A Genuine Issue For Trial Precluding Summary Judgment.**

Ricoh's Statement of "Material Facts" fails to raise "specific facts showing that there is a genuine issue for trial." *Tinoco v. Belshe*, 916 F. Supp. 974, 979 (N.D. Cal. 1995) (quoting *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986)). The use of the computer aided design methods of claims 13 and 15-17 of the '432 patent result in the production of design data, specifically a netlist. The design methods of claim 14 also result in production of design data, specifically mask data. The only issue before the Court is whether the claimed design processes are used *directly* in the manufacture of an ASIC.

The underlying facts from which the Court can make that determination do not appear to be in dispute. Ricoh's opposition does not dispute that additional design processes are required to produce mask data from a netlist as described by Mr. Olson. Nor does Ricoh dispute that these additional processes are neither claimed nor described in the '432 patent.[1] Likewise, Ricoh does not dispute the complex processes of photomask manufacture as described by Mr. Heynes or the fact that these processes are not claimed or described in the '432 patent. Nor does Ricoh dispute the operations and processes involved in ASIC manufacturing described by Mr. Heynes or the fact that these processes too are not claimed or described in the '432 patent. Finally, Ricoh does not dispute that the claimed processes for generating netlists and mask data, are not steps in the actual physical manufacture of ASICs.

Ricoh and its declarants, Rhyne and Yamada, apparently agree with Synopsys and the Customer Defendants that a netlist undergoes a number of different processes before it is transformed into mask data, that mask data is utilized in the production of photomasks, not ASICs, and that photomasks are ultimately used in the process of ASIC manufacture. Rhyne Decl. ¶ 10; Yamada Decl. ¶¶ 3-6. Synopsys and the Customer Defendants certainly agree that you have to design an ASIC before

---

[1] The '432 patent specification is in accord. See '432 patent Col. 4, lines, 44-46.

you can manufacture it and, to that extent, there is a relationship between the design and the end product, *i.e.*, the ASIC. The only dispute between the parties appears to be the definition of "used directly in the manufacture" of ASICs and whether this definition is so broad as to encompass each and every step extending backwards in time, including photomask manufacture, and ultimately design. That is an issue of law for the Court to decide. Thus, no genuine issue regarding application of Section 271(g) remains for trial.

For the most part, Ricoh's issues of material fact merely restate the issue before the Court. Opp. at 4-7. Ricoh's first and second "material facts" relate to where the Customer Defendants use the patented process, which is not an issue addressed by this motion. Opp. at 4. Ricoh has asserted a 271(g) claim in its pleadings against each of the Customer Defendants and this motion is directed solely to whether the claims at issue (claims 13-17) can support a 271(g) claim of infringement as a matter of law. Ricoh's third through eighth "material facts" likewise assert the issue in dispute – whether the patented methods are sufficiently proximate to the imported ASICs to apply Section 271(g) here, a question of law for the Court. Opp. at 4-5. Thus, Ricoh's Statement of Material Facts does not raise a genuine issue for trial and the Court may grant summary judgment.

Moreover, Ricoh's allegedly material facts, separate and apart from its Statement of "Material Facts," do not raise a genuine issue for trial. Opp. at 18-23. Indeed, these "facts" largely concern Ricoh arguing for a definition of "manufacturing" that incorporates the design process. Opp. at 18-23. But, Ricoh's "evidence" consists of an alleged industry understanding of "manufacture" that is both irrelevant and fabricated for purposes of litigation. Ricoh thus attempts to substitute an alleged industry definition of "manufacture" for the legal definition at issue and to usurp the decision of the ultimate legal issue for the court, *i.e.*, whether a design process can be part of a manufacturing process for purposes of Section 271(g). Similarly, Ricoh's "facts" supposedly showing that the Customer Defendants agree that the claimed methods are directly used to manufacture ASICs concern general ASIC design and manufacture processes. Opp. at 13-18. None of the documents or testimony cited supports the conclusion that the claimed methods here are directly used in the physical manufacture of ASICs. Ricoh fails to provide any authority for applying Section 271(g) based on industry definitions,

experts' conclusory statements or anything other than the legal definitions in controlling precedent. Indeed, using an industry definition could lead to surprising, anomalous and inconsistent results across, and even within, industries.

Thus, no genuine issue regarding application of Section 271(g) remains for trial.

