**CONFIDENTIAL PURSUANT**
**TO PROTECTIVE ORDER**

July 18, 2006

The Honorable Edward M. Chen
United States Magistrate Judge
United States District Court
Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94012

**Re:** ***Synopsys v. Ricoh Company, Ltd.*, Case No. C03-2289 MJJ (EMC)**
***Ricoh Company, Ltd. v. Aeroflex, Inc., et al.*, Case No. C03-4669 MJJ (EMC)**

Dear Judge Chen:

Counsel for the parties submit this joint letter in accordance with the Court's request, addressing the remaining dispute raised by Defendants' Motion for Additional Time to Complete Already Outstanding Discovery. In particular, a dispute remains regarding whether or not Synopsys and the Customer Defendants should be permitted to depose a 30(b)(6) representative of the University of South Carolina. The parties agree that all other issues relating to Defendants Motion for Additional Time to Complete Already Outstanding Discovery have been resolved.

**The Customer Defendant and Synopsys Statement**

The Customer Defendants and Synopsys ("Defendants") seek to depose the University of South Carolina regarding issues relating to primarily to ownership of the '432 patent in accordance with the timely served subpoena.

Dr. Hideaki Kobayashi, the first named inventor of the U.S. Patent No. 4,922,432 ("the '432 patent") was a professor at the University of South Carolina ("USC") at the time of the alleged conception of the '432 patent. Documents produced just today as a result of Defendants' Motion to Compel reveal that the contributions of the other named (Ricoh) inventor, Mr. Shindo, relate primarily to the identification of the problem to be solved by the claimed invention, and not to the details of the patented system or the functions it would perform; the latter details were all handled by Dr. Kobayashi. Dr. Kobayashi, however, has already confirmed that he did not do any coding and that the implementation of the system was handled largely by USC graduate students (whom he claims were also ICC employees). Defendants, however, contend that all or most of the contributions of the graduate students (as well as the contributions of Dr. Kobayashi) were made in the course of their studies and research (as well as employment) at the University.

The University of South Carolina recently produced manuals that contain patent ownership provisions applicable to students and faculty. These provisions, and related

documentation, will be the focus of the deposition. This is a significant issue and it could be potentially dispositive of the issues in this case.

From a procedural perspective, on May 31, the Court's Clerk called with guidance on Defendant's Motion to Extend Time. During the call, the Court's Clerk indicated that if the subpoenas were timely served, the motion was unnecessary. During the call, the parties agreed that the depositions at issue were limited to Motorola, Texas Instruments, Zhone/Paradyne, and the University of South Carolina. Defendants agreed to make best efforts to schedule these depositions prior to June 16. The Court indicated that this issue should not extend indefinitely.

Although the University of South Carolina produced documents on June 6, 2006, eleven other depositions were scheduled through June 16, and the last two weeks of June were filled with briefings related to the Defendants' Motion to Compel Discovery as well as the preparation of opening expert reports. From June 30 through July 10, 2006, the parties agreed to no communication due to the office move of Ricoh's counsel. On July 7, 2006, Defendants notified the Court's Clerk that the only remaining issue regarding this Motion to Extend Time was the University of South Carolina deposition. The Clerk indicated that the parties should submit a joint letter to Judge Chen by July 14; however counsel for the University of South Carolina was on vacation from July 10 through 17, and so Defendants were unable to obtain the availability of a witness last week.

The Court should allow the deposition of the University of South Carolina to proceed. The designated witness is available for a deposition on July ___, 2006. There is simply no prejudice to Ricoh in letting this deposition go forward. It was already going to be scheduled after the close of discovery, and will not affect the case schedule in the slightest. Ricoh has no reasonable basis to object. In contrast, from Defendants' perspective, the deposition could shed additional light on significant issues that could be dispositive of the case.

**Ricoh's Statement**

Defendants are reaching for straws. Discovery from the University of South Carolina is not "potentially dispositive" to any issue in this litigation, but is at best of tangential relevance to an undefined defense. Defendants have no evidence whatsoever to support their supposition that Dr. Kobayashi violated University procedures by employing graduate students to write software code – Dr. Kobayashi has refuted such speculation, and University documents show that the University has no claim to any "discovery resulting from work not substantially supported by the University." Here, ICC's work on the software was not "substantially supported" by the University, but was instead supported by Ricoh and other non-University related sources. Further, the University has never asserted any claim of having any rights in the '432 patent.

But even assuming that, in the face of all of the contrary evidence, Dr. Kobayashi's private employment of graduate students somehow gave the University a claim to of some rights in certain software, that is simply not relevant to this case. Although defendants argue that some of Dr. Kobayashi's software may be an embodiment of the '432 patent, defendants do not dispute that the '432 patent is not limited to any single embodiment. In fact, it is error for the

Court to construe the patent in light of any so-called embodiment. Thus, discovery into 20-year old University policies will not be "potentially dispositive" of any issue. The issue is the '432 patent and defendants' infringement of it. In producing its documents, the University of South Carolina stated that it no longer had documents related to the subject matter during the relevant time period.

Defendants have known since 2003 that Dr. Kobayashi was a University of South Carolina professor in the 1980s when his company, ICC, developed certain software code. In 2003, Ricoh and KBSC produced documents reflecting that graduate students who were employed by Dr. Kobayashi's company helped in the coding of the KBSC system software. In 2003 and 2004, defendants deposed all of the key KBSC players. For example, in June 2003, defendants deposed Dr. James Davis, a University of South Carolina professor who was the chief operating officer of ICC, and explored issues relating to the University, ICC and its software. Defendants also deposed Dr. Kobayashi for two days in May 2004, and another KBSC witness in January 2004. The early actions of ICC were explored at all of those depositions.

