1  Teresa M. Corbin (SBN 132360)
   Denise M. De Mory (SBN 168076)
2  Jaclyn C. Fink (SBN 217913)
   HOWREY LLP
3  525 Market Street, Suite 3600
   San Francisco, California 94105
4  Telephone:  (415) 848-4900
   Facsimile:   (415) 848-4999
5
   Attorneys for Plaintiff SYNOPSYS, INC.
6  and for Defendants AEROFLEX INCORPORATED,
   AMI SEMICONDUCTOR, INC., MATROX
7  ELECTRONIC SYSTEMS, LTD., MATROX
   GRAPHICS, INC., MATROX INTERNATIONAL
8  CORP., MATROX TECH, INC., and
   AEROFLEX COLORADO SPRINGS, INC.
9

10                 UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13

14  RICOH COMPANY, LTD,                    Case No. C03-04669 MJJ (EMC)

15          Plaintiff,                     Case No. C03-02289 MJJ (EMC)

16     vs.                                 **DECLARATION OF DENISE M. DE MORY
                                           PURSUANT TO CIVIL LOCAL RULE 56-**
17  AEROFLEX INCORPORATED, AMI             **2(b)**
    SEMICONDUCTOR, INC., MATROX
18  ELECTRONIC SYSTEMS LTD., MATROX
    GRAPHICS INC., MATROX
19  INTERNATIONAL CORP., MATROX TECH,
    INC., AND AEROFLEX COLORADO
20  SPRINGS, INC.,

21          Defendants.

22  SYNOPSYS, INC.,

23          Plaintiff,

24     vs.

25  RICOH COMPANY, LTD.,

26          Defendant.

27

28                    **REDACTED PUBLIC COPY**

HOWREY LLP   Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)         -1-
             RULE 56-2 DECLARATION

             DM_US\8391964.v1

## DECLARATION OF DENISE M. DE MORY

I, Denise M. De Mory declare as follows:

1.    I am a partner at the law firm of Howrey LLP, counsel of record for Synopsys and the Customer Defendants in the above-captioned actions.  I am a member in good standing of the State Bar of California and have been admitted to practice before this Court.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.    I make this declaration pursuant to Civil Local Rule 56-2, which states that "If the nonmoving party refuses to join in the statement, the moving party will nevertheless be permitted to file the motion, accompanied by a separate declaration of counsel explaining why a joint statement was not filed. Whether or not sanctions should be imposed for failure to file a joint statement of undisputed facts is a matter within the discretion of the assigned Judge."

3.    Synopsys and the Customer Defendants have filed nine summary judgment motions with the Court, and Ricoh has filed one summary judgment motion with the Court.  Briefing was completed on Friday, September 8, 2006, and the hearing was originally set for Tuesday, September 26, 2006, but has since been taken off-calendar.  The parties were able to reach agreement regarding a Separate Statement of Facts in support of Ricoh's Motion for Summary Judgment, and a complete Separate Statement of Facts was filed with regard to that Motion.  See *Synopsys* Docket No. 482. With regard to Synopsys and the Customer Defendants' Motions, however, the parties were unable to reach complete agreement on a Separate Statement.  A partial Separate Statement was filed.  Id.  This Declaration addresses facts to which Ricoh refused stipulate.

4.    At 1:08 p.m. Pacific Time on Monday, September 11, 2006, I sent counsel for Ricoh a proposed joint stipulation of undisputed facts relating to all ten summary judgment motions pending before the Court.  A true and correct copy of this e-mail (with attachment) is attached hereto as Exhibit 1.

5.    At 11:22 a.m. Pacific Time on Tuesday, September 12, counsel for Ricoh sent me comments on the proposed undisputed facts sent the previous day.  A true and correct copy of this e-mail (with attachment) is attached hereto as Exhibit 2.

6.      Over the next 12 hours, the parties engaged in extensive meet and confer efforts to reach agreement on a joint statement of undisputed facts.  Exhibit 3 is an e-mail from me to Ricoh's counsel providing all changes Synopsys and the Customer Defendants were willing to agree to. Exhibit 4 is Ricoh's response to this e-mail.

7.      The Joint Statement, as it existed as of approximately 11:00 p.m. on September 12, was then filed.  After the filing was complete, I sent counsel for Ricoh the following e-mail:

Ken:

I dispute your characterizations.  You have known about all of the facts included in each version of our joint statement since August 18.  You did not [dispute] the facts in your [oppositions] to our motions, and thus, they were appropriately included in joint statement. Moreover, to the extent that we included what you improperly characterize as "new facts" in the draft distributed this evening, they were either something that we specifically discussed, or they were to attempt to address your concerns, and thus, not new facts at all.  You inserted specific comments regarding those facts that you disputed because it was allegedly too late for you to verify the facts.  Please advise before 6 p.m. PST tomorrow whether or not you the facts to which you included your "11:00 p.m. objection" are agreeable to Ricoh.  Also please explain why you could not agree to facts 1 and 2 as written which were verbatim from [the] Soderman transcript.

Exhibit 5.

Ricoh's counsel has never responded to this e-mail.

8.      The facts Ricoh rejected fall primarily into two categories — those that were verbatim quotes from or close paraphrases of Ricoh's pleadings, expert reports and/or expert depositions, and those that were raised in Synopsys and the Customer Defendants' opening papers, and to which Ricoh came forward with no controverting evidence with its opposition papers.

9.      For the proposed facts Ricoh rejected which were verbatim quotes or paraphrases from Ricoh's own pleadings and experts, I provided Ricoh's counsel with the original citations.  Ricoh still did not agree to the proposed facts.

10.      With regard to Summary Judgment Motion No. 1, the proposed facts Ricoh rejected as well as the source material cited to Ricoh are set forth in the table below.   The proposed facts are taken from Exhibit 1, unless otherwise noted.

| **Proposed Fact** | **Original Ricoh Source Material Cited To Ricoh In Support of Proposed Fact** |
| --- | --- |
| 1.      The Customer Defendant designs at issue | "Q    Do the customer designs include a |

Case No. C03-2289 MJJ (EMC)                                    -3-
RULE 56-2 DECLARATION

DM_US\8391964.v1

| include a specification of inputs. | specification of the inputs? |
| | A  Yes." Soderman Depo. At 77:21-23. |
| 2.       The Customer Defendant designs at issue include a specification of outputs. | "Q   Do the customer designs include a specification of the outputs? |
| | A  Yes." Soderman Depo. At 77:24-78:1. |
| 3.       The Customer Defendant designs at issue include a specification of registers (which may be flip-flops or latches). | Q   Do the customer Defendant designs include a specification of registers if we define specification of registers to include inferring a register from statements such as pos clock edge, always@(posclkedge)? |
| | A   Here again, if you substitute the word "FlipFlop", I would agree. |
| | Q   Let's do it that way.  Do the customer Defendant designs include a specification of FlipFlops if we define specification of FlipFlops to include inferring if FlipFlop from statements such as always@(posclkedge)? |
| | A   Yes." Soderman Depo. At 80:1-13. |
| 4.       The Customer Defendant designs at issue, for each clock cycle, include a description of how the values of the outputs and registers should be set according to the value of the inputs, the previous values of the registers and the logic functionality between register locations. | "Q   Let me try it again.  Do the customer Defendant designs include for each clock cycle a description of how the values of the outputs and FlipFlops should be set according to the values of the inputs, the previous values of the FlipFlops and the logic functionality as specified by the HDL operators? |
| | A   Yes." Soderman Depo. At 108:2-9. |

11.    With regard to Summary Judgment Motion No. 2, the proposed facts Ricoh rejected as well as the source material cited to Ricoh are set forth in the table below.

| Proposed Fact | Original Ricoh Source Material Cited To Ricoh In Support of Proposed Fact |
|---|---|
| | "Q    So the RBO rules at issue, for purposes of your infringement analysis, are applied to the customer Defendant designs after the designs have been mapped to target technology hardware cells; is that correct? <br><br> A    The rules are applied there.  Could have been applied other places at other times, but they're definitely applied there. <br><br> Q    But for purposes of your infringement analysis -- <br><br> A    That's where they're applied.  That's where we say it infringes. <br><br> Q    When those rules are applied, is it correct that the functionality of the circuit is not changed? <br><br> A    Well, it's still doing an add operation.  That part isn't changed.  You may have changed the size of a gate, or maybe combined a couple of gates together.  That's what the rules do. <br><br> Q    And it doesn't -- the rules don't change the architecture of the cell either, do they?  If it's a ripple carry adder, it stays a ripple carry adder; is that correct? <br><br> A    Correct, it doesn't change the architecture that way. |

1

2    Q  And so if a ripple carry adder has been

3    selected, application of the RBO rules to the

4    design after that selection does not change the

5    architecture; is that correct?

6    *A It does change a ripple carry into a carry save*

7    *or a BK.  That's extremely clear.  If that's the*

8    *question you are asking, that's the answer.*

9    Soderman Depo. at 169:13-170:22.

10   "Q.    You put in a plus.  You had more than one

11   choice, and Design Compiler chose a synthetic

12   operator?

13   A    One of the synthetic operators, yes.

14   Q    Okay.  So you put in a plus and Design

15   Compiler had a choice of multiple synthetic

16   operators and at some point in time, it selected

17   one synthetic operator; correct?

18   A    Yes.

19   Q    That happened without applying RBO SOT

20   rules; correct?

21   A    Yes.

22   Q    From that one synthetic operator, Design

23   Compiler had a choice of multiple synthetic

24   modules; is that correct?

25   A    Yes.

26   Q    And Design Compiler at some point in time

27   chose one synthetic module to correspond to the

28   synthetic operator which corresponds to the plus;

1    correct?

2    A    Yes.

3    Q    And Design Compiler does that without

4    applying RBO SOT rules; is that correct?

5    A    Yes.

6    Q    At some point in time, the selected synthetic

7    module is mapped to a DesignWare

8    implementation such as what we've been talking

9    about, DW01_ADD ripple underscore something,

10    and that corresponds to the selected synthetic

11    module, which corresponds to the selected

12    synthetic operator which corresponds to the plus,

13    and all of that happened without the application of

14    RBO rules; is that correct?

15    A    *Yes, because what was originally defined was*

16    *architecturally independent operator, and it went*

17    *through the various -- we'll call it decision trees,*

18    *and when it found the most optimum, we'll call it*

19    *architecture, it then ran in the RBO – then it runs*

20    *the RBO rules to further refine i*t." Soderman

21    Depo. at 145:9-146:22.

22

23    12.    With regard to Summary Judgment Motion No. 3, the proposed facts rejected by Ricoh

24    as well as the source material cited to Ricoh are set forth in the table below.   Ricoh's attorney

25    explained his refusal to agree with these proposed facts by stating "[g]enerally, I think you are

26    attempting to substitute attorney characterizations of evidence for the actual evidence, which as you

27    have pointed out in your briefs is improper.  We are not going to let you pick an choose from the

28    statements in all our briefs and let you agree with some and dispute or not include others."  The e-mail

1    in which Ricoh's attorney set forth this explanation is attached hereto as Exhibit 6.   It is Synopsys'

2    and the Customer Defendants' position that it is appropriate to identify areas of agreement, especially

3    agreement that is apparent from Ricoh's briefs, as undisputed facts.  Furthermore, as explained in the

4    Reply brief, based solely on the facts to which Ricoh has agreed in its briefs, summary judgment is

5    appropriate without regard to the other facts.

| **Proposed Fact** | **Original Ricoh Source Material Cited To Ricoh In Support of Proposed Fact** |
|---|---|
| 11.      Dr. Kobayashi was Dr. Foo's advisor for his master's thesis, attached as Exhibit 66 to the Brothers Declaration. | "Mr. Foo authored a master's thesis entitled: 'Managing VLSI CAD with a relational Database system.' (Brothers Dec. Ex. 65 Foo Tr. at 7). . . . Dr. Kobayashi approved of the topic and acted as Mr. Foo's advisor for his master's thesis. (*Id*.)." Ricoh Opp. to SJM #3 at 3:16-4:3. |
| 12.      This thesis describes the use of a relational database system to manage very large scale integration designs. | "Mr. Foo's master thesis describes the use of a relational database system to manage very large scale integration designs. (Brothers Dec. Ex. 66 Foo Master Thesis)."  Ricoh Opp. to SJM #3 at 17:3-4. |
| 14.      One of these papers, titled "A Framework for Managing VLSI CAD Data," discusses a frame based approach for managing VLSI CAD data, attached as Exhibit 67 to the Brothers Declaration. | "One of the papers is entitled 'A Framework for Managing VLSI CAD Data' and was published in April, 1986.  (Brothers Dec. Ex. 67 ) This paper discusses a frame based approach for managing VLSI CAD data."  Ricoh Opp. to SJM #3 at 4:4-6. |
| 15.      The other paper, titled "A Knowledge Based System for VLSI module selection," discusses a program called NEPTUNE, which is a | "A second co-authored paper is entitled 'A Knowledge based system for VLSI module selection' and was published October, 1986. |

| | |
|---|---|
| system that selects VLSI modules, and based on domain specific knowledge and heuristic rules, helps find optimized solutions, attached as Exhibit 68 to the Brothers Declaration. | (Brothers Dec. Ex. 68)  This paper discusses 'Neptune,' a system that selects VLSI modules, and based on domain specific knowledge and heuristic rules. [sic] helps find optimized solutions."  Ricoh Opp. to SJM #3 at 4:19-22. |
| 16.    Neptune is listed as one of the names of the program modules for cell selection that was part of the contract between ICC and Ricoh for the joint development of the Knowledge Based Silicon Compiler (which is attached to the contract between ICC and Ricoh with an effective date of January 15, 1987), and Dr. Foo is listed as one of the two program designers for Neptune. | "Neptune is listed as one of the names of the program module for cell selection that was part of the contract between ICC and Ricoh for the joint development of the Knowledge based Silicon Compiler. Program specification indicated that there were two program designers: Mr. Foo and Stuart Anderson."  Ricoh Opp. to SJM #3 at 18:1-4. |

13.    With regard to Summary Judgment Motion No. 3, the proposed facts rejected by Ricoh which have no controverting evidence in the record, with citations to the evidence which supports them, are set forth in the table below.  The proposed facts are contained in Exhibit 1, unless they specify otherwise.

| **Proposed Fact** | **Uncontroverted Supporting Evidence** |
|---|---|
| 18 (Ex. 3).  As described in "A Knowledge Based System for VLSI module selection," the VLSI modules that are selected by the NEPTUNE system are selected using rules stored in an expert system knowledge base. | "This paper introduces a frame-based system for selecting VLSI modules, called NEPTUNE. Based on domain specific knowledge and heuristic rules, NEPTUNE assists IC designers to select an optimized solution, and explore different implementation alternatives." Brothers Decl., Ex. 68, at 184. |

14.    With regard to Summary Judgment Motion No. 4, the proposed facts rejected by Ricoh as well as the source material cited to Ricoh are set forth in the table below.

| Proposed Fact | Original Ricoh Source Material Cited To Ricoh In Support of Proposed Fact |
|---|---|
| 24.    The VDAA system accepted as input an algorithmic description of the behavior of the chip, written in a language known as ISPS, and the ISPS description described the desired functionality of the chip in terms of actions and conditions. | "The VDAA system inputs an algorithmic description in a programming language known as 'ISP.' [sic] The VDAA system transforms the algorithmic description into a network of functional modules (e.g., registers, adders, multiplexers) using expert knowledge." Soderman Rebuttal Report at 19:2-7. |

15.    With regard to Summary Judgment Motion No. 4, the proposed facts rejected by Ricoh which have no controverting evidence in the record, with citations to the evidence which supports them, are set forth in the table below.  The proposed facts are contained in Exhibit 1, unless they specify otherwise, and are separated by Motion.  After receiving comments from Ricoh to certain facts proposed in Exhibit 1, Synopsys and the Customer Defendants separated certain original facts into constituent parts — for instance, Fact No. 20, which was not challenged by Ricoh in its oppositions, was first challenged by Ricoh in its response to the proposed fact.  *See* Exhibit 2.  Synopsys and the Customer Defendants proposed Facts Nos. 20d-20f, also uncontroverted, to attempt to determine whether Ricoh's objection could be addressed.  The same is true with Fact No. 21.

| Proposed Fact | Uncontroverted Supporting Evidence |
|---|---|
| 20.  The article T.J. Kowalski, D.J. Geiger, W.H. Wolf, and W. Fichner, "The VLSI Design Automation Assistant:  From Algorithms to Silicon," *IEEE Design and Test of Computers* | |

| | |
|---|---|
| 1 *Magazine*, Vol. 2, No. 4, pp. 33-43 | |
| 2 ("Kowalski85") was published in August 1985. | |
| 3 | |
| 4 20d (Ex. 3). *IEEE Design and Test of Computers* | |
| 5 *Magazine* is a periodical which is publicly | |
| 6 available from at least one library. | |
| 7 20e (Ex. 3). The August 1985 issue of *IEEE* | |
| 8 *Design and Test of Computers Magazine* is | |
| 9 publicly available from at least one library. | |
| 10 | |
| 11 20f (Ex. 3). The August 1985 issue of *IEEE* | |
| 12 *Design and Test of Computers Magazine* was | |
| 13 publicly available from at least one library prior to | |
| 14 January 13, 1987. | |
| 15 | |
| 16 | |
| 17 | |
| 18 | Oka Depo. at 364:20-365:20. |
| 19 21. The thesis "The VLSI design automation | De Mory Decl., Ex. 101; Brothers Decl., Ex. 82 at |
| 20 assistant: a knowledge based expert system," | cover page and Acknowledgements. |
| 21 written by Thaddeus Julius Kowalski at Carnegie | |
| 22 Mellon University, was available to the public via | |
| 23 the Carnegie Mellon library in 1984 ("Kowalski | |
| 24 Thesis" or "Kowalski84"), and was republished | |
| 25 by Kulwer in 1985 in book form. | |
| 26 | |
| 27 21c (Ex. 3). The Kowalski Thesis contains an | |
| 28 indication that it is designated as SRC Report | |

| | |
|---|---|
| CMU-CAD-84-29. | |
| 21d (Ex. 3).   The work on the Kowalski Thesis was financed in part by the National Science Foundation. | |
| 21e (Ex. 3).   The Kowalski Thesis contains a limited distribution notice stating that the thesis has been, or will be, submitted for publication, has been issued as a Research Report for dissemination of its contents, and because of potential transfer of copyright to the publisher, distribution outside CMU is limited to peers and specific requests until publication. | |
| 22a (Ex. 3).   Kowalski85 and the Kowalski Thesis describe versions of the same program, which is entitled VLSI Design Automation Assistant. | Kowalski Depo. at 9:14-17 & 13:5-12; Kowalski85 at Note 8 (citation to Kowalski Thesis). |
| 22b (Ex. 3).   The parties refer to the VLSI Design Automation Assistant as "VDAA." | *See generally*, Ricoh Opp. to SJM #4. |
| 23b (Ex. 3).   Dr. Kowalski provided deposition testimony on the VDAA program, Kowalski85, and the Kowalski Thesis, among other topics, in response to questions posed by Ricoh's attorneys. | De Mory Decl., Ex. 37 (Kowalski Depo.) |
| 24a (Ex. 3).  The VDAA system inputs an algorithmic description in a programming language known as "ISP." [sic]  The VDAA system transforms the algorithmic description into a network of functional modules (e.g., registers, | Soderman Rebuttal Report at 19:2-7. |

| | |
|---|---|
| adders, multiplexers) using expert knowledge. | |
| 25.      The ISPS description was then translated into a data-flow graph representation known as VT by the VDAA system.  In the process of compiling the design into a VT, the compiler translated each of the actions and conditions into a predefined operator, which forms the node of the graph. | Kowalski Thesis at 49 ("The ISPS description is compiled into a VT data-flow representation. . . . The VT is a directed acyclic graph. . . .  The nodes in this graph are called *operators* and correspond to operations that take certain values as input and produce new values as output. . . .  The arcs connecting the nodes are called *outnodes* and represent the generation or use of data values. They are translations of the ISPS carriers and the temporary carriers needed to pass results from one operator to another.  The graph is partitioned into subgraphs called *VT-bodies*, corresponding to a set of operations that can be evoked, entered, or left as a unit.  These subgraphs are translations of ISPS procedures, labeled blocks and loops."); Kowalski85 at 36 ("The DAA actually works from a dataflow representation extracted from the ISPS description"). |
| 26.      The nodes in the VT representation were used to select hardware cells from the "technology-sensitive database" using expert rules stored in the VDAA system. | Kowalski Thesis at 69 ("This section overviews allocating memories, registers, constants, controller, and database by recognizing certain features in the VT representation.  These rules, like all the other rules in this chapter, use the service function rules to do their bookkeeping."); *id.* at 71 ("Once the designer has allocated the |

| | |
|---|---|
| | global non-changing hardware, the next task is to partition the whole design into smaller blocks and select a partition for allocation. . . . The DAA allocates the clock phases, operators, registers, data paths and control logic in two subtasks, VT allocation and SCS allocation, which are shown in Figure 27. This allows the DAA to gather all the information about register usage in the VT allocation and then allocate registers and modules in the SCS allocation.); Kowalski85 at 34 ("A cornerstone of our hardware synthesis approach is the use of knowledge-based expert systems. Such systems make decisions based on knowledge, expressed as rules, obtained from expert designers."); *id.* at 36 ("The DAA is a knowledge-based expert system that uses a database of over 500 rules to synthesize an architectural implementation from an algorithmic description with constraints. The description is written in ISPS.") |
| 27.      The rules in the VDAA system were in an IF-THEN antecedent format. | Kowalski Thesis at 11 ("The rule memory is a collection of conditional statements that operate on elements stored in the working memory. The statements resemble the conditional statements of conventional programming languages: *IF: <antecedent 1> . . . <antecedent n> THEN: <consequence 1> . . . <consequence m>.*") |

| | |
|---|---|
| 28.    After the hardware cells were bound using the module binder, a netlist was created by the control allocator. | Kowalski Depo. at 106:7-13. |
| 29 (Ex. 3).   At deposition, Dr. Kowalski testified (without corroboration) that the "technology sensitive" database in Kowalski85 contained technology-independent "cell descriptions," where he defined that term stating: "It varied.  It could be as low as a single an gate or as high and complicated as an ALU.  So it is a broad list of possible things." | Kowalski Depo. at 83:5-24. |
| 30b (Ex. 3).    Dr. Kowalski refined the VDAA program while at AT&T. | Kowalski Depo. 14:4-6; 77:16-20; 78:15-79:19; 94:20-99:17; 104:8-21; 118:7-119:12; 130:6-131:3. |
| 30c (Ex. 3).    One of these refinements to VDAA was to eliminate the need for a separate module binder process. | *Id.*; *see also* Kowalski Depo. Ex. 463. |
| 30d (Ex. 3).    Under this refinement, the VDAA program itself selected and bound hardware cell, and created a netlist, without the need for a separate module binder. | *Id.*; *see also* Kowalski Depo. Ex. 463. |

