1  Gary M. Hoffman (*Pro Hac Vice*)
   Kenneth W. Brothers (*Pro Hac Vice*)
2  DICKSTEIN SHAPIRO MORIN
     & OSHINSKY, LLP
3  2101 L Street, NW
   Washington, DC  20037-1526
4  Phone (202) 785-9700
   Fax (202) 887-0689
5
   Edward A. Meilman (*Pro Hac Vice*)
6  DICKSTEIN SHAPIRO MORIN
     & OSHINSKY, LLP
7  1177 Avenue of the Americas
   New York, New York  10036-2714
8  Phone (212) 835-1400
   Fax (212) 997-9880
9
   Jeffrey B. Demain, State Bar No. 126715
10 Jonathan Weissglass, State Bar No. 185008
   ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
11 177 Post Street, Suite 300
   San Francisco, California  94108
12 Phone  (415) 421-7151
   Fax (415) 362-8064
13
   Attorneys for Ricoh Company, Ltd.
14
15           UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA
16             SAN FRANCISCO DIVISION

17 RICOH COMPANY, LTD.,                    )
18                                          )  **CASE NO. CV 03-4669-MJJ (EMC)**
                Plaintiff,                  )
19      vs.                                 )
                                            )  **CASE NO. CV-03-2289- MJJ (EMC)**
20 AEROFLEX INC., et al.,                   )
                Defendants.                 )  **DECLARATION OF GARY M. HOFFMAN IN**
21                                          )  **SUPPORT OF RICOH'S OPPOSITION TO**
                                            )  **RENEWED MOTION TO STAY**
22 SYNOPSYS, INC.,                          )
                                            )
23                                          )
                                            )
24              Plaintiff,                  )
        vs.                                 )
25                                          )
   RICOH COMPANY, LTD.,                     )
26                                          )
                Defendant.                  )
27 _____      )

28

1    Gary M. Hoffman declares as follows:

2        1.    My name is Gary M. Hoffman, a partner with the law firm of Dickstein, Shapiro, Morin

3    & Oshinsky, LLP, counsel for Ricoh Company Limited.  I am over the age of 21 and am competent to

4    make this declaration.  Based on my personal knowledge and information, I hereby declare to all the

5    facts in this declaration.

6        2.    In one recent reexamination proceeding being handled by my firm, after granting the

7    request, over one year later the PTO finally acted on the merits of the patent, allowing all of the original

8    claims.

9        3.    In two other reexamination proceedings being handled by my firm, after an initial official

10   action rejecting all of the claims, the PTO informally indicated during an interview that all of the

11   original claims appeared to be allowable.  In spite of such indication, it still took over well over one

12   more year, after we filed our response, before the PTO took any action; that action indicated the

13   allowance of all of the original independent claims plus two additional claims.

14       4.    In another reexamination, after over one year from when the request was filed, the PTO

15   issued an initial official action, we had an interview and the examiner and his supervisor indicated a

16   likelihood that claims would be allowed; a response was then submitted in June 2006 and we are still

17   waiting for the PTO to act.  We have been told that our response is "in the stack of cases to be worked

18   on."  We understand that once the examiner works on the case, the file then goes to the stack of a

19   supervisory examiner to be reviewed.

20       5.    We are involved in  various cases that have been pending before the Board of Patent

21   Appeals and Interferences for more than two years.

22       6.    Attached hereto as Ex. 1 is a true and correct copy of the USPTO Performance and

23   Accountability Report for Fiscal Year 2005.

24       7.    Attached hereto as Ex. 2 is a true and correct copy of a flow diagram from MPEP 2201 to

25   introduce reexamination proceedings.

26

27

28

1    I declare under penalty of perjury under the laws of the United States of America that the foregoing is

2    true and correct.  Signed at Washington, D.C. on December 11, 2006.

3

4                                                    /s/ Gary M. Hoffman
                                                     Gary M. Hoffman
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT  1

## (Part 1 of 3)



# UNITED STATES
# PATENT AND
# TRADEMARK OFFICE



*Performance and Accountability Report*

*for Fiscal Year 2005*

## FINANCIAL HIGHLIGHTS

| (Dollars In Thousands) | % Change 2005 over 2004 | September 30, 2005 | September 30, 2004 |
|---|---|---|---|
| Fund Balance with Treasury | 9.3% | $ 1,240,798 | $ 1,135,268 |
| Property, Plant, and Equipment, Net | 8.1% | 148,401 | 137,303 |
| Other Assets | (19.4)% | 19,950 | 24,741 |
| **Total Assets** | 8.6% | $ 1,409,149 | $ 1,297,312 |
| | | | |
| Deferred Revenue | 21.9% | $ 706,734 | $ 579,596 |
| Accounts Payable | 31.7% | 101,770 | 77,287 |
| Accrued Payroll, Benefits, and Leave | 8.8% | 90,727 | 83,408 |
| Other Liabilities | 4.7% | 92,088 | 87,970 |
| **Total Liabilities** | 19.7% | $ 991,319 | $ 828,261 |
| Net Position | (10.9)% | 417,830 | 469,051 |
| **Total Liabilities & Net Position Program** | 8.6% | $ 1,409,149 | $ 1,297,312 |
| | | | |
| Total Program Cost | 10.5% | $ 1,424,028 | $ 1,289,181 |
| Total Earned Revenue | 10.8% | (1,372,807) | (1,239,023) |
| Net Cost of Operations | 2.1% | $ 51,221 | $ 50,158 |
| | | | |
| Budgetary Resources Available for Spending | 22.3% | $ 1,511,155 | $ 1,235,201 |
| | | | |
| Total Collections, Net | 35.6% | $ 102,126 | $ 75,314 |
| | | | |
| Federal Personnel | 8.0% | 7,363 | 6,816 |
| | | | |
| Disbursements by Electronic Funds Transfer (EFT) | — | 99% | 99% |
| | | | |
| On-Time Payments to Vendors | 1.0% | 99% | |

## PERFORMANCE HIGHLIGHTS

| Performance Measures | Target | Actual | Met/Not Met Score[1] |
|---|---|---|---|
| Patent Allowance Error Rate | 4.0% | 4.6% | 🟡 |
| Patent In-Process Examination Compliance Rate | 84.0% | 86.2% | 🟢 |
| Patent Average First Action Pendency (months) | 21.3 | 21.1 | 🟢 |
| Patent Average Total Pendency (months) | 31.0 | 29.1 | 🟢 |
| Patent Efficiency | $4,122 | $3,877[2] | 🟢 |
| Trademark Final Action Deficiency Rate | 5.0% | 5.9% | 🟡 |
| Trademark First Action Deficiency Rate | 7.5% | 4.7% | 🟢 |
| Trademark First Action Pendency (months) | 6.4 | 6.3 | 🟢 |
| Trademark Final Action Pendency (months) | 20.3 | 19.6 | 🟢 |
| Trademark Efficiency | $701 | $677[2] | 🟢 |
| Patent Applications Filed Electronically | 4.0% | 2.2%[3] | 🔴 |
| Patent Applications Managed Electronically | 90.0% | 96.7% | 🟢 |
| Trademark Applications Filed Electronically | 70.0% | 88.0% | 🟢 |
| Trademark Applications Managed Electronically | 99.0% | 99.9% | 🟢 |
| Intellectual Property Technical Activities/Countries Completed | 80/75 | 59/142 | 🔴/🟢 |

[1] Following the guidance set forth by the Department of Commerce (DOC) we are using three ratings for met or not met.  Green is for the actual meeting or exceeding the target.  Yellow is for the target to be more than or equal to 75% met.  Red is for the target which was not met by 75%

[2,3] Preliminary data. Data should be finalized by December 2005 and will be reported in the FY 2006 PAR.

## TABLE OF CONTENTS

Message from the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office (USPTO)   3

Message from the Acting Chief Financial Officer   7

Management's Discussion and Analysis   11

Mission and Organization of the USPTO   13

Performance Goals and Results   15

Patent Performance   18

Trademark Performance   26

E-government and Intellectual Property Performance   35

Management Challenges   50

The President's Management Agenda   51

Management Controls and Compliance with Laws and Regulations   54

Financial Highlights   58

Financial Section   71

Principal Financial Statements and Related Notes   71

Required Supplementary Information   95

Independent Auditors' Report   99

Management and Performance Challenges Identified by the Inspector General   107

Other Accompanying Information   111

Glossary of Acronyms and Abbreviation Lists   149

WEB ADDRESS FOR THE USPTO PERFORMANCE AND ACCOUNTABILITY REPORT

http://www.uspto.gov/web/offices/com/annual/2005/index.html



## MESSAGE FROM THE UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

### FIGHTING PIRACY AND COUNTERFEITING BY PROTECTING INTELLECTUAL PROPERTY RIGHTS



The benefits of a strong intellectual property system have always been obvious to Americans. Article I, Section 8, Clause 8 of our Constitution grants Congress the power "to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." That clause was adopted in our Constitution without a dissenting vote and without even any debate. History has repeatedly affirmed the wisdom of our nation's founders in establishing these principles.

The tremendous ingenuity of American inventors, coupled with an intellectual property system that encourages and rewards innovation, has propelled our nation from a small agrarian society to the world's preeminent technological and economic superpower. And all of our patented technology finds its way to the public domain within 20 years — freely available to any and all. The success of a strong system of intellectual property rights is not limited to the United States — it has become the basis for economic development in nations throughout the world.

Unfortunately, a growing chorus of critics now questions whether this fundamental system of patents, trademarks, and copyrights enhances development in other nations. At the same time, there has been dramatic growth in the counterfeiting of products and pirating of digital content because of the advancement of digital technology, an increased focus by criminal organizations, and the lack of understanding by consumers that buying fake goods or illegally copying digital content is stealing and has victims.

During fiscal year (FY) 2005, the United States Patent and Trademark Office (USPTO) worked to educate many different audiences about the need to respect intellectual property. We led numerous initiatives to ensure that our country's system of intellectual property protection remains the best in the world and that it continues to protect public health and safety, encourage technological development, and provide for economic growth.

### USPTO EDUCATES OTHERS ABOUT INTELLECTUAL PROPERTY PROTECTION

The USPTO communicated the importance of protecting and respecting intellectual property, both domestically and internationally. We worked with other U.S. government agencies, and we reached out to individuals, businesses, and foreign governments to strengthen and enforce intellectual property rights.

***Working with other U.S. government agencies***

As part of the Bush Administration's Strategy Targeting Organized Piracy! (STOP!) initiative, the USPTO worked with other U.S. government agencies on the shared goal of fighting piracy and counterfeiting. For example, the USPTO and the Department of Homeland Security, Customs and Border Protection (CBP) collaborated to inform trademark owners of the customs recording process to prevent the import of fakes. We also worked with our colleagues at the Department of Justice and the Office of the United States Trade Representative (USTR) to enhance the domestic and international intellectual property environment for American businesses.

During FY 2005, USPTO assisted the Department of Justice in developing the U.S. government position in *MGM v. Grokster,* a case involving the infringement of copyrighted works over peer-to-peer file sharing networks. In a unanimous decision, the Supreme Court held that companies may be liable for copyright infringement by others, if they induce such copyright infringement.

### *Working with individuals and businesses*

As part of STOP!, the USPTO launched an intensive communications campaign to educate small businesses on protecting their intellectual property in the United States and abroad.  In 2005, we offered small-business conferences in Salt Lake City, Phoenix, Austin, and Miami.  Other USPTO conferences held in Baltimore and Detroit focused exclusively on challenges associated with doing business in China.  All conferences had strong attendance and overwhelmingly positive feedback.

The USPTO staffed the STOP! hotline, 1-866-999-HALT, which lets callers receive information from our attorneys with regional expertise on intellectual property rights and enforcement.   During FY 2005, the hotline received more than 750 phone calls from people across America with a range of intellectual property questions.

The STOP! gateway website, www.stopfakes.gov, features specialized information, including USPTO-designed "intellectual property toolkits" to help businesses protect their rights in other countries, such as China, Korea, and Mexico. The USPTO also added *www.stopfakes.gov/smallbusiness* to meet the specific needs of smaller companies seeking to protect intellectual property rights.

### *Working with other governments*

To strengthen global intellectual property protection, the USPTO represented the U.S. government in discussions and negotiations at the World Intellectual Property Organization (WIPO) throughout the year.

In January, we unveiled a comprehensive plan of technical assistance and cooperative exchanges with our counterparts in the Chinese government to improve China's intellectual property rights administration and enforcement.  Through the Joint Commission on Commerce and Trade (JCCT) Intellectual Property Rights (IPR) Working Group, and together with the Office of the USTR, we helped negotiate a comprehensive set of commitments from the Chinese government to reduce counterfeiting and piracy in China.

We established the USPTO Global Intellectual Property Academy to consolidate and greatly expand current intellectual property training programs for foreign government officials.  As part of our ongoing technical assistance, the USPTO conducted programs on IPR protection and enforcement issues for officials and private sector representatives from Southeast Asia, the Middle East, North Africa, Latin America, Russia, Turkey, and many other countries.

We launched an initiative to place USPTO IPR experts in Brazil, China, India, Russia, and other developing regions, working closely with the United States and Foreign Commercial Service and the Department of State.  These experts will press for improved IPR protection for American businesses and coordinate training and technical assistance efforts to stop piracy and counterfeiting.

## USPTO CONTINUALLY IMPROVES INTELLECTUAL PROPERTY PROTECTION IN OUR OFFICE

We are proud of our 200-year history of administering the system that has helped make our nation a technological and economic giant.  Today, through issuing patents, the USPTO carries on the tradition of encouraging technological advancement.  Through registering trademarks, we help businesses protect their investments and safeguard consumers against deception in the marketplace. To continue this legacy in 2005, we worked to maintain and improve the world's best patent and trademark systems.

## IMPROVING THE WORLD'S BEST PATENT OFFICE

In 2005, the number of patent applications we received continued to grow at a rapid pace.   Our office now receives many patent applications on CD-ROM, containing millions of pages of data.  In short, the volume and complexity of patent applications continues to outpace current capacity to examine them.  The result is a pending — and growing — application backlog of historic proportions. Patent pendency — the amount of time a patent application is waiting before a patent is issued — now averages more than two years.  In more complex art areas, such as data-processing technologies, average pendency stands at more than three years.

We are still faster and less expensive than any other major patent office in the world, but without the fundamental changes we have made in the way USPTO operates, average patent pendency would have sky rocketed. And we continue to take steps to reduce pendency.

We had made a set of commitments in this regard two years ago, and we have delivered on them — across the board.  We promised electronic processing for patents and trademark applications within two years, and we delivered.  We promised to make patent reexaminations faster, and we delivered.  We said our production would improve, and it has.  We said we would hire patent examiners in record proportions.  We have, and we will continue to do so.

### *Hiring more patent examiners, providing better training, and implementing a work-from-home program*

The USPTO hired a record 978 patent examiners, exceeding our FY 2005 hiring goal by approximately 100.  We also plan to hire approximately 1,000 new examiners over the next year, representing a monumental increase in professional staff.

With such dramatic hiring, we needed to find new ways to train and provide space for this new group of professionals.   We are developing an academy approach to training our new patent examiners, in which we teach them in a classroom for up to one year, rather than our traditional one-on-one training.  This new initiative is expected to help the USPTO better train and retain the large number of new examiners we are hiring, while freeing up more of our experienced supervisory patent examiners to mentor and supervise.

We are also piloting a Patents' Hoteling Program, which includes providing patent examiners with access to the systems they need to do their jobs from home.  This will give us space to add examiners more quickly and cost-effectively.   Up to 200 patent managers will be deployed as teleworkers by December 2005.  Additionally, up to 500 more patent examiners, managers, and technical support staff will gain this capability in FY 2006.

### *Offering more efficient options to applicants*

The USPTO has implemented initiatives to improve the timeliness, efficiency, and quality of patent reexaminations.  During FY 2005, we developed a new pre-appeal brief conference pilot program that offers applicants the ability to request a panel of examiners to formally review their application rejections before they file an appeal brief.  We expect this change to save patent applicants at least $30 million annually in litigation costs.

We have ensured that all *ex parte* patent reexaminations pending for more than two years were processed to final determination, and we have put in place a system that will process *ex parte* reexaminations more efficiently going forward. This effort includes placing 20 experienced primary examiners to concentrate solely on reexaminations.

We are developing a web-based patent application filing system that allows automated processing of images, rather than manually uploading image data.  The new system will enhance the quality of patent examination by providing a searchable database not previously available.  We expect this system to be initially deployed by the winter of 2005.

## IMPROVING THE WORLD'S BEST TRADEMARK OFFICE

Similarly, we are always working to improve our trademark operations as well.  We want to get to new cases faster with the best possible decisions, so our customers can make sound business judgments as soon as possible.

### *Enhancing e-filing*

More than 88 percent of trademark applications were filed electronically in FY 2005.  We continued to enhance our electronic filing by expanding the number and type of transactions that can be completed on-line and by offering reduced fees to encourage electronic communications.

### *Offering greater transparency*

We achieved a major milestone in maximizing electronic tools to make the trademark registration process fully transparent to the public.  Anyone with Internet access can now review documents in our official trademark application file.

***Continuing successful hoteling program***

The Trademark operation's award-winning work-at-home hoteling program for examining attorneys was expanded to include 69 percent of eligible examiners by the end of FY 2005. This program proved successful in retaining experienced examiners and helping address increases in trademark filing without incurring additional real estate costs.

## CONCLUSION

This Performance and Accountability Report summarizes the USPTO's achievements and challenges for FY 2005. I am pleased to certify that our agency's systems of management control, taken as a whole, comply with Section 2 of the Federal Managers' Financial Integrity Act of 1982 (FMFIA). Our agency is also in substantial compliance with applicable federal accounting standards and the U.S. Standard General Ledger at the transaction level and with federal financial system requirements. Accordingly, our agency fully complies with Section 4 of the FMFIA, with no material non-conformances. In addition, we are confident that the USPTO's financial and performance data is complete, reliable, accurate, and consistent, as we improve our ability to measure progress toward performance objectives.

For the 13th consecutive year, we have received an unqualified audit opinion on our annual financial statements. In addition, the independent auditors' report did not identify any material weaknesses, reportable conditions, or instances of noncompliance.

The USPTO has received the Inspector General's statement summarizing the major management and performance challenges that are facing our agency. We recognize the importance of ensuring a stable human resources operation. We have created a comprehensive Human Capital Improvement Plan that defines and addresses these challenges. This plan will join human resources practices with management and business results.

Advancements in agency operations enabled the USPTO to achieve a majority (75 percent) of our key performance measures in FY 2005 despite higher than planned application filings, the fact that we hired and assimilated approximately 1,000 new examiners in Patents and Trademarks, our continued transition to an electronic processing environment, and our relocation to the Alexandria campus. Of the four measures we did not meet, we made significant progress in the latter part of the year on two quality metrics, and we implemented a program to encourage electronic filing of patent applications. Further, we exceeded our technical assistance activities target, when training and enforcement activities are considered.

During FY 2005, the USPTO lived up to our duty to strengthen intellectual property protection in the United States and around the world. By definition, that has meant fighting piracy and counterfeiting efforts on every front and have educated numerous constituents on the importance of intellectual property to economic and technological progress.

Our vision also means continually improving our own operations and preparing to become even more agile in the future. With the leadership of President George W. Bush and Secretary of Commerce Carlos Gutierrez, I am confident that we will continue to meet the challenges of a 21st century economy.

*Jon W. Dudas*
*Under Secretary of Commerce for Intellectual Property and*
*Director of the United States Patent and Trademark Office*

*November 2, 2005*

## MESSAGE FROM THE ACTING CHIEF FINANCIAL OFFICER



I am pleased to present the USPTO's FY 2005 *Performance and Accountability Report*. For a third consecutive year, the USPTO was awarded the Association of Government Accountants' Certificate of Excellence in Accountability Reporting for its FY 2004 *Performance and Accountability Report*.   We also received an unqualified opinion from our independent auditors on the USPTO's FY 2005 financial statements for a 13th consecutive year.  This "clean" opinion was issued together with no reported material weaknesses or reportable conditions in the design and operation of our system of internal control.

USPTO's fee modernization bill was enacted in FY 2005.  This major change provided resources to enhance our capabilities to meet the goals of our *21st Century Strategic Plan* of high quality and timely issuance of patents and registration of  trademarks, increased electronic government, and work sharing initiatives worldwide.  The additional funds available to the USPTO allowed us to increase the number of patent examiners, which will greatly assist in reducing pendency levels caused by the growing average complexity of applications and increasing workloads.

These advancements serve to improve us as an agency and allow us to protect intellectual property in the United States and abroad.  We will continue supporting the USPTO's role in structuring new multilateral and bilateral agreements with other intellectual property offices and promoting global harmonization of law in order to strengthen the rights of our intellectual property holders and provide international protection for their inventions.

The USPTO separated the offices of the Chief Financial Officer and the Chief Administrative Officer this year.  This organizational change will allow the organization to focus on the continued improvement of USPTO financial and performance information, which will result in better decision-making, improve utilization of resources, and support the President's Management Agenda for competitive sourcing, improved financial performance, budget and performance integration, and expanded electronic government.

The *21st Century Strategic Plan* identified new approaches for performing work using competitive sourcing.  During the current year, we were able to implement some of these approaches.  We successfully completed two competitions for commercial activities, including classification of patent pre-grant publication documents and mail fulfillment operations.  In addition, we have competitively sourced search activities associated with the Patent Cooperation Treaty (PCT) process.  This activity serves as a pilot for competitively sourcing the search of national cases in accordance with the requirements of the Consolidated Appropriations Act, 2005 (Public Law 108-447) and our efforts to utilize our resources in the most productive manner will continue in the future.

We continued to strengthen our internal review program and performed more internal control reviews than any single year to date.  Further, we continued to emphasize the importance of internal control certifications required by our management to provide the annual assurance, which is required under the FMFIA.  Our periodic evaluation process, together with our strong management oversight, and continued commitment to improvements in internal control allow me to provide reasonable assurance that the USPTO's systems of internal accounting and administrative control fully comply with the requirements of the FMFIA for FY 2005.  This existing internal control review program positioned the USPTO for full compliance with the new requirements for internal controls over financial reporting outlined in the Office of Management and Budget's (OMB) revised Circular A-123, *Management's Responsibility for Internal Control.*

Having attained a reliable process for preparing financial statements, we continue to identify areas of financial management for further improvement.  During FY 2005, we revised our key monthly management report to include enhanced planned performance and spending compared against actual performance and spending results, with forecasts for the remainder of the year.  This report allows management to continually monitor financial and program performance against plans to take timely corrective action.

The USPTO continues to realize the benefits of the electronic government initiatives that were put in place as a part of our *21st Century Strategic Plan.*  These initiatives were taken to provide services that are tailored to customer needs, as well as to improve the efficiency of our processing systems.  During the current year, we saw an increased use of the internet for patent and trademark applications and searches on-line. Our electronic fee receipts for patent and trademark products and services increased by 19 percent during FY 2005 as compared to the prior fiscal year.

In the upcoming year, we will continue to focus our efforts on the initiatives related to the President's Management Agenda, improve our financial management systems, and enhance our internal control program.  Our goals remain to provide timely, reliable, and useful financial management information to USPTO management and to serve our customers as best as we can.

*Howard N. Goldberg*
*Acting Chief Financial Officer*
*November 2, 2005*



# Management's Discussion and Analysis





# MISSION AND ORGANIZATION OF THE USPTO

## MISSION STATEMENT

The USPTO's mission is to ensure that the Intellectual Property system contributes to a strong global economy, encourages investment in innovation, and fosters entrepreneurial spirit. Intellectual property is an invention or creation embodied in the form of a patent, trademark, trade secret, or copyright.

For over 200 years, the basic role of the USPTO has remained the same: to promote the progress of science and the useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries (Article 1, Section 8 of the United States Constitution). American industry has flourished under this system of protection as new products have been invented, new uses for inventions have been discovered, and employment opportunities have been created for millions of Americans. Customers have been protected against confusion and deception in the marketplace, and businesses have been given the enhanced protection of trademark rights and notices of the trademark rights claimed by others. Patents and trademarks have long protected American creativity and ingenuity. The first patent was issued in 1790 for a method of making potash fertilizer and the oldest active trademark was originally registered in 1884 for SAMSON, a design for "cords, lines, and ropes."

The strength and vitality of our economy depends directly on effective mechanisms that protect new ideas and investments in innovation and creativity. The continued demand for patents and trademarks underscores the ingenuity of American inventors and entrepreneurs. The USPTO is at the cutting edge of our nation's technological progress and achievement.

The primary services provided by the USPTO are examining patent and trademark applications and disseminating patent and trademark information. Through issuing patents, we encourage technological advancement by providing incentives to invent, invest in, and disclose new technology. Through registering trademarks, we assist businesses in protecting their investments, promoting quality goods and services, and safeguarding consumers against confusion and deception in the marketplace. By disseminating both patent and trademark information, we promote a global understanding of intellectual property protection and facilitate the development and sharing of new technologies worldwide.



*Interior of the Madison Building's glass atrium.*

## LOCATION, ORGANIZATIONAL STRUCTURE, AND WORKFORCE

The USPTO is an agency of the United States within Department of Commerce. In FY 2005, USPTO successfully completed its move to its new facility in Alexandria, Virginia.  In addition, USPTO has two storage facilities in Alexandria and Springfield, Virginia, and leased storage space in Boyers, Pennsylvania.  The USPTO workforce is comprised of 7,363 federal employees, including 4,258 patent examiners and 357 trademark examining attorneys, and 3,687 contract employees.



*View of the USPTO headquarters from Dulany Gardens.*

The USPTO has evolved into a unique government agency. Since 1991—under the Omnibus Budget Reconciliation Act (OBRA) of 1990—the USPTO has operated in much the same way as a private business, providing valued products and services to its customers in exchange for fees that are used to fund its operations. The USPTO is lead by the Under Secretary of Commerce for Intellectual Property and Director of the USPTO who consults with the Patent Public Advisory Committee and Trademark Public Advisory Committee. The USPTO has two major business lines – Patents and Trademarks – as shown in the following organization chart:



# PERFORMANCE GOALS AND RESULTS

## USPTO STRATEGIC PLAN

The Government Performance and Results Act (GPRA) requires that agencies plan and measure the performance of their programs. In carrying out GPRA, the USPTO prepares a Performance Report and a *Strategic Plan*, which can be found on our website: http://www.uspto.gov/web/offices/com/strat21/index.htm.  By design, the performance plan is linked to the budget submissions and reflects the priorities of the Under Secretary and the goals contained in the *21st Century Strategic Plan*.  The budget can be found at: http://www.uspto.gov/web/offices/ac/comp/budg/index.html.

The USPTO began FY 2005 guided by the five year *21st Century Strategic Plan,* most recently updated in February 2003 and covering the period through FY 2008.  Technology has been increasingly complex and customer demands for high quality products and services have escalated.  At the same time, the number of pending patent applications in the world's examination pipeline continues to increase significantly.  Congress has voiced concerns about the agency's ability to effectively fulfill our mission in the future if we continue to operate in a traditional business model.  The *21st Century Strategic Plan* addresses these challenges and concerns.  It is a far-reaching and aggressive plan designed to transform the USPTO into an organization that is truly responsive to the global economy.   The *Plan* facilitates tailoring products and services to customer needs and focusing our expertise on examination.  Three long-term, cross-cutting strategic themes comprise the *Plan's* core:

- *Agility:*  Address the 21st century economy by becoming a more agile organization—We will create a flexible organization and work processes that can handle the increasing expectations of our markets, the growing complexity and volume of our work, and the globalization that characterizes the 21st century economy. We will work, both bilaterally and multilaterally, with our partners to create a stronger, better-coordinated, and more streamlined framework for protecting intellectual property around the world. We will transform the USPTO workplace by radically reducing labor-intensive paper processing.

- *Capability:* Enhance quality through workforce and process improvements—We will make patent and trademark quality our highest priority by emphasizing quality in every component of this *Strategic Plan*. Through the timely issuance of high-quality patents and trademark registrations, we will respond to market forces by promoting advances in technology, expanding business opportunities and creating jobs.

- *Productivity:* Accelerate processing times through focused examination—We will control patent and trademark pendency, reduce time to first office action, and recover our investments in people, processes, and technology.

The USPTO has developed supporting performance goals and measures to implement our strategic themes. The three supporting performance goals tracked through 16 measures include:

> **GOAL 1:**    Improve the quality of patent products and services and optimize patent processing time.
>
> **GOAL 2:**    Improve the quality of trademark products and services and optimize trademark processing time.
>
> **GOAL 3:**    Create a more flexible organization through transitioning patent and trademark operations to an e-government environment and participate in intellectual property development worldwide.

The Agility theme is linked to the third performance goal and incorporates ongoing initiatives in e-government. As a first priority, the USPTO has made electronic end-to-end processing of both patents and trademarks the centerpiece of its business model by deploying critical automated information systems. In addition, the USPTO is currently working on ways to improve delivery schedules, reliability, performance, security, and monitoring of the cost of all our automated information systems. Further, the USPTO is enhancing existing and establishing new alliances with our friends in other national and international intellectual property organizations to strengthen intellectual property rights around the world.

The Capability theme crosses all performance goals, emphasizing the quality and process improvement elements within the USPTO and permeating our activities and operations. Quality will be assured throughout the process by hiring the people who make the best patent and trademark examiners, certifying their knowledge and competencies throughout their careers at the USPTO, and focusing on quality throughout the examination of patent and trademark applications.

The Productivity theme is linked to performance goals 1 and 2 and addresses the planned longer-term reduction in patent and trademark pendency, as measured by the average first action pendency and the average total pendency.

In FY 2005, the USPTO continued implementing goals and objectives put forth in the *Plan*, to the extent they were consistent with congressional intent and supported by our stakeholders and applicants.

## PERFORMANCE DATA VERIFICATION AND VALIDATION

In accordance with GPRA requirements, the USPTO is committed to making certain that performance information reported is complete, accurate, and consistent. To ensure the highest quality data, the USPTO has developed a strategy to validate and verify the quality, reliability, and credibility of USPTO performance results and has undertaken the following:

*Accountability* – Responsibility for providing performance data lies with the management of USPTO programs. The USPTO holds program managers accountable for ensuring procedures are in place regarding the accuracy of their data and that the performance measurement source is complete and reliable.

*Quality Control* – Automated systems and databases that collect, track, and store the performance indicators are monitored and maintained by the management of USPTO programs, with systems support provided by the Chief Information Officer's organization. Each system, such as the Patent Application Location and Monitoring (PALM) or Trademark Reporting and Monitoring (TRAM), incorporates internal program edits to control the accuracy of supporting data. The edits typically evaluate data for reasonableness, consistency, and accuracy. Cross-checks against other internal automated systems also provide assurances of data reasonableness and consistency. In addition to internal monitoring of each system, experts outside of the business units routinely monitor the data collection methodology. The Chief Financial Officer's organization is responsible for monitoring the agency's performance, providing direction and support on data collection methodology and analysis, ensuring that data quality checks are in place, and reporting performance management data.

*Financial Statement Audit* – During the FY 2005 financial statement audit, various tests and reviews of the primary accounting system and internal controls were conducted, as required by the Chief Financial Officers' Act.  In their FY 2005 report, the auditors reported no material weaknesses in internal controls or material compliance violations.  The auditors issued an unqualified opinion on the USPTO's FY 2005 financial statements.  Additionally, as required by OMB Bulletin Number 01-02, the auditors reported that they had "obtained an understanding of the design of significant internal controls relating to the existence and completeness assertions" with respect to the performance measures reported in the Management Discussion and Analysis section.

*Data Accuracy* – The USPTO conducts verification and validation of performance measures periodically to ensure quality, reliability, and credibility.  At the beginning of each fiscal year, and at various points throughout the reporting or measurement period, sampling techniques and sample counts are reviewed and adjusted to ensure data are statistically reliable for making inferences about the population as a whole. Data analyses are also conducted to assist the business units in interpreting the program data, such as the identification of statistically significant trends and underlying factors that may be impacting a specific performance indicator. For examination quality measures, the review programs themselves are assessed in terms of reviewer variability, data entry errors, and various potential biases.



*Members of the Annual Performance Review Team. The team received the "Certificate of Excellence in Accountability Reporting Award," from the Association of Government Accountants for the USPTO FY 2004 Performance and Accountability Report.*

## PERFORMANCE AUDITS AND EVALUATIONS

The Office of the Inspector General (OIG) also contributes to the USPTO's efforts to assure audit and evaluation coordination and coverage of USPTO goals.

One evaluation was completed in FY 2005.  In this case, the OIG evaluated whether required information technology (IT) security clauses have been incorporated into IT service contracts and whether the clause requirements have been properly implemented.  *(Information Security in Contracts Needs Better Enforcement and Oversight, OSE-17455/September 2005).*  While most of the contracts contained the required clauses, the OIG found that the clauses are not being properly implemented and in some cases requirements are not being enforced, placing USPTO IT systems at risk.

The performance of the USPTO's two major program activities was assessed in FY 2003 using the Program Assessment Rating Tool (PART).  The Patent organization received a rating of "adequate" with a score of 68, and the Trademark organization received a rating of "moderately effective" with a score of 73.  In response to PART recommendations, the USPTO has implemented efficiency measures as unit cost measures for the Patent and Trademark organizations.

The Government Accounting Office (GAO) issued two reports this year.  The USPTO agreed with the recommendations in the report entitled *Intellectual Property:  USPTO Has Made Progress in Hiring Examiners, but Challenges to Retention Remain* and has taken steps to develop a communication plan and labor management strategy to inform employees about progress on initiatives, successes and lessons learned.  The USPTO also is developing a more formalized technical program for patent examiners to ensure their skills are fresh and ready to address state-of-the-art technology in patent applications.

 In the second GAO report, *Intellectual Property: Key Processes for Managing Patent Automation,* the USPTO generally agreed with the GAO's recommendations and with the need for key improvements, such as developing architectural linkages to the planning process, implementing a capital planning and investment control guide, and completing planned organizational changes.  The USPTO disagreed with the GAO finding related to project management and cost accounting.  However, weaknesses associated with the "select phase" of the Capital Planning and Investment Control (CPIC) process are being refined to better support selection of USPTO investments.  As noted in the response to the draft report, the USPTO already has started implementing many of the GAO recommended improvements.

In addition, the USPTO received the results of a study conducted by the National Academy of Public Administration entitled *U.S. Patent and Trademark Office: Transforming to Meet the Challenges of the 21st Century.*  The USPTO currently is considering the findings and recommendations in the report.

## PATENT PERFORMANCE

The principal function of the Patent organization is the examination of an inventor's application for a patent. Patent examiners compare the claimed subject matter of an application to a large body of technological information to determine whether the claimed invention is new, useful, and non-obvious to someone knowledgeable in that subject matter. The examination process includes the preparation of: correspondence relating to the examination; answers on applications appealed to the Board of Patent Appeals and Interferences (BPAI); interference proceedings to determine priority of invention; and Search Reports and International Preliminary Examination Reports for PCT applications.



*Commissioner for Patents John Doll stands with Under Secretary Dudas after completing the swearing in ceremony.*

Additional offices within the Patent organization perform activities essential to the patent process. At the front end, the Office of Initial Patent Examination (OIPE) performs the initial administrative review of newly filed applications. In FY 2005, OIPE received 384,228 Utility, Plant, and Reissue (UPR) patent applications, 25,304 Design applications, as well as 46,926 PCT applications. This represents a 8.1 percent increase over FY 2004 UPR filings; an 7.9 percent increase over FY 2004 design applications; and a 3 percent increase over FY 2004 PCT applications. Additionally, 111,753 provisional applications were received.

At the back end of the process, the Office of Patent Publications performs post-examination processing of allowed applications, disseminates published applications, and issues patents to the public. In FY 2005, 152,090 UPR and 13,395 Design patents were granted and 291,221 pending applications were published, as provided for in the American Inventors Protection Act (AIPA) of 1999.

PCT Operations and the PCT Legal Administration Office administer the processing of international patent applications. The Search and Information Resources Administration (SIRA) supports examination processes by working closely with the Office of the Chief Information Officer in managing Patent IT activities. SIRA also implements and maintains classification schemes for the efficient retrieval of patent information and other documents residing in the search files. Additionally, SIRA acquires, maintains, and provides access to scientific and technical literature from multiple sources. The Office of Patent Training coordinates the development of curriculums and deployment of training throughout the Patent organization.

Quality is the first priority of the *21st Century Strategic Plan*. The Office of Patent Quality Assurance performs a quality review function, comprising reviews of a random sample of both in-process and allowed applications. To ensure that our primary patent examiners maintain the knowledge, skills, and abilities necessary to perform high quality examinations, the USPTO continued the re-certification program previously implemented, recertifying an additional one third of all primary examiners. A certification-testing program is provided to junior examiners prior to promotion to the level where they are given legal and negotiation authority. Both new first-line and experienced managers attended training to increase the effectiveness of work product reviews and improve coaching skills. The skills of the technical support staff are a vital component of supporting an



*(Left to right) Under Secretary Jon Dudas, Deputy Under Secretary Steve Pinkos, Secretary Gutierrez, and Vice President of Design for Daimler/Chrysler Trevor Creed join in celebrating the 500,000th U.S. design patent.*

efficient examination process, and the Patent organization is in the process of assessing the training needs of the technical support staff.

In support of quality examination, during FY 2005, the Patent organization developed a new pre-appeal brief conference pilot program that offers applicants a way to request a panel of managers and examiners to formally review application rejections before they file an appeal brief. The introduction of the pre-appeal brief conference complies with the President's Management Agenda mandate for a more citizen-centered, results-oriented government.

Additionally, during FY 2005, the Patent organization implemented initiatives to improve the quality and timeliness of patent reexaminations. A Central Reexam Unit (CRU) became operational in July of 2005. The CRU has consolidated and reorganized staff for handling new requests for reexamination. This effort included the placement of twenty experienced Primary Examiners in the new CRU to concentrate solely on reexaminations.

With the implementation of the *21st Century Strategic Plan,* the USPTO will reduce patent pendency and substantially cut the size of our work backlog. The Office continues to strive to meet its performance goals by hiring sufficient numbers of new patent examiners, exploring work sharing with other patent Offices, administering competitive sourcing of PCT application searches, and implementing variable, incentive-driven fees. The Patent organization exceeded its FY 2005 hiring goal for patent examiners by hiring 978 new Utility, Plant, Reissue and Design examiners. USPTO plans to hire approximately 1,000 new patent examiners over the next year, representing a monumental increase in professional staff.

The USPTO successfully completed deployment of the patent Image File Wrapper (IFW) system in FY 2004, facilitating the electronic processing and management of Patent application files. Electronic capture of all pending paper applications was completed in FY 2005, enabling the electronic management of 96.7 percent of applications undergoing examination. For the first time in FY 2004, the Patent Application Image Retrieval (PAIR) system provided anyone with Internet access the ability to track the status of a public patent application as it moved from pre-grant publication to final disposition. In FY 2005, the Patent organization began development of a web-based Private PAIR to provide applicants with secure private access to their unpublished application documents via the Internet as soon as the application is internally processed. An integral component

of this service depended upon upgrades in FY 2005 to the IFW interface system (eDAN). Improvements to eDAN provided additional user functionality and enhanced data sharing with other systems such as PALM, Private PAIR, and Public PAIR. Additionally, a web-based version of the Electronic File System (EFS), is scheduled to be piloted in December 2005 and is expected to be in full production in FY 2006.

To attain our goal of increasing the number of applications filed electronically in FY 2006, the Patent organization held multiple forums in FY 2005 with customer groups to gather requirements for the development of a system that would increase the use of electronic filing by identifying and addressing applicants' needs. The resulting design for a web-based system with portable document format (PDF) attachments will be complemented by a marketing plan to ensure that our customers are familiar with the benefits of electronic filing.



*Employees from the Office of Human Resources greet and register interested candidates during a USPTO job fair.*

In FY 2004, the Patent organization achieved its e-government *21st Century Strategic Plan* objectives with all patent examiners, technical staff, and support staff working from an image-based system. Capitalizing on this capability, the organization launched a Patents' Hoteling Program pilot in FY 2005, providing participants the ability to work at home with full remote access to all systems needed to perform patent-examining functions.

In FY 2005, Patents began a new e-government initiative, Trilateral Document Access (TDA), to facilitate access by patent examiners to the content of patent applications stored in participating foreign intellectual property offices' application document image systems. The first phase of TDA, File Wrapper Access, was implemented with the European Patent Office (EPO) to allow examiners in both offices to instantly view application document images for published applications using existing viewing tools. As a result, a patent examiner may conveniently compare the foreign application documents to the application under review and assist in the possibility of future sharing of prior searches for applications with common filings among patent offices.

Specific performance results related to the Patent organization goals and measures are as follows:

---

**PERFORMANCE GOAL:**  *Improve the quality of patent products and services and optimize patent processing time*

---

Under the *21st Century Strategic Plan*, the Patent organization will improve the quality of our products and services using in-depth reviews of work in progress and enhanced end-process reviews to provide feedback to examiners on areas for improvement, targeted training, and safeguards to ensure competencies. The following performance measures have been established to reflect the USPTO's success and progress in meeting the *Strategic Plan* goal.

## QUALITY OF PATENTS

**MEASURE:  *Patent Allowance Error Rate***

### PATENT ALLOWANCE ERROR RATE



**DATA VALIDATION AND VERIFICATION**

| | |
|---|---|
| **Data source:** | Office of Patent Quality Review Report. |
| **Frequency:** | Daily input, monthly reporting. |
| **Data storage:** | Automated systems, reports. |
| **Verification:** | Manual reports and analysis. |
| **Data Limitations:** | None. |

| | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| **Target** | 5.0% | 4.0% | 4.0% | 4.0% |
| **Actual** | 4.2% | 4.4% | 5.3% | 4.6% *not met* |

**Discussion:**  *Target not met. We failed to meet this year's target because a further enhanced second pair of eyes review was not instituted until the second half of the fiscal year.*

*We plan on meeting our goal next year because we have implemented quality initiatives to address the current shortcomings.  These initiatives are already making an impact; the error rate for the second half of FY 2005 improved significantly.  We anticipate further long-term quality improvements in FY 2006.*

**MEASURE:  *Patent In-Process Examination Compliance Rate***

### PATENT IN-PROCESS EXAMINATION COMPLIANCE RATE

**DATA VALIDATION AND VERIFICATION**

| | |
|---|---|
| **Data source:** | Office of Patent Quality Review Report. |
| **Frequency:** | Daily input, monthly reporting. |
| **Data storage:** | Automated systems, reports. |
| **Verification:** | Manual reports and analysis. |
| **Data Limitations:** | None. |

| | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| **Target** | — | — | Baseline | 84% |
| **Actual** | — | — | 82% | 86.2% *met* |

**Discussion:** *Target met.  The improvement in the in-process compliance rate indicates that the quality initiatives previously implemented, such as targeted training, are producing the desired results.*

In support of the *21st Century Strategic Plan*, the USPTO will reduce patent pendency and substantially cut the size of the work backlog. The two primary measures of Patent organization processing time are: (1) average first action pendency, which measures the average time in months from filing until an examiner's initial determination is made of the patentability of an invention; and (2) average total pendency, which measures the average time in months from filing until the application is issued as a patent or the average application is abandoned by the applicant.

## PENDENCY

**MEASURE:** *Patent Average First Action Pendency*



| PATENT AVERAGE FIRST ACTION PENDENCY | | | |
|---|---|---|---|

**DATA VALIDATION AND VERIFICATION**

| | |
|---|---|
| Data source: | PALM system. |
| Frequency: | Daily input, monthly reporting. |
| Data storage: | PALM, automated systems, reports. |
| Verification: | Accuracy of supporting data is controlled through internal program edits in the PALM system. Final test for reasonableness is performed internally by patent examiners, supervisors, and program management analysts. |
| Data Limitations: | None. |

| | | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|---|
| | **Target** *(months)* | 14.7 | 18.4 | 20.2 | 21.3 |
| | **Actual** *(months)* | 16.7 | 18.3 | 20.2 | 21.1 *met* |

*Discussion:* *Target met. The initiatives identified in the USPTO* **21st Century Strategic Plan** *and aggressive hiring of highly qualified new examiners, will ultimately reduce pendency, decrease the work backlog, and recover our investments in people, processes, and technology.*

**MEASURE:** *Patent Average Total Pendency*



### PATENT AVERAGE TOTAL PENDENCY

**DATA VALIDATION AND VERIFICATION**

| Data source: | PALM system. |
|---|---|
| Frequency: | Daily input, monthly reporting. |
| Data storage: | PALM, automated systems, reports. |
| Verification: | Accuracy of supporting data is controlled through internal program edits in the PALM system. Final test for reasonableness is performed internally by patent examiners, supervisors, and program management analysts. |
| Data Limitations: | None. |

|  | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| **Target** *(months)* | 26.5 | 27.7 | 29.8 | 31.0 |
| **Actual** *(months)* | 24.0 | 26.7 | 27.6 | 29.1 *met* |

**Discussion:** *Target met. The initiatives identified in the USPTO 21st Century Strategic Plan will, over several years, reduce total patent pendency.*

**MEASURE:** *Patent Efficiency*

This measure[1] is a relative indicator of the efficiency of the patent process as measured by the total cost of programs that support the examination of patents compared to its core outputs.



### PATENT EFFICIENCY

**DATA VALIDATION AND VERIFICATION**

| Data Source: | PALM system. |
|---|---|
| Frequency: | Daily input, quarterly reporting. |
| Data storage: | PALM, Data Warehouse, Metify Activity Based Management (ABM). |
| Verification: | Accuracy of supporting data is controlled through internal program edits in PALM, Momemtum, Metify ABM. Quality control review of data by Activity-Based Cost Accounting (ABC) and Program Business Teams. |
| Data Limitations: | None. |

|  | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| **Target** | — | $3,444 | $3,502 | $4,122 |
| **Actual** | $3,376 | $3,329 | $3,556 | $3,877[1] *met* |

**Discussion:** *Target met.*
[1]*This number is preliminary. Data should be finalized by December 2005 and will be reported in the FY 2006 PAR.*

[1] *The USPTO recognizes that there is an inherent difference between the projected obligations in a President's budget that are used to calculate the efficiency measure target, and the actual expenses that are used to calculate the end of year results. This is primarily a timing problem in that targets are calculated 18 months in advance. The USPTO has formed a group of financial management experts to identify alternatives for a better way of calculating this metric.*

## PATENT COMMISSIONER'S PERFORMANCE FOR FY 2005

The AIPA, Title VI, and Subtitle G, the Patent and Trademark Office Efficiency Act, established the USPTO as an agency of the United States, within DOC, on March 29, 2000. The legislation provides for appointment of a Commissioner for Patents as the Chief Operating Officer for Patents, and a Commissioner for Trademarks as the Chief Operating Officer for Trademarks. It also requires that an annual performance agreement be established between the Commissioners and the Secretary of Commerce. The agreement outlines measurable organizational goals and objectives for the organization. The Commissioners may be rewarded a bonus, based upon an evaluation of their performance as defined in the agreement, of up to 50 percent of their base salary.

The Patent organization goals form the foundation for the annual performance agreement between the Commissioner for Patents and the Secretary of Commerce, as required by the AIPA. The performance agreement outlines measurable organizational goals and objectives for the Patent organization based on the performance goals and measures. These performance measures incorporate the milestones and objectives to achieve the following Patent goals: improve quality of examination, implement e-government initiatives, and achieve the lowest possible pendency. At the time of publication, no determination regarding a performance bonus for the Commissioner of Patents had yet been made.

## THE PATENT ORGANIZATION – WHAT'S AHEAD

The USPTO must address the challenges of rising workloads, the shift of applications from traditional arts to more complex technologies, and changes in the timing of some of the milestones of the *Strategic Plan* which will delay the efficiency gains outlined in the *Plan.*

In FY 2006, we will continue to emphasize the importance of quality and timely examination by continuing and building on programs currently in place.  We will also focus on the hiring, training, and retention of our employees.  In January 2006, the Patent organization will pilot an eight-month, university-style training program for new patent examiners.  The program will provide participants with a more structured initial training so that they will have a better understanding of the examination process and be better equipped to effectively contribute after assignment to a technology center.   The existing Patent Examining Initial Training program will run concurrently until the new university concept is reviewed and fully implemented.

In recognition of the vital importance of technical support in building an efficient examining organization, we will design a certification program for the technical support staff in FY 2006.   To ensure that patent examiner candidates possess the needed competencies to succeed, and to improve the efficiency of the hiring process, the Patent organization will develop, with

*A class of newly hired patent examiners receives training on the role and responsibilities of being a patent examiner.*



an on-line pre-employment screening tool.   Reviews of work products throughout prosecution to ensure compliance with examination practice and procedures standards will continue, and feedback from these reviews will drive our training programs.  In combination, these initiatives will improve patent quality.

During FY 2005 the Patent organization initiated a program to ensure that applications filed under existing provisions to request expedited examination for certain subject matter areas or under certain circumstances are acted on timely.  During FY 2006 the Patent organization will review the existing program and consider revising the accelerated examination provision to provide guaranteed final examiner disposition within 12 months if applicants share a greater burden in assisting the examiner.  Any subject matter would be eligible for this provision of expedited examination.



*Chief Administrative Patent Judge Michael Fleming and other BPAI officials demonstrate the video features of the new electronic hearing room.*

Both the Patent and Trademark operations are rapidly moving to eliminate paper documents from their processes. As the reliance on paper disappears from internal processes, the costs for handling applications and related materials will be substantially reduced.   The deployment of a web-based electronic filing system accommodating PDF attachments, in conjunction with a marketing program to inform patent applicants of the availability and benefits of the system, will encourage more applicants to file electronically.

The Patent organization is also looking at proposed rule changes that are directed to supplementing improvements in effective examination quality.  There are pendency reduction benefits with some of these changes although the main focus is on quality. These proposed changes, if implemented, are anticipated to become effective no earlier than FY 2007.

## BOARD OF PATENT APPEALS AND INTERFERENCES (BPAI)

The BPAI was very successful in FY 2005. The average pendency for decided patent appeals before the Board has been reduced to less than six months.  Similarly, the average pendency for interferences is now less than 12 months.  Furthermore, the final decisions in over 80 percent of all interferences were mailed within 24 months.  During the course of the year, the BPAI also held its first remote video hearings at the new state-of-the-art electronic hearing room.  With respect to e-government, almost all patent appeals at BPAI are now in electronic form.  Additionally, based upon the success of the pilot program for processing interferences in electronic form, the Board has started the development of a full-scale electronic filing and information system for interferences.  This automation effort will also lay the groundwork for the implementation of the proposed post-grant review proceedings that are currently planned to be conducted in the future at the Board as a part of the *21st Century Strategic Plan.*

## TRADEMARK PERFORMANCE



*Under Secretary Dudas congratulates Commissioner for Trademarks Lynne Beresford after swearing her in.*

The Trademark organization continues to build upon its progress toward achieving the e-government objectives of the *21st Century Strategic Plan,* which relies on electronic communications to offer market based services and improve the availability of trademark information to more effectively serve an increasingly larger, global client-base. Electronic access increases the opportunity for filing for federal registration, which provides protection to business owners and consumers by providing notice of marks in use. Electronic filing and information systems serve customers in two very important ways: by improving the time and accessibility of information and by improving the quality of the initial application and therefore the quality of the data that is captured and shared in the publication and registration of trademarks.

The USPTO established more options for filing a trademark registration, consistent with its *21st Century Strategic Plan,* to create financial and market-based incentives and encourage greater participation in the U.S. trademark system. Trademark owners can now select the option that best meets their needs — with the highest fees for filing on paper, lower fees for filing electronically, and the lowest fees for both filing and prosecuting electronically. The trademark user community has benefited from the introduction of three options for filing for registration, which has allowed trademark filers to pay $1.7 million less in filing fees than they otherwise would have paid. In the first eleven weeks when customers had a choice of three options for filing, 10 percent of applications were filed on paper, 68 percent were filed electronically, and 22 percent were filed under the newest option with the lowest filing fee.

The USPTO achieved a major milestone in maximizing electronic tools to make the trademark registration process fully transparent to the public through the Trademark Document Retrieval (TDR) System, anyone with Internet access anywhere in the world can review documents in the official trademark application file, including all decisions made by trademark examining attorneys and their reasons for making them.

The USPTO has discontinued the practice of creating and maintaining paper file copies of trademark applications and now relies exclusively on trademark data submitted or captured electronically to support trademark examination, publication of documents, and granting of registrations. During FY 2005, a number of improvements were made that increased efficiency and provided better internal controls for tracking the status of correspondence and progress of work performed and completed. These changes in practice are a result of the on-going progress made in creating and using electronic records to process and examine applications filed for registration of a trademark. A complete electronic records database covering all trademark applications including ongoing correspondence was created by capturing the text and image of nearly 500,000 pending paper files and documents. The database supports paperless examination as the source of application records used within the Trademark organization.

Electronic systems continued to be upgraded to increase the number and type of transactions that can be completed. Significant process changes and enhancements have been incorporated that provide the capability to manage all examiner actions and dockets in a completely electronic environment as well as manage the assignment of new applications. Changes were made in the past year to eliminate the need for manual processing of files for transactions that are required to process marks for publication and registration. These changes improve workflow functionality and eliminate the need to have paper files to manage the work and take office actions for the core trademark examination and registration process.

Electronic communications make it possible to conduct a preliminary search prior to filing an application; determine the status of pending and registered trademarks; respond to office actions; access general information, examination manuals, treaties, laws and regulations; obtain weekly information on marks published, registered, and renewed; file initial applications; and maintain a registered mark through the USPTO website. The USPTO publishes a weekly Trademark Official Gazette that contains information covering several thousand marks and other office actions electronically. The weekly publication is fully electronic; text and images that contain the layout are extracted from electronic records and sent to the Government Printing Office for printing registration certificates. The weekly Trademark Official Gazette, Registration Certificates, and Updated Registration Certificates for the five most recent weekly issues are available electronically from the USPTO website. The entire publication, including registration certificates, are available as a PDF file that can be downloaded free via the Internet, providing expanded, as well as more timely access to trademark information.

The USPTO achieved several milestones by expanding the content and accessibility of trademark information in the past year. In the seven years since electronic filing first became available, more than 716,000 applications, including more than 900,000 classes, have been filed for the registration of a trademark. Today, more than 88 percent of all new trademark applications are filed using the award-winning Trademark Electronic Application System (TEAS), an increase of more than 21 percent over FY 2004 results.

Over the past year, the Trademark organization has continued to enhance the features available to the public as well as working to ensure the overall transformation of the Trademark organization as an effective e-government operation. Twenty-six electronic TEAS forms are now available and new forms have been added in the past year, expanding the number and type of transactions that can be completed on-line. The availability of more types of transactions as well as the convenience of trademark related information available via the Internet, improves our ability to provide timely, useful information, as well as stimulating demand for more services.

TEAS was recognized in FY 2005 as one of five winners at the Excellence.Gov Awards ceremony in Washington, D.C. on February 9th as an example of a best practice in federal e-government implementation. TEAS was selected from a pool of 80 outstanding federal e-government programs that demonstrated high customer satisfaction, strong market segment penetration, broad stakeholder acceptance, and improved program utilization over time.



*Congressman Tom Feeney (R-FL), who serves on the Financial Services and Judiciary committees and represents Florida's 24th District (center), listens as senior trademark attorney Terry Rupp (left), explains trademark searching.*

### Madrid Protocol

The process of registering trademarks in one or more of the 60 members of the Madrid Protocol has been greatly improved since the United States became a member of the Madrid Protocol on November 2, 2003. U.S. business owners are now able to file a single application with the USPTO in English, pay in U.S. dollars, and potentially have their mark protected in any or all of the Members of the Protocol. Non-U.S. trademark owners of Madrid members may elect to seek an extension of protection of their international registration in the U.S. by filing through the International Bureau of the WIPO. The USPTO received 2,772 international applications and 9,976 requests for extension of protection or subsequent designation containing 19,635 classes from the International Bureau under the Protocol.

### Trilateral Project

Representatives from the USPTO, the European Union's Office of Harmonization in the Internal Market (OHIM), and the Japan Patent Office (JPO) continue their work on harmonization of identifications project. The objective of the Trilateral Identification and Classification Manual Project is to make the trademark application and examination process easier by agreeing on the acceptability of certain identifications of goods and services for use in all three offices. The Trademark Identification Manual is updated to incorporate identifications for goods and services that have been accepted as a result of efforts through this project.

The USPTO began development of a secure web site to enable representatives from the USPTO, OHIM, and JPO to add to, delete from, or modify the identifications of goods and services that were accepted during the first phase of Trilateral Identification and Classification Manual Project. Future work on the web site will include incorporating the suggestions and comments of representatives from OHIM and JPO. The site is expected to be available in FY 2006.

### Quality

During the past year, the Trademark organization worked to establish a more consistent quality measure that would better reflect the current quality of examination. The criteria expands on the issues that are considered for determining the quality of "in-process" first and final office actions as "excellent" and "deficient" to better reflect more meaningful and rigorous standards of quality. The information from these reviews has been used to identify and focus training to enhance overall product quality and to improve the consistency of examination. Four new training modules under section 2(a) and (d) of the Trademark Act were prepared to address some of the recurring problems that were determined based on analyses of the reviews. Examiners are required to take a series of self-paced tutorials in support of the USPTO's commitment to improve the quality of examination and ensure all that all Examiners maintain the knowledge and skills necessary to perform their jobs.

### Customer Call Center

The USPTO operates a modern call center system with customer relationship management technology to enhance its effectiveness in handling and responding to customer calls and inquiries. The call center is a state-of-the-art web-based information system which enables agents to manage customer data, track problems, fulfill information requests, answer e-mails, and provide consistent information. Data is used to identify trends, track problem resolution, conduct root cause analysis, and take action to prevent and eliminate the recurrence of problems.

### Telecommuting

The USPTO continues to gain recognition as a leader in the federal government for its successful telecommuting program. The Trademark telecommuting program was designed so that examiners could perform the same work and access the same IT systems from home as they do in the office.  Examiners work from home for a majority of the workweek using an automated reservation system to assign office space on an as-needed basis.  The program met its objective to greatly reduce office space requirements and costs.  The Trademark program was expanded to include 190 examiners in the past year.   Sixty-nine percent of the eligible examiners now take advantage of the program.  The program continues to be expanded to include other employees throughout the Trademark organization.

### Filings

New application filings for trademark registration increased by 8.4 percent in the past year.  The USPTO received 259,932 trademark applications, including 323,501 classes for registration in FY 2005.

### Office Disposals

Total office disposals were 205,378, including 252,275 classes, 0.5 percent above plan.  Registrations were one percent above plan although registrations decreased by more than eight percent from the prior year to 112,495 including 143,396 classes as the number of pending applications remaining from prior years with higher filings continue to be disposed.

### Pending Inventory

Total trademark applications pending in the USPTO increased by more than ten percent in FY 2005 to 497,394 with 653,000 classes.  Twenty percent of the pending file inventory is in a post-Notice of Allowance status awaiting the filing of a statement of use. The inventory of unexamined applications at the end of the year was 140,705 containing 171,230 classes; the number of files increased 10.7 percent from the prior fiscal year with numbers of classes increasing by 13.2 percent.

---

**PERFORMANCE GOAL:**  *Improve the quality of trademark products and services and optimize trademark processing time*

---

Under the *21st Century Strategic Plan,* the USPTO will continue to work with our intellectual property partners to improve the efficiency of our processing systems by increasing the number of applications and communications received and processed electronically, create more coordinated and streamlined work processes, and best position the USPTO for the globalization that characterizes the 21st century economy.  The following performance measure has been established to reflect the USPTO's success and progress in meeting Trademark *Strategic Plan* goals.

## TRADEMARK QUALITY

---

**MEASURE:**  *Trademark Final Action Deficiency Rate*

---

The Trademark organization implemented two new measures for assessing examination quality in FY 2004 that includes an evaluation for all issues that could be considered deficient in making a substantive refusal.  Evaluations are conducted on a random sample of applications to review the quality of decision making of the examiner's first office action and final action refusal.  In FY 2005, 2,253 files were reviewed with 4.7 percent of the files having at least one deficient substantive refusal. Also 2,299 files were reviewed with at least one issue determined for a final action deficiency rate of 5.9 percent.

## FINAL ACTION DEFICIENCY RATE



**DATA VALIDATION AND VERIFICATION**

| | |
|---|---|
| **Data source:** | Office of Trademark Quality Review Report. |
| **Frequency:** | Daily input, monthly reporting. |
| **Data storage:** | Automated systems, reports. |
| **Verification:** | Manual reports and analysis. |
| **Data Limitations:** | None. |

| | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| **Target** | — | — | 5.0% | 5.0% |
| **Actual** | — | — | 5.8% | 5.9% *not met* |

**Discussion:** Target not met. We failed to meet this year's target as a conscious effort was made to initially focus on first action quality, which results in applications receiving a high-quality initial examination. In FY 2005 we exceeded the *first* action deficiency rate by over 60%. The Trademark organization believes that building quality at the beginning of the process will yield higher quality throughout the process.

We plan on meeting our goal next year as we have implemented quality initiatives to address the current shortcomings. These initiatives are already making an impact; the error rate for the second half of FY 2005 was significantly lower than the error rate at the start of the year. We anticipate further long-term quality improvements in FY 2006.

**MEASURE:** *Trademark First Action Deficiency Rate*

## FIRST ACTION DEFICIENCY RATE



**DATA VALIDATION AND VERIFICATION**

| | |
|---|---|
| **Data source:** | Office of Trademark Quality Review Report. |
| **Frequency:** | Daily input, monthly reporting. |
| **Data storage:** | Automated systems, reports. |
| **Verification:** | Manual reports and analysis. |
| **Data Limitations:** | None. |

| | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| **Target** | — | — | 8.3% | 7.5% |
| **Actual** | — | — | 7.9% | 4.7% *met* |

**Discussion:** Target met. The Trademark organization established an "in-process review" standard for assessing excellent and deficient work to create a more comprehensive, meaningful, and rigorous review of what constitutes quality. The results of an examiner's first action are reviewed for the quality of the substantive basis for decision-making, search strategy, evidence, and writing. The new measure considers more elements for review and evaluation with training targeted to topics that warrant improvement. Examiners are given specific feedback about excellent as well as deficient work to further improve quality. Quality results achieved exceeded the target set.

## TRADEMARK PENDENCY

**MEASURE:** *Reduce average first action pendency*

This measure reflects the timeliness of the first office action as measured from the date of application filing to the mailing of the first action.



### TRADEMARK FIRST ACTION PENDENCY

**DATA VALIDATION AND VERIFICATION**

**Data source:** TRAM system.

**Frequency:** Daily input, monthly reporting.

**Data storage:** TRAM, automated systems, reports.

**Verification:** Accuracy of supporting data is controlled through internal program edits in the TRAM system. Program management performs final test for reasonableness.

**Data Limitations:** None.

|  | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| **Target** *(months)* | 3.0 | 3.0 | 5.4 | 6.4 |
| **Actual** *(months)* | 4.3 | 5.4 | 6.6 | 6.3 *met* |

*Discussion:* Target met.

**MEASURE:** *Reduce average total pendency*

This measure reflects the timeliness related to the disposal of a trademark application as measured from the date of filing to registration, abandonment or issuance of a notice of allowance including applications that are suspended awaiting further action or involved in inter partes proceedings. Disposal pendency including suspended and inter partes cases was 19.6 months. Excluding applications that were suspended or delayed for inter partes proceedings, disposal pendency was 17.2 months.



### TRADEMARK FINAL ACTION PENDENCY

**DATA VALIDATION AND VERIFICATION**

| | | |
|---|---|---|
| Data source: | TRAM system. | |
| Frequency: | Daily input, monthly reporting. | |
| Data storage: | TRAM, automated systems, reports. | |
| Verification: | Accuracy of supporting data is controlled through internal program edits in the TRAM system. Program management performs final test for reasonableness. | |
| Data Limitations: | None. | |

| | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| **Target** *(months)* | 15.5 | 15.5 | 21.6 | 20.3 |
| **Actual** *(months)* | 19.9 | 19.8 | 19.5 | 19.6 *met* |

***Discussion:*** *Target met.*

**MEASURE:  *Trademark Efficiency***

This measure[1] is a relative indicator of the efficiency of the trademark process as measured by the total cost of programs that support the examination and registration of trademarks compared to its core outputs.



## TRADEMARK EFFICIENCY

### DATA VALIDATION AND VERIFICATION

| | |
|---|---|
| **Data source:** | TRAM system, Momentum, Metify ABM. |
| **Frequency:** | Daily input, quarterly reporting. |
| **Data storage:** | TRAM, Data Warehouse, Metify ABM. |
| **Verification:** | Accuracy of supporting data is controlled through internal program edits in TRAM, Momemtum, Metify ABM.  Quality control review of data by ABC and Program Business Teams. |
| **Data Limitations:** | None. |

| | | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|---|
| 🟨 | **Target** | — | $683 | $583 | $701 |
| 🟦 | **Actual** | $487 | $433 | $542 | $677[1] *met* |

***Discussion:*** *Target met.  The measure indicates the degree to which the program can operate within plan costs relative to outputs produced.  The measure is calculated by dividing total USPTO expenses associated with the examination and processing of trademarks (including associated overhead and support expenses) by outputs (office disposals).  It should be noted that this measure does not represent the average cost to process, examine, and register a trademark since office disposals are but one measure of USPTO products and services.*

[1] *This number is preliminary.  Data should be finalized by December 2005 and will be reported in the FY 2006 PAR.*

## TRADEMARK COMMISSIONER'S PERFORMANCE FOR FY 2005

The AIPA, Title VI, Subtitle G, the Patent and Trademark Office Efficiency Act, established the USPTO as an agency of the United States, within DOC, on March 29, 2000.  The legislation provides for appointment of a Commissioner for Patents as the Chief Operating Officer for Patents, and a Commissioner for Trademarks as the Chief Operating Officer for Trademarks.  It also requires that an annual performance agreement be established between the Commissioners and the Secretary of Commerce.  The agreement outlines measurable organizational goals and objectives for the organization.  The Commissioners may be rewarded a bonus, based upon an evaluation of their performance as defined in the agreement, of up to 50 percent of their base salary.

---

[1]   *The USPTO recognizes that there is an inherent difference between the projected obligations in a President's budget that are used to calculate the efficiency measure target, and the actual expenses that are used to calculate the end of year results.  This is primarily a timing problem in that targets are calculated 18 months in advance.  The USPTO has formed a group of financial management experts to identify alternatives for a better way of calculating this metric.*

The Trademark Business goals formed the foundation for the annual performance agreement between the Commissioner for Trademarks and the Secretary of Commerce, as required by the AIPA. The performance agreement outlined measurable organizational goals and objectives for the Trademark Business based on the above goals and performance measures. Eight of the nine trademark performance measures included in the agency performance plan were met for a score of 89 percent. The Commissioner's performance for the past year had not been evaluated at the time that this report was completed.

## THE TRADEMARK ORGANIZATION – WHAT'S AHEAD

The Trademark organization will continue to move aggressively in the next year to implement the objectives of the *21st Century Strategic Plan* by completeing the redesign of its operations to use e-government as the primary means of doing business with applicants and registrants, and as the sole means for processing work inside the examining operation.

The Trademark organization has achieved considerable success in implementing its business process reengineering plan to move from primarily doing business with paper to doing business in an electronic environment. Completion of an electronic file management system, in addition to our currently available electronic filing and information systems, permits:

- Reduction in cycle times by consolidating separate processes and eliminating the potential for lost or missing papers that create additional delays and poor service;

- Enhancements in the functionality and number of electronic filing options; and

- Ability to offer a totally electronic filing and receiving process to handle applications from U.S. applicants seeking protection of their mark in foreign countries, and requests for protection of marks from foreign countries in the United States.



*TTAB e-government enhancements help it reach pendecy goals.*

As paper records disappear from internal processes, the cost for handling applications and related materials, along with the reliance on increasing numbers of employees or contractors to handle increases in filings, will continue to decrease. Data quality has improved as data is captured electronically to support examination and to publish documents and registrations. Electronic file management presents an opportunity for the USPTO to offer multiple options for filing that allow applicants to select the method of filing that best suits their business needs.

## TRADEMARK TRIAL AND APPEAL BOARD (TTAB)

The TTAB met its pendency goal in FY 2005. The goal was to issue final decisions and decisions on trial motions, on average, within ten weeks of the time they were submitted for decision. During FY 2005, the TTAB issued decisions, on average, in nine and a half weeks.

In FY 2005, the TTAB added two options to its suite of electronic filing forms. Now, changes of correspondence address may be updated using the TTAB's electronic filing system. Also, parties in contested cases may electronically file most consented motions, which are granted automatically. By the end of FY 2005, 84 percent of extensions of time to oppose were being received and processed electronically, as were 58 percent of notices of opposition and 59 percent of petitions to cancel. Finally, the TTAB held its first electronic oral hearing in the electronic courtroom it shares with the BPAI. The electronic courtroom permits parties to appear before TTAB and BPAI from remote teleconferencing locations.

## E-GOVERNMENT AND INTELLECTUAL PROPERTY PERFORMANCE

**PERFORMANCE GOAL:** *Create a more flexible organization through transitioning the patent and trademark processes to e-government operations and participating in intellectual property development worldwide*

Under the *21st Century Strategic Plan,* the USPTO will work with our intellectual property partners to improve the efficiency of our processing systems by increasing the number of applications and communications received and processed electronically, create more coordinated and streamlined work processes, and best position the USPTO for the globalization that characterizes the 21st century economy. The following performance measures have been established to reflect the USPTO's success and progress in meeting the *Strategic Plan* goals.

**MEASURE:** *Patent Applications Filed Electronically*

### PATENT APPLICATIONS FILED ELECTRONICALLY



**DATA VALIDATION AND VERIFICATION**

| | |
|---|---|
| **Data source:** | PALM system. |
| **Frequency:** | Daily input, weekly reporting. |
| **Data storage:** | PALM and automated systems. |
| **Verification:** | Accuracy of supporting data is controlled through internal program edits in the PALM system and cross checks against other automated systems. |
| **Data Limitations:** | None. |

| | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| **Target** | — | 2.0% | 2.0% | 4.0% |
| **Actual** | — | 1.3% | 1.5% | 2.2%[1] not met |

*Discussion:* Target not met. This measure indicates USPTO's support of, and applicants' willingness to operate in, an e-government environment and identifies the percent of patent applications filed electronically. In FY 2005, the agency held multiple forums to identify specific components of patent applicants' reluctance to file electronically. Customer needs and concerns were translated to system requirements, resulting in the design of a web-based system with PDF attachments, which will be piloted in December 2005.

For next year's target we are implementing user community suggested changes to increase acceptance of our electronic filing system.

[1] This number is preliminary. Data should be finalized by December 2005 and will be reported in the FY 2006 PAR.

**MEASURE:** *Patent Applications Managed Electronically*

The USPTO has eliminated the movement of paper patent applications by creating an electronic image of all patent applications. The IFW system is used by all patent examiners, technical support staff, and adjunct users. Although the patent application process is fully electronic with the IFW system, the USPTO will be deploying a text-based process in FY 2006. The text-based process will allow the USPTO to provide more automation of manual processes, will improve accuracy and reliability, and will allow greater electronic management of the patent system.



## PATENT APPLICATIONS MANAGED ELECTRONICALLY

### DATA VALIDATION AND VERIFICATION

| Data source: | PALM system. |
| Frequency: | Daily input, weekly reporting. |
| Data storage: | PALM and automated systems. |
| Verification: | Accuracy of supporting data is controlled through internal program edits in the PALM system and cross checks against other automated systems. |
| Data Limitations: | None. |

|  | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| **Target** | — | — | 70% | 90% |
| **Actual** | — | — | 88% | 96.7% *met* |

*Discussion:* Target met.

**MEASURE:** *Trademark Applications Filed Electronically*

### TRADEMARK APPLICATIONS FILED ELECTRONICALLY



Target / Actual

**DATA VALIDATION AND VERIFICATION**

| | |
|---|---|
| **Data source:** | TRAM system. |
| **Frequency:** | Daily input, monthly reporting. |
| **Data storage:** | TRAM and automated systems. |
| **Verification:** | Accuracy of supporting data is controlled through internal program edits in the TRAM system and crosschecks against other automated systems. |
| **Data Limitations:** | None. |

| | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| **Target** | 50% | 80% | 65% | 70% |
| **Actual** | 38% | 57.5% | 73% | 88% *met* |

**Discussion:** Target met. The measure indicates USPTO's support of and applicants' willingness to operate in an e-government environment and identifies the percent of basic trademark applications filed electronically. Total electronic filings increased by nearly 21 percent over FY 2004 results. The rate of filing trademark applications has progressed steadily over the years as a result of promotional events, increased number and type of applications and documents that may be filed electronically, and improved functionality and enhancements that have been made to appeal to more customers.

**MEASURE:** *Trademark Applications Managed Electronically*

This measure was introduced in FY 2004 to demonstrate the progress the Trademark organization has made to examine and process applications in a completely electronic environment. The Trademark organization has captured nearly 100 percent of the application inventory as an electronic file record that includes text and image of the initial application and subsequent applicant and office correspondence for nearly 500,000 pending applications. Examining attorneys have been using the electronic record of the initial application to conduct their first office actions since July 2003 through a system that manages the workflow and their transactions. In July 2004 second and subsequent actions were added eliminating the need to use paper files to process and examine applications for the core examination function. In January 2005 the contents were accessible to the public with the introduction of the TDR System.



### TRADEMARK APPLICATIONS MANAGED ELECTRONICALLY

**DATA VALIDATION AND VERIFICATION**

| | |
|---|---|
| **Data source:** | TRAM system. |
| **Frequency:** | Daily input, weekly reporting. |
| **Data storage:** | TRAM and automated systems. |
| **Verification:** | Accuracy of supporting data is controlled through internal program edits in the TRAM system and crosschecks against other automated systems. |
| **Data Limitations:** | None. |

Chart legend: Target, Actual

| | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| **Target** | — | — | 80% | 99.0% |
| **Actual** | — | — | 98% | 99.9% *met* |

***Discussion:*** *Target met. The measure indicates the USPTO's progress towards conducting business in an e-government environment.*

**MEASURE:  *Intellectual Property Technical Assistance Activities/Countries Completed***

This measure was introduced in FY 2005 to demonstrate the number and variety of training and technical assistance activities provided to the intellectual property offices and staff of countries with developing economies in need of strengthening the protection of intellectual property rights as part of their economic and trade development.  Attorney specialists from the Office of International Relations and the Office of Enforcement provide country specific review of intellectual property laws, and recommend strengthened enforcement provisions along with training of judges, prosecutors, customs officials, and intellectual property office technical staff.  Broader multilateral training programs, such as the intellectual property Enforcement Academy and the Visiting Scholars Program, are offered to representatives of a variety of countries throughout the year.

## INTELLECTUAL PROPERTY TECHNICAL ASSISTANCE ACTIVITIES/COUNTRIES COMPLETED



ACTIVITIES COMPLETED — FY 2005

COUNTRIES COMPLETED — FY 2005

Target / Actual

### DATA VALIDATION AND VERIFICATION

| | |
|---|---|
| Data source: | Office of Congressional Relations, International Relations and Enforcement Activity Report. |
| Frequency: | Weekly input, monthly reporting. |
| Data storage: | Automated systems, reports. |
| Verification: | Manual reports and analysis. |
| Data Limitations: | None. |

### INTELLECTUAL PROPERTY TECHNICAL ASSISTANCE ACTIVITIES COMPLETED

| | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| Target | — | — | — | 80 |
| Actual | — | — | — | 59 *not met* |

***Discussion:*** *Target not met.  Technical assistance is, generally, a demand driven activity.  While the raw number of activities extracted for this measure was lower than the target, many activities were regional or consolidated, involving multiple countries. This multiplier effect is evidenced by the fact that the number of countries involved greatly exceeded that target.*

*We plan on meeting our goal next year by offering technical advice and assistance in the form of our technical experts providing a review of developing countries intellectual property laws and legal system (patents, trademarks, copyrights, enforcement of IP rights through criminal penalties, customs requirements and prosecutorial and judicial training) for compliance with the international trade standard of the World Trade Organization (WTO) Trade Related Aspects of Intellectual Property (TRIPS).  Membership in the WTO takes place through a lengthy accession process.  A developing country wishing to join and take advantage of the trading privileges of membership might shorten the accession process by several years by having their country's laws in compliance with WTO's requirements.  We believe this proactive technical assistance will help us achieve our goal.*

### INTELLECTUAL PROPERTY TECHNICAL ASSISTANCE COUNTRIES COMPLETED

| | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| Target | — | — | — | 75 |
| Actual | — | — | — | 142 *met* |

***Discussion:*** *Target met.*

### INTELLECTUAL PROPERTY POLICY AND LEADERSHIP PERFORMANCE



The DOC and the USPTO are diligently working to help curb intellectual property theft and strengthen intellectual property enforcement in every corner of the globe. As the largest intellectual property office in the world, the USPTO is leading efforts to develop and strengthen domestic and international intellectual property protection.

In October 2004, the Bush Administration launched the STOP! initiative, which is the most comprehensive U.S. Government-wide initiative created to combat trade in pirated and counterfeit goods. The initiative is a collaboration of the Departments of Commerce, Justice, Homeland Security, and the Office of the USTR. The goal of the STOP! program is to prevent international piracy and counterfeiting and protect U.S. businesses, especially small and medium-sized enterprises, overseas. What makes the STOP! initiative so unprecedented is that for the first time, the issues surrounding intellectual property enforcement have been raised to the highest levels in the Administration. For the past four years, this Administration has vigorously worked to enforce intellectual property rights and clearly understands that intellectual property is a vital component of our nation's economy. STOP! allows us to leverage the Administration's efforts to provide new innovative solutions to better protect our nation's intellectual property rights. The STOP! initiative has brought together all the major players at the highest levels — the federal government, private sector, and trade partners — and is the culmination of a lengthy, multi-agency effort, in consultation with the private sector and Congress.

As part of STOP!, the USPTO manages a hotline (1-866-999-HALT) that helps small-and medium-sized businesses leverage the resources of the U.S. Government to protect their intellectual property rights in the United States and abroad. The USPTO has established a link from the USPTO website to *www.stopfakes.gov* on DOC's website, which provides in-depth detail of the STOP! initiative. One key feature of the website is the country specific "Toolkits" that have been created by our embassies overseas to assist small- and medium-sized businesses with intellectual property rights issues in China, Korea, Mexico, Taiwan, and Russia, with additional toolkits to be posted soon.

STOP! also seeks to increase global awareness of the risks and consequences of intellectual property crimes through a section of its website, *www.stopfakes.com/smallbusiness*, that is specifically designed and operated by the USPTO to answer common questions of small businesses so they can better identify and address their intellectual property protection needs.



*Under Secretary Dudas speaks to small business owners at the "Conference on Intellectual Property in the Global Marketplace", in Miami, FL.*

DOC is in charge of another important component of the STOP! Initiative: the no-trade-in-fakes program that is being developed in cooperation with the private sector. This is a voluntary, industry driven set of guidelines and a corporate compliance program that participating companies will use to ensure their supply chains and retail networks are free of counterfeit or pirated goods. In addition, CBP maintains a trademark recordation system for marks registered at the USPTO to assist the CBP in its efforts to prevent the importation of goods that infringe registered marks. In FY 2005, the USPTO began mailing notices to new trademark registrants directing them to the services that CBP offers, as well as established a website link on the USPTO homepage which contains the CBP form for recordation.

While counterfeiting and piracy pose a serious threat to all American businesses, small businesses are particularly at risk since they often lack the knowledge and expertise to effectively combat it. Because small businesses typically do not have personnel or maintain large operations in other countries, theft of their intellectual property overseas can go undetected. As part of the STOP! initiative, the USPTO has launched an intensive national public awareness campaign to help educate small businesses on protecting their intellectual property both here and abroad.

In FY 2005, the USPTO began a conference series targeting small- and medium-sized businesses where participants learn what intellectual property rights are, why they are important, and how to protect and enforce these rights. Four workshops were conducted throughout the country in FY 2005.  The USPTO will continue to hold small-business outreach seminars in FY 2006 to give American businesses face-to-face contact with intellectual property experts. The USPTO also participated in a China road show in FY 2005 in several U.S. cities for companies ranging from small businesses contemplating entering the China market to large corporations with established presence in China. Topics included a review of recent laws and regulations promulgated by the Chinese government that affect protection and enforcement of intellectual property, what the United States government is doing to improve intellectual property protection and enforcement in China, how to best protect business assets to avoid intellectual property problems, how to recognize product infringement, and steps to take if infringement occurs.

Through STOP! and the small business outreach campaign, the USPTO will continue to work with Congress, other government agencies, and the private sector to stunt the growth of global trade in pirated and counterfeit goods that threatens America's innovation economy, the competitiveness of our leading companies and small manufacturers, and the livelihood of their workers.

Under the AIPA of 1999 (Public Law 106-113), the USPTO is directed to advise the President, through the Secretary of Commerce, and all federal agencies on national and international intellectual property policy issues, including intellectual property protection in other nations. The USPTO is also authorized by the AIPA to provide guidance, conduct programs and studies, and otherwise interact with foreign intellectual property offices and international intergovernmental organizations on matters involving the protection of intellectual property.

Through our Offices of International Relations, Enforcement, and Congressional Relations, the USPTO: (1) helps negotiate and works with Congress to implement international intellectual property treaties and develop domestic intellectual property related legislation; (2) provides technical assistance to foreign governments that are looking to develop or improve their intellectual property laws and systems; (3) provides capacity-building training programs to foreign intellectual property officials on intellectual property enforcement; (4) advises the Department of State and USTR on drafting and reviewing of intellectual property sections in bilateral and multilateral investment treaties and trade agreements; (5) advises the USTR and the Department of State on intellectual property issues in the World Trade Organization (WTO); (6) works with USTR, the Department of State, and American industry on the annual review of intellectual property protection and enforcement under the Special 301 provisions of the Trade Act of 1974; and (7) consults with the Department of Justice and other federal law enforcement entities who are responsible for intellectual property enforcement.



*During a seminar in Austin, TX, Deputy Under Secretary Pinkos explains that small business are vulnerable to intellectual property theft because they often lack the knowledge and expertise to effectively combat it.*

## INTELLECTUAL PROPERTY TREATIES/AGREEMENTS

In FY 2005, intellectual property activities included:

***Patent Cooperation Treaty Reform:*** The USPTO continued to participate in the WIPO's Working Group on Reform of the PCT in an effort to achieve a simpler, cost-effective system. Major treaty reforms, based on a U.S. initiative, became effective on January 1, 2004. The United States led efforts in FY 2003 to revise the PCT search and preliminary examination guidelines, which provide International Authorities with guidance in the handling and processing of applications under the new combined search and examination system. In March 2004, these guidelines went into effect for international applications filed on or after January 1, 2004. The Meeting of the International Authorities mechanism was reconvened in FY 2004 to, among other things, exchange information on the new enhanced international search and preliminary examination system in effect since January 1, 2004. In FY 2005, the USPTO initiated discussions in the Meeting of the International Authorities of pending proposals from the Working Group on Reform of the PCT. As a result of this effort, the PCT Assembly is expected to approve many outstanding reform proposals in FY 2006.

***Standing Committee on the Law of Patents (SCP):*** The USPTO participated in WIPO's June 2005 meeting of the SCP in an effort to move forward the discussions on substantive patent law harmonization forward. A proposal, based on a similar proposal introduced at last year's SCP meeting by the Trilateral Offices, USPTO, JPO, and European Patent Office (EPO), to limit the discussions to prior-art related issues was not adopted. In FY 2005, the WIPO General Assembly took up the issue of the future work of the SCP and these discussions will continue through FY 2006.

***WIPO Internet Treaties:*** The WIPO Copyright Treaty (WCT) and the WIPO Performances and Phonograms Treaty (WPPT), commonly known as the WIPO Internet Treaties, are designed to ensure international protection of copyrighted works, performances, and sound recordings in the digital environment. Over the last several years, the USPTO has worked to ensure the ratification and full implementation of the Treaties, which entered into force in FY 2002. Currently, 54 countries are members of the WCT and 53 are members of the WPPT, helping to create a seamless web of protection for copyright works online.

***Standing Committee on the Law of Trademarks, Industrial Designs, and Geographical Indications:*** The USPTO continued to promote and actively participate in Trademark Law Treaty (TLT) reform as the primary focus of work by the Standing Committee. The USPTO supports inclusion in the revised TLT of the text of the Joint Recommendation on Trademark Licenses, which sets out maximum requirements for license recordal. Inclusion of the text would limit the negative effects for trademark owners in those countries where recordal of trademark licenses is required to maintain both the trademark registration and the license. Also, the Standing Committee reached consensus that the revised TLT should allow offices to choose the means of transmittal of communications, giving the USPTO the flexibility to move to complete electronic processing for trademarks in the future. The WIPO General Assembly has scheduled a diplomatic conference for March 2006, in which adoption of the revised TLT will be considered.

***Standing Committee on Copyright and Related Rights (SCCRR):*** The USPTO continued to participate in the work of the SCCRR to develop its proposal on treaty language for a new WIPO treaty for the Protection of the Rights of Broadcasting, Cablecasting, and Webcasting Organizations. The SCCRR also monitored national developments in the legal protection of databases and reported on related developments in U.S. legislation.

***Free Trade Agreements (FTA):*** The USPTO is participating in FTA negotiations with several countries, including Thailand, Andean Countries (Peru, Colombia, and Ecuador), Oman, United Arab Emirates, and the Southern Africa Customs Union, composed of Botswana, Lesotho, Namibia, South Africa, and Swaziland. In these negotiations, the USPTO works with USTR and delegations from each country to assure that standards are created which build on the foundation established in the Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPs) and other international agreements to protect intellectual property. In addition, the USPTO, in cooperation with USTR, continues to monitor compliance with existing FTAs, such as the Central America FTA and the United States-Morocco FTA.

***WTO/TRIPs:***  The USPTO actively participated in U.S. delegations to the WTO's Council for TRIPs of the WTO over the past year. The TRIPs Council continued to review the intellectual property regimes of numerous countries and continued its discussions relating to traditional knowledge, genetic resources, technology transfer, the protection of Geographical Indications (GI), and other issues.  With the continuation of the ongoing round of multilateral trade negotiations in the WTO, which was launched at Doha, Qatar in November 2001, the USPTO has remained actively involved in WTO intellectual property issues.



***WIPO Intergovernmental Committee:*** The USPTO headed the U.S. delegation to the WIPO Intergovernmental Committee on Intellectual Property and Genetic Resources, Traditional Knowledge, and Folklore. The focus of United States efforts is to encourage developing countries to meet stated concerns about protecting genetic resources, traditional

*USPTO executives listen intently as officials from other countries present opinions about the current state of substantive patent law harmonization and possible approaches for moving harmonization forward.*

knowledge, and folklore either through current intellectual property regimes or through non-intellectual property laws. Progress has been made in the development of model contractual provisions and traditional knowledge databases.  In FY 2005, USPTO worked with the Australian, Canadian, and Japanese Patent Offices to block a proposed negotiation of treaty language on the misappropriation of traditional knowledge and traditional cultural expressions.

***International Science and Technology (S&T) Agreements:***  Throughout FY 2005, the USPTO continued working closely with the U.S. Department of State in the negotiation of cooperative S&T agreements with other countries, including provisions of the intellectual property annex to S&T agreements that ensure equitable allocation of rights to intellectual property created in the course of cooperative research.

## ENFORCEMENT

***Technical Assistance and Capacity-Building:*** The USPTO enforcement efforts were strengthened by increasing the number of full-time attorney positions dedicated to improving global intellectual property protection to thirteen. The Office of Enforcement participated in FTA negotiations with Panama, Thailand, Andean Community, Oman, United Arab Emirates, and Morocco by providing advice relating to enforcement obligations. Technical assistance was provided in the implementation of the Central America FTA and FTAs with Australia and Morocco. Within the context of WTO accession negotiations, the Office of Enforcement provided policy guidance to USTR. Guidance and recommendations were provided to the USTR under the Special 301 review.

The Office of Enforcement partnered with numerous international and non-governmental organizations in designing and delivering technical assistance programs including the Association of South East Asian Nations (ASEAN), United Nations Economic Commission for Europe (UNECE), International Intellectual Property Institute (IIPI), WIPO, Asia-Pacific Economic Cooperation, Secretariat for Central American Integration, Bureau for International Narcotics and Law Enforcement Affairs (INL), and the Middle East Partnership Initiative (MEPI).

The Office of Enforcement increased technical assistance offered in China, with a focus on providing the provinces with capacity building programs relating to civil, criminal, and border enforcement. Programs in China included: World Customs Organization Regional Forum, Shanghai; Criminal Copyright Enforcement Seminar in Guangzhou; Seminar on new Chinese Judicial Interpretation for Criminal Intellectual Property Infringements; Criminal Copyright Seminar, "How to File a Criminal Case," Beijing; and the Pearl River Delta Seminar on Intellectual Property Enforcement in Southern China.

The Office of Enforcement, in coordination with IIPI, provided technical assistance in Russia for border enforcement officials in St. Petersburg and Vladivostok. These programs utilized a case study method involving discussions of problem solving exercises. Additional programs in Europe and Central Asia included: UNECE Intellectual Property Advisory Group consultations with Romania; USPTO Intellectual Property Enforcement Conference in Azerbaijan; and WIPO-UNECE-World Customs Organization Sub-regional Seminar on Enforcement of Intellectual Property Rights in Almaty, Kazakhstan.

In Asia, the Office of Enforcement conducted intellectual property protection and enforcement programs that included: ASEAN-USPTO Workshop on Optical Media Regulation and Enforcement, Bangkok, Thailand; International Association for the Protection of Intellectual Property-Japan IPR Enforcement Symposia on Anti-Counterfeiting, Tokyo and Fukuoka, Japan; US-Vietnam Trade Council Program in Ho Chi Minh City, Vietnam; U.S. Consulate-United States Vietnam Trade Council-Association of American Publishers Seminar on Copyright Licensing, Ho Chi Minh City, Vietnam; Support for Trade Acceleration Program Vietnam-KI Asia-IIPI Judicial Education Program on IPR Protection and Enforcement, Hanoi, Vietnam; ASEAN-USPTO Workshop on Effective Practices in Combating Trade in Counterfeit Hard Goods, Bangkok, Thailand; ASEAN-USPTO Seminar on IPR Capacity-Building for Small and Medium-Size Enterprises in Bangkok, Thailand; Combating Internet Piracy, Taipei, Taiwan; and intellectual property protection and enforcement workshops and public awareness seminars in Ulaan Baatar, Mongolia.

Through partnership with MEPI, programs were provided that focused on a variety of enforcement issues including: a workshop in Tunis, Tunisia for judges, prosecutors and Customs officials on best practices for effective IPR enforcement; Middle East regional program on intellectual property rights border enforcement in Amman, Jordan; training for Algerian judges in Algiers, Algeria; training for magistrate students in Algiers, Algeria; Enforcement Academy and United States Study tour for judges from throughout the Middle East in Washington, D.C., New York, Los Angeles, and San Francisco; customs training in Algiers, Algeria; judicial training in Oran, Algeria; and IPR Border Enforcement Program for Moroccan Customs, Rabat, Morocco.



*Attendees of the ASEAN-UDOJ-USPTO "Workshop on Effective Practices in Combating Trade in Counterfeit Hard Goods" held in Bangkok, Thailand.*

Technical assistance programs were offered in Africa, which included:  IIPI-West Africa regional conference in Dakar, Senegal, Africa; and Intellectual Property: Policy Priorities to Foster Economic Growth, Public Health and Culture; and Bureau for INL, Department of State/USPTO Program on Combating Counterfeit Medicines in Sub-Saharan Africa, Johannesburg. Enforcement programs were also conducted in Colombo, Sri Lanka and Dhaka, Bangladesh.

Several enforcement programs were conducted in the Washington D.C. area for foreign officials including: USPTO Enforcement Academy; Central America FTA Enforcement Academy; and the USPTO-WIPO Academy for the Judiciary on the Enforcement of Intellectual Property Rights. Training was also provided to U.S. Government officials whose portfolios include intellectual property issues.

## TRILATERAL

***Patent Trilateral Offices:***  The USPTO hosted the 22nd Annual Trilateral Conference, continuing the cooperative effort that began in 1983 among the USPTO, the JPO, and the EPO. The focus of the conference was to address workload challenges resulting from growth and complexity of applications.

The three offices recognized that exploiting the prior art search results performed by another office will reduce duplication of efforts and will decrease workloads and enhance patent quality policy in each office. Working toward this objective, Trilateral cooperation focused on establishment of a pilot program for exchange of search history results and continuing study of work-sharing initiatives to look for solutions to allow timely access to search information in the office of first filing in order to provide benefits to the office of second filing.

In support of the work-sharing project, the offices also agreed to provide mutual access to the electronic files of each office in order to enable each office's examiners to access application content, examination search results, priority documents, and other related information among the offices.

Trilateral cooperation also continued discussions on aspects of harmonization including international patent classification reform and substantive patent law harmonization.

***Trademark Trilateral Offices:***  The USPTO, together with the JPO and the European Community's OHIM, are continuing work on the Trademark Trilateral Identification Manual Project's list of identifications for goods and services that will be accepted in trademark applications filed in the three offices. Recent efforts of the Trilateral include creating an online forum for Trilateral voting on proposed identifications. The electronic forum for voting will increase the pace at which the offices can propose and consider new identifications for inclusion in the list.  This list of accepted identifications streamlines the trademark application process for those filing applications within the United States, Europe, and Japan.

## GEOGRAPHICAL INDICATIONS (GI)

***GIs Website:*** The USPTO's Office of International Relations (OIR) created a dedicated webpage on the USPTO website for GI issues, addressing domestic protection as well as the ongoing international GI debate. The webpage features a GI video, produced by OIR in conjunction with the Foreign Agricultural Service (FAS) of the Department of Agriculture, that explains the U.S. system for protecting GIs through the trademark system. FAS overseas posts are using the video to explain the U.S. system for protecting GIs as well as the U.S. position on GIs at the WTO. The video will be used in emerging foreign markets such as Argentina, Brazil, Bolivia, China, Chile, Colombia, Costa Rica, Cuba, Ecuador, Egypt, Guatemala, India, Indonesia, Mexico, Nigeria, Pakistan, Paraguay, Peru, Sri Lanka, Thailand, and Venezuela.



*Mark Cohen, USPTO's IP attaché assigned to the U.S. Embassy in Beijing, speaks on the Chinese Supreme People's Court's judicial interpretation on "Handling Criminal Cases of Infringing Intellectual Property."*

**WTO GI Issues:**  The USPTO actively works on GI issues in the WTO TRIPs Council. Negotiations continue on establishing a multilateral system of notification and registration of GIs wines and spirits. The USPTO and other United States government agencies do not support establishing a multilateral system that treats GIs differently from trademarks and undermines the existing protection for trademark rights. Discussions also continue regarding extension of higher-level protection to products other than wine and spirits. The United States opposes amending the TRIPs Agreement to change the level of protection for all GI products, as there has not been any demonstration that existing protection is inadequate. Also, the topic of GIs continues to be included in the modalities on the WTO Agriculture negotiations where generic terms (i.e., parmesan, feta, chablis) would be considered intellectual property of a particular region. The USPTO continues to work on an inter-agency basis to ensure that the domestic and export interests of our trademark holders are not damaged.

## CHINA INITIATIVES

**Technical Assistance:**  The USPTO increased technical assistance offered in China, with a focus on providing the provinces with capacity building programs relating to civil, criminal, and border enforcement. Programs in China included: World Customs Organization Regional Forum, Shanghai; Criminal Copyright Enforcement Seminar in Guangzhou; Seminar on new Chinese Judicial Interpretation for Criminal Intellectual Property Infringements at the USPTO headquarters in Alexandria, VA; Criminal Copyright Seminar, "How To File a Criminal Case", Beijing; and the Pearl River Delta Seminar on Intellectual Property Enforcement in Southern China.



*Under Secretary Jon Dudas meets with senior-level copyright lawmakers from China during a conference hosted by the USPTO on "Internet Copyright Issues in China and the United States: Implementing the WIPO Copyright Treaty and the WIPO Performances and Phonograms Treaty."*

***Diplomatic Initiatives:*** In January 2005, Under Secretary Dudas visited Beijing and met with his counterparts from various intellectual property agencies, including the State Intellectual Property Office (SIPO), the Chinese Trademark Office, the National Copyright Administration, and the Supreme People's Court. Under Secretary Dudas also rolled out a Work Plan for Technical Assistance and Cooperative Exchanges. The work plan is divided into several broad topics including general rule of law, patents and data exclusivity, trademarks and GIs, copyrights, and enforcement. Each broad topic is further divided into discrete items that represent areas of specific concern for U.S. rights holders. The USPTO is currently in the process of implementing this work plan.

***Training:*** The USPTO hosted visiting delegations from China, both from Beijing and from the provinces. The visitors included Chinese judges who wanted to learn about our legal system and the administrative procedures followed by the USPTO. The visitors also included officials from SIPO interested in learning about our patent examination processes for several emerging technologies.

Several enforcement programs were conducted in the Washington, D.C. area for the Chinese, including the USPTO Enforcement Academy. The Enforcement Academy is designed to train foreign judges, enforcement officials and program administrators on international intellectual property obligations under WTO/TRIPs, as well as how to establish and maintain a system of intellectual property protections. Chinese officials also attended the USPTO's Visiting Scholars Program during the fiscal year. Plans are currently underway to expand such training to more than double the size of our existing programs.

***Diplomatic Negotiations:*** A delegation from the DOC will visit China in November 2005 to take part in the Ambassador's Roundtable on IPR in China as well as the U.S.–China JCCT IPR working group in Beijing.

***Expert Posting:*** USPTO and DOC's U.S. and Foreign Commercial Service (USFCS) are working together to place intellectual property experts in Guangzhou and Shanghai. The new team of experts, who will be deployed in FY 2006, will provide in-country assistance to U.S. businesses facing intellectual property problems, and work with local officials on efforts to curb piracy. This will supplement our intellectual property experts team already in Beijing since FY 2004.

## CONGRESSIONAL ACTIVITY

During FY 2005, Under Secretary Dudas, Deputy Under Secretary Pinkos, and the USPTO's Offices of International Relations, Enforcement, and Congressional Relations participated in various meetings, hearings, and briefings with Members of Congress and staff relating to patent, trademark, and copyright issues including patent reform and intellectual property protection and enforcement both in the United States and abroad. In addition, the USPTO was host to several congressional delegations during FY 2005 at its new USPTO Alexandria facilities.

***Testimony:*** Under Secretary Dudas testified on the "Patent System: Today and Tomorrow" at a hearing before the Senate Judiciary Subcommittee on Intellectual Property and at an oversight hearing on patent reform held by the House Judiciary Subcommittee on Courts, the Internet, and Intellectual Property on a "Committee Print Regarding Patent Quality Improvement." In addition, Under Secretary Dudas provided testimony on international IPR issues relating to China at a



*Under Secretary Dudas testifies before the U.S. House of Representatives, Subcommittee on Courts, the Internet, and Intellectual Property.*

hearing entitled "Issues before the U.S.-China Joint Commission on Commerce and Trade" before the House Energy and Commerce Committee's Subcommittee on Commerce, Trade, and Consumer Protection. The Under Secretary also testified before the Senate Committee on Homeland Security and Governmental Affairs, Subcommittee on Oversight of Government Management, the Federal Workforce, and the District of Columbia on the U.S. Government's comprehensive initiative established to stop trade in pirated and counterfeit goods at a hearing entitled "Finding and Fighting Fakes: Reviewing the Strategy Targeting Organized Piracy." Finally, Under Secretary Dudas testified before the House Judiciary Subcommittee on Courts, the Internet, and Intellectual Property on a "Review of U.S. Patent and Trademark Office Operations, including Analysis of General Accounting Office, Inspector General, and National Academy of Public Administration Reports."

Deputy Under Secretary Pinkos provided testimony to the Senate Judiciary Subcommittee on Intellectual Property on "Piracy of Intellectual Property." Deputy Under Secretary Pinkos also testified at a joint hearing of the Small Business Committee's Subcommittee on Rural Enterprises, Agriculture, and Technology and Subcommittee on Tax, Finance and Exports on the U.S. trade relationship with China at a hearing entitled "Does China Enact Barriers to Fair Trade?"

**Patent Reform:**  H.R. 2795, the "Patent Reform Act of 2005," was introduced in the House on June 8, 2005. The bill contains various initiatives intended to address patent quality, limitation of litigation abuses, and harmonization of United States patent laws with those of our key trading partners. Some of the major proposals include a shift from a first-to-invent system to a first-inventor-to-file, a limitation on treble damages for patent infringement, establishment of a post-grant opposition proceeding at the USPTO, expansion of the *inter partes* reexamination proceeding, allowance of assignee filing, the publication of all patent applications after eighteen months, elimination of the best mode requirement, and broadening of the scope of prior user rights. Consideration of the bill will continue in FY 2006.

## INTELLECTUAL PROPERTY POLICY DEVELOPMENTS AND DOMESTIC LITIGATION

Under United States Code (U.S.C.) § 2, the Under Secretary of Commerce for Intellectual Property and Director of the USPTO advises the President and other agencies on intellectual property policy, both domestic and international.  For example, in domestic litigation, in addition to defending cases in which the USPTO is sued for decisions it has rendered, the USPTO advises the Solicitor General of the United States on intellectual property matters before the Supreme Court.  In FY 2005, the USPTO assisted the Solicitor General in formulating the government's position before the Supreme Court in several important intellectual property cases.  For example, the USPTO assisted the Solicitor General's Office with the Government's brief in *Metro-Goldwyn Mayer Studios v. Grokster,* U.S., 125 S.Ct. 2764 (2005).  In keeping with the government's recommendation, the Supreme Court held that one who distributes file-sharing software designed for use in copyright infringement by third parties is liable for any resulting acts of infringement by those parties.  The USPTO also assisted the Solicitor General's Office with the government's brief in *Merck KGAA v. Integra Life Sciences I, Ltd., et al.,* U.S., 125 S.Ct. 2372 (2005).  In *Merck,* the Supreme Court held that the safe harbor provisions of 35 U.S.C. § 271(e)(1), which exempt from patent infringement the use of a patented invention "solely for uses reasonably related to the development and submission of information" to the Food and Drug Administration (FDA), extend to experiments using patented drugs for developing new drugs which will be the subject of an FDA submission, not just to clinical trials related to an FDA submission.

In addition to the USPTO's *amicus curiae* work before the Supreme Court, the Court of Appeals for the federal Circuit specifically invited the USPTO to participate as an *amicus curiae* in an *en banc* case involving critical patent policy issues.  In *Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005), the Federal Circuit asked the USPTO to brief the proper role of technical dictionaries and the patent specification when construing patent claims, which is a core issue in both patent application prosecution and patent infringement litigation.  In keeping with the USPTO's *amicus curiae* brief, the Federal Circuit reaffirmed the principle that the specification is the best guide to the meaning of a disputed patent claim term, and rejected an approach to claim construction that gives primacy to dictionaries over the specification.

# EXHIBIT  1

## (Part 2 of 3)

The Solicitor's Office also appeared as a party in several other important patent cases before the Federal Circuit.  For example, in *In re Fisher,* F.3d (Fed. Cir. 2005), the Federal Circuit considered for the first time whether the requirement of 35 U.S.C. § 101 that a patented invention must be "useful" is satisfied by an allegation that patent claims to a nucleic acid compound have utility as a research tool even where there is no known practical significance to any result from a test using the claimed nucleic acids.  The Court ruled that the USPTO correctly applied the Supreme Court's patent utility standard to genetic materials, and expressly approved the USPTO's "Utility Examination Guidelines."   The USPTO's position was supported by *amicus curiae* briefs from the biotechnology and pharmaceutical industries, professional associations, and the National Academy of Sciences.  The USPTO also appeared as a party in *In re Rath,* 402 F.3d 1207 (Fed. Cir. 2005).  *Rath* is a trademark case in which the Federal Circuit considered whether the statutory prohibition against registering surnames that have not acquired distinctiveness conflicts with the U.S.' obligations under the Paris Convention.   The Court affirmed the USPTO's TTAB's refusal to register two proposed marks as primarily merely surnames, and that the Paris Convention is not "self executing" and thus cannot override the statutory prohibition.



*International judges attend the USPTO - WIPO Academy for the Judiciary.*

## REGISTRATION

### Office of Enrollment and Discipline

The Office of Enrollment and Discipline (OED) had a very successful FY 2005.  OED fully implemented computerized testing of applicants for registration to practice in patent cases before the USPTO.  Several important advantages of computerized testing that were expected have been realized.  These include: steady-state, non-cyclical workflow in processing applications and preparing examination questions; and greater convenience for applicants scheduling examinations.  Turnaround time for processing applications and examination results has been reduced.  Applicants who take the examination via computer obtain their results on the day of the examination.  In FY 2005, OED processed 3,025 applications concerning the registration examination.  OED admitted 2,669 applicants who took the computerized registration examination and 32 applicants who took the examination in a paper format.  OED registered 941 individuals as agents and 501 individuals as attorneys.  OED issued 146 limited recognition numbers to non-citizens of the United States.  During the course of the year, OED also supported USPTO's Patents organization, with emphasis on assuring quality patent examination, by successfully administering promotion examinations for patent examiners and patent manager candidates.  In FY 2005, OED continued to effectively protect members of the public.   Upon OED's review of the applications for registration that were received, OED determined that in 46 applications, the issue of an applicant's present moral character was raised.  Six applicants were not registered because of negative moral character decisions by the OED Director.  One applicant withdrew the application after the OED Director issued a Show Cause requirement.  OED either dismissed or closed the investigations regarding 34 candidates and proceeded with their registration.  During the course of the year, OED received 113 grievances concerning possible misconduct by registered practitioners.  OED opened 51 investigations.  Twenty-five grievances were dismissed, after thorough review and analysis, without investigation.  OED closed 61 pending investigations through a combination of warning letters, memorandums for the Committee on Discipline, and closure for lack of probable cause to determine that a USPTO Disciplinary Rule had been violated.

## MANAGEMENT CHALLENGES

***Shift in Complexity of Filings / Sustained Emphasis on Quality*** — The USPTO must address the challenges of rising workloads, the shift of applications from traditional arts to more complex technologies, and the reality that any limitations and delays in implementing the *21st Century Strategic Plan* initiatives will delay some of the quality improvements and many efficiency gains projected in the *Strategic Plan.* Technology has become increasingly complex, and responding to demands from the public for higher quality products and services continues to be a priority.

***Electronic Workplace*** — The Patent and Trademark operations are rapidly moving to eliminate paper documents from their processes. As the reliance on paper disappears from internal processes, the costs for handling applications and related materials will be substantially reduced. Electronic communications will be improved, encouraging more applicants to do business electronically with the delivery of web-based text and image systems. Both Patent and Trademark organizations have made significant progress in support of the long-term goal to create an e-government operation, and the Trademark organization now relies exclusively on trademark data submitted or captured electronically to support examination, publish documents, and issue registrations. However, this increased reliance on electronic systems presents challenges in storage and maintenance for data recovery in the event of outage. Keeping systems robust and adaptable to continuous improvement is imperative.

***Strengthening IPR System*** — An effective IPR system is important to trade because it provides confidence to businesses that rights will be respected and that profits will be returned to IPR holders. The tremendous ingenuity of American inventors, coupled with a strong intellectual property system, encourages and rewards innovation and helps propel the economic and technological growth of our nation. Our challenges include deepening the dialogue on global intellectual property policy, facilitating technical cooperation with foreign countries, surveying and exchanging information on the current status of IPR protection and administrative systems, and arriving at agreement on standards of enhanced intellectual property enforcement to include increased criminal and civil protection, as well as tighter controls on circumventing technological protection.

***Human Capital Strategy Improvements attract and retain talent and build an exceptional employee base*** — The USPTO knows that a talented human resource base can be a competitive advantage in any economic environment. However, building this base is a challenge when faced with ever changing market requirements, increased employee demands, and competition for talent. Therefore, the human capital strategy must include elements that anticipate resource requirements and establishes a long-term approach to securing them. This includes a brand in the labor marketplace and investing in talent, a valuable corporate asset, as well as providing for varied motivitional factors. The long-term approach must also attempt to integrate systems to monitor the needs of employees and ensure that human capital policies continue to reflect employee goals linked to corporate strategy.

***Long-Term Funding Stability*** — Adequate funding is important for helping the USPTO accomplish its mission of evaluating patent and trademark applications in a timely and quality manner. Long-term funding stability, will create a predictable environment for planning purposes.

## THE PRESIDENT'S MANAGEMENT AGENDA

*Strategic Management of Human Capital* —
The USPTO's *21st Century Strategic Plan,*
together with the USPTO Strategic
Workforce/Restructuring Plan, lay out an
explicit workforce planning strategy that is
linked to the Agency's strategic and program
planning efforts. The Agency has projected its
current and future human capital needs,
including the size of the workforce and its
deployment across the organization; and has
identified key competencies needed to fulfill
the agency's mission and strategic goals. The
*21st Century Strategic Plan* and the USPTO
Strategic Workforce/Restructuring Plan
demonstrate that the USPTO is focused on
building competencies in response to customer
demands for enhanced quality. We have
continued both the primary patent examiner
recertification program and the testing of
junior examiners to ensure that patent
examiners have the requisite knowledge and



*Under Secretary Dudas reviews enterprise goals with executive
level managers during an executive retreat.*

skills to be promoted to the GS-13 level and to be granted certification of legal competency.   The Agency is leveraging
competitive sourcing and e-government to better manage time devoted to examination of patent and trademark applications.

The USPTO has become a recognized leader in federal government telework programs, and has received numerous awards for
its accomplishments in this regard. The Office was the recipient of the 2003 Mid-Atlantic Telecommuting Advisory Council's
Best Company/Organization for Teleworkers Award because of its leadership in telework policy, and active promotion of
telework programs.  In FY 2005, the Patent organization launched a patent hoteling program pilot providing participants the
ability to work at home fully supported with complete access to online USPTO-provided resources in conducting their assigned
duties.  The pilot program incorporates the concept of "hoteling" where telecommuting participants reserve time in designated
shared "hotel" offices at the Alexandria campus to conduct activities such as personal interviews with applicants, and
attending meetings or training classes.   Pilot participants received special training to enable them to work as effectively at
home as in the office.  Feedback from participants and reviews of the technologies used in the pilot will be used to finalize
designs for a vastly expanded Telework program that could potentially allow virtually any USPTO employee to participate.

The *21st Century Strategic Plan* also views workforce planning from an international perspective, and incorporates how work
sharing can have an impact on USPTO's human capital planning and management. In addition, the USPTO's current
organizational structure supports decision-making at the lowest appropriate level.

*Competitive Sourcing* — During FY 2005, the USPTO, in support of the President's Management Agenda, continued to
competitively source those activities that have been identified as commercial in nature. The USPTO's *21st Century Strategic
Plan,* with the goal of increasing quality and productivity and decreasing pendency, identified new approaches for performing
work that is currently accomplished by federal employees. The USPTO is currently in the process of and plans to successfully
compete the implementation of competitive sourcing activities, to include a pilot of prior art searches in PCT applications, and
classification of patent documents.

*Improved Financial Performance* — Again, in FY 2005, the USPTO is in compliance with all federal accounting principles and standards and has encountered no instances of material weaknesses in internal controls or non-compliance with financial related laws and regulations. We will continue to maintain and strengthen our internal controls and improve the timeliness and usefulness of our financial management information. In fact, for FY 2005, the USPTO met all quarterly financial reporting requirements instituted by the OMB. Again, the USPTO sustained its clean audit opinion, with FY 2005 marking the 13th consecutive unqualified audit opinion and the ninth consecutive year with no material weaknesses. The USPTO has a certified and accredited, fully integrated financial management system and uses a data warehouse to accommodate both financial and operational data. The data warehouse is used by managers for analyzing financial results and performance and by supervisory patent examiners for managing patent processing timeframes. The USPTO also operates a mature ABC system that captures costs of core mission activities and both direct and indirect costs for the entire USPTO. Managers use data from the ABC system to analyze the cost of operations when making decisions regarding improving processes, setting fees, or developing budget requirements.

*E-Government* — The USPTO chooses IT projects that best support its mission and comply with its enterprise architecture. Individual projects are evaluated in the broader context of technical alignment with other IT systems, as well as the investment's impact to the USPTO IT portfolio's performance, as measured by cost, benefit, and risk. As part of the Capital Planning and Investment Control process, the USPTO prioritizes each investment and decides which projects will be funded in subsequent fiscal years. Once selected, each project is managed and monitored consistently throughout its life cycle. At key milestone dates, progress reviews are conducted to compare the project's status to planned benefit, cost, schedule technical efficiency, and effectiveness measures. All major IT system investments are included in FY 2005 Exhibit 53 and Exhibit 300 business cases.

The USPTO is accelerating deployment of critical automated information systems, particularly the electronic end-to-end processing of patent and trademark applications. Deployment of the patent IFW system was successfully completed in FY 2004, facilitating the electronic processing and management of Patent application files. Electronic capture of all pending paper applications was completed in FY 2005, enabling the electronic management of 96.7 percent of applications undergoing examination and the designation of the electronic file as the official file. The USPTO Capital Planning and Investment Control Process (CPIC) governance process describes how and by whom transformation will be implemented within the agency. Among other things, the CPIC is a management vehicle designed to ensure execution, guidance, and oversight for capital programming and capital asset plans to achieve business transformation and compliance activities, and describes the guidance and management processes that support program management, execution and oversight.

The Supplemental Complex Repository for Examiners (SCORE), which was deployed in FY 2005, represents another component in electronic end-to-end processing. SCORE is a data repository system designed to augment IFW with the capture and retrieval of non-standard application content such as drawings, chemical files, and DNA sequence files. Examiners are provided immediate access to this data and the system includes features that provide efficient means of reviewing the information, such as a "find" feature to detect peptide strings with a within sequence ID's. The Automatic Routing Tool was launched to assist in directing newly captured applications to the appropriate Technology Center. Additionally, EFS underwent major reengineering to a web-based architecture.

Activities aimed at providing the public with improved access to government includes the implementation of the PAIR in FY 2004. For the first time, anyone with Internet access could use the USPTO's website to track the status of a public patent application as it moved from pre-grant publication to final disposition, and to review documents in the official application file. The system offered the public an advanced electronic portal for PDF viewing, downloading and printing an array of information and documents for patent applications. In FY 2005, the Patent organization began development of Private PAIR to provide applicants with secure private access to their unpublished application documents via the Internet as soon as the application is internally processed. Significant upgrades were made to eDAN to provide added user functionality and enhanced interface with other systems such as PALM, Private PAIR, and Public PAIR.

The USPTO  has established additional options for filing a trademark application, consistent with the *21st Century Strategic Plan.*   By offering financial and market-based incentives, Trademark owners can now select the option that best meets their needs – with higher fees for filing on paper, and lower fees for filing and processing electronically. Changes in the fee structure and system improvements have led to an increase in the number of trademark applications that are filed through the award winning TEAS. More than 85 percent of applications for registration are now submitted electronically, making it easier than ever to file for federal trademark registration. Electronic communications also make it possible to conduct a preliminary search prior to filing an application, determine the status of pending and registered trademarks, respond to office actions, access general information on marks published, registered and renewed, file initial applications and maintain a registered mark through the USPTO website. The USPTO has continued to enhance this system and expand the number and type of transactions that can be completed on-line. Twenty-six TEAS forms are available and provide the means to handle most trademark transactions electronically.

***Budget and Performance Integration*** — Since FY 1999, the USPTO has developed an annual corporate plan that links the annual performance plan and budget request, so that resource requirements for continuing programs and new initiatives are aligned with outputs and performance goals. In June 2002, the USPTO introduced the *21st Century Strategic Plan* and an updated version of the plan in February 2003, in order to address issues raised by intellectual property stakeholders. The *21st Century Strategic Plan* is a five-year plan that identifies critical tasks designed to provide the USPTO and external stakeholders with a long-term vision of agency goals, potential funding levels, and planned outcomes. The USPTO has refined its budget formulation process to better equate budgetary resources with both enterprise-wide strategic goals and individual unit performance targets. The annual integrated budget/performance plan is an effective and efficient way of establishing accountability of resources against performance.  The agency routinely monitors program performance targets to ensure achievement of performance goals.  Performance goals are evaluated regularly against stakeholder requirements, business conditions, and planned and actual resources available.  Organizational goals and crosscutting performance measures are also included in senior executive members' performance appraisal plans to ensure alignment with agency mission, goals, and strategic plan objectives.



*The "Wave Wall" of the new USPTO Museum located in the Madison Building.*

## MANAGEMENT CONTROLS AND COMPLIANCE

## WITH LAWS AND REGULATIONS

This section provides information on the USPTO's compliance with the following legislative mandates:

- Federal Managers' Financial Integrity Act
- Federal Information Security Management Act
- Inspector General (IG) Act Amendments
- Federal Financial Management Improvement Act (FFMIA)
- OMB Financial Management Indicators
- Prompt Payment Act
- Civil Monetary Penalty Act
- Debt Collection Improvement Act
- Biennial Review of Fees
- Improper Payments Information Act of 2002

### FEDERAL MANAGERS' FINANCIAL INTEGRITY ACT

The FMFIA requires federal agencies to provide an annual statement of assurance regarding management controls and financial systems. The statement of assurance is provided in the Director's opening letter at the front of this Performance and Accountability report. This statement was based on the review and consideration of a wide variety of evaluations, control assessments, internal analyses, reconciliations, reports, and other information, including the Department of Commerce OIG audits, and the independent public accountants' opinion on the USPTO's financial statements and their reports on internal control and compliance with laws and regulations. In addition, USPTO is not identified on the Government Accountability Office's (GAO) High Risk List related to controls governing various areas.

### FEDERAL INFORMATION SECURITY MANAGEMENT ACT

The USPTO continues to stay vigilant in ensuring that there are no material weaknesses in administrative controls over information systems and is always seeking methods of improving our secure configuration. With all mission and business systems fully certified and accredited, the USPTO systems have maintained full authority to operate since September 2004.

## INSPECTOR GENERAL ACT AMENDMENTS

The Inspector General Act, as amended, requires semi-annual reporting on IG audits and related activities, as well as any requisite agency follow-up.  The report is required to provide information on the overall progress on audit follow-up and internal management controls, statistics on audit reports with disallowed costs, and statistics on audit reports with funds put to better use.  The USPTO did not have audit reports with disallowed costs or funds put to better use.

The USPTO's follow-up actions on audit findings and recommendations are essential to improving the effectiveness and efficiency of our programs and operations.  As of September 30, 2005, while actions were being taken to address the findings, management had two recommendations outstanding on reports issued in FY 2004.  Also, action was taken to close three recommendations contained in the audit reports issued in FY 2004 and prior.  No new reports had been issued during FY 2005.  A summary of audit findings and recommendations follows.

### STATUS OF IG ACT AMENDMENTS AUDIT RECOMMENDATIONS
### as of September 30, 2005

| Report for Fiscal Year | Status | Recommendation | Action Plan | Completion Date[1] |
|---|---|---|---|---|
| FY 2001 | Closed | Coordinate training in international intellectual property law enforcement and provide clarification of the Council's role to the other agencies involved. | Additional staff was hired in May 2005 for enforcement activities. | May 2005 |
| FY 2004 | Open | Ensure that the USPTO works with Commerce and the Office of Personnel Management (OPM) to officially obtain delegated examining authority. | The USPTO has coordinated with OPM to grant us formal delegated examining authority status.  The final decision is pending our corrections for staffing violations identified in the OPM audit of our existing delegated examining unit. | Estimated March 2006 |
| FY 2004 | Open | Ensure that the USPTO develops Office of Human Resources (OHR) organizational descriptions, policies, and procedures, in accordance with the intent of DOO 10-14. | The USPTO is now in the process of updating all our OHR policies, operating procedures, and processes.  We have also developed the OHR Policy Document Control system to track and maintain our policies and procedures. | Estimated February 2006 |
| FY 2004 | Closed | Ensure that the OHR staff using the automated staffing system comply with federal personnel regulations and the Veterans' Employment Oportunities Act of 1998. | The OHR put measures in place to ensure that our staff is trained on the automated staffing system and that appropriate safeguards are in place to ensure that we are in compliance with all legal and regulatory requirements. | September 2005 |
| FY 2004 | Closed | Ensure that the OHR staff possess the expertise and receive the training necessary to accomplish their assigned duties. | The OHR enacted a framework that will ensure that all staff members receive the necessary training to accomplish their assigned duties, to include counseling employees on strengths and weaknesses, developing an Individual Development Plan for each employee that will set forth how skill gaps will be filled, and providing both in-house and third-party training opportunities to address skill gaps. | May 2005 |

[1]  For the Delegated Examining Authority:  The date of completion was revised to allow time to make corrections in response to a recent OPM audit.
For the Organizational Policies:  The Office of Human Resources is currently revamping, getting approval and implementing all 55 of its agency administrative orders, policies, and standard operating procedures.  To complete this, the anticipated completion time was adjusted from last year.

## FEDERAL FINANCIAL MANAGEMENT IMPROVEMENT ACT

The FFMIA requires federal agencies to report on agency substantial compliance with federal financial management system requirements, federal accounting standards, and the U.S. Government Standard General Ledger.  The USPTO complied substantially with the FFMIA for FY 2005.

## OMB FINANCIAL MANAGEMENT INDICATORS

The OMB prescribes the use of quantitative indicators to monitor improvements in financial management. The USPTO tracks other financial performance measures as well. The table below shows the USPTO's performance during FY 2005 against performance targets established internally, by OMB, and the government-wide Metric Tracking System (MTS):

| Financial Performance Measure | FY 2005 Target | FY 2005 Performance |
|---|---|---|
| Percentage of Timely Vendor Payments (MTS) | 98% | 99% |
| Percentage of Payroll by Electronic Transfer (OMB) | 90% | 99% |
| Percentage of Treasury Agency Locations Fully Reconciled (OMB) | 95% | 100% |
| Timely Reports to Central Agencies (OMB) | 95% | 100% |
| Audit Opinion on FY 2005 Financial Statements (OMB) | Unqualified | Unqualified |
| Material Weaknesses Reported by OIG (OMB) | None | None |
| Timely Posting of Inter-Agency Charges (USPTO) | 30 days | 21 days |
| Average Processing Time for Travel Payments (USPTO) | 8 days | 7 days |

## PROMPT PAYMENT ACT

The Prompt Payment Act requires federal agencies to report on their efforts to make timely payments to vendors, including interest penalties for late payments. In FY 2005, the USPTO did not pay interest penalties on 98.7 percent of the 8,045 vendor invoices processed, representing payments of approximately $459.6 million. Of the 186 invoices that were not processed in a timely manner, the USPTO was required to pay interest penalties on 109 invoices, and was not required to pay interest penalties on 77 invoices, where the interest was calculated at less than $1. The USPTO paid only $15 in interest penalties for every million dollars disbursed in FY 2005. Virtually all recurring payments were processed by EFT in accordance with the EFT provisions of the Debt Collection Improvement Act of 1996.

## CIVIL MONETARY PENALTY ACT

There were no Civil Monetary Penalties assessed by the USPTO during FY 2005.

## DEBT COLLECTION IMPROVEMENT ACT

The Debt Collection Improvement Act prescribes standards for the administrative collection, compromise, suspension, and termination of federal agency collection actions, and referral to the proper agency for litigation. Although the Act has no material effect on the USPTO since it operates with minimal delinquent debt, all debt more than 180 days old has been transferred to the U.S. Department of the Treasury for cross-servicing.

## BIENNIAL REVIEW OF FEES

The Chief Financial Officers Act of 1990 requires a biennial review of agency fees, rents, and other charges imposed for services and things of value the USPTO provides to specific beneficiaries as opposed to the American public in general. The objective of the review is to identify such activities and to begin charging fees, where permitted by law, and to periodically adjust existing fees to reflect current costs or market value so as to minimize general taxpayer subsidy of specialized services or things of value (such as rights or privileges) provided directly to identifiable non-Federal beneficiaries. The USPTO is a fully fee-funded agency without subsidy of general taxpayer revenue. For non-legislative fees, it uses ABC accounting to evaluate the costs of activities and determine if fees are set appropriately. When necessary, fees are adjusted to be consistent with the program and with the legislative requirement to recover full cost of the goods or services provided to the public.

## IMPROPER PAYMENTS INFORMATION ACT OF 2002

During FY 2005, the USPTO did not have any erroneous payments that exceeded the ten million dollar threshold. The USPTO identifies, analyzes, and compiles information regarding improper payments to determine when and if systemic and/or managerial issues exist that may require corrective actions on the part of the USPTO management. The USPTO identifies actual improper payments, overpayments and erroneous payments, by reviewing (1) credit memos and refund checks issued by vendors or customers and (2) undelivered electronic payments returned by financial institutions.

While our erroneous payments were only 0.18 percent of total disbursements and primarily related to inaccurate banking information, we plan to further reduce this percentage through our use of the government-wide Central Contractor Registration (CCR) database. The CCR database is maintained by the Department of Defense and requires all government contractors to maintain current contact and banking information. Implementation of an automated interface with the CCR database is planned for FY 2006.

Significant challenges encountered during FY 2005 included not only the lack of an automated interface with the CCR database, which requires the continued application of manual procedures for banking data verification, but also vendors failure to maintain current and accurate banking data within the CCR database.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Improper Payment Reduction Outlook** *(Dollars in millions)* | | | | | | | | | |
| **Program** | **FY 2004 Outlays** | **FY 2004 Improper Payment Percent** | **FY 2004 Improper Payment Dollars** | **FY 2005 Outlays** | **FY 2005 Improper Payment Percent** | **FY 2005 Improper Payment Dollars** | **FY 2006 Improper Payment Percent** | **FY 2007 Improper Payment Percent** | **FY 2008 Improper Payment Percent** |
| Patent | $ 1,109 | 0.03% | $ 0.42 | $ 1,247 | 0.18% | $ 2.21 | 0.00% | 0.00% | 0.00% |
| Trademark | 137 | 0.01% | 0.05 | 155 | 0.19% | 0.30 | 0.00% | 0.00% | 0.00% |
| Total | $ 1,246 | 0.04% | $ 0.47 | $ 1,402 | 0.18% | $ 2.51 | 0.00% | 0.00% | 0.00% |

| **Summary of Recovery Audit Effort** *(Dollars in millions)* | |
|---|---|
| **Amount subject to review** | $ 159.4 |
| *# of invoices* | *4,433* |
| **Actual amount reviewed** | $ 107.3 |
| *# of invoices* | *985* |
| **Remaining amount to review** | $ 24.7 |
| *# of invoices* | *86* |

During FY 2005, the USPTO entered into an agreement with the DOC to use an existing contract for recovery audit services. The audit was limited to closed obligations greater than $0.1 million. Further excluded were grants, travel payments, purchase card transactions, inter-agency agreements, government bills of lading, and gift and bequest transactions, leaving simplified acquisitions available to audit.

The audit, to date, has resulted in two invoices that have been identified as potentially recoverable improper payments, which are insignificant. Confirmation with the vendors is in progress. No amounts were recovered as of the end of FY 2005.

# FINANCIAL HIGHLIGHTS

T he USPTO is a self-sufficient federal agency that funds the cost of its operations through product and service fees paid by its customers – applicants for and owners of patents and trademarks.  Over 84 percent of Patent and Trademark fees collected are set by statute.  The USPTO uses ABC techniques to report costs incurred for operations. This information is used to establish non-statutory fees for products and services at an amount that recovers full costs.  The ABC data is also one of many factors considered when determining statutory fee amounts.

The following presents the USPTO's FY 2005 financial highlights with regard to budgetary resources and requirements, along with results of operations.  Details behind these highlights are included in the discussion of the USPTO's financial statements beginning on page 60.

## BUDGETARY RESOURCES AND REQUIREMENTS

The USPTO was provided appropriation authority to spend all planned fee collections in FY 2005.  In the past, the appropriation authority was less than fee collections.  When spending authority is less than fee collections, the additional fee collections are temporarily unavailable.

The following table presents the source of funds made available to the USPTO, and the use of such funds.

| Source and Status of Funds *(Dollars in Millions)* | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| **Source of Funds:** | | | | |
| Unobligated Beginning Balance | $    11.0 | $    5.6 | $    3.5 | $    2.3 |
| Spending Authority from Offsetting Collections | 1,151.8 | 1,194.7 | 1,321.7 | 1,504.2 |
| Recovery of Prior Year Obligations | 10.1 | 5.9 | 10.4 | 7.6 |
| Net Increase in Unavailable Fees | (23.3) | (11.7) | (99.9) | – |
| Total Source of Funds | $  1,149.6 | $ 1,194.5 | $ 1,235.7 | $ 1,514.1 |
| **Status of Funds:** | | | | |
| Obligations Incurred | $  1,144.0 | $ 1,191.0 | $ 1,233.4 | $ 1,508.4 |
| Unobligated Balance, Available | 2.6 | 2.0 | 1.8 | 2.7 |
| Unobligated Balance, Unavailable | 3.0 | 1.5 | 0.5 | 3.0 |
| Total Status of Funds | $  1,149.6 | $ 1,194.5 | $ 1,235.7 | $ 1,514.1 |



During FY 2005, total budgetary resources available for spending increased 22.3 percent over the amount available in the preceding year. This significant increase in budgetary resources available for use is depicted by the graph to the left.

In FY 2005, USPTO's fee modernization bill was enacted which increased and changed its fee structure. This allowed greater flexibility and placed the USPTO in a better position to realize the goals of the *21st Century Strategic Plan*, including transitioning to a fully electronic operating environment, improving the quality of its services and products, and reducing patent and trademark pendency. Further, the additional funding has enabled the USPTO to increase the number of patent and trademark examiners to assist in addressing the growing average complexity of patent applications and increasing workloads and to allocate additional resources towards protecting intellectual property in the U.S. and abroad.

## RESULTS OF OPERATIONS

The USPTO incurred a net cost of $51.2 million in FY 2005, a decrease of $48.4 million, or 48.6 percent, from the net cost in FY 2002 of $99.6 million.

Typically, the USPTO gross cost of operations for a fiscal year exceeds the total obligations incurred in that same fiscal year. This is due to including the costs of non-budgetary items, such as depreciation expense and imputed costs. However, in FY 2005, the gross cost of operations was less than obligations incurred. This difference is partly due to a change in the method to recognize the cost of post-employment benefits. In past years, the USPTO recognized an imputed financing source and corresponding expense to represent its share of the cost to the federal government of providing pension and post-retirement health and life insurance benefits to all eligible USPTO employees. This year, the USPTO is now using fees to fund the cost of post-retirement benefits, resulting in increased obligations. Another contributing factor is the focus on our primary goal of issuing high quality patents, which temporarily decreased the number of patents issued. This reduced the requirement for printing costs that were planned for and obligated in FY 2005.

Due to the increase in pendency, the time it takes to process a patent or trademark, the USPTO has been recognizing a steadily increasing deferred revenue liability for fees received prior to the revenue being earned. From FY 2002 through FY 2005, unearned patent fees increased 48.1 percent, with a 24.6 percent increase from FY 2004. In FY 2005, for each month of patent pendency to first action, deferred revenue for patents increased approximately $5.7 million per pendency month, with a corresponding decrease in earned revenue. From FY 2002 through FY 2005, unearned trademark fees increased $43.0 million, primarily due to an improvement in the methodology used to calculate trademark deferred revenue, which was implemented in FY 2004. The USPTO has an aggressive goal of hiring 1,000 new employees each fiscal year through FY 2011, as well as implementing new operating practices to reduce the backlog of unprocessed applications and reduce pendency.

## FINANCIAL STATEMENTS

The USPTO received an unqualified ("clean") audit opinion from the independent public accounting firm of KPMG LLP on its FY 2005 financial statements, provided on pages 71 to 94. This is the 13th consecutive year that the USPTO received a "clean" opinion. Our unqualified audit opinions provides independent assurance to the public that the information presented in the USPTO financial statements is fairly presented, in all material respects, in conformity with accounting principles generally accepted in the U.S. In addition, KPMG LLP reported no material weaknesses or reportable conditions in the USPTO's internal control, and no instances of non-compliance with laws and regulations affecting the financial statements.

The USPTO financial management process ensures that management decision-making information is dependable, internal controls over financial reporting are effective, and that compliance with laws and regulations is maintained. The preparation of these financial statements is a component of the USPTO's objective to continually improve the accuracy and usefulness of its financial management tools.

The following sections provide a discussion and analysis of the financial statements and related information.

## STATEMENT OF BUDGETARY RESOURCES

The following table displays the USPTO's total budgetary resources available for spending over the past four years, with the related percentage change. Also presented are the human resources that the USPTO has employed to respond to the increases in patent and trademark filings. The resources available for spending do not include amounts that were not available through September 30, 2005, but will become available for spending on October 1, 2005.

| Resources | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| Budgetary Resources Available for Spending *(dollars in millions)* | $1,146.7 | $1,193.0 | $1,235.2 | $1,511.1 |
| *Percentage Change* | *9.2%* | *4.0%* | *3.5%* | *22.3%* |
| Patent Examiners | 3,538 | 3,579 | 3,681 | 4,177 |
| *Percentage Change* | *15.6%* | *1.2%* | *2.8%* | *13.5%* |
| Trademark Examining Attorneys | 258 | 256 | 286 | 357 |
| *Percentage Change* | *(33.7)%* | *(0.8)%* | *11.7%* | *24.8%* |

As evident from the above table, total budgetary resources available for spending increased significantly in FY 2005, a 22.3 percent increase over the prior fiscal year and only a 31.8 percent increase over the past three fiscal years. This increase in available budgetary resources was partially used to fund the increased cost of additional human capital to address the growing average complexity of patent applications and the increase in patent and trademark filings.

| Filings | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| Patent Filings | 353,394 | 355,418 | 378,984 | 409,532 |
| *Percentage Change* | *2.5%* | *0.6%* | *6.6%* | *8.1%* |
| Trademark Filings | 258,873 | 267,218 | 298,489 | 323,501 |
| *Percentage Change* | *(12.7%)* | *3.2%* | *11.7%* | *8.4%* |

The increase in available budgetary resources also allows the USPTO to apply additional funds towards the accomplishment of strategic goals and other initiatives that are associated with the performance goals contained in the *21st Century Strategic Plan* and the PMA. The plan aims to transform the USPTO into a quality-focused, highly productive, responsive organization supporting a market-driven intellectual property system.

The USPTO fee collections did not exceed the fee appropriation of $1,554.8 million during FY 2005, therefore the USPTO was able to spend all $1,497.2 million of fees collected during the year. The USPTO did not meet planned fee collections primarily due to a decrease in patent claims fees because the number of claims submitted in patent applications were less than planned, and a decrease in patent issue fees, attributed to an enhanced emphasis on quality and a reduction in patent allowance rates. The FY 2005 fee collections increased 13.3 percent over FY 2004 collections of $1,321.0 million, of which $1,222.5 million was appropriated. This increase in collections is due to an increase in patent and trademark application filings, the revision of patent and trademark fees in general, as well as the separation of the patent application fee into a separate filing fee, search fee, and examination fee.

As defined earlier, temporarily unavailable fee collections occur when the USPTO is not appropriated the authority to spend all fees collected during a given year. During FY 2005, the USPTO did not collect any fee collections that were designated as temporarily unavailable. As a result, the $516.5 million in temporarily unavailable fee collections at the end of FY 2004 remained the same through FY 2005.

The below chart illustrates amounts that Congress has appropriated to the USPTO over the past four fiscal years, as well as the cumulative unavailable fee collections.

| Temporary Unavailable Fee Collections *(Dollars in Millions)* | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| Fiscal year fee collections | $ 1,150.8 | $ 1,193.7 | $ 1,321.0 | $ 1,497.2 |
| Fiscal year collections appropriated | (843.7) | (1,015.2) | (1,222.5) | (1,497.2) |
| Reductions - Rescissions | (0.6) | - | 77.0 | - |
| Fiscal year unavailable collections | $ 306.5 | $ 178.5 | $ 175.5 | $ - |
| Prior year collections unavailable | 305.1 | 329.3 | 341.0 | 516.5 |
| Prior year collections subsequently appropriated | (282.3) | ( 166.8) | - | - |
| Cumulative temporarily unavailable fee collections | $ 329.3 | $ 341.0 | $ 516.5 | $ 516.5 |

In addition to these annual restrictions, collections of $233.5 million are unavailable in accordance with OBRA of 1990, and deposited in a special fund receipt account at the U.S. Department of the Treasury.

## STATEMENT OF NET COST

The Statement of Net Cost presents the USPTO's results of operations by Patent and Trademark business areas.  The following table presents the total USPTO's results of operations for the past four fiscal years.

| Net Cost (Dollars in Millions) | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| Earned Revenue | $1,061.4 | $1,162.3 | $1,239.0 | $1,372.8 |
| Program Cost | (1,161.0) | (1,206.1) | (1,289.2) | (1,424.0) |
| Net Cost | $   99.6 | $   43.8 | $   50.2 | $   51.2 |

The Statement of Net Cost compares fees earned to costs incurred during a specific period of time.  It is not necessarily an indicator of net income or net cost over the life of a patent or trademark.  Net income or net cost for the fiscal year is dependent upon the groups of work that have been completed over the various phases of the production life cycle.  The net income calculation is based on fees earned during the fiscal year being reported, regardless of when those fees were collected. Maintenance fees play a large part in whether a total net income or net cost is recognized.  Maintenance fees collected in FY 2005 are a reflection of patent issue levels 3.5, 7.5, and 11.5 years ago, rather than a reflection of patents issued in FY 2005. Therefore, maintenance fees can have a significant impact on matching costs and revenue.  For example, in order to reduce the net cost associated with the patent business line to zero, maintenance fees collected would have needed to be 13.2 percent greater — and the desire to maintain a patent is in the hands of the patent holder and not within the influence of the USPTO. Another example is that first action pendency would have needed to increase by only 0.5 months, instead of 0.9 months, without incurring any related increase in costs.

From FY 2002 through FY 2005, the USPTO's operations resulted in a net cost.  However, in FY 2005, due to changes in the fee schedule and continued increases in filings, the USPTO net cost of operations only increased $1.0 million.

## EARNED REVENUE

The USPTO's earned revenue is derived from the fees collected for patent and trademark products and services.  Fee collections are recognized as earned revenue when the activities to complete the work associated with the fee are completed.  The following table presents the earned revenue for the past four years.

| Earned Revenue (Dollars in Millions) | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| Patent | $   910.1 | $1,004.5 | $1,092.5 | $1,197.8 |
| *Percentage Change in Patent Earned Revenue* | *5.9%* | *10.4%* | *8.8%* | *9.6%* |
| Trademark | 151.3 | 157.8 | 146.5 | 175.0 |
| *Percentage Change in Trademark Earned Revenue* | *(16.5)%* | *4.3%* | *(7.2)%* | *19.5%* |
| Total Earned Revenue | $1,061.4 | $1,162.3 | $1,239.0 | $1,372.8 |
| *Percentage Change in Earned Revenue* | *2.0%* | *9.5%* | *6.6%* | *10.8%* |

Earned revenue totaled $1,372.8 million for FY 2005, an increase of $133.8 million, or 10.8 percent, over FY 2004 earned revenue of $1,239.0 million.  Of revenue earned during FY 2005, $327.5 million related to fee collections that were deferred for revenue recognition in prior fiscal years, $418.8 million related to maintenance fees collected during FY 2005, which were considered earned immediately, $621.0 million related to work performed for fees collected during FY 2005, and $5.5 million that were not fee-related.

## PATENT

Traditionally, the major components of earned revenue derived from patent operations are maintenance fees, filing fees, and issue fees.  These fees account for over 80 percent of total patent income.   The chart on the right depicts the relationship among the most significant patent fee types.



Patent maintenance fees are the largest source of earned revenue by fee type.  As these are recognized immediately as earned revenue, any fluctuations in the rates of renewal have a significant impact on the total earned revenue of the USPTO.  To some extent, renewals recoup costs incurred during the initial patent process.  As shown below, the renewal rates for all three stages of maintenance fees have been increasing modestly over the last four years and the trend indicates that this growth pattern will continue.

| Patent Renewal Rates* | FY 2002 | FY 2003 | FY 2004 | FY 2005[1] |
|---|---|---|---|---|
| First Stage | 85.1% | 86.8% | 91.9% | 83.1% |
| Second Stage | 59.5% | 61.1% | 65.7% | 65.4% |
| Third Stage | 38.4% | 42.9% | 43.8% | 45.0% |

**\* Note:** *The First Stage refers to the end of the 3rd year after the initial patent is issued; the Second Stage refers to the end of the 7th year after the initial patent is issued; and the Third Stage refers to the end of the 11th year after the initial patent is issued.  For example, in FY 2005, 83.1 percent of the patents issued three years ago were renewed, 65.4 percent of the patents issued seven years ago were renewed, and 45.1 percent of the patents issued 11 years ago were renewed.*

[1] *Preliminary data*

Earned filing fee revenue increased from $289.1 million in FY 2004 to $344.9 million in FY 2005, with the number of applications increasing from 378,984 to 409,532 over the same period, increases of 19.3 percent and 8.1 percent, respectively. The FY 2006 President's Budget Request projects an increase of 5.5 percent in patent applications filed beginning in FY 2006 and extending through FY 2010, which will contribute to the continued growth in earned fee revenue.

Earned issue fee revenue decreased from $242.2 million in FY 2004 to $235.9 million in FY 2005, with the number of patents issued decreasing from 187,170 to 165,485 over the same period, decreases of 2.6 percent and 11.6 percent, respectively.  The number of patents issued in FY 2005 temporarily decreased resulting from an enhanced emphasis on quality and a reduction in patent allowance rates.  The FY 2006 President's Budget Request projects that patents issued will increase an average of 10.9 percent each fiscal year through FY 2010.

## TRADEMARK

Trademark fees are comprised of application filing, renewal services, and Trademark Trial and Appeal Board fees. Additional fees are charged for intent-to-use filed applications, as additional requirements must be met for registration. The chart on the right depicts the relationship among the most significant trademark fee types.



### FY 2005 TRADEMARK REVENUE BY FEE TYPE

- Use Based and Intent to Use Applications for Registration
- Other Intent to Use Fees
- Renewal Fees
- Services
- Trademark Trial and Appeal Board

58.1%  13.9%  11.3%  6.8%  9.9%

Trademark application fee revenue increased from $73.7 million in FY 2004 to $101.5 million in FY 2005, with the number of applications increasing from 298,489 to 323,501 over the same period, increases of 37.7 percent and 8.4 percent, respectively. The FY 2006 President's Budget Request projects that trademark applications filed will continue to increase, which will contribute to the continued growth in earned fee revenue.

Trademark registration can be a recurring source of revenue. To some extent, renewal fees recoup costs incurred during the initial examination process. As shown below, the renewal rates for trademarks have remained fairly stable over the last four years, indicating continued earned revenue from this source. Further, in the FY 2006 President's Budget Request, earned revenue from trademark renewals is expected to continue in the future.

| Trademark Renewal Rates | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| Renewals | 29.7% | 29.6% | 28.7% | 23.3% |

**Note:** *the renewals occur every 10th year for trademarks registered after November 15, 1989. For trademarks issued or renewed before November 15, 1989, renewal will occur after the 20th year and the renewal will be for a ten-year period. For example, in FY 2005, 23.3 percent of the trademarks granted ten and 20 years ago were renewed.*

## PROGRAM COSTS

Program costs totaled $1,424.0 million for the year ended September 30, 2005, an increase of $134.8 million, or 10.5 percent, over FY 2004 program costs of $1,289.2 million. The USPTO's most significant program cost is personnel services and benefits, which traditionally comprise over half of USPTO's total program costs. Any significant change or fluctuation in staffing or pay rate directly impacts the change in total program costs from year to year. Total personnel services and benefits costs for the year ended September 30, 2005, were $802.2 million, an increase of $57.0 million, or 7.6 percent, over FY 2004 personnel services and benefits costs of $745.2 million. This change, 42.3 percent of the total increase in program costs, was a result of a 3.7 percent increase in the Federal pay scale, combined with a net increase of 547 personnel, from 6,816 at the end of FY 2004 to 7,363 at the end of FY 2005.



### FY 2005 PROGRAM COSTS

- Personnel Costs
- Rent, Communication, and Utilities
- Printing
- Contractual Services
- Other
- Depreciation
- Allocated Costs

51.0%  6.4%  4.9%  12.6%  2.0%  2.3%  20.8%

The USPTO directs maximum resources to the priority functions of patent and trademark examination. For FY 2005, costs directly attrib-



PROGRAM COSTS (Dollars in Millions)

utable to the Patent and Trademark business areas represent 79.2 percent of total USPTO costs. The remaining costs, representing support costs, are allocated to the business areas using ABC accounting. Allocated costs in FY 2005 appear to increase, however a change in presentation is causing the increase, not an actual increase in cost.

## PATENT

Total costs for the Patent business area increased from $1,145.8 million in FY 2004 to $1,253.1 million for FY 2005, representing an increase of 9.4 percent. The following table presents the major components of Patent costs for the past four years.

| Patent Costs *(Dollars in Millions)* | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| Personnel Costs | $   535.5 | $   566.3 | $   603.6 | $   646.5 |
| Contractual Services | 123.4 | 125.1 | 150.4 | 156.1 |
| Printing and Reproduction | 65.2 | 72.7 | 71.8 | 68.9 |
| Rent, Communications, and Utilities | 60.2 | 62.9 | 76.3 | 82.6 |
| Depreciation, Amortization, or Loss on Asset Disposition | 41.3 | 36.4 | 32.5 | 26.1 |
| Other | 15.5 | 18.8 | 21.3 | 25.7 |
| Direct Costs | 841.1 | 882.2 | 955.9 | 1,005.9 |
| Allocated Costs | 181.2 | 191.9 | 189.9 | 247.2 |
| Total Patent Costs | $ 1,022.3 | $ 1,074.1 | $ 1,145.8 | $ 1,253.1 |
| *Percentage Change in Patent Costs* | *15.8%* | *5.1%* | *6.7%* | *9.4%* |

The USPTO's most significant program costs relate to personnel services, and account for 48.1 percent of the increase in total cost of Patent operations during the past three years. Patent personnel costs for the year ended September 30, 2005, were $646.5 million, an increase of $42.9 million, or 7.1 percent, over FY 2004 personnel costs of $603.6 million. Rent, communications, and utilities, printing and reproduction, and contractual service costs represent 24.5 percent of the Patent program costs for FY 2005. Over the last three years, these costs increased in line with the overall increase in total Patent costs due to additional rental costs for the new USPTO headquarters in Alexandria, and increased spending on IT maintenance and development. In FY 2005, printing costs decreased 4.0 percent, consistent with the decrease in the number of patents issued. In addition, the increases in rental costs are temporary and will begin to level off now that the move to Alexandria has been completed.

Patent costs were spread over four main patent products: utility patents, design patents, plant patents, and PCT patents. Utility patents were further broken down into the technology of the utility patent. The cost percentages presented to the right are based on direct and indirect costs allocated to patent operations and are a function of the volume of applications processed in each product area.

### TRADEMARK

Total costs for the Trademark business unit were largely unchanged from FY 2002 through FY 2004. However, total Trademark costs increased $27.5 million, 19.2 percent, over FY 2004 costs. The following table shows the major components of Trademark costs for that period.



FY 2005 PATENT COST BY PRODUCT

- Utility-Transportation
- Utility-Mechanical
- Utility-Computer and Electronic Commerce
- Utility-Communications
- Utility-Biotechnology
- Utility-Chemical
- Utility-Physics
- Design
- Plant
- PCT
- Other

| Trademark Costs *(Dollars in Millions)* | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| Personnel Costs | $ 72.3 | $ 65.4 | $ 72.6 | $ 80.0 |
| Contractual Services | 18.2 | 19.9 | 22.3 | 23.2 |
| Printing and Reproduction | 2.2 | 2.6 | 1.2 | 0.8 |
| Rent, Communications, and Utilities | 8.7 | 7.5 | 8.9 | 8.4 |
| Depreciation, Amortization, or Loss on Asset Disposition | 3.9 | 4.5 | 4.9 | 6.1 |
| Other | 2.6 | 3.5 | 4.4 | 3.7 |
| Direct Costs | 107.9 | 103.4 | 114.3 | 122.2 |
| Allocated Costs | 30.8 | 28.6 | 29.1 | 48.7 |
| Total Trademark Costs | $ 138.7 | $ 132.0 | $ 143.4 | $ 170.9 |
| *Percentage Change in Total Trademark Costs* | *3.4%* | *(4.8%)* | *8.6%* | *19.2%* |

The most significant program costs relate to personnel services, which represent more than 46 percent of Trademark cost of operations for each of the past four years. These costs have increased $7.7 million, or 23.9 percent, of the increase in total cost of trademark operations during the past three years. Contractual services have increased $5.0 million, which represents 15.5 percent of the increase in total trademark costs over the past three years, primarily attributable to the increase in scanning contracts as the USPTO moves to a fully electronic workplace.

The Intent to Use cost includes costs related to examining both the application and the additional intent to use disclosures. The overall cost percentages presented to the right are based on both direct costs and indirect costs allocated to trademark operations and are a function of the volume of applications processed in each product area.



FY 2005 TRADEMARK COST by PRODUCT

- Intent to Use Marks
- Madrid Protocol
- Use Based Marks
- Renewals
- Trademark Trial and Appeal Board
- Other Services

## BALANCE SHEET AND STATEMENT OF CHANGES IN NET POSITION

At the end of FY 2005, the USPTO's consolidated Balance Sheet presents total assets of $1,409.1 million, total liabilities of $991.3 million, and a net position of $417.8 million.

Total assets increased 28.6 percent over the last three years, resulting largely from the increase in Fund Balance with Treasury. The following table shows the changes in assets during this period.

| Composition of USPTO Assets (Dollars in Millions) | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| Cash | $    9.3 | $   11.4 | $   11.9 | $    8.8 |
| Fund Balance with Treasury | 926.1 | 985.6 | 1,135.2 | 1,240.8 |
| Property, Plant, and Equipment, Net | 119.2 | 117.4 | 137.3 | 148.4 |
| Accounts Receivable and Prepayments | 40.9 | 37.1 | 12.9 | 11.1 |
| Total Assets | $ 1,095.5 | $ 1,151.5 | $ 1,297.3 | $ 1,409.1 |
| *Percentage Change in Total Assets* | *2.1%* | *5.1%* | *12.7%* | *8.6%* |

Fund Balance with Treasury is the single largest asset on the Balance Sheet and represents 88.1 percent of total assets at the end of FY 2005. This asset is comprised of unpaid obligated funds of $403.2 million, temporarily unavailable fees of $516.5 million, unavailable special fund receipts under OBRA of $233.5 million, other funds held on deposit for customers of $81.9 million, and unobligated funds of $5.7 million.

The unavailable special fund receipts and the temporarily unavailable funds require Congressional appropriation before they will be available for USPTO's use. These funds, together with amounts obligated and held on deposit, represent 99.5 percent of the Fund Balance with Treasury.

The other major asset is property, plant, and equipment. The net balance of this asset has increased by $29.2 million during the past three years, with the acquisition values of property, plant, and equipment increasing by $99.1 million. Leasehold improvements at its consolidated headquarters in Alexandria of $68.7 million are expected to provide significant cost savings in the future. In addition, investments in IT software and software in development increased $43.0 million, in conjunction with the enhancement of the existing e-government capabilities in areas such as e-filing, application information retrieval, data and image capture, and web-based search systems. While there has been a decrease in IT equipment of $13.5 million over the past three years, due to additional budgetary resources available for spending during FY 2005, this component of property and equipment increased $4.6 million from FY 2004.

Total liabilities increased from $828.2 million at the end of FY 2004 to $991.3 million at the end of FY 2005, representing an increase of $163.1 million, or 19.7 percent. The following table shows the change in liabilities during the past four years.

| Composition of USPTO Liabilities (Dollars in Millions) | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| Deferred Revenue | $  466.0 | $  504.2 | $  579.6 | $  706.7 |
| Accounts Payable | 74.7 | 80.1 | 77.3 | 101.8 |
| Accrued Payroll, Leave, and Benefits | 68.0 | 75.4 | 83.4 | 90.7 |
| Customer Deposit Accounts | 64.8 | 74.4 | 70.7 | 74.1 |
| Other Liabilities | 11.3 | 14.2 | 17.2 | 18.0 |
| Total Liabilities | $  684.8 | $  748.3 | $  828.2 | $  991.3 |
| *Percentage Change in Total Liabilities* | *15.3%* | *9.3%* | *10.7%* | *19.7%* |

The USPTO's deferred revenue is the largest liability on the Balance Sheet. The liability for deferred revenue is calculated by analyzing the process for completing each service provided. The percent incomplete based on the inventory of pending work is applied to fee collections to estimate the amount for deferred revenue liability.

At the end of FY 2005, deferred revenue liability was $706.7 million, representing an increase of $240.7 million, or 51.7 percent, over the past three years. The deferred revenue liability includes unearned patent and trademark fees, as well as undeposited checks. The unearned patent fees represented 86.6 percent of this liability. The following graph depicts the composition of the deferred revenue liability, in addition to the increase in this liability during each of the past four years.

Deferred revenue at the USPTO is largely impacted by the change in patent and trademark filings, changes in first action pendency rates, and changes in fee rates. From FY 2002 through FY 2004, the percentage increase in deferred revenue is consistent with the percentage increases in first action pendency months. However, in FY 2005, the



percentage increase in first action pendency months was less than the percentage increase in deferred revenue as a result of the increased fees associated with the unearned patent and trademark application filings. The following table depicts the changes in the filings and pendencies during the past four years.

| Filings and Pendencies | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| Patent Filings | 353,394 | 355,418 | 378,984 | 409,532 |
| *Percentage Change in Patent Filings* | *2.5%* | *0.6%* | *6.6%* | *8.1%* |
| | | | | |
| Patent First Action Pendency (months) | 16.7 | 18.3 | 20.2 | 21.1 |
| *Percentage Change in Patent First Action Pendency* | *16.0%* | *9.6%* | *10.4%* | *4.5%* |
| Total Patent Pendency (months) | 24.0 | 26.7 | 27.6 | 29.1 |
| *Percentage Change in Total Patent Pendency* | *(2.8)%* | *11.3%* | *3.4%* | *5.4%* |
| | | | | |
| Trademark Filings | 258,873 | 267,218 | 298,489 | 323,501 |
| *Percentage Change in Trademark Filings* | *(12.7%)* | *3.2%* | *11.7%* | *8.4%* |
| | | | | |
| Trademark First Action Pendency (months) | 4.3 | 5.4 | 6.6 | 6.3 |
| *Percentage Change in Trademark First Action Pendency* | *59.3%* | *25.6%* | *22.2%* | *(4.5%)* |
| Total Trademark Pendency (months) | 19.9 | 19.8 | 19.5 | 19.6 |
| *Percentage Change in Total Trademark Pendency* | *11.8%* | *(0.5%)* | *(1.5%)* | *0.5%* |

Deferred revenue associated with the patent process is expected to further increase. In the FY 2006 President's Budget Request, the number of patent applications filed from FY 2006 through FY 2010 are expected to increase approximately 5.5 percent each year, with first action pendency increasing to 22.2 months in FY 2007 and total pendency increasing to 32.2 months in FY 2008. Once the pendency starts to decrease in FY 2009, patent deferred revenue will likewise decrease. In addition, if the USPTO fee schedule authorized for two years in the Consolidated Appropriations Act of 2005 (Public Law 108-447) is not reauthorized in FY 2007, the USPTO fees will decrease, causing a decrease in the deferred revenue liability.

While the deferred revenue associated with the trademark process has been increasing, estimates included in the FY 2006 President's Budget Request project a decrease in FY 2006 when first action pendency decreases to 5.3 months and total pendency decreases to 18.7 months.

The Statement of Changes in Net Position presents the changes in the financial position of the USPTO due to results of operations and unexpended appropriations. The major components of the movement in net position are the net income or net cost for the year, and the post-retirement costs for USPTO employees. For FY 2004 and prior, the USPTO recognized an imputed financing source and corresponding expense to represent its share of the cost to the federal government of providing pension and post-retirement health and life insurance benefits to all eligible USPTO employees. Beginning in FY 2005, the USPTO is now funding the costs of post-retirement benefits and the pension liabilities, resulting in an expense using earned revenue in the statement of net cost, without an imputed financing source. The change in the net position during the past four years is presented in the following table.

| USPTO Net Position<br>*(Dollars in Millions)* | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| Net Position | $ 410.7 | $ 403.2 | $ 469.1 | $ 417.8 |
| *Percentage Change in Net Position* | *(14.2)%* | *(1.8)%* | *16.3%* | *(10.9)%* |

The decrease in net position from $469.1 million at the end of FY 2004 to $417.8 million at the end of FY 2005, or 10.9 percent, is attributable largely to the results of operations. The significant increase in net position during FY 2004 is attributable largely to reversing the permanent rescission of $75.6 million to a temporarily unavailable reduction in budgetary resources.

## LIMITATIONS

The USPTO has prepared its FY 2005 financial statements in accordance with the requirements of OMB Circular A-136, *Financial Reporting Requirements*, and guidance provided by the Department of Commerce. OMB Circular A-136 incorporates the concepts and standards contained in the Statements of Federal Financial Accounting Concepts (SFFAC) and the Statements of Federal Financial Accounting Standards (SFFAS) recommended by the Federal Accounting Standards Advisory Board (FASAB) and approved by the Secretary of the Treasury, the Director of the OMB, and the Comptroller General.

On October 19, 1999, the American Institute of Certified Public Accountants Council designated the FASAB as the accounting standards-setting body for Federal government entities. Therefore, the SFFAS constitute accounting principles generally accepted in the United States (GAAP) for the Federal government. These concepts and standards have been set by FASAB to help Federal agencies comply with the requirements of the *Chief Financial Officers' Act of 1990*, as amended by the *Government Management Reform Act of 1994*. These two Acts demand financial accountability from Federal agencies and require the integration of accounting, financial management, and cost accounting systems.

The financial data in this report and the financial statements that follow have been prepared from the accounting records of the USPTO in conformity with GAAP for the federal government.  The USPTO's financial statements consist of the Balance Sheet, the Statement of Net Cost, the Statement of Changes in Net Position, the Statement of Budgetary Resources, the Statement of Financing, and the Statement of Cash Flows.  The financial statements were prepared pursuant to the requirements of 31 (United States Code) U.S.C. 3515 (b).  The following limitations apply to the preparation of the financial statements:

- While the statements are prepared from books and records in accordance with the formats prescribed by the OMB, the statements are in addition to the financial reports used to monitor and control budgetary resources, which are prepared from the same books and records.

- The statements should be read with the realization that the USPTO is a component of the U.S. Government, a sovereign entity.  One implication is that unfunded liabilities cannot be liquidated without legislation that provides resources to do so.

In addition, certain information contained in this financial discussion and analysis and in other parts of this Performance and Accountability Report may be deemed forward-looking statements regarding events and financial trends that may affect future operating results and financial position.  Such statements may be identified by words such as "estimate," "project," "plan," "intend," "believe," "expect," "anticipate," or variations or negatives thereof or by similar or comparable words or phrases.  Prospective statements are subject to risks and uncertainties that could cause actual results to differ materially from those expressed in the statements.  Such risks and uncertainties include, but are not limited to, the following: changes in U.S. or international intellectual property laws; changes in U.S. or global economic conditions; the availability, hiring and retention of qualified staff employees; management of patent and trademark growth; Government regulations; disputes with labor organizations; and deployment of new technologies.  The USPTO undertakes no obligation to publicly update these financial statements to reflect events or circumstances after the date hereof, or to reflect the occurrence of unanticipated events.

## MANAGEMENT RESPONSIBILITIES

USPTO management is responsible for the fair presentation of information contained in the principal financial statements, in conformity with GAAP, the requirements of OMB Circular A-136, and guidance provided by The Department of Commerce.  Management is also responsible for the fair presentation of the USPTO's performance measures in accordance with OMB requirements.  The quality of the USPTO's internal control rests with management, as does the responsibility for identifying and complying with pertinent laws and regulations.

# Principal Financial Statements
# and Related Notes





# UNITED STATES PATENT AND TRADEMARK OFFICE
# CONSOLIDATED BALANCE SHEETS

**As of September 30, 2005 and 2004**

| (Dollars in Thousands) | 2005 | 2004 |
|---|---|---|
| **ASSETS** | | |
| Intragovernmental: | | |
|     Fund Balance with Treasury (Note 2) | $ 1,240,798 | $ 1,135,268 |
|     Accounts Receivable | 50 | 35 |
|     Advances and Prepayments | 2,729 | 6,370 |
| Total Intragovernmental | 1,243,577 | 1,141,673 |
| Cash | 8,874 | 11,871 |
| Accounts Receivable, Net | 2,666 | 1,303 |
| Advances and Prepayments | 5,631 | 5,162 |
| Property and Equipment, Net (Note 4) | 148,401 | 137,303 |
| Total Assets | $ 1,409,149 | $ 1,297,312 |
| **LIABILITIES** | | |
| Intragovernmental: | | |
|     Accounts Payable | $ 5,163 | $ 2,220 |
|     Accrued Payroll and Benefits | 5,409 | 4,108 |
|     Accrued Postemployment Compensation | 1,367 | 1,522 |
|     Customer Deposit Accounts (Note 3) | 4,230 | 3,906 |
| Total Intragovernmental | 16,169 | 11,756 |
| Accounts Payable | 96,607 | 75,067 |
| Accrued Payroll and Benefits | 46,221 | 40,365 |
| Accrued Leave | 39,097 | 38,935 |
| Customer Deposit Accounts (Note 3) | 69,844 | 66,863 |
| Patent Cooperation Treaty Account (Note 3) | 9,035 | 8,195 |
| Madrid Protocol Account (Note 3) | 334 | — |
| Deferred Revenue (Note 6) | 706,734 | 579,596 |
| Actuarial Liability (Note 7) | 7,278 | 7,484 |
| Total Liabilities (Note 5) | $ 991,319 | $ 828,261 |
| **NET POSITION** | | |
| Unexpended Appropriations | $ 26 | $ 23 |
| Cumulative Results of Operations | 417,804 | 469,028 |
| Total Net Position | $ 417,830 | $ 469,051 |
| Total Liabilities and Net Position | $ 1,409,149 | $ 1,297,312 |

The accompanying notes are an integral part of these financial statements.

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CONSOLIDATED STATEMENTS OF NET COST

**For the years ended September 30, 2005 and 2004**

| (Dollars in Thousands) | 2005 | 2004 |
|---|---|---|
| **Strategic Goal 1: Enhance Patent Quality and Minimize Processing Time** | | |
| Total Program Cost | $ 1,149,793 | $ 1,062,744 |
| Total Program Earned Revenue | (1,197,781) | (1,092,491) |
| Net Program Income | (47,988) | (29,747) |
| **Strategic Goal 2: Enhance Trademark Quality and Minimize Processing Time** | | |
| Total Program Cost | 149,145 | 126,287 |
| Total Program Earned Revenue | (175,026) | (146,532) |
| Net Program Income | (25,881) | (20,245) |
| **Strategic Goal 3: Create a Flexible Organization Through E-Government and Worldwide Intellectual Property** | | |
| Total Program Cost | 125,090 | 100,150 |
| Net Cost of Operations | $ 51,221 | $ 50,158 |
| **Total Entity** | | |
| Total Program Cost (Notes 11 and 12) | $ 1,424,028 | $ 1,289,181 |
| Total Earned Revenue | (1,372,807) | (1,239,023) |
| Net Cost of Operations (Note 10) | $ 51,221 | $ 50,158 |

The accompanying notes are an integral part of these financial statements.

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CONSOLIDATED STATEMENTS OF CHANGES IN NET POSITION

**For the years ended September 30, 2005 and 2004**

| (Dollars in Thousands) | 2005 | | 2004 | |
| --- | --- | --- | --- | --- |
| | Cumulative Results of Operations | Unexpended Appropriations | Cumulative Results of Operations | Unexpended Appropriations |
| Net Position, Beginning of Year | $ 469,028 | $      23 | $ 403,152 | $      25 |
| Budgetary Financing Sources: | | | | |
|   Appropriations Used | (3) | 3 | 2 | (2) |
|   Other Budgetary Financing Sources (Note 2) | — | — | 75,584 | — |
| Other Financing Sources: | | | | |
|   Imputed Financing (Note 9) | — | — | 40,448 | — |
| Total Financing Sources | (3) | 3 | 116,034 | (2) |
| Net Cost of Operations | (51,221) | — | (50,158) | — |
| Net Change | (51,224) | 3 | 65,876 | (2) |
| Net Position, End of Year | $ 417,804 | $      26 | $ 469,028 | $      23 |

The accompanying notes are an integral part of these financial statements.

# UNITED STATES PATENT AND TRADEMARK OFFICE
# COMBINED STATEMENTS OF BUDGETARY RESOURCES

**For the years ended September 30, 2005 and 2004**

| (Dollars in Thousands) | 2005 | 2004 |
|---|---|---|
| **BUDGETARY RESOURCES** | | |
| Unobligated Balance - Beginning of Year (Note 13) | $ 2,363 | $ 3,540 |
| Spending Authority from Offsetting Collections: | | |
| Earned - Collected | 1,373,808 | 1,247,238 |
| Earned - Customer Receivables and Refund Payables | (52) | (167) |
| Change in Unfilled Customer Orders - Advances Received | 130,458 | 74,649 |
| Total Spending Authority from Offsetting Collections | 1,504,214 | 1,321,720 |
| Actual Recoveries of Prior Year Obligations | 7,543 | 10,362 |
| Temporarily not Available Pursuant to Public Law | — | (175,486) |
| Permanently not Available (Note 2) | — | 75,584 |
| Total Budgetary Resources | $ 1,514,120 | $ 1,235,720 |
| | | |
| **STATUS OF BUDGETARY RESOURCES** | | |
| Obligations Incurred – Reimbursable | $ 1,508,392 | $ 1,233,357 |
| Unobligated Balance Available: | | |
| Realized and Apportioned for Current Year (Note 13) | 2,763 | 1,844 |
| Unobligated Balances not Available - Not Apportioned (Note 13) | 2,965 | 519 |
| Total Status of Budgetary Resources | $ 1,514,120 | $ 1,235,720 |
| | | |
| **RELATIONSHIP OF OBLIGATIONS TO OUTLAYS** | | |
| Obligated Balance, Net, Beginning of Year | $ 304,378 | $ 327,789 |
| Accounts Receivable | 927 | 875 |
| Undelivered Orders (Note 14) | 273,635 | 203,014 |
| Accounts Payable | 128,577 | 100,489 |
| Obligated Balance, Net, End of Year | 403,139 | 304,378 |
| Outlays: | | |
| Disbursements | 1,402,140 | 1,246,573 |
| Collections | (1,504,266) | (1,321,887) |
| Net Collections | $ (102,126) | $ (75,314) |

The accompanying notes are an integral part of these financial statements.

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CONSOLIDATED STATEMENTS OF FINANCING

**For the years ended September 30, 2005 and 2004**

| (Dollars in Thousands) | 2005 | 2004 |
|---|---|---|
| **RESOURCES USED TO FINANCE ACTIVITIES** | | |
| Budgetary Resources Obligated: | | |
| Obligations Incurred | $ 1,508,392 | $ 1,233,357 |
| Spending Authority from Offsetting Collections and Recoveries | (1,511,757) | (1,332,082) |
| Net Obligations | (3,365) | (98,725) |
| Other Resources - Imputed Financing from Cost Absorbed by Others | — | 40,448 |
| Total Resources Used to Finance Activities | (3,365) | (58,277) |
| **RESOURCES USED TO FINANCE ITEMS NOT PART OF THE NET COST OF OPERATIONS** | | |
| Change in Budgetary Resources Obligated for Goods, Services and Benefits Ordered but not yet Provided | (67,450) | 43,765 |
| Resources that Fund Costs Recognized in Prior Periods (Note 13) | (360) | (138) |
| Budgetary Offsetting Collections that do not Affect Net Cost of Operations (Note 13) | 130,458 | 74,649 |
| Resources that Finance the Acquisition of Assets Capitalized on the Balance Sheet | (66,181) | (75,511) |
| Total Resources Used to Finance Items not Part of the Net Cost of Operations | (3,533) | 42,765 |
| **COMPONENTS OF NET COST OF OPERATIONS THAT WILL NOT REQUIRE OR GENERATE RESOURCES IN THE CURRENT PERIOD** | | |
| Components Requiring or Generating Resources in Future Periods: | | |
| Costs that will be Funded by Resources in Future Periods (Note 13) | 3,647 | 2,510 |
| Net (Increase)/Decrease in Revenue Receivables not Generating Resources until Collected | (576) | 7,528 |
| Total Components of Net Cost of Operations that will Require or Generate Resources in Future Periods | 3,071 | 10,038 |
| Components not Requiring or Generating Resources: | | |
| Depreciation, Amortization, or Loss on Asset Dispositions | 55,083 | 55,573 |
| Other Costs that will not Require Resources | (35) | 59 |
| Total Components of Net Cost of Operations that will not Require or Generate Resources | 55,048 | 55,632 |
| Total Components of Net Cost of Operations that will not Require or Generate Resources in the Current Period | 58,119 | 65,670 |
| Net Cost of Operations | $     51,221 | $     50,158 |

The accompanying notes are an integral part of these financial statements.

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CONSOLIDATED STATEMENTS OF CASH FLOWS (INDIRECT METHOD)

**For the years ended September 30, 2005 and 2004**

| (Dollars in Thousands) | 2005 | 2004 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net Cost of Operations | $ (51,221) | $ (50,158) |
| Adjustments Affecting Cash Flow: | | |
| Imputed Financing from Cost Absorbed by Others | — | 40,448 |
| (Increase)/Decrease in Accounts Receivable | (1,378) | 7,553 |
| Decrease in Advances and Prepayments | 3,172 | 16,698 |
| Increase/(Decrease) in Accounts Payable | 24,483 | (2,837) |
| Increase in Accrued Payroll and Benefits | 7,157 | 7,066 |
| Increase in Accrued Leave and Postemployment Benefits | 7 | 842 |
| Increase/(Decrease) in Customer Deposit Accounts | 3,305 | (3,638) |
| Increase in Patent Cooperation Treaty Account | 840 | 2,086 |
| Increase in Madrid Protocol Account | 334 | — |
| Increase in Deferred Revenue | 127,138 | 75,403 |
| (Decrease)/Increase in Actuarial Liability | (206) | 990 |
| Depreciation, Amortization, or Loss on Asset Dispositions | 55,083 | 55,573 |
| Total Adjustments | 219,935 | 200,184 |
| Net Cash Provided by Operating Activities | 168,714 | 150,026 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Purchases of Property and Equipment | (66,181) | (75,511) |
| Net Cash Used in Investing Activities | (66,181) | (75,511) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Rescissions Restored (Note 2) | — | 75,584 |
| Net Cash Provided by Financing Activities | — | 75,584 |
| Net Cash Provided by Operating, Investing, and Financing Activities | $ 102,533 | $ 150,099 |
| Fund Balance with Treasury and Cash, Beginning of Year | $1,147,139 | $ 997,040 |
| Net Cash Provided by Operating, Investing, and Financing Activities | 102,533 | 150,099 |
| Fund Balance with Treasury and Cash, End of Year | $1,249,672 | $1,147,139 |

The accompanying notes are an integral part of these financial statements.

# UNITED STATES PATENT AND TRADEMARK OFFICE
# NOTES TO FINANCIAL STATEMENTS

**As of and for the years ended September 30, 2005 and 2004**

# NOTE 1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

## Reporting Entity

The United States Patent and Trademark Office (USPTO) is an agency of the United States within the U.S. Department of Commerce. The USPTO administers the laws relevant to patents and trademarks and advises the Secretary of Commerce, the President of the United States, and the Administration on patent, trademark, and copyright protection, and trade-related aspects of intellectual property.

These financial statements include the USPTO's two core business activities – granting patents and registering trademarks – that promote the use of intellectual property rights as a means of achieving economic prosperity. These activities give innovators, businesses, and entrepreneurs the protection and encouragement they need to turn their creative ideas into tangible products, and also provide protection for their inventions and trademarks.

These financial statements report the accounts for salaries and expenses (13X1006), special fund receipts (135127), customer deposits from the public (13X6542), customer deposits from other federal agencies (13F3885), Patent Cooperation Treaty collections (13X6538), and Madrid Protocol collections (13X6554) which are under the control of the USPTO. The federal budget classifies the USPTO under the Other Advancement of Commerce (376) budget function. The USPTO does not have custodial responsibility, nor does it have lending or borrowing authority. The USPTO does not transact business among its own operating units, and therefore, no intra-entity eliminations are necessary.

## Basis of Presentation

As required by the Chief Financial Officers' Act of 1990 and 31 U.S.C. 3515 (b), the accompanying financial statements present the financial position, net cost of operations, budgetary resources, and cash flows for the USPTO's core business activities. The books and records of the USPTO serve as the source of this information.

These financial statements were prepared in accordance with accounting principles generally accepted in the U.S. (GAAP) and the form and content for entity financial statements specified by the Office of Management and Budget (OMB) in Circular A-136, *Financial Reporting Requirements*, as well as the accounting policies of the USPTO. Therefore, they may differ from other financial reports submitted pursuant to OMB directives for the purpose of monitoring and controlling the use of the USPTO's budgetary resources. The GAAP for federal entities are the standards prescribed by the Federal Accounting Standards Advisory Board (FASAB), which is the official body for setting the accounting standards of the federal government. There were no changes in GAAP during FY 2005 that affected the financial statements. Certain prior year balances were reclassified to conform with current year presentation.

Throughout these financial statements, assets, liabilities, revenues, and costs have been classified according to the type of entity with which the transactions are associated. Intra-governmental assets and liabilities are those from or to other federal entities. Intra-governmental earned revenues are collections or accruals of revenue from other federal entities and intra-governmental costs are payments or accruals to other federal entities.

## Basis of Accounting

Transactions are recorded on the accrual basis of accounting, as well as on a budgetary basis. Accrual accounting allows for revenue to be recognized when earned and expenses to be recognized when goods or services are received, without regard to the receipt or payment of cash. Budgetary accounting allows for compliance with the requirements for and controls over the use of federal funds. The accompanying financial statements are presented on the accrual basis of accounting.

## Budgets and Budgetary Accounting

Total budgetary resources are primarily comprised of Congressional authority to spend current year fee collections, as well as fees collected in a prior year that were previously temporarily unavailable.  Temporarily unavailable fee collections occur when the Congress does not provide appropriation authority for the USPTO to spend all fees collected during the given fiscal year.

In FY 2005 and FY 2004, the USPTO was appropriated up to $1,554,754 thousand and $1,222,460 thousand for fees collected during each fiscal year, respectively.  During FY 2005, the USPTO collected $57,603 thousand less than the amount appropriated.  In accordance with Public Law 108–447, the USPTO adjusted its spending from fee collections to $1,497,151 thousand.  For FY 2004, the USPTO's fee collections of $1,320,950 thousand exceeded the congressional authority, leaving $98,490 thousand that was not available for spending.

In addition to these annual restrictions, certain USPTO collections of $233,529 thousand were withheld in accordance with the Omnibus Budget Reconciliation Act (OBRA) of 1990, and deposited in a special fund receipt account at the U.S. Department of the Treasury.

The total temporarily unavailable fee collections pursuant to Public Law at the end of FY 2005 are $750,028 thousand.

The USPTO receives an appropriation of Category A funds from OMB, which apportions budgetary resources by fiscal quarter.  The USPTO does not receive any Category B funds, or those exempt from apportionment.

## Use of Estimates

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities as of the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.  Actual results could differ from these estimates.

## Revenue and Other Financing Sources

The USPTO's fee rates are established by law and, consequently, in some instances may not represent full cost or market price.  Since FY 1993, the USPTO funding has been primarily through the collection of user fees.  Fees that are remitted with initial applications and requests for other services are recorded as exchange revenue when received, with an adjustment to defer revenue for services that have not been performed.  All amounts remitted by customers without a request for service are recorded as liabilities in customer deposit accounts until services are ordered.

The USPTO also receives some financial gifts and gifts-in-kind.  All such transactions are included in the consolidated Gifts and Bequests Fund financial statements of the Department of Commerce.  These gifts are not of significant value and are not reflected in the USPTO's financial statements.  Most gifts-in-kind are used for official travel to further attain the USPTO mission and objectives.

## Entity/Non-Entity

Assets that an entity is authorized to use in its operations are termed entity assets, while assets that are held by an entity and are not available for the entity's use are termed non-entity assets.  Most of the USPTO's assets are entity assets and are available to carry out the mission of the USPTO, as appropriated by Congress, with the exception of a portion of the Fund Balance with Treasury, cash, and accounts receivable, as highlighted in Note 3.

## Fund Balance with Treasury

The USPTO deposits revenue in commercial bank accounts maintained by the Treasury's Financial Management Service (FMS).  All moneys maintained in these accounts are transferred to the Federal Reserve Bank on the next business day following the day of deposit.  In addition, many customer deposits are wired directly to the Federal Reserve Bank.  All banking activity is conducted in accordance with the directives issued by the FMS.  Treasury processes all disbursements.

## Accounts Receivable

Most of the USPTO's public accounts receivable balance consists of electronic funds transfer and credit card payments for fees that are in transit and have not been credited to the USPTO's accounts. As of September 30, 2005 and 2004, respectively, $2,244 thousand and $1,015 thousand are in transit due to the lag time between deposits in commercial bank accounts and the confirmation received from Treasury.

The remaining portion of accounts receivable are mainly comprised of amounts due from former employees for the reimbursement of education expenses and other benefits. This balance in accounts receivable remains as a very small portion of the USPTO's assets as the USPTO requires payment prior to the provision of goods or services during the course of its core business activities.

The USPTO recorded a $1 thousand allowance for uncollectible amounts to reduce the gross amount of its employee-related accounts receivable to its net realizable value as of September 30, 2005 and 2004, respectively. The allowance is established for receivables that have been transferred to Treasury. The gross amount of USPTO's employee-related accounts receivable as of September 30, 2005 and 2004 was $423 thousand and $289 thousand, respectively.

## Advances and Prepayments

On occasion, the USPTO prepays amounts in anticipation of receiving future benefits. Although a payment has been made, an expense is not recorded until goods have been received or services have been performed. The USPTO has prepayments and advances with non-governmental, as well as governmental vendors.

Total prepayments and advances to non-governmental vendors as of September 30, 2005 and 2004 were $5,631 thousand and $5,162 thousand, respectively. The largest single prepayment as of September 30, 2005 was $3,261 thousand for an annual operating lease for mass information technology storage space. The USPTO advances include funds to personnel for travel costs, which are expensed after travel has occurred. Travel advances to personnel as of September 30, 2005 were $33 thousand.

Total prepayments and advances to governmental vendors as of September 30, 2005 and 2004 were $2,729 thousand and $6,370 thousand, respectively. The governmental prepayments include the USPTO deposit accounts held with the U.S. Government Printing Office and the U.S. Department of Commerce to facilitate recurring transactions. Deposit accounts held with the U.S. Government Printing Office as of September 30, 2005 were $1,902 thousand. Deposit accounts held with the U.S. Department of Commerce as of September 30, 2005 were $163 thousand.

## Cash

Most of the USPTO's cash balance consists of undeposited checks for fees that were not processed at the Balance Sheet date due to the lag time between receipt and initial review. All such undeposited check amounts are considered to be cash equivalents. As of September 30, 2005 and 2004, the cash balance includes undeposited checks of $8,872 thousand and $11,869 thousand, respectively. Of these balances, $787 thousand and $463 thousand were non-entity Patent Cooperation Treaty Account assets as of September 30, 2005 and 2004, respectively. Cash is also held outside the Treasury to be used as imprest funds. An imprest fund of $2 thousand was held as of September 30, 2005 and 2004.

## Property, Plant, and Equipment, Net

The USPTO's capitalization policies are summarized below:

| Classes of Property, Plant, and Equipment | Capitalization Threshold for Individual Purchases | Capitalization Threshold for Bulk Purchases |
|---|---|---|
| IT Equipment | $25 thousand or greater | $500 thousand or greater |
| Software | $25 thousand or greater | Not applicable |
| Software in Progress | $25 thousand or greater | Not applicable |
| Furniture | $25 thousand or greater | $ 50 thousand or greater |
| Equipment | $25 thousand or greater | $500 thousand or greater |
| Construction in Progress | $25 thousand or greater | Not applicable |
| Leasehold Improvements | $25 thousand or greater | Not applicable |

Contractor costs for developing custom internal use software are capitalized when incurred for the design, coding, and testing of the software.  Software in progress and construction in progress are not amortized until placed in service.

Property, plant, and equipment acquisitions that do not meet the capitalization criteria are expensed upon receipt.

## Injury Compensation

Claims brought by USPTO employees for on-the-job injuries fall under the Federal Employees Compensation Act (FECA) administered by the U.S. Department of Labor (DOL).  The DOL bills each agency annually as its claims are paid, but payment on these bills is deferred approximately two years to allow for funding through the budget process.  As of September 30, 2005, the USPTO had a $1,328 thousand liability for claims paid on its behalf during the benefit period October 1, 2003 through September 30, 2005.  As of September 30, 2004, the USPTO had a $1,449 thousand liability for claims paid on its behalf during the benefit period October 1, 2002 through September 30, 2004.

## Post-employment Compensation

USPTO employees who lose their jobs through no fault of their own may receive unemployment compensation benefits under the unemployment insurance program administered by the DOL.  The DOL bills each agency quarterly as its claims are paid.  As of September 30, 2005 and 2004, the USPTO liability was $39 thousand and $73 thousand, respectively, for estimated claims paid by the DOL on behalf of the USPTO.

## Annual, Sick, and Other Leave

Annual leave and compensatory time are accrued as earned, with the accrual being reduced when leave is taken.  An adjustment is made each fiscal quarter to ensure that the balances in the accrued leave accounts reflect current pay rates.  No portion of this liability has been obligated.  To the extent current or prior year funding is not available to pay for leave earned but not taken, funding will be obtained from future financing sources.  Sick leave and other types of non-vested leave are expensed as used.

Accrued leave as of September 30, 2005 and 2004 was $39,097 thousand and $38,935 thousand, respectively.

## Employee Retirement Systems and Benefits

USPTO employees participate in either the Civil Service Retirement System (CSRS) or the Federal Employees Retirement System (FERS).  The FERS was established by the enactment of Public Law 99-335.  Pursuant to this law, the FERS and Social Security automatically cover most employees hired after December 31, 1983.  Employees who had five years of federal civilian service prior to 1984 and who are rehired after a break in service of more than one year may elect to join the FERS and Social Security system or be placed in the CSRS offset retirement system.

The USPTO's financial statements do not report CSRS or FERS assets, accumulated plan benefits, or liabilities applicable to its employees.  The reporting of such amounts is the responsibility of the U.S. Office of Personnel Management (OPM) who administers the plans.  While the USPTO reported no liability for future payments to employees under these programs, the federal government is liable for future payments to employees through the various agencies administering these programs.  The USPTO financial statements for FY 2005 recognize an expense, which represents the USPTO's share of the costs to the federal government of providing pension, post-retirement health, and post-retirement life insurance benefits to all eligible USPTO employees. Prior to FY 2005, the USPTO did not fully fund the pension and post-retirement health and life insurance benefits of all eligible USPTO employees.  Instead, the USPTO recognized an imputed financing source and corresponding expense to represent its share of the cost to the federal government of providing pension and post-retirement health and life insurance benefits, to all eligible USPTO employees.  The USPTO appropriation for FY 2005 required full funding of the present costs of post-retirement benefits such as the Federal Employees Health Benefit Program (FEHB) and the Federal Employees Group Life Insurance Program (FEGLI), and to fully fund the CSRS and FERS pension liabilities.  While ultimate administration of any post-retirement benefits or retirement system payments will continue to be administered by various federal government agencies, the USPTO is responsible for the payment of the present value associated with these costs calculated using the OPM factors.

For the year ended September 30, 2005, the USPTO made current year contributions equivalent to approximately 7.0 percent and 11.2 percent of the employee's basic pay for those employees covered by CSRS and FERS, respectively, based on OPM cost factors. For the year ended September 30, 2004, the USPTO made contributions equivalent to approximately 7.0 percent and 10.7 percent of the employee's basic pay for those employees covered by CSRS and FERS, respectively, based on OPM cost factors.

All employees are eligible to contribute to a thrift savings plan. For those employees participating in the FERS, a thrift savings plan is automatically established, and the USPTO makes a mandatory contribution to this plan equal to one percent of the employees' compensation. In addition, the USPTO makes matching contributions ranging from one to four percent of the employees' compensation for FERS–eligible employees who contribute to their thrift savings plans. No matching contributions are made to the thrift savings plans for employees participating in the CSRS. Employees participating in the FERS are also covered under the Federal Insurance Contributions Act (FICA), for which the USPTO contributes a matching amount to the Social Security Administration.

### Deferred Revenue

Deferred revenue represents fees that have been received by the USPTO for requested services that have not been substantially completed. Two types of deferred revenue are recorded. The first type results from checks received, with requests for services, which were not yet deposited due to the lag time between receipt and initial review. The second type of deferred revenue relates primarily to fees for applications that have been partially processed. The deferred revenue calculation is a complex accounting estimate, dependent upon numerous business and administrative processes, workloads, and inventories.

### Environmental Cleanup

The USPTO does not have any liabilities for environmental cleanup.

## NOTE 2.  FUND BALANCE WITH TREASURY

As of September 30, 2005 and 2004, Fund Balance with Treasury consisted of the following:

| (Dollars in Thousands) | 2005 | 2004 |
|---|---|---|
| Obligated Balance Not Yet Disbursed | $    403,139 | $    304,378 |
| Unobligated Balance Available | 2,763 | 1,844 |
| Unobligated Balance Unavailable | 752,992 | 750,545 |
| Non-Budgetary Fund Balance with Treasury | 81,904 | 78,501 |
| Total Fund Balance with Treasury | $  1,240,798 | $  1,135,268 |

No discrepancies exist between the Fund Balance reflected in the general ledger and the balance in the Treasury accounts.

As of September 30, 2005 and 2004, the unobligated balance unavailable includes revenue withheld of $233,529 thousand.

During FY 1999, FY 2000, and FY 2002, a total of $75,584 thousand in fees were considered permanently rescinded. In FY 2004, OMB Circular A-11 clarified that rescissions of offsetting collections should now be considered reductions in budgetary resources and should be classified as either permanently or temporarily unavailable. Due to the clarification regarding rescissions and reductions, fee resources previously rescinded as permanently unavailable were restored to the USPTO and recorded as a reduction and classified as temporarily unavailable fee collections in FY 2004.

## NOTE 3.   NON-ENTITY ASSETS

Non-entity assets consist of amounts held on deposit for the convenience of the USPTO customers and fees collected on behalf of the World Intellectual Property Organization (WIPO) and the European Patent Office (EPO).  Customers have the option of maintaining a deposit account at the USPTO to facilitate the order process.  Customers can draw from their deposit account when they place an order and can replenish their deposit account as desired.  Funds maintained in customer deposit accounts are not available for the USPTO use until an order has been placed.  Once an order has been placed, the funds are reclassified to entity funds.  Also, in accordance with the Patent Cooperation Treaty and the Madrid Protocol Implementation Act, the USPTO collects international fees on behalf of the WIPO and the EPO.

| (Dollars in Thousands) | 2005 | 2004 |
|---|---|---|
| Fund Balance with Treasury: | | |
| Intragovernmental Deposit Accounts | $      4,230 | $      3,906 |
| Other Customer Deposit Accounts | 69,092 | 66,863 |
| Patent Cooperation Treaty Account | 8,248 | 7,732 |
| Madrid Protocol Account | 334 | — |
| Total Fund Balance with Treasury | 81,904 | 78,501 |
| Cash: | | |
| Patent Cooperation Treaty Account | 787 | 463 |
| Accounts Receivable: | | |
| Other Customer Deposit Accounts | 752 | — |
| Total Non-Entity Assets | $     83,443 | $     78,964 |

# NOTE 4.  PROPERTY, PLANT, AND EQUIPMENT, NET

As of September 30, 2005, property, plant, and equipment, net consisted of the following:

**(Dollars in Thousands)**

| Class of Fixed Asset | Depreciation/ Amortization Method | Service Life (Years) | Acquisition Value | Accumulated Depreciation/ Amortization | Net Book Value |
|---|---|---|---|---|---|
| IT Equipment | SL | 3-5 | $ 197,719 | $ 163,412 | $ 34,307 |
| Software | SL | 3-5 | 179,566 | 147,274 | 32,292 |
| Software in Progress | — | — | 6,099 | — | 6,099 |
| Furniture | SL | 5 | 15,318 | 5,691 | 9,627 |
| Equipment | SL | 3-5 | 10,150 | 7,989 | 2,161 |
| Leasehold Improvements | SL | 5-20 | 68,724 | 4,809 | 63,915 |
| Total Fixed Assets | | | $ 477,576 | $ 329,175 | $ 148,401 |

As of September 30, 2004, property, plant, and equipment, net consisted of the following:

**(Dollars in Thousands)**

| Class of Fixed Asset | Depreciation/ Amortization Method | Service Life (Years) | Acquisition Value | Accumulated Depreciation/ Amortization | Net Book Value |
|---|---|---|---|---|---|
| IT Equipment | SL | 3-5 | $ 193,116 | $ 163,050 | $ 30,066 |
| Software | SL | 3-5 | 173,341 | 127,564 | 45,777 |
| Software in Progress | — | — | 5,893 | — | 5,893 |
| Furniture | SL | 5 | 10,541 | 6,312 | 4,229 |
| Equipment | SL | 3-5 | 10,798 | 10,094 | 704 |
| Construction in Progress | — | — | 25,196 | — | 25,196 |
| Leasehold Improvements | SL | 20 | 25,810 | 372 | 25,438 |
| Total Fixed Assets | | | $ 444,695 | $ 307,392 | $ 137,303 |

# NOTE 5.  LIABILITIES

The USPTO records liabilities for amounts that are likely to be paid as the direct result of events that have already occurred.  The USPTO considers liabilities covered by three types of resources: realized budgetary resources; unrealized budgetary resources that become available without further Congressional action; and cash and Fund Balance with Treasury.  Realized budgetary resources include obligated balances funding existing liabilities and unobligated balances as of September 30, 2005.  Unrealized budgetary resources are amounts that were not available for spending through September 30, 2005, but become available for spending on October 1, 2005 once apportioned by the OMB.  In addition, cash and Fund Balance with Treasury cover liabilities that will never require the use of a budgetary resource.  These liabilities consist of deposit accounts, refunds payable to customers for fee overpayments, undeposited collections, and amounts collected by the USPTO on behalf of other organizations.

Liabilities not covered by budgetary resources include Accrued Post-employment Compensation, Accrued Leave, Deferred Revenue, and Actuarial Liability.  Although future appropriations to fund these liabilities are probable and anticipated, Congressional action is needed before budgetary resources can be provided.

As of September 30, 2005 and 2004, liabilities covered and not covered by budgetary resources were as follows:

| (Dollars in Thousands) | 2005 | 2004 |
|---|---|---|
| **Liabilities Covered by Resources** | | |
| Intragovernmental: | | |
| Accounts Payable | $   2,797 | $   2,220 |
| Accrued Payroll and Benefits | 5,409 | 4,108 |
| Customer Deposit Accounts | 4,230 | 3,906 |
| Total Intragovernmental | 12,436 | 10,234 |
| Accounts Payable | 96,487 | 75,067 |
| Accrued Payroll and Benefits | 24,862 | 20,004 |
| Customer Deposit Accounts | 69,844 | 66,863 |
| Patent Cooperation Treaty Account | 9,035 | 8,195 |
| Madrid Protocol | 334 | — |
| Deferred Revenue | 13,812 | 13,769 |
| Total Liabilities Covered by Resources | $ 226,810 | $ 194,132 |
| **Liabilities Not Covered by Resources** | | |
| Intragovernmental: | | |
| Accounts Payable | 2,366 | — |
| Accrued Post-employment Compensation | $   1,367 | $   1,522 |
| Total Intragovernmental | 3,733 | 1,522 |
| Accounts Payable | 120 | — |
| Accrued Payroll and Benefits | 21,359 | 20,361 |
| Accrued Leave | 39,097 | 38,935 |
| Deferred Revenue | 692,922 | 565,827 |
| Actuarial Liability | 7,278 | 7,484 |
| Total Liabilities Not Covered by Resources | $ 764,509 | $ 634,129 |
| Total Liabilities | $ 991,319 | $ 828,261 |

# NOTE 6.  DEFERRED REVENUE

As of September 30, 2005, deferred revenue consisted of the following:

| (Dollars in Thousands) | Patent | Trademark | Total |
|---|---|---|---|
| Unearned Fees | $ 611,778 | $ 86,871 | $ 698,649 |
| Undeposited Checks | 7,125 | 960 | 8,085 |
| **Total Deferred Revenue** | **$ 618,903** | **$ 87,831** | **$ 706,734** |

As of September 30, 2004, deferred revenue consisted of the following:

| (Dollars in Thousands) | Patent | Trademark | Total |
|---|---|---|---|
| Unearned Fees | $ 491,004 | $ 77,186 | $ 568,190 |
| Undeposited Checks | 10,231 | 1,175 | 11,406 |
| **Total Deferred Revenue** | **$ 501,235** | **$ 78,361** | **$ 579,596** |

# NOTE 7.  ACTUARIAL LIABILITY

The FECA provides income and medical cost protection to covered federal civilian employees injured on the job and for those who have contracted a work-related occupational disease, and beneficiaries of employees whose death is attributable to a job-related injury or occupational disease.  Claims incurred for benefits under the FECA for the USPTO's employees are administered by the DOL and are paid ultimately by the USPTO.

The DOL estimated the future workers compensation liability by applying actuarial procedures developed to estimate the liability for FECA benefits.  The actuarial liability estimates for FECA benefits include the expected liability for death, disability, medical, and miscellaneous costs for approved compensation cases, plus a component for incurred but not reported claims.  The actuarial liability is updated annually.

The DOL method of determining the liability uses historical benefit payment patterns for a specific incurred period to predict the ultimate payments for that period.  Consistent with past practice, these projected annual benefit payments have been discounted to present value using the OMB's economic assumptions for ten-year Treasury notes and bonds.   Interest rate assumptions utilized for discounting were as follows:

| 2005 | 2004 |
|---|---|
| 4.53% in year 1, | 4.88% in year 1, |
| 5.02% in year 2, | 5.24% in year 2, |
| and thereafter | and thereafter |

Based on information provided by the DOL, the Department of Commerce estimated the USPTO's liability as of September 30, 2005 and 2004 was $7,278 thousand and $7,484 thousand, respectively.

# NOTE 8.  LEASES

### Operating Leases:

The GSA negotiates long-term office space leases and levies rent charges, paid by the USPTO, approximate to commercial rental rates.  These operating lease agreements for the USPTO's office buildings expire at various dates between FY 2006 and FY 2023.  During the years ended September 30, 2005 and 2004, the USPTO paid $95,613 thousand and $74,521 thousand, respectively, to the GSA for rent.

Under existing commitments, the future minimum lease payments as of September 30, 2005 are as follows:

| Fiscal Year | (Dollars in Thousands) |
|---|---|
| 2006 | $   61,759 |
| 2007 | 60,068 |
| 2008 | 56,675 |
| 2009 | 56,343 |
| 2010 | 56,068 |
| Thereafter | 718,292 |
| Total Future Minimum Lease Payments | $ 1,009,205 |

The commitments shown above relate primarily to the operating lease for the USPTO headquarters in Alexandria, Virginia, beginning in FY 2004 and extending to FY 2023.  The operating lease commitments for the USPTO offices in Crystal City, Virginia, will expire in FY 2008.

# NOTE 9.  POST-EMPLOYMENT BENEFITS

As of September 30, 2005 and 2004, the post-employment benefit expenses were as follows:

| (Dollars in Thousands) | 2005 | | 2004 | |
|---|---|---|---|---|
| | Funded | Funded | Imputed | Total |
| CSRS | $   16,622 | $   6,826 | $   10,738 | $   17,564 |
| FERS | 52,566 | 45,637 | 2,121 | 47,758 |
| FEHB | 32,319 | — | 27,504 | 27,504 |
| FEGLI | 105 | — | 85 | 85 |
| FICA | 36,463 | 33,840 | — | 33,840 |
| Total Cost | $ 138,075 | $ 86,303 | $ 40,448 | $ 126,751 |

# NOTE 10.  INTRAGOVERNMENTAL COSTS AND EXCHANGE REVENUE

Total intragovernmental costs and exchange revenue, by Strategic Goal, for the years ended September 30, 2005 and 2004 were as follows:

| (Dollars in Thousands) | 2005 | | |
|---|---|---|---|
| | **Patent** | **Trademark** | **Total** |
| **Strategic Goal 1: Enhance Patent Quality and Minimize Processing Time** | | | |
| Intragovernmental Gross Cost | $   240,733 | $      — | $   240,733 |
| Gross Cost with the Public | 909,060 | — | 909,060 |
| Total Program Cost | 1,149,793 | — | 1,149,793 |
| Intragovernmental Earned Revenue | (5,869) | — | (5,869) |
| Earned Revenue from the Public | (1,191,912) | — | (1,191,912) |
| Total Program Earned Revenue | (1,197,781) | — | (1,197,781) |
| Net Program Income | $   (47,988) | $      — | $   (47,988) |
| **Strategic Goal 2: Enhance Trademark Quality and Minimize Processing Time** | | | |
| Intragovernmental Gross Cost | $      — | $   31,227 | $   31,227 |
| Gross Cost with the Public | — | 117,918 | 117,918 |
| Total Program Cost | — | 149,145 | 149,145 |
| Intragovernmental Earned Revenue | — | (239) | (239) |
| Earned Revenue from the Public | — | (174,787) | (174,787) |
| Total Program Earned Revenue | — | (175,026) | (175,026) |
| Net Program Income | $      — | $   (25,881) | $   (25,881) |
| **Strategic Goal 3: Create a Flexible Organization Through E-Government and Worldwide Intellectual Property** | | | |
| Intragovernmental Gross Cost | $   21,635 | $   4,555 | $   26,190 |
| Gross Cost with the Public | 81,699 | 17,201 | 98,900 |
| Total Program Cost | 103,334 | 21,756 | 125,090 |
| Net Cost/(Income) from Operations | $   55,346 | $   (4,125) | $   51,221 |
| **Total Entity** | | | |
| Total Program Cost (Notes 11 and 12) | $ 1,253,127 | $ 170,901 | $ 1,424,028 |
| Total Earned Revenue | (1,197,781) | (175,026) | (1,372,807) |
| Net Cost/(Income) of Operations | $   55,346 | $   (4,125) | $   51,221 |

| (Dollars in Thousands) | | 2004 | |
|---|---|---|---|
| | Patent | Trademark | Total |
| **Strategic Goal 1: Enhance Patent** **Quality and Minimize Processing Time** | | | |
| Intragovernmental Gross Cost | $    203,312 | $      — | $    203,312 |
| Gross Cost with the Public | 859,432 | — | 859,432 |
| Total Program Cost | 1,062,744 | — | 1,062,744 |
| Intragovernmental Earned Revenue | (5,218) | — | (5,218) |
| Earned Revenue from the Public | (1,087,273) | — | (1,087,273) |
| Total Program Earned Revenue | (1,092,491) | — | (1,092,491) |
| Net Program Income | $    (29,747) | $      — | $    (29,747) |
| **Strategic Goal 2: Enhance Trademark** **Quality and Minimize Processing Time** | | | |
| Intragovernmental Gross Cost | $      — | $    24,160 | $    24,160 |
| Gross Cost with the Public | — | 102,127 | 102,127 |
| Total Program Cost | — | 126,287 | 126,287 |
| Intragovernmental Earned Revenue | — | (209) | (209) |
| Earned Revenue from the Public | — | (146,323) | (146,323) |
| Total Program Earned Revenue | — | (146,532) | (146,532) |
| Net Program Income | $      — | $    (20,245) | $    (20,245) |
| **Strategic Goal 3: Create a Flexible Organization** **Through E-Government and Worldwide Intellectual Property** | | | |
| Intragovernmental Gross Cost | $    15,888 | $    3,272 | $    19,160 |
| Gross Cost with the Public | 67,159 | 13,831 | 80,990 |
| Total Program Cost | 83,047 | 17,103 | 100,150 |
| Net Cost/(Income) from Operations | $    53,300 | $    (3,142) | $    50,158 |
| **Total Entity** | | | |
| Total Program Cost (Notes 11 and 12) | $ 1,145,791 | $    143,390 | $ 1,289,181 |
| Total Earned Revenue | (1,092,491) | (146,532) | (1,239,023) |
| Net Cost/(Income) of Operations | $    53,300 | $    (3,142) | $    50,158 |

Intragovernmental expenses relate to the source of the goods or services, not the classification of the related revenue.

# NOTE 11.   PROGRAM COSTS

Program costs consist of both costs related directly to the individual business lines and overall support costs allocated to the business lines.  All costs are assigned to specific programs.  Total program or operating costs for the years ended September 30, 2005 and 2004 by cost category were as follows:

| (Dollars in Thousands) | 2005 | | | 2004 |
|---|---|---|---|---|
| | Direct | Allocated | Total | Total |
| Personnel Services and Benefits | $  726,540 | $  75,673 | $  802,213 | $  745,152 |
| Travel and Transportation | 663 | 5,649 | 6,312 | 5,425 |
| Rent, Communications, and Utilities | 90,993 | 37,363 | 128,356 | 106,210 |
| Printing and Reproduction | 69,695 | 388 | 70,083 | 73,159 |
| Contractual Services | 179,337 | 114,505 | 293,842 | 262,523 |
| Training | 2,727 | 1,154 | 3,881 | 1,266 |
| Maintenance and Repairs | 11,038 | 31,896 | 42,934 | 20,834 |
| Supplies and Materials | 7,234 | 1,578 | 8,812 | 7,609 |
| Equipment not Capitalized | 7,691 | 4,821 | 12,512 | 11,459 |
| Insurance Claims and Indemnities | — | — | — | (29) |
| Depreciation, Amortization, or Loss on Asset Dispositions | 32,208 | 22,875 | 55,083 | 55,573 |
| Total Program Costs | $ 1,128,126 | $   295,902 | $ 1,424,028 | $ 1,289,181 |

The unfunded portion of personnel services and benefits for the years ended September 30, 2005 and 2004 was $801 thousand and $2,372 thousand, respectively.

## NOTE 12.  PROGRAM COSTS BY CATEGORY AND RESPONSIBILITY SEGMENT

The program costs for the years ended September 30, 2005 and 2004 by cost category and business line were as follows:

| (Dollars in Thousands) | 2005 | | | 2004 | | |
|---|---|---|---|---|---|---|
| | Patent | Trademark | Total | Patent | Trademark | Total |
| **Direct Costs** | | | | | | |
| Personnel Services and Benefits | $  646,517 | $  80,023 | $  726,540 | $  603,616 | $  72,571 | $  676,187 |
| Travel and Transportation | 597 | 66 | 663 | 364 | 64 | 428 |
| Rent, Communications, and Utilities | 82,578 | 8,415 | 90,993 | 76,313 | 8,906 | 85,219 |
| Printing and Reproduction | 68,888 | 807 | 69,695 | 71,757 | 1,197 | 72,954 |
| Contractual Services | 156,111 | 23,226 | 179,337 | 150,376 | 22,267 | 172,643 |
| Training | 2,518 | 209 | 2,727 | 639 | 30 | 669 |
| Maintenance and Repairs | 8,923 | 2,115 | 11,038 | 8,048 | 2,029 | 10,077 |
| Supplies and Materials | 6,826 | 408 | 7,234 | 6,776 | 418 | 7,194 |
| Equipment not Capitalized | 6,799 | 892 | 7,691 | 5,585 | 1,846 | 7,431 |
| Insurance Claims and Indemnities | — | — | — | (31) | — | (31) |
| Depreciation, Amortization, or Loss on | | | | | | |
| Asset Dispositions | 26,131 | 6,077 | 32,208 | 32,468 | 4,926 | 37,394 |
| Subtotal Direct Costs | 1,005,888 | 122,238 | 1,128,126 | 955,911 | 114,254 | 1,070,165 |
| | | | | | | |
| **Allocated Costs** | | | | | | |
| Automation | 106,530 | 19,593 | 126,123 | 82,854 | 14,333 | 97,187 |
| Resource Management | 140,709 | 29,070 | 169,779 | 107,026 | 14,803 | 121,829 |
| Subtotal Allocated Costs | 247,239 | 48,663 | 295,902 | 189,880 | 29,136 | 219,016 |
| | | | | | | |
| Total Program Costs | $ 1,253,127 | $  170,901 | $ 1,424,028 | $ 1,145,791 | $  143,390 | $ 1,289,181 |

The unfunded portion of personnel services and benefits for the years ended September 30, 2005 and 2004 was $801 thousand and $2,372 thousand, respectively.

# NOTE 13.    FUTURE FUNDING REQUIREMENTS

The Consolidated Statement of Financing provides information on the total resources used by an agency, both those received through budgetary resources and those received through other means during the reporting period. The statement reconciles these resources with the net cost of operations by (1) removing resources that do not fund net cost of operations and (2) including components of net cost of operations that did not generate or use resources during the year.

The relationship between the amounts reported as liabilities not covered by budgetary resources as shown in Note 5, Liabilities, and the amounts reported as components requiring or generating resources in future periods on the Statement of Financing were analyzed. The differences are primarily due to budgetary offsetting collections that do not affect net cost of operations, which consists of the change in unfilled customer orders with advance.

For the year ended September 30, 2005, future funding requirements were as follows:

| **(Dollars in Thousands)** | |
| --- | --- |
| Liabilities not Covered by Budgetary Resources as of 9/30/2004 | $  634,129 |
| Unobligated Balance Used to Cover Unfunded Liabilities | 2,363 |
| Unfunded Liabilities as of 9/30/2004 | $  636,492 |
| Liabilities not Covered by Budgetary Resources as of 9/30/2005 | $  764,509 |
| Unobligated Balance Used to Cover Unfunded Liabilities | 5,728 |
| Unfunded Liabilities as of 9/30/2005 | $  770,237 |
| Increase in Unfunded Liabilities | $  133,745 |
| Costs that will be Funded by Resources in Future Periods | $    3,647 |
| Resources that Fund Costs Recognized in Prior Periods | (360) |
| Budgetary Offsetting Collections that do not Affect Net Cost of Operations | 130,458 |
| Increase in Future Funding Requirements | $  133,745 |

For the year ended September 30, 2004, future funding requirements were as follows:

**(Dollars in Thousands)**

| | |
|---|---:|
| Liabilities not Covered by Budgetary Resources as of 9/30/2003 | $ 555,931 |
| Unobligated Balance Used to Cover Unfunded Liabilities | 3,540 |
| **Unfunded Liabilities as of 9/30/2003** | **$ 559,471** |
| Liabilities not Covered by Budgetary Resources as of 9/30/2004 | $ 634,129 |
| Unobligated Balance Used to Cover Unfunded Liabilities | 2,363 |
| **Unfunded Liabilities as of 9/30/2004** | **$ 636,492** |
| **Increase in Unfunded Liabilities** | **$ 77,021** |
| Costs that will be Funded by Resources in Future Periods | $ 2,510 |
| Resources that Fund Costs Recognized in Prior Periods | (138) |
| Budgetary Offsetting Collections that do not Affect Net Cost of Operations | 74,649 |
| **Increase in Future Funding Requirements** | **$ 77,021** |

# NOTE 14. COMMITMENTS AND CONTINGENCIES

## Commitments

In addition to the future lease commitments discussed in Note 8, the USPTO is obligated for the purchase of goods and services that have been ordered, but not yet received. Total undelivered orders for all of the USPTO's activities were $281,995 thousand and $214,546 thousand as of September 30, 2005 and 2004, respectively. Of these amounts, $273,635 thousand and $203,014 thousand, respectively, were unpaid.

## Contingencies

The USPTO is a party to various routine administrative proceedings, legal actions, and claims brought by or against it, including threatened or pending litigation involving labor relations claims, some of which may ultimately result in settlements or decisions against the federal government. As of September 30, 2005, management expects it is reasonably possible that three cases involving employment or labor relations claims may ultimately result in an adverse decision and require payment of awards or damages where the outcomes are expected to be less than $825 thousand. In addition, a discrimination class action suit outcome is considered reasonably possible, but a range of outcomes cannot be determined. In September 2005, a grievance was ruled in favor of a terminated employee. The employee has returned to work. The USPTO will be liable for lost wages offset by outside earnings. Information is not available to prepare an estimate, however the liability will not exceed $350 thousand.

Additionally, the USPTO may be required to make contributions to the Judgment Fund. For the years ended September 30, 2005 and 2004, there were no payments made on the USPTO's behalf from the Judgment Fund.

# Required Supplementary Information





# UNITED STATES PATENT AND TRADEMARK OFFICE
# REQUIRED SUPPLEMENTARY INFORMATION

### As of September 30, 2005 and 2004

**Intragovernmental Assets:**

| (Dollars in Thousands) | | | 2005 | | 2004 |
|---|---|---|---|---|---|
| Trading Partner | Fund Balance with Treasury | Accounts Receivable,Net | Advances and Prepayments | Total | Total |
| 04 U.S. Government Printing Office | $ - | $ - | $ 1,912 | $ 1,912 | $ 2,238 |
| 12 Department of Agriculture | - | 50 | - | 50 | - |
| 13 Department of Commerce | - | - | 817 | 817 | 494 |
| 20 Department of Treasury | 1,240,798 | - | - | 1,240,798 | 1,135,268 |
| 47 General Services Administration | - | - | - | - | 3,638 |
| 68 Environmental Protection Agency | - | - | - | - | 35 |
| Total | $ 1,240,798 | $ 50 | $ 2,729 | $ 1,243,577 | $ 1,141,673 |

**Intragovernmental Liabilities:**

| (Dollars in Thousands) | | | | 2005 | | 2004 |
|---|---|---|---|---|---|---|
| Trading Partner | Accounts Payable | Accrued Payroll and Benefits | Accrued Post-employment Compensation | Customer Deposit Accounts | Total | Total |
| 03 Library of Congress | $ 210 | $ - | $ - | $ - | $ 210 | $ 205 |
| 04 Government Printing Office | 275 | - | - | - | 275 | 105 |
| 11 Executive Office of the President | 211 | - | - | - | 211 | 220 |
| 12 Department of Agriculture | 17 | - | - | 161 | 178 | 229 |
| 13 Department of Commerce | 114 | - | - | 131 | 245 | 211 |
| 14 Department of Interior | 1 | - | - | 67 | 68 | 31 |
| 15 Department of Justice | 3 | - | - | 11 | 14 | 272 |
| 16 Department of Labor | 52 | - | 1,367 | - | 1,419 | 1,574 |
| 17 Department of the Navy | - | - | - | 1,565 | 1,565 | 1,536 |
| 18 United States Postal Service | - | - | - | 13 | 13 | 30 |
| 19 Department of State | 328 | - | - | - | 328 | 63 |
| 20 Department of Treasury | 4 | - | - | - | 4 | 7 |
| 21 Department of the Army | - | - | - | 633 | 633 | 543 |
| 24 Office of Personnel Management | 219 | 3,878 | - | - | 4,097 | 3,298 |
| 36 Department of Veterans Affairs | 95 | - | - | - | 95 | 193 |
| 45 U.S. Equal Employment Opportunity Commission | 1 | - | - | - | 1 | 2 |
| 47 General Services Administration | 2,834 | - | - | - | 2,834 | 208 |
| 57 Department of the Air Force | - | - | - | 301 | 301 | 199 |
| 68 Environmental Protection Agency | 51 | - | - | 82 | 133 | 159 |
| 69 Department of Transportation | - | - | - | 3 | 3 | 4 |
| 75 Health and Human Services | 528 | - | - | 34 | 562 | 219 |
| 80 National Aeronautics and Space Administration | - | - | - | 333 | 333 | 220 |
| 88 National Archives and Records Administration | 167 | - | - | - | 167 | 21 |
| 89 Department of Energy | - | - | - | 858 | 858 | 988 |
| 96 U.S. Army Corps of Engineers | - | - | - | 9 | 9 | 4 |
| 97 Department of Defense | 53 | - | - | 29 | 82 | 36 |
| 99 Treasury General Fund | - | 1,531 | - | - | 1,531 | 1,179 |
| Total | $ 5,163 | $ 5,409 | $ 1,367 | $ 4,230 | $ 16,169 | $ 11,756 |

**Intragovernmental Earned Revenue:**
**(Dollars in Thousands)**

| Trading Partner | 2005 | 2004 |
|---|---:|---:|
| 12  Department of Agriculture | $     342 | $     285 |
| 13  Department of Commerce | 61 | 54 |
| 14  Department of Interior | 7 | 12 |
| 15  Department of Justice | 8 | 5 |
| 17  Department of the Navy | 1,505 | 1,367 |
| 18  United States Postal Service | 150 | 136 |
| 19  Department of State | 350 | 106 |
| 21  Department of the Army | 846 | 831 |
| 24  Office of Personnel Management | 104 | - |
| 47  General Services Administration | 141 | 98 |
| 49  National Science Foundation | 37 | 31 |
| 57  Department of the Air Force | 341 | 275 |
| 68  Environmental Protection Agency | 94 | 192 |
| 69  Department of Transportation | - | 4 |
| 75  Department of Health and Human Services | 4 | 2 |
| 80  National Aeronautics and Space Administration | 617 | 587 |
| 89  Department of Energy | 1,345 | 1,293 |
| 96  U.S. Army Corps of Engineers | 71 | 81 |
| 97  Department of Defense | 85 | 68 |
| Total | $   6,108 | $   5,427 |

**Gross Costs that Generated Intragovernmental Earned Revenue:**
**(Dollars in Thousands)**

| Budget Functional Classification | 2005 | 2004 |
|---|---:|---:|
| 376   Other Advancement of Commerce | $   6,272 | $   5,647 |
| Total | $   6,272 | $   5,647 |

The USPTO has not deferred to a future period maintenance on the property and equipment presented on the Balance Sheet as of September 30, 2005 and 2004.

# Independent
# Auditors' Report







**UNITED STATES DEPARTMENT OF COMMERCE**
**The Inspector General**
Washington, D.C. 20230

NOV - 7 2005

MEMORANDUM FOR:     Jon W. Dudas
                                      Under Secretary of Commerce for Intellectual Property and
                                          Director of the U.S. Patent and Trademark Office

FROM:                      Johnnie E. Frazier

SUBJECT:                  *USPTO's FY 2005 Financial Statements*
                                   Audit Report No. FSD-17434-6-0001

I am pleased to provide you with the attached audit report, which presents an unqualified opinion
on the U.S. Patent and Trademark Office's FY2005 financial statements.  The audit results
indicate that the USPTO has established an internal control structure that facilitates the
preparation of reliable financial and performance information.  We commend the USPTO for the
noteworthy accomplishment of attaining an unqualified opinion for the 13th consecutive year,
and for meeting the fiscal year 2005 accelerated reporting deadline.

My office contracted with the independent public accounting firm of KPMG LLP (KPMG) to
perform the audit of the USPTO's financial statements as of and for the year ended
September 30, 2005.  The contract required that the audit be done in accordance with
U.S. generally accepted government auditing standards and OMB Bulletin 01-02, *Audit
Requirements for Federal Financial Statements.*

In its audit of the USPTO, KPMG found that:
- the financial statements were fairly presented, in all material respects and in conformity with
  U.S. generally accepted accounting principles;
- there were no material weaknesses in internal control, as defined on page 2 of the audit
  report;
- there were no instances in which the USPTO's financial management systems did not
  substantially comply with the requirements of the Federal Financial Management
  Improvement Act of 1996, and no instances of noncompliance with other laws and
  regulations tested.

My office defined the audit's scope and oversaw its performance and delivery.  We reviewed
KPMG's report and related documentation, and made inquiries of its representatives.  Our
review disclosed no instances where KPMG did not comply, in all material respects, with
U.S. generally accepted government auditing standards.  However, our review, as differentiated
from an audit in accordance with U.S. generally accepted government auditing standards, was



not intended to enable us to express, and we do not express, an opinion on the USPTO's financial statements, conclusions about the effectiveness of internal control, or conclusions on compliance with laws and regulations. KPMG is responsible for the attached audit report dated November 2, 2005, and the conclusions expressed in the report.

If you wish to discuss the contents of this report, please call me on (202) 482-4661, or Edward Blansitt, Deputy Inspector General, on (202) 482-3516. We appreciate the cooperation and courtesies the USPTO extended to KPMG and my staff during the audit.

Attachment

cc:    Howard N. Goldberg
       Acting Chief Financial Officer
       U.S. Patent and Trademark Office

       Otto J. Wolff
       Chief Financial Officer and Assistant Secretary for Administration
       Department of Commerce

2

# EXHIBIT  1

## (Part 3 of 3)



**KPMG LLP**
2001 M Street, NW
Washington, DC 20036

**Independent Auditors' Report**

Office of Inspector General, U.S. Department of Commerce and
Under Secretary of Commerce for Intellectual Property and
    Director of the U.S. Patent and Trademark Office:

We have audited the accompanying consolidated balance sheets of the U.S. Patent and Trademark Office (USPTO), an agency within the U.S. Department of Commerce, as of September 30, 2005 and 2004, and the related consolidated statements of net cost, changes in net position, financing, and cash flows, and the combined statement of budgetary resources, for the years then ended. The objective of our audits was to express an opinion on the fair presentation of these financial statements. In connection with our audits, we also considered the USPTO's internal control over financial reporting and tested the USPTO's compliance with certain provisions of applicable laws, regulations, and contracts that could have a direct and material effect on these financial statements.

**SUMMARY**

As stated in our opinion on the financial statements, we concluded that the USPTO's financial statements as of and for the years ended September 30, 2005 and 2004, are presented fairly, in all material respects, in conformity with accounting principles generally accepted in the United States of America.

Our consideration of internal control over financial reporting would not necessarily disclose all matters in the internal control over financial reporting that might be material weaknesses under standards issued by the American Institute of Certified Public Accountants. However, we noted no matters involving the internal control and its operation that we considered to be material weaknesses.

The results of our tests of compliance with certain provisions of laws, regulations, and contracts disclosed no instances of noncompliance or other matters that are required to be reported herein under *Government Auditing Standards*, issued by the Comptroller General of the United States, and Office of Management and Budget (OMB) Bulletin No. 01-02, *Audit Requirements for Federal Financial Statements*.

The following sections discuss our opinion on the USPTO's financial statements, our consideration of the USPTO's internal control over financial reporting, our tests of the USPTO's compliance with certain provisions of applicable laws, regulations, and contracts, and management's and our responsibilities.

**OPINION ON THE FINANCIAL STATEMENTS**

We have audited the accompanying consolidated balance sheets of the U.S. Patent and Trademark Office (USPTO) as of September 30, 2005 and 2004, and the related consolidated statements of net cost, changes in net position, financing, and cash flows, and the combined statement of budgetary resources, for the years then ended.

KPMG LLP. KPMG LLP, a U.S. limited liability partnership, is
a member of KPMG International, a Swiss association.



In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the USPTO as of September 30, 2005 and 2004, and its net costs, changes in net position, budgetary resources, and reconciliation of net costs to budgetary obligations, and cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America.

The information in Management's Discussion and Analysis and Required Supplementary Information sections is not a required part of the financial statements, but is supplementary information required by accounting principles generally accepted in the United States of America or OMB Circular A-136, *Financial Reporting Requirements*, Part A, *Form and Content of the Performance and Accountability Report*. We have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of this information. However, we did not audit this information and, accordingly, we express no opinion on it.

Our audits were conducted for the purpose of forming an opinion on the financial statements taken as a whole. The Management and Performance Challenges Identified by the Inspector General and Other Accompanying Information on pages 107 to 148, are an integral part of the USPTO's *Fiscal Year 2005 Performance and Accountability Report*. However, this information is not a required part of the financial statements and is presented for purposes of additional analysis. This information has not been subjected to the auditing procedures applied in the audits of the financial statements and, accordingly, we express no opinion on it.

## INTERNAL CONTROL OVER FINANCIAL REPORTING

Our consideration of internal control over financial reporting would not necessarily disclose all matters in the internal control over financial reporting that might be material weaknesses under standards issued by the American Institute of Certified Public Accountants. Material weaknesses are conditions in which the design or operation of one or more of the internal control components does not reduce to a relatively low level the risk that misstatements, in amounts that would be material in relation to the financial statements being audited, may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions. However, we noted no matters involving the internal control and its operation that we considered to be material weaknesses as defined above.

* * * * *

However, we noted other matters that we reported to the management of the USPTO in two separate letters addressing information technology and other matters, respectively.

## COMPLIANCE AND OTHER MATTERS

The results of our tests of compliance with certain provisions of laws, regulations, and contracts, as described in the Responsibilities section of this report, exclusive of those referred to in *Federal Financial Management Improvement Act of 1996* (FFMIA), disclosed no instances of noncompliance or other matters that are required to be reported herein under *Government Auditing Standards* or OMB Bulletin No. 01-02.

The results of our tests of FFMIA disclosed no instances in which the USPTO's financial management systems did not substantially comply with the three requirements discussed in the Responsibilities section of this report.

2



**RESPONSIBILITIES**

**Management's Responsibilities**

The *Government Management Reform Act of 1994*, *Accountability of Tax Dollars Act,* and *Government Corporation Control Act* require agencies to report annually to Congress on their financial status and any other information needed to fairly present their financial position and results of operations. To meet these reporting requirements, the USPTO prepares and submits financial statements in accordance with Part A of OMB Circular A-136.

Management is responsible for the financial statements, including:

- Preparing the financial statements in conformity with accounting principles generally accepted in the United States of America;

- Preparing the Management's Discussion and Analysis (including the performance measures), and Required Supplementary Information;

- Establishing and maintaining internal controls over financial reporting; and

- Complying with laws, regulations, and contracts, including FFMIA.

In fulfilling this responsibility, management is required to make estimates and judgments to assess the expected benefits and related costs of internal control policies. Because of inherent limitations in internal control, misstatements due to error or fraud may nevertheless occur and not be detected.

**Auditors' Responsibilities**

Our responsibility is to express an opinion on the fiscal year 2005 and 2004 financial statements of the USPTO based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America, the standards applicable to financial audits contained in *Government Auditing Standards*, and OMB Bulletin No. 01-02. Those standards and OMB Bulletin No. 01-02 require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the USPTO's internal control over financial reporting. Accordingly, we express no such opinion.

An audit also includes:

- Examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements;

- Assessing the accounting principles used and significant estimates made by management; and

- Evaluating the overall financial statement presentation.

We believe that our audits provide a reasonable basis for our opinion.

In planning and performing our fiscal year 2005 audit, we considered the USPTO's internal control over financial reporting by obtaining an understanding of the USPTO's internal control, determining whether internal controls had been placed in operation, assessing control risk, and performing tests of controls in order to determine our auditing procedures for the purpose of expressing our opinion on the financial statements. We limited our internal control testing to those controls necessary to achieve the objectives

3



described in *Government Auditing Standards* and OMB Bulletin No. 01-02. We did not test all internal controls relevant to operating objectives as broadly defined by the *Federal Managers' Financial Integrity Act of 1982*. The objective of our audit was not to provide assurance on the USPTO's internal control over financial reporting. Consequently, we do not provide an opinion thereon.

As required by OMB Bulletin No. 01-02, in our fiscal year 2005 audit, with respect to internal control related to performance measures determined by management to be key and reported in the Management's Discussion and Analysis and Performance sections, we obtained an understanding of the design of significant internal controls relating to the existence and completeness assertions. Our procedures were not designed to provide assurance on internal control over reported performance measures and, accordingly, we do not provide an opinion thereon.

As part of obtaining reasonable assurance about whether the USPTO's fiscal year 2005 financial statements are free of material misstatement, we performed tests of the USPTO's compliance with certain provisions of laws, regulations, and contracts noncompliance with which could have a direct and material effect on the determination of financial statement amounts, and certain provisions of other laws and regulations specified in OMB Bulletin No. 01-02, including certain provisions referred to in FFMIA. We limited our tests of compliance to the provisions described in the preceding sentence, and we did not test compliance with all laws, regulations, and contracts applicable to the USPTO. However, providing an opinion on compliance with laws, regulations, and contracts was not an objective of our audit and, accordingly, we do not express such an opinion.

Under OMB Bulletin No. 01-02 and FFMIA, we are required to report whether the USPTO's financial management systems substantially comply with (1) Federal financial management systems requirements, (2) applicable Federal accounting standards, and (3) the United States Government Standard General Ledger at the transaction level. To meet this requirement, we performed tests of compliance with FFMIA Section 803(a) requirements.

**DISTRIBUTION**

This report is intended solely for the information and use of the USPTO's management, the U.S. Department of Commerce's Office of Inspector General, OMB, the Government Accountability Office, and the U.S. Congress and is not intended to be and should not be used by anyone other than these specified parties.



November 2, 2005

4



# Management and Performance Challenges Identified by the Inspector General





**INSPECTOR GENERAL'S STATEMENT SUMMARIZING THE MAJOR MANAGEMENT AND PERFORMANCE CHALLENGES FACING THE UNITED STATES PATENT AND TRADEMARK OFFICE**

Jon W. Dudas

Under Secretary of Commerce for Intellectual Property

Director of the United States Patent and Trademark Office

**W**e are providing the management challenges for the United States Patent and Trademark Office (PTO) in accordance with the provisions of the Reports Consolidation Act of 2000 (PL. 106-531). Detailed information about our work is available on our website at: *http://www.oig.doc.gov/*.

### Enhance the U.S. Patent and Trademark Office's Ability to Manage and Operate Its Own Processes

Our work at USPTO continues to focus on critical aspects of its functioning as a performance-based organization as the agency implements budget, procurement, and personnel operations that provide the flexibility to adapt to changing market forces and meet the needs of customers. Our previous work at USPTO assessed patent examiner production goals, performance appraisal plans and awards, the agency's move to its new headquarters complex, and reports of improper personnel practices. (See September 2004 Semiannual Report to Congress, pages 38–40.)

This latter issue has been long-standing. Since 1999 we have received repeated complaints that management of USPTO's Office of Human Resources (OHR) has allowed or encouraged unfair personnel practices and activities that undermine the integrity of that office and of USPTO in general. Our work in response to the complaints confirmed numerous problems. Resolution of these issues is particularly critical: USPTO has received authority to hire hundreds of examiners. It must have an effective HR operation that adheres to federal regulations, is guided by sound policies and procedures, and affords all employees the rights and protections required by law.

During this semiannual period, we reemphasized this point to senior Department and USPTO officials, noting several issues identified at USPTO that remain unresolved. These include the need to uphold merit system principles, establish human resource policies and procedures to guide decision-making, and ensure those policies and procedures are followed. In addition, the agency's HR staff needs appropriate training in the Standards of Ethical Conduct for Employees of the Executive Branch. It is imperative that USPTO bring stability to its human resources operation and ensure that its employees have the appropriate skills and experience to perform the jobs to which they are assigned.

To its credit, the bureau has taken action to address the problems OIG found in the past. In early 2005, the Office of General Counsel conducted an ethics training course for USPTO's human resources department. Subsequently, USPTO split the position of chief financial officer and chief administrative officer into two positions, each with its own organization, and hired experienced human resources professionals to be OHR director and deputy director, rather than continuing to rely on detailing other staff to those positions. USPTO also created a Comprehensive Human Capital Improvement Plan intended to address long-standing problems in human resources.

While we are pleased that USPTO has been receptive to our recommendations and has implemented numerous changes, the problems we identified are serious and long-standing. The actions PTO has taken to date are strong steps in the right direction, but the ultimate resolution of these issues will require the sustained commitment of senior management.

Johnnie E. Frazier
Inspector General

# Other Accompanying Information





# THE NATURE OF THE TRAINING PROVIDED TO USPTO EXAMINERS

**A**chieving organizational excellence demands a high performance workforce that delivers high quality work products and provides customer service excellence. Training is a critical component in achieving consistently high quality products and services.

Patent examiners and Trademark examining attorneys received extensive legal, technical and automation training in FY 2005. The USPTO has a comprehensive training program for new patent examiners and trademark examining attorneys, embedding a well-established curriculum including initial legal training, automation training and training in examination practice and procedure. Automation training is provided to all examiners on an as-needed basis; more than 260 automation classes were conducted on Patent examination tools.  New technology-specific legal and technical training was conducted throughout the examining operations. This specific training either focuses on practices particular to a technology or was developed to address training needs identified through Patent and Trademark examination reviews or staff requests.

The USPTO training staff works one-on-one with the Patent and Trademark business units to address specific training concerns and serve as consultants to design specific internal programs to fit the education needs of each business unit. Training is reviewed and evaluated on an ongoing basis to ensure it is up-to-date and that coursework reflects developments and changes that have taken place in the industry.  In FY 2005, the USPTO continued to expand training opportunities by developing additional computer based training and instructional videos.

In FY 2005 in the Trademark organization, data gathered from the results of quality reviews were analyzed and used to prepare the content of online e-learning training materials for trademark examining attorneys. Seven e-learning modules have been developed in Trademarks.

- Concurrent User Applications (released)

- Section 2(d) - Likelihood of Confusion - Weak and Diluted Marks (released)

- Section 2(a): Scandalous and Disparaging Marks (released)

- Amendments to Goods and Services - Are They Within The Scope? (released)

- Section 2(d) - Likelihood of Confusion - Relatedness of Goods and Services: A General Framework (completed, not released)

- Section 2(d) - Likelihood of Confusion - Relatedness of Goods and Services: Evidence (completed, not released)

- Section 2(d) - Likelihood of Confusion - Relatedness of Goods and Services: Food and Beverages Goods and Services (completed, not released)

Reviewers continue to gather data regarding dozens of examination issues on each file they review.  In FY 2005, the Patent organization developed a database for the management of review findings that will provide managers with ready access to review results to better identify training needs and assist individual examiners in gaining enhanced skills and improving quality.

| PATENT EXAMINER TRAINING | |
|---|---|
| **Procedural Training** – Mandatory for all first year examiners | Patent Examiner Initial Training and Introduction to Practice and Procedures<br><br>Standardized training is provided to new patent examiners to teach them the basic skills and knowledge of the patent process, and practices and procedures such that they will be able to successfully examine a patent application.  The examiner will also be able to provide an initial report to their supervisor on what is the claimed, as well as the disclosed invention contained in the application so as to permit him or her to perform a prior art search.  The number of courses offered each year is based on the projected number of new examiners entering the patent business unit. |
| **Legal Training** – Mandatory for all first year examiners | Practice and Procedures Lectures covering the following topics:<br>■ "Novelty" Requirements<br>■ "Non-Obviousness" Requirements<br>■ "Utility" Requirements<br>■ Restriction Practice<br>■ Unity of Invention<br>■ Double Patenting<br>■ Allowance and Issue<br>■ Appeals |
| **Continuing Education** – Courses are for students from all Technology Centers, some taught by TC personnel, some modified to include TC specific examples | ■ Review of Recent Court of Appeals for the Federal Circuit Decisions<br>■ Claim Interpretation<br>■ Update on Rule Changes<br>■ Rule Changes – Strategic Plan Rule Package<br>■ Federal Circuit Decisions Affecting USPTO Practice: Key Cases of the Past Year<br>■ Search Strategy |
| **Legal Training** – Technology Center Level courses taught by TC personnel, some developed within the TCs | Examples include:<br>■ 101 Training<br>■ 102/103 Training<br>■ Obviousness Type Double Patenting |
| **Legal Training** – Legal Courses | ■ Patent Law & Evidence |
| **Examiner Technical Training (Technology Center Focused)** | ■ Technology Fairs<br>■ Biotechnology<br>■ Computer Software and Hardware<br>■ Optics, Semiconductor, Electrical Engineering<br>■ Communication Technology<br>■ Service Oriented Architecture (SOA)<br>■ Knowledge Management<br>■ Modern Processor Design<br>■ Understanding Mobile Internet<br>■ Understanding Emerging Wireless Technologies |

## PATENT EXAMINER TRAINING *Continued*

| | |
|---|---|
| **Non-Duty Technical Training Program** | Examples:<br>■ Mathematical Methods for Physics |
| **Automation Training**<br><br>*All first year examiners are provided mandatory initial automation training.* | Examples:<br>IFW Classes<br>■ IFW for Examiners (eDAN)<br>■ IFW for Technical Support Staff (MADRAS)<br>■ IFW for Coordinating Committee<br>■ IFW Messaging for Supervisory Patent Examiners<br>■ IFW Refresher Course<br><br>Non-IFW Classes<br>■ Classification Data System Desktop Training<br>■ ChemDraw<br>■ Examiner Automated Search System (EAST) 1.3:  New Features<br>■ EAST and Bibliographic Retrieval System:  The Fundamentals<br>■ Office Action Correspondence System (OACS) 1.3:  New Features<br>■ OACS  Basics<br>■ OACS for Non-Typists<br>■ OACS:  Creating Personal Forms<br>■ Chemical Searching for Non-chemists<br>■ West:  Refresher<br>■ Microsoft® PowerPoint<br>■ Microsoft® Outlook<br>■ PALMExpo Overview<br><br>TC-Focused Classes<br>■ EAST Databases<br>■ EAST:  Automated Searching for Design Examiners<br>■ EAST and Optical Character Recognition<br>■ OACS Basics for Design Examiners<br>■ Non-Patent Literature (NPL) Web Resources in Your Art Area<br>■ Classification and Security Review<br>■ Obviousness Type Double Patenting<br>■ Means Plus Function Claims (35 USC § 112) |
| **Management Training** | ■ Review of Recent Court of Appeals for the Federal Circuit Decisions<br>■ Claim Interpretation<br>■ Update on Rule Changes |

## TRADEMARK EXAMINING ATTORNEY TRAINING

| | |
|---|---|
| **Trademark Organization Training and Learning**<br><br>**Legal Training** – mandatory for all first year trademark-examining attorneys. | This course provides new trademark attorneys with basic knowledge of the Federal Trademark Act, examination procedures and automated search tools. Lectures and Activities cover the following topics:<br><br>■ Trademark Law Overview<br>■ Refusals under Section 2(d) of Trademark Act (Likelihood of Confusion)<br>■ Refusals under Section 2(e)(1) of Trademark Act (Mere Descriptiveness/Deceptively Misdescriptive)<br>■ Refusals under Section 2(e)(2) of Trademark Act (Geographically Descriptive)<br>■ Refusals under Section 2(e)(3) of Trademark Act (Geographically Deceptively Misdescriptive)<br>■ Refusals under Section 2(e)(4) of Trademark Act (Primarily Merely Surname)<br>■ Refusals under Section 2(e)(5) of the Trademark Act (Functionality)<br>■ Requirements for Intent-to-Use Applications<br>■ Requirements for Use-Based Applications<br>■ Specimens and Use-Based Refusals<br>■ Requirements for Applications filed under Section 44 of the Trademark Act<br>■ Madrid Protocol Practice - Requirements for Applications filed under Section 66(a) of the Trademark Act<br>■ Identification and Classification of Goods and Services Practice<br>■ Legal Writing<br>■ Drawing Requirements<br>■ Options Practice – Section 2(f) of Trademark Act and Supplemental Register<br>■ Disclaimer Requirements<br>■ Evidence Practice<br>■ Refusals under Sections 2(a), (b) and (c) of Trademark Act<br>■ Legal Research<br>■ Ex Parte Appeal Practice Before the Trademark Trial and Appeal Board |
| **Automation Training** | ■ PTOnet System and Applications<br>■ X-Search Automated Trademark Search System<br>■ FAST – First Action System for Trademarks |

## FISCAL YEAR 2005 USPTO WORKLOAD TABLES

**Index of Tables**                                                                                              **Page**

Table 1      Summary of Patent Examining Activities                                                        118

Table 2      Patent Applications Filed                                                                      119

Table 3      Patent Applications Pending Prior to Allowance                                                120

Table 4      Patent Pendency  Statistics                                                                    121

Table 5      Summary of Total Pending Patent Applications                                                  122

Table 6      Patents Issued                                                                                 123

Table 7      Patent Applications Filed by Residents of the United States                                   124

Table 8      Patents Issued to Residents of the United States                                              125

Table 9      United States Patent Applications Filed by Residents of Foreign Countries                     126

Table 10     Patents Issued by the United States to Residents of Foreign Countries                         128

Table 11     Statutory Invention Registrations (SIRs) Published                                            129

Table 12     United States Government Agency Patents                                                       130

Table 13a    Ex Parte Reexamination                                                                        131

Table 13b    Inter Partes Reexamination                                                                    131

Table 14     Summary of Contested Patent Cases                                                             132

Table 15     Summary of Trademark Examining Activities                                                     133

Table 16     Trademark Applications Filed for Registration and Renewal and Trademark Affidavits Filed      134

Table 17     Summary of Pending Trademark Applications                                                     135

Table 18     Trademarks Registered, Renewed, and Published Under Section 12(C)                             136

Table 19     Trademark Applications Filed by Residents of the United States                                137

Table 20     Trademarks Registered to Residents of the United States                                       138

Table 21     Trademark Applications Filed by Residents of Foreign Countries                                139

Table 22     Trademarks Registered to Residents of Foreign Countries                                       141

Table 23     Summary of Contested Trademark Cases                                                          143

Table 24     Actions on Petitions to the Commissioner of Patents and Trademarks                            144

Table 25     Cases in Litigation                                                                           145

Table 26     Patent Classification Activity                                                                146

Table 27     Scientific and Technical Information Center Activity                                          147

Table 28     End of Year Personnel                                                                         148

**TABLE 1**

**SUMMARY OF PATENT EXAMINING ACTIVITIES**
*(As of September 30 of each fiscal year)*

| PATENT EXAMINING ACTIVITY | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|
| **Applications filed, total[1]** | **344,717** | **353,394** | **355,418** | **378,984** | **409,532** |
| Utility [2] | 324,211 | 331,580 | 331,729 | 353,319 | 381,797 |
| Reissue | 956 | 974 | 938 | 996 | 1,143 |
| Plant | 914 | 1,134 | 785 | 1,212 | 1,288 |
| Design | 18,636 | 19,706 | 21,966 | 23,457 | 25,304 |
| **Provisional Applications Filed[1,3]** | **86,123** | **89,537** | **92,517** | **102,268** | **111,753** |
| **First actions** | | | | | |
| Design | 17,748 | 19,029 | 19,013 | 17,328 | 20,108 |
| Utility, Plant, and Reissue | 241,770 | 275,054 | 283,111 | 288,315 | 297,287 |
| PCT/Chapter | 17,972 | 19,460 | 23,277 | 17,935 | 22,795 |
| **Patent application disposals, total** | **257,467** | **279,297** | **303,635** | **304,921** | **298,838** |
| **Allowed patent applications, total** | **183,394** | **189,191** | **205,879** | **195,611** | **182,254** |
| Design | 16,526 | 17,377 | 17,596 | 16,262 | 18,161 |
| Utility, Plant, and Reissue | 166,868 | 171,814 | 188,283 | 179,349 | 164,093 |
| **Abandoned, total** | **74,014** | **90,092** | **97,745** | **109,295** | **116,564** |
| Design | 1,448 | 1,675 | 1,569 | 1,471 | 1,332 |
| Utility, Plant, and Reissue | 72,566 | 88,417 | 96,176 | 107,824 | 115,232 |
| **Statutory invention registration disposals, total** | **59** | **14** | **11** | **15** | **20** |
| **PCT/Chapter II examinations completed** | **18,859** | **16,456** | **21,005** | **19,439** | **12,594** |
| **Applications Published[4]** | **25,359** | **169,729** | **243,007** | **248,561** | **291,221** |
| **Patents issued[5]** | **187,822** | **177,317** | **189,597** | **187,170** | **165,485** |
| Utility | 169,576 | 160,843 | 171,500 | 169,296 | 151,079 |
| Reissue | 504 | 466 | 394 | 343 | 195 |
| Plant | 563 | 912 | 1,178 | 998 | 816 |
| Design | 17,179 | 15,096 | 16,525 | 16,533 | 13,395 |
| Pendency time of average patent application[6] | 24.7 | 24.0 | 26.7 | 27.6 | 29.1 |
| Reexamination certificates issued | 287 | 200 | 193 | 138 | 223 |
| PCT international applications received by USPTO as receiving office | 43,322 | 42,889 | 42,969 | 45,396 | 46,926 |
| National requirements received by USPTO as designated/elected office | 26,821 | 29,846 | 32,753 | 37,173 | 39,385 |
| Patents renewed under Public Law (P.L.) 102-204 [7] (Preliminary) | 205,117 | 194,143 | 253,475 | 269,815 | 268,935 |
| Patents expired under P.L. 102-204 [7] (Preliminary) | 49,077 | 53,724 | 57,770 | 63,552 | 67,534 |

[1]  *FY 2004 data has been updated with final end of year numbers.*

[2]  *Utility patents include chemical, electrical and mechanical applications.*

[3]  *Provisional applications provided for in P.L. 103-465.*

[4]  *Eighteen-month publication of patent applications provided for in the American Inventors Protection Act of 1999, P.L. 106-113.*

[5]  *Excludes withdrawn numbers.*

[6]  *Average time (in months) between filing and issuance or abandonment of utility, plant, and reissue applications. This average does not include design patents.*

[7]  *The provisions of P.L. 102-204 regarding the renewal of patents superceded P.L. 96-517 and P.L. 97-247.*

| TABLE 2 | \multicolumn{5}{c}{PATENT APPLICATIONS FILED (FY 1985 - FY 2005)} |

| Year | Utility | Design | Plant | Reissue | Total |
|------|---------|--------|-------|---------|-------|
| 1985 | 115,893 | 9,504 | 244 | 290 | 125,931 |
| 1986 | 120,988 | 9,792 | 291 | 332 | 131,403 |
| 1987 | 125,677 | 10,766 | 364 | 366 | 137,173 |
| 1988 | 136,253 | 11,114 | 377 | 439 | 148,183 |
| 1989 | 150,418 | 11,975 | 418 | 495 | 163,306 |
| 1990 | 162,708 | 11,140 | 395 | 468 | 174,711 |
| 1991 | 166,765 | 10,368 | 414 | 536 | 178,083 |
| 1992 | 171,623 | 12,907 | 335 | 581 | 185,446 |
| 1993 | 173,619 | 13,546 | 362 | 572 | 188,099 |
| 1994 | 185,087 | 15,431 | 430 | 606 | 201,554 |
| 1995 | 220,141 | 15,375 | 516 | 647 | 236,679 |
| 1996 | 189,922 | 15,160 | 557 | 637 | 206,276 |
| 1997 | 219,486 | 16,272 | 680 | 607 | 237,045 |
| 1998 | 238,850 | 16,576 | 658 | 582 | 256,666 |
| 1999 | 259,618 | 17,227 | 759 | 664 | 278,268 |
| 2000 | 291,653 | 18,563 | 786 | 805 | 311,807 |
| 2001 | 324,211 | 18,636 | 914 | 956 | 344,717 |
| 2002 | 331,580 | 19,706 | 1,134 | 974 | 353,394 |
| 2003 | 331,729 | 21,966 | 785 | 938 | 355,418 |
| 2004[1] | 353,319 | 23,457 | 1,212 | 996 | 378,984 |
| **2005** | **381,797** | **25,304** | **1,288** | **1,143** | **409,532** |

[1]  *Revised to reflect final FY 2004 data.*

| **TABLE 3** | PATENT APPLICATIONS PENDING PRIOR TO ALLOWANCE[1] (FY 1985 - FY 2005) | |
|---|---|---|
| Year | Awaiting action by examiner | Total applications pending[2] |
| 1985 | 90,648 | 215,512 |
| 1986 | 80,547 | 207,774 |
| 1987 | 65,010 | 209,911 |
| 1988 | 75,678 | 215,280 |
| 1989 | 92,377 | 222,755 |
| 1990 | 104,179 | 244,964 |
| 1991 | 104,086 | 254,507 |
| 1992 | 112,201 | 269,596 |
| 1993 | 99,904 | 244,646 |
| 1994 | 107,824 | 261,249 |
| 1995 | 124,275 | 298,522 |
| 1996 | 139,943 | 303,720 |
| 1997 | 112,430 | 275,295 |
| 1998 | 224,446 | 379,484 |
| 1999 | 243,207 | 414,837 |
| 2000 | 308,056 | 485,129 |
| 2001 | 355,779 | 542,007 |
| 2002 | 433,691 | 636,530 |
| 2003 | 471,382 | 674,691 |
| 2004 | 528,685 | 756,604 |
| **2005** | **611,114** | **885,002** |

[1] Includes patents pending at end of period indicated, and includes utility, reissue, plant, and design applications. Does not include allowed applications.

[2] Applications under examination, including those in preexamination processing.

| TABLE 4 | PATENT PENDENCY STATISTICS (FY 2005) | | |
|---|---|---|---|
| **UPR Pendency Statistics by Technology Center (in months)** | | **Average First Action Pendency** | **Total Average Pendency** |
| Total UPR Pendency | | | |
| Tech Center 1600 - Biotechnology & Organic Chemistry | | 23.0 | 32.3 |
| Tech Center 1700 - Chemical & Materials Engineering | | 19.7 | 29.7 |
| Tech Center 2100 - Computer Architecture, Software & Information Security | | 32.7 | 43.5 |
| Tech Center 2600 - Communications | | 30.5 | 42.3 |
| Tech Center 2800 - Semiconductor, Electrical, Optical Systems & Components | | 14.5 | 24.9 |
| Tech Center 3600 - Transportation, Construction, Agriculture, & Electronic Commerce | | 18.4 | 26.9 |
| Tech Center 3700 - Mechanical Engineering, Manufacturing & Products | | 18.3 | 26.3 |
| | | | |
| Pendency is calculated based on the most recent filing date. | | | |

| TABLE 5 | SUMMARY OF TOTAL PENDING PATENT APPLICATIONS (As of September 30, 2005) | | |
|---|---|---|---|
| **Stage of processing** | **Utility, plant and reissue applications** | **Design applications** | **Total patent applications** |
| **Pending patent applications, total** | **931,958** | **38,098** | **970,056** |
| **In preexamination processing, total** | **74,254** | **3,021** | **77,275** |
| **Under examination, total** | **782,415** | **24,964** | **807,379** |
| Undocketed | 159,652 | 4,326 | 163,978 |
| Awaiting first action by examiner | 352,674 | 17,187 | 369,861 |
| Rejected, awaiting response by applicant | 191,486 | 2,731 | 194,217 |
| Amended, awaiting action by examiner | 63,572 | 619 | 64,191 |
| In interference | 361 | 1 | 362 |
| On appeal, and other [1] | 14,670 | 100 | 14,770 |
| **In postexamination processing, total** | **75,289** | **10,113** | **85,402** |
| Awaiting issue fee | 37,819 | 4,128 | 41,947 |
| Awaiting printing [2] | 34,396 | 5,984 | 40,380 |
| D-10s (secret cases in condition for allowance) | 3,074 | 1 | 3,075 |

[1]  Includes cases on appeal and undergoing petitions.
[2]  Includes withdrawn cases.

| TABLE 6 | PATENTS ISSUED (FY 1985 - FY 2005) | | | | |
|---|---|---|---|---|---|
| **Year** | **Utility [1]** | **Design** | **Plant** | **Reissue** | **Total** |
| 1985 | 69,667 | 5,058 | 277 | 300 | 75,302 |
| 1986 | 71,301 | 5,202 | 227 | 263 | 76,993 |
| 1987 | 82,141 | 6,158 | 240 | 254 | 88,793 |
| 1988 | 77,317 | 5,740 | 283 | 244 | 83,584 |
| 1989 | 95,831 | 5,844 | 728 | 309 | 102,712 |
| 1990 | 88,974 | 7,176 | 295 | 282 | 96,727 |
| 1991 | 91,822 | 9,386 | 318 | 334 | 101,860 |
| 1992 | 99,405 | 9,612 | 336 | 375 | 109,728 |
| 1993 | 96,676 | 9,946 | 408 | 302 | 107,332 |
| 1994 | 101,270 | 11,138 | 513 | 347 | 113,268 |
| 1995 | 101,895 | 11,662 | 390 | 294 | 114,241 |
| 1996 | 104,900 | 11,346 | 338 | 291 | 116,875 |
| 1997 | 111,979 | 10,331 | 400 | 267 | 122,977 |
| 1998 | 139,298 | 14,420 | 577 | 284 | 154,579 |
| 1999 | 142,856 | 15,480 | 437 | 393 | 159,166 |
| 2000 | 164,490 | 16,719 | 453 | 561 | 182,223 |
| 2001 | 169,576 | 17,179 | 563 | 504 | 187,822 |
| 2002 | 160,843 | 15,096 | 912 | 466 | 177,317 |
| 2003 | 171,500 | 16,525 | 1,178 | 394 | 189,597 |
| 2004 | 169,296 | 16,533 | 998 | 343 | 187,170 |
| **2005** | **151,079** | **13,395** | **816** | **195** | **165,485** |

[1] *Includes chemical, electrical, and mechanical applications.*

| TABLE 7 | PATENT APPLICATIONS FILED BY RESIDENTS OF THE UNITED STATES[1] (FY 2005) | | | | |
| --- | --- | --- | --- | --- | --- |
| *(PRELIMINARY FOR FY 2005)[2]* | | | | | |
| **State/Territory** | **No. for 2005** | **State/Territory** | **No. for 2005** | **State/Territory** | **No. for 2005** |
| **Total** | **225,152** | Kentucky | 1,105 | Oklahoma | 1,005 |
| | | Louisiana | 724 | Oregon | 4,595 |
| Alabama | 828 | Maine | 326 | Pennsylvania | 6,359 |
| Alaska | 88 | Maryland | 3,196 | Rhode Island | 653 |
| Arizona | 3,794 | Massachusetts | 9,159 | South Carolina | 1,156 |
| Arkansas | 363 | Michigan | 7,217 | South Dakota | 164 |
| California | 48,568 | Minnesota | 6,379 | Tennessee | 1,921 |
| Colorado | 4,445 | Mississippi | 327 | Texas | 12,951 |
| Connecticut | 3,583 | Missouri | 1,865 | Utah | 1,822 |
| Delaware | 801 | Montana | 333 | Vermont | 812 |
| District of Columbia | 184 | Nebraska | 525 | Virginia | 2,789 |
| Florida | 6,862 | Nevada | 1,302 | Washington | 9,452 |
| Georgia | 3,712 | New Hampshire | 1,257 | West Virginia | 271 |
| Hawaii | 194 | New Jersey | 7,274 | Wisconsin | 3,830 |
| Idaho | 2,667 | New Mexico | 868 | Wyoming | 117 |
| Illinois | 7,833 | New York | 12,521 | Puerto Rico | 83 |
| Indiana | 2,963 | North Carolina | 4,479 | Virgin Islands | 9 |
| Iowa | 1,332 | North Dakota | 191 | U.S. Pacific Islands [3] | 3 |
| Kansas | 1,194 | Ohio | 6,285 | United States [4] | 3 |
| | | | | Other [5] | 22,413 |

[1]  *Data include utility, plant, design, and reissue applications.*

[2]  *Data should be finalized by December 2005 and will be reported in the FY 2006 PAR.*

[3]  *Represents residents of American Samoa, Guam, and miscellaneous U.S. Pacific Islands.*

[4]  *No State indicated in database.*

[5]  *State/Territory information not available.*

| TABLE 8 | PATENTS ISSUED TO RESIDENTS OF THE UNITED STATES[1] (FY 2005) | | | | |
|---|---|---|---|---|---|
| **State/Territory** | **No. for 2005** | **State/Territory** | **No. for 2005** | **State/Territory** | **No. for 2005** |
| **Total** | **85,238** | Kentucky | 408 | Oklahoma | 430 |
| | | Louisiana | 308 | Oregon | 1,843 |
| Alabama | 364 | Maine | 143 | Pennsylvania | 2,735 |
| Alaska | 33 | Maryland | 1,306 | Rhode Island | 333 |
| Arizona | 1,635 | Massachusetts | 3,443 | South Carolina | 553 |
| Arkansas | 149 | Michigan | 3,907 | South Dakota | 78 |
| California | 19,928 | Minnesota | 2,659 | Tennessee | 754 |
| Colorado | 2,044 | Mississippi | 138 | Texas | 5,660 |
| Connecticut | 1,716 | Missouri | 791 | Utah | 688 |
| Delaware | 386 | Montana | 130 | Vermont | 439 |
| District of Columbia | 60 | Nebraska | 222 | Virginia | 1,045 |
| Florida | 2,744 | Nevada | 461 | Washington | 2,446 |
| Georgia | 1,383 | New Hampshire | 569 | West Virginia | 106 |
| Hawaii | 64 | New Jersey | 2,978 | Wisconsin | 1,812 |
| Idaho | 1,646 | New Mexico | 308 | Wyoming | 60 |
| Illinois | 3,352 | New York | 5,631 | Puerto Rico | 26 |
| Indiana | 1,303 | North Carolina | 1,882 | Virgin Islands | 1 |
| Iowa | 650 | North Dakota | 84 | U.S. Pacific Islands [2] | 1 |
| Kansas | 509 | Ohio | 2,892 | United States [3] | 2 |

[1]  *Data include utility, plant, design, and reissue patents.*

[2]  *Represents residents of American Samoa, Guam, and miscellaneous U.S. Pacific Islands.*

[3]  *No State indicated in database.*

**TABLE 9**  **UNITED STATES PATENT APPLICATIONS FILED BY RESIDENTS OF FOREIGN COUNTRIES[1]**
**(FY 2001 - FY 2005)**

*(PRELIMINARY FOR FY 2005)[2]*

| Residence | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|
| **Total** | **154,205** | **160,036** | **158,162** | **159,504** | **184,380** |
| Afghanistan | - | - | - | - | 1 |
| Albania | - | - | - | - | 1 |
| Algeria | 2 | - | 1 | - | 2 |
| Andorra | 3 | 3 | 2 | 1 | 1 |
| Angola | - | 1 | - | - | - |
| Anguilla | - | 1 | - | - | - |
| Antigua & Barbuda | - | - | - | - | 2 |
| Argentina | 146 | 109 | 123 | 86 | 83 |
| Armenia | 4 | 1 | 1 | - | 3 |
| Aruba | 1 | 1 | - | - | - |
| Australia | 2,088 | 2,246 | 2,498 | 1,759 | 2,873 |
| Austria | 945 | 1,134 | 1,009 | 627 | 941 |
| Azerbaijan | 2 | - | 1 | - | 3 |
| Bahamas | 14 | 26 | 22 | 24 | 17 |
| Bahrain | - | - | 1 | 1 | - |
| Bangladesh | 1 | 1 | 1 | - | - |
| Barbados | 4 | 4 | - | 7 | 9 |
| Belarus | 4 | 8 | 6 | 7 | 4 |
| Belgium | 1,341 | 1,435 | 1,420 | 884 | 1,314 |
| Belize | - | - | - | - | - |
| Benelux Convention | - | - | - | - | - |
| Benin | - | - | - | - | 1 |
| Bermuda | 4 | 12 | 11 | 3 | 7 |
| Bolivia | 1 | 1 | - | 1 | 1 |
| Bosnia & Herzegovina | - | - | - | - | 1 |
| Botswana | - | - | - | - | - |
| Brazil | 247 | 288 | 333 | 203 | 276 |
| British Virgin Islands | 2 | 13 | 15 | 14 | 5 |
| Brunei | 2 | 2 | - | - | - |
| Bulgaria | 10 | 10 | 8 | 74 | 53 |
| Cameroon | - | - | - | - | 2 |
| Canada | 7,802 | 7,967 | 8,138 | 6,705 | 8,309 |
| Cayman Islands | 8 | 10 | 1 | 5 | 14 |
| Chile | 29 | 44 | 27 | 42 | 48 |
| China (Hong Kong) | 1,008 | 1,109 | 1,159 | 1,120 | 1,223 |
| China (People's Republic) | 694 | 966 | 1,230 | 1,132 | 2,043 |
| Columbia | 28 | 26 | 22 | 16 | 13 |
| Cook Islands | - | - | - | - | - |
| Costa Rica | 8 | 18 | 17 | 15 | 47 |
| Cote D'Ivoire | - | 2 | - | - | - |
| Croatia | 22 | 20 | 23 | 17 | 38 |
| Cuba | 6 | 11 | 7 | 1 | 7 |
| Cyprus | 7 | 5 | 7 | 5 | 9 |
| Czech Republic | 83 | 55 | 52 | 46 | 80 |
| Czechoslovakia | - | - | - | - | - |
| Democratic Republic of the Congo | - | - | - | - | - |
| Denmark | 1,130 | 1,227 | 1,145 | 700 | 947 |
| Djibouti | - | - | - | - | - |
| Dominica | - | - | - | 1 | - |
| Dominican Republic | 1 | 3 | 5 | 6 | 5 |

| Residence | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|
| Ecuador | 8 | 11 | 9 | 5 | 4 |
| Egypt | 16 | 13 | 13 | 6 | 13 |
| El Salvador | 3 | 1 | 2 | 2 | - |
| EPO | - | - | - | - | - |
| Equatorial Guinea | - | - | - | 1 | - |
| Estonia | 7 | 8 | 6 | 5 | 18 |
| Ethiopia | - | - | - | - | - |
| Falkland Islands | - | - | - | - | - |
| Fiji | 2 | 1 | 1 | 1 | - |
| Finland | 1,799 | 2,045 | 1,866 | 1,279 | 1,851 |
| French Polynesia | - | - | - | - | 1 |
| France | 7,154 | 7,434 | 6,887 | 4,296 | 6,298 |
| French Guiana | - | - | - | - | - |
| Gabon | - | - | - | - | - |
| Georgia | 5 | 3 | 5 | 3 | 5 |
| Germany | 19,776 | 21,657 | 19,646 | 11,904 | 18,245 |
| Ghana | - | - | - | - | 3 |
| Gibraltar | - | 1 | - | - | 5 |
| Greece | 48 | 56 | 44 | 37 | 52 |
| Grenada | - | - | 1 | - | - |
| Guadeloupe | - | - | - | - | - |
| Guatemala | 12 | 3 | 1 | - | 1 |
| Guyana | 1 | - | - | - | - |
| Guinea | - | - | - | - | - |
| Haiti | - | 1 | - | - | - |
| Honduras | 1 | - | - | 3 | 3 |
| Hungary | 91 | 135 | 128 | 71 | 105 |
| Iceland | 39 | 40 | 49 | 36 | 38 |
| India | 636 | 813 | 1,105 | 937 | 1,278 |
| Indonesia | 10 | 25 | 26 | 32 | 21 |
| Iran | 4 | 4 | 5 | 2 | 3 |
| Iraq | 1 | 1 | - | - | - |
| Ireland | 401 | 448 | 382 | 311 | 446 |
| Israel | 2,781 | 2,737 | 2,611 | 1,840 | 2,827 |
| Italy | 3,185 | 3,336 | 3,325 | 2,208 | 3,170 |
| Jamaica | 1 | 2 | 3 | 3 | 5 |
| Japan | 62,676 | 61,259 | 61,177 | 46,267 | 65,025 |
| Jordan | 4 | 3 | 6 | 4 | 1 |
| Kazakhstan | 2 | 1 | 2 | 1 | 2 |
| Kenya | 13 | 12 | 28 | 3 | 7 |
| Korea, Dem. Republic of | - | - | - | - | - |
| Korea, Republic of | 6,792 | 7,757 | 9,614 | 9,730 | 15,200 |
| Kuwait | 6 | 11 | 7 | 4 | 19 |
| Kyrgyzstan | - | - | - | - | - |
| Laos | - | - | - | - | - |
| Latvia | 5 | 2 | 2 | 3 | 6 |
| Lebanon | 9 | 11 | 6 | 5 | 6 |
| Lesotho | - | - | - | - | - |
| Liechtenstein | 33 | 28 | 34 | 16 | 23 |
| Lithuania | 8 | 2 | 8 | 14 | 9 |
| Luxembourg | 77 | 81 | 72 | 51 | 71 |
| Macau | 4 | 7 | 7 | 7 | 4 |
| Madagascar | 2 | - | - | - | - |

*PERFORMANCE AND ACCOUNTABILITY REPORT: FISCAL YEAR 2005  |  OTHER ACCOMPANYING INFORMATION*

| TABLE 9 CONT. | UNITED STATES PATENT APPLICATIONS FILED BY RESIDENTS OF FOREIGN COUNTRIES[1] (FY 2001 - FY 2005)[2] |
| --- | --- |

**(PRELIMINARY FOR FY 2005)[2]**

| Residence | 2001 | 2002 | 2003 | 2004 | 2005 | Residence | 2001 | 2002 | 2003 | 2004 | 2005 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Macedonia | 2 | - | - | 3 | 1 | San Marino | 1 | - | - | - | - |
| Malaysia | 144 | 136 | 237 | 238 | 315 | Saudi Arabia | 32 | 35 | 33 | 20 | 36 |
| Maldives | - | - | - | - | - | Senegal | - | - | - | - | - |
| Mali | - | - | - | - | - | Seychelles | 1 | - | 3 | 1 | 2 |
| Malta | 6 | 5 | 3 | 2 | 6 | Sierra Leone | - | - | - | - | - |
| Marshall Islands | 1 | - | - | - | - | Singapore | 766 | 792 | 817 | 676 | 848 |
| Mauritius | 1 | - | 2 | - | - | Slovakia | 3 | 15 | 6 | 2 | 14 |
| Mexico | 220 | 167 | 213 | 152 | 197 | Slovenia | 21 | 21 | 55 | 32 | 40 |
| Moldova | 2 | 3 | 2 | 1 | - | Solomon Islands | - | - | - | - | - |
| Monaco | 29 | 27 | 29 | 10 | 16 | South Africa | 259 | 248 | 263 | 122 | 210 |
| Mongolia | - | - | - | - | - | Soviet Union | - | - | - | - | - |
| Montserrat | - | - | - | - | - | Spain | 611 | 690 | 633 | 460 | 727 |
| Morocco | 1 | 1 | 5 | 3 | 3 | Sri Lanka | 8 | 20 | 3 | 3 | 3 |
| Mozambique | - | - | - | 1 | - | St. Lucia | 1 | 1 | - | - | - |
| Myanmar | - | - | - | - | - | Suriname | - | - | - | - | - |
| Namibia | - | - | - | - | - | Swaziland | - | - | - | - | - |
| Nauru | - | - | - | - | - | Sweden | 3,001 | 2,692 | 2,311 | 1,360 | 2,002 |
| Nepal | - | - | - | - | - | Switzerland | 2,494 | 2,560 | 2,362 | 1,525 | 2,222 |
| Netherlands | 2,822 | 3,074 | 2,382 | 1,743 | 2,938 | Syria Arab Rep | - | 3 | 4 | - | 2 |
| Netherlands Antilles | 1 | 1 | 1 | 1 | - | Taiwan | 12,403 | 13,761 | 14,537 | 13,129 | 16,865 |
| New Caledonia | - | 3 | - | - | - | Tanzania | 1 | 1 | 1 | - | - |
| New Zealand | 355 | 402 | 473 | 202 | 324 | Thailand | 106 | 85 | 88 | 85 | 75 |
| Nicaragua | 1 | - | - | - | - | Trinidad & Tobago | 1 | 1 | 4 | - | 4 |
| Niger | - | - | - | - | - | Tunisia | 1 | 3 | 2 | 3 | 1 |
| Nigeria | 7 | 3 | 4 | 2 | 3 | Turkey | 31 | 39 | 41 | 34 | 53 |
| Norfolk Island | - | 1 | - | - | - | Turks and Caicos Islands | 5 | 7 | 6 | 1 | 2 |
| Norway | 452 | 587 | 470 | 275 | 463 | Uganda | - | - | - | - | - |
| Oman | - | 1 | 4 | - | 3 | Ukraine | 39 | 46 | 39 | 27 | 33 |
| Pakistan | 2 | 6 | 6 | 8 | 11 | United Arab Emirates | 2 | 11 | 10 | 14 | 12 |
| Palau | - | 1 | - | - | - | United Kingdom | 8,464 | 9,238 | 8,215 | 5,013 | 7,275 |
| Panama | 10 | 4 | 6 | 8 | 3 | Uruguay | 7 | 8 | 10 | 6 | 10 |
| Paraguay | - | - | - | 1 | - | Uzbekistan | - | 3 | 1 | 1 | - |
| Peru | 8 | 9 | 7 | 2 | 3 | Vatican City | - | 1 | - | - | - |
| Philippines | 47 | 72 | 37 | 52 | 53 | Venezuela | 65 | 41 | 30 | 18 | 30 |
| Poland | 43 | 46 | 48 | 58 | 101 | Vietnam | 5 | 1 | 1 | 2 | 6 |
| Portugal | 27 | 31 | 22 | 15 | 51 | Yemen | - | - | - | - | - |
| Qatar | - | 1 | 1 | 4 | 1 | Yugoslavia | 4 | 8 | 10 | 2 | 5 |
| Romania | 13 | 9 | 10 | 12 | 14 | Zimbabwe | 1 | 2 | 1 | 2 | 1 |
| Russian Federation | 417 | 403 | 345 | 195 | 313 | Other [3] | - | - | - | 41,389 | 15,936 |
| Saint Kitts & Nevis | 2 | 1 | 6 | - | - | | | | | | |

- Represents zero.

[1] Data include utility, design, plant, and reissue applications. Country listings include possessions and territories of that country unless listed separately in the table.

[2] Data should be finalized by December 2005 and will be reported in the FY 2006 PAR.

[3] Country of origin information not available.

| TABLE 10 | PATENTS ISSUED BY THE UNITED STATES TO RESIDENTS OF FOREIGN COUNTRIES[1] (FY 2001 - FY 2005) |

**(PRELIMINARY FOR FY 2005)[2]**

| Residence | 2001 | 2002 | 2003 | 2004 | 2005 | Residence | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | **86,203** | **83,970** | **89,699** | **89,257** | **80,247** | French Polynesia | 1 | 1 | - | - | - |
| | | | | | | Georgia | 2 | 1 | 3 | 4 | 2 |
| Albania | - | - | - | - | - | Germany | 12,128 | 11,529 | 12,361 | 11,623 | 10,502 |
| Algeria | 1 | - | - | 1 | - | Ghana | - | - | - | - | - |
| Andorra | - | 1 | 1 | 1 | 2 | Gibralter | - | - | - | - | - |
| Angola | | | | 1 | - | Greece | 23 | 21 | 26 | 15 | 18 |
| Anguilla | - | - | - | - | - | Guadeloupe | - | - | - | - | - |
| Antigua & Barbuda | - | - | - | - | - | Guatemala | - | 5 | 3 | - | 1 |
| Arab Emirates | | | | 3 | 4 | Guinea | - | - | - | - | - |
| Argentina | 58 | 54 | 68 | 57 | 37 | Haiti | - | - | - | - | - |
| Armenia | 1 | 1 | 2 | 1 | - | Honduras | - | 2 | 1 | - | 1 |
| Aruba | - | 1 | - | 1 | - | Hungary | 57 | 49 | 67 | 62 | 48 |
| Australia | 1,041 | 955 | 1,040 | 1,079 | 1,091 | Iceland | 23 | 17 | 17 | 18 | 23 |
| Austria | 653 | 535 | 627 | 606 | 546 | India | 159 | 254 | 338 | 366 | 405 |
| Azerbaijan | - | - | - | 2 | - | Indonesia | 9 | 14 | 13 | 12 | 36 |
| Bahamas | 12 | 14 | 6 | 11 | 9 | Iran | 1 | 1 | - | - | 1 |
| Bahrain [2] | - | - | - | - | - | Ireland | 174 | 136 | 187 | 190 | 192 |
| Bangladesh | - | - | 1 | - | - | Israel | 1,023 | 1,042 | 1,265 | 1,157 | 1,000 |
| Barbados | 2 | 6 | 2 | - | - | Italy | 2,052 | 1,945 | 2,015 | 2,009 | 1,706 |
| Belarus | 5 | 3 | 6 | 2 | 2 | Ivory Coast | - | - | - | 1 | - |
| Belgium | 805 | 772 | 762 | 698 | 629 | Jamaica | 1 | 2 | 1 | 1 | 1 |
| Bermuda | 5 | 4 | 7 | 4 | 2 | Japan | 34,875 | 34,954 | 37,862 | 37,734 | 34,079 |
| Bolivia | - | - | 1 | - | - | Jordan | 3 | 1 | 1 | 2 | - |
| Bosnia and Herzogovina | 1 | 1 | - | - | - | Kazakhstan | 3 | 2 | 1 | 2 | 2 |
| Brazil | 127 | 113 | 150 | 192 | 93 | Kenya | 4 | 3 | 7 | 18 | 10 |
| British Virgin Islands | 1 | - | 8 | 10 | 7 | Korea, Dem. Republic of | - | - | - | - | - |
| Brunei | - | 1 | - | - | - | Korea, Republic of | 3,783 | 3,755 | 4,198 | 4,590 | 4,811 |
| Bulgaria | 5 | 1 | 9 | 8 | 6 | Kuwait | 4 | 11 | 5 | 6 | 3 |
| Canada | 4,157 | 3,809 | 3,869 | 3,980 | 3,368 | Kyrgyzstan | 2 | - | - | - | - |
| Cayman Islands | 6 | 6 | 11 | 2 | 2 | Latvia | - | 1 | 2 | 4 | 2 |
| Chile | 15 | 13 | 16 | 17 | 15 | Lebanon | 4 | 2 | 6 | 3 | 1 |
| China (Hong Kong) | 603 | 546 | 667 | 672 | 627 | Liechtenstein | 22 | 15 | 20 | 17 | 16 |
| China (Mainland) | 239 | 347 | 442 | 551 | 583 | Lithuania | 4 | 2 | 4 | 3 | 5 |
| Colombia | 13 | 14 | 11 | 11 | 9 | Luxembourg | 46 | 52 | 55 | 56 | 49 |
| Cook Islands | - | - | - | - | - | Macau | - | - | 6 | 2 | 1 |
| Costa Rica | 8 | 10 | 10 | 7 | 12 | Macedonia, Former | - | - | 1 | - | - |
| Croatia | 8 | 10 | 14 | 9 | 10 | Madagascar | 1 | 1 | - | - | - |
| Cuba | 4 | 8 | 8 | 4 | 3 | Malaysia | 51 | 57 | 65 | 86 | 95 |
| Cyprus | 1 | - | 1 | 2 | 6 | Malta | 2 | - | 3 | 2 | 1 |
| Czech Republic | 32 | 24 | 38 | 40 | 28 | Marshall Islands | - | 1 | - | - | - |
| Czechoslovakia | 7 | 4 | - | 1 | - | Mauritius | - | - | - | - | - |
| Denmark | 532 | 569 | 609 | 580 | 463 | Mexico | 95 | 93 | 92 | 113 | 88 |
| Dominica | 2 | - | - | - | - | Moldova, Republic | - | 1 | 1 | 4 | 1 |
| Dominican Republic | 3 | - | 1 | - | 1 | Monaco | 21 | 16 | 12 | 16 | 8 |
| Ecuador | 3 | 1 | 5 | 2 | 3 | Morocco | 2 | - | 1 | 1 | - |
| Egypt | 10 | 4 | 6 | 4 | 7 | Myanmar | - | - | - | - | - |
| El Salvador [2] | 3 | - | - | 2 | 2 | Namibia | - | - | - | - | - |
| Estonia | 4 | 5 | 4 | 2 | 3 | Netherlands | 1,465 | 1,604 | 1,640 | 1,619 | 1,268 |
| Faroe Islands | - | - | - | - | - | Netherlands Antilles | - | 2 | 1 | - | - |
| Fiji | - | 1 | 2 | 1 | 1 | New Caledonia | - | - | - | - | - |
| Finland | 778 | 805 | 904 | 1,002 | 778 | New Guinea | - | - | 1 | - | - |
| France | 4,576 | 4,289 | 4,228 | 3,846 | 3,355 | New Zealand | 147 | 162 | 171 | 187 | 163 |
| French Guiana | - | - | - | - | - | Nicaragua | - | - | - | 1 | - |

## TABLE 10 CONT.

### PATENTS ISSUED BY THE UNITED STATES TO RESIDENTS OF FOREIGN COUNTRIES[1]
(FY 2001 - FY 2005)

### (PRELIMINARY FOR FY 2005)[2]

| Residence | 2001 | 2002 | 2003 | 2004 | 2005 | Residence | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Nigeria | - | 3 | 5 | 2 | - | Sri Lanka | 5 | 5 | 14 | 2 | 3 |
| Norfolk Island | - | - | - | - | - | Suriname | 1 | - | - | - | - |
| Norway | 292 | 262 | 277 | 271 | 245 | Sweden | 1,946 | 1,824 | 1,708 | 1,452 | 1,270 |
| Pakistan | 2 | 2 | 1 | 3 | 4 | Switzerland | 1,574 | 1,489 | 1,513 | 1,406 | 1,214 |
| Panama | 1 | 1 | 2 | 2 | 1 | Syrian Arab Rep | 1 | 1 | 1 | 1 | - |
| Paraguay | - | - | - | - | - | Taiwan | 6,766 | 6,346 | 6,719 | 7,376 | 6,311 |
| Peru | 6 | 1 | 5 | 5 | 4 | Tanzania | - | 1 | 2 | - | - |
| Philippines | 14 | 20 | 17 | 28 | 18 | Thailand | 46 | 49 | 53 | 33 | 28 |
| Poland | 20 | 14 | 16 | 18 | 29 | Trinidad & Tobago | 2 | 2 | 2 | - | - |
| Portugal | 16 | 12 | 12 | 16 | 14 | Tunisia | - | 1 | - | 1 | 1 |
| Palau | - | - | - | 1 | - | Turkey | 14 | 16 | 21 | 31 | 11 |
| Qatar | - | - | - | - | 2 | Turks and Caicos Islands | 1 | 1 | 2 | 1 | 7 |
| Romania | 10 | 5 | 8 | 8 | 6 | Uganda | 1 | 1 | - | - | - |
| Russian Federation | 242 | 198 | 208 | 187 | 160 | Ukraine | 28 | 28 | 14 | 21 | 18 |
| Saint Kitts & Nevis | 2 | 1 | 1 | - | - | United Arab Emirates | 7 | 6 | 3 | - | - |
| Saint Vincent/The Grenadines | - | - | - | - | - | United Kingdom | 4,425 | 4,076 | 4,110 | 4,044 | 3,745 |
| San Marino | - | - | - | - | - | Uruguay | 1 | 3 | 1 | 1 | 1 |
| Saudi Arabia | 13 | 8 | 20 | 13 | 16 | Uzbekistan | 2 | 1 | - | 1 | - |
| Singapore | 299 | 392 | 443 | 498 | 420 | Venezuela | 33 | 27 | 23 | 24 | 14 |
| Slovakia | 3 | 8 | 5 | 6 | 1 | Vietnam | - | 5 | 1 | 1 | 2 |
| Slovenia | 22 | 16 | 16 | 23 | 17 | Yemen | - | 1 | - | - | - |
| South Africa | 144 | 107 | 145 | 107 | 115 | Yugoslavia | 4 | 5 | 1 | 1 | 5 |
| Soviet Union | - | 1 | - | - | - | Democratic Republic of the Congo | - | - | - | - | - |
| Spain | 350 | 350 | 341 | 337 | 320 | Zimbabwe | 1 | 1 | 1 | - | 2 |

- Represents zero.

[1] Data include utility, design, plant, and reissue patents. Country listings include possessions and territories of that country unless separately listed in the table.

[2] Data should be finalized by December 2005 and will be reported in the FY 2006 PAR.

## TABLE 11

### STATUTORY INVENTION REGISTRATIONS (SIRs) PUBLISHED
(FY 2001 - 2005)

| Assignee | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|
| Air Force | 11 | 8 | 2 | 5 | 6 |
| Army | 4 | 1 | - | 1 | - |
| Energy | 2 | 1 | - | - | - |
| Navy | 20 | 10 | 6 | 4 | 3 |
| Health & Human Services | - | - | 1 | - | - |
| USA [1] | 1 | 1 | - | - | - |
| Other Than U.S. Government | 93 | 32 | 25 | 17 | 5 |
| **Total** | **131** | **53** | **34** | **27** | **14** |

- Represents zero.

[1] United States of America - no agency indicated in database.

| TABLE 12 | UNITED STATES GOVERNMENT AGENCY PATENTS[1] (FY 2001 - FY 2005) | | | | | |
|---|---|---|---|---|---|---|
| **AGENCY** | **2001** | **2002** | **2003** | **2004** | **2005** | **TOTAL** |
| Agriculture | 66 | 46 | 58 | 51 | 25 | 246 |
| Air Force | 103 | 66 | 75 | 54 | 38 | 336 |
| Army | 151 | 149 | 140 | 130 | 124 | 694 |
| Attorney General | - | - | 1 | - | - | 1 |
| Commerce | 21 | 21 | 13 | 9 | 8 | 72 |
| Energy | 68 | 52 | 43 | 46 | 22 | 231 |
| EPA | 11 | 8 | 5 | 11 | 7 | 42 |
| FCC | - | 1 | - | - | - | 1 |
| HEW/HHS | 99 | 92 | 84 | 125 | 76 | 476 |
| Interior | 7 | 7 | 13 | 7 | 12 | 46 |
| Library of Congress | - | - | - | - | - | - |
| NASA | 92 | 82 | 82 | 98 | 74 | 428 |
| Navy | 326 | 362 | 359 | 353 | 257 | 1,657 |
| NSA | 11 | 11 | 15 | 10 | 10 | 57 |
| NSF | - | - | - | 1 | - | 1 |
| Postal Service | 2 | - | 4 | 3 | 7 | 16 |
| State Department | 1 | - | - | - | 1 | 2 |
| Transportation | - | 1 | 5 | 1 | 2 | 9 |
| Treasury | - | - | - | - | - | - |
| TVA | 3 | - | 2 | 1 | 1 | 7 |
| USA [2] | 1 | - | 1 | - | - | 2 |
| VA | 1 | 2 | 4 | 1 | 6 | 14 |
| **Total** | **963** | **900** | **904** | **901** | **670** | **4,338** |

- Represents zero.
1 Data in this table represent utility patents assigned to agencies at the time of patent issue.
2 United States of America - no agency indicated in database.

| TABLE 13A | EX PARTE REEXAMINATION (FY 2001 - FY 2005) | | | | |
|---|---|---|---|---|---|
| **ACTIVITY** | **2001** | **2002** | **2003** | **2004** | **2005** |
| **Requests filed, total** | **296** | **272** | **392** | **441** | **524** |
|     By patent owner | 144 | 121 | 136 | 166 | 166 |
|     By third party | 150 | 140 | 239 | 268 | 358 |
|     Commissioner ordered | 2 | 11 | 17 | 7 | – |
| **Determinations on requests, total** | **342** | **272** | **381** | **419** | **535** |
|     Requests granted: | | | | | |
|         By examiner | 263 | 262 | 360 | 408 | 509 |
|         By petition | 2 | 1 | 1 | – | – |
|     Requests denied | 77 | 9 | 20 | 11 | 26 |
| **Requests known to have related litigation** | **80** | **52** | **109** | **138** | **176** |
| **Filings by discipline, total** | **296** | **272** | **392** | **441** | **524** |
|     Chemical | 90 | 87 | 124 | 130 | 138 |
|     Electrical | 89 | 78 | 118 | 156 | 188 |
|     Mechanical | 117 | 107 | 150 | 155 | 198 |

| TABLE 13B | INTER PARTES REEXAMINATION (FY 2001 - FY 2005) | | | | |
|---|---|---|---|---|---|
| **ACTIVITY** | **2001** | **2002** | **2003** | **2004** | **2005** |
| **Requests filed, total** | **1** | **4** | **21** | **27** | **59** |
| **Determinations on requests, total** | **-** | **5** | **20** | **25** | **57** |
|     Requests granted: | - | 5 | 18 | 25 | 54 |
|         By examiner | - | - | 18 | 25 | 54 |
|         By petition | - | - | - | - | - |
|     Requests denied | - | - | 2 | - | 3 |
| **Requests known to have related litigation** | **-** | **-** | **4** | **5** | **20** |
| **Filings by discipline, total** | **1** | **4** | **21** | **27** | **59** |
|     Chemical | 1 | 2 | 3 | 6 | 17 |
|     Electrical | - | - | 7 | 7 | 20 |
|     Mechanical | - | 2 | 11 | 14 | 22 |

| TABLE 14 | SUMMARY OF CONTESTED PATENT CASES *(Within the U.S. Patent and Trademark Office, as of September 30, 2005)* | |
|---|---|---|
| **ITEM** | | **TOTAL** |
| **Ex parte cases** | | |
| Appeals[1] | | |
| Cases Pending as of 9/30/05 | | 985 |
| Cases Filed During FY 2005 | | 2,834 |
| | | |
| **Disposals During FY 2005, total** | | |
| Decided, total | | **2,937** |
| Affirmed | | 1.121 |
| Affirmed-in-Part | | 366 |
| Reversed | | 1,163 |
| Dismissed/Withdrawn | | 111 |
| Remanded | | 176 |
| | | |
| **Cases Pending as of 9/30/05** | | **882** |
| | | |
| **Rehearings** | | |
| Cases Pending as of 9/30/05 | | 21 |
| | | |
| **Inter partes cases** | | |
| Cases pending as of 9/30/05 | | 76 |
| Cases declared or reinstituted during FY 2005 | | 94 |
| **Inter partes cases, FY 2005 total** | | **170** |
| | | |
| Cases terminated during FY 2005 | | 96 |
| **Cases pending as of 9/30/05** | | **74** |

| TABLE 15 | SUMMARY OF TRADEMARK EXAMINING ACTIVITIES (FY 2001 - FY 2005) | | | | |
|---|---|---|---|---|---|
| **ITEM** | **2001** | **2002** | **2003** | **2004** | **2005** |
| **Applications for Registration:** | | | | | |
| Applications including Additional Classes | 296,388 | 258,873 | 267,218 | 298,489 | 323,501 |
| Applications Filed | 232,939 | 207,287 | 218,596 | 244,848 | 258,527 |
| **Disposal of Trademark Applications:** | | | | | |
| Registrations including Additional Classes | 124,502 | 164,457 | 185,182 | 155,991 | 143,396 |
| Abandonments including Additional Classes | 142,973 | 120,102 | 119,858 | 109,931 | 108,879 |
| Trademark First Actions including Additional Classes | 464,618 | 253,187 | 276,568 | 268,865 | 317,757 |
| Applications Approved for Publication including Additional Classes | 235,419 | 217,487 | 168,235 | 186,271 | 211,624 |
| **Certificates of Registration Issued:**[1] | | | | | |
| 1946 Act Principal Register | 61,152 | 81,096 | 83,022 | 65,797 | 63,088 |
| Principal Register | | | | | |
| ITU-Statements of Use Registered | 36,188 | 45,064 | 54,046 | 49,479 | 43,930 |
| 1946 Act Supplemental Register | 4,974 | 7,065 | 6,356 | 4,780 | 5,477 |
| Total Certificates of Registration | 102,314 | 133,225 | 143,424 | 120,056 | 112,495 |
| **Renewal of Registration:*** | | | | | |
| Section 9 Applications Filed | 24,174 | 34,325 | 35,210 | 32,352 | 39,354 |
| Section 8 Applications Filed** | 24,167 | 34,271 | 34,189 | 32,389 | 39,659 |
| Registrations Renewed | 31,477 | 29,957 | 34,370 | 34,735 | 32,279 |
| Affidavits, Sec. 8/15: | | | | | |
| Affidavits Filed | 33,547 | 39,484 | 43,151 | 41,157 | 47,752 |
| Affidavits Disposed | 37,092 | 35,375 | 39,603 | 40,765 | 41,466 |
| Affidavits for Benefits: | | | | | |
| Under Sec. 12(c) | - | - | 1 | 9 | 1 |
| Published Under Sec. 12(c) | 15 | 26 | 5 | 4 | 3 |
| Amendments to Allege Use Filed | 8,582 | 8,261 | 8,458 | 9,414 | 9,497 |
| Statements of Use Filed | 47,811 | 53,974 | 67,222 | 57,731 | 54,182 |
| Notice of Allowance Issued | 120,166 | 158,868 | 139,332 | 108,684 | 108,268 |
| **Total Active Certificates of Registration** | **1,063,164** | **1,116,200** | **1,184,888** | **1,216,691** | **1,255,570** |
| Pendency - Average Months: | | | | | |
| Between Filing and Examiner's First Action | 2.7 | 4.3 | 5.4 | 6.6 | 6.3 |
| Between Filing, Registration (Use Applications) | | | | | |
| Abandonments, and NOA's - including suspended and inter partes proceedings | 17.8 | 19.9 | 19.8 | 19.5 | 19.6 |
| Between Filing, Registration (Use Applications) | | | | | |
| Abandonments. and NOA's - excluding suspended and inter partes proceedings | 16.4 | 18.3 | 16.2 | 16.2 | 17.2 |

[1]  With the exception of Certificates of Registration, Renewal of Registration, Affidavits filed under Section 8/15 and 12(c), the workload count includes extra classes.

"Applications filed" refers simply to the number of individual trademark applications received by the PTO. There are, however, 47 different classes of items in which a trademark may be registered. An application must request registration in at least one class, but may request registration in multiple classes. Each class application must be individually researched for registerability. "Applications filed, including additional classes" reflects this fact, and therefore more accurately reflects the Trademark business workload. With the exception of Certificates of Registration, Renewal of Registration, Affidavits filed  under Section 8/15 and 12(c), the workload count includes extra classes.

*Renewal of registration is required beginning 10 years following registration concurrent with 20 - year renewals coming due.

**Section 8 Affidavit is required for filing a renewal beginning October 30, 1999 (FY 2000) with the implementation of the Trademark Law Treaty.

| TABLE 16 | TRADEMARK APPLICATIONS FILED FOR REGISTRATION AND RENEWAL AND TRADEMARK AFFIDAVITS FILED (FY 1985 - FY 2005) | | | |
|---|---|---|---|---|
| **YEAR** | **FOR REGISTRATION** | **FOR RENEWAL** | **SECTION 8 AFFIDAVIT** | **SEC. 12(C) AFFIDAVIT** |
| 1985 | 64,677 | 5,275 | 8,823 | 29 |
| 1986 | 69,253 | 5,660 | 8,519 | 19 |
| 1987 | 70,002 | 5,871 | 16,644 | 34 |
| 1988 | 76,813 | 6,763 | 18,316 | 23 |
| 1989 | 83,169 | 6,127 | 17,986 | 104 |
| 1990 | 127,294 | 6,602 | 20,636 | 5 |
| 1991 | 120,365 | 5,634 | 25,763 | 1 |
| 1992 | 125,237 | 6,355 | 20,982 | 25 |
| 1993 | 139,735 | 7,173 | 21,999 | 5 |
| 1994 | 155,376 | 7,004 | 20,850 | 4 |
| 1995 | 175,307 | 7,346 | 23,497 | - |
| 1996 | 200,640 | 7,543 | 22,169 | 6 |
| 1997 | 224,355 | 6,720 | 20,781 | 2 |
| 1998 | 232,384 | 7,413 | 33,231 | - |
| 1999 | 295,165 | 7,944 | 33,104 | - |
| 2000 | 375,428 | 24,435 [1] | 28,920 | - |
| 2001 | 296,388 | 24,174 | 33,547 | 4 |
| 2002 | 258,873 | 34,325 | 39,484 | - |
| 2003 | 267,218 | 35,210 | 43,151 | 1 |
| 2004 | 298,489 | 32,352 | 41,157 | 9 |
| **2005** | **323,501** | **39,354** | **47,752** | **1** |

- *Represents zero.*
[1] *Concurrent 10 and 20 year renewal of registration.*

| TABLE 17 | SUMMARY OF PENDING TRADEMARK APPLICATIONS *(As of September 30, 2005)* | |
|---|---|---|
| **STAGE OF PROCESSING** | **APPLICATION FILES** | **CLASSES** |
| **Pending applications, total** | **497,394** | **653,039** |
| **In preexamination processing** | **138,010** | **165,612** |
| **Under examination, total** | **247,150** | **338,004** |
|     **Applications under initial examination** | **101,007** | **136,044** |
|         Amended, awaiting action by Examiner | 98,312 | 132,654 |
|         Awaiting first action by Examiner | 2,695 | 3,390 |
|     **Intent-To-Use applications pending Use** | **99,484** | **133,944** |
|     **Applications under second examination** | **7,156** | **9,310** |
|         Administrative processing of Statements of Use | 106 | 119 |
|         Undergoing second examination | 2,342 | 2,951 |
|         Amended, awaiting action by Examiner | 4,708 | 6,240 |
|     **Other pending applications** [1] | **39,503** | **58,706** |
| **In postexamination processing** | **112,234** | **149,423** |
|     (Includes all applications in all phases of publication and issue and registration) | | |

[1] *Includes applications pending before the Trademark Trial and Appeal Board, and suspended cases.*

| TABLE 18 | TRADEMARKS REGISTERED, RENEWED, AND PUBLISHED UNDER SECTION 12(C)[1] (FY 1985 - FY 2005) | | | |
|---|---|---|---|---|
| YEAR | CERTIFICATES OF REGIS. ISSUED | RENEWED | PUBLISHED UNDER 12(C) | Registrations *(Incl Classes)* |
| 1985 | 63,122 | 5,177 | 27 | - |
| 1986 | 48,971 | 5,550 | 29 | - |
| 1987 | 47,522 | 4,415 | 24 | - |
| 1988 | 46,704 | 5,884 | 29 | - |
| 1989 | 51,802 | 9,209 | 84 | - |
| 1990 | 56,515 | 7,122 | 19 | - |
| 1991 | 43,152 | 6,416 | 19 | - |
| 1992 | 62,067 | 5,733 | 13 | - |
| 1993 | 74,349 | 6,182 | 21 | 86,122 |
| 1994 | 59,797 | 6,136 | 11 | 68,853 |
| 1995 | 65,662 | 6,785 | 4 | 75,372 |
| 1996 | 78,674 | 7,346 | 11 | 91,339 |
| 1997 | 97,294 | 7,389 | 11 | 112,509 |
| 1998 | 89,634 | 6,504 | 8 | 106,279 |
| 1999 | 87,774 | 6,280 | 3 | 104,324 |
| 2000 | 106,383 | 8,821 | 15 | 127,794 |
| 2001 | 102,314 | 31,477 | 11 | 124,502 |
| 2002 | 133,225 | 29,957 | 26 | 164,457 |
| 2003 | 143,424 | 34,370 | 5 | 185,182 |
| 2004 | 120,056 | 34,735 | 4 | 155,991 |
| **2005** | **112,495** | **32,279** | **3** | **143,396** |

- Represents zero.
[1] Includes withdrawn numbers.

| **TABLE 19** | **TRADEMARK APPLICATIONS FILED BY RESIDENTS OF THE UNITED STATES (FY 2005)** | | | | |
|---|---|---|---|---|---|
| **State/Territory** | **No. for 2005** | **State/Territory** | **No. for 2005** | **State/Territory** | **No. for 2005** |
| **Total** | **262,506** | Kentucky | 1,418 | Oklahoma | 1,328 |
| | | Louisiana | 1,379 | Oregon | 2,808 |
| Alabama | 1,370 | Maine | 743 | Pennsylvania | 7,376 |
| Alaska | 275 | Maryland | 4,794 | Rhode Island | 945 |
| Arizona | 5,020 | Massachusetts | 7,491 | South Carolina | 1,559 |
| Arkansas | 761 | Michigan | 5,356 | South Dakota | 385 |
| California | 56,167 | Minnesota | 5,610 | Tennessee | 3,412 |
| Colorado | 5,738 | Mississippi | 474 | Texas | 13,609 |
| Connecticut | 4,328 | Missouri | 3,931 | Utah | 2,752 |
| Delaware | 3,552 | Montana | 550 | Vermont | 533 |
| District of Columbia | 2,390 | Nebraska | 988 | Virginia | 6,113 |
| Florida | 17,285 | Nevada | 4,303 | Washington | 5,580 |
| Georgia | 6,700 | New Hampshire | 1,029 | West Virginia | 286 |
| Hawaii | 825 | New Jersey | 10,227 | Wisconsin | 3,484 |
| Idaho | 708 | New Mexico | 678 | Wyoming | 284 |
| Illinois | 11,782 | New York | 28,164 | Puerto Rico | 279 |
| Indiana | 2,588 | North Carolina | 4,273 | Virgin Islands | 26 |
| Iowa | 1,297 | North Dakota | 183 | U.S. Pacific Islands [1] | 8 |
| Kansas | 1,563 | Ohio | 7,510 | United States [2] | 289 |

[1] Represents residents of American Samoa, Guam, and miscellaneous U.S. Pacific Islands.

[2] No State indicated in data base, includes APO filings.

| TABLE 20 | TRADEMARKS REGISTERED TO RESIDENTS OF THE UNITED STATES[1] (FY 2005) | | | | |
|---|---|---|---|---|---|
| **State/Territory** | **No. for 2005** | **State/Territory** | **No. for 2005** | **State/Territory** | **No. for 2005** |
| **Total** | **92,527** | Kentucky | 387 | Oklahoma | 399 |
| | | Louisiana | 320 | Oregon | 891 |
| Alabama | 331 | Maine | 228 | Pennsylvania | 2,061 |
| Alaska | 51 | Maryland | 1,061 | Rhode Island | 409 |
| Arizona | 1,002 | Massachusetts | 1,653 | South Carolina | 452 |
| Arkansas | 172 | Michigan | 1,728 | South Dakota | 98 |
| California | 10,016 | Minnesota | 1,856 | Tennessee | 792 |
| Colorado | 1,337 | Mississippi | 133 | Texas | 3,278 |
| Connecticut | 749 | Missouri | 1,095 | Utah | 713 |
| Delaware | 20,040 | Montana | 107 | Vermont | 150 |
| District of Columbia | 500 | Nebraska | 344 | Virginia | 1,367 |
| Florida | 3,696 | Nevada | 1,909 | Washington | 1,686 |
| Georgia | 1,564 | New Hampshire | 272 | West Virginia | 70 |
| Hawaii | 147 | New Jersey | 2,166 | Wisconsin | 1,295 |
| Idaho | 166 | New Mexico | 172 | Wyoming | 111 |
| Illinois | 3,042 | New York | 5,359 | Puerto Rico | 49 |
| Indiana | 978 | North Carolina | 1,084 | Virgin Islands | 11 |
| Iowa | 516 | North Dakota | 62 | U.S. Pacific Islands [2] | 3 |
| Kansas | 401 | Ohio | 2,134 | United States [3] | 11,914 |

[1] When a trademark is registered, the trademark database is corrected to indicate the home state of the entity registering the trademark.

[2] Represents residents of American Samoa, Guam, and miscellaneous U.S. Pacific Islands.

[3] No State indicated in data base, includes APO filings.

**TABLE 21**

## TRADEMARK APPLICATIONS FILED BY RESIDENTS OF FOREIGN COUNTRIES
### (FY 2001 - FY 2005)

| Residence | 2001 | 2002 | 2003 | 2004 | 2005 | Residence | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | **65,589** | **50,052** | **49,371** | **46,832** | **60,995** | Dominican Republic | 43 | 40 | 57 | 13 | 47 |
| | | | | | | East Timor | - | - | 1 | - | - |
| Albania | - | - | 1 | 1 | 1 | Ecuador | 40 | 10 | 15 | 25 | 18 |
| Algeria | - | - | - | - | - | Egypt | 24 | 3 | 8 | 19 | 17 |
| Andorra | 1 | 5 | 3 | - | 3 | El Salvador | 59 | 33 | 35 | 55 | 50 |
| Angola | 1 | 1 | - | - | 2 | EPO | - | - | - | - | - |
| Anguilla | 18 | 11 | 7 | 6 | 4 | Estonia | 13 | 10 | 4 | 3 | 16 |
| Antigua & Barbuda | 43 | 30 | - | 2 | 26 | Ethiopia | - | - | 1 | - | 4 |
| Argentina | 246 | 189 | 266 | 202 | 225 | Faroe Islands | - | - | - | - | - |
| Armenia | 8 | 1 | - | 1 | 2 | Fiji | - | 10 | 3 | 2 | 12 |
| Aruba | 13 | 9 | 6 | 3 | 24 | Finland | 656 | 442 | 336 | 275 | 374 |
| Australia | 1,731 | 1,478 | 1,794 | 1,845 | 2,204 | France | 4,636 | 3,546 | 3,473 | 2,427 | 4,555 |
| Austria | 604 | 743 | 444 | 401 | 696 | French Guiana | - | 1 | - | - | - |
| Azerbaijan | - | - | - | 5 | - | French Polynesia | 1 | 1 | 6 | 49 | 16 |
| Bahamas | 153 | 220 | 158 | 139 | 207 | French South/Antarctic | - | - | - | - | - |
| Bahrain | 3 | 3 | 4 | 10 | 3 | Gabon | - | - | - | - | - |
| Bangladesh | 7 | - | - | - | - | Georgia | 12 | 1 | 1 | 2 | 6 |
| Barbados | 92 | 120 | 165 | 207 | 213 | Germany | 9,474 | 7,195 | 6,412 | 6,466 | 8,146 |
| Belarus | - | 2 | 1 | - | 18 | Ghana | - | - | - | - | - |
| Belgium | 548 | 454 | 425 | 266 | 581 | Gibraltar | 12 | 11 | 21 | 24 | 65 |
| Belize | 15 | 23 | 9 | 9 | 12 | Greece | 22 | 46 | 44 | 236 | 64 |
| Benelux Convention | - | 2 | - | - | - | Greenland | - | - | - | - | - |
| Benin | - | - | - | 3 | 2 | Grenada | 3 | 1 | - | - | 1 |
| Bermuda | 258 | 322 | 340 | 282 | 251 | Guadeloupe | - | 1 | 2 | 2 | 3 |
| Bolivia | 2 | 4 | 1 | 2 | 4 | Guatemala | 30 | 19 | 8 | 39 | 42 |
| Botswana | - | - | - | - | - | Guinea | - | - | - | - | - |
| Brazil | 443 | 472 | 400 | 453 | 495 | Guyana | 2 | 4 | 1 | 1 | 6 |
| British Virgin Islands | 363 | 259 | 202 | 151 | 389 | Hague | - | - | - | - | - |
| Brunei | 1 | - | - | - | 1 | Haiti | 8 | 6 | 5 | 8 | 4 |
| Bulgaria | 6 | 2 | 13 | 17 | 84 | Honduras | 4 | 1 | 6 | 5 | 4 |
| Burundi | - | - | - | - | - | Hong Kong | 898 | 860 | 794 | 862 | 1,130 |
| Cambodia | 1 | 1 | - | 1 | - | Hungary | 48 | 35 | 33 | 40 | 88 |
| Cameroon | - | 3 | - | 2 | - | Iceland | 64 | 15 | 35 | 86 | 42 |
| Canada | 8,086 | 6,765 | 6,838 | 7,365 | 7,730 | India | 214 | 267 | 291 | 260 | 275 |
| Cape Verde | - | - | 2 | - | - | Indonesia | 50 | 37 | 45 | 24 | 55 |
| Cayman Islands | 190 | 117 | 113 | 81 | 188 | Iran | 3 | - | 1 | 20 | 12 |
| Central African Republic | - | 1 | - | - | - | Ireland | 469 | 331 | 317 | 359 | 392 |
| Channel Islands | 65 | 72 | 50 | 27 | 73 | Isle of Man | 34 | 55 | 27 | 27 | 56 |
| Chile | 207 | 141 | 190 | 183 | 217 | Israel | 835 | 448 | 480 | 476 | 534 |
| China (mainland) | 448 | 472 | 474 | 594 | 1,246 | Italy | 2,380 | 1,919 | 2,115 | 1,577 | 2,894 |
| Christmas Island | - | 2 | - | - | - | Jamaica | 56 | 33 | 31 | 50 | 55 |
| Colombia | 170 | 135 | 151 | 181 | 156 | Japan | 9,008 | 4,450 | 4,342 | 4,239 | 4,824 |
| Comoros | 1 | - | - | - | - | Jordan | 13 | 14 | 6 | 18 | 7 |
| Cook Islands | 10 | 9 | 4 | 3 | 2 | Kazakhstan | - | - | - | 2 | - |
| Costa Rica | 12 | 23 | 32 | 41 | 58 | Kenya | 42 | 13 | 21 | 9 | 9 |
| Cote d'Ivoire | - | 1 | - | - | - | Korea, Dem. Republic of | - | 1 | 6 | - | 1 |
| Croatia | 7 | 10 | 6 | 10 | 47 | Korea, Republic of | 913 | 887 | 758 | 446 | 614 |
| Cuba | 1 | 2 | - | 2 | 26 | Kuwait | 7 | 3 | - | 3 | 2 |
| Cyprus | 34 | 21 | 66 | 60 | 73 | Kyrgyzstan | - | - | - | - | 2 |
| Czechoslovakia | 39 | 58 | 55 | 59 | 93 | Latvia | 4 | - | 7 | 8 | 29 |
| Democratic Republic of the Congo | - | - | - | - | - | Laos | - | - | - | - | - |
| Denmark | 716 | 568 | 564 | 353 | 637 | Lebanon | 13 | 10 | 13 | 14 | 22 |
| Djibouti | - | - | - | - | - | Liberia | - | - | - | - | - |
| Dominica | 2 | - | - | 1 | 3 | Liechtenstein | 89 | 61 | 58 | 56 | 165 |
| | | | | | | Lithuania | 3 | 3 | 1 | 1 | 9 |

**TABLE 21** *CONT.*

**TRADEMARK APPLICATIONS FILED BY RESIDENTS OF FOREIGN COUNTRIES (FY 2001 - FY 2005)**

| Residence | 2001 | 2002 | 2003 | 2004 | 2005 | Residence | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Luxembourg | 135 | 186 | 130 | 134 | 294 | Saint Christ-Nevis | - | 6 | 2 | 2 | 12 |
| Macao | - | - | - | 1 | 1 | Saint Lucia | - | 2 | - | 2 | 8 |
| Macau | 1 | 3 | 5 | - | - | Saint Pierre/Mique | - | - | - | - | - |
| Macedonia | 1 | - | 1 | - | - | Saint Vincent/Grenadines | 14 | 1 | - | 1 | 3 |
| Madagascar | - | 1 | - | 2 | - | Samoa | - | 1 | - | 1 | 2 |
| Malawi, Republic of | - | - | - | - | - | San Marino | 6 | - | - | 3 | 2 |
| Malaysia | 66 | 60 | 28 | 98 | 97 | Saudi Arabia | 22 | 18 | 26 | 21 | 27 |
| Mali | - | - | - | - | - | Scotland | 95 | 82 | 94 | 35 | 66 |
| Malta | 6 | 3 | 29 | 10 | 8 | Senegal, Republic of | 1 | - | - | - | - |
| Marshall Islands | 2 | - | - | 4 | 2 | Serbia/Montenegro | - | - | - | 3 | 3 |
| Martinique | 1 | 1 | - | - | - | Seychelles | 5 | 5 | 1 | 1 | 5 |
| Mauritania | - | - | - | - | 2 | Sierra Leone | - | - | - | - | 1 |
| Mauritius | 30 | 38 | 44 | 46 | 27 | Singapore | 339 | 283 | 285 | 205 | 311 |
| Mayotte | - | - | - | - | - | Slovakia | 3 | 3 | 7 | 2 | 24 |
| Mexico | 982 | 1,026 | 994 | 1,103 | 1,403 | Slovenia | 8 | 36 | 38 | 13 | 53 |
| Micronesia | - | 1 | - | - | 2 | Solomon Islands | 4 | - | - | - | - |
| Moldova | 2 | - | - | - | - | Somalia | - | - | - | - | - |
| Monaco | 136 | 72 | 68 | 69 | 81 | South Africa | 206 | 170 | 175 | 194 | 208 |
| Mongolia | - | - | 3 | 1 | - | Russian Federation | 111 | 145 | 144 | 118 | 276 |
| Montserrat | - | - | 1 | - | - | Spain | 1,035 | 852 | 984 | 1,097 | 1,136 |
| Morocco | - | 1 | 2 | 2 | 18 | Sri Lanka | 7 | 6 | 10 | 20 | 12 |
| Mozambique | - | - | - | - | 1 | Sudan | - | 1 | - | - | - |
| Myanmar | - | - | 1 | - | - | Suriname | 1 | - | - | 1 | - |
| N. Mariana Island | - | 3 | 1 | 4 | 2 | Swaziland | 57 | - | 1 | 1 | 2 |
| Namibia | 3 | 1 | - | - | - | Sweden | 1,490 | 836 | 919 | 658 | 1,123 |
| Nauru | - | - | - | - | - | Switzerland | 3,023 | 2,754 | 2,867 | 2,093 | 3,346 |
| Navassa Island | - | - | - | - | - | Syria | - | - | - | 1 | 3 |
| Nepal | 5 | 9 | - | - | - | Taiwan | 1,060 | 1,143 | 1,259 | 1,424 | 1,196 |
| Netherlands | 2,063 | 1,596 | 1,331 | 1,088 | 1,725 | Tajikistan | - | - | - | - | - |
| Netherlands Antilles | 64 | 55 | 30 | 22 | 41 | Tanzania | - | - | - | - | - |
| New Caledonia | 1 | - | - | - | - | Thailand | 78 | 103 | 153 | 127 | 114 |
| New Hebrides | 1 | - | - | - | - | Tokelau | 1 | - | - | - | - |
| New Zealand | 359 | 292 | 362 | 535 | 510 | Tonga | - | - | - | - | - |
| Newfoundland | 2 | 5 | - | - | - | Trinidad & Tobago | 11 | 9 | 11 | 3 | 7 |
| Nicaragua | 5 | 5 | 7 | 10 | 9 | Tunisia | 1 | - | 3 | - | 5 |
| Nigeria | - | 15 | 6 | 1 | 1 | Turkey | 131 | 85 | 166 | 174 | 349 |
| Niue | - | - | - | - | 2 | Turks and Caicos Islands | 2 | 5 | - | - | - |
| Norway | 319 | 206 | 178 | 159 | 331 | Uganda | - | 1 | 7 | - | - |
| Oman | 2 | 2 | - | 5 | 5 | Ukraine | 17 | 2 | 29 | 19 | 59 |
| Pakistan | 5 | 4 | 8 | 18 | 12 | United Arab Emirates | 61 | 31 | 24 | 21 | 48 |
| Panama | 36 | 47 | 46 | 108 | 125 | United Kingdom | 7,860 | 5,597 | 5,586 | 5,432 | 6,273 |
| Papua New Guinea | - | - | 1 | - | 1 | Uruguay | 17 | 19 | 36 | 41 | 47 |
| Paraguay | 4 | 2 | 2 | 28 | 11 | Uzbekistan | - | - | - | 1 | - |
| Peru | 27 | 37 | 28 | 33 | 50 | Vanuatu | 9 | 2 | 31 | 6 | 7 |
| Philippines | 42 | 31 | 12 | 26 | 56 | Venezuela | 115 | 75 | 112 | 73 | 53 |
| Pitcairn Islands | - | - | - | - | - | Vietnam | 5 | 55 | 79 | 60 | 39 |
| Poland | 64 | 59 | 99 | 97 | 148 | Yemen | - | - | - | 1 | 3 |
| Portugal | 134 | 106 | 133 | 77 | 198 | Yugoslavia | - | 4 | - | 10 | 9 |
| Qatar | 6 | 6 | - | - | 6 | Yukon Territory | - | - | - | - | - |
| Republic Moldova | | | 22 | 2 | 22 | Zambia | - | - | - | - | - |
| Reunion | - | - | - | - | - | Zimbabwe | 2 | 2 | 2 | 1 | - |
| Romania | 14 | 14 | 1 | 6 | 48 | Other[1] | 547 | 257 | 143 | 82 | 261 |
| St. Kitts & Nevis | - | - | - | - | - | | | | | | |

- Represents zero.

[1] Country of Origin information not available or not indicated in database, includes ARIPO filings.

**TABLE 22**

## TRADEMARKS REGISTERED TO RESIDENTS OF FOREIGN COUNTRIES
### (FY 2001 - FY 2005)

| Residence | 2001 | 2002 | 2003 | 2004 | 2005 | Residence | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | **21,269** | **19,052** | **25,217** | **22,485** | **19,968** | El Salvador | 4 | 9 | 18 | 11 | 20 |
| | | | | | | Estonia | - | 2 | 3 | 5 | 4 |
| Afghanistan | 1 | - | - | 2 | 2 | Ethiopia | 2 | 1 | 1 | - | - |
| Albania | - | - | - | - | 1 | Faroe Islands | - | - | - | - | - |
| Algeria | - | - | - | - | - | Fiji | 4 | 1 | 5 | 5 | 2 |
| Andorra | 1 | - | 1 | 2 | - | Finland | 135 | 159 | 200 | 163 | 130 |
| Angola, Republic of | 3 | 2 | - | - | - | France | 2,063 | 1,560 | 2,105 | 1,642 | 1,360 |
| Anguilla | 2 | 1 | 8 | 3 | 5 | French Polynesia | - | 1 | - | 9 | - |
| Antigua & Barbuda | 12 | 15 | 11 | 5 | 4 | Gabon | - | 1 | - | - | - |
| Argentina | 47 | 68 | 108 | 142 | 92 | Georgia | 7 | 8 | 10 | 5 | - |
| Armenia | 2 | 5 | 6 | 3 | 1 | Germany | 3,691 | 2,561 | 3,654 | 2,996 | 2,583 |
| Aruba | - | 1 | 2 | 2 | - | Ghana | - | 2 | 2 | - | - |
| Australia | 629 | 663 | 845 | 775 | 709 | Gibraltar | 15 | 11 | 4 | 7 | 2 |
| Austria | 217 | 171 | 268 | 199 | 178 | Greece | 10 | 16 | 15 | 16 | 18 |
| Azerbaijan | - | - | - | - | - | Greenland | - | - | - | - | - |
| Bahamas | 31 | 41 | 79 | 57 | 39 | Grenada | - | - | 2 | - | - |
| Bahrain | 1 | 1 | 1 | 2 | 4 | Guatemala | 7 | 9 | 17 | 11 | 5 |
| Bangladesh | - | - | 2 | 2 | 1 | Guyana | - | 1 | 3 | 5 | 1 |
| Barbados | 22 | 26 | 38 | 56 | 78 | Hague | - | - | - | - | - |
| Belarus | - | 1 | 2 | - | 2 | Haiti | 1 | - | 2 | - | - |
| Belgium | 211 | 205 | 272 | 194 | 152 | Honduras | 3 | 2 | 3 | 2 | 1 |
| Belize | 4 | 3 | 5 | 16 | 3 | Hong Kong | 267 | 288 | 387 | 391 | 290 |
| Benelux Convention | - | 1 | 2 | - | 6 | Hungary | 8 | 10 | 13 | 16 | 27 |
| Bermuda | 82 | 94 | 108 | 93 | 148 | Iceland | 8 | 10 | 14 | 17 | 11 |
| Bolivia | 1 | - | 3 | - | 1 | India | 96 | 73 | 111 | 115 | 104 |
| Bosnia & Herzegovina | - | - | 2 | - | - | Indonesia | 18 | 16 | 26 | 24 | 17 |
| Brazil | 55 | 110 | 160 | 181 | 152 | Iraq | - | 1 | - | - | - |
| British Virgin Islands | - | 133 | 177 | 167 | 182 | Iran | 5 | 8 | 7 | 2 | 5 |
| Brunei Darussalam | - | 1 | - | - | - | Ireland | 135 | 107 | 151 | 133 | 117 |
| Bulgaria | 2 | 5 | 4 | 4 | 7 | Isle of Man | 12 | 7 | 8 | 11 | 5 |
| Burundi | - | - | - | 1 | 1 | Israel | 226 | 262 | 380 | 248 | 218 |
| Cambodia | - | 1 | - | 1 | - | Italy | 1,079 | 979 | 1,253 | 967 | 899 |
| Cameroon | - | - | 1 | - | 1 | Jamaica | 12 | 19 | 16 | 9 | 23 |
| Canada | 3,062 | 2,911 | 3,398 | 3,187 | 2,917 | Japan | 1,585 | 1,510 | 1,896 | 2,010 | 1,821 |
| Cayman Islands | 47 | 43 | 85 | 81 | 53 | Jordan | 6 | 9 | 3 | 3 | 11 |
| Central African Rep. | - | - | - | - | - | Kenya | 1 | 1 | 6 | 7 | 4 |
| Channel Islands | 7 | 50 | 40 | - | 14 | Kiribati | - | - | - | - | - |
| Chile | 35 | 45 | 110 | 90 | 92 | Korea, Dem. Republic of | - | 2 | 1 | 8 | 2 |
| China (mainland) | 197 | 174 | 326 | 358 | 364 | Korea, Republic of | 251 | 283 | 431 | 470 | 395 |
| Colombia | 44 | 58 | 69 | 59 | 85 | Kuwait | 2 | 2 | 2 | 3 | 1 |
| Comoros | - | - | - | - | - | Latvia | 1 | 1 | 3 | 2 | 2 |
| Congo | - | - | - | - | - | Lebanon | 6 | 2 | 7 | 9 | 6 |
| Cook Islands | 2 | 7 | 5 | 6 | 1 | Liberia | 12 | 13 | 13 | 13 | 5 |
| Costa Rica | 8 | 4 | 14 | 7 | 17 | Libya | - | - | - | - | - |
| Cote D'Ivoire | - | - | - | 1 | 1 | Liechtenstein | 38 | 30 | 43 | 48 | 44 |
| Croatia | - | 5 | 1 | 3 | 4 | Lithuania | - | 1 | 3 | 2 | 3 |
| Cuba | 4 | 4 | 8 | 4 | - | Luxembourg | 47 | 59 | 56 | 57 | 71 |
| Cyprus | 8 | 6 | 15 | 10 | 11 | Macau | 3 | 2 | - | - | 3 |
| Czechoslovakia | 18 | 22 | 30 | 24 | 13 | Macedonia | - | 2 | - | 1 | - |
| Denmark | 187 | 177 | 281 | 219 | 193 | Malaysia | 17 | 24 | 21 | 27 | 27 |
| Dominica | - | - | - | - | 1 | Malta | - | 1 | 4 | 9 | 5 |
| Dominican Republic | 18 | 24 | 19 | 26 | 27 | Marshall Islands | - | - | - | 3 | 1 |
| Ecuador | 13 | 9 | 18 | 8 | 10 | Mauritania | - | - | - | 1 | - |
| Egypt | 3 | 3 | 4 | 1 | 3 | Mauritius | 1 | 3 | 12 | 16 | 16 |

| TABLE 22 CONT. | TRADEMARKS REGISTERED TO RESIDENTS OF FOREIGN COUNTRIES (FY 2001 - FY 2005) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Residence** | **2001** | **2002** | **2003** | **2004** | **2005** | **Residence** | **2001** | **2002** | **2003** | **2004** | **2005** |
| Mexico | 308 | 342 | 435 | 396 | 433 | Sierra Leone | 1 | - | - | - | - |
| Micronesia | - | 1 | 1 | 1 | - | Singapore | 76 | 82 | 95 | 102 | 100 |
| Moldova | - | 1 | - | - | - | Slovakia | 1 | - | 4 | 10 | 2 |
| Monaco | 30 | 10 | 18 | 14 | 19 | Slovenia | 15 | 5 | 9 | 5 | 3 |
| Mongolia | - | - | - | - | 1 | South Africa | 57 | 62 | 117 | 92 | - |
| Morocco | 2 | 1 | 1 | 1 | 2 | Russian Federation | 35 | 23 | 53 | 46 | 37 |
| Myanmar | - | - | - | - | - | Spain | 391 | 474 | 560 | 482 | 432 |
| Namibia | - | 1 | 1 | 1 | - | Spratly Islands | - | - | - | - | - |
| N. Mariana Island | - | - | 1 | 1 | 4 | Sri Lanka | 5 | 9 | 3 | 5 | 5 |
| Netherlands | 701 | 628 | 782 | 615 | 610 | Sudan | - | - | 1 | - | - |
| Netherlands Antilles | 48 | 27 | 33 | 29 | 17 | Swaziland | 2 | - | 1 | 1 | 1 |
| Nepal | - | - | 3 | - | 1 | Sweden | 476 | 406 | 532 | 460 | 381 |
| New Zealand | 113 | 97 | 196 | 165 | 136 | Switzerland | 1,028 | 820 | 1,261 | 1,078 | 932 |
| Nicaragua | 1 | 6 | 1 | 4 | 2 | Syria | - | 1 | 3 | 6 | 3 |
| Nigeria | 17 | 7 | 5 | 4 | 2 | Taiwan | 569 | 656 | 698 | 662 | 683 |
| Norway | 86 | 100 | 145 | 84 | 71 | Thailand | 42 | 43 | 55 | 62 | 52 |
| Oman | - | - | - | - | 2 | Tonga | - | - | - | 1 | - |
| Pakistan | 6 | 10 | 7 | 5 | 7 | Trinidad & Tobago | 5 | 4 | 8 | 24 | 8 |
| Panama | 28 | 41 | 34 | 43 | 42 | Tunisia | - | - | - | 1 | - |
| Papua New Guinea | - | - | - | - | - | Turkey | 35 | 35 | 43 | 48 | 57 |
| Paraguay | 1 | 2 | 1 | - | 3 | Turks and Caicos Islands | 12 | 9 | 14 | - | - |
| Peru | 6 | 9 | 22 | 22 | 16 | Uganda | - | - | - | - | 1 |
| Philippines | 12 | 12 | 25 | 23 | 16 | Ukraine | 3 | 4 | 6 | 4 | 3 |
| Poland | 7 | 20 | 25 | 31 | 36 | United Arab Emirates | 3 | 9 | 6 | 10 | 12 |
| Portugal | 39 | 40 | 64 | 60 | 48 | United Kingdom | 2,260 | 1,803 | 2,357 | 2,234 | 1,777 |
| Qatar | - | - | - | 1 | - | Upper Volta | - | - | - | 1 | - |
| Republic Moldova | - | - | 1 | - | 3 | Uruguay | 2 | 12 | 9 | 12 | 23 |
| Romania | 8 | 3 | 11 | 3 | 8 | Uzbekistan | - | - | - | - | 1 |
| Saint Christ & Nevis | - | - | 6 | 15 | 18 | Vanuatu | - | 3 | - | 1 | 1 |
| St. Kitts & Nevis | 1 | - | - | - | - | Vatican City | - | - | - | - | - |
| Saint Lucia | - | - | 3 | - | 1 | Venezuela | 21 | 29 | 43 | 39 | 28 |
| Saint Vincent/Grenadines | - | - | 2 | - | 4 | Vietnam | - | 5 | 21 | 35 | 35 |
| San Marino | - | - | 1 | - | 4 | Western Samoa | - | 1 | 1 | 1 | 1 |
| Saudi Arabia | 4 | 2 | 12 | 3 | 12 | Yemen | - | - | - | - | - |
| Scotland | 23 | 10 | 18 | 18 | 12 | Yugoslavia | 1 | - | - | 1 | - |
| Senegal | - | - | 1 | - | - | Zimbabwe | 1 | - | 2 | - | - |
| Seychelles | 7 | 1 | 6 | 21 | 9 | Other[1] | 26 | 27 | 15 | 12 | 15 |

- Represents zero.

[1] Country of origin information not available.

| TABLE 23 | SUMMARY OF CONTESTED TRADEMARK CASES *(Within the U.S. Patent and Trademark Office, as of September 30, 2005)* | | | | | |
|---|---|---|---|---|---|---|
| **ACTIVITY** | **EX PARTE** | **CANCELLATIONS** | **USE** | **INTERFERENCE** | **OPPOSITION** | **TOTAL** |
| **Cases pending as of 9/30/05, total** | **2,533** | **1,766** | **102** | **-** | **6,457** | **10,858** |
| **Cases filed during FY 2005** | **2,536** | **1,368** | **52** | **-** | **4,696** | **8,652** |
| **Disposals during FY 2005, total** | **2,169** | **1,402** | **53** | **-** | **5,031** | **8,655** |
| Before hearing | 1,822 | 1,381 | 53 | - | 4,946 | 8,202 |
| After hearing | 347 | 21 | - | - | 85 | 453 |
| **Cases pending as of 9/30/05, total** | **2,900** | **1,732** | **101** | **-** | **6,122** | **10,855** |
| Awaiting decision | 91 | 9 | - | - | 32 | 132 |
| In process before hearing[1] | 2,809 | 1,723 | 101 | - | 6,090 | 10,723 |
| **Requests for extension of time to oppose** | **-** | **-** | **-** | **-** | **-** | **-** |

- *Represents zero.*
[1] *Includes suspended cases.*

**TABLE 24** — ACTIONS ON PETITIONS TO THE COMMISSIONER OF PATENTS AND TRADEMARKS (FY 2001 - FY 2005)

| NATURE OF PETITION | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|
| **Patent matters** | | | | | |
| **Actions on patent petitions, total** | **37,523** | **16,461** | **49,049** | **46,568** | **44,361** |
| Acceptance of: | | | | | |
| Late assignments | 85 | 30 | 42 | 33 | 432 |
| Late issue fees | 1,332 | 1,676 | 2,362 | 1,441 | 938 |
| Late priority papers | 72 | 330 | 1,184 | 1,112 | 27 |
| Access | 4 | 6 | 3 | - | 10 |
| Certificates of correction | 22,157 | - | 32,455 | 30,406 | 27,763 |
| Deferment of issue | 25 | 21 | 40 | 40 | 21 |
| Entity Status Change | 986 | 836 | - | 1,621 | 1,289 |
| Filing date | 1,375 | 2,158 | 1,776 | 1,267 | 1,815 |
| Maintenance fees | 1,614 | 1,614 | 2,002 | 1,913 | 2,208 |
| Revivals | 4,231 | 3,395 | 4,154 | 4,400 | 5,190 |
| Rule 47 (37 CFR 1.47) | 1,531 | 1,698 | 2,045 | 1,519 | 2,055 |
| Supervisory authority | 44 | 112 | 196 | 69 | 131 |
| Suspend rules | 875 | 1,052 | 1,441 | 1,006 | 290 |
| Withdrawal from issue | 991 | 1,178 | 881 | 1,451 | 1,950 |
| Withdrawals of holding of aband./pat. lapse | 2,201 | 2,355 | 468 | 290 | 242 |
| **Trademark matters** | | | | | |
| **Actions on trademark petitions, total** | **10,374** | **24,699** | **18,493** | **17,791** | **22,377** |
| Affidavits of Use and extensions | - | 1 | 3 | - | - |
| Decision by examiner | 23 | 14 | 20 | 23 | 10 |
| Filing date restorations[1] | 1,785 | 846 | 495 | 270 | 211 |
| Grant application filing date | 25 | 29 | 21 | 8 | 17 |
| Inadvertently issued registrations | 325 | 654 | 516 | 220 | 181 |
| Interferences | 1 | 2 | - | | 1 |
| Letters of Protest* | | | | 765 | 811 |
| Make special | 199 | 133 | 138 | 167 | 208 |
| Miscellaneous | 23 | 40 | 46 | 74 | 68 |
| Oppositions and extensions | 6 | 3 | 4 | 1 | 2 |
| Record documents affecting title | 2 | 1 | 4 | - | - |
| Reinstatements[2] | 2,043 | 6,304 | 3,845 | 2,972 | 1,964 |
| Restore jurisdiction to examiner | 2 | 2 | 8 | 19 | 3 |
| Review board decisions | 13 | 10 | 14 | 5 | 8 |
| Revive | 5,633 | 16,222 | 12,771 | 12,476 | 18,134 |
| Section 7 correction/amendment | 10 | 17 | 10 | 16 | 20 |
| Section 9 renewal | 13 | 14 | 28 | 21 | 10 |
| Section 8 or 15 | 60 | 75 | 61 | 86 | 73 |
| Section 44(e) Amendment | 183 | 317 | 493 | 622 | 629 |
| Review Letter of Protest Decision | 8 | 4 | 2 | 4 | 3 |
| Waive fees/refunds | 20 | 11 | 14 | 42 | 24 |
| **Petitions awaiting action as of 9/30** | | | | | |
| Trademark petitions awaiting response | 503 | 2,197 | 354 | 253 | 222 |
| Trademark petitions awaiting action | 6,060 | 582 | 1,791 | 2,179 | 379 |
| Trademark pending filing date issues | 24 | 12 | 8 | 1 | 7 |

- Represents zero.
1 Trademark Applications entitled to a particular filing date; based on clear evidence of Trademark organization error.
2 Trademark Applications restored to pendency; inadvertently abandoned by the Trademark organization.
* Not reported in previous years.

| TABLE 25 | CASES IN LITIGATION *(Selected Courts of the United States, as of September 30, 2005)* | | | |
|---|---|---|---|---|
| | **PATENTS** | **TRADEMARKS** | **OED** | **TOTAL** |
| **United States District Courts** | | | | |
| **Civil actions pending as of 9/30/04, total** | 15 | 1 | 1 | 17 |
| **Filed during FY 2005** | 11 | 2 | 1 | 14 |
| **Disposals, total** | **14** | **1** | **1** | **16** |
| Affirmed | 2 | 1 | 1 | 4 |
| Reversed | - | - | - | - |
| Remanded | - | - | - | - |
| Dismissed | 11 | - | - | 11 |
| Amicus/intervene | - | - | - | - |
| Transfer | 1 | - | - | 1 |
| **Civil actions pending as of 9/30/05, total** | **12** | **2** | **1** | **15** |
| **United States Courts of Appeals[1]** | | | | |
| **Ex parte cases** | | | | |
| **Cases pending as of 9/30/04** | 29 | 7 | 1 | 37 |
| **Cases filed during FY 2005** | 36 | 9 | 2 | 47 |
| **Disposals, total** | **40** | **12** | **2** | **54** |
| Affirmed | 19 | 7 | 1 | 27 |
| Reversed | - | - | - | - |
| Remanded | 6 | 2 | - | 8 |
| Dismissed | 12 | 2 | 1 | 15 |
| Vacated | - | 1 | - | 1 |
| Transfer | 1 | - | - | 1 |
| Writs of mandamus: | - | - | - | - |
| Granted | - | - | - | **-** |
| Granted-in-part | - | - | - | - |
| Denied | 2 | - | - | 2 |
| Dismissed | - | - | - | - |
| **Total ex parte cases pending as of 9/30/05** | **25** | **4** | **1** | **30** |
| **Inter partes cases** | | | | |
| **Cases pending as of 9/30/04** | 10 | 15 | - | 25 |
| **Cases filed during FY 2005** | 7 | 21 | - | 28 |
| **Disposals, total** | 12 | 23 | - | 35 |
| Affirmed | 1 | 10 | - | 11 |
| Reversed | - | 2 | - | 2 |
| Remanded | 5 | 1 | - | 6 |
| Dismissed | 6 | 9 | - | 15 |
| Amicus/intervene | - | - | - | - |
| Transferred | - | 1 | - | 1 |
| **Total inter partes cases pending as of 9/30/05** | **5** | **13** | **-** | **18** |
| **Total United States Courts of Appeals cases pending as of 9/30/05** | **30** | **17** | **-** | **48** |
| **Supreme Court** | | | | |
| **Ex parte cases** | | | | |
| **Cases pending as of 9/30/04** | 1 | - | - | 1 |
| **Cases filed during FY 2005** | 3 | - | - | 3 |
| **Disposals, total** | 1 | - | - | 1 |
| **Cases pending as of 9/30/05, total** | **3** | **-** | **-** | **3** |
| **Notices of Suit filed in FY 2005** | **2,115** | **1,766** | **-** | **3,881** |

- Represents zero.

[1] Includes Federal Circuit and others.

| TABLE 26 | **PATENT CLASSIFICATION ACTIVITY**<br>**(FY 2001 - FY 2005)** | | | | |
|---|---|---|---|---|---|
| **ACTIVITY** | **2001** | **2002** | **2003** | **2004** | **2005** |
| Original patents professionally reclassified - completed projects | 39,209 | 19,621 | 10,802 | 20,370 | 12,170 |
| Subclasses established | 1,878 | 780 | 2,023 | 552 | 496 |
| **Reclassified patents clerically processed, total** | **135,877** | **52,023** | **205,476** | **58,738** | **50,932** |
| Original U.S. patents | 51,266 | 13,155 | 16,202 | 20,555 | 16,572 |
| Cross-reference U.S. patents | 84,611 | 38,868 | 189,274[1] | 38,183 | 34,360 |

[1] *FY 2003 cross-reference U.S. patents includes 1,700 EULA based subclasses that were added to the semiconductor classes in USPC.*

| TABLE 27 | SCIENTIFIC AND TECHNICAL INFORMATION CENTER ACTIVITY (FY 2005) | |
|---|---|---|
| **ACTIVITY** | | **QUANTITY** |
| **Prior Art Search Services Provided:** | | |
| Automated Prior Art Searches Completed | | 31,824 |
| On-line and Manual Foreign Patent Searches Completed | | 3,467 |
| Genetic Sequence Searches Completed | | 11,752 |
| Number of Genetic Sequences Searched | | 38,051 |
| CRF Submissions Processed | | 15,525 |
| PLUS Searches Completed | | 18,987 |
| **Document Delivery Services Provided:** | | |
| Document Delivery/Interlibrary Loan Requests Processed | | 44,646 |
| Copies of Foreign Patents Provided: | | 5,674 |
| Copies Purchased by the Public | | 751 |
| Copies Provided to USPTO Staff | | 4,823 |
| Foreign Patents Provided Using Electronic Tools | | 5,175 |
| **Information Assistance and Automation Services:** | | |
| One-on-One Examiner Information Assistance | | 17,212 |
| One-on-One Examiner Automation Assistance | | 11,200 |
| Patents Employees Attending Automation Classes | | 7,881 |
| Foreign Patents Assistance for Examiners and Public | | 5,196 |
| Examiner Briefings on STIC Information Sources and Services | | 4,445 |
| Number of STIC Web pages | | 1,125 |
| **Translation Services Provided for Examiners:** | | |
| Written Translations of Documents | | 6,436 |
| Number  of Words Translated (Written) | | 17,436,111 |
| Documents Orally Translated | | 6,299 |
| **Total Number of Examiner Service Contacts** | | 164,881 |
| **Collection Usage and Growth:** | | |
| Print/Electronic (NPL) Collection Usage | | 1,053,975 |
| Print Books/Subscriptions Purchased | | 36,760 |
| Full Text Electronic Journal Titles Available | | 11,868 |
| Full Text Electronic Book Titles Available | | 6,151 |
| NPL Databases Available for Searching (est.) | | 1,510 |
| Foreign Patent Databases/Web Sites Accessed | | 85 |

| TABLE 28 | END OF YEAR PERSONNEL (FY 2001 - FY 2005) | | | | |
|---|---|---|---|---|---|
| **ACTIVITY** | **2001** | **2002** | **2003** | **2004** | **2005** |
| **Business** | | | | | |
| Patent Business Line | 5,454 | 6,045 | 5,990 | 6,060 | 6,494 |
| Trademark Business Line | 972 | 894 | 733 | 756 | 869 |
| Total USPTO | 6,426 | 6,939 | 6,723 | 6,816 | 7,363 |
| **Examination Staff** | | | | | |
| Patent Examiners | | | | | |
| UPR Examiners | 3,061 | 3,538 | 3,579 | 3,681 | 4,177 |
| Design Examiners | 60 | 58 | 58 | 72 | 81 |
| Total UPR and D Examiners | 3,121 | 3,596 | 3,637 | 3,753 | 4,258 |
| Trademark Examining Attorneys | 389 | 258 | 256 | 286 | 357 |

# Glossary of Acronyms
# and Abbreviation List





| | | | | |
|---|---|---|---|---|
| **ABC** | Activity-Based Cost Accounting | | **FERS** | Federal Employees Retirement System |
| **ABM** | Activity-Based Management | | **FDA** | Food and Drug Administration |
| **AIPA** | American Inventors Protection Act | | **FFMIA** | Federal Financial Management Improvement Act |
| **ASEAN** | Association of South East Asian Nations | | **FICA** | Federal Insurance Contributions Act |
| **BPAI** | Board of Patent Appeals and Interferences | | **FMFIA** | Federal Managers' Financial Integrity Act |
| **CBP** | Customs and Border Protection | | **FMS** | Financial Management Services |
| **CCR** | Central Contractor Registration | | **FTA** | Free Trade Agreement |
| **CEAR** | Certificate of Excellence in Accountability Reporting | | **FY** | Fiscal year |
| **CRU** | Central Reexam Unit | | **GAAP** | Generally Accepted Accounting Principles |
| **CSRS** | Civil Service Retirement System | | **GAO** | Government Accountability Office |
| **DOC** | Department of Commerce | | **GI** | Geographical indication |
| **DOL** | U.S. Department of Labor | | **GPRA** | Government Performance and Results Act |
| **eDAN** | IFW interface system | | **IFW** | Image File Wrapper |
| **EAST** | Examiner Automated Search System | | **IG** | Inspector General |
| **EFS** | Electronic File System | | **IIPI** | International Intellectual Property Institute |
| **EFT** | Electronic Funds Transfer | | **INL** | International Narcotics and Law Enforcement Affairs |
| **EPO** | European Patent Office | | **IP** | Intellectual property |
| **FAS** | Foreign Agricultural Service | | **IPR** | Intellectual property rights |
| **FASAB** | Federal Accounting Standards Advisory Board | | **IT** | Information technology |
| **FECA** | Federal Employees Compensation Act | | **JCCT** | Joint Commission on Commerce and Trade |
| **FEGLI** | Federal Employees Group Life Insurance | | **JPO** | Japan Patent Office |
| **FEHB** | Federal Employees Health Benefit Program | | **MEPI** | Middle East Partnership Initiative |

| | | | | |
|---|---|---|---|---|
| **MTS** | Metric Tracking System | | **SIPO** | State Intellectual Property Office |
| **OACS** | Office Action Correspondence System | | **SIRA** | Search and Information Resources Administration |
| **OBRA** | Omnibus Budget Reconciliation Act | | **STOP!** | Strategy Targeting Organized Piracy! |
| **OED** | Office of Enrollment and Discipline | | **TC** | Technology Centers |
| **OHIM** | Office for Harmonization in the Internal Market | | **TDA** | Trilateral Document Access |
| **OHR** | Office of Human Resources | | **TDR** | Trademark Document Retrieval |
| **OIG** | Office of the Inspector General | | **TEAS** | Trademark Electronic Application System |
| **OIPE** | Office of Initial Patent Examination | | **TLT** | Trademark Law Treaty |
| **OIR** | Office of International Relations | | **TRAM** | Trademark Reporting And Monitoring |
| **OMB** | Office of Management and Budget | | **TRIPs** | Trade Related Aspects of Intellectual Property |
| **OPF** | Official Personnel Files | | **TTAB** | Trademark Trial and Appeal Board |
| **PAIR** | Patent Application Information Retrieval | | **U.S.C.** | United States Code |
| **PALM** | Patent Application Location and Monitoring | | **UDRP** | Uniform Domain Name Dispute Resolution Policy |
| **PAR** | Performance and Accountability Report | | **UNECE** | United Nations Economic Commission for Europe |
| **PCT** | Patent Cooperation Treaty | | **UPR** | Utility, Plant, and Reissue |
| **PMA** | President's Management Agenda | | **USPTO** | United States Patent and Trademark Office |
| **S&T** | Science and technology | | **USTR** | United States Trade Representative |
| **SCCRR** | Standing Committee on Copyright and Related Rights | | **WCT** | WIPO Copyright Treaty |
| **SCORE** | Supplemental Complex Repository for Examiners | | **WIPO** | World Intellectual Property Organization |
| **SCP** | Standing Committee on the Law of Patents | | **WPPT** | WIPO Performances and Phonograms Treaty |
| **SFFAC** | Statements of Federal Financial Accounting Concepts | | **WTO** | World Trade Organization |
| **SFFAS** | Statements of Federal Financial Accounting Standards | | | |

# ACKNOWLEDGMENTS

**T**his Performance and Accountability Report was produced with the energies and talents of the USPTO staff. To these individuals we would like to offer our sincerest thanks and acknowledgement.

In particular, we would like to recognize the following organizations and individuals for their contributions:

Office of Corporate Planning – Jack Buie, Melissa Stagnaro, Narryn Fisher,Walter Schlueter and Gerard Torres; Office of Finance – Michelle Picard, Dennis Detar, Shana Dowling, Jeanette Kuendel, Candace Yu, Mariam Hooks, Mark Krieger, Britt Fucito, Thao Cicala, and John Yandziak; Office of Public Affairs – Richard Maulsby and Michael Lee; Patents – Karen Young, John Mielcarek and Nancy Savage; Trademarks – Karen Strohecker and Robert Allen; Office of External Affairs – Talis Dzenitis and Peggy Orser; Office of the CIO – Susan Callis, Paul Harrison and Jim Hirabayashi; Office of General Counsel – James Toupin, Mary Kelly, John Whealan, J. David Sams, Gary Harkcom, Merrell Cashion and Mike Briskin; Office of Administrative Services – Calvin Holloway; Office of Procurement – Kate Kudrewicz; Office of the Director – Beth Gibson, Eleanor Meltzer and Norma Rose; Deva & Associates, P.C., and Grant Thornton LLP.

We would also like to acknowledge the Office of the Inspector General and KPMG LLP for the professional manner in which they conducted the audit of the FY 2005 Financial Statements.

We offer special thanks to Bob Shimshock of AOC Solutions, Inc. and to Michael James and Sheri Beauregard of The DesignPond for their outstanding contributions in the design and production of this report.

To send comments or get additional information about this report please contact Melissa Stagnaro. 600 Dulany Street, Alexandria, VA 22314 melissa.stagnaro@uspto.gov. Phone: 571-272-6303 Fax: 571-273-0127





UNITED STATES
PATENT AND
TRADEMARK OFFICE

*An Agency of the United States Department of Commerce*

***www.uspto.gov***

# EXHIBIT  2

CITATION OF PRIOR ART AND EX PARTE REEXAMINATION OF PATENTS     **2201**

**>



*Ex Parte* Reexamination - PROCEDURE PRIOR TO APPEAL
(applicable rule section)

**2201**          MANUAL OF PATENT EXAMINING PROCEDURE

### *Ex Parte* Reexamination – PROCEDURE FROM TIME OF APPEAL
(applicable rule section)

