DANIEL J. BERGESON, SBN 105439
dbergeson@be-law.com
DONALD P. GAGLIARDI, SBN 138979
dgagliardi@be-law.com
HWAY-LING HSU, SBN 196178
hhsu@be-law.com
BERGESON, LLP
303 Almaden Boulevard, Suite 500
San Jose, CA 95110-2712
Telephone: (408) 291-6200
Facsimile: (408) 297-6000

KENNETH W. BROTHERS (*Pro Hac Vice*)
brothersk@dicksteinshapiro.com
GARY M. HOFFMAN (*Pro Hac Vice*)
hoffmang@dicksteinshapiro.com
DICKSTEIN SHAPIRO, LLP
1825 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 420-2200
Facsimile: (202) 420-2201

Attorneys for Plaintiff and Declaratory Judgment Defendant
RICOH COMPANY, LTD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE RICOH COMPANY, LTD. PATENT LITIGATION | Case No. 03-CV-02289 JW (HRL) |
| | **RICOH'S REPLY IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE THE *DIRKES REPORT* AND TESTIMONY OR RELIANCE THEREON** |
| | Date: March 8, 2010<br>Time: 9:00 a.m.<br>Crtrm: 8, 4th Floor<br>Judge: Hon. James Ware |

1

# TABLE OF CONTENTS

2    I.     INTRODUCTION ...................................................................................... 1

3    II.    DEFENDANTS MISSTATE THE LEGAL STANDARDS ......................... 2

4           A.    Defendants Mischaracterize The Governing Law ............................ 2

5           B.    The Examiner's Views In The Pending Reexamination Are Not Relevant
                  Here ................................................................................................ 3

6
     III.   DEFENDANTS MISSTATE THE RELEVANT FACTS ............................ 5
7
            A.    The *Dirkes Report* Does Not Match Either Thesis Citation .............. 5
8
            B.    Ricoh Disclosed CMU-DA During The Prosecution Of The '432 Patent .............. 6
9
            C.    Defendants' Expert States That The Subject of the *Dirkes Report* Was
10                Included In CMU-DA .................................................................. 6

11   IV.    ARGUMENT ........................................................................................... 7

12          A.    Defendants Failed To Show The *Dirkes Report* Is a Printed Publication .............. 7

13                1.    Defendants have no evidence that the *Dirkes Report* was publicly
                        available prior to January 1988 .................................................. 7
14
                  2.    The *Dirkes Report* Was Not Publicly Accessible From SRC .................. 10
15
            B.    Defendants' Chain Of Assumptions Fails In Every Link ..................... 11
16
                  1.    The May 1985 *Dirkes Report* is not her master's thesis ................. 12
17
                  2.    *Thesis Citation I* does not refer to the *Dirkes Report* ................. 12
18
                  3.    *Thesis Citation II* does not refer to the *Dirkes Report* either .................. 13
19
                  4.    The *Cornell* case does not control this outcome ......................... 13
20
            C.    The *Dirkes Report* Cannot Be Used For Defendants' "Corroboration" Theory ... 14
21
     V.     CONCLUSION ....................................................................................... 15

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

Page(s)

Cases

*Bruckelmyer v. Ground Heaters, Inc.,*
    445 F.3d 1374 (Fed. Cir. 2006) .................................................................................. 2, 3

*Callicrate v. Wadsworth Mfg.,*
    427 F.3d 1361 (Fed. Cir. 2005) ...................................................................................... 15

*CBS Interactive, Inc. v. Etilize, Inc.,*
    257 F.R.D. 195 (N.D. Cal. Jan.7, 2009) .......................................................................... 15

*Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.,*
    291 F.3d 1317 (Fed. Cir. 2002) ...................................................................................... 10

*Cordis Corp. v. Boston Scientific Corp.,*
    561 F.3d 1319 (Fed. Cir. 2009) ...................................................................................... 13

*Cornell Univ. v. Hewlett-Packard Co.,*
    No. 01-CV-1974, 2008 U.S. Dist. LEXIS 39343 (N.D.N.Y. May 14, 2008) ................. *passim*

*Ethicon, Inc. v. Quigg,*
    849 F.2d 1422 (Fed. Cir. 1998) ........................................................................................ 4

*In re Etter,*
    756 F.2d 852 (Fed. Cir. 1985) .......................................................................................... 4

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.,*
    No. C03-1431 SBA, 2006 WL 1343648 (N.D. Cal. May 16, 2006)...................................... 3

*Garrett Corp. v. United States,*
    422 F.2d 874 (Ct. Cl. 1970) ............................................................................................ 10

*Kyocera Wireless Corp. v. Int'l Trade Com'n,*
    545 F.3d 1340 (Fed. Cir. 2008) ...................................................................................... 10

*In re Lister,*
    583 F.3d 1307 (Fed. Cir. 2009) ...................................................................................... 14

*Norian Corp. v. Stryker Corp.,*
    363 F.3d 1321 (Fed. Cir. 2004) ...............................................................................*passim*

*Northern Telecom v. Datapoint Corp.,*
    908 F.2d 931 (Fed. Cir. 1990) ............................................................................... 4, 10, 11

*Quad Envtl. Techs. Corp. v. Union Sanitary Dist.*,
 946 F.2d 870 (Fed. Cir. 1991) ............................................................................................. 3

*Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*,
 264 F.3d 1344 (Fed. Cir. 2001) ......................................................................................... 15

*Sick A.G. v. Omron Scientific Techs., Inc.*,
 2007 U.S. Dist. LEXIS 33818 (N.D. Cal. 2007) ......................................................... 14, 15

*SRI Int'l, Inc. v. Internet Sec. Sys. Inc.*,
 511 F.3d 1186 (Fed. Cir. 2008) .................................................................................. 10, 11

*Woodland Trust v. Flowertree Nursery, Inc.*,
 148 F.3d 1368 (Fed. Cir. 1997) ......................................................................................... 15

*In re Wyer*,
 655 F.2d 221 (C.C.P.A. 1981) ..................................................................................... 2, 3, 7

<u>Statutes</u>

37 C.F.R. § 1.570 ...................................................................................................................... 4

37 C.F.R. § 41.43 ...................................................................................................................... 4

35 U.S.C. § 102 ........................................................................................................................ 1

35 U.S.C. § 282 ........................................................................................................................ 4

Fed. R. Evid. 104 .................................................................................................................... 15

Fed. R. Evid. 402 .................................................................................................................... 15