### B. Additional Discovery Is Not Warranted.

#### 1. Ricoh agreed that the Customer Defendants' motion requires only the discovery already taken.

At the July 13, 2005 Case Management Conference, the Court addressed the discovery necessary for the Customer Defendants to bring their summary judgment motion. Ricoh agreed that all they needed were the depositions of Messrs. Olson and Heynes who had offered declarations in support of the motion. See Declaration of Teresa M. Corbin ("Corbin Decl.") ¶ 3. Ricoh took that discovery and has relied on it in its opposition, as well as other declarations and depositions provided in this case. At the Case Management Conference, the Court made clear that it would not thereafter entertain a Rule 56(f) motion in connection with this matter. *Id.* at ¶ 3. Nevertheless, Ricoh now asserts that the motion must be denied because it is based on an incomplete record, though it fails to explain why the Court should not hold Ricoh to its agreement.

#### 2. Ricoh fails to show that Rule 56(f) warrants additional delay or discovery.

Michael A. Weinstein's Declaration in support of Ricoh's opposition ("Weinstein Decl.") fails to state reasons showing Ricoh "cannot . . . present by affidavit facts essential to justify [Ricoh's] opposition." Fed. R. Civ. P. 56(e). In fact, Ricoh asserts that it has already provided "more than sufficient evidence of disputed material facts sufficient to deny the motion. Opp. at 3, footnote 2. Weinstein's Declaration fails to explain the relevance of any of the discovery it discusses, especially with respect to opposing the Customer Defendants' motion. Nor does Ricoh explain how any additional discovery could shed more light on the issue before the Court than the discovery the Court already has before it.[2] Indeed, Ricoh submitted numerous pages of "evidence" from its experts, from

---

[2] In Ricoh's opposition (Opp. at 3 fn. 2, 23-24 and Weinstein Decl. ¶ 12), it makes unsubstantiated and untrue representations regarding the Customer Defendants' refusal to comply with their discovery

(Continued...)

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)   4
DEFENDANTS' REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

1  the Customer Defendants' experts, from other witnesses, from hearings and orders. Further discovery
2  would be futile.[3]

3      The reasons stated in paragraphs 2-11 of the Weinstein Decl. are irrelevant with respect to
4  deciding whether the claimed design methods are sufficiently proximate to, *i.e.*, used directly in the
5  manufacture of, the imported ASICs to apply Section 271(g). Weinstein Decl. ¶ 2-11.[4] For example,
6  the details of the logic synthesis design process, which produce only data and information, are
7  immaterial to the proximity of the design process to the ASICs. The Weinstein Decl. fails to explain
8  how or why Ricoh could not present relevant manufacturing process details, especially in light of the
9  "evidence" Ricoh submitted. Nor does the Weinstein Decl. explain why any missing manufacturing
10 process details are relevant. Moreover, Ricoh cites to its own experts' testimony about the
11 manufacturing process. Opp. at 15-17. The geographic location of ASIC design for all defendants is
12 irrelevant. The issue is whether the accused ASICs are "made by" the claimed processes. Likewise,
13 the companies involved in ASIC manufacturing, and the location of ASIC manufacturing, are
14 irrelevant to deciding whether Section 271(g) can be applied to the technology at issue.

15     Because Ricoh fails to identify any fact creating a genuine issue for trial, and because Ricoh
16 fails to demonstrate the propriety of delaying judgment under Rule 56(f), defendants' summary
17 judgment motion is ripe for decision.

---

(...Continued)

obligations. The Customer Defendants deny this allegation but do not address the specifics here as these arguments are not relevant to this motion.

[3] Ricoh seeks to delay this motion so that it can seek the very same burdensome and irrelevant discovery that the early hearing on this motion is aimed to avoid, *e.g.*, "all documents" related to ASIC manufacturing. This issue was discussed at length at the Case Management Conference and provided the basis, at least in part, for the Court's leave to file this motion in advance of the date set for all other dispositive motions. Corbin Decl. ¶ 2.

[4] Several of the discovery items identified have already been produced. For example, source code for the Synopsys logic synthesis products used by the Customer Defendants (3) and identification of products and libraries the defendants use in performing logic synthesis (7).

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)    5
DEFENDANTS' REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

HOWREY
LLP

### III. THE CUSTOMER DEFENDANTS CORRECTLY AND ACCURATELY REPRESENTED THIS COURT'S CLAIM CONSTRUCTION RULING.

It is Ricoh, not the Customer Defendants who misrepresent the Court's claim construction ruling. The Customer Defendants accurately pointed out that the Court found that claim 13 deals with ASIC design, not ASIC manufacturing. Mot. at 10. The Customer Defendants do not contend, as Ricoh suggests, that there is no relationship between the output of the design processes of claims 13 and 14 (netlists and mask data, respectively) and the manufactured ASICs. Instead, they simply contend that the claimed processes are not used "directly" in the manufacture of ASICs, *i.e.*, in the actual acts of transforming raw materials into a product.