For years, defendants ignored the University of South Carolina. Then, in 2006, defendants issued two subpoenas to the University – one on January 30, and another on May 16. It is the response to the second subpoena that is at issue here. Of course, general fact discovery closed more than a month and a half ago, and in a conversation with the Court's clerk on May 31, defendants' counsel committed to complete all deposition discovery by June 16.[1] Between May 31 and July 17, defendants' counsel made no mention of attempting to schedule a deposition of the University of South Carolina. Even though the University of South Carolina produced documents to defendants on June 6, defendants did nothing; they did not even forward the documents to Ricoh's counsel until June 27. Defendants simply have shown a lack of diligence in pursuing a deposition of the University of South Carolina.

Defendants do not specifically argue that there is anything in the University of South Carolina documents (or any other documents[2]) that justifies the deposition. Indeed, the transmittal letter from the University acknowledges that documents from the 1980s were not retained. Any deposition of the University through a 30(b)(6) witness would be limited to the information in the documents; anything beyond that only would lead to speculation. A deposition would also be prejudicial to Ricoh, because it falls well after the cutoff of discovery,

---

[1] Defendants misleadingly state that they informed the Court's clerk that "Defendants agreed to make best efforts to schedule these depositions prior to June 16." The Court's clerk was emphatic that all deposition discovery was to be *completed* by June 16. Likewise, on May 31 defendants represented to the clerk that they would seek only "one or two" telephonic depositions from four targets (TI, Motorola, Paradyne/Zhone and the University). Between May 31 and June 16, counsel for the parties repeatedly discussed depositions and schedules. Defendants deposed TI on June 16, and indicated that they would not take any other third party depositions. Prior to July 17, defendants never advised Ricoh's counsel they intended to depose the University.

[2] Defendants gratuitously mischaracterize documents produced by Ricoh on July 17 pursuant to the July 5 Stipulated Order. Those documents have no relationship to any line of inquiry that could be directed to the University.

interrupts Ricoh's expert discovery, and forces Ricoh to spend thousands of dollars preparing for and attending a deposition that will do nothing to advance the core issues in this case.[3]

In addition, defendants' motion for their out-of-time deposition is not limited in duration or scope, and defendants have refused to serve Ricoh with copies of their communications with third parties, making it difficult for Ricoh to adequately prepare and further adding to Ricoh's undue burden.[4]

**Reply of the Customer Defendants and Synopsys**

Ricoh is simply wrong in its characterization of the relevance of this deposition. The deposition relates largely to ownership and inventorship of the '432 patent. It is Ricoh's burden to prove that it owns the patent. Moreover, Ricoh's complaint can be dismissed for lack of standing – even at trial or on appeal – if it does not carry its burden on this issue, which is still at issue in this case and squarely alleged in Defendants' answers.

Contrary to Ricoh's contentions, with no evidentiary support, Dr. Kobayashi, for his part, could not remember very much about where or when the conception of the patent occurred. Ricoh's interrogatory responses are likewise lacking in any specificity. To date, no documents produced by anyone (other than Professor Simon Foo's documents indicating that work on the '432 patent was done by him as a student at the university) evidence conception or reduction to practice (other than the December 1986 contract that the Court has already seen, which includes Dr. Kobayashi's students names right on the face of the document). Thus, at this point, the only documentary evidence points to significant work on conception and reduction to practice having been done by Simon Foo as a student of the University of South Carolina, and the alleged development contract with Ricoh simply confirms that the students were responsible for all the functions of what later became a commercial embodiment of the patented system.

Because of these facts, as well as Ricoh's complete failure to come forward with any countervailing facts, Ricoh in fact has a serious problem proving that it, or ICC, ever owned rights to the patent. The documents recently produced by the University of South Carolina

---

[3] Defendants have failed to discuss potential dates with Ricoh's counsel; even in the draft of this letter, defendants have not disclosed when the University may be available for a deposition. In the next several weeks Ricoh's counsel will be extremely busy working on expert rebuttal reports, preparing for and engaging in expert discovery, reviewing a large volume of documents as required by the Court's orders of July 5, 2006, supplementing a large number of discovery responses as required by the Stipulated Order of July 5, 2006, and preparing summary judgment motions that are due next month. In addition, Ricoh's counsel has obligations on other cases.

[4] Ricoh understands that defendants have not advised the University of this motion, and the University has not been given an opportunity to be heard. Ricoh understands that defendants' request for a deposition imposes an undue burden upon the school. Ricoh submits that, if the Court is not inclined to deny outright defendants' motion, the Court should permit the University to explain its view on defendants' untimely deposition request, so the Court is fully advised of the premises.

directly shed further light on this issue. The documents include the policies in place in the mid-1980s that governed intellectual property ownership rights for both students and professors. The University's testimony regarding these how these policies are interpreted and enforced is indeed relevant. In addition, the University can verify that Dr. Kobayashi never complied with the very specific requirements regarding disclosure of inventions set forth in the policies, and the implications thereof regarding ownership of the associated intellectual property rights. See Exhibit 2 at 66-67 (University reserves right to assert that it owns full title to delineated Category 2 and Category 3 inventions).