16.    With regard to Summary Judgment Motion No. 5, the proposed facts rejected by Ricoh which have no controverting evidence in the record with citations to the evidence which supports them are set forth in the table below.  The proposed facts are contained in Exhibit 1, unless they specify otherwise.

| **Proposed Fact** | **Uncontroverted Supporting Evidence** |
|---|---|

| 38. The 1989 KBSC Article discusses eight prior art systems, including VDAA as disclosed in Kowalski85, and distinguishes those systems from KBSC. | Brothers Dec. Ex. 84 (at 388-389) |
|---|---|
| 39. The 1989 KBSC Article refers to VDAA as DAA (or just Design Automation Assistant). | Brothers Dec. Ex. 84 (at 389). |
| 40. Reference [5] to Kowalski85 in the 1989 KBSC Article is incorrectly cited as being published in 1986. | Brothers Dec. Ex. 84 (at 390); De Mory Supp. Decl. Ex. 92 (1986 TOC). |
| 41. No article exists for Reference [5] as cited in the 1989 KBSC Article (i.e., as a 1986 Kowalski article). | *Id.* |

17.    With regard to Summary Judgment Motion No. 6, the proposed facts rejected by Ricoh which have no controverting evidence in the record with citations to the evidence which supports them are set forth in the table below.  The proposed facts are contained in Exhibit 1, unless they specify otherwise.   After receiving comments from Ricoh to certain facts proposed in Exhibit 1, Synopsys and the Customer Defendants separated certain original facts into constituent parts — for instance, Fact No. 44, which was not challenged by Ricoh in its oppositions, was first challenged by Ricoh in its response to the proposed fact. *See* Exhibit 2.

| **Proposed Fact** | **Uncontroverted Supporting Evidence** |
|---|---|
| 44.  Ricoh asserts that over 350 of the Customer Defendants' designs infringe the '432 claims. | See below. |
| 44a (Ex. 3).    231 of the over 350 ASICs at issue in this case are AMI Semiconductor, Inc. ASICs for which the only logic synthesis performed by AMI Semiconductor, Inc. using the Design | Casavant Decl., ¶ 9 and Ex. 2; De Mory Decl., Ex. 50 at 5-10. |

| | |
|---|---|
| Compiler system was the creation of a BIST (Built In Self Test) memory controller.  These 231 ASICS are listed in the June 1, 2006 Corrected Third Supplemental Product Declaration of Robert B. Smith of AMI. | |
| 44b (Ex. 3).    A BIST is not an ASIC, but merely a portion of an ASIC whose only purpose is to allow testing of a memory device on the chip prior to shipment to the customer. | Casavant Decl., ¶ 9; De Mory Decl., Ex. 51 (Warren) at 63:13-65:25. |
| 44c (Ex. 3).    Of the over 350 ASICs at issue, at least the following Aeroflex, Inc. and Aeroflex Colorado Springs, Inc. ASICs are mixed-signal ASICs: JW01, YA04/YA13, YB01, DA01, DA02, JW02. | Casavant Decl., ¶ 8 and Ex. 2. |
| 44d (Ex. 3).    Of the over 350 ASICs at issue, at least the following Matrox Electronic Systems Ltd., Matrox Graphics, Inc., Matrox International Corp., and Matrox Tech, Inc. ASICs are mixed-signal ASICs: Cyclone, Eclipse, Eclipse PCI, Calao, Toucan, Condor, Condor Plus, Parhelia, Sundog, Parhelia8x, Sunex, Maven, Rainbow Runner, Twister. | Casavant Decl., ¶ 8 and Ex. 2. |
| 44e (Ex.3).    Of the over 350 ASICs at issue, at least the following AMI Semiconductor, Inc. ASICs are mixed-signal ASICs: 11241-801, 802, 803; 0QJBW-001, 002, 900, 901, 902, 903, 904, 905, 906; 11636-501; 14167-001; 14948-501, | Casavant Decl., ¶ 8 and Ex. 2. |

| | |
|---|---|
| 502, 503; 15088-501; 15124-501, 502; 19007-001; 19075-001, 002, 003; 19320-001; 19371-001; 19402-001; 0JGBE-001, 002, 900, 901, 902; 19293-001, 002, 004; 19070-001, 002; 19134-001; 0MNTA-900, 901, 902, 903, 904, 905, 906, 907, 908, 909, 910, 911, 912, 913, 914; 13855-501; 15078-001, 002; 19219-001, 002, 003; 19299-001; 19409-001, 002, 003; 19428-001; 19429-001, 002, 003; 19529-001; 19558-002; 19608-001; 19645-001; 19664-002; 19693-001, 002; 0AFCB-002; D1AFCC; 0APSE-002; 0C621-003; 0C622-003; D1CORC; D1CORD; 0HISB-001; 0IEBA-002; D1SEBA. | |
| 44f.    For all ASIC designs, the Design Compiler system cannot be used to design certain portions of the ASIC such as instantiated pad cells, asynchronous logic, and hand instantiated logic. | Casavant Decl., ¶ 10; Brothers Decl., Ex. 27 (Casavant report) at 7. |
| 46.    The Design Compiler system can only be used to design digital portions of ASICs. | See Casavant Decl., ¶ 8; Brothers Decl., Ex. 27 (Casavant report) at 7. |
| 47.    Mixed-signal products contain both analog and digital portions. | See Casavant Decl., ¶ 8. |
| 48.    The ASIC products Ricoh accuses of infringement in this case that are mixed-signal products are listed in Exhibit 2 to the August 18, 2006 Declaration of Albert E. Casavant in Support of Synopsys and the Customer Defendants' Motions for Summary Judgment. | Casavant Decl. ¶ 8; Exhibit 2 to the August 18, 2006 Declaration of Albert E. Casavant in Support of Synopsys and the Defendants' Motions for Summary Judgment. |

| | |
|---|---|
| 49 (Ex. 3).    The Corrected Third Supplemental Product Declaration of Robert B. Smith of AMI dated June 1, 2006 declares that for 231 of the AMI designs that Ricoh accuses of infringement, AMI used the Design Compiler system to design a portion of the ASIC known as "BIST" or "Built-In Self Test." These AMI designs are listed in Exhibit 2 to the August 18, 2006 Declaration of Albert E. Casavant in Support of Synopsys and the Defendants' Motions for Summary Judgment. | Casavant Decl. ¶ 9; Exhibit 2 to the August 18, 2006 Declaration of Albert E. Casavant in Support of Synopsys and the Defendants' Motions for Summary Judgment; De Mory Decl., ¶ 50(Corrected Third Supplemental Product Declaration of Robert B. Smith of AMI dated June 1, 2006). |
| | Casavant Decl. ¶ 10; Brothers Decl. Ex. 27 at 7. |
| | Brothers Decl., Ex. 32 (Soderman) at 156:2-157:3; 158:24-160:6; 165:17-24; 255:15-19; Soderman Decl., ¶44. |
| | Casavant Decl., ¶ 17; Brothers Decl., Ex. 27 (Casavant report) at 11-12. |
| | Casavant Decl., ¶20; Brothers Decl., Ex. 27 (Casavant report) at 14. |

| | |
|---|---|
| | Casavant Decl., ¶ 18; Brothers Decl., Ex. 27 (Casavant report) at 13. |
| 56.     For each of the 350 designs at issue, additional circuitry must be added to the Design Compiler system netlist prior to the time that mask data can be created. | Casavant Decl., ¶ 10, 57-60. |

18.     With regard to Summary Judgment Motion No. 7, the proposed facts rejected by Ricoh which have no controverting evidence in the record, with citations to the evidence which supports them (or, for facts which state that there is a lack of evidence, the reasons that lack of evidence is apparent), are set forth in the table below.  The proposed facts are contained in Exhibit 1, unless they specify otherwise.  After receiving comments from Ricoh to certain facts proposed in Exhibit 1, Synopsys and the Customer Defendants separated certain original facts into constituent parts — for instance, Fact Nos. 57-60 and 62-63, which were not challenged by Ricoh in its oppositions, were first challenged by Ricoh in its response to the proposed facts.  *See* Exhibit 2.

| **Proposed Fact** | **Uncontroverted Supporting Evidence** |
|---|---|
| 57.     There is no evidence that the use of the Design Compiler system drives the demand for Matrox graphics boards.<br>57 (Ex. 3).  There is no evidence that customers purchase the accused Matrox graphics boards because Design Compiler is used as part of the | This point was raised in SJM #7 at 7:27-8:1 & n.6.  Ricoh's sole rebuttal was a citation to Mr. Lipscomb's deposition, where he claims that Dr. Soderman's testimony provides "indirect evidence" of this proposition.  However, Dr. Soderman stated only that there was cost reduction, not that demand was driven by the use of Design Compiler.  *See, e.g.*, Reply #7 at 3:10-4:2. |

| | |
|---|---|
| design process. | |
| 58.    There is no evidence that the use of the Design Compiler system drives the demand for the Customer Defendants' ASICs.<br><br>58 (Ex. 3).  There is no evidence that customers purchase the accused Defendant ASICs because Design Compiler is used as part of the design process. | This point was raised in SJM #7 at 7:27-8:1 & n.6.  Ricoh's sole rebuttal was a citation to Mr. Lipscomb's deposition, where he claims that Dr. Soderman's testimony provides "indirect evidence" of this proposition.  However, Dr. Soderman stated only that there was cost reduction, not that demand was driven by the use of Design Compiler.  *See, e.g.*, Reply #7 at 3:10-4:2. |
| 60.    The VIA/1 was not synthesized during the damages period. | De Mory Decl., Ex. 65 (Boisvert Depo.) at 201-15. |
| 61.    There is no evidence that the VIA/1 was synthesized during the damages period. | Ricoh relies upon the fact that VIA/1 was included in the product declaration.  However, deposition testimony, under questioning from Ricoh, establishes that this inclusion was in error. *Id.* |
| 62.    There is no evidence that any infringing activity for the Matrox Calao; Condor; CondorPlus; cyclone; Eclipse; Maven; Sunex; Toucan; SIB; and Oasis products took place in the United States. | De Mory Decl., Exs. 60-61.  Ricoh relies upon the fact that these products were included in the product declaration and provided sales figure. However, none of this evidence suggests that there was infringing activity for these chips. |
| 62a (Ex. 3).  There is no evidence that any infringing activity for the Matrox Maven product took place in the United States. | De Mory Decl., Exs. 60-61.  Ricoh relies upon the fact that these products were included in the product declaration and provided sales figure. However, none of this evidence suggests that there was infringing activity for these chips. |
| 63.    Foreign sales of the Matrox Calao; Condor; CondorPlus; Cyclone; Eclipse; Maven; Sunex; Toucan; SIB; and Oasis products should be excluded from the royalty base.<br><br>63 (Ex. 3).  If there was no infringing activity in the United States for the Matrox Calao; Condor; CondorPlus; Cyclone; Eclipse; Maven; Sunex; | De Mory Decl., Ex. 62.  Ricoh relies upon the fact that these products were included in the product declaration and provided sales figure.  However, none of this evidence suggests that there was infringing activity for these chips. |

| Proposed Fact | Uncontroverted Supporting Evidence |
|---|---|
| Toucan; SIB; and Oasis products, then foreign sales of the products should be excluded from the royalty base. | |
| 63a (Ex. 3).  If there was no infringing activity in the United States for the Matrox Maven product, then foreign sales of the Maven product should be excluded from the royalty base. | De Mory Decl., Ex. 62.  Ricoh relies upon the fact that these products were included in the product declaration and provided sales figure.  However, none of this evidence suggests that there was infringing activity for these chips. |

19.     With regard to Summary Judgment Motion No. 8, the facts rejected by Ricoh which have no controverting evidence in the record, with citations to the evidence which supports them (or, for facts which state that there is a lack of evidence, the reasons that lack of evidence is apparent), are set forth in the table below.  The proposed facts are contained in Exhibit 1, unless they specify otherwise, and are separated by Motion.

| **Proposed Fact** | **Uncontroverted Supporting Evidence** |
|---|---|
| 67a (Ex. 3).     Ricoh had no more information about the alleged architecture independent nature of the Defendants' Verilog and VHDL ASIC inputs when it initiated this suit than it had before January 21, 1997. | This issue was raised in Reply #8 at 10:25-11:7.  Ricoh has failed to provide any substantive basis for failing to agree to this fact. |
| 69.     Between 1990 and 1996, Ricoh entered into over 40 contracts with Synopsys for the licensing or support of the products-in-suit. | De Mory Decl., Ex. 68 |
| 71a (Ex. 3).     As a licensee, Ricoh received product manuals describing the use and functionality of the tools comprising the Design Compiler system. | De Mory Decl., Ex. 70 |
| 71b (Ex. 3).     As a licensee, KBSC received | *Id.* |

1  product manuals describing the use and

2  functionality of the tools comprising the Design

3  Compiler system.

4

5      I declare under penalty of perjury under the laws of the United States of America that the

6  foregoing is true and correct.

7      Executed on September 25, 2006, at San Francisco, California.

8

9                                              /s/

10                                      Denise M. De Mory

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

**Andelman, Ethan**

| | |
|---|---|
| **From:** | DeMory, Denise |
| **Sent:** | Monday, September 11, 2006 1:08 PM |
| **To:** | Brothers, Kenneth |
| **Cc:** | Andelman, Ethan; Fink, Jacky; .-Ricoh Attorneys |
| **Subject:** | joint statement draft 1.doc |

**Attachments:**     joint statement draft 1.doc

Ken:

Attached please find a draft joint statement of undisptued facts.  To expedite discussions, we have also included drafted facts for your motion.  Please let me know when tomorrow you are available to meet and confer regarding the attached. Noon PST or later would be best for me, but I can be flexible.

Regards,

Denise



joint statement
draft 1.doc (1...

1

DRAFT

1  Teresa M. Corbin (SBN 132360)
   Denise M. De Mory (SBN 168076)
2  Jaclyn C. Fink (SBN 217913)
   HOWREY LLP
3  525 Market Street, Suite 3600
   San Francisco, California 94105
4  Telephone: (415) 848-4900
   Facsimile: (415) 848-4999
5
   Attorneys for Plaintiff SYNOPSYS, INC.
6  and for Defendants AEROFLEX INCORPORATED,
   AMI SEMICONDUCTOR, INC., MATROX
7  ELECTRONIC SYSTEMS, LTD., MATROX
   GRAPHICS, INC., MATROX INTERNATIONAL
8  CORP., MATROX TECH, INC., and
   AEROFLEX COLORADO SPRINGS, INC.
9

10                  UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13  RICOH COMPANY, LTD.,                    Case No. C03-04669 MJJ (EMC)

14          Plaintiff,                       Case No. C03-02289 MJJ (EMC)

15     vs.                                   **JOINT STATEMENT OF UNDISPUTED
                                             FACTS RE PENDING MOTIONS FOR
16  AEROFLEX INCORPORATED, AMI               SUMMARY JUDGMENT**
    SEMICONDUCTOR, INC., MATROX
17  ELECTRONIC SYSTEMS LTD., MATROX
    GRAPHICS INC., MATROX                    Date:       September 26, 2006
18  INTERNATIONAL CORP., MATROX TECH,        Time:       9:30 a.m.
    INC., AND AEROFLEX COLORADO              Courtroom:  11, 19th Floor
19  SPRINGS, INC.                            Judge:      Martin J. Jenkins

20          Defendants.

    SYNOPSYS, INC.,
21
            Plaintiff,
22
       vs.
23
    RICOH COMPANY, LTD.,
24
            Defendant.
25

26

27

28

HOWREY LLP   Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)
             STATEMENT OF UNDISPUTED FACTS

             DM_US\8385804.v1

DRAFT

1       **Statement of Undisputed Facts for Summary Judgment No. 1**

2       1.     The Customer Defendant designs at issue include a specification of inputs.

3       2.     The Customer Defendant designs at issue include a specification of outputs.

4       3.     The Customer Defendant designs at issue include a specification of registers (which

5 may be flip-flops or latches).

6       4.     The Customer Defendant designs at issue, for each clock cycle, include a description

7 of how the values of the outputs and registers should be set according to the value of the inputs, the

8 previous values of the registers and the logic functionality between register locations.

9       **Statement of Undisputed Facts for Summary Judgment No. 2**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24       **Statement of Undisputed Facts for Summary Judgment No. 3**

25       11.     Dr. Kobayashi was Dr. Foo's advisor for his master's thesis, attached as Exhibit 66 to

26 the Brothers Declaration.

27       12.     This thesis describes the use of a relational database system to manage very large scale

28 integration designs.

DRAFT

13.    Dr. Kobayashi and Dr. Foo co-authored two papers published in 1986 which describe systems that use expert knowledge in the selection of functional modules.

14.    One of these papers, titled "A Framework for Managing VLSI CAD Data," discusses a frame based approach for managing VLSI CAD data, attached as Exhibit 67 to the Brothers Declaration.

15.    The other paper, titled "A Knowledge Based System for VLSI module selection," discusses a program called NEPTUNE, which is a system that selects VLSI modules, and based on domain specific knowledge and heuristic rules, helps find optimized solutions, attached as Exhibit 68 to the Brothers Declaration.

16.    Neptune is listed as one of the names of the program modules for cell selection that was part of the contract between ICC and Ricoh for the joint development of the Knowledge Based Silicon Compiler (which is attached to the contract between ICC and Ricoh with an effective date of January 15, 1987), and Dr. Foo is listed as one of the two program designers for Neptune.

17.    Dr. Foo's thesis describes storing hardware cells in a frame-based database, as does the FAME paper.

18.    As described in "A Knowledge Based System for VLSI module selection," the VLSI modules that are selected by the NEPTUNE system are hardware cells from the frame-based database described in the FAME paper and Dr. Foo's thesis, and they are selected using rules stored in an expert system knowledge base.

19.    Dr. Foo, then a USC graduate student and multi-year collaborator with Dr. Kobayashi, contributed to the conception of significant portions of the invention claimed in the '432 patent — specifically, each element of the claims (or, at least, a significant portion of those elements) that do not deal with architecture independent actions and conditions — through his thesis, co-authored papers, and development of the NEPTUNE system.

### Statement of Undisputed Facts for Summary Judgment No. 4

20.    The article T.J. Kowalski, D.J. Geiger, W.H. Wolf, and W. Fichtner, "The VLSI Design Automation Assistant: From Algorithms to Silicon," *IEEE Design and Test of Computers Magazine*, Vol. 2, No. 4, pp. 33-43 ("Kowalski85") was published in August 1985.

DRAFT

21.     The thesis "The VLSI design automation assistant: a knowledge-based expert system," written by Thaddeus Julius Kowalski at Carnegie Mellon University, was available to the public via the Carnegie Mellon library in 1984 ("Kowalski Thesis" or "Kowalski84"), and was republished by Kulwer in 1985 in book form.

22.     Kowalski85 and the Kowalski Thesis describe the same program — VLSI Design Automation Assistant ("VDAA").

23.     Dr. Kowalski also provided deposition testimony on the workings of the VDAA system.

24.     The VDAA system accepted as input an algorithmic description of the behavior of the chip, written in a language known as ISPS, and the ISPS description described the desired functionality of the chip in terms of actions and conditions.

25.     The ISPS description was then translated into a data-flow graph representation known as VT by the VDAA system.  In the process of compiling the design into a VT, the compiler translated each of the actions and conditions into a predefined operator, which forms the node of the graph.

26.     The nodes in the VT representation were used to select hardware cells from the "technology-sensitive database" using expert rules stored in the VDAA system.

27.     The rules in the VDAA system were in an IF-THEN antecedent format.

28.     After the hardware cells were bound using the module binder, a netlist was created by the control allocator.

29.     At deposition, Dr. Kowalski clarified that the "technology sensitive" database discussed in these papers contained cell descriptions that "could be as low as a single an[d] gate or as high and complicated as an ALU."

30.     In addition to his affiliation with CMU, Dr. Kowalski was a researcher at AT&T Bell Laboratories, and after receiving his doctorate in 1984 for his work on VDAA, Dr. Kowalski further refined the program at AT&T.  One of these refinements was to eliminate the need for a separate module binder process — the hardware cells were selected, bound, and a netlist was created all in one step.

DRAFT

<u>Statement of Undisputed Facts for Summary Judgment No. 5</u>

1

2    31.    On February 24, 2006, the PTO ordered reexamination of the '432 patent based on

3    Kowalski85 and Kowalsk84 [the Kowalski Thesis].

4    32.    The PTO's order granting reexamination of the '432 patent found that "the Kowalski-

5    85 reference (including the inherent teachings of Kowalski84) would have been considered important

6    by a reasonable Examiner in deciding whether or not at least claim 13 was patentable...."