Fed. R. Evid. 901 .................................................................................................................... 15

Fed. R. Evid. 902 .................................................................................................................... 15

<u>Other Authorities</u>

Patent L.R. 3-3 ....................................................................................................................... 15

RICOH'S REPLY IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE THE *DIRKES REPORT* AND
TESTIMONY OR RELIANCE THEREON                          Case No. 03-CV-02289 JW (HRL)

1

## I.    INTRODUCTION

2    Although Defendants have the burden of proving by clear and convincing evidence that the

3  *Dirkes Report* meets the requirements to be legally available as a prior art "printed publication"

4  under 35 U.S.C. § 102, their opposition brief instead regurgitates the *sua sponte* opinion of an ex-

5  aminer in the Patent Office. The examiner's opinion is not a final agency action, and currently is

6  under review within the Patent Office. It also is irrelevant. In a Patent Office reexamination, the

7  evidentiary standard is only a mere preponderance; in this Court, Defendants must possess clear

8  and convincing evidence. In the Patent Office, there is no presumption that the patent is valid; in

9  this Court, Ricoh's patent is presumed valid. Most importantly, the Federal Circuit has empha-

10  sized that a District Court *independently* must determine invalidity without deference to the find-

11  ings of a patent examiner.

12    An independent review of the facts and case law shows that Defendants do not have clear

13  and convincing evidence showing that the *Dirkes Report* is prior art. Defendants mangle the facts

14  in their opposition brief. For example:

15  - Defendants falsely claim (at 1) that, during the prosecution of the '432 patent, Ricoh
16    did not disclose the CMU-DA system. Defendants' own expert admits that a compo-
    nent of the *Dirkes Report*, MOBY, was part of the CMU-DA System. In fact, the
17    CMU-DA system was disclosed to and considered by the examiner prior to issuing the
    '432 patent.
18

19  - Defendants falsely assert (at 2, 6, 24) that the *Dirkes Report* was indexed by CMU.
    There is no evidence whatsoever to support this assertion.
20
  - Defendants assert (at 20) that, because SRC had 40 members in 1985, SRC documents
21    were publicly accessible to all of the relevant public, despite an explicit written confi-
    dentiality policy to the contrary. SRC's 1985 membership excluded 100% of the solo
22    inventors and more than half of the companies and universities involved in VLSI de-
    sign. Confidential disclosure of the *Dirkes Report* to four SRC members between 1985
23    and 1988 was not disclosure to the relevant public.

24  - Defendants continue to conceal how they first obtained the *Dirkes Report*, belying their
    assertions that it was publicly available.
25

26    As Ricoh predicted, Defendants sidestep the fundamental questions of whether the *Dirkes*

27  *Report* ever was offered to the public, and if so, who offered it, where was it offered, when was it

28  offered, and how was it offered to the public. There is no clear and convincing evidence to support

---

1

1    Defendants' alternative theories. <u>First</u>, Defendants speculate that the May 1985 *Dirkes Report* is

2    the same thing as Ms. Dirkes' missing masters thesis. Ms. Dirkes' masters thesis was never pub-

3    lished, cataloged, or distributed in any way. <u>Second</u>, there is no basis other than speculation to

4    substitute the *Dirkes Report* for the missing thesis referenced in *Thesis Citation I*. <u>Third</u>, likewise,

5    there is no basis to substitute the *Dirkes Report* for the missing thesis referenced in *Thesis Citation*

6    *II*. <u>Fourth</u>, the facts here are different from the non-precedential *Cornell* case.

7           Finally, Defendants' newly invented reason for using the *Dirkes Report* to "corroborate"

8    other prior art is inconsistent with their invalidity contentions and expert report. This Court should

9    grant Ricoh's motion in limine and preclude Defendants' untimely theory.

10   **II.      DEFENDANTS MISSTATE THE LEGAL STANDARDS**

11          **A.      Defendants Mischaracterize The Governing Law**

12          Ricoh's opening brief sets forth (at 4-5) the factors followed by the Federal Circuit to de-

13   termine whether a reference qualifies as a "printed publication," including "intent to make public,

14   activity in disseminating information, production of a certain number of copies, and production by

15   a method allowing production of a large number of copies may aid in determining whether an item

16   may be termed a 'printed publication.'" *In re Wyer*, 655 F.2d 221, 227 (C.C.P.A. 1981). Defen-

17   dants (at 2) ignore these factors and instead invent a new test: public accessibility can be demon-

18   strated by the mere existence of a "research aid."

19          Ricoh's opening brief (at 5) correctly stated the legal standard: "Defendants must prove

20   with clear and convincing evidence that: 1) the *Dirkes Report* could have been *located by the in-*

21   *terested public*; and 2) that the *Dirkes Report* was *actually available* to the public before the filing

22   date of the '432 patent." The research aids in *Bruckelmyer*, *Wyer* and *Cornell* were roadmaps to

23   documents that could be located by and were actually available to the interested public before the

24   critical date. *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1379 (Fed. Cir. 2006) (an is-

25   sued Canadian patent provided a sufficient roadmap to locate the corresponding publicly-available

26   indexed patent application); *Wyer*, 655 F.2d at 226 (a publicly-available indexed and categorized

27   Australian patent application that had a published abstract was a printed publication); *Cornell*

28   *Univ. v. Hewlett-Packard Co.*, No. 01-CV-1974, 2008 U.S. Dist. LEXIS 39343 at *16-17, 24-25

RICOH'S REPLY IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE THE *DIRKES REPORT* AND
TESTIMONY OR RELIANCE THEREON                                    Case No. 03-CV-02289 JW (HRL)

1    (N.D.N.Y. May 14, 2008) (weighing "all indicia of public accessibility" to find a thesis publicly

2    accessible, including that the cited thesis was catalogued, shelved and "open for inspection" to

3    anyone in the university library, and that the thesis was accessed prior to the critical date).

4         Unlike the research aids in *Bruckelmyer*, *Wyer,* and *Cornell*, the *Dirkes Report* was never

5    catalogued or shelved anywhere by CMU or anyone else for public inspection. There simply is no

6    evidence – let alone no clear and convincing evidence – showing that the *Kowalski85c* article

7    would have led readers to be able to obtain either the thesis cited in the Kowalski article or the

8    separate (confidential) *Dirkes Report* prior to the critical date. Ironically, the so-called "research

9    aid" of *Kowalski85c* has yet to produce even a single draft of the Dirkes thesis. Thus, Defendants'

10   reliance on *Bruckelmyer*, *Wyer* and *Cornell* to support their contention that public accessibility can

11   be demonstrated by the mere existence of a "research aid" is misplaced.