The Court likewise found a distinction between designing and manufacturing ASICs. Indeed, the Court rejected Ricoh's proposed "during manufacture of [an ASIC] . . . a process of designing the desired ASIC . . ." language. Claim Construction Order ("CCO") at 6-8. Instead, ". . . the Court *finds* that the 'computer-aided design process' described in claim 13 *does not* include a manufacturing process for ASICs." CCO at 7-8 (footnote omitted; emphasis added).[5]

In addition, the Court found Ricoh's proposed construction "problematic because it clearly attempts to blur the line between the process of designing integrated circuits and the process of manufacturing integrated circuits. Nothing in the claim language [of independent claim 13] supports Ricoh's attempt to broaden the claims to include a manufacturing process for a desired ASIC . . . the specification consistently describes a design, rather than a manufacturing, process. In fact, the term 'manufacture' does not appear in the claim or specification language. While the 'netlist' [of claim 13] may be required to 'produce the particular [ASIC],' that does not compel the conclusion that the '432 patent's design process is inherently a part of the manufacturing process of the actual ASIC chips." CCO at 7 (footnote and citations omitted). Thus, the Court found that claim 13 concerns a design process, not a manufacturing process.

---

[5] Ricoh represents this finding as "The Court *noted* that ... claim 13 *need not* include a manufacturing process for ASICs' [citing Claim Construction Order at 7-8]." Opp. at 12 (emphasis added).

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)  
DEFENDANTS' REPLY IN SUPPORT OF THEIR  
MOTION FOR SUMMARY JUDGMENT  
6

Contrary to Ricoh's assertions, the Court, in adopting its definition of "netlist", did not "recognize that the netlist is actually used to *manufacture* the end product, *i.e.*, the ASICs." Opp. At 12. Nor did the Court "acknowledge the proximate relationship" between design and manufacture for purposes of assessing section 271(g) jurisdiction. Opp. At 12. The footnote Ricoh relies on does not demonstrate a proximate relationship between the design process and the manufacturing process. Opp. at 12 (citing CCO at 8 n. 4). Instead, it only points out that dependent claim 14 claims an additional design process, subsequent to that in claim 13, further demonstrating that claim 13 is a distinct process from manufacturing. CCO at 8 n. 4. Moreover, claim 14 explicitly claims a design process, not a manufacturing process. '432 Patent at 16:34-36, 66. And, claim 14 directly produces only data or information. As such, it is similar to claim 13 in that it is distinct from physically manufacturing an ASIC. That claim 14's data is used in manufacturing masks and masks are needed to manufacture ASICs does not resolve the issue of whether the process of claim 14 is used directly in the physical manufacture of ASICs.[6]

As the court recognized in its claim construction order, ASIC design is different from ASIC manufacturing. As shown in the Customer Defendants' motion and this reply, that difference precludes application of Section 271(g) as a matter of law. The design methods of claims 13-17 are not directed to manufacturing processes and their output, design data, is not directly used in the physical manufacture of ASICs.

---

[6] Moreover, dependent claim 14 does not reflect any additional invention on the part of the patentee. It merely recites that mask data can be generated from the netlist created in claim 13. The '432 patent merely states that "the netlist can be used as input to any existing VLSI layout and routing tool 16 to create mask data 18 for geometrical layout." '432 patent Col.4, lines, 44-46; see also '432 patent Abstract.

## IV. THE CLAIMED METHODS ARE NOT USED DIRECTLY IN THE MANUFACTURE OF ASICS.

### A. Only One Substantive Issue Is Before The Court – Whether The Claimed Methods Are Directly Used In The Manufacture Of ASICs.

Ricoh does not contest the Customer Defendants' showing that direct application of Section 271(g) requires manufacture of a physical product. Mot. at 11-14; *see* Opp. at 2. Ricoh agrees that the claimed methods result in design information, not a physical product. Opp. at 3 (counterstatement of issue). Accordingly, Section 271(g) liability cannot be based only on the use, importation or sale of the claimed methods' design information.