With regard to what exists and does not exist, Ricoh flatly misconstrues the letter from the University. See Exhibit 1. It simply says that three contracts no longer exist. It is silent as to other documents from the mid-1980s (meaning that the University may know that some never existed) or as to the University's search for those documents. Moreover, since Ricoh bears the burden on the issue of ownership, and also is the party who waited thirteen years after the patent issued to file suit, any consequences flowing from the lack of existence of such documents must be borne by Ricoh, not Defendants. Thus, it is important for Defendants to develop the evidentiary record as to what happened with regard to any relevant documents that were once known to exist.[5]

Moreover, simply because documents don't exist does not mean that the 30(b)(6) deponent will have no knowledge of contemporaneous facts. Indeed, the University's letter is silent on this issue. This deposition is potentially critical to Defendants' case because it can help to develop a story that Ricoh and Dr. Kobayashi have assiduously shrouded in mystery—the exact relationship between the research work performed by Dr. Kobayashi and his graduate students at the University of South Carolina and the seemingly parallel work ostensibly being done under the auspices of International Chip Corporation or KBSC. Defendants have diligently uncovered new information pointing to a clear connection between the USC research and ICC/KBSC development work. Front and center are the documents and deposition testimony provided by Professor Simon Foo, who incontrovertibly developed a "knowledge based silicon compiler" as part of his dissertation research under Dr. Kobayashi's guidance at USC. Dr. Foo further testified that he declined Dr. Kobayashi's request to turn his academic research into a commercial effort for ICC; this points to a clear connection between the research done at the University and the development projects pending at ICC.

Another recent development also buttresses the relevance and importance of a deposition from the University. This Court recently ordered Ricoh's counsel to search the contents of 23 boxes of KBSC documents held at a storage facility and to re-review some 23,000 pages of

[5] In addition to Defendants' motion for evidentiary laches based on Ricoh's delay, Defendants recently learned that Ricoh specifically knew that certain users of Design Compiler infringed the '432 patent as early as mid-2000 (and Defendants assert, in fact, that Ricoh knew or should have known as early as the early 1990s when it started using Design Compiler). If it is discovered that the University had the documents through 2000, and destroyed them thereafter, Defendants motion for evidentiary laches against Ricoh would become much stronger.

imaged KBSC documents pulled from 26 boxes for responsiveness. (Documents Nos. 3:03-CV-02289-383 and 3:03-CV-04669-524.) In view of the potential production of additional KBSC documents by Ricoh, Defendants' request to pursue parallel discovery from the University is timely and wholly relevant.

Contrary to Ricoh's assertions above, the taking of this deposition will not create any prejudice or undue burden for Ricoh. Importantly, the deposition would be held within the vicinity of the University, in Columbia, South Carolina, which is geographically more accessible to Ricoh's counsel in Washington, DC, than it is to Defendants' counsel in San Francisco. As a result, it is unlikely to interrupt Ricoh's counsel from their attention to other matters; they need only send one lawyer to Columbia for a one-day trip at a modest cost.

Defendants have diligently pursued a deposition from the University through repeated efforts to contact counsel for the University. Moreover, the University has been advised that Defendants are in the process of wrapping up fact discovery. Because of the absence of counsel for the University from the office, recent case deadlines and other scheduling issues, however, Defendants' counsel heretofore has been unsuccessful in scheduling this deposition for a date certain (which is why the date above has been left blank). Defendants will continue their efforts to secure a date certain for this deposition and respectfully request that this Court grant them additional time to complete the deposition.

Respectfully submitted,

By: /s/ Denise M. De Mory
Denise M. De Mory
Counsel for SYNOPSYS, INC. and Customer Defendants AEROFLEX INCORPORATED, AEROFLEX COLORADO SPRINGS, AMI SEMICONDUCTOR, INC., MATROX ELECTRONIC SYSTEMS, LTD., MATROX RAPHICS, INC., MATROX INTERNATIONAL CORP., and MATROX TECH, INC.

By: /s/ Kenneth W. Brothers
Kenneth W. Brothers
Counsel for RICOH COMPANY, LTD




June 6, 2006

OFFICE OF THE GENERAL COUNSEL

Henry Su, Esq.
Howrey, L.L.P.
525 Market Street
Ste. 3600
San Francisco, CA 94105-2708

Re: Subpoena in a Civil Case
Synopsis, Inc. v. Ricoh Company, Ltd.

Dear Henry:

Enclosed herewith in response to the referenced subpoena, dated May 16, 2006, are the following materials: copies of Faculty Manuals and University IP Policies in effect during the period 1983-1990 (RFP Nos. 4 and 5); copy of a license agreement between the University and Research Design Associates, Inc. (RFP Nos. 6 and 7); copies of four (4) research agreements in which Dr. Hideaki Kobayashi is identified as the Principal Investigator (RFP No. 3).

According to the University's records, there were three (3) research contracts between International Chip Corporation and the USC Research & Development Foundation (RFP No. 12). The records identify these agreements as follows:

1. FY 1985-1986 "Chip Architectures" Hideaki Kobayashi, PI $30,357.00

2. FY 1987-1988 "International Chip" Hideaki Kobayashi, PI $58,500.00

3. FY 1989-1990 "International Chip" Hideaki Kobayashi, PI $41,415.00

The foregoing projects were conducted under the Master Agreement between the University and the USC Research & Development Foundation. However, the University has not maintained copies of the research agreements.