7    33.    The PTO's order granting reexamination of the '432 patent found that "Kowalkski-85

8    and Kowalkski-84 references were not of record in the file of the '432 patent and are not cumulative

9    to the art of record in the original file."

10    34.    The PTO's order granting reexamination of the '432 patent found that Kowalski85 is

11    material.

12    35.    The named '432 patent inventors, Dr. Kobayashi and Mr. Shindo, co-authored with

13    Mr. Suehiro and published "KBSC:  A Knowledge-Based Approach to Automate Logic Synthesis"

14    (1989 KBSC Article) in 1989 during prosecution of the '432 patent application.

15    36.    All three co-authors of the 1989 KBSC Article were substantively involved in the

16    prosecution of the '432 patent.

17    37.    Kowalski85 describes a system called the VLSI Design Automation Assistant

18    (VDAA).

19    38.    The 1989 KBSC Article discusses eight prior art systems, including VDAA as

20    disclosed in Kowalski85, and distinguishes those systems from KBSC.

21    39.    The 1989 KBSC Article refers to VDAA as DAA (or just Design Automation

22    Assistant).

23    40.    Reference [5] to Kowalski85 in the 1989 KBSC Article is incorrectly cited as being

24    published in 1986.

25    41.    No article exists for Reference [5] as cited in the 1989 KBSC Article (i.e., as a 1986

26    Kowalski article).

27    42.    Kowalski85 was not disclosed to the PTO prior to issuance of the '432 patent in

28    January of 1990.

**DRAFT**

1      43.     Kowalski85 was not disclosed to the PTO by anyone substantively involved in the

2  prosecution of the '432 patent.

3                    **Statement of Undisputed Facts for Summary Judgment No. 6**

4      44.     Ricoh asserts that over 350 of the Customer Defendants' designs infringe the '432

5  claims.

6      45.     For each of the over 350 Customer Defendant designs at issue, the output of the

7  Design Compiler system did not comprise the full design for an ASIC.

8      46.     The Design Compiler system can only be used to design digital portions of ASICs.

9      47.     Mixed-signal products contain both analog and digital portions.

10      48.     The ASIC products Ricoh accuses of infringement in this case that are mixed-signal

11  products are listed in Exhibit 2 to the August 18, 2006 Declaration of Albert E. Casavant in Support

12  of Synopsys and the Customer Defendants' Motions for Summary Judgment.

13      49.     For approximately 230 of the AMI designs that Ricoh accuses of infringement, AMI

14  used the Design Compiler system to design only a very small portion of the ASIC known as "BIST"

15  or "Built-In Self Test."  These AMI designs are listed in Exhibit 2 to the August 18, 2006 Declaration

16  of Albert E. Casavant in Support of Synopsys and the Customer Defendants' Motions for Summary

17  Judgment.

18

19

20

21

22

23

24

25

26

27

28

1    55.    Many processing steps must occur between the creation of a Design Compiler netlist

2  output and generation of mask data.

3    56.    For each of the 350 designs at issue, additional circuitry must be added to the Design

4  Compiler system netlist prior to the time that mask data can be created.

5    **Statement of Undisputed Facts for Summary Judgment No. 7**

6    57.    There is no evidence that the use of the Design Compiler system drives the demand for

7  Matrox graphics boards.

8    58.    There is no evidence that the use of the Design Compiler system drives the demand for

9  the Customer Defendants' ASICs.

10    59.    The patented process is not required or necessary to the production of an ASIC.

11    60.    The VIA/1 was not synthesized during the damages period.

12    61.    There is no evidence that the VIA/1 was synthesized during the damages period.

13    62.    There is no evidence that any infringing activity for the Matrox Calao; Condor;

14  CondorPlus; cyclone; Eclipse; Maven; Sunex; Toucan; SIB; and Oasis products took place in the

15  United States.

16    63.    Foreign sales of the Matrox Calao; Condor; CondorPlus; Cyclone; Eclipse; Maven;

17  Sunex; Toucan; SIB; and Oasis products should be excluded from the royalty base.

18    **Statement of Undisputed Facts for Summary Judgment No. 8**

19    64.    Ricoh initiated this infringement suit against the Customer Defendants on January 21,

20  2003, alleging infringement of the '432 patent based on Customer Defendants' sale of application

21  specific integrated circuits ("ASICs") that were designed with Synopsys' Design Compiler system,

22  which includes Design Compiler, HDL Compiler for Verilog, VHDL Compiler, and the DesignWare

23  libraries ("the Design Compiler system").

24    65.    Ricoh's infringement allegations are based on the premise that software licensed from

25  Synopsys and used by the Customer Defendants performs all of the steps of the asserted claims

26  except the describing step.

27

28

66.    For the describing step, Ricoh contends the limitation is met because "the ASIC Designer entered a written description of the desired functions of the ASIC Product into HDL Compiler for Verilog."

67.    Ricoh alleges that the Verilog and VHDL ASIC designs that include HDL operators, including, for example +, *, -, /, >, < and "if," "case," and "wait" statements, comprise "architecture independent actions and conditions," which, when input by the Customer Defendants into the Synopsys products in suit, fulfill the describing step and thus infringe the '432 patent.

68.    On October 22, 1990, Ricoh licensed the Design Compiler and HDL Compiler for Verilog from Synopsys.

69.    Between 1990 and 1996, Ricoh entered into over 40 contracts with Synopsys for the licensing or support of the products-in-suit.

70.    The co-owner of the asserted patent, KBSC, also took a license from Synopsys in July of 1993, and renewed that license in 1995. Ex. 69 at SP00001-SP00032.

71.    As licensees, both Ricoh and KBSC received product manuals describing the use and functionality of the tools comprising the Design Compiler system.

72.    In January of 1990, Synopsys' HDL Compiler won the *Electronic Products* magazine's product of the year award. Ex. 71.

73.    By 1997, Synopsys had an over 80% share of the logic synthesis tool market.

74.    In 1990, Electronic Engineering Times reported on Matrox Electronics' use of Synopsys' synthesis tools. Ex. 74.

75.    In 1991, Electronic News reported on AMI's development of cell libraries for use with Synopsys' Design Compiler product. Ex. 75.

76.    In 1996, the AMI website disclosed that "AMI Design Kits support EDA tools from vendors such as Synopsys." Ex.78.

77.    In 1996, the Aeroflex website (at the time under the company's former name, UTMC) contained a November 28, 1995 press release in which UTMC announced the introduction of its VHDL design kits to enhance customers' VHDL-based ASIC designs and systems. Ex. 79.

DRAFT

1    78.    The Synopsys website from 1997 contains a list of Synopsys Semiconductor Vendor

2    Program participants, including AMI and UTMC (Aeroflex), who had developed strategic

3    relationships with Synopsys to take full advantage of ASIC technology advancements.  Ex. 80.

4    **Statement of Undisputed Facts for Summary Judgment No. 9**

5    79.    Ricoh has represented that it will not claim enhanced damages due to willfulness.

6    **Statement of Undisputed Facts for Ricoh's Summary Judgment Motion**

7    80.    Aeroflex does not contend that sales the following products:  UTCAM-Engine, JW01,

8    KD08A, KD11A, JF01A/B, YA04/YA13, YB01, DA01, DA02, JW02, and KC01A.

13    82.    The Customer Defendants could have used non-infringing alternatives, such as tools

14    by Cadence and Mentor, to synthesize their ASICs.

15    83.    The end customer (ASIC consumer) cares about the functionality of the ASIC, rather

16    than a specific design flow.

17    84.    The use of the '432 methods claimed in claims 13-17 is not embodied in the structure

18    or composition of any article used in creating using any of the accused designs at issue.

19    85.    The use of the '432 methods claimed in claims 13-17 is not used in machinery, tools,

20    or methods whose use necessarily results from manufacturing and delivering ASICs to an end user.

22    Dated:  September 12, 2006          HOWREY LLP

By:    /s/
        Denise M. De Mory
        Attorney for Plaintiff SYNOPSYS, INC.
        and Defendants AEROFLEX
        INCORPORATED, AMI
        SEMICONDUCTOR, INC., MATROX
        ELECTRONIC SYSTEMS, LTD.,
        MATROX GRAPHICS INC., MATROX
        INTERNATIONAL CORP., MATROX
        TECH, INC., and AEROFLEX
        COLORADO SPRINGS, INC.

DRAFT

1  Dated:  September 12, 2006

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DICKSTEIN SHAPIRO LLP

By:   /s/
     Kenneth W. Brothers
     Attorney for Plaintiff RICOH COMPANY,
     LTD.

-9-

# Exhibit 2

## Andelman, Ethan

| | |
|---|---|
| **From:** | Brothers, Kenneth [BrothersK@dicksteinshapiro.com] |
| **Sent:** | Tuesday, September 12, 2006 11:22 AM |
| **To:** | DeMory, Denise |
| **Cc:** | Andelman, Ethan; Fink, Jacky |
| **Subject:** | Draft comments on proposed statements of facts |
| **Attachments:** | DSMDB-#2141613-v3-edited_statement_of_facts.DOC |

Denise:

Enclosed are our initial comments on your proposed joint statement of facts. We may have further comments, but wanted to get this to you as quickly as possible. I await your call, as well as your comments to our proposed statement.

<<DSMDB-#2141613-v3-edited_statement_of_facts.DOC>>

Ken Brothers

Please note my new contact information:
Dickstein Shapiro LLP
1825 Eye Street NW
Washington DC 20006
direct (202) 420-4128
phone (202) 420-2200
fax (202) 420-2201
brothersk@dicksteinshapiro.com

---------------------------------------------------------

This e-mail message and any attached files are confidential and are intended solely for the use of the addressee(s) named above. This communication may contain material protected by attorney-client, work product, or other privileges. If you are not the intended recipient or person responsible for delivering this confidential communication to the intended recipient, you have received this communication in error, and any review, use, dissemination, forwarding, printing, copying, or other distribution of this e-mail message and any attached files is strictly prohibited. Dickstein Shapiro reserves the right to monitor any communication that is created, received, or sent on its network. If you have received this confidential communication in error, please notify the sender immediately by reply e-mail message and permanently delete the original message.

To reply to our email administrator directly, send an email to postmaster@dicksteinshapiro.com

Dickstein Shapiro LLP
http://www.DicksteinShapiro.com
====================================================================================

DRAFT

1  ~~Teresa M. Corbin (SBN 132360)~~
   ~~Denise M. De Mory (SBN 168076)~~
2  ~~Jaelyn C. Fink (SBN 217913)~~
   ~~HOWREY LLP~~
3  ~~525 Market Street, Suite 3600~~
   ~~San Francisco, California 94105~~
4  ~~Telephone: (415) 848-4900~~
   ~~Facsimile: (415) 848-4999~~
5
   ~~Attorneys for Plaintiff SYNOPSYS, INC.~~
6  ~~and for Defendants AEROFLEX INCORPORATED,~~
   ~~AMI SEMICONDUCTOR, INC., MATROX~~
7  ~~ELECTRONIC SYSTEMS, LTD., MATROX~~
   ~~GRAPHICS, INC., MATROX INTERNATIONAL~~
8  ~~CORP., MATROX TECH, INC., and~~
   ~~AEROFLEX COLORADO SPRINGS, INC.~~
9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

13  RICOH COMPANY, LTD.,              Case No. C03-04669 MJJ (EMC)

14            Plaintiff,              Case No. C03-02289 MJJ (EMC)

15       vs.                         **JOINT STATEMENT OF UNDISPUTED**
                                     **FACTS RE PENDING MOTIONS FOR**
16  AEROFLEX INCORPORATED, AMI        **SUMMARY JUDGMENT**
    SEMICONDUCTOR, INC., MATROX
17  ELECTRONIC SYSTEMS LTD., MATROX
    GRAPHICS INC., MATROX            Date:      September 26, 2006
18  INTERNATIONAL CORP., MATROX TECH, Time:      9:30 a.m.
    INC., AND AEROFLEX COLORADO       Courtroom: 11, 19th Floor
19  SPRINGS, INC.                     Judge:     Martin J. Jenkins

20            Defendants.

    SYNOPSYS, INC.,
21
              Plaintiff,
22
         vs.
23
    RICOH COMPANY, LTD.,
24
              Defendant.
25

26

27

28

DRAFT

**Statement of Undisputed Facts for Summary Judgment No. 1**

1. The ~~Customer~~Aeroflex -Defendants' ~~designs ASICs at issue include a specification of inputs~~accused designs specify inputs.

2. The ~~Customer~~Aeroflex Defendants' ~~designs ASICs at issue include a specification of outputs~~ accused designs specify outputs.

3. The ~~Customer~~Aeroflex Defendants' ~~designs ASICs at issue~~accused designs may or may not ~~include a specification of~~specify registers ~~(which may be flip-flops or latches)~~.

4. ~~The Customer Defendant designs at issue, for each clock cycle, include a description of how the values of the outputs and registers should be set according to the value of the inputs, the previous values of the registers and the logic functionality between register locations.~~ [Disputed; this sentence is incomprehensible. To the extent we understand it, there is no record evidence to support it.]

**Statement of Undisputed Facts for Summary Judgment No. 2**

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)       -1-
REPLY ISO MSJ OF INVALIDITY OF U.S. PATENT NO.
4,922,432 FOR VIOLATION OF 35 U.S.C. § 102(f), OR TO
DISMISS FOR FAILURE TO JOIN ALL CO-OWNERS AS PLTFS
DM_US\8385804.v1

HOWREY LLP

DSMDB-2141613v03

DRAFT

1
2
3
4
5
6
7
8 **Statement of Undisputed Facts for Summary Judgment No. 3**

9    11.    Dr. Kobayashi was Simon ~~Dr.~~ Foo's advisor for his master's thesis, attached as Exhibit
10 66 to the Brothers Declaration.

11    12.    ~~This thesis describes the use of a relational database system to manage very large scale~~
12 ~~integration designs.~~ [This is an incomplete and misleading characterization.]

13    13.    Dr. Kobayashi and Simon Foo co-authored two papers ~~published~~ that had copyright
14 dates in 1986 ~~which describe systems that use expert knowledge in the selection of functional~~
15 ~~modules.~~ [The characterization of the papers is disputed. For example, the first paper, "A
16 Framework for Managing VLSI CAD Data" discusses management of data more than selection.]

17    14.    One of these papers, titled "A Framework for Managing VLSI CAD Data," discusses a
18 frame based approach for managing VLSI CAD data, attached as Exhibit 67 to the Brothers
19 Declaration. The level of design described in this paper was technology independent.

20    15.    The other paper, titled "A Knowledge Based System for VLSI module selection,"
21 discusses a program called NEPTUNE, ~~which is a system that selects VLSI modules, and based on~~
22 ~~domain specific knowledge and heuristic rules, helps find optimized solutions,~~ attached as Exhibit 68
23 to the Brothers Declaration. [The characterization of the paper is disputed. NEPTUNE does not
24 necessarily "help find optimized solutions" on its own. In addition, the level of design described in
25 this paper was technology independent]

26    16.    Neptune is listed as one of the names of the program modules for cell selection that
27 was part of the contract between ICC and Ricoh for the joint development of the Knowledge Based

28

-2-

DRAFT

1  Silicon Compiler (which is attached to the contract between ICC and Ricoh with an effective date of

2  January 15, 1987). ~~, and Dr.~~ Simon Foo is listed as one of the two program designers for Neptune.

3  There is no evidence that Mr. Foo did any program design work for ICC in 1987.  There is no

4  evidence that the Neptune referenced in the ICC and Ricoh joint project and the NEPTUNE

5  referenced in "A Knowledge Based System for VLSI module selection" were identical.

6      17.  ~~Dr. Foo's thesis describes storing hardware cells in a frame-based database, as does the~~

7  ~~FAME paper.~~ [Disputed, as the parties do not agree on what comprises "hardware cells." In addition,

8  the Foo thesis describes managing and storing design objects in a frame-based database, and the

9  FAME paper describes storing design information as a collection of design objects.  Finally, Foo was

10  not a "Dr." when he wrote his this thesis.]

11      18.  ~~As described in "A Knowledge Based System for VLSI module selection," the VLSI~~

12  ~~modules that are selected by the NEPTUNE system are hardware cells from the frame-based database~~

13  ~~described in the FAME paper and Dr. Foo's thesis, and they are selected using rules stored in an~~

14  ~~expert system knowledge base.~~ [Disputed.  The characterizations are incorrect.  NEPTUNE and

15  Foo's thesis refers to design objects, not hardware cells.  In Foo's thesis, design objects are selected

16  using functional partitioning stored in an database.  The level of design was technology independent.]

17      19.  ~~Dr. Foo, then a USC graduate student and multi-year collaborator with Dr. Kobayashi,~~

18  ~~contributed to the conception of significant portions of the invention claimed in the '432 patent —~~

19  ~~specifically, each element of the claims (or, at least, a significant portion of those elements) that do~~

20  ~~not deal with architecture independent actions and conditions — through his thesis, co-authored~~

21  ~~papers, and development of the NEPTUNE system.~~ [Disputed.  Dr. Kobayashi, without Mr. Foo,

22  published an article in 1986 called "A knowledge based approach to VLSI CAD data. This article

23  describes a system for translating high level specifications to geometrical VLSI layout.  In this

24  system, heuristic rules are integrated into a mechanism for mapping macro operations to functional

25  modules and the rules are stored in frame implemented knowledge base.  In addition, as set forth in

26  Ricoh's brief, Dr. Kobayashi met with Mr. Shindo on several occasions and together came up with

27  the invention of the '432 patent.  Mr. Foo did not show any of his alleged hand drawn figures of the

28

-3-

DRAFT

1  knowledge based silicon compiler until after this lawsuit was initiated.  Mr. Foo did not tell anyone

2  that he was inventor of the Knowledge based silicon compiler until after this lawsuit was initiated.

3  The work of Mr. Foo was at level of technology independent.  The level of design described in the

4  '432 patent is at a level of technology dependent.]

5  **Statement of Undisputed Facts for Summary Judgment No. 4**

6  20.  ~~The~~ An article T.J. Kowalski, D.J. Geiger, W.H. Wolf, and W. Fichtner, "The VLSI

7  Design Automation Assistant: From Algorithms to Silicon," *IEEE Design and Test of Computers*

8  *Magazine*, Vol. 2, No. 4, pp. 33-43  ("Kowalski85") ~~was published in~~ has a copyright notice reading

9  "August 1985." ["Published" is disputed; defendants have the burden to show that the article was

10  formally "published" as that term is used in patent law, and they have not done so.]

11  21.  ~~The thesis "The VLSI design automation assistant: a knowledge-based expert system,"~~

12  ~~written by Thaddeus Julius Kowalski at Carnegie Mellon University, was available to the public via~~

13  ~~the Carnegie Mellon library in 1984 ("Kowalski Thesis" or "Kowalski84"), and was republished by~~

14  ~~Kulwer in 1985 in book form.~~  [Disputed; defendants have not established that the thesis was in the

15  CMU library, cataloged, and otherwise "accessible" as required to meet the "publication"

16  requirements.]

17  22.  ~~Kowalski85 and the Kowalski Thesis describe the same program— VLSI Design~~

18  ~~Automation Assistant ("VDAA").~~ [This is in dispute as set forth in our brief.]

19  23.  ~~Dr. Kowalski also provided deposition testimony on the workings of the VDAA~~

20  ~~system.~~  [Disputed:  "workings" is vague; Kowalski did not give a full description of the "workings"

21  of the DAA system, he did not refer to anything as a "VDAA system."]

22  24.  The ~~VDAA~~ system described in Kowalski85 (DEF018108-18118) as accepting~~ed as~~

23  input an ~~algorithmic~~ description ~~of the behavior of the chip,~~ written in a language known as ISPS~~, and~~

24  ~~the ISPS description described the desired functionality of the chip in terms of actions and conditions.~~

25  [Modified to present an accurate description of the facts.]

26  25.  The system described in Kowalski85 (DEF018108-18118) works from a data-flow

27  representation extracted from ~~T~~the ISPS description ~~was then translated into a data-flow graph~~

28

-4-

**DRAFT**

1  ~~representation known as VT by the VDAA system. In the process of compiling the design into a VT,~~

2  ~~the compiler translated each of the actions and conditions into a predefined operator, which forms the~~

3  ~~node of the graph.~~  [Modified to present accurate description (see DEF018111). How that description

4  maps to the claims obviously is in dispute.]

5  ~~26.    The nodes in the VT representation were used to select hardware cells from the~~

6  ~~"technology-sensitive database" using expert rules stored in the VDAA system.~~[Whether "rules" were

7  used to select "hardware cells" is obviously a key issue in dispute. Even whether the so-called

8  "rules" are "applied" DIRECTLY to the VT representation is in dispute.]

9  ~~27.    The rules in the VDAA system were in an IF-THEN antecedent format.~~[Disputed:

10  Kowalski85 does not disclose "rules" in an IF-THEN format.]

11  ~~28.    After the hardware cells were bound using the module binder, a netlist was created by~~

12  ~~the control allocator.~~[Disputed: Whether "hardware cells" were bound into a "netlist" is another key

13  issue in dispute.]

14  ~~———~~

15  29.    At deposition, Dr. Kowalski ~~clarified~~ testified (without corroboration) that the "technology

16  sensitive" database ~~discussed in these papers~~ in Kowalski85 contained technology-independent "cell

17  descriptions," where he defined that term stating ~~that~~: "It varied. It could be as low as a single an~~[d]~~

18  gate or as high and complicated as an ALU. So it is a broad list of possible things." [Disputed as

19  originally written. Kowalski never testified that Kowalski85 itself disclosed this usage, or even that

20  any "refinement" of the work included AND gates.]