12        **B.      The Examiner's Views In The Pending Reexamination Are Not Relevant Here**

13        Defendants repeatedly cite (at 12, 15-17, 23) the opinion of a PTO examiner in the reex-

14   amination[1] as if it was somehow binding on this Court. It is not. This Court has held that "a district

15   court must review a patent's validity independently of the patent examiner." *Fresenius Med. Care*

16   *Holdings, Inc. v. Baxter Int'l, Inc.*, No. C03-1431 SBA, 2006 WL 1343648 at *18 (N.D. Cal. May

17   16, 2006). The Federal Circuit has emphasized that a district court must determine validity on the

18   basis of an independent examination of the prior art with no deference to the patent examiner.

19   *Quad Envtl. Techs. Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 875-76 (Fed. Cir. 1991).[2]

20   _____

21   [1] Defendants refused to admit to this Court that they filed the initial request for reexamination of
     the '432 patent. D.I. 303 at 6-9. They now contradict their prior representation to the Court and
22   finally admit it (at 7). They also mischaracterize the basis of their reexamination request in stating
     (at 1): "Synopsys filed *ex parte* requests for reexamination of the '432 patent in light of the CMU-
23   DA system and references that describe it." In fact, Synopsys filed a request for reexamination
     based on *Kowalski85c*, which its own expert, Dr. Mitchell, *distinguishes* from CMU-DA. *See* pp.
24   6, *infra*.
     [2] Defendants (at 16) rely only on *Quad. Environmental* to support their contention that this Court
25   should rely upon the examiner's conclusions. That case actually supports Ricoh's position: "The
     courts are the final arbiter of patent validity and, although courts may take cognizance of, and
26   benefit from, the proceedings before the patent examiner, the question is ultimately for the courts
     to decide, *without deference to the rulings of the patent examiner*." 946 F.2d at 876 (emphasis
27   added).

28

RICOH'S REPLY IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE THE *DIRKES REPORT* AND
TESTIMONY OR RELIANCE THEREON                                    Case No. 03-CV-02289 JW (HRL)

1    The opinion of the examiner is irrelevant to this proceeding. In a Patent Office reexamina-

2    tion, the evidentiary standard is only a mere preponderance. *Ethicon, Inc. v. Quigg*, 849 F.2d 1422,

3    1427 (Fed. Cir. 1998). In this Court, Defendants must possess clear and convincing evidence.

4    *Northern Telecom v. Datapoint Corp.*, 908 F.2d 931, 936 (Fed. Cir. 1990); *Norian Corp. v.*

5    *Stryker Corp.*, 363 F.3d 1321, 1330 (Fed. Cir. 2004). In the Patent Office, there is no presumption

6    that the patent is valid. *In re Etter*, 756 F.2d 852, 858 (Fed. Cir. 1985). In this Court, Ricoh's pat-

7    ent is presumed valid. 35 U.S.C. § 282.

8    Defendants admit (at 7) that the examiner *sua sponte* decided that the *Dirkes Report* was a

9    printed publication, with no benefit of briefing. Having unilaterally made that decision, the exam-

10   iner provided continually shifting justifications for his uninformed and hasty conclusion, disre-

11   garding Ricoh's considerable evidence to the contrary.[3] And, despite Defendants' characteriza-

12   tions, the examiner's opinion does not constitute a final agency action. *See* 37 C.F.R. § 1.570(a)

13   ("To conclude an *ex parte* reexamination proceeding, the Director will issue and publish an *ex*

14   *parte* reexamination certificate."). The Patent Office is reviewing the examiner's actions.[4]

---

16   [3] The continual shifting bases relied upon by the PTO examiner underscores the fact that he has
17   yet to find any real basis for invalidating the '432 patent claims. Originally, for example, the ex-
     aminer attempted to meet the "storing definitions" limitations by relying on one portion ("ISPS
18   descriptions") of *Kowalski85c*. Frenkel Ex. B at SNPS2010-3773. The examiner subsequently
     shifted his position, suggesting that a different portion (the "DAA rules") met the "definitions"
19   limitations, instead of the ISPS descriptions. Brothers Ex. R at SNPS2010-4922. The examiner
     later shifted his position again by suggesting that yet another feature ("VT and hardware op-
20   codes") in a completely separate reference (Kowalski84) met the "definitions" limitations. *Id.* at
     SNPS2010-4924.

     [4] Defendants criticize (at 9, n.4) Ricoh's recent request to reopen prosecution and defer the pro-
21   ceedings before the BPAI. As shown in n.3, the examiner in the reexamination proceeding has
     continually shifted his positions, including in the recent Supplemental Examiner's Answer. Pursu-
22   ant to 37 C.F.R § 41.43(a)(2) of Patent Office rules, Ricoh believes that the Examiner should have
     classified his new reason for the rejection as a "new rejection," thereby reopening prosecution. On
23   January 20, 2010, Ricoh petitioned the PTO to consider reopening the prosecution. To prevent fil-
     ing a possibly unnecessary Supplemental Reply Brief, Ricoh also asked the PTO for an extension
24   of time to file it. However, the PTO did not timely act on the request for an extension of time, and
     thus Ricoh filed its Supplemental Reply Brief on February 12, 2010. The PTO may still decide
25   that the examiner's new rejection is a "new rejection" and reopen the prosecution. Otherwise, the
     BPAI eventually will review the examiner's actions – a process that could take years.

RICOH'S REPLY IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE THE *DIRKES REPORT* AND
TESTIMONY OR RELIANCE THEREON                                       Case No. 03-CV-02289 JW (HRL)

III.   **DEFENDANTS MISSTATE THE RELEVANT FACTS**

    A.   **The *Dirkes Report* Does Not Match Either Thesis Citation**

Defendants have no evidentiary basis to conflate the *Dirkes Report* with *Thesis Citation I* and/or *II*. The only relevant document written by Ms. Dirkes is the *Dirkes Report*, (Brothers 1/8/10 Ex. A). It is dated May 15, 1985. It does not purport to be a thesis. It does not even purport to be a report resulting from work towards a masters degree. It was never published. It suggests it may be published in the future, but there is no evidence that it ever was.