The only other basis for applying Section 271(g) is indirectly through use of the claimed processes *directly* in manufacturing ASICs. *See Bayer AG v. Housey Pharm., Inc.*, 340 F.3d 1367, 1378 (Fed. Cir. 2003). Ricoh agrees that the issue before the Court is whether the patented methods are used directly in the manufacture of imported ASICs. Opp. at 3 (restating issue to presume judgment in its favor –"design information directly used in the manufacture of a physical product"); *see Bayer* at 1377-78 ("process must be used directly in the manufacture of the product, and not merely as a predicate process to identify the product to be manufactured"). Thus, the only issue before the Court is whether the claimed design processes are used directly in the manufacture of an ASIC.

### B. "Used Directly In The Manufacture" Means Used In The Physical Transformation Of Raw Materials Into ASICs.

Ricoh agrees that *Bayer* and *Bio-Technology General Corp. v. Genentech, Inc.*, 80 F.3d 1553 (Fed. Cir. 1996) control the outcome here. Opp. at 7. The *Bayer* court examined the meaning of "manufacture" and "made by" in the context of Section 271. The definitions the court relied on as relevant focus on the direct transformation of raw material into a physical product. Indeed, the *Bayer* court rejected the argument that "made by" is not "limited to methods of 'manufacture,'" and refused to construe "made" as broader than its manufacturing-related sense. *See Bayer* at 1373. In reaching its decision, the *Bayer* court classified the different definitions of "made" into those "limited to manufacturing" and those "broadly encompass[ing] activities in addition to manufacturing." *Bayer* at 1372. In determining which of these definitions applied to Section 271(g), the court looked to other provisions of the statute and the legislative history. The court found applicable the narrower

manufacturing-related definitions exemplified by "to bring (a material thing) into being by forming, shaping, or altering material," and inapplicable, the broader definitions exemplified by "[to] form as a result of calculation or design." *Bayer* at 1372 (emphasis added).

In holding that Section 271(g) applies only to tangible objects, the *Bayer* court also examined "manufacture" definitions. See *Bayer* at 1371-72. The *Bayer* court found relevant such definitions as "to make (as raw material) into a product suitable for use … to make from raw materials by hand or machinery" and "the making of goods or wares by manual labor or machinery." *Bayer* at 1371-72. The *Bayer* court further distinguished protected manufacturing processes from other processes in stating that Section 271(g) "is concerned exclusively with products that are physical goods produced by a manufacturing process." *Bayer* at 1372. Tellingly, in reviewing the legislative history of Section 271, the Court stated that Congress had interpreted "process patent" to be synonymous with "manufacturing technique." *Bayer* at 1376.

In determining whether the requisite proximity exists between a patented process and a resulting product, the *Bayer* court stated that it must determine whether the product was "made by" that process. *Bayer* at 1377. The court determined that the pertinent dictionary definitions of "by" in "made by" in Section 271(g) "are 'through the means or instrumentality of[;] … through the direct agency of[;] … through the medium of[;] … through the work or operation of.'" *Bayer* at 1378. Accordingly, the *Bayer* court described the required proximity as "used directly in the manufacture of the [physical] product." *Bayer* at 1377-8. Thus, from an examination of the definitions the court found relevant, and taken in context together, "used directly in the manufacture …" means used in immediate formation of a tangible product and describes the actual transformation of raw material into a product.

    C.    **Section 271(G) Is Inapplicable Here Because The Claimed Processes Are Not Part Of An ASIC Manufacturing Process.**

In *Bio-Technology*, the process claim at issue was a method of making a plasmid and the accused product was hGH, human growth hormone. The preferred embodiment of the process patent was independently claimed and described the making of a plasmid, which contained a gene that

expressed hGH. The process patent described in detail not only how to make the plasmid containing the DNA encoding for hGH, but also how to use that plasmid in the commercial manufacture of hGH. The process patent claims at issue were thus themselves methods of manufacture and the method of manufacturing a plasmid containing DNA encoding hGH was the first physical step in the manufacture of the accused product, hGH. The process of manufacturing hGH is described in *Bio-Technology* at 1557. See also U.S. Patent No. 4,342,832 attached to the Corbin Declaration as Exhibit A. The court concluded that hGH is a product that is "made by" the '832 patented process. *Bio-Technology* at 1561. The court emphasized "that the legislative history [of the Process Patents Amendment Act of 1988] precisely anticipated the fact situation of the *Bio-Technology* case and indicated Congress' intent that infringement of a process for making a plasmid is not to be avoided by using it to express its intended protein " and (2) that "the '832 patent itself explicitly contemplates that the patented process will be used as part of an overall [manufacturing] process for producing hGH; indeed, the patent discloses in detail how to make hGH by carrying out the claimed process and other necessary steps." This ruling is consistent with the later analysis in *Bayer* regarding the meaning of "made by" in Section 271(g) as requiring use of the process at issue in the direct manufacture of the accused product. In other words the process of making the plasmid was used in the physical manufacture of hGH.