UNIVERSITY OF SOUTH CAROLINA • COLUMBIA, SOUTH CAROLINA 29208 • 803/777-7854 • FAX 803/777-9500

AN AFFIRMATIVE ACTION / EQUAL OPPORTUNITY INSTITUTION

Sincerely,

George W. Lampl, III
Associate General Counsel

Enclosures

gwl

cc: Dr. Duncan A. Buell (w/ Enclosures)



From the Original in
THE SOUTH CAROLINIANA LIBRARY
Permission is Required for
Duplication or Publication

# 4 Research

## Research Policy

It is the policy of the University to encourge research by members of its faculty. It is understood that research to be conducted at the University is to be devoted primarily to broadening the research worker's competence and professional ability and in furthering the general objective of expanding the horizons of knowledge. Research is also regarded as an indispensable adjunct to the education of graduate students. In addition to research efforts undertaken by individual faculty members, the University has created a number of bureaus and centers to perform research activities of significance to the University and the State

## Support

*University Funds.* The University assigns a moderate sum each year for research purposes through the Research and Productive Scholarship Fund and the Carolina Venture Fund. Applications for support from these funds may be obtained from the Office of Sponsored Programs and Research. These applications must have the endorsement of the faculty member's department chairman and dean.



CONFIDENTIAL

From the Original in THE SOUTH CAROLINIANA LIBRARY Permission Required for Duplication Publication

*Outside Funds* Numerous federal agencies, private foundations and private business firms operate extensive programs of sponsored research. The costs that will be funded by these agencies will vary according to their own rules or terms Faculty members interested in such projects are requested to consult with their department chairman, dean, and the Office of Sponsored Programs and Research. To facilitate such support, the University will serve as the Contracting Authority. Further, the Office of Sponsored Programs and Research will assist in the preparation of proposals, and otherwise assist in locating interested sponsors. No commitment to an outside agency which involves University participation can be made by individuals without the concurrence of a signatory authority of the University. The University will contribute to sponsored research when the work involved is significant to the purpose of the University

**Payments for Research**

Normally, payments to research participants are limited to the rate of pay the party receives as a member of the University faculty or staff.

**Relation of Research to Teaching Duties**

It is understood that research to be conducted at the University by faculty members is to be devoted to broadening the research worker's competence and professional ability. The University does not operate testing bureaus or perform routine tests and measurements as distinguished from research to broaden human understanding and knowledge.

Any member of the instructional staff who has received a reduction in teaching load for research or other University duties will not be permitted to teach courses in the Evening Division for additional compensation. Any deviations from this policy must have the recommendation of the dean concerned, with adequate justification, and the approval of the Provost

**Grant Administration**

Each research, training, or special project which is sponsored is assigned a named individual of the faculty or staff who is designated principal investigator or project director. Normally, this is the member who conceived and proposed the activity resulting in a grant or contract. He may not be changed without the approval of the sponsor The principal investigator or project director is responsible for the technical direction of the project and for making all technical reports required. He is also responsible for administration of all direct funds allocated to the project and for compliance with the terms and conditions of the grant or contract. The Office of Sponsored Programs and Research will assist the principal investigator in resolving any procedural or administrative questions.



**Use of Consultants**

The University policy with respect to the use of and payment for consultants on funded research and training projects is as follows:

1 The need for services of consultants must be justified in the contract or general proposal approved by the granting agency.

2. The principal investigator shall state that the individual consultant selected is the best qualified available considering the nature of the services provided.

3. The principal investigator shall also state that the fee is appropriate considering the qualifications of the consultant, his normal charges, and the nature of services to be provided.

4. Within the University, consultation is considered to be a part of the normal professional duties. However, in unusual circumstances where consulting is across departmental lines or is to be performed at a remote location and is in addition to regular assigned duties, compensation may be authorized. In these cases, advance approval of the Provost is required and the principal investigator shall certify as required above (2 and 3).

**Conflicts of Interest**

The University has adopted the principles of the December 1964 joint statement of the ACE-AAUP entitled *On Preventing Conflicts of Interest in Government-Sponsored Research at Universities.* The Office of Sponsored Programs and Research, upon request made through a department chairman or dean, will consider all suspected conflicts of interest in the area of grants and research. Should any conflict of interest be indicated, the individual concerned will be contacted in order to clarify and / or rectify the situation. In addition, the Office of Sponsored Programs and Research will be available for advice and assistance with regard to consulting agreements or potential conflicts of interest.

## Patent and Copyright Policy

**I. Purpose and Scope**

*Patents.* Although the search for commercially exploitable inventions is not a specific function of the University, a discovery leading to an invention may be a by-product of creative endeavor

From the Original in
THE SOUTH CAROLINIANA LIBRARY
Permission required for
Duplication

undertaken for other purposes. When such a discovery is made, it is the desire of the University to assist the inventor in evaluating, patenting, and exploiting his discovery. The purpose of this policy is to delineate procedures to encourage inventors to report discoveries with patent potential, and to assist them while safeguarding the interests of all concerned parties. This policy pertains to all students, whether undergraduate, graduate or postgraduate, part-time and full-time members of the faculty and staff, all other agents and employees of the University, and all other individuals who have made substantial use of the resources of the University

It is the explicit intent of this policy to exclude any University claim to a discovery resulting from endeavor not supported by the University or endeavor to which the University's contribution is negligible. To safeguard against any future dispute as to University support, each discovery must be submitted for review in accordance with these procedures A written opinion of the University will be provided the inventor to include, when appropriate, release of any University claim to the discovery.