21  30.    ~~In addition to his affiliation with CMU~~From his CV, Dr. Kowalski has stated he was a

22  researcher at AT&T Bell Laboratories~~, and after receiving his doctorate in 1984 for his work on~~

23  ~~VDAA, Dr. Kowalski further refined the program at AT&T. One of these refinements was to~~

24  ~~eliminate the need for a separate module binder process — the hardware cells were selected, bound,~~

25  ~~and a netlist was created all in one step.~~ [There is no evidence to support the rest of this. What

26  Kowalski did to "refine" anything called a "VDAA system" is a subject of dispute– one in which

27  defendants have *no* corroborating evidence.]

28

-5-

DRAFT

**Statement of Undisputed Facts for Summary Judgment No. 5**

31.  On February 24, 2006, the PTO ordered reexamination of the '432 patent ~~based on Kowalski85 and Kowalsk84 [the Kowalski Thesis]~~. [As set forth in Ricoh's opposition, the parties dispute whether the reexam was in response to a petition, whether the reexam was ordered in reliance in part upon the Dirkes thesis, and whether the PTO has drawn any conclusions.]

32.  The PTO's order granting reexamination of the '432 patent ~~found~~ stated that "the Kowalski-85 reference (including the inherent teachings of Kowalski84) would have been considered important by a reasonable Examiner in deciding whether or not at least claim 13 was patentable...."

33.  The PTO's order granting reexamination of the '432 patent ~~found~~ stated that "Kowalkski-85 and Kowalkski-84 references were not of record in the file of the '432 patent and are not cumulative to the art of record in the original file."

34.  ~~The PTO's order granting reexamination of the '432 patent found that Kowalski85 is material.~~ [Disputed, as set forth in Ricoh's opposition brief. The PTO did not expressly find that Kowalski85 by itself was material. Materiality is sharply disputed; in addition, there was no "finding" by the PTO.]

35.  The named '432 patent inventors, Dr. Kobayashi and Mr. Shindo, co-authored with Mr. Suehiro and published "KBSC: A Knowledge-Based Approach to Automate Logic Synthesis" (1989 KBSC Article) in 1989 ~~during prosecution of the '432 patent application~~. [The implication that there is a linkage between the publication and prosecution is disputed. In addition, the article was published in 1989, and the notice of allowance was issued in 1989.]

36.  ~~All three co-authors of the 1989 KBSC Article were substantively involved in the prosecution of the '432 patent.~~ [Disputed. There is no evidence that Suehiro provided anything substantive in connection with the prosecution of the '432 patent.]

37.  Kowalski85 describes a system called the VLSI Design Automation Assistant (VDAA).

HOWREY LLP

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)
STATEMENT OF UNDISPUTED FACTS
DM_US\8385804.v1

DSMDB-2141613v03

DRAFT

38. ~~The 1989 KBSC Article discusses eight prior art systems, including VDAA as~~ ~~disclosed in Kowalski85, and distinguishes those systems from KBSC.~~ [Disputed. Ricoh has not conceded that the "1989 KBSC Article discusses . . . VDAA as disclosed in Kowalski85."]

39. ~~The 1989 KBSC Article refers to VDAA as DAA (or just Design Automation~~ ~~Assistant).~~ [Disputed. Ricoh has not conceded that the "1989 KBSC Article refers to VDAA", or the implication that that the DAA referenced in Kowalski86 was VDAA as disclosed in Kowalski85.]

40. ~~Reference [5] to Kowalski85 in the 1989 KBSC Article is incorrectly cited as being~~ ~~published in 1986.~~[Disputed. Ricoh ahs not conceded this point, as stated in the opposition brief.]

41. ~~No article exists for Reference [5] as cited in the 1989 KBSC Article (i.e., as a 1986~~ ~~Kowalski article).~~ [Disputed as written. The August 1986 table of Contents from the *IEEE Design and Test of Computers Magazine* does not show a Kowalski article in that issue, but there is no evidence that any of the authors of the 1989 KBSC Article knew of Kowalski85.]

42. ~~Kowalski85 was not disclosed to the PTO prior to issuance of the '432 patent in~~ ~~January of 1990.~~[Disputed, for the reasons set forth in Ricoh's opposition brief.]

43. ~~Kowalski85 was not disclosed to the PTO by anyone substantively involved in the~~ ~~prosecution of the '432 patent.~~ [Disputed, for the reasons set forth in Ricoh's opposition brief.]

**Statement of Undisputed Facts for Summary Judgment No. 6**

44. Ricoh asserts that over 350 of the ~~Customer~~Aeroflex Defendants' ~~designs~~ASICs were designed and manufactured using a process that infringes claims 13-17 of the '432 ~~claims~~patent.

45. ~~For each of the over 350 CustomerDefendant designs at issue, the output of the Design~~ ~~Compiler system did not comprise the full design for an ASIC.~~ [Disputed for multiple reasons: "Customer Defendants" is misleading, ""designs at issue" is incorrect, "output of the Design Compiler system" is undefined and not supported by record evidence; "full design of an ASIC" is undefined and not supported by record evidence."]

46. Ricoh accuses in this litigation processes in which t~~Th~~e Design Compiler system ~~can~~ is used to ~~only be used to~~ design digital portions of ASICs.

47. Mixed-signal products may contain both analog and digital portions.

HOWREY LLP

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)
STATEMENT OF UNDISPUTED FACTS
DM_US\8385804.v1

DSMDB-2141613v03

**DRAFT**

1    48.    The ASIC products Ricoh accuses of infringement in this case that are mixed-signal

2    products are listed in Exhibit 2 to the August 18, 2006 Declaration of Albert E. Casavant in Support

3    of Synopsys and the ~~Customer~~Aeroflex Defendants' Motions for Summary Judgment.  [Disputed.

4    We don't agree this is an undisputed fact. Ex 2 says he relied on conversations to get this information.

5    We have never received proof that this is a true and accurate list of the mixed-signal ASICs.]

6    49.    The Corrected Third Supplemental Product Declaration of Robert B. Smith of AMI

7    dated June 1, 2006 declares that ~~F~~for ~~approximately 23~~10 of the AMI designs that Ricoh accuses of

8    infringement, AMI used the Design Compiler system to design ~~only a very small~~ portion of the ASIC

9    known as "BIST" or "Built-In Self Test." These AMI designs are listed in Exhibit 2 to the August 18,

10    2006 Declaration of Albert E. Casavant in Support of Synopsys and the ~~Customer~~Aeroflex

11    Defendants' Motions for Summary Judgment.

DRAFT

1

2 _____                    _____ —

3 _____

4    55.    ~~Many processing steps must occur between the creation of a Design Compiler netlist~~

5 ~~output and generation of mask data.~~ [Disputed.  This is so general it is meaningless.]

6    56.    ~~For each of the 350 designs at issue, additional circuitry must be added to the Design~~

7 ~~Compiler system netlist prior to the time that mask data can be created.~~[Disputed.  There is no

8 evidence to support this.]

**Statement of Undisputed Facts for Summary Judgment No. 7**

10    57.    ~~There is no evidence that the use of the Design Compiler system drives the demand for~~

11 ~~Matrox graphics boards.~~ [DISPUTED – misrepresents the legal requirement ("drives the demand")

12 and even if correct, Lipscomb testified there was such evidence - the infringing use of Design

13 Compiler allows for timely and cost-effective production of the accused Matrox graphics boards,

14 which are packaged and sold as functional units, and which cannot be split into component parts

15 without destroying their functionality; the infringing use of Design Compiler allows Defendants to

16 bring the accused graphics boards to market sooner and at a more attractive price than would be

17 possible without the use of Design Compiler.  The patented method is used by Defendants since it

18 gives them the ability to provide error-free product at a reasonable cost and on a timely basis.

19 Soderman Dec. ¶59; *see also* Brothers Dec. Ex. 11 (Expert Report of Michael J. Wagner), at 18;

20 Brothers Dec. Ex. 10, (Lipscomb Tr.) at 30, 34-35, 40-41, 45. That is what customers demand. Also,

21 it's not DC, it's the infringing process.]

22    58.    ~~There is no evidence that the use of the Design Compiler system drives the demand for~~

23 ~~the Customer~~Aeroflex ~~Defendants'~~ ~~ASICs.~~ [DISPUTED – misrepresents the legal requirement

24 ("drives the demand") and even if correct, Lipscomb testified there was such evidence - the infringing

25 use of Design Compiler allows for timely and cost-effective production of the accused ASICs, which

26 are packaged and sold as functional units, and which cannot be split into component parts without

27 destroying their functionality; the infringing use of Design Compiler allows Defendants to bring the

28

-9-

DRAFT

1  accused ASICs to market sooner and at a more attractive price than would be possible without the use

2  of Design Compiler. The patented method is used by Defendants since it gives them the ability to

3  provide error-free product at a reasonable cost and on a timely basis. Soderman Dec. ¶59; *see also*

4  Brothers Dec. Ex. 11 (Expert Report of Michael J. Wagner), at 18; Brothers Dec. Ex. 10, (Lipscomb

5  Tr.) at 30, 34-35, 40-41, 45. That is what customers demand. Also, it's not DC, it's the infringing

6  process.]

7  59.    The creation of a design of an ASIC is a necessary step in the production of an ASIC.

8  The patented process is not required or necessary to the production of an ASIC, although the

9  alternatives would require use of an entirely different design process that could result in a measurable

10  increase in cost and delay. Brothers Dec. Ex. 10, (Lipscomb Tr.) at 33-35.  . [As originally written,

11  this sentence does not make sense – you need to have a design.]

12  60.    The VIA/1 was manufactured not synthesized during the damages period. [Disputed

13  as originally written – Matrox admitted that the VIA/1 is a "Commercial ASIC . . . as defined in the

14  May 5, 2006 Amended Stipulation Re Supplemental Production." Brothers Dec. Ex. 13 (Second

15  Supplemental Product Declaration of Eric Boisvert of Matrox Electronic Systems), at 2. That

16  Stipulation defined a "Commercial ASIC" as "any ASIC . . . that was, between 1997 and the present,

17  (1) synthesized using Design Compiler for which (2) revenue was received and (3) one or more

18  physical ASICs were manufactured . . . *all three criteria must be met and all three criteria must have*

19  *occurred between 1997 and the present* for an ASIC to qualify as a 'Commercial ASIC.'" Brothers

20  Dec. Ex. 14 (D.I. 459) at 1-2 (emphasis added). Matrox's declaration that the VIA/1 ASIC is a

21  "Commercial ASIC" is an admission that the VIA/1 was synthesized and received revenue within the

22  damages period.]

23  61.    There is no evidence that the VIA/1 was synthesized during the damages period.

24  [Disputed, as set forth for ¶60.]

25  62.    There is no evidence that any infringing activity for the Matrox Calao; Condor;

26  CondorPlus; cyclone; Eclipse; Maven; Sunex; Toucan; SIB; and Oasis products took place in the

27  United States. [DISPUTED – Matrox has made multiple conflicting product declarations, and the

28

-10-

DRAFT

Court has repeatedly instructed Defendants as to the scope of those declarations.  See Brothers Dec. Ex. 1, (Ricoh's Motion to Show Cause); D.I. 443.  Matrox agreed to the May 5, 2006 Stipulation and Order and submitted a sworn declaration in compliance with the Court's Order and with its obligations under the Stipulation.  Brothers Dec. Ex. 14 (D.I. 459) at 1-2; Brothers Dec. Ex. 13 (Matrox May 10, 2006, Product Declarations).  Hence, they admitted there was infringing activity.  Ricoh repeatedly requested specific financial data regarding Matrox's declared products, and Matrox has represented that their production included that requested data, and that data only.  Included in the Amended Stipulation and Order entered by the Court on May 5, 2006, is the requirement that "Defendants agree to produce financial documents including sales and cost information" with the condition that "if all synthesis was done in the United States, or the RTL or technology library was supplied from the United States, or the netlist or mask data was shipped into the United States for manufacturing, then the producing Defendant will produce worldwide sales information for the newly identified Commercial ASIC.  Otherwise, the producing Defendant will produce only information regarding sales in the United States."  Brothers Dec. Ex. 14 (D.I. 459) at 2.  Not until submitting their motion for summary judgment on this issue did Defendants ever make any allegation that any of the sales information that they provided was for sales outside of the United States or outside of the damage period.  Ricoh's expert relied on Matrox's representation that all financial documents involved either (1) ASICs created in the U.S. or (2) ASICs imported into the U.S.]

63.   ~~Foreign sales of the Matrox Calao; Condor; CondorPlus; Cyclone; Eclipse; Maven; Sunex; Toucan; SIB; and Oasis products should be excluded from the royalty base.~~  [Disputed, as set forth for ¶62, plus this is a conclusion of law based upon disputed interpretations of the evidence.]

**Statement of Undisputed Facts for Summary Judgment No. 8**

64.   Ricoh initiated this infringement suit against the ~~Customer~~Aeroflex Defendants on January 21, 2003, alleging infringement of the '432 patent based on the ~~Customer~~Aeroflex Defendants' sale of application specific integrated circuits ("ASICs") that were designed by the Defendants ~~with~~ using a process that among other things included the use of Synopsys' Design

-11-

DRAFT

1   Compiler system, which includes Design Compiler, HDL Compiler for Verilog, VHDL Compiler,

2   and the DesignWare libraries ("the Design Compiler system").

3       65. ~~Ricoh's infringement allegations are based on the premise that software licensed from~~

4   ~~Synopsys and used by the Customer Defendants performs all of the steps of the asserted claims~~

5   ~~except the describing step.~~ [DISPUTED – This "fact" regarding Ricoh's infringement contentions is

6   a gross simplification and distortion of Ricoh's infringement contentions. In addition, Ricoh's

7   infringement contentions cite to and relies upon on evidence designated confidential by Synopsys and

8   Defendants. *See* Def. Ex. 4. Ricoh's contentions were filed under seal and are clearly marked

9   "Confidential Pursuant to Protective Order."]

10       66.    For the describing step of claim 13, Ricoh contends the limitation is met ~~because~~

11   when, at least "the ASIC Designer entered a written description of the desired functions of the ASIC

12   Product into HDL Compiler ~~for Verilog~~."

13       67.    Ricoh alleges that the Verilog and VHDL ASIC designs that include HDL operators,

14   including, for example +, *, -, /, >, < and "if," "case," and "wait" statements, comprise "architecture

15   independent actions and conditions," as used in a certain way, which, when input by the

16   ~~Customer~~Aeroflex Defendants into the Synopsys products in suit, fulfill the describing step and thus

17   infringe the '432 patent. [Disputed as written; we are not alleging EVERY use of a "+" infringes,

18   only those that are used in an "architecture independent" fashion.]

19       68.    ~~On October 22, 1990, Ricoh licensed the Design Compiler and HDL Compiler for~~

20   ~~Verilog from Synopsys.~~ [Disputed. This "fact" is legally irrelevant. The current laches allegations

21   expressly are limited to allegations regarding the actions of KBS between 1991 and January 12, 1997

22   (6 years prior to suit), which paragraph 61 avers was coordinated with Ricoh. The time constraints

23   pled alone eliminate much of Defendants' own cited evidence, including the 1989 article by Dr.

24   Kobayashi (Def. Ex. 66) and the 1990 license between Ricoh and Synopsys (Def. Ex. 67).*See, e.g.,*

25   (Brothers Dec. Ex. 19, D.I. 177, April 26, 2004, Answer and Counterclaims of Defendant AMI

26   Semiconductor, Inc. at 8). In addition, The Synopsys licenses specifically forbade Ricoh from

27   reverse engineering the source code for the licensed products. *See, e.g.,* Brothers Dec. Ex. 91 at 2SP

28

-12-

DRAFT

1  0708480 (prohibiting Ricoh to "decompile, disassemble, reverse engineer or attempt to reconstruct,

2  identify or discover any source code, underlying ideas, underlying ideas, underlying user interface

3  techniques or algorithms of the Licensed Product by any means whatever").]

4       69.    ~~Between 1990 and 1996, Ricoh entered into over 40 contracts with Synopsys for the~~

5  ~~licensing or support of the products-in-suit.~~[Disputed. This "fact" is legally irrelevant as set forth for

6  paragraph 68. In addition, the reference to "products in suit" is wrong, and the contracts were not all

7  for the "Design Complier products." In addition, if the assertion is meant to imply Ricoh knew or

8  should have known that the ASIC Defendants were actually using the patented process to design and

9  manufacture ASICs for sales in the United States, it is disputed, as Mr. Ishijima has testified to the

10  contrary. ]

11       70.    The co-owner of the asserted patent, KBSC, ~~also took a~~ licensed certain software tools

12  from Synopsys in July of 1993, and renewed that license in 1995. Ex. 69 at SP00001-SP00032.

13  KBSC was contractually prohibited from reverse engineering or investigating the inner workings of

14  the licensed software tools.

15       71.    ~~As licensees, both Ricoh and KBSC received product manuals describing the use and~~

16  ~~functionality of the tools comprising the Design Compiler system.~~ [Disputed. For Ricoh, this "fact"

17  is legally irrelevant as set forth in paragraphs 68 and 69. In addition, the statement is overbroad for

18  the Ricoh manuals, and the characterization is incomplete and misleading. For KBSC, there is no

19  record evidence of any KBSC manuals, or when those manuals were received by KBSC. In addition,

20  Synopsys restricted the use of the manuals and has marked them as Confidential. There is no

21  evidence to assume that any manuals (1) contained sufficient disclosure to make it reasonable to

22  conclude that KBSC (or Ricoh) knew or should have known Design Compiler involved those other

23  steps of the patented process (none of the three technical experts engaged by defendants have

24  provided any report to support this) and (2) that they were received more than six years before the

25  filing of this action.]

26

27

28

-13-

DRAFT

72. ~~In January of 1990, Synopsys' HDL Compiler won the *Electronic Products* magazine's product of the year award. Ex. 71.~~ [Disputed. This is legally irrelevant as it is pre-1991 activity that is outside the scope of Defendants' pleadings, as set forth above.]

73. ~~By 1997, Synopsys had an over 80% share of the logic synthesis tool market.~~ [Disputed. There is no record evidence to support this statement. Also, when in 1997?]

74. ~~In 1990, Electronic Engineering Times reported on Matrox Electronics' use of Synopsys' synthesis tools. Ex. 74.~~ [Disputed. This is legally irrelevant as it is pre-1991 activity that is outside the scope of Defendants' pleadings, as set forth above. Also, there is no disclosure of where this activity supposedly was taking place; in Ricoh's opposition, we say it (at least) implies in Canada; there is no evidence that Ricoh knew or had reason to know Matrox was doing anything in the United States prior to 2000 or 2001.]

75. ~~In 1991, Electronic News reported on AMI's development of cell libraries for use with Synopsys' Design Compiler product. Ex. 75.~~ [Disputed – this is irrelevant because it is outside the scope of their pleadings – AMI's activity is irrelevant except with respect to their licensing of Design Compiler. The only reference to Defendants' activity in the pleadings is "63. [Defendant] purchased the Design Compiler software from Synopsys." *See. e.g.*, (Brothers Dec. Ex. 19, D.I. 177, April 26, 2004, Answer and Counterclaims of Defendant AMI Semiconductor, Inc. at 8. Also, Def. Ex. 75 is a 1991 report that AMI was trying to develop a product without any forecast about when, if ever, it would be used; Def. Ex. 77 indicates AMI failed to have any product until some unknown time in 1996 and even then does not contain any indication that AMI's entry at that time had any relationship to DC.]

76. ~~In 1996, the AMI website disclosed that "AMI Design Kits support EDA tools from vendors such as Synopsys." Ex.78.~~ [Disputed as set forth in ¶75. Also, Def. Ex. 78 is undated, not authenticated, and states that AMI's products "support EDA tools from vendors such as Synopsys", but does not even say that AMI was actually using Synopsys tools (or which of the Synopsys tools) alone or in combination with its own products.]

DRAFT

77.    ~~In 1996, the Aeroflex website (at the time under the company's former name, UTMC)~~ ~~contained a November 28, 1995 press release in which UTMC announced the introduction of its~~ ~~VHDL design kits to enhance customers' VHDL-based ASIC designs and systems.  Ex. 79.~~ [Disputed as set forth in ¶75.  Also, Ex. 79 is prospective only (we are going to introduce next year), and does not suggest this had anything to do w/DC or say what Aeroflex was doing.]

78.    ~~The Synopsys website from 1997 contains a list of Synopsys Semiconductor Vendor~~ ~~Program participants, including AMI and UTMC (Aeroflex), who had developed strategic~~ ~~relationships with Synopsys to take full advantage of ASIC technology advancements.  Ex. 80.~~ [Disputed as set forth in ¶75.  Also, it is not clear from the website whether the information was available more than six years prior to suit.  Ex. 80 says Aeroflex and AMI are companies which offered libraries for use with Synopsys products.  It does not provide a basis for speculating, much less having reason to know, whether either company was using any Synopsys product in the U.S. so as to infringe the patent in suit.]

**Statement of Undisputed Facts for Summary Judgment No. 9**

79.    Ricoh has represented that it will not claim enhanced damages due to willfulness.

**Statement of Undisputed Facts for Ricoh's Summary Judgment Motion**

80.    Aeroflex does not contend that sales of the following products received authorization and consent:  UTCAM-Engine, JW01, KD08A, KD11A, JF01A/B, YA04/YA13, YB01, DA01, DA02, JW02, and KC01A.

82.    The ~~Customer~~Aeroflex Defendants could have used ~~non-infringing~~ alternatives that Ricoh has not accused of infringement, such as tools by Cadence Design Systems, Inc. and Mentor Graphics Corp., to synthesize their ASICs.

-15-

DRAFT

83.   The end customer (ASIC consumer) requires ~~cares about~~ the functionality of the ASIC, rather than a specific design flow.

84.   ~~The use of the '432 methods claimed in claims 13-17 is not embodied in the structure or composition of any article used in creating using any of the accused designs at issue.~~ [Disputed: to the extent we understand this, it appears to be inconsistent with how the ASICs are actually used.]