There are two different citations to a masters thesis authored by Ms. Dirkes. The first – *Thesis Citation I* – is found in footnote 10 of *Kowalski85c*. That citation states:

> E. Dirkes, *A Module Binder for the CMU-DA System*, masters thesis,
> Dept. Electrical and Computer Eng., Carnegie-Mellon University,
> Pittsburgh, Pa., Apr. 1985

Brothers 1/8/10 Ex. N at SNPS2010-0421. The April 1985 date of the masters thesis is different from the May 15, 1985 date of the *Dirkes Report*. There is no evidence that the document referenced in *Thesis Citation I* was ever made available to anyone, and certainly not the interested public prior to the filing date of the '432 patent.

The second citation to a Dirkes thesis is referred to in a September 1985 SRC Newsletter:

> T85029; Carnegie-Mellon, Contract 82-11-007, "A Module Binder
> for the CMU-DA System," M.S. Thesis, Elizabeth Dirkes, 51 pps.

Brothers 1/8/10 Ex. F at SNPS2010-4381. Like the reference in the first citation, this reference – *Thesis Citation II* – has never been produced.

Defendants insist that *Thesis Citation II* is the same as the *Dirkes Report*, claiming (at 15-16) that the abstract is "word-for-word the same." Not so. The abstract of the *Dirkes Report* contains a critical sentence not contained within the abstract of *Thesis Citation II*:

**Abstract**

The MOBY module binder provides a means of associating hardware with the data paths created by the upper levels of the CMU-DA system. This is done by binding hardware cells from a library to data path modules, with provisions made for synthesizing new cell descriptions when necessary. The binding is done with respect to designer specified criteria. The information provided by the hardware binding is important to several aspects of the system including the control path allocation and design evaluation. The results of using this module binder on several designs show that MOBY generally produces non-inferior points in the design space relative to the designer specified criteria.

Brothers 1/8/10 Ex. A at SNPS2010-4812. The *Thesis Citation II* abstract recites:

5

RICOH'S REPLY IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE THE *DIRKES REPORT* AND
TESTIMONY OR RELIANCE THEREON                                    Case No. 03-CV-02289 JW (HRL)

T85029  Carnegie-Mellon, Contract 82-11-007, "A Module Binder for the CMU-DA System," M.S. Thesis, Elizabeth Dirkes, 51 pps.
ABSTRACT: The MOBY module binder provides a means of associating hardware with the data paths created by the upper levels of the CMU-DA system. This is done by binding hardware cells from a library to data path modules, with provisions made for synthesizing new cell descriptions when necessary. The information provided by the hardware binding is important to several aspects of the system including the control path allocation and design evaluation. The results of using this module binder on several designs show that MOBY generally produces noninferior points in the design space relative to the designer specified criteria.

Brothers 1/8/10 Ex. F at SNPS2010-4381. This missing sentence – "The binding is done with re-spect to designer specified criteria" – is at the heart of the reexamination proceeding.[5]

**B.      Ricoh Disclosed CMU-DA During The Prosecution Of The '432 Patent**

The CMU-DA system was disclosed by Ricoh during the prosecution of the '432 patent. As Defendants' expert, Dr. Mitchell, acknowledges the CMU-DA system was developed at CMU. Frenkel Ex. D at 24. Specifically, Ricoh disclosed the CMU-DA system as detailed in Parker et al., "The CMU Design Automation System – An Example Of Automated Data Path Design," Pro-ceedings of the 16th Design Automation Conference, Las Vegas, Nevada, 1979, pp.73-80 ("Parker"). Brothers Ex. U at RCL186-187, RCL199-206. In addition, Ricoh discussed and distin-guished Parker during prosecution. Brothers Ex. V at RCL221. Defendants' assertion (at 1) that Ricoh never disclosed CMU-DA to the Patent Office is simply incorrect.

**C.      Defendants' Expert States That The Subject of the *Dirkes Report* Was Included In CMU-DA**

In discussing the development of the DAA system in his expert report on invalidity, Dr. Mitchell categorizes the work into three groups: (1) an original phase developed at CMU (which he calls CMU-DA); (2) a second phase which was partially developed at CMU and also continued by Dr. Kowalski at AT&T Bell Laboratories (which he calls VDAA); and (3) a third phase later phase developed at AT&T Bell Laboratories. Frenkel Ex. D at 24. Dr. Mitchell states that MOBY, which is discussed in the *Dirkes Report*, was a component of CMU-DA, which was disclosed to

---

[5] The examiner's only attempt to meet the "rules" limitations of the '432 patent using the *Dirkes Report* (or any other prior art reference) was in alleging that the system in the *Dirkes Report* makes decisions "based on *knowledge*, expressed as *rules* (*i.e.*, 'user-supplied constraints on area, power, and speed') obtained from design experts (those 'users' who supplied the area, power, and speed constraints)." Frenkel Ex. A at SNPS2010-2898-99; Frenkel Ex. B at SNPS2010-3777, 3797. Ricoh has repeatedly shown from evidence of record that input "constraints" (whether en-tered by the user/designer or anyone else) cannot be "expert cell selection rules" under any rea-sonable interpretation. *See, e.g.*, Brothers Ex. S, at SNPS2010-3187-98; Brothers Ex. T at SNPS2010-4146-50.

---

6

1    the Patent Office. *Id.*

2    **IV.**    **ARGUMENT**

3       A review of the circumstances surrounding the *Dirkes Report* shows that there were no re-

4    search aids making it available to the relevant public prior to January 1988. Defendants tacitly

5    concede this point, because they struggle to persuade the Court that the *Dirkes Report* corresponds

6    either to *Thesis Citation I* or *II*. But Defendants' speculative chain lacks clear and convincing evi-

7    dence on each link. And Defendants' new basis for using the *Dirkes Report* to "corroborate" other

8    prior art violates the Local Rules, because that basis was never previously disclosed.

9       **A.**      **Defendants Failed To Show The *Dirkes Report* Is a Printed Publication**

10         **1.**      **Defendants have no evidence that the *Dirkes Report* was publicly available prior to January 1988**

11

12       Defendants failed to show by clear and convincing evidence that the *Dirkes Report* entered

13    the public domain prior to the filing date of the '432 patent.[6] They ignore the *Wyer* factors of "in-

14    tent to make public, activity in disseminating information, production of a certain number of cop-

15    ies, and production by a method allowing production of a large number of copies may aid in de-

16    termining whether an item may be termed a 'printed publication.'" *Wyer*, 655 F.2d at 227. None of

17    those factors are present in this case.