In *Bayer*, the process claim at issue was not a method of manufacture at all but rather a method of screening for protein inhibitors and activators. The end product of the process at issue was the identification and characterization of a drug, *i.e.*, data. The accused product was the drug that had been identified as useful using the process claims in issue. The court concluded after analyzing the meaning of "made by" and "manufacture" as used in the statute and discussed above, that in order for the drug product to be "made by" the claimed process, the process must be used *directly* in the *manufacture* of the product, and not merely as a predicate process to identify the product to be manufactured. *Bayer* at 1378. The court upheld the District Court's conclusion that "processes of identification and generation of data are not *steps in the manufacture* of a final drug product." (Emphasis added). *Bayer* at 1377. Therefore, the drug product was held "not [to be] a product 'made by' those claimed processes" and

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)   10
DEFENDANTS' REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

HOWREY LLP

1 Section 271g did not apply. *Id.* at 1378. The court distinguished *Bio-Technology* on the basis that, in *Bayer*, the patented process was not used in the actual synthesis of the drug product. *Id.* at 1377.

The process claims here (claims 13-17), as construed by this Court, relate to methods of designing ASICs, not methods of manufacturing ASICs. Like *Bayer*, the output of the claimed methods is data, (*i.e.*, netlists and mask data). Like *Bayer*, and in contrast to *Bio-Technology*, the design processes at issue here are not part of the physical transformation of raw material into a product, *i.e.*, as ASIC. The netlist is not directly used in the physical manufacturing process that produces ASICs. Nor is mask data. Just as the court concluded in *Bayer* that the patented process was not used in the actual synthesis of the drug product (*Bayer* at 1377), the design processes of claims 13-17 are not used in the actual physical manufacture of ASICs. As explained by Mr. Heynes and uncontradicted by Ricoh, "the claimed processes for generating netlists and mask data are not even steps in the manufacture of masks, let alone ASIC chips."[7] Heynes Decl. paragraph 20. Also, unlike *Bio-Technology*, the '432 patent here does not "disclose[] *in detail* how to make [an ASIC] by carrying out the claimed process and other necessary steps." *Bio-Technology* at 1561 (emphasis added). Unlike *Bio-Technology*, nothing in the statute itself or its legislative history addresses the facts before this Court. Accordingly, the claimed methods are not "used directly in the manufacture" of ASICs and, thus, the accused ASICs are not "made by" those claimed processes. Thus, there can be no infringement by a Customer Defendant ASIC based on the asserted claims. No court has construed Section 271(g) as extending to processes that are not directly used in the physical manufacture of the accused product and the court should decline to do so here.[8]

---

[7] Thus, at best, the plasmid in *Bayer* is akin to the mask in ASIC manufacture. However, unlike *Bayer*, the claims at issue here are not directed to a process of making masks, they are processes for generating design data.

[8] As indicated in *Bayer*, parts of the legislative history of the statute indicate that Congress interpreted "process patent" as synonymous with "manufacturing technique." *Bayer* at 1376. In the face of silence in the legislative history as to coverage of the statute beyond processes that are directly used in physical manufacture of an accused product, as indicated in *Bayer*, courts should be reluctant to broadly interpret the legislation. Bayer at 1376.

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)   11
DEFENDANTS' REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

HOWREY LLP

## V. CONCLUSION

The issue before the Court is ripe for decision because further discovery would not further illuminate the issue. The relevant cases support the Customer Defendants' position that the ASIC design methods here, resulting in only data and information, are not directly used in the manufacture of ASICs and thus cannot provide the basis of Section 271(g) infringement liability. None of the admittedly controlling law applies Section 271(g) as broadly as Ricoh recommends the Court to do here. No cited case applies Section 271(g) to design methods producing only data and information or to methods which are not used directly in the physical manufacture of the accused product. Accordingly, the Court should grant the Customer Defendants' summary judgment motion.

Dated: August 30, 2005

Respectfully submitted,

HOWREY LLP

By: /s/
Teresa M. Corbin
Attorneys for Defendants
AEROFLEX INCORPORATED, AMI SEMICONDUCTOR, INC., MATROX ELECTRONIC SYSTEMS, LTD., MATROX GRAPHICS INC., MATROX INTERNATIONAL CORP., MATROX TECH, INC., and AEROFLEX COLORADO SPRINGS, INC.