Nothing herein will conflict with any agreement executed by the University with an outside agency. Outside sponsorship, particularly by federal agencies, usually involves agreement on patent matters, and each principal investigator will ensure that he and any fellow investigators understand such agreement. The Office of Sponsored Programs and Research will endeavor to obtain patent agreements with terms as favorable as possible for University personnel, and will ensure that the inventor understands the final agreement.

*Copyrights.* The University places special emphasis on assistance to faculty for the development of instructional materials and other literary materials. The application of new technology to instruction and the creation of literary works often require expensive and complex equipment which cannot be owned or operated economically by individual faculty members or by regular departments on campus In these cases the University often provides the necessary resources (or contracts for these resources). In addition, the development and production of educational or instructional materials, media materials, and literary or other materials often require specialized skills. Because data about the learning process, teaching modes, and new concepts in education are increasing very rapidly, it is difficult for faculty to remain abreast of such developments without assistance. Therefore, many faculty utilize University consulting specialists and other types of support to bring themselves up to date. New instructional materials and other literary creations, consequently, may reflect a collaborative effort[3] involving faculty members and other individuals or units on campus.



This policy governs the ownership, use, distribution and rights to income produced by these and other University-commissioned materials but specifically does not apply to materials or resources which are not University-commissioned (as defined in a later section of this policy statement) This policy applies to educational, literary and media materials (regardless of medium utilized) provided the copyrightable material meets the University-commissioned test.

## II. Administration

*A. Committee.* The University Patent and Copyright Committee (hereafter called the Committee) consists of three members appointed by the President and six members of the faculty elected for terms of three years, with two members elected annually. The Committee will select its own chairman At any time the chairman may call upon any member of the University to appear before the Committee to augment its expertise.

The Committee will consider individual cases prescribed herein, and be the patent and copyright advisory body within the University It will report to the Provost.

*B Review Procedures* Any student, whether undergradute, graduate or postgraduate, or any faculty or staff member, or any agent or employee of the University, or any individual who has made substantial use of the resources of the University, who believes he has a new invention, e.g., discovery, computer program, process, method, use or combination, whether patentable or not, or a University-commissioned copyrightable work shall bring it to the attention of the Committee through its chairman. Within a reasonable time period, usually thrity days after receiving such notification, the Committee will convene to consider the invention or work. In considering the invention or work, the Committee may consult with and receive advice from the University's counsel Within ninety days following the initial meeting, the Committee will make a determination of disposition of the case within the options of this policy and report its findings and recommendations to the Provost in writing. The Committee, if it deems appropriate, may recommend changes in the equities set forth herein. The Committee will also take reasonable steps to ensure that any joint inventors or authors (including students) are identified and, when appropriate, will recommend distribution of income among the inventors or authors (Author[s] is used to designate the person[s] responsible for producing a copyrightable work.)

The Provost will promptly notify the inventor or author in writing of the decision of the University, courses of action open to the inventor or author and the equity in any income resulting from his discovery or work.

From the Original in
THE SOUTH CAROLINIANA LIBRARY
Permission is Required for
Duplication or Publication



*C Appeal.* Upon receipt of official notification from the Provost, the inventor may submit a written appeal to the President which will include the specific points to which objection is raised. The decision of the President will be final.

**III. Patent Policy**

*A. Documenting a Discovery.* When an individual believes he has conceived an invention, he should prepare a written and dated memorandum (disclosure statement) describing the invention (which serves as one proof of the date of conception). This memorandum, however, should be only supplementary to the careful keeping of regular laboratory notebooks. Included as a part of the memorandum should be the names of all inventors, drawings, sketches, and other pertinent data to illustrate the principle of operation of the invention and its performance. The inventor should date and sign each page of his notebook and the memorandum, including all sketches and data sheets. Two witnesses, thoroughly capable of understanding the invention, and who are not joint inventors of nor interested in it, should also date and sign each page. Since priority of filing a patent application is often a decisive factor in awarding a patent, it is important that the notebook be kept current and the disclosure document be prepared as soon as possible, since these records can be relied upon as corroboration of dates of conception and reduction to practice.

The law provides that the inventor is not entitled to a patent if his invention has been described in a printed publication anywhere in the world more than a year before his patent application is filed. Since extensive developmental work is often required before a patent application can be filed, an inventor should consider the desirability of delaying publication for a reasonable period of time.

The disclosure memorandum should be submitted to the Chairman of the Committee for review in accordance with the procedures in Section II. B.

*B. Invention Categories.* The Committee will determine that the discovery belongs to one of the following categories.

CATEGORY 1. The discovery resulted from endeavor to which the University did not contribute or contributed insignificantly. In these cases the University relinquishes any equity and the inventor is at liberty to dispose of his discovery as he sees fit. The inventor may elect to submit his discovery through the University to a patent development organization with which the University has entered into agreement.

A determination that a discovery belongs in Category 1 would indicate the inventor did not receive financial support from University resources other than salary and related benefits, did not use time during which he was released from duties, had no assistance from other faculty members, staff, or students unless clearly shown to be on their own time, and made no use of University facilities, supplies, or equipment. Further, it would indicate that the inventor's association with the University was not a major factor in obtaining non-University support. A Category 1 discovery could also result from University support which is judged by the Committee to be insignificant.

CATEGORY 2. The discovery resulted from endeavor supported by non-University agencies but with University sponsorship. In most cases a degree of University support will be evident, although in some instances association with the University as a factor in obtaining outside support may be the only University contribution. In cases in this category, the University reserves the right to patent and exploit the discovery, subject to such limitations as may be imposed by prior agreement with the external sponsor. Federal regulations require written invention disclosures and written assignments of such inventions made under programs sponsored in whole or in part by the federal government. Forms of the inventions disclosures and assignments may be obtained from the Committee or from the System Legal Department.