85.   The use of the '432 methods claimed in claims 13-17 is not required ~~used~~ in machinery, tools, or methods whose use necessarily results from manufacturing and delivering ASICs to an end user under the Government contracts at issue in Ricoh's motion.

Dated:  September 12, 2006          HOWREY LLP

                                    By:    /s/
                                           Denise M. De Mory
                                           Attorney for Plaintiff SYNOPSYS, INC.
                                           and Defendants AEROFLEX
                                           INCORPORATED, AMI
                                           SEMICONDUCTOR, INC., MATROX
                                           ELECTRONIC SYSTEMS, LTD.,
                                           MATROX GRAPHICS INC., MATROX
                                           INTERNATIONAL CORP., MATROX
                                           TECH, INC., and AEROFLEX
                                           COLORADO SPRINGS, INC.

Dated:  September 12, 2006          DICKSTEIN SHAPIRO LLP

                                    By:    ~~/s/~~DRAFT
                                           Kenneth W. Brothers
                                           Attorney for Plaintiff RICOH COMPANY,
                                           LTD.

-16-

# Exhibit 3

## Andelman, Ethan

| | |
|---|---|
| **From:** | DeMory, Denise |
| **Sent:** | Tuesday, September 12, 2006 8:10 PM |
| **To:** | Brothers, Kenneth |
| **Cc:** | Allen, DeAnna; Fink, Jacky; Andelman, Ethan; Barbisch, Rebecca; Weinstein, Michael; Meilman, Edward; olivere@dicksteinsharpiro.com |
| **Subject:** | Use This Draft Please |

**Attachments:** separate statement 808 pm.DOC

Ken:

Please use this draft as opposed to the one I sent moments ago.

Denise

separate
ment 808 pm.D(

DRAFT

1  ~~Teresa M. Corbin (SBN 132360)~~
~~Denise M. De Mory (SBN 168076)~~
2  ~~Jaclyn C. Fink (SBN 217913)~~
~~HOWREY LLP~~
3  ~~525 Market Street, Suite 3600~~
~~San Francisco, California 94105~~
4  ~~Telephone: (415) 848-4900~~
~~Facsimile: (415) 848-4999~~
5

6  ~~Attorneys for Plaintiff SYNOPSYS, INC.~~
~~and for Defendants AEROFLEX INCORPORATED,~~
7  ~~AMI SEMICONDUCTOR, INC., MATROX~~
~~ELECTRONIC SYSTEMS, LTD., MATROX~~
8  ~~GRAPHICS, INC., MATROX INTERNATIONAL~~
~~CORP., MATROX TECH, INC., and~~
9  ~~AEROFLEX COLORADO SPRINGS, INC.~~
10

11              UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA
12             SAN FRANCISCO DIVISION

13  RICOH COMPANY, LTD.,                    Case No. C03-04669 MJJ (EMC)

14              Plaintiff,                  Case No. C03-02289 MJJ (EMC)

15        vs.                              **JOINT STATEMENT OF UNDISPUTED**
                                           **FACTS RE PENDING MOTIONS FOR**
16  AEROFLEX INCORPORATED, AMI             **SUMMARY JUDGMENT**
    SEMICONDUCTOR, INC., MATROX
17  ELECTRONIC SYSTEMS LTD., MATROX
    GRAPHICS INC., MATROX                  Date:        September 26, 2006
18  INTERNATIONAL CORP., MATROX TECH,      Time:        9:30 a.m.
    INC., AND AEROFLEX COLORADO            Courtroom:   11, 19th Floor
19  SPRINGS, INC.                          Judge:       Martin J. Jenkins
20
             Defendants.
21  SYNOPSYS, INC.,

22              Plaintiff,

23        vs.

24
    RICOH COMPANY, LTD.,
25
             Defendant.
26

27

28

HOWREY LLP

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)
STATEMENT OF UNDISPUTED FACTS

DM_US\8385804.v1

DSMDB-2141613v03

**DRAFT**

This Joint Statement of Facts is proposed in accordance with Local Rule 56-2(b) and the Standing Order of the Honorable Martin J. Jenkins.

### Statement of Undisputed Facts for Summary Judgment No. 1

**[Awaiting comments from Ricoh; Defendant/Synopsys provided Soderman deposition cites to which Ricoh has not yet responded].**

1.   The ~~Customer~~Aeroflex ~~Defendants'~~ designs ~~ASICs at issue include a specification of inputs~~accused designs specify inputs.

2.   The ~~Customer~~Aeroflex ~~Defendants~~Defendants' designs ~~ASICs at issue include a specification of outputs~~ accused designs specify outputs.

3.   The ~~Customer~~Aeroflex ~~Defendants~~Defendants' designs ~~ASICs at issue~~accused designs may or may not ~~include a specification of~~specify registers ~~(which may be flip-flops or latches)~~.

4.   ~~The Customer Defendant designs at issue, for each clock cycle, include a description of how the values of the outputs and registers should be set according to the value of the inputs, the previous values of the registers and the logic functionality between register locations.~~ [Disputed; this sentence is incomprehensible. To the extent we understand it, there is no record evidence to support it.]

### Statement of Undisputed Facts for Summary Judgment No. 2

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)    -1-
REPLY ISO MSJ OF INVALIDITY OF U.S. PATENT NO.
4,922,432 FOR VIOLATION OF 35 U.S.C. § 102(f), OR TO
DISMISS FOR FAILURE TO JOIN ALL CO-OWNERS AS PLTFS
DM_US\8385804.v1

HOWREY LLP

DSMDB-2141613v03

DRAFT

### Statement of Undisputed Facts for Summary Judgment No. 3

[We are at an impasse regarding facts 12-16, 19; they will go in Rule 56 declaration]

_____11.    Dr. Kobayashi was Simon Foo's advisor for his master's thesis, attached as Exhibit 66 to the Brothers Declaration.

12.    This thesis describes the use of a relational database system to manage very large scale integration designs. [This is an incomplete and misleading characterization.]

13.    Dr. Kobayashi and Simon Foo co-authored two papers published that had copyright dates in 1986.

17.    Both the Foo Thesis and the FAME paper discuss storing representations of functional modules in a frame-based database.

-2-

DRAFT

18.     As described in "A Knowledge Based System for VLSI module selection," the VLSI modules that are selected by the NEPTUNE system are selected using rules stored in an expert system knowledge base. Brothers Decl., Ex. 68, at 184 ("This paper introduces a frame-based system for selecting VLSI modules, called NEPTUNE. Based on domain specific knowledge and heuristic rules, NEPTUNE assists IC designers to select an optimized solution, and explore different implementation alternatives.")

19.

**Statement of Undisputed Facts for Summary Judgment No. 4**

20.     ~~The~~ An article ~~T.J. Kowalski, D.J. Geiger, W.H. Wolf, and W. Fichtner, "The VLSI Design Automation Assistant: From Algorithms to Silicon," IEEE Design and Test of Computers Magazine, Vol. 2, No. 4, pp. 33-43  ("Kowalski85") was published in~~ has a copyright notice reading ~~"August 1985."  ["Published" is disputed; defendants have the burden to show that the article was formally "published" as that term is used in patent law, and they have not done so.]~~

20a.     An article written by T.J. Kowalski, D.J. Geiger, W.H. Wolf, and W. Fichtner entitled "The VLSI Design Automation Assistant: From Algorithms to Silicon" is listed in the table of contents of the August 1985 issue of IEEE Design and Test of Computers Magazine as appearing at pp. 33-43. This article is referred to by the parties as "Kowalski85."

20b.     Kowalski85 was published in August 1985.

20c.     IEEE Design and Test of Computers Magazine is a periodical.

20d.     IEEE Design and Test of Computers Magazine is a periodical which is publicly available from at least one library.

20e.     The August 1985 issue of IEEE Design and Test of Computers Magazine is publicly available from at least one library.

20f.     The August 1985 issue of IEEE Design and Test of Computers Magazine was publicly available from at least one library prior to January 13, 1987.

-3-

**DRAFT**

21.    ~~The thesis "The VLSI design automation assistant: a knowledge-based expert system,"~~ ~~written by Thaddeus Julius Kowalski at Carnegie Mellon University, was available to the public via~~ ~~the Carnegie Mellon library in 1984 ("Kowalski Thesis" or "Kowalski84"), and was republished by~~ ~~Kulwer in 1985 in book form.  [Disputed; defendants have not established that the thesis was in the~~ ~~CMU library, cataloged, and otherwise "accessible" as required to meet the "publication"~~ ~~requirements.]~~

21a.    Thaddeus Julius Kowalski authored a thesis at Carnegie Mellon University entitled "The VLSI design automation assistant: a knowledge-based expert system."  This thesis is referred to by the parties as "Kowalski Thesis" or "Kowalski84."

21b.    The Carnegie Mellon University online card catalog lists a publication date of 1984 for the Kowalski Thesis.  (De Mory Ex. 101.)

21c.    The Kowalski Thesis contains an indication that it is designated as SRC Report CMU-CAD-84-29. Brothers Decl., Ex. 82 at cover page.

21d.    The work on the Kowalski Thesis was financed in part by the National Science Foundation.  Brothers Decl., Ex. 82 at Acknowledgements.

21e.    The Kowalski Thesis contains a limited distribution notice stating that the thesis has been, or will be, submitted for publication, has been issued as a Research Report for dissemination of its contents, and because of potential transfer of copyright to the publisher, distribution outside CMU is limited to peers and specific requests until publication.  *Id.*

22.    ~~Kowalski85 and the Kowalski Thesis describe the same program — VLSI Design~~ ~~Automation Assistant ("VDAA").  [This is in dispute as set forth in our brief.]~~

22a.    Kowalski85 and the Kowalski Thesis describe versions of the same program, which is entitled VLSI Design Automation Assistant.  Kowalski Depo. at 9:14-17 & 13:5-12; Kowalski85 at Note 8 (citation to Kowalski Thesis).

22b.    The parties refer to the VLSI Design Automation Assistant as "VDAA."

-4-

DRAFT

23. ~~Dr. Kowalski also provided deposition testimony on the workings of the VDAA system.  [Disputed:  "workings" is vague; Kowalski did not give a full description of the "workings" of the DAA system, he did not refer to anything as a "VDAA system."]~~

23a.   Dr. Kowalski provided deposition testimony in this case on May 23, 2006, pursuant to a subpoena served by Ricoh.

23b.   Dr. Kowalski provided deposition testimony on the VDAA program, Kowalski85, and the Kowalski Thesis, among other topics, in response to questions posed by Ricoh's attorneys.

24. ~~The VDAA system described in Kowalski85 (DEF018108-18118) as accepted as input an algorithmic description of the behavior of the chip, written in a language known as ISPS, and the ISPS description described the desired functionality of the chip in terms of actions and conditions. [Modified to present an accurate description of the facts.]~~

24a.  The VDAA system inputs an algorithmic description in a programming language known as "ISP." [sic]  The VDAA system transforms the algorithmic description into a network of functional modules (e.g., registers, adders, multiplexers) using expert knowledge.  See Soderman Rebuttal Report at 19:2-7.

_____ [Facts 25-27 are supported by the citations to evidence contained in Exhibits A and B to our Motion; you did not dispute any of these facts.  If you will not agree to them as written, we will put them in our Rule 56 declaration]

25. ~~The system described in Kowalski85 (DEF018108-18118) works from a data-flow representation extracted from T~~the ISPS description was then translated into a data-flow graph representation known as VT by the VDAA system.  ~~In the process of compiling the design into a VT, the compiler translated each of the actions and conditions into a predefined operator, which forms the node of the graph.  [Modified to present accurate description (see DEF018111).  How that description maps to the claims obviously is in dispute.]~~

26. ~~The nodes in the VT representation were used to select hardware cells from the "technology-sensitive database" using expert rules stored in the VDAA system.[Whether "rules" were~~

-5-

DRAFT

used to select "hardware cells" is obviously a key issue in dispute. Even whether the so-called "rules" are "applied" DIRECTLY to the VT representation is in dispute.]

27. The rules in the VDAA system were in an IF-THEN antecedent format. [Disputed: Kowalski85 does not disclose "rules" in an IF-THEN format.]

28. [See Kowalski Depo. at 106:7-13] After the hardware cells were bound using the module binder, a netlist was created by the control allocator.[Disputed: Whether "hardware cells" were bound into a "netlist" is another key issue in dispute.]

_____

29. [See Kowalski Depo. at 83:5-24.] At deposition, Dr. Kowalski clarified testified (without corroboration) that the "technology sensitive" database discussed in these papers in Kowalski85 contained technology-independent "cell descriptions," where he defined that term stating that: "It varied. It could be as low as a single an[d] gate as high and complicated as an ALU. So it is a broad list of possible things." [Disputed as originally written. Kowalski never testified that Kowalski85 itself disclosed this usage, or even that any "refinement" of the work included AND gates.]

30. In addition to his affiliation with CMUFrom his CV, Dr. Kowalski has stated he was a researcher at AT&T Bell Laboratories, and after receiving his doctorate in 1984 for his work on VDAA, Dr. Kowalski further refined the program at AT&T. One of these refinements was to eliminate the need for a separate module binder process — the hardware cells were selected, bound, and a netlist was created all in one step. [There is no evidence to support the rest of this. What Kowalski did to "refine" anything called a "VDAA system" is a subject of dispute—one in which defendants have no corroborating evidence.]

30a. Dr. Kowalski was affiliated with AT&T Bell Laboratories. Kowalski85, title line.

30b. Dr. Kowalski refined the VDAA program while at AT&T. Kowalski Depo. 14:4-6; 77:16-20; 78:15-79:19; 94:20-99:17; 104:8-21; 118:7-119:12; 130:6-131:3.

30c. One of these refinements to VDAA was to eliminate the need for a separate module binder process. *Id.; see also* Kowalski Depo. Ex. 463.

-6-

DRAFT

30d.    Under this refinement, the VDAA program itself selected and bound hardware cell, and created a netlist, without the need for a separate module binder. *Id.; see also* Kowalski Depo. Ex. 463.

### Statement of Undisputed Facts for Summary Judgment No. 5

31.    On February 24, 2006, the PTO ordered reexamination of the '432 patent based on a request "that '432 patent claims 13-17 are anticipated under 35 U.S.C. sect. 102 in light of the following references:  T.J. KOWALSKI, D.J. Geiger, W.H. Wolf, W. Fichtner, The VLSI Design Automation Assistant: From Algorithms to Silicon, IEEE Design & Test, pp. 33-43 (1985). (i.e., "KOWALSKI-85") [and] Thaddeus Julius KOWALSKI, The VLSI Design Automation Assistant: A Knowledge-Based Expert System, Carnegie-Mellon University PhD Thesis, April 1984. (i.e., "KOWALSKI-84").

32.    The February 24, 2006 PTO order granting reexamination of the '432 patent stated that "the Kowalski-85 reference (including the inherent teachings of Kowalski84) would have been considered important by a reasonable Examiner in deciding whether or not at least claim 13 was patentable...."

33.    The February 24, 2006 PTO order granting reexamination of the '432 patent stated that "Kowalski-85 and Kowalski-84 references were not of record in the file of the '432 patent and are not cumulative to the art of record in the original file."

35.    The named '432 patent inventors, Dr. Kobayashi and Mr. Shindo, co-authored with Mr. Suehiro and published "KBSC:  A Knowledge-Based Approach to Automated Logic Synthesis" (1989 KBSC Article) in 1989.  According to the cover page footer of the article, the manuscript for the 1989 KBSC Article was submitted in November 1988 and revised for publication in February 1989.  The '432 patent Notice of Allowability was mailed on November 29, 1989, and the '432 patent issued on May 1, 1990

36.    KBSC00002884 is a letter in Japanese dated November 27, 1987 from Mr. Shindo to Dr. Kobayashi.  A translation of the letter is at Exhibit 93.  The letter states that it is "[r]egarding the

-7-

joint patent application by ICC and Ricoh." The letter further states that "[i]n order to file the patent application, we will need to have a meeting with a US patent agent regarding the preparation of a US patent specification." The agenda for the meeting included the "[c]ompletion of patent specification." The meeting was scheduled for December 8-9, 1987 at ICC Columbia and included among the participants Dr. Kobayashi, Mr. Shindo, and Mr. Suehiro.

36B.    Mr. Suehiro was an attendee at the December 8-9, 1987 meeting relating to ~~the~~ what became the application for the '432 patent.

37.    Kowalski85 describes a system called the VLSI Design Automation Assistant (VDAA).

38.    [Will go in Rule 56 Declaration]

39.    [Will go in Rule 56 Declaration]

40.    [Will go in Rule 56 Declaration]

41.    [Will go in Rule 56 Declaration as written; will include agreed fact]. The August 1986 table of Contents from the *IEEE Design and Test of Computers Magazine* does not show a Kowalski article in that issue.

41A.    The August 1985 table of Contents from the *IEEE Design and Test of Computers Magazine* does show a Kowalski article in that issue cited as "T.J. Kowalski, D.J. Geiger, W.H. Wolf, W. Fichtner, The VLSI Design Automation Assistant: From Algorithms to Silicon, *IEEE Design & Test*, pp. 33-43 (1985)."

42.    Kowalski85 is not listed on the cover page of the '432 patent as a reference that was considered by the patent examiner, and a physical copy of Kowalski85 is not included in the '432 prosecution file history.

43.    During the prosecution of the '432 patent, the Applicants supplied to the PTO an article entitled "FLAMEL: A High-Level Hardware Compiler" by Trickey. On the first page of the Trickey article, it states that "Some examples of compilers that operate this way are: the CMU-DA project [1], particularly the Design Automation Assistant [2], [3] portion; Arsenic [4]; the USC Design Automation project [5]; the AT&T Bell Labs VLSI Design Automation Assistant [6]; and SC

-8-

DRAFT

[7]." Reference [6] is Kowalski85, and the Trickey paper provides a full citation to Kowalski85. Kowalski85 is not referenced again in the Trickey paper.

**Statement of Undisputed Facts for Summary Judgment No. 6**

44.    ~~Ricoh asserts that over 350 of the Customer~~Aeroflex Defendants' designs ~~ASICs were designed and manufactured using a process that infringes~~ ~~claims 13-17 of the '432 claims~~patent.

44a.    231 of the over 350 ASICs at issue in this case are AMI Semiconductor, Inc. ASICs for which the only logic synthesis performed by AMI Semiconductor, Inc. using the Design Compiler system was the creation of a BIST (Built In Self Test) memory controller.  These 231 ASICS are listed in the June 1, 2006 Corrected Third Supplemental Product Declaration of Robert B. Smith of AMI.

44b.    A BIST is not an ASIC, but merely a portion of an ASIC whose only purpose is to allow testing of a memory device on the chip prior to shipment to the customer.

44c.    Of the over 350 ASICs at issue, at least the following Aeroflex, Inc. and Aeroflex Colorado Springs, Inc. ASICs are mixed-signal ASICs: JW01, YA04/YA13, YB01, DA01, DA02, JW02.

44d.    Of the over 350 ASICs at issue, at least the following Matrox Electronic Systems Ltd., Matrox Graphics, Inc., Matrox International Corp., and Matrox Tech, Inc. ASICs are mixed-signal ASICs: Cyclone, Eclipse, Eclipse PCI, Calao, Toucan, Condor, Condor Plus, Parhelia, Sundog, Parhelia8x, Sunex, Maven, Rainbow Runner, Twister.

44e.    Of the over 350 ASICs at issue, at least the following AMI Semiconductor, Inc. ASICs are mixed-signal ASICs: 11241-801, 802, 803; 0QJBW-001, 002, 900, 901, 902, 903, 904, 905, 906; 11636-501; 14167-001; 14948-501, 502, 503; 15088-501; 15124-501, 502; 19007-001; 19075-001, 002, 003; 19320-001; 19371-001; 19402-001; 0JGBE-001, 002, 900, 901, 902; 19293-001, 002, 004; 19070-001, 002; 19134-001; 0MNTA-900, 901, 902, 903, 904, 905, 906, 907, 908, 909, 910, 911,

-9-

DRAFT

912, 913, 914; 13855-501; 15078-001, 002; 19219-001, 002, 003; 19299-001; 19409-001, 002, 003; 19428-001; 19429-001, 002, 003; 19529-001; 19558-002; 19608-001; 19645-001; 19664-002; 19693-001, 002; 0AFCB-002; D1AFCC; 0APSE-002; 0C621-003; 0C622-003; D1CORC; D1CORD; 0HISB-001; 0IEBA-002; D1SEBA.

44f.    For all ASIC designs, the Design Compiler system cannot be used to design certain portions of the ASIC such as instantiated pad cells, asynchronous logic, and hand instantiated logic. (Casavant Decl., ¶ 10; Brothers Decl., Ex. 27 (Casavant report) at 7).

45.    ~~For each of the over 350 Customer Defendant designs at issue, the output of the Design Compiler system did not comprise the full design for an ASIC.    [Disputed for multiple reasons: "Customer Defendants" is misleading, ""designs at issue" is incorrect, "output of the Design Compiler system" is undefined and not supported by record evidence; "full design of an ASIC" is undefined and not supported by record evidence."~~

46.    [Will go in Rule 56 declaration as written; will include the following and propose 56b]. Ricoh accuses in this litigation processes in which t~~he~~ The Design Compiler system ~~can~~ is used to ~~only be used to~~ design digital portions of ASICs.

46a.    Design Compiler cannot be used to synthesize analog portions of an ASIC.