18       Defendants' assertion (at 2, 6, 24) that the *Dirkes Report* was indexed by CMU is not sup-

19    ported by the evidence. Defendants rely on the declaration of Roxann Martin (Brothers 1/8/10 Ex.

20    M), who is not employed at CMU, and Defendants represent that the "Research Report Series list"

21    was circulated to a portion of the Electrical and Computer Engineering Department every six

22    weeks prior to January 1988. Instead, Ms. Martin only states that the Research Report Series list

23

24    [6] Defendants' assertion (at 10, 24 n.7) that the parties "specifically agreed" that the Court could rely on what Defendants concede is inadmissible evidence misstates the email exchange between

25    the parties. That email exchange makes clear Ricoh's belief that Defendants should disclose all evidence supporting their contention that the *Dirkes Report* should be admitted. Frenkel Ex. L.

26    Defendants' responded that "the universe of support for the public accessibility of Dirkes is as has been produced so far in the litigation" and that Defendants "do not presently expect to get more

27    discovery" regarding the admissibility of Dirkes. *Id.* Ricoh's counsel stated that it would "rely on your representation regarding your client's position on the evidence." *Id.* This email exchange

28    does not reflect *any* agreement on the suitability of Defendants' Dirkes-related evidence.

7

RICOH'S REPLY IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE THE *DIRKES REPORT* AND
TESTIMONY OR RELIANCE THEREON           Case No. 03-CV-02289 JW (HRL)

1  was circulated to "Center members and industrial affiliates" of SRC. Brothers 1/8/10 Ex. M at

2  SNPS2010-4392. Although CMU was a member of SRC, there is no evidence that members of the

3  CMU Electrical and Computer Engineering Department received the SRC Newsletter. Moreover,

4  the SRC Newsletter is not a CMU index or catalog of the *Dirkes Report*, and there is no evidence

5  that the SRC Newsletter was available to the entire CMU community, let alone the relevant public.

6      There is also no evidence whatsoever that any librarian at CMU ever entered the *Dirkes

7  Report* into any index or catalog.[7] Indeed, in 2007, the CMU librarian was unable to locate either

8  the *Dirkes Report* or any Dirkes thesis or any index referring to the Report. Brothers 1/8/10 Ex. P

9  at SNPS2010-4557. Only when a CMU webmaster (not a librarian) searched the Internet and

10  sought out Dr. Thomas (a consultant previously engaged by Synopsys in this case) and inquired

11  for writings by Ms. Dirkes was Dr. Thomas able to locate a copy in his private, uncataloged files.

12  Brothers 1/8/10 Ex. O at SNPS 2010-4528-29.[8]

13      These facts are striking similar to *Norian*, 363 F.3d at 1330. There, as here, the alleged

14  printed publication was only available upon request to the authors or reviewers. *Id.* There, as here,

15  the party attacking the patent attempted to show that the publication was made available by an as-

16  sociation. *Id.* There, the district court noted testimony of two co-authors of the publication that

17  they could not recall whether the publication was made available at the meeting. *Id.* There, evi-

18  _____

19  [7] Ms. Martin has no personal knowledge during the critical 1988 period, and does not state what

20  proof she has of the procedures that were in place at the time. Nor does she have any personal
   knowledge of Dirkes thesis or the *Dirkes Report*. Martin *assumes* that the "thesis" was issued as a
   technical report and *assumes* that it was indexed prior to 1988. She claims that it was the practice

21  in 1988 to index reports dating back to 1982, but yet she provides no physical reproduction of
   such a list or index.

22  [8] These facts expose as hollow Defendants' claim (at 8, 13, 22) that the *Dirkes Report* was pub-

23  licly available because, when the PTO and Ricoh went looking for it in 2007, they found it. The
   only reason Ricoh and the PTO knew what to look for was because Defendants already had ob-

24  tained the report under mysterious and still-undisclosed circumstances. Both the PTO and Ricoh
   knew that the *Dirkes Report* existed because Defendants had produced it. Neither *Thesis Citation I*

25  or *II* guided the PTO or Ricoh to the *Dirkes Report*. And there is no evidence that those cites
   guided anyone else to the *Dirkes Report* either.

26      Defendants purport (at 6, n.2) to reserve the right to depose Dr. Thomas. But due to misconduct
   by Defendants regarding their improper *ex parte* communications with Dr. Thomas while he was

27  consulting for Ricoh, the Delaware Court, prior to transferring this case to this Court, prohibited
   Defendants from having any contact with Dr. Thomas. Brothers 1/8/10 Ex. J. at SNPS2010-4388.

28  This Court repeatedly has rejected Defendants' attempts to depose Dr. Thomas. D.I. 122; D.I. 145.

RICOH'S REPLY IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE THE *DIRKES REPORT* AND
TESTIMONY OR RELIANCE THEREON                                    Case No. 03-CV-02289 JW (HRL)

1    dence was presented that it was customary for authors to make their publications available at the

2    meetings. *Id.* There, the court held that the patent challenger had not met its burden to show by

3    clear and convincing evidence that the publication was actually available. *Id.* The same result is

4    appropriate here.

5          Similarly, Defendants' assertion that the *Dirkes Report* was available prior to January 1988

6    by request from CMU is not supported by clear and convincing evidence. Defendants rely (at 21)

7    only on Mike Phillips' email to Defendants' counsel dated March 26, 2008 (Brothers 1/8/10 Ex.

8    G) to support their theory that the author (Ms. Dirkes) or the thesis advisor (Dr. Thomas) could

9    have distributed the Dirkes Report to non-SRC members some 20 years earlier. The next day,

10   however, Phillips contradicted his earlier email and clarified that "*[a]ll* SRC members employees

11   ***are bound by confidentiality agreements*** *by virtue of their membership in SRC.*" Brothers 1/8/10

12   Ex. H (emphasis added). CMU was a member of SRC. Brothers 1/8/10 Ex. D at SNPS2010-4307;

13   Brothers 1/8/10 Ex. E at SNPS2010-4342. Thus, all CMU employees, including Dr. Thomas, and

14   employed student researchers like Ms. Dirkes and Dr. Kowalski, were bound by SRC's confiden-

15   tiality agreements. *See* Brothers 1/8/10 Exs. D, E and H.[9]

16         Defendants studiously ignore the fact that the *Dirkes Report* (Brothers 1/8/10 Ex. A) itself

17   suggests that it was not intended to be published, as reflected in the "Limited Distribution Notice,"

18   on page 2 of the report. Defendants have identified no evidence that the report ever was submitted