CATEGORY 3. The discovery resulted from endeavor supported by the University. In these cases the University reserves the right to patent and exploit the discovery.

*C. Developing Marketable Discoveries.* In each case where the University support is evident (Category 2 or Category 3), the University reserves the right to assume full title to the discovery, to obtain a patent, and to exploit the invention. Sometimes it will not be to the best interest of the University or the Carolina Research and Development Foundation to assume this responsibility, weighing the complexity and cost involved against probable returns.

In the event the University or the Carolina Research and Development Foundation decline to assume the responsibility for development, the inventor will have the option of proceeding on his own or using the services of a patent development organization with which the University has entered into agreement. The decision by the inventor to proceed on his own will release the

From the Original in
THE SOUTH CAROLINIANA LIBRARY
Permission is Required for
Duplication or Publication

University or the Foundation from any further responsibility, but for its contribution to the discovery the University or the Foundation will receive a share of any income realized from commercial exploitation. This share of income will be determined at the time that either the University or the Foundation declines to assume the responsibility for development.

*D. Patent Development Organizations.* The University has entered into formal agreements with, among others, The Battelle Development Corporation (BDC) and Research Corporation. Under each agreement the University may submit for evaluation such discoveries as it wishes. If the evaluation is favorable, BDC will provide the further development necessary to bring the invention to a point where it may be advantageously licensed. Research Corporation does not develop discoveries, nor does it provide funds to others for such development but rather relies on licensing established industrial concerns to do this at their own expense. Both organizations will accept title to the invention and proceed to obtain patents and to negotiate licenses. Any resulting income is divided among the organization, the University, and the inventor.

Normally, the inventor will recommend the organization to use in developing his discovery. The agreements between the University and the two organizations are filed in the Office of Sponsored Programs and Research where they are available for review, and members of the Committee and of the Office of Sponsored Programs and Reseach may be consulted.

*E. Latent Discoveries.* Frequently, an external agency will solicit materials or devices from a University project for investigation by the agency staff for any patentable discovery. Such a solicitation shall be referred to the Committee which will determine whether there is any apparent discovery which should be developed under this policy. The Committee will also determine whether proposed arrangements with the soliciting agency are reasonable from the point of view of the University and University personnel involved. It will submit a written report to the Provost who will take appropriate action.

*F Equity.* The equity in any marketable invention is expressed as a percentage of income. Nothing herein shall conflict with an agreement signed by the University as a condition to receiving support from an external sponsor.

1. In cases where the inventor proceeds on his own but in which the University or the Carolina Research and Development Foundation has established an interest (Category 2 and 3), the University or the Carolina Research and Development Foundation will receive a maximum of 15 percent of income after deducting from income any expenses of litigation and expenses including, but not limited to, research and development expenses, patent expenses, and licensing expenses.



2. In cases in which Research Corporation assumes responsibility, after first deducting any expenses of litigation consented to by the University, 42½ percent of royalty income will be retained by the Corporation in accordance with the terms of the agreement. The first $1,000 of the balance will be paid to the inventor, and any balance beyond $1,000 will be divided equally between the University and the inventor. All costs of filing and prosecuting U.S. and foreign patents, and for negotiating and administering licenses are paid by Research Corporation out of its 42½ percent share of the royalty income.

3. In cases where The Battelle Development Corporation assumes responsibility, 50 percent from income will be paid to BDC after deducting amounts from income necessary to reimburse BDC for its expenses including, but not limited to, research and development expenses, patent expenses, and licensing expenses. The first $1,000 of the balance will be paid to the inventor, and any balance beyond $1,000 will be divided equally between the University and the inventor

4. In cases in which the University or the Carolina Research and Development Foundation assume responsibility, 25 percent of income will be paid to the inventor after deducting from income any expenses of litigation and expenses, including but not limited to, research and development expenses, patent expenses and licensing expenses.

With a Category 1 discovery (no University interest), the inventor may elect to use the services of a patent development corporation, submitting his discovery through the University. In these cases the distribution of income between the University and the inventor will be adjusted in favor of the inventor.

**IV. Copyright Policy**

*A. Definition of University-Commissioned Educational and Other Literary Materials and Media Materials.*

1. The University of South Carolina recognizes the right of all employees to engage in the uncommissioned creation of scholarly, pedagogical, and artistic works subject to copyright, and to copyright such works and to receive royalties from their use. Uncommissioned activities are defined as those which do not receive substantial aid from the University, or from an outside

From the Original in
THE SOUTH CAROLINIANA LIBRARY
Permission ... for
Duplication or Publication

agency through University channels. The University does not normally construe the provision of office and library facilities and modest routine secretarial assistance as constituting substantial aid, nor does it construe the payment of salary as substantial aid except in situations where the funds are paid specifically to support the development of original materials subject to copyright. Scholarly books and articles, textbooks resulting from usual teaching activities, painting, musical compositions, graphic art, and media materials are all examples of work that may be uncommissioned.