47.    [Will go in Rule 56 Declaration].  ~~Mixed-signal products may contain both analog and digital portions.~~

48.    [Will go in Rule 56 Declaration]. ~~The ASIC products Ricoh accuses of infringement in this case that are mixed-signal products are listed in Exhibit 2 to the August 18, 2006 Declaration of Albert E. Casavant in Support of Synopsys and the Customer~~ Aeroflex ~~Defendants' Motions for Summary Judgment.  [Disputed.  We don't agree this is an undisputed fact. Ex 2 says he relied on conversations to get this information.  We have never received proof that this is a true and accurate list of the mixed-signal ASICs.]~~

-10-

DRAFT

49.    The Corrected Third Supplemental Product Declaration of Robert B. Smith of AMI dated June 1, 2006 declares that Ffor approximately 2310 of the AMI designs that Ricoh accuses of infringement, AMI used the Design Compiler system to design only a very small portion of the ASIC known as "BIST" or "Built-In Self Test."  These AMI designs are listed in Exhibit 2 to the August 18, 2006 Declaration of Albert E. Casavant in Support of Synopsys and the CustomerAeroflex DefendantsDefendants' Motions for Summary Judgment.

55.    [Will go in Rule 56 Declaration]  ~~Many processing steps must occur between the creation of a Design Compiler netlist output and generation of mask data.  [Disputed.  This is so general it is meaningless.]~~

56.    [Will go in Rule 56 Declaration].  ~~For each of the 350 designs at issue, additional circuitry must be added to the Design Compiler system netlist prior to the time that mask data can be created.[Disputed.  There is no evidence to support this.]~~

## Statement of Undisputed Facts for Summary Judgment No. 7

57.    There is no evidence that customers purchase the accused Matrox graphics boards because Design Compiler is used as part of the design process.  ~~There is no evidence that the use of the Design Compiler system drives the demand for Matrox graphics boards. [DISPUTED – misrepresents the legal requirement ("drives the demand") and even if correct, Lipscomb testified there was such evidence - the infringing use of Design Compiler allows for timely and cost-effective production of the accused Matrox graphics boards, which are packaged and sold as functional units, and which cannot be split into component parts without destroying their functionality; the infringing use of Design Compiler allows Defendants to bring the accused graphics boards to market sooner and at a more attractive price than would be possible without the use of Design Compiler.  The patented method is used by Defendants since it gives them the ability to provide error-free product at a reasonable cost and on a timely basis.  Soderman Dec. ¶59; see also Brothers Dec. Ex. 11 (Expert Report of Michael J. Wagner), at 18; Brothers Dec. Ex. 10, (Lipscomb Tr.) at 30, 34-35, 40-41, 45. That is what customers demand.Also, it's not DC, it's the infringing process.]~~

58.    There is no evidence that customers purchase the accused Defendant ASICs because Design Compiler is used as part of the design process.  ~~There is no evidence that the use of the Design Compiler system drives the demand for the CustomerAeroflex Defendants' ASICs.  [DISPUTED – misrepresents the legal requirement ("drives the demand") and even if correct, Lipscomb testified there was such evidence - the infringing use of Design Compiler allows for timely and cost-effective production of the accused ASICs, which are packaged and sold as functional units, and which cannot be split into component parts without destroying their functionality; the infringing use of Design~~

-12-

DRAFT

1
2   ~~Compiler allows Defendants to bring the accused ASICs to market sooner and at a more attractive~~
3   ~~price than would be possible without the use of Design Compiler. The patented method is used by~~
    ~~Defendants since it gives them the ability to provide error-free product at a reasonable cost and on a~~
4   ~~timely basis. Soderman Dec. ¶59; *see also* Brothers Dec. Ex. 11 (Expert Report of Michael J.~~
5   ~~Wagner), at 18; Brothers Dec. Ex. 10, (Lipscomb Tr.) at 30, 34-35, 40-41, 45. That is what customers~~
6   ~~demand. Also, it's not DC, it's the infringing process.]~~

7       59.    The Aeroflex Defendants could have used alternatives that Ricoh has not accused of
8   infringement, such as tools by Cadence Design Systems, Inc. and Mentor Graphics Coprp., to
9   synthesize their ASICs. ~~The creation of a design of an ASIC is a necessary step in the production of~~
10  ~~an ASIC. The patented process is not required or necessary to the production of an ASIC, although~~
11  ~~the alternatives would require use of an entirely different design process that could result in a~~
12  ~~measurable increase in cost and delay. Brothers Dec. Ex. 10, (Lipscomb Tr.) at 33-35. . [As~~
13  ~~originally written, this sentence does not make sense—you need to have a design.]~~
14
15      60.    ~~The VIA/1 was manufactured not synthesized during the damages period. [Disputed~~
16  ~~as originally written—Matrox admitted that the VIA/1 is a "Commercial ASIC . . . as defined in the~~
17  ~~May 5, 2006 Amended Stipulation Re Supplemental Production." Brothers Dec. Ex. 13 (Second~~
18  ~~Supplemental Product Declaration of Eric Boisvert of Matrox Electronic Systems), at 2. That~~
19  ~~Stipulation defined a "Commercial ASIC" as "any ASIC . . . that was, between 1997 and the present,~~
20  ~~(1) synthesized using Design Compiler for which (2) revenue was received and (3) one or more~~
21  ~~physical ASICs were manufactured . . . *all three criteria must be met and all three criteria must have*~~
22  ~~*occurred between 1997 and the present* for an ASIC to qualify as a 'Commercial ASIC.'" Brothers~~
23  ~~Dec. Ex. 14 (D.I. 459) at 1-2 (emphasis added). Matrox's declaration that the VIA/1 ASIC is a~~
24  ~~"Commercial ASIC" is an admission that the VIA/1 was synthesized and received revenue within the~~
25  ~~damages period.]~~
26      ~~61.    There is no evidence that the VIA/1 was synthesized during the damages period.~~
27  ~~[Disputed, as set forth for ¶60.]~~
28

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)
STATEMENT OF UNDISPUTED FACTS
DM_US\8385804.v1

DSMDB-2141613v03

DRAFT

62.    There is no evidence that any infringing activity for the Matrox Calao; Condor; CondorPlus; Cyclone; Eclipse; Maven; Sunex; Toucan; SIB; and Oasis products took place in the United States.  ~~There is no evidence that any infringing activity for the Matrox Calao; Condor; CondorPlus; cyclone; Eclipse; Maven; Sunex; Toucan; SIB; and Oasis products took place in the United States.  [DISPUTED—Matrox has made multiple conflicting product declarations, and the Court has repeatedly instructed Defendants as to the scope of those declarations.  See Brothers Dec. Ex. 1, (Ricoh's Motion to Show Cause); D.I. 443.  Matrox agreed to the May 5, 2006 Stipulation and Order and submitted a sworn declaration in compliance with the Court's Order and with its obligations under the Stipulation.  Brothers Dec. Ex. 14 (D.I. 459) at 1-2; Brothers Dec. Ex. 13 (Matrox May 10, 2006, Product Declarations).  Hence, they admitted there was infringing activity.  Ricoh repeatedly requested specific financial data regarding Matrox's declared products, and Matrox has represented that their production included that requested data, and that data only.  Included in the Amended Stipulation and Order entered by the Court on May 5, 2006, is the requirement that "Defendants agree to produce financial documents including sales and cost information" with the condition that "if all synthesis was done in the United States, or the RTL or technology library was supplied from the United States, or the netlist or mask data was shipped into the United States for manufacturing, then the producing Defendant will produce worldwide sales information for the newly identified Commercial ASIC.  Otherwise, the producing Defendant will produce only information regarding sales in the United States." Brothers Dec. Ex. 14 (D.I. 459) at 2.  Not until submitting their motion for summary judgment on this issue did Defendants ever make any allegation that any of the sales information that they provided was for sales outside of the United States or outside of the damage period.  Ricoh's expert relied on Matrox's representation that all financial documents involved either (1) ASICs created in the U.S. or (2) ASICs imported into the U.S.]~~

62Aa.  There is no evidence that any infringing activity for the Matrox Maven product took place in the United States.

-14-

DRAFT

63.  If there was no infringing activity in the United States for the Matrox Calao; Condor; CondorPlus; Cyclone; Eclipse; Sunex; Toucan; SIB; and Oasis products, then foreign sales of the products should be excluded from the royalty base.

63Aa.  If there was no infringing activity in the United States for the Matrox Maven product, then foreign sales of the Maven product should be excluded from the royalty base.

~~63.  Foreign sales of the Matrox Calao; Condor; CondorPlus; Cyclone; Eclipse; Maven; Sunex; Toucan; SIB; and Oasis products should be excluded from the royalty base.  [Disputed, as set forth for ¶62, plus this is a conclusion of law based upon disputed interpretations of the evidence.]~~

### Statement of Undisputed Facts for Summary Judgment No. 8

64.  Ricoh initiated this infringement suit against the Defendants on January 21, 2003, alleging infringement of the '432 patent based on the Defendants' sale of application specific integrated circuits ("ASICs") that were designed by the Defendants using a process that among other things included the use of Synopsys' Design Compiler system, which includes Design Compiler, HDL Compiler for Verilog, VHDL Compiler, and the DesignWare libraries  ("the Design Compiler system").

~~65.  Ricoh's infringement allegations are based on the premise that software licensed from Synopsys and used by the Customer Defendants performs all of the steps of the asserted claims except the describing step.  [DISPUTED – This "fact" regarding Ricoh's infringement contentions is a gross simplification and distortion of Ricoh's infringement contentions. In addition, Ricoh's infringement contentions cite to and relies upon on evidence designated confidential by Synopsys and Defendants.  See Def. Ex. 4.  Ricoh's contentions were filed under seal and are clearly marked "Confidential Pursuant to Protective Order."]~~

-15-

DRAFT

66.    For the describing step of claim 13, Ricoh contends the limitation is met when, at least "the ASIC Designer entered a written description of the desired functions of the ASIC Product into HDL Compiler."

67.    [We are still considering this language] Ricoh alleges that the Verilog and VHDL ASIC designs that include HDL operators, including, for example +, *, -, /, >, < and "if," "case," and "wait" statements, comprise "architecture independent actions and conditions," as used in a certain way, which, when input by the Defendants into the Synopsys products in suit, fulfill the describing step and thus infringe the '432 patent.

67a.    Ricoh had no more information about the alleged architecture independent nature of the Defendants' Verilog and VHDL ASIC inputs when it initiated this suit than it had before January 21, 1997.

68.    On October 22, 1990, Ricoh licensed the Design Compiler and HDL Compiler for Verilog from Synopsys. [Ricoh objections: legally irrelevant; not plead].

68a.    The Synopsys licenses specifically forbade Ricoh from reverse engineering the source code for the licensed products. [Defendant objection: legally irrelevant]

68b.    Ricoh had not reverse engineered the licensed Synopsys software prior to the time it filed the lawsuit against Defendants.

~~[Disputed. This "fact" is legally irrelevant. The current laches allegations expressly are limited to allegations regarding the actions of KBS between 1991 and January 12, 1997 (6 years prior to suit), which paragraph 61 avers was coordinated with Ricoh. The time constraints pled alone eliminate much of Defendants' own cited evidence, including the 1989 article by Dr. Kobayashi (Def. Ex. 66) and the 1990 license between Ricoh and Synopsys (Def. Ex. 67) See, e.g., (Brothers Dec. Ex. 19, D.I. 177, April 26, 2004, Answer and Counterclaims of Defendant AMI Semiconductor, Inc. at 8). In addition, The Synopsys licenses specifically forbade Ricoh from reverse engineering the source code for the licensed products. See, e.g., Brothers Dec. Ex. 91 at 2SP 0708480 (prohibiting Ricoh to "decompile, disassemble, reverse engineer or attempt to reconstruct, identify or discover any source~~

-16-

**DRAFT**

~~code, underlying ideas, underlying ideas, underlying user interface techniques or algorithms of the Licensed Product by any means whatever").]~~

69.    Between 1990 and 1996, Ricoh entered into over 40 contracts with Synopsys for the licensing or support of the products-in-suit.  [Ricoh objection: legally irrelevant].  ~~[Disputed.  This "fact" is legally irrelevant as set forth for paragraph 68.  In addition, the reference to "products in suit" is wrong, and the contracts were not all for the "Design Compiler products."  In addition, if the assertion is meant to imply Ricoh knew or should have known that the ASIC Defendants were actually using the patented process to design and manufacture ASICs for sales in the United States, it is disputed, as Mr. Ishijima has testified to the contrary.  ]~~

70.    The co-owner of the asserted patent, KBSC, ~~also took a~~ licensed certain software tools from Synopsys in July of 1993, and renewed that license in 1995.  Ex. 69 at SP00001-SP00032.

_____ 70a.    KBSC was contractually prohibited from reverse engineering or investigating the inner workings of the licensed software tools.  [Defendant objection:  legally irrelevant]

71.    ~~As licensees, both Ricoh and KBSC received product manuals describing the use and functionality of the tools comprising the Design Compiler system.  [Disputed.  For Ricoh, this "fact" is legally irrelevant as set forth in paragraphs 68 and 69.  In addition, the statement is overbroad for the Ricoh manuals, and the characterization is incomplete and misleading.  For KBSC, there is no record evidence of any KBSC manuals, or when those manuals were received by KBSC.  In addition, Synopsys restricted the use of the manuals and has marked them as Confidential.  There is no evidence to assume that any manuals (1) contained sufficient disclosure to make it reasonable to conclude that KBSC (or Ricoh) knew or should have known Design Compiler involved those other steps of the patented process (none of the three technical experts engaged by defendants have provided any report to support this) and (2) that they were received more than six years before the filing of this action.]~~

_____ 71a.    As a licensee, Ricoh received product manuals describing the use and functionality of the tools comprising the Design Compiler system.  [Ricoh objection:  legally irrelevant; not plead]

-17-

DRAFT

71b.    As a licensee, KBSC received product manuals describing the use and functionality of the tools comprising the Design Compiler system.  [Ricoh objection:  legally irrelevant]

72.    In January of 1990, Synopsys' HDL Compiler won the *Electronic Products* magazine's product of the year award. Ex. 71. [Ricoh objection:  legally irrelevant; not plead] [Disputed.  This is legally irrelevant as it is pre-1991 activity that is outside the scope of Defendants' pleadings, as set forth above.]

73.    By 1997, Synopsys had an over 80% share of the logic synthesis tool market. [Disputed.  There is no record evidence to support this statement.  Also, when in 1997?]

74.    In 1990, Electronic Engineering Times reported on Matrox Electronics' use of Synopsys' synthesis tools. Ex. 74. [Disputed.  This is legally irrelevant as it is pre-1991 activity that is outside the scope of Defendants' pleadings, as set forth above.  Also, there is no disclosure of where this activity supposedly was taking place; in Ricoh's opposition, we say it (at least) implies in Canada; there is no evidence that Ricoh knew or had reason to know Matrox was doing anything in the United States prior to 2000 or 2001.]  [Ricoh objection:  legally irrelevant]

75.    In 1991, Electronic News reported on AMI's development of cell libraries for use with Synopsys' Design Compiler product.  Ex. 75.  [Disputed - this is irrelevant because it is outside the scope of their pleadings - AMI's activity is irrelevant except with respect to their licensing of Design Compiler.  The only reference to Defendants' activity in the pleadings is "63.  [Defendant] purchased the Design Compiler software from Synopsys." See, e.g., (Brothers Dec. Ex. 19, D.I. 177, April 26, 2004, Answer and Counterclaims of Defendant AMI Semiconductor, Inc. at 8.  Also, Def. Ex. 75 is a 1991 report that AMI was trying to develop a product without any forecast about when, if ever, it would be used; Def. Ex. 77 indicates AMI failed to have any product until some unknown time in 1996 and even then does not contain any indication that AMI's entry at that time had any relationship to DC.]  [Ricoh objection:  legally irrelevant]

76.    In 1996, the AMI website disclosed that "AMI Design Kits support EDA tools from vendors such as Synopsys." Ex.78.  [Disputed as set forth in ¶75.  Also, Def. Ex. 78 is undated, not authenticated, and states that AMI's products "support EDA tools from vendors such as Synopsys".

-18-

DRAFT

~~but does not even say that AMI was actually using Synopsys tools (or which of the Synopsys tools)~~
~~alone or in combination with its own products.]~~ [Ricoh objection: legally irrelevant]

77.    In 1996, the Aeroflex website (at the time under the company's former name, UTMC)
contained a November 28, 1995 press release in which UTMC announced the introduction of its
VHDL design kits to enhance customers' VHDL-based ASIC designs and systems. Ex. 79.
~~[Disputed as set forth in ¶75. Also, Ex. 79 is prospective only (we are going to introduce next year),~~
~~and does not suggest this had anything to do w/DC or say what Aeroflex was doing.]~~ [Ricoh
objection: legally irrelevant]

78.    The Synopsys website from 1997 contains a list of Synopsys Semiconductor Vendor
Program participants, including AMI and UTMC (Aeroflex), who had developed strategic
relationships with Synopsys to take full advantage of ASIC technology advancements. Ex. 80.
~~[Disputed as set forth in ¶75. Also, it is not clear from the website whether the information was~~
~~available more than six years prior to suit. Ex. 80 says Aeroflex and AMI are companies which~~
~~offered libraries for use with Synopsys products. It does not provide a basis for speculating, much~~
~~less having reason to know, whether either company was using any Synopsys product in the U.S. so~~
~~as to infringe the patent in suit.]~~ [Ricoh objection: legally irrelevant]

**Statement of Undisputed Facts for Summary Judgment No. 9**

79.    Ricoh has represented that it will not claim enhanced damages due to willfulness.

**Statement of Undisputed Facts for Ricoh's Summary Judgment Motion**

1.    The Sixth Affirmative Defense of Aeroflex is "Authorization and Consent," which is
based on 28 U.S.C. § 1498 (the "affirmative defense").

2.    In the documents produced relating to Aeroflex's Sixth Affirmative Defense, there are
no U.S. Government prime contracts with provisions expressly requiring use of Synopsys Design
Compiler.

3.    In the documents produced relating to Aeroflex's Sixth Affirmative Defense, there are
no U.S. Government subcontracts that contain language on their face that expressly requires Aeroflex
to use Synopsys' Design Compiler.

-19-

DRAFT

80.    Aeroflex does not contend that sales of the following products received authorization and consent:  UTCAM-Engine, JW01, KD08A, KD11A, JF01A/B, YA04/YA13, YB01, DA01, DA02, JW02, and KC01A.

4.    Aeroflex made no argument in their Opposition for eleven accused ASICs (#1 (UTCAM-Engine/UT100CE 02 JAA), #2 (JW01), #3 (KD08A), #10 (KD11A), #24 (JF01A/B), #25 (KC01A), #26 (YA04/YA13), #27 (YB01), #28 (DA01), #29 (DA02), and #30 (JW02)).  Aeroflex is not asserting authorization and consent for these eleven ASICs.

[Objection:  Irrelevant.  Ricoh moved on entire affirmative defense]

5.    The only prime contract presented in the Aeroflex Opposition that contains Alternate I to FAR § 52.227-1 is U.S. Air Force contract no. F04701-99-C-0027 dated August 23, 1999.  This contract has not been produced by Aeroflex in its entirety.

6.    Synopsys Design Compiler is a commercial product used by multiple customers of Synopsys, including Aeroflex. [[Objection:  Misleading, irrelevant] ]

7.    The design flow and manufacturing steps used by Aeroflex to create the ASICs that are the subject of the Sixth affirmative defense are substantially similar to the design flow and manufacturing steps used by Aeroflex to create ASICs that are sold to commercial (e.g., non-government contract) customers.[[Objection:  Misleading, irrelevant]]

8.    Aeroflex currently offers for sale to the general public, via its website (www.aeroflex.com), "the UT0.06um ASIC Family," also referred to as the "0.6 micron Gate Array Family," which refers to a large variety of ASICs sold to commercial and Government customers. [[Objection: Irrelevant, misleading]]

9.    All of the ASICs for which Aeroflex is asserting the authorization and consent defense are in the "0.6 micron Gate Array Family." [ [Objection: Irrelevant, misleading] ]

-20-

DRAFT

10. Since at least 1997, Aeroflex has offered to sell commercial, custom and "semi-custom" ASICs to the general public, tailored to the requests of individual customers. [ [Objection: Irrelevant, misleading]]

82.    The Aeroflex Defendants could have used alternatives that Ricoh has not accused of infringement, such as tools by Cadence Design Systems, Inc. and Mentor Graphics Corp., to synthesize their ASICs.

83.    The end customer (ASIC consumer) requires the functionality of the ASIC, rather than a specific design flow or the use of particular tools.

Dated: September 12, 2006                    HOWREY LLP


                                             By:  /s/
                                             _____

                                                  Denise M. De Mory

                                                  Attorney for Plaintiff SYNOPSYS, INC.

                                                  and Defendants AEROFLEX

                                                  INCORPORATED, AMI

                                                  SEMICONDUCTOR, INC., MATROX

                                                  ELECTRONIC SYSTEMS, LTD.,

                                                  MATROX GRAPHICS INC., MATROX

                                                  INTERNATIONAL CORP., MATROX

                                                  TECH, INC., and AEROFLEX

                                                  COLORADO SPRINGS, INC.

Dated: September 12, 2006                    DICKSTEIN SHAPIRO LLP


                                             By:  /s/DRAFT
                                             _____

                                                  Kenneth W. Brothers

                                             -21-

DRAFT

Attorney for Plaintiff RICOH COMPANY,

LTD.

-22-

# Exhibit 4

## Andelman, Ethan

| | |
|---|---|
| **From:** | Brothers, Kenneth [BrothersK@dicksteinshapiro.com] |
| **Sent:** | Tuesday, September 12, 2006 10:26 PM |
| **To:** | DeMory, Denise |
| **Cc:** | Fink, Jacky; Andelman, Ethan |
| **Subject:** | Revised version of proposed joint statement |
| **Attachments:** | DSMDB-#2142304-v3-joint_statement_of_facts_draft.DOC |

Denise:

I have tried very hard to turn around your extensive edits and new language that was sent afte 11 pm ET.
Enclosed is what I have been able to do so far. I took what you sent me at 11:08 pm ET, accepted all of the
redlining, so everything now redlined is newly added to your 11:08 version. I have not been able to look at many
of the new references that you just cited after 11 pm. In addition, I have the feeling that I gave you some prior
comments that were not incorporated into your draft, and I have not had the time to go back and carefully cross-
check everything. I trust you will look at those emails that I have sent to you, but I reserve the right to review this
tomorrow and submit an errata if necessary.