19   for publication, peer reviewed, or otherwise shared by anyone other than Ms. Dirkes' faculty advi-

20   sor. Even Defendant's paid fact witness, Dr. Kowalski, cannot say that he ever shared the *Dirkes*

21   *Report* with anyone prior to January 1988.[10] In sum, Defendants have no evidence that the *Dirkes*

22   _____

23   [9] Even if an exception to SRC's confidentiality policy is made for CMU employees, the mere pos-
     sibility that three individuals (Thomas, Kowalski and Dirkes) had access to the *Dirkes Report*
24   prior to January 1988 is insufficient to prove public accessibility. *Norian,* 363 F.3d at 1330.
     [10] Defendants try to whitewash the fact that Dr. Kowalski has never been an objective fact witness.
25   Dr. Kowalski was retained by Synopsys early in this litigation in 2003. Ricoh subpoenaed Dr.
     Kowalski as a fact witness, and he was represented by Defendants' counsel at his May 2006 depo-
26   sition, even though he had no idea who was paying his legal fees. Brothers Ex. W at 5. Dr.
     Kowalski admitted that he was paid $400 per hour for his time and expenses as a fact witness. *Id.*
27   at 6-7. Thereafter, in June 2006 Dr. Kowalski submitted an expert report on behalf of the Defen-
     dants.

28

1    *Report* ever was generally available to the relevant public prior to January 1988.

2         **2.    The *Dirkes Report* Was Not Publicly Accessible From SRC**

3         The Federal Circuit repeatedly has ruled that internal documents intended to be confiden-

4    tial or subject to other protective measures do not qualify as printed publications. *See, e.g., SRI*

5    *Int'l, Inc. v. Internet Sec. Sys. Inc.*, 511 F.3d 1186, 1197 (Fed. Cir. 2008) (finding no public acces-

6    sibility of a prepublication paper in part because the paper was not intended for dissemination to

7    the public); *Northern Telecom*, 908 F.2d at 936-37 (confidential documents were not printed pub-

8    lications even though they were distributed to about fifty organizations). Defendants' contention

9    (at 20-21) that *Cooper Cameron* and *Kyocera* support their position is without merit. In *Cooper*

10   *Cameron*, the court found that the SISL reports could qualify as prior art because the record indi-

11   cated that they "were not considered confidential" and that "any other interested persons exercis-

12   ing reasonable diligence could have sought [the] information . . . from SISL, much if not all of

13   which information was available without restriction." *Cooper Cameron Corp. v. Kvaerner Oilfield*

14   *Prods., Inc.*, 291 F.3d 1317, 1324 (Fed. Cir. 2002). Similarly, in *Kyocera*, the organization ETSI

15   did not impose restrictions on members from disseminating information to non-members, there

16   was no evidence that ETSI had a policy of confidentiality, and the information was visible to the

17   general public without requesting them from an ETSI member. *Kyocera Wireless Corp. v. Int'l*

18   *Trade Com'n*, 545 F.3d 1340, 1350-51 (Fed. Cir. 2008). Defendants admit (at 20) that SRC only

19   allowed member companies and university affiliates access to technical research reports ***subject to***

20   ***a confidentiality restriction***. Thus, this case is far more analogous to *Northern Telecom* and *SRI*,

21   where there were confidentiality policies, than *Cooper Cameron* and *Kyocera*, where there were

22   no confidentiality policies.

23        Defendants' only resort is to argue that SRC was co-equal with the relevant public, but the

24   facts are otherwise. "The public . . . constitutes that class of persons concerned with the art to

25   which the document relates and thus most likely to avail themselves of its contents." *Garrett Corp.*

26   *v. United States*, 422 F.2d 874, 878 (Ct. Cl. 1970). In 1984, SRC was a two-year old organization

27   and admittedly a "relatively small operation" that was formed by eleven U.S. companies. Brothers

28   1/8/10 Ex. C at SNPS2010-4279. According to SRC's annual report in 1984, all U.S. semiconduc-

1   tor companies combined have only 54% of the worldwide semiconductor market. *Id.* Because

2   SRC never purported to include all U.S. semiconductor companies, Defendants' claim that SRC

3   represented a "majority" of the world's semiconductor industry is nonsense. Indeed, in 1985, SRC

4   did *not* include more than 150 major universities with advanced computer science programs, in-

5   cluding the University of South Carolina, where Dr. Kobayashi, one of the '432 patent co-

6   inventors, taught.[11] SRC did not include Ricoh or any other foreign company, such as Sony, To-

7   shiba, Hitachi, or NEC. SRC membership did not include other major semiconductor companies,

8   including Samsung, LG, Philips, Qualcomm, Apple, Alcatel-Lucent, Orbital Sciences, Mentor

9   Graphics, or Defendants Matrox or Aeroflex. Indeed, many U.S. companies were not affiliated

10  with SRC before 1988, including Micron Technology, NCR, or Xilinx. Many U.S. government

11  agencies were also not SRC members before 1988 including MITRE, Defense Nuclear Agency, or

12  Office of the Undersecretary of Defense/Computer and Electronic Technology. And SRC had no

13  individual members, even though many U.S. microchip patents were granted to individual inven-

14  tors. In short, SRC was not coequal to the relevant public.

15       The fact that four SRC members actually saw the document cited in *Thesis Citation II* un-

16  der the SRC confidentiality obligation does not convert it into a printed publication. In *Northern*

17  *Telecom*, about ***fifty different organizations*** saw the confidential documents without them being

18  converted to printed publications. 908 F.2d at 936-37. And in *SRI*, there was no public accessibil-

19  ity of a confidential prepublication paper given to a number of organizations because the paper

20  was not intended for dissemination to the public. 511 F.3d at 1197.

21       **B.      Defendants' Chain Of Assumptions Fails In Every Link**

22       Lacking evidence that the *Dirkes Report* was publicly available prior to January 1988, De-

23  fendants posit an alternative theory that requires multiple separate assumptions. The premise of

24  _____

25  [11] *See* Brothers 1/8/10 Ex. D at SNPS2010-4307; Brothers Ex. X at 8. For example, the following
    universities with electrical engineering or computer science programs were not members of SRC
26  before 1988: University of California at Irvine; University of Maryland; University of Denver;
    Massachusetts Microelectronics Center; University of New Mexico; University of North Carolina
27  at Charlotte; Ohio State University; Virginia Tech; University of Pennsylvania; University of
    Washington; Rice University; University of California at San Diego; and Princeton University.