2. The University gains a right to materials subject to copyright when such materials result from activity commissioned by the University or by an outside agency through University channels. The substantial aid that constitutes a commission may be in the form of directly allocated funds or of University facilities and resources. Educational, literary, and media materials which may be comissioned by the University include, but are not limited to, the following.

a. Books; periodicals; lectures or other productions prepared for oral delivery, and the notes to same; study guides, texts, syllabi, workbooks, bibliographies, and tests.
b. Programmed instructional materials.
c. A work or works of art or models or designs for a work or works of art.
d. Slides, transparencies, charts, maps, photographs, drawings, prints, pictorial illustrations, labels, and other graphic materials, photographic or similar visual materials and film strips.
e. Computer programs
f. Dramatic productions, musical productions or music compositions of any length or description.
g. Three-dimensional works of a scientific, technical, or instructional character.
h Three-dimensional materials and exhibits.
i. Motion pictures
j. Recorded video and audio tapes or live transmission.
k. Contributions to or component parts of any of the above, including notes, drafts, models, story outlines, scripts, shooting scripts, production outlines, out-takes.
l Combinations of the above and other types of materials; *e.g.*, multimedia and other instructional or educational, literary, and media packages
m. Reproductions of any of the above in any quality and in any form.



3. Faculty members, students, or staff members having questions as to whether educational, literary, and media materials they are preparing or planning to prepare should be considered University-commissioned, must petition their department heads who will in turn notify the "Patent and Copyright Committee" of the circumstances surrounding the project. The petition should contain brief descriptions of the materials to be produced, the resources to be utilized, and a statement concerning the time to be devoted by the author / creator to its preparation The committee may wish to call a hearing to further investigate the production of the piece of work in accordance with the Review Procedures in Section II. The findings of the Committee and the Provost are subject to appeal as outlined in Section II.

*B. Ownership and Copyright.*

The legal title to all University-commissioned educational, literary, and media materials as defined in Section II shall be vested in the University of South Carolina with the following exception: materials produced on grants from the federal government or other outside sponsors shall be subject to the conditions of the contract or grant (to be negotiated solely by the University) with respect to ownership, distribution, use and other residual rights of and to such materials. All such materials shall bear the required statutory notice of copyright naming the University as the copyright proprietor. The University will advance the copyrights on those materials deemed by legal counsel to be eligible for new copyright. After consultation with the author, the University may at its discretion use, assign, transfer, license, lease, or sell all or part of its legal rights in educational, literary, and media materials.

*C. Pre-Production Agreement.*

Since conditions of production, use, and final disposition will vary from time to time prior to the beginning of production, authors / creators and the University will develop written agreements to define the rights and responsibilities of the parties. Such agreements are subject to the guidelines set forth herein and will be complete and specify any or all exclusions. The University legal staff will be consulted so that appropriate contractual details may be worked out, and a final copy of all contracts shall be maintained on record in the legal office.

*D. Internal University Use*

"Internal" is defined as all University of South Carolina campuses and extensions by television or otherwise.

From the Original in
THE SOUTH CAROLINIANA LIBRARY
Permission Required for
Duplication or Publication

All use of University-commissioned materials by any unit of the University for instruction or other purposes will be subject to the following conditions:

1. Use internal to the University requires approval of the college, department, or individual primarily responsible for the materials, so long as said materials are used within the context of their intended use. Use out of such context requires special permission of the creator and his department.
2. The contribution of the faculty member, student, or staff member involved in the production of University-commissioned materials must be explicitly recognized and noted by the user.

*E. External Use*

After consultation with the author the University as owner and copyright holder may at its discretion assign, license, transfer, lease, sell, or otherwise convey all or part of its rights in University-commissioned materials. Charges to external users will be negotiated solely by the University or its assignees with such users. It is possible that differing fees to other state agencies, nonprofit educational users, consortium users, and others will be a result of these negotiations. In any case, the University has the exclusive right to set per unit prices, package prices, and conditions under which sale, lease, reproduction or use of materials is authorized

*F. Revision*

Revision of University-commissioned material which does not require substantial University resources may be made at any time by the faculty member, student, or staff member involved subject to the approval of the member's department.

The responsible faculty member may recommend to the University and other users the discontinuance of distribution and / or use of materials which he deems no longer appropriate, or which he judges to be detrimental to his professional reputation. Mutual agreement by both parties is required for revision or discontinuance in such cases.

After a significant period of non-use (at least three years), materials which have not been revised shall be reviewed by the authoring faculty member, student, or staff member, and the University unit or units most directly involved in their production and the authoring faculty member, student, or staff member may request their withdrawal, erasure, or destruction. The University, in its sole discretion, may require such withdrawal, erasure, or destruction and its decision in that regard shall be final



*G. Equity.*

With the exception specified below, the University shall not make any payment to the University-employed faculty member, student, or staff member involved in the production of University-commissioned educational, literary, and media materials for production and internal use other than the compensation which he regularly receives from the University.

1. Exceptions on payments for internal use of materials.
   a. At the discretion of the department chairman faculty will normally be accorded released time at a declining level through the stages of planning, production, and presentation, including the first and subsequent semesters of utilization. Faculty eligible for released time include the responsible faculty member and other faculty members assigned to work on the project by department or its functional equivalent.
   b. If the faculty member, student, or staff member leaves the University, further internal use of the materials upon reasonable terms shall be provided for and payments to him or his estate for such internal use of the material shall continue to be made, subject to terms of preproduction agreements.
   c. A faculty member, student, or staff member not on assignment to the University (*e.g.*, during summer sessions or on leave) but appearing in or involved in producing educational, literary, or media materials may be provided compensation when such materials in which he personally and prominently appears are used. Compensation will be mutually agreed upon in the preproduction agreement by the faculty member, student, or staff member and the department involved, based upon (1) the amount of continual responsibility of the party involved for monitoring, revision of lessons, or supervision of the work of the course if known; (2) whether the course is completely or partially recorded; (3) the extent to which the participating faculty member, student, or staff member's time and creative efforts have been previously compensated; and (4) any other relevant factors.
2. The University shall have the perpetual right to market or license external use of University-commissioned materials. The financial benefits of external distribution shall be shared by the department or functional equivalent; the responsible faculty member, student, or staff member; and the institution, with a negotiated portion designated for outside or non-University production sources as required.