To be clear, if we state that we dispute a fact, then we do not agree to it being included in this joint statement. If
in doubt, leave it out. I understand that you will finalize consistent with our agreements and file with the court.

I am going to bed now and will not be available to do any more review work on this.

Regards, Ken

<<DSMDB-#2142304-v3-joint_statement_of_facts_draft.DOC>>

--------------------------------------------------------
This e-mail message and any attached files are confidential and are intended solely for the use of the
addressee(s) named above. This communication may contain material protected by attorney-client, work
product, or other privileges. If you are not the intended recipient or person responsible for delivering this
confidential communication to the intended recipient, you have received this communication in error,
and any review, use, dissemination, forwarding, printing, copying, or other distribution of this e-mail
message and any attached files is strictly prohibited. Dickstein Shapiro reserves the right to monitor any
communication that is created, received, or sent on its network. If you have received this confidential
communication in error, please notify the sender immediately by reply e-mail message and permanently
delete the original message.

To reply to our email administrator directly, send an email to postmaster@dicksteinshapiro.com

Dickstein Shapiro LLP
http://www.DicksteinShapiro.com

DRAFT

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT
                         NORTHERN DISTRICT OF CALIFORNIA
9                            SAN FRANCISCO DIVISION

10   RICOH COMPANY, LTD.,                        Case No. C03-04669 MJJ (EMC)

11              Plaintiff,                       Case No. C03-02289 MJJ (EMC)

12        vs.                                    **JOINT STATEMENT OF UNDISPUTED
                                                 FACTS RE PENDING MOTIONS FOR
13   AEROFLEX INCORPORATED, AMI                  SUMMARY JUDGMENT**
     SEMICONDUCTOR, INC., MATROX
14   ELECTRONIC SYSTEMS LTD., MATROX
     GRAPHICS INC., MATROX                       Date:        September 26, 2006
15   INTERNATIONAL CORP., MATROX TECH,           Time:        9:30 a.m.
     INC., AND AEROFLEX COLORADO                 Courtroom:   11, 19th Floor
16   SPRINGS, INC.                               Judge:       Martin J. Jenkins
17
              Defendants.
18   SYNOPSYS, INC.,

19              Plaintiff,

20        vs.

21   RICOH COMPANY, LTD.,

22
              Defendant.
23

24

25

26

27   Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)
     STATEMENT OF UNDISPUTED FACTS
28
     DM_US\8385804.v1

HOWREY LLP
     ~~DSMDB-2142304v01~~

~~DSMDB-2142304v02~~
DSMDB-2142304v03

> **DRAFT**

1
2       This Joint Statement of Facts is proposed in accordance with Local Rule 56-2(b) and the
3   Standing Order of the Honorable Martin J. Jenkins.

                    **Statement of Undisputed Facts for Summary Judgment No. 1**

4   ~~[Awaiting comments from Ricoh; Defendant/Synopsys provided Soderman deposition cites to~~
5   ~~which Ricoh has not yet responded].~~
6
7       1.      The Defendants' accused designs specify inputs.

    2.      The Defendants' accused designs specify outputs.

8       3.      ~~The Defendants' accused designs may or may not specify registers.~~  [Disputed. We
9   still don't agree that Soderman's testimony supports this assertion.  Inferring registers is not
10  Darringer, as we explain in our papers.  This is a disputed fact.  ]

11      4.      [Disputed; this sentence is incomprehensible.  To the extent we understand it, there is
12  no record evidence to support it.]  [We have reviewed Soderman's testimony, and it does not support
13  the proposed language.  For example, in the cite you provided, Soderman does not testify to logic
14  functionality "between register locations"; and his earlier testimony re inferring registers has to be
15  considered, and is evidence that this is not an undisputed fact.]

                    **Statement of Undisputed Facts for Summary Judgment No. 2**

16
17
18
19
20
21
22
23
24
25
26
27
28

HOWREY LLP

~~DSMDB-2142304v01~~

~~DSMDB-2142304v02~~
DSMDB-2142304v03

DRAFT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Statement of Undisputed Facts for Summary Judgment No. 3**

26

[We are at an impasse regarding facts 12-16, 19; they will go in Rule 56 declaration]

27

-2-

28

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)
STATEMENT OF UNDISPUTED FACTS
DM_US\8385804.v1

HOWREY LLP

DRAFT

11.     Dr. Kobayashi was Simon Foo's advisor for his master's thesis, attached as Exhibit 66 to the Brothers Declaration[This is an incomplete and misleading characterization.]

13.     Dr. Kobayashi and Simon Foo co-authored two papers that had copyright dates in 1986.

17.     ~~Both the Foo Thesis and the FAME paper discuss storing representations of functional modules in a frame-based database.~~ [Disputed.  This does not fairly characterize the two papers.]

18.     ~~As described in "A Knowledge Based System for VLSI module selection," the VLSI modules that are selected by the NEPTUNE system are selected using rules stored in an expert system knowledge base.  Brothers Decl., Ex. 68, at 184 ("This paper introduces a frame-based system for selecting VLSI modules, called NEPTUNE.  Based on domain specific knowledge and heuristic rules, NEPTUNE assists IC designers to select an optimized solution, and explore different implementation alternatives.")~~ [Disputed for the reason set forth in my email of 9:49 pm:  "On 18, you are overreaching.  Neptune does not say that rules are stored in an expert system knowledge base."]

19.

**Statement of Undisputed Facts for Summary Judgment No. 4**

20.

20a.     An article written by T.J. Kowalski, D.J. Geiger, W.H. Wolf, and W. Fichtner entitled "The VLSI Design Automation Assistant: From Algorithms to Silicon" is listed in the table of contents of the August 1985 issue of *IEEE Design and Test of Computers Magazine* as appearing at pp. 33-43.  This article is referred to by the parties as "Kowalski85."

20b.     Kowalski85 ~~was published~~is in a publication with a date of ~~in~~ August 1985.

20c.     *IEEE Design and Test of Computers Magazine* is a periodical.

20d.     ~~*IEEE Design and Test of Computers Magazine* is a periodical which is publicly available from at least one library.~~ [Disputed.  No record evidence to support it.  Oka's testimony referred to a private library in Japan.]

-3-

DRAFT

20e.    ~~The August 1985 issue of~~ *IEEE Design and Test of Computers Magazine* ~~is publicly available from at least one library.~~  [Disputed for the same reason.]

20f.    ~~The August 1985 issue of~~ *IEEE Design and Test of Computers Magazine* ~~was publicly available from at least one library prior to January 13, 1987.~~  [Disputed for the same reason.]

21.    21a.    Thaddeus Julius Kowalski authored a thesis at Carnegie Mellon University entitled "The VLSI design automation assistant: a knowledge-based expert system." This thesis is referred to by the parties as "Kowalski Thesis" or "Kowalski84."

21b.    The Carnegie Mellon University online card catalog lists a publication date of 1984 for the Kowalski Thesis.  (De Mory Ex. 101.)

21c.    The Kowalski Thesis contains an indication that it is designated as SRC Report CMU-CAD-84-29. Brothers Decl., Ex. 82 at cover page.  [Disputed.  The late addition of this citation (after 11 pm ET on the day this joint statement is due) has prevented us from further reviewing it.]

21d.    The work on the Kowalski Thesis was financed in part by the National Science Foundation.  Brothers Decl., Ex. 82 at Acknowledgements. [Disputed.  The late addition of this citation (after 11 pm ET on the day this joint statement is due) has prevented us from further reviewing it.]

21e.    The Kowalski Thesis contains a limited distribution notice stating that the thesis has been, or will be, submitted for publication, has been issued as a Research Report for dissemination of its contents, and because of potential transfer of copyright to the publisher, distribution outside CMU is limited to peers and specific requests until publication. *Id.*  [Disputed.  This is so vague that it is meaningless.  In addition, the late addition of this citation (after 11 pm ET on the day this joint statement is due) has prevented us from further reviewing it.]

22a.    ~~Kowalski85 and the Kowalski Thesis describe versions of the same program, which is entitled VLSI Design Automation Assistant.  Kowalski Depo. at 9:14-17 & 13:5-12; Kowalski85 at Note 8 (citation to Kowalski Thesis).~~  [Disputed.  This is misleading.  The programs and the

-4-

HOWREY LLP

~~DSMDB-2142304v01~~

~~DSMDB-2142304v02~~
DSMDB-2142304v03

DRAFT

descriptions were not the same, and to refer to both by the same name or acronym is misleading. It's also inconsistent with #37.]

22b. ~~The parties refer to the VLSI Design Automation Assistant as "VDAA."~~ [Disputed for the same reasons.]

23. 23a. Dr. Kowalski provided deposition testimony in this case on May 23, 2006, pursuant to a subpoena served by Ricoh.

23b. Dr. Kowalski provided deposition testimony on the VDAA program, Kowalski85, and the Kowalski Thesis, among other topics, in response to questions posed by Ricoh's attorneys. [Disputed. The reference to VDAA is misleading, and the rest is so general to be meaningless.]

24.

24a. The VDAA system inputs an algorithmic description in a programming language known as "ISP." [sic] The VDAA system transforms the algorithmic description into a network of functional modules (e.g., registers, adders, multiplexers) using expert knowledge. See Soderman Rebuttal Report at 19:2-7. [Disputed. The reference to VDAA is misleading. The late addition of this citation (after 11 pm ET on the day this joint statement is due) has prevented us from further reviewing it.]

[Facts 25-27 are supported by the citations to evidence contained in Exhibits A and B to our Motion; you did not dispute any of these facts. If you will not agree to them as written, we will put them in our Rule 56 declaration]25. [See Kowalski Depo. at 106:7-13] [Disputed: Whether "hardware cells" were bound into a "netlist" is another key issue in dispute.] [They remain disputed]

29. ~~[See Kowalski Depo. at 83:5-24.]~~ At deposition, Dr. Kowalski testified (without corroboration) that the "technology sensitive" database in Kowalski85 contained technology-independent "cell descriptions," where he defined that term stating: "It varied. It could be as low as a single an gate or as high and complicated as an ALU. So it is a broad list of possible things." ~~[Disputed as originally written. Kowalski never testified that Kowalski85 itself disclosed this usage, or even that any "refinement" of the work included AND gates.]~~

-5-

HOWREY LLP

~~DSMDB-2142304v01~~

~~DSMDB-2142304v02~~
DSMDB-2142304v03

**DRAFT**

30a.    Dr. Kowalski was affiliated with AT&T Bell Laboratories.  Kowalski85, title line.

30b.    Dr. Kowalski refined the VDAA program while at AT&T.    Kowalski Depo. 14:4-6; 77:16-20; 78:15-79:19; 94:20-99:17; 104:8-21; 118:7-119:12; 130:6-131:3.  [Disputed.  The reference to VDAA is misleading.  We dispute any facts regarding the "refinement" work done by Kowalski where the only evidence provided is his own oral testimony (we objected to such evidence in our Opposition.  The late addition of this citation (after 11 pm ET on the day this joint statement is due) has prevented us from further reviewing it.]

30c.    One of these refinements to VDAA was to eliminate the need for a separate module binder process.  *Id.*; *see also* Kowalski Depo. Ex. 463.  [Disputed.  The reference to VDAA is misleading.  We dispute any facts regarding the "refinement" work done by Kowalski where the only evidence provided is his own oral testimony (we objected to such evidence in our Opposition.  The late addition of this citation (after 11 pm ET on the day this joint statement is due) has prevented us from further reviewing it.]

30d.    Under this refinement, the VDAA program itself selected and bound hardware cell, and created a netlist, without the need for a separate module binder.  *Id.*; *see also* Kowalski Depo. Ex. 463.  [Disputed.  The reference to VDAA is misleading.  We dispute any facts regarding the "refinement" work done by Kowalski where the only evidence provided is his own oral testimony (we objected to such evidence in our Opposition.    The late addition of this citation (after 11 pm ET on the day this joint statement is due) has prevented us from further reviewing it.]

**Statement of Undisputed Facts for Summary Judgment No. 5**

31.    On February 24, 2006, the PTO ordered reexamination of the '432 patent based on a request "that '432 patent claims 13-17 are anticipated under 35 U.S.C. sect. 102 in light of the following references:  T.J. KOWALSKI, D.J. Geiger, W.H. Wolf, W. Fichtner, The VLSI Design Automation Assistant: From Algorithms to Silicon, IEEE Design & Test, pp. 33-43 (1985). (i.e., "KOWALSKI-85") [and] Thaddeus Julius KOWALSKI, The VLSI Design Automation Assistant: A

-6-

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)
STATEMENT OF UNDISPUTED FACTS
DM_US\8385804.v1

HOWREY LLP
~~DSMDB-2142304v01~~

~~DSMDB-2112301v02~~
DSMDB-2142304v03

DRAFT

Knowledge-Based Expert System, Carnegie-Mellon University PhD Thesis, April 1984. (i.e., "KOWALSKI-84").

32.    The February 24, 2006 PTO order granting reexamination of the '432 patent stated that "the Kowalski-85 reference (including the inherent teachings of Kowalski84) would have been considered important by a reasonable Examiner in deciding whether or not at least claim 13 was patentable…."

33.    The February 24, 2006 PTO order granting reexamination of the '432 patent stated that "Kowalski-85 and Kowalski-84 references were not of record in the file of the '432 patent and are not cumulative to the art of record in the original file."

35.    The named '432 patent inventors, Dr. Kobayashi and Mr. Shindo, co-authored with Mr. Suehiro and published "KBSC: A Knowledge-Based Approach to Automated Logic Synthesis" (1989 KBSC Article) in 1989. According to the cover page footer of the article, the manuscript for the 1989 KBSC Article was submitted in November 1988 and revised for publication in February 1989. The '432 patent Notice of Allowability was mailed on November 29, 1989, and the '432 patent issued on May 1, 1990

36.    KBSC00002884 is a letter in Japanese dated November 27, 1987 from Mr. Shindo to Dr. Kobayashi. A translation of the letter is at Exhibit 93. The letter states that it is "[r]egarding the joint patent application by ICC and Ricoh." The letter further states that "[i]n order to file the patent application, we will need to have a meeting with a US patent agent regarding the preparation of a US patent specification." The agenda for the meeting included the "[c]ompletion of patent specification." The meeting was scheduled for December 8-9, 1987 at ICC Columbia and included among the participants Dr. Kobayashi, Mr. Shindo, and Mr. Suehiro.

36B.    Mr. Suehiro was an attendee at the December 8-9, 1987 meeting relating to what became the application for the '432 patent.

37.    Kowalski85 describes a system called the VLSI Design Automation Assistant (VDAA).

-7-

HOWREY LLP

~~DSMDB-2142304v01~~

~~DSMDB-2142304v02~~
DSMDB-2142304v03

DRAFT

38.    [Will go in Rule 56 Declaration]

39.    [Will go in Rule 56 Declaration]

40.    [Will go in Rule 56 Declaration]

41.    [Will go in Rule 56 Declaration as written; will include agreed fact].  The August 1986 table of Contents from the *IEEE Design and Test of Computers Magazine* does not show a Kowalski article in that issue.

41A.    The August 1985 table of Contents from the *IEEE Design and Test of Computers Magazine* does show a Kowalski article in that issue cited as "T.J. Kowalski, D.J. Geiger, W.H. Wolf, W. Fichtner, The VLSI Design Automation Assistant: From Algorithms to Silicon, *IEEE Design & Test*, pp. 33-43 (1985)."

42.    Kowalski85 is not listed on the cover page of the '432 patent as a reference that was considered by the patent examiner,  and a physical copy of Kowalski85 is not included in the '432 prosecution file history.

43.    During the prosecution of the '432 patent, the Applicants supplied to the PTO an article entitled "FLAMEL:  A High-Level Hardware Compiler" by Trickey.  On the first page of the Trickey article, it states that "Some examples of compilers that operate this way are:  the CMU-DA project [1], particularly the Design Automation Assistant [2], [3] portion; Arsenic [4]; the USC Design Automation project [5]; the AT&T Bell Labs VLSI Design Automation Assistant [6]; and SC [7]."  Reference [6] is Kowalski85, and the Trickey paper provides a full citation to Kowalski85. ~~Kowalski85 is not referenced again in the Trickey paper.~~  [This last sentence is misleading, because the full reference appears at the very end.  It's just an argumentative characterization – leave it out.]

## Statement of Undisputed Facts for Summary Judgment No. 6

44.

44a.    231 of the over 350 ASICs at issue in this case are AMI Semiconductor, Inc. ASICs for which the only logic synthesis performed by AMI Semiconductor, Inc. using the Design Compiler system was the creation of a BIST (Built In Self Test) memory controller.  These 231 ASICS are

-8-

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)
STATEMENT OF UNDISPUTED FACTS
DM_US\8385804.v1

HOWREY LLP

~~DSMDB-2142304v01~~

~~DSMDB-2142304v02~~
DSMDB-2142304v03

listed in the June 1, 2006 Corrected Third Supplemental Product Declaration of Robert B. Smith of AMI. [Disputed. Neither Cliff Warren nor Robert Smith could testify to details of the BISTs and in the absence of fact testimony we are not going to accept the uncorroborated assertions of an expert, especially when the introduction of such evidence is precluded due to the lack of knowledge of the 30(b)(6) designees. Plus, the late addition of this citation (after 11 pm ET on the day this joint statement is due) has prevented us from further reviewing it.]

44b.    A BIST is not an ASIC, but merely a portion of an ASIC whose only purpose is to allow testing of a memory device on the chip prior to shipment to the customer. [Disputed for the same reasons.]

44c.    Of the over 350 ASICs at issue, at least the following Aeroflex, Inc. and Aeroflex Colorado Springs, Inc. ASICs are mixed-signal ASICs: JW01, YA04/YA13, YB01, DA01, DA02, JW02. [Disputed for the same reasons.]

44d.    Of the over 350 ASICs at issue, at least the following Matrox Electronic Systems Ltd., Matrox Graphics, Inc., Matrox International Corp., and Matrox Tech, Inc. ASICs are mixed-signal ASICs: Cyclone, Eclipse, Eclipse PCI, Calao, Toucan, Condor, Condor Plus, Parhelia, Sundog, Parhelia8x, Sunex, Maven, Rainbow Runner, Twister. [Disputed. The late addition of this citation (after 11 pm ET on the day this joint statement is due) has prevented us from further reviewing it.]

44e.    Of the over 350 ASICs at issue, at least the following AMI Semiconductor, Inc. ASICs are mixed-signal ASICs: 11241-801, 802, 803; 0QJBW-001, 002, 900, 901, 902, 903, 904, 905, 906; 11636-501; 14167-001; 14948-501, 502, 503; 15088-501; 15124-501, 502; 19007-001; 19075-001, 002, 003; 19320-001; 19371-001; 19402-001; 0JGBE-001, 002, 900, 901, 902; 19293-001, 002, 004; 19070-001, 002; 19134-001; 0MNTA-900, 901, 902, 903, 904, 905, 906, 907, 908, 909, 910, 911, 912, 913, 914; 13855-501; 15078-001, 002; 19219-001, 002, 003; 19299-001; 19409-001, 002, 003;

-9-

**DRAFT**

19428-001; 19429-001, 002, 003; 19529-001; 19558-002; 19608-001; 19645-001; 19664-002; 19693-001, 002; 0AFCB-002; D1AFCC; 0APSE-002; 0C621-003; 0C622-003; D1CORC; D1CORD; 0HISB-001; 0IEBA-002; D1SEBA. [Disputed. The late addition of this citation (after 11 pm ET on the day this joint statement is due) has prevented us from further reviewing it.]

44f.    For all ASIC designs, the Design Compiler system cannot be used to design certain portions of the ASIC such as instantiated pad cells, asynchronous logic, and hand instantiated logic. (Casavant Decl., ¶ 10; Brothers Decl., Ex. 27 (Casavant report) at 7). [Disputed for the reasons previously stated. We are not going to agree to this as an absolute. There is no evidence that these functions must be in an ASIC.]

45.

46.    [Will go in Rule 56 declaration as written; will include the following and propose 56b]. ~~Ricoh accuses in this litigation processes in which the Design Compiler system is used to design digital portions of ASICs.~~

46a.    Design Compiler cannot be used to synthesize analog portions of an ASIC.

47.    [Will go in Rule 56 Declaration].

48.    [Will go in Rule 56 Declaration].

49.    The Corrected Third Supplemental Product Declaration of Robert B. Smith of AMI dated June 1, 2006 declares that for 231 of the AMI designs that Ricoh accuses of infringement, AMI used the Design Compiler system to design a portion of the ASIC known as "BIST" or "Built-In Self Test." These AMI designs are listed in Exhibit 2 to the August 18, 2006 Declaration of Albert E. Casavant in Support of Synopsys and the Defendants' Motions for Summary Judgment. [Disputed for the reasons set forth in 44.]

-10-

HOWREY LLP

~~DSMDB-2142304v01~~

~~DSMDB-2142304v02~~
DSMDB-2142304v03

DRAFT

55.    [Will go in Rule 56 Declaration]

56.    [Will go in Rule 56 Declaration].

**Statement of Undisputed Facts for Summary Judgment No. 7**

57.    There is no evidence that customers purchase the accused Matrox graphics boards because Design Compiler is used as part of the design process.  [Disputed. Customers purchase Matrox graphics boards because of the advantages Design Compiler provides (which the customers appreciate) even if they do not know that Design Compiler is specifically used in as part of the design process.  The statement still misinterprets the applicable law]

58.    There is no evidence that customers purchase the accused Defendant ASICs because Design Compiler is used as part of the design process.  [Disputed. Customers purchase the accused ASICs because of the advantages Design Compiler provides (which the customers appreciate) even if they do not know that Design Compiler is specifically used in as part of the design process.  The statement still misinterprets the applicable law]

-11-

DRAFT

59.    The Aeroflex Defendants could have used alternatives that Ricoh has not accused of infringement, such as tools by Cadence Design Systems, Inc. and Mentor Graphics Corp., to synthesize their ASICs.

60.

62.    There is no evidence that any infringing activity for the Matrox Calao; Condor; CondorPlus; Cyclone; Eclipse; Maven; Sunex; Toucan; SIB; and Oasis products took place in the United States.  [Disputed.  These are conclusions of law, not statements of fact.  Ricoh's inference is reasonable because Defendants stipulated that their financial data on foreign synthesized commercial ASICs would only include US sales.  Defendants never informed Ricoh that they had provided non-US sales for their other foreign ASICs.  Ricoh's expert therefore relied on the stipulation for all foreign synthesized ASICs.  The existence of foreign shipping addresses is not dispositive of where the sale took place.  Because the shipping data was in a separate spreadsheet that used different names for the same ASICs and boards and that did not match up well with their sales data, such data is ambiguous.]

62a.    There is no evidence that any infringing activity for the Matrox Maven product took place in the United States.  [Disputed.  These are conclusions of law, not statements of fact.  Defendants' stipulation that Maven is a commercial ASIC is an admission that the ASIC was synthesized in the United States during the damages period.  Ricoh's inference with respect to U.S. sales of Maven is reasonable because Defendants stipulated that their financial data on foreign synthesized commercial ASICs would only include US sales.  Defendants never informed Ricoh that they had provided non-US sales for their other foreign ASICs.  Ricoh's expert therefore relied on the stipulation for all foreign synthesized ASICs.  The existence of foreign shipping addresses is not dispositive of where the sale took place.  Because the shipping data was in a separate spreadsheet that used different names for the same ASICs and boards and that did not match up well with their sales data, such data is ambiguous.]

-12-

HOWREY LLP

~~DSMDB-2142304v01~~

~~DSMDB-2142304v02~~
DSMDB-2142304v03

**DRAFT**

63.  If there was no infringing activity in the United States for the Matrox Calao; Condor; CondorPlus; Cyclone; Eclipse; Sunex; Toucan; SIB; and Oasis products, then foreign sales of the products should be excluded from the royalty base.  [Disputed.  These are conclusions of law, not statements of fact]

63a.  If there was no infringing activity in the United States for the Matrox Maven product, then foreign sales of the Maven product should be excluded from the royalty base.  [Disputed.  These are conclusions of law, not statements of fact]

## Statement of Undisputed Facts for Summary Judgment No. 8

64.      Ricoh initiated this infringement suit against the Defendants on January 21, 2003, alleging infringement of the '432 patent based on the Defendants' sale of application specific integrated circuits ("ASICs") that were designed by the Defendants using a process that among other things included the use of Synopsys' Design Compiler system, which includes Design Compiler, HDL Compiler for Verilog, VHDL Compiler, and the DesignWare libraries ("the Design Compiler system").

66.      For the describing step of claim 13, Ricoh contends the limitation is met when, at least "the ASIC Designer entered a written description of the desired functions of the ASIC Product into HDL Compiler."

67.      [We are still considering this language] Ricoh alleges that the Verilog and VHDL ASIC designs that include HDL operators, including, for example +, *, -, /, >, < and "if," "case," and "wait" statements, comprise "architecture independent actions and conditions," as used in a certain way, which, when input by the Defendants into the Synopsys products in suit, fulfill the describing step and thus infringe the '432 patent.  [If you do not accept this language, then we dispute it.]

-13-

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)
STATEMENT OF UNDISPUTED FACTS
DM_US\8385804.v1

HOWREY LLP

~~DSMDB-2142304v01~~

~~DSMDB-2142304v02~~
DSMDB-2142304v03

**DRAFT**

67a.     Ricoh had no more information about the alleged architecture independent nature of the Defendants' Verilog and VHDL ASIC inputs when it initiated this suit than it had before January 21, 1997.  [Disputed, as set forth in the Ishijima testimony.  Also, the late addition of this prevents us from further considering this assertion.]

68.     On October 22, 1990, Ricoh licensed the Design Compiler and HDL Compiler for Verilog from Synopsys.  [Ricoh objections:  legally irrelevant; not plead].

68a.     The Synopsys licenses specifically forbade Ricoh from reverse engineering the source code for the licensed products.  [Defendant objection:  legally irrelevant]

68b.     Ricoh had not reverse engineered ~~the~~ any licensed Synopsys software prior to the time it filed the lawsuit against Defendants or anytime thereafter.

69.     Between 1990 and 1996, Ricoh entered into over 40 contracts with Synopsys for the licensing or support of the products-in-suit.  [Disputed:  This is not supported by the evidence.  The contracts have not been put into evidence, and there is no other evidence on this point.]  [Ricoh objection:  legally irrelevant].

[     70.     The co-owner of the asserted patent, KBSC, licensed certain software tools from Synopsys in July of 1993, and renewed that license in 1995.  Ex. 69 at SP00001-SP00032.

70a.     KBSC was contractually prohibited from reverse engineering or investigating the inner workings of the licensed software tools.  [Defendant objection:   legally irrelevant]

71.     71a.     As a licensee, Ricoh received product manuals describing the use and functionality of the tools comprising the Design Compiler system.  [Disputed:  This is overbroad.  There is record evidence of only one manuals, no evidence of when they were received, or their contents.]  [Ricoh objection:  legally irrelevant; not plead]

71b.     As a licensee, KBSC received product manuals describing the use and functionality of the tools comprising the Design Compiler system.  [Disputed:  There is no record evidence of any KBSC manuals, or when they were received, or their contents.]  [Ricoh objection:  legally irrelevant]

-14-

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)
STATEMENT OF UNDISPUTED FACTS
DM_US\8385804.v1

HOWREY LLP     ~~DSMDB-2142304v01~~

~~DSMDB-2142304v02~~
DSMDB-2142304v03

DRAFT

72.   In January of 1990, Synopsys' HDL Compiler won the *Electronic Products* magazine's product of the year award. Ex. 71[Ricoh objection:  legally irrelevant; not plead]

———    74.   In 1990, Electronic Engineering Times reported on Matrox Electronics' use of Synopsys' synthesis tools. Ex. 74. [Ricoh objection:  legally irrelevant]

75.   In 1991, Electronic News reported on AMI's development of cell libraries for use with Synopsys' Design Compiler product. Ex. 75.   [Ricoh objection:  legally irrelevant]

76.   In 1996, the AMI website disclosed that "AMI Design Kits support EDA tools from vendors such as Synopsys." Ex.78. [Ricoh objection:  inadmissible; website is unverifiable;legally irrelevant]

77.   In 1996, the Aeroflex website (at the time under the company's former name, UTMC) contained a November 28, 1995 press release in which UTMC announced the introduction of its VHDL design kits to enhance customers' VHDL-based ASIC designs and systems. Ex. 79.   [Ricoh objection:  inadmissible; website is unverifiable; legally irrelevant]

78.   The Synopsys website from 1997 contains a list of Synopsys Semiconductor Vendor Program participants, including AMI and UTMC (Aeroflex), who had developed strategic relationships with Synopsys to take full advantage of ASIC technology advancements. Ex. 80.  [ [Ricoh objection:  inadmissible; website is unverifiable; legally irrelevant]

### Statement of Undisputed Facts for Summary Judgment No. 9

79.   Ricoh has represented that it will not claim enhanced damages due to willfulness.

### Statement of Undisputed Facts for Ricoh's Summary Judgment Motion

### DENISE: WE ASSUME YOU WILL FIX THE NUMBERING

1.   The Sixth Affirmative Defense of Aeroflex is "Authorization and Consent," which is based on 28 U.S.C. § 1498 (the "affirmative defense").

2.   In the documents produced relating to Aeroflex's Sixth Affirmative Defense, there are no U.S. Government prime contracts with provisions expressly requiring use of Synopsys Design Compiler.

-15-

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)
STATEMENT OF UNDISPUTED FACTS
DM_US\8385804.v1

HOWREY LLP

DSMDB-2142304v01

DSMDB-2142304v02
DSMDB-2142304v03

DRAFT

3.  In the documents produced relating to Aeroflex's Sixth Affirmative Defense, there are no U.S. Government subcontracts that contain language on their face that expressly requires Aeroflex to use Synopsys' Design Compiler.

80.  Aeroflex does not contend that sales of the following products received authorization and consent:  UTCAM-Engine, JW01, KD08A, KD11A, JF01A/B, YA04/YA13, YB01, DA01, DA02, JW02, and KC01A.

4.  Aeroflex made no argument in their Opposition for eleven accused ASICs (#1 (UTCAM-Engine/UT100CE 02 JAA), #2 (JW01), #3 (KD08A), #10 (KD11A), #24 (JF01A/B), #25 (KC01A), #26 (YA04/YA13), #27 (YB01), #28 (DA01), #29 (DA02), and #30 (JW02)).  Aeroflex is not asserting authorization and consent for these eleven ASICs.

[Objection:  Irrelevant.  Ricoh moved on entire affirmative defense]

5.  The only prime contract presented in the Aeroflex Opposition that contains Alternate I to FAR § 52.227-1 is U.S. Air Force contract no. F04701-99-C-0027 dated August 23, 1999.  This contract has not been produced by Aeroflex in its entirety.

6.  Synopsys Design Compiler is a commercial product used by multiple customers of Synopsys, including Aeroflex. [[Objection:  Misleading, irrelevant] ]

7.  The design flow and manufacturing steps used by Aeroflex to create the ASICs that are the subject of the Sixth affirmative defense are substantially similar to the design flow and manufacturing steps used by Aeroflex to create ASICs that are sold to commercial (e.g., non-government contract) customers.[[Objection:  Misleading, irrelevant]]

8.  Aeroflex currently offers for sale to the general public, via its website (www.aeroflex.com), "the UT0.06um ASIC Family," also referred to as the "0.6 micron Gate Array

-16-

HOWREY LLP

~~DSMDB-2142304v01~~

~~DSMDB-2142304v02~~
DSMDB-2142304v03

**DRAFT**

Family," which refers to a large variety of ASICs sold to commercial and Government customers. [[Objection: Irrelevant, misleading]]

        9.   All of the ASICs for which Aeroflex is asserting the authorization and consent defense are in the "0.6 micron Gate Array Family." [ [Objection: Irrelevant, misleading] ]

        10. Since at least 1997, Aeroflex has offered to sell commercial, custom and "semi-custom" ASICs to the general public, tailored to the requests of individual customers. [ [Objection: Irrelevant, misleading]]

      82.   The Aeroflex Defendants could have used alternatives that Ricoh has not accused of infringement, such as tools by Cadence Design Systems, Inc. and Mentor Graphics Corp., to synthesize their ASICs.

      83.   The end customer (ASIC consumer) requires the functionality of the ASIC, rather than a specific design flow or the use of particular tools.

Dated:  September 12, 2006               HOWREY LLP

                                  By:   __/s/_____

                                      Denise M. De Mory

-17-

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)
STATEMENT OF UNDISPUTED FACTS
DM_US\8385804.v1

HOWREY LLP

~~DSMDB-2142304v01~~

~~DSMDB-2142304v02~~
DSMDB-2142304v03

**DRAFT**

Attorney for Plaintiff SYNOPSYS, INC.

and Defendants AEROFLEX

INCORPORATED, AMI

SEMICONDUCTOR, INC., MATROX

ELECTRONIC SYSTEMS, LTD.,

MATROX GRAPHICS INC., MATROX

INTERNATIONAL CORP., MATROX

TECH, INC., and AEROFLEX

COLORADO SPRINGS, INC.

Dated: September 12, 2006

DICKSTEIN SHAPIRO LLP

By:  DRAFT _____

Kenneth W. Brothers

Attorney for Plaintiff RICOH COMPANY,

LTD.

-18-

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)
STATEMENT OF UNDISPUTED FACTS
DM_US\8385804.v1

HOWREY LLP

~~DSMDB-2142304v01~~

~~DSMDB-2142304v02~~
DSMDB-2142304v03

# Exhibit 5

## Andelman, Ethan

**From:** DeMory, Denise
**Sent:** Wednesday, September 13, 2006 12:00 AM
**To:** Brothers, Kenneth
**Cc:** Fink, Jacky; Andelman, Ethan
**Subject:** RE: Revised version of proposed joint statement

Ken:

I dispute your characterizations. You have known about all of the facts included in each version of our joint statement since August 18. You did not disptue the facts in your opoositions to our motions, and thus, they were appropriately included in joint statement. Moreover, to the extent that we included what you improperly characterize as "new facts" in the draft distributed this evening, they were either something that we specifically discussed, or they were to attempt to address your concerns, and thus, not new facts at all. You inserted specific comments regarding those facts that you disputed because it was allegedly too late for you to verify the facts. Please advise before 6 p.m. PST tomorrow whether or not you the facts to which you included your "11:00 p.m. objection" are agreeable to Ricoh. Also please explain why you could not agree to facts 1 and 2 as written which were verbatim from teh Soderman transcript.

I did not re-review every e-mail that you sent today after receiving your revisions at 10:26, but did attempt to carefully include your comments on the draft I sent at approximately 8:00 p.m. I also tried to be conservative with regard to what I included in the joint statement, ; if I was not sure you agreed to something, I did not include it. If you have any concerns about what was filed, please let me know, so that we can understand and address your concerns prior to the time that an errata is filed.

Regards,

Denise

---

**From:** Brothers, Kenneth [mailto:BrothersK@dicksteinshapiro.com]
**Sent:** Tuesday, September 12, 2006 10:26 PM
**To:** DeMory, Denise
**Cc:** Fink, Jacky; Andelman, Ethan
**Subject:** Revised version of proposed joint statement

Denise:

I have tried very hard to turn around your extensive edits and new language that was sent afte 11 pm ET. Enclosed is what I have been able to do so far. I took what you sent me at 11:08 pm ET, accepted all of the redlining, so everything now redlined is newly added to your 11:08 version. I have not been able to look at many of the new references that you just cited after 11 pm. In addition, I have the feeling that I gave you some prior comments that were not incorporated into your draft, and I have not had the time to go back and carefully cross-check everything. I trust you will look at those emails that I have sent to you, but I reserve the right to review this tomorrow and submit an errata if necessary.

To be clear, if we state that we dispute a fact, then we do not agree to it being included in this joint statement. If in doubt, leave it out. I understand that you will finalize consistent with our agreements and file with the court.

I am going to bed now and will not be available to do any more review work on this.

Regards, Ken

<<DSMDB-#2142304-v3-joint_statement_of_facts_draft.DOC>>

--------------------------------------------------------

This e-mail message and any attached files are confidential and are intended solely for the use of the addressee(s) named above. This communication may contain material protected by attorney-client, work product, or other privileges. If you are not the intended recipient or person responsible for delivering this confidential communication to the intended recipient, you have received this communication in error, and any review, use, dissemination, forwarding, printing, copying, or other distribution of this e-mail message and any attached files is strictly prohibited. Dickstein Shapiro reserves the right to monitor any communication that is created, received, or sent on its network. If you have received this confidential communication in error, please notify the sender immediately by reply e-mail message and permanently delete the original message.

To reply to our email administrator directly, send an email to postmaster@docksteinshapiro.com

Dickstein Shapiro LLP
http://www.DicksteinShapiro.com

# Exhibit 6

## Andelman, Ethan

**From:**     Brothers, Kenneth [BrothersK@dicksteinshapiro.com]
**Sent:**     Tuesday, September 12, 2006 3:42 PM
**To:**       DeMory, Denise
**Cc:**       Andelman, Ethan; Fink, Jacky
**Subject:**  RE: Draft comments on proposed statements of facts

Denise:

I have reviewed these cites.  Generally, I think you are attempting to substitute attorney characterizations of evidence for the actual evidence, which as you have pointed out in your briefs is improper.  We are not going to let you pick an choose from the statements in all our briefs and let you agree with some and dispute or not include others.  For example, on paragraphs 12, 13, 14, 15 and 16, you do not include all our descriptions of the evidence.

That being said, we are willing to work in good faith with you on what the actual undisputed evidence shows.  We have done so in our draft responses.  Specifically, we have the following comments to your cites:

11 - our language is accurate
12 - your language is incomplete - we refer and describe to the thesis about 10 times; you have cherry-picked only one reference.
13 - same - we refer to FAME 8 times; you have cherry-picked 2 references.
14 - we have not modified your language, but to be fair and complete have insisted that you should include the undisputed fact that FAME is technology independent (at p. 14)
15 - same - we refer to Neptune 16 times, you have cherry-picked one reference.
16 - same - in particular, you ignore the rest of the paragraph.

Let me know whether we can agree on our proposed language, or whether we are at an impasse.  As it stands, we do not agree that your proposed language should be in the joint submission.  If your elect to submit a separate filing, please attach this document and advise the court of the basis of our objections.

Regards,

Ken Brothers
Dickstein Shapiro LLP

---

**From:** DeMory, Denise [mailto:demoryd@Howrey.com]
**Sent:** Tuesday, September 12, 2006 2:58 PM
**To:** Brothers, Kenneth
**Cc:** Andelman, Ethan; Fink, Jacky
**Subject:** RE: Draft comments on proposed statements of facts

Ken:

Regarding Motion 3, facts 11-16 were taken from your opposition.

11.  See Opp. at 3:16-4:3.
12.  See Opp. at 17:3-4.
13.  See Opp. 4:4-5; 19-20..

14. See Opp. 4:4-6.
15. See Opp. 4:19-22.
16. See Opp. 18:1-4.

Regards,

Denise

---

**From:** Brothers, Kenneth [mailto:BrothersK@dicksteinshapiro.com]
**Sent:** Tuesday, September 12, 2006 11:33 AM
**To:** DeMory, Denise
**Cc:** Andelman, Ethan; Fink, Jacky
**Subject:** RE: Draft comments on proposed statements of facts

ok


Ken Brothers

Dickstein Shapiro LLP


---

**From:** DeMory, Denise [mailto:demoryd@Howrey.com]
**Sent:** Tuesday, September 12, 2006 2:30 PM
**To:** Brothers, Kenneth
**Cc:** Andelman, Ethan; Fink, Jacky
**Subject:** RE: Draft comments on proposed statements of facts

Ken:

I am having some technical difficulty with the redines on your draft -- will have it to you shortly.  I propose a call at noon so I have some time to digest your comments.

Denise

---

**From:** Brothers, Kenneth [mailto:BrothersK@dicksteinshapiro.com]
**Sent:** Tuesday, September 12, 2006 11:22 AM
**To:** DeMory, Denise
**Cc:** Andelman, Ethan; Fink, Jacky
**Subject:** Draft comments on proposed statements of facts

Denise:

Enclosed are our initial comments on your proposed joint statement of facts.  We may have further comments, but wanted to get this to you as quickly as possible.  I await your call, as well as your comments to our proposed statement.

<<DSMDB-#2141613-v3-edited_statement_of_facts.DOC>>

Ken Brothers

Please note my new contact information:

Dickstein Shapiro LLP

1825 Eye Street NW

Washington DC 20006

direct (202) 420-4128

phone (202) 420-2200

fax (202) 420-2201

brothersk@dicksteinshapiro.com

--------------------------------------------------------
This e-mail message and any attached files are confidential and are intended solely for the use of the addressee(s) named above. This communication may contain material protected by attorney-client, work product, or other privileges. If you are not the intended recipient or person responsible for delivering this confidential communication to the intended recipient, you have received this communication in error, and any review, use, dissemination, forwarding, printing, copying, or other distribution of this e-mail message and any attached files is strictly prohibited. Dickstein Shapiro reserves the right to monitor any communication that is created, received, or sent on its network. If you have received this confidential communication in error, please notify the sender immediately by reply e-mail message and permanently delete the original message.

To reply to our email administrator directly, send an email to postmaster@dicksteinshapiro.com

Dickstein Shapiro LLP
http://www.DicksteinShapiro.com
================================================================

--------------------------------------------------------------------------------
This email and any attachments contain information from the law firm of Howrey LLP, which may be co
The information is intended to be for the use of the individual or entity named on this email.
If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the con
If you receive this email in error, please notify us by reply email immediately so that we can arrange for

--------------------------------------------------------
This e-mail message and any attached files are confidential and are intended solely for the use of the addressee(s) named above. This communication may contain material protected by attorney-client, work product, or other privileges. If you are not the intended recipient or person responsible for delivering this confidential communication to the intended recipient, you have received this communication in error, and any review, use, dissemination, forwarding, printing, copying, or other distribution of this e-mail message and any attached files is strictly prohibited. Dickstein Shapiro reserves the right to monitor any communication that is created, received, or sent on its network. If you have received this confidential communication in error, please notify the sender immediately by reply e-mail message and permanently delete the original message.

To reply to our email administrator directly, send an email to postmaster@dicksteinshapiro.com

Dickstein Shapiro LLP
http://www.DicksteinShapiro.com

--------------------------------------------------------
This e-mail message and any attached files are confidential and are intended solely for the use of the addressee(s) named above. This communication may contain material protected by attorney-client, work product, or other privileges. If you are not the intended recipient or person responsible for delivering this confidential communication to the intended recipient, you have received this communication in error, and any review, use, dissemination, forwarding, printing, copying, or other distribution of this e-mail message and any attached files is strictly prohibited. Dickstein Shapiro reserves the right to monitor any communication that is created, received, or sent on its network. If you have received this confidential communication in error, please notify the sender immediately by reply e-mail message and permanently delete the original message.

To reply to our email administrator directly, send an email to postmaster@dicksteinshapiro.com

Dickstein Shapiro LLP
http://www.DicksteinShapiro.com