28

this chain is that *Thesis Citations I* and/or *II* are "research aids" to locating the *Dirkes Report*. But a careful review of the underlying assumptions reveals that none are supported by clear and convincing evidence.

### 1.    The May 1985 *Dirkes Report* is not her master's thesis

Defendants speculate (at 15-17) that the May 1985 *Dirkes Report* is the same thing as Ms. Dirkes' missing masters thesis. But the *Dirkes Report* does not purport to be a masters thesis, or any work related to post-graduate work. Instead, it holds itself out as a confidential report prepared for and funded by SRC. Ms. Dirkes' masters thesis was never published, cataloged, or distributed in any way. It is not in the record. With no evidence of the content of the thesis, Defendants' argument that the *Dirkes Report* is the same as the thesis is nothing but speculation.[12]

Dr. Kowalski's declaration casts no light on the issue of whether Ms. Dirkes' masters thesis and the *Dirkes Report* were identical. Although Dr. Kowalski's own thesis and reports were similar, Dr. Kowalski does not speak to whether Ms. Dirkes' thesis and report were the same or even whether it was typical for changes to be made between the report and thesis.[13] Accordingly, Dr. Kowalski's declaration is utterly irrelevant with regard to Ms. Dirkes' thesis and report.[14]

### 2.    *Thesis Citation I* does not refer to the *Dirkes Report*

There is no basis other than speculation to substitute the *Dirkes Report* for the missing thesis referenced in *Thesis Citation I*. As set forth above, there is no basis to conclude that the *Dirkes Report* is identical to the thesis. The citation to a Dirkes thesis in *Kowalski85c* is to something

--------

[12] Defendants rely on a 1989 thesis (Frenkel Ex. F) for evidence of public accessibility of the *Dirkes Report*. This thesis is not prior art. Mr. Un and Ms. Dirkes had the same thesis advisor, Dr. Thomas and Mr. Un thanked Ms. Dirkes for her assistance. The thesis provides no evidence of the public accessibility of the *Dirkes Report*.

[13] The technical report of Kowalski's thesis suggests that the *Dirkes Report* was *not* the same as the Dirkes thesis. In the "republication" of the Kowalski thesis, Kowalski includes language that makes it clear that the information is his thesis work: "A dissertation submitted to the graduate school in partial fulfillment of the requirements for the degree Doctor of Philosophy in Electrical and Computer Engineering." Brothers Ex. Y at DTH00138. No similar language is found in the *Dirkes Report*.

[14] Kowalski reproduces CMU library catalog information showing full indexing of both his thesis and his technical report. Kowalski's intent to publicize and disseminate his work is clear. But neither Defendants nor Kowalski has provided any similar evidence of library cataloging of either the Dirkes thesis or the *Dirkes Report*. There is no evidence of her intent to publicize her work.

1    with a different title – a thesis – and date – April 1985 – than the *Dirkes Report*. This is enough to

2    show the absence of clear and convincing evidence that the two are identical.

3              **3.    *Thesis Citation II* does not refer to the *Dirkes Report* either**

4              Likewise, there is no basis to substitute the *Dirkes Report* for the missing thesis referenced

5    in *Thesis Citation II*. The citation to an undated Dirkes thesis in the September 1985 SRC News-

6    letter cannot overcome the fact that the *Dirkes Report* lacks any of the trappings of a thesis. As

7    shown above (at 5-6), the abstract associated with *Thesis Citation II* is different from the abstract

8    in the *Dirkes Report*. Without a detailed comparison between the *Dirkes Report* and the missing

9    *Thesis Citation II*, one cannot assume that the documents are the same.

10             Dr. Kowalski's declaration supports the conclusion that SRC reports were different from

11   theses. Dr. Kowalski only states it was common for CMU theses and reports to have the same *sub-*

12   *stance*. Kowalski Dec. ¶6 ("It was common practice in 1984-1985 at CMU for theses that were

13   supported by research grants to be first published as theses, and then republished as SRC research

14   reports, without changing anything substantively."). Although Dr. Kowalski states that there are

15   no differences between *his* thesis and his republished technical report, he decidedly does not make

16   any comparisons between *Ms. Dirkes*' thesis and report. But for purposes of a prior art analysis,

17   the details matter. *See, e.g., Cordis Corp. v. Boston Scientific Corp.*, 561 F.3d 1319, 1333-35 (Fed.

18   Cir. 2009) (analyzing the public accessibility of a paper written in 1980 separately from a 1983

19   revised version of the paper). This is especially apparent with the undisputed differences between

20   the abstracts, as shown above. In the absence of the actual phrasing of the document cited in *The-*

21   *sis Citation II*, there is no basis for the Court to graft the *Dirkes Report* onto *Thesis Citation II*.

22             **4.    The *Cornell* case does not control this outcome**

23             The facts here are different from the non-precedential *Cornell* case. Defendants concede

24   that, for *Cornell* to apply, they must bootstrap the May 1985 *Dirkes Report* onto one of the non-

25   matching citations (*Dirkes Thesis Citation I* or *II*). Only if one or both of those citations actually

26   applies to the *Dirkes Report* would *Cornell* possibly have any relevance. But as set forth above,

27   there is no evidence that either of those citations to a master's thesis actually refer to the *Dirkes*

28

RICOH'S REPLY IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE THE *DIRKES REPORT* AND
TESTIMONY OR RELIANCE THEREON                              Case No. 03-CV-02289 JW (HRL)

1  *Report.*[15] Certainly there is no clear and convincing evidence that they are the same.

2       Even if the Court was prepared to make such a leap of faith, *Cornell* still would not man-

3  date a finding that the *Dirkes Report* is a printed publication. First, the master's thesis at issue in

4  *Cornell* was actually deposited in the university library, where it was indexed by author and year.

5  The Dirkes thesis referenced in *Thesis Citation I or II* was never deposited in CMU's library,[16]

6  and it was never indexed by author or year. Neither was the *Dirkes Report*.

7       In addition, *Cornell* is a non-dispositive district court ruling that must give way to the

8  weight of Federal Circuit opinions. The facts here are closer to *Norian*, which overturned a jury

9  verdict of invalidity based on an abstract that "was available only upon individual request to the

10 authors," and "such request and dissemination had not been shown." 363 F.3d at 1330. By Defen-

11 dants' own admission, the only way anyone could locate the *Dirkes Report* was by an individual

12 request to the author or her research advisors (Dr. Thomas or Dr. Kowalski). *See also In re Lister*,

13 583 F.3d 1307, 1316-17 (Fed. Cir. 2009) (a manuscript was not publicly accessible as of the filing

14 date of the asserted patent, even though it was added to an on-line database at some point).

15 **C.    The *Dirkes Report* Cannot Be Used For Defendants' "Corroboration" Theory**

16       Defendants' brief identifies (at 23), for the first time, that they intend to use the *Dirkes Re-*

17 *port* to "corroborate the details about how the CMU-DA system was designed and operated." De-

18 fendants never previously provided Ricoh with notice that they intended to rely on the *Dirkes Re-*

19 *port* for this purpose and thus, are precluded from doing so. *Sick A.G. v. Omron Scientific Techs.,*

20 ────────────────────

21 [15] An influential factor for the Court in *Cornell* was the fact that the IEEE publication "refers
   readers to the thesis for a 'specific illustration' of" a critical aspect of the invention at issue. *Cor-*

22 *nell*, 2008 U.S. Dist. LEXIS 39343 at *21. No such "specific illustration" reference is made in
   *Kowalski85c. Kowalski85c* simply notes as a matter of fact a component (i.e., "module binder")

23 used in the Kowalski VDAA system was the subject of a masters thesis.

24 [16] As stated in *Cornell*: "[t]he Federal Circuit explained that a variety of factors are involved in the
   public accessibility determination, including *intent* to publicize and dissemination activities." *Id.*

25 at *22 (citing *Wyer*, 655 F.2d at 226-27) (emphasis added). The examples of recognized "publica-
   tions" such as book, etc., all show an "intent" to publicize or disseminate. The reason people se-

26 cure their works in a library, whether fully indexed, or simply by name and year (as in *Cornell*), is
   to disseminate their work so that others can benefit. Even in *Cornell*, without the deposit of the

27 thesis in the Cornell library, there is *no* evidence that the *author intended* to publicize/disseminate
   his/her work. The fact that *someone else* created a "research aid" is immaterial if the *author*

28

1  *Inc.,* No. C 06-2028 CW, 2007 U.S. Dist. LEXIS 33818 at *4 (N.D. Cal. 2007) ("The Patent Local

2  Rules are designed to require the parties to crystallize their theories early in the litigation and to

3  adhere to those theories once they have been disclosed."); *CBS Interactive, Inc. v. Etilize, Inc.*, 257

4  F.R.D. 195, 202 (N.D. Cal. Jan. 7, 2009) ("The Patent Local Rules were designed to prevent the

5  parties from shuffling or re-framing their theories in reaction to adverse substantive rulings.").

6        Pursuant to Patent L.R. 3-3(a), Defendants were required to disclose in their invalidity con-

7  tentions that they intended to rely on the *Dirkes Report* as corroborating the CMU-DA system.

8  While Defendants disclosed the CMU-DA system, Frankel Ex. G at 6, they never said they would

9  use the *Dirkes Report* to "corroborate" it.[17] Thus, Defendants cannot dodge their failure to show

10 by clear and convincing evidence that the *Dirkes Report* is a printed publication.

11 **V.      CONCLUSION**

12       Ricoh's motion in limine should be granted.

13 ———————————

14 him/herself did not *intend* to publicize the work in the first instance. No such intent regarding Dirkes thesis is evident in this case.

15 [17] Even if Defendants did properly disclose an intent to use the *Dirkes Report* for that purpose, it is highly questionable whether they could lay a sufficient foundation. Defendants' only citation justi-

16 fying this argument has far different facts – it was an inventor citing multiple documents, including his own patent application, to corroborate his testimony. *Sandt Tech., Ltd. v. Resco Metal &*

17 *Plastics Corp.*, 264 F.3d 1344, 1350-53 (Fed. Cir. 2001). Defendants' "corroboration" argument is similar to *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368 (Fed. Cir. 1997), where the

18 Federal Circuit held that the purported corroborating evidence from witnesses associated with the defendants (such as Dr. Kowalski), about twenty-year old prior art (such as CMU-DA), was not

19 sufficient to corroborate the alleged inventor's testimony, and thus was not admissible.

20     Nor is *Dirkes Report* an "ancient document" Fed. R. of Evid. 901(b)(8), as defendants urge (at 23-24), for four reasons. <u>First</u>, the record does not establish that the *Dirkes Report* is what Defen-

21 dants claim it to be, *i.e.*, the same as the theses cited in *Thesis Citation I* and *Thesis Citation II*. As such, the *Dirkes Report* is not "in such condition as to create no suspicion concerning its authen-

22 ticity." Fed. R. Evid. 901(b)(8). <u>Second</u>, Defendants have not disclosed the circumstances sur-rounding how they obtained the *Dirkes Report* and thus cannot prove that it "was in a place where

23 it, if authentic, would likely be" even after many attempts by Ricoh to request such information. *Id.* <u>Third</u>, the *Dirkes Report* is not "self-authenticating." Rule 902, not Rule 901, relates to self-

24 authentication. Rule 902 sets out special types of documents in which authenticity is taken as suf-ficiently established for purposes of admissibility, though the opposite party is never foreclosed

25 from disputing authenticity. *See* Fed. R. Evid. 902. These "special types of documents" do not in-clude master's theses. <u>Finally</u>, and most importantly, this Court – not a jury – must determine

26 whether a document is relevant. Fed. R. Evid. 104(a). "Whether a document is a prior publication is a question of law." *Norian,* 363 F.3d at 133. If the *Dirkes Report* is not a "printed publication,"

27 then it is not prior art, and cannot be admitted into evidence because it is irrelevant. *See* Fed. R. Evid. 402; *Callicrate v. Wadsworth Mfg.*, 427 F.3d 1361, 1373 (Fed. Cir. 2005) (a reference that is

28 not prior art is inadmissible and cannot sustain a finding of invalidity).

1  DATED: February 19, 2010          Respectfully submitted,
                                     DICKSTEIN SHAPIRO LLP
2                                    BERGESON, LLP

3

4                                    By: /s/ Kenneth W. Brothers
                                         Gary M. Hoffman
5                                        Kenneth W. Brothers
                                         Attorneys for Plaintiff and Declaratory Judgment Defendant
6                                        RICOH COMPANY, LTD.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RICOH'S REPLY IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE THE *DIRKES REPORT* AND
TESTIMONY OR RELIANCE THEREON                    Case No. 03-CV-02289 JW (HRL)