From the Original in
THE SOUTH CAROLINIANA LIBRARY
Permission is Required for
Duplication or Publication



a. The division of income accruing to the University under this policy shall be: 25 percent to the faculty member, student, or staff member (to be divided equitably if there is more than one originator); 25 percent to the department and / or other functional unit which authorized and supported the development and production of the materials, 25 percent to the Instructional Development Fund; and 25 percent as general University income. The monies distributed to the department and / or other functional units and to the Instructional Development Fund shall be used to encourage further educational and instructional activities by the faculty

b. Exceptions to distribution percentages and / or payment provisions may be made for incentive purposes but must be negotiated in preparation agreements.

3. If the University licenses an external agency to produce or market the materials, the total royalties shall be negotiated between the University and the external agency. The net income from royalties accruing to the University shall be divided between the faculty member, student, or staff member, the University, and the department in the same proportions as previously delineated.

4 It is expected that the share of each department (or functional equivalent) will be devoted to (1) teaching load adjustment necessitated by production, or (2) development of new course materials or other educational, literary, and media works and / or the revision or upgrading of the original materials.

5. The distributions above shall be continuing except in the case of termination or death. (See 7 below.)

6 The foregoing does not apply to "work-for-hire" arrangement or to the production of copyrightable materials as an assigned duty.

7. The institution's right to use materials will continue regardless of the employment status of the responsible faculty member, student, or staff member. The author / creator's share in external distribution revenues shall remain the same for a ten-year period and shall accrue to his heirs in the event of termination or death.

*H. Protection and Liability.*

1. PROTECTION

The University shall be responsible for the investigation of recorded allegations of unauthorized use or infringement of copyrighted materials. Where legal action is deemed necessary by the University, in its sole discretion, to enforce copyrights, the University agrees that all costs and expenses incidental to such actions shall be borne by the University and any proceeds of litigations in excess of costs shall be shared between the parties in the proportions set forth previously (as applicable) when final adjudication of the legal action is rendered.

2. LIABILITY

a. The faculty member, student, or staff members responsible for the creation of University-sponsored educational, literary, and media materials shall obtain appropriate releases from individuals prominently appearing in or giving support to the materials, giving all necessary rights to the University. Form releases may be obtained from the System Legal Department. All original releases must be filed with the University's legal counsel

b Before any external use is made of University-sponsored material, the faculty member, student or staff member authoring or creating the material shall certify in writing to the University that to the best of his knowledge materials used therein do not infringe or violate any existing copyright, or other personal or property right of any legal or natural person If this statement proves false due to misrepresentation or negligence, the faculty member, student, or staff member shall indemnify and hold harmless the University for all costs and expenses to which it has been subjected as a result of such representation made herein.

c In the event that others allege violations of personal or property rights by the University, or by the faculty member, student, or staff member, or producer of University-sponsored educational and other literary materials, the University will assume responsibility for defense of any litigation and the satisfaction of any judgment rendered against the University, faculty member, student, or staff member. (This provision is subject to the conditions set out above )

**V. Consultant Activity (see also p. 63)**

A member of the University staff may be permitted to do professional work of an expert character outside the University and to receive pay therefor when the work in question contributes to the professional development of the faculty member. No such outside work shall be undertaken except on the prior approval of

the dean of the school or college concerned and prior authorization of the Provost. The University reserves the right to declare a conflict of interest at any time. Laboratories, equipment or other facilities of the University generally are not available to University employees for consulting work. Patent and copyrights for approved consultant activities are matters to be decided between the faculty member and the outside agency. If, however, University facilities are used, an interest of the University is thereby established, and agreement as to patent and / or copyright matters should be resolved before undertaking the project. Conversely, when the University hires a consultant, specific prior arrangements should be made in the consultative agreement for protection of the University's rights. The Patent and Copyright Committee should be consulted for assistance in resolving these questions.

In cases where a University employee is hiring a consultant to be paid from a University grant or contract, such consulting is subject to the funding agency's regulations imposed within the grant or contract document. Further, if the consultant to be hired is a State employee, remuneration for such activities is governed by the University's policies on extra compensation and the State's policy on dual employment.

From the Original in
THE SOUTH CAROLINIANA LIBRARY
Permission is Required for
Duplication or Publication

# 5 Benefits and Privileges

## Insurance

The University of South Carolina in conjunction with the State of South Carolina has a comprehensive program of insurance and annuity plans for members of the faculty, staff, and their dependents. The various plans consist of life insurance, health insurance, long-term disability insurance and annuity benefits made available to assist in meeting financial security needs.

### State Employees Health and Life Insurance Programs

Blue Cross-Blue Shield, Liberty Life Insurance Company and Metropolitan Life Insurance Company provide plans of group insurance benefits for all eligible employees of the state. These comprehensive plans include basic hospital, surgical, regular medical and major medical benefits; life insurance and accidental death and dismemberment benefits, and long-term disability benefits. Employees may enroll their eligible dependents for health insurance benefits and dependent life insurance. Information on the various insurance plans available may be obtained from the University Personnel